# 23-0352

# United States Court of Appeals

*for the*

# Second Circuit

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## APPENDIX FOR DEFENDANT-APPELLANT
### Volume 6 (Pages A-1233 to A-1472)

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

# TABLE OF CONTENTS

**Page**

### Volume 1

District Court Docket List.......................................... A-1

Amended Complaint, dated March 27, 2019 ............. A-34

Answer to Amended Complaint,
  dated April 15, 2019 ............................................... A-56

Notice of Motion to Dismiss, dated April 24, 2020... A-80

Memorandum of Law in Support of Defendants'
  Motion to Dismiss, dated April 24, 2020............... A-82

Supporting Declaration, dated April 24, 2020 ........... A-107

Exhibit A to Declaration -
Affidavit of Lt. Salvatore Losi,
sworn to on April 15, 2020.................................... A-112

Exhibit B to Declaration -
P-73 of Mark R. Stambach, dated November 16,
2004, and Notes...................................................... A-114

Exhibit C to Declaration -
Plaintiff's Deposition Transcript,
dated March 15, 2018............................................. A-117

### Volume 2

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019........................................... A-241

ii

Page

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019............................................ A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card .......................................................................... A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 ............................................ A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued)............................................................... A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 .......................................................................... A-746

Exhibit I to Declaration -
Indictment................................................................ A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ........................................ A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005.......................................... A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction ............................................................... A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit .................................................. A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ........................................ A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ....................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing ..................................................................... A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ....................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion ...................................................................... A-983

Statement of Undisputed Facts,
dated April 24, 2020 ............................................... A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 ................................................... A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
    Material Facts, dated July 3, 2020 ........................ A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.*
*Ortiz*, Indictment No. 02630-04 ........................... A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ............... A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ...................................... A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued)............................................................. A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019.................................... A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3............................ A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ................................................................ A-1450

v

Page

**Volume 7**

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................. A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ...................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 .............................................. A-1706

**Volume 8**

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 ............... A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
  Defendants' Motion to Dismiss, and for
  Judgment on the Pleadings and/or Summary
  Judgment, dated July 5, 2020 ............................... A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
  Defendants' Motion to Dismiss,
  dated July 24, 2020 ................................................ A-1789

Decision and Order of the Honorable Elizabeth A.
  Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
  dated April 1, 2022 ................................................ A-1837

Defendants' Proposed Jury Instructions,
  dated April 1, 2022 ................................................ A-1861

Plaintiffs' Reply Motions in Limine,
  dated April 6, 2022 ................................................ A-1924

Defendant's Objections to Plaintiff's Proposed Jury
  Instructions, dated April 6, 2022 ........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022 ........ A-1937

Stipulation of Undisputed Facts,
  dated April 27, 2022 .............................................. A-1996

Trial Transcript, Preliminary Instructions and
  Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022 ........................... A-2053

vii

**Page**

Plaintiff's Witnesses:

| | | |
|---|---|---|
| E. Coogins | Direct | A-2054 |
| | Cross | A-2116 |
| J. Ortiz | Direct | A-2125 |

**Volume 10**

Trial Transcript, dated May 4, 2022
(Cotinued) ............................................................ A-2187

| | | |
|---|---|---|
| M. Vaughn | Direct | A-2189 |
| | Cross | A-2219 |
| | Redirect | A-2225 |
| J. Lonergan | Direct | A-2229 |
| | Cross | A-2281 |
| | Redirect | A-2284 |
| | Recross | A-2287 |

Trial Transcript, dated May 5, 2022 ........................ A-2297

| | | |
|---|---|---|
| M. Stambach | Direct | A-2299 |
| | Cross | A-2361 |
| | Redirect | A-2384 |
| J. Ortiz | Direct | A-2393 |
| | Cross | A-2426 |

**Volume 11**

Trial Transcript, dated May 6, 2022 ........................ A-2467

| | | |
|---|---|---|
| M. Evans | Direct | A-2470 |
| | Cross | A-2495 |
| M. Lauber | Direct | A-2504 |
| | Cross | A-2518 |

Trial Transcript, May 9, 2022 ................................ A-2554

viii

**Page**

J. Ortiz              Direct.......................... A-2599
                      Cross.......................... A-2653
                      Redirect ..................... A-2671
                      Recross ...................... A-2674

Trial Transcript, Closing Arguments, May 9, 2022 ...  A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
    (Continued) .............................................  A-2717

Jury Questionnaire, dated May 9, 2022 ....................  A-2760

Jury Questionnaire, Damages, dated May 9, 2022 ....  A-2764

Judgment in a Civil Case, dated May 10, 2022 ........  A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
    dated May 20, 2022 ................................  A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
    Support of Motion, dated May 20, 2022...............  A-2768

    Exhibit A to Felle Declaration -
    Ledger..................................................  A-2773

    Exhibit B to Felle Declaration -
    Invoices for Services ............................  A-2792

Plaintiff's Memorandum of Law in Support of his
    Motion for Attorneys' Fees and Costs,
    dated May 20, 2023 ................................  A-2823

Notice of Motion, by Defendant, for Judgment as a
    Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
    new trial Pursuant to Fed. R. Civ. P. 59(a), and
    for Remittur Pursuant to Fed. R. Civ. P. 59(e),
    dated June 7, 2022 ................................  A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
    Defendant, in Support of Motion,
        dated June 7, 2022 ................................................ A-2848

    Exhibit A to Sahasrabudhe Declaration -
    Trial Exhibits Entered by Counsel for
    Plaintiff.................................................................... A-2862

    Exhibit B to Sahasrabudhe Declaration -
    Trial Exhibits Entered by Counsel for
    Defendant ............................................................... A-2909

Memorandum of Law in Support of Motion for
    Judgment as a Matter of Law Under Fed. R. Civ.
    P. 50(b), dated June 7, 2022 .................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
    to Plaintiff's Motion for Attorneys' Fees,
        dated June 10, 2022 .............................................. A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
    Plaintiff's Motion for Attorneys' Fees,
        dated June 10, 2022 .............................................. A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
    Opposition to Defendant's Post Trial Motion,
        dated June 28, 2022 .............................................. A-3013

Plaintiff's Memorandum of Law in Opposition to
    Defendant's Post Trial Motions,
        dated June 28, 2022 .............................................. A-3023

Reply Memorandum of Law in Further Support of
    Defendant's Motion for Judgment as a Matter of
    Law, a New Trial, or Remittitur,
        dated July 8, 2022 ................................................ A-3071

**x**

|                                                                                          | Page   |
|------------------------------------------------------------------------------------------|--------|
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 ....... | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 .........                             | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 .....                                      | A-3159 |

8

notes [11] - 38:16, 49:2, 71:22, 85:15, 85:20, 86:9, 86:13, 86:22, 88:15, 96:1, 133:12
nothing [5] - 30:23, 111:11, 122:16, 124:20, 133:9
notice [2] - 56:7, 133:10
notified [2] - 32:12, 34:7
notifying [1] - 37:12
November [39] - 6:7, 21:2, 21:14, 25:2, 52:21, 56:9, 57:6, 61:2, 62:19, 62:20, 68:10, 92:16, 92:18, 92:19, 92:21, 92:22, 93:2, 93:10, 93:15, 93:16, 95:14, 95:15, 95:16, 96:2, 96:9, 96:10, 103:7, 103:8, 108:19, 112:2, 113:6, 113:7, 113:8, 115:11, 123:11, 123:18, 128:20
number [5] - 9:23, 38:18, 83:13, 109:13, 109:15

O

oath [1] - 4:10
object [3] - 110:17, 110:21, 122:7
objection [8] - 39:14, 40:20, 42:13, 111:4, 120:10, 120:21
objections [2] - 4:12, 39:21
observed [1] - 7:20
obtain [2] - 54:4, 91:4
obtained [3] - 13:13, 54:1, 75:18
obviously [2] - 39:22, 47:21
occasions [1] - 38:18
occur [1] - 11:14
occurred [2] - 6:7, 106:17
October [3] - 9:21, 17:8, 93:1
odd [3] - 41:22, 42:3, 45:16
OF [9] - 1:1, 1:2, 1:7, 2:5, 133:1, 133:3, 134:4, 134:6
office [1] - 66:20, 96:5, 96:22, 103:13

Office [16] - 1:12, 13:2, 34:8, 35:4, 37:12, 72:17, 73:2, 74:20, 75:9, 75:23, 86:21, 89:7, 91:9, 91:17, 103:17, 125:15
OFFICE [2] - 2:5, 2:7
officer [14] - 5:5, 11:11, 16:13, 21:22, 49:20, 81:19, 83:19, 102:14, 102:21, 103:3, 120:15, 122:2, 122:4, 123:7
Officer [11] - 28:9, 28:22, 29:20, 36:18, 43:19, 66:16, 75:23, 79:13, 80:22, 81:1, 121:23
Officers [5] - 53:17, 82:16, 114:22, 120:15, 122:15
officers [8] - 19:9, 34:4, 78:17, 80:8, 80:16, 80:20, 124:13, 125:1
official [1] - 22:23
old [3] - 13:6, 48:21, 88:22
once [5] - 38:2, 44:9, 44:15, 77:1, 96:8
one [33] - 8:5, 20:4, 26:13, 28:23, 34:6, 40:10, 42:7, 44:17, 45:12, 45:17, 46:4, 48:14, 50:21, 52:16, 59:6, 63:13, 63:15, 63:16, 65:12, 79:6, 81:19, 88:4, 101:22, 101:23, 103:15, 108:7, 108:9, 120:15, 126:5, 130:19, 130:23
ongoing [2] - 74:4, 100:6
open [2] - 46:3, 81:14
opened [1] - 50:15
opening [1] - 13:5
operating [1] - 87:7
opinion [2] - 101:16, 102:15
opinions [2] - 102:19, 104:8
opposed [1] - 95:9
organized [1] - 11:12
Ortiz [93] - 6:18, 7:11, 8:13, 8:20, 13:8, 25:10, 29:10, 37:6, 38:18, 38:23, 39:12, 40:19, 42:22, 50:23,

56:6, 60:2, 60:17, 62:19, 64:4, 64:8, 65:12, 67:9, 67:14, 68:8, 68:11, 69:10, 69:19, 70:16, 76:8, 78:2, 78:7, 80:22, 80:23, 83:21, 84:2, 85:2, 85:16, 87:23, 89:5, 89:23, 90:4, 90:23, 91:13, 91:16, 96:17, 96:23, 97:7, 97:13, 99:7, 101:15, 101:18, 102:8, 102:16, 103:14, 103:18, 104:10, 104:20, 105:6, 105:21, 106:4, 107:21, 108:16, 109:2, 110:7, 110:9, 111:19, 112:1, 114:12, 117:12, 118:7, 118:11, 118:19, 120:8, 120:16, 120:20, 121:11, 121:12, 121:23, 122:14, 124:2, 124:9, 124:21, 125:1, 125:8, 125:14, 126:20, 127:1, 127:6, 127:7, 128:11, 130:4, 130:10, 134:1
ORTIZ [1] - 1:14
ortiz [5] - 68:4, 92:12, 98:19, 104:15, 119:7
Ortiz' [1] - 71:12
otherwise [1] - 121:14
outcome [2] - 130:12, 133:15
outside [11] - 17:9, 17:11, 17:23, 18:7, 33:20, 34:10, 68:3, 68:7, 72:11, 74:6, 102:4
overall [2] - 47:20, 110:9
overseas [1] - 17:3
oversight [1] - 70:3
own [1] - 36:3

P

P-73 [12] - 3:3, 53:12, 60:2, 62:18, 63:5, 63:11, 113:6, 113:14, 115:10, 118:13, 121:6, 123:13
P-73s [1] - 71:22

P.C [2] - 1:13, 2:1
p.m [4] - 61:6, 61:8, 63:2, 132:12
page [11] - 8:23, 9:1, 57:3, 57:10, 61:5, 63:15, 63:16, 88:8, 91:18, 91:20, 93:21
PAGE [2] - 3:2, 134:9
Palmer [1] - 13:19, 13:22, 48:12, 50:12
paper [1] - 97:11
paperwork [3] - 84:15, 112:5, 126:3
paragraph [1] - 124:6
paraphrase [2] - 53:16, 86:2
Parole [1] - 102:14
part [14] - 14:13, 14:15, 21:17, 33:6, 37:23, 43:3, 70:16, 71:3, 71:7, 72:20, 78:17, 97:23, 105:8, 109:8
particular [2] - 21:8, 49:14
parties [1] - 4:9
partner [10] - 25:11, 26:10, 74:14, 74:15, 74:21, 74:23, 75:1, 75:3, 75:4
partners [2] - 26:13, 107:13
party [1] - 133:14
past [1] - 6:1
patience [1] - 123:7
Patrick [1] - 63:6
patrol [2] - 16:13, 21:22
PD [13] - 12:7, 23:14, 35:7, 35:8, 35:17, 49:17, 50:8, 62:3, 68:20, 73:2, 74:20, 112:23, 115:12
penalties [1] - 81:18
pending [3] - 54:11, 54:21, 129:5
people [8] - 39:6, 40:23, 42:4, 45:2, 58:17, 67:22, 79:15, 118:12, 124:17
People [2] - 16:22, 17:4
percussionist [1] - 17:16
period [2] - 103:15, 112:14
permission [2] - 18:10, 117:13
perpetrator [7] - 44:18, 45:12, 45:18,

46:4, 67:10, 111:12, 111:18
perpetrators [10] - 42:12, 46:18, 58:13, 59:1, 59:8, 60:5, 63:19, 63:22, 108:8, 116:11
person [4] - 70:7, 116:5, 127:12
person's [1] - 59:20
personally [2] - 87:5, 97:1
persons [1] - 125:2
perspective [1] - 81:6
pertaining [9] - 47:4, 47:13, 55:4, 56:6, 78:5, 81:14, 105:21, 121:19, 126:13
phone [2] - 32:21, 109:22
phonetically [1] - 52:4
photographs [4] - 8:12, 8:15, 31:3
photos [1] - 33:21
physical [6] - 49:21, 50:5, 59:2, 63:22, 65:17, 111:17
physically [1] - 41:9
pick [1] - 89:18
picture [1] - 9:7
piece [1] - 115:23
Place [1] - 2:8
place [4] - 53:20, 54:13, 65:19, 133:10
Plaintiff [2] - 1:5, 2:4
play [2] - 17:18, 17:19
played [2] - 17:15, 17:20
point [20] - 6:11, 16:14, 21:23, 22:21, 24:19, 36:19, 37:1, 44:23, 45:1, 45:15, 50:14, 51:21, 67:7, 69:3, 70:22, 76:7, 76:11, 96:14, 97:13, 125:13
pointed [1] - 111:11
pointing [1] - 88:3
points [1] - 64:12
Police [71] - 6:12, 9:17, 9:20, 11:5, 16:17, 17:5, 17:8, 17:10, 17:13, 18:1, 18:5, 18:11, 19:17, 23:13, 23:21, 24:10, 24:12, 25:6, 26:1, 27:14, 28:9, 36:21, 46:12, 47:16, 49:3, 50:3, 51:4, 51:11, 52:23, 53:17, 57:7,

9

58:5, 58:7, 59:16, 61:18, 62:2, 62:4, 62:17, 63:23, 64:17, 64:20, 64:21, 65:5, 65:6, 66:16, 66:23, 72:12, 73:9, 74:6, 74:11, 74:14, 75:23, 79:13, 80:12, 82:16, 105:22, 112:1, 112:9, 113:4, 114:21, 116:9, 116:12, 118:16, 119:16, 120:5, 120:15, 121:16, 121:23, 122:15, 124:3, 125:20
**police** [14] - 10:5, 19:9, 23:23, 57:15, 77:6, 78:17, 80:8, 81:19, 102:21, 118:6, 118:11, 122:2, 122:4
**policies** [6] - 23:14, 46:11, 64:18, 65:23, 121:2
**policy** [1] - 45:22
**position** [2] - 17:6, 17:7
**possibility** [3] - 46:23, 71:2, 72:14
**post** [2] - 56:12, 56:14
**posture** [1] - 129:2
**potential** [1] - 34:22
**Practice** [1] - 1:12
**practice** [2] - 61:17, 86:12
**preliminary** [1] - 42:9
**prepare** [1] - 101:2
**prepared** [3] - 3:3, 31:12, 31:22, 53:13, 123:14
**present** [7] - 84:12, 84:13, 89:9, 89:10, 89:11, 97:23, 101:20
**pressing** [1] - 80:7
**presume** [1] - 89:14
**pretty** [2] - 6:3, 99:20
**previously** [1] - 62:15
**primarily** [3] - 7:16, 11:12, 69:14
**prison** [6] - 88:22, 90:4, 90:23, 91:6, 96:23, 110:10
**prisons** [1] - 101:23
**private** [4] - 18:3, 18:7, 18:14, 19:3
**probe** [1] - 44:5
**problem** [2] - 65:8, 81:10
**problems** [3] - 82:17,

118:8
**procedural** [1] - 129:2
**procedure** [1] - 72:19
**procedures** [4] - 23:11, 46:11, 64:19, 65:23
**productive** [1] - 14:13
**promoted** [1] - 10:20
**promotion** [1] - 10:21
**property** [2] - 58:14
**prosecuted** [2] - 82:5, 108:9
**prosecution** [4] - 64:17, 83:21, 105:23, 125:14
**prove** [1] - 54:4
**proved** [1] - 57:21
**provide** [8] - 27:14, 70:3, 96:20, 97:1, 99:1, 101:16
**provided** [10] - 28:4, 28:22, 62:1, 62:20, 96:4, 97:3, 102:18, 117:12, 126:20, 127:3
**psychiatric** [4] - 112:3, 118:8, 118:17, 119:7
**Public** [4] - 1:16, 133:5, 133:20, 135:22
**Puerto** [1] - 6:22
**pull** [1] - 37:6
**pulled** [4] - 41:6, 41:13, 44:9, 112:15
**purported** [6] - 60:16, 76:19, 111:13, 117:12, 120:9, 124:1
**purportedly** [3] - 79:17, 106:8, 119:5
**purports** [1] - 120:19
**pursuant** [2] - 1:11, 133:10
**put** [2] - 9:5, 33:12

**Q**

**question"** [1] - 38:8
**questions** [11] - 4:13, 5:17, 7:7, 7:18, 38:1, 63:11, 89:14, 89:17, 120:17, 122:14, 132:9
**quick** [3] - 57:2, 60:19, 85:17

**R**

**R-O-N-D-O-N** [1] - 4:23

**raise** [2] - 106:19, 107:11
**raises** [1] - 77:5
**raspy** [1] - 7:4
**reach** [1] - 71:19
**reached** [2] - 72:1, 72:2
**read** [11] - 4:3, 13:17, 27:5, 31:15, 85:17, 85:18, 87:12, 90:10, 94:20, 97:11, 123:15
**reading** [3] - 38:16, 52:4, 58:16
**real** [2] - 85:17, 116:11
**really** [10] - 5:9, 14:23, 15:26, 25:16, 34:9, 37:18, 46:8, 61:5, 109:11, 126:23
**reanalyze** [1] - 49:21
**REASON** [10] - 134:12, 134:15, 134:18, 134:21, 135:1, 135:4, 135:7, 135:10, 135:13, 135:16
**reason** [1] - 19:3
**reasons** [2] - 107:4, 134:8
**reassigned** [1] - 10:22
**receive** [1] - 20:3
**received** [5] - 19:18, 19:23, 37:2, 39:8, 68:20
**recess** [3] - 84:19, 123:4, 126:7
**recognize** [7] - 26:23, 44:16, 45:11, 51:11, 51:17, 58:12, 118:5
**recollection** [9] - 6:17, 6:19, 7:10, 7:17, 7:21, 8:21, 54:20, 89:15, 94:15
**record** [12] - 4:21, 5:8, 8:7, 27:19, 40:13, 51:20, 79:21, 84:21, 89:18, 94:22, 95:1, 126:9
**recorded** [3] - 29:10, 29:12, 52:12, 86:4, 86:5, 86:6, 92:6, 92:7, 94:19, 95:8, 95:10, 95:11, 115:18
**recording** [1] - 86:7
**records** [7] - 9:22, 27:4, 95:14, 118:6, 119:11, 120:14, 127:10
**recreationally** [1] - 17:21, 17:22
**Referee** [1] - 4:10

**reference** [1] - 119:3
**referencing** [1] - 128:10
**referred** [2] - 57:6, 80:11
**referring** [3] - 73:8, 74:21, 87:18
**reflect** [1] - 96:1
**refresh** [5] - 7:12, 7:23, 84:15, 94:17, 98:11
**refreshes** [1] - 89:17
**regarding** [4] - 20:19, 66:3, 83:3, 113:17
**REGIONAL** [1] - 2:7
**regular** [1] - 34:10
**regulations** [3] - 65:9, 65:22, 121:4
**related** [4] - 13:14, 47:22, 69:15, 133:14
**relative** [7] - 96:16, 101:17, 102:7, 102:20, 103:2, 130:12, 131:20
**release** [5] - 96:23, 97:10, 97:16, 103:14, 103:17
**released** [5] - 53:1, 97:8, 98:19, 109:5, 110:3
**releasing** [1] - 81:9
**relocated** [2] - 10:22, 10:23
**remained** [3] - 47:5, 47:18, 103:23
**remaining** [1] - 71:7
**remember** [28] - 6:20, 20:11, 31:17, 32:11, 41:21, 48:13, 56:16, 80:15, 80:16, 84:8, 84:14, 88:12, 89:12, 90:16, 92:5, 94:16, 116:6, 117:19, 118:1, 118:3, 118:13, 118:14, 118:19, 122:17, 125:23, 126:2, 127:15
**reopened** [1] - 73:6
**report** [8] - 29:15, 85:23, 101:2, 127:3
**reported** [1] - 102:4
**REPORTER** [2] - 4:1, 4:20
**reporter** [2] - 5:12, 5:20
**reporting** [1] - 58:17
**reports** [7] - 72:15, 72:22, 86:20, 101:5, 101:6, 101:19

**request** [1] - 119:16
**requested** [1] - 99:1
**reserved** [1] - 4:13
**residence** [1] - 58:18
**respect** [22] - 23:2, 23:17, 28:19, 31:13, 58:8, 59:21, 64:15, 68:16, 69:14, 70:4, 72:22, 73:19, 74:9, 79:16, 81:7, 87:3, 100:23, 101:14, 115:5, 116:13, 128:11, 129:20
**respective** [1] - 4:9
**respond** [1] - 57:18
**response** [1] - 7:9
**responsible** [1] - 113:21
**result** [2] - 13:3, 99:6
**resulted** [2] - 13:7, 98:18
**results** [2] - 68:15, 68:22
**retired** [7] - 14:7, 14:17, 15:14, 15:21, 18:19, 19:8, 19:9
**retiring** [1] - 16:3
**reveal** [2] - 44:4, 117:17
**reveals** [1] - 48:2
**Review** [1] - 24:19
**review** [41] - 6:13, 13:10, 29:1, 30:19, 31:2, 31:23, 33:14, 37:10, 37:23, 39:1, 42:9, 44:15, 48:8, 48:21, 49:15, 53:14, 58:5, 58:22, 59:12, 59:13, 60:11, 60:13, 63:10, 64:16, 68:8, 69:10, 69:19, 71:15, 71:23, 72:7, 74:4, 76:7, 78:5, 87:3, 89:16, 97:15, 105:9, 117:10, 121:5, 122:13, 126:17
**reviewed** [16] - 7:12, 24:4, 25:4, 42:18, 44:20, 45:3, 45:4, 45:9, 55:3, 56:5, 58:11, 101:22, 105:20, 111:22, 115:3, 118:4
**reviewing** [11] - 25:14, 31:13, 52:8, 59:7, 67:8, 67:21, 68:21, 89:18, 89:19, 106:14, 117:20
**Rican** [1] - 6:22
**Richard** [2] - 80:22,

80:23
Rochester [1] - 10:13
RONDON [1] - 1:11
Rondon [7] - 4:22,
4:23, 53:11, 57:1,
85:1, 126:12, 134:2
Ronnie [5] - 125:22,
126:14, 126:19,
127:12, 128:11
room [3] - 60:4, 65:12,
65:14
root [1] - 81:10
Rosario [4] - 130:20,
130:23, 131:8
Rosario's [1] - 131:10
Rules [1] - 1:12
rules [4] - 5:15, 64:18,
65:2, 65:4
running [1] - 58:13
runs [1] - 19:3

**S**

Safe [2] - 11:11, 11:19
sake [1] - 85:12
saw [9] - 9:22, 12:11,
27:19, 37:13, 58:17,
105:11, 111:10,
116:7, 130:19
scene [6] - 23:8,
49:22, 68:18,
105:12, 106:21,
107:5
scenes [1] - 105:9
scheduled [1] - 30:11
scope [1] - 106:1
SDU [1] - 12:2
seal [1] - 133:17
search [2] - 117:13,
117:21
second [4] - 8:5, 8:23,
9:1, 113:2
secure [1] - 96:23
see [42] - 7:22, 25:5,
26:22, 27:4, 28:11,
32:4, 32:12, 32:15,
50:23, 55:5, 56:14,
57:14, 57:16, 58:6,
60:16, 60:18, 60:23,
61:9, 61:10, 68:10,
73:23, 77:10, 82:20,
89:7, 89:8, 90:5,
90:8, 90:23, 91:1,
91:16, 92:16, 93:6,
93:19, 106:3,
111:23, 114:18,
115:4, 116:3,
117:10, 124:5, 126:3
seeing [19] - 29:14,
31:17, 32:2, 32:11,

56:16, 59:3, 60:1,
75:16, 117:14,
117:15, 118:13,
122:12, 122:17,
125:19, 126:19,
127:8, 127:11,
131:7, 131:9
senior [1] - 49:7
sense [2] - 76:11,
121:3
sensitive [1] - 44:5
sentenced [2] - 129:9,
129:13
sentencing [2] -
54:12, 129:16
separate [2] - 74:8,
87:2
September [7] - 12:17,
69:12, 92:4, 94:4,
94:6, 94:7
Sergeant [3] - 75:10,
75:18, 79:9
sergeant [1] - 79:9
serious [1] - 77:5
set [2] - 67:14, 133:10
shield [1] - 9:23
shooting [1] - 113:22
shootings [2] - 43:3,
43:5, 43:13
short [5] - 84:17,
84:19, 122:23,
123:4, 126:7
shorthand [1] -
133:12
shortly [1] - 99:22
show [14] - 8:2, 8:10,
31:4, 31:11, 57:1,
60:8, 61:3, 62:8,
62:10, 62:14, 86:17,
113:3, 113:5, 123:13
showing [1] - 123:9
shown [1] - 7:13
shows [2] - 93:6, 93:7
shuffled [1] - 93:21
sickness [1] - 30:12
Side [17] - 12:10,
12:13, 13:14, 20:2,
21:4, 27:21, 37:3,
39:9, 47:12, 47:23,
51:22, 54:3, 55:14,
56:1, 69:15, 100:7
side [1] - 14:4
sign [2] - 4:3, 101:5
Signature [1] - 135:18
signed [2] - 101:21
signing [1] - 4:10
similar [1] - 23:3
simply [1] - 60:22
sit [1] - 41:9
six [1] - 58:23, 59:18

size [2] - 59:2, 59:18
sleeve [1] - 87:2
small [1] - 43:14
solve [1] - 23:12
solving [1] - 47:22
someone [3] - 39:17,
66:5, 86:15
somewhere [1] - 93:9
sorry [31] - 15:4,
19:19, 25:18, 35:16,
35:18, 38:3, 38:13,
47:8, 50:20, 52:3,
54:16, 77:12, 78:21,
80:18, 82:12, 83:10,
85:21, 87:19, 88:3,
88:11, 89:10, 90:21,
91:20, 92:2, 98:6,
98:12, 49:3, 50:3,
59:16, 61:17, 61:18,
62:2, 62:4, 65:1,
65:5, 74:11, 74:14,
90:4, 90:23, 91:6,
121:5, 121:16,
133:6, 133:21, 134:1
state [8] - 4:20, 24:6,
26:21, 49:20, 57:11,
65:22, 120:14
STATE [5] - 1:1, 1:7,
2:5, 133:1, 134:4
statement [27] - 29:10,
29:12, 31:14, 51:12,
51:18, 56:16, 57:5,
57:10, 57:11, 61:1,
61:6, 61:7, 61:11,
61:19, 62:1, 63:2,
67:20, 76:14,
101:17, 104:12,
106:11, 115:18,
125:20, 125:21,
126:20, 128:2, 131:7
Statement [1] - 3:4
statements [4] - 51:3,
79:21, 102:18,
111:17
states [1] - 90:3
States [1] - 16:21
stating [3] - 58:17,
116:1, 118:12
stationed [3] - 5:1,
10:10, 21:4
stations [1] - 11:4
status [1] - 54:15
step [5] - 50:17, 72:6
stick [1] - 43:20
still [12] - 10:15,
44:13, 46:21, 49:2,
54:10, 54:20, 81:13,
96:16, 100:5,
100:12, 129:5,
131:16

stand [1] - 99:9
standing [1] - 58:14
start [6] - 11:5, 60:7,
61:9, 61:19, 61:23,
62:8
started [5] - 10:5,
12:17, 14:14, 61:11,
63:1
State [47] - 6:12, 9:17,
9:20, 11:5, 12:2,
12:23, 16:17, 17:5,
17:8, 17:10, 17:13,
18:1, 18:5, 18:11,
18:14, 19:17, 23:13,
23:17, 23:21, 24:10,
24:12, 25:5, 25:6,
25:23, 27:14, 36:21,
46:12, 49:3, 50:3,
59:16, 61:17, 61:18,
62:2, 62:4, 65:1,
65:5, 74:11, 74:14,
90:4, 90:23, 91:6,
121:5, 121:16,
133:6, 133:21, 134:1
state [8] - 4:20, 24:6,
26:21, 49:20, 57:11,
65:22, 120:14
STATE [5] - 1:1, 1:7,
2:5, 133:1, 134:4
statement [27] - 29:10,
29:12, 31:14, 51:12,
51:18, 56:16, 57:5,
57:10, 57:11, 61:1,
61:6, 61:7, 61:11,
61:19, 62:1, 63:2,
67:20, 76:14,
101:17, 104:12,
106:11, 115:18,
125:20, 125:21,
126:20, 128:2, 131:7
Statement [1] - 3:4
statements [4] - 51:3,
79:21, 102:18,
111:17
states [1] - 90:3
States [1] - 16:21
stating [3] - 58:17,
116:1, 118:12
stationed [3] - 5:1,
10:10, 21:4
stations [1] - 11:4
status [1] - 54:15
step [5] - 50:17, 72:6
stick [1] - 43:20
still [12] - 10:15,
44:13, 46:21, 49:2,
54:10, 54:20, 81:13,
96:16, 100:5,
100:12, 129:5,
131:16

stipulated [1] - 4:8
stipulations [2] - 4:2,
4:5
stopped [2] - 61:6,
61:7
Street [6] - 1:13, 2:2,
2:9, 11:11, 20:20,
57:14
street [1] - 113:21
Streets [1] - 11:19
strike [1] - 41:22
striking [1] - 59:6
struck [2] - 42:2
stuff [1] - 74:17
stumbled [2] - 47:4,
47:13
subject [2] - 66:3,
122:5
submit [1] - 32:6
submitted [7] - 31:19,
72:15, 72:23, 73:3,
74:12, 74:14, 86:20
subpoena [1] - 98:23
Subscribed [1] -
135:19
subscribed [1] -
133:17
subsequent [2] -
24:17, 25:9
suggest [1] - 116:3
Suite [1] - 2:8
summary [2] - 31:10,
85:11, 85:22, 87:11,
87:23, 90:9, 125:6
superseding [1] - 96:8
suppose [1] - 45:15
surprise [1] - 122:3
surprising [1] - 52:20
surrounding [5] -
24:23, 37:7, 101:7,
111:16, 118:6
suspect [2] - 61:20,
121:19
suspects [1] - 42:9
suspicion [1] - 106:19
suspicious [4] -
39:12, 40:6, 40:18,
59:11
sworn [3] - 4:17,
133:9, 135:19
synopsis [1] - 31:11,
32:8, 32:9, 33:4,
33:7, 33:12, 72:7,
83:23, 85:4, 86:1,
87:10, 89:3, 89:19,
90:2, 90:9, 91:16,
93:14

**T**

TAKEN:3/13/2019 [1] - 134:3
task [42] - 11:10, 12:23, 13:13, 13:17, 14:9, 21:7, 47:9, 47:20, 47:21, 48:6, 54:2, 69:1, 71:18, 72:1, 72:10, 74:9, 75:8, 75:22, 76:18, 78:1, 79:23, 80:5, 81:6, 81:17, 82:1, 83:2, 83:19, 86:21, 87:7, 91:11, 100:18, 100:19, 101:8, 102:4, 107:14, 107:17, 107:21, 108:5, 108:13, 127:22, 128:2, 131:13
Task [1] - 11:11
team [6] - 14:14, 26:18, 70:8, 71:1, 80:4
technically [1] - 39:21
ten [2] - 110:9, 111:2
Terrorism [1] - 11:22
testified [5] - 4:18, 42:14, 99:4, 99:10, 119:22
testify [2] - 6:16, 133:9
testifying [2] - 65:3, 74:7
testimony [16] - 6:1, 6:2, 34:1, 34:16, 36:2, 78:5, 97:21, 99:1, 101:14, 102:19, 133:8, 133:9, 133:10, 133:10, 133:12
thankful [1] - 109:8
THE [44] - 1:7, 2:5, 4:1, 4:20, 4:22, 25:18, 25:22, 26:2, 26:12, 30:22, 31:5, 35:8, 35:18, 36:5, 37:18, 38:6, 38:9, 40:22, 44:22, 45:4, 46:7, 54:15, 61:14, 62:4, 73:14, 77:9, 77:15, 88:3, 88:11, 90:15, 91:22, 93:3, 93:20, 98:6, 110:23, 111:5, 119:20, 120:11, 120:22, 122:9, 123:2, 123:18, 123:20, 132:8
theatrics [1] - 6:4

thereafter [1] - 133:11
thereof [1] - 133:15
third [2] - 61:5, 114:8
three [13] - 42:9, 42:11, 79:15, 100:13, 105:1, 108:14, 113:21, 113:22, 114:23, 116:10, 120:15, 128:19, 130:13
throughout [3] - 7:6, 19:17, 23:20
tied [1] - 117:18
Tim [1] - 98:15
timing [1] - 118:22
TIMOTHY [1] - 2:6
Timothy.Flynn@ag. ny.gov [1] - 2:10
tip [3] - 113:17, 115:5, 115:8
today [14] - 5:9, 6:5, 6:17, 7:7, 30:11, 30:13, 30:18, 32:3, 32:10, 34:1, 43:19, 74:7, 131:12
together [1] - 72:16
Tom [7] - 13:22, 48:11, 50:12, 82:9, 82:11, 82:21, 83:3
took [13] - 12:19, 29:6, 50:4, 50:6, 53:20, 54:13, 79:7, 85:20, 118:18, 119:5, 125:20, 125:21
top [1] - 93:9
Torres [6] - 28:9, 28:22, 29:20, 29:21, 76:1, 79:13
toward [1] - 47:22
Tower [1] - 2:8
town [4] - 23:23, 26:21, 49:10, 49:11
township [1] - 49:9
train [1] - 10:9
transcribed [1] - 133:11
transcript [1] - 4:11
transcription [1] - 133:12
transfer [2] - 50:11, 68:16
transferred [3] - 48:15, 50:7, 132:1
translate [1] - 27:9
translated [2] - 29:7, 29:16
translation [3] - 27:15, 28:4, 28:23
translator [3] - 66:12, 66:14, 79:13

traveled [2] - 88:22, 94:10
Trial [1] - 1:10
trial [3] - 4:14, 6:1, 6:2
trials [1] - 15:22
Tripi [10] - 69:4, 69:11, 70:14, 70:23, 80:7, 82:3, 83:19, 89:1, 94:10, 95:7
Troop [5] - 10:11, 10:13, 11:10, 11:14, 22:13
Trooper [1] - 65:1
trooper [2] - 10:15, 10:17
troopers' [1] - 109:17, 109:20
true [1] - 133:12
truth [3] - 133:9, 133:9
try [5] - 46:16, 50:21, 81:6, 81:10, 81:11
trying [6] - 16:1, 23:12, 26:19, 26:22, 42:6, 65:7, 73:22, 76:22, 77:20, 118:12, 124:18, 125:2
turn [2] - 57:9, 85:11
TV [2] - 82:19, 82:20
Two [1] - 5:1
two [15] - 8:15, 12:11, 22:3, 57:3, 66:20, 77:22, 81:19, 92:19, 103:12, 103:15, 103:23, 114:22, 116:10, 120:15, 129:7
two-page [1] - 57:3
type [1] - 101:16
types [1] - 22:8
typewriting [1] - 133:11

**U**

U.S [13] - 37:12, 69:3, 72:16, 73:2, 74:20, 75:8, 75:22, 80:6, 82:2, 86:21, 89:6, 91:8, 91:17
Uda [9] - 113:23, 114:10, 114:11, 114:14, 114:16, 116:21, 130:4, 130:5
ultimately [6] - 54:7, 58:1, 71:6, 98:18, 114:2, 117:5
unaware [1] - 65:19
under [3] - 12:2, 12:3, 12:4

uniform [1] - 22:1
uniformed [2] - 10:15, 10:17
unit [4] - 12:3, 62:16, 113:4, 123:10
Unit [5] - 11:7, 11:8, 12:3, 12:5, 61:18
United [1] - 16:21
Units [1] - 11:15
universal [1] - 107:20
unjustful [1] - 40:5
unknown [1] - 125:2
unlawful [1] - 40:12
unless [1] - 101:11
up [18] - 9:5, 19:3, 25:9, 25:20, 55:6, 58:7, 61:12, 72:6, 89:18, 93:6, 93:7, 104:3, 104:7, 115:4, 116:3, 116:4, 116:7, 116:17
usual [1] - 4:1
utilized [1] - 31:22

**V**

vaguely [1] - 33:3
various [9] - 7:7, 10:18, 13:3, 28:1, 51:3, 58:12, 59:3, 98:16, 104:19
verbally [1] - 29:8
victims [2] - 33:1, 105:11
video [2] - 86:7, 86:8
vindicate [1] - 96:22
violation [1] - 65:22
violence [1] - 43:14
violent [3] - 105:6, 105:18, 106:4
visit [1] - 92:5
voice [3] - 7:4, 86:7, 86:8
vs [1] - 1:6

**W**

waived [2] - 4:10, 4:12
wall [1] - 9:5
Walsh [4] - 14:6, 14:9, 16:3, 36:18
wants [1] - 25:16
ward [2] - 118:17, 119:8
Waterloo [2] - 10:13, 10:14
Wayne [2] - 1:13, 5:7
WAYNE [2] - 2:1, 2:1
waynefelle@ waynefellelaw.com

[1] - 2:3
Wednesday [1] - 1:14
weeks [1] - 119:1
welcome [2] - 62:13, 123:8
West [17] - 12:9, 12:10, 12:13, 13:14, 20:1, 21:4, 27:21, 37:3, 39:9, 47:12, 47:23, 51:22, 54:3, 55:14, 56:1, 69:15, 100:7
Western [1] - 43:14
whatsoever [1] - 102:19
wherein [2] - 81:17, 126:20
WHEREOF [1] - 133:16
whole [7] - 14:11, 15:17, 48:6, 63:1, 63:2, 107:23, 133:9
Williams [5] - 125:22, 126:14, 126:19, 127:13, 128:11
Williamsville [2] - 1:14, 2:2
wiretap [1] - 28:5
wiretaps [2] - 28:2, 39:11
wish [1] - 134:7
withstanding [1] - 103:11
WITNESS [41] - 4:22, 25:18, 25:22, 26:2, 26:12, 30:22, 31:5, 35:8, 35:18, 36:5, 37:18, 38:6, 38:9, 40:22, 44:22, 45:4, 46:7, 54:15, 61:14, 62:4, 73:14, 77:9, 77:15, 88:3, 88:11, 90:15, 91:22, 93:3, 93:20, 98:6, 110:23, 111:5, 119:20, 120:11, 120:22, 122:9, 123:2, 123:18, 123:20, 132:8, 133:16
witness [7] - 44:17, 59:19, 59:21, 63:19, 65:16, 111:16, 133:8
witnesses [4] - 58:12, 58:23, 59:4, 98:16
wondering [7] - 28:23, 70:13, 73:20, 83:14, 86:3, 86:19, 109:19
wounds [1] - 105:14
wow [3] - 14:18, 19:1, 85:22

A-1237

12

**writing** [2] - 5:12,
    29:15
**written** [3] - 7:11,
    29:6, 29:14
**wrongful** [4] - 39:13,
    39:16, 40:7, 40:19
**wrongfully** [3] -
    110:15, 111:3, 111:5
**Wurtsboro** [2] - 10:12

## Y

**year** [6] - 16:10, 16:11,
    48:15, 91:7, 91:12,
    103:15
**years** [19] - 9:18,
    12:12, 12:15, 12:16,
    16:8, 16:11, 18:23,
    19:17, 22:3, 27:21,
    59:17, 83:13, 98:18,
    103:12, 103:23,
    110:9, 110:15,
    111:3, 121:16
**yesterday** [1] - 30:23
**YORK** [4] - 1:1, 1:7,
    2:5, 133:1
**York** [30] - 1:14, 2:2,
    2:9, 5:2, 6:12, 9:17,
    9:20, 10:8, 10:9,
    10:11, 11:4, 16:17,
    17:5, 17:8, 18:1,
    18:13, 19:16, 23:21,
    24:12, 27:14, 43:14,
    46:12, 49:2, 59:16,
    61:18, 65:1, 121:16,
    133:6, 133:21, 134:1
**yourself** [6] - 83:18,
    84:11, 85:18, 87:13,
    90:11, 123:15

*WENDY ROYCE McCANN - COURT REPORTER*

1

1   STATE OF NEW YORK

2   COURT OF CLAIMS

3   -------------------------------------------------

4   **JOSUE ORTIZ,**

5                        Plaintiff,

6       -vs-                    **Claim No: 126292**

7   **THE STATE OF NEW YORK,**

8                        Defendant.
    -------------------------------------------------

9

10              Examination Before Trial of

11   **MARY EVANS,** held pursuant to Article 31 of the

12   Civil Practice Law and Rules, at the Law Office of

13   Wayne C. Felle, P.C., 6024 Main Street,

14   Williamsville, New York, commencing on Thursday,

15   January 24th, 2019 at 10:00 A.M., before Denise C.

16   Burger, Notary Public.

17

18

19

20

21

22

23

2

```
 1   APPEARANCES:  WAYNE C. FELLE, P.C.,
                   BY: WAYNE C. FELLE, ESQ.,
 2                 6024 Main Street,
                   Williamsville, New York 14221,
 3                 (716) 505-2700,
                   e-mail: waynefelle@waynefellelaw.com,
 4                 Attorneys for the Plaintiff.

 5                 LETITIA JAMES,
                   STATE OF NEW YORK OFFICE OF THE
 6                 ATTORNEY GENERAL,
                   BY: TIMOTHY J. FLYNN, ESQ.,
 7                 ASSISTANT ATTORNEY GENERAL,
                   BUFFALO REGIONAL OFFICE,
 8                 Main Place Tower,
                   Suite 300A,
 9                 350 Main Street,
                   Buffalo, New York 14202,
10                 (716) 853-8437,
                   e-mail: Timothy.Flynn@ag.ny.gov.
11                 Attorneys for the Defendant.

12                 TIMOTHY A. BALL,
                   CORPORATION COUNSEL,
13                 BY: MAEVE E. HUGGINS, ESQ.,
                   ASSISTANT CORPORATION COUNSEL,
14                 Department of Law,
                   1112 City Hall,
15                 Buffalo, New York 14202,
                   (716) 851-4317,
16                 e-mail: mhuggins@city-buffalo.com,
                   Attorneys for Mary Evans.
17

18

19

20

21

22

23
```

**MCCANN & MCCANN REPORTING**

A-1240

3

1   The following stipulations were entered into by

2   counsel:

3

4        It is hereby stipulated by and between the

5   attorneys for the respective parties hereto that

6   the oath of the Referee is waived, that signing,

7   filing and certification of the transcript are

8   waived and that all objections, except as to the

9   form of the questions, are to be reserved until the

10  time of trial.

11

12                  **M A R Y   E V A N S**,

13        having been first duly sworn, was examined

14  and testified as follows:

15

16        THE REPORTER:  Can you state your name and

17  address for the record, please.

18        THE WITNESS:  Mary Evans, 68 Court Street,

19  Buffalo, New York 14202.

20

21  **EXAMINATION BY MR. FELLE:**

22        Q.   Good morning, Detective Evans.  My name

23  is Wayne Felle.  We met off the record, and just to

MS. EVANS    -    MR. FELLE    -    1/24/2019

4

1  give you kind of an overview, we're here today to

2  discuss the circumstances surrounding your

3  investigation into the arrest and conviction of

4  Josue Ortiz, okay?

5       A.    Okay.

6       Q.    If at any time you have any questions,

7  if my questions are confusing to you, please let me

8  know.  It's certainly not my intention to try to

9  trick or confuse you today, okay?

10      A.    Okay.

11      Q.    And the last rule, I am sure you know

12  this, having testified in court, is to keep your

13  voice audible, all responses, so the court reporter

14  can take them down, okay?

15      A.    Okay.

16      Q.    There may be times throughout the day

17  that your attorney my object, most often she'll

18  object to the form of the question to preserve it

19  for a later review.  She may object though and

20  instruct you not to answer, so I would ask you to

21  give her a chance to speak to announce which of

22  those she's apt to do.

23           Now I would like to start by asking you some

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

5

1  questions about your position at the Buffalo Police
2  Department, can you tell me, how long have you been
3  employed as a Buffalo Police Detective?
4         **A.**    Since February of 19 -- oh, detective?
5         **Q.**    Well, tell me about your entire career
6  with the Buffalo Police Department, when did you
7  start?
8         **A.**    February of 1994.
9         **Q.**    Okay.  And when did you get promoted to
10  detective?
11         **A.**    2001.
12         **Q.**    Prior to starting at the Buffalo Police
13  Department in '94, what kind of employment did you
14  hold?
15         **A.**    I worked at the Statler Golden Ballroom
16  booking weddings.  I worked at many, many
17  restaurants bartending, waiting on tables.  That's
18  about it.
19         **Q.**    Okay.  How long did you work at the
20  Statler?
21         **A.**    About four years.
22         **Q.**    And what is your educational
23  background?  What is the highest level of education

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

6

1  you acquired?

2        **A.**   I have about 62 college credits.

3        **Q.**   Okay.

4        **A.**   I didn't get a degree.

5        **Q.**   Okay.  Where did you get the credits

6  from?

7        **A.**   Buff State and UB.

8        **Q.**   And what were those, generally

9  speaking, the course of study?

10        **A.**   A lot of general education.  A little

11  bit of chemistry.  I can't think of anything else

12  as far as a little Spanish, a little bit of math.

13        **Q.**   Are you fluent in Spanish?

14        **A.**   No.  I wish.

15        **Q.**   And did you graduate from high school

16  locally?

17        **A.**   Yes.

18        **Q.**   And what high school was that?

19        **A.**   Mount Mercy Academy.

20        **Q.**   And other than the 62 hours that you

21  received credits for in college studies, did you go

22  on to receive any kind of licensure,

23  certifications, anything of that nature?

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

7

1       A.    No.

2       Q.    When you started at the Buffalo Police

3  Department in 1994, did you go on to get any kind

4  of training for that position?

5       A.    Well, the police academy trained us for

6  five months, and anything that was offered after

7  that point that I could obtain, I did.

8  Specifically, my domestic violence training.

9  Responding to a hazmat situation.  Things like

10  that.

11       Q.    When you became a detective in 2001,

12  did you go on for any special certifications as a

13  detective?

14       A.    No.

15       Q.    Did you go to, for example, the Reid

16  School for Interrogation?

17       A.    No.

18       Q.    Did you go on to any formal

19  accreditations for detective work?

20       A.    No.

21       Q.    When -- when you started as a detective

22  in 2001, were you in the General Major Crimes Unit?

23       A.    No.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

8

1    Q.   What specific crimes were you assigned

2  to?

3    A.   For two months I worked with the Sex

4  Offense Unit and then I transferred to the C

5  District, which is over at Ferry and Fillmore.  And

6  then about 18 months into being a detective, there

7  was a budget cut, so the fourteen lowest detectives

8  in seniority reverted back to patrol for eighteen

9  months, and I was one of them.

10    Q.   Okay.

11    A.   And then after that eighteen months

12  back in patrol, I was re-promoted and went back to

13  the C District and then I worked there until

14  October of 2006, which is when I transferred to the

15  Homicide Squad.

16    Q.   So without going through all of those

17  changes, we'll say, in your position, in November

18  of 2004, what position did you maintain with the

19  Buffalo Police Department?

20    A.   I would have been a detective at that

21  time.

22    Q.   And would you have been -- it was

23  before you got through homicide, so you were, at

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

9

1   that time, assigned particular crimes?

2        **A.**   On C District.

3        **Q.**   C District.  Now through testimony

4   yesterday with Detective Stambach, I understand

5   that there was a period of time at the Homicide

6   Unit, was merged into the Major Crimes Unit of the

7   Buffalo Police Department.  Do you recall that time

8   period?

9        **A.**   I recall that it happened, but I don't

10  know a specific time frame.

11       **Q.**   Do you know, had that -- had the

12  Homicide Bureau gone back to being its own entity

13  by the time you returned as a detective to homicide

14  in October of 2006?

15       **A.**   Yes.

16       **Q.**   When you took the assignment to the

17  Homicide Detective Bureau, did you work along side

18  anyone in particular?

19       **A.**   I originally worked with Detective

20  Reggie Minor and Detective Patrick Judge and

21  Detective Sergeant Jonathan Walton.

22       **Q.**   And I apologize, the first name is

23  Reggie?

MS. EVANS   -   MR. FELLE   -   1/24/2019

10

1        A.    Minor, M-I-N-O-R.

2        Q.    Okay, for approximately how long did

3   you work with those three?

4        A.    Probably a year, and then I was also

5   with Detective Brian Ross and Detective Scott

6   Mallick.  During that time probably, until the end

7   of 2007, I want to say.

8        Q.    Did there come a point in time when you

9   were assigned to the Cold Case Unit?

10       A.    Yes.

11       Q.    And when did that take place?

12       A.    2009.

13       Q.    And at the time you were assigned to

14   the Cold Case Unit, were there any other detectives

15   working in that unit?

16       A.    Yes, Brian Ross.  Detective Brian Ross,

17   Detective Lisa Redmond, and Detective Charles

18   Aronica.

19       Q.    And with respect to the Cold Case

20   Squad, we'll call it, were you assigned cases that

21   included homicide and other major crimes?

22       A.    No.

23       MS. HUGGINS:  Form.  Go ahead, you can

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

11

1   answer.

2          THE WITNESS:  I am sorry, just homicide.

3

4   BY MR. FELLE:

5          **Q.**   And so when you went into that squad in

6   2009, along with the three other individuals you

7   described, were the four of you assigned only to

8   homicide investigations?

9          **A.**   Yes.  I do need to explain a little bit

10  though.

11         **Q.**   Please, do.

12         **A.**   When I joined the Homicide Squad or

13  Cold Case Squad, I was asked by our commissioner to

14  look into some gang activity that was going on on

15  the west side between two gangs, and that

16  investigation did include non homicides, acts of

17  violence between two gangs.

18         **Q.**   Okay.

19         **A.**   They weren't -- it included homicide,

20  but some attempted murders and some things like

21  that.

22         **Q.**   Was that in relation to your review or

23  investigation of any cold cases?

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page28 of 251

A-1249

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

12

```
 1          MS. HUGGINS:  Form.  You can answer that.

 2          THE WITNESS:  Could you be more specific.

 3

 4  BY MR. FELLE:

 5          Q.   Sure.

 6          A.   Sorry.

 7          Q.   You said the commissioner asked you to

 8  look at the gang activity on the west side of

 9  Buffalo?

10          A.   Yes.

11          Q.   And I am wondering, was that because

12  you were working or reviewing a cold case that

13  involved that criminal activity?

14          A.   No, actually, right before I moved over

15  to cold case, I was working with Detective Noreen

16  Walsh and another detective, detective sergeant,

17  and while on that team, we -- our team, picked up,

18  if you will, we responded to two homicides.  One

19  was in -- they were both in June of 2009, which

20  were also related to these two specific gangs.  So

21  when I moved to Cold Case, with the request by the

22  commissioner to address the two gangs, those two

23  recent murders were the beginning, if you will, of
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

13

1  the research that went into learning the violence,

2  the pattern that had gone on between the two gangs.

3           So they weren't cold cases.  They had

4  actually just occurred in June of 2009.

5           **Q.**   Okay.  So it's really just a special

6  assignment outside of the cold -- of the Cold Case

7  Squad, normal assignment?

8           **A.**   Yes.

9           **Q.**   And who is the commissioner that asked

10  you to do that?

11          **A.**   Daniel Derenda.

12          **Q.**   And was anyone else assigned to that?

13          **A.**   Detective Noreen Walsh from Buffalo

14  Police.  I am sorry, I have -- maybe be more

15  specific, the commissioner was actually I think the

16  deputy commissioner at that time when he made that

17  request.

18          **Q.**   Okay.

19          **A.**   He later on went to become

20  commissioner.

21          **Q.**   Okay.  And Noreen Walsh was a police

22  officer, was she not a detective?

23          **A.**   She was a detective.

**MCCANN & MCCANN REPORTING**

MS. EVANS   -   MR. FELLE   -   1/24/2019

14

1      Q.   A detective, okay.  And was she

2  assigned at that point to the Cold Case Squad also?

3      A.   Not specifically, but kind of detailed

4  to this gang investigation.

5      Q.   Okay.  Since you started with the

6  Buffalo Police Department in 1994, have you

7  received any accreditations or awards?

8      A.   A couple of awards.  Just -- I can't

9  think of specifically.  One was from the -- it was

10  Law Day from the Erie County Bar, I think.  I can't

11  remember, I'm sorry, it's been a while.  Another

12  one was through the U.S. Attorney's Office.

13      MS. HUGGINS:  You have posed that question

14  to one of the most modest police officers that

15  works for us.

16

17  BY MR. FELLE:

18      Q.   That's refreshing to see your modesty.

19  I had two pages of notes yesterday on this

20  question, but with respect to the accreditations

21  and awards that you received during your career,

22  did any of those stem from your involvement in the

23  review or investigation of the Josue Ortiz case?

*MS. EVANS  -  MR. FELLE  -  1/24/2019*
                                                          15

1        **A.**    His case, not specifically, but it was

2   included, the FBI assisted with the gang case

3   because of the U.S. Attorney's Office, and our

4   case, our investigation, was awarded by the FBI,

5   which at that point, I don't even know if this case

6   was finished, so to speak, the Ortiz case, so I

7   don't know if I am answering the right way, but

8   does that answer the question, I don't know.

9        MS. HUGGINS:  That's fine.

10

11  BY MR. FELLE:

12       **Q.**    It may have in part been a reason why

13  you received an award from the FBI and the U.S.

14  General's Office; is that a fair statement?

15       **A.**    I would have kept the date --

16       **Q.**    Okay.

17       **A.**    -- because I -- the award thing was in

18  New York City and I did not go down there to get

19  it.  And then I can't remember in time if the

20  Camacho brothers' case was still being investigated

21  at the time they awarded the 10th Street Gang.

22       **Q.**    Okay.

23       **A.**    Sorry.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

16

1      Q.    On the flip side, I need to ask you,

2  during your tenure with the Buffalo Police

3  Department, have you ever been involved is any

4  disciplinary action, suspensions or demotions?

5      A.    No.

6      MS. HUGGINS:   I am going to object under the

7  50A.

8      MR. FELLE:   Okay.

9

10 BY MR. FELLE:

11     Q.    And again, just so the record is clear,

12 on November 11th of 2004, when the double homicides

13 occurred with the Camacho brothers, Nelson and

14 Miguel Camacho, what was your official title at

15 that time with the Buffalo Police Department?

16     A.    I was a detective.

17     Q.    And were you assigned to a particular

18 unit?

19     A.    Well, the C District.

20     Q.    And just so I am clear, would that mean

21 that your office was physically at the C District?

22     A.    Yes.

23     Q.    Did you also maintain an office at the

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

17

1   Major Crimes Unit at that point?

2        **A.**    No.

3        **Q.**    Okay.  Prior to the arrest, the arrest

4   of Josue Ortiz, did you have any involvement at all

5   in the homicide investigation?

6        **A.**    No.

7        **Q.**    During your employment with the Buffalo

8   Police Department, have you ever been partnered

9   with Detective Mark Stambach?

10        **A.**    No.

11        **Q.**    Have you ever been part of a group of

12   detectives under Detective Sergeant Lonergan?

13        **A.**    No.

14        **Q.**    Have you ever investigated a case along

15   with Detective Mark Stambach in particular?

16        **A.**    No.

17        **Q.**    Have you ever --

18        MS. HUGGINS:  Wayne, I don't mean to

19   interrupt, terminology, detectives, do you call it

20   your partner or do you work with a specific team

21   with multiple people?

22        THE WITNESS:  We don't really have assigned

23   partners.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

18

```
 1          MS. HUGGINS:  Okay, that's --
 2          THE WITNESS:  But, no, I never --
 3          MR. FELLE:  Okay.
 4          MS. HUGGINS:  Yeah.
 5
 6   BY MR. FELLE:
 7          Q.   Okay, let me ask you this, during that
 8   time frame when the homicide department or bureau
 9   merged with the Major Crimes Unit, how did that
10   affect your detective work?
11          A.   It didn't affect me in any way.
12          Q.   And that's because you were at the C
13   District at that point?
14          A.   Yes.
15          Q.   Did you recognize any change in the way
16   that your investigations were ongoing with respect
17   to when that merger took place?
18          MS. HUGGINS:  Form.
19
20   BY MR. FELLE:
21          Q.   Have you ever been part of the group
22   investigating a crime with Police Officer Nelson
23   Torres?  Excuse me, Edwin Torres?
```

A-1256

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

19

```
1          A.   No.

2          Q.   Edwin Torres.  Do you know who Police

3    Officer Edwin Torres is?

4          A.   Yes.

5          Q.   And do you know if he's still with the

6    Buffalo Police Department?

7          A.   I don't.

8          Q.   Do you know if Detective Sergeant

9    Lonergan is still with the Buffalo Police

10   Department?

11         A.   He is not.

12         Q.   He's not.  Do you know where he resides

13   currently?

14         A.   I don't.

15         Q.   When is the last time that you may have

16   seen Detective Sergeant Lonergan?

17         A.   About three years ago maybe.

18         Q.   When is the last time you may have seen

19   Police Officer Edwin Torres?

20         A.   Oh, probably more -- longer than that.

21   I don't recall the last time I saw him.

22         Q.   Okay, greater than three years.  And

23   how about Detective Stambach, when is the last time
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

20

1  you saw him?

2      **A.**   Probably -- I might have seen him

3  within the last year in passing somewhere, but I

4  don't specifically recall where.

5      **Q.**   In November of 2004, in addition to

6  your employment with the Buffalo Police Department,

7  did you hold any other forms of employment?

8      **A.**   No.

9      **Q.**   Did you own any other companies?

10     **A.**   No.

11     **Q.**   Did you do any outside investigation

12  work for the investigation company owned by

13  Detective Mark Stambach outside of the Buffalo

14  Police Department?

15     **A.**   No.

16     **Q.**   Upon starting your employment with the

17  Buffalo Police Department, do you recall being

18  given the Buffalo Police Department Policies and

19  Procedures manual?

20     **A.**   Yes.

21     **Q.**   Do you recall reviewing that?

22     **A.**   Vaguely.

23     **Q.**   Do you recall that within that Policies

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

21

1  and Procedures manual, there were certain

2  responsibilities of a Buffalo Police Officer while

3  in the course of their duties?

4        **A.**   Yes.

5        **Q.**   I'd just like to show you what we had

6  marked as Exhibit 1.

7        MR. FELLE:  And I know, Counsel, it's

8  changed a bit for the City of Buffalo, but as long

9  as it's okay with you, I'd like to refer to the

10  same exhibits from yesterday --

11        MS. HUGGINS:  That's fine.

12        MR. FELLE:  -- to the extent if we need to

13  add to them, we can make that differentiation on

14  the record, but I'd like to continue in the

15  numerical order we left off on yesterday.

16        MS. HUGGINS:  That's fine.

17        MR. FELLE:  Okay.

18        MS. HUGGINS:  Since we're doing that, do you

19  mind if I just take a quick glance at that?

20        MR. FELLE:  That's no problem at all.  Every

21  exhibit I'll follow up with you first.

22

23  BY MR. FELLE:

Case 23-352, Document 39, 06/23/2023, 3533142, Page38 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

22

```
 1        Q.   So starting with Exhibit 1, this is a

 2   copy of the Buffalo Police Department Policies and

 3   Procedures manual provided to me by your attorneys,

 4   and specifically it refers to Chapter 15, entitled

 5   Disciplinary Charge.  I want to turn your attention

 6   to the first page at Section 1.3 under the title

 7   Law Enforcement Code of Ethics.  That's the only

 8   part of this document I am going to look at right

 9   now.

10        MS. HUGGINS:  Okay.

11

12        (Whereupon a short recess was taken.)

13

14   BY MR. FELLE:

15        Q.   Have you had a chance to review the

16   exhibit?

17        A.   Yes.

18        Q.   Okay.  And the section under Law

19   Enforcement Code of Ethics, can you read that for

20   us, the first paragraph?

21        A.   Sure, as a law enforcement officer, my

22   fundamental duty is to serve mankind, to safeguard

23   lives and property.  To protect the innocent
```

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

23

 1  against deception.  The weak against oppression or

 2  intimidation and the peaceful against violence or

 3  disorder and to respect the constitutional rights

 4  of all to liberty, equality and justice.

 5       **Q.**   Would you agree that that is a

 6  responsibility of every Buffalo Police Officer?

 7       **A.**   Yes.

 8       **Q.**   Now before we went to Exhibit 1, we

 9  were talking about your position back in November

10  of 2004, and you told us that you worked at the C

11  District.  Can you tell us what were your

12  responsibilities as a detective at the C District

13  of Buffalo?

14       **A.**   The district detectives investigate

15  burglaries, some robberies, non fatal shootings or

16  non fatal assaults.  Some fraud.  Occasionally a

17  bank robbery.  Mostly burglaries.

18       **Q.**   How many detectives were assigned to

19  District C at that time?

20       **A.**   I want to say five, plus the sergeant.

21       **Q.**   Well, you were assigned to the C

22  District, did you also work with any joint task

23  forces?

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

24

 1      **A.**    No.

 2      **Q.**    With respect to the bank robbery cases,

 3  did you work along with anybody, with the either

 4  FBI or the U.S. Attorney's General office?

 5      **A.**    On occasions, I guess they would

 6  participate if it was some sort of, like takeover a

 7  bank robbery as opposed to just the garden variety

 8  where a note is shown and someone leaves, so for a

 9  while we were supposed to handle them and then they

10  were supposed to handle them, so we never really

11  knew.  If there was any kind of violence involved,

12  the FBI was usually involved in that.

13      **Q.**    Okay.  With respect to your

14  responsibilities as a C District detective, were

15  you also involved in criminal prosecutions of gang

16  related violence crimes?

17      **A.**    No.

18      **Q.**    What area of the city does the C

19  District encompass, generally speaking?

20      **A.**    The east side, Ferry and Fillmore

21  eastbound to the city line and then south to, I

22  want to say William Street.

23      **Q.**    Who was the sergeant at the C District

A-1262

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

25

1    at that time?

2         **A.**    Byron Lockwood.

3         **Q.**    Prior to coming in today for this

4    testimony, what documents did you review?

5         **A.**    I looked over the synopsis, if you

6    will, that I generated and a couple of the press

7    releases that were done with regard to this case

8    from the U.S. Attorney's Office.

9         **Q.**    Did you offer any press releases that

10   were provided on this case?

11        **A.**    No.

12        **Q.**    With respect to the synopsis you're

13   referring to, did you author that synopsis?

14        **A.**    Yes.

15        **Q.**    Okay.  And was that an ongoing

16   document?

17        **A.**    At the end I guess I added a few

18   things.

19        **Q.**    The version that we have been given is

20   redacted.  I am -- I don't have it marked.  We had

21   it marked yesterday as Exhibit 4, just for the sake

22   of reference, since you have called it a synopsis,

23   I want to show you what's been marked as Exhibit 4

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page42 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

26

1  and it's entitled Synopsis of Buffalo Police

2  Department Homicide Investigation Nelson Camacho

3  and Miguel Camacho.  Can you just take a look at

4  that exhibit and tell me, is that what you were

5  referencing?

6          A.   Yes.

7          Q.   And just again, so the record is clear,

8  is that a document you authored?

9          A.   Yes.

10         Q.   And what was the purpose of creating

11 that document?

12         A.   Just to provide a basic overview of the

13 course of the investigation.

14         Q.   Was the document shared with others

15 involved in that investigation?

16         A.   Yes.

17         Q.   The synopsis, as it's fairly called, is

18 a summary, would you agree, of the various

19 documents that you reviewed in the course of your

20 review of the arrest and conviction of Josue Ortiz?

21         MS. HUGGINS:  Object to the form.

22         THE WITNESS:  Can you repeat that.  I'm

23 sorry.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

27

```
 1  BY MR. FELLE:

 2       Q.   Sure.  Is that a synopsis, it's kind of

 3  paraphrased, of the documents and information that

 4  you reviewed while investigating and reviewing the,

 5  we'll say the homicides that occurred of Nelson and

 6  Miguel Camacho on November 11th of 2004?

 7       MS. HUGGINS:  Form.  You can answer.

 8       THE WITNESS:  Yes, but it's not complete.

 9

10  BY MR. FELLE:

11       Q.   Is there another version of that

12  document that is more complete?

13       A.   No, I just didn't include each and

14  every investigative step when I was trying to

15  generate this.

16       Q.   Okay, understood, and that's why it's

17  kind of a paraphrased version?

18       A.   Yes.

19       Q.   A summary, if you will?

20       A.   Yes.

21       Q.   Okay.  And you extracted what you

22  thought was pertinent in your review of the case?

23       MS. HUGGINS:  Form.
```

Case 23-352, Document 39, 06/23/2023, 3533142, Page44 of 251

MS. EVANS   -   MR. FELLE   -   1/24/2019

28

1      THE WITNESS:  Well, I put in here basically

2   what I believed were the key points so that a

3   person who was unfamiliar with the investigation

4   would be able to have some understanding as to how

5   the investigation evolved.  I don't know if that

6   makes sense, but --

7

8   BY MR. FELLE:

9        Q.   It does.

10       A.   Okay.

11       Q.   And that's kind of what I am asking, so

12  you say key points and I just said you extracted

13  what you felt was important.

14       MS. HUGGINS:  Form.

15       THE WITNESS:  Yes.  Not every -- I mean,

16  there were other things that were probably

17  important that I didn't include, but only because I

18  was unsure about putting in certain protected

19  information, if you will.

20

21  BY MR. FELLE:

22       Q.   Certainly, and I appreciate that.  The

23  document that you have in front of you, Exhibit 4,

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
29

1  do you notice on the document that there are

2  certain redactions?

3       **A.**   Yes.

4       **Q.**   Did you create those redactions?

5       **A.**   I don't recall redacting it.  I don't

6  think I redacted it.

7       MS. HUGGINS:  She didn't, I did it.

8       MR. FELLE:  Okay, so appreciated.  For the

9  sake of the record, Counsel for the City of Buffalo

10 Corporation Counsel has stated that she is the one

11 that created those redactions.

12

13 BY MR. FELLE:

14      **Q.**   And just so the record is also clear,

15 Detective, does an un-redacted version of that

16 document exist?

17      **A.**   Yes.

18      **Q.**   Okay.  And in addition to the synopsis,

19 what other documents did you review?

20      MS. HUGGINS:  Let me, to be accurate, what I

21 want to say, I know I redacted a number of

22 documents related to because of the various

23 confidentiality here and that was about two years

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

30

1 ago that I did that, so I want to say I believe

2 that I did those redactions based on the

3 information I was given.

4     MR. FELLE:  All right, we'll depose you

5 another time.

6     MS. HUGGINS:  Right.  I don't believe that

7 my client did it.

8     MR. FELLE:  Fair enough.

9

10 BY MR. FELLE:

11     Q.  And I'm sorry, my question was, what

12 other documents, outside of the synopsis, did you

13 review to prepare for today?

14     A.  Just a couple of press releases that

15 were done by the U.S. Attorney's Office and that

16 was it.

17     Q.  Did those press releases include

18 announcements by a Joseph Tripi, the U.S. Attorney

19 General, about the indictment of the perpetrators

20 of the murders of the Camacho brothers?

21     A.  I don't recall specifically.  I think

22 it -- I don't recall what they specifically said.

23 I kind of briefly scanned them, but --

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

31

1        Q.    Did you bring them with you?

2        A.    No.

3        Q.    No, okay.  How many of them were there,

4   press releases, that you looked at?

5        A.    Two or three.

6        Q.    Do you remember the dates of them?

7        A.    No.

8        Q.    And what was the significance of

9   reviewing the press releases to help refresh your

10  memory for today?

11       MS. HUGGINS:  Form.  You can answer the

12  question to the extent that it doesn't include the

13  conversation that you and I had as your attorney,

14  okay.

15       THE WITNESS:  Okay.  Can you please ask the

16  question again.

17

18  BY MR. FELLE:

19       Q.    Sure.  What was the significance of

20  reviewing those press releases in order to prepare

21  for today?

22       A.    To try to familiarize myself with the

23  time frame.

Case 23-352, Document 39, 06/23/2023, 3533142, Page48 of 251

A-1269

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

32

1       Q.   Fair enough.  Outside of those two or

2   three press releases, the synopsis, what other

3   documents did you review to prepare?

4       A.   Nothing.

5       Q.   Did you review any photographs?

6       A.   No.

7       Q.   Did you look at any parts of the

8   homicide file involving the double homicide of

9   Nelson and Miguel Camacho?

10      A.   No.

11      Q.   Did you look at the evidence case file

12  pertaining to that same homicide?

13      A.   No.

14      Q.   Outside of the conversations that you

15  have had with your attorneys, did you speak with

16  anyone else to help prepare for today's deposition?

17      A.   No.

18      Q.   Since the exoneration of Mr. Ortiz, has

19  anyone contacted you to speak to you about their

20  involvement, albeit a Buffalo Police Officer,

21  detective, anyone else who may have been involved

22  in that investigation, contacted you to discuss

23  their involvement with the case?

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

33

1          MS. HUGGINS:  Form.  You can answer that if

2     you understand it.  She may need clarification on

3     the time, the timing of what you are --

4

5     BY MR. FELLE:

6          Q.   Since the exoneration.

7          A.   Since the exoneration.

8          Q.   Of Mr. Ortiz, correct?

9          A.   Have I spoken with?

10          Q.   Yeah, has anyone contacted you with

11     respect to their involvement in the case?

12          A.   No.  Well, last week Investigator

13     Rondon from the State Police called me and asked me

14     if I had been notified to come in and I had said

15     that I had been notified by Corporation Counsel,

16     but I hadn't received it through our developmental

17     notification for some reason and he -- I believe he

18     said he was notified as well.

19          Q.   Okay.

20          A.   So that was it.

21          Q.   Did you and Investigator Rondon talk at

22     all about what would be the content of the

23     depositions?

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

34

```
 1        A.    No.

 2        Q.    Outside of Investigator Rondon, did you

 3  speak with anyone else about your testimony today?

 4        A.    No.

 5        Q.    So I want to go back to, we started to

 6  talk about the quasi role you were playing when you

 7  started in the Cold Case Unit or Squad, and you

 8  said in addition to the cold case investigation

 9  you may have been assigned to, you were also

10  assigned separately by the deputy commissioner to

11  investigate some gang related violent crimes, would

12  that be a fair statement?

13        A.    Yes.

14        Q.    And maybe a connection that those gang

15  related crimes, what connection they had?

16        A.    Yes.

17        MS. HUGGINS:   Form.

18

19  BY MR. FELLE:

20        Q.    Okay.  Within the course of that

21  investigation, did you ever come across the name

22  Josue Ortiz?

23        A.    Yes.
```

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

35

1        Q.    In what context?

2        A.    In the review of the Camacho brothers'

3  file.

4        Q.    The -- when you refer to the Camacho

5  brothers' file, are you referring, there's a number

6  of Camachos, are you referring to Nelson and

7  Miguel, who were murdered?

8        A.    Yes.

9        Q.    Okay.  So we're -- I guess we're in

10  somewhat of a gray area --

11        A.    Okay.

12        Q.    -- because my understanding is that the

13  real perpetrators of that crime were involved in

14  some gang activity.  I am going to just name them

15  and then you can -- you can -- you can tell me and

16  we'll talk about how they were related to either

17  your cold case investigation and/or your

18  investigation of gang related activity.

19        A.    Okay.

20        Q.    Does that make sense?

21        A.    Sure.

22        Q.    So if I was to start with -- let me

23  just name them all, Brandon Jonas, when did you

Case 23-352, Document 39, 06/23/2023, 3533142, Page52 of 251

A-1273

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

36

1 first become aware of Brandon Jonas?

2       **A.**    The name Brandon Jonas?

3       **Q.**    Correct.

4       **A.**    During the investigation into the 7th

5 Street Gang activity.

6       **Q.**    Okay.  And what brought his name to

7 your attention in that investigation?

8       **A.**    A male named Efrain Hidalgo, who's

9 nickname is Cheko, was one of the individuals

10 charged in the 7th Street case, so in reviewing any

11 material related to him, I was led to Brandon

12 Jonas, he is Cheko's cousin.

13       **Q.**    Cousin, okay.  And Efrain Hidalgo,

14 H-I-D-A-L-G-O, he was also one of the persons

15 ultimately convicted by the U.S. Attorney General's

16 Office for the commission of the murders of Nelson

17 and Miguel Camacho, correct?

18       **A.**    Yes.

19       MS. HUGGINS:  Form.

20

21 BY MR. FELLE:

22       **Q.**    And as was Brandon Jonas, correct?

23       MS. HUGGINS:  Form.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

37

```
 1          THE WITNESS:  Yes.

 2

 3  BY MR. FELLE:

 4          Q.   And are you familiar with Efrain

 5  Hidalgo's brother, that's Uda?

 6          A.   Yes.

 7          Q.   What is his full name, if you recall?

 8          A.   It's Uda Hidalgo, U-D-A, H-I-D-A-L-G-O.

 9  His real government name, if you will, is

10  U-R-A-Y-O-A-N.

11          Q.   Okay, thank you.

12          A.   And it was shortened by the family and

13  made into documents, so --

14          Q.   Okay.  Did -- in the course of your

15  investigation of the 7th Street Gangs' activity,

16  did you also come upon that name, Uda?

17          A.   Yes.

18          Q.   Okay.  And did you also come upon the

19  name of Misael Montalvo, M-O-N-T-A-L-V-O, also

20  known as Misa?

21          A.   Yes.

22          Q.   And just so I am clear, you came upon

23  their names during your investigation of gang
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

38

1   related activity, correct?

2        **A.**   Yes.

3        **Q.**   And was that before you started your

4   investigation, your cold case investigation

5   surrounding the homicides of Nelson and Miguel

6   Camacho?

7        MS. HUGGINS:   Form.   Did you conduct the

8   cold case investigation into that murder?

9        THE WITNESS:   No.   Well, not as a part of

10   the -- I don't know.   Can you ask me again, I am

11   sorry.

12

13   BY MR. FELLE:

14        **Q.**   You know what, maybe it's my fault, and

15   maybe I am assuming something that's not true.

16        **A.**   Okay.

17        **Q.**   Because you were assigned to the Cold

18   Case Unit --

19        **A.**   Correct.

20        **Q.**   -- so I guess I am thinking this is a

21   conviction that had taken place years before --

22        **A.**   Yes.

23        **Q.**   -- and so that you had gotten it to

**MCCANN & MCCANN REPORTING**

A-1276

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

39

1    review as a part of the Cold Case Unit.  Are you

2    suggesting -- let me strike that.  Is it your

3    testimony today that you became aware of the

4    conviction of Josue Ortiz as part of your

5    investigation into the 7th Street Gang activities?

6         **A.**    Yes.

7         **Q.**    And with respect to your investigation

8    into the 7th Street Gangs' activities, were you

9    also involved in the joint task force with either

10   the State or U.S. Attorney General's Office?

11        **A.**    Yes.

12        **Q.**    And there was a period of time that

13   there were wiretaps, were there not, on the 7th

14   Street Gang members?

15        MS. HUGGINS:  Form.  I am going to object

16   only because we are in a gray area in terms of

17   certain things that are under certain

18   confidentiality orders.

19        MR. FELLE:  No, our confidentiality order

20   and our stipulation only goes to issues involving

21   what was presented to the grand jury, so what I am

22   asking her now is, how she became aware of these

23   individuals that -- that led her to the conclusion

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page56 of 251

A-1277

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

40

1  they were involved in the crime.  I think -- I

2  think the wiretap plays an important role in that

3  and I am going to let the detective tell me what

4  role they played.

5         MS. HUGGINS:  So I am going to object to

6  that for two reasons.  One is, I don't want to step

7  on the toes of confidentiality orders, but

8  secondly, certain information may be under the Law

9  Enforcement Privilege.  The detective can provide

10 an answer generally how she became involved in it,

11 I think will satisfy you, but specific to wiretaps,

12 I would object to her answering that specifically

13 as to a wiretap.  She can provide a --

14        MR. FELLE:  Okay.

15        MS. HUGGINS:  -- broader scope, if that

16 makes sense.

17        MR. FELLE:  It does, and I'll respect the

18 semantics of that change, okay.

19

20 BY MR. FELLE:

21        Q.   So during the course of your

22 investigation of the activities of the 7th Street

23 Gang members, did you become privy to, were you

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page57 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

41

1   given the contents of various investigation

2   materials that were gained by the U.S. Attorney

3   General's Office?

4        **A.**   Would you be more specific.  I am

5   sorry, I don't -- I am not following.

6        **Q.**   At some point in time you related these

7   members that we just discussed, the three members

8   to -- you related them to the crimes, the double

9   homicide of Nelson and Miguel Camacho?

10        **A.**   Yes.

11        **Q.**   What led you to involve them in the

12   commission of that crime?

13        **A.**   One of the 7th Street Gang members had

14   told us that Hidalgo, Efrain Hidalgo, had been

15   involved in something in the past and that he was

16   questioned.  The 7th Street Gang member said that

17   Efrain Hidalgo had been questioned back in the day

18   by the police and that whatever Efrain had been

19   questioned about, he was involved in.  That was our

20   clue.  We were aware of Efrain Hidalgo's name at

21   that time already, and in doing the interviews of

22   the associates of Efrain Hidalgo, we were always

23   asking, is there anything else we don't know about

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

42

1  and that's how we learned that Hidalgo may have

2  been involved in something in the past that we

3  were, at that point, not aware of.

4      **Q.**   Okay.

5      **A.**   Does that help?

6      **Q.**   It does, thank you.

7      **A.**   Okay.

8      **Q.**   Would it be fair to say that that was

9  the first trigger to you looking at the double

10  homicide of Nelson and Miguel Camacho?

11      MS. HUGGINS:  Form.  You can answer.

12      THE WITNESS:  Well, the information was very

13  vague, and so for this specific, the Camacho

14  brothers' homicides, the trigger, in my mind, was

15  around June of 2011 after an arrest of an

16  individual who claimed upon his arrest, totally

17  separate from our investigation, that this person

18  who was being arrested said, I have information on

19  someone that you already know about, but you don't

20  know that he did this.  And that person provided us

21  with more details with regard to, I want to say the

22  general geographic location pointers, if you will,

23  for me to be able to then try again to locate this

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

43

1  incident that Hidalgo had allegedly participated

2  in, so that's -- that's how I was drawn to the

3  Camacho file.

4

5  BY MR. FELLE:

6       **Q.**   Okay.  The arrest in June of 2011 that

7  you're referring to, what was the nature of that

8  crime, do you recall?

9       **A.**   I believe it was a traffic stop.  The

10  individual was on the cell phone.  He was also on

11  probation.  I believe he had drugs.

12       **Q.**   Okay.  Who was that individual, do you

13  recall?

14       **A.**   (Name redacted.)

15       **Q.**   At the time that you initially --

16       MS. HUGGINS:  Before you ask another

17  question, I don't mean to interrupt.  Off the

18  record, Wayne.

19

20       (Discussion off the record.)

21

22  BY MR. FELLE:

23       **Q.**   Prior to June of 2011, and this new

MS. EVANS  -  MR. FELLE  -  1/24/2019

44

1  information that you received, with respect to the

2  three individuals that we just spoke about, Brandon

3  Jonas, Efrain Hidalgo and Misael Montalvo, were you

4  aware that those three individuals had a criminal

5  history?

6      A.    Prior to June of 2011, no.

7      Q.    Yeah.

8      A.    Oh, I'm sorry you said Efrain?

9      Q.    Correct.

10      A.    I would have been aware of his criminal

11  history and probably Brandon's, but I did not know

12  about Misael at all.

13      Q.    Up to that point, had they been, as far

14  as you know, convicted of any major crime?

15  Felonies?

16      MS. HUGGINS:  Form.

17      THE WITNESS:  I don't recall specifically

18  what each individual, what their criminal history

19  would have been.

20

21  BY MR. FELLE:

22      Q.    Okay.  Now this question borders on

23  what we just discussed, but it's important to my

Case 23-352, Document 39, 06/23/2023, 3533142, Page61 of 251

MS. EVANS  -  MR. FELLE  -  1/24/2019

45

1  investigation of my case, were those three
2  individuals, up to the time of June of 2011, were
3  they being utilized by the Buffalo Police
4  Department as informants?
5       MS. HUGGINS:  I would object to that
6  question.
7       MR. FELLE:  I think that's important in my
8  -- my review because I need to know the familiarity
9  with the Buffalo Police Department and those three
10  individuals.  Why don't you object to the form and
11  hear what she has to say and then we can preserve
12  it afterwards if you're concerned about the
13  response.
14       MS. HUGGINS:  I can -- okay, I am going to
15  assert a General Law Enforcement privilege
16  objection and as to form.  Depending on her answer,
17  I may request further, but to answer as to your
18  personal knowledge, that question.
19       THE WITNESS:  I have no idea.
20
21  BY MR. FELLE:
22       Q.    Okay.  So at some point in time, I am
23  trying to piece this together, I apologize if this

**MCCANN & MCCANN REPORTING**

A-1283

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
46

1  comes off as completely stupid, at some point in

2  time you were involved, while in the Cold Case

3  Unit, involved in a separate investigation of the

4  activities of the 7th Street Gang members that

5  included the three individuals that we just spoke

6  about, correct?

7      **A.**   Correct.

8      **Q.**   At some point in time in your

9  investigation of the 7th Street Gang members'

10 activities, were you prompted to reopen the arrest

11 and conviction related to Josue Ortiz in the double

12 homicides of Nelson and Miguel Camacho?

13     MS. HUGGINS:   Form.   You can answer.

14     THE WITNESS:   Okay, can you ask me again,

15 please.

16

17 BY MR. FELLE:

18     **Q.**   Sure, did your investigation into the

19 activities of the 7th Street Gang members

20 activities --

21     **A.**   Yes.

22     **Q.**   -- prompt you to reopen the file

23 pertaining to the arrest and conviction of Josue

**MCCANN & MCCANN REPORTING**

MS. EVANS   -   MR. FELLE   -   1/24/2019

47

1  Ortiz?

2        A.   Yes.

3        MS. HUGGINS:   Same form objection.   Thank

4  you.

5

6  BY MR. FELLE:

7        Q.   Now did your review of the arrest and

8  conviction of Josue Ortiz, was that part of your

9  investigation with the 7th Street Gang members

10  activities or part of your responsibilities with

11  the Cold Case Squad?

12        A.   The 7th Street Gang.

13        Q.   Okay.   Who, at that point, was

14  assisting you in that investigation?

15        A.   With the 7th Street Gang?

16        ·Q.   Yeah, at the point in time when they

17  promoted you to reopen the case involving the

18  arrest and conviction of Josue Ortiz, who else was

19  involved?

20        A.   Investigator, New York State Police

21  Investigator Geraldo Rondon.   And New York State,

22  now Senior Investigator, Josh Keats.   And FBI

23  Special Agent Thomas Palmer.   And FBI Special Agent

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

48

1   Jason Galle, G-A-L-L-E.  I think that's it.

2        **Q.**   Okay, at that point, when you first --

3   strike that.  What was the involvement of

4   Investigator Rondon?

5        MS. HUGGINS:  Form.

6        THE WITNESS:  Exactly what I was doing,

7   reviewing the file.  Beginning to go back and try

8   to interview people who were originally interviewed

9   in this case.

10

11   BY MR. FELLE:

12        **Q.**   Okay.  Would you say it was a

13   collaborative effort between you and the other

14   three officers --

15        **A.**   Yes.

16        **Q.**   -- and agents?  And since you are the

17   only member of that team, we'll say that involved

18   the Buffalo Police Department, did you have

19   responsibilities pulling the actual Buffalo Police

20   Department file?

21        **A.**   Yes.

22        **Q.**   And when you pulled that file, was it

23   an active or inactive file?

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

49

```
 1         MS. HUGGINS:  Form.

 2         THE WITNESS:  Inactive.  Well, I don't know

 3   how to explain it.  When I originally pulled the

 4   file, I thought it was inactive, because in our

 5   list of homicides, and all things that Homicide

 6   would respond to, there's a list and the Camacho

 7   brothers, and then there's a disposition where it

 8   would say active, open or whatever, open, active or

 9   cleared by arrest, and where it said Camacho

10   brothers, it said cleared.

11         So when I read that on the line, I assumed

12   an arrest was made, you know, this probably isn't

13   the file that I'm looking for with regard to this

14   incident that Hidalgo was involved with.  Does that

15   make sense?

16

17   BY MR. FELLE:

18         Q.   It does.

19         A.   Okay.

20         Q.   It does.  Because when you saw the fact

21   it was cleared, you thought they had the right

22   person in jail?

23         A.   Well, yes.  It just says cleared.  I
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

50

```
 1    don't recall seeing Josue's name.  I was scanning

 2    the list of incidents that occurred on Niagara

 3    Street and several of them were active or, other

 4    than homicides, for example, a DOA or a suicide,

 5    things like that, that Homicide would respond to,

 6    but this one said cleared, so I kind of thought,

 7    well, that might not be the one that he was

 8    involved with because that one already has someone

 9    that was being held responsible.  That had been

10    arrested.

11         Q.   Okay.

12         A.   Without ever looking at the actual

13    file, that's what I saw first.

14         Q.   I see.  Do you know who wrote the word

15    cleared on that file?

16         A.   Oh, no, sir.

17         Q.   Is there initials, names to it?

18         A.   No.

19         Q.   That file, once you obtained it, did

20    you continue to maintain that file?

21         A.   Yes.

22         Q.   Okay.  And can you tell me, what was --

23    what was in the file itself, generally speaking?
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
                                                                51

 1          A.    Witness statements.   Photos from the

 2    crime scene.   There was a statement from Efrain

 3    Hidalgo in there.   P-73s, their departmental memos

 4    that are generated through the course of the

 5    investigation which indicate the investigative

 6    steps.   Probably the evidence report would have

 7    been in there.   Documentation of the crime scene.

 8    The detectives canvass that they do following the

 9    murder -- murders.   That's about it.

10          Q.    Do you recall there being any video of

11    any of the witness statements in that

12    investigation?

13          A.    I don't think so.   I don't recall there

14    being any.

15          Q.    And in addition to the witness

16    statement that was taken during that investigation

17    of Efrain Hidalgo, do you recall there also being a

18    statement that was taken of Misael Montalvo?

19          A.    Yes.

20          Q.    And so at some point in time during the

21    investigation, both of those individuals were

22    interviewed, but neither of them was arrested,

23    correct?

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page68 of 251

A-1289

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

52

```
 1          MS. HUGGINS:  Form.

 2

 3   BY MR. FELLE:

 4          Q.   Initially?

 5          A.   Yes.  Correct.

 6          Q.   And did you also see all the various

 7   P-73 reporting forms in that file?

 8          A.   Yes.

 9          Q.   Okay.  And tell me a little bit about

10   the policies and procedures of the Buffalo Police

11   Department as it pertains to P-73s, there was some

12   questions yesterday about how long it might take

13   those P-73s to get into the file.  What's your

14   understanding, back in November of 2004, what was

15   the policy and procedure?

16          A.   I -- I don't know.  At the district

17   level we did not generate P-73s for our

18   investigations.  I didn't learn of that procedure

19   until I got to Homicide.

20          Q.   Okay.

21          MS. HUGGINS:  At that time when you were at

22   C District?

23          THE WITNESS:  Right.
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

53

1   BY MR. FELLE:

2        Q.   When you pulled that file, did you

3   review the various interactions that the Buffalo

4   Police Department had with Josue Ortiz?

5        A.   Yes.

6        Q.   And is that part of your synopsis?

7        A.   Yes.

8        Q.   And did -- did you recognize that as

9   early as November 15th of 2004, that Buffalo Police

10   Officers had met with Josue Ortiz at Buffalo

11   General Hospital?

12        A.   Yes.

13        Q.   And did you see the various P-73s that

14   outlined their interactions?

15        A.   Yes.

16        Q.   And I believe it was Detective Lobaugh,

17   Mark Lobaugh, who initially had met Mr. Ortiz on

18   the 15th and called for an ambulance to have him

19   admitted, do you recall that?

20        A.   Yes.

21        MS. HUGGINS:   Form.

22

23   BY MR. FELLE:

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
54

1      Q.   And that he was of the opinion that he

2   was exhibiting bizarre, psychiatric behavior, would

3   that be fair a statement?

4      MS. HUGGINS:  Form.  You can answer that

5   question if you understand it.  I am objecting to

6   the form of it.

7      MR. FELLE:  Sure.

8      THE WITNESS:  I just read what he had just

9   written on the P-73, and that is, I believe was

10  their interaction prompted them to ask him if he

11  wanted to go to the hospital or something like

12  that.  I don't specifically recall the wording in

13  it though.

14

15  BY MR. FELLE:

16     Q.   Okay.  Showing you what we had marked

17  as Exhibit 6 yesterday at the deposition and I just

18  want to ask you, I am going to show you the P-73

19  prepared by Detective Mark Lobaugh on November 15th

20  of 2004 and ask you if that refreshes your memory?

21     MS. HUGGINS:  Refreshes her memory as to

22  what was written in it or --

23     MR. FELLE:  What she recalls Dr. -- or

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

55

1   excuse me, Detective Lobaugh had stated about the

2   appearance and demeanor of Mr. Ortiz on the 15th?

3          MS. HUGGINS:   Form.

4          THE WITNESS:   Okay.

5

6   BY MR. FELLE:

7          **Q.**   Does that help refresh your memory as

8   to what you recall about Detective Lobaugh's

9   interaction with Mr. Ortiz on the 15th?

10         **A.**   Yes.

11         MS. HUGGINS:   Form.

12

13  BY MR. FELLE:

14         **Q.**   And he did in fact call for an

15  ambulance and have him brought to Buffalo General

16  Hospital?

17         MS. HUGGINS:   Form.

18         THE WITNESS:   I believe so, yes.

19

20  BY MR. FELLE:

21         **Q.**   And Detective Lobaugh indicates that he

22  appeared to be under the influence of drugs at the

23  time, correct?

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

56

1       Ms. HUGGINS:  Well, form.  This witness

2  didn't testify that she was present for any of

3  that.

4       MR. FELLE:  I understand.

5

6  BY MR. FELLE:

7       Q.   I'm just, Detective Lobaugh indicated

8  that at that time, right, I am looking at the P-73

9  with the witness, just so the record is clear,

10  Exhibit 6, isn't that what Detective Lobaugh states

11  in his P-73?

12       MR. FRIEDMAN:  Form.  That's a different

13  question than what you asked her.  Her

14  understanding of the content of a P-73 is a

15  different question than what the events of November

16  15th, 2004 are.

17       THE WITNESS:  Yes, that's what Detective

18  Lobaugh wrote.

19

20  BY MR. FELLE:

21       Q.   And do you recall seeing another P-73

22  surrounding various police officers going to

23  Buffalo General Hospital later that day?

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 39, 06/23/2023, 3533142, Page73 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

57

1         **A.**    Yes.

2         **Q.**    And do you remember, just in a general

3    sense, do you recall what that indicated?

4         **A.**    I believe Buffalo General contacted the

5    detectives and told them that there was, the

6    individual was -- had been seen by the staff there

7    and the worker at Buffalo General asked the

8    homicide detective if they wanted to speak with him

9    and they proceeded to go to that location and have

10   another conversation with him.

11        **Q.**    Do you recall the P-73 indicating that

12   at that time Mr. Ortiz was asked if he had

13   knowledge of who committed the murders?

14        MS. HUGGINS:   Form.

15        THE WITNESS:   I don't recall the specific

16   wording, I'm sorry.

17

18   BY MR. FELLE:

19        **Q.**    No, that's okay.  I know this happened

20   a long time ago, so I am, you know, looking to

21   trick you or confuse you if you don't know.  Just

22   ask you to look at the document to refresh.  So

23   again, Exhibit 6, as it's marked, I am going to

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*
58

1    show you what is the P-73 of Detective Mark Vaughn,

2    it's under Bates Number 1183.  That's a two-page

3    document.

4         **A.**   Okay.

5         **Q.**   Does that help to refresh your memory?

6         **A.**   Yes.

7         **Q.**   And -- and based on that P-73, the

8    report of Detective Vaughn, did Mr. Ortiz deny any

9    knowledge of the murders of the Camacho brothers?

10        MS. HUGGINS:  Form.  You can answer that

11   question with regard to the P-73 you just reviewed.

12        THE WITNESS:  Yes, he claimed he did not

13   have knowledge.

14

15   BY MR. FELLE:

16        **Q.**   And this was on November 15th of 2004?

17        **A.**   Yes.

18        **Q.**   That was the day before Mr. Ortiz was

19   -- was arrested, correct?

20        MS. HUGGINS:  Well, form.

21

22   BY MR. FELLE:

23        **Q.**   Do you recall that?

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*
                                                          59

1        **A.**   I would have to look at the P-73 from

2   his arrest for his exact arrest date.

3        **Q.**   Okay.  During the course of your review

4   of the case, did you look at the statement that Mr.

5   Ortiz provided, purportedly provided to Detective

6   Stambach on the 16th?

7        **A.**   Yes.

8        **Q.**   And prior to that meeting between Mr.

9   Ortiz and Detective Stambach, did you see any

10  involvement on that investigation by Detective

11  Stambach?

12        MS. HUGGINS:  Form.

13        THE WITNESS:  Not that I recall.

14

15  BY MR. FELLE:

16        **Q.**   Do you recall the circumstances under

17  which Josue Ortiz was brought in to speak to

18  Detective Stambach?

19        MS. HUGGINS:  Form.  I -- do you have any

20  personal involvement in this investigation prior to

21  your -- your 7th Street/10th Street Gang

22  investigation?

23        THE WITNESS:  No.

Case 23-352, Document 39, 06/23/2023, 3533142, Page76 of 251

A-1297

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

60

1       MR. FELLE:  Listen, listen, this
2   is a fair question, okay.  We're going to be here
3   all day if you continue to do that, okay.

4

5   BY MR. FELLE:
6       Q.   The question simply is, when you opened
7   this investigation, reviewed this as part of your
8   investigation under what we have talked about, did
9   you, as part of that investigation, recognize that
10  -- that Detective Mark Stambach was the one that
11  took a purported confession from Mr. Ortiz?
12      A.   Yes.
13      MS. HUGGINS:  Form.
14
15  BY MR. FELLE:
16      Q.   And prior to that time, the time he
17  took a purported confession of my client, did he
18  have any involvement at all in that investigation,
19  as far as you can recall?
20      A.   Not as far as I can recall.
21      Q.   And my next question was, do you recall
22  what circumstances led the police officers to bring
23  Josue Ortiz in to see Detective Stambach?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

61

1           MS. HUGGINS:   Form.

2           THE WITNESS:   From reading the P-73,

3    correct.

4

5    BY MR. FELLE:

6           Q.    You reviewed the investigation of this

7    case?

8           A.    Yes, I recall.

9           Q.    Okay, what do you recall, generally?

10          A.    Police officers from the D District

11   received a call of an irrational person or a person

12   needing help, something along those lines.

13   Officers Sadalka and Lobaugh responded to the

14   vicinity of Military Avenue -- Military Road to

15   some sort of community center where they were

16   informed by a person working there that an

17   individual was present but had then gone to 142

18   Germain.

19          The officers proceeded to that location at

20   142 Germain where then encountered Josue Ortiz and

21   Josue Ortiz said something to them, I don't know

22   what, but it prompted them to have him come with

23   them down to the Buffalo Police Department, to

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

62

1   headquarters.

2       **Q.**   And that's where he met with Detective

3   Stambach?

4       **A.**   Yes.

5       MS. HUGGINS:  Form.

6

7   BY MR. FELLE:

8       **Q.**   Okay.  When you pulled the file

9   pertaining to the double homicides of Nelson and

10  Miguel Camacho, once you started to get into the

11  document, did you contact any of the investigators,

12  including the detectives or Buffalo Police Officers

13  that were involved in that investigation and

14  subsequent arrest of Josue Ortiz?

15      **A.**   No.

16      **Q.**   Did you ever have a conversation with

17  Detective Stambach?

18      **A.**   No.

19      **Q.**   Did you ever have a discussion with

20  Detective Lieutenant Lonergan?

21      **A.**   No.

22      **Q.**   When you got the file, all of the

23  P-73s, and we just reviewed two of them from

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

63

1    November 11th, 2004, were in the file, correct?

2            MS. HUGGINS:  Form.

3            THE WITNESS:  Can you repeat.  I am sorry.

4

5    BY MR. FELLE:

6            **Q.**    I think you said you saw that in the

7    file, correct?

8            **A.**    Yes.  Yes.

9            **Q.**    Yeah.  Those two P-73s, Detective

10   Lonergan and Detective Vaughn, those tell us about

11   Josue Ortiz, correct?  They tell us about the

12   interactions with him on the 15th, correct?

13           **A.**    Yes.

14           **Q.**    Would it surprise you to hear that

15   Detective Stambach says that before he arrested Mr.

16   Ortiz, that he never saw those P73s, would that

17   surprise you?

18           MS. HUGGINS:  Form.

19           THE WITNESS:  I don't -- I don't know.

20

21   BY MR. FELLE:

22           **Q.**    Would that, in your opinion, as a

23   detective in the Buffalo Police Department, would

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

64

 1  it be important that an arresting officer see all

 2  of the investigation materials before coming to the

 3  conclusion of arresting somebody?

 4       MS. HUGGINS:  Form.

 5       THE WITNESS:  When possible, yes.

 6

 7  BY MR. FELLE:

 8       Q.   At the time that Josue Ortiz was

 9  arrested, based on your review of the file, did you

10  see any other evidence in the case that

11  corroborated a purported confession that Detective

12  Stambach presented?

13       MS. HUGGINS:  Form.

14       THE WITNESS:  Could you ask me one more

15  time, I'm sorry.

16

17  BY MR. FELLE:

18       Q.   Sure.  At the time he was arrested --

19       A.   Yes.

20       Q.   -- when you reviewed the file, did you

21  see any other corroborating evidence that led to

22  Josue Ortiz as being one of the perpetrators in the

23  crime?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

65

1           MS. HUGGINS:  Form.

2           THE WITNESS:  I am not sure.  I -- during

3     the statement with Stambach, Detective Stambach?

4

5     BY MR. FELLE:

6           Q.   No, at the time he was arrested?

7           A.   Okay, yes.

8           Q.   Right.  We know that Detective Stambach

9     has what he purports to be a confession of Josue

10    Ortiz?

11          A.   Yes.

12          Q.   My question to you, at the time he

13    arrested him, is there any other corroborating

14    evidence as part of the investigation that would

15    have made Mr. Ortiz a suspect or in any way

16    corroborated his guilt in the crime?

17          MS. HUGGINS:  Form.

18

19    BY MR. FELLE:

20          Q.   That you're aware?

21          A.   Well, there were cartridge cases there

22    were from a AK-47 present inside the crime scene in

23    the home, and that was mentioned by Ortiz during

**MCCANN & MCCANN REPORTING**

A-1303

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

66

1  his statement.

2      **Q.**   Were those tested, do you know?

3      **A.**   I don't recall.

4      **Q.**   Anything else that corroborated, to the

5  extent that that even corroborated, anything that

6  would have corroborated outside of the statement,

7  corroborated that Josue Ortiz was involved in the

8  crime?

9      MS. HUGGINS:  Form.

10     THE WITNESS:  Not that I am aware of.

11

12  BY MR. FELLE:

13     **Q.**   When -- when you received the file, you

14  saw that it had said cleared, when you started to

15  get into the file and you noticed all witnesses

16  were pointing to three perpetrators, did that

17  surprise you that the file had indicated that it

18  was cleared?

19     MS. HUGGINS:  Form.

20     THE WITNESS:  It didn't surprise me.  I

21  don't know if I have ever seen something listed as

22  partially cleared as opposed to cleared in that

23  column.  If it had said partially cleared, that

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

67

1   would indicate to me that there were outstanding --

2   potential outstanding codefendants.

3

4   BY MR. FELLE:

5        **Q.**   Okay.  But it didn't say that, correct?

6        **A.**   It did not.  It just said cleared.

7   Sorry, what was the question?

8        **Q.**   Would it be fair to say that that

9   surprised you --

10        MS. HUGGINS:  Form.

11

12   BY MR. FELLE:

13        **Q.**   -- once you got into the file?

14        **A.**   Yes.

15        **Q.**   If the file indicated it was clear,

16   although all of the witnesses --

17        **A.**   Yes.

18        **Q.**   -- indicated that there were three

19   perpetrators?

20        **A.**   Yes.

21        **Q.**   Okay.

22        MS. HUGGINS:  Just let him finish his

23   question.  That's okay.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

68

1   BY MR. FELLE:

2       **Q.**   During the course of your investigation

3   of the file, I already asked you this if you spoke

4   with Detective Stambach and/or Detective Lonergan,

5   did you speak with Police Officer Edwin Torres at

6   all?

7       **A.**   I did speak with him once.  I don't

8   recall when.

9       **Q.**   Was that in a formal setting?

10      **A.**   No.

11      **Q.**   Was it over the phone or in person?

12      **A.**   No, in person.

13      **Q.**   Okay.  And was it regarding your review

14  of the Camacho brothers' homicide?

15      **A.**   Yes.

16      **Q.**   And what specifically, if you can

17  recall, did you discuss about that?

18      **A.**   I think I asked him if he remembers

19  translating, and he said he did, but I don't recall

20  what else he said about it, just that he was there

21  and, yeah, the guy -- they had the conversation.

22      **Q.**   Anything else that's significant to

23  your review of that arrest?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

69

1          A.    No.

2          Q.    Was that a recorded statement?

3          A.    No.

4          Q.    And other than that conversation, have

5    you had any other conversations with Police Officer

6    Torres?

7          A.    No.

8          Q.    Was he ever called into any of the

9    proceedings surrounding the indictment of the three

10   perpetrators?

11         A.    I don't know.  I don't know.  He may

12   have, but I don't recall specifically.

13         MS. HUGGINS:  Called in terms of getting

14   information, or called in terms of as being a

15   witness?

16         MR. FELLE:  Either.

17         MS. HUGGINS:  Okay.

18         MR. FELLE:  That she's aware of.

19         MS. HUGGINS:  That you're aware of.

20

21         (Whereupon a short recess was taken.)

22

23   BY MR. FELLE:

Case 23-352, Document 39, 06/23/2023, 3533142, Page86 of 251

A-1307

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

70

1    **Q.**   All right, after a short break,

2    Detective, you had talked about the idea that on or

3    around June of 2011, is when your attention was

4    brought to this case involving Josue Ortiz,

5    correct?

6         **A.**   Correct.

7         **Q.**   And you pulled that file, correct?

8         **A.**   Yes.

9         **Q.**   And you started to look into it along

10   with four other officers that you outlined,

11   correct?

12        **A.**   Correct.

13        **Q.**   During the course of that

14   investigation, you prepared the synopsis that you

15   discussed earlier, we marked that, correct?

16        **A.**   Correct.

17        **Q.**   Did you prepare any other documents

18   relative to your review of that case?

19        MS. HUGGINS:   Form.

20        THE WITNESS:   I don't think so.   Not for

21   review, no.

22

23   BY MR. FELLE:

**MCCANN & MCCANN REPORTING**

A-1308

MS. EVANS  -  MR. FELLE  -  1/24/2019

71

1       Q.   At some point in time, based on your

2  review of that file, along with the information you

3  were obtaining about the gang activity of the 7th

4  Street Gang, did you come to the conclusion that

5  the perpetrators of that murder might be other than

6  Josue Ortiz?

7            MS. HUGGINS:  Form.

8            THE WITNESS:  Originally?

9

10 BY MR. FELLE:

11      Q.   Did you at some point come to the

12 conclusion that --

13      A.   Yes.

14      Q.   -- the information pointed to different

15 perpetrators of that murder?

16      A.   At some point, yes.

17      Q.   And so just so I understand things,

18 these two things are happening simultaneously,

19 right?

20      A.   Yes.

21      Q.   You're -- you're getting information

22 about the gangs activities through your team's work

23 in that regard and you're also learning through

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
72

1  your own review about this investigation

2  surrounding the Camacho brother homicides, correct?

3         **A.**    Correct.

4         MS. HUGGINS:  Form.

5

6  BY MR. FELLE:

7         **Q.**    And now I understand that

8  collaboratively, the five of you were working on

9  the gang members' activities, but were you working

10 on your investigation of the Camacho homicides with

11 anyone else?

12        **A.**    Other than those people, no.

13        **Q.**    Were they also being made privy to the

14 materials you had through the Buffalo Police

15 Department file regarding Josue Ortiz?

16        **A.**    Yes.

17        MS. HUGGINS:  Form.

18

19 BY MR. FELLE:

20        **Q.**    At the same time were you working on

21 other files or was this your exclusive focus?

22        **A.**    We had other, when I say we, you mean

23 the task force, or do you mean Buffalo PD separate?

Case 23-352, Document 39, 06/23/2023, 3533142, Page89 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

73

1      Q.   I mean you in your position with

2 Buffalo PD?

3      A.   Yes.

4      Q.   Was that basically what you were doing

5 or were you also investigating other cold case

6 files?

7      A.   We had another file we were looking at,

8 but I am a little foggy on the exact timeline, but

9 cases other than those pertaining to the gang, plus

10 the Camacho case, no, that was our sole focus.

11      Q.   Okay.  During the scope of your review

12 of the investigation into the Camacho brothers

13 homicides, did you reanalyze any of the physical

14 evidence from the crime scene?

15      MS. HUGGINS:  Form.

16      THE WITNESS:  We asked that it be tested by

17 the lab.

18

19 BY MR. FELLE:

20      Q.   Okay.

21      A.   Yes.

22      Q.   So you made a distinction, I said we,

23 you're saying that might have been for the first

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

74

1   time it was analyzed --

2        **A.**   Yes.

3        **Q.**   -- is that a fair statement?

4        MS. HUGGINS:  Form.

5

6   BY MR. FELLE:

7        **Q.**   And did you find that to be the case

8   with all the physical evidence from the crime

9   scene?

10       MS. HUGGINS:  Form.

11       THE WITNESS:  I don't -- I don't recall what

12   was originally tested specifically, but I know that

13   during the 7th Street investigation slash Camacho

14   brothers investigation, we did have items submitted

15   to the lab for DNA.  Does that help?

16

17   BY MR. FELLE:

18       **Q.**   It helps.  I understand your answer,

19   but --

20       **A.**   Yes.

21       **Q.**   -- it doesn't necessarily help me with

22   understanding, was that physical evidence that was

23   taken from the investigation file from the Camacho

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

75

1  brothers' murders?

2       **A.**   Yes.

3       MS. HUGGINS:   Form.

4

5  BY MR. FELLE:

6       **Q.**   It was.   The statements that were taken

7  during that investigation, including eyewitnesses

8  who saw the perpetrators, were those shared with

9  the collaborative team?

10      **A.**   Yes.

11      MS. HUGGINS:   Form.   It may be helpful, I

12 think you're referring to them as two separate

13 things.   It may be helpful to ask her is this -- do

14 you consider them two separate things, yeah.

15

16 BY MR. FELLE:

17      **Q.**   Well, I think that I had got the

18 conclusion that they became merged at some point,

19 right?   The review and investigation into the

20 Camacho brothers' murders came into -- merged into

21 your investigation of the 7th Street Gang members

22 activities, correct?

23      **A.**   Correct.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

76

1          MS. HUGGINS:  Form.

2

3    BY MR. FELLE:

4          **Q.**    And so all of, you know, what started

5    out as maybe two different things, kind of merged

6    into one, would that be a fair statement?

7          **A.**    Yes, I guess.  I would consider the

8    Camacho brothers' investigation almost an offshoot

9    of the original 7th Street Gang investigation, if

10   that makes sense.

11         **Q.**    Of the four other members that you

12   discussed earlier who were involved with you from

13   the federal, state and your office, which of those

14   five people worked on the review of the Camacho

15   brothers' homicides?

16         **A.**    I would think we all did.  Some

17   probably a little bit more than others, if that's

18   what --

19         **Q.**    With respect to who did more and who

20   did less, generally speaking?

21         **A.**    It's hard to say, because it's hard to

22   quantify, because Investigator Rondon and I and

23   Sergeant -- well, he's a Senior Investigator now,

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

77

1   Josh Keats got promoted during this investigation,

2   so he had to leave and return to his duties with

3   the State Police.  And then the FBI agents assisted

4   us, but they also had, I think other things going

5   on as well, in addition to this investigation.

6          **Q.**    Okay.

7          **A.**    So it's hard to quantify who did the

8   more -- more and less.  Geraldo Rondon and I, we

9   contributed a lot, but Josh Keats did too up to the

10  time he had to go.  And the FBI also contributed as

11  well, it's just hard to give a gauge on a

12  percentage or anything like that.

13         **Q.**    Fair enough, just the way you were

14  giving that answer, I just wanted to probe it.

15  With respect to New York State Investigator Rondon,

16  do you know, is he assigned to particular cases?

17         **A.**    He's assigned right now to the Safe

18  Streets Task Force.

19         **Q.**    At the time you and he worked together

20  on this case, was he involved in Cold Case review?

21         MS. HUGGINS:  Form.

22         THE WITNESS:  Not specifically.  Some of the

23  cases that we investigated as part of the 7th

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

78

1   Street Gang investigation included older slash cold

2   cases, so in that respect, yes, but he -- that --

3   not independent of that, do you know what I mean?

4

5   BY MR. FELLE:

6          **Q.**    I do.

7          **A.**    Okay.

8          **Q.**    I think generically speaking, many

9   attorneys just, you know, kind of associated him

10   with being involved in various cold cases, in

11   investigations, but be that as it may, that's not

12   his only function, is what you're saying, right, he

13   does full-fledged investigations for the State of

14   New York?

15          **A.**    Yes.

16          **Q.**    Fair enough.  As you started to process

17   the physical evidence from the scene, review

18   witness statements, did you find any

19   inconsistencies with respect to the evidence

20   insofar as it did not point to Josue Ortiz?

21          MS. HUGGINS:  Form.

22          THE WITNESS:  Eventually, yes.

23

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

79

1  BY MR. FELLE:

2       **Q.**   For example, when you looked at the

3  eyewitness statements, I think there were seven of

4  them in this case --

5       **A.**   Okay.

6       **Q.**   -- do you recall that none of the

7  witnesses placed any of the three perpetrators over

8  six foot, do you recall that being the case?

9       MS. HUGGINS:  Form.

10       THE WITNESS:  I recall them being described

11  as average height.

12

13  BY MR. FELLE:

14       **Q.**   Do you recall how tall Mr. Ortiz is?

15       **A.**   Yes.

16       **Q.**   He's a little over 6'6", right?

17       **A.**   Yes.  I thought he was 6'5", but, yeah,

18  I'll go for that.

19       **Q.**   And I am going to show you what's been

20  marked as Exhibit 2, it's a picture of Mr. Ortiz

21  when he was booked, do you see his measurements

22  next to him?

23       **A.**   Yes.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
80

```
 1          Q.   He's a just little over 6'6", right?

 2          A.   Yes.

 3          Q.   Okay.  In any event, when you look at

 4   the witness statement forms, none of those

 5   eyewitnesses put the perpetrators anywhere near the

 6   height of Mr. Ortiz, would that be a fair

 7   statement?

 8          MS. HUGGINS:  Form.

 9          THE WITNESS:  Yes.

10          MS. HUGGINS:  What's that exhibit number?

11          MR. FELLE:  Number 6.  Or excuse me, I

12   misspoke, 2.

13          MS. HUGGINS:  Thank you.

14

15   BY MR. FELLE:

16          Q.   With respect to the physical evidence

17   that you had analyzed, did you have DNA evidence

18   analyzed from the scene?

19          A.   Yes.

20          Q.   And did any -- any DNA evidence from

21   the scene of the crime point to Josue Ortiz?

22          MS. HUGGINS:  Form.

23          THE WITNESS:  No.  No.
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

81

1  BY MR. FELLE:

2      **Q.**  Did you make any connections with any

3  of the DNA evidence to the three perpetrators who

4  were ultimately convicted of the crime?

5      MS. HUGGINS:  Form.

6      THE WITNESS:  No.

7

8  BY MR. FELLE:

9      **Q.**  My notes indicate that the first time

10  you spoke with Josue Ortiz was on June 29th of 2011

11  at the Auburn Correctional Facility, is that a fair

12  statement?

13      **A.**  Yes.

14      **Q.**  Prior to that point, it's my

15  understanding you met with him in person at the

16  facility, correct?

17      **A.**  Correct.

18      **Q.**  Prior to that point, had you talked to

19  him on the phone, exchanged any written

20  communication, anything?

21      **A.**  No.

22      **Q.**  So this was in fact your first

23  encounter with Josue Ortiz, correct?

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
<div align="right">82</div>

1          A.    Correct.

2          Q.    And up to that point you had been

3    involved in this investigation, as we talked about,

4    you had looked at witness statements, physical

5    evidence was analyzed, you looked at the

6    investigation as it resulted in his arrest?

7          MS. HUGGINS:   Form.

8

9    BY MR. FELLE:

10         Q.    Do you understand?

11         A.    Can I make a little correction on the

12   DNA?

13         Q.    Sure.

14         A.    That DNA testing wasn't done until

15   further on in the investigation.  So prior to

16   meeting with Josue the first time, I just reviewed

17   the contents of the file.

18         Q.    Okay.  And that's right, but you said

19   in about June of 2011 is when you first really

20   started to take an earnest look at the case files

21   surrounding the Camacho brothers' homicide,

22   correct?

23         A.    That's when we identified that it

*MS. EVANS  -  MR. FELLE  -  1/24/2019*
83

1  existed.

2      **Q.**   So this was part of your preliminary

3  review of that investigation?

4      **A.**   Yes.

5      **Q.**   And I think when you were discussing,

6  you stated that some of the analysis information

7  wasn't available to you yet?

8      **A.**   Correct, we did not have it submitted

9  until later on.

10      **Q.**   Okay.  Who attended that interview with

11  you at the Auburn Correctional Facility, do you

12  recall?

13      **A.**   Investigator Rondon.

14      **Q.**   And was that interview recorded?

15      **A.**   No.

16      **Q.**   It is part of your synopsis though,

17  correct?

18      **A.**   Yes.

19      **Q.**   Okay.  And does your synopsis also,

20  does that also then indicate that on or about July

21  14th of 2011, about two weeks later, that Mr. Ortiz

22  presented to the U.S. Attorney General's Office,

23  just yes or no, I don't want to get into the

Case 23-352, Document 39, 06/23/2023, 3533142, Page100 of 251

```
 1  contents of it?
 2        A.   I believe that's --
 3        MS. HUGGINS:  I am sorry, could you just
 4  repeat your question.
 5
 6  BY MR. FELLE:
 7        Q.   Sure.  The next time you met with Josue
 8  Ortiz was on or about July 14th of 2011 at the U.S.
 9  Attorney General's Office?
10        A.   Yes.
11        Q.   Okay.  And were -- you were you present
12  for an interview that was had with Mr. Ortiz at
13  that time?
14        A.   Yes, some of it.
15        Q.   Was that interview recorded?
16        A.   No.
17        Q.   Who was present?
18        A.   I don't recall specifically who was
19  present other than USA Tripi, but as far as the
20  investigators, I couldn't tell you who was in the
21  room.
22        Q.   Fair enough.  The next time that I had
23  you meeting with him is almost a year later, you
```

Case 23-352, Document 39, 06/23/2023, 3533142, Page101 of 251

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

85

```
1   interviewed Josue Ortiz on July 11th of 2012 at the

2   Attica State Prison, do you recall that?

3        A.   Yes.

4        Q.   And who was present with you then?

5        A.   Investigator Rondon.

6        Q.   Anyone else?

7        A.   Nope.

8        Q.   And was that interview recorded?

9        A.   No.

10        Q.   And would it be fair to say that during

11   the course of that year, year and a month, that you

12   had reopened this investigation, to some extent you

13   were reviewing the homicide of the Camacho

14   brothers, that you gained a lot more information

15   about the commission -- excuse me, about that

16   crime?

17        A.   Yes.

18        MS. HUGGINS:   Form.

19

20   BY MR. FELLE:

21        Q.   And when you went back to discuss the

22   circumstances with Josue Ortiz on July 11th of

23   2012, had you come to the conclusion by that point
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
<div align="right">86</div>

1  that -- that Mr. Ortiz may not have been involved

2  in that crime?

3        MS. HUGGINS:  Form.

4        THE WITNESS:  No.

5

6  BY MR. FELLE:

7        Q.   You met with Mr. Ortiz next on or about

8  September 6th of 2012 and that was also at the U.S.

9  Attorney General's Office, do you recall that,

10  generally speaking?

11        MS. HUGGINS:  Wayne, just a correction on

12  the terminology, I believe it's the U.S. Attorneys

13  Office and the state investigators are the Attorney

14  General State Police Investigators.

15        MR. FELLE:  Oh, I thought it was called the

16  USAG office.

17        MS. HUGGINS:  Just the terminology.

18        MR. FELLE:  Okay, we know what we're talking

19  about.

20        MS. HUGGINS:  Yeah.

21        THE WITNESS:  I don't recall him coming back

22  to the U.S. Attorneys Office.  I thought we saw him

23  at that point at Attica, but I could be wrong.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

87

1   BY MR. FELLE:

2        **Q.**   Do you remember on or about that time

3   frame that Josue Ortiz was stating to you, and

4   probably Investigator Rondon, that he was innocent

5   of the crimes?

6        MS. HUGGINS:  Form.

7        THE WITNESS:  I am sorry, what date?

8

9   BY MR. FELLE:

10       **Q.**   Well, according to the summary, it's

11  9/3 of 2012, but -- but on or around that time

12  frame when you met with him at Attica and then when

13  you may have met with him at the U.S. Attorney

14  General, the attorney's office, do you recall him

15  being emphatic about the fact that he was innocent

16  of the crimes?

17       **A.**   He was -- he did not say that he was

18  innocent until the last time we met with him, which

19  was at Attica, whatever date that is, that's when

20  he said "I am innocent.".  "Okay, I am innocent."

21       **Q.**   And at that time, forget about the

22  exact time frame, but on or about that time when

23  you met with him at Attica and he told you he was

Case 23-352, Document 39, 06/23/2023, 3533142, Page104 of 251

A-1325

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

88

1  innocent, at that point of your review of the file,

2  was there any evidence that would corroborate that

3  Mr. Ortiz wasn't in fact involved in those murders?

4       MS. HUGGINS:  Form.  That he was in fact or

5  he was in fact not?

6       MR. FELLE:  That he was in fact involved in

7  those murders.

8       MS. HUGGINS:  Okay, same form objection.

9       THE WITNESS:  Can you repeat it, I am sorry?

10

11  BY MR. FELLE:

12       Q.   Sure.  So at that point in time, from

13  about June of 2011, now we're talking late summer,

14  into 2012, now you have had this case for about a

15  year, you analyze evidence, looking at witness

16  statements, also getting information related to the

17  investigation of the 7th Street Gang members

18  activities and you're putting together this case

19  surrounding the murders of the Camacho brothers on

20  November 11th of 2004, with respect to all that you

21  looked at, up to the point where you met with Mr.

22  Ortiz at the Attica Correctional Facility, he tells

23  you he's innocent, you now had a chance to look at

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
89

1   all of the information regarding the crime, did you

2   have any reason or any evidence that would suggest

3   that Mr. Ortiz committed that crime, other than the

4   purported confession from Detective Stambach?

5          MS. HUGGINS:  Form.

6          THE WITNESS:  No.

7

8   BY MR. FELLE:

9          Q.   At that time, was Detective -- excuse

10  me, was the U.S. Attorney Tripi, as he was

11  investigating that murder, we know that he came out

12  with an indictment on November 8th of 2012 against

13  the three individuals that we spoke about earlier,

14  correct?

15         A.   Correct.

16         Q.   And did your investigation lead him to

17  that superseding federal indictment?

18         MS. HUGGINS:  Form.

19         THE WITNESS:  I would have to say yes.

20

21  BY MR. FELLE:

22         Q.   When your investigation led to that

23  superseding indictment, it specifically did not

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

90

1  include any charges against Mr. Ortiz, correct?

2         MS. HUGGINS:  You're talking about -- I am

3  sorry, and this is just for clarification, you're

4  talking about the federal indictment.

5

6  BY MR. FELLE:

7         **Q.**  Three individuals were indicted for the

8  murder of the Camacho brothers on November 11th,

9  2004, correct?

10        **A.**  Correct.

11        **Q.**  And at that time, had you and the other

12 investigators made a determination that Mr. Ortiz

13 was not involved in those murders?

14        MS. HUGGINS:  Form.

15        THE WITNESS:  I want to say probably yes.  I

16 would qualify that to say, by saying we had a lot

17 of the pieces of the puzzle at that point, but not

18 all of them, if that makes sense.

19

20 BY MR. FELLE:

21        **Q.**  Sure.  I mean, the indictment was just

22 coming down on the three individuals --

23        **A.**  Yes.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

91

1      **Q.**   -- correct?

2      **A.**   Yes.

3      **Q.**   And so that investigation was -- was

4    still continuing?

5      **A.**   Yes.

6      **Q.**   You had a prosecution that you

7    continued to prepare for, correct?

8      **A.**   Yes.

9      MS. HUGGINS:   Form.

10

11   BY MR. FELLE:

12     **Q.**   Okay, but with respect to that decision

13   to bring a superseding indictment based on

14   everything that the grand jury had considered, Mr.

15   Ortiz, at that point, was essentially being

16   excluded from the commission of the crime, would

17   that be a fair statement?

18     MS. HUGGINS:   Form.

19     THE WITNESS:   Yeah, at that point we didn't

20   have a reason to believe that he was involved, but

21   like I said, we didn't have the complete puzzle,

22   picture, at that point when the indictment came

23   down.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

92

1   BY MR. FELLE:

2        Q.    Okay.  Now your synopsis indicates that

3   on the following day, so on November 8th of 2012,

4   the indictment comes down on the three individuals

5   we talked about, Misael Montalvo, Efrain Hidalgo

6   and Brandon Jonas, and they were indicted for the

7   murders of Nelson and Miguel Camacho, correct?

8        A.    Correct.

9        Q.    On the following day, November 9th of

10   2012, your synopsis indicates that the grand jury

11   minutes from the federal proceedings were turned

12   over to the Erie County District Attorney's Office?

13        A.    Okay.

14        Q.    Why?

15        A.    I don't know.

16        Q.    Were they turned over so that the Erie

17   County District Attorney's Office could look at the

18   conviction of Josue Ortiz for that same murder?

19        MS. HUGGINS:  Form.

20        THE WITNESS:  I don't know the exact

21   purpose.  I -- I don't know why that would have

22   been done at that point.

23

**MCCANN & MCCANN REPORTING**

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

93

1  BY MR. FELLE:

2        Q.    Let me ask you this, up to that time,

3  up to November 9th of 2012, you were working in

4  cooperation with other State U.S. Agents

5  surrounding that murder investigation, but you're

6  also a Buffalo Police Officer, did you share any of

7  the information, conclusions or opinions that that

8  team had arrived at, with anyone else in the City

9  of Buffalo and/or the Erie County District

10  Attorney's Office?

11        MS. HUGGINS:  Form.

12        THE WITNESS:  I don't recall specifically

13  relaying information to people about it.  I'm --

14

15  BY MR. FELLE:

16        Q.    Well, at some point, we just talked

17  about the idea that you and other members came to

18  the conclusion that Mr. Ortiz was not involved in

19  the murders of the Camacho brothers, correct?

20        MS. HUGGINS:  Form.

21        THE WITNESS:  At some point, yes.

22

23  BY MR. FELLE:

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
94

```
1          Q.   When you guys came to that conclusion,
2   was that before the federal indictment came down
3   for the three individuals we just named?
4          A.   I think so.
5          Q.   And when the team came to that
6   conclusion, did you share it with anyone within the
7   Erie County District Attorney's Office or the
8   Buffalo Police Department that there might be an
9   innocent man in jail?
10          MS. HUGGINS:  Form.
11          THE WITNESS:  I probably shared it with my
12   bosses, but I thought the U.S. Attorney's Office
13   was communicating with the DA's Office.
14
15   BY MR. FELLE:
16          Q.   Okay.  And did you know that to be the
17   case?
18          A.   I don't know it for a fact when that
19   communication took place between them.
20          Q.   And who specifically would you say,
21   supervisors, who specifically did you tell of those
22   conclusions?
23          A.   I -- well, probably Commissioner
```

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

95

1   Derenda.   Chief Dennis Richards.   I believe my

2   captain at time was Joe Gramaglia.   That would

3   probably be it.

4          **Q.**   Now you're aware that at some point

5   Josue Ortiz, through attorneys, brought a 440

6   motion, are you familiar with what that is?

7          **A.**   Yes.

8          **Q.**   It's a motion to vacate his conviction

9   and to secure his release, correct?

10         **A.**   Correct.

11         **Q.**   Now at the time that motion was filed,

12   did anyone from the Erie County District Attorney's

13   Office contact you to discuss with you the results

14   of your investigation?

15         **A.**   I know -- I don't recall the timing on

16   it, but I know I spoke with Jim Bargnesi about it,

17   he's a judge now, he was the Homicide Chief

18   Prosecutor, I think that's -- yeah.   Yeah, I think

19   that's who was it.   I am sorry about the vagueness.

20         **Q.**   That's okay, I know these things

21   happened a long time ago, I think you're doing a

22   great job, so I appreciate it.   Can you recall,

23   from a time frame standpoint, when it was that you

MS. EVANS   -   MR. FELLE   -   1/24/2019

96

1   talked to Mr. Bargnesi?

2        A.   Oh, I have no idea.

3        Q.   Was it after the motion had been filed?

4        A.   I don't recall.

5        Q.   Was it before Mr. Ortiz was released

6   from incarceration?

7        A.   It's likely, but I'm -- it's likely,

8   but I'm not positive, but I would probably guess

9   yes, it would have been before he was released.

10        Q.   Did -- did you ever appear as part of

11   the hearing in that matter?

12        A.   Yes.

13        Q.   Did you ever appear as a witness?

14        A.   Yes.

15        Q.   Did you give testimony in that case?

16        A.   Yes.

17        Q.   Do you recall approximately when that

18   was?

19        MR. FLYNN:   Just for clarification, what

20   case are you talking about, the 440 or the federal

21   case?

22        MR. FELLE:   440.

23        MR. FLYNN:   Thank you.

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

97

1  BY MR. FELLE:

2      **Q.**   I think you understand that?

3      **A.**   Yes.

4      MR. FLYNN: I was unclear.

5      THE WITNESS:  I don't know the exact date of

6  that.

7

8  BY MR. FELLE:

9      **Q.**   And did you give sworn testimony in

10  court?

11      **A.**   Yes.

12      **Q.**   Okay.  And at that point did you

13  testify that your investigation had led you and

14  maybe other team members to the conclusion that Mr.

15  Ortiz was not involved in the murders?

16      **A.**   No.

17      MS. HUGGINS:  Form.

18

19  BY MR. FELLE:

20      **Q.**   And prior to testifying in court, would

21  you have talked with then Chief Homicide Unit

22  District Attorney Jim Bargnesi?

23      **A.**   I believe -- I don't remember the exact

MS. EVANS  -  MR. FELLE  -  1/24/2019

98

1  date, but I would guess, yes, only because we had

2  the hearing and I believe the defense had called

3  me, Josue's attorney and ADA or Chief Bargnesi was

4  doing my cross.

5       Q.   Okay.  So again, we don't want you to

6  guess --

7       A.   Yeah, I'm sorry.

8       Q.   -- but based on kind of going through

9  this again in your mind, do you believe that it was

10 before that testimony that you met with Mr.

11 Bargnesi?  If you don't know, you don't --

12      A.   Yeah, I just don't recall.  I am sorry.

13      Q.   Other than the documentation that we

14 have talked about, the summary synopsis, any other

15 documentation that you brought with you, either to

16 the meeting with Mr. Bargnesi and/or to the

17 testimony that you gave in court?

18      A.   I don't think I brought anything to the

19 meeting with ADA Bargnesi and I don't believe I

20 brought anything to court.

21      Q.   Do you -- do you recall going to a

22 detention hearing regarding Josue Ortiz on December

23 12th of 2012?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
<div align="right">99</div>

1        **A.**    A detention hearing?

2        **Q.**    A little, it would have been a little

3   over a month after the U.S. Attorney's Office came

4   out with the superseding indictment?

5        **A.**    I don't -- I don't recall attending a

6   detention hearing for him, I don't think.

7        **Q.**    Do you recall at least being aware, if

8   you weren't physically present, were you aware that

9   federal prosecutor Joseph Tripi spoke at that

10  hearing?

11       MS. HUGGINS:   Form.   The detention hearing?

12       THE WITNESS:   The detention hearing?

13

14  BY MR. FELLE:

15       **Q.**    Right, at the detention hearing of

16  December 12th of 2012?

17       **A.**    Was that the -- that was the detention

18  hearing for Josue or was it for the others that

19  were indicted?

20       **Q.**    No, it was the detention hearing --

21       **A.**    For Josue?

22       **Q.**    -- for Josue with respect to his

23  incarceration?

A-1337

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

100

1          A.    I recall being at a hearing where AUSA

2    Tripi spoke, but I don't recall being at a hearing

3    for Josue as for a detention hearing.

4          Q.    At some point, subsequent to the U.S.

5    Attorney's Office coming down with the superseding

6    indictment, do you recall there being a press

7    release by the Attorney General Joseph Tripi?

8          A.    As to?

9          Q.    As to the superseding indictment and

10   about the -- the homicides themselves involving the

11   crime, do you recall there being press releases to

12   that extent?

13         A.    I recall there being a press release

14   announcing the indictment of Efrain Hidalgo,

15   Brandon Jonas and Misael Montalvo.

16         Q.    Okay.  And in addition to the press

17   release, I believe there were some -- some

18   third-party -- or media sources that were also

19   airing that on TV, correct?

20         A.    Correct.

21         Q.    And were you present when they

22   announced that at that press meeting?

23         A.    No.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

101

1        Q.    After the announcement of that

2    indictment for the three individuals, did that

3    essentially end your involvement in the

4    investigation of the 7th Street Gang's activities?

5        A.    I don't -- I want to say no, because

6    we're always investigating, even after people have

7    been arrested, we're still interviewing, and I

8    don't recall at what phase of the prosecution, if

9    you will, we were at when the Camacho brothers'

10   case was indicted.  So we could have been still

11   conducting some interviews, if -- I wouldn't say we

12   were finished until we're really done, when they're

13   all done.

14       Q.    This -- this gang, the 16th Street --

15   excuse me, the 7th Street Gang, roughly how many

16   members did it have?

17       A.    Twenty-two people were indicted from

18   the 7th Street Gang and Cheko's crew.

19       Q.    And Cheko was somewhat of a gang

20   leader?

21       A.    Yes.

22       Q.    The three individuals under that

23   indictment, are they still incarcerated?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

102

```
1          A.    Yes.

2          Q.    Have they been sentenced?

3          A.    I know -- I believe one.  I believe

4    Montalvo has not been sentenced.  I can't remember

5    if Brandon Jonas and Efrain Hidalgo have been

6    sentenced.  They could have been.

7          Q.    The motion to vacate the conviction of

8    Josue Ortiz, we talked about that before, that

9    motion was filed on April 23rd of 2013?

10         A.    Okay.

11         Q.    So that was roughly four, five months

12   after the superseding indictments were announced.

13         A.    Okay.

14         Q.    During the time that motion was

15   pending, it looks like it was opposed by the Erie

16   County District Attorney's until December 8th of

17   2014, during that time frame, did you make any

18   recommendations to the Erie County District

19   Attorney's Office that you found no merits in the

20   idea of keeping Mr. Ortiz incarcerated for that

21   crime?

22         MS. HUGGINS:  Form.

23         THE WITNESS:  I don't recall.
```

**MCCANN & MCCANN REPORTING**

A-1340

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

103

1  BY MR. FELLE:

2      **Q.**   Your testimony that you gave with

3  respect to that, I think you told us earlier, but

4  when you testified --

5      **A.**   Yes.

6      **Q.**   -- your conclusions were that Mr. Ortiz

7  did not commit that crime, correct?

8      **A.**   Yes.

9      MS. HUGGINS:   Form.

10

11  BY MR. FELLE:

12      **Q.**   And you would have reiterated that to

13  Mr. Bargnesi in your meeting with him?

14      MS. HUGGINS:   Form.

15      THE WITNESS:   It's -- at the point where I

16  spoke with ADA Bargnesi, I don't believe that we

17  had what I would term the final piece of the

18  puzzle, which would have been Efrain Hidalgo

19  cooperating and talking about the incident.   I

20  don't know if that makes sense.

21

22  BY MR. FELLE:

23      **Q.**   Well, I appreciate that that part of

A-1341

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

104

1  the puzzle was still outstanding --

2        **A.**   Yes.

3        **Q.**   -- but with respect to your opinions

4  and conclusions about the involvement of Mr. Ortiz,

5  at that point you had gotten to the point of

6  concluding that he was not involved in the murders,

7  correct?

8        MS. HUGGINS:  Form.

9        THE WITNESS:  Yes, we had nothing to suggest

10  that he did participate.

11

12  BY MR. FELLE:

13        **Q.**   So let me ask you this, I know you told

14  us you were called by the defense attorneys, the

15  motion at that time pending before Judge Fronczak

16  was a motion to release, basically vacate and

17  release Mr. Ortiz.  Was your position at that point

18  that he should be released?

19        MS. HUGGINS:  Form.  Her personal position?

20        MR. FELLE:  Yeah.  Yeah.  Her position.  She

21  testified.

22        MS. HUGGINS:  She was called as a witness.

23        MR. FELLE:  Correct.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

105

1        THE WITNESS:  She's not -- wasn't a party to

2  it.

3

4  BY MR. FELLE:

5        Q.   You can answer the question.

6        MS. HUGGINS:  Objection to form.  You can

7  answer to the extent you understand.

8        THE WITNESS:  Well, based on the -- that our

9  investigation didn't show that he did participate

10  in it, I would say I wouldn't oppose him, I

11  wouldn't oppose him being released because we had

12  no evidence to put him there and I don't know.

13

14  BY MR. FELLE:

15        Q.   When you met with Jim Bargnesi, did he

16  make you aware of any evidence that corroborated

17  any guilt on the part of Josue Ortiz, anything that

18  you were not aware of?

19        A.   No.

20        Q.   Did DA Bargnesi tell you that there was

21  any reason, particular reason, why they were

22  opposing the release of Mr. Ortiz at that time?

23        MS. HUGGINS:  Form.

Case 23-352, Document 39, 06/23/2023, 3533142, Page122 of 251

*MS. EVANS  -  MR. FELLE  -  1/24/2019*

106

1          THE WITNESS:  No.

2

3    BY MR. FELLE:

4          **Q.**    And so -- and you testified today

5    between the period of April 23rd of 2013 and

6    December 8th of 2014, you have no knowledge of any

7    merit as to why that motion would be opposed,

8    correct?

9          **A.**    I have no idea.

10          **Q.**    You have no knowledge of any merits as

11   to why that would be opposed, do you?

12          MS. HUGGINS: Form.

13          THE WITNESS:  Could you explain that?

14

15   BY MR. FELLE:

16          **Q.**    Correct.  That motion was pending for a

17   year and six months?

18          **A.**    Yes.

19          **Q.**    Eight months, excuse me, my math is

20   poor, and I am asking you, during that time frame

21   that the Erie County District Attorney's Office

22   opposed that motion --

23          **A.**    Okay.

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

107

```
 1        Q.   -- I am trying to find the basis for
 2   why they did that, and I am asking you if you had
 3   any knowledge of any merits that would support
 4   their opposition to that motion?
 5        MS. HUGGINS:  Form.
 6        THE WITNESS:  I don't.  I don't know.
 7
 8   BY MR. FELLE:
 9        Q.   Is that a yes or no, or you don't know,
10   because this is pertaining to your knowledge, did
11   you have any knowledge of any merit that would
12   support opposing that motion?
13        MS. HUGGINS:  Form.
14        THE WITNESS:  Can you define merit?
15
16   BY MR. FELLE:
17        Q.   Any evidence?
18        A.   I don't know why they -- I don't know
19   why the motion was opposed.  I have no idea.
20        Q.   And you had no reason to oppose it,
21   correct?
22        MS. HUGGINS:  Well, form.  I am going to
23   direct her not to answer that.  She's not an
```

A-1345

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

108

1    attorney.  She doesn't work for the -- she's not a

2    district attorney.  She's not a party to that.

3         MR. FELLE:  She's a detective.

4

5    BY MR. FELLE:

6         Q.   Were you aware of any evidence that

7    would support opposing that motion?

8         MS. HUGGINS:  Form.

9         THE WITNESS:  No, I wasn't.

10

11   BY MR. FELLE:

12        Q.   Since the exoneration of Josue Ortiz,

13   have any changes been made with the Buffalo Police

14   Department with respect to the interview of

15   suspects for a homicide?

16        A.   We -- we began recording suspect

17   interviews.  It's now the policy of the department.

18   And I don't know -- it's probably been going on, I

19   am guessing two or three years, so I don't know if

20   it started, not splitting hairs, right before or

21   after, and I don't know if that was a contributing

22   factor to them telling us that from now on we need

23   to wire up the room for recording, do you know what

**MCCANN & MCCANN REPORTING**

MS. EVANS   -   MR. FELLE   -   1/24/2019

109

1  I mean.

2      Q.   I do.

3      A.   Okay.

4      Q.   Not sure why that was -- why that

5  policy has changed, but it's now a policy?

6      A.   Yes.

7      Q.   Okay.  And do you recall back in

8  November of 2004, there was a Detective Vivian, do

9  you remember a Detective Vivian?

10     A.   Yes.

11     Q.   And he had an office in the Major

12 Crimes Unit?

13     A.   I don't specifically recall where he

14 would have been assigned at that time.

15     Q.   Let me ask you this, the interview

16 rooms at the Major Crimes Units, were those wired

17 for recording?

18     A.   I don't believe so.

19     Q.   Two-way mirrors?

20     A.   One of the rooms would have the two-way

21 mirror.  The others do not.

22     Q.   Would they just be closed wall rooms?

23     A.   The other rooms that you could use to

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

110

1  interview, each had a window.  All three -- all

2  three rooms had a window.  One had the mirror that

3  you could watch from the adjoining room.

4       **Q.**   Okay, so all -- all three rooms had the

5  ability to observe the person, the witness?

6       **A.**   Just the one.  Just the one room.  The

7  other two are just a small, probably ten-by-ten

8  windows from the outside, but were on the third

9  floor.

10      **Q.**   Okay.

11      **A.**   Door closes, nobody can watch.

12      **Q.**   Gotcha.

13      **A.**   You can probably listen, but you

14  couldn't see.

15      **Q.**   Got you, it's a solid door, no window

16  to the door?

17      **A.**   Correct.

18      **Q.**   Okay.  And were there recording devices

19  in those rooms, did you say?

20      **A.**   Well, there are now.

21      **Q.**   Okay.

22      **A.**   And we just moved to a new building, so

23  now all of our -- any room that we're using,

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
<div align="right">111</div>

 1  they're not completed yet, any room that we are

 2  using to interview a suspect in is automatically

 3  recorded.

 4       **Q.**    Okay.  Any other policy changes that

 5  have been made in the Buffalo Homicide Department

 6  with the respect to the interview of witnesses?

 7       **A.**    With regard to photo arrays, we now do

 8  the double blind --

 9       **Q.**    Okay.

10       **A.**    -- photo array procedure.

11       **Q.**    Okay.

12       **A.**    That probably has been about the same

13  time as we have been recording.  I can't be

14  specific on when we instituted which one, which

15  policy.

16       **Q.**    Okay.  Any other changes that you're

17  aware of?

18       **A.**    No.

19       **Q.**    Any changes -- strike that.  As a

20  result of the exoneration of Mr. Ortiz, has any

21  officer or detective of the Buffalo Police

22  Department been disciplined or reprimanded?

23       MS. HUGGINS:  Objection.  I am going to

<div align="center">**MCCANN & MCCANN REPORTING**</div>

*MS. EVANS   -   MR. FELLE   -   1/24/2019*
112

1   object on 50A grounds and direct her not to answer

2   that question.

3         MR. FELLE:   That's not a police privilege.

4   How could you -- how could you say it's a 50A?

5   Look it, we can take a break and we can call the

6   judge for clarification on it.   I think she can

7   answer the question.   If you want to preserve your

8   right, you can take it up with the judge again.

9   That wouldn't be privileged information.   You can

10  argue that if you wanted to, but I am certainly

11  entitled to ask if any of the police officers

12  involved in the arrest of an innocent man were

13  disciplined or --

14        MS. HUGGINS:   We can take a break and call

15  the judge.

16        MR. FELLE:   All right.

17

18   (Whereupon a recess was taken to call the judge.)

19

20        MR. FELLE:   Thank you, Detective, we

21  appreciate your patience.

22        THE WITNESS:   No problem.

23

**MCCANN & MCCANN REPORTING**

A-1350

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

113

1  BY MR. FELLE:

2      Q.    We did call the court and we spoke with

3  the Law Clerk of Judge Hudson, Jennifer Noah, we

4  did explain to her our varying positions and she

5  did agree with your attorney, and based on the

6  statutory privilege, we are going to respect the

7  objection, although she did say that I would be

8  protected to bring a motion to compel that

9  information at a later time if I felt I had a basis

10  to do that, okay.  So I am just going to move on

11  from that subject on to some other things, okay.

12  And I do think I am wrapping it up, so I should be

13  pretty quick.

14      A.    Okay.

15      Q.    With respect to your review and

16  investigation of the homicides of the Camacho

17  brothers, did you see various witness reports in

18  the file?

19      A.    Yes.

20      Q.    And did you see witness reports where a

21  caller to the homicide bureau on 11/12 of '04 gave

22  information and identified, Brandon, Cheko and Uda

23  as the perpetrators of the crime?

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

114

1            A.   Yes.

2            Q.   And other than Uda, who is the brother

3    of Misael, that caller gave the Buffalo Police

4    Department information that turned out to be

5    accurate and true?

6            MS. HUGGINS:  Form.

7

8    BY MR. FELLE:

9            Q.   Cheko and Brandon were perpetrators of

10   the murders, correct?

11           A.   Yes.

12           Q.   And the Buffalo Police Department had

13   that information as early as 11/12 of '04, correct?

14           A.   Yes.

15           Q.   When you reviewed the file, did you see

16   any follow-up on that information in the file?

17           MS. HUGGINS:  Form.

18

19   BY MR. FELLE:

20           Q.   Before the arrest of Mr. Ortiz?

21           A.   I don't recall.  There was a note in

22   the file with regard to I believe a relative of

23   Brandon Jonas with a potential address, but other

A-1352

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

115

1  than that, no, I believe Efrain's statement was --

2  went beyond that.  And I don't recall seeing any

3  documentation of Uda being interviewed by the

4  Buffalo Police Department.

5        **Q.**   Okay.  Did you also see a statement in

6  the file that was given on 11/11/ of '04, the date

7  of the murders was given to Detective Mary

8  Gugliuzza, G-U-G-L-I-U-Z-Z-A, by a Jeilyn,

9  J-E-I-L-Y-N, Rosario?

10        **A.**   Yes.

11        **Q.**   And did her statement to the detective

12  indicate that she -- she was asked if anybody

13  wanted to kill or hurt Nelson or Miguel Camacho,

14  correct?

15        **A.**   Correct.

16        **Q.**   And her response was, yes, Misael

17  Montalvo, correct?

18        MS. HUGGINS:  Form.

19        THE WITNESS:  Yes.

20

21  BY MR. FELLE:

22        **Q.**   Correct?  And that's information that

23  was in the investigation folder before the arrest

*MS. EVANS  -  MR. FELLE  -  1/24/2019*
116

1  of my client, correct?

2       **A.**   Yes.

3       MS. HUGGINS:  Form.

4

5  BY MR. FELLE:

6       **Q.**   And as we know, through your

7  investigation, Misael Montalvo was -- was convicted

8  as a perpetrator of this murder, correct?

9       MS. HUGGINS:  Form.

10      THE WITNESS:  I am not -- I am not sure of

11 his status right now.  I can't remember how it

12 worked out, because Montalvo had a drug charge and

13 I am sorry, I don't recall the disposition of his

14 case.

15

16 BY MR. FELLE:

17      **Q.**   Okay, but he was one of the people

18 included in the superseding indictment by Attorney

19 General Tripi --

20      **A.**   Yes.

21      **Q.**   -- as being a perpetrator of the

22 murder, correct?

23      **A.**   Yes.

**MCCANN & MCCANN REPORTING**

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

117

1        Q.   And again, the Buffalo Police

2   Department had that tip as early as November 11th

3   of 2004, correct?

4        MS. HUGGINS:   Form.

5        THE WITNESS:   The information from Jeilyn?

6

7   BY MR. FELLE:

8        Q.   Correct?

9        A.   Yes.

10        Q.   During your -- during the period of

11   time that you had been working on cold cases in the

12   Cold Case Department, how many cases have you been

13   involved in that resulted in the release of an

14   incarcerated person?

15        MS. HUGGINS:   Form and relevancy.   You can

16   answer if you understand it.

17        THE WITNESS:   Two.

18

19   BY MR. FELLE:

20        Q.   Mr. Ortiz being one?

21        A.   Yes.

22        Q.   Who was the other?

23        A.   The individual who was released is

*MS. EVANS   -   MR. FELLE   -   1/24/2019*

118

1  Jerome Thagard.

2         **Q.**   Can you spell that for us?

3         **A.**   Sure, J-E-R-O-M-E and T-H-A-G-A-R-D.

4         **Q.**   And when was Mr. Thagard released from

5  incarceration?

6         MS. HUGGINS:  Form and relevance.

7         THE WITNESS:  I would have to look it up.  I

8  am not sure.

9

10 BY MR. FELLE:

11        **Q.**   Was it before or after Mr. Ortiz?

12        **A.**   Oh, I don't know.  I don't know which

13 came first.

14        **Q.**   With respect to your work on the Cold

15 Case Squad, do you -- do you talk or work with any

16 other agencies with respect to your investigations?

17        **A.**   If need be, yes.

18        **Q.**   Poor question.  But let me ask you

19 this, at any time have you ever worked with the

20 Cardozo Law School Innocence Project with respect

21 to any of the people that -- that -- your cases

22 that you're reviewing?

23        **A.**   No.

*MS. EVANS   -   MS. HUGGINS   -   1/24/2019*
119

1        Q.    Are you familiar with Barry Scheck?

2        A.    Yes.

3        Q.    And are you familiar with the work

4   that's being done at the Innocence Project?

5        A.    Yes.

6        Q.    Have you ever been to one of their

7   summits, as they call them?

8        A.    No.

9        Q.    No.  Has any -- has that project ever

10  been involved in any other cases that you're

11  investigating or reviewing?

12       A.    No.

13       MR. FELLE:  That's all I have.

14       MS. HUGGINS:  I have three brief questions.

15

16  **EXAMINATION BY MS. HUGGINS:**

17       Q.    Do you know the order that documents

18  made it into the original homicide file at the time

19  that the original investigation was done?

20       A.    No.

21       Q.    Is your knowledge of the original

22  investigation limited to the documents you reviewed

23  later as part of the 7th Street Gang investigation?

**MCCANN & MCCANN REPORTING**

MS. EVANS  -  MR. FELLE  -  1/24/2019

120

1        A.   Yes.

2        MR. FELLE:  Object.

3

4   BY MS. HUGGINS:

5        Q.   And the investigation into the 7th

6   Street Gang, what agency directed your

7   investigative efforts during that time frame?

8        A.   I don't -- I don't -- I mean, it was

9   kind of like a collaborative effort and, I mean,

10  the U.S. Attorney's Office was in charge of it --

11       Q.   Okay.

12       A.   -- so therefore I guess the FBI.

13       MS. HUGGINS:  Okay, that's all of my

14  questions.  Thank you.

15       MR. FELLE:  Any questions, Mr. Flynn?

16       MR. FLYNN:  I do not have any questions for

17  Detective Evans.  Thank you for coming in.

18       THE WITNESS:  Thank you.

19

20  EXAMINATION BY MR. FELLE:

21       Q.   I have one question just based on your

22  attorney's question.  She insinuated that your

23  review of the homicide investigation into the

MCCANN & MCCANN REPORTING

A-1358

121

1  Nelson and Miguel Camacho murders was somehow

2  limited.  Did you have access to the full

3  investigation file from the Buffalo Police

4  Department?

5      **A.**  Yes.

6      MR. FELLE:  Okay, that's all I have.  Thank

7  you.

8

9  (Whereupon, the deposition concluded at 12:20 p.m.)

10          *       *       *

11

12

13

14

15

16

17

18

19

20

21

22

23

122

1  STATE OF NEW YORK)

2                          )  ss.

3  COUNTY OF ERIE    )

4

5

       I, Denise C. Burger, Notary Public, in and
6  for the County of Erie, State of New York, do
   hereby certify:
7

8       That the witness whose testimony appears
   hereinbefore was, before the commencement of their
9  testimony, duly sworn to testify the truth, the
   whole truth and nothing but the truth; that said
10 testimony was taken pursuant to notice at the time
   and place as herein set forth; that said testimony
11 was taken down by me and thereafter transcribed
   into typewriting, and I hereby certify that the
12 foregoing testimony is a full, true and correct
   transcription of my shorthand notes so taken.

13

14      I further certify that I am neither counsel
   for nor related to any party to said action, nor in
15 any way interested in the outcome thereof.

16

       IN WITNESS WHEREOF, I have hereunto
17 subscribed my name and affixed my seal this *10th*____
   day of __*March*_____, 2019.
18

19 _Denise C Burger_____

20 Denise C. Burger,
   Notary Public,
21 State of New York, County of Erie
   My commission expires 7/25/19

22

23

1

**'04** [3] - 113:21, 114:13, 115:6
**'94** [1] - 5:13

## 1

**1** [3] - 21:6, 22:1, 23:8
**1.3** [1] - 22:6
**10:00** [1] - 1:15
**10th** [1] - 15:21
**11/11** [1] - 115:6
**11/12** [1] - 113:21
**1112** [1] - 2:14
**1183** [1] - 58:2
**11th** [8] - 16:12, 27:6, 63:1, 85:1, 85:22, 88:20, 90:8, 117:2
**126292** [1] - 1:6
**12:20** [1] - 121:9
**12th** [2] - 98:23, 99:16
**142** [2] - 61:17, 61:20
**14202** [3] - 2:9, 2:15, 3:19
**14221** [1] - 2:2
**14th** [2] - 83:21, 84:8
**15** [1] - 22:4
**15th** [8] - 53:9, 53:18, 54:19, 55:2, 55:9, 56:16, 58:16, 63:12
**16th** [2] - 59:6, 101:14
**18** [1] - 8:6
**19** [1] - 5:4
**1994** [3] - 5:8, 7:3, 14:6

## 2

**2** [2] - 79:20, 80:12
**2001** [3] - 5:11, 7:11, 7:22
**2004** [15] - 8:18, 16:12, 20:5, 23:10, 27:6, 52:14, 53:9, 54:20, 56:16, 58:16, 63:1, 88:20, 90:9, 109:8, 117:3
**2006** [2] - 8:14, 9:14
**2007** [1] - 10:7
**2009** [4] - 10:12, 11:6, 12:19, 13:4
**2011** [11] - 42:15, 43:6, 43:23, 44:6, 45:2, 70:3, 81:10, 82:19, 83:21, 84:8, 88:13
**2012** [11] - 85:1, 85:23, 86:8, 87:11, 88:14, 89:12, 92:3, 92:10, 93:3, 98:23, 99:16

## 3

**300A** [1] - 2:8
**31** [1] - 1:11
**350** [1] - 2:9

## 4

**4** [3] - 25:21, 25:23, 28:23
**440** [3] - 95:5, 96:20, 96:22

## 5

**505-2700** [1] - 2:3
**50A** [3] - 16:7, 112:1, 112:4

## 6

**6** [4] - 54:17, 56:10, 57:23, 80:11
**6'5** [1] - 79:17
**6'6** [2] - 79:16, 80:1
**6024** [2] - 1:13, 2:2
**62** [2] - 6:2, 6:20
**68** [1] - 3:18
**6th** [1] - 86:8

## 7

**7/26/19** [1] - 122:21
**716** [3] - 2:3, 2:10, 2:15
**7th** [27] - 36:4, 36:10, 37:15, 39:5, 39:8, 39:13, 40:22, 41:13, 41:16, 46:4, 46:9, 46:19, 47:9, 47:12, 47:15, 59:21, 71:3, 74:13, 75:21, 76:9, 77:23, 88:17, 101:4, 101:15, 101:18, 119:23, 120:5

## 8

**851-4317** [1] - 2:15
**863-8437** [1] - 2:10
**8th** [4] - 89:12, 92:3, 102:16, 106:6

## 9

**9/3** [1] - 87:11
**9th** [2] - 92:9, 93:3

## A

**A.M** [1] - 1:15
**ability** [1] - 110:5
**able** [2] - 28:4, 42:23
**Academy** [1] - 6:19
**academy** [1] - 7:5
**access** [1] - 121:2
**according** [1] - 87:10
**accreditations** [3] - 7:19, 14:7, 14:20
**accurate** [2] - 29:20, 114:5
**acquired** [1] - 6:1
**action** [2] - 16:4, 122:14
**active** [3] - 48:23, 49:8, 50:3
**activities** [13] - 39:5, 39:8, 40:22, 46:4, 46:10, 46:19, 46:20, 47:10, 71:22, 72:9, 75:22, 88:18, 101:4
**activity** [8] - 11:14, 12:8, 12:13, 35:14, 35:18, 36:5, 37:15, 38:1, 71:3
**acts** [1] - 11:6
**actual** [2] - 48:19, 50:12
**ADA** [2] - 98:3, 98:19, 103:16
**add** [1] - 21:13
**added** [1] - 25:17
**addition** [6] - 20:5, 29:18, 34:8, 51:15, 77:5, 100:16
**address** [3] - 3:17, 12:22, 114:23
**adjoining** [1] - 110:3
**admitted** [1] - 53:19
**affect** [2] - 18:10, 18:11
**affixed** [1] - 122:17
**afterwards** [1] - 45:12
**agencies** [1] - 118:16
**agency** [1] - 120:6
**Agent** [2] - 47:23
**Agents** [1] - 93:4
**agents** [2] - 48:16, 77:3
**ago** [4] - 19:17, 30:1, 57:20, 95:21
**agree** [3] - 23:5, 26:18, 113:5

**ahead** [1] - 10:23
**airing** [1] - 100:19
**AK-47** [1] - 65:22
**albeit** [1] - 32:20
**allegedly** [1] - 43:1
**almost** [2] - 76:8, 84:23
**ambulance** [2] - 53:18, 55:15
**analysis** [1] - 83:6
**analyze** [1] - 88:15
**analyzed** [4] - 74:1, 80:17, 80:18, 82:5
**announce** [1] - 4:21
**announced** [2] - 100:22, 102:12
**announcement** [1] - 101:1
**announcements** [1] - 30:18
**announcing** [1] - 100:14
**answer** [22] - 4:20, 11:1, 12:1, 15:8, 27:7, 31:11, 33:1, 40:10, 42:11, 45:16, 45:17, 46:13, 54:4, 58:10, 74:18, 77:14, 105:5, 105:7, 107:23, 112:1, 112:7, 117:16
**answering** [2] - 15:7, 40:12
**apologize** [2] - 9:22, 45:23
**appear** [2] - 96:10, 96:13
**appearance** [1] - 55:2
**APPEARANCES** [1] - 2:1
**appeared** [1] - 55:22
**appreciate** [4] - 28:22, 95:22, 103:23, 112:21
**appreciated** [1] - 29:8
**April** [2] - 102:9, 106:5
**apt** [1] - 4:22
**area** [3] - 24:18, 35:10, 39:16
**argue** [1] - 112:10
**Aronica** [1] - 10:18
**array** [1] - 111:10
**arrays** [1] - 111:7
**arrest** [21] - 4:3, 17:3, 26:20, 42:15, 42:16, 43:6, 46:10, 46:23, 47:7, 47:18, 49:9, 49:12, 59:2, 62:14, 68:23, 82:6, 112:12, 114:20, 115:23

**arrested** [10] - 42:18, 50:10, 51:22, 58:19, 63:15, 64:9, 64:18, 65:6, 65:13, 101:7
**arresting** [2] - 64:1, 64:3
**arrived** [1] - 93:8
**Article** [1] - 1:11
**assaults** [1] - 23:16
**assert** [1] - 45:15
**assigned** [18] - 8:1, 9:1, 10:9, 10:13, 10:20, 11:7, 13:12, 14:2, 16:17, 17:22, 23:18, 23:21, 34:9, 34:10, 38:17, 77:16, 77:17, 109:14
**assignment** [3] - 9:16, 13:6, 13:7
**ASSISTANT** [2] - 2:7, 2:13
**assisted** [2] - 15:2, 77:3
**assisting** [1] - 47:14
**associated** [1] - 78:9
**associates** [1] - 41:22
**assumed** [1] - 49:11
**assuming** [1] - 38:15
**attempted** [1] - 11:20
**attended** [1] - 83:10
**attending** [1] - 99:5
**attention** [3] - 22:5, 36:7, 70:3
**Attica** [6] - 85:2, 86:23, 87:12, 87:19, 87:23, 88:22
**Attorney** [13] - 30:18, 36:15, 39:10, 41:2, 83:22, 84:9, 86:9, 86:13, 87:13, 89:10, 97:22, 100:7, 116:18
**ATTORNEY** [2] - 2:6, 2:7
**attorney** [6] - 4:17, 31:13, 98:3, 108:1, 108:2, 113:5
**Attorney's** [17] - 14:12, 15:3, 24:4, 25:8, 30:15, 92:12, 92:17, 93:10, 94:7, 94:12, 95:12, 99:3, 100:5, 102:16, 102:19, 106:21, 120:10
**attorney's** [2] - 87:14, 120:22
**attorneys** [5] - 3:5, 22:3, 32:15, 78:9, 95:5, 104:14
**Attorneys** [5] - 2:4,

2

2:11, 2:16, 86:12,
86:22
**Auburn** [2] - 81:11,
83:11
**audible** [1] - 4:13
**AUSA** [1] - 100:1
**author** [1] - 25:13
**authored** [1] - 26:8
**automatically** [1] -
111:2
**available** [1] - 83:7
**Avenue** [1] - 61:14
**average** [1] - 79:11
**award** [2] - 15:13,
15:17
**awarded** [2] - 15:4,
15:21
**awards** [3] - 14:7,
14:8, 14:21
**aware** [18] - 36:1,
39:3, 39:22, 41:20,
42:3, 44:4, 44:10,
65:20, 66:10, 69:18,
69:19, 95:4, 99:7,
99:8, 105:16,
105:18, 108:6,
111:17

**B**

**background** [1] - 5:23
**BALL** [1] - 2:12
**Ballroom** [1] - 5:15
**bank** [3] - 23:17, 24:2,
24:7
**Bar** [1] - 14:10
**Bargnesi** [8] - 95:16,
97:22, 98:3, 98:16,
98:19, 103:13,
103:16, 105:15,
105:20
**bargnesi** [2] - 96:1,
98:11
**Barry** [1] - 119:1
**bartending** [1] - 5:17
**based** [9] - 30:2, 58:7,
64:9, 71:1, 91:13,
98:8, 105:8, 113:5,
120:21
**basic** [1] - 26:12
**basis** [2] - 107:1,
113:9
**Bates** [1] - 58:2
**became** [5] - 7:11,
39:3, 39:22, 40:10,
75:18
**become** [3] - 13:19,
36:1, 40:23
**began** [1] - 108:16
**beginning** [2] - 12:23,

48:7
**behavior** [1] - 54:2
**between** [8] - 3:4,
11:15, 11:17, 13:2,
48:13, 59:8, 94:19,
106:5
**beyond** [1] - 115:2
**blt** [6] - 6:11, 6:12,
11:9, 21:8, 52:9,
76:17
**bizarre** [1] - 54:2
**blind** [1] - 111:8
**booked** [1] - 79:21
**booking** [1] - 5:16
**borders** [1] - 44:22
**bosses** [1] - 94:12
**Brandon** [12] - 35:23,
36:1, 36:2, 36:11,
36:22, 44:2, 92:6,
100:15, 102:5,
113:22, 114:9,
114:23
**Brandon's** [1] - 44:11
**break** [3] - 70:1,
112:5, 112:14
**Brian** [3] - 10:5, 10:16
**brief** [1] - 119:14
**briefly** [1] - 30:23
**bring** [4] - 31:1, 60:22,
91:13, 113:8
**broader** [1] - 40:15
**brother** [3] - 37:5,
72:2, 114:2
**brothers** [12] - 16:13,
30:20, 49:7, 49:10,
58:9, 73:12, 74:14,
85:14, 88:19, 90:8,
93:19, 113:17
**brothers'** [11] - 15:20,
35:2, 35:5, 42:14,
68:14, 75:1, 75:20,
76:8, 76:15, 82:21,
101:9
**brought** [8] - 36:6,
55:15, 59:17, 70:4,
95:5, 98:15, 98:18,
98:20
**budget** [1] - 8:7
**Buff** [1] - 6:7
**BUFFALO** [1] - 2:7
**Buffalo** [59] - 2:9,
2:15, 3:19, 5:1, 5:3,
5:6, 5:12, 7:2, 8:19,
9:7, 12:9, 13:13,
14:6, 16:2, 16:15,
17:7, 19:6, 19:9,
20:6, 20:13, 20:17,
20:18, 21:2, 21:8,
22:2, 23:6, 23:13,
26:1, 29:9, 32:20,

45:3, 45:9, 48:18,
48:19, 52:10, 53:3,
53:9, 53:10, 55:15,
56:23, 57:4, 57:7,
61:23, 62:12, 63:23,
72:14, 72:23, 73:2,
93:6, 93:9, 94:8,
108:13, 111:5,
111:21, 114:3,
114:12, 115:4,
117:1, 121:3
**buffalo.com** [1] - 2:16
**building** [1] - 110:22
**bureau** [2] - 18:8,
113:21
**Bureau** [2] - 9:12, 9:17
**Burger** [3] - 1:16,
122:5, 122:20
**burglaries** [2] - 23:15,
23:17
**BY** [123] - 2:1, 2:6,
2:13, 3:21, 11:4,
12:4, 14:17, 15:11,
16:10, 18:6, 18:20,
21:23, 22:14, 27:1,
27:10, 28:8, 28:21,
29:13, 30:10, 31:18,
33:5, 34:19, 36:21,
37:3, 38:13, 40:20,
43:5, 43:22, 44:21,
45:21, 46:17, 47:6,
48:11, 49:17, 52:3,
53:12, 53:23, 54:15,
55:6, 55:13, 55:20,
56:6, 56:20, 57:18,
58:15, 58:22, 59:15,
60:5, 60:15, 61:5,
62:7, 63:5, 63:21,
64:7, 64:17, 65:5,
65:19, 66:12, 67:4,
67:12, 68:1, 69:23,
70:23, 71:10, 72:6,
72:19, 73:19, 74:6,
74:17, 75:5, 75:16,
76:3, 78:5, 79:1,
79:13, 80:15, 81:1,
81:8, 82:9, 84:6,
85:20, 86:6, 87:1,
87:9, 88:11, 89:8,
89:21, 90:6, 90:20,
91:11, 92:1, 93:1,
93:15, 93:23, 94:15,
97:1, 97:8, 97:19,
99:14, 103:1,
103:11, 103:22,
104:12, 105:4,
105:14, 106:3,
106:15, 107:8,
107:16, 108:5,
108:11, 113:1,

114:8, 114:19,
115:21, 116:5,
116:16, 117:7,
117:19, 118:10,
119:16, 120:4,
120:20
**Byron** [1] - 25:2

**C**

**caller** [2] - 113:21,
114:3
**Camacho** [41] - 15:20,
16:13, 16:14, 26:2,
26:3, 27:6, 30:20,
32:9, 35:2, 35:4,
36:17, 38:6, 41:9,
42:10, 42:13, 43:3,
46:12, 49:6, 49:9,
58:9, 62:10, 68:14,
72:2, 72:10, 73:10,
73:12, 74:13, 74:23,
75:20, 76:8, 76:14,
82:21, 85:13, 88:19,
90:8, 92:7, 93:19,
101:9, 113:16,
115:13, 121:1
**Camachos** [1] - 35:6
**canvass** [1] - 51:8
**captain** [1] - 95:2
**Cardozo** [1] - 118:20
**career** [2] - 5:5, 14:21
**cartridge** [1] - 65:21
**Case** [15] - 10:9,
10:14, 10:19, 11:13,
12:21, 13:6, 14:2,
34:7, 38:18, 39:1,
46:2, 47:11, 77:20,
117:12, 118:15
**case** [44] - 12:12,
12:15, 14:23, 15:1,
15:2, 15:4, 15:5,
15:6, 15:20, 17:14,
25:7, 25:10, 27:22,
32:11, 32:23, 33:11,
34:8, 35:17, 36:10,
38:4, 38:8, 45:1,
47:17, 48:9, 59:4,
61:7, 64:10, 70:4,
70:18, 73:5, 73:10,
74:7, 77:20, 79:4,
79:8, 82:20, 88:14,
88:18, 94:17, 96:15,
96:20, 96:21,
101:10, 116:14
**cases** [14] - 10:20,
11:23, 13:3, 24:2,
65:21, 73:9, 77:16,
77:23, 78:2, 78:10,
117:11, 117:12,

118:21, 119:10
**coll** [1] - 43:10
**center** [1] - 61:15
**certain** [6] - 21:1,
28:18, 29:2, 39:17,
40:8
**certainly** [3] - 4:8,
28:22, 112:10
**certification** [1] - 3:7
**certifications** [2] -
6:23, 7:12
**certify** [3] - 122:6,
122:11, 122:14
**chance** [3] - 4:21,
22:15, 88:23
**change** [2] - 18:15,
40:18
**changed** [2] - 21:8,
109:5
**changes** [5] - 8:17,
108:13, 111:4,
111:16, 111:19
**Chapter** [1] - 22:4
**charge** [2] - 116:12,
120:10
**Charge** [1] - 22:5
**charged** [1] - 36:10
**charges** [1] - 90:1
**Charles** [1] - 10:17
**Cheko** [4] - 36:9,
101:19, 113:22,
114:9
**Cheko's** [2] - 36:12,
101:18
**chemistry** [1] - 6:11
**Chief** [3] - 95:17,
97:21, 98:3
**chief** [1] - 95:1
**circumstances** [4] -
4:2, 59:16, 60:22,
85:22
**city** [2] - 24:18, 24:21
**City** [5] - 2:14, 15:18,
21:8, 29:9, 93:8
**Civil** [1] - 1:12
**Claim** [1] - 1:6
**claimed** [2] - 42:16,
58:12
**CLAIMS** [1] - 1:2
**clarification** [4] - 33:2,
90:3, 96:19, 112:6
**clear** [7] - 16:11,
16:20, 26:7, 29:14,
37:22, 56:9, 67:15
**cleared** [12] - 49:9,
49:10, 49:21, 49:23,
50:6, 50:15, 66:14,
66:18, 66:22, 66:23,
67:6
**Clerk** [1] - 113:3

client [3] - 30:7, 60:17, 116:1
closed [1] - 109:22
closes [1] - 110:11
clue [1] - 41:20
Code [2] - 22:7, 22:19
codefendants [1] - 67:2
Cold [15] - 10:9, 10:14, 10:19, 11:13, 12:21, 13:6, 14:2, 34:7, 38:17, 39:1, 46:2, 47:11, 77:20, 117:12, 118:14
cold [13] - 11:23, 12:12, 12:15, 13:3, 13:6, 34:8, 35:17, 38:4, 38:8, 73:5, 78:1, 78:10, 117:11
collaborative [3] - 48:13, 75:9, 120:9
collaboratively [1] - 72:8
college [2] - 6:2, 6:21
column [1] - 66:23
coming [6] - 25:3, 64:2, 86:21, 90:22, 100:5, 120:17
commencement [1] - 122:8
commencing [1] - 1:14
commission [5] - 36:16, 41:12, 85:15, 91:16, 122:17
Commissioner [1] - 94:23
commissioner [8] - 11:13, 12:7, 12:22, 13:9, 13:15, 13:16, 13:20, 34:10
commit [1] - 103:7
committed [2] - 57:13, 89:3
communicating [1] - 94:13
communication [1] - 81:20, 94:19
community [1] - 61:15
companies [1] - 20:9
company [1] - 20:12
compel [1] - 113:8
complete [3] - 27:8, 27:12, 91:21
completed [1] - 111:1
completely [1] - 46:1
concerned [1] - 45:12
concluded [1] - 121:9
concluding [1] - 104:6
conclusion [10] -

39:23, 64:3, 71:4, 71:12, 75:18, 85:23, 93:18, 94:1, 94:6, 97:14
conclusions [4] - 93:7, 94:22, 103:6, 104:4
conduct [1] - 38:7
conducting [1] - 101:11
confession [5] - 60:11, 60:17, 64:11, 65:9, 89:4
confidentiality [4] - 29:23, 39:18, 39:19, 40:7
confuse [2] - 4:9, 57:21
confusing [1] - 4:7
connection [2] - 34:14, 34:15
connections [1] - 81:2
consider [2] - 75:14, 76:7
considered [1] - 91:14
constitutional [1] - 23:3
contact [2] - 62:11, 95:13
contacted [4] - 32:19, 32:22, 33:10, 57:4
content [2] - 33:22, 56:14
contents [3] - 41:1, 82:17, 84:1
context [1] - 35:1
continue [3] - 21:14, 50:20, 60:3
continued [1] - 91:7
continuing [1] - 91:4
contributed [2] - 77:9, 77:10
contributing [1] - 108:21
conversation [5] - 31:13, 57:10, 62:16, 68:21, 69:4
conversations [2] - 32:14, 69:5
convicted [4] - 36:15, 44:14, 81:4, 116:7
conviction [11] - 4:3, 26:20, 38:21, 39:4, 46:11, 46:23, 47:8, 47:18, 92:18, 95:8, 102:7
cooperating [1] - 103:19
cooperation [1] - 93:4
copy [1] - 2:2

CORPORATION [2] - 2:12, 2:13
Corporation [2] - 29:10, 33:15
correct [70] - 33:8, 36:3, 36:17, 36:22, 38:1, 38:19, 44:9, 46:6, 46:7, 51:23, 52:5, 55:23, 58:19, 61:3, 63:1, 63:7, 63:11, 63:12, 67:5, 70:5, 70:6, 70:7, 70:11, 70:12, 70:15, 70:16, 72:2, 72:3, 75:22, 75:23, 81:16, 81:17, 81:23, 82:1, 82:22, 83:8, 83:17, 89:14, 89:15, 90:1, 90:9, 90:10, 91:1, 91:7, 92:7, 92:8, 93:19, 95:9, 95:10, 100:19, 100:20, 103:7, 104:7, 104:23, 106:8, 106:16, 107:21, 110:17, 114:10, 114:13, 115:14, 115:15, 115:17, 115:22, 116:1, 116:8, 116:22, 117:3, 117:8, 122:12
correction [2] - 82:11, 86:11
Correctional [3] - 81:11, 83:11, 88:22
corroborate [1] - 88:2
corroborated [7] - 64:11, 65:16, 66:4, 66:5, 66:6, 66:7, 105:16
corroborating [2] - 64:21, 65:13
Counsel [4] - 24:7, 29:9, 29:10, 33:15
COUNSEL [2] - 2:12, 2:13
counsel [2] - 3:2, 122:14
COUNTY [1] - 122:3
County [11] - 14:10, 92:12, 92:17, 93:9, 94:7, 95:12, 102:16, 102:18, 106:21, 122:6, 122:21
couple [3] - 14:8, 25:6, 30:14
course [12] - 6:9, 21:3, 26:13, 26:19, 34:20, 37:14, 40:21, 51:4, 59:3, 68:2, 70:13,

85:11
COURT [1] - 1:2
Court [1] - 3:18
court [7] - 4:12, 4:13, 97:10, 97:20, 98:17, 98:20, 113:2
cousin [2] - 36:12, 36:13
create [1] - 29:4
created [1] - 29:11
creating [1] - 26:10
credits [3] - 6:2, 6:5, 6:21
crew [1] - 101:18
crime [25] - 18:22, 35:13, 40:1, 41:12, 43:8, 44:14, 51:2, 51:7, 64:23, 65:16, 65:22, 66:8, 73:14, 74:8, 80:21, 81:4, 85:16, 86:2, 89:1, 89:3, 91:16, 100:11, 102:21, 103:7, 113:23
Crimes [6] - 7:22, 9:6, 17:1, 18:9, 109:12, 109:16
crimes [9] - 8:1, 9:1, 10:21, 24:16, 34:11, 34:15, 41:8, 87:5, 87:16
criminal [5] - 12:13, 24:15, 44:4, 44:10, 44:18
cross [1] - 98:4
cut [1] - 8:7

**D**

DA [1] - 105:20
DA's [1] - 94:13
Daniel [1] - 13:11
date [7] - 15:15, 59:2, 87:7, 87:19, 97:5, 98:1, 115:6
dates [1] - 31:6
December [4] - 98:22, 99:16, 102:16, 106:6
deception [1] - 23:1
decision [1] - 91:12
Defendant [2] - 1:8, 2:11
defense [2] - 98:2, 104:14
define [1] - 107:14
degree [1] - 6:4
demeanor [1] - 55:2
demotions [1] - 16:4
Denise [3] - 1:15, 122:5, 122:20

Dennis [1] - 95:1
deny [1] - 58:8
department [2] - 18:8, 108:17
Department [38] - 2:14, 5:2, 5:6, 5:13, 7:3, 8:19, 9:7, 14:6, 16:3, 16:15, 17:8, 19:6, 19:10, 20:6, 20:14, 20:17, 20:18, 22:2, 26:2, 45:4, 45:9, 48:18, 48:20, 52:11, 53:4, 61:23, 63:23, 72:15, 94:8, 108:14, 111:5, 111:22, 114:4, 114:12, 115:4, 117:2, 117:12, 121:4
departmental [1] - 51:3
depose [1] - 30:4
deposition [2] - 32:16, 54:17, 121:9
depositions [1] - 33:23
deputy [2] - 13:16, 34:10
Derenda [2] - 13:11, 95:1
described [2] - 11:7, 79:10
detailed [1] - 14:3
details [1] - 42:21
Detective [56] - 3:22, 5:3, 9:4, 9:17, 9:19, 9:20, 9:21, 10:5, 10:16, 10:17, 12:15, 17:9, 17:12, 17:15, 19:8, 19:16, 19:23, 20:13, 29:15, 53:16, 54:19, 55:1, 55:8, 55:21, 56:7, 56:10, 56:17, 58:1, 58:8, 59:5, 59:9, 59:10, 59:18, 60:10, 60:23, 62:2, 62:17, 62:20, 63:9, 63:10, 63:15, 64:11, 65:3, 65:8, 68:4, 70:2, 89:4, 89:9, 109:8, 109:9, 112:20, 115:7, 120:17
detective [27] - 5:4, 5:10, 7:11, 7:13, 7:19, 7:21, 8:6, 8:20, 9:13, 12:16, 13:13, 13:22, 13:23, 14:1, 16:16, 18:10, 23:12, 24:14, 32:21, 40:3, 40:9, 57:8, 63:23,

108:3, 111:21, 115:11
**detectives** [9] - 8:7, 10:14, 17:12, 17:19, 23:14, 23:18, 51:8, 57:5, 62:12
**detention** [9] - 98:22, 99:1, 99:6, 99:11, 99:12, 99:15, 99:17, 99:20, 100:3
**determination** [1] - 90:12
**developmental** [1] - 33:16
**devices** [1] - 110:18
**different** [4] - 56:12, 56:15, 71:14, 76:5
**differentiation** [1] - 21:13
**direct** [2] - 107:23, 112:1
**directed** [1] - 120:6
**disciplinary** [1] - 16:4
**Disciplinary** [1] - 22:5
**disciplined** [2] - 111:22, 112:13
**discuss** [5] - 4:2, 32:22, 68:17, 85:21, 95:13
**discussed** [4] - 41:7, 44:23, 70:15, 76:12
**discussing** [1] - 83:5
**Discussion** [1] - 43:20
**discussion** [1] - 62:19
**disorder** [1] - 7:8
**disposition** [2] - 49:7, 116:13
**distinction** [1] - 73:22
**District** [25] - 8:5, 8:13, 9:2, 9:3, 16:19, 16:21, 18:13, 23:11, 23:12, 23:19, 23:22, 24:14, 24:19, 24:23, 52:22, 61:10, 92:12, 92:17, 93:9, 94:7, 95:12, 97:22, 102:16, 102:18, 106:21
**district** [3] - 23:14, 52:16, 108:2
**DNA** [6] - 74:15, 80:17, 80:20, 81:3, 82:12, 82:14
**DOA** [1] - 50:4
**document** [12] - 22:8, 25:16, 26:8, 26:11, 26:14, 27:12, 28:23, 29:1, 29:16, 57:22, 58:3, 62:11
**documentation** [4] -

51:7, 98:13, 98:15, 115:3
**documents** [11] - 25:4, 26:19, 27:3, 29:19, 29:22, 30:12, 32:3, 37:13, 70:17, 119:17, 119:22
**domestic** [1] - 7:8
**done** [8] - 25:7, 30:15, 82:14, 92:22, 101:12, 101:13, 119:4, 119:19
**door** [3] - 110:11, 110:15, 110:16
**double** [7] - 16:12, 32:8, 41:8, 42:9, 46:11, 62:9, 111:8
**down** [6] - 4:14, 15:18, 61:23, 90:22, 91:23, 92:4, 94:2, 100:5, 122:11
**Dr** [1] - 54:23
**drawn** [1] - 43:2
**drug** [1] - 116:12
**drugs** [2] - 43:11, 55:22
**duly** [2] - 3:13, 122:9
**during** [26] - 10:6, 14:21, 16:2, 17:7, 18:7, 36:4, 37:23, 40:21, 51:16, 51:20, 59:3, 65:2, 65:23, 68:2, 70:13, 73:11, 74:13, 75:7, 77:1, 85:10, 102:14, 102:17, 106:20, 117:10, 120:7
**duties** [2] - 21:3, 77:2
**duty** [1] - 22:22

**E**

**e-mail** [3] - 2:3, 2:10, 2:16
**early** [4] - 53:9, 114:13, 117:2
**earnest** [1] - 82:20
**east** [1] - 24:20
**eastbound** [1] - 24:21
**education** [2] - 5:23, 6:10
**educational** [1] - 5:22
**Edwin** [5] - 18:23, 19:2, 19:3, 19:19, 68:5
**effort** [2] - 48:13, 120:9
**efforts** [1] - 120:7
**Efrain** [6] - 36:8, 36:13, 37:4, 41:14,

41:17, 41:18, 41:20, 41:22, 44:3, 44:8, 51:2, 51:17, 92:5, 100:14, 102:5, 103:18
**Efrain's** [1] - 115:1
**eight** [1] - 106:19
**eighteen** [2] - 8:8, 8:11
**either** [5] - 24:3, 35:16, 39:9, 69:16, 98:15
**emphatic** [1] - 87:15
**employed** [1] - 5:3
**employment** [5] - 5:13, 17:7, 20:6, 20:7, 20:16
**encompass** [1] - 24:19
**encounter** [1] - 81:23
**encountered** [1] - 61:20
**end** [3] - 10:6, 25:17, 101:3
**Enforcement** [4] - 22:7, 22:19, 40:9, 45:15
**enforcement** [1] - 22:21
**entered** [1] - 3:1
**entire** [1] - 5:5
**entitled** [3] - 22:4, 26:1, 112:11
**entity** [1] - 9:12
**equality** [1] - 23:4
**Erie** [11] - 14:10, 92:12, 92:16, 93:9, 94:7, 95:12, 102:15, 102:18, 106:21, 122:6, 122:21
**ERIE** [1] - 122:3
**ESQ** [3] - 2:1, 2:6, 2:13
**essentially** [2] - 91:15, 101:3
**Ethics** [2] - 22:7, 22:19
**Evans** [4] - 2:16, 3:18, 3:22, 120:17
**EVANS** [1] - 1:11
**event** [1] - 80:3
**events** [1] - 56:15
**eventually** [1] - 78:22
**evidence** [22] - 32:11, 51:6, 64:10, 64:21, 65:14, 73:14, 74:8, 74:22, 78:17, 78:19, 80:16, 80:17, 80:20, 81:3, 82:5, 88:2, 88:15, 89:2, 105:12,

105:16, 107:17, 108:6
**evolved** [1] - 28:5
**exact** [6] - 59:2, 73:8, 87:22, 92:20, 97:5, 97:23
**exactly** [1] - 48:6
**Examination** [1] - 1:10
**EXAMINATION** [3] - 3:21, 119:16, 120:20
**examined** [1] - 3:13
**example** [3] - 7:15, 50:4, 79:2
**except** [1] - 3:8
**exchanged** [1] - 81:19
**excluded** [1] - 91:16
**exclusive** [1] - 72:21
**excuse** [7] - 18:23, 55:1, 80:11, 85:15, 89:9, 101:15, 106:19
**exhibit** [4] - 21:21, 22:16, 26:4, 80:10
**Exhibit** [1] - 21:6, 22:1, 23:8, 25:21, 25:23, 28:23, 54:17, 56:10, 57:23, 79:20
**exhibiting** [1] - 54:2
**exhibits** [1] - 21:10
**exist** [1] - 29:16
**existed** [1] - 83:1
**exoneration** [5] - 32:18, 33:6, 33:7, 108:12, 111:20
**expires** [1] - 122:21
**explain** [4] - 11:9, 49:3, 106:13, 113:4
**extent** [6] - 21:12, 31:12, 66:5, 85:12, 100:12, 105:7
**extracted** [1] - 27:21, 28:12
**eyewitness** [1] - 79:3
**eyewitnesses** [2] - 75:7, 80:5

**F**

**Facility** [3] - 81:11, 83:11, 88:22
**facility** [1] - 81:16
**fact** [6] - 49:20, 55:14, 81:22, 87:15, 88:3, 88:4, 88:5, 88:6, 94:18
**factor** [1] - 108:22
**fair** [17] - 15:14, 30:8, 32:1, 34:12, 42:8, 54:3, 60:2, 67:8, 74:3, 76:6, 77:13, 78:16, 80:6, 81:11,

84:22, 85:10, 91:17
**fairly** [1] - 26:17
**familiar** [4] - 37:4, 95:6, 119:1, 119:3
**familiarity** [1] - 45:8
**familiarize** [1] - 31:22
**family** [1] - 37:12
**far** [5] - 6:12, 44:13, 60:19, 60:20, 84:19
**fatal** [2] - 23:15, 23:16
**fault** [1] - 38:14
**FBI** [10] - 15:2, 15:4, 15:13, 24:4, 24:12, 47:22, 47:23, 77:3, 77:10, 120:12
**February** [2] - 5:4, 5:8
**federal** [7] - 76:13, 89:17, 90:4, 92:11, 94:2, 96:20, 99:9
**Felle** [2] - 1:13, 3:23
**fELLE** [1] - 73:19
**FELLE** [153] - 2:1, 2:1, 3:21, 11:4, 12:4, 14:17, 15:11, 16:8, 16:10, 18:3, 18:6, 18:20, 21:7, 21:12, 21:17, 21:20, 21:23, 22:14, 27:1, 27:10, 28:8, 28:21, 29:6, 29:13, 30:4, 30:8, 30:10, 31:18, 33:5, 34:19, 36:21, 37:3, 38:13, 39:19, 40:14, 40:17, 40:20, 43:5, 43:22, 44:21, 45:7, 45:21, 46:17, 47:6, 48:11, 49:17, 52:3, 53:1, 53:23, 54:7, 54:15, 54:23, 55:6, 55:13, 55:20, 56:4, 56:6, 56:20, 57:18, 58:15, 58:22, 59:15, 60:1, 60:5, 60:15, 61:5, 62:7, 63:5, 65:5, 65:19, 66:12, 67:4, 67:12, 68:1, 69:16, 69:18, 69:23, 70:23, 71:10, 72:6, 72:19, 74:6, 74:17, 75:5, 75:16, 76:3, 78:5, 79:1, 79:13, 80:11, 80:15, 81:1, 81:8, 82:9, 84:6, 85:20, 86:6, 86:15, 86:18, 87:1, 87:9, 88:6, 88:11, 89:8, 89:21, 90:6, 90:20, 91:11, 92:1, 93:1, 93:15, 93:23, 94:15,

96:22, 97:1, 97:8, 97:19, 99:14, 103:1, 103:11, 103:22, 104:12, 104:20, 104:23, 105:4, 105:14, 106:3, 106:15, 107:8, 107:16, 108:3, 108:5, 108:11, 112:3, 112:16, 112:20, 113:1, 114:8, 114:19, 115:21, 116:5, 116:16, 117:7, 117:19, 118:10, 119:13, 120:2, 120:15, 120:20, 121:6

**felonies** [1] - 96:22

**felt** [2] - 28:13, 113:9

**Ferry** [2] - 8:5, 24:20

**few** [1] - 25:17

**file** [46] - 32:8, 32:11, 35:3, 35:5, 43:3, 46:22, 48:7, 48:20, 48:22, 48:23, 49:4, 49:13, 50:13, 50:15, 50:19, 50:20, 50:23, 52:7, 52:13, 53:2, 62:8, 62:22, 63:1, 63:7, 64:9, 64:20, 66:13, 66:15, 66:17, 67:13, 67:15, 68:3, 70:7, 71:2, 72:15, 73:7, 74:23, 82:17, 88:1, 113:18, 114:15, 114:16, 114:22, 115:6, 119:18, 121:3

**filed** [3] - 95:11, 96:3, 102:9

**files** [3] - 72:21, 73:6, 82:20

**filing** [1] - 3:7

**Fillmore** [2] - 8:5, 24:20

**final** [1] - 103:17

**fine** [3] - 15:9, 21:11, 21:16

**finish** [1] - 67:22

**finished** [2] - 15:6, 101:12

**first** [15] - 3:13, 9:22, 21:21, 22:6, 22:20, 36:1, 42:9, 48:2, 50:13, 73:23, 81:9, 81:22, 82:16, 82:19, 118:13

**five** [5] - 7:6, 23:20, 72:8, 76:14, 102:11

**fledged** [1] - 78:13

**flip** [1] - 16:1

**floor** [1] - 110:9

**fluent** [1] - 6:13

**FLYNN** [5] - 2:6, 96:19, 96:23, 97:4, 120:16

**Flynn** [1] - 120:15

**focus** [2] - 72:21, 73:10

**foggy** [1] - 73:8

**folder** [1] - 115:23

**follow** [2] - 21:21, 114:16

**follow-up** [1] - 114:16

**following** [5] - 3:1, 41:5, 51:8, 92:3, 92:9

**follows** [1] - 3:14

**foot** [1] - 79:8

**force** [2] - 39:9, 72:23

**Force** [1] - 77:18

**forces** [1] - 23:23

**foregoing** [1] - 122:12

**forget** [1] - 87:21

**form** [103] - 3:9, 4:18, 10:23, 12:1, 18:18, 26:21, 27:7, 27:23, 28:14, 31:11, 33:1, 34:17, 36:19, 36:23, 38:7, 39:15, 42:11, 44:16, 45:10, 45:16, 46:13, 47:3, 48:5, 49:1, 52:1, 53:21, 54:4, 54:6, 55:3, 55:11, 55:17, 56:1, 56:12, 57:14, 58:10, 58:20, 59:12, 59:19, 60:13, 61:1, 62:5, 63:2, 63:18, 64:4, 64:13, 65:1, 65:17, 66:9, 66:19, 67:10, 70:19, 71:7, 72:4, 72:17, 73:15, 74:4, 74:10, 75:3, 75:11, 76:1, 77:21, 78:21, 79:9, 80:8, 80:22, 81:5, 82:7, 85:18, 86:3, 87:6, 88:4, 88:8, 89:5, 89:18, 90:14, 91:9, 91:18, 92:19, 93:11, 93:20, 94:10, 97:17, 99:11, 102:22, 103:9, 103:14, 104:8, 104:19, 105:6, 105:23, 106:12, 107:5, 107:13, 107:22, 108:8, 114:6, 114:17,

115:18, 116:3, 116:9, 117:4, 117:15, 118:6

**formal** [2] - 7:18, 68:9

**forms** [3] - 20:7, 52:7, 80:4

**forth** [1] - 122:10

**four** [5] - 5:21, 11:7, 70:10, 76:11, 102:11

**fourteen** [1] - 8:7

**frame** [10] - 9:10, 18:8, 31:23, 87:3, 87:12, 87:22, 95:23, 102:17, 106:20, 120:7

**fraud** [1] - 23:16

**FRIEDMAN** [1] - 56:12

**Fronczak** [1] - 56:12

**front** [1] - 28:23

**full** [4] - 37:7, 78:13, 121:2, 122:12

**full-fledged** [1] - 78:13

**function** [1] - 78:12

**fundamental** [1] - 22:22

## G

**G-A-L-L-E** [1] - 48:1

**gained** [2] - 41:2, 85:14

**Galle** [1] - 48:1

**Gang** [23] - 15:21, 36:5, 39:5, 39:14, 40:23, 41:13, 41:16, 46:4, 46:9, 46:19, 47:9, 47:12, 47:15, 59:21, 71:4, 75:21, 76:9, 78:1, 88:17, 101:15, 101:18, 119:23, 120:6

**gang** [15] - 11:14, 12:8, 14:4, 15:2, 24:15, 34:11, 34:14, 35:14, 35:18, 37:23, 71:3, 72:9, 73:9, 101:14, 101:19

**Gang's** [1] - 101:4

**gangs** [6] - 11:15, 11:17, 12:10, 12:22, 13:2, 71:22

**Gangs'** [2] - 37:15, 39:8

**garden** [1] - 24:7

**gauge** [1] - 77:11

**GENERAL** [2] - 2:6, 2:7

**General** [13] - 7:22, 24:4, 30:19, 45:15, 53:11, 55:15, 56:23,

57:4, 57:7, 86:14, 87:14, 100:7, 116:19

**general** [3] - 6:10, 42:22, 57:2

**General's** [7] - 15:14, 36:15, 39:10, 41:3, 83:22, 84:9, 86:9

**generally** [7] - 6:8, 24:19, 40:10, 50:23, 61:9, 76:20, 86:10

**generate** [2] - 27:15, 52:17

**generated** [2] - 25:6, 51:4

**generically** [1] - 78:8

**geographic** [1] - 42:22

**Geraldo** [2] - 47:21, 77:8

**Germain** [2] - 61:18, 61:20

**given** [6] - 20:18, 25:19, 30:3, 41:1, 115:6, 115:7

**glance** [1] - 21:19

**Golden** [1] - 5:15

**gotcha** [1] - 110:12

**government** [1] - 37:9

**graduate** [1] - 6:15

**Gramaglia** [1] - 95:2

**grand** [3] - 39:21, 91:14, 92:10

**gray** [2] - 35:10, 39:16

**great** [1] - 95:22

**greater** [1] - 19:22

**grounds** [1] - 112:1

**group** [2] - 17:11, 18:21

**guess** [8] - 24:5, 25:17, 35:9, 38:20, 76:7, 96:8, 98:1, 98:6, 120:12

**guessing** [1] - 108:19

**Gugliuzza** [1] - 115:8

**GUGLIUZZA** [1] - 115:8

**guilt** [2] - 65:16, 105:17

**guy** [1] - 68:21

**guys** [1] - 94:1

## H

**H-I-D-A-L-G-O** [1] - 37:8

**hairs** [1] - 108:20

**Hall** [1] - 2:14

**handle** [2] - 24:9, 24:10

**hard** [4] - 76:21, 77:7, 77:11

**hazmat** [1] - 7:9

**headquarters** [1] - 62:1

**hear** [2] - 45:11, 63:14

**hearing** [14] - 96:11, 98:2, 98:22, 99:1, 99:6, 99:10, 99:11, 99:12, 99:15, 99:18, 99:20, 100:1, 100:2, 100:3

**height** [2] - 79:11, 80:6

**hold** [2] - 1:11, 50:9

**help** [8] - 31:9, 32:16, 42:5, 55:7, 58:5, 61:12, 74:15, 74:21

**helpful** [2] - 75:11, 75:13

**helps** [1] - 74:18

**hereby** [3] - 3:4, 122:6, 122:11

**herein** [1] - 122:10

**hereinbefore** [1] - 122:8

**hereto** [1] - 3:5

**hereunto** [1] - 122:16

**Hidalgo** [17] - 36:8, 36:13, 37:8, 41:14, 41:17, 41:22, 42:1, 43:1, 44:3, 49:14, 51:3, 51:17, 92:5, 100:14, 102:5, 103:18

**HIDALGO** [1] - 36:14

**Hidalgo's** [2] - 37:5, 41:20

**high** [2] - 6:15, 6:18

**highest** [1] - 5:23

**history** [3] - 44:5, 44:11, 44:18

**hold** [2] - 5:14, 20:7

**home** [1] - 65:23

**Homicide** [12] - 8:15, 9:5, 9:12, 9:17, 11:12, 26:2, 49:5, 50:5, 52:19, 95:17, 97:21, 111:5

**homicide** [21] - 8:23, 9:13, 10:21, 11:2, 11:8, 11:19, 17:5, 18:8, 32:8, 32:12, 41:9, 42:10, 57:8, 68:14, 82:21, 85:13, 108:15, 113:21, 119:18, 120:23

**homicides** [16] - 11:16, 12:18, 16:12, 27:5, 38:5, 42:14, 46:12, 49:5, 50:4, 62:9, 72:2, 72:10,

73:13, 76:15, 100:10, 113:16
Hospital [3] - 53:11, 55:16, 56:23
hospital [1] - 54:11
hours [1] - 6:20
Hudson [1] - 113:3
HUGGINS [136] - 2:13, 10:23, 12:1, 14:13, 15:9, 16:6, 17:18, 18:1, 18:4, 18:18, 21:11, 21:16, 21:18, 22:10, 26:21, 27:7, 27:23, 28:14, 29:7, 29:20, 30:6, 31:11, 33:1, 34:17, 36:19, 36:23, 38:7, 39:15, 40:5, 40:15, 42:11, 43:16, 44:16, 45:5, 45:14, 46:13, 47:3, 48:5, 49:1, 52:1, 52:21, 53:21, 54:4, 54:21, 55:3, 55:11, 55:17, 56:1, 57:14, 58:10, 58:20, 59:12, 59:19, 60:13, 61:1, 62:5, 63:2, 63:18, 64:4, 64:13, 65:1, 65:17, 66:9, 66:19, 67:10, 67:22, 69:13, 69:17, 69:19, 70:19, 71:7, 72:4, 72:17, 73:15, 74:4, 74:10, 75:3, 75:11, 76:1, 77:21, 78:21, 79:9, 80:8, 80:10, 80:13, 80:22, 81:5, 82:7, 84:3, 85:18, 86:3, 86:11, 86:17, 86:20, 87:6, 88:4, 88:8, 89:5, 89:18, 90:2, 90:14, 91:9, 91:18, 92:19, 93:11, 93:20, 94:10, 97:17, 99:11, 102:22, 103:9, 103:14, 104:8, 104:19, 104:22, 105:6, 105:23, 106:12, 107:5, 107:13, 107:22, 108:8, 111:23, 112:14, 114:6, 114:17, 115:18, 116:3, 116:9, 117:4, 117:15, 118:6, 119:14, 119:16, 120:4, 120:13
hurt [1] - 115:13

**I**

Idea [7] - 45:19, 70:2, 93:17, 96:2, 102:20, 106:9, 107:19
Identified [2] - 82:23, 113:22
Important [6] - 28:13, 28:17, 40:2, 44:23, 45:7, 64:1
IN [1] - 122:16
Inactive [3] - 48:23, 49:2, 49:4
Incarcerated [3] - 101:23, 102:20, 117:14
Incarceration [3] - 96:6, 99:23, 118:5
Incident [3] - 43:1, 49:14, 103:19
Incidents [1] - 50:2
Include [6] - 11:16, 27:13, 28:17, 30:17, 31:12, 90:1
Included [6] - 10:21, 11:19, 15:2, 46:5, 78:1, 116:18
Including [2] - 62:12, 75:7
Inconsistencies [1] - 78:19
Independent [1] - 78:3
Indicate [5] - 51:5, 67:1, 81:9, 83:20, 115:12
indicated [5] - 56:7, 57:3, 66:17, 67:15, 67:18
Indicates [3] - 55:21, 92:2, 92:10
Indicating [1] - 57:11
Indicted [5] - 90:7, 92:6, 99:19, 101:10, 101:17
Indictment [16] - 30:19, 69:9, 89:12, 89:17, 89:23, 90:4, 90:21, 91:13, 91:22, 92:4, 94:2, 99:4, 100:6, 100:9, 100:14, 101:2, 101:23, 116:18
Indictments [1] - 102:12
Individual [7] - 42:16, 43:10, 43:12, 44:18, 57:6, 61:17, 117:23
Individuals [16] - 11:6, 36:9, 39:23, 44:2, 44:4, 45:2, 45:10,

46:5, 51:21, 89:13, 90:7, 90:22, 92:4, 94:3, 101:2, 101:22
influence [1] - 55:22
Informants [1] - 4:4
Information [25] - 27:3, 28:19, 30:3, 40:8, 42:12, 42:18, 44:1, 69:14, 71:2, 71:14, 71:21, 83:6, 85:14, 88:16, 89:1, 93:7, 93:13, 112:9, 113:9, 113:22, 114:4, 114:13, 114:16, 115:22, 117:5
Informed [1] - 61:16
initials [1] - 50:17
Innocence [2] - 118:20, 119:4
Innocent [9] - 22:23, 87:4, 87:15, 87:18, 87:20, 88:1, 88:23, 94:9, 112:12
Innocent." [1] - 87:20
Inside [1] - 65:22
Insinuated [1] - 120:22
Insofar [1] - 78:20
Instituted [1] - 111:14
Instruct [1] - 4:20
Intention [1] - 4:8
Interaction [2] - 54:10, 55:9
Interactions [1] - 53:3, 53:14, 63:12
Interested [1] - 122:15
Interrogation [1] - 7:16
Interrupt [2] - 17:19, 43:17
Interview [11] - 48:8, 83:10, 83:14, 84:12, 84:15, 85:8, 108:14, 109:15, 110:1, 111:2, 111:6
interviewed [4] - 48:8, 51:22, 85:1, 115:3
Interviewing [1] - 101:7
Interviews [3] - 41:21, 101:11, 108:17
Intimidation [1] - 23:2
Investigate [2] - 23:14, 34:11
Investigated [3] - 15:20, 17:14, 77:23
investigating [6] - 18:22, 27:4, 73:5, 89:11, 101:6, 119:11

Investigation [1] - 26:2
investigation [90] - 4:3, 11:16, 11:23, 14:4, 14:23, 15:4, 17:5, 20:11, 20:12, 26:13, 26:15, 28:3, 28:5, 32:22, 34:8, 34:21, 35:17, 35:18, 36:4, 36:7, 37:15, 37:23, 38:4, 38:8, 39:5, 39:7, 40:22, 41:1, 42:17, 45:1, 46:3, 46:9, 46:18, 47:9, 47:14, 51:5, 51:12, 51:16, 51:21, 59:10, 59:20, 59:22, 60:7, 60:8, 60:9, 60:18, 61:6, 62:13, 64:2, 65:14, 68:2, 70:14, 72:1, 72:10, 73:12, 74:13, 74:14, 74:23, 75:7, 75:19, 75:21, 76:8, 76:9, 77:1, 77:5, 78:1, 82:3, 82:6, 82:15, 83:3, 85:12, 88:17, 89:16, 89:22, 91:3, 93:5, 95:14, 97:13, 101:4, 105:9, 113:16, 115:23, 116:7, 119:19, 119:22, 119:23, 120:5, 120:23, 121:3
Investigations [6] - 11:8, 18:16, 52:18, 78:11, 78:13, 118:16
investigative [3] - 27:14, 51:5, 120:7
Investigator [10] - 33:12, 33:21, 34:2, 47:21, 47:22, 48:4, 76:22, 76:23, 77:15, 87:4
investigator [3] - 47:20, 83:13, 85:5
Investigators [1] - 86:14
Investigators [4] - 62:11, 84:20, 86:13, 90:12
involve [1] - 41:11
involved [37] - 12:13, 16:3, 24:11, 24:12, 24:15, 26:15, 32:21, 35:13, 39:9, 40:1, 40:10, 41:15, 41:19, 42:2, 46:2, 46:3, 47:19, 48:17, 49:14, 50:8, 62:13, 66:7,

76:12, 77:20, 78:10, 82:3, 86:1, 88:3, 88:6, 90:13, 91:20, 93:18, 97:15, 104:6, 112:12, 117:13, 119:10
involvement [11] - 14:22, 17:4, 32:20, 32:23, 33:11, 48:3, 59:10, 59:20, 60:18, 101:3, 104:4
involving [5] - 32:8, 39:20, 47:17, 70:4, 100:10
irrational [1] - 61:11
Issues [1] - 39:20
items [1] - 74:14
itself [1] - 50:23

**J**

Jail [2] - 49:22, 94:9
JAMES [1] - 2:5
January [1] - 1:15
Jason [1] - 48:1
Jeilyn [2] - 115:8, 117:5
JEILYN [1] - 115:9
Jennifer [1] - 113:3
Jerome [1] - 118:1
JEROME [1] - 118:3
Jim [3] - 95:16, 97:22, 105:15
job [1] - 95:22
Joe [1] - 95:2
joined [1] - 11:12
joint [2] - 23:22, 39:9
Jonas [10] - 35:23, 36:1, 36:2, 36:12, 36:22, 44:3, 92:6, 100:15, 102:5, 114:23
Jonathan [1] - 9:21
Joseph [3] - 30:18, 99:9, 100:7
Josh [3] - 47:22, 77:1, 77:9
JOSUE [1] - 1:4
Josue [44] - 4:4, 14:23, 17:4, 26:20, 34:22, 39:4, 46:11, 46:23, 47:8, 47:18, 53:4, 53:10, 59:17, 60:23, 61:20, 61:21, 62:14, 63:11, 64:8, 64:22, 65:9, 66:7, 70:4, 71:6, 72:15, 78:20, 80:21, 81:10, 81:23, 82:16, 84:7, 85:1, 85:22, 87:3,

92:18, 95:5, 98:22, 99:18, 99:21, 99:22, 100:3, 102:8, 105:17, 108:12
**Josue's** [2] - 50:1, 98:3
**judge** [5] - 95:17, 112:6, 112:8, 112:15, 112:18
**Judge** [3] - 9:20, 104:15, 113:3
**July** [4] - 83:20, 84:8, 85:1, 85:22
**June** [11] - 12:19, 13:4, 42:15, 43:6, 43:23, 44:6, 45:2, 70:3, 81:10, 82:19, 88:13
**jury** [2] - 39:21, 91:14, 92:10
**justice** [1] - 23:4

## K

**Keats** [3] - 47:22, 77:1, 77:9
**keep** [1] - 4:12
**keeping** [1] - 102:20
**kept** [1] - 15:15
**key** [2] - 28:2, 28:12
**kill** [1] - 115:13
**kind** [15] - 4:1, 5:13, 6:22, 7:3, 14:3, 24:11, 27:2, 27:17, 28:11, 30:23, 50:6, 76:5, 78:9, 98:8, 120:9
**knowledge** [10] - 45:18, 57:13, 58:9, 58:13, 106:6, 106:10, 107:3, 107:10, 107:11, 119:21
**known** [1] - 37:20

## L

**lab** [2] - 73:17, 74:15
**last** [8] - 4:11, 19:15, 19:18, 19:21, 19:23, 20:3, 33:12, 87:18
**late** [1] - 88:13
**Law** [10] - 1:12, 2:14, 14:10, 22:7, 22:18, 40:8, 45:15, 113:3, 118:20
**law** [1] - 22:21
**lead** [1] - 89:16
**leader** [1] - 101:20
**learn** [1] - 52:18

**learned** [1] - 42:1
**learning** [2] - 13:1, 71:23
**least** [1] - 99:7
**leave** [1] - 77:2
**leaves** [1] - 24:8
**led** [7] - 36:11, 39:23, 41:11, 60:22, 64:21, 89:22, 97:13
**left** [1] - 21:15
**less** [2] - 76:20, 77:8
**LETITIA** [1] - 2:5
**level** [2] - 5:23, 52:17
**liberty** [1] - 23:4
**licensure** [1] - 6:22
**Lieutenant** [1] - 62:20
**likely** [2] - 96:7
**limited** [2] - 119:22, 121:2
**line** [2] - 24:21, 49:11
**lines** [1] - 61:12
**Lisa** [1] - 10:17
**list** [3] - 49:5, 49:6, 50:2
**listed** [1] - 66:21
**listen** [3] - 60:1, 110:13
**lives** [1] - 22:23
**ll/12** [1] - 114:13
**Lobaugh** [9] - 53:16, 53:17, 54:19, 55:1, 55:21, 56:7, 56:10, 56:18, 61:13
**Lobaugh's** [1] - 55:8
**locally** [1] - 6:16
**locate** [1] - 42:23
**location** [3] - 42:22, 57:9, 61:19
**Lockwood** [1] - 25:2
**Lonergan** [8] - 17:12, 19:9, 19:16, 62:20, 63:10, 68:4
**look** [16] - 11:14, 12:8, 22:8, 26:3, 32:7, 32:11, 57:22, 59:1, 59:4, 70:9, 80:3, 82:20, 88:23, 92:17, 112:5, 118:7
**looked** [6] - 25:5, 31:4, 79:2, 82:4, 82:5, 88:21
**looking** [7] - 42:9, 49:13, 50:12, 56:8, 57:20, 73:7, 88:15
**looks** [1] - 102:15
**lowest** [1] - 8:7

## M

**M-I-N-O-R** [1] - 10:1

**MAEVE** [1] - 2:13
**mail** [3] - 2:3, 2:10, 2:16
**Main** [4] - 1:13, 2:2, 2:8, 2:9
**maintain** [3] - 8:18, 16:23, 50:20
**major** [2] - 10:21, 44:14
**Major** [6] - 7:22, 9:6, 17:1, 18:9, 109:11, 109:16
**male** [1] - 36:8
**Mallick** [1] - 10:6
**man** [2] - 94:9, 112:12
**mankind** [1] - 22:22
**manual** [2] - 20:19, 21:1, 22:3
**Mark** [7] - 17:9, 17:15, 20:13, 53:17, 54:19, 58:1, 60:10
**marked** [8] - 21:6, 25:20, 25:21, 25:23, 54:16, 57:23, 70:15, 79:20
**MARY** [1] - 1:11
**Mary** [3] - 2:16, 3:18, 115:7
**material** [1] - 36:11
**materials** [3] - 41:2, 64:2, 72:14
**math** [2] - 6:12, 106:19
**matter** [1] - 96:11
**mean** [12] - 16:20, 17:18, 28:15, 43:17, 72:22, 72:23, 73:1, 78:3, 90:21, 109:1, 120:8, 120:9
**measurements** [1] - 79:21
**media** [1] - 100:18
**meeting** [7] - 59:8, 82:16, 84:23, 98:16, 98:19, 100:22, 103:13
**member** [2] - 41:16, 48:17
**members** [14] - 39:14, 40:23, 41:7, 41:13, 46:4, 46:19, 47:9, 75:21, 76:11, 88:17, 93:17, 97:14, 116:10
**members'** [2] - 46:9, 72:9
**memory** [5] - 31:10, 54:20, 54:21, 55:7, 58:5
**memos** [1] - 51:3
**mentioned** [1] - 65:23

**Mercy** [1] - 6:19
**merged** [5] - 9:6, 18:9, 75:18, 75:20, 76:5
**merger** [1] - 18:17
**merit** [3] - 106:7, 107:11, 107:14
**merits** [3] - 102:19, 106:10, 107:3
**met** [14] - 3:23, 53:10, 53:17, 62:2, 81:15, 84:7, 86:7, 87:12, 87:13, 87:18, 87:23, 88:21, 98:10, 105:15
**mhuggins@city** [1] - 2:16
**mhuggins@city-buffalo.com** [1] - 2:16
**might** [6] - 20:2, 50:7, 52:12, 71:5, 73:23, 94:8
**Miguel** [14] - 16:14, 26:3, 27:6, 32:9, 35:7, 36:17, 38:5, 41:9, 42:10, 46:12, 62:10, 92:7, 115:13, 121:1
**Military** [2] - 61:14
**mind** [3] - 21:19, 42:14, 98:9
**Minor** [2] - 9:20, 10:1
**minutes** [1] - 92:11
**mirror** [2] - 109:21, 110:2
**mirrors** [1] - 109:19
**Misa** [1] - 37:20
**Misael** [9] - 37:19, 44:3, 44:12, 51:18, 92:5, 100:15, 114:3, 115:16, 116:7
**misspoke** [1] - 80:12
**modest** [1] - 14:14
**modesty** [1] - 14:18
**Montalvo** [9] - 37:19, 44:3, 51:18, 92:5, 100:15, 102:4, 115:17, 116:7, 116:12
**MONTALVO** [1] - 37:19
**month** [2] - 85:11, 99:3
**months** [8] - 7:6, 8:3, 8:6, 8:9, 8:11, 102:11, 106:17, 106:19
**morning** [1] - 3:22
**most** [2] - 4:17, 14:14
**mostly** [1] - 23:17
**motion** [17] - 95:6,

95:8, 95:11, 96:3, 102:7, 102:9, 102:14, 104:15, 104:16, 106:7, 106:16, 106:22, 107:4, 107:12, 107:19, 108:7, 113:8
**mount** [1] - 6:19
**move** [1] - 113:10
**moved** [5] - 12:14, 12:21, 110:22
**MR** [157] - 3:21, 11:4, 12:4, 14:17, 15:11, 16:8, 16:10, 18:3, 18:6, 18:20, 21:7, 21:12, 21:17, 21:20, 21:23, 22:14, 27:1, 27:10, 28:8, 28:21, 29:8, 29:13, 30:4, 30:8, 30:10, 31:18, 33:5, 34:19, 36:21, 37:3, 38:13, 39:19, 40:14, 40:17, 40:20, 43:5, 43:22, 44:21, 45:7, 45:21, 46:17, 47:6, 48:11, 49:17, 52:3, 53:1, 53:23, 54:7, 54:15, 54:23, 55:6, 55:13, 55:20, 56:4, 56:6, 56:12, 58:20, 57:18, 58:15, 58:22, 59:15, 60:1, 60:5, 60:15, 61:5, 62:7, 63:5, 63:21, 64:7, 64:17, 65:5, 65:19, 66:12, 67:4, 67:12, 68:1, 69:16, 69:18, 69:23, 70:23, 71:10, 72:6, 72:19, 73:19, 74:6, 74:17, 75:5, 75:16, 76:3, 78:5, 79:1, 79:13, 80:11, 80:15, 81:1, 81:8, 82:9, 84:6, 85:20, 86:6, 86:15, 86:18, 87:1, 87:9, 88:6, 88:11, 89:8, 89:21, 90:6, 90:20, 91:11, 92:1, 93:1, 93:15, 93:23, 94:15, 96:19, 96:22, 96:23, 97:1, 97:4, 97:8, 97:19, 99:14, 100:1, 103:11, 103:22, 104:12, 104:20, 104:23, 105:4, 105:14, 106:3, 106:15, 107:8, 107:16, 108:3, 108:5, 108:11, 112:3, 112:16,

112:20, 113:1,
114:8, 114:19,
115:21, 116:5,
116:16, 117:7,
117:19, 118:10,
119:13, 120:2,
120:15, 120:16,
120:20, 121:6
**MS** [133] - 10:23, 12:1,
14:13, 15:9, 16:6,
17:18, 18:1, 18:4,
18:18, 21:11, 21:16,
21:18, 22:10, 26:21,
27:7, 27:23, 28:14,
29:7, 29:20, 30:6,
31:11, 33:1, 34:17,
36:19, 36:23, 38:7,
39:15, 40:5, 40:15,
42:11, 43:16, 44:16,
45:5, 45:14, 46:13,
47:3, 48:5, 49:1,
52:1, 52:21, 53:21,
54:4, 54:21, 55:3,
55:11, 55:17, 57:14,
58:10, 58:20, 59:12,
59:19, 60:13, 61:1,
62:5, 63:2, 63:18,
64:4, 64:13, 65:1,
65:17, 66:9, 66:19,
67:10, 67:22, 69:13,
69:17, 69:19, 70:19,
71:7, 72:4, 72:17,
73:15, 74:4, 74:10,
75:3, 75:11, 76:1,
77:21, 78:21, 79:9,
80:8, 80:10, 80:13,
80:22, 81:5, 82:7,
84:3, 85:18, 86:3,
86:17, 86:20, 87:6,
88:4, 88:8, 89:5,
89:18, 90:2, 90:14,
91:9, 91:18, 92:19,
93:11, 93:20, 94:10,
97:17, 99:11,
102:22, 103:9,
103:14, 104:8,
104:19, 104:22,
105:6, 105:23,
106:12, 107:5,
107:13, 107:22,
108:8, 111:23,
112:14, 114:6,
114:17, 115:18,
116:3, 116:9, 117:4,
117:15, 118:6,
119:14, 119:16,
120:4, 120:13
**multiple** [1] - 17:21
**murder** [10] - 38:8,
51:9, 71:5, 71:15,
89:11, 90:8, 92:18,

93:5, 116:8, 116:22
**murdered** [1] - 35:7
**murders** [20] - 11:20,
12:23, 30:20, 36:16,
51:9, 57:13, 58:9,
75:1, 75:20, 88:3,
88:7, 88:19, 90:13,
92:7, 93:19, 97:15,
104:6, 114:10,
115:7, 121:1

# N

**name** [16] - 3:16, 3:22,
9:22, 34:21, 35:14,
35:23, 36:2, 36:6,
37:7, 37:9, 37:16,
37:19, 41:20, 43:14,
50:1, 122:17
**named** [2] - 36:8, 94:3
**names** [2] - 37:23,
50:17
**nature** [2] - 6:23, 43:7
**near** [1] - 80:5
**necessarily** [1] - 74:21
**need** [7] - 11:9, 16:1,
21:12, 33:2, 45:8,
108:22, 118:17
**needing** [1] - 61:12
**Nelson** [15] - 16:13,
18:22, 26:2, 27:5,
32:9, 35:6, 36:16,
38:5, 41:9, 42:10,
46:12, 62:9, 92:7,
115:13, 121:1
**never** [3] - 18:2, 24:10,
63:16
**NEW** [4] - 1:1, 1:7, 2:5,
122:1
**new** [2] - 43:23,
110:22
**New** [12] - 1:14, 2:2,
2:9, 2:15, 3:19,
15:18, 47:20, 47:21,
77:15, 78:14, 122:6,
122:21
**next** [5] - 60:21, 79:22,
84:7, 84:22, 86:7
**Niagara** [1] - 50:2
**nickname** [1] - 36:9
**Noah** [1] - 113:3
**nobody** [1] - 110:11
**non** [3] - 11:16, 23:15,
23:16
**none** [2] - 79:6, 80:4
**Noreen** [3] - 12:15,
13:13, 13:21
**normal** [1] - 13:7
**Notary** [1] - 1:16,
122:5, 122:20

**note** [2] - 24:8, 114:21
**notes** [3] - 14:19,
81:9, 122:12
**nothing** [3] - 32:4,
104:9, 122:9
**notice** [2] - 29:1,
122:10
**noticed** [1] - 66:15
**notification** [1] - 33:17
**notified** [3] - 33:14,
37:18, 38:18
**November** [19] - 8:17,
16:12, 20:5, 23:9,
27:6, 52:14, 53:9,
54:19, 56:15, 58:16,
63:1, 88:20, 89:12,
90:8, 92:3, 92:9,
90:3, 109:8, 117:2
**Number** [1] - 58:2
**number** [4] - 29:21,
35:5, 80:10, 80:11
**numerical** [1] - 21:15

# O

**oath** [1] - 3:6
**Object** [1] - 26:21
**object** [11] - 4:17,
4:18, 4:19, 16:6,
39:15, 40:5, 40:12,
45:5, 45:10, 112:1,
120:2
**objecting** [1] - 54:5
**objection** [6] - 45:16,
47:3, 88:8, 105:6,
111:23, 113:7
**objections** [1] - 3:8
**observe** [1] - 110:5
**obtain** [1] - 7:7
**obtained** [1] - 50:19
**obtaining** [1] - 71:3
**occasionally** [1] -
23:16
**occasions** [1] - 24:5
**occurred** [4] - 13:4,
16:13, 27:5, 50:2
**October** [2] - 8:14,
9:14
**OF** [7] - 1:1, 1:2, 1:7,
2:5, 122:1, 122:3
**Offense** [1] - 8:4
**offer** [1] - 25:9
**offered** [1] - 7:6
**office** [7] - 16:21,
16:23, 24:4, 76:13,
86:16, 87:14, 109:11
**Office** [26] - 1:12,
14:12, 15:3, 15:14,
25:8, 30:15, 36:16,
39:10, 41:3, 83:22,

84:9, 86:9, 86:13,
86:22, 92:12, 92:17,
93:10, 94:7, 94:12,
94:13, 95:13, 99:3,
100:5, 102:19,
106:21, 120:10
**OFFICE** [2] - 2:5, 2:7
**officer** [4] - 13:22,
22:21, 64:1, 111:21
**Officer** [9] - 18:22,
19:3, 19:19, 21:2,
23:6, 32:20, 68:5,
69:5, 93:6
**Officers** [2] - 53:10,
62:12
**officers** [8] - 14:14,
48:14, 56:22, 60:22,
61:10, 61:13, 61:19,
70:10, 112:11
**official** [1] - 16:14
**offshoot** [1] - 76:8
**often** [1] - 4:17
**older** [1] - 78:1
**once** [4] - 50:19,
62:10, 67:13, 68:7
**one** [27] - 8:9, 12:18,
14:9, 14:12, 14:14,
29:10, 36:9, 36:14,
40:6, 41:13, 50:6,
50:7, 50:8, 60:10,
64:14, 64:22, 76:6,
102:3, 109:20,
110:2, 110:6,
111:14, 116:17,
117:20, 119:6,
120:21
**ongoing** [2] - 18:16,
25:15
**open** [2] - 49:8
**opened** [1] - 60:6
**opinion** [2] - 54:1,
63:22
**opinions** [2] - 93:7,
104:3
**oppose** [3] - 105:10,
105:11, 107:20
**opposed** [7] - 24:7,
66:22, 102:15,
106:7, 106:11,
106:22, 107:19
**opposing** [3] - 105:22,
107:12, 108:7
**opposition** [1] - 107:4
**oppression** [1] - 23:1
**order** [4] - 21:15,
31:20, 39:19, 119:17
**orders** [2] - 39:18,
40:7
**original** [4] - 76:9,
119:18, 119:19,

119:21
**originally** [5] - 9:19,
48:8, 49:3, 71:8,
74:12
**ORTIZ** [1] - 1:4
**Ortiz** [75] - 4:4, 14:23,
15:6, 17:4, 26:20,
32:18, 33:8, 34:22,
39:4, 46:11, 47:1,
47:8, 47:18, 53:4,
53:10, 53:17, 55:2,
55:9, 57:12, 58:8,
58:18, 59:5, 59:9,
59:17, 60:11, 60:23,
61:20, 61:21, 62:14,
63:11, 63:16, 64:8,
64:22, 65:10, 65:15,
65:23, 66:7, 70:4,
71:6, 72:15, 78:20,
79:14, 79:20, 80:6,
80:21, 81:10, 81:23,
83:21, 84:8, 84:12,
85:1, 85:22, 86:1,
86:7, 87:3, 88:3,
89:3, 90:12, 92:18,
93:18, 95:5, 96:5,
97:15, 98:22, 102:8,
102:20, 103:6,
104:17, 105:17,
105:22, 108:12,
111:20, 114:20,
117:20, 118:11
**ortiz** [4] - 88:22, 90:1,
91:15, 104:4
**outcome** [1] - 122:15
**outlined** [2] - 53:14,
70:10
**outside** [9] - 13:6,
20:11, 20:13, 30:12,
32:1, 32:14, 34:2,
66:6, 110:8
**outstanding** [3] -
67:1, 67:2, 104:1
**overview** [2] - 4:1,
26:12
**own** [3] - 9:12, 20:9,
72:1
**owned** [1] - 20:12

# P

**P-73** [13] - 52:7, 54:9,
54:18, 56:8, 56:11,
56:14, 56:21, 57:11,
58:1, 58:7, 58:11,
59:1, 61:2
**P-73s** [1] - 51:3,
52:11, 52:13, 52:17,
53:13, 62:23, 63:9
**P.C** [2] - 1:13, 2:1

9

**p.m** [1] - 121:9
**P73s** [1] - 63:16
**page** [2] - 22:6, 58:2
**pages** [1] - 14:19
**Palmer** [1] - 47:23
**paragraph** [1] - 22:20
**paraphrased** [2] - 27:3, 27:17
**part** [20] - 15:12, 17:11, 18:21, 22:8, 38:9, 39:1, 39:4, 47:8, 47:10, 53:6, 60:7, 60:9, 65:14, 77:23, 83:2, 83:16, 96:10, 103:23, 105:17, 119:23
**partially** [2] - 66:22, 66:23
**participate** [3] - 24:6, 104:10, 105:9
**participated** [1] - 43:1
**particular** [8] - 9:1, 9:18, 16:17, 17:15, 77:16, 105:21
**parties** [1] - 3:5
**partner** [1] - 17:20
**partnered** [1] - 17:8
**partners** [1] - 17:23
**parts** [1] - 32:7
**party** [4] - 100:18, 105:1, 108:2, 122:14
**passing** [1] - 20:3
**past** [2] - 41:15, 42:2
**patience** [1] - 112:21
**Patrick** [1] - 9:20
**patrol** [2] - 8:8, 8:12
**pattern** [1] - 13:2
**PD** [2] - 72:23, 73:2
**peaceful** [1] - 23:2
**pending** [3] - 102:15, 104:15, 106:16
**people** [9] - 17:21, 48:8, 72:12, 76:14, 93:13, 101:6, 101:17, 116:17, 118:21
**percentage** [1] - 77:12
**period** [5] - 9:5, 9:8, 39:12, 106:5, 117:10
**perpetrator** [2] - 116:8, 118:21
**perpetrators** [14] - 30:19, 35:13, 64:22, 66:16, 67:19, 69:10, 71:5, 71:15, 75:8, 79:7, 80:5, 81:3, 113:23, 114:9
**person** [12] - 28:3, 42:17, 42:20, 49:22, 61:11, 61:16, 68:11,

68:12, 81:15, 110:5, 117:14
**personal** [3] - 45:18, 59:20, 104:19
**persons** [1] - 36:14
**pertaining** [5] - 32:12, 46:23, 62:9, 73:9, 107:10
**pertains** [1] - 52:11
**pertinent** [1] - 27:22
**phase** [1] - 101:8
**phone** [3] - 43:10, 68:11, 81:19
**photo** [1] - 111:7, 111:10
**photographs** [1] - 32:5
**photos** [1] - 51:1
**physical** [6] - 73:13, 74:8, 74:22, 78:17, 80:16, 82:4
**physically** [2] - 16:21, 99:8
**picked** [1] - 12:17
**picture** [2] - 79:20, 91:22
**piece** [2] - 45:23, 103:17
**pieces** [1] - 90:17
**Place** [1] - 2:8
**place** [5] - 10:11, 18:17, 38:21, 94:19, 122:10
**placed** [1] - 79:7
**Plaintiff** [2] - 1:5, 2:4
**played** [1] - 40:4
**playing** [1] - 34:6
**plays** [1] - 40:2
**plus** [2] - 23:20, 73:9
**point** [44] - 7:7, 10:8, 14:2, 15:5, 17:1, 18:13, 41:6, 42:3, 44:13, 45:22, 46:1, 46:8, 47:13, 47:16, 48:2, 51:20, 71:1, 71:11, 71:16, 75:18, 78:20, 80:21, 81:14, 81:18, 82:2, 85:23, 86:23, 88:1, 88:12, 88:21, 90:17, 91:15, 91:19, 91:22, 92:22, 93:16, 93:21, 95:4, 97:12, 100:4, 103:15, 104:5, 104:17
**pointed** [1] - 71:14
**pointers** [1] - 42:22
**pointing** [1] - 66:16
**points** [2] - 28:2, 28:15

**Police** [52] - 5:1, 5:3, 5:6, 5:12, 7:2, 8:19, 9:7, 13:14, 14:6, 16:2, 16:15, 17:8, 18:22, 19:2, 19:6, 19:9, 19:19, 20:6, 20:14, 20:17, 20:18, 21:2, 22:2, 23:6, 26:1, 32:20, 33:13, 45:3, 45:9, 47:20, 48:18, 48:19, 52:10, 53:4, 53:9, 61:23, 62:12, 63:23, 68:5, 69:5, 72:14, 77:3, 86:14, 93:6, 94:8, 108:13, 111:21, 114:3, 114:12, 115:4, 117:1, 121:3
**police** [9] - 7:5, 13:21, 14:14, 41:18, 56:22, 60:22, 61:10, 112:3, 112:11
**Policies** [3] - 20:18, 20:23, 22:2
**policies** [1] - 52:10
**policy** [6] - 52:15, 108:17, 109:5, 111:4, 111:15
**poor** [1] - 106:20, 118:18
**posed** [1] - 14:13
**position** [9] - 5:1, 7:4, 8:17, 8:18, 23:9, 73:1, 104:17, 104:19, 104:20
**positions** [1] - 113:4
**positive** [1] - 96:8
**possible** [1] - 64:5
**potential** [2] - 67:2, 114:23
**Practice** [1] - 1:12
**preliminary** [1] - 83:2
**prepare** [6] - 30:13, 31:20, 32:3, 32:16, 70:17, 91:7
**prepared** [2] - 54:19, 70:14
**present** [9] - 56:2, 61:17, 65:22, 84:11, 84:17, 84:19, 85:4, 99:8, 100:21
**presented** [3] - 39:21, 64:12, 83:22
**preserve** [3] - 4:18, 45:11, 112:7
**press** [13] - 25:6, 25:9, 30:14, 30:17, 31:4, 31:9, 31:20, 32:2, 100:6, 100:11, 100:13, 100:16,

100:22
**pretty** [1] - 113:13
**Prison** [1] - 85:2
**privilege** [3] - 45:15, 112:3, 113:6
**Privilege** [1] - 40:9
**privileged** [1] - 112:9
**privy** [2] - 40:23, 72:13
**probation** [1] - 43:11
**probe** [1] - 77:14
**problem** [2] - 21:20, 112:22
**procedure** [3] - 52:15, 52:18, 111:10
**Procedures** [3] - 20:19, 21:1, 22:3
**procedures** [1] - 52:10
**proceeded** [2] - 57:9, 61:19
**proceedings** [2] - 69:9, 92:11
**process** [1] - 78:16
**Project** [2] - 118:20, 119:4
**project** [1] - 119:9
**promoted** [4] - 5:9, 8:12, 47:17, 77:1
**prompt** [1] - 46:22
**prompted** [3] - 46:10, 54:10, 61:22
**property** [1] - 22:23
**prosecution** [2] - 91:6, 101:8
**prosecutions** [1] - 24:15
**Prosecutor** [1] - 95:18
**prosecutor** [1] - 99:9
**protect** [1] - 22:23
**protected** [2] - 28:18, 113:8
**provide** [3] - 26:12, 40:9, 40:13
**provided** [9] - 22:3, 25:10, 42:20, 59:5
**psychiatric** [1] - 54:2
**Public** [3] - 1:16, 122:5, 122:20
**pulled** [5] - 48:22, 49:3, 53:2, 62:8, 70:7
**pulling** [1] - 48:19
**purported** [4] - 60:11, 60:17, 64:11, 89:4
**purportedly** [1] - 59:5
**purports** [1] - 65:9
**purpose** [2] - 26:10, 92:21
**pursuant** [2] - 1:11, 122:10
**put** [3] - 28:1, 80:5,

105:12
**putting** [2] - 28:18, 88:18
**puzzle** [4] - 90:17, 91:21, 103:18, 104:1

**Q**

**qualify** [1] - 90:16
**quantify** [2] - 76:22, 77:7
**quasi** [1] - 34:6
**questioned** [3] - 41:16, 41:17, 41:19
**questions** [9] - 3:9, 4:6, 4:7, 5:1, 52:12, 119:14, 120:14, 120:15, 120:16
**quick** [2] - 21:19, 113:13

**R**

**re** [1] - 8:12
**re-promoted** [1] - 8:12
**read** [3] - 22:19, 49:11, 54:8
**reading** [1] - 61:2
**real** [2] - 35:13, 37:9
**really** [5] - 13:5, 17:22, 24:10, 82:19, 101:12
**reanalyze** [1] - 73:13
**reason** [7] - 15:12, 33:17, 89:2, 91:20, 105:21, 107:20
**reasons** [1] - 40:6
**receive** [1] - 6:22
**received** [9] - 6:21, 14:7, 14:21, 15:13, 33:16, 44:1, 61:11, 66:13
**recent** [1] - 12:23
**recess** [3] - 22:12, 69:21, 112:18
**recognize** [3] - 18:15, 53:8, 60:9
**recommendations** [1] - 102:18
**record** [10] - 3:17, 3:23, 16:11, 21:14, 26:7, 29:9, 29:14, 43:18, 43:20, 56:9
**recorded** [5] - 69:2, 83:14, 84:15, 85:8, 111:3
**recording** [5] - 108:16, 108:23, 109:17, 110:18, 111:13
**redacted** [5] - 25:20,

29:6, 29:15, 29:21, 43:14
**redacting** [1] - 29:5
**redactions** [4] - 29:2, 29:4, 29:11, 30:2
**Redmond** [1] - 10:17
**refer** [2] - 21:9, 35:4
**Referee** [1] - 3:6
**reference** [1] - 25:22
**referencing** [1] - 26:5
**referring** [5] - 25:13, 35:5, 35:6, 43:7, 75:12
**refers** [1] - 22:4
**refresh** [4] - 31:9, 55:7, 57:22, 58:5
**refreshes** [2] - 54:20, 54:21
**refreshing** [1] - 14:18
**regard** [7] - 25:7, 42:21, 49:13, 58:11, 71:23, 111:7, 114:22
**regarding** [4] - 68:13, 72:15, 89:1, 98:22
**Reggie** [2] - 9:20, 9:23
**REGIONAL** [1] - 2:7
**Reld** [1] - 7:15
**reiterated** [1] - 103:12
**related** [14] - 12:20, 24:16, 29:22, 34:11, 34:15, 35:16, 35:18, 36:11, 38:1, 41:6, 41:8, 46:11, 88:16, 122:14
**relation** [1] - 11:22
**relative** [2] - 70:18, 114:22
**relaying** [1] - 93:13
**release** [6] - 95:9, 100:7, 100:13, 100:17, 104:16, 104:17, 105:22, 117:13
**released** [6] - 96:5, 96:9, 104:18, 105:11, 117:23, 118:4
**releases** [9] - 25:7, 25:9, 30:14, 30:17, 31:4, 31:9, 31:20, 32:2, 100:11
**relevance** [1] - 118:6
**relevancy** [1] - 117:15
**remember** [9] - 14:11, 15:19, 31:6, 57:2, 87:2, 97:23, 102:4, 109:9, 116:11
**remembers** [1] - 68:18
**reopen** [3] - 46:10, 46:22, 47:17

**reopened** [1] - 85:12
**repeat** [4] - 26:22, 63:3, 84:4, 88:9
**report** [2] - 51:6, 58:8
**reporter** [1] - 4:13
**REPORTER** [1] - 3:16
**reporting** [1] - 52:7
**reports** [2] - 113:17, 113:20
**reprimanded** [1] - 111:22
**request** [3] - 12:21, 13:17, 45:17
**research** [1] - 13:1
**reserved** [1] - 3:9
**resides** [1] - 19:12
**respect** [28] - 10:19, 14:20, 18:16, 23:3, 24:2, 24:13, 25:12, 33:11, 39:7, 40:17, 44:1, 76:19, 77:15, 78:2, 78:19, 80:16, 88:20, 91:12, 99:22, 103:3, 104:3, 108:14, 111:6, 113:6, 113:15, 118:14, 118:16, 118:20
**respective** [1] - 3:5
**respond** [2] - 49:6, 50:5
**responded** [2] - 12:18, 61:13
**responding** [1] - 7:9
**response** [2] - 45:13, 115:16
**responses** [1] - 4:13
**responsibilities** [5] - 21:2, 23:12, 24:14, 47:10, 48:19
**responsibility** [1] - 23:6
**responsible** [1] - 50:9
**restaurants** [1] - 5:17
**result** [1] - 111:20
**resulted** [2] - 82:6, 117:13
**results** [1] - 95:13
**return** [1] - 77:2
**returned** [1] - 9:13
**reverted** [1] - 8:8
**review** [33] - 4:19, 11:22, 14:23, 22:15, 25:4, 26:20, 27:22, 29:19, 30:13, 32:3, 32:5, 35:2, 39:1, 45:8, 47:7, 53:3, 59:3, 64:9, 68:13, 68:23, 70:18, 70:21, 71:2, 72:1, 73:11,

75:19, 76:14, 77:20, 78:17, 83:3, 88:1, 113:15, 120:23
**reviewed** [10] - 26:19, 27:4, 58:11, 60:7, 61:6, 62:23, 64:20, 82:16, 114:15, 119:22
**reviewing** [10] - 12:12, 20:21, 27:4, 31:9, 31:20, 36:10, 48:7, 85:13, 118:22, 119:11
**Richards** [1] - 95:1
**rights** [1] - 23:3
**Road** [1] - 61:14
**robberies** [1] - 23:15
**robbery** [3] - 23:17, 24:2, 24:7
**role** [3] - 34:6, 40:2, 40:4
**Rondon** [1] - 33:13, 33:21, 34:2, 47:21, 48:4, 76:22, 77:8, 77:15, 83:13, 85:5, 87:4
**room** [6] - 84:21, 108:23, 110:3, 110:6, 110:23, 111:1
**rooms** [7] - 109:16, 109:20, 109:22, 109:23, 110:2, 110:4, 110:19
**Rosario** [1] - 115:9
**Ross** [3] - 10:5, 10:16
**roughly** [2] - 101:15, 102:11
**rule** [1] - 4:11
**Rules** [1] - 1:12

**S**

**Sadalka** [1] - 61:13
**Safe** [1] - 77:17
**safeguard** [1] - 22:22
**sake** [2] - 25:21, 29:9
**satisfy** [1] - 40:11
**saw** [9] - 19:21, 20:1, 49:20, 50:13, 63:6, 63:16, 66:14, 75:8, 86:22
**scanned** [1] - 30:23
**scanning** [1] - 50:1
**scene** [8] - 51:2, 51:7, 65:22, 73:14, 74:9, 78:17, 80:18, 80:21
**Scheck** [1] - 119:1
**school** [2] - 6:15, 6:18
**School** [2] - 7:16, 118:20

**scope** [2] - 40:15, 73:11
**Scott** [1] - 10:5
**seal** [1] - 122:17
**secondly** [1] - 40:8
**Section** [1] - 22:6
**section** [1] - 22:18
**secure** [1] - 95:9
**see** [16] - 14:18, 50:14, 52:6, 53:13, 59:9, 60:23, 64:1, 64:10, 64:21, 79:21, 110:14, 113:17, 113:20, 114:15, 115:5
**seeing** [3] - 50:1, 56:21, 115:2
**semantics** [1] - 40:18
**Senior** [2] - 47:22, 76:23
**seniority** [1] - 8:8
**sense** [8] - 28:6, 35:20, 40:16, 49:15, 57:3, 76:10, 90:18, 103:20
**sentenced** [3] - 102:2, 102:4, 102:6
**separate** [5] - 42:17, 46:3, 72:23, 75:12, 75:14
**separately** [1] - 34:10
**September** [1] - 86:8
**sergeant** [3] - 12:16, 23:20, 24:23
**Sergeant** [5] - 9:21, 17:12, 19:8, 19:16, 76:23
**serve** [1] - 22:22
**set** [1] - 122:10
**setting** [1] - 68:9
**seven** [1] - 79:3
**several** [1] - 50:3
**Sex** [1] - 8:3
**share** [2] - 93:6, 94:6
**shared** [3] - 26:14, 75:8, 94:11
**shootings** [1] - 23:15
**short** [3] - 22:12, 69:21, 70:1
**shortened** [1] - 37:12
**shorthand** [1] - 122:12
**show** [6] - 21:5, 25:23, 54:18, 58:1, 79:19, 105:9
**showing** [1] - 54:16
**shown** [1] - 24:8
**side** [5] - 9:17, 11:15, 12:8, 16:1, 24:20
**significance** [2] -

31:8, 31:19
**significant** [1] - 68:22
**signing** [1] - 3:6
**simply** [1] - 60:6
**simultaneously** [1] - 71:18
**situation** [1] - 7:9
**six** [2] - 79:8, 106:17
**slash** [2] - 74:13, 78:1
**small** [1] - 110:7
**sole** [1] - 73:10
**solid** [1] - 110:15
**someone** [3] - 24:8, 42:19, 50:8
**somewhat** [2] - 35:10, 101:19
**somewhere** [1] - 20:3
**sorry** [22] - 11:2, 12:6, 13:14, 14:11, 15:23, 26:23, 30:11, 38:11, 41:5, 44:8, 57:16, 63:3, 64:15, 67:7, 84:3, 87:7, 88:9, 90:3, 95:19, 98:7, 98:12, 116:13
**sort** [2] - 24:6, 61:15
**sources** [1] - 100:18
**south** [1] - 24:21
**Spanish** [2] - 6:12, 6:13
**speaking** [6] - 6:9, 24:19, 50:23, 76:20, 78:8, 86:10
**special** [2] - 7:12, 13:5
**Special** [2] - 47:23
**specific** [11] - 8:1, 9:10, 12:2, 12:20, 13:15, 17:20, 40:11, 41:4, 42:13, 57:15, 111:14
**specifically** [21] - 7:8, 14:3, 14:9, 15:1, 20:4, 22:4, 30:21, 30:22, 40:12, 44:17, 54:12, 68:16, 69:12, 74:12, 77:22, 84:18, 89:23, 93:12, 94:20, 94:21, 109:13
**spell** [1] - 118:2
**splitting** [1] - 108:20
**spoken** [1] - 33:9
**Squad** [9] - 8:15, 10:20, 11:12, 11:13, 13:7, 14:2, 34:7, 47:11, 118:15
**squad** [1] - 11:5
**ss** [1] - 122:2
**staff** [1] - 57:6
**Stambach** [20] - 9:4, 17:9, 17:15, 19:23,

20:13, 59:6, 59:9,
59:11, 59:18, 60:10,
60:23, 62:3, 62:17,
63:15, 64:12, 65:3,
65:8, 68:4, 89:4
**standpoint** [1] - 95:23
**start** [3] - 4:23, 5:7,
35:22
**started** [13] - 7:2, 7:21,
14:5, 34:5, 34:7,
38:3, 62:10, 66:14,
70:9, 76:4, 78:16,
82:20, 108:20
**starting** [3] - 5:12,
20:16, 22:1
**STATE** [4] - 1:1, 1:7,
2:5, 122:1
**State** [13] - 6:7, 33:13,
39:10, 47:20, 47:21,
77:3, 77:15, 78:13,
85:2, 86:14, 93:4,
122:6, 122:21
**state** [3] - 3:16, 76:13,
86:13
**statement** [20] - 15:14,
34:12, 51:2, 51:16,
51:18, 54:3, 59:4,
65:3, 66:1, 66:6,
69:2, 74:3, 76:6,
80:4, 80:7, 81:12,
91:17, 115:1, 115:5,
115:11
**statements** [7] - 51:1,
51:11, 75:6, 78:18,
79:3, 82:4, 88:16
**states** [1] - 56:10
**stating** [1] - 87:3
**Statler** [2] - 5:15, 5:20
**status** [1] - 116:11
**statutory** [1] - 113:6
**stem** [1] - 14:22
**step** [2] - 27:14, 40:6
**steps** [1] - 51:6
**still** [9] - 15:20, 19:5,
19:9, 91:4, 101:7,
101:10, 101:23,
104:1
**stipulated** [1] - 3:4
**stipulation** [1] - 39:20
**stipulations** [1] - 3:1
**stop** [1] - 43:9
**Street** [35] - 1:13, 2:2,
2:9, 3:18, 15:21,
24:22, 36:5, 36:10,
37:15, 39:5, 39:8,
39:14, 40:22, 41:13,
41:16, 46:4, 46:9,
46:19, 47:9, 47:12,
47:15, 50:3, 59:21,
71:4, 74:13, 75:21,

76:9, 78:1, 88:17,
101:4, 101:14,
101:15, 101:18,
119:23, 120:6
**Street/10th** [1] - 59:21
**Streets** [1] - 77:18
**strike** [3] - 39:2, 48:3,
111:19
**studies** [1] - 6:21
**study** [1] - 6:9
**stupid** [1] - 46:1
**subject** [1] - 113:11
**submitted** [2] - 74:14,
83:8
**subscribed** [1] -
122:17
**subsequent** [2] -
62:14, 100:4
**suggest** [2] - 89:2,
104:9
**suggesting** [1] - 39:2
**suicide** [1] - 50:4
**Suite** [1] - 2:8
**summary** [4] - 26:18,
27:19, 87:10, 98:14
**summer** [1] - 88:13
**summits** [1] - 119:7
**superseding** [8] -
89:17, 89:23, 91:13,
99:4, 100:5, 100:9,
102:12, 116:18
**supervisors** [1] -
94:21
**support** [3] - 107:3,
107:12, 108:7
**supposed** [2] - 24:9,
24:10
**surprise** [4] - 63:14,
63:17, 66:17, 66:20
**surprised** [1] - 67:9
**surrounding** [8] - 4:2,
38:5, 56:22, 69:9,
72:2, 82:21, 88:19,
93:5
**suspect** [3] - 65:15,
108:16, 111:2
**suspects** [1] - 108:15
**suspensions** [1] -
16:4
**sworn** [3] - 3:13, 97:9,
122:9
**synopsis** [16] - 25:5,
25:12, 25:13, 25:22,
26:17, 27:2, 29:18,
30:12, 32:2, 53:6,
70:14, 83:16, 83:19,
92:2, 92:10, 98:14
**Synopsis** [1] - 26:1

**T**

**T-H-A-G-A-R-D** [1] -
118:3
**tables** [1] - 5:17
**takeover** [1] - 24:6
**tall** [1] - 79:14
**task** [3] - 23:22, 39:9,
72:23
**Task** [1] - 77:18
**team** [8] - 12:17,
17:20, 48:17, 75:9,
93:8, 94:5, 97:14
**team's** [1] - 71:22
**ten** [2] - 110:7
**ten-by-ten** [1] - 110:7
**tenure** [1] - 16:2
**term** [1] - 103:17
**terminology** [3] -
17:19, 86:12, 86:17
**terms** [3] - 39:16,
69:13, 69:14
**tested** [1] - 66:2,
73:16, 74:12
**testified** [5] - 3:14,
4:12, 103:4, 104:21,
106:4
**testify** [3] - 56:2,
97:13, 122:9
**testifying** [1] - 97:20
**testimony** [14] - 9:3,
25:4, 34:3, 39:3,
96:15, 97:9, 98:10,
98:17, 103:2, 122:8,
122:9, 122:10,
122:10, 122:12
**testing** [1] - 82:14
**Thagard** [2] - 118:1,
118:4
**THE** [79] - 1:7, 2:5,
3:16, 3:18, 11:2,
12:2, 17:22, 18:2,
26:22, 27:8, 28:1,
28:15, 31:15, 37:1,
38:9, 42:12, 44:17,
45:19, 46:14, 48:6,
49:2, 52:23, 54:8,
55:4, 55:18, 56:17,
57:15, 58:12, 59:13,
59:23, 61:2, 63:3,
63:19, 64:5, 64:14,
65:2, 66:10, 66:20,
70:20, 71:8, 73:16,
74:11, 77:22, 78:22,
79:10, 80:9, 80:23,
81:6, 86:4, 86:21,
87:7, 88:9, 89:6,
89:19, 90:15, 91:19,
92:20, 93:12, 93:21,
94:11, 97:5, 99:12,

102:23, 103:15,
104:9, 105:1, 105:8,
106:1, 106:13,
107:6, 107:14,
108:9, 112:22,
115:19, 116:10,
117:5, 117:17,
118:7, 120:18
**themselves** [1] -
100:10
**thereafter** [1] - 122:11
**therefore** [1] - 120:12
**thereof** [1] - 122:15
**thinking** [1] - 38:20
**third** [2] - 100:18,
110:8
**third-party** [1] -
100:18
**Thomas** [1] - 47:23
**three** [10] - 3:10, 11:6,
19:17, 19:22, 31:5,
32:2, 41:7, 44:2,
44:4, 45:1, 45:9,
46:5, 48:14, 66:16,
67:18, 69:9, 79:7,
81:3, 89:13, 90:7,
90:22, 92:4, 94:3,
101:2, 101:22,
108:19, 110:1,
110:2, 110:4, 119:14
**throughout** [1] - 4:16
**Thursday** [1] - 1:14
**timeline** [1] - 73:8
**timing** [2] - 33:3,
95:15
**TIMOTHY** [2] - 2:6,
2:12
**Timothy.Flynn@ag.
ny.gov** [1] - 2:10
**tip** [1] - 117:2
**title** [2] - 16:14, 22:6
**today** [9] - 4:1, 4:9,
25:3, 30:13, 31:10,
31:21, 34:3, 39:3,
106:4
**today's** [1] - 32:16
**toes** [1] - 40:7
**together** [3] - 45:23,
77:19, 88:18
**took** [5] - 9:16, 18:17,
60:11, 60:17, 94:19
**Torres** [1] - 18:23,
19:2, 19:3, 19:19,
68:5, 69:6
**totally** [1] - 42:16
**Tower** [1] - 2:8
**traffic** [1] - 43:9
**trained** [1] - 7:5
**training** [2] - 7:4, 7:8
**transcribed** [1] -

122:11
**transcript** [1] - 3:7
**transcription** [1] -
122:12
**transferred** [2] - 8:4,
8:14
**translating** [1] - 68:19
**Trial** [1] - 1:10
**trial** [1] - 3:10
**trick** [2] - 4:9, 57:21
**trigger** [2] - 42:9,
42:14
**Tripl** [7] - 30:18,
84:19, 89:10, 99:9,
100:2, 100:7, 116:19
**true** [3] - 38:15, 114:5,
122:12
**truth** [3] - 122:9, 122:9
**try** [4] - 4:8, 31:22,
42:23, 48:7
**trying** [3] - 27:14,
45:23, 107:1
**turn** [1] - 22:5
**turned** [3] - 92:11,
92:16, 114:4
**TV** [1] - 100:19
**twenty** [1] - 101:17
**twenty-two** [1] -
101:17
**two** [27] - 8:3, 11:15,
11:17, 12:18, 12:20,
12:22, 13:2, 14:19,
29:23, 31:5, 32:1,
40:6, 58:2, 62:23,
63:9, 71:18, 75:12,
75:14, 78:5, 83:21,
101:17, 108:19,
109:19, 109:20,
**two-page** [1] - 58:2
**two-way** [2] - 109:19,
109:20
**typewriting** [1] -
122:11

**U**

**U-R-A-Y-O-A-N** [1] -
37:10
**U.S** [22] - 14:12, 15:3,
15:13, 24:4, 25:8,
30:15, 30:18, 36:15,
39:10, 41:2, 83:22,
84:8, 86:8, 86:12,
86:22, 87:13, 89:10,
93:4, 94:12, 99:3,
100:4, 120:10
**UB** [1] - 6:7
**Uda** [6] - 37:5, 37:8,
37:16, 113:22,

114:2, 115:3
UDA [1] - 37:8
ultimately [2] - 36:15, 81:4
un-redacted [1] - 29:15
unclear [1] - 97:4
under [11] - 16:6, 17:12, 22:6, 22:18, 39:17, 40:8, 55:22, 58:2, 59:16, 60:8, 101:22
understood [1] - 27:16
unfamiliar [1] - 28:3
Unit [14] - 7:22, 8:4, 9:6, 10:9, 10:14, 17:1, 18:9, 34:7, 38:18, 39:1, 46:3, 97:21, 109:12
unit [2] - 10:15, 16:18
Units [1] - 109:16
unsure [1] - 28:18
up [14] - 12:17, 21:21, 44:13, 45:2, 77:9, 82:2, 88:21, 93:2, 93:3, 108:23, 112:8, 113:12, 114:16, 118:7
USA [1] - 84:19
USAG [1] - 86:16
utilized [1] - 45:3

**V**

vacate [3] - 95:8, 102:7, 104:16
vague [1] - 42:13
vaguely [1] - 20:22
vagueness [1] - 95:19
variety [1] - 24:7
various [9] - 26:18, 29:22, 41:1, 52:6, 53:3, 53:13, 56:22, 78:10, 113:17
varying [1] - 113:4
Vaughn [3] - 58:1, 58:8, 63:10
version [4] - 25:19, 27:11, 27:17, 29:15
vicinity [1] - 61:14
video [1] - 51:10
violence [6] - 7:8, 11:17, 13:1, 23:2, 24:11, 24:16
violent [1] - 34:11
Vivian [2] - 109:8, 109:9
voice [1] - 4:13
vs [1] - 1:6

**W**

waiting [1] - 5:17
waived [2] - 3:6, 3:8
wall [1] - 109:22
Walsh [3] - 12:16, 13:13, 13:21
Walton [1] - 9:21
watch [2] - 110:3, 110:11
Wayne [5] - 1:13, 3:23, 17:18, 43:18, 86:11
WAYNE [2] - 2:1, 2:1
waynefelle@ waynefellelaw.com [1] - 2:3
weak [1] - 23:1
weddings [1] - 5:16
week [1] - 33:12
weeks [1] - 83:21
west [2] - 11:15, 12:8
WHEREOF [1] - 122:16
whole [1] - 122:9
William [1] - 24:22
Williamsville [2] - 1:14, 2:2
window [3] - 110:1, 110:2, 110:15
windows [1] - 110:8
wire [1] - 108:23
wired [1] - 109:16
wiretap [2] - 40:2, 40:13
wiretaps [2] - 39:13, 40:11
wish [1] - 6:14
WITNESS [77] - 3:18, 11:2, 12:2, 17:22, 18:2, 26:22, 27:8, 28:1, 28:15, 31:15, 37:1, 38:9, 42:12, 44:17, 45:19, 46:14, 48:6, 49:2, 52:23, 54:8, 55:4, 55:18, 56:17, 57:15, 58:12, 59:13, 59:23, 61:2, 63:3, 63:19, 64:5, 64:14, 65:2, 66:10, 66:20, 70:20, 71:8, 73:16, 74:11, 77:22, 78:22, 79:10, 80:9, 80:23, 81:6, 86:4, 86:21, 87:7, 88:9, 89:6, 89:19, 90:15, 91:19, 92:20, 93:12, 93:21, 94:11, 97:5, 99:12, 102:23, 103:15, 104:9, 105:1, 105:8, 106:1,

106:13, 107:6, 107:14, 108:9, 112:22, 115:19, 116:10, 117:5, 117:17, 118:7, 120:18, 122:16
witness [16] - 51:1, 51:11, 51:15, 56:1, 56:9, 69:15, 78:18, 80:4, 82:4, 88:15, 96:13, 104:22, 110:5, 113:17, 113:20, 122:8
witnesses [4] - 66:15, 67:16, 79:7, 111:6
wondering [1] - 12:11
word [1] - 50:14
wording [2] - 54:12, 57:16
worker [1] - 57:7
works [1] - 14:15
wrapping [1] - 113:12
written [3] - 54:9, 54:22, 81:19
wrote [2] - 50:14, 56:18

**Y**

year [7] - 10:4, 20:3, 84:23, 85:11, 88:15, 106:17
years [6] - 5:21, 19:17, 19:22, 29:23, 38:21, 108:19
yesterday [7] - 9:4, 14:19, 21:10, 21:15, 25:21, 52:12, 54:17
YORK [4] - 1:1, 1:7, 2:5, 122:1
York [12] - 1:14, 2:2, 2:9, 2:15, 3:19, 15:18, 47:20, 47:21, 77:15, 78:14, 122:6, 122:21

**CITY OF Buffalo Police Department**
**HOMICIDE SECTION**

1
2
3
4
5     **STATE OF NEW YORK)**
6     **COUNTY OF ERIE**    ) **SS**
7     **CITY OF BUFFALO**
8
9     **NAME OF PERSON: Carlos Osario**
10    **RACE/SEX: PR/M**
11    **AGE: 37**
12    **D/O/B: 9/29/67**
13    **ADDRESS: 863 Niagara St.**
14    **PHONE: 886- 0913**
15
16    The above named person being duly sworn, deposes and makes the following statement while in
17    the Buffalo Police Department Homicide Office. The questions are asked by Det. Michael F.
18    Root , and the statement is typewritten by Det. Michael F. Root. Police Officer John Garcia is
19    present and will interpret all questions and answers from English to Spanish.
20
21    Q. Can you read and wite English?
22    A. No.
23
24    Q. How far have you gone in school?
25    A. GED.
26
27    Q. Where were you on Thursday, November 11, 2004 at about 2130hrs?
28    A. On the porch of my house.
29
30    Q. What is the address?
31    A. 863 Niagara St.
32
33    Q. Were you with anyone else?
34    A. I was with Cano and my son.
35
36    Q. What were you three doing?
37    A. We were watching three men across the street. I thought they were going to kill me.
38
39    Q. Why did you think that?
40    A. Because I have some problems with some people.
41
42    Q. Can you tell me what you saw these three men do?
43    A. They were standing on the porch of an abandoned house across the street from me, for

| DATE: | 11/13/04 |
| FILE #: | 04-242 |
| CD #: | 04-3160879 |
| STARTED: | 1720hrs |

A-1372

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

**CITY OF Buffalo Police Department**
**HOMICIDE SECTION**



Page 2 - statement of Carlos Osario

A. All three were short, they were young. One was a B/M with cornrows and a zippered grey hoodie. The other B/M also had a gey hoodie, and he's got thick eyebrows a wide noise and big lips. The PR/M had on a black hoodie and black pants. He's brown skinned and has trimmed eyebrows.

Q. Have you seen any of these three men before?
A. The PR/M I see at the Barber Shop on Niagara, across the street from Shoreline. I also have seen him before on 10th St., between Virginia and Carolina Sts. Earlier in the day I saw him and one of the B/M's arguing with the brothers in front of Zip's. The other B/M, the one with the cornrows has been on my porch before.

Q. Do you know the B/M who hass been on your porch's name?
A. No, but I can find out. I know where the two B/M live.

Q. When was this B/M on your porch?
A. He was on my porch November 7th. I remember that date because I'm in a program at 291 Elm, and they gave me a pass that day.

Q. Why was he on your porch?
A. He always hangs out on the porch with other kids and smoke maihuana.

Q. Where do the two B/M's live?
A. One lives right across the street from me. Next door to the Tailor. It's a brown brick house with a white door. He lives upstairs. Thats the guy with the cornrows. The other B/M lives next to the Pizzaria, with his brother. It's a green house with two front doors. To get to his apartment, use the right side door and it's upstairs on the right.

Q. Who is Cano?
A. I' ll find out. I've known him since 2002.

Q. Was Cano with you the entire time you have described to me?
A. He was there the whole time.

Q. Do you know the two blonde PR/F that came out of the house?
A. I know them from seeing them around the nieghborhood.

Q. They came out of the house after the B/M and PR/M?
A. They came out screaming after the guys ran out and before the police came.

Q. Explain to me exactly where the two males went after exiting the house.
A. When the two males ran from the house, they ran across the street north and jumped

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1373

**CITY OF Buffalo Police Department**
**HOMICIDE SECTION**

1    page 3 - statement of Carlos Osario
2
3    A. No I didn't see anyone.
4
5    Q. Can you describe Tebo to me?
6    A. He's a Puerto Rican male-tall-white hair-light skin- about 38yoa.
7
8    Q. Is there anything else that you can tell me, to help in this investigation, that I havn't asked
9    you?
10    A. Nothing that I can think of.
11
12    Q. Is everything that you have told me in this statement the truth?
13    A. Yes.
14
15    Q. I am going to have Police Officer Garcia read this statement to you. If it is true and
16    accurate, will you sign it?
17    A. Yes.
18
19
20    Statement ended at 1920 hrs.
21
22    I understand that any false statements made herein are punishable as a class "A"
23    Misdemeanor, pursuant to Section 210.45 of the Penal Law of the State of New York.
24
25    Subscribed and verified under penalty of perjury.
26
27    Signed: _Carlos Osario_
28
29    Witness: DET. _Michael F. Root_
30
31    Sworn and subscribed to before me, this day _13TH_ of _NOVEMBER_, 19 _2004_
32
33    _Michael F. Root_      _12/04_
34    Commissioner of Deeds in and for the City of Buffalo, New York    My Commission expires
35
36
37
38
39
40
41
42
43



City of Buffalo
Department of Police
Major Crimes Unit

To:        Captain Mark Morgan
           Commander, Major Crimes Unit

From:      Michael A. Mordino Det
           Michael Acquino Det.

Date: 11-12-04
Subject. Double homicide at 879 Niagara Street, Lower apt.
Case#, 04-242
CD# 04-316-0879
Sir,
        Your writer Along with Det. Michael Acquino, returned to the scene at 879
Niagara Street. We assisted evidence and photo officers, and spoke to the victim's
brother Luis Camacho, and his sister, Luz Camacho 26 10th Street apt. #1, 603-
7422. Luis stated that his brother Flaco called him, and told him to come to the
house right away, because, something was happening, and Nelson was on the floor,
and he also told him to come armed. Luis stated that that he did not own a gun, and
did not bring one with him when he went to his brother's house. He further stated
that he and his brothers used drugs, but they did not sell drugs, just personal use.
At 1430hrs, the seen was released to the victim's sister, Luz Camacho, The door
was locked, and the keys were given to her.

                        Respectfully Submitted,
                        Michael A. Mordino Det.

                        Michael Acquino Det.



City of Police Buffalo – Department of
*Detective Division*

To:     Mark Morgan
        Captain / Major Crimes Unit

From:   Thomas M. Vivian
        Detective Sergeant / Major Crimes Unit

Subject: Homicide case #04-242, 242a

Date:       11/20/04

---

Attn: Lieut. Margaret Sack

Sir:

On 11/20/04 at 1745 hrs this writer did meet with Mr. Luis Comacho of 32 School St, telephone #'s 830-2659/578-4140 and Ms. Luz Camacho of 26 10th St, telephone # 603-7422, in the vicinity of 57 Elmwood Ave, Buffalo, NY. This writer was accompanied by Narcotics Detectives E. Neiman/M. Judge and Cheektowaga Police K-9 Officer John Doskocz.

Mr. and Ms. Camacho are relatives of both victims listed in this case. Ms. Camacho informs this officer that she is handling all legal affairs for her brother (victim) Nelson Camacho. This writer and Det J. Cook did locate a garage where Mr. Nelson Camacho did lease space. The garage owner, Mr. Paul Indelicato, of 639 W Delevan St, telephone #883-2139, suggests Nelson Camacho stores an automobile in his garage located behind 57 Elmwood Ave, on Derrout Alley. Mr. and Ms. Camacho did agree to allow this writer and accompanying officers permission to search any and all property in this leased space.

A "Permission to Search" application was signed by Ms. Camacho and Mr. Indelicato. Officers did conduct the search of Mr. Indelicato's garage and also a 2drsd, white Toyota, bearing NY registration CLZ-7216. Nothing of value or criminal liability was discovered. Officers did thank Mr. and Ms. Camacho and did advise same that this vehicle would not be needed to assist with our investigation.

Investigation to continue, this officer will keep you informed of any new developments.

Respectfully Submitted



BPO 31 (12-77)

**BUFFALO POLICE DEPARTMENT**
**BUFFALO, NEW YORK 14202**

# Permission to Search

26 10 ⅞ 5+

The undersigned, residing at: 32 School St, Buffalo, N.Y.

Telephone # 603-7422.

does hereby voluntarily authorize D/sgt Thomas N Vivian

and other officers he may designate to assist him, to search ~~my residence~~ (or
other real property) located at (Rented Garage) 57 Elmwood Ave, Rear
Buffalo, NY, ANy property therein - Derrout Alley

and my motor vehicle, namely my Toyota

(year)          (make)

bearing license plate number C LZ - 72 16 , of the State of

_____, presently parked or located at Rear of
57 Elmwood (Derraut Alley) Garage owner Paul Indelicato

and I further authorize said officers to remove from my residence, real estate
and/or motor vehicle, whatever documents, or items of property whatsoever
which they deem pertinent to their investigation, with the understanding that
said officers will give me a receipt for whatever is removed.

I am giving this written permission to these officers freely and voluntarily,
without any threats or promises having been made, and after having been
informed by said officer that I have a right to refuse this search and/or seizure.
Ms Luce Camacho is handling the estate of her deceased brother
Nelson Camacho

Luz Camacho

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1377



```
G207      0757
NYMV RVEH ABPD 2149
VEHCLZ7216
HEDR C01447 75187 413046-68
                        UFFALO NY
  PLATE CLZ7216  16    ERIE 14213  00 06
REG 10 06/08/05 06/09/03 306090007A 1000
INS      JT2RA44C2B0035408
    2DSD WH    G04    002610
BTCH PLATE            3060900000
BTCH CLIENT ID        0185018225
 >
```

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1378

P-73s

FILE NUMBER: 04-242    DATE: 11-11-04    VICTIM: Miguel A Nelson Camacho

| DATE | FROM | SUBJECT | DATE | FROM | SUBJECT |
|------|------|---------|------|------|---------|
| 11-11-04 | Westoff | Scene Camras | | | |
| 11-11-04 | Huntington | Inside scene | | | |
| 11-13-04 | Dr Bonill | Autopsy | | | |
| 11-12-04 | Salmon | Autopsy | | | |
| 11-12-04 | Cook | Pip Call | | | |
| 11-12-04 | Mordlar | Scene Release | | | |
| 11-13-04 | Root | Notice | | | |
| 11-12-04 | Root | Dura | | | |
| 11-12-04 | Root | Luis Camacho | | | |
| 11-13-04 | Gursia | Matthew Smith | | | |
| 11-13-04 | Gursia | Weapon | | | |
| 11-13-04 | Root | Carlo Ossario | | | |
| 11-15-04 | Dauber | Juctriano Family | | | |
| 11-15-04 | Vaughn | Bibl. General | | | |
| 11-16-04 | Cadletha | 142 Germain | | | |
| 11-16-04 | Judge | C. Osario | | | |
| 11-12-04 | Denton | Scene | | | |
| 11-12-04 | Widman | Evidence | | | |
| 11-15-04 | Nuthrob | Ossie Ortiz | | | |
| 11-16-04 | Hamburg | Value Letter | | | |
| 11-16-04 | Vaugh | Value Ortiz | | | |
| 11-17-04 | Vaughn | 142 Germain | | | |

City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

**To:** Captain Mark Morgan
Captain of the Major Crimes Unit

**Date:** 11/11/04

**From:** Det. Richard Wagstaff

MCU

**Subject:** MCU#04-242
Homicide Shooting Inv
Victims – Nelson Camacho
Miguel Camacho

**Attention:** Lt. Margaret Sack

Sir,

The Shift Leut contacted this writer at home. Stabler to respond to a double shooting at 879 Niagara Street. I responded to the scene and assisted MCU Detective Sergeant James Lonergan and Detective Mary Gugliuzza. Sgt. Lonergan informed me that there was another scene with possible evidence from the primary crime scene.

The second scene is located outside in the rear yard of 53 Massachusetts Street. 53 Massachusetts is located on the southwest corner of Massachusetts and Niagara Street. The yard is located between the rear of 53 Massachusetts and the north side of 886 Niagara Street. Observed on the ground, several feet south of the rear door of 53 Massachusetts is a blue color baseball bat. There is a walk path, west side of 53 Massachusetts, leading from the rear yard going to the front area of 53 Massachusetts.

The BPD Evidence and Photograph Unit was informed of this location and they process the scene. They will provide separate reports in regards their involvement in this case.

Conducted a canvass and interviewed several individuals.

Interviewed Steven Acevedo, ph# 602-1010 of 53 Massachusetts. He stated that he had just came home when he saw three guys and they had something in there hand. One had on a gray hoody and the other two had dark hoody on. He did not see their faces. This witness would not come down to the office at this time but he would when his available.

Interviewed Carmelo Mercado, ph#563-8524 of 97 Rhode Island. He stated that he was

Case 1:16-cv-00321-EAW-MJR    Document 78-6    Filed 07/03/20

A-1380

Spanish like. The ran down Massachusetts to 7th Street then towards Rhode Island Street.
This witness would not come down to the MCU office at this time.

Respectfully submitted,

Det. Richard Wagstaff
MCU

A-1381



Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1382

**CITY OF BUFFALO**
**DEPARTMENT OF POLICE**
**MAJOR CRIME UNIT**

**TO:** Capt. Mark Morgan    **SUBJECT:** MCU # 04-242
       Major Crime Unit      **DATE:** November 11, 2004

**FROM:** Det. Mary E. Gugliuzza    **VICTIM:** Miguel & Nelson Camacho
         Major Crime Unit

Sir,

On this date at approximately 2200 hours this writer did receive a call from Lt. Stabler, Shift officer regarding needing my assistance at a double shooting at 879 Niagara St. Upon arrival the scene, a house at above address, was taped in yellow tape. I did meet with Det/Sgt Lonergan, MCU and he apprised me of the situation. Det. Tom Balk, Photography, Paula Carducci and Jim Maroney from Evidence Unit were also on the scene. Lt. March and numerous officers from B & D-districts were on scene for crowd and traffic control. Prior to writing the scene, this writer did canvass the scene, along with Det Richard Wagstaff. He did accompany Det Maroney across the street regarding evidence in rear yard. Det. Wagstaff will cover his actions on his own P-73.

This writer did go to the upper apartment and spoke to the residents who were there during this homicide. They are Beverly and David Laborgne of 879 Niagara upper 885-5514. Also their 9-year-old daughter, Brenda was in the apartment. There was also a small Hispanic male approximately 2 yrs old who was there. The Laborgne's did not know the boys name. The boys female guardian had arrived on the scene with him, she was hysterical after finding out who was murdered and the Laborgne's took the boy upstairs to their apartment for warmth. It was learned later that the boy was at the scene with his aunt, Jeilyn Rosario. Later on in the evening this writer did bring boy downstairs to be re-united with his mother who came to the scene. This writer did interview the Laborgne's separately and decided that Beverly saw more than her husband. This writer did get a district car to take her downtown for a sworn statement.



47 have killed him. She stated Nelson and Montalvo were best friends and while she
48 was dating Nelson, Montalvo tried to kiss her and then ended up threatening to kill
49 Nelson. This occurred about a month ago. This writer had a district officer drive her
50 downtown for a statement. On the way, this writer advised the officer to drive by
51 Hudson St. and have her pick out the house where Montalvo lives; he also drives a
52 yellow car, according to Jeilyn. It was also learned from PO Gramaglia that the
53 brother of the victims was at the scene when 1st officers arrived. He was transported
54 downtown already. He was with his girlfriend when he pulled up to the scene, His
55 girlfriends name is Yvette Maldonado dob 8/24/72 of 32 School 578-4140. Luis
56 Camacho pulled up in a small car, parked inside inner perimeter NY Reg BEL-
57 6729. Also parked outside of house is NY Reg, CYW-7446.

58

59 The scene is a two-story, two family home, on the Northeast corner of Niagara St.
60 between Rhode Island and Massachusetts. There are stairs going up to the house.
61 The outer door was open, which leads you to the hallway. On the left is a door to
62 lead you to the upper apartment. To the right is a white metal door, which leads to
63 the lower apartment. This was kicked in from the outside. The doorframe on the
64 inside is noticeably damaged and the double deadbolt lock is damaged along with
65 the metal door, which has noticeable dent near the door handle. As you walk into
66 the lower apartment, there is a small hallway, to my right is a dining room area,
67 walking in hallway you see the back of the fireplace to my right. On the floor at the
68 rear of the fireplace is Evidence Marker #2. This is for a gold chain that appears
69 broken. Walking in an eastern direction in the hallway past the dining room on the
70 right is a small living room area. This consists of a futon couch to my left, a small
71 couch on my right, a larger couch on the south wall of apartment, a glass table with
72 the glass top tipped on side of table, a large entertainment center with TV which is
73 turned on. There is what appears to be brain matter/flesh on the small couch back
74 area. In this living room past the coffee table to the left is a body of a white male.
75 This white male is deceased; he is face up, wearing white t-shirt, blue shorts, white
76 socks and no shoes. His head is facing north, feet south. His right arm is to his side;
77 left arm is crooked touching his left shoulder. He has obvious gunshot wound to the
78 face and left bicep. Evidence Marker (EM) #3 is TV remote, #4 is a drinking glass,
79 #5 cell phone, #6 Pepsi can, #7 gray remote, # Cheetos bag, all these items located
80 between the large couch and coffee table. EM# 9 is a nickel-plated handgun, small
81 caliber. This is located next to body #1 in living room area. On the carpet is what
82 appears to be brain matter, large red stain just west of victim's head. According to
83 the brother, Luis Comacho, who was the first inside house and discovered bodies,
84 stated that he did roll his brother over. This accounts for the large red stain area in
85 different location as victim's head.

86

87 Evidence marker (EM) #10 is a large cal. Bullet casing found to the right of



Located on living floor next to victim #1 was a bullet hole that traveled to the basement area. This writer accompanied Det Jim Maroney to basement area and it appears the bullet traveled into the furnace and was not recovered at this time. There is a red stain on ceiling of basement, which dripped to the basement floor. This would be directly underneath victim #1 in the living room.

Walking east toward the back of the house is a hallway; there is a wooden door that would separate the living room from the hallway. This door is open and opens toward the rear of the house, hinges on my left. Approximately half way up the door is a bullet graze on the open door. EM#14 is a large caliber bullet casing on the floor of the hallway, EM#15 is a gold anchor charm; EM# 16 is a large caliber bullet casing, EM # 17 is also found in the hallway.

Evidence marker #41 is a bullet that was extricated from bedroom #1 doorframe.

Found later in search of inside premises is EM #27 a large caliber bullet casing found partly inside the heating duct in hallway near wooden door. There are red stains in hallway area leading to rear of house, Evidence Marker #32.

Off the hallway to my right is the bathroom. This is located on the south wall of the hallway. Going inside the bathroom on floor, ceiling and horizontal blinds on bathroom window is what appears to be brain matter/flesh.

Traveling east through hallway on my left is a bedroom #1. Immediately inside doorway to my left on floor is pooled red liquid. There is a pair of gray slacks on floor. EM# 23- Partly in /out of pocket of slacks are numerous $20 bills. EM#24, #25 and #26 are all pieces of paper, deposit slips with shoe prints in red stain on pieces of paper, EM#33 wet red stain. Leading out of bedroom #1 I turn to my left into rear hallway, which leads you to the kitchen.

Traveling east through the hallway, you enter a kitchen area; this is where victim #2 is located. Lying against the rear door which leads to the hallway to back of house is a w/m. He has on a white t-shirt and pair of boxer shorts. He is laying on his left side, head in a southerly direction. His right hand is under his face area; his left arm is under his body. Left leg is going west, right leg is bent at knee and right foot is inside pair of jeans, which are located inside bedroom #2.

Bedroom # 2 is located at rear of the house, door opening on the north wall of the kitchen. Also on north side of kitchen wall are bullet graze marks traveling to rear of house. EM#18 a large caliber bullet casing located in kitchen near the

Case 1:16-cv-00321-EAW-MJR    Document 78-6    Filed 07/03/20

A-1384



139  EM#35 is red shoe pattern in rear hallway, which appears to be leading to rear of
140  the house.

141

142

143   On the rear metal door leading to the back yard are 6 bullet holes, these are
144  marked A, B, C, D, E, and F. Five of these bullet holes appear to be from a large
145  caliber gun. One hole on the left side wood molding is a smaller bullet hole.

146

147   Bedroom #2 is located on the north side of the kitchen to the rear of the house.
148  Walking into the bedroom, there is a bed facing west to east, a dresser with mirror
149  and a tall dresser to my immediate right. It is noted that the TV set is turned on.

150

151   EM# 19 splintered door wood found on bed in bedroom #2. Looking at the door
152  from inside of bedroom #2 is a slide lock, which is still engaged. Around this slide
153  lock the wood is broken off. This is what is located on the bed
154   EM# 20 black leather holster for a small caliber gun, found on bed in bedroom
155  #2.
156   EM# 21 Cellphone on bed in bedroom #2
157   EM#22 located in dresser in bedroom #2 is drug paraphinalia: baggies, scale with
158  residue, blue pills, coffee grinder and spoon with residue on it.

159

160

161   Information from the Major Crime Unit Office is that the names of the victims
162  are Nelson Camacho, dob 4-26-68 is victim #1 located in living room area. Miguel
163  Camacho dob 9-9-79 is victim #2 located in the kitchen area.

164

165   At 0130 hours Greg Luca and Josiah Schultz, morgue attendants arrive on the
166  scene. Dr Evan Evans, Medical Examiner then did arrive on the scene. He did
167  examine both victims and they were transported to the morgue at 0200 hours. Upon
168  removal of the second victim in kitchen area it is noted that the rear door is not
169  locked and can be opened by turning knob. Through this metal door heading east
170  towards the back of the house is another hallway. There is a wooden door, which
171  was partially open; this door is half glass on top, covered with a blue lace curtain,
172  which leads to the outside porch. There are holes in the blue lace curtain and the top
173  window of wooden door has visible bullet holes in it.

174

175   In the rear hallway, leading to the backyard are two dresser tables. In and
176  around these tables Det. Maroney did locate bullets and bullet fragments, EM #38,
177  #39, # 40. To my right is a rear staircase leading to the upper apartment from this
178  hallway. A bullet was located under the 1st step leading to the second floor, this is
179  EM # 37. Evidence Marker # 36 is a dried red stain in rear hallway.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1385



185  this time he did leave the scene as it is.

186

187      This writer did contact radio to have this scene held until after the autopsies.

188  P.O. Terrell was left holding the scene at approximately 0450 hours. This writer and

189  Det. Tom Balk and Det Jim Maroney did return to Headquarters at this time to

190  finish paperwork.

191                                                   Respectfully submitted,

192                                                   Det. Mary E. Guglinzza

193

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1386



## City of Buffalo Police Department
## Major Crimes Unit

TO: Captain Mark Morgan
Major Crimes Unit

DATE: 11/12/04

FROM: Detective Timothy J. Salamone

RE: Autopsy of Nelson
Camacho #04-0242

ATTENTION: Lieutenant Margaret Sack

---

Sir;

Your writer was directed to attend and record the post-mortem examination of Nelson Camacho, 879 Niagara Street, Buffalo, NY, date of birth 4/26/1968. Also present was Detective James Maroney of the Evidence Unit and Detective Thomas Balk of the Photography Unit.

Doctor Sung-Ook Baik performed the autopsy with his assistant Mr. Thomas Lamb.

The body was present on table #2, a Hispanic male 67"inches in length and 145 pounds in scale weight. There was a tag on the bodies right ankle with the name Nelson Camacho, Dr. Evans, 2259-04, 11/11/04. There were two entrance gunshot wounds visible on the front of the body, one to the right cheek/face, the other the left arm and armpit area, entering and exiting in the upper bicep area as well as the forearm area.

The Doctor made the standard Y incision to reveal the inner organs and collect the usual sample of blood and bodily fluids. The internal organs were removed and examined. Left arm showed extensive gunshot wound damage affecting the brachial artery. The gunshot wound to the face traveled through the sinus cavity the skull and exited at the crown top of the skull No other damage or abnormalities were noted.

The skullcap was removed and the brain examined. The bullet passed through the brain causing extensive damage. No other damage noted.

The Doctor issued a ruling of death by homicide by means of gunshot wounds to the head and back. Doctor provided copies of his notes, a schematic of the body, and a death certificate. Any further information will be recorded and included in this file.

Respectfully submitted,

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1387



## City of Buffalo Police Department
## Major Crimes Unit

TO: Captain Mark Morgan
Major Crimes Unit

DATE: 11/12/04

FROM: Detective Timothy J. Salamone

RE: Autopsy of Miguel
Camacho #04-0242

ATTENTION: Lieutenant Margaret Sack

Sir;

Your writer was directed to attend and record the post-mortem examination of Miguel Camacho, 879 Niagara Street, Buffalo, NY, date of birth 9/9/1979. Also present was Detective James Maroney of the Evidence Unit and Detective Thomas Balk of the Photography Unit.

Doctor Sung-Ook Baik performed the autopsy with his assistant Mr. Thomas Lamb.

The body was present on table #3, a Hispanic male 74"inches in length and 141 pounds in scale weight. There was a tag on the bodies left ankle with the name Miguel Camacho, Dr. Evans, 2260-04, 11/11/04. There were four entrance gunshot wounds visible on the front of the body. One entered the body in the upper right arm near the should, the second entered just to the right of the right chest/nipple area, the third to the left of the sternum at mid-chest, and the fourth at the bottom of the left chest rib area. There was also an exit wound visible in the left side chest area

The body was rolled over to the back revealing three exit gunshot wounds on the back at the left and right shoulder blades and one to the lower left back. No bullets were visible on the e-rays of the body.

The Doctor made the standard Y incision to reveal the inner organs and collect the usual sample of blood and bodily fluids. The internal organs were removed and examined. Bullet paths showed the bullets pierced the arch of the aorta, left and right lungs, left kidney and stomach. First shot traveled right to left, front to back, upward and through and through the 2nd rib, right lung and scapula. The second shot traveled through the 3rd ICS right side, arch of the aorta, and both lungs. This bullet traveled right to left, front to back, downward through and through. The third shot entered at the 5th rib exiting through the left upper arm through and through, there were no organs damaged. The 4th shot entered on the left side at the 7th rib piercing the diaphragm, and left kidney left to right, front to back, through and through horizontally. No other damage or abnormalities were noted.

A-1388

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

wounds to the right upper arm and chest. Doctor provided copies of his notes, a schematic of the body, and a death certificate. Any further information will be recorded and included in this file.

Respectfully submitted,

Detective Timothy J. Salamone
Major Crimes Unit

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1389



## CITY OF BUFFALO - POLICE DEPT – MAJOR CRIMES UNIT

To:    Mark Morgan
         Captain / Major Crimes Unit

From:   Joseph M. Cook / Detective Major Crimes Unit

**Subject: Homicide Case # 04-242 Victims Miguel Camacho**
           **DOB 09-09-79 / Nelson Camacho DOB 04-26-68**

Date:    11-12-04

Attn:   Lieut. Margaret Sack

Sir:

On the above date, at 1920 hrs, this writer did receive an anonymous Tip, regarding the above double Homicide. The Call did come into the Major Crimes Office, on Line 851-4466. The Caller was a Female, who would not give a Name.

The Caller states that she has heard on the Street that three individuals were responsible for the Shooting. She further states that the Three go by the Names "Brandon", "Checko", and "Udah". The Caller states that she believes the Subject "Brandon" may live on Helen Street, in Buffalo. She also states that she has heard that the Shooting took place over a large quantity of Money. Investigation continues.

Respectfully submitted

Det. Joseph M. Cook

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1390



City of Buffalo
Department of Police
Major Crimes Unit

To:     Captain Mark Morgan
        Commander, Major Crimes Unit

From:   Michael A. Mordino Det
        Michael Acquino Det.

Date: 11-12-04
Subject. Double homicide at 879 Niagara Street, Lower apt.
Case#, 04-242
CD# 04-316-0879
Sir,
        Your writer Along with Det. Michael Acquino, returned to the scene at 879
Niagara Street. We assisted evidence and photo officers, and spoke to the victim's
brother Luis Camacho, and his sister, Luz Camacho 26 10th Street apt. #1, 603-
7422. Luis stated that his brother Flaco called him, and told him to come to the
house right away, because, something was happening, and Nelson was on the floor,
and he also told him to come armed. Luis stated that that he did not own a gun, and
did not bring one with him when he went to his brother's house. He further stated
that he and his brothers used drugs, but they did not sell drugs, just personal use.
At 1430hrs, the seen was released to the victim's sister, Luz Camacho, The door
was locked, and the keys were given to her.

                        Respectfully Submitted,
                        Michael A. Mordino Det.

                        Michael Acquino Det.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1391



CITY OF BUFFALO - DEPARTMENT OF POLICE
*MAJOR CRIMES UNIT*

*TO: CAPTAIN MARK MORGAN*

*FROM: DET. MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE CASE #04-242(A)*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date Officer John Garcia of B-District contacted this writer. Officer Garcia stated that an informant had contacted him and related the following regarding the above captioned case. That on 11/11/04, the date of this crime, the victims had an altercation with a 14-15yoa hispanic male in front of Zips Deli. This altercation ended when one of the Camacho brothers produced a handgun and fired at this youth, only to have the gun jam. This hispanic male was purported to have said "this isn't over" and fled the scene. This all ocurred approximately 1600hrs.

The informant went on to tell Garcia that this unidentified hispanic youth recruited two B/M, both who live in the same block of Niagara St., that the Camacho brothers lived in. Together, the three went to 879 Niagara St., armed with R-15's (AR-15 ?) and committed the homicide. The only other information this informant could supply to help identify this hispanic male was that he resides somewhere on Whitney between Hudson and Virginia.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted

Case 1:16-cv-00321-EAW-MJR    Document 78-6    Filed 07/03/20

A-1392



. CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE #04-242*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date this writer received a telephone call from Police
Officer Robert Quintana. Officer Quintana stated that he had information
relating to the Camacho brothers Homicide. This information was from
"community sources" that said a dark skinned PR/M 5'9" 30's by the street
name of "Tawa" was involved. Quintana stated that "Tawa" was known for
setting up robberies/home invasions of victim's that would be reluctant to
report them to the police. He would enter these locations and then alert
"others" that would actually do the robbery. It was speculated by Officer
Quintana's sources that this is what occurred on Niagara St. Quintana said
that "Tawa" supposedly did this at 241 Vermont St., about a month ago.
241 Vermont St., is a location where individuals gamble on dominos.

This writer believes that the "Tawa" Officer Quintana refers to is actually
"Dagua". Dagua's name is *Manuel Medina PR/M DOB 1/20/71 BPD
MUG #213608.* This investigation continues.

Your office will be kept apprised of any and all new developments in this
case.

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1393

# CITY OF BUFFALO, NEW YORK

## POLICE DEPARTMENT

## MUGSHOT PROFILE



**NAME:** MEDINA, MANUEL
**AKA:**
**NICKNAME:**
**DOB:** 01-20-1971
**MUG NUMBER:** 213608
**PHOTO DATE:** May 28 1996 10:00PM

### PHYSICAL DESCRIPTION

| | |
|---|---|
| **SEX:** | MALE |
| **RACE:** | HISPANIC WHITE |
| **HEIGHT:** | 5'08" |
| **WEIGHT:** | 160 |
| **HAIR:** | BLACK |
| **EYES:** | BROWN |
| **BUILD:** | MEDIUM |
| **COMPLEXION:** | |

### SCARS/MARKS/TATTOOS/DEFORMITIES

#1:
#2:
#3:
#4:

### CHARGES

#1: 195 OFF MISCONDUCT
#2: 205 ESCAPE_RELATE
#3: 240 PUB. ORDER OFF
#4: 240 PUB. ORDER OFF





Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1394



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE CASE #04-242*
*RE-INTERVIEW OF LUIS CAMACHO*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On this date at approximately 1830hrs this writer contacted Luis A.
Camacho, brother of the two victims in this case. The purpose was to
request that Mr. Camacho come to these offices, in an effort to clear up a
few questions that had arisen relative to his sworn statement. Mr. Camcho
complied and arrived at these offices at 1900hrs.

This writer conducted a brief interview that centered on these questions.
Had Miguel told him to come armed when he called him for help? Luis
stated that yes Miguel had told him to come armed. He neglected to tell
Detective Wagstaff this in his sworn statement. He told this writer that he
brought no weapon with him. This writer asked if he had brought the
recovered .25 caliber automatic to the house, or had he ever seen his
brothers with this weapon. He replied negative to both questions.

Mr. Camaho was then asked if he knew someone named "Dagua", or if
either of his brothers had known someone by this name. Mr. Camacho acted
somewhat surprised and told this writer of an incident that had occurred
about a month ago at a "gambling house" on Vermont near Normal. He

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1395



"Dauga" had some how been involved. Camacho said he didn't however know "Dauga". The interview was concluded.

Your office will be kept apprised of any and all new developments in this case.

Respectfully submitted,

Michael F. Root
Det.

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1396

*City of Buffalo - Department of Police*
## Major Crimes Squad

*To:*       CAPTAIN MARK MORGAN
        ***CRIMES AGAINST PERSONS BUREAU***
*From:*     DETECTIVE ERNEST W. BURSIE
        MAJOR CRIMES UNIT

*Subject:*   MCU FILE# 04-242

*Date:*     *NOVEMBER 13TH,   2004*

SIR;

THIS WRITER ASSIGNED TO MCU CAR 1271 THIS DATE, DID RESPOND TO A RADIO CALL AT APPROX. 1015HRS TO CONTACT THE BRAVO DISTRICT. THIS WRITER PHONED THE BRAVO DISTRICT AND SPOKE WITH DET. O'BRIEN – BRAVO DISTRICT, WHO STATED THAT P.O. MONTE MONTALVO HAD ARRESTED AN INDIVIDUAL FOR A STOLEN VEHICLE AND DRUGS, AND THAT THIS PERSON HAD POSSIBLE INFORMATION ON THIS CASE. DET. O'BRIEN GAVE THIS WRITER A PHONE NUMBER TO CONTACT P.O. MONTALVO.

THIS WRITER THEN PHONED P.O. MONTALVO WHO STATED THAT HE HAD JUST GRABBED A GUY FOR DRUGS TODAY WHO HE HAD PREVIOUSLY ARRESTED FOR DRUGS AND A STOLEN CAR. P.O. MONTALVO SAID THIS GUY'S PREVIOUS CASE S STILL PENDING, AND THAT THIS GUY TOLD HIM HE HAS SOME INFORMATION REGARDING THE HOMICIDE ON NIAGARA ST. P.O. MONTALVO SAID THAT HIS GUY KNOWS A GUY NAMED MATTHEW SMITH WHO HAS AN AK47, AND MAY HAVE BEEN INVOLVED IN THE HOMICIDE ON NIAGARA ST. THE GUY TOLD P.O. MONTALVO THAT MATTHEW BELONG TO A GANG FROM THE WEST SIDE KNOWN AS THE TEN FIFTEENERS, AND THAT MATTHEW TOLD HIM ABOUT ANOTHER GUY IN THIS GANG CALLED BALCK HAIR TONY, WHO IS A BLACK MALE. THE GUY SAID THAT BLACK HAIR TONY HAD A BEEF WITH A COUPLE OF LATIN GUYS AT MASSACHUSETTS AND NIAGARA A COUPLE OF DAYS BEFORE THE SHOOTING. THE GUY SAID MATTHEW TOLD HIM THAT ON THE SAME DAY OF THE SHOOTING, AROUND 7:30PM, MATTHEW HEARD BLACK HAIR TONY TA;LKING TO SOOMEONE ON HIS CELLPHONE, TELLING THEM ABOUT HIS BEEF WITH THE LATINS, AND TELLING THEM THAT THEY WOULD HAVE TO TAKE CARE OF THE LATINS FOR HIM. P.O. MONTALVO

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1397

TWO DAYS AGO. P.O. MONTALVO ASKED THIS WRITER IF THIS WAS
ENOUGH INFORMATION TO OBTAIN A SEARCH WARRANT FOR MATTHEW'S
ATTIC. THIS WRITER OBTAINED A CRIMINAL RECORD CHECK AND FRAP
FOR MATTHEW L. SMITH B/M DOB 1/14/86, BPD# 246608 OF 221 FOURTEENTH
ST. MATTHEW HAS NO FELONY CONVICTIONS, AND POSSESSION OF THE
AK47 IS NOT ILLEGAL. THIS WRITER ADVISED P.O. MONTALVO THAT HE
DIDN'T HAVE SUFFICIENT CAUSE TO OBTAIN A SEARCH WARRANT, BUT
ADVISED HIM TO NOTIFY HIS CAR CREWS TO MATTHEW'S ADDRESS, AND
IF THEY WERE ABLE TO SEIZE THE WEAPON, TO SUBMIT IT TO THE CPS
LAB FOR COMPARISON.

YOU WILL BE KEPT APPRISED OF ANY ADDITIONAL INFORMATION
REGARDING THIS INVESTIGATION.

RESPECTFULLY SUBMITTED,

DET. ERNEST W. BURSIE
MAJOR CRIMES UNIT

A-1398

City of Buffalo - Department of Police
## Major Crimes Squad

*To:*      CAPTAIN MARK MORGAN
         *CRIMES AGAINST PERSONS BUREAU*
*From:*    DETECTIVE ERNEST W. BURSIE
         MAJOR CRIMES UNIT

*Subject:*    MCU FILE# 04-242

*Date:*     *NOVEMBER 13TH, 2004*

SIR;
     CONTINUING THIS INVESTIGATION, THIS WRITER CONTACTED P.O.
MONTE MONTALVO, B-222 AND ADVISED HIM THAT IF THE MAN HE
ARRESTED FOR DRUGS EARLIER THIS DATE IS WILLING TO GO BACK
INSIDE OF MATTHEW SMITH'S HOUSE TO DETERMINE IF HE STILL HAS
DRUGS AND THE AK47 IN HIS ATTIC, THAT THIS WRITER WILL CONTACT
NARCOTICS SQUAD. THIS WRITER INFORMED P.O. MONTALVO THAT THE
NAROCTICS DETECTIVES COULD TAKE HIS GUY BEFORE A JUDGE AND
OBTAIN A SEARCH WARRANT FOR SMITH'S HOUSE IF HIS GUY CAN SAY
THE DRUGS AND GUN ARE IN THERE NOW. P.O. MONTALVO SAID THAT HIS
GUY IS WILLING TO GO BACK INSIDE OF SMITH'S HOUSE, AND P.O.
MONTALVO SAID HE HAS WORKED WITH DET. CHARLIE MILLITELLO FROM
NARCOTICS BEFORE, AND WILL CONTACT HIM WHEN HE RETURNS TO
WORK.
     YOU WILL BE KEPT APPRISED OF ANY ADDITIONAL INFORMATION
REGARDING THIS INVESTIGATION.

                RESPECTFULLY SUBMITTED,

                DET. ERNEST W. BURSIE
                MAJOR CRIMES UNIT

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1399



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 13, 2004*

*SUBJECT: HOMICIDE #04-242*
*RE: STATEMENT OF CARLOS OSARIO*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date at approximately 1645hrs, this writer was notified by
Police Officer John Garcia the he and Police Leo McGrath had an individual
in their vehicle who wished to give a statement relative to the above
captioned case. It was agreed that they proceed directly to these offices,
which they did, arriving at approximately 1655hrs. *CARLOS OSARIO*
*PR/M DOB 9/29/67* of *863 NIAGARA ST.*, accompanied the Officers. This
writer briefly interviewed Osario after which a sworn statement was taken.
Police Officer John Garcia, who is fluent in Spanish, acted as an interpreter
while this interview was conducted and a statement was obtained. Mr.
Osario speaks no English. This statement is self-explanatory and is now a
permanent part of this file.

Respectfully submitted,

Michael F. Root
Det.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1400

City of Buffalo Department of Police

## Major Crimes Unit

**To:**      Captain Mark Morgan
            Crimes Against Persons Bureau

**From:**    Det. Mark J. Lauber
            Det. Mary Gugliuzza
            Major Crime Unit

**Subject:**  MCU File # 04-242.
            Homicides of Nelson and Miguel Camacho.

**Date:**    November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did assist Det/Sgt. Torre & Det. Aronica. Mr. Miseal Montalbo had appeared at the Major Crime Unit, on his own volition, and offered an alibi for his whereabouts during this homicide. We were directed to investigate the alibi that he was at the home of his girlfriend Carmen Justiniano and her father Segundo Justiniano on November 11, 2004 between the hour of 9:00pm and 10:00pm. Montalbo was unsure of the address but he was able to describe the house as being 2 houses from the "All-State" insurance office on Niagara near the former 10th Precinct site, painted brown/orange.

We found the location at 1410hrs. and the address is 571 Niagara St. The Justiniano family resides in the rear lower apartment and we find that Segundo Justiniano is home and we are let inside to interview him. Present is Mr. Jose Oramas who also resides here and is a family friend from Puerto Rico. In addition to these 2 gentlemen, 2 younger daughters of Mr. Justiniano ages 12 and 8 reside here and both are at school.

Mr. Justiniano is questioned about the last time he has seen his daughter Carmen and her boyfriend Miseal Montalbo. He says he has seen Carmen within the last 2 days and recalls seeing them both (Carmen & Miseal) last Thursday night at his house. He recalls this being the night of the homicides as he saw on the 10:00 news that the Police had crime scene tape somewhere on Niagara St. near Massachusetts. He recalls that all 3 watched "WWF" wrestling which began at 9:00pm and ended at 10:00pm, which was immediately followed by the 10:00pm newscast on WNLO. Detectives verified that at 9:00pm a wrestling program was being broadcast until 10:00pm, which was followed by the local CBS affiliate 10pm news

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1401



Neither Mr. Oramas nor Justiniano claim the Camacho family threatened them. Justiniano said he saw Louis Camacho early this morning on Niagara St. and they exchanged greetings, he planned on attending the wakes of the Camacho's tonight. A rumor that the New York City chapter of the "Latin Kings" was in Buffalo and had threatened to kill Justiniano and his family if Montalbo was responsible for the homicides was received by this Unit, anonymously. Allegedly, a Latin King appeared at the Justiniano residence, kissed the floor and then threatened to kill the whole family. I asked Mr. Justiniano about this rumor and he denied being threatened in this manner and not ever meeting with anyone in the Latin Kings. We ended the interview at about 1500hrs. and proceeded to 35 Hudson to meet with Carmen Justiniano.

Carmen Justiniano is the girlfriend of Miseal Montalbo; they reside together and have a 3-year-old son. She is 21 years old, DOB 03-13-1983-telephone 480-2508. Carmen verified the information obtained from her boyfriend and father on the whereabouts of Montalbo on November 11, 2004 between 9:00pm and 10:00pm which that he was with them at 571 Niagara watching wrestling on the television. Carmen also told us of the parting of the friendship of Montalbo and Nelson Camacho and that it was last year, they had argued over the title of a car and that they had one small fistfight and had not spoken to each other since. Carmen also said that Camacho threatened to bring his whole family over to assault Montalbo and that Montalbo told Camacho he would kill him. Carmen said that Montalbo was scared and threatened by the Camacho family and that he did not have any family in Buffalo to help him so he made that threat with no intentions of following up on it and was not capable of killing anyone. Carmen never saw Montalbo with a weapon at any time in the past and does not carry one.

Carmen then told us that an unknown person had called the family of Montalbo in Puerto Rico and said he was "dead" in Buffalo, then threatened to kill the family down in Puerto Rico. She is concerned of these threats as she feels vulnerable and fears for the safety of her child. We decided to place a "hazard – threat premises" at their address of 35 Hudson via the 911 system to expedite response time at the address if calls are received in 911.

Your office will continue to be kept informed of developments in this investigation as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

A-1402



City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 15, 2004

Sir:

   On the above date at approx. 1645 hrs., your writer
received a phone call at the MCU office from Kevin Enburg.
Mr. Enburg is the Emergency Room staff counselor for
Psychiatric Services at Buffalo General Hospital. Mr.
Enburg stated that a Hispanic male had been brought to the
hospital for evaluation. The doctors had cleared him
psychiatrically. During the evaluation, the Hispanic male
claimed he had information on the recent double homicide
that occurred at 879 Niagara. He further stated that he was
in fear of his life because the killers were after him.
   Your writer and Det. James Lema proceeded to Buffalo
General. Det/Sgt. James Lonergan and P.O. Edwin Torres of
B-District met us there. Torres was there to act as an
interpreter.
   At 1715 hrs., Mr. Enburg placed the four of us in the
family conference room on the first floor just off the
emergency room. He brought the Hispanic to the room. This
male identified himself as Josue Ortiz, d.o.b. 10/14/81 of
19 Hoyt, rear. Ortiz stated that he spoke some English but
was more comfortable speaking Spanish. P.O. Torres told us
the following after conversing in Spanish with Ortiz.
   Ortiz knew the deceased Camacho brothers. They were

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1403



Caranzo's stored large quantities of cocaine at the Germain address. The Caranzo's also had an apartment at 46 Blum.

Through the interpreter, we asked Ortiz if he had any direct knowledge of the murders at 879 Niagara. He claimed he did not. He said that it was his opinion that the Camacho brothers were killed because of jealousy due to their drug selling.

When asked whom he was specifically afraid of, Ortiz gave the name, Rinaldo Valesquez. When asked why he was afraid of Valesquez, Ortiz stated it was because he had a shotgun. Ortiz did not claim that Valesquez had anything to do with the above murders.

Mr. Ortiz was definitely upset at the time of the interview. He was given a card with our names and phone numbers on it and asked to call us if he had any further information. Ortiz was turned back over Mr. Enburg. Ortiz was going to be medically evaluated before being released from the hospital.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted,

Det. Mark Vaughn

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1404

## City Of Buffalo - Department Of Police
### Major Crimes Unit

**To:**     Captain Mark Morgan
            Crimes Against Persons Bureau

**From:**   P.O. David Sadlocha
            D District

**Subject:**   File #04-242

**Date:**   11/16/04

Sir;

On 11-16-4, while working 1530-0130 tour in D-District, sector D432 did receive 911 radio of Unknown Trouble call at 1005 Grant St. Upon arrival I spoke with person from Native American Center who stated a man was seeking help and walk away. This person said the young man stated he would be at 142 Germain St. I went to said address with assistance from P.O. John Lobaugh and encounter an individual outside residence. The individual did state to me that he had something to say regarding "Niagara St."! I told him not to say anything else to me at this point and I notified 911 Dispatch that I needed to speak with someone working Major Case Squad. Suspect was placed in patrol vehicle #333 and transported to Police Headquarters and given to Major Case Detectives.

Respectfully Submitted,

P.O. David Sadlocha

P.O. David Sadlocha

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1405



### CITY OF BUFFALO - DEPARTMENT OF POLICE
### HOMICIDE UNIT

**To:** Captain Mark Morgan
Chief of Homicide

**From:** Det. Patrick Judge
Det. James Lema

**Subject:** File 04-242

**Date:** 11/16/04          879 Niagara Street-Double Homicide

**Attn:** D/Sgt James Lonergan

Sir:

On 11/16/04 at approximately 2000 hours, B District Police Officer Ed Torres brought to the Major Crime Office Mr. Carlos Osario to be re-interviewed. According to Police Officer Torres, Mr. Osario came to the B-District and wanted to talk to PO Ken Anaya about the homicides that occurred at 879 Niagara Street.

Det. Lema and your writer interviewed Mr. Osario in the Major Crime Unit interview room. Mr. Osario said that the three individuals who he saw running from 879 Niagara Street on the night of the homicides assaulted him last night (11/15/04) at approximately 2300 hours at the corner of West and Rhode Island Streets. Mr. Osario describes the three individuals who assaulted him as all dark skinned Hispanic males with Hispanic accents and all about 5'7" tall. It should be noted that during Mr. Osario's sworn statement given to Det. Michael Root on 11/13/04, Mr. Osario described the suspects from the homicide as two black males and one Puerto Rican male all of whom he described as short and young.

Mr. Osario stated that he reported this assault to the Buffalo Police Department but a check of the Buffalo Police Records shows no such call for service and no reports made.

Respectfully submitted,

Det Patrick Judge

A-1406

Buffalo Police Department
Intra-Departmental Correspondence

TO: Commissioner Rocco Diina

DATE: 11/12/04

FROM: PO Ronald Jentz
B District

SUBJECT: CD 043160879
Double Homicide – 879 Niagara

Attention: Capt. Morgan
Det/Sgt Lonergan

Sir:

On 11/11/04 at approximately 2145 hours I responded to a call of a person shot at 879 Niagara. Upon arrival I did enter the house with several other officers. I saw one male lying on the ground in the front room who had been shot in the head. I then saw a Hispanic male (later identified as Luis Camacho 3-13-63) enter the room I was in from the back of the house. In his hand was a small handgun. Luis was ordered to drop the gun. At that time I secured Luis in the back of my patrol vehicle. At approximately 2202 hours I transported Camacho to the Major Crimes office to be interviewed. This ended my involvement in this case.

Respectfully submitted,

PO Ronald Jentz

A-1407

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

1                              **CITY OF BUFFALO**
2                       **DEPARTMENT OF POLICE**
3                          **MAJOR CRIME UNIT**

4

5

6

7  **TO:**    Capt. Mark Morgan      **SUBJECT:** MCU # 04-242

8          Major Crime Unit       **DATE:**    November 12, 2004

9

10  **FROM:**  Det. Mary E. Gugliuzza    **VICTIM:**  Miguel & Nelson Camacho

11           Major Crime Unit

12

13

14

15

16  Sir,

17

18     In regards to double homicide from 879 Niagara St, dated 11-11-04. This writer

19  did hand over papers, different forms of identification, and address book to Jim

20  Maroney, Evidence Unit. This was turned over to him while at the initial crime

21  scene on 11/11/04-11/12/04. This will be logged as Item #65. These items were taken

22  from dresser of Bedroom #2 on the dresser on East wall.

23

24

25

26

27                                     Respectfully submitted,

28

29                                     Det. Mary E. Gugliuzza

A-1408

City Of Buffalo - Department Of Police

**Major Crimes Unit**

**To:**   Captain Mark Morgan
          Crimes Against Persons Bureau

**From:**   Det. Mark J. Lauber
            Det/Sgt. Philip Torre
            Major Crime Unit

**Subject:**   MCU File #04-242,
               Homicides of Nelson & Miguel Camacho

**Date:**   November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did respond at about 1100hrs. to the area of Hampshire & 19th St. This was in request to a call by car D-341 PO Marie Schreckenberger concerning a male she had encountered at that location.

We arrived at about 1105hrs. and met with PO Schreckenberger, PO's Poleon (D-241) and Lewczyk (D-342) along with off-duty PO B. Rodriguez. We were informed that a subject identified as Josue Ortiz, DOB 11-14-1981 of 142 Germain St. Buffalo had stopped PO Schreckenberger and jumped into her patrol car saying that people were trying to kill him. Subject Ortiz was speaking Spanish and Rodriguez was interpreting for us.

Ortiz had told the Officers that person(s) unknown were trying to kill him because they thought he was involved in the homicides of Nelson & Miguel Camacho. We talked with Ortiz and he stated he just came to Buffalo from Puerto Rico. Ortiz admitted that he had just smoked marihuana, his eyes were glassy and he exhibited signs of being under the influence of marihuana (dilated, red pupils and unsteady gait). He continued to state that unknown persons where attempting to kill him although he could not articulate the manner in which these attempts were being made, the location these attempts were occurring at, the identities or motives for those trying to kill him.

Ortiz stated he was scared and needed help. After consulting with the Officers and observing the behavior of Ortiz it was decided that he might be in need of medical and or physic iatric

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1409

**City Of Buffalo - Department Of Police**
*Major Crimes Unit*

**To:**     Captain Mark Morgan
Crimes Against Persons Bureau

**From:**    Det. Mark R. Stambach
D/Sgt. James Lonergan
Major Crimes Unit

**Subject:**    **FILE # 04-242**

**Date:**    11/16/04

ATTN:    Lt. Margaret Sack
Major Crimes Unit

Sir:

Your writers did meet with P.O. David Sadlocha and P.O. John Lobaugh at the Major Crimes Unit Office. Both officers did have with them a Mr. Josue Daniel Ortiz. They responded to a call at 7:16pm. P.O. Sadlocha, Car D432, indicated the subject was confessing about the homicide on Niagara Street.

Mr. Josue Daniel Ortiz was placed into Sgt. Vivian's Office at 7:25pm. A formal interview was started at 7:30pm. He gave information during this interview that indicated he was involved in the homicides. Present in the Interview Room was P.O. Edwin Torres of B District. He was used as an interpreter as he informed your writers he spoke only a little English.

After listening to Mr. Ortiz explain what had happened, he was advised of his rights.

P.O. Edwin Torres read a Spanish Rights Card to Mr. Ortiz. The rights were read at 8:25pm. He then signed the Rights Card. His waiver was read at 8:30pm. This Rights Card shall now become a part of this file.

At 8:40pm, Mr. Ortiz was given a Coke, large fries and a sandwich from McDonald's .

At 9:00pm, a formal sworn statement was taken from him. Please see attached sworn statement for further details on this matter. This sworn statement will now become a part of this

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1410



City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 17, 2004

Sir:

On the above date at approx. 0300 hrs., your writer along with Det/Sgt. James Lonergan and Det. James Lema went to 19 Hoyt St, Apt. #3. Josue Ortiz signed a permission to search for this address.

Ortiz did not have a key on his person for this apartment. Through our investigation, we learned that the landlord for this property is Dennis Dunson. His address is 687 Eggert Rd. His phone number is 835-6049 and his cell number is 308-3837. He agreed to meet us at this property. He arrived at 0330 hrs. He stated that the person he rented apartment #3 to was Angel Rivera. Dunson was shown a photo of Josue Ortiz. He stated that it was not Rivera but that he had seen Ortiz at this address in the past. Dunson unlocked apartment #3 and we entered. It did not appear that anyone was living in this apartment. There was very little furniture and no clothing.

There was nothing of an evidentiary nature at this

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20...

A-1411

Respectfully submitted,

Det. Mark J. Vaughn



**City of Buffalo Police Department**
**Intra-Departmental Correspondence**
**Major Crimes Unit**

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 17, 2004

Sir:

     On the above date at approx. 0030 hrs., your writer
along with Det/Sgt. James Lonergan and Det. James Lema went
to 142 Germain St. Josue Ortiz signed a permission to
search for this address. The apartment rented by Ortiz was
in the rear house at this address. His apartment was in
the upper. His name was on the mailbox.
     Ortiz did not have a key on his person for this
apartment. Through our investigation, we learned that the
landlord for this property is Joseph Domagala. His resides
at 184 Haverford, Williamsville. His home phone number is
688-8061 and his cell number is 316-8560. Mr. Domagala
agreed to meet us on Germain. He arrived at 0055 hrs. He
brought a key and unlocked the upper apartment door of the
rear house for us.
     Mr. Domagala told us that Ortiz has been a tenant in
this apartment since August. He was the sole tenant
although Ortiz told Domagala that his wife would be coming

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1413



found. Four pairs of sneakers were found in the apartment. Two pairs of dark sneakers were located in the bedroom with the mattress. One pair of white sneakers was found in the kitchen and another pair of white sneakers was found in the bathroom. Several pieces of men's clothing were found in the kitchen and the bedroom with the mattress.

Your writer took custody of the cell phone and the pieces of mail. Det. Lema took custody of the sneakers and clothing. All of the above-described items were turned over to Det/Sgt. Patrick Murphy at the MCU office. Mr. Domagala allowed us to keep the key for this apartment. When we left, we locked the upper apartment door.

It should be noted that when we initially arrived at this address, we observed a window screen lying on top of a blue City of Buffalo garbage can. Directly above from where the screen was, a window to the upper apartment was observed wide open. The open window was the only one that was missing a screen.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted,

Det. Mark Vaughn

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1414



City of Buffalo
Department of Police
Major Crimes Unit

To:  Captain Mark Morgan
Commander, Major Crimes Unit

From:  Michael A. Mordino Det
Michael Acquino Det.

Date: 11-12-04
Subject. Double homicide at 879 Niagara Street, Lower apt.
Case#, 04-242
CD# 04-316-0879
Sir,
    Your writer Along with Det. Michael Acquino, returned to the scene at 879
Niagara Street. We assisted evidence and photo officers, and spoke to the victim's
brother Luis Camacho, and his sister, Luz Camacho 26 10th Street apt. #1, 603-
7422. Luis stated that his brother Flaco called him, and told him to come to the
house right away, because, something was happening, and Nelson was on the floor,
and he also told him to come armed. Luis stated that that he did not own a gun, and
did not bring one with him when he went to his brother's house. He further stated
that he and his brothers used drugs, but they did not sell drugs, just personal use.
At 1430hrs, the seen was released to the victim's sister, Luz Camacho, The door
was locked, and the keys were given to her.

Respectfully Submitted,
*signature*
Michael A. Mordino Det.

Michael Acquino Det.

Case 1:16-cv-00321-EAW-MJR  Document 78-6  Filed 07/03/20

A-1415

```
1                          CITY OF BUFFALO
2                       POLICE DEPARTMENT
3                      MAJOR CRIMES SECTION
4
5    STATE OF NEW YORK )           DATE : November19. 2004
6    COUNTY OF ERIE    )           HOURS:  1230hrs
7    CITY OF BUFFALO   )           CD,043160879
8                                  Case#04-242
9
```

10  Efrain Hidaldo,  DOB, 06-11-86, 18 years old, social security #unk   , residing at, 302
11  Busti Ave. Buffalo, New York  ,phone number 853-0940    . Being duly sworn, deposes
12  and makes the following statement while in the Buffalo Police Major Crimes Office. The
13  questions are being asked by both Detective Michael Acquino and Detective Michael
14  Mordino, and typed by Detective Michael Mordino.

15

16

17  Q.   Can you read and write and how far have you gone to school?
18  R.   Yes, I can read and write, and I attended school to the ninth grade.

19

20  Q,   Efrain, I have read you your rights from a card, and you signed both sides of the
21       card, indicating that you understood these rights. Is that correct?

22

23  A,   Yes.

24

25  Q,   The Buffalo Police Department is investigating the death's of Miguel and Nelson
26       Camacho, that occurred on 11-11-04 at about 2144hrs at 879 Niagara Street. What
27       if anything can you tell me about this incident?

28

29  A,   On the night of November 11th 2004, I was at my friends Sammy Ortiz house on
30       Seventh Street. I don't know the address, but the phone number is, 886-8355. We
31       were playing Play Station 2, and eating Chinese food that was purchased at
32       Panda's on Niagara Street. I arrived there around 6:00pm, and left the next day in
33       the morning. I have an appointment at ADDS, Alcohol and Drug Dependency
34       Services, Statler Towers, Suite #555, 107 Delaware Buffalo, New York 14202,
35       885-0163. I believe that I arrived there between 8:30 and 9:00am. On 11-12-04.

36

37  Q,   Who else was at the house with you?

38

39  A,   Sammy, his brother, Xavier AKA Savi, his mother Sonya, his brother's friend,
40       Angel, and my cousin, Brandon or "B".

41

42  Q,   Were you at the house on Seventh Street between 9:00pm and 11:00pm on 11-11-
43       04?

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1416

$\mathcal{E}\mathcal{H}$

63 Q, Do you know the whereabouts of your brother, Urayoan Udal, Hidalgo, on the
64 night of 11/11/04 between the hours of 9:00pm and 11:pm ?
65
66 A, No.
67
68 Q, Did you call your brother on the phone that night?
69
70 A, No.
71
72 Q, Where you and your brother having trouble with anybody in the streets within the
73 last few years?
74
75 A, My brother had a problem with the 1015 gang. They would jump him all the time,
76 $\mathcal{E}\mathcal{H}$ and while I was away in jail, they continued to beat him up. When I came him on
77 June 12th 2003, shortly thereafter, our house located at 121 Whitney Street was
78 shot up.
79
80 Q, Do you know Miguel or Nelson Camacho, who live at 879 Niagara Street?
81
82 A, No.
83
84 Q Have you ever been in the house at 879 Niagara Street, either in the upper or
85 lower apartment?
86
87 A, No, never.
88
89 Q, Do you know anyone by the name of Josue Ortiz?
90
91 A, No.
92
93 Q, Did you or you brother or kill Miguel or Nelson Camacho at 879 Niagara Street
94 on 11-11-04?
95
96 A, No .
97
98 Q, Did you or you brother see anyone shoot the Camacho brothers at 879 Niagara Street
99 on 11-11-04?
100
101 A, No.
102
103 Q, Is there anything else hat you would like to add to this statement at this time that
104 would help us in this investigation?

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1417



## CITY OF BUFFALO - DEPARTMENT OF POLICE
### HOMICIDE UNIT

**To:**    Captain Mark Morgan
           Chief of Homicide

**From:**  Det. Patrick Judge
           Det. James Lema

**Subject:**   File 04-242

**Date:**  11/16/04                    879 Niagara Street-Double Homicide

**Attn:**  D/Sgt James Lonergan

Sir:

      On 11/16/04 at approximately 2000 hours, B District Police Officer Ed Torres brought to the Major Crime Office Mr. Carlos Osario to be re-interviewed. According to Police Officer Torres, Mr. Osario came to the B-District and wanted to talk to PO Ken Anaya about the homicides that occurred at 879 Niagara Street.

      Det. Lema and your writer interviewed Mr. Osario in the Major Crime Unit interview room. Mr. Osario said that the three individuals who he saw running from 879 Niagara Street on the night of the homicides assaulted him last night (11/15/04) at approximately 2300 hours at the corner of West and Rhode Island Streets. Mr. Osario describes the three individuals who assaulted him as all dark skinned Hispanic males with Hispanic accents and all about 5'7" tall. It should be noted that during Mr. Osario's sworn statement given to Det. Michael Root on 11/13/04, Mr. Osario described the suspects from the homicide as two black males and one Puerto Rican male all of whom he described as short and young.

      Mr. Osario stated that he reported this assault to the Buffalo Police Department but a check of the Buffalo Police Records shows no such call for service and no reports made.

                Respectfully submitted,

                Det Patrick Judge

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1418

## Permission to Search

The undersigned, residing at _142   Germain   upper_

does hereby voluntarily authorize _Det   Patrick   Judge_ ,
and other officers he may designate to assist him, to search my residence (or
other real property) located at _142   Germain   upper._

and my motor vehicle, namely my _____
                                 (year)           (make)

bearing license plate number_____, of the State of
_____, presently parked or located at _____
_____

and I further authorize said officers to remove from my residence, real estate
and/or motor vehicle whatever documents, or items of property whatsoever
which they deem pertinent to their investigation with the understanding that
said officers will give me a receipt for whatever is removed.

    I am giving this written permission to these officers freely and voluntarily,
without any threats or promises having been made, and after having been
informed by said officer that I have a right to refuse this search and/or seizure.

                                              _____
                                                 Signature

Witnesses:



### CITY OF BUFFALO - DEPARTMENT OF POLICE
### HOMICIDE UNIT

To:     Captain Mark Morgan
        Chief of Homicide

From:   Det. Patrick Judge
        Det. James Lema

Subject:  File 04-242

Date:    11/16/04             879 Niagara Street-Double Homicide

Attn:    D/Sgt James Lonergan

Sir:

On 11/16/04 at approximately 2000 hours, B District Police Officer Ed Torres brought to the Major Crime Office Mr. Carlos Osario to be re-interviewed. According to Police Officer Torres, Mr. Osario came to the B-District and wanted to talk to PO Ken Anaya about the homicides that occurred at 879 Niagara Street.

Det. Lema and your writer interviewed Mr. Osario in the Major Crime Unit interview room. Mr. Osario said that the three individuals who he saw running from 879 Niagara Street on the night of the homicides assaulted him last night (11/15/04) at approximately 2300 hours at the corner of West and Rhode Island Streets. Mr. Osario describes the three individuals who assaulted him as all dark skinned Hispanic males with Hispanic accents and all about 5'7" tall. It should be noted that during Mr. Osario's sworn statement given to Det. Michael Root on 11/13/04, Mr. Osario described the suspects from the homicide as two black males and one Puerto Rican male all of whom he described as short and young.

Mr. Osario stated that he reported this assault to the Buffalo Police Department but a check of the Buffalo Police Records shows no such call for service and no reports made.

Respectfully submitted,

Det Patrick Judge

Case 1:16-cv-00321-EAW-MJR   Document 78-6  Filed 07/03/20

A-1420



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 13, 2004*

*SUBJECT: HOMICIDE #04-242*
*RE: STATEMENT OF CARLOS OSARIO*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date at approximately 1645hrs, this writer was notified by Police Officer John Garcia the he and Police Leo McGrath had an individual in their vehicle who wished to give a statement relative to the above captioned case. It was agreed that they proceed directly to these offices, which they did, arriving at approximately 1655hrs. *CARLOS OSARIO PR/M DOB 9/29/67* of *863 NIAGARA ST.,* accompanied the Officers. This writer briefly interviewed Osario after which a sworn statement was taken. Police Officer John Garcia, who is fluent in Spanish, acted as an interpreter while this interview was conducted and a statement was obtained. Mr. Osario speaks no English. This statement is self-explanatory and is now a permanent part of this file.

Respectfully submitted,

*Michael F. Root*

Michael F. Root
Det.

**CITY OF Buffalo Police Department**
**HOMICIDE SECTION**

1
2                                                       DATE:        11/13/04
3                                                       FILE #:      04-242
4                                                       CD #:        04-3160879
                                                        STARTED: 1720hrs
5      STATE OF NEW YORK)
6      COUNTY OF ERIE        ) SS
7      CITY OF BUFFALO
8
9      NAME OF PERSON:  Carlos Osario
10     RACE/SEX: PR/M
11     AGE: 37
12     D/O/B: 9/29/67
13     ADDRESS: 863 Niagara St.
14     PHONE: 886- 0913
15
16     The above named person being duly sworn, deposes and makes the following statement while in
17     the Buffalo Police Department Homicide Office.  The questions are asked by Det. Michael F.
18     Root , and the statement is typewritten by Det. Michael F. Root.  Police Officer John Garcia is
19     present and will interpret all questions and answers from English to Spanish.
20
21     Q. Can you read and wite English?
22     A. No.
23
24     Q. How far have you gone in school?
25     A. GED.
26
27     Q. Where were you on Thursday, November 11, 2004 at about 2130hrs?
28     A. On the porch of my house.
29
30     Q. What is the address?
31     A. 863 Niagara St.
32
33     Q. Were you with anyone else?
34     A. I was with Cano and my son.
35
36     Q. What were you three doing?
37     A. We were watching three men across the street. I thought they were going to kill me.
38
39     Q. Why did you think that?
40     A. Because I have some problems with some people.
41
42     Q. Can you tell me what you saw these three men do?
43     A. They were standing on the porch of an abandoned house across the street from me, for

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1422



CITY OF Buffalo Police Department
HOMICIDE SECTION

Page 2 - statement of Carlos Osario

A. All three were short, they were young. One was a B/M with cornrows and a zippered grey hoodie. The other B/M also had a gey hoodie, and he's got thick eyebrows a wide noise and big lips. The PR/M had on a black hoodie and black pants. He's brown skinned and has trimmed eyebrows.

Q. Have you seen any of these three men before?
A. The PR/M I see at the Barber Shop on Niagara, across the street from Shoreline. I also have seen him before on 10th St., between Virginia and Carolina Sts. Earlier in the day I saw him and one of the B/M's arguing with the brothers in front of Zip's. The other B/M, the one with the cornrows has been on my porch before.

Q. Do you know the B/M who hass been on your porch's name?
A. No, but I can find out. I know where the two B/M live.

Q. When was this B/M on your porch?
A. He was on my porch November 7th. I remember that date because I'm in a program at 291 Elm, and they gave me a pass that day.

Q. Why was he on your porch?
A. He always hangs out on the porch with other kids and smoke maihuana.

Q. Where do the two B/M's live?
A. One lives right across the street from me. Next door to the Tailor. It's a brown brick house with a white door. He lives upstairs. Thats the guy with the cornrows. The other B/M lives next to the Pizzaria, with his brother. It's a green house with two front doors. To get to his apartment, use the right side door and it's upstairs on the right.

Q. Who is Cano?
A. I' ll find out. I've known him since 2002.

Q. Was Cano with you the entire time you have described to me?
A. He was there the whole time.

Q. Do you know the two blonde PR/F that came out of the house?
A. I know them from seeing them around the nieghborhood.

Q. They came out of the house after the B/M and PR/M?
A. They came out screaming after the guys ran out and before the police came.

Q. Explain to me exactly where the two males went after exiting the house.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1423

**CITY OF Bnffalo Police Department**
**HOMICIDE SECTION**

1  page 3 - statement of Carlos Osario
2
3  A. No I didn't see anyone.
4
5  Q. Can you describe Tebo to me?
6  A. He's a Puerto Rican male-tall-white hair-light skin- about 38yoa.
7
8  Q. Is there anything else that you can tell me, to help in this investigation, that I havn't asked
9  you?
10  A. Nothing that I can think of.
11
12  Q. Is everything that you have told me in this statement the truth?
13  A. Yes.
14
15  Q. I am going to have Police Officer Garcia read this statement to you. If it is true and
16  accurate, will you sign it?
17  A. Yes.
18
19
20  Statement ended at 1920 hrs.
21
22  I nnderstand that any false statements made herein are punishable as a class "A"
23  Misdemeanor, pursuant to Section 210.45 of the Penal Law of the State of New York.
24
25  Subscribed and verified under penalty of perjury.
26
27  Signed: _Carlos Osario_
28
29  Witness: DET. _Michael J. Root_
30
31  Sworn and subscribed to before me, this day _13TH_ of _NOVEMBER_, 19 2004
32
33  _Michael J. Root_                                      _12/04_
34  Commissioner of Deeds in and for the City of Buffalo, New York     My Commission expires
35
36
37
38
39
40
41
42
43



City of Buffalo
Department of Police
Major Crimes Unit

To:     Captain Mark Morgan
        Commander, Major Crimes Unit

From:   Michael A. Mordino Det
        Michael Acquino Det.

Date: 11-12-04
Subject. Double homicide at 879 Niagara Street, Lower apt.
Case#, 04-242
CD# 04-316-0879
Sir,
    Your writer Along with Det. Michael Acquino, returned to the scene at 879
Niagara Street. We assisted evidence and photo officers, and spoke to the victim's
brother Luis Camacho, and his sister, Luz Camacho 26 10th Street apt. #1, 603-
7422. Luis stated that his brother Flaco called him, and told him to come to the
house right away, because, something was happening, and Nelson was on the floor,
and he also told him to come armed. Luis stated that that he did not own a gun, and
did not bring one with him when he went to his brother's house. He further stated
that he and his brothers used drugs, but they did not sell drugs, just personal use.
At 1430hrs, the seen was released to the victim's sister, Luz Camacho, The door
was locked, and the keys were given to her.

                    Respectfully Submitted,
                    Michael A. Mordino Det.

                    Michael Acquino Det.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1425



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE CASE #04-242*
*RE-INTERVIEW OF LUIS CAMACHO*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On this date at approximately 1830hrs this writer contacted Luis A. Camacho, brother of the two victims in this case. The purpose was to request that Mr. Camacho come to these offices, in an effort to clear up a few questions that had arisen relative to his sworn statement. Mr. Camcho complied and arrived at these offices at 1900hrs.

This writer conducted a brief interview that centered on these questions. Had Miguel told him to come armed when he called him for help? Luis stated that yes Miguel had told him to come armed. He neglected to tell Detective Wagstaff this in his sworn statement. He told this writer that he brought no weapon with him. This writer asked if he had brought the recovered .25 caliber automatic to the house, or had he ever seen his brothers with this weapon. He replied negative to both questions.

Mr. Camaho was then asked if he knew someone named "Dagua", or if either of his brothers had known someone by this name. Mr. Camacho acted somewhat surprised and told this writer of an incident that had occurred about a month ago at a "gambling house" on Vermont near Normal. He

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1426

"Dauga" had some how been involved. Camacho said he didn't however know "Dauga". The interview was concluded.

Your office will be kept apprised of any and all new developments in this case.

Respectfully submitted,

Michael F. Root
Det.



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE CASE #04-242*
*RE-INTERVIEW OF LUIS CAMACHO*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On this date at approximately 1830hrs this writer contacted Luis A. Camacho, brother of the two victims in this case. The purpose was to request that Mr. Camacho come to these offices, in an effort to clear up a few questions that had arisen relative to his sworn statement. Mr. Camcho complied and arrived at these offices at 1900hrs.

This writer conducted a brief interview that centered on these questions. Had Miguel told him to come armed when he called him for help? Luis stated that yes Miguel had told him to come armed. He neglected to tell Detective Wagstaff this in his sworn statement. He told this writer that he brought no weapon with him. This writer asked if he had brought the recovered .25 caliber automatic to the house, or had he ever seen his brothers with this weapon. He replied negative to both questions.

Mr. Camaho was then asked if he knew someone named "Dagua", or if either of his brothers had known someone by this name. Mr. Camacho acted somewhat surprised and told this writer of an incident that had occurred about a month ago at a "gambling house" on Vermont near Normal. He

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1428



"Dauga" had some how been involved. Camacho said he didn't however know "Dauga". The interview was concluded.

Your office will be kept apprised of any and all new developments in this case.

Respectfully submitted,

Michael F. Root
Det.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1429

CITY OF BUFFALO
DEPARTMENT OF POLICE



**HOMICIDE UNIT**

74 Franklin Street
Buffalo, New York
Rm# 401

Telephone: (716) 851-4466
Fax: (716) 851-4487

DATE: 12/2/04

File # 04 - 242

Please release the following vehicle to Luis Camacho H/m/m
JoB 3/13/63

i. That pending letter from Parking Violations Bureau, this vehicle will be released with no
charges for towing and/or storage. as per ADA Ken Case

N.Y. Reg # BEL - 6729

Sgt. P. Torre
Major Crimes Unit

NOTE: You must proceed to the Commissioner's Office, 2nd Floor Police headquarters for
additional release letter. Then to Parking Violations Bureau, City Hall.

X Luis Camacho



Case 1:16-cv-00321-EAW-MJR    Document 78-6    Filed 07/09

A-1430



**CITY OF BUFFALO**
**DEPARTMENT OF POLICE**

| HOMICIDE UNIT | 74 Franklin Street Buffalo, New York Rm# 401 | Telephone: (716) 851-4466 Fax: (716) 851-4487 |

DATE: 12/29/04

File # 04-272

Please release the following property to _Luis Camacho_

Property # _279425_

Consisting of _× Item 46 A - only_
_A - 7 Keys + key chain_

per DA Ken Case

Sgt. J. Honegger
Detective
Major Crimes Unit

× Luis A Camacho

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

A-1431

# EVIDENCE

BUFFALO POLICE DEPT.          P-112

**DATE OF INCIDENT:** 11  11  2004
**TYPE OF INCIDENT:** Double Homicide/Shooting
**LOCATION:** 879 Niagara



**VICTIM:** 1) Nelson Camacho  2) Miguel Camacho
**CASE NO.:** 04-0929  BY:JM

Description of Evidence & Location Found:
The following physical evidence was collected on 11/12/04 @ 0600hrs while in the Evidence Collection Unit
Office.

## KEYS/ LOTTERY TICKETS

Obtained from the inside pocket of item # 13 (leather jacket)
  a)  keys (7) and key chain
  b)  54 New York State daily numbers tickets for 11/07/04
  c)  deposit slip from M&T Bank – Account # 8891715412

**279425**

# EVIDENCE

BUFFALO POLICE DEPT.          P-112

**DATE OF INCIDENT:** 11  11  2004
**TYPE OF INCIDENT:** Double Homicide/Shooting
**LOCATION:** 879 Niagara

**VICTIM:** 1) Nelson Camacho  2) Miguel Camacho
**CASE NO.:** 04-0929  BY:JM

Description of Evidence & Location Found:
The following physical evidence was collected on 11/12/04 @ 0600hrs while in the Evidence Collection Unit
Office.

## MONEY AND PERSONAL PAPERS

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1432

# EVIDENCE     BUFFALO POLICE DEPT.     P-112

**DATE OF INCIDENT:**  **11  11   2004**
**TYPE OF INCIDENT:**   **Double Homicide/Shooting**
**LOCATION:**   **879 Niagara**

**VICTIM:**   **1) Nelson Camacho  2) Miguel Camacho**
**CASE NO.:**   **04-0929**   **BY:JM**

NUMBER

Description of Evidence & Location Found:
The following physical evidence was collected on 11/12/04 between 0800-0845hrs while at the Erie County Morgue during the post mortem examination of the victim. Examination conducted by Erie County Medical Examiner Dr Baik and assisted by morgue technician T Lamb.

### VICTIMS PROPERTY (NELSON CAMACHO)

a)  gold tone ring
b)  gold tone earring

279425

# EVIDENCE     BUFFALO POLICE DEPT.     P-112

**DATE OF INCIDENT:**  **11  11   2004**
**TYPE OF INCIDENT:**   **Double Homicide/Shooting**
**LOCATION:**   **879 Niagara**

NUMBER

**VICTIM:**   **1) Nelson Camacho  2) Miguel Camacho**
**CASE NO.:**   **04-0929**   **BY:JM**

Description of Evidence & Location Found:
The following physical evidence was collected on 11/12/04 between 0900-1000hrs while at the Erie County Morgue during the post mortem examination of the victim. Examination conducted by Erie County Medical Examiner Dr Baik and assisted by morgue technician T Lamb.



### VICTIMS PROPERTY (MIGUEL CAMACHO)
Earring w/ white stone

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1433

**BUFFALO POLICE DEPARTMENT**
BUFFALO, NEW YORK·14202

EVIDENCE UNIT

1/18/04

MSG. _____ hr.

(CHECK BOX(ES))

DATE OF MSG.

| | 2. LOST | 3. FOUND | 4. ABANDONED | 5. RECOVERED | 6. EVIDENCE |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

ATION WHERE PROPERTY WAS OBTAINED, ETC.)

| .cene/Morgue | | | | | |
|---|---|---|---|---|---|
| STREET | APT. NO. | CITY/TOWN/VILLAGE | | STATE) |
| | | Buffalo | | New York |

| 8. OWNER | (FIRST | M.I. | LAST NAME) | (OWNERS ADDRESS) | (PHONE) |
|---|---|---|---|---|---|
| Nelson and Miguel | | | Camacho (deceased) | 879 Niagara | unk. |

10. OFFICER IN CHARGE OF THE CASE

| James Maroney | RANK | COMMAND | (CO PHONE) |
|---|---|---|---|
| LP# 04- 0929  HOM # 04- 242 | Detective | Evidence Unit | 851-4484 |

| ITEM NO. | QUANTITY | DESCRIPTION (SPECIFY MAKE ,MODEL, DENOMINATION, SERIAL NOS., MANUFACTURER'S NAME) BIKES-FRAME & SERIAL NOS.) (BIKES-FRAME & SERIAL NOS., LICENSE NO. & YR. OF LIC.) |
|---|---|---|
| 1 | 4 | Bag of sealed physical evidence<br><br>Boxes contain the following item #'s  46, 47 and 52 (property of victim Nelson Camacho)<br>          Item #   58  (property of victim Miguel Camacho)<br><br>See copies of P-112's for complete inventory (attached)<br><br><br>RECEIVED FROM: ECU J main 1600 Dani.<br><br>RECEIVED BY: ____ 11/18/06<br><br>PLACED IN: ____ box 28 Safe<br><br>RELEASED BY: ____ 12/29/06<br><br>has 2320 or CASH with other Paper etc.<br><br>lookensip item 46A only keys + keychain<br><br>Opened By ____ 46A only<br>Resealed 12/29/06 1345 ___ |

REMARKS :  Double Homicide/Shooting  11/11/04  879 Niagara   Victims  Nelson and Miguel Camacho

Major Crimes Unit Investigating

**SEE  LINE #12 BELOW FOR RELEASE OR DISPOSAL  AUTHORITY**

1. HOLD PROPERTY UNTIL: (SPECIFY CONDITIONS OF RELEASE)
☐    RELEASED COURT ORDER

2. (PERSON WHO/HAS/WILL AUTHORIZE THE RELEASE)

| | (RANK) | (COMMAND) | (CO PHONE) |
|---|---|---|---|
| Chief of Major Crimes Unit    **OR** | Captain | MCU | 851-4466 |
| ADA in Charge of Case | ADA | n/a | 858-2424 |

3. DEFENDANT (S)

Ossie Ortiz Velez ____  (CHARGED WITH STATE OFFENSE)

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1434

CITY OF BUFFALO
DEPARTMENT OF POLICE

HOMICIDE          74 Franklin Street          Telephone: (716) 851-4466
SQUAD             Buffalo, New York            Fax: (716) 851-4487

DATE: 8 - 15 - 0 6

File # 04-242

553-0025

Please release the following property to Mr. Camacho

Property # 279 426

Item # 2 - 15 - 17

Property # 279 425
Item # 47 - 52 - 58

Homicide Squad

# Items can be released as per
okay of ADA Ken Case

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1435

CITY OF BUFFALO
DEPARTMENT OF POLICE



HOMICIDE
UNIT

74 Franklin Street
Buffalo, New York
Rm#.401

Telephone: (716) 851-4466
Fax: (716) 851-4487

DATE: 12/29/04

File # 04-242

Please release the following property to _Luis Camacho_

Property #_____

Consisting of _Item 46 A - only_
_A - 7 Keys + key chain_

_per DA Ken Casey_

Sgt. J. Sonegan
Detective
Major Crimes Unit

X _Luis a Camacho_

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1436

**BUFFALO POLICE DEPARTMENT**
**BUFFALO, NEW YORK**
**MAJOR CRIMES UNIT**

STATE OF NEW YORK)                    **DATE: 11/13/04**
COUNTY OF ERIE      )    **VS:**
CITY OF BUFFALO    )              **TIME COMMENCED: 12:01AM**

**NAME: Luis A. Camacho AGE**: 41 **DOB**: 3/13/63 **TELEPHONE**: 830-2659, 578-4140 **ADDRESS**: 32 School Street, Bflo., N.Y. **BEING DULY SWORN, DEPSOES AND MAKES THE FOLLOWING STATEMENT TO**: Det. Richard Wagstaff - MCU, **OF THE CITY OF BUFFALO POLICE DEPARTMENT ON**: November 13, 2004 **AT**: 74 Franklin Street, Bflo. N.Y., MCU office.

This statement is being taken in regards to a double shooting home invasion robbery that occurred on 11/13/04 at about 2140hrs while at 879 Niagara Street in the City of Buffalo, N.Y.

Q. Can you read and write?
A. I can read but no writing.

Q. What grade you complete in school?
A. Six grade.

Q. Did have anything to do with the crime that occurred at 879 Niagara Street tonight?
A. No.

Q. What time did you arrive at this location?
A. No more than four minutes. I pass two red lights and I live close by.

Q. Did you come alone or were you with someone else?
A. With my girlfriend.

Q. What is her name?
A. Evette Maldonado.

Q. Who was at the house when you got there?
A. My two brothers lying on the floor. The door was open and I call and no body answer. Then I look and saw the body.

Q. Why did you come over to 879 Niagara?

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1437

When more cops showed up, for some reason the gun didn't want to go down, it fall out my hand and they told me to go face down. They put the handcuffs on me and put me in the car.

Q. Is there any reason why anybody would want to harm your brothers?
A. No. But my brother Lobo told me that somebody told him that he hit the lotto for sixty five thousand dollars.

Q. Did any of your brother's hit the lotto for a large sum of money?
A. No. Lobo only won two hundred dollars about two weeks ago.

Q. Is there any drug activity going on at your brother's house?
A. We party but no dealing.

Q. What do your brother's do for a living?
A. Lobo worked at the Towne Restaurant for eighteen years. Miguel is on SSI, he's handicap.

Q. Did you see anyone in the area when you arrived at your brother's house?
A. When I passed the light at Massachusetts, I saw three persons running towards Massachusetts behind the black truck.

Q. Can you described them?
A. All I remember was a yellow shirt and they look skinny. They duck down in front of the truck and kept running. I think they might know me because they might of recognized the car. The car is Lobo's car.

Q. Did you see anything in there hands?
A. No.

Q. What kind of car did you come in?
A. 1983 BMW, gold color.

Q. Could you recognize them if you saw them again?
A. If there on the video, may be.

Q. Is there anything else you can add to this statement that may help in this investigation?
A. No.

**TIME CONCLUDED:** 00:39 AM/PM

**NAME:** Luis A. Chamacho, **HEREBY SOLEMNLY SWEAR AND AFFIRM THAT THE ABOVE IS MY STATEMENT, THAT I HAVE READ/OR HAVE HAD**

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1438

P. V. R.

```
 1                    CITY OF BUFFALO
 2                    POLICE DEPARTMENT
 3                    HOMICIDE SECTION
 4
 5                                            NOV 13, 2004
 6                                            FILE # 04-242
 7                                            CD#043160879
 8                                            STARTED00:00
 9     STATE OF NEW YORK)
10     COUNTY OF ERIE    )  SS
11     CITY OF BUFFALO   )
12
13     Pedro Ramos Vega Hispanic Male 30 years old, d/o/b 05-27-74, residing at
14     76 Barton st. Buffalo, NY. phone no-phone .  Being duly sworn, deposes and
15     makes the following statement while in the Buffalo Police Department
16     Homicide office.   The questions are asked by, and the statement is
17     typewritten by Det. Reginald Minor
18
19     Q)  Can you read and write and how far have you gone in school?
20     A)  Yes I can read and write english and I went to the 12th grade.
21
22     Q)  Who do you live with?
23     A)  Virginia Huertas my girlfriend.
24
25     Q)  How do you support yourself?
26     A)  I do mechanic jobs
27
28     Q)  The Buffalo Police Homicide Section is investigating the death of
29         Nelson Camacho 30 y/o hispanic male dob 04-26-68 and Miquel Camacho
30         19 y/o hispanic male dob 09-09-79 both of 879 Niagara. The incident
31         took place at 879 Niagara st in the vicinity of Rhode Island and
32         Massachusetts 11-11-04 at approx 21:44 hrs.  Please can you tell me
33         in your words what you know about this incident.
34
35     A)  Sometime that night the night of Nov 11th on a thursday, I was fixing
36         a car on Zips on Niagara and Mass.  Then I went to get some pizza at
37         Mr Pizza also on Niagara st.  When I got to the pizzeria I saw three
38         guys, standing across the street from the Pizzeria, in front of a
39         vacant store.  When I got out of the Pizzeria I noticed them walking
40         towards Zips on the same side of the street.  Then they walked onto
41         the porch of this abandon house.   They kept pacing back and forth.
42         And I noticed that they were looking toward the apposite side of
```

Case 1:16-cv-00321-EAW-MJR  Document 78-6  Filed 07/03/20

A-1439

P.V.R.

| | | |
|---|---|---|
| 1 | Q) | What is Carlos to you? |
| 2 | A) | A friend. |
| 3 | | |
| 4 | Q) | How long have you known Carlos? |
| 5 | A) | About a year. |
| 6 | | |
| 7 | Q) | How close did the three individuals get to you? |
| 8 | A) | About 100 feet, across Niagara. |
| 9 | | |
| 10 | Q) | Was it light or dark out? |
| 11 | A) | It was getting dark. |
| 12 | | |
| 13 | Q) | Describe the three guys you referred too? |
| 14 | A) | They were all light skin. They looked young. They were wearing dark |
| 15 | | color hoodies with jeans. |
| 16 | | |
| 17 | Q) | Which one was carrying the item that looked like a gun? |
| 18 | A) | The tallest one. |
| 19 | | |
| 20 | Q) | How tall were the three men you seen enter the house down the street? |
| 21 | A) | The tallest is at lease 5'11". The other two were around 5'8" |
| 22 | | |
| 23 | Q) | Were you able to see their faces clear? |
| 24 | A) | No. |
| 25 | | |
| 26 | Q) | Did you recognize any of them? |
| 27 | A) | No. |
| 28 | | |
| 29 | Q) | Can you identify the three individuals you seen walk to the victim's |
| 30 | | house? |
| 31 | A) | No. |
| 32 | | |
| 33 | Q) | Describe the abandon house that they were standing in front of? |
| 34 | A) | No, but it's next to the abandon store front. |
| 35 | | |
| 36 | Q) | How much time elapsed from the three guys entering the house and the |
| 37 | | shot fired? |
| 38 | A) | About five minutes. |
| 39 | | |
| 40 | Q) | After you heard the shot did you see any of the three guys leave the |
| 41 | | house they entered? |
| 42 | A) | No. |

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1440

P.V.R.

```
1
2    Q)   What did you heard after the shot was fired?
3    A)   I heard a lady screaming and crying.
4
5    Q)   How soon after the shot did you heard the screams and crying?
6    A)   Between one and two minutes.
7
8    Q)   Did you see any women running from the house before or after the
9         shot?
10   A)   Nope.
11
12   Q)   Did Carlos mention anything about the three guys when you observed
13        them from his porch?
14   A)   No.
15
16   Q)   Pedro do you have a nick name?
17   A)   Yes, Cano which means blond hair.
18
19   Q)   Is there anything else that you can think of that can assist us in
20        this investigation?
21   A)   No.
22
23   Q)   I will now have you read your statement to determine if it is true
24        and accurate.
25   A)   Yes.
26
27   Q)   Now that you have read the statement is it true and correct and will
28        you sign it.
29   A)   yes.
30
31        STATEMENT ENDED AT ........
32
33   I UNDERSTAND THAT ANY FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A
34   CLASS "A" MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE
35   STATE OF NEW YORK.
36
37   SUBSCRIBED AND VERIFIED UNDER PENALTY OF PERJURY.
38
39
40                                     SIGNED: Pedro Vega Ramos
41
42
```

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1441



SANYO/SPRINT    NCAMACNO98@SPRINTPCS.com

(716)  228-3344

OUTGOING

| | | |
|---|---|---|
| 597-3070 JEILYN | 8:47 PM | 11/11/04 |
| 871-1167 | 8:02 PM | 11/11/04 |
| 587-2566 | 8:00 PM | 11/11/04 |
| 578-4140 | 7:57 PM | 11/11/04 |
| 207-2812 PAPO | 7:55 PM | 11/11/04 |
| 830-5762 | 6:43 PM | 11/11/04 |
| 903-3059 FAMUSO | 6:42 PM | 11/11/04 |
| 348-7421 | 1:48 AM | 11/11/04. |
| 310-9027 | 1:47 AM | 11/11/04. |
| 830-2659 CANARIO | 10:39 PM | 11/10/04 |
| 563-7757 BIMBO | 7:47 PM | 11/10/04 |
| 563-2598 | 6:43 PM | 11/10/04 |
| 836-4600 | 3:00 PM | 11/10/04 |
| 374-4650 | 2:46 PM | 11/10/04 |
| 384-7877 | 2:40 PM | 11/8/04 |

INCOMING

| | | |
|---|---|---|
| 871-1167 | 6:47 PM | 11/11/04 |
| 597-3070 JEILYN | 3:40 AM | 11/11/04 |

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1442

11/16/04

TM

ITEM 21

CELLPHONE

NOKIA/SPRINT

(716) 316-9086

NO CALL HISTORY AVAILABLE.

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1443

ITEM 67

CELL PHONE

"SPRINT"   (716) 812-6408

JVELDZQUEZ 33 @ SPINTPCS. COM

OUTGOING

563-2632          10/29/04   7:09pm
978-459-4677     10/13/04   8:03pm
841-350-8350     10/11/04   8:19pm

INCOMING

603-0802     9/3/04   1:15pm

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1444

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20

A-1445



04-0929

Case 1:16-cv-00321-EAW-MJR Document 78-6 Filed 07/03/20

ITEM 65A

| | |
|---|---|
| 853.6729 | Edwin B. |
| 855-6[illegible]62 | F. & T. |
| 990-2420 | Edward |
| 852-2653 | LUZU |
| 603-7422 | LUZ. Cell |
| 400.9161 | ORAMA |
| 922.6771 | DR |
| 563.2599 | TONY |
| 553 2771 | Chino |

04-0929

A-1446

A-1447

Case 1:16-cv-00321-EAW-MJR   Document 78-6   Filed 07/03/20   P



A-1448

563-7757 "Bimbo" 2005 charms AlexisPerez #17 W28TH
5/12/82 ₤

836-4600 - Northtown Toyota, Volks/Isuzu
874-4050 - United Imports
884-5128 "T.R." Town Restaurant
603-3542 "Anne" Charms Anna Wilson 6/11/7 9
12/1/2005 712 Moore Ave. Tonawanda 603-3542
Fabric/apena Saved on Wilson
9/7/06 20 Vowalden on removing prosthtnm
11/7/05 "Anna Wilson - escort service - tried 2 steal watches
- on track
553-2741 OHMO= Omegar Montalvo



Buffalo Police Department                                      Page 2 of 2

#4:

FOR LAW ENFORCEMENT USE ONLY

Josue Ortz' phone  716-812-6408

OUTGOING

10/29/04 - 563-2632  nohit

10/13/04  978-459-4677 (massachusetts) no hit
                       Lowell, MASS

10/11/04  841-350-8350  no such area code

Incoming
    9/3/04  603-0802  nohit

Jenka  603-9804          2007 Assault cmplt
    TLO Jerica ARROYO  —— vs. Andres Cruz-Medina
    115 military Rd Bflo  │       37 14½ 12/9/86
        9/22/78  5'6"   Childrn.
                        Common

Janny  308-5901  Yajaira Planell Camacho 11/2/82
                  526 Niagara

Case 1:16-cv-00321-EAW-MJR  Document 78-6  Filed 07/03/20

A-1449

# EVIDENCE UNIT

## CASE FILE

## LP# 04-0929

## HOM # 04-242

*Double Homicide/Shooting*
879 Niagara St.
11/11/04   CD# 04-316-0879



EXHIBIT
6
1/23/19

A-1451

## EVIDENCE UNIT CASE REPORT   P-77B

| CC# | CD/CASE# | CRIME | LOCATION | DATE OF OCC | DATE PROCESSED |
|---|---|---|---|---|---|
| 04-0929 | 04-316-0879 | HOMICIDE | 879 Niagara | 11/11/04 | 11/11/04 |

| PROCESSED AT | COMPLT | IN YOUR UNIT/OFFICER | CO UNIT |
|---|---|---|---|
| SCENE | Camacho | MCU | Maroney/Murphy/Carducci |

| CALL OUT | PHOTOS | PHOTOGRAPHER | EVIDENCE COLLECTED | FP EXAM | COMPARABLE LATENTS DEC | SUB TO SAFIS |
|---|---|---|---|---|---|---|
| ✓ | ✓ | BALK | ✓ | ✓ | ✓ | ✓ |

| SUSPECTS COMPARED | COMPLT SUBJ | BAS SUBMISSION | LAB SUBMISSION |
|---|---|---|---|
| | | 279424, 279425 ,279426 , 279428 | 04-06432 |

**REMARKS:**

11/11/04 2230hrs- Notified , via telephone by DDSO Stabler, to respond to 879 Niagara St to meet members of the Major Crimes Unit in regards to a Double Homicide/Shooting at that location.

11/11/04 2300 hrs- Arrived at 879 Niagara St where I was met by D/Sgt Lonergan of the Major Crimes Unit who advised me to what had possibly transpired. After photographs of the scene were taken by Police Photographer Balk , a crime scene search was conducted. Collected and secured were items of physical evidence numbered # 01-41 and item # 65. Photocopies of P-112's attached. A latent fingerprint examination was also conducted at the scene by Det Carducci of the ECU. Processed using black fingerprint powder were the POE doors and the glass table top in the living room. Useable latent fingerprints of comparable value were developed on the POE doors.

11/12/04 0330hrs- Det Carducci of the ECU arrived at the Major Crimes Unit Office where she collected and secured items of physical evidence numbered # 42-45. Photocopies of P-112's attached.

11/12/04 0660hrs- While in the Evidence Collection Unit Office I secured items of physical evidence numbered # 46-47. Photocopies of P-112's attached.

11/12/04 0800hrs - Arrived at the Erie County Morgue where I attended the post mortem examination of the victims conducted by Erie County Medical Examiner Dr Balk and assisted by morgue technician T Lamb. Collected and secured were items of physical evidence numbered # 48-58. Photocopies of P-112's attached.

11/12/04 1030hrs- Arrived at 879 Niagara St where a secondary crime scene search was conducted upon the still secured scene. Collected and secured were items of physical evidence numbered # 59-61. Photocopies of P-112's attached. A latent fingerprint examination was also conducted using black fingerprint powder. Processed were the door jams, POE doors to the bedrooms, the kitchen appliances and the dressers in bedroom #1. Useable latent fingerprints and palmprints of comparable value were developed on the POE doors to the bedrooms.

11/12/04 1230hrs- While in the Evidence Collection Unit Office I collected and secured items of physical evidence numbered # 62-64. Photocopies of P-112's attached.

11/17/04 0240hrs- D/Sgt Murphy of the ECU collected and secured items of physical evidence numbered # 66-69. Photocopies of P-112's attached.

11/17/04 1100hrs- While in the ECU office a latent fingerprint examination was conducted on items of physical evidence numbered # 01, 03, 04-12, 14, 16, 18, 21-22, 27, 59-60 using cyanoacrylate fuming and the application of black fingerprint powder. "Magna-Jet black magnetic fingerprint powder was also used on item # 08. No usable latent fingerprints of comparable value were developed. Several poor partial latents were developed on items 3, 4, 8, 12, and 22 however they lacked adequate ridge detail to be used for ID/Comparison purposes. The latents that were developed at the crime scene were forwarded to SAFIS for possible ID.

11/19/04 1315hrs - Arrived at the Bureau of Administrative Services where I submitted items of physical evidence numbered # 02-08, 12, 13, 15, 17, 19-21, 23, 32-34, 42-44, 48-51, 53-57 and 61-67 to PO Teprovich of the BAS. The items were assigned BAS Property # 279426. Also submitted were items of physical evidence numbered # 9 (firearm) which was assigned BAS Property # 279424 and items of physical evidence numbered # 46, 47, 52, 58 which were assigned BAS property # 279425.
I also obtained BAS Property # 279428 for items of physical evidence numbered # 01, 10, 11, 14, 16, 18, 22, 24-31, 35-41, 59, 60, 68-71.

11/19/03 1350 - Arrived at the Erie County Central Police Services Laboratory where I submitted items of physical evidence numbered # 01, 10, 11, 14, 16, 18, 22, 24-31, 35-41, 59, 60, 68-71 to B Weiss of the CPS Lab. The items were assigned CPS Lab # 04-06432.

Please refer to case folder for all reports regarding this investigation.

Respectfully Submitted

Det J Maroney- ECU

00001011



ITEMS

1)
2) CHAIR
3) REMOTE
4) GLASS
5) CELL PH.
6) GUN
7) REMOTE
8) BAG
9) GUN
10) CART. CASE
11) CART. CASE
12) PIECE OF METAL
13) COAT
14) CART. CASE
15) MEDALLION
16) CART. CASE
17) MEDALLION
18) CART. CASE
19) WOOD
20) HOLSTER
21) CELL PH.
22) DRUGS
23) PANTS
24) SHOE PRINT
25) SHOE PRINT
26) SHOE PRINT
27) CART. CASE
28) SHOE PRINT
29) SHOE PRINT
30) SHOE PRINT
31) SHOE PRINT
32) WRS
33) WRS
34) DRS
35) DRS
36) DRS
37) BULLET
38) BULL
39) BUL
40) BULL

59) CART. CASE
60) CART. CASE

11/12/04
JM

*NOT TO SCALE

N E + S W

879 NIAGARA



BULLET DAMAGE / DRS SHOE PRINTS

A) BULLET HOLE
B) BULLET HOLE
C) BULLET HOLE
D) BULLET HOLE
E) BULLET HOLE
F) BULLET HOLE
G) FURROW MARK
H) BULLET HOLE
I) FURROW MARK
J) BULLET HOLE
K) BULLET HOLE
L) HOLE IN GLASS
M) HOLE IN GLASS
N) HOLE IN GLAS

V) DRS SHOEPRINT
W) DRS SHOEPRINT
X) DRS SHOEPRINT
Y) DRS SHOEPRINT
Z) DRS SHOEPRIN

899 NIAGARA

00001013

A-1454





11/11/0

4 ROUNDS RECOV.
IN REAR HALL
(ITEMS 37-40)

1 ROUND RECOV.
DOOR FRAME - BR#1
(ITEM 41)

REAR KITCHEN DOOR

BACK PORCH DOOR
(DIRECTLY BEHIND KITCHEN DOOR)

A) BULLET HOLE   4'4" UP   7" S OF N EDGE   (PASSED INTO HALL)

B) BULLET HOLE   4'1" UP   9" S OF N EDGE   (PASSED INTO HALL)

C) SMALL CAL. BULLET HOLE   3'3" UP   3" S OF N EDGE   (PASSED INTO HALL)

D) BULLET HOLE   1'10" UP   4" S OF N EDGE   (PASSED INTO HALL)

E) BULLET HOLE   1'6" UP   7" S OF N EDGE   (PASSED INTO HALL)

F) BULLET HOLE   9" UP   11" S OF N EDGE   (PASSED INTO HALL)

G) FURROW MARK - N WALL OF KITCHEN   24" UP   4'0" W OF E WALL

H) BULLET HOLE   E DOOR FRAME BEDROOM #1   4'10" UP   (RECOVERED AS ITEM 41)

I) FURROW MARK - DOOR LEADING FROM LIV. ROOM TO KITCHEN   3'8" UP

J) BULLET HOLE - LIV ROOM FLOOR   7'9 S OF N WALL   (THROUGH FLOOR INTO FURNACE)
4'4" W OF E WALL

K) BULLET HOLE - IN WOOD - 4'3" UP   4" S OF N EDGE   (PASSED THROUGH)

L) HOLE IN GLASS   5'9" UP   12" S OF N EDGE

m) HOLE IN GLASS   4'4" UP   2'0" S OF N EDGE

N) HOLE IN GLASS   3'8" UP   17" S OF N EDGE

ALL TRAJ. MOVING FRONT OF HOUSE TO BACK

00001014

A-1455

P-127 (Rev.11/85)

**04 0929**

POLICE DEPARTMENT, BUFFALO, N.Y.

**EVIDENCE CONTROL REPORT**

CD 04 316 0879

Date 11/18/04

TT Pg.#

Hrs.

**NOTE:** For Fingerprint Examination, Use Form P-77-C
For Laboratory Analysis, Use Form DCPS-L-1

EVIDENCE DESCRIPTION: One Surveillance Videotape From
Zips Food Store 896 Niagara Street

| WHERE FOUND | (Specify: Ex. Kitchen, Car, Suspect's Person; etc.) 896 Niagara | | (Address 896 Niagara St | No. | St. | Apt.No. BFO |
|---|---|---|---|---|---|---|
| Time 2310 HRS. | MO. 11 | Date DAY 18 | YEAR 04 | Charge | | (Suspect's Mug No.) |
| (Suspect's | Last Name | First | M.I.) | (Date of Birth) Mo. Day Year | (Address No. St. | Apt. No.) |
| (Suspect's | Last Name | First | M.I.) | (Date of Birth) Mo. Day Year | (Address No. St. | Apt.No.) |
| (Victim's | Last Name | First | M.I.) | | (Address No. St. | Apt.No.) |

EVIDENCE SEIZED BY: (Name-Print or Type) Richard Wagstaff   (Rank) DET   (Unit) MCU   (Signature)

**CHAIN OF POSSESSION OF EVIDENCE**

| | OBTAINED FROM (Signature Required) | GIVEN TO (Signature Required) | TIME Hrs. | MO. | DATE DAY | YEAR |
|---|---|---|---|---|---|---|
| 1. | | Charles Carduca | 3:00 Am | 11 | 12 | 04 |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | **04-0929** | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |

REMARKS:

00001052

```
nted for: G185/000830                                   Thu Nov 11 22:33:45 2004
NCIDENT HISTORY DETAIL:  B043160879


INITIATE: 21:44:24  11/11/04      CALL NUMBER:      B0879
ENTRY:    21:45:01                CURRENT STATUS: CLEARED
DISPATCH: 21:46:09                PRIMARY UNIT:   B440
ONSCENE:  21:48:02                CASE NUMBER:    BP0400047641
CLOSE:                            DISPOSITION:    AST


LOCATION: 879 NIAGARA ST ,BUF (RHODE ISLAND & MASSACHUSETTS)
LOCATION COMMENTS: LOWER APT
DAREA:     DD
BEAT:      D4                     TYPE:     PSHOT  SHOOTING
GZONE:     05012                  PRIORITY: 1
ST CODE:   1132

21:45:01 HC09 ENTRY     COMP:LABORGNE, DAVID J \SOURCE:RESD \LOC:879
                        NIAGARA,BUF \PH:716/885-5514 \TEXT:INV 7 SHOTS FIRED
                        INSIDE LOWER APT........NEIGHBOR SAID HE CAN HEAR
                        PEOPLE SCREAMING
21:45:01 HC09 MAP       PAGE ---- BLK COORD - ----- ----
21:45:01 HC09 E911      LOCATION:879 NIAGARA,BUF \PHONE:716/885-5514
                        COMP:LABORGNE, DAVID J
21:46:09 HD02 DISP-ENR  D540 D431
21:46:09 HD02 ID        D540 <000230>DELANO,WILLIAM
21:46:09 HD02 ID        D431 <001306>MARTINEZ,MICHAEL
21:46:16 HD02 BACKUP    D540 D451
21:46:16 HD02 ID        D451 <000593>MARCH,MICHAEL
21:46:19 HD02 BACKUP    D540 D411
21:46:19 HD02 ID        D411 <000835>ROSS,BRIAN
21:46:22 HD02 ENROUTE   D451
21:46:22 HD02 ENROUTE   D411
21:46:29 HD02 BACKUP    D540 B540
21:46:29 HD02 ID        B540 <000364>GRAMAGLIA,JOSEPH
21:46:34 HD02 BACKUP    D540 B512
21:46:34 HD02 ID        B512 <001100>JENTZ,RONALD E
21:46:47 HD02 BACKUP    D540 D420
21:46:47 HD02 ID        D420 <000344>GENOVESE,DONALD
21:46:48 HC08 UPDATE    TYPE:SHOTS-->PSHOT D TYPE:SHOTS FIRED-->SHOOTING
21:46:48 HC08 E911      LOCATION:307 PORTER AV,BUF \PHONE:716/830-2659
                        COMP:SPRINT PCS WIRELESS
21:46:48 HC08 SUPP      TEXT:C/MAN.......PERSONS SHOT. COMPLAINANTS TWO
                        BROTHERS ARE SHOT. ADI NTFD
21:47:05 HD02 ENROUTE   B512
21:47:05 HD02 ENROUTE   B540
21:47:05 HD02 ENROUTE   D420
21:47:25 HD02 BACKUP    D431 D442
21:47:25 HD02 ID        D442 <000877>SERCU JR.,THOMAS
21:47:30 HD02 BACKUP    D420 D410
21:47:30 HD02 ID        D410 <000773>PITTORF,LAURA
21:47:32 HD02 BACKUP    D420 D421
21:47:32 HD02 ID        D421 <000654>MONTEFORTE,ALBERT
21:47:33 HD02 BACKUP    D411 D423
21:47:33 HD02 ID        D423 <000655>TOMASSI,KIMBERLY
21:47:34 HC08 SUPP      TEXT:...VICTIMS ARE INSIDE THE HOUSE NOW.
21:47:34 M035 BACK-ER   B540 B511
21:47:34 M035 ID.       B511 <000522>LAPIANA,ANTHONY
21:47:38 HD02 ENROUTE   D410
21:47:38 HD02 ENROUTE   D421
```

00001075

```
inted for: G185/000830                              Thu Nov 11 22:33:45 2004
 :47:38 HD02 ENROUTE     D423
.1:47:38 HD02 ENROUTE    D442
21:47:42 HC05 E911       LOCATION:877 NIAGARA,BUF \PHONE:716/884-5493
                         COMP:DEJESUS, LUIS
21:47:42 HC05 SUPP       TEXT:ADI NTFD----SOMEONE SHOT, NFI
21:48:02 M069 BACK-ER    D421 B440
21:48:02 M069 ID         B440 <001042>WITASZEK,EDWARD
21:48:02 HD02 ONSCENE    B512
21:48:03 AK03 ONSCENE    D431
21:48:53 HD02 MISC       D451, ADI NOTIFIED FOR 2 UNTIS
21:50:09 HD02 BACK-ER    D451 DO3
21:50:20 HD02 BACKUP     D420 D510
21:50:20 HD02 ID         D510 <000601>MAYER,MITCHELL
21:51:00 HD02 MISC       D510, 3 PM'S, 2 IN BLACK HOODIES, 1 IN GRAY
                         HOODIE...ALL 3 RUNNING ON 7TH
21:51:43 HD02 MISC       D510, 1271, NOTIFIED
21:51:54 HD02 BACKUP     D420 B520
21:51:54 HD02 ID         B520 <001037>WILLIAMS,JOHN
21:51:59 HD02 ENROUTE    D510
21:51:59 HD02 ENROUTE    B520
21:52:06 HD02 ONSCENE    D510
21:52:09 HD02 ONSCENE    D410
21:52:09 HD02 ONSCENE    D411
21:52:09 HD02 ONSCENE    D420
21:52:09 HD02 ONSCENE    D421
21:52:09 HD02 ONSCENE    D423
21:52:15 HD02 ONSCENE    B440
21:52:15 HD02 ONSCENE    B511
21:52:15 HD02 ONSCENE    B520
21:52:21 HD02 ONSCENE    D442
21:52:21 HD02 ONSCENE    D451
21:52:21 HD02 ONSCENE    D540
21:52:21 HD02 ONSCENE    DO3
21:52:58 HD02 BACKUP     D421 D430
21:52:58 HD02 ID         D430 <001065>YEATES,ROBERT
21:53:03 HD02 ONSCENE    D430
21:54:05 HD02 MISC       .879, AK47 USED IN THIS SHOOTING
21:54:23 HD02 BACKUP     D421 B431
21:54:23 HD02 ID         B431 <000158>CHAPPELL,ROBERT
21:54:31 HD02 CHGLOCOS   B431 116 JERSEY ST ,BUF
21:54:55 HD02 CHGLOCOS   B511 116 JERSEY ST ,BUF
21:55:11 HD02 MISC       B431, POSSIBLE SUSPECTS RUNNING THRU YARDS
21:55:44 HD02 MISC       B511, POSSIBLE SOUTH ON BUSTI
21:55:56 HD02 MISC       B511, ONE IN A WHITE HOODIE
21:56:18 HD02 MISC       B511, SOUTH ON 7TH FROM JHERSEY
21:56:50 M090 BACK-ER    B431 B531
21:56:50 M090 ID         B531 <001271>DRABIK,WILLIAM
21:57:06 DK18 BACK-ER    D540 B521
21:57:06 DK18 ID         B521 <000502>KROLIKOWSKI,PATTYJO
21:57:27 DK18 ONSCENE    B521
21:58:55 HD02 MISC       D510, 3 MEN TOOK OFF, ALSO HAD A BAT ......DROPPED
                         BAT, MAN SHOWED POLICE WHERE IT IS
21:59:15 M089 BACK-ER    B511 B522
21:59:15 M089 ID         B522 <000193>LONERGAN,PAMELA
22:00:02 HD02 MISC       DO3, NEED EVIDENCE////PHOTO
22:00:30 HD02 MISC       DO3, ALSO ALOOW CALL OUT FOR EVIDENCE ANFD PHOTO
22:00:50 HD02 MISC       DO3, ALSO ALLOW CALL OUT FOR OTHER MAJOR CRIME
                         DETECTIVES
22:02:20 HD02 MISC       B512, GOING TO MAJOR CRIMES
22:02:44 HD02 BACKUP     D410 D511
```

Page 2

Case 23-352, Document 39, 06/23/2023, 3533142, Page237 of 251

A-1458

```
Printed for: G185/000830                              Thu Nov 11 22:33:45 2004
22:02:44 HD02 ID        D511 <000965>SUPPLES,TERRY
22:02:46 HD02 BACKUP    D421 D530
22:02:46 HD02 ID        D530 <000293>FAHEY, JOSEPH
22:02:49 HD02 ONSCENE   D511
22:02:49 HD02 ONSCENE   D530
22:04:54 HD02 BACKUP    D420 D432
22:04:54 HD02 ID        D432 <000472>KELLY,LOUIS
22:04:56 HD02 ONSCENE   D432
22:05:34 HD02 BACKUP    D431 1300
22:05:35 HD02 BACKUP    D423 1301
22:05:43 HD02 ENROUTE   1300
22:05:43 HD02 ENROUTE   1301
22:06:05 HD02 BACKUP    D421 B441
22:06:05 HD02 ID        B441 <000548>LOCICERO,MARK
22:06:09 HD02 ONSCENE   B441
22:07:44 HD02 MISC      B512, 3 MALES WERE SKINNY, ONE WAS WEARING YELLOW
                        SHIRT, HEADED UP NIAGARA, UNK IF INVOLVED
22:12:03 M089 INSRVICE  B522
22:18:34 HD02 INSRVICE  B540
22:18:36 HD02 BACKUP    B521 B540
22:18:36 HD02 ID        B540 <000364>GRAMAGLIA,JOSEPH
22:18:41 HD02 ONSCENE   B540
22:18:49 HD02 BACKUP    D410 B541
22:18:49 HD02 ID        B541 <001087>RUGGIERO, JOSEPH J.
22:18:53 HD02 ONSCENE   B541
22:18:55 HD02 BACKUP    D421 B542
22:18:55 HD02 ID        B542 <001092>GALLAGHER,ALLEN
22:18:59 HD02 ONSCENE   B542
22:19:50 HD02 INSRVICE  D442
22:20:37 HD02 INSRVICE  D410
22:21:03 HD02 INSRVICE  D511
22:24:16 CK02 INSRVICE  D432
22:27:58 HD02 MISC      D451, HAVE ALL CARS THAT RESPONDED TO THIS CALL RETURN
                        TO THE SCENE......LG GROUP GATHERING....NEED AREA
                        SECURE
22:28:46 M069 CLRCASE   B440 AST BP0400047641 assigned

OPERATOR ASSIGNMENTS:   HC09  001586 SCHEIB,LISA
                        HD02  001158 MARTH, ROBERT J
                        HC08  001141 WIERZBOWSKI,KAREN
                        M035  000522 LAPIANA,ANTHONY
                        HC05  001124 MEYER,MARGARET
                        M069  001042 WITASZEK,EDWARD
                        AK03  001306 MARTINEZ,MICHAEL
                        M090  001271 DRABIK,WILLIAM
                        DK18  000502 KROLIKOWSKI,PATTYJO
                        M089  000193 LONERGAN,PAMELA
                        CK02  000472 KELLY,LOUIS
```

00001077

A-1459

## City Of Buffalo - Department Of Police
### Major Crimes Unit

**To:**       Captain Mark Morgan
             Crimes Against Persons Bureau

**From:**     Det. Mark J. Lauber
             Det/Sgt. Philip Torre
             Major Crime Unit

**Subject:**  MCU File #04-242,
             Homicides of Nelson & Miguel Camacho

**Date:**     November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did respond at about 1100hrs. to the area of Hampshire & 19th St. This was in request to a call by car D-341 PO Marie Schreckenberger concerning a male she had encountered at that location.

We arrived at about 1105hrs. and met with PO Schreckenberger, PO's Poleon (D-241) and Lewczyk (D-342) along with off-duty PO B. Rodriguez. We were informed that a subject identified as Josue Ortiz, DOB 11-14-1981 of 142 Germain St. Buffalo had stopped PO Schreckenberger and jumped into her patrol car saying that people were trying to kill him. Subject Ortiz was speaking Spanish and Rodriguez was interpreting for us.

Ortiz had told the Officers that person(s) unknown were trying to kill him because they thought he was involved in the homicides of Nelson & Miguel Camacho. We talked with Ortiz and he stated he just came to Buffalo from Puerto Rico. Ortiz admitted that he had just smoked marihuana, his eyes were glassy and he exhibited signs of being under the influence of marihuana (dilated, red pupils and unsteady gait). He continued to state that unknown persons where attempting to kill him although he could not articulate the manner in which these attempts were being made, the location these attempts were occurring at, the identities or motives for those trying to kill him.

Ortiz stated he was scared and needed help. After consulting with the Officers and observing the behavior of Ortiz it was decided that he might be in need of medical and or physic iatric evaluation. Ortiz agreed to voluntarily go to the Buffalo General Hospital for these examinations and was taken there via Rural/Metro ambulance.

We departed the area at about 1135hrs. and continued to investigate the homicides. Your office will be kept informed of developments as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

00001189

## City Of Buffalo - Department Of Police
### Major Crimes Unit

**To:** Captain Mark Morgan
Crimes Against Persons Bureau

**From:** Det. Mark R. Stambach
D/Sgt. James Lonergan
Major Crimes Unit

**Subject:** FILE # 04-242

**Date:** 11/16/04

ATTN: Lt. Margaret Sack
Major Crimes Unit

Sir:

Your writers did meet with P.O. David Sadlocha and P.O. John Lobaugh at the Major Crimes Unit Office. Both officers did have with them a Mr. Josue Daniel Ortiz. They responded to a call at 7:16pm. P.O. Sadlocha, Car D432, indicated the subject was confessing about the homicide on Niagara Street.

Mr. Josue Daniel Ortiz was placed into Sgt. Vivian's Office at 7:25pm. A formal interview was started at 7:30pm. He gave information during this interview that indicated he was involved in the homicides. Present in the Interview Room was P.O. Edwin Torres of B District. He was used as an interpreter as he informed your writers he spoke only a little English.

After listening to Mr. Ortiz explain what had happened, he was advised of his rights.

P.O. Edwin Torres read a Spanish Rights Card to Mr. Ortiz. The rights were read at 8:25pm. He then signed the Rights Card. His waiver was read at 8:30pm. This Rights Card shall now become a part of this file.

At 8:40pm, Mr. Ortiz was given a Coke, large fries and a sandwich from McDonald's.

At 9:00pm, a formal sworn statement was taken from him. Please see attached sworn statement for further details on this matter. This sworn statement will now become a part of this file. The statement was finished at 10:30pm, whereas it was read back to him and he signed it.

Your office will be kept apprised of any new developments in this case.

Respectfully,

Mark R. Stambach

Det. Mark R. Stambach
Major Crimes Unit

00001190

City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 17, 2004

Sir:

On the above date at approx. 0300 hrs., your writer
along with Det/Sgt. James Lonergan and Det. James Lema went
to 19 Hoyt St, Apt. #3.  Josue Ortiz signed a permission to
search for this address.
Ortiz did not have a key on his person for this
apartment.  Through our investigation, we learned that the
landlord for this property is Dennis Dunson.  His address
is 687 Eggert Rd.  His phone number is 835-6049 and his
cell number is 308-3837.  He agreed to meet us at this
property.  He arrived at 0330 hrs.  He stated that the
person he rented apartment #3 to was Angel Rivera.  Dunson
was shown a photo of Josue Ortiz.  He stated that it was
not Rivera but that he had seen Ortiz at this address in
the past.  Dunson unlocked apartment #3 and we entered.  It
did not appear that anyone was living in this apartment.
There was very little furniture and no clothing.
There was nothing of an evidentiary nature at this
apartment.  We secured the door and left at 0350 hrs.
Your office will be kept apprised of any new
developments in this case.

00001191

Respectfully submitted,

Det. Mark J. Vaughn

Case 23-352, Document 39, 06/23/2023, 3533142, Page242 of 251

A-1463



1   — CITY OF BUFFALO
2   DEPARTMENT OF POLICE
3   MAJOR CRIME UNIT

7   TO:      Capt. Mark Morgan          SUBJECT: MCU # 04-242
8            Major Crime Unit           DATE:    November 11, 2004

10  FROM:    Det. Mary E. Gugliuzza      VICTIM:  Miguel & Nelson Camacho
11           Major Crime Unit

16  Sir,

18     On this date at approximately 2200 hours this writer did receive a call from Lt.
19  Stabler, Shift officer regarding needing my assistance at a double shooting at 879
20  Niagara St. Upon arrival the scene, a house at above address, was taped in yellow
21  tape. I did meet with Det/Sgt Lonergan, MCU and he apprised me of the situation.
22  Det. Tom Balk, Photography, Paula Carducci and Jim Maroney from Evidence Unit
23  were also on the scene. Lt. March and numerous officers from B & D districts were
24  on scene for crowd and traffic control. Prior to writing the scene, this writer did
25  canvass the scene, along with Det Richard Wagstaff. He did accompany Det
26  Maroney across the street regarding evidence in rear yard. Det. Wagstaff will cover
27  his actions on his own P-73.

29     This writer did go to the upper apartment and spoke to the residents who were
30  there during this homicide. They are Beverly and David Laborgue of 879 Niagara
31  upper 885-5514. Also their 9-year-old daughter, Brenda was in the apartment.
32  There was also a small Hispanic male approximately 2 yrs old who was there. The
33  Laborgne's did not know the boys name. The boys female guardian had arrived on
34  the scene with him, she was hysterical after finding out who was murdered and the
35  Laborgne's took the boy upstairs to their apartment for warmth. It was learned later
36  that the boy was at the scene with his aunt, Jeilyn Rosario. Later on in the evening
37  this writer did bring boy downstairs to be re-united with his mother who came to
38  the scene. This writer did interview the Laborgne's separately and decided that
39  Beverly saw more than her husband. This writer did get a district car to take her
40  downtown for a sworn statement.

42     Outside of the scene officers did advise me that the victims girlfriend was there
43  and was the one with the baby. This writer did speak to Jeilyn Rosario of 801
44  Niagara; she stated that she was one of the deceased (Nelson) girlfriends. This writer
45  asked her if she knew of anyone who would want to kill Nelson and Miguel. She
46  stated that a Hispanic male by the name of Amisale Montalvo from Hudson St may

00001162

Case 23-352, Document 39, 06/23/2023, 3533142, Page243 of 251

47  have killed him. She stated Nelson and Montalvo were best friends and while she
48  was dating Nelson, Montalvo tried to kiss her and then ended up threatening to kill
49  Nelson. This occurred about a month ago. This writer had a district officer drive her
50  downtown for a statement. On the way, this writer advised the officer to drive by
51  Hudson St. and have her pick out the house where Montalvo lives; he also drives a
52  yellow car, according to Jeilyn. It was also learned from PO Gramaglia that the
53  brother of the victims was at the scene when 1st officers arrived. He was transported
54  downtown already. He was with his girlfriend when he pulled up to the scene, His
55  girlfriends name is Yvette Maldonado dob 8/24/72 of 32 School 578-4140. Luis
56  Camacho pulled up in a small car, parked inside inner perimeter NY Reg BEL-
57  6729. Also parked outside of house is NY Reg, CYW-7446.
58
59      The scene is a two-story, two family home, on the Northeast corner of Niagara St.
60  between Rhode Island and Massachusetts. There are stairs going up to the house.
61  The outer door was open, which leads you to the hallway. On the left is a door to
62  lead you to the upper apartment. To the right is a white metal door, which leads to
63  the lower apartment. This was kicked in from the outside. The doorframe on the
64  inside is noticeably damaged and the double deadbolt lock is damaged along with
65  the metal door, which has noticeable dent near the door handle. As you walk into
66  the lower apartment, there is a small hallway, to my right is a dining room area,
67  walking in hallway you see the back of the fireplace to my right. On the floor at the
68  rear of the fireplace is Evidence Marker #2. This is for a gold chain that appears
69  broken. Walking in an eastern direction in the hallway  past the dining room on the
70  right is a small living room area. This consists of a futon couch to my left, a small
71  couch on my right, a larger couch on the south wall of apartment, a glass table with
72  the glass top tipped on side of table, a large entertainment center with TV which is
73  turned on. There is what appears to be brain matter/flesh on the small couch back
74  area. In this living room past the coffee table to the left is a body of a white male.
75  This white male is deceased; he is face up, wearing white t-shirt, blue shorts, white
76  socks and no shoes. His head is facing north, feet south.  His right arm is to his side;
77  left arm is crooked touching his left shoulder. He has obvious gunshot wound to the
78  face and left bicep. Evidence Marker (EM) #3 is TV remote, #4 is a drinking glass,
79  #5 cell phone, #6 Pepsi can, #7 gray remote, # Cheetos bag, all these items located
80  between the large couch and coffee table. EM# 9 is a nickel-plated handgun, small
81  caliber. This is located next to body #1 in living room area. On the carpet is what
82  appears to be brain matter, large red stain just west of victim's head. According to
83  the brother, Luis Comacho, who was the first inside house and discovered bodies,
84  stated that he did roll his brother over. This accounts for the large red stain area in
85  different location as victim's head.
86
87      Evidence marker (EM) #10 is a large cal. Bullet casing found to the right of
88  victim#1's right leg, EM#11 – large caliber bullet casing found at right foot of victim
89  #1.
90      To the left of victim #1 north of his head is a black metal futon couch, on this
91  futon as EM# 12 which is a black metal futon leg, EM#13 is a black leather jacket.
92

93   Located on living floor next to victim #1 was a bullet hole that traveled to the
94   basement area. This writer accompanied Det Jim Maroney to basement area and it
95   appears the bullet traveled into the furnace and was not recovered at this time.
96   There is a red stain on ceiling of basement, which dripped to the basement floor.
97   This would be directly underneath victim #1 in the living room.
98
99   Walking east toward the back of the house is a hallway; there is a wooden door
100  that would separate the living room from the hallway. This door is open and opens
101  toward the rear of the house, hinges on my left. Approximately half way up the door
102  is a bullet graze on the open door. EM#14 is a large caliber bullet casing on the floor
103  of the hallway, EM#15 is a gold anchor charm; EM# 16 is a large caliber bullet
104  casing, EM # 17 is also found in the hallway.
105
106  Evidence marker #41 is a bullet that was extricated from bedroom #1
107  doorframe.
108
109  Found later in search of inside premises is EM #27 a large caliber bullet casing
110  found partly inside the heating duct in hallway near wooden door. There are red
111  stains in hallway area leading to rear of house, Evidence Marker #32.
112
113  Off the hallway to my right is the bathroom. This is located on the south wall of
114  the hallway. Going inside the bathroom on floor, ceiling and horizontal blinds on
115  bathroom window is what appears to be brain matter/flesh.
116
117  Traveling east through hallway on my left is a bedroom #1. Immediately inside
118  doorway to my left on floor is pooled red liquid. There is a pair of gray slacks on
119  floor. EM# 23- Partly in /out of pocket of slacks are numerous $20 bills. EM#24,
120  #25 and #26 are all pieces of paper, deposit slips with shoe prints in red stain on
121  pieces of paper, EM#33 wet red stain. Leading out of bedroom #1 I turn to my left
122  into rear hallway, which leads you to the kitchen.
123
124  Traveling east through the hallway, you enter a kitchen area; this is where
125  victim #2 is located. Lying against the rear door which leads to the hallway to back
126  of house is a w/m. He has on a white t-shirt and pair of boxer shorts.  He is laying on
127  his left side, head in a southerly direction. His right hand is under his face area; his
128  left arm is under his body. Left leg is going west, right leg is bent at knee and right
129  foot is inside pair of jeans, which are located inside bedroom #2.
130
131  Bedroom # 2 is located at rear of the house, door opening on the north wall of
132  the kitchen. Also on north side of kitchen wall are bullet graze marks traveling to
133  rear of house. EM#18 a large caliber bullet casing located in kitchen near the
134  bottom of the stove. Also on kitchen floor are red stain splatters and what appear to
135  be shoe prints, these are Evidence Markers # 28, #29. #30, #31 that were tiles from
136  the kitchen floor that were removed.
137
138  EM# 34 is red stain in kitchen

139  EM#35 is red shoe pattern in rear hallway, which appears to be leading to rear of
140  the house.

143      On the rear metal door leading to the back yard are 6 bullet holes, these are
144  marked A, B, C, D, E, and F. Five of these bullet holes appear to be from a large
145  caliber gun. One hole on the left side wood molding is a smaller bullet hole.

147      Bedroom #2 is located on the north side of the kitchen to the rear of the house.
148  Walking into the bedroom, there is a bed facing west to east, a dresser with mirror
149  and a tall dresser to my immediate right. It is noted that the TV set is turned on.

151      EM# 19 splintered door wood found on bed in bedroom #2. Looking at the door
152  from inside of bedroom #2 is a slide lock, which is still engaged. Around this slide
153  lock the wood is broken off. This is what is located on the bed
154      EM# 20 black leather holster for a small caliber gun, found on bed in bedroom
155  #2.
156      EM# 21 Cellphone on bed in bedroom #2
157      EM#22 located in dresser in bedroom #2 is drug paraphinalia: baggies, scale with
158  residue, blue pills, coffee grinder and spoon with residue on it.

161      Information from the Major Crime Unit Office is that the names of the victims
162  are Nelson Camacho, dob 4-26-68 is victim #1 located in living room area. Miguel
163  Camacho dob 9-9-79 is victim #2 located in the kitchen area.

165      At 0130 hours Greg Luca and Josiah Schultz, morgue attendants arrive on the
166  scene. Dr Evan Evans, Medical Examiner then did arrive on the scene. He did
167  examine both victims and they were transported to the morgue at 0200 hours. Upon
168  removal of the second victim in kitchen area it is noted that the rear door is not
169  locked and can be opened by turning knob. Through this metal door heading east
170  towards the back of the house is another hallway. There is a wooden door, which
171  was partially open; this door is half glass on top, covered with a blue lace curtain,
172  which leads to the outside porch. There are holes in the blue lace curtain and the top
173  window of wooden door has visible bullet holes in it.

175      In the rear hallway, leading to the backyard are two dresser tables. In and
176  around these tables Det. Maroney did locate bullets and bullet fragments, EM #38,
177  #39, # 40. To my right is a rear staircase leading to the upper apartment from this
178  hallway. A bullet was located under the 1st step leading to the second floor, this is
179  EM # 37. Evidence Marker # 36 is a dried red stain in rear hallway.

181      This writer did speak to P.O. Schultz who stated when he arrived at the scene he
182  traveled to the backyard. He did climb up to rear porch. Screen door was tied open
183  and the wooden door with glass in it was partly open. Officer Schultz stated that he
184  did notice shoeprints in red liquid on floor and did see holes through the door. At

A-1467

185   this time he did leave the scene as it is.
186
187        This writer did contact radio to have this scene held until after the autopsies.
188   P.O. Terrell was left holding the scene at approximately 0450 hours. This writer and
189   Det. Tom Balk and Det Jim Maroney did return to Headquarters at this time to
190   finish paperwork.
191                                              Respectfully submitted,
192
193                                              Det. Mary E. Gugliuzza

00001166

City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 15, 2004

Sir:

On the above date at approx. 1645 hrs., your writer
received a phone call at the MCU office from Kevin Enburg.
Mr. Enburg is the Emergency Room staff counselor for
Psychiatric Services at Buffalo General Hospital. Mr.
Enburg stated that a Hispanic male had been brought to the
hospital for evaluation. The doctors had cleared him
psychiatrically. During the evaluation, the Hispanic male
claimed he had information on the recent double homicide
that occurred at 879 Niagara. He further stated that he was
in fear of his life because the killers were after him.

Your writer and Det. James Lema proceeded to Buffalo
General. Det/Sgt. James Lonergan and P.O. Edwin Torres of
B-District met us there. Torres was there to act as an
interpreter.

At 1715 hrs., Mr. Enburg placed the four of us in the
family conference room on the first floor just off the
emergency room. He brought the Hispanic to the room. This
male identified himself as Josue Ortiz, d.o.b. 10/14/81 of
19 Hoyt, rear. Ortiz stated that he spoke some English but
was more comfortable speaking Spanish. P.O. Torres told us
the following after conversing in Spanish with Ortiz.

Ortiz knew the deceased Camacho brothers. They were
members of a cocaine ring that was headed up by Justo and
Jose Caranzo (phonetically spelled). Ortiz was also a
member of this ring. The Caranzo brothers rented an
apartment in Ortiz's name at 142 Germain, upper. Ortiz
lived there until moving to 19 Hoyt. Ortiz claims the

00001183

A-1469

Caranzo's stored large quantities of cocaine at the Germain address. The Caranzo's also had an apartment at 46 Blum.

Through the interpreter, we asked Ortiz if he had any direct knowledge of the murders at 879 Niagara. He claimed he did not. He said that it was his opinion that the Camacho brothers were killed because of jealousy due to their drug selling.

When asked whom he was specifically afraid of, Ortiz gave the name, Rinaldo Valesquez. When asked why he was afraid of Valesquez, Ortiz stated it was because he had a shotgun. Ortiz did not claim that Valesquez had anything to do with the above murders.

Mr. Ortiz was definitely upset at the time of the interview. He was given a card with our names and phone numbers on it and asked to call us if he had any further information. Ortiz was turned back over Mr. Enburg. Ortiz was going to be medically evaluated before being released from the hospital.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted,

Det. Mark Vaughn

A-1470

# City Of Buffalo - Department Of Police
## Major Crimes Unit

**To:**        Captain Mark Morgan
               Crimes Against Persons Bureau

**From:**      P.O. David Sadlocha
               D District

**Subject:**   File #04-242

**Date:**      11/16/04

Sir;

On 11-16-4, while working 1530-0130 tour in D-District, sector D432 did receive 911 radio of Unknown Trouble call at 1005 Grant St. Upon arrival I spoke with person from Native American Center who stated a man was seeking help and walk away. This person said the young man stated he would be at 142 Germain St. I went to said address with assistance from P.O. John Lobaugh and encounter an individual outside residence. The individual did state to me that he had something to say regarding "Niagara St." I told him not to say anything else to me at this point and I notified 911 Dispatch that I needed to speak with someone working Major Case Squad. Suspect was placed in patrol vehicle #333 and transported to Police Headquarters and given to Major Case Detectives.

Respectfully Submitted,

*P.O. David Sadlocha*

P.O. David Sadlocha

00001185

A-1471

## CITY OF BUFFALO - DEPARTMENT OF POLICE
### HOMICIDE UNIT

**To:**      Captain Mark Morgan
            Chief of Homicide

**From:**    Det. Patrick Judge
            Det. James Lema

**Subject:**   **File 04-242**

**Date:**      **11/16/04**              879 Niagara Street-Double Homicide

**Attn:**      D/Sgt James Lonergan

Sir:

      On 11/16/04 at approximately 2000 hours, B District Police Officer Ed Torres brought to the Major Crime Office Mr. Carlos Osario to be re-interviewed.  According to Police Officer Torres, Mr. Osario came to the B-District and wanted to talk to PO Ken Anaya about the homicides that occurred at 879 Niagara Street.

      Det. Lema and your writer interviewed Mr. Osario in the Major Crime Unit interview room.  Mr. Osario said that the three individuals who he saw running from 879 Niagara Street on the night of the homicides assaulted him last night (11/15/04) at approximately 2300 hours at the corner of West and Rhode Island Streets.  Mr. Osario describes the three individuals who assaulted him as all dark skinned Hispanic males with Hispanic accents and all about 5'7" tall.  It should be noted that during Mr. Osario's sworn statement given to Det. Michael Root on 11/13/04, Mr. Osario described the suspects from the homicide as two black males and one Puerto Rican male all of whom he described as short and young.

      Mr. Osario stated that he reported this assault to the Buffalo Police Department but a check of the Buffalo Police Records shows no such call for service and no reports made.

Respectfully submitted,

Det Patrick Judge

00001186

A-1472

## CITY OF BUFFALO - POLICE DEPT – MAJOR CRIMES UNIT

**To:**     Mark Morgan
             Captain / Major Crimes Unit

**From:**   Joseph M. Cook / Detective Major Crimes Unit

**Subject: Homicide Case # 04-242 Victims Miguel Camacho
DOB 09-09-79 / Nelson Camacho DOB 04-26-68**

**Date:**   11-12-04

---

Attn:   Lieut. Margaret Sack

Sir:

On the above date, at 1920 hrs, this writer did receive an anonymous Tip, regarding the above double Homicide. The Call did come into the Major Crimes Office, on Line 851-4466. The Caller was a Female, who would not give a Name.

The Caller states that she has heard on the Street that three individuals were responsible for the Shooting. She further states that the Three go by the Names "Brandon", "Checko", and "Udah". The Caller states that she believes the Subject "Brandon" may live on Helen Street, in Buffalo. She also states that she has heard that the Shooting took place over a large quantity of Money. Investigation continues.

Respectfully submitted

Det. Joseph M. Cook

00001170