# 23-0352

## United States Court of Appeals

*for the*

## Second Circuit

JOSUE ORTIZ,

*Plaintiff-Appellee,*

— v. —

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## APPENDIX FOR DEFENDANT-APPELLANT
### Volume 7 (Pages A-1473 to A-1724)

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

## TABLE OF CONTENTS

**Page**

### Volume 1

District Court Docket List.......................................... A-1

Amended Complaint, dated March 27, 2019 ............. A-34

Answer to Amended Complaint,
    dated April 15, 2019 ................................................ A-56

Notice of Motion to Dismiss, dated April 24, 2020... A-80

Memorandum of Law in Support of Defendants'
    Motion to Dismiss, dated April 24, 2020............... A-82

Supporting Declaration, dated April 24, 2020 ........... A-107

Exhibit A to Declaration -
Affidavit of Lt. Salvatore Losi,
sworn to on April 15, 2020.................................... A-112

Exhibit B to Declaration -
P-73 of Mark R. Stambach, dated November 16,
2004, and Notes...................................................... A-114

Exhibit C to Declaration -
Plaintiff's Deposition Transcript,
dated March 15, 2018............................................ A-117

### Volume 2

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019.......................................... A-241

ii

**Page**

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 .......................................... A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ....................................................................... A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 .......................................... A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................ A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ....................................................................... A-746

Exhibit I to Declaration -
Indictment .............................................................. A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ....................................... A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ........................................ A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction ............................................................... A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit ................................................. A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ....................................... A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ...................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing .................................................................... A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ...................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion ..................................................................... A-983

Statement of Undisputed Facts,
dated April 24, 2020 ............................................... A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 .................................................. A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
    Material Facts, dated July 3, 2020 ........................ A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.
Ortiz*, Indictment No. 02630-04 ........................... A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ............... A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ...................................... A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued) ........................................................... A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019 .................................... A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3 ............................ A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ............................................................... A-1450

v

Page

**Volume 7**

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ........................................................... A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ....................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 ............................................... A-1706

**Volume 8**

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 ............... A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion to Dismiss, and for
Judgment on the Pleadings and/or Summary
Judgment, dated July 5, 2020 ............................... A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
Defendants' Motion to Dismiss,
dated July 24, 2020 ................................................. A-1789

Decision and Order of the Honorable Elizabeth A.
Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
dated April 1, 2022 ................................................. A-1837

Defendants' Proposed Jury Instructions,
dated April 1, 2022 ................................................. A-1861

Plaintiffs' Reply Motions in Limine,
dated April 6, 2022 ................................................. A-1924

Defendant's Objections to Plaintiff's Proposed Jury
Instructions, dated April 6, 2022........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022........ A-1937

Stipulation of Undisputed Facts,
dated April 27, 2022 ............................................. A-1996

Trial Transcript, Preliminary Instructions and
Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022........................... A-2053

vii

**Page**

Plaintiff's Witnesses:

|  |  |  |
|---|---|---|
| E. Coogins | Direct | A-2054 |
|  | Cross | A-2116 |
| J. Ortiz | Direct | A-2125 |

**Volume 10**

Trial Transcript, dated May 4, 2022
(Cotinued) ............................................................ A-2187

| M. Vaughn | Direct | A-2189 |
|---|---|---|
|  | Cross | A-2219 |
|  | Redirect | A-2225 |
| J. Lonergan | Direct | A-2229 |
|  | Cross | A-2281 |
|  | Redirect | A-2284 |
|  | Recross | A-2287 |

Trial Transcript, dated May 5, 2022 ........................ A-2297

| M. Stambach | Direct | A-2299 |
|---|---|---|
|  | Cross | A-2361 |
|  | Redirect | A-2384 |
| J. Ortiz | Direct | A-2393 |
|  | Cross | A-2426 |

**Volume 11**

Trial Transcript, dated May 6, 2022 ........................ A-2467

| M. Evans | Direct | A-2470 |
|---|---|---|
|  | Cross | A-2495 |
| M. Lauber | Direct | A-2504 |
|  | Cross | A-2518 |

Trial Transcript, May 9, 2022 ................................. A-2554

viii

                                                                    **Page**

J. Ortiz                    Direct..........................   A-2599
                           Cross...........................   A-2653
                           Redirect .....................   A-2671
                           Recross ......................   A-2674

Trial Transcript, Closing Arguments, May 9, 2022 ...   A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
   (Continued) .............................................   A-2717

Jury Questionnaire, dated May 9, 2022 ....................   A-2760

Jury Questionnaire, Damages, dated May 9, 2022 ....   A-2764

Judgment in a Civil Case, dated May 10, 2022 .........   A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
   dated May 20, 2022 ................................   A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
   Support of Motion, dated May 20, 2022...............   A-2768

   Exhibit A to Felle Declaration -
   Ledger..................................................   A-2773

   Exhibit B to Felle Declaration -
   Invoices for Services ............................   A-2792

Plaintiff's Memorandum of Law in Support of his
   Motion for Attorneys' Fees and Costs,
   dated May 20, 2023 ................................   A-2823

Notice of Motion, by Defendant, for Judgment as a
   Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
   new trial Pursuant to Fed. R. Civ. P. 59(a), and
   for Remittur Pursuant to Fed. R. Civ. P. 59(e),
   dated June 7, 2022 ................................   A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
　　Defendant, in Support of Motion,
　　　dated June 7, 2022 ................................................ A-2848

　Exhibit A to Sahasrabudhe Declaration -
　Trial Exhibits Entered by Counsel for
　Plaintiff ................................................................... A-2862

　Exhibit B to Sahasrabudhe Declaration -
　Trial Exhibits Entered by Counsel for
　Defendant .............................................................. A-2909

Memorandum of Law in Support of Motion for
　　Judgment as a Matter of Law Under Fed. R. Civ.
　　P. 50(b), dated June 7, 2022 .................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
　　to Plaintiff's Motion for Attorneys' Fees,
　　　dated June 10, 2022 .............................................. A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
　　Plaintiff's Motion for Attorneys' Fees,
　　　dated June 10, 2022 .............................................. A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
　　Opposition to Defendant's Post Trial Motion,
　　　dated June 28, 2022 .............................................. A-3013

Plaintiff's Memorandum of Law in Opposition to
　　Defendant's Post Trial Motions,
　　　dated June 28, 2022 .............................................. A-3023

Reply Memorandum of Law in Further Support of
　　Defendant's Motion for Judgment as a Matter of
　　Law, a New Trial, or Remittitur,
　　　dated July 8, 2022 ................................................ A-3071

**x**

|  | Page |
|---|---|
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 ........................ | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 ........................................ | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 ..... | A-3159 |

A-1473

SYNOPSIS OF BUFFALO POLICE DEPARTMENT HOMICIDE INVESTIGATION
VICTIMS NELSON CAMACHO AND MIGUEL CAMACHO

BPD Homicide File 04-242

Occurred 11/11/2004 2145 hours 879 Niagara Street Buffalo, NY
Victims: Nelson CAMACHO h/m DOB 04/26/68  879 Niagara St aka Lobo
          Miguel CAMACHO h/m  DOB 09/09/79  879 Niagara Street aka Flaco

** It should be noted that this synopsis is not complete. It does not contain all of the
details of grand jury testimony from federal court or lab analysis.

## 11/11/04  2145 hours:

911 call to 879 Niagara Street for a call of a person shot

Patrol responds and finds two males deceased inside the residence and Luis CAMACHO,
brother of the victims, holding a .25 caliber handgun in the living room at the residence.
The males were found deceased due to multiple gunshot wounds.
CAMACHO was brought to BPD homicide and interviewed.

Scene Documentation: Det. Mary Gugliuzza

Canvass of the area and documentation of secondary crime scene at 53 Massachusetts
rear yard/ 886 Niagara Street where a bat was found which was thrown by one of the
suspects fleeing the scene : Det. Richard Wagstaff . (Witness Frank COPPOLA saw a
male throw the bat into the yard at that location.)

Persons interviewed during canvass by Wagstaff:

Steven ACEVEDO aka Estevan ACEVEDO ███████ 53 Massachusetts- said he saw
three males, one had something in his hand. All males were wearing hooded sweatshirts,
one gray and two darker colored. ACEVEDO would not come to the homicide office at
the time of the canvass.

Carmelo MERCADO 97 Rhode Island – was standing outside Zip's store at
Massachusetts and Niagara Street when he saw three males, looked Hispanic, two with
dark blue or black hoodies and one with a gray hoodie. The male wearing the gray hoodie
was coming out of the walkway next to 53 Massachusetts. All males were between 5'5-6'
tall, medium build, Hispanic. Males ran west on Massachusetts and south on 7th
(Columbus Pkwy). MERCADO would not come to the homicide office to be interviewed.

BPD Evidence Collection Unit : Det. James Maroney

BPD Photographer:  Det. Thomas Balk

1

A-1474

Supervisor: Det. Sgt. James Lonergan

**Present at Scene:**

Jeilyn ROSARIO DOB 12/25/87 879 Niagara St. h/f,  girlfriend of Nelson CAMACHO. ROSARIO was transported to BPD homicide and provided a sworn statement which was taken by Det. Reginald Minor.  ROSARIO states that "Amisel MONTALVO" was a friend of the CAMACHO brothers and had tried to kiss her. ROSARIO said Nelson found out what happened and was angry with MONTALVO. ROSARIO said MONTALVO lives at 35 Hudson and drives a small yellow car. ROSARIO said she was at her sister's house and that CAMACHO was supposed to play pool at "The Famous Corner" but the game had been cancelled. ROSARIO said that CAMACHO (Nelson) had called her and told her to come to the house so they could watch movies. ROSARIO said CAMACHO did not want to come and pick ROSARIO up because he had just taken a shower and was wearing his boxer shorts. ROSARIO told CAMACHO that she would ask her mother to drive her to the house (879 Niagara) when her mother got home from work. ROSARIO said her mother drove ROSARIO to 879 Niagara and when ROSARIO arrived, she saw CUCA outside crying. (AKA CUCA is believed to be Ivette MALDONADO 08/24/72 32 School St. Buffalo, NY and was the girlfriend of Luis CAMACHO.) ROSARIO said CUCA told her that Nelson and Miguel CAMACHO were both shot inside the house.

## ***11/12/04***

### 11/12/2004  0001 hours

Luis CAMACHO (statement taken 11/12/04 0001 hours by Det. Richard Wagstaff). CAMACHO said he received a call from his brother, Miguel, who said, "They are doing something to LOBO, come and bring a weapon." CAMACHO said while on his way to his brothers' house, CAMACHO was stopped at the red light at Niagara and Massachusetts when he saw three males running westbound across Niagara toward Massachusetts. CAMACHO said he did not own any weapons and that when he arrived at the house, he found his brother Nelson in the living room and his brother, Miguel, lying in the kitchen holding a .25 caliber handgun. CAMACHO said he took the gun from Miguel and went back to the living room and the police arrived at that time.

### 11/12/2004  0025 hours

Frank COPPOLA 11/25/68 886 Niagara Street – statement taken 11/12/04 0025 hours by Det. Michael Root. COPPOLA said he heard a "pop" when he was on his way to Zip's market. As COPPOLA was walking back home , he saw three males wearing dark hoodies, all about 6 feet tall, run past COPPOLA. COPPOLA saw one of the males throw something into the yard and heard a "klunk". COPPOLA went into the yard and saw a metal baseball bat. COPPOLA called 911 and waited for the police to come.

## 11/12/2004  0155 hours

Beverly LABORGNE 05/31/56 879 Niagara St. upper – statement taken by Det. Tim Salamone 11/12/04 0155 hours – LABORGNE was in her apartment when she heard a loud crash, like someone kicking in the front door, heard two or three shots, then six or seven shots, heard loud voices hollering, went to her front window (looks onto Niagara Street), saw three males running in a line. The last male had something long in his hand, the males crossed the street (westbound), all males in dark clothes and hoodies. LABORGNE's husband called 911.

## 11/12/2004  0800 hours

Post mortem examinations conducted at Medical Examiner's Office. Attended by Det. Timothy Salamone. Both victims died due to multiple gunshot wounds.

## 11/12/2004  1430 hours

879 Niagara Street  1430 hours– Detectives Mordino and Acquino speak with Luis CAMACHO and Luz Marie CAMACHO, siblings of the victims. At 1430 hours, the crime scene was released. Det. Gugliuzza turns over the victims' personal papers and identification which were found in the rear (east) bedroom to Det. Maroney.

## 11/12/2004  Unknown time

Det. Root received a call from BPD P.O. Robert Quintana who informed Root that "community sources" said a dark-skinned Puerto Rican male named "Tawa" (Dagua) was known to set up robberies and allegedly had set up a robbery at 241 Vermont Street one month prior. Quintana said he speculated that this is what may have occurred on Niagara Street. AKA Dagua is known to officers as Manuel MEDINA 1/20/71 BPD Mug 213608.

## 11/12/2004  Unknown time

Det. Root received a call from P.O. John Garcia of the B District. Garcia reports that ████ ███████████ on the date of the homicides, the victims had had an altercation with a 14-15 yoa Hispanic male in front of Zips Deli. The altercation ended when one of the CAMACHO brothers produced a handgun and fired at the youth, only to have the gun jam. The h/m was purported to have said, "This isn't over." And fled the scene. ████████ this h/m recruited two black males who live on the same block on Niagara Street as the CAMACHO brothers and that the three went to 879 Niagara Street armed with an AR-15 and committed the homicides. ████████████ the Hispanic male resided somewhere on Whitney between Hudson and Virginia.

A-1476

**11/12/2004  1830 hours**

Det. Root contacted Luis CAMACHO to ask him some follow up questions regarding information contained in his sworn statement. CAMACHO told Root he had never seen the .25 caliber handgun prior to seeing it in his brother Miguel's hand when Luis discovered the victims. CAMACHO said he was not acquainted with DAGUA and said that he (CAMACHO) had been present at a gambling house on Vermont just prior to it being robbed. CAMACHO said he was told that DAGUA had something to do with that robbery.

**11/12/2004  1920 hours**

Det. Joseph Cook takes a call ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓ stated ▓▓▓▓ heard on the street that Brandon,
Checko and Udah were responsible for the shooting of the CAMACHO brothers and that
Brandon may live on Helen Street" ▓▓▓▓ said ▓ heard the "the shooting took place
over a large quantity of money".

**\*\*\*11/13/04\*\*\***

**11/13/2004  1015 hours**

Det. Ernie Bursie receives information that P.O. Monte Montalvo ▓▓▓ a ▓▓▓ that
may have information on the Niagara Street homicides. Montalvo said ▓▓▓▓▓▓▓ told
him that a male named Matthew SMITH owns an AK-47 and that an associate of
SMITH'S in the 1015 gang named "Black Hair Tony" was heard by SMITH on the
phone talking about having problems with Latin males at Massachusetts and Niagara
Street. (It should be noted that on 11/02/04, Samuel ORTIZ ▓▓▓▓▓▓▓▓▓▓▓▓▓ and
Jason ACEVEDO were arrested for shooting up Matthew SMITH's house. ACEVEDO
lives at the corner of Massachusetts and Niagara, 53 Massachusetts, at the time of the
homicides.)

**11/13/2004  1645 hours**

Det. Michael Root was notified by P.O. John Garcia that he and P.O. Leo McGrath had
an individual in their police vehicle who wished to provide information about the
CAMACHO brothers' homicides. At approximately 1655 hours, Garcia and McGrath
brought Carlos OSORIO Sr. 09/29/67 863 Niagara Street (now deceased) to the homicide
office.

4

A-1477

**11/13/2004   1720 hours**

Carlos OSORIO 09/29/67 provided a sworn statement in which he said he saw three males across from his house on Niagara Street and thought the males were going to kill OSORIO. . OSORIO said he thought the males were (two) black and (one) Puerto Rican, and that he had seen them before in the neighborhood. OSORIO saw the males cross the street toward the victims' house. OSORIO said he saw the males on the porch of a house across from his for 15 minutes. OSORIO said he saw the males start to walk north on Niagara from there and then they crossed the street to the same side as OSORIO's. OSORIO said the Puerto Rican male had a long barreled rifle under his hoodie. OSORIO said one of the black males wearing a grey hoodie knocked on the door and the OSORIO heard a loud bang on the door. OSORIO said he then saw two males running back across the street and saw someone go into a back window of a house across the street. OSORIO said he saw two Puerto Rican females with blond hair and a young male child come out of the house screaming. . OSORIO said his son, Carlos OSORIO Jr. and OSORIO's friend Pedro VEGA-RAMOS aka CANO were also present on Niagara Street. OSORIO said he saw a male ████████████ on ████████ bike talking to CANO after the shooting near the crime scene tape.

**\*\*\*11/15/04\*\*\***

**11/15/04   1045 hours**

P.O. Marie Schreckenberger of the D District is flagged down by Josue ORTIZ (11/14/81) in the vicinity of Hampshire & 19th Street at 378 West Perry. ORTIZ jumped in Schreckenberger's vehicle and told Schreckenberger that people are trying to kill him. ORTIZ was speaking Spanish. P.O. B. Rodriguez was translating.

**11/15/04   1100 hours**

Schreckenberger notifies the Major Crimes Squad about ORTIZ. Det. Mark Lauber and Det. Sgt. Philip Torre respond to Hampshire and 19th. ORTIZ said person(s) unknown were trying to kill him because they thought he was involved in the homicides of Nelson and Miguel CAMACHO. ORTIZ said he had recently come to Buffalo from Puerto Rico. ORTIZ admitted he just smoked marijuana. ORTIZ continued to say people were trying to kill him, but could not say who or how or why. ORTIZ said he was scared and needed help. Detectives thought ORTIZ might be in need of medical and/or psychiatric help. ORTIZ agreed to go voluntarily to BGH and was taken there by ambulance.

**A-1478**

**11/15/04  1300 hours**

Det. Charles Aronica was informed that Misael MONTALV0 (aka Misael MONTALBO h/m 04/05/75 of 35 Hudson Street) would present himself at the Buffalo Police homicide office to be interviewed. MONTALVO arrived at approximately 1300 hours in the company of Samuel ORTIZ Sr. who translated for MONTALVO. During the taking of MONTALVO'S statement (approximately 1355 hours), P.O.Lopez was present for translation purposes. ORTIZ told the detectives that MONTALVO neither spoke nor understood English very well.

MONTALVO told the detectives that he came to the Buffalo Police Department this date because people are making comments in the street that as soon as they bury the victims that they are going to take him (MONTALVO), his mother and his whole family out. MONTALVO said he was being blamed because the CAMACHO brothers used to hang out at MONTALVO's house. MONTALVO said a problem started when one of the brothers had the title to MONTALVO'S car and MONTALVO asked Nelson for it. MONTALVO said the incident involving the title occurred in Febrary of 2004 inside a barber shop at 233 Niagara Street. MONTALVO said he told Nelson that he needed the title because MONTALVO had a baby and needed the vehicle. MONTALVO said Nelson told MONTALVO that Nelson's brother's would jump MONTALVO and that MONTALVO responded that he would do what he had to do. MONTALVO said he and Nelson had a "pushing and shoving match" but that no one was injured. MONTALVO denied ever trying to kiss Jeilyn ROSARIO.

Regarding the night of 11/11/04, MONTALVO said he was at his father-in-law's house on Niagara Street watching wrestling. MONTALVO said his father in law's name is Segundo JUSTINIANO. MONTALVO said others present were Samuel ORTIZ, MONTALVO'S girlfriend ██████████████████ and Sammy ORTIZ' daughter. MONTALVO said prior to watching wrestling, he and Samuel ORTIZ went to pick up Sonia RUIZ, Samuel ORTIZ' children's mother, at US Sugar. ORTIZ said he took RUIZ to work and picked her up every day. MONTALVO said he picked up RUIZ at 7 pm and then went to Fargo to pick up RUIZ' children. MONTALVO said he took RUIZ and her children to their house at 482 7th St. MONTALVO said after he dropped of RUIZ, MONTALVO went to the 24 hour store at Massachusetts and Niagara Streets to check out lottery numbers. MONTALVO said after that, he went to his father-in-law's house at about 8:15 pm. MONTALVO said he stayed at ██████████ house until about 10:15 pm and left there with Samuel ORTIZ, ████████ ORTIZ' daughter ███████████████ son and took them home. MONTALVO said he never left ████████ house between 9 and 10 pm that night and was watching WWF wrestling at the house. MONTALVO denied being involved with the homicides of the CAMACHO brothers.

Prior to leaving the homicide office, MONTALVO voice concern for his safety. MONTALVO said because of the bad blood between himself and Nelson CAMACHO he heard that the CAMACHO family was blaming him for the murders. MONTALVO said

A-1479

he was going to go to New Jersey to stay with relatives and would send detectives their names and address when he arrived there.

## 11/15/04  1410 hours

While MONTALVO was at the homicide office being interviewed, Det. Mark LAUBER and Det. Mary Gugliuzza traveled to Niagara Street and located the home of Segundo JUSTINIANO at 571 Niagara Street. LAUBER notes that the JUSTINIANO family resides in the rear lower apartment. Lauber finds Segundo JUSTINIANO at home. Also present is a male who identified himself as Jose ORAMAS who tells Lauber that he (ORAMAS) also resides at the JUSTINIANO house. (It should be noted that the name Jose ORAMAS was found among a list of names written on a piece of paper which is attached to the mailbox at 879 Niagara Street.)

JUSTINIANO told Lauber that he recalled his daughter████████and her boyfriend, Misael, being at his house on 11/11/04. JUSTINIANO said he knew that they were at his house the night of the homicides because he recalled seeing the 10 o' clock news showing crime scene tape on Niagara Street near Massachusetts. JUSTINIANO said they were watching wrestling.

Lauber said ORAMAS interjected saying that upon returning home from work at about midnight on 11/11/04 that he was asked by JUSTINIANO to call the CAMACHOS as he saw the location on the news and wanted to see if the CAMACHOS knew what was happening. ORAMAS said he has known the CAMACHOS for a long time and that they are friends and grew up down the street from each other in Puerto Rico. ORAMAS said he called Miguel CAMACHO's cellphone ████████from ORAMAS' phone ████████but got no answer. ORAMAS said he was informed the next morning of the murders.

Lauber noted that the BPD homicide office received anonymous information that a NY City chapter of the Latin Kings was in Buffalo and threatened to kill JUSTINIANO and his family if MONTALVO was responsible for the homicides. The rumor was that a Latin King appeared at the JUSTINIANO residence, kissed the floor and threatened to kill the whole family. JUSTINIANO denied that that occurred.

## 11/15/04  1500 hours

Lauber and Gugliuzza went to 35 Hudson St. to meet with Carmen JUSTINIANO. JUSTINIANO (03/13/83████████ verified information obtained from her father and MONTALVO regarding the whereabouts of MONTALVO on 11/11/04 between 9 and 10 pm. Carmen told detectives that an unknown person called MONTALVO'S family in Puerto Rico and told them MONTALVO was dead in Buffalo and threatened to kill the family in Puerto Rico. Lauber placed a "hazard" on the address 35 Hudson in the 911 system.

**11/15/04  1645 hours**

Det. Mark Vaughn received a call from BGH ER Staff Counselor for Psychiatric Services Kevin Enburg. ENBURG told Vaughn that an Hispanic male had been brought to BGH for evaluation and had been cleared psychiatrically. During the evaluation the male had claimed that he had information on the recent double homicide which occurred at 879 Niagara Street. ENBURG said the male said he was in fear for his life because the killers were after him.

Vaughn, Det. James Lema , Det. Sgt. James Lonergan and P.O. Edwin Torres proceeded to BGH. P.O. Torres acted as an interpreter.

**11/15/04  1715 hours**

Detectives were placed in a family conference room. Josue ORTIZ was brought to the room. ORTIZ identified himself as Josue ORTIZ DOB 10/14/81 of 19 Hoyt, rear. ORTIZ saisd he spoke some English but was more comfortable speaking Spanish. P.O. Torres spoke with ORTIZ and relayed the information to the detectives.

Torres said ORTIZ said ORTIZ knew the deceased CAMACHO brothers and that the brothers were members of a cocaine ring that was headed by Justo CARANZO (GALARZA). ORTIZ said ORTIZ was a member of this ring. The CARANZO (GALARZA) brothers rented an apartment in ORTIZ' name at 142 Germain St, upper. ORTIZ said he lived there until he moved to 19 Hoyt. ORTIZ claimed the (GALARZA'S) stored large quantities of cocaine at the Germain address. ORTIZ said the (GALARZAS) also had an apartment at 46 Blum.

ORTIZ was asked through the interpreter if he had any direct knowledge of the murders at 879 Niagara Street. ORTIZ said he did not. ORTIZ said it was his opinion that the brothers were killed because of jealousy due to their drug selling.

When asked whom he was specifically afraid of, ORTIZ gave the name "Rinaldo VELAZQUEZ". (It should be noted that Rinaldo VELAZQUEZ is the name of ORTIZ' uncle and cousin (father/son). ORTIZ was asked why he was afraid of VELAZQUEZ and ORTIZ said he was afraid because VELAZQUEZ had a shotgun. ORTIZ did not claim that VELAZQUEZ had anything to do with the murders.

VAUGHN noted that ORTIZ "was definitely upset at the time of the interview". ORTIZ was provided contact information for the detectives and was asked to contact the detectives if he had any further information. ORTIZ was turned back over to ENBURG and was then to be medically evaluated before being released from the hospital.

A-1481

## ***11/16/04***

### 11/16/04  1846 hours

BPD P.O. David Sadlocha and P.O. John Lobaugh were dispatched a call to 1005 Grant St. to the Native American Center regarding unknown trouble. Upon arrival, Sadlocha and Lobaugh are told that a male came to the center asking for help and stated he would be at 142 Germain St. Lobaugh and Sadlocha go to 142 Germain where they encounter Josue ORTIZ who is upset and saying something about "Niagara Street". Officers transport ORTIZ to the homicide office, arriving at approximately 1927 hours.

### 11/16/04  1930 hours

ORTIZ begins speaking with Det. Mark Stambach. P.O. Edwin Torres acts as a translator.

### 11/16/04  2000 hours

Carlos OSORIO Sr is brought by P.O. Edwin Torres to the homicide office to be reinterviewed. OSORIO states the three males he saw in front of his house the night of the homicides had assaulted him 11/15/04 at Rhode Island and West Avenues. OSORIO now describes the suspects as being all dark skinned Hispanic males about 5'7" with Hispanic accents.

### 11/16/04  2025 hours

ORTIZ is read his Miranda Warnings by Det. Stambach.

### 11/16/04  2100 hours

Sworn statement of Josue ORTIZ begins.

### 11/16/04  2230 hours

ORTIZ statement ends.

## \*\*\*11/17/04\*\*\*

### 11/17/04  0030 hours

Vaughn., Lonergan and Lema go to 142 Germain. Landlord Joseph Domagala from Williamsville is present. Clothing and personal papers are taken from the apartment.

Vaughn, Lonergan and Lema go to 19 Hoyt #3. Dennis DUNSON, landlord, meets the detectives. DUNSON tells the detectives that the apartment was rented █████████████

### 11/17/04  0215 hours

ORTIZ was charged and processed.

### 11/17/04  1550 hours

Sworn statement obtained by Det. Sgt. Philip Torre from Uda HIDALGO. HIDALGO states he heard about the homicides on the news, that he was home with his girlfriend Helyna RIVERA (now deceased) at the time of the homicides, that he did not know JOsue ORTIZ, that he did not know the whereabouts of his brother, Efrain HIDALGO aka Checko, at the time of the homicides, that he has never been to 879 Niagara Street, that he has a cousin named Brandon JONAS.

## \*\*\*11/19/04\*\*\*

### 11/19/04 1230 hours

After being Mirandized, a sworn statement obtained by Efrain HIDALGO aka Checko by Dets. Mordino and Acquino. HIDALGO said on the night of the homicides, HIDALGO was at his friend Sammy's (ORTIZ) house on 7th Street along with Sammy's mother (Sonia RUIZ), Sammy's brother, XAVI (Xavier ORTIZ), aka ANGEL (Gregorio CHEVERE) and HIDALGO's cousin Brandon or B (JONAS). HIDALGO said they watched wrestling, ate Chinese food, that he stayed there all night from 6pm until the morning and never left the house. HIDALGO said his brother, Uda, had a problem with the males from "1015".

A-1483

***11/20/04***

**11/20/04  1745 hours**

Det. Sgt. Thomas Vivian and Det. Joseph Cook meet with Luz Marie CAMACHO and Luis CAMACHO regarding a garage located at Derrout Alley which had been rented by Nelson CAMACHO from Mr. Paul INDELICATO of 639 W. Delavan. The CAMACHOS allowed detectives to search said garage. Nothing of an evidentiary nature was present. A white Toyota Celica 2dsd was present and searched which bore the license plate NY CLZ-7216.

**12/02/04**

Some personal items which belonged to the victims were released to Luis CAMACHO.

*******************2005*******************

**02/17/05** (Efrain HIDALGO and Sammy ORTIZ, Jr. are arrested together in a vehicle with crack cocaine  BPD Inc#05-048-0020. This is relevant because it illustrates the relationship between HIDALGO and ORTIZ. ORTIZ is one of the founders of the 7th Street gang and is and was a close friend of HIDALGO.)

**03/14/05**

Det. Dennis Delano goes to Alden Correctional Facility to interview Gabriel TAYLOR (05/13/85). TAYLOR states that the males who committed the homicides of the brothers at Niagara and Massachusetts are friends of TAYLOR'S from the neighborhood. TAYLOR said a male named "Brandon" and his cousin (fnu lnu) and Efrain HIDALGO and "UDAH" (lnu). TAYLOR said Brandon got drunk one night and told him about the killings and how one of the victims had come out of a bedroom with a gun in his hand. TAYLOR said Brandon said they were only going to rob the males but "It got out of hand." And they had to kill them. TAYLOR said Brandon is the person who told TAYLOR that the others were involved.

**09/30/05**

Det. Stambach meets with inmate Ronnie WILLIAMS (06/28/47) (now deceased) at the ECHC. Stambach reports that WILLIAMS told Stambach that WILLIAMS was in the

~~Delta wing housed with Jesus ORTIZ and that ORTIZ made statements to WILLIAMS~~ about the homicides.

## ***************2008***************

### 10/01/08

~~[redacted]~~ This information was provided to BPD but BPD was unable to identify the incident which was being spoken about at that time. (It should be noted that in the BPD caselog, the Camacho Brothers homicides were listed as "cleared" instead of "partially cleared".)

## ***************2009***************

In September of 2009, at the request of then Deputy police Commissioner Daniel Derenda, a federal task force was formed which included members of BPD, NYSP, FBI/SSTF and ATF to investigate and prosecute gang violence on the west side of Buffalo. One of the acts of violence being investigated was a homicide which occurred on 06/26/09 at Ullman and Roesch Streets. The victim was Anthony COLON aka ACE. COLON was a member of Cheko's Crew and was also closely associated with many members of the 7th Street gang. During this investigation, Efrain HIDALGO aka Cheko became known to the task force. The investigation and prosecution is continuing as of this writing.

## ***************2011***************

### 06/05/11

BPD Officers ~~[redacted]~~ effect a traffic stop of ~~[redacted]~~ possesses information regarding Efrain HIDALGO aka Cheko. ~~[redacted]~~ was debriefed by ~~[redacted]~~. Information ~~[redacted]~~ conveyed to the US Attorney's Office and task force officers ~~[redacted]~~ reported that ~~[redacted]~~ has known Cheko for many years and that Cheko told ~~[redacted]~~ out the homicides of the brothers in detail.

**A-1485**

**06/06/11 0830 hours**

BPD Det. Mary Evans confers with BPD Det. Brian Ross from the homicide cold case squad regarding attempting to identify the homicides about which ▇▇▇ had spoken involving Efrain HIDALGO. Ross, who was a patrol officer in the D District around the time of the incident, recalled two shootings which had occurred in close proximity in both time and location on Niagara Street several years prior. After looking at the BPD homicide case log, two possible incidents were located. Det. Ross recalled that for one of the shootings, which involved two brothers, an arrest had been made of a person who had confessed to the crime. Ross said he was working the night of the brothers' homicides and responded to the scene. Det. Evans located said files and after ruling out one of the incidents as not being the incident referenced by ▇▇▇ opened the second incident in which there had been an arrest.

Upon opening the file of the CAMACHO brothers' homicides, a sworn statement from Efrain HIDALGO was discovered. After reviewing the file, task force officers began to attempt to identify the outstanding co-defendants which were seen by witnesses the night of the homicides fleeing the scene.

**06/12/11  1100 hours**

Det. Evans ▇▇▇▇▇▇▇▇▇ to interview ▇▇▇▇▇▇ relates details of the account given to ▇▇▇▇ regarding the homicides. ▇▇▇ conversation with Cheko occurred shortly after the homicides in 2004 and ▇▇▇ felt badly about not coming forward sooner with the information.

**06/17/11  1530 hours**

Det. Evans receives ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ informing Evans that ▇▇ had spoken with ▇▇ and that ▇▇ recalled that the name of the person Cheko said he (Cheko) was with during the homicides was a Native American male who is a cousin to HIDALGO named Brandon.

**06/29/11  1145 hours**

NYSP Inv. Geraldo Rondon and Det. Evans travel to Auburn Correctional Facility to interview Josue ORTIZ. We asked ORTIZ if he would tell us about the events of the night of 11/11/04. ORTIZ said, "No disrespect, but where I come from, we don't talk."

A-1486

Detectives attempted to converse with ORTIZ. ORTIZ engaged in conversation but reiterated that he would not talk about the incident. ORTIZ said he recalled Det. Stambach and that there might have been another person present in the homicide office. ORTIZ said he had come to Buffalo about 5 months prior to the homicides. ORTIZ said he "lost his mind for a while" but "did not know why".

## 07/14/11

Josue ORTIZ was brought in by DOCCS and was interviewed at the US Attorney's Office. ORTIZ said he had met Uda before but was unable to identify him in a photo array. ORTIZ claimed that when he was inside the CAMACHO house, that he had an AK-47 and the other males were armed with a 9mm handgun and a shotgun. ORTIZ claimed that a male emerged from a rear bedroom and was talking on a cellphone saying something about his brother. ( It should be noted that ORTIZ account was not completely consistent with the facts of the case as we now know them to be.)

## 07/26/11

A letter is received by the US Attorney's Office ████████ who states ████ has information regarding Efrain HIDALGO.

## 08/04/11

████████████████████ is interviewed and provided information regarding the CAMACHO Brothers homicides. See investigators for details. Names mentioned as being involved are Efrain HIDALGO, Uda HIDALGO, a Native American (described as and believed to be Brandon JONAS) and aka MACHO, Frank MATIAS.

## 09/22/11 1700 hours

NYSP Inv. Josh Keats, Rondon and Evans traveled to Clinton Correctional Facility to interview Gabriel TAYLOR. TAYLOR was extremely hostile and uncooperative. TAYLOR admitted knowing a male named Brandon but claimed to not know what we were talking about with regard to admissions TAYLOR had claimed were made to him by Brandon (JONAS) back in 2005.

It should be noted that investigators became aware shortly after this prison visit that Brandon JONAS was also incarcerated at Clinton Correctional Facility. JONAS prison calls were monitored and requested. Within two hours of the visit to TAYLOR, JONAS was calling his grandfather asking his grandfather if anyone had spoken to "Uda", Uda HIDALGO had killed his children's mother, Helyna RIVERA, on 08/10/11 and was at the Erie County Holding Center at this time. JONAS told his grandfather, "Someone should talk to Uda. Uda can't do time like that." (or words to that effect.)

14

**09/23/11**

Sonia RUIZ, mother of Samuel ORTIZ Jr. a/k/a Macho a/k/a Machito was interviewed at BPD by Evans. RUIZ said she did not recall ever hearing about the homicides of two brothers on Niagara Street in November 2004. RUIZ said Efrain HIDALGO a/ka Checko was her son Sammy's close friend and that when HIDALGO was younger he was allowed to be inside RUIZ' house. RUIZ said HIDALGO was not allowed in her house as a teenager and that RUIZ was very particular about whom she allowed in her house. RUIZ was shown a photo of Brandon JONAS. RUIZ denied knowing JONAS and said he was never inside her house.

**10/05/11**

Evans requests that evidence from the CAMACHO brothers homicides be removed from the storage room for submission to the CPS Lab for analysis.

**10/10/11**

███████████████████████████ Misael MONTALVO is a drug dealer who lives in NYC and travels to Buffalo frequently to deal drugs. ██████ MONTALVO has a nickname of BORI.

**10/11/11**

NYSP Invs. Keats and Rondon interview Jeilyn ROSARIO 11/25/87. ROSARIO was consistent with her account which she provided to detectives on 11/11/04. ROSARIO said that despite the fact that an arrest had been made in the case, she still felt that Misael MONTALVO had had something to do with the homicides. ROSARIO said that both brothers were using and selling cocaine. ROSARIO said Nelson told her that he was trying to complete a 5 to 10 kilo drug deal, but would keep ROSARIO away from the drugs and would meet with people in another room.

**10/25/11**

████████████████████████████████████ MONTALVO said he (MONTALVO) was the person who sent "them" to do the robbery of the brothers. ██████ MONTALVO grew up with the CAMACHO brothers in Puerto Rico.

**11/19/11**

Misael MONTALVO was arrested in Batavia, NY ████████████████████ ████████████████████████████████████ Rondon interviewed MONTALVO. MONTALVO admits to driving a small yellow Toyota

during the time MONTALVO lived in Buffalo. MONTALVO becomes emotional after revealing this to Rondon. MONTALVO'S rental vehicle was found to contain approximately 10 ounces of cocaine concealed within the dashboard area.

**12/05/11 1230 hours**

Evans and Keats interview Jose GALARZA 10/24/74 in the vicinity of Elmwood and Kenmore Avenues. GALARZA informs investigators that he was a friend of the deceased CAMACHO brothers at the time they were murdered and is still friends with their older brother, Luis. GALARZA said he was supposed to play pool with Nelson CAMACHO but that CAMACHO had called GALARZA and told him that CAMACHO was not playing pool that night. GALARZA said he recalled getting a phone call from his girlfriend that night and that she had driven past the CAMACHO house and told GALARZA something must have happened there.

GALARZA said he knew Josue ORTIZ because ORTIZ was related to GALARZA'S brother, Justo GALARZA'S ex-wife, Vanessa VELAZQUEZ. GALARZA said ORTIZ hung out with Vanessa's brother, Reinaldo VELAZQUEZ. GALARZA said ORTIZ went with the GALARZAS to the funeral and that after ORTIZ was arrested, it made GALARZA angry because he felt it would cause the victims' family to be suspicious of the GALARZAS. GALARZA said he did not hear that ORTIZ had committed the homicides prior to learning that ORTIZ had been arrested. GALARZA said ORTIZ never spoke about the homicides.

GALARZA said ORTIZ used to hang out with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GALARZA said his ex-girlfriend's name was Edna RIVERA and that she currently lives in Amherst.

GALARZA said shortly after the homicides, he was outside of Luis CAMACHO'S house when a male rode by in a vehicle. GALARZA said that Luis CAMACHO pointed at the male and said he thought the male had something to do with the homicides. GALARZA said, "We chased the car and when we caught up to it the male was inside the car crying like a girl." GALARZA said he thought the male's name was something like "Michael" and described him as being short and chubby. GALARZA said this male and Nelson were "like a married couple" because they would argue and get back together.

GALARZA said Nelson CAMACHO was "moving ounces, not 8 balls" referring to the amount of cocaine dealt by CAMACHO.

GALARZA said one time GALARZA brought a "big 8" (cocaine) to Nelson CAMACHO and that GALARZA was accompanied by Josue ORTIZ. GALARZA said he could not recall if ORTIZ had entered the CAMACHO house, and that GALARZA trusted ORTIZ.

A-1489

**12/05/11 1500 hours**

Keats and Evans travel to 214 Thompson Street to interview Juan GALARZA 10/31/76. GALARZA said he didn't go out to socialize around the time of the homicides, but did go to The Famous Corner. GALARZA claimed he never heard anything about who may have committed the homicides. (It should be noted that the investigation into this matter showed recent and frequent contact as of this interview between Misael MONTALVO and Juan GALARZA.

**12/06/11**

Keats and Evans interview Justo GALARZA at the Attorney General's Office at the Main Place Mall. GALARZA said Josue ORTIZ is GALARZA'S ex-wife, Vanessa, cousin. GALARZA said Misael MONTALVO hung out with the CAMACHO brothers very frequently. GALARZA said he never had dealings with MONTALVO.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2012\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**01/03/12**

Keats, Rondon and Evans interview Uda HIDALGO at the Erie County Holding Center. HIDALGO said he knew exactly about what we were asking (CAMACHO homicides), that he was not involved and could take a lie detector test with regard to that. HIDALGO said he confronted the two people involved and that one of the people involved was always two steps ahead of the police. HIDALGO would not provide the names of those involved at that time.

**01/04/12**

Keats, Rondon and Evans re-interview Luis CAMACHO at the Main Place Mall office of the NYSP/Attorney General. CAMACHO said he recalled seeing a male he did not know shortly after the homicides at the store at Carolina and West Avenues. CAMACHO recalled that this male said something to CAMACHO that Checko and Uda were involved in his brothers' homicides. CAMACHO said that around the time of the homicides, he had begun seeing a new woman and because of that, he had not spent a lot of time with his brothers.

A-1490

**01/27/12**

_____ positively identifies Misael MONTALVO as talking about the Camacho Brothers' homicides. _____ MONTALVO said that the person who was arrested for the homicides "had nothing to do with it."

**03/22/12**

_____ information about the relationships among Efrain HIDALGO,    da HIDALGO, Brandon JONAS, Sammy ORTIZ Jr. and Sr. _____

**04/13/12**

**05/01/12**

Rondon and Evans interview Kadeejah KIRK at 33 19th Street. Ms. KIRK's NY State Driver's License had been found near the curb in front of the CAMACHO'S house at the time of the homicides. KIRK said during 2004, she resided at 849 Niagara Street and worked at the Wilson Farms at Niagara and Hampshire. KIRK said she had misplaced her license a couple of times and did not believe her identification had been stolen.

**05/04/12**

Rondon and Evans interview Dennis DUNSON at 518 E. Ferry Street. DUNSON owned 19 Hoyt in 2004. Josue ORTIZ told detectives he lived at 19 Hoyt at the time of the homicides. DUNSON told us that he rented the apartment on Hoyt _____ _____ DUNSON had never seen identification. DUNSON was shown a photo of Josue ORTIZ. DUNSON recalled that ORTIZ was tall and quiet and was surprised that ORTIZ had killed someone. DUNSON said ORTIZ never gave DUNSON any trouble and that ORTIZ hung out at the apartment with a couple other males. DUNSON was shown photos of mal_____ but he did not recognize any of the males _____
DUNSON was shown photos of Efrain HIDALGO, Uda HIDALGO, Brandon JONAS,

Juan GALARZA, Jose GALARZA, Reinaldo VELAZQUEZ Jr. and Sr. but did not recognize any of the males as being present in the apartment at any time.

DUNSON said he recalls that the other tenants he spoken about heard about the homicides on Niagara Street. DUNSON said he heard that the murders occurred "because the brothers had won the lottery and that someone had said something smart to someone's niece or aunt and that someone had gone in there with a golf club or something". DUNSON said he had heard the rumors from his friend, Thomas TRIBBLE, who had since passed away. DUNSON said TRIBBLE'S wife suffers from severe mental illness. DUNSON could not recall the names of other tenants, but did recall someone pulling up to the house on time and yelling, "Harvey!!"

(It should be noted that a paper from Josue ORTIZ' belongings had the name "Javi" written on it with the number ███████ Lotus notes search shows this number belonging to a Javier CASTILLO in 2002.)

**05/17/12**

Rondon and Evans travel to Dunkirk, NY to attempt to locate Segubdo JUSTINIANO, father-in-law of Misael MONTALVO and part of MONTALVO'S alibi regarding nhis whereabouts at the time of the homicides. Negative results for JUSTINIANO at his last known address. JUSTINIANO is subsequently found to be residing in NY City ██████

**05/25/12**

Samuel ORTIZ Jr. and several other 7th Street/ Cheko's Crew members, including Uda HIDALGO are arrested and charged federally. HIDALGO was in state custody at this time.

**05/31/12**

Request for the lab to conduct footwear / fingerprint analysis and comparison for Efrain HIDALGO, Uda HIDALGO, Brandon JONAS and Josue ORTIZ to evidence at scene.

**06/05/12**

Uda HIDALGO is transported from Auburn Correctional Facility to US Courthouse for arraignment by Rondon and Evans.

A-1492

**06/07/12**

Rondon and Evans travel to Orleans Correctional Facility to serve a federal subpoena on Brandon JONAS requesting a DNA sample via buccal swab. JONAS is told that we are investigating many acts of violence which occurred on the west side of Buffalo dating back approximately 10 years. JONAS is told that if he would like to hear details of the investigations, that we would read him his Miranda rights and discuss the cases, but that if he did not with to hear details of the investigations that it was his choice. JONAS said he did not wish to discuss the investigations. JONAS provides the DNA sample.

**06/18/12**

Rondon and Evans interview Sammy ORTIZ Sr. at the US Attorney's Office. ORTIZ said he accompanied MONTALVO to BPD back in 2004. ORTIZ said he has known Checko since Checko was a kid and that Checko and ORTIZ' son, Sammy ORTIZ Jr. are close friends.

**07/06/12**

Rondon and Evans go to 537 Riley to interview Hiram ROSADO. Information was received that ROSADO knew that the AK-47 which was used during the CAMACHO homicides was stolen from Waldemar RAMOS' house by Checko. ROSADO denied ever speaking to Checko or Uda and denied knowing about the AK-47.

**07/06/12**

Rondon and Evans go to 31 Rich Place, Lackawanna, NY to interview Frank COPPOLA. COPPOLA had lives across from the CAMACHO house in 2004 and had seen three males running from the scene, one of which had thrown a bat into a yard. COPPOLA recalled that night and was consistent with what he had told detectives the night of the homicides. COPPOLA described the three males as looking to be Hispanic and all about the same height.

**07/11/12**

Rondon and Evans █████████████████████████████████████████
████████did not have any recollection of the homicides from 2004
bought drugs from Checko.██████████████████████████ouse on
Niagara and Cheko and his girl lived in the back.

**07/11/12**

Rondon and Evans interview Josue ORTIZ at Attica Correctional Facility. ORTIZ would not elaborate on the events of the night of 11/11/04. ORTIZ asked what the CAMACHO family thought of him. When ORTIZ was told that the family was shocked and saddened by his involvement, ORTIZ appeared to be bothered. ORTIZ was asked, "Were you even there?" and ORTIZ replied, "Did you find my dna at the scene?" ORTIZ was told that there were items being tested and that if he recalled touching something it could be compared. ORTIZ did not reply.

**07/11/12**

Rondon and Evans ~~███████████████~~ to interview ~~███████~~ new who MONTALVO was and ~~███████████~~ that MONTALVO had had a falling out with one of the CAMACHO brothers because MONTALVO had "hit on" the girlfriend of one of the brothers.

**07/14/12**

Detectives leave a notice at 32 Briggs attempting to contact Sonia RUIZ, mother of Samuel ORTIZ Jr. MONTALVO, in 2004, told detectives that he picked up RUIZ from work at US Sugar every day and did so on 11/11/04.

**07/16/12**

Rondon and Evans go to 102 Pennsylvania to interview Yahaira CRUZ, current girlfriend of Efrain HIDALGO. CRUZ said she has known HIDALGO since about 2009. CRUZ acted as if she did not know HIDALGO's nickname was "Checko", yet, Rondon saw that CRUZ had the name "Checko" tattooed on her wrist. CRUZ tried to hide the tattoo and said, "That's personal."

**08/05/12**

Sonia RUIZ is interviewed a second time at BPD by Evans. During this interview, RUIZ never removes her sunglasses although the room is not bright. RUIZ begins by saying that after the prior interview, she asked some people about the homicides and that now she did recall hearing about the homicides. RUIZ was asked if she knew a male named "Misa". RUIZ said Misa is a friend of the family and she met him through his girlfriend, Carmen JUSTINIANO. RUIZ said she knew MONTALVO to be a cocaine dealer and that he never had a job that she knew of. RUIZ said MONTALVO never took her to work or picked her up from work when she worked at US Sugar.

**08/06/12**

Rondon and Evans interview Reinaldo VELAZQUEZ aka Tito and Vanessa VELAZQUEZ at 354 Riverside regarding their cousin , Josue ORTIZ. The VELAZQUEZ said they recently visited ORTIZ but didn't discuss the homicides. We asked the VELAZQUEZ' to contact us if Josue did speak about the incident.

**08/07/12**

Rondon and Evans interview ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the AK-47 which was used in the CAMACHO homicides and an SKS rifle were stolen from a male ▮▮▮▮▮▮▮▮▮▮▮▮ Waldemar RAMOS aka Waldi ▮▮▮▮▮▮▮▮ RAMOS is currently in Florida ▮▮▮▮▮▮▮▮▮ heard from "Pete's (Luis MEDINA) brother that the AK-47 was used by Checko on the brothers.

**08/08/12**

Rondon and Evans travel to Allenwood Federal Correctional Facility in White Deer, PA to interview inmate Carmelo MERCADO. MERCADO was working as a security guard at Zip's store at Massachusetts and Niagara and was interviewed briefly during the original canvass on 11/11/04. MERCADO said he recalled hearing 3 or 4 shots and saw three or four males running, all of which were of similar height. MERCADO said the males were wearing dark hoodies with the hoods up. MERCADO said he saw the males run to Massachusetts to Columbus Pkwy (7th Street) and then south on Columbus. MERCADO said he knew the victims from coming into the store and recalled that one of the victims had a Puerto Rican girlfriend who looked white. MERCADO was shown photo arrays and said he recognized Frank MATIAS from around the neighborhood.

**08/08/12**

Rondon and Evans traveled to Lewisburg Federal Correctional Facility to interview inmate Javier CASTILLO. A phone number believed to be that of CASTILLO'S was found at the time of ORTIZ' arrest in ORTIZ' personal papers. CASTILLO said around 2004 CASTILLO was using heroin. CASTILLO said CASTILLO rented an apartment for Justo and Juan GALARZA at 19 Hoyt. CASTILLO said he had met Josue ORTIZ through the GALARZA brothers. Although CASTILLO did not recognize a photo of ORTIZ, CASTILLO said he recalled that ORTIZ was bald at the time he had met ORTIZ. CASTILLO said, "He was big and bald. He had my number in case he needed to get in the house or to bring me something. I didn't really know him." CASTILLO said he did not know the CAMACHO brothers and didn't hear anything about the homicides other than "it was over drugs". CASTILLO said he did hear that ORTIZ was arrested for the homicides a couple months after they occurred.

**08/09/12**

Rondon and Evans traveled to Moshannon Federal Correctional Facility in Pennsylvania to interview inmate Genesis TORIBIO. TORIBIO was in the Erie County Holding Center at the same time as Misael MONTALVO. TORIBIO was shown a photo array containing a photo of MONTALVO. TORIBIO identified MONTALVO as being housed near TORIBIO about one month before TORIBIO was sentenced. TORIBIO refused to sign any paperwork. TORIBIO said he did not recall the male whom he identified as speaking about anything other than his drug case.



**08/16/12**

his intimate knowledge of the CAMACHO brothers homicides and gives a detailed description of the event. ▓▓▓ implicates Efrain HIDALGO, Brandon JONAS and Misael MONTALVO as well as Samuel ORTIZ Jr., Samuel ORTIZ Sr and Sonia RUIZ.

**08/17/12**

▓▓▓ "If Misael is charged with these murders, what's going to happen to the guy that's doing time innocently for the murders?"

**08/22/12**

Rondon and Evans intervie▓▓▓ e "traphouse" at 9 Hoyt for Justo GALARZA, Josue ORTIZ about t▓▓ n owl▓▓ ge ▓ the homicide▓ ▓▓▓▓ heard that ORTIZ had claimed responsibility for the homicides of the CAMACHO brothers, he couldn't believe it because ORTIZ was with ▓▓▓▓▓ at that time, 19 Hoyt was monitored by surveillance cameras and that when they heard that ORTIZ confessed, ▓▓▓ footage on the surveillance cameras and ▓▓▓ no one left the house the night of 11/11/04 ▓▓ ORTIZ frequently became disoriented when ORTIZ would leave the house and

23

A-1496

would call ██████ for help to get back to Hoyt. ██████████████ ORTIZ knew details from the incident from hearing Luis CAMACHO and the GALARZAS talking about it. ████████████ when the GALARZAS learned of the homicides, that they were saying that whoever killed their friends should be tied to a tree and stabbed ████████████ ORTIZ being present for that conversation and sitting on the floor with his knees to his chest listening to the males. ████████ ORTIZ sold and used Loritab sticks.

**09/06/12**

Rondon, AUSA Joseph Tripi and Evans travel to Attica CF to interview Josue ORTIZ. ORTIZ is told that the investigation is becoming complete and that his claims of involvement do not correspond with the facts now known to investigators. ORTIZ tells us that he is innocent and when asked why he said what he said back in 2004, ORTIZ said that he thinks that he lost his mind for a while at that time and does not know why. ORTIZ was asked why he said the names that he did during his interview/confession. ORTIZ said he believes that the detectives told ORTIZ the names and that he does not know anyone named UDA. ORTIZ is told that he will have to explain what happened to grand jurors. ORTIZ said he was offered four separate sentencing lengths. ORTIZ said he wanted to take it to trial because he thought he would be acquitted. ORTIZ said he wanted to pull his guilty plea but was told that he could not. ORTIZ said he took the plea because he was told that he would do 50 years if he lost at trial. ORTIZ said while in prison he had been on numerous medications but stopped taking all medication because "it tore my stomach up". ORTIZ said after he was sentenced and went to prison, he thought of it the way he thought of his mother's death, that it was just something he "would have to live with". ORTIZ denied participating in the homicides and denied being present when the homicides occurred.

**10/12/12**

Rondon and Evans interviewed ████████████████████ the night of 11/11/04. ██████████ outside Checko, Brandon and Uda on the porch ██████████████ male known to him as Brandon had a long ponytail and was carrying a rifle, like an SKS. ██████████ the males go to the house on Niagara and then ██████████ heard a shot, then more shots ██████████ never saw the males run out the front of the house ████████ with Checko and Brandon and they were laughing about the incident and bragging about it ████████ reservation. ████████ Brandon said (about Josue ORTIZ), "A guy got drunk and said he did it, but he didn't do it."

**11/12/12**

**11/15/12**

Arraignment of Brandon JONAS, Misael MONTALVO and Efrain HIDALGO for the CAMACHO brothers' homicides.

**12/17/12**

Interview Jermick ACEVEDO at the US Attorney's Office by Rondon and Evans. ACEVEDO is a close friend of Sammy ORTIZ Jr. and is the son of Estevan ACEVEDO ██████████████████████████████████████████████████ was involved in the CAMACHO brothers' homicides ████████ was forced to go with Cheko and Brandon that day and that afterward, Checko slapped ████████ ACEVEDO heard while JONAS was in prison, that JONAS wanted to kill ████

**12/18/12**

Rondon and Evans interview Luciano RAMOS, aka Tito Saka, close friend of the victims. RAMOS told us he was not present when the homicides occurred but was working at the Crocodile Bar on Chippewa when he received a call from "Georgie" at The Famous Corner telling him that the CAMACHOS had been killed. RAMOS said he never knew the brothers' to have problems with anyone and could only recall one time when Nelson argued with someone about a vehicle.

**12/19/12**

Rondon, Evans and ██████████████████████ interviewed ████████ at ████████████████████████ that prior to the homicides ████ Cheko, Brandon ██████████ outside ██████████████ prior to the homicides. ████████ the males running from the CAMACHO house west on Massachusetts form Niagara Street ████ one of the males throw a bat behind ██████ house ████████████ another had a long gun ██████████ went to the CAMACHO house ████████ Nelson CAMACHO on the floor in the living room when Luis CAMACHO was there. ████████████ left the house ██████████████████ Brandon was the shooter ██████████████████████████ killed the brothers had nothing to do with it. ████████████ should have said no, though ████ ████ knew who had killed the brothers ██████████ Checko after the homicides ██████████ Checko was happy and laughing and said he couldn't believe it.

A-1498

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2013\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**03/08/13**

~~[redacted]~~

**04/25/13**

Interview of Anthony ORTIZ aka Fat Tony. ORTIZ was a friend of the CAMACHO brothers as well as Misael MONTALVO. ORTIZ claims he was at the CAMACHO house the night of the homicides but left there approximately 10 minutes prior to the incident. ORTIZ offered to take a polygraph test regarding his whereabouts at/around the time of the homicides. Said polygraph tentatively scheduled for Monday 04/29/13.

The investigation continues...

Det. Mary Evans
03/18/13

A-1499

```
1                           CITY OF BUFFALO
2                        POLICE DEPARTMENT
3                        HOMICIDE SECTION
4
5                                               NOV 11, 2004
6                                               FILE #04-242
7                                             CD #B043160879
8                                             STARTED 00:30
9     STATE OF NEW YORK)
10    COUNTY OF ERIE   ) SS
11    CITY OF BUFFALO  )
12
13    Jeilyn Mary Rosario hispanic female 16 years old, d/o/b 12-25-87, residing
14    at 801 Niagara st . Buffalo, NY. phone 884-7018/cell-phone 597-3070 .
15    Being duly sworn, deposes and makes the following statement while in the
16    Buffalo Police Department Homicide office.  The questions are asked by,
17    and the statement is typewritten by Det. Reginald Minor
18
19    Q)   Can you read and write and how far have you gone in school?
20    A)   Yes I can read and write, I went to the 10th grade.
21
22    Q)   How do you support yourself?
23    A)   I receive S.S.I.
24
25    Q)   Who do you live with?
26    A)   My mother Jannette Diac.
27
28    Q)   The Buffalo Police Homicide Section is investigating the deaths of
29         Nelson Camacho 30 y/o hispanic 04-26-68 of 879 Niagara st and Miquel
30         Camacho 19 y/o hispanic male dob 09-09-79 of same address. The
31         incident took place at 879 Niagara st in the vicinity of Rhode Island
32         and Massacusette 11-11-04 at approx 21:44 hrs.  Please can you tell
33         me in your words what you know about this incident.
34
35    A)   Around 9:00 pm I was over my sister's house went Nelson called me on
36         my cell-phone.  He told me he had some movies from Block-Buster.  He
37         asked me to come over.  I told him to come pick me up.  He told me
38         that he had already took a shower and was in his boxer short.  I told
39         him that I will call my mother and see if she will drive me over his
40         house.  Then he hung-up.  I waited for my mom to come, it was close
41         to 10:00 pm.  Then my mom came, I took my sister's baby with me.  We
42         drove over to Nelson's house.  Then I seen the police and everything.
43         I saw Cucah, she was crying on the stairs of the house.  I said,
44         don't tell me it's Nelson.  She calmed down and told me they shot
45         him.  I said, who.  She said, they shot them both and after that she
46         wouldn't talk any more.
47
48    Q)   What is your relationship with the victim Nelson Camacho?
49    A)   He was my boyfriend we've been together for four years.
50
51    Q)   What is your relationship with Miquel Camacho?
52    A)   Nelson's brother, we were very close friends.
53
54    Q)   When was the last time you seen Nelson or Miquel?
55    A)   Today, Nelson dropped me off at my sister's house around 8:00pm.
56
57    Q)   Where did you last see him?
58    A)   At his house. And when he dropped me off at my sister's
59
60    Q)   Who else was at Nelson's house at that time?
61    A)   Miquel his brother.
```

A-1500

| | | |
|---|---|---|
| 1 | Q) | Did either of them appear upset or nervous? |
| 2 | A) | No. |
| 3 | | |
| 4 | Q) | What did Nelson do for a living? |
| 5 | A) | He worked at the Town restaurant he worked there for sixteen years |
| 6 | | |
| 7 | Q) | Did Nelson sell drugs? |
| 8 | A) | No. |
| 9 | | |
| 10 | Q) | What about Miquel? |
| 11 | A) | He was on S.S.I. |
| 12 | | |
| 13 | Q) | Did Miquel sell drugs? |
| 14 | A) | No. |
| 15 | | |
| 16 | Q) | When Nelson call you on your cell phone at your sister's house did he |
| 17 | | appear nervous, excited, or anxious. |
| 18 | | |
| 19 | Q) | Did you ever see Nelson or Miquel with a gun? |
| 20 | A) | No. |
| 21 | | |
| 22 | Q) | Do you know of any one the would want to hurt Nelson or Miquel? |
| 23 | A) | Yes, Amisael Motalvo. |
| 24 | | |
| 25 | Q) | Why? |
| 26 | A) | Motalvo tried to kiss me, he wanted to be with me.  I told Nelli |
| 27 | | Camacho, she told, Luis Camacho, and he told, Nelson.  Then one day |
| 28 | | Nelson and Motalvo had a argument at the barber shop on West Ferry. |
| 29 | | They were arguing over me. |
| 30 | | |
| 31 | Q) | How long ago did this happen? |
| 32 | A) | About one or two months |
| 33 | | |
| 34 | Q) | Did you ever see Motalvo with a gun? |
| 35 | A) | No. |
| 36 | | |
| 37 | Q) | Describe Motalvo? |
| 38 | A) | A hispanic male about 5'4" about 200 lbs, short hair, he lives at 35 |
| 39 | | Hudson ave. |
| 40 | | |
| 41 | Q) | Is there anything else that you can think of that can assist us in |
| 42 | | this investigation? |
| 43 | A) | No. |
| 44 | | |
| 45 | Q) | I will now have you read your statement to determine if it is true |
| 46 | | and accurate. |
| 47 | A) | Yes. |
| 48 | | |
| 49 | Q) | Now that you have read the statement is it true and correct and will |
| 50 | | you sign it. |
| 51 | A) | yes. |
| 52 | | |
| 53 | | STATEMENT ENDED AT 01:17 HRS |
| 54 | | |
| 55 | | I UNDERSTAND THAT ANY FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A |
| 56 | | CLASS "A" MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE |
| 57 | | STATE OF NEW YORK. |
| 58 | | |
| 59 | | SUBSCRIBED AND VERIFIED UNDER PENALTY OF PERJURY. |
| 60 | | |
| 61 | | |

2

A-1501

```
1                                              SIGNED:
2
3                                              WITNESS:
4        SWORN AND SUBSCRIBED TO BEFORE ME
5        THIS  DAY OF 2004
6
7
8        REGINALD MINOR
9        COMMISSIONER OF DEEDS IN AND FOR
10       THE CITY OF BUFFALO, NEW YORK
11       MY COMMISSION EXPIRES DEC. 31, 2004
12
```

3

A-1502

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSUE ORTIZ,

                          Plaintiff,

-vs-                                                                          Civil Action No.:
                                                                             16-cv-00322
KENNETH F. CASE, ESQ. in his Capacity
as an Assistant District Attorney of the
ERIE COUNTY DISTRICT ATTORNEY'S OFFICE,
and FRANK A. SEDITA, III, ESQ., Individually and
in his Capacity as District Attorney of the ERIE
COUNTY DISTRICT ATTORNEY'S OFFICE and
FRANK J. CLARK, ESQ., Individually and in his
capacity as District Attorney of the ERIE
COUNTY DISTRICT ATTORNEY'S OFFICE and
The ERIE COUNTY DISTRICT ATTORNEY'S OFFICE

                          Defendants.

_____

## DECLARATION OF HON. KENNETH F. CASE

        Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

        1.        From January 1994 until June 2007, I was an Assistant District Attorney in the

Homicide Bureau at the Erie County District Attorney's Office.

        2.        I am fully familiar with the facts and circumstances of this litigation and submit

this Declaration in support of Defendants' motion for summary judgment.

        3.        On or about November 11, 2004, brothers Nelson Camacho and Miguel Camacho

were murdered inside their apartment located on Niagara Street in the City of Buffalo.

        4.        On or about November 16, 2004, the Plaintiff, Josue Ortiz (hereinafter referred to

as "Plaintiff" or "Ortiz"), gave a sworn statement to Buffalo police detectives admitting his role

in the Camacho brothers' murders.  A copy of Josue Ortiz's statement is attached as **Exhibit A**.

5.      Based on his admission, Ortiz was arrested by the Buffalo Police on November 16, 2004.  A copy of Josue Ortiz's Arrest/Booking Report is attached as **Exhibit B**.

6.      I was the lead prosecutor in the criminal case against Josue Ortiz.

7.      As the lead prosecutor, I evaluated the evidence obtained by the Buffalo Police Department, including Ortiz's confession.  However, the Erie County District Attorney's Office ("ECDAO") played no role in investigating the Camacho brothers' murders.  The Buffalo police were the lead investigators and gathered all evidence without any assistance from anyone at the ECDAO.  No one from the ECDAO participated in obtaining Ortiz's statement or his arrest.

8.      I acted only as a prosecutor in this matter.

9.      Ortiz was indicted on December 8, 2004.  The indictment charged Ortiz with multiple counts of Murder in the First Degree, multiple counts of Murder in the Second Degree, and one count of Burglary in the First Degree.  A copy of the indictment is attached as **Exhibit C**.

10.      Following the indictment, the criminal proceeding against Ortiz included several competency evaluations, multiple competency hearings, a Huntley hearing, motion practice, and plea negotiations.

11.      Initially, I offered Ortiz a plea to two counts of Murder in the Second Degree, with no opposition to concurrent time.  After extensive negotiations with Ortiz's defense counsel, and with input from the victims' family, I agreed to a plea to two counts of Manslaughter in the First Degree, with a minimum of 25 years.

12.      On or about March 22, 2006, Ortiz pleaded guilty to two counts of First Degree Manslaughter before Erie County Judge Michael D'Amico.  A copy of the plea transcript is attached as **Exhibit D**.

- 2 -

13.     On or about June 16, 2006, Plaintiff was sentenced to twenty-five years in prison. A copy of the sentencing transcript is attached as **Exhibit E**.

14.     I left the Erie County District Attorney's Office in June 2007.

15.     On January 1, 2011, I began my first term as Erie County Judge, a position I have held continuously through the present day.

16.     Although I am aware there was a subsequent Federal investigation into gang activity in the City of Buffalo, which included the Camacho brothers' murders, I was not involved in the investigation in any way.

17.     I am also aware that Josue Ortiz, through legal counsel, filed a motion, sometime in 2013, pursuant to New York Criminal Procedure Law § 440 (the "440 Motion") seeking to vacate his conviction.

18.     At the time the 440 Motion was filed, I was no longer working at the ECDAO.  I was not involved in any way with any of the proceedings related to the 440 Motion.

19.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of March 2018.

/s/ *Hon. Kenneth F. Chase*
Hon. Kenneth F. Case

A-1505

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSUE ORTIZ,

                Plaintiff,

-vs-                                        Civil Action No.:
                                               16-cv-00322
KENNETH F. CASE, ESQ. in his Capacity
as an Assistant District Attorney of the
ERIE COUNTY DISTRICT ATTORNEY'S OFFICE,
and FRANK A. SEDITA, III, ESQ., Individually and
in his Capacity as District Attorney of the ERIE
COUNTY DISTRICT ATTORNEY'S OFFICE and
FRANK J. CLARK, ESQ., Individually and in his
capacity as District Attorney of the ERIE
COUNTY DISTRICT ATTORNEY'S OFFICE and
The ERIE COUNTY DISTRICT ATTORNEY'S OFFICE

                Defendants.

_____

## <u>DECLARATION OF HON. FRANK A. SEDITA, III</u>

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      From January 1, 2009 until December 31, 2015, I was the District Attorney of

Erie County, New York.

2.      From 2000 until December 31, 2008, I was the chief of the Homicide Bureau at

the Erie County District Attorney's Office.

3.      I am fully familiar with the facts and circumstances of this litigation and submit

this Declaration in support of Defendants' motion for summary judgment.

4.      On or about November 11, 2004, brothers Nelson Camacho and Miguel Camacho

were murdered inside their apartment located on Niagara Street in the City of Buffalo.

- 1 -

Case 23-352, Document 40, 06/23/2023, 3533146, Page45 of 263

A-1506

Case 1:16-cv-00321-EAW-MJR   Document 78-1   Filed 07/02/20   Page 2 of 7
Case 1:16-cv-00321-EAW-MJR   Document 49-1   Filed 09/06/18   Page 2 of 7

5.      On or about November 16, 2004, the Plaintiff, Josue Ortiz (hereinafter referred to as "Plaintiff" or "Ortiz"), gave a sworn statement to Buffalo police detectives admitting his role in the Camacho brothers' murders.  A copy of Josue Ortiz's statement is attached as **Exhibit A**.

6.      Based on his sworn confession, Ortiz was arrested by the Buffalo Police on November 16, 2004.  A copy of Josue Ortiz's Arrest/Booking Report is attached as **Exhibit B**.

7.      On or about March 22, 2006, Plaintiff again admitted to his role in the Camacho brothers' murders.  This time, under oath, and accompanied by two experienced criminal defense attorneys, Ortiz pleaded guilty to two counts of first degree manslaughter before Erie County Judge Michael D'Amico.  A copy of the plea transcript is attached as **Exhibit C**.

8.      On or about June 16, 2006, Plaintiff was sentenced to twenty-five years in prison. A copy of the sentencing transcript is attached as **Exhibit D**.

9.      I played no role in the investigation of the Camacho brothers' murders.  The Buffalo police were the lead investigators and gathered all evidence without any assistance from me.  I did not participate in obtaining Ortiz's statement or his arrest.  The ECDAO and the individually named defendants acted only as prosecutors in this matter.

10.     On or about December 21, 2007, the Appellate Division, Fourth Department affirmed the conviction of Josue Ortiz , specifically holding that (1) Josue Ortiz was mentally fit to proceed in Supreme Court; (2) no additional competency examinations were required; (3) CPL 730.30 was complied with; (4) the record from the Huntley hearing supported the conclusion that Josue Ortiz was not in custody before he made incriminatory statements; (5) Miranda warnings were properly given; (6) Josue Ortiz knowingly and intelligently  waived his rights before making further statements; and (6) the sentence was not unduly harsh or severe.  A copy of the Fourth Department decision is attached as **Exhibit E**.

- 2 -

Case 23-352, Document 40, 06/23/2023, 3533146, Page46 of 263

A-1507

Case 1:16-cv-00321-EAW-MJR   Document 78-1   Filed 07/03/20   Page 3 of 7
Case 1:16-cv-00321-EAW-MJR   Document 49-1   Filed 09/06/18   Page 3 of 7

11.     Between 2004 and 2011, Josue Ortiz admitted to killing Nelson Camacho and Miguel Camacho to several different people on at least six different occasions.

12.     As mentioned above, he initially admitted his guilt to the Buffalo police in the days following the murders and then again when he pleaded guilty in Erie County Court.

13.     Prior to his guilty plea, Plaintiff admitted his guilt to a fellow inmate at the Erie County Holding Center named Ronnie Williams. A copy of correspondence, dated September 30, 2005, from Buffalo Police Detective Mark R. Stambach is attached as **Exhibit F**.

14.     Medical records from the Central New York Psychiatric Center, dated January 29, 2008, note that Ortiz stated "I know I did wrong but everybody makes mistakes." Additional records from Central New York Psychiatric Center, dated November 18, 2009, note that Ortiz agrees "he made a bad decision and has to deal with the consequences." Copies of Josue Ortiz's medical records are attached as **Exhibit G**.

15.     At some time around 2011, a Federal grand jury was convened as part of an ongoing investigation into gang activity in the City of Buffalo. The ECDAO was not involved in this investigation. On or about July 21, 2011, Ortiz went before the Federal grand jury and provided testimony under oath acknowledging his guilt in the Camacho brothers' murders.

16.     On or about September 13, 2012, Ortiz went before the Federal grand jury again. This time, for the first time, Ortiz denied that he was involved in the murders.

17.     On or about November 16, 2012, William Hochul, who was at that time the United States Attorney for the Western District of New York, announced publicly that Efrain Hidalgo, Brandon Jonas, and Misael Montalvo had been indicted related to the murders of Nelson Camacho and Miguel Camacho.

Case 23-352, Document 40, 06/23/2023, 3533146, Page47 of 263

A-1508

Case 1:16-cv-00321-EAW-MJR   Document 78-1   Filed 07/03/20   Page 4 of 7
Case 1:16-cv-00321-EAW-MJR   Document 49-1   Filed 09/06/18   Page 4 of 7

18.     Around this same time, the U.S. Attorney's Office provided certain information regarding their investigation to the ECDAO.  Any information the U.S. Attorney's Office provided to the ECDAO was immediately provided to Plaintiff's then criminal defense attorney, John Nuchereno.

19.     On or about April 23, 2013, Mr. Nuchereno, filed a motion pursuant to New York Criminal Procedure Law § 440 (the "440 Motion") seeking to vacate Ortiz's conviction.  Mr. Nuchereno's enclosure letter confirms that the ECDAO provided Mr. Nuchereno with the information received from the U.S. Attorney's Office.  A copy of correspondence from John Nuchereno, dated April 23, 2013, the notice of motion, dated April 23, 2013, and the supporting attorney affidavit (without exhibits), dated April 23, 2013, is attached as **Exhibit H**.

20.     The 440 Motion was based primarily on the 2011 Federal investigation and the 2012 Federal indictment of Efrain Hidalgo, Brandon Jonas, and Misael Montalvo.

21.     On or about July 12, 2013, the ECDAO opposed Josue Ortiz's 440 Motion based primarily on concerns that the motion was based on significant conflicting evidence and did not demonstrate Ortiz's innocence.  A copy of the ECDAO's papers (without exhibits) submitted in opposition to the 440 Motion is attached as **Exhibit I**.

22.     On or about July 17, 2013, John Nuchereno supplemented the 440 Motion with DNA evidence found on a baseball bat and a driver's license.  A copy of the supplemental notice of motion, dated July 17, 2013, and supporting attorney affidavit (without exhibits), dated July 17, 2013, is attached as **Exhibit J**.

23.     On or about July 25, 2013, the ECDAO filed further opposition to the 440 Motion because the DNA evidence was wholly irrelevant and did not prove the innocence of Josue Ortiz.

- 4 -

A copy of the ECDAO's papers (without exhibits) submitted in further opposition to the 440 Motion is attached as **Exhibit K**.

24.     On or about July 29, 2013, the Erie County Court held oral argument on the 440 Motion.

25.     On or about August 28, 2013, Emily Trott, an attorney who briefly represented Ortiz related to the Federal grand jury, submitted an affidavit on behalf of Ortiz.  A copy of the Trott affidavit, sworn to August 28, 2013, is attached as **Exhibit L**.

26.     On September 6, 2013, the U.S. Attorney's Office sent correspondence to the Erie County Court providing information regarding the Federal investigation.  The ECDAO and Ortiz's criminal defense attorney were copied on this correspondence.  A copy of correspondence from Timothy Lynch, dated September 6, 2013, is attached as **Exhibit M**.

27.     On September 19, 2013 and October 1, 2013, Ortiz submitted supplemental affidavits regarding the information received from the U.S. Attorney's Office.  A copy of the attorney affidavits in further support of the 440 Motion is attached as **Exhibit N**.

28.     On December 4, 2013, the ECDAO submitted supplemental opposition to the 440 Motion responding to the affidavit submitted by Emily Trott and the supplemental affidavits submitted by Ortiz.  A copy of the ECDAO's papers (without exhibits) submitted in further opposition to the 440 Motion is attached as **Exhibit O**.

29.     On January 2, 2014, the Erie County Court sent correspondence to the parties regarding certain witness statements in the underlying criminal case.  A copy of correspondence from Hon. Timothy Franczyk, dated January 2, 2014, is attached as **Exhibit P**.

30.     On January 9, 2014, Ortiz submitted a supplemental affidavit responding to the affidavit submitted by the ECDAO on December 4, 2013.  A copy of the attorney affidavit in further support of the 440 Motion is attached as **Exhibit Q**.

31.     On January 21, 2014, Josue Ortiz submitted a supplemental affidavit regarding questions asked by the Erie County Court.  A copy of the attorney affidavit in further support of the 440 Motion is attached as **Exhibit R**.

32.     On January 21, 2014, the ECDAO submitted a supplemental affidavit regarding questions asked by the Erie County Court.  A copy of the ECDAO's papers submitted in further opposition to the 440 Motion is attached as **Exhibit S**.

33.     On February 7, 2014, the Erie County Court issued a Decision and Order scheduling a hearing on the 440 Motion.  A copy of the Erie County Court's Decision and Order is attached as **Exhibit T**.  The Court's lengthy Decision and Order provides a detailed summary of the entire procedural history of the criminal case against Ortiz.

34.     On September 2, 2014, September 3, 2014, October 8, 2014, and November 7, 2014, hearings on the 440 Motion were held in Erie County Court.

35.     On or about November 15, 2014, the U.S. Attorney's Office advised the ECDAO that a proffer had been held on November 14, 2014 at the U.S. Attorney's Office where Efrain Hidalgo admitted to the murders of Nelson Camacho and Miguel Camacho and stated he did not know Josue Ortiz.

36.     The U.S. Attorney's Office further advised the ECDAO that Efrain Hidalgo was coming back for an additional proffer in the near future and invited the ECDAO to attend.

37.     On November 25, 2014, the ECDAO was allowed to meet with and interview Efrain Hidalgo.  This was the first time a non-immunized and available witness disputing Ortiz'

guilt was presented to the ECDAO. This was also the first and only time the ECDAO talked to

Efrain Hidalgo.

38.    In light of Hidalgo's interview, the ECDAO asked Mr. Ortiz' defense attorneys if

he would voluntarily speak with prosecutors.  On December 4, 2014, the ECDAO was allowed to

meet with and interview Ortiz.  This was the first and only time the ECDAO interviewed Ortiz.

39.    Despite the fact that it would have been legally appropriate to require Mr. Ortiz to

affirmatively prove his innocence, on December 8, 2014, the ECDAO withdrew its opposition to

the 440 Motion.  A copy of correspondence from the Hon. Frank A. Sedita, III, dated December

8, 2014, is attached as **Exhibit U**.

40.    On December 9, 2014, Josue Ortiz was released from prison.  A copy of the Erie

County Court Decision is attached as **Exhibit V**.

41.    All information that was provided by the U.S. Attorney's Office to the ECDAO,

Ortiz's criminal defense attorneys, and/or the Erie County Court was provided pursuant to

protective Orders issued by the Hon. Richard Arcara.  A copy of Judge Arcara's Orders are

attached at **Exhibit W**.

42.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of March 2018.

/s/ *Frank A. Sedita, III*
Hon. Frank A. Sedita, III

CITY OF Buffalo Police Department
HOMICIDE SECTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46

DATE: 11/15/04
FILE #: 04-242
CD #:
STARTED: 1355hrs

STATE OF NEW YORK )
COUNTY OF ERIE    ) SS
CITY OF BUFFALO

NAME OF PERSON: Misael Montalvo
RACE/SEX: PR Male
AGE: 29
D/O/B: 4/5/75
ADDRESS: 35 Hudson
PHONE: 480-3917

The above named person being duly sworn, deposes and makes the following statement while in the Buffalo Police Department Homicide Office. The questions are asked by C Aronica, and the statement is typewritten by C Aronica also present to interpret questions and answers from English to Spanish is Police Officer Lopez.

Q. Can you read and write English?
A. No.

Q. The Buffalo Police Major Crimes Unit is investigating the shooting of Nelson and Migal Camaho. The shooting occurred at approximately 945PM 11/11/04 at 879 Niagara St. In your own word's what can you tell me about this incident?
A. Nothing/

Q. Misial Montalvo, can you tell me why you presented yourself to the Buffalo Police Department Major Crimes Unit today?

A. The people are making comments in the street that as soon as they bury these two guys that they are going to take him out, his mother out and his whole family out.

Q. Can you tell me why the Camacho family is blaming you for the murders of Nelson and Miguel?
A. They were like brothers and Nelson and Miguel used to hang at my house. The whole problem started that one of the Camacho guys had the title to my car and I asked Nelson for it.

Q. Could you tell me when this incident about the title occurred?
A. February of this year.

Q. Where did this incident take place?
A. In a barber shop at 233 Niagara Street.

Case 1:16-cv-00321-EAW-MJR  Document 78-12  Filed 07/03/20

A-1512

M.M

### CITY OF Buffalo Police Department
#### HOMICIDE SECTION

1
2   Q. When was the last time you spoke to Nelson or Miguel Camacho?
3   A. The day we had the argument in the barber shop about the title to the car.
4
5   Q. Do you know Nelson Camacho's girlfriend Jeilyn Rosario?
6   A. Yes, she was a real good friend of our family's.
7
8   Q. On the night the Camacho's were murdered, she told detectives from our office that you
9   attempted to kiss her about a month ago and she told the Camacho family about the incident.
10  Did you try to kiss Jeilyn?
11  A. No.
12
13  Q. Did you ever have bad words with her?
14  A. No.
15
16  Q. Has anybody in the Camacho family personally threaten you?
17  A. No.
18
19  Q. Can you tell me you whereabouts on Thursday, November 11, 2004 between the hours of
20  9pm and 10pm?
21  A. I was at my father in law's house watching wrestling.
22
23  Q. Can you tell me where your father in law lives?
24  A. I don't know the address. He lives on Niagara Street, two houses from the Alstate
25  Insurance Store going towards Porter Avenue. It's an orange house with brown trim.
26
27  Q. What is your father in laws name?
28  A. Segundo Justiniano.
29
30  Q. Can you tell me who you were with at your father in laws house?
31  A. Samuel Ortiz, my girlfriend, Carmen Justiniano, Carmen's son and Sam's daughter.
32
33  Q. Where were you coming from before you arrived at your father in laws house?
34  A. I was picking up Sonia Ruiz from her job.
35
36  Q. Who is Sonia?
37  A. It is a lady that I take to work and pick up everyday. She works at US Sugar.
38
39  Q. What time did you pick her up?
40  A. 7:00.
41
42  Q. Where did you go after you picked her up?
43  A. I went to Fargo Avenue to pick up her kids and they dropped them off at her house at 482
44  7th street.

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1513

*M.M.*

## CITY OF Buffalo Police Department
### HOMICIDE SECTION

1  Q. How old is Sam's daughter?
2  A. 4 years old.
3
4  Q. What time did you leave your father in laws house and who did leave with?
5  A/. About 10:15 I left the house with Sam, his daughter, my girlfriend and her son and took
6  them home.
7
8  Q. Did you leave the house at all between 9pm and 10pm for anything.?
9  A. No, I did not.
10
11 Q. What were you watching on TV?
12 A. WWF Wrestling.
13
14 Q. What time did the wrestling match start?
15 A. 8pm-10pm.
16
17 Q. Did you have anything to do with the killing of Nelson and Miguel Camacho?
18 A. No.
19
20 Q. I am now going to have P.O. Lopez read your statement back to you in Spanish to
21    determine if it is true and accurate. If it is correct, will you sign it?
22 A. Yes.
23
24
25
26 Statement ended at        hrs.
27
28 I understand that any false statements made herein are punishable as a class "A"
29 Misdemeanor, pursuant to Section 210.45 of the Penal Law of the State of New York.
30
31 Subscribed and verified under penalty of perjury.
32
33 Signed: *Musa Montalvo*
34
35 Witness: _____
36
37 Sworn and subscribed to before me, this day *15* of *Nov* , *20 04*
38
39 _____
40 Commissioner of Deeds in and for the City of Buffalo, New York      My Commission expires
41
42
43
44

TO MARK MORGAN
CAPT MCU

From C ARONICA

Date 11/15/04

Sub File #04-242

ATT. M. SACK LT.
ATT. P TERRANA D/SGT.

Sir

IN CONT the INVEST OF HOM VICTIMS Nelson + Migal CAMAHO. your writer were INFORMED MISAEL Montalvo would present Himself TO TO OUR OFFICE TO be INTERVIEWED. MR Montalvo Along with SAMUEL ORTIZ ARRIVED AT Approx 1300HRS.

MR ORTIZ INFORMED US Montalvo NEITHER spoke nor understood English very WELL. HE would ASSIST IN INTERPRETING THE INTERVIEW.

indicate he was with mr ORTIZ THEY were watching THE wrestling matches btwn 8-10pm AT MoTAlvo GirlFRIENDS Father House. AT this Time

Det Lauber AND Guglizza Departed the office To verify MoTAlvo Alibi. Their Activies will be covered in A Separate P-73.

This writer Took A Formal STATEMENT FROM MOTAlvo AT 1355HRS. THE STATEMENT is SELF-EXPLANATORY AND is NOW A permanent part of this File.

Before Departing our office MOTAlvo VOICED concerns for his SAFETY. HE SAID Because of BAD BLOOD btwn HIMSELF AND Nelson CAMACHO (HE HEARD) THE CAMACHO Family was Blaming him for the murder.

Motalvo Said he was going To N.J. To STAY with

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

Members between HB advised,
This Inmate can't be
will keep his office appraised
of any new news

Respect sub.

C. Mrowick



CITY OF BUFFALO - DEPARTMENT OF POLICE
*MAJOR CRIMES UNIT .*

*TO: CAPTAIN MARK MORGAN*

*FROM: DET. MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE CASE #04-242(A)*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date Officer John Garcia of B-District contacted this writer. Officer Garcia stated that an informant had contacted him and related the following regarding the above captioned case. That on 11/11/04, the date of this crime, the victims had an altercation with a 14-15yoa hispanic male in front of Zips Deli. This altercation ended when one of the Camacho brothers produced a handgun and fired at this youth, only to have the gun jam. This hispanic male was purported to have said "this isn't over" and fled the scene. This all ocurred approximately 1600hrs.

The informant went on to tell Garcia that this unidentified hispanic youth recruited two B/M, both who live in the same block of Niagara St., that the Camacho brothers lived in. Together, the three went to 879 Niagara St., armed with R-15's (AR-15 ?) and committed the homicide. The only other information this informant could supply to help identify this hispanic male was that he resides somewhere on Whitney between Hudson and Virginia.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted

A-1518



**City of Buffalo Police Department**
**Intra-Departmental Correspondence**
**Major Crimes Unit**

**To:**   Captain Mark Morgan          **Date: 11/11/04**
          Captain of the Major Crimes Unit

**From:** Det. Richard Wagstaff          **Subject:** MCU#04-242
                                                    Homicide Shooting Inv
          MCU                                       Victims – Nelson Camacho
                                                    Miguel Camacho

**Attention:** Lt. Margaret Sack

Sir,

The Shift Leut contacted this writer at home. Stabler to respond to a double shooting at 879 Niagara Street. I responded to the scene and assisted MCU Detective Sergeant James Lonergan and Detective Mary Gugliuzza. Sgt. Lonergan informed me that there was another scene with possible evidence from the primary crime scene.

The second scene is located outside in the rear yard of 53 Massachusetts Street. 53 Massachusetts is located on the southwest corner of Massachusetts and Niagara Street. The yard is located between the rear of 53 Massachusetts and the north side of 886 Niagara Street. Observed on the ground, several feet south of the rear door of 53 Massachusetts is a blue color baseball bat. There is a walk path, west side of 53 Massachusetts, leading from the rear yard going to the front area of 53 Massachusetts.

The BPD Evidence and Photograph Unit was informed of this location and they process the scene. They will provide separate reports in regards their involvement in this case.

Conducted a canvass and interviewed several individuals.

Interviewed Steven Acevedo, ph# 602-1010 of 53 Massachusetts. He stated that he had just came home when he saw three guys and they had something in there hand. One had on a gray hoody and the other two had dark hoody on. He did not see their faces. This witness would not come down to the office at this time but he would when his available.

Interviewed Carmelo Mercado, ph#563-8524 of 97 Rhode Island. He stated that he was standing outside the store at Massachusetts and Niagara when he saw three guys. They

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1519



Spanish like. The ran down Massachusetts to 7th Street then towards Rhode Island Street. This witness would not come down to the MCU office at this time.

Respectfully submitted,

Det. Richard Wagstaff
MCU

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/0...

A-1521

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20



Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20



Steven Acevedo
53 Mons
602-1010

Three guys had
something on hand

Hoodies
Mass to
7th St

Zip's Food
896 N Main

Consuelo Mercado
563-8524
97 Rhode Island

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1524



City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
     Major Crimes Unit

Subject: MCU File #04-242
        879 Niagara

Date: November 15, 2004

Case 1:16-cv-00321-EAW-MJR  Document 78-12  Filed 07/03/20

A-1525

Sir:

    On the above date at approx. 1645 hrs., your writer
received a phone call at the MCU office from Kevin Enburg.
Mr. Enburg is the Emergency Room staff counselor for
Psychiatric Services at Buffalo General Hospital.  Mr.
Enburg stated that a Hispanic male had been brought to the
hospital for evaluation.  The doctors had cleared him
psychiatrically.  During the evaluation, the Hispanic male
claimed he had information on the recent double homicide
that occurred at 879 Niagara.  He further stated that he was
in fear of his life because the killers were after him.
    Your writer and Det. James Lema proceeded to Buffalo
General.  Det/Sgt. James Lonergan and P.O. Edwin Torres of
B-District met us there.  Torres was there to act as an
interpreter.
    At 1715 hrs., Mr. Enburg placed the four of us in the
family conference room on the first floor just off the
emergency room.  He brought the Hispanic to the room.  This
male identified himself as Josue Ortiz, d.o.b. 10/14/81 of
19 Hoyt, rear.  Ortiz stated that he spoke some English but
was more comfortable speaking Spanish.  P.O. Torres told us
the following after conversing in Spanish with Ortiz.
    Ortiz knew the deceased Camacho brothers.  They were

**BUFFALO POLICE DEPARTMENT**
**BUFFALO, NEW YORK**
**MAJOR CRIMES UNIT**

STATE OF NEW YORK)

COUNTY OF ERIE   )    **VS:**

CITY OF BUFFALO   )

**DATE: 11/13/04**

**TIME COMMENCED: 12:01AM**

**NAME: Luis A. Camacho AGE:** 41 **DOB:** 3/13/63 **TELEPHONE:** 830-2659, 578-4140 **ADDRESS:** 32 School Street, Bflo., N.Y. **BEING DULY SWORN, DEPSOES AND MAKES THE FOLLOWING STATEMENT TO:** Det. Richard Wagstaff - MCU, **OF THE CITY OF BUFFALO POLICE DEPARTMENT ON:** November 13, 2004 **AT:** 74 Franklin Street, Bflo. N.Y., MCU office.

This statement is being taken in regards to a double shooting home invasion robbery that occurred on 11/13/04 at about 2140hrs while at 879 Niagara Street in the City of Buffalo, N.Y.

Q. Can you read and write?
A. I can read but no writing.

Q. What grade you complete in school?
A. Six grade.

Q. Did have anything to do with the crime that occurred at 879 Niagara Street tonight?
A. No.

Q. What time did you arrive at this location?
A. No more than four minutes. I pass two red lights and I live close by.

Q. Did you come alone or were you with someone else?
A. With my girlfriend.

Q. What is her name?
A. Evette Maldonado.

Q. Who was at the house when you got there?
A. My two brothers lying on the floor. The door was open and I call and no body answer. Then I look and saw the body.

Q. Why did you come over to 879 Niagara?

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

A-1526

When more cops showed up, for some reason the gun didn't want to go down, it fall out my hand and they told me to go face down. They put the handcuffs on me and put me in the car.

Q. Is there any reason why anybody would want to harm your brothers?
A. No. But my brother Lobo told me that somebody told him that he hit the lotto for sixty five thousand dollars.

Q. Did any of your brother's hit the lotto for a large sum of money?
A. No. Lobo only won two hundred dollars about two weeks ago.

Q. Is there any drug activity going on at your brother's house?
A. We party but no dealing.

Q. What do your brother's do for a living?
A. Lobo worked at the Towne Restaurant for eighteen years. Miguel is on SSI, he's handicap.

Q. Did you see anyone in the area when you arrived at your brother's house?
A. When I passed the light at Massachusetts, I saw three persons running towards Massachusetts behind the black truck.

Q. Can you described them?
A. All I remember was a yellow shirt and they look skinny. They duck down in front of the truck and kept running. I think they might know me because they might of recognized the car. The car is Lobo's car.

Q. Did you see anything in there hands?
A. No.

Q. What kind of car did you come in?
A. 1983 BMW, gold color.

Q. Could you recognize them if you saw them again?
A. If there on the video, may be.

Q. Is there anything else you can add to this statement that may help in this investigation?
A. No.

TIME CONCLUDED: 00:39 AM/PM

NAME: Luis A. Chamacho, HEREBY SOLEMNLY SWEAR AND AFFIRM THAT
THE ABOVE IS MY STATEMENT, THAT I HAVE READ/OR HAVE HAD



Caranzo's stored large quantities of cocaine at the Germain address. The Caranzo's also had an apartment at 46 Blum.

Through the interpreter, we asked Ortiz if he had any direct knowledge of the murders at 879 Niagara. He claimed he did not. He said that it was his opinion that the Camacho brothers were killed because of jealousy due to their drug selling.

When asked whom he was specifically afraid of, Ortiz gave the name, Rinaldo Valesquez. When asked why he was afraid of Valesquez, Ortiz stated it was because he had a shotgun. Ortiz did not claim that Valesquez had anything to do with the above murders.

Mr. Ortiz was definitely upset at the time of the interview. He was given a card with our names and phone numbers on it and asked to call us if he had any further information. Ortiz was turned back over Mr. Enburg. Ortiz was going to be medically evaluated before being released from the hospital.

Your office will be kept apprised of any new developments in this case.

Respectfully submitted,

Det. Mark Vaughn

A-1528

CITY OF Buffalo Police Department
MAJOR CRIME UNIT

STATE OF NEW YORK)                    Date:  November 17, 2004

COUNTY OF ERIE      )SS                File# 04- 04-242

CITY OF BUFFALO                       CD# 04-

                                      Started at: 1550hrs

NAME OF PERSON :  Urayoan Hidalgo
RACE/SEX:  Hispanic Male
AGE:  20yrs old
ADDRESS: 403 Prospect
D/O/B: 06-20-84
PHONE: No Phone

The above named person being duly sworn deposes and makes the following statement while at
the Major Crime Unit office. The questions are asked and this statement is typed by Det./Sgt.
Philip Torre.

U. H.

Q. Can you read and write the English language?

   A. Yes.

Q. What is the highest grade of education that was completed?

   A. 8th grade

Q. The Buffalo Police Department is currently investigating the Shooting deaths of Miquel
Camacho and Nelson Camacho that occurred on 11-11-04 at approximately 9:44 PM , in your
own words can you tell me about this incident?

A. Nothing, I heard on the news and in the street that they were killed.

Q. Where were you and who were you with on November 11th, 2004 between the hours of 6pm
and 11pm?

A. That was a Thursday night and I was home at 403 Prospect with my Girlfriend Helyna
Rivera and our daughter Alexia.

Q. Do you recall what activities you were involved in during that time?

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1529



found. Four pairs of sneakers were found in the apartment.
Two pairs of dark sneakers were located in the bedroom with
the mattress. One pair of white sneakers was found in the
kitchen and another pair of white sneakers was found in the
bathroom. Several pieces of men's clothing were found in
the kitchen and the bedroom with the mattress.

Your writer took custody of the cell phone and the
pieces of mail. Det. Lema took custody of the sneakers and
clothing. All of the above-described items were turned
over to Det/Sgt. Patrick Murphy at the MCU office. Mr.
Domagala allowed us to keep the key for this apartment.
When we left, we locked the upper apartment door.

It should be noted that when we initially arrived at
this address, we observed a window screen lying on top of a
blue City of Buffalo garbage can. Directly above from
where the screen was, a window to the upper apartment was
observed wide open. The open window was the only one that
was missing a screen.

Your office will be kept apprised of any new
developments in this case.

                    Respectfully submitted,

                    Det. Mark Vaughn

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1530

CITY OF Buffalo Police Department
MAJOR CRIME UNIT

1  A. No I don't know where he was.

2

3  Q. Do you know or have you ever met a person by the name of Josue Ortiz?

4

5  A. No

6

7  Q. Prior to this statement I showed you a picture of a Hispanic male with a dark complexion
8  and after looking at the picture I asked you if you know this person. You responded that you
9  did not know and have never met this person, is that correct?

10

11  A. Yes

12

13  Q. Did you shoot to death Miquel and Nelson Camacho on the night of November 11th, 2004?

14

15  A. No

16

17  Q. Do you have any knowledge of who committed this crime?

18

19  A. No

20.

21  Q. Have you ever been at the residence of 879 Niagara where the Camacho brothers lived?

22.

23  A. No

24

25  Q. Did you know or have you ever met Miquel and Nelson Camacho?

26

27  A. No.

28

29  Q. Is there anything you would like to add to your statement ?

30

31  A. No

32

33

34

35

36

37  I will now have you read your statement word for word to determine if it is correct and true.
38  At the conclusion of this reading I will ask you to initial the top and bottom of every page and
39  then sign this sworn statement.

40.

41

42

43

44  Completed at: 1625hrs

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1531



City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
    Major Crimes Unit

Subject: MCU File #04-242
    879 Niagara

Date: November 17, 2004

Sir:

On the above date at approx. 0030 hrs., your writer
along with Det/Sgt. James Lonergan and Det. James Lema went
to 142 Germain St.  Josue Ortiz signed a permission to
search for this address.  The apartment rented by Ortiz was
in the rear house at this address.  His apartment was in
the upper.  His name was on the mailbox.

Ortiz did not have a key on his person for this
apartment.  Through our investigation, we learned that the
landlord for this property is Joseph Domagala.  His resides
at 184 Haverford, Williamsville.  His home phone number is
688-8061 and his cell number is 316-8560.  Mr. Domagala
agreed to meet us on Germain.  He arrived at 0055 hrs.  He
brought a key and unlocked the upper apartment door of the
rear house for us.

Mr. Domagala told us that Ortiz has been a tenant in
this apartment since August.  He was the sole tenant
although Ortiz told Domagala that his wife would be coming

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1532

## City Of Buffalo - Department Of Police
### Major Crimes Unit

**To:**         Captain Mark Morgan
Crimes Against Persons Bureau

**From:**     Det. Mark R. Stambach
D/Sgt. James Lonergan
Major Crimes Unit

**Subject:**    **FILE # 04-242**

**Date:**     11/16/04

ATTN:     Lt. Margaret Sack
Major Crimes Unit

Sir:

     Your writers did meet with P.O. David Sadlocha and P.O. John Lobaugh at the Major Crimes Unit Office. Both officers did have with them a Mr. Josue Daniel Ortiz. They responded to a call at 7:16pm. P.O. Sadlocha, Car D432, indicated the subject was confessing about the homicide on Niagara Street.

     Mr. Josue Daniel Ortiz was placed into Sgt. Vivian's Office at 7:25pm. A formal interview was started at 7:30pm. He gave information during this interview that indicated he was involved in the homicides. Present in the Interview Room was P.O. Edwin Torres of B District. He was used as an interpreter as he informed your writers he spoke only a little English.

     After listening to Mr. Ortiz explain what had happened, he was advised of his rights.

     P.O. Edwin Torres read a Spanish Rights Card to Mr. Ortiz. The rights were read at 8:25pm. He then signed the Rights Card. His waiver was read at 8:30pm. This Rights Card shall now become a part of this file.

     At 8:40pm, Mr. Ortiz was given a Coke, large fries and a sandwich from McDonald's .

     At 9:00pm, a formal sworn statement was taken from him. Please see attached sworn statement for further details on this matter. This sworn statement will now become a part of this file. The statement was finished at 10:30pm, whereas it was read back to him and he signed it

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1533



8:25 pm

AVISO    DERECHOS DEL SOSPECHO

1. Ud. tiene el derecho de quedarse callado.
2. Cualquier declaración que ud. haga puede ser usada y sera usada contra ud. en el juicio.
3. Ud. tiene el derecho de hablar con un abogado y de pedirle que este presente mientras lo interrogan a ud.
4. Si ud. no puede pagar a un abogado, se nombrara uno para representarlo antes de que lo interrogan, si lo desea ud.

11-16-2004  Mark R. Stambach

November 16th, 2004

City of Buffalo
Department of the Police

State of New York
County of Erie
City of Buffalo

Mister Josue Daniel Ortiz, WM23-11-14-81 residing at 142 Germain Street in
the City of Buffalo, New York. Being duly sworn deposes and makes the follow-
ing sworn statement. This statement is taken by Detective Mark R. Stambach of
the HOMICIDE SQUAD in the prescence of Det/Sgt James Lonergan. The statement
is typed by Detective Mark R. Stambach and the questions are being asked in
Spanish by Police Officer Edwin Torres.

Q. Do you kno how to read and write?
A. Soo- So woth the english.

Q. How far have you gone in school and do you have a formal education?
A. 11 grade I dropped out of the 11th grade.

Q. How long have you lived here in Buffalo, New York?
A. Four or five months I got here in May.

Q. Have you lived in the United States for how long?
A. This is my first time.

Q. The Buffalo Police Departments Homicide Squad is investigating the
   shooting and the death of Mister Miguel Camacho and also Misterv Nelson
   Camacho. Both were victims of a homicide that occured on 11-11-2004 at
   or about 9:44 PM at 879 Niagara Street in the City of Buffalo. Can you
   tell me in your own words what you know about those homicides?
A. It was about 9:30 PM we started to head over there. We went over there
   to get money. There was three of us. Me, UDAH, and UDAHS brother. We got
   there. And we did what we did. Went over there and got in. Because we
   heard that they were making money. We went over there to assault them only
   He opened the door. I mean I did. UDAH kicked the door in. We entered.
   We got in. All three of us entered. Entered and BAM. Fired shots. Forced
   way in and fired a shot. Then he heard the other brother yell out they
   are killing my brother. They jumped on FLOCO. UDAHS brother fired the
   nine millimeter. No the rifle I mean. Shot fired at FLOCO. FLOCO came and
   then UDAHS brother came and POW - POW. They we rean off.

Q. Did you enter through the front or the side door?
A. The front door.

Q. How did you open the door?
A. We kicked in the door, I did.

Q. How may of there was it that went inside?

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

STATEMENMT PAGE TWO CONTD..........

Q. Did you see anyone else inside the house with LOBO?
A. The brother.

Q. What was the brothers name?
A. Thye called him EL-FLACO.

Q. Where was EL-FLACO inside the house when he came in?
A. He was standing in the rear of the apartment.

Q. Did EL- FLACO have anything in his hands when he was standing?
A. A gun, in one hand, and a telephone in his other hand.

Q. What was EL - FLACO doing with the telephone?
A. I heard him talking.

Q. Did you hear what he was saying?
A. Yes they are killing LOBO they are killing LOBO.

Q. Did you see a T.V. inside the apartment?
A. Yes.

Q. Was it a small one or a large one?
A. It was big.

Q. Was the T.V on or off?
A. The T.V. was on.

Q. Did you go there to get drugs or money?
A. Yes both.

Q. Did anyone find the money or the drugs?
A. I saw money there and drugs.

Q. Can you name the three types of guns you took with you?
A. A shotgun - A pistol, and a AK.

Q. Who brought the AK to the house?
A. It was UDAHS brother.

Q. Who actually kicked the door in to the bottom apartment?
A. I did/.

Q. What were you wearing the night this all happened?
A. Dark clothing, a dark hooded coat, combination matching set, not what
   I am wearing right now. sneakers white.

Q. Where are the clothes that youuwer wearing that night?
A. They are on or at 19 Hoyt street.

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1536

STATEMENT PAGE THREE. ( . . . . . . . . . . . .

Q. Did you take anything from the apartment?
A. No we got scared.

Q. Why did you tell us at first you had a shot gun instead of the AK?
A. I was scared.

Q. How have the police treated you tonight?
A. You treated me good.

Q. Did anyone yell at you tonight?
A. No.

Q. Did you have dinner here tonight?
A. Yes.

Q. Did anyone make you any promises?
A. No promises were made.

Q. And you had your rights read to you correct?
A. Yes.

Q. I am now going to have Police Officer Torres read this three page statement and ask you if it is correct?
A. It is correct.

Q. Will you now sign this statement for me now?
A. Yes.

STATEMENT IS STOPPED AT 10:30 PM.

SIGNED _____

WITNESSED: _____

WITNESSED: _____

Sworn and subribed before me this
16th day of November 2004

Mark R Stambach

Case 1:05-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1537

P-1302

NOTES                          11 - 16 - 2004

                                7:30 pm


        JOSUE              WM 23
        DANIEL          |    11 - 14 - 1981
        ORTIZ                142 GERMAIN ST.


        ARRESTED  IN  PUERTO  RICO
        FOR  GUNS  AND  DOPE . . . .


                                        VICTIM
   Ⓐ   CELL PHONE IN HAND      Ⓐ  ONE  IN
        PISTOL  IN  OTHER          REAR OF
        FLOCO  HAD  PISTOL IN HAND   HOUSE
        CELL


   Ⓐ   T.V.  WAS  BIG       Ⓐ  GOLD  CHAIN
   Ⓐ   T.V.  WAS  ON             RIPPED OFF
                                  LOBO  WHO
                                  WAS  AT
        HE  WAS  WITH             FRONT  DOOR
        UDAH
        HE IS  JOEY              RAN  AWAY

Case 1:16-cv-00321-EAW-MJR  Document 78-12  Filed 07/03/20

A-1538



Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

(☆) NAME OF GUN
MILATARY GUN
AK -.. ← HIS WORDS

(☆) YES AK WAS
FIRED

(☆) Where is the milatary gun
rightnow
He knows 8:25 PM
were it is.. Adirsed
8:30 PM
Waiver

8:40PM
Feed
McDonalds
Cake - Fries
Sandwhich

8:25 pm
AVISO    DERECHOS DEL SOSPECHO ✓

1. Ud. tiene el derecho de quedarse callado. ✓
2. Cualquier declaración que ud. haga puede ser usada y sera usada contra ud. en el juicio. ✓
3. Ud. tiene el derecho de hablar con un abogado y de pedirle que este presente mientras lo interrogan a ud. ✓
4. Si ud. no puede pagar a un abogado, se nombrara uno para representarlo antes de que lo interroguen, si lo desea ud. ✓

11-16-2004  Mark R. Stanlach

A-1540



**RICI #: 10035834**
Caution Indicator:
**BUFFALO POLICE DEPARTMENT**
**ARRESTING/BOOKING REPORT**

**Agency Case #: 04-13723-20 (A)**

Report Date: 11/17/2004 04:17
Report Printed By: BLADY, Marian

―――――― **PERSON INFORMATION** ――――――

NAME: **ORTIZ, Josue D**

DOB: **11/14/1981** AGE: **23** SEX: **Male** RACE: **Other**

HEIGHT: **6'03** WEIGHT: **280** BUILD: **Heavy** ETHNICITY: **Hispanic** SS #: **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**

HAIR COLOR: **Black** HAIR TYPE: **Brush Cut** EYE COLOR: **Brown**

EYE DEFECTS: FACE: SKIN TONE:

FACIAL FEATURES: DISABILITY:

SCARS/MARKS/TATTOOS:

ADDRESS: **142 GERMAIN ST, BUFFALO NY US**

HOME TELEPHONE: MARITAL STATUS: **Single (never married)**

EDUCATION: **09** CITIZEN OF: **US** PLACE OF BIRTH: **PUERTO RICO PR**

RELIGION: **Catholic** DRIVERS LICENSE #: LICENSE STATE:

NYSID #: FBI #: MUG #:

―――――― **ARREST/OFFENSE INFORMATION** ――――――

INCIDENT #: **04-3160879** ARREST TYPE: **CIP - Crime in Progress** ARRESTING AGENCY: **BUF**

STATUS AT ARREST: **Held** ARREST DATE/TIME: **11/17/2004 02:15**

CONDITION AT ARREST:

ARRESTING OFFICER: **JUDGE, PATRICK**

ASSISTING OFFICER:

ADDRESS OF ARREST: **74 FRANKLIN ST, BUFFALO NY US**

PRIMARY ARREST CHARGE: **PL 125.25-01 MURDER: INTENTION** ATT: **N**

―――――― **BOOKING INFORMATION** ――――――

CJTN #: BOOKING STATUS: **Normal** BAIL:

BOOKING START DATE/TIME: **11/17/2004 03:35** BOOKING END DATE/TIME: **11/17/2004 04:11**

ITEM(S) SEIZED AT ARREST:

ARRAIGNMENT COURT: **NY014011J CITY OF BUFFALO**

BOOKING COMMENTS: **THE DEFENDANT DID ON 11/11/2004 WHILE AT 879 NIAGARA STREET AT OR ABOUT 9:45PM BREAK IN THROUGH THE FRONT DOOR AND DID SHOOT**

F/P'S TAKEN BY: **DIAMOND, Anthony** DATE: **11/17/2004**

NCIC CLASS. BY: DATE/TIME:

ARRESTEE SIGNATURE:



**Rolled Right Thumb**
NCIC CLASS:

**Arrest Charges:** Att. Incident #: Warrant #: Summons #:

PL 125.25 06 01 MURDER INTENTION N 04 3160879

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1541

THIS SIDE TO BE COMPLETED BY THE ARRESTING OFFICER

P-163

BUFFALO POLICE DEPARTMENT
ARREST DATA REPORT

AFN 04-13723-20(A)

Date 11-17-2004

CD 04-3160879

DEFENDANT'S NAME _____ ORTIZ _____ JOSUE _____ DANIEL
                        (LAST)        (FIRST)         (M)

STREET NAMES/ALIASES _____

DATE OF BIRTH 11-14-81 RACE W SEX M ETHNIC _____ SKIN WHITE

ADDRESS 142 GERMAIN STREET

CITY BUFFALO _____ STATE N.Y. ZIP CODE _____

HEIGHT 6.3 WEIGHT 280 BUILD H EYES BROWN HAIR BLACK

SCARS, MARKS, TATTOOS _____ NONE

U.S. CITIZEN? Yes ☒ No ☐ PLACE OF BIRTH PUERTO-RICO OCCUPATION _____

MARITAL STATUS SINGLE SOCIAL SECURITY NUMBER 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

ARREST DATE 11-17-04 ARREST TIME 2:15A ARRESTING OFFICER DET. M. STAMBACH

ASSISTING OFFICER DET. P. JUDGE ASSIGNMENT/RADIO CALL NUMBER 1271

ADDRESS OF ARREST 74 FRANKLIN STREET

COMPLAINANT'S NAME CAMACHO-MIGUEL _____ RELATIONSHIP VICTIM
                   CAMACHO-NELSON
                   (LAST)    (FIRST)    (M)

COMPLAINANT'S ADDRESS BOTH DECEASED _____ PHONE NUMBER _____

CITY _____ STATE _____ ZIP CODE _____

CHARGES MURDER IN THE SECOND DEGREE - TWO COUNTS
        125.25-1 P.L. (2) COUNTS.

NARRATIVE THE DEFENDANT DID ON 11-11-2004 WHILE AT 879
NIAGARA STREET AT OR ABOUT 9:45PM BREAK IN THROUGH THE
FRONT DOOR AND DID SHOOT MIGUEL CAMACHO AND ALSO
NELSON CAMACHO WERE BOTH VICTIMS MET THERE
DEMISE.

VTRS Yes ☐ No ☒

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1542

## City Court of Buffalo – Department of Police
### Central Booking Bureau

FELONY COMPLAINT

State of New York, County of Erie, City Court of Buffalo

**THE PEOPLE OF THE STATE OF NEW YORK**

| | **DEFENDANT(S)** | **DOB** | **CASE NO.** |
|---|---|---|---|
| VS | Ortiz, Josue | 11-14-81 | 04-13723-20 |
| VS | | | |
| VS | | | |
| VS | | | |

I, <u>Det Mark Stambach</u> accuse the above named defendant(s) in this action, that on or about <u>9:45PM</u> <u>November 11, 2004</u> in the City of Buffalo, did intentionally, knowingly and unlawfully commit the felony of <u>Murder in the Second Degree</u> Contrary to the provision of <u>125.25-1 2cts</u> of the [x] Penal Law [ ] Vehicle and Traffic Law [ ] of the State of New York [ ] Ordinances of the City of Buffalo.

The facts upon which this accusation is based are [ ] of my own knowledge [x] on information and belief.

125.25-1 2 cts. Murder in the Second Degree
In that the defendant, while at 879 Niagara Street, did with the intent to cause the death of Miguel Camacho and Nelson Camacho, cause the death of Miguel Camacho and Nelson Camacho, in that the defendant did while at 879 Niagara along with two co-defendants, break in through the front door and did fire shots from a weapon striking Miguel Camacho and Nelson Camaco resulting in gun shot wounds to both complainants and ultimately causing demise.

MAS

Please take notice, pursuant to CPL 710.30, of the People's intent to offer at trial, evidence of defendant's statements to a public servant as referenced above.

Relationship: NONE

NOTICE: False statements made herein are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the New York State Penal Law

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1543



## City Court of Buffalo – Department of Police
### Central Booking Bureau

FELONY COMPLAINT

State of New York, County of Erie, City Court of Buffalo

### THE PEOPLE OF THE STATE OF NEW YORK

| DEFENDANT(S) | DOB | CASE NO. |
|---|---|---|
| VS | | |
| VS | | |
| VS | | |
| VS | | |

I, <u>Det Mark Stambach</u> accuse the above named defendant(s) in this action, that on or about <u>9:45PM</u> <u>November 11, 2004</u> in the City of Buffalo, did intentionally, knowingly and unlawfully commit the felony of <u>Murder in the Second Degree</u> Contrary to the provision of <u>125.25-1 2cts</u> of the [x] Penal Law [ ] Vehicle and Traffic Law [ ] the State of New York [ ] Ordinances of the City of Buffalo.

The facts upon which this accusation is based are [ ] of my own knowledge [x] on information and belief.

125.25-1 2 cts. Murder in the Second Degree
In that the defendant, while at 879 Niagara Street, did with the intent to cause the death of Miguel Camacho and Nelson Camacho, cause the death of Miguel Camacho and Nelson Camacho, in that the defendant did while at 879 Niagara along with two co-defendants, break in through the front door and did fire shots from a weapon striking Miguel Camacho and Nelson Camaco resulting in gun shot wounds to both complainants and ultimately causing demise.

MAS

Please take notice, pursuant to CPL 710.30, of the People's intent to offer at trial, evidence of defendant's statements to a public servant as referenced above.

Relationship: NONE

NOTICE: False statements made herein are punishable as a Class A Misdemeanor pursuant to Section

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1544

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

**A-1545**

**City Of Buffalo – Department Of Police**
**Central Booking Bureau**

Docket No.
CD No.    04-316-0879
AFN    04-13723-20

<u>**NOTICE TO DEFENDANT OF INTENTION TO OFFER EVIDENCE AT TRIAL**</u> (CPL 710.30 AND 700.70)

**PEOPLE OF THE STATE OF NEW YORK**
    **-VS-**

<u>DEFENDANT: Ortiz, Josue</u>     <u>DOB: 11-14-81</u>     Date of Arrest: 11-17-04

<u>Officer in charge of case: Det Mark Stambach</u>     Assignment: MCU

**THE PEOPLE** INTEND TO OFFER AT TRIAL:

I.    **STATEMENTS BY DEFENDANT:** EVIDENCE OF A STATEMENT MADE BY THE DEFENDANT TO A **PUBLIC SERVANT** ENGAGED IN LAW ENFORCEMENT ACTIVITY OR TO A PERSON THEN ACTING UNDER HIS DIRECTION OR IN COOPERATION WITH HIM.

☒   1. Written statement (attach copy)
☐   2. What was said by the defendant at the time of arrest? (specify: date, place, content and to whom)
☐   3. No statements were made    **Arresting Officers Initials** _____

<u>See Homicie case Number 2004-242</u>

**MAS**

**IDENTIFICATION OF DEFENDANT:** TESTIMONY IDENTIFYING THE DEFENDANT AS A PERSON WHO COMMITTED THE OFFENSE CHARGED BY WITNESSES WHO HAVE IDENTIFIED HIM AS SUCH PRIOR TO ARREST / TRIAL. SPECIFICALLY:

WHO MADE IDENTIFICATION OF DEFENDANT? (SPECIFY NAME)    <u>Det Mark Stambach</u>

Date <u>11 / 17 / 04</u>     Place <u>74 Franklin St</u>

☒   Showup Identification
☐   Photograph Identification
☐   Line-up
☐   Observation of defendant upon some other occasion **relevant** to case

**Central Booking Bureau**

P-32 **Defendant Information**   Cn. No.   CMO ID No.

AFN   04-13723-20

| DEFENDANT: Ortiz, Josue | DOB: 11-14-81 | Date Of Arrest: 11-17-04 |
|---|---|---|

Co-DEFENDANTS:

| 1. | DOB: |
|---|---|
| 2. | DOB: |
| 3. | DOB: |

1. Officer in charge of case: Det Mark Stambach    Assignment: MCU

| Victim(s) / Witness (es) | Date / Chg'd | Purpose | Notice | Date / Initial |
|---|---|---|---|---|
| 2. Name    Miguel Camacho  Deceased | | | | |
| Address | | | | |
| Phone | | | | |
| 3. Name    Nelson Camacho  Deceased | | | | |
| Address | | | | |
| Phone | | | | |
| 4. Name | | | | |
| Address | | | | |
| Phone | | | | |
| 5. Name | | | | |
| Address | | | | |
| Phone | | | | |

### Erie County District Attorney – Buffalo City Court Disposition Form

| Arraign Date: | | Defense Attorney | Type | Bail Status | Judge | | ADA |
|---|---|---|---|---|---|---|---|
| Disp. Date: | | | | | | | |

| Charges | PL 20 | Disposition | Disp. Code | Sentenced to: |
|---|---|---|---|---|
| 1.  125.25.1  2 cts | | | | |
| 2. | | | | |
| 3. | | | | |

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1546

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

LATER, HEARD 2-3 SHOTS, THEY
SOUNDED LIKE FIRECRACKERS. NO
VOICES OR SCUFFLE. WAS PLAYING A
COMPUTER GAME, ALSO TV ON. AFT
SHOTS TURNED TV off AND STOPPED PLA
THE COMPUTER GAME. WENT TO THE
FRONT WINDOW, I SAW NELSO
CAMACHO'S CAR IN THE DRIVEWAY.
I FIGURED HE WAS HOME. HIS OTH
BROTHER LIVED WITH NELSON, BUT
UNKOWN IF HE WAS AT HOME. DID
SEE ANY ONE COME IN. THEN
WHEN I WAS LOOKING OUT THE
WINDOW, I HEARD MORE SHOTS
ABOUT 6-7, THEY WERE LOUDER
I WAS TO SCARED TO MOVE. THE
I SAW THREE MEN LEAVE OUT THE
FRONT OF THE HOUSE. THE THIRD
GUY HAD SOMETHING LONG IN HI
HAND. COULDN'T SEE WHAT IT
WAS BUT HE HELD IT ALONG HI
RIGHT LEG. HE HAD ON DARK CLOT
AND A HOODIE, IT WAS UP. DIDN'

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/02/20

A-1548

WERE - SPEAKING - SPANISH

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20





Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1550

1                 **CITY OF BUFFALO**

2            **DEPARTMENT OF POLICE**

3               **MAJOR CRIME UNIT**

4

5

6

7  **TO:**   Capt. Mark Morgan      **SUBJECT:** MCU # 04-242

8        Major Crime Unit        **DATE:**   November 11, 2004

9

10 **FROM:**  Det. Mary E. Guglinzza    **VICTIM:**  Miguel & Nelson Camacho

11         Major Crime Unit

12

13

14

15

16 Sir,

17

18     On this date at approximately 2200 hours this writer did receive a call from Lt.

19 Stabler, Shift officer regarding needing my assistance at a double shooting at 879

20 Niagara St. Upon arrival the scene, a house at above address, was taped in yellow

21 tape. I did meet with Det/Sgt Lonergan, MCU and he apprised me of the situation.

22 Det. Tom Balk, Photography, Paula Carducci and Jim Maroney from Evidence Unit

23 were also on the scene. Lt. March and numerous officers from B & D-districts were

24 on scene for crowd and traffic control. Prior to writing the scene, this writer did

25 canvass the scene, along with Det Richard Wagstaff. He did accompany Det

26 Maroney across the street regarding evidence in rear yard. Det. Wagstaff will cover

27 his actions on his own P-73.

28

29     This writer did go to the upper apartment and spoke to the residents who were

30 there during this homicide. They are Beverly and David Laborgne of 879 Niagara

31 upper 885-5514. Also their 9-year-old daughter, Brenda was in the apartment.

32 There was also a small Hispanic male approximately 2 yrs old who was there. The

33 Laborgne's did not know the boys name. The boys female guardian had arrived on

34 the scene with him, she was hysterical after finding out who was murdered and the

35 Laborgne's took the boy upstairs to their apartment for warmth. It was learned later

36 that the boy was at the scene with his aunt, Jeilyn Rosario. Later on in the evening

37 this writer did bring boy downstairs to be re-united with his mother who came to

38 the scene. This writer did interview the Laborgne's separately and decided that

39 Beverly saw more than her husband. This writer did get a district car to take her

40 downtown for a sworn statement.



47   have killed him. She stated Nelson and Montalvo were best friends and while she
48   was dating Nelson, Montalvo tried to kiss her and then ended up threatening to kill
49   Nelson. This occurred about a month ago. This writer had a district officer drive her
50   downtown for a statement. On the way, this writer advised the officer to drive by
51   Hudson St. and have her pick out the house where Montalvo lives; he also drives a
52   yellow car, according to Jeilyn. It was also learned from PO Gramaglia that the
53   brother of the victims was at the scene when 1st officers arrived. He was transported
54   downtown already. He was with his girlfriend when he pulled up to the scene, His
55   girlfriends name is Yvette Maldonado dob 8/24/72 of 32 School 578-4140. Luis
56   Camacho pulled up in a small car, parked inside inner perimeter NY Reg BEL-
57   6729. Also parked outside of house is NY Reg, CYW-7446.
58

59   The scene is a two-story, two family home, on the Northeast corner of Niagara St.
60   between Rhode Island and Massachusetts. There are stairs going up to the house.
61   The outer door was open, which leads you to the hallway. On the left is a door to
62   lead you to the upper apartment. To the right is a white metal door, which leads to
63   the lower apartment. This was kicked in from the outside. The doorframe on the
64   inside is noticeably damaged and the double deadbolt lock is damaged along with
65   the metal door, which has noticeable dent near the door handle. As you walk into
66   the lower apartment, there is a small hallway, to my right is a dining room area,
67   walking in hallway you see the back of the fireplace to my right. On the floor at the
68   rear of the fireplace is Evidence Marker #2. This is for a gold chain that appears
69   broken. Walking in an eastern direction in the hallway  past the dining room on the
70   right is a small living room area. This consists of a futon couch to my left, a small
71   couch on my right, a larger couch on the south wall of apartment, a glass table with
72   the glass top tipped on side of table, a large entertainment center with TV which is
73   turned on. There is what appears to be brain matter/flesh on the small couch back
74   area. In this living room past the coffee table to the left is a body of a white male.
75   This white male is deceased; he is face up, wearing white t-shirt, blue shorts, white
76   socks and no shoes. His head is facing north, feet south.  His right arm is to his side;
77   left arm is crooked touching his left shoulder. He has obvious gunshot wound to the
78   face and left bicep. Evidence Marker (EM) #3 is TV remote, #4 is a drinking glass,
79   #5 cell phone, #6 Pepsi can, #7 gray remote, # Cheetos bag, all these items located
80   between the large couch and coffee table. EM# 9 is a nickel-plated handgun, small
81   caliber. This is located next to body #1 in living room area. On the carpet is what
82   appears to be brain matter, large red stain just west of victim's head. According to
83   the brother, Luis Comacho, who was the first inside house and discovered bodies,
84   stated that he did roll his brother over. This accounts for the large red stain area in
85   different location as victim's head.
86

87   Evidence marker (EM) #10 is a large cal. Bullet casing found to the right of

A-1551



93     Located on living floor next to victim #1 was a bullet hole that traveled to the
94 basement area. This writer accompanied Det Jim Maroney to basement area and it
95 appears the bullet traveled into the furnace and was not recovered at this time.
96 There is a red stain on ceiling of basement, which dripped to the basement floor.
97 This would be directly underneath victim #1 in the living room.

98

99     Walking east toward the back of the house is a hallway; there is a wooden door
100 that would separate the living room from the hallway. This door is open and opens
101 toward the rear of the house, hinges on my left. Approximately half way up the door
102 is a bullet graze on the open door. EM#14 is a large caliber bullet casing on the floor
103 of the hallway, EM#15 is a gold anchor charm; EM# 16 is a large caliber bullet
104 casing, EM # 17 is also found in the hallway.

105

106     Evidence marker #41 is a bullet that was extricated from bedroom #1
107 doorframe.

108

109     Found later in search of inside premises is EM #27 a large caliber bullet casing
110 found partly inside the heating duct in hallway near wooden door. There are red
111 stains in hallway area leading to rear of house, Evidence Marker #32.

112

113     Off the hallway to my right is the bathroom. This is located on the south wall of
114 the hallway. Going inside the bathroom on floor, ceiling and horizontal blinds on
115 bathroom window is what appears to be brain matter/flesh.

116

117     Traveling east through hallway on my left is a bedroom #1. Immediately inside
118 doorway to my left on floor is pooled red liquid. There is a pair of gray slacks on
119 floor. EM# 23 Partly in /out of pocket of slacks are numerous $20 bills. EM#24,
120 #25 and #26 are all pieces of paper, deposit slips with shoe prints in red stain on
121 pieces of paper, EM#33 wet red stain. Leading out of bedroom #1 I turn to my left
122 into rear hallway, which leads you to the kitchen.

123

124     Traveling east through the hallway, you enter a kitchen area; this is where
125 victim #2 is located. Lying against the rear door which leads to the hallway to back
126 of house is a w/m. He has on a white t-shirt and pair of boxer shorts. He is laying on
127 his left side, head in a southerly direction. His right hand is under his face area; his
128 left arm is under his body. Left leg is going west, right leg is bent at knee and right
129 foot is inside pair of jeans, which are located inside bedroom #2.

130

131     Bedroom # 2 is located at rear of the house, door opening on the north wall of
132 the kitchen. Also on north side of kitchen wall are bullet graze marks traveling to
    rear of house. EM#18 a large caliber bullet casing located in kitchen near the

Case 1:16-cv-00321-EAW-MJR    Document 78-12   Filed 07/03/20

A-1552



139    EM#35 is red shoe pattern in rear hallway, which appears to be leading to rear of
140    the house.
141
142
143    On the rear metal door leading to the back yard are 6 bullet holes, these are
144    marked A, B, C, D, E, and F. Five of these bullet holes appear to be from a large
145    caliber gun. One hole on the left side wood molding is a smaller bullet hole.
146
147    Bedroom #2 is located on the north side of the kitchen to the rear of the house.
148    Walking into the bedroom, there is a bed facing west to east, a dresser with mirror
149    and a tall dresser to my immediate right. It is noted that the TV set is turned on.
150
151    EM# 19 splintered door wood found on bed in bedroom #2. Looking at the door
152    from inside of bedroom #2 is a slide lock, which is still engaged. Around this slide
153    lock the wood is broken off. This is what is located on the bed
154    EM# 20 black leather holster for a small caliber gun, found on bed in bedroom
155    #2.
156    EM# 21 Cellphone on bed in bedroom #2
157    EM#22 located in dresser in bedroom #2 is drug paraphinalia: baggies, scale with
158    residue, blue pills, coffee grinder and spoon with residue on it.
159
160
161    Information from the Major Crime Unit Office is that the names of the victims
162    are Nelson Camacho, dob 4-26-68 is victim #1 located in living room area. Miguel
163    Camacho dob 9-9-79 is victim #2 located in the kitchen area.
164
165    At 0130 hours Greg Luca and Josiah Schultz, morgue attendants arrive on the
166    scene. Dr Evan Evans, Medical Examiner then did arrive on the scene. He did
167    examine both victims and they were transported to the morgue at 0200 hours. Upon
168    removal of the second victim in kitchen area it is noted that the rear door is not
169    locked and can be opened by turning knob. Through this metal door heading east
170    towards the back of the house is another hallway. There is a wooden door, which
171    was partially open; this door is half glass on top, covered with a blue lace curtain,
172    which leads to the outside porch. There are holes in the blue lace curtain and the top
173    window of wooden door has visible bullet holes in it.
174
175    In the rear hallway, leading to the backyard are two dresser tables. In and
176    around these tables Det. Maroney did locate bullets and bullet fragments, EM #38,
177    #39, # 40. To my right is a rear staircase leading to the upper apartment from this
178    hallway. A bullet was located under the 1st step leading to the second floor, this is
179    EM # 37. Evidence Marker # 36 is a dried red stain in rear hallway.

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

A-1553

185  this time he did leave the scene as it is.

186

187      This writer did contact radio to have this scene held until after the autopsies.

188  P.O. Terrell was left holding the scene at approximately 0450 hours. This writer and

189  Det. Tom Balk and Det Jim Maroney did return to Headquarters at this time to

190  finish paperwork.

191                                Respectfully submitted,

192

193                                Det. Mary E. Guglinzza

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1554



City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Captain Mark Morgan          Date: 11/11/04
     Captain of the Major Crimes Unit

From: Det. Richard Wagstaff        Subject: MCU#04-242
                                            Homicide Shooting Inv
          MCU                              Victims – Nelson Camacho
                                                    Miguel Camacho

Attention: Lt. Margaret Sack

Sir,

The Shift Leut contacted this writer at home. Stabler to respond to a double shooting at 879 Niagara Street. I responded to the scene and assisted MCU Detective Sergeant James Lonergan and Detective Mary Gugliuzza. Sgt. Lonergan informed me that there was another scene with possible evidence from the primary crime scene.

The second scene is located outside in the rear yard of 53 Massachusetts Street. 53 Massachusetts is located on the southwest corner of Massachusetts and Niagara Street. The yard is located between the rear of 53 Massachusetts and the north side of 886 Niagara Street. Observed on the ground, several feet south of the rear door of 53 Massachusetts is a blue color baseball bat. There is a walk path, west side of 53 Massachusetts, leading from the rear yard going to the front area of 53 Massachusetts.

The BPD Evidence and Photograph Unit was informed of this location and they process the scene. They will provide separate reports in regards their involvement in this case.

Conducted a canvass and interviewed several individuals.

Interviewed Steven Acevedo, ph# 602-1010 of 53 Massachusetts. He stated that he had just came home when he saw three guys and they had something in there hand. One had on a gray hoody and the other two dark hoody on. He did not see their faces. This witness would not come down to the office at this time but he would when his available.

Interviewed Carmelo Mercado, ph#563-8524 of 97 Rhode Island. He stated that he was



Spanish like. The ran down Massachusetts to 7ᵗʰ Street then towards Rhode Island Street. .
This witness would not come down to the MCU office at this time.

Respectfully submitted,

Det. Richard Wagstaff
MCU

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1556

BEVERLY J. LABORGNE
879 NIAGARA ST UPPER
BUFFALO NY 885-5514
DOB 5-31-56
LIVED IN THE HOUSE 4+ YEARS.
LIVES WITH HUSBAND, DAVID AGE 50, DAUGHTER BRENDA AGE 9, SON DAVID L. 21 YOA, DAVID SR + BRENDA AT HOME, going to BED.
HEARD A LOUD CRASHING NOISE AROUND 9:45. A COUPLE OF SECONDS LATER, HEARD 2-3 SHOTS; THEY SOUNDED LIKE FIRECRACKERS. NO VOICES OR SCUFFLE. WAS PLAYING A COMPUTER GAME, ALSO TV ON. AFTER SHOTS TURNED TV OFF AND STOPPED PLAYING THE COMPUTER GAME. WENT TO THE FRONT WINDOW. I SAW NELSON CAMACHO'S CAR IN THE DRIVEWAY. I FIGURED HE WAS HOME. HIS OTHER BROTHER LIVED WITH NELSON BUT

A-1558

JAMES J. HONARD TWO OFFICERS WERE

JUST BEFORE THE SECOND SHOTS, (242)

WERE SPEAKING SPANISH.

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20





### City of Buffalo Police Department
### Major Crimes Unit

TO: Captain Mark Morgan  
Major Crimes Unit

DATE: 11/12/04

FROM: Detective Timothy J. Salamone

RE: Autopsy of Nelson  
Camacho #04-0242

ATTENTION: Lieutenant Margaret Sack

---

Sir;

Your writer was directed to attend and record the post-mortem examination of Nelson Camacho, 879 Niagara Street, Buffalo, NY, date of birth 4/26/1968. Also present was Detective James Maroney of the Evidence Unit and Detective Thomas Balk of the Photography Unit.

Doctor Sung-Ook Baik performed the autopsy with his assistant Mr. Thomas Lamb.

The body was present on table #2, a Hispanic male 67"inches in length and 145 pounds in scale weight. There was a tag on the bodies right ankle with the name Nelson Camacho, Dr. Evans, 2259-04, 11/11/04. There were two entrance gunshot wounds visible on the front of the body, one to the right cheek/face, the other the left arm and armpit area, entering and exiting in the upper bicep area as well as the forearm area.

The Doctor made the standard Y incision to reveal the inner organs and collect the usual sample of blood and bodily fluids. The internal organs were removed and examined. Left arm showed extensive gunshot wound damage affecting the brachial artery. The gunshot wound to the face traveled through the sinus cavity the skull and exited at the crown top of the skull No other damage or abnormalities were noted.

The skullcap was removed and the brain examined. The bullet passed through the brain causing extensive damage. No other damage noted.

The Doctor issued a ruling of death by homicide by means of gunshot wounds to the head and back. Doctor provided copies of his notes, a schematic of the body, and a death certificate. Any further information will be recorded and included in this file.

Respectfully submitted,

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

A-1560



A-1561

Case 1:16-cv-00321-EAW-MJR · Document 78-12 · Filed 07/03/20...

*City of Buffalo Police Department*
*Major Crimes Unit*

TO: Captain Mark Morgan                    DATE: 11/12/04
Major Crimes Unit

FROM: Detective Timothy J. Salamone       RE: Autopsy of Miguel
                                          Camacho #04-0242

ATTENTION: Lieutenant Margaret Sack

---

Sir;

Your writer was directed to attend and record the post-mortem examination of Miguel Camacho, 879 Niagara Street, Buffalo, NY, date of birth 9/9/1979. Also present was Detective James Maroney of the Evidence Unit and Detective Thomas Balk of the Photography Unit.

Doctor Sung-Ook Baik performed the autopsy with his assistant Mr. Thomas Lamb.

The body was present on table #3, a Hispanic male 74"inches in length and 141 pounds in scale weight. There was a tag on the bodies left ankle with the name Miguel Camacho, Dr. Evans, 2260-04, 11/11/04. There were four entrance gunshot wounds visible on the front of the body. One entered the body in the upper right arm near the should, the second entered just to the right of the right chest/nipple area, the third to the left of the sternum at mid-chest, and the fourth at the bottom of the left chest rib area. There was also an exit wound visible in the left side chest area

The body was rolled over to the back revealing three exit gunshot wounds on the back at the left and right shoulder blades and one to the lower left back. No bullets were visible on the e-rays of the body.

The Doctor made the standard Y incision to reveal the inner organs and collect the usual sample of blood and bodily fluids. The internal organs were removed and examined. Bullet paths showed the bullets pierced the arch of the aorta, left and right lungs, left kidney and stomach. First shot traveled right to left, front to back, upward and through and through the 2nd rib, right lung and scapula. The second shot traveled through the 3rd ICS right side, arch of the aorta, and both lungs. This bullet traveled right to left, front to back, downward through and through. The third shot entered at the 5th rib exiting through the left upper arm through and through, there were no organs damaged. The 4th shot entered on the left side at the 7th rib piercing the diaphragm, and left kidney left to right, front to back, through and through horizontally. No other damage or abnormalities



wounds to the right upper arm and chest. Doctor provided copies of his notes, a
schematic of the body, and a death certificate. Any further information will be recorded
and included in this file.

Respectfully submitted,

Detective Timothy J. Salamone
Major Crimes Unit

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1562

Case 23-352, Document 46, 06/23/2023, 3533146, Page102 of 263
Filed 07/07/20 Document 78-12 Case 1:16-cv-00321-EAW-MJR

A-1563

Edwin Rosario Jr.
801 Niagara St. Apt #1
Buffalo NY
DOB 11-17-83

About received a call from his
Mother, Janette Diaz, unknown address
calls w/boyfriend, 830-0833. She said
that someone killed Nelson
and Miguel Camacho, went
right to the scene, saw front of
people at scene but could not
ADD.

I know that my sister is
Nelson's girlfriend, then name is
③. Jeylin Rosario @ 874 Niagara (604)
This guy named Amlsa Montalvo,
I don't remember his address, hill on
her. Amlsa + Nelson were best friends.
My sister Nelson was really mad.
Am(sa + Nelson fought, they had
bad blood over this.

A-1564





Buffalo Police Department
Intra-Departmental Correspondence

| TO: Commissioner Rocco Diina | DATE: 11/12/04 |
|---|---|
| FROM: PO Ronald Jentz<br>B District | SUBJECT: CD 043160879<br>Double Homicide – 879 Niagara |

Attention: Capt. Morgan
Det/Sgt Lonergan

Sir:

On 11/11/04 at approximately 2145 hours I responded to a call of a person shot at 879 Niagara. Upon arrival I did enter the house with several other officers. I saw one male lying on the ground in the front room who had been shot in the head. I then saw a Hispanic male (later identified as Luis Camacho 3-13-63) enter the room I was in from the back of the house. In his hand was a small handgun. Luis was ordered to drop the gun. At that time I secured Luis in the back of my patrol vehicle. At approximately 2202 hours I transported Camacho to the Major Crimes office to be interviewed. This ended my involvement in this case.

Respectfully submitted,

PO Ronald Jentz

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1565

Buffalo Police Department
Intra-Departmental Correspondence

| TO: Commissioner Of Police Rocco Diina | DATE: 11-18-2004 |
| --- | --- |
| FROM: P.O. Stephen P. Schulz<br>P.O joseph A. Gramaglia | SUBJECT: CD # 043160879<br>Double Homicide-879 Niagara Street |

Attention: Capt. Mark Morgan

Sir,
On 11-11-2004 at approximately 2145 hours we responded to a call of a person shot at 879 Niagara Street. Officer Schulz did enter the house through the front door and did observe one male lying on the ground who was shot in the head. Officer Schulz further observed a hispanic male (Later identified as Luis Camacho) holding a small handgun. I did observe officer Jentz disarm this individual.

Office Schulz, Gramaglia, Monteforte, and Genovese cleared the house.
Officer Schulz, Gramaglia and Genovese did then exit the front door and went through the side alley to the back of the house. The back door was open and we did observe what appeared to be gunshot holes in the doors window. Officers Schulz, Gramaglia and Genovese did then climb onto the back porch and observed a bloody footprint which appeared to have been exiting the house and blood spots in the hallway. Officer Schulz, Gramaglia and Genovese did clear the basement and upper hallway and observed no further blood.

Respectfully Submitted,

P.O. Stephen Schulz

Respectfully Submitted,

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1566

Buffalo Police Department
Intra-Departmental Correspondence

| TO: Commissioner Rocco Diina | DATE: 11/12/04 |
|---|---|
| FROM: PO Ronald Jentz<br>      B District | SUBJECT: CD 043160879<br>      Double Homicide – 879 Niagara |

Attention: Capt. Morgan
          Det/Sgt Lonergan

Sir:

On 11/11/04 at approximately 2145 hours I responded to a call of a person shot at 879 Niagara. Upon arrival I did enter the house with several other officers. I saw one male lying on the ground in the front room who had been shot in the head. I then saw a Hispanic male (later identified as Luis Camacho 3-13-63) enter the room I was in from the back of the house. In his hand was a small handgun. Luis was ordered to drop the gun. At that time I secured Luis in the back of my patrol vehicle. At approximately 2202 hours I transported Camacho to the Major Crimes office to be interviewed. This ended my involvement in this case.

Respectfully submitted,

PO Ronald Jentz

PO Ronald Jentz

Buffalo Police Department
Intra-Departmental Correspondence

| TO: Commissioner Rocco Diina | DATE: 11/12/04 |
|---|---|
| FROM: PO Ronald Jentz<br>B District | SUBJECT: CD 043160879<br>Double Homicide – 879 Niagara |

Attention: Capt. Morgan
Det/Sgt Lonergan

Sir:

On 11/11/04 at approximately 2145 hours I responded to a call of a person shot at 879 Niagara. Upon arrival I did enter the house with several other officers. I saw one male lying on the ground in the front room who had been shot in the head. I then saw a Hispanic male (later identified as Luis Camacho 3-13-63) enter the room I was in from the back of the house. In his hand was a small handgun. Luis was ordered to drop the gun. At that time I secured Luis in the back of my patrol vehicle. At approximately 2202 hours I transported Camacho to the Major Crimes office to be interviewed. This ended my involvement in this case.

Respectfully submitted,

PO Ronald Jentz

PO Ronald Jentz

A-1568

```
1                          CITY OF BUFFALO
2                          POLICE DEPARTMENT
3                          HOMICIDE SECTION
4
5                                              NOV 11, 2004
6                                              FILE #04-242
7                                           CD  #B043160879
8                                              STARTED00:30
9    STATE OF NEW YORK)
10   COUNTY OF ERIE   )  SS
11   CITY OF BUFFALO  )
12
13   Jeilyn Mary Rosario hispanic female 16 years old, d/o/b 12-25-87, residing
14   at 801 Niagara st . Buffalo, NY. phone 884-7018/cell-phone 597-3070 .
15   Being duly sworn, deposes and makes the following statement while in the
16   Buffalo Police Department Homicide office.  The questions are asked by,
17   and the statement is typewritten by Det. Reginald Minor
18
19   Q)  Can you read and write and how far have you gone in school?
20   A)  Yes I can read and write, I went to the 10th grade.
21
22   Q)  How do you support yourself?
23   A)  I receive S.S.I.
24
25   Q)  Who do you live with?
26   A)  My mother Jannette Diac.
27
28   Q)  The Buffalo Police Homicide Section is investigating the deaths of
29       Nelson Camacho 30 y/o hispanic 04-26-68 of 879 Niagara st and Miquel
30       Camacho 19 y/o hispanic male dob 09-09-79 of same address. The
31       incident took place at 879 Niagara st in the vicinity of Rhode Island
32       and Massacusette 11-11-04 at approx 21:44 hrs.  Please can you tell
33       me in your words what you know about this incident.
34
35   A)  Around 9:00 pm I was over my sister's house went Nelson called me on
36       my cell-phone.  He told me he had some movies from Block-Buster.  He
37       asked me to come over.  I told him to come pick me up.  He told me
38       that he had already took a shower and was in his boxer short.  I told
39       him that I will call my mother and see if she will drive me over his
40       house.  Then he hung-up.  I waited for my mom to come, it was close
41       to 10:00 pm.  Then my mom came, I took my sister's baby with me.  We
42       drove over to Nelson's house.  Then I seen the police and everything
```

A-1569

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

```
 1    Q)   Did either of them appear upset or nervous?
 2    A)   No.
 3
 4    Q)   What did Nelson do for a living?
 5    A)   He worked at the Town restaurant he worked there for sixteen years
 6
 7    Q)   Did Nelson sell drugs?
 8    A)   No.
 9
10    Q)   What about Miquel?
11    A)   He was on S.S.I.
12
13    Q)   Did Miquel sell drugs?
14    A)   No.
15
16    Q)   When Nelson call you on your cell phone at your sister's house did he
17         appear nervous, excited, or anxious.
18
19    Q)   Did you ever see Nelson or Miquel with a gun?
20    A)   No.
21
22    Q)   Do you know of any one the would want to hurt Nelson or Miquel?
23    A)   Yes, Amisael Motalvo.
24
25    Q)   Why?
26    A)   Motalvo tried to kiss me, he wanted to be with me.  I told Nelli
27         Camacho, she told, Luis Camacho, and he told, Nelson.  Then one day
28         Nelson and Motalvo had a argument at the barber shop on West Ferry.
29         They were arguing over me.
30
31    Q)   How long ago did this happen?
32    A)   About one or two months
33
34    Q)   Did you ever see Motalvo with a gun?
35    A)   No.
36
37    Q)   Describe Motalvo?
38    A)   A hispanic male about 5'4" about 200 lbs, short hair, he lives at 35
39         Hudson ave.
40
41    Q)   Is there anything else that you can think of that can assist us in
42         this investigation?
```

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1570

SIGNED: _Julyn Roscie_

WITNESS: . . . . . . . . . . . . . . . . . . . . . . . . .

1
2
3
4     SWORN AND SUBSCRIBED TO BEFORE ME
5     THIS   DAY OF 2004
6
7
8     REGINALD MINOR
9     COMMISSIONER OF DEEDS IN AND FOR
10    THE CITY OF BUFFALO, NEW YORK
11    MY COMMISSION EXPIRES DEC. 31, 2004
12

P.V.R.

```
 1                    CITY OF BUFFALO
 2                  POLICE DEPARTMENT
 3                  HOMICIDE SECTION
 4
 5                                            NOV 13, 2004
 6                                            FILE # 04-242
 7                                            CD#043160879
 8                                            STARTED00:00
 9     STATE OF NEW YORK)
10     COUNTY OF ERIE   )  SS
11     CITY OF BUFFALO  )
12
13     Pedro Ramos Vega Hispanic Male 30 years old, d/o/b 05-27-74, residing at
14     76 Barton st. Buffalo, NY. phone no-phone . Being duly sworn, deposes and
15     makes the following statement while in the Buffalo Police Department
16     Homicide office.   The questions are asked by, and the statement is
17     typewritten by Det. Reginald Minor
18
19     Q)   Can you read and write and how far have you gone in school?
20     A)   Yes I can read and write english and I went to the 12th grade.
21
22     Q)   Who do you live with?
23     A)   Virginia Huertas my girlfriend.
24
25     Q)   How do you support yourself?
26     A)   I do mechanic jobs
27
28     Q)   The Buffalo Police Homicide Section is investigating the death of
29          Nelson Camacho 30 y/o hispanic male dob 04-26-68 and Miquel Camacho
30          19 y/o hispanic male dob 09-09-79 both of 879 Niagara. The incident
31          took place at 879 Niagara st in the vicinity of Rhode Island and
32          Massachusetts 11-11-04 at approx 21:44 hrs. Please can you tell me
33          in your words what you know about this incident.
34
35     A)   Sometime that night the night of Nov 11th on a thursday, I was fixing
36          a car on Zips on Niagara and Mass. Then I went to get some pizza at
37          Mr Pizza also on Niagara st. When I got to the pizzeria I saw three
38          guys, standing across the street from the Pizzeria, in front of a
39          vacant store. When I got out of the Pizzeria I noticed them walking
40          towards Zips on the same side of the street. Then they walked onto
41          the porch of this abandon house.   They kept pacing back and forth.
42          And I noticed that they were looking toward the apposite side of
```

A-1572

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

P.V.R.

```
1    Q)   What is Carlos to you?
2    A)   A friend.
3
4    Q)   How long have you known Carlos?
5    A)   About a year.
6
7    Q)   How close did the three individuals get to you?
8    A)   About 100 feet, across Niagara.
9
10   Q)   Was it light or dark out?
11   A)   It was getting dark.
12
13   Q)   Describe the three guys you referred too?
14   A)   They were all light skin. They looked young.  They were wearing dark
15        color hoodies with jeans.
16
17   Q)   Which one was carrying the item that looked like a gun?
18   A)   The tallest one.
19
20   Q)   How tall were the three men you seen enter the house down the street?
21   A)   The tallest is at lease 5'11".  The other two were around 5'8"
22
23   Q)   Were you able to see their faces clear?
24   A)   No.
25
26   Q)   Did you recognize any of them?
27   A)   No.
28
29   Q)   Can you identify the three individuals you seen walk to the victim's
30        house?
31   A)   No.
32
33   Q)   Describe the abandon house that they were standing in front of?
34   A)   No, but it's next to the abandon store front.
35
36   Q)   How much time elapsed from the three guys entering the house and the
37        shot fired?
38   A)   About five minutes.
39
40   Q)   After you heard the shot did you see any of the three guys leave the
41        house they entered?
42   A)   No.
```

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1573

P.V.R.

```
 1
 2    Q)   What did you heard after the shot was fired?
 3    A)   I heard a lady screaming and crying.
 4
 5    Q)   How soon after the shot did you heard the screams and crying?
 6    A)   Between one and two minutes.
 7
 8    Q)   Did you see any women running from the house before or after the
 9         shot?
10    A)   Nope.
11
12    Q)   Did Carlos mention anything about the three guys when you observed
13         them from his porch?
14    A)   No.
15
16    Q)   Pedro do you have a nick name?
17    A)   Yes, Cano which means blond hair.
18
19    Q)   Is there anything else that you can think of that can assist us in
20         this investigation?
21    A)   No.
22
23    Q)   I will now have you read your statement to determine if it is true
24         and accurate.
25    A)   Yes.
26
27    Q)   Now that you have read the statement is it true and correct and will
28         you sign it.
29    A)   yes.
30
31         STATEMENT ENDED AT ..........
32
33    I UNDERSTAND THAT ANY FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A
34    CLASS "A" MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE
35    STATE OF NEW YORK.
36
37    SUBSCRIBED AND VERIFIED UNDER PENALTY OF PERJURY.
38
39
40
41                                      SIGNED: _____
42
```

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1574

CITY OF Buffalo Police Department
MAJOR CRIME UNIT

STATE OF NEW YORK)                          Date:  November 17, 2004

COUNTY OF ERIE        )SS               File#  04- 04-242

CITY OF BUFFALO                         CD#  04-

                                        Started at: 1550hrs

NAME OF PERSON :  Urayoan Hidalgo
RACE/SEX:  Hispanic Male
AGE:  20yrs old
ADDRESS: 403 Prospect
D/O/B:  06-20-84
PHONE: No Phone

The above named person being duly sworn deposes and makes the following statement while at
the Major Crime Unit office.  The questions are asked and this statement is typed by Det./Sgt.
Philip Torre.

U. H.

Q. Can you read and write the English language?

A. Yes.

Q. What is the highest grade of education that was completed?

A. 8th grade

Q. The Buffalo Police Department is currently investigating the  Shooting deaths of Miquel
Camacho and Nelson Camacho that occurred on 11-11-04 at approximately 9:44 PM , in your
own words can you tell me about this incident?

A. Nothing, I heard on the news and in the street that they were killed.

Q. Where were you and who were you with on November 11th, 2004 between the hours of 6pm
and 11pm?

A. That was a Thursday night and I was home at 403 Prospect with my Girlfriend Helyna
Rivera and our daughter Alexia.

Q. Do you recall what activities you were involved in during that time?

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1575



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

TO: *CAPTAIN MARK MORGAN*

FROM: *DETECTIVE MICHAEL F. ROOT*

DATE: *NOVEMBER 12, 2004*

SUBJECT: *HOMICIDE CASE #04-242*
*RE-INTERVIEW OF LUIS CAMACHO*

ATTENTION: *LIEUTENANT MARGARET SACK*

*SIR,*

   On this date at approximately 1830hrs this writer contacted Luis A.
Camacho, brother of the two victims in this case. The purpose was to
request that Mr. Camacho come to these offices, in an effort to clear up a
few questions that had arisen relative to his sworn statement. Mr. Camcho
complied and arrived at these offices at 1900hrs.

   This writer conducted a brief interview that centered on these questions.
Had Miguel told him to come armed when he called him for help? Luis
stated that yes Miguel had told him to come armed. He neglected to tell
Detective Wagstaff this in his sworn statement. He told this writer that he
brought no weapon with him. This writer asked if he had brought the
recovered .25 caliber automatic to the house, or had he ever seen his
brothers with this weapon. He replied negative to both questions.

   Mr. Camaho was then asked if he knew someone named "Dagua", or if
either of his brothers had known someone by this name. Mr. Camacho acted
somewhat surprised and told this writer of an incident that had occurred
about a month ago at a "gambling house" on Vermont near Normal. He
stated while at this location gambling, he lost all of his money. He left this

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1576



"Dauga" had some how been involved. Camacho said he didn't however know "Dauga". The interview was concluded.

Your office will be kept apprised of any and all new developments in this case.

Respectfully submitted,

Michael F. Root
Det.

A-1577



CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

*TO: CAPTAIN MARK MORGAN*

*FROM: DETECTIVE MICHAEL F. ROOT*

*DATE: NOVEMBER 12, 2004*

*SUBJECT: HOMICIDE #04-242*

*ATTENTION: LIEUTENANT MARGARET SACK*

*SIR,*

On the above date this writer received a telephone call from Police Officer Robert Quintana. Officer Quintana stated that he had information relating to the Camacho brothers Homicide. This information was from "community sources" that said a dark skinned PR/M 5'9" 30's by the street name of "Tawa" was involved. Quintana stated that "Tawa" was known for setting up robberies/home invasions of victim's that would be reluctant to report them to the police. He would enter these locations and then alert "others" that would actually do the robbery. It was speculated by Officer Quintana's sources that this is what occurred on Niagara St. Quintana said that "Tawa" supposedly did this at 241 Vermont St., about a month ago. 241 Vermont St., is a location where individuals gamble on dominos.

This writer believes that the "Tawa" Officer Quintana refers to is actually "Dagua". Dagua's name is *Manuel Medina PR/M DOB 1/20/71 BPD MUG #213608.* This investigation continues.

Your office will be kept apprised of any and all new developments in this case.

Respectfully submitted.

Case 1:16-cv-00321-EAW-MJR Document 78-12 Filed 07/03/20

A-1578

04-242

FRANK V. COPPOLA
886 NIAGARA
11-25-68
882 -0133

- CAME OUT FRONT DOOR
HEARD POP
- WALKED TO ZIP'S BOUGHT
CIGARETTES / WAITED IN
LINE ONE CUSTOMER
IN FRONT OF HIM
- WALKED BACK HOME
SOUTH ON NIAG
- 3 MALES IN HOODIES
RAN PAST NORTH ON
NIAGARA / WEST ON
MASS.
- HEARD "KLUNK" IN
YARD NEXT DOOR (HOUSE
NORTH OF 886.
- WENT TO LOOK AND
FOUND METAL BAT.
- TOLD POLICE WHEN THEY ARRIVED

City Of Buffalo - Department Of Police

**Major Crimes Unit**

**To:**  Captain Mark Morgan
Crimes Against Persons Bureau

**From:**  Det. Mark J. Lauber
Det. Mary Gugliuzza
Major Crime Unit

**Subject:**  MCU File # 04-242.
Homicides of Nelson and Miguel Camacho.

**Date:**  November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did assist Det/Sgt. Torre & Det. Aronica. Mr. Miseal Montalbo had appeared at the Major Crime Unit, on his own volition, and offered an alibi for his whereabouts during this homicide. We were directed to investigate the alibi that he was at the home of his girlfriend Carmen Justiniano and her father Segundo Justiniano on November 11, 2004 between the hour of 9:00pm and 10:00pm. Montalbo was unsure of the address but he was able to describe the house as being 2 houses from the "All-State" insurance office on Niagara near the former 10th Precinct site, painted brown/orange.

We found the location at 1410hrs. and the address is 571 Niagara St. The Justiniano family resides in the rear lower apartment and we find that Segundo Justiniano is home and we are let inside to interview him. Present is Mr. Jose Oramas who also resides here and is a family friend from Puerto Rico. In addition to these 2 gentlemen, 2 younger daughters of Mr. Justiniano ages 12 and 8 reside here and both are at school.

Mr. Justiniano is questioned about the last time he has seen his daughter Carmen and her boyfriend Miseal Montalbo. He says he has seen Carmen within the last 2 days and recalls seeing them both (Carmen & Miseal) last Thursday night at his house. He recalls this being the night of the homicides as he saw on the 10:00 news that the Police had crime scene tape somewhere on Niagara St. near Massachusetts. He recalls that all 3 watched "WWF" wrestling which began at 9:00pm and ended at 10:00pm, which was immediately followed by the 10:00pm newscast on WNLO. Detectives verified that at 9:00pm a wrestling program was being broadcast until

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1580



Neither Mr. Oramas nor Justiniano claim the Camacho family threatened them. Justiniano said he saw Louis Camacho early this morning on Niagara St. and they exchanged greetings, he planned on attending the wakes of the Camacho's tonight. A rumor that the New York City chapter of the "Latin Kings" was in Buffalo and had threatened to kill Justiniano and his family if Montalbo was responsible for the homicides was received by this Unit, anonymously. Allegedly, a Latin King appeared at the Justiniano residence, kissed the floor and then threatened to kill the whole family. I asked Mr. Justiniano about this rumor and he denied being threatened in this manner and not ever meeting with anyone in the Latin Kings. We ended the interview at about 1500hrs. and proceeded to 35 Hudson to meet with Carmen Justiniano.

Carmen Justiniano is the girlfriend of Miseai Montalbo; they reside together and have a 3-year-old son. She is 21 years old, DOB 03-13-1983-telephone 480-2508. Carmen verified the information obtained from her boyfriend and father on the whereabouts of Montalbo on November 11, 2004 between 9:00pm and 10:00pm which that he was with them at 571 Niagara watching wrestling on the television. Carmen also told us of the parting of the friendship of Montalbo and Nelson Camacho and that it was last year, they had argued over the title of a car and that they had one small fistfight and had not spoken to each other since. Carmen also said that Camacho threatened to bring his whole family over to assault Montalbo and that Montalbo told Camacho he would kill him. Carmen said that Montalbo was scared and threatened by the Camacho family and that he did not have any family in Buffalo to help him so he made that threat with no intentions of following up on it and was not capable of killing anyone. Carmen never saw Montalbo with a weapon at any time in the past and does not carry one.

Carmen then told us that an unknown person had called the family of Montalbo in Puerto Rico and said he was "dead" in Buffalo, then threatened to kill the family down in Puerto Rico. She is concerned of these threats as she feels vulnerable and fears for the safety of her child. We decided to place a "hazard – threat premises" at their address of 35 Hudson via the 911 system to expedite response time at the address if calls are received in 911.

Your office will continue to be kept informed of developments in this investigation as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

A-1581



# CITY OF BUFFALO NEW YORK
## POLICE DEPARTMENT
### MUGSHOT PROFILE

"BRANDON"

**NAME:** JONAS, Brandon L
**AKA:** 137 PROSPECT
**NICKNAME:**
**DOB:** 03-26-1985
**MUG NUMBER:** 249198
**PHOTO DATE:** Sep 21 2004 11:57PM

## PHYSICAL DESCRIPTION

**SEX:** MALE
**RACE:** AMERICAN INDIAN
**HEIGHT:** 5'06"
**WEIGHT:** 230
**HAIR:** BLACK
**EYES:** BROWN
**BUILD:** MEDIUM
**COMPLEXION:**

## SCARS/MARKS/TATTOOS/DEFORMITIES

#1:
#2:
#3:
#4:

## CHARGES

#1: 165.40 CRIM POSSESSION STOLN PROP-5TH
#2: 240.20 DIS/CON:OBSCENE LANG/GESTURES
#3: 240.20 DIS/CON:OBSTRUCTING TRAFFIC
#4: 240.20 DIS/CON:UNREASONABLE NOISE





Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1582

04-242   879 NIAGARA   NELSON+MIGUEL CAMACHO
LAUBER-TORRE
"UDA"  URAYOAN GROUND   6-20-84  403 PROSPECT
INT. TODAY IN MCU OFFICE - STATES HE WAS AT
HOME NIGHT OF HOMICIDES WITH GIRLFRIEND NELEN
RIVERA AT 403 PROSPECT. DOESN'T KNOW JOSUE ORTIZ,
NEVER MET HIM - BROTHER HANES OUT WITH "BRANDON."
(SEE P-73 TIP CALL BY JOE COOK)
BRANDON ID'D BY 'UDA' AS BRANDON L. JONAS
DOB 03-26-1985.
ADDRESS FOR BRANDON JONAS
140 NIAGARA APT. 603 - MOTHER- EMILY JONAS 883-2024
142 COTTAGE LOWR REAR - SISTER SANDRA JOHN 852-4655
10 SHELBY CHEEKTOWAGA - SISTER JUANITA   603-2590

STATEMENT TAKEN!
          P-73 TO FOLLOW

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1583



BUFFALO POLICE DEPARTMENT
**BUFFALO, NEW YORK**

STATE OF NEW YORK                          **DATE**: 11-12-04
COUNTY OF ERIE          **SS**:
CITY OF BUFFALO                    **TIME COMMENCED**: 0155 hours

Beverly J. Laborgne          **AGE**: 48          **DOB**: 5/31/56          **TELEPHONE**: 885-5514
**ADDRESS**: 879 Niagara Street upper apartment

BEING DULY SWORN, DEPOSES AND MAKES THE FOLLOWING STATEMENT TO:
Detective Timothy J. Salamone MCU          , OF THE CITY OF BUFFALO POLICE DEPARTMENT
**ON**: 11/12/04          **AT**: 74 Franklin Street Major Crime Unit Office
**TIME**: 0155 hours  **AM**/PM

Q. This office is investigating the shootings that occurred tonight at 879 Niagara Street, lower apartment.
Were you home at the time.
A. Yes, I was home with my husband and daughter. I had just got home around 8:30 from bowling
watching my husband, my older daughter, my son-in-law and my son bowl.
Q. You reside in the home with one daughter and your husband.
A. Yes, my daughter Brenda, she's nine, my husband David, and my son David L. he's 21, but he wasn't
home at the time.
Q. What time did this incident occur.
A. I was sitting at my computer around 9:45, my husband and daughter were in the bedrooms. My
husband was watching TV and my daughter was going to sleep. I was sitting at the computer playing a
game and the TV was on in the front room. Then I heard a loud crash, it sounded like someone kicking in
the front door. About fifteen seconds later I heard two to three shots go off. They sounded like
firecrackers. I got up and walked in and turned the TV off. My husband got up amd started to come in.
Q. What did you do after you turned the TV off.
A. I looked out my front window. I didn't see anything. I did see Nelson's car in the driveway. It was
there when I got home blocking the driveway.
Q. Who is Nelson.
A. That's they guy that lives downstairs. He lives with his brother.
Q. what happened next.
A. About a minute or two after the first shots, I heard like six or seven more. Before I heard the shots I
heard people talking in Spansh. I don't know what they were saying I don't speak Spanish.
Q. Was the talking loud, argumentative, like fighting.
A. It was like hollering, but I don't know what they were saying.
After the second set of shots, what did you do.
A. I was frozen right at the window because I was so scared to move. I saw three men  They were in a
line. They were running across the street. The last one in line had something in his hand, he held it with
his right hand and held it against his leg. It was long but I couldn't quite see what it was. They crossed
the street.
Q. Were you able to see their faces.
A. No, they all had their backs to me. The last one with the thing in his hand was wearing baggy pants
and a hoodie. All three were wearing hoodies, and all three dressed in dark clothes.
Q. Where did they go to.
A. They disappeared across the street. There's a big tree right in front of the house and I lost them when
they crossed past it.
Q. Is there anything else that you can tell me about the guys that ran from the house.

A-1584



alone.

Q. Do you know what happened in the aprtment below yours.

A. I guess the two brothers were shot. Then the Police told us they were both dead.

Q. Do you know if Nelson or Miguel Camacho had any enemies, anyone mad at them.

A. Not that I know of.

Q. Is there anything you want to add that you were not asked.

A. No

Q. Can you read and write, how far have you gone in school.

A. I can read and write, I have one year of college at Bryant and Stratton College.

Q. Is everything you have told me the truth

A. Yes.

**TIME CONCLUDED:** 0250 hours  **AM/PM**

Beverly Laborgne_____ , I HEREBY SOLEMNLY SWEAR AND AFFIRM THAT THE ABOVE IS MY STATEMENT, THAT I HAVE READ/OR HAVE HAD READ TO ME THIS STATEMENT AND THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AND TRUE TO THE BEST OF MY RECOLLECTION.

SWORN AND SUBSCRIBED BEFORE ME  **SIGNED:** _Beverly Laborgne_

THIS 12 DAY OF November 2004

COMMISSIONER OF DEEDS, EXPIRES -- 12/05

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1585

City Of Buffalo - Department Of Police

## Major Crimes Unit

**To:** Captain Mark Morgan
Crimes Against Persons Bureau

**From:** Det. Mark J. Lauber
Det. Mary Gugliuzza
Major Crime Unit

**Subject:** MCU File # 04-242.
Homicides of Nelson and Miguel Camacho.

**Date:** November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did assist Det/Sgt. Torre & Det. Aronica. Mr. Miseal Montalbo had appeared at the Major Crime Unit, on his own volition, and offered an alibi for his whereabouts during this homicide. We were directed to investigate the alibi that he was at the home of his girlfriend Carmen Justiniano and her father Segundo Justiniano on November 11, 2004 between the hour of 9:00pm and 10:00pm. Montalbo was unsure of the address but he was able to describe the house as being 2 houses from the "All-State" insurance office on Niagara near the former 10th Precinct site, painted brown/orange.

We found the location at 1410hrs. and the address is 571 Niagara St. The Justiniano family resides in the rear lower apartment and we find that Segundo Justiniano is home and we are let inside to interview him. Present is Mr. Jose Oramas who also resides here and is a family friend from Puerto Rico. In addition to these 2 gentlemen, 2 younger daughters of Mr. Justiniano ages 12 and 8 reside here and both are at school.

Mr. Justiniano is questioned about the last time he has seen his daughter Carmen and her boyfriend Miseal Montalbo. He says he has seen Carmen within the last 2 days and recalls seeing them both (Carmen & Miseal) last Thursday night at his house. He recalls this being the night of the homicides as he saw on the 10:00 news that the Police had crime scene tape somewhere on Niagara St. near Massachusetts. He recalls that all 3 watched "WWF" wrestling which began at 9:00pm and ended at 10:00pm, which was immediately followed by the 10:00pm newscast on WNLO. Detectives verified that at 9:00pm a wrestling program was being broadcast until



Neither Mr. Oramas nor Justiniano claim the Camacho family threatened them. Justiniano said he saw Louis Camacho early this morning on Niagara St. and they exchanged greetings, he planned on attending the wakes of the Camacho's tonight. A rumor that the New York City chapter of the "Latin Kings" was in Buffalo and had threatened to kill Justiniano and his family if Montalbo was responsible for the homicides was received by this Unit, anonymously. Allegedly, a Latin King appeared at the Justiniano residence, kissed the floor and then threatened to kill the whole family. I asked Mr. Justiniano about this rumor and he denied being threatened in this manner and not ever meeting with anyone in the Latin Kings. We ended the interview at about 1500hrs. and proceeded to 35 Hudson to meet with Carmen Justiniano.

Carmen Justiniano is the girlfriend of Miseal Montalbo; they reside together and have a 3-year-old son. She is 21 years old, DOB 03-13-1983-telephone 480-2508. Carmen verified the information obtained from her boyfriend and father on the whereabouts of Montalbo on November 11, 2004 between 9:00pm and 10:00pm which that he was with them at 571 Niagara watching wrestling on the television. Carmen also told us of the parting of the friendship of Montalbo and Nelson Camacho and that it was last year, they had argued over the title of a car and that they had one small fistfight and had not spoken to each other since. Carmen also said that Camacho threatened to bring his whole family over to assault Montalbo and that Montalbo told Camacho he would kill him. Carmen said that Montalbo was scared and threatened by the Camacho family and that he did not have any family in Buffalo to help him so he made that threat with no intentions of following up on it and was not capable of killing anyone. Carmen never saw Montalbo with a weapon at any time in the past and does not carry one.

Carmen then told us that an unknown person had called the family of Montalbo in Puerto Rico and said he was "dead" in Buffalo, then threatened to kill the family down in Puerto Rico. She is concerned of these threats as she feels vulnerable and fears for the safety of her child. We decided to place a "hazard – threat premises" at their address of 35 Hudson via the 911 system to expedite response time at the address if calls are received in 911.

Your office will continue to be kept informed of developments in this investigation as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

A-1587

04-242   879 NIAGARA   NELSON+MIGUEL CAMACHO
LAUBER-TORRE
"UDA"  URAYOAN GROUND  6-20-84  403 PROSPECT
INT. TODAY IN MCW OFFICE - STATES HE WAS AT
HOME NIGHT OF HOMICIDES WITH GIRLFRIEND HELEN
RIVERA AT 403 PROSPECT. DOESN'T KNOW JOSUE ORTIZ,
NEVER MET HIM - BROTHER HANGS OUT WITH BRANDON."
(SEE P-73 TIP CALL BY JOE COOK)
BRANDON ID'D BY 'UDA' AS BRANDON L JONAS
DOB 03-26-1985.
ADDRESS FOR BRANDON JONAS
140 NIAGARA APT. 603 - MOTHER-EMILY JONAS 883-2024
142 COTTAGE LOWR REAR - SISTER SANDRA JOHN 852-4655
10 SHELBY CHEEKTOWAGA - SISTER JUANITA 603-2590

STATEMENT TAKEN!
        P-73 TO FOLLOW

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1588

CITY OF Buffalo Police Department
MAJOR CRIME UNIT

1  A. No I don't know where he was.
2
3  Q. Do you know or have you ever met a person by the name of Josue Ortiz?
4
5  A. No
6
7  Q. Prior to this statement I showed you a picture of a Hispanic male with a dark complexion
8  and after looking at the picture I asked you if you know this person. You responded that you
9  did not know and have never met this person, is that correct?
10
11  A. Yes
12
13  Q. Did you shoot to death Miquel and Nelson Camacho on the night of November 11th, 2004?
14
15  A. No
16
17  Q. Do you have any knowledge of who committed this crime?
18
19  A. No
20
21  Q. Have you ever been at the residence of 879 Niagara where the Camacho brothers lived?
22
23  A. No
24
25  Q. Did you know or have you ever met Miquel and Nelson Camacho?
26
27  A. No.
28
29  Q. Is there anything you would like to add to your statement ?
30
31  A. No
32
33
34
35
36
37  I will now have you read your statement  word for word to determine if  it  is correct and true.
38  At the conclusion of this reading I will ask you to initial the top and bottom of every page and
39  then sign this sworn statement.
40
41
42
43
44  Completed at: 1625hrs.

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1589

City of Buffalo - Department Of Police

## Major Crimes Unit

**To:**     Captain Mark Morgan
          Crimes Against Persons Bureau

**From:**   Det. Mark J. Lauber
          Det. Mary Gugliuzza
          Major Crime Unit

**Subject:**  MCU File # 04-242.
           Homicides of Nelson and Miguel Camacho.

**Date:**   November 15, 2004

Sir;

In the continuing investigation of the above captioned file, your writers did assist Det/Sgt. Torre & Det. Aronica. Mr. Miseal Montalbo had appeared at the Major Crime Unit, on his own volition, and offered an alibi for his whereabouts during this homicide. We were directed to investigate the alibi that he was at the home of his girlfriend Carmen Justiniano and her father Segundo Justiniano on November 11, 2004 between the hour of 9:00pm and 10:00pm. Montalbo was unsure of the address but he was able to describe the house as being 2 houses from the "All-State" insurance office on Niagara near the former 10th Precinct site, painted brown/orange.

We found the location at 1410hrs. and the address is 571 Niagara St. The Justiniano family resides in the rear lower apartment and we find that Segundo Justiniano is home and we are let inside to interview him. Present is Mr. Jose Oramas who also resides here and is a family friend from Puerto Rico. In addition to these 2 gentlemen, 2 younger daughters of Mr. Justiniano ages 12 and 8 reside here and both are at school.

Mr. Justiniano is questioned about the last time he has seen his daughter Carmen and her boyfriend Miseal Montalbo. He says he has seen Carmen within the last 2 days and recalls seeing them both (Carmen & Miseal) last Thursday night at his house. He recalls this being the night of the homicides as he saw on the 10:00 news that the Police had crime scene tape somewhere on Niagara St. near Massachusetts. He recalls that all 3 watched "WWF" wrestling which began at 9:00pm and ended at 10:00pm, which was immediately followed by the 10:00pm newscast on WNLO. Detectives verified that at 9:00pm a wrestling program was being broadcast until 10:00pm, which was followed by the local CBS affiliate 10

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1590



Neither Mr. Oramas nor Justiniano claim the Camacho family threatened them. Justiniano said he saw Louis Camacho early this morning on Niagara St. and they exchanged greetings, he planned on attending the wakes of the Camacho's tonight. A rumor that the New York City chapter of the "Latin Kings" was in Buffalo and had threatened to kill Justiniano and his family if Montalbo was responsible for the homicides was received by this Unit, anonymously. Allegedly, a Latin King appeared at the Justiniano residence, kissed the floor and then threatened to kill the whole family. I asked Mr. Justiniano about this rumor and he denied being threatened in this manner and not ever meeting with anyone in the Latin Kings. We ended the interview at about 1500hrs. and proceeded to 35 Hudson to meet with Carmen Justiniano.

Carmen Justiniano is the girlfriend of Miseai Montalbo; they reside together and have a 3-year-old son. She is 21 years old, DOB 03-13-1983-telephone 480-2508. Carmen verified the information obtained from her boyfriend and father on the whereabouts of Montalbo on November 11, 2004 between 9:00pm and 10:00pm which that he was with them at 571 Niagara watching wrestling on the television. Carmen also told us of the parting of the friendship of Montalbo and Nelson Camacho and that it was last year, they had argued over the title of a car and that they had one small fistfight and had not spoken to each other since. Carmen also said that Camacho threatened to bring his whole family over to assault Montalbo and that Montalbo told Camacho he would kill him. Carmen said that Montalbo was scared and threatened by the Camacho family and that he did not have any family in Buffalo to help him so he made that threat with no intentions of following up on it and was not capable of killing anyone. Carmen never saw Montalbo with a weapon at any time in the past and does not carry one.

Carmen then told us that an unknown person had called the family of Montalbo in Puerto Rico and said he was "dead" in Buffalo, then threatened to kill the family down in Puerto Rico. She is concerned of these threats as she feels vulnerable and fears for the safety of her child. We decided to place a "hazard – threat premises" at their address of 35 Hudson via the 911 system to expedite response time at the address if calls are received in 911.

Your office will continue to be kept informed of developments in this investigation as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

Case 1:16-cv-00321-EAW-MJR    Document 78-12    Filed 07/03/20

A-1591



Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1592

# CITY OF BUFFALO
## DEPARTMENT OF POLICE
## MAJOR CRIME UNIT

TO:   Capt. Mark Morgan      **SUBJECT:** MCU # 04-242
       Major Crime Unit      **DATE:**  November 11, 2004

FROM:  Det. Mary E. Gugliuzza   **VICTIM:** Miguel & Nelson Camacho
       Major Crime Unit

Sir,

On this date at approximately 2200 hours this writer did receive a call from Lt. Stabler, Shift officer regarding needing my assistance at a double shooting at 879 Niagara St. Upon arrival the scene, a house at above address, was taped in yellow tape. I did meet with Det/Sgt Lonergan, MCU and he apprised me of the situation. Det. Tom Balk, Photography, Paula Carducci and Jim Maroney from Evidence Unit were also on the scene. Lt. March and numerous officers from B & D-districts were on scene for crowd and traffic control. Prior to writing the scene, this writer did canvass the scene, along with Det Richard Wagstaff. He did accompany Det Maroney across the street regarding evidence in rear yard. Det. Wagstaff will cover his actions on his own P-73.

This writer did go to the upper apartment and spoke to the residents who were there during this homicide. They are Beverly and David Laborgne of 879 Niagara upper 885-5514. Also their 9-year-old daughter, Brenda was in the apartment. There was also a small Hispanic male approximately 2 yrs old who was there. The Laborgne's did not know the boys name. The boys female guardian had arrived on the scene with him, she was hysterical after finding out who was murdered and the Laborgne's took the boy upstairs to their apartment for warmth. It was learned later that the boy was at the scene with his aunt, Jeilyn Rosario. Later on in the evening this writer did bring boy downstairs to be re-united with his mother who came to the scene. This writer did interview the Laborgne's separately and decided that Beverly saw more than her husband. This writer did get a district car to take her downtown for a sworn statement.



A-1593

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

47   have killed him. She stated Nelson and Montalvo were best friends and while she
48   was dating Nelson, Montalvo tried to kiss her and then ended up threatening to kill
49   Nelson. This occurred about a month ago. This writer had a district officer drive her
50   downtown for a statement. On the way, this writer advised the officer to drive by
51   Hudson St. and have her pick out the house where Montalvo lives; he also drives a
52   yellow car, according to Jeilyn. It was also learned from PO Gramaglia that the
53   brother of the victims was at the scene when 1st officers arrived. He was transported
54   downtown already. He was with his girlfriend when he pulled up to the scene, His
55   girlfriends name is Yvette Maldonado dob 8/24/72 of 32 School 578-4140. Luis
56   Camacho pulled up in a small car, parked inside inner perimeter NY Reg BEL-
57   6729. Also parked outside of house is NY Reg, CYW-7446.
58
59       The scene is a two-story, two family home, on the Northeast corner of Niagara St.
60   between Rhode Island and Massachusetts. There are stairs going up to the house.
61   The outer door was open, which leads you to the hallway. On the left is a door to
62   lead you to the upper apartment. To the right is a white metal door, which leads to
63   the lower apartment. This was kicked in from the outside. The doorframe on the
64   inside is noticeably damaged and the double deadbolt lock is damaged along with
65   the metal door, which has noticeable dent near the door handle. As you walk into
66   the lower apartment, there is a small hallway, to my right is a dining room area,
67   walking in hallway you see the back of the fireplace to my right. On the floor at the
68   rear of the fireplace is Evidence Marker #2. This is for a gold chain that appears
69   broken. Walking in an eastern direction in the hallway  past the dining room on the
70   right is a small living room area. This consists of a futon couch to my left, a small
71   couch on my right, a larger couch on the south wall of apartment, a glass table with
72   the glass top tipped on side of table, a large entertainment center with TV which is
73   turned on. There is what appears to be brain matter/flesh on the small couch back
74   area. In this living room past the coffee table to the left is a body of a white male.
75   This white male is deceased; he is face up, wearing white t-shirt, blue shorts, white
76   socks and no shoes. His head is facing north, feet south.  His right arm is to his side;
77   left arm is crooked touching his left shoulder. He has obvious gunshot wound to the
78   face and left bicep. Evidence Marker (EM) #3 is TV remote, #4 is a drinking glass,
79   #5 cell phone, #6 Pepsi can, #7 gray remote, # Cheetos bag, all these items located
80   between the large couch and coffee table. EM# 9 is a nickel-plated handgun, small
81   caliber. This is located next to body #1 in living room area. On the carpet is what
82   appears to be brain matter, large red stain just west of victim's head. According to
83   the brother, Luis Comacho, who was the first inside house and discovered bodies,
84   stated that he did roll his brother over. This accounts for the large red stain area in
85   different location as victim's head.
86
87       Evidence marker (EM) #10 is a large cal. Bullet casing found to the right of
88   victim#1's right leg, EM#11 – large caliber bullet casing found at right foot of victim



93      Located on living floor next to victim #1 was a bullet hole that traveled to the
94  basement area. This writer accompanied Det Jim Maroney to basement area and it
95  appears the bullet traveled into the furnace and was not recovered at this time.
96  There is a red stain on ceiling of basement, which dripped to the basement floor.
97  This would be directly underneath victim #1 in the living room.
98

99      Walking east toward the back of the house is a hallway; there is a wooden door
100  that would separate the living room from the hallway. This door is open and opens
101  toward the rear of the house, hinges on my left. Approximately half way up the door
102  is a bullet graze on the open door. EM#14 is a large caliber bullet casing on the floor
103  of the hallway, EM#15 is a gold anchor charm; EM# 16 is a large caliber bullet
104  casing, EM # 17 is also found in the hallway.
105

106      Evidence marker #41 is a bullet that was extricated from bedroom #1
107  doorframe.
108

109      Found later in search of inside premises is EM #27 a large caliber bullet casing
110  found partly inside the heating duct in hallway near wooden door. There are red
111  stains in hallway area leading to rear of house, Evidence Marker #32.
112

113      Off the hallway to my right is the bathroom. This is located on the south wall of
114  the hallway. Going inside the bathroom on floor, ceiling and horizontal blinds on
115  bathroom window is what appears to be brain matter/flesh.
116

117      Traveling east through hallway on my left is a bedroom #1. Immediately inside
118  doorway to my left on floor is pooled red liquid. There is a pair of gray slacks on
119  floor. EM# 23- Partly in /out of pocket of slacks are numerous $20 bills. EM#24,
120  #25 and #26 are all pieces of paper, deposit slips with shoe prints in red stain on
121  pieces of paper, EM#33 wet red stain. Leading out of bedroom #1 I turn to my left
122  into rear hallway, which leads you to the kitchen.
123

124      Traveling east through the hallway, you enter a kitchen area; this is where
125  victim #2 is located. Lying against the rear door which leads to the hallway to back
126  of house is a w/m. He has on a white t-shirt and pair of boxer shorts. He is laying on
127  his left side, head in a southerly direction. His right hand is under his face area; his
128  left arm is under his body. Left leg is going west, right leg is bent at knee and right
129  foot is inside pair of jeans, which are located inside bedroom #2.
130

131      Bedroom # 2 is located at rear of the house, door opening on the north wall of
132  the kitchen. Also on north side of kitchen wall are bullet graze marks traveling to
133  rear of house. EM#18 a large caliber bullet casing located in kitchen near the
134  bottom of the stove. Also on kitchen floor are red stain splatters and what appear to

A-1594

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20



139   EM#35 is red shoe pattern in rear hallway, which appears to be leading to rear of
140   the house.
141
142
143      On the rear metal door leading to the back yard are 6 bullet holes, these are
144   marked A, B, C, D, E, and F. Five of these bullet holes appear to be from a large
145   caliber gun. One hole on the left side wood molding is a smaller bullet hole.
146
147      Bedroom #2 is located on the north side of the kitchen to the rear of the house.
148   Walking into the bedroom, there is a bed facing west to east, a dresser with mirror
149   and a tall dresser to my immediate right. It is noted that the TV set is turned on.
150
151      EM# 19 splintered door wood found on bed in bedroom #2. Looking at the door
152   from inside of bedroom #2 is a slide lock, which is still engaged. Around this slide
153   lock the wood is broken off. This is what is located on the bed
154      EM# 20 black leather holster for a small caliber gun, found on bed in bedroom
155   #2.
156      EM# 21 Cellphone on bed in bedroom #2
157      EM#22 located in dresser in bedroom #2 is drug paraphinalia: baggies, scale with
158   residue, blue pills, coffee grinder and spoon with residue on it.
159
160
161      Information from the Major Crime Unit Office is that the names of the victims
162   are Nelson Camacho, dob 4-26-68 is victim #1 located in living room area. Miguel
163   Camacho dob 9-9-79 is victim #2 located in the kitchen area.
164
165      At 0130 hours Greg Luca and Josiah Schultz, morgue attendants arrive on the
166   scene. Dr Evan Evans, Medical Examiner then did arrive on the scene. He did
167   examine both victims and they were transported to the morgue at 0200 hours. Upon
168   removal of the second victim in kitchen area it is noted that the rear door is not
169   locked and can be opened by turning knob. Through this metal door heading east
170   towards the back of the house is another hallway. There is a wooden door, which
171   was partially open; this door is half glass on top, covered with a blue lace curtain,
172   which leads to the outside porch. There are holes in the blue lace curtain and the top
173   window of wooden door has visible bullet holes in it.
174
175      In the rear hallway, leading to the backyard are two dresser tables. In and
176   around these tables Det. Maroney did locate bullets and bullet fragments, EM#38,
177   #39, # 40. To my right is a rear staircase leading to the upper apartment from this
178   hallway. A bullet was located under the 1st step leading to the second floor, this is
179   EM # 37. Evidence Marker # 36 is a dried red stain in rear hallway.
180

Case 1:16-cv-00321-EAW-MJR   Document 78-12   Filed 07/03/20

A-1595



185    this time he did leave the scene as it is.

186

187       This writer did contact radio to have this scene held until after the autopsies.

188    P.O. Terrell was left holding the scene at approximately 0450 hours. This writer and

189    Det. Tom Balk and Det Jim Maroney did return to Headquarters at this time to

190    finish paperwork.

191                        Respectfully submitted,

192

193                        Det. Mary E. Gugliuzza

1

1  STATE OF NEW YORK

2  COURT OF CLAIMS : COUNTY OF ERIE

3  -------------------------------------------------------

4  **JOSUE ORTIZ,**

5                              Plaintiff,

6      -vs-                    **Claim No. 126292**

7  **THE STATE OF NEW YORK,**

8                              Defendant.

9  -------------------------------------------------------

10

11      Examination Before Trial of **DR. EVELYN COGGINS,** held

12  pursuant to Article 31 of the Civil Practice Law and Rules,

13  at the Law Office of Wayne C. Felle, 6024 Main Street,

14  Williamsville, New York on Monday, October 1, 2018,

15  commencing at 1:00 P.M., before Wendy Royce McCann,

16  Registered Professional Reporter, Notary Public.

17

18

19

20

21

22

23

*MCCANN & MCCANN REPORTING*

2

| | |
|---|---|
| 1 | APPEARANCES: |

APPEARANCES:                    THE LAW OFFICE OF WAYNE C. FELLE
1                                BY:  WAYNE C. FELLE, ESQ.
2                                6024 Main Street
                                 Williamsville, New York  14221
3                                Appearing for the Plaintiff.

4
                                 BARBARA D. UNDERWOOD, ESQ.
5                                ATTORNEY GENERAL
                                 BY:  TIMOTHY J. FLYNN, ESQ.
6                                ASSISTANT ATTORNEY GENERAL
                                 350 Main Street
7                                300A Main Place Tower
                                 Buffalo, New York  14202
8                                Appearing for the State of New York.

9
                                 MICHAEL A. SIRAGUSA, ESQ.
10                               ERIE COUNTY ATTORNEY
                                 BY:  LESLIE ORTIZ-FOGG, ESQ.
11                               ASSISTANT ERIE COUNTY ATTORNEY
                                 95 Franklin Street
12                               Room 1634
                                 Buffalo, New York  14202
13                               Appearing for Dr. Evelyn Coggins

14

15

16

17

18

19

20

21

22

23

3

1                          I N D E X.

2    WITNESS                EXAMINED BY                    PAGE

3    DR. EVELYN COGGINS     MR. FELLE                        6

4                           MR. FLYNN                       88

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

4

1                    **E X H I B I T S**

2   <u>PLAINTIFF'S EXHIBIT NO:</u>                      <u>PAGE</u>

3   1  - Buffalo General Hospital Records              5

4   2  - Screening summary - 4 pgs.                    5

5   3  - Forensic Consultation Form/Report             5

6   4  - ECMC Records dated 11/26/04                   5

7   5  - ECMC HS file - 26 pgs. 11/29/04               5

8   6  - ECMC records - 11/30/04                       5

9   7  - Dr. Liebergall letter to Judge Ogden          5

10  8  - Dr. Coggin's letter to Judge Forma            5

11  9  - Letter to Judge Forma 1/24/05                 5

12  10 - Transcript - Competency Hearing               5

13  11 - Dr. Coggins' letter to Judge Forma            5

14

15

16

17

18

19

20

21

22

23

*MCCANN & MCCANN REPORTING*

A-1601

5

1    MR. FELLE:              Mark these, please.

2

3                           (Whereupon, eleven exhibits were then

4                           pre-marked Plaintiff's Exhibits 1

5                           through 11 for identification.)

6

7                           (Whereupon, the following stipulation

8                           was entered upon the record:  "It is

9                           hereby stipulated by and between

10                          counsel for the respective parties

11                          hereto that the oath of the Referee

12                          is waived, that signing, filing and

13                          certification of the transcript are

14                          waived; and that all objections

15                          except as to the form of the

16                          questions are reserved until the time

17                          of the trial.")

18

19   Whereupon, **EVELYN COGGINS**, after first being duly sworn,

20   was examined and testified as follows:

21

22   THE STENOGRAPHER:       Please state your name and address

23                           for the record.

**MCCANN & MCCANN REPORTING**

6

1    THE WITNESS:              Evelyn Coggins, 125 West Eagle,

2                             Buffalo, New York 14202.

3

4    **EXAMINATION BY MR. FELLE:**

5    Q.    Good afternoon, Dr. Coggins.  My name is Wayne

6          Felle.  We met off the record briefly.  Just to

7          remind you, I am representing Josue Ortiz who was,

8          as you may remember, a patient in custody at the

9          Erie County Holding Facility back in 2004-2005 at

10         which time you provided forensic psychiatric

11         treatment for him.  During the course of my

12         questioning today, it's not my intention to trick or

13         confuse you in any way.  If you don't understand my

14         question, please let me know, okay?

15   A.    Okay.

16   Q.    I am sure you provided testimony in various legal

17         proceedings, so you know the rules with respect to

18         the court reporter, just to keep your answers

19         audible and loud, please.

20   A.    Okay.

21   Q.    I don't want go through all your credentials or

22         affiliations, but for the sake of brevity, can you

23         tell me back in 2004 did you provide forensic

7

```
 1          psychiatric consulting for the Erie County Mental
 2          Health Services Department?
 3   A.     Yes, I did.
 4   Q.     Was that on an independent contractor basis?
 5   A.     At that time, yes.
 6   Q.     That department, for lack of a better word, Erie
 7          County Mental Health Services Department, was that
 8          headed by Dr. Liebergall?
 9   A.     Yes, at the time.
10   Q.     So with respect to the work that you did for the
11          Erie County Mental Health Services Department, that
12          would have been at the request of Dr. Liebergall?
13   A.     Yes.
14   Q.     Incidently, do you happen to still be in contact
15          with Dr. Liebergall?
16   A.     No.
17   Q.     Do you happen to know his whereabouts?
18   A.     He retired and moved to Florida, as far as I know.
19   Q.     Back in 2004, outside of yourself and Dr.
20          Liebergall, there were other doctors in psychiatry
21          that provided treatment to inmates, correct?
22   A.     Yes.
23   Q.     Do you recall Dr. Gokhale, G-o-k-h-a-l-e?
```

*MCCANN & MCCANN REPORTING*

8

| | | |
|---|---|---|
| 1 | A. | That is Gokhale, I don't think he worked at the |
| 2 | | jail, he worked at the hospital. |
| 3 | Q. | At ECMC? |
| 4 | A. | Yes. |
| 5 | Q. | In the psych department? |
| 6 | A. | Yes. |
| 7 | Q. | How about your affiliation back in 2004 with Buffalo |
| 8 | | General Hospital and their psychiatric department, |
| 9 | | did you have privileges? |
| 10 | A. | Yes. |
| 11 | Q. | Were you an attending doctor? |
| 12 | A. | Yes. |
| 13 | Q. | Were you familiar with a Dr. Christian Defazio? |
| 14 | A. | I don't know if I know him, but I believe he also |
| 15 | | was an ER doctor at ECMC. |
| 16 | Q. | How about a Dr. Durford, D-u-r-f-o-r-d? |
| 17 | A. | That doesn't sound familiar. |
| 18 | Q. | Dr. Defazio provided psychiatric treatment to |
| 19 | | Mr. Ortiz when he was admitted to Buffalo General |
| 20 | | Hospital back in November of 2004, just before your |
| 21 | | initial involvement with Mr. Ortiz, do you recall |
| 22 | | his involvement in this case at all? |
| 23 | A. | No. |

9

```
 1   Q.   Is that a doctor that you had worked with?

 2   A.   Defazio, it's possible he was a resident and I just

 3        don't remember we were residents.  I don't remember

 4        an attending named Defazio.

 5   Q.   Getting back to the work that you did for the Erie

 6        County Forensic Mental Health Services Department,

 7        was it common back in 2004 for different

 8        psychiatrists to be involved in the treatment of an

 9        inmate or patient?

10   A.   Yes -- in the holding center?

11   Q.   Correct.

12   A.   Yes.

13   Q.   In other words, we talked about this in terms of a

14        multidisciplinary approach, this isn't

15        multidisciplinary, these are all psychiatric

16        forensic psychologists, but you do assist each other

17        in the treatment of patients, correct?

18   A.   Yes.

19   Q.   So in the case of Mr. Ortiz, for example, we see

20        that the initial screening was done by Dr.

21        Liebergall?

22   A.   Well, Dr. Liebergall is a psychologist, so he

23        wouldn't provide treatment, just the psychiatrists
```

*MCCANN & MCCANN REPORTING*

10

1        provided treatment.  He did assessment only.

2  Q.    Let me ask you this, and with respect to the record,

3        we have had it marked and will look at it in a

4        minute, we see in the Erie County Mental Health

5        Services folder or file that was submitted to the

6        court early on in this case and there are notes

7        dated and then handwritten by, it looks to be

8        different doctors, was that common back then in

9        2004?

10  A.    So that a different doctor would see one patient,

11        yes.

12  Q.    On a different day?

13  A.    Right, like at that time I worked there once a week.

14        So if he needed to be seen twice a week, he would

15        have seen a different doctor.  I don't know if

16        that's what happened.

17  Q.    Sure, but that was certainly possible back in 2004?

18  A.    Yes.

19  Q.    And I just want to ensure, it makes common sense,

20        but I want to for the record be clear on this.

21        There is professional reliability when it comes to

22        your colleagues seeing your patient, would you

23        agree?

11

```
 1   A.    Yes.
 2   Q.    In other words, when you consider the condition of
 3         the patient, you have professional reliance on the
 4         notes and examination comments of your colleagues,
 5         correct?
 6   A.    Yes.
 7   Q.    And, in fact, you rely on that to assist in your
 8         diagnosis and treatment of the patient, correct?
 9   A.    Yes.
10   Q.    Now the records indicate -- well, before I get into
11         the records, let me ask you this.  Do you have an
12         independent recollection of having met with and/or
13         examined Mr. Ortiz?
14   A.    Yes.
15   Q.    Can you tell me from your independent recollection
16         when was the first time that you recall seeing him
17         or meeting him?
18   A.    I saw him early on in his incarceration before he
19         went to the hospital, so sometime in the fall, in
20         November of 2004 before he went to the hospital --
21         before we transferred him to the hospital.
22   Q.    Okay.  And there were a couple of admissions, and we
23         will get to that, but I think, by way of the
```

*MCCANN & MCCANN REPORTING*

12

```
 1              records, your first evaluation of him was November
 2              19th of 2004?
 3    A.        Okay.
 4    Q.        And I don't presume for a moment you remember the
 5              day, but does that sound right with respect to your
 6              recollection?
 7    A.        Yes.
 8    Q.        Do you recall that being a face-to-face meeting with
 9              Mr. Ortiz?
10    A.        Yes.
11    Q.        And why is it that fourteen years later you have an
12              independent recollection of that meeting?
13    A.        I remember him because he was so ill in the
14              beginning.  I remember taking care of him later.
15              And he always maintained his innocence and I always
16              had a feeling that he might not have done it, and I
17              don't think that about most of the people that I
18              take care of.
19    Q.        And I definitely want to get back to that because
20              you do indicate that in your notes consistently that
21              he maintained his innocence, correct?
22    A.        Yes.  Yes.
23    Q.        And outside of that independent recollection,
```

*MCCANN & MCCANN REPORTING*

13

1        obviously it sat with you for fourteen years and you

2        remembered having doubts about what you just stated

3        about his confession and/or conviction, was there

4        anything else that you have an independent

5        recollection about with respect to your involvement

6        with Mr. Ortiz?

7  A.    I remember that he was in bad shape when I first saw

8        him and he was -- got significantly better, but

9        still he was mentally ill the whole time.

10  Q.    Do you recall the circumstances in which he tried to

11       commit suicide while in custody?

12  A.    I don't actually recall that.

13  Q.    In preparation for today, did you review any

14       documents to help refresh your memory?

15  A.    No -- well, just that transcript.

16  Q.    And that's the transcript from the competency

17       hearing back in 2005?

18  A.    Yes.

19  Q.    Did you have any conversations with anyone else

20       regarding your care or treatment of Mr. Ortiz

21       outside of your attorney, of course?

22  A.    Well, I asked if there were records of Ron

23       Schoelerman, he's in Joe Liebergall's position now.

A-1610

14

1    He said it was way before his time and he got back

2    to me and he said those records had been supplied at

3    sometime in the past.

4  Q.  Did you have any conversations with him about what

5    your testimony should be today?

6  A.  He has no idea of anything about the case.  He has

7    pretty little interest in any of it.

8  Q.  Did you have any conversations with anyone else

9    outside of your counsel about the legal proceedings

10   that brought you here today?

11 A.  No.

12 Q.  Did you come to recognize, independent of these

13   legal proceedings through media sources, that

14   Mr. Ortiz was eventually exonerated of the murders

15   that he was charged with?

16 A.  Well, I remember seeing it in the Buffalo News a few

17   years ago, 2015 or 2016 maybe.

18 Q.  Just that, that he was exonerated of the crimes that

19   he was charged with?

20 A.  Yes.

21 Q.  Did you reach out to anyone at that time to inquire

22   about what had happened?

23 A.  I don't believe so.  No one was there anymore who

*MCCANN & MCCANN REPORTING*

A-1611

15

1           would have remembered him.

2    Q.    Prior to your first visit with Mr. Ortiz, again I

3           will show it to you by way of exhibits, Exhibit 3 is

4           just a one page document and I will have you review

5           it and once you reviewed it, let me know, okay?

6    A.    Okay.

7    Q.    So looking at Exhibit 1, can you tell me what that

8           is, excuse me, Exhibit 3?

9    A.    It's a progress note.

10   Q.    And is it your first examination or meeting with

11          Mr. Ortiz?

12   A.    As far as, I don't remember, but it looks like it

13          was, he came in -- when was he was arrested?

14   Q.    The 16th.

15   A.    So it would have been the first time then.

16   Q.    So if you can, just for the sake of clarity, because

17          it's a handwritten note, can you tell us what it

18          states for reason for consultation?

19   A.    Two counts of murder, after arrest seemingly became

20          catatonic.

21   Q.    Then under counselor's comments and observations?

22   A.    Something positive, regressed maybe --

23   Q.    You can imagine our difficulty.

**MCCANN & MCCANN REPORTING**

A-1612

16

1    A.    Medical issues as well.  Now somewhat -- I don't
2          know if it is saying improved, competency exam
3          pending.
4    Q.    Is that your signature there?
5    A.    Up above there I have, I think it's Julie, it's one
6          of the counselors, so that's the way they, when we
7          are about to see a patient, they have this part
8          filled out, it's the referral on top, and then my
9          work where it says psychiatric response.
10   Q.    Much more neater, correct?
11   A.    I can read it.
12   Q.    Can you read it for us, for the record, please,
13         psychiatric response.
14   A.    23 year old Hispanic male with history of
15         depression, complains of feeling sad, reported poor
16         sleep, complained of hearing voices, poor historian,
17         past medical history unknown, substance - history of
18         alcohol, Xanax, marijuana in the past.  Mental
19         status exam - melodious, speech - underproductive,
20         affect - blunt, mood - dysphoric, guarded, poverty
21         of content, positive for auditory hallucinations,
22         positive for thoughts of suicide at times, but no
23         plan or intent, denied thoughts of hurting others.

17

```
 1          Impression - schizophrenia.  Plan - continued 20
 2          milligrams CID, needs interpreter for competency
 3          eval.
 4     Q.   Do you know whether there was an interpreter for
 5          this exam?
 6     A.   No, I don't, but I can tell in looking at it now
 7          that it was the first time I saw him because I had
 8          this third and fourth line, I only ask those things
 9          the first time.  Usually I would note that there was
10          an interpreter present if there was one, so I must
11          have felt -- I don't know for sure, maybe I thought
12          his English wasn't good enough to go through that
13          type of examination without an interpreter.
14     Q.   And do you speak Spanish?
15     A.   No.
16     Q.   And just for clarify sake, from your first
17          examination of Mr. Ortiz, you are commenting on the
18          need for competency.  Within the scope of your
19          services as a forensic psychologist in treating
20          patients at the Erie County Holding Center, is that
21          within the scope of your services to comment on
22          competency?
23     A.   Yes.  I am a forensic psychiatrist, not a
```

18

1        psychologist.

2    Q.   I apologize.

3    A.   But yes, it is.

4    Q.   And can you tell me what else is in the scope of

5         your assignment, if you will, of a patient at Erie

6         County Holding Center?

7    A.   At that time I saw patients for treatment and for

8         court ordered evaluations.

9    Q.   In addition to the reporting that you might do for

10        the court for the sake of competency evaluations,

11        would you also have kept private records between a

12        patient and a doctor?

13   A.   No.

14   Q.   With respect to medications, would you prescribe

15        medications to a patient?

16   A.   Yes.

17   Q.   And in this first note you state that you're going

18        to continue medication that he is already on.  Do

19        you know who put him on that?

20   A.   I don't.  That's why at first I was confused whether

21        it was the first time I had seen him, but I don't

22        know who had prescribed that.

23   Q.   You told us earlier that Dr. Liebergall could not

*MCCANN & MCCANN REPORTING*

A-1615

19

```
 1          prescribe medications at that time, correct?
 2   A.     Correct.
 3   Q.     So just for the moment I want to show you now what
 4          is marked as Exhibit 2, I apologize that I am going
 5          backwards, but that's a four page document marked as
 6          Exhibit 2.  Can you just review that and tell me
 7          when you are ready for a question.
 8   A.     I don't think this was done by a doctor either.
 9          Okay.
10   Q.     This report was prepared by Dr. Liebergall and
11          looking for the moment at the first two pages of the
12          exhibit, can you tell me when it is dated?
13   A.     November 17, 2004.
14   Q.     And it's entitled screening and admission summary,
15          is that correct?
16   A.     Yes.
17   Q.     Was that normal operating procedure for there to be
18          this kind of summary for a new patient at the
19          holding center?
20   A.     Yes.
21   Q.     Would it be common that Dr. Liebergall would
22          complete that?
23   A.     Yes.
```

*MCCANN & MCCANN REPORTING*

20

| | | |
|---|---|---|
| 1 | Q. | You are familiar then with his handwriting on the |
| 2 | | document? |
| 3 | A. | Yes. |
| 4 | Q. | Can you just maybe help us read it a little bit.  I |
| 5 | | am not sure if Dr. Liebergall is available to go |
| 6 | | through this report.  If you are familiar with his |
| 7 | | writing? |
| 8 | A. | Which part? |
| 9 | Q. | The part where it says medical history/medications. |
| 10 | A. | On no meds, denied medical problems. |
| 11 | Q. | And below that where it says ID, can you see any of |
| 12 | | those responses on that line? |
| 13 | A. | D-e-f -- what could that be -- |
| 14 | Q. | I don't want you to guess. |
| 15 | A. | Deferred -- I have no idea what that means. |
| 16 | Q. | Where it talks about review of current arrests, can |
| 17 | | you read that? |
| 18 | A. | I can't read that first word, something charges. |
| 19 | Q. | All right, how about the current life situation, can |
| 20 | | you help us make sense out of that? |
| 21 | A. | Lives with wife -- |
| 22 | Q. | If you can't read it, just let us know that. |
| 23 | A. | I can't read it. |

21

1   Q.   How about presenting problem, can you read that

2        part?

3   A.   Appears perplexed, verbalization -- I can't read

4        that word either.

5   Q.   When you examined Mr. Ortiz two days after this

6        report on the 19th, would you have had this report

7        to review as part of your diagnosis and treatment?

8   A.   I should have.

9   Q.   Do you recall if you talked to Dr. Liebergall about

10       his initial screening?

11  A.   I don't recall.

12  Q.   Do you see anywhere on that two-page, do you see

13       anywhere where medications were prescribed?

14  A.   No, I don't.

15  Q.   Going to the section where it says summary including

16       initial level of supervision.  Can you make that out

17       for us?

18  A.   Where are you?

19  Q.   The second page, towards the bottom page, summary

20       including the initial level of supervision.

21  A.   23 year old male, difficult to interview, reports

22       are vague, something for English or poor English, I

23       don't know what the first word is there.  I don't

22

1      know if he claims poor English -- I don't know what

2      that word is, but poor English is there.

3  Q.  Now when we turn to the third page of Exhibit 2,

4      it's entitled suspected suicidal inmate notification

5      form, do you see that there?

6  A.  Yes.

7  Q.  And does it state there information received or

8      observations colon, what does it read there?

9  A.  Serious charges, previous suicide attempt.

10 Q.  So then under actions taken colon, what does it

11     indicate there?

12 A.  One to one constant observation in room.

13 Q.  And below that where it says forensic follow-up,

14     there is a history of -- is that depression?

15 A.  Yes.

16 Q.  And again the suicide watch was indicated below

17     that, right?

18 A.  Correct.

19 Q.  Again, you are not sure if you had that report when

20     you evaluated Mr. Ortiz on the 19th, correct?

21 A.  I am not sure.  Ordinarily I would.

22 Q.  But there is no indication in the notes to indicate

23     that, correct?

A. No.
Q. Showing you what we have marked as Exhibit 1, Plaintiff's Exhibit 1 is a fourteen page document. These are medical reports surrounding an admission of Mr. Ortiz on November 15th. We are just moving backwards. So this is the day before Dr. Liebergall would have interviewed him three days before you initially interviewed him.
A. Okay.
Q. Looking at those documents, and I think you told us earlier that you were affiliated with Buffalo General Hospital at that time, correct?
A. Yes.
Q. And that's a department that you would have worked in?
A. Yes.
Q. Can you tell us what does the first page of Exhibit 1 indicate?
A. So I don't know if this is outpatient -- what's the question?
Q. I am asking what does it indicate? So there is indication of chief complaint --
A. Do you want me to read this?

Q. Please, if you can.
A. This 23 year old male with no report psych history, no thoughts -- no -- I don't know what that says, brought to ER by ambulance -- I can't read this -- something I am scared.
Q. Does it say he complains of, C/O, complains of?
A. He complains of, I am scared, people are trying to kill me, something patient states he wants to file a police report is the last line there.
Q. Do you read in the center, does it have in quotes that they are after me?
A. Yes. It sounds like he's kind of paranoid.
Q. And certainly based on the notation there that he was scared or frightened, correct?
A. Yes.
Q. As you look through the exhibit, turning to the third page of the exhibit, do you see where it says subjective summary, it says believes someone is trying to kill him?
A. Yes.
Q. Is that consistent with the notes in the beginning?
A. Yes.
Q. And thumb through those notes to the fifth page, can

A-1621

25

1   you see the notes that are indicated under the

2   mental status --

3 A. 23 year old Hispanic male appearing, date and age,

4   appropriately something, casually and appropriately

5   attired.

6 Q. Below when it gets to the thought process, can you

7   see, what does it say there, complains of?

8 A. I can see the slash anxiety.  I don't know what that

9   word is there.

10 Q. It's not fearfulness, is it?

11 A. Yes.

12 Q. Is that what it says?

13 A. Yes.

14 Q. Fearfulness slash anxiety?

15 A. Yes.

16 Q. And then if you were to look down to the section

17   mood and effect, what are the indications there?

18 A. Worried, anxious, fearful.

19 Q. And then ultimately below where it says diagnostic

20   impression, does it state anxiety?

21 A. Yes.

22 Q. Now anywhere in those notes from Buffalo General

23   Hospital do you see where Mr. Ortiz was placed on

**MCCANN & MCCANN REPORTING**

26

```
 1          any medications?
 2  A.      This was the 15th, right?
 3  Q.      Correct.
 4  A.      There is no mention of it.  I don't see a medication
 5          section though.  Medication prescribed is blank.
 6  Q.      So as far as the records from Buffalo General
 7          Hospital indicate as Exhibit 1, he did not receive a
 8          prescription upon his release from Buffalo General
 9          Hospital?
10  A.      Not according to this.
11  Q.      And if you turn in the exhibit, okay, it's this one.
12  A.      Okay.
13  MR. FLYNN:          Wayne, if you can identify, for the
14                      record, how many pages for me because
15                      I don't have a copy of that exhibit
16                      in front of me, just so when I look
17                      at it later.
18  MR. FELLE:          This is a fourteen page document
19                      entitled --
20  MR. FLYNN:          But for that one page, you asked her
21                      to look for this page, if I take the
22                      transcript, I won't know what page
23                      you are referring to.  If you would
```

27

```
 1                             want to identify that page within

 2                             there or how many pages, just so I

 3                             can find it later.

 4  MR. FELLE:                 It appears to be the tenth page in a

 5                             fourteen page document, Exhibit 1.

 6

 7  BY MR. FELLE:

 8  Q.     Does it say chief complaint in quotes, I am afraid,

 9         end quotes?

10  A.     Yes.

11  Q.     And as you look through the history of present

12         illness, does it state complains of being afraid in

13         quotes?

14  A.     Yes.

15  Q.     And then further down in quotes it says fearful

16         of --

17  A.     Harming self.

18  Q.     Harming self end quotes, or excuse me, it starts

19         with not, not is not in quotes for some reason, but

20         not fearful of hurting self, is that what it says?

21  A.     Yes.

22  Q.     After that it says, but fearful that he may be

23         harmed by someone else because of the information he
```

A-1624

28

1       has, correct?

2   A.  Yes.  It also says no past mental health care, which

3       would suggest he wasn't on meds at the time of this

4       either.

5   Q.  So as this record appears as Exhibit 1, do you

6       recall ever seeing this before today?

7   A.  No.

8   Q.  Do you recall if you would have had that to review

9       before you saw Mr. Ortiz on the 19th of November?

10  A.  I most certainly would not have had this.

11  Q.  Okay, and those documents are significant, are they

12      not?

13  A.  Yes.

14  Q.  And reviewing those records under that context with

15      a person with no history of being on any meds and

16      presenting in that state, what is your professional

17      opinion of how he should have been treated at that

18      point?

19  A.  I don't know.  I mean, in hindsight it seems like he

20      was probably psychotic and paranoid and should have

21      been hospitalized.

22  Q.  And the records, Exhibit 1 indicates, he was not, he

23      was released?

*MCCANN & MCCANN REPORTING*

A-1625

29

1  A.    Yes.

2  Q.    In fact, he was released without any treatment plan?

3  A.    They didn't make the diagnosis, they thought he had

4        adjustment disorder or something.

5  Q.    In fact, I think at the last page of Exhibit 1, it

6        indicates that if he had further problems, he should

7        call the police?

8  A.    Yes, call 911, I think it said somewhere in there.

9        Is it the very last page?

10 Q.    Correct, the last page of Exhibit 1.   Does it

11       indicate he should call 911?

12 A.    Yes.

13 Q.    And then if we go further into the record and we

14       look at Exhibit 4, I think you indicated earlier

15       after your initial evaluation of Mr. Ortiz, there

16       was a point in time when he was hospitalized,

17       correct?

18 A.    Yes.

19 Q.    Do you recall under what the circumstances were,

20       independent of records, do you recall what the

21       circumstances were?

22 A.    He deteriorated during the course of the

23       hospitalization.   He was -- I believe he had -- he

*MCCANN & MCCANN REPORTING*

A-1626

30

1      became catatonic and took him to the hospital.  He

2      might have gone and had, you know, very little done

3      and then come back to jail for a few days and then

4      went back again and they kept him for a month or so,

5      something along those lines.

6  Q.    That's correct.  Showing you first what has been

7      marked as Plaintiff's Exhibit 4, it's a seven page

8      document, does that tell us that he was admitted to

9      Erie County Medical Center on or about November

10     22nd?

11  A.    Yes.

12  Q.    Of 2004?

13  A.    Yes.

14  Q.    And it looks like he was admitted for a four day

15      period until November 26th of 2004, correct?

16  A.    Yes.

17  Q.    And when we look at the first page of Exhibit 4,

18      does it state that the admitting diagnosis, in

19      parentheses, reason for admission, end parentheses

20      colon is psychotic and bizarre behavior, psychotic

21      disorder, does it state that?

22  A.    Yes.

23  Q.    Do you recall that between the 19th of November and

A-1627

31

```
 1          the 22nd of November, did you see Mr. Ortiz again?
 2   A.     I don't believe so.
 3   Q.     And were you given any information to advise you,
 4          over that three day period, of his behavior?
 5   A.     I don't recall.
 6   Q.     The fifth page of Exhibit 4 is the signature page
 7          for the discharge summary and does it appear that
 8          the attending physician was Dr. Gokhale, I think I
 9          am mispronouncing his name?
10   A.     Yes.
11   Q.     Did you tell me earlier that you were familiar with
12          that doctor?
13   A.     Yes.
14   Q.     Does he still treat in the area?
15   A.     I think he may still belong to our department, yes.
16   Q.     And the report of his admission, if you were to
17          review that, do you see at the end his discharge
18          diagnosis is undifferentiated schizophrenia?
19   A.     Yes.
20   Q.     And he states that possibly first break?
21   A.     Yes.
22   Q.     What's the significance of that?
23   A.     That he had, this was new onset, psychotic illness,
```

*MCCANN & MCCANN REPORTING*

32

1          new onset schizophrenia.

2   Q.     That may seem odd to the layman, but in your

3          discipline it is not uncommon for someone to have

4          their first break as a male in their early twenties,

5          isn't it?

6   A.     It's a very common time, yes.

7   Q.     And so this could have, in fact, been his first

8          psychotic break from reality, if you know?

9   A.     Yes.

10  Q.     And there are a lot of reasons why that could have

11         happened, correct?

12  A.     Yes.

13  Q.     We can talk about those in a minute.  But as we look

14         at the discharge diagnosis, do you see there where

15         it says status post - catatonia?

16  A.     Yes.

17  Q.     So Mr. Ortiz had become catatonic, correct?

18  A.     Yes.

19  Q.     And can you tell me what does that mean in your

20         profession?

21  A.     Catatonic means a person slows way down or almost

22         everything stops, movement, thought, responsiveness

23         and they can become rigid and sometimes not even

*MCCANN & MCCANN REPORTING*

33

1    response to painful stimuli.

2  Q.   And there is an indication in the records that

3       Mr. Ortiz was found just staring at the wall, would

4       that be consistent?

5  A.   Yes.

6  Q.   He had a flat affect?

7  A.   Yes.

8  Q.   How about auditory hallucinations, do you see an

9       indication of that?

10 A.   Not in the diagnoses, but maybe elsewhere in here.

11 Q.   Do you remember that being a condition that

12      Mr. Ortiz was facing?

13 A.   Yes.

14 Q.   Generally speaking, given that you had interviewed

15      and examined Mr. Ortiz, were aware at least at that

16      point from a one-on-one examination of him of his

17      general condition and then reading what the

18      discharge and admissions summaries indicate for his

19      admission on November 22, 2004, would you generally

20      speaking agree of the diagnosis given by Dr.

21      Gokhale?

22 A.   Yes.

23 Q.   And turning to that fifth page, which I think you

*MCCANN & MCCANN REPORTING*

34

1   had earlier, are you able to read the attending

2   admission note?

3 A. Patient seen, chart reviewed, I am not sure what

4   that says, some kind of team, oh, discussed with

5   team, d/w, discussed with team chief complaint, 23

6   year old Hispanic male sent from Erie County Holding

7   Center for evaluation for bizarre behavior, suicidal

8   threat -- do you want me to continue on?

9 Q. Yes, if you can, please.

10 A. History of present illness - patient apparently

11   accused of two murders of family members over

12   lottery money.  Patient presents very agitated,

13   making suicidal comments, bizarre, cannot be

14   redirected, needing frequent physical and chemical

15   restraints, unmanageable at the holding center, not

16   making any sense, irrational, illogical behavior,

17   patient appears to be psychotic, preoccupied.

18 Q. Before we move further, the note seems to indicate

19   that while at the holding center he needed frequent

20   physical and chemical restraints.  What is meant by

21   that?

22 A. Physical restraints, I am not sure if they were

23   using -- what they were doing.  If they were just

**MCCANN & MCCANN REPORTING**

A-1631

35

```
 1            going in and holding him down, or it might have been
 2            the restraint chair that they have.  I am not sure.
 3            Chemical restraint, at the time they were using the
 4            Haldol injection.
 5     Q.     Is that something that you would have to authorize
 6            as his treating doctor?
 7     A.     Well, I did not, I was not involved in that.  It
 8            would have been whichever doctor was there at the
 9            time doing that.  So maybe Dr. Joseph or one of the
10            nurse practitioners, but it should have been ordered
11            by a doctor.
12     Q.     And just so I understand the policies and procedures
13            then in place, even though you are the treating
14            doctor of the patient, Mr. Ortiz, another doctor
15            could have ordered his chemical restraint?
16     A.     Yes, at that time I was a consultant.  I came just
17            once a week or around that time I started coming
18            twice a week because I was not on call at night, Dr.
19            Joseph was.
20     Q.     And as the treating doctor for the patient, would
21            you, by policy and procedure, would you have been
22            noticed if your patient was under a chemical
23            restraint?
```

**MCCANN & MCCANN REPORTING**

A-1632

36

1  A.   I might have, I might not have been.  I might have

2      found out the next time I came to work when he would

3      have been scheduled to see me, but he ended up being

4      hospitalized before he saw me.

5  Q.   As we go further down that report, can you read --

6      it seems to be MSE colon, it talks about some basic

7      orientation, but towards the bottom of that it says

8      --

9  A.   Which line?

10 Q.   Where this highlighted area starts.

11 A.   First -- well, let's see.  It would be easier for me

12     to kind of read the whole thing.  I am not sure what

13     that word is, no inside and judgement, has no

14     insight and judgement is impaired.  Might be

15     certainly no insight and judgement is impaired.

16 Q.   Mood is agitated?

17 A.   Mood is agitated and thought process is irrational.

18     Behavior is explosive, something unpredictable.

19 Q.   Now the comment there that the patient certainly has

20     no insight, is that that he has no insight as to his

21     behavior or his circumstances, do you know?

22 A.   I don't know what he was thinking, but usually

23     psychiatrists are referring to insight into his

**MCCANN & MCCANN REPORTING**

37

```
 1              mental illness, insight into the need for treatment.

 2     Q.       Now would you say that in this comment being dated

 3              November 23, 2006, essentially four days, or I am

 4              sorry, 2004, essentially four days after your

 5              examination, would you agree that Mr. Ortiz became

 6              progressively worse and psychotic at that point?

 7     A.       Yes.

 8     Q.       And when you met with him, did he exhibit the level

 9              of behavior that you see in this admission note on

10              November 22nd?

11     A.       That's not what I documented, so no.

12     Q.       Incidently, when you met with him, did you meet with

13              him with law enforcement officials?

14     A.       Usually security was either in the room or right

15              outside the room with the door ajar, so yes.

16     Q.       Do you recall which it was --

17     A.       No.  I didn't specify in my note.  Usually they are

18              outside the door unless I specify.  If they are in

19              the room I usually make note of that.

20     Q.       And when you were with Mr. Ortiz, you certainly

21              didn't indicate that you ever felt threatened during

22              that one-on-one, correct?

23     A.       Right.
```

**MCCANN & MCCANN REPORTING**

38

1   Q.   Now I want to turn to the next exhibit, please,

2        which is Exhibit 5 and this exhibit is a little

3        longer.  This is the actual Erie County Mental

4        Health Services file and it's a twenty-six page

5        document, again entitled Plaintiff's Exhibit 5, if

6        you can look at that and then I will turn your

7        attention to the fourth page that are some notes.

8   A.   This is the hospital, ECMC, okay.

9   Q.   To some extent the Erie County Mental Health

10       Services Department would have gotten copies of

11       various records from the hospital where Mr. Ortiz

12       presented, correct, for reference?

13  A.   These are the hospital records, right.

14  Q.   No, I believe the first page may be, but I am asking

15       you in general, as the treatment provider, would you

16       have gotten a copy of the emergency room record if

17       your patient was admitted?

18  A.   We should, yes.  It didn't always happen in a timely

19       manner.

20  Q.   You do see in this file some records from the

21       hospital, but turning to the fourth page of that

22       exhibit, there appears to be a note of November 29,

23       2004, do you see that?

*MCCANN & MCCANN REPORTING*

A-1635

39

1   A.    Yes.

2   Q.    And do you know who made that note?

3   A.    I am not recognizing that.  I don't recognize it.

4   Q.    When you say you don't recognize it, is that to say

5         that you don't recognize the name at the end of the

6         comments?

7   A.    Yes.

8   Q.    How about if we move down to the next day on the

9         30th of November, do you recognize that name and

10        signature?

11  A.    No.

12  Q.    Going down the page, do you recognize the signature

13        of any of those notes?

14  A.    This looks like Julie, the counselor, this one

15        request.  I am not even sure of that.  It could be

16        the counselor.  So these are Erie County Holding

17        Center notes you are saying?

18  Q.    No, these are the Erie County, the Mental

19        Services --

20  A.    From jail though, not from the hospital?

21  Q.    Right, but I think it incorporated some of the

22        hospital records that we just talked about, but

23        these should be notes from folks involved from Erie

*MCCANN & MCCANN REPORTING*

A-1636

40

```
 1           County Department of Mental Health Services.  And I
 2           was hoping that you might a recognize some of the
 3           signatures so I can make sense of what these notes
 4           say.
 5    A.     I think Julie, the counselor.  I can't remember her
 6           last name.
 7    Q.     She seems to be the notation on December 1st,
 8           correct?
 9    A.     Yes.
10    Q.     Let me show you now what has been marked as Exhibit
11           6.
12    A.     Some of these are Liebergall.  This one is
13           Liebergall.
14    Q.     What date is that?
15    A.     That is 12/3/04.
16    Q.     Can you tell us what that says?
17    A.     Reviewed with RN Mary Watson, patient at that point
18           unchanged -- at this point unchanged and denotes an
19           ECMC chart, so he's calling the hospital, so a lot
20           of these are his actually, Joe Liebergall's.
21    Q.     Okay, we'll move on from that record.  I am going to
22           show you, because there is a written report from Dr.
23           Liebergall from that same date which will make it
```

**MCCANN & MCCANN REPORTING**

A-1637

41

```
 1            clear.  Showing you Exhibit 6, this is the next
 2            admission of Mr. Ortiz to the Erie County Holding
 3            Center.
 4   A.       Okay.
 5   Q.       So by way of your testimony, we understand from
 6            Exhibit 4 that Mr. Ortiz was released on November
 7            26, 2004.
 8   A.       Okay.
 9   Q.       Back to the Erie County Holding Center, he was seen
10            by folks with the Erie County Mental Health Services
11            Department.  I don't believe you saw him during that
12            period of time, but then he was readmitted to the
13            Erie County Medical Center on the 30th of November
14            and that's bringing us to Exhibit 6 in front of us
15            now.  Can you tell us at that time, what were the
16            complaints or symptoms that Mr. Ortiz was
17            experiencing?
18   A.       Do you want me to read this chief complaints or
19            history of present illness?
20   Q.       Yes, the significant parts of it, please.
21   A.       Thought to be very disorganized, very confused, not
22            talking at all and remaining very preoccupied and
23            unable to communicate with anybody else and was
```

*MCCANN & MCCANN REPORTING*

42

1       transferred to in-patient psychiatry nine oh two for

2       further management.  So upon admission the patient

3       had a couple of IMPR injections of Haldol, and

4       appeared to be somewhat stiff and his CPKs elevated

5       and although his autonomic were not unstable, the

6       patient was considered potentially, that's probably

7       supposed to say MNS, including hydration as his CPK

8       was very high and was transferred to medicine

9       in-patient.  Let's see, I don't know if you want me

10      to read all that, that's about a physical.

11  Q.  I appreciate that.  If you could turn please to the

12      second page and the second page starts with the

13      second paragraph of the psychosocial history and

14      after giving some background about the fact that

15      Mr. Ortiz was from Puerto Rico and some educational

16      background, on the second page the paragraph reads

17      that it wasn't until after the patient became

18      familiar with the deaths -- you know what, instead

19      of me putting words or summarizing this, can you

20      read this for us and I will ask your opinion.

21  A.  As per the events known and as the patient has

22      communicated to his family and to me while being an

23      inpatient, the patient was friends with the two

**MCCANN & MCCANN REPORTING**

A-1639

43

1       people whom he is accused of murdering.  He was

2       seeing them socially and according to the patient's

3       brother and sister, along with the patient, they had

4       all attended the funeral for these people, however,

5       for some reason after that, the patient without any

6       warning confessed to police about committing these

7       murders as per the news reports and the stories,

8       there might be sufficient evidence to suggest that

9       the patient was involved in these murders.  However,

10      the patient has not been able to talk about this and

11      has always maintained that he does not want to talk

12      about this when he was able to talk about other

13      things.

14  Q.     Do you recall, did this discharge summary make it

15       into the Erie County Mental Health Services file?

16  A.     I don't recall, but this seems familiar so I think

17       it may have.

18  Q.     Again, there is a bit of a theme in two areas, one

19       is about history, he initially told the hospital or

20       at least in the notes he said that the people

21       murdered were his family members, do you recall

22       that?

23  A.     Yes.

A-1640

44

1   Q.   And now in the notes it says they were friends, do

2        you see that?

3   A.   Yes.

4   Q.   So there is some inconsistencies with the history of

5        his association with them, but more importantly,

6        doesn't there appear to be some consistency with

7        doubt with respect to him committing the murders?

8   A.   Yes.

9   Q.   And I think you told us this already and I know it's

10       clear in your records, but did Mr. Ortiz maintain

11       his innocence in all his discussions with you?

12  A.   Yes.

13  Q.   And here he and others appear to be shedding some

14       doubt with respect to the veracity of his

15       confession, even early on in November of 2004,

16       correct?

17  A.   Yes.

18  Q.   And we now know a lot more about his psychological

19       profile now leading to this admission in very late

20       November, November 30th, that this man was suffering

21       some serious psychological illnesses, correct?

22  A.   Yes.

23  Q.   And it had led Dr. Gokhale to suggest that he was

**MCCANN & MCCANN REPORTING**

45

1      suffering from schizophrenia, correct?

2   A.   Yes.

3   Q.   And you likewise, through your first assessment,

4        agreed that he was suffering a psychotic break,

5        correct?

6   A.   Yes.

7   Q.   And Dr. Liebergall concurred in that diagnosis,

8        correct?

9   A.   I don't recall that.

10  Q.   Was there a point in time that Dr. Liebergall opined

11       that Mr. Ortiz was not competent to stand trial?

12  A.   I believe so.

13  Q.   And so we just read from Exhibit 6 which was the

14       admission to ECMC of Mr. Ortiz and that described

15       the various behaviors that he was exhibiting at that

16       time, correct?

17  A.   Yes.

18  Q.   I want to turn your attention next to Exhibit 7 and

19       Exhibit 7, it's a four page document, and there

20       appears to be a report from Dr. Liebergall dated

21       November 29th, and it's a letter, starting on the

22       second page, a letter of November 29, 2004 directed

23       to Judge Janette Ogden who was overseeing the legal

46

1           proceedings of Mr. Ortiz, do you see that?

2    A.     The second page?

3    Q.     Correct.

4    A.     Yes.

5    Q.     And does Dr. Liebergall convey to the court at that

6           time that Mr. Ortiz is undergoing -- it says his

7           condition has deteriorated progressively since his

8           arrival, does it state that?

9    A.     Yes.

10   Q.     And does he say at that time he and other treatment

11          providers are going to continue to monitor his

12          condition?

13   A.     I am not seeing that.

14   Q.     On the second paragraph, will continue to evaluate

15          his progress?

16   A.     I am just wondering if I have something else because

17          I don't see it in the second paragraph -- oh, yes.

18   Q.     And then as we look above that, it says that he's

19          going to return to psychiatric services once he is

20          stabilized and becomes responsive, correct?

21   A.     Yes.

22   Q.     So does that indicate he was still catatonic at that

23          point?

*MCCANN & MCCANN REPORTING*

A-1643

47

1   A.      Possibly.  Because what was the date on that --

2           December 3rd -- oh no, that's the adjourned date.

3   Q.      It's right on top, November 29th, so this is the day

4           before that he's admitted the second time to ECMC?

5   A.      Yes.

6   Q.      So, in fact, if we go a little further in that same

7           exhibit to the next page, to page 3, do you see

8           another report from Dr. Liebergall dated December

9           3rd of 2004?

10  A.      Yes.

11  Q.      And if you just read that, at the very end of

12          paragraph 2, does he say there is alternating

13          periods of agitation of what appears to be catatonic

14          presentation?

15  A.      Yes.

16  Q.      And if you turn to the fifth paragraph, the very

17          bottom paragraph, does it read currently it's quite

18          clear reviewing his presentation and his history

19          that he at this point in time is demonstrating

20          evidence of a psychotic mental illness?

21  A.      Yes.

22  Q.      Does it say he may well be reactive to stressors?

23  A.      It may well be reactive to stressors.

**MCCANN & MCCANN REPORTING**

48

1    Q.    Can you tell me what that means in your profession?

2    A.    That means that the psychotic episodes may have been

3          precipitated by stressors.

4    Q.    And stressors can be any number of things that can

5          trigger a psychotic episode or break, correct?

6    A.    Yes.

7    Q.    In addition to his then incarceration which could be

8          a stressor?

9    A.    Yes.

10   Q.    Could a stressor also be a death of someone known to

11         the person?

12   A.    Yes.

13   Q.    Can a stressor be a fear of being hurt, attacked or

14         killed by others?

15   A.    Yes.

16   Q.    Can all those things precipitate a psychotic break

17         of an individual?

18   A.    Yes.

19   Q.    And then does Dr. Liebergall go on to state in

20         Exhibit 7 in that fifth paragraph, at this point in

21         time comma it is quite clear he cannot adequately

22         demonstrate the testimonial capacity or participate

23         meaningful in directing his attorney in the

**MCCANN & MCCANN REPORTING**

49

1       courtroom?
2   A.  Yes.
3   Q.  And then he states he's considered incompetent,
4       correct?
5   A.  Yes.
6   Q.  So did you become aware of this letter at the time
7       it was written?
8   A.  I may not have known about this until he got
9       discharged from the hospital, more likely I would
10      have found out about it later.
11  Q.  So bringing us from November the 19th to December
12      the 3rd, when that letter was written by
13      Mr. Liebergall, do you have any recollection of
14      having seen Mr. Ortiz?
15  A.  No, I didn't.
16  Q.  That would have been documented in the records,
17      correct?
18  A.  Yes.
19  Q.  When was the next time you saw him, if you recall?
20  A.  Sometime after he got out of the hospital in early
21      January, I believe.
22  Q.  I want to show you what has been marked as Exhibit
23      8.  This is a two-page document, it's authored by

**MCCANN & MCCANN REPORTING**

50

1        yourself, January 21st of 2005.

2   A.   This says Lawrence Smith.

3   Q.   I believe in your testimony you stated that that was

4        a typo by your secretary, and that's understandable,

5        it certainly doesn't apply to that patient, it

6        applies to Mr. Ortiz.

7   A.   Right, yes.

8   Q.   It is a secretarial mistype?

9   A.   Yes.

10  Q.   Now at the time you wrote this note it indicates

11       that you had completed a psychiatric evaluation,

12       correct?

13  A.   Yes.

14  Q.   I think when you were asked about this in the

15       hearing, was this exam about fifty minutes long?

16  A.   A little longer than that usually.

17  Q.   Is a one-on-one evaluation?

18  A.   There is usually a counselor in the room and

19       security nearby.

20  Q.   Looking at the second paragraph you indicate by

21       summary that Mr. Ortiz experienced a psychotic

22       decompensation after his arrest necessitating

23       hospitalization, correct?

**MCCANN & MCCANN REPORTING**

A-1647

51

```
1    A.    Yes.
2    Q.    He was disorganized, bizarre and catatonic prior to
3          treatment?
4    A.    Yes.
5    Q.    Mr. Ortiz has continued to complain of hearing
6          voices that are telling him that he would be better
7          off dead, correct?
8    A.    Yes.
9    Q.    And we talked earlier about hallucinations being a
10         sign of a psychotic illness, correct?
11   A.    Yes.
12   Q.    And not all hallucinations are an indicator of a
13         psychotic illness, correct?
14   A.    Correct.
15   Q.    But when a person can't identify those voices or
16         place them or differentiate them, I should say, from
17         reality as opposed to a secondary source, that
18         becomes systematic of a psychotic illness, correct?
19   A.    Yes.
20   Q.    And here, and you might recall your treatment of
21         Mr. Ortiz, outside of these auditory hallucinations
22         telling him that he might be better off dead, do you
23         recall him telling you that those voices demanded
```

*MCCANN & MCCANN REPORTING*

Case 23-352, Document 40, 06/23/2023, 3533146, Page187 of 263

52

1       him to do things at different times?

2   A.    I don't -- I don't recall specifically.  Did I say

3       that in here?  So yes, later on in the report, my

4       notes indicate that he did.

5   Q.    Are those kind of hallucinations indicative of a

6       psychotic break?

7   A.    Command hallucinations?

8   Q.    Correct.

9   A.    They are consistent with a psychotic break, yes.

10  Q.    Can those hallucinations come and go?

11  A.    Yes.

12  Q.    And if it is a true psychotic break, that can often

13      be treated through medication, can it not?

14  A.    Yes.

15  Q.    But different stressors, even while on medications

16      can cause another subsequent and/or initial

17      psychotic break, correct?

18  A.    Yes.  Medication doesn't work for everyone either.

19      Some people continue to hallucinate even with

20      maximum treatment.

21  Q.    In December of 2004 the notes indicate that

22      Mr. Ortiz was hearing voices in quotes and that he

23      was suffering from auditory hallucinations even in

*MCCANN & MCCANN REPORTING*

53

```
 1          December of 2004, is that consistent with your
 2          memory and treatment of him?
 3    A.    Yes.
 4    MR. FLYNN:            Object to the form.  I mean, she
 5                          doesn't have that kind of notes in
 6                          front of her.  She has something from
 7                          January of 2005 in front of her?
 8    MR. FELLE:            Correct.  The question is her
 9                          recollection of her treatment as
10                          opposed to the exhibit, so I am going
11                          to talk a little bit more about that
12                          in a moment.  I apologize for this
13                          process of going through documents,
14                          but because this happened so long
15                          ago, this is very important to the
16                          presentation of his case that we just
17                          go through in sequential order at
18                          some of these documents.
19
20    BY MR. FELLE:
21    Q.    Now looking still at that letter of January 21st,
22          did you believe at that time that Mr. Ortiz was
23          competent to at least understand a legal proceeding
```

**MCCANN & MCCANN REPORTING**

54

1          now that he had been on medications for a while?

2     A.   Yes.

3     Q.   And just so we are clear, having capacity for the

4          sake of participating in your legal proceedings is

5          much different than saying he does not have a

6          psychotic illness, correct?

7     A.   Yes.

8     Q.   And, in fact, you are not saying that at all when

9          you are saying that he's not incapacitated, are you?

10    A.   No.

11    Q.   You acknowledged in all of your records and reports

12         that he's suffering and had suffered from a

13         psychotic illness, correct?

14    A.   Yes.

15    Q.   And I think at point, certainly in this record,

16         Exhibit 8, document of January 21st of 2005, you

17         said that Mr. Ortiz was suffering from psychotic

18         illness, possibly schizoaffective disorder, bipolar

19         subtype, is that correct?

20    A.   Yes.

21    Q.   And he was placed on a medication, is it Zyprexa?

22    A.   Yes.

23    Q.   That's a pretty high dose medicine for psychotic

*MCCANN & MCCANN REPORTING*

A-1651

55

| | | |
|---|---|---|
| 1 | | illness, is it not? |
| 2 | A. | Well, that dose that I saw in the records, 20 |
| 3 | | milligrams twice a day is a very high dose. |
| 4 | Q. | And at that time you felt it was commensurable with |
| 5 | | the symptoms and behaviors he was demonstrating, |
| 6 | | correct? |
| 7 | A. | Yes. |
| 8 | Q. | And is that to say in your professional opinion that |
| 9 | | he was having a very severe psychotic episode? |
| 10 | A. | Yes. |
| 11 | Q. | With severe psychotic episode, there is no way to |
| 12 | | tell the duration of time that that may last, |
| 13 | | correct? |
| 14 | A. | Correct. |
| 15 | MR. FLYNN: | Object to the form. |
| 16 | | |
| 17 | BY MR. FELLE: | |
| 18 | Q. | So with respect to Mr. Ortiz, there's no way to tell |
| 19 | | when his psychotic break started, is there?  I |
| 20 | | should say from the standpoint of you having |
| 21 | | examined him not until November 19th of 2004, at |
| 22 | | that point when he presented, there was no way of |
| 23 | | you knowing what his mental health or condition was |

*MCCANN & MCCANN REPORTING*

A-1652

56

```
 1            prior to that date and whether he was suffering a

 2            psychotic illness before that date, correct?

 3    A.      At the time when I first saw him, I did not have any

 4            history or information from outside sources, so I

 5            couldn't tell.

 6    Q.      And at the time you first met him, you would not

 7            have tested the veracity of his commission of the

 8            crime, would you?

 9    A.      I wouldn't have, no.

10    Q.      It's not within the purview or scope of your

11            treatment, correct?

12    A.      Correct, the first time I saw him I was trying to

13            take care of him, that's all.

14    Q.      Looking at page two of Exhibit 8 under mental status

15            examination, does it state there that Mr. Ortiz

16            complained to you of hearing voices, comma, coming

17            from all around him saying it was you end quotes?

18    A.      Yes.

19    Q.      He also reported command hallucinations at times?

20    A.      Yes.

21    Q.      Does that paragraph end by judgement was impaired?

22    A.      Yes.

23    Q.      In the second paragraph while you state that
```

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 40, 06/23/2023, 3533146, Page192 of 263

A-1653

57

1       Mr. Ortiz was able to discuss the charges against

2       him in a rational manner, you were quite clear to

3       state that he also states that he maintained his

4       innocence, correct?

5  A.   Yes.

6  Q.   And I know I asked you about a bunch of other

7       doctors, and I think you mentioned Dr. Brian Joseph.

8       Back in 2004, what was your affiliation with Dr.

9       Joseph?

10  A.   Well, he was an employee of the County at the time

11      working, I think half time in the job doing this and

12      I was a consultant hired by Dr. Liebergall to also

13      do the work he couldn't do, so colleagues would be

14      the answer.

15  Q.   Was he a mentor to you with respect to you starting

16      in your position with the County?  I don't mean to

17      make that sound demeaning in any sense.

18  A.   No, it's not.

19  Q.   Was he, for example, if Dr. Liebergall was the

20      director, obviously everyone consulting would report

21      to him, when you were with the County, would you

22      report to Dr. Joseph?

23  A.   No.

*MCCANN & MCCANN REPORTING*

A-1654

58

1   Q.   So you were colleagues?

2   A.   Yes.

3   Q.   So Dr. Joseph's involvement in this case, would it

4       have been similar to your involvement?

5   A.   Yes.

6   Q.   Just in an evaluation capacity?

7   A.   Yes.

8   Q.   So we see as Exhibit 9 that just two days or three

9       days after your report to the court, that Dr. Joseph

10      on January 24th of 2005, that's Exhibit 9, it's a

11      two-page document?

12   A.   This was a day after mine?

13   Q.   I think three days after your report to the court,

14      Dr. Joseph performs, he writes a letter, his exam

15      date was on January 21st and he provides a report to

16      the court, correct?

17   A.   Yes.

18   Q.   And I guess by history, even though you got your

19      letter out much quicker than he did, your exam was

20      on January 20th of 2005, that you reported on

21      January 21st of 2005 as Exhibit 8.  Exhibit 9, Dr.

22      Joseph sees Mr. Ortiz on January 21st, the day after

23      you saw him, but reports it on January 24, 2005 to

59

1    the court.  Now looking at that letter for a moment,

2    does Dr. Joseph also indicate that at that time

3    Mr. Ortiz was not an incapacitated person for the

4    purposes of legal proceedings?

5  A.   That's the way they make us write that.  They always

6    say that the person is or is not incapacitated and

7    he said that the defendant is not an incapacitated

8    person.

9  Q.   So essentially in his examination of Mr. Ortiz the

10   day after yours he agreed with your conclusion,

11   correct?

12 A.   Yes.

13 Q.   Did you two consult about that?

14 A.   No.

15 Q.   Did you know he was examining the patient at that

16   time?

17 A.   I knew that there would be another report.  I

18   probably knew that, that two reports were requested.

19   That's pretty standard.

20 Q.   And when we look at the second paragraph of Dr.

21   Joseph's report of January 24th, he states Mr. Ortiz

22   did acknowledge continuing auditory hallucinations,

23   do you see that?

**MCCANN & MCCANN REPORTING**

60

```
 1   A.   Second page you said or second paragraph?

 2   Q.   First page, second paragraph.

 3   A.   Yes.

 4   Q.   And he also makes the point here that he seemed

 5        credible, right, he makes that distinction?

 6   A.   Yes.

 7   Q.   Your notes always indicated, I think you were asked

 8        this, you never felt that Mr. Ortiz was malingering

 9        --

10   A.   No.

11   Q.   -- or magnifying his symptoms, correct?

12   A.   No, I didn't.

13   Q.   And I don't think, neither did Mr. Joseph, he seemed

14        credible?

15   A.   Right.

16   Q.   In fact, all the doctors that saw Mr. Ortiz were

17        pretty consistent what they both noted, observed and

18        then diagnosed, correct?

19   A.   Yes.

20   Q.   And it states in the third paragraph that it would

21        seem that he may well suffer from chronic paranoid

22        schizophrenia and had his first break perhaps at the

23        time of the instant offense, do you see that?
```

A-1657

61

1    A.    Yes.

2    Q.    So you can start by telling us what is meant by

3          chronic paranoid schizophrenia?

4    A.    So it's a thought disorder characterized by

5          delusions, paranoid delusions and hallucinations and

6          a formal thought disorder or a disorder of the way

7          information is processed and it's always chronic

8          because that's the nature of the illness.  There is

9          no cure for it.  And was that it?

10   Q.    Correct.  I was just looking to find out what that

11         is.  And then again he said he had his first break

12         perhaps?

13   A.    Yes.

14   Q.    So by indication there was no history of mental

15         illness or condition, but certainly it was severe by

16         the time he presented to the holding center?

17   A.    Yes.

18   MR. FLYNN:             Objection to form.

19

20   BY MR. FELLE:

21   Q.    Now I am going to turn your attention to Exhibit 10

22         and Exhibit 10 was the transcript from the

23         competency hearing that was conducted on May 4th of

**MCCANN & MCCANN REPORTING**

62

1          2005 or thereabouts, right?

2   A.     Okay.

3   Q.     And first of all, do you recall giving testimony in

4          court regarding Mr. Ortiz's competency?

5   A.     I am sorry, I do not.

6   Q.     So that's why we have transcripts for that reason.

7          Now that transcript indicates that you were in court

8          before a judge, asked questions by the attorneys,

9          both the prosecuting attorney and the defense

10         attorney, about Mr. Ortiz's conditions and

11         competency, correct?

12  A.     Yes.

13  Q.     And certainly your answers would have been truthful

14         as you were sworn to tell the truth, correct?

15  A.     Yes.

16  Q.     And so without going through that entire document, I

17         am sure you would agree with me now on the record as

18         it was sworn to back then, that that is all truthful

19         testimony, correct?

20  A.     Yes.

21  Q.     And I just want to turn your attention to a couple

22         of parts of it.  I want to reiterate that starting

23         on page 13 that your initial diagnosis of Mr. Ortiz

**MCCANN & MCCANN REPORTING**

63

```
 1          was that he suffered a schizoaffective disorder with
 2          significant mood symptoms, including depression,
 3          correct?
 4   A.     Yes.
 5   Q.     And as of November 19th of 2004 when you first met
 6          him, he presented guarded and afraid, correct?
 7   A.     Yes.
 8   Q.     Multiple places in the transcript, on pages 16, 18,
 9          57, 56 and I quote from page 56 that that day and
10          every other day Mr. Ortiz told you that he was
11          innocent, correct?
12   A.     Yes.
13   Q.     You were Mr. Ortiz's we will say primary treatment
14          provider from November 19th of 2004 through the time
15          that he was transferred to state custody outside of
16          those times that he was hospitalized, correct?
17   A.     Yes.
18   Q.     Turning to page 42, you were asked some questions by
19          the late attorney John Nuchereno who has since
20          passed away, and some of the questions went back to
21          Mr. Ortiz's condition at the time of his arrest and
22          the time of his purported confession, and at page 42
23          you stated under oath that the defendant may have
```

A-1660

64

1     been psychotic at the time of his arrest, would you

2     agree with that statement?

3  A.  Yes.

4  Q.  You also stated on page 43 Mr. Ortiz was not

5     malingering in any of the times that you met with

6     him, correct?

7  A.  Yes.

8  Q.  Page 45 you indicated under oath that Mr. Ortiz was

9     having command hallucinations and had a history of

10    that, correct?

11 A.  Yes.

12 Q.  And then on page 49 you reiterated under oath that

13    when you first met him in November of 2004 he

14    presented in quotes scared to death end quotes, is

15    that correct?

16 A.  Yes.

17 Q.  Now again, I want to thank you for your patience in

18    going through some of the documents in trying to

19    refresh your memory a bit.  Now I want to talk to

20    you about your field of expertise.

21 A.  Okay.

22 Q.  And I would like to ask you some questions about

23    some medical references that we see.  This case

**MCCANN & MCCANN REPORTING**

A-1661

65

1           presents a situation where Mr. Ortiz was

2           incarcerated for more than ten years, ten years and

3           22 days to be exact, and he was then exonerated,

4           cleared of any wrongdoing with respect to the

5           commission of these murders, that we know.

6    MR. FLYNN:          Object to form.

7    MR. FELLE:          Fair enough.

8

9    BY MR. FELLE:

10   Q.     But with that in mind, if we work backwards, we have

11          to now understand how we got in that situation.  So

12          we look to the confession and we have to challenge

13          how that could have happened.

14   MR. FLYNN:          Object to the form.

15

16   BY MR. FELLE:

17   Q.     So I just want to ask you a couple of questions

18          about the nature of schizophrenia.  Okay.  Is it

19          true that a person suffering from schizophrenia have

20          a particular difficulty with assertiveness?

21   MR. FLYNN:          Object to the form.

22

23   BY MR. FELLE:

**MCCANN & MCCANN REPORTING**

66

1   Q.      What I mean by that is mental fortitude, the ability

2           to make strong decisions and maybe even challenge a

3           proposition by other people.

4   MR. FLYNN:              Object to the form.

5

6   BY MR. FELLE:

7   Q.      I apologize.  Let me ask you this.  What are some of

8           the symptoms of schizophrenia?

9   A.      So it's a thinking disorder and it's an information

10          processing disorder and there is also impairment of

11          relatedness with other people, so I don't know if

12          that gets to --

13  Q.      Would you agree that some of the negative symptoms

14          of schizophrenia are deficits in memory, reasoning

15          and problem solving?

16  A.      Yes.

17  Q.      Would you agree with the fact that cognitive

18          impairment is observed in schizophrenia demonstrates

19          a failure of reality monitoring at times?

20  MR. FLYNN:              Object to form.

21  THE WITNESS:            Patients with schizophrenia have

22                          problems distinguishing reality from

23                          non reality.

67

BY MR. FELLE:

Q.      From imagination, correct?

A.      Well, imagination is delusions from what is real and
        from what is not, from misconception,
        misinterpretation.

Q.      We talked earlier about the idea of stressors that
        can cause psychotic breaks or cause severity in
        psychotic illness, correct?

A.      Yes.

Q.      And would it be fair to say that those stressors can
        be any numbers of things for an individual?

A.      Yes.

Q.      And pretty difficult to identify just one or two
        things that could be a stressor.  It could be
        anything that causes a severe emotional reaction to
        a person?

MR. FLYNN:          Object to form.

MR. FELLE:          Would that be a fair statement?

THE WITNESS:        Yes.


BY MR. FELLE:

Q.      Would you agree with me that use of medication,
        illegal drugs, like marijuana, unprescribed Xanax,

**MCCANN & MCCANN REPORTING**

68

1   alcohol, sleep deprivation, those type of things can

2   create physical stressors that can bring on a

3   psychotic break?

4   A.   Yes.

5   Q.   Were you given, at the time you were treating

6        Mr. Ortiz, any information surrounding his arrest

7        for the crimes?

8   A.   When I first saw him, no.  At the time of the, that

9        I did the capacity assessment, I would have had

10       something.  I don't know if I had his confession, I

11       don't think I had that, so -- but maybe like at

12       least the indictment.

13  Q.   You told me something curious very early on in the

14       case, you said that you always had this doubt in the

15       back of your mind about whether he had committed

16       this crime, is that a correct statement?

17  A.   That's mainly why I want to remember him.  I

18       remember when he was going upstate and I had just

19       such a bad feeling about it and I hoped it wasn't a

20       mistake.

21  Q.   Had you ever brought that to the attention of

22       anyone, for example, in the DA's office, Buffalo

23       police department or even the judicial system at the

A-1665

69

1           time he was being charged?

2  A.     No.

3  Q.     Did you ever make your own inquiry into the facts

4         surrounding his prosecution?

5  A.     No.

6  Q.     Did you ever inquire as to whether there were any

7         other facts that linked him to this crime other than

8         this purported confession?

9  A.     No.

10  Q.     Did you come to find out later after you heard of

11         his exoneration there were very little by way of

12         links to him committing this crime other than his

13         purported confession?

14  A.     I don't remember.  I remember reading about it, but

15         I don't remember those details.

16  Q.     Given his condition in the later parts of November

17         of 2004, what we have read about in all these

18         exhibits and what you can recall independently,

19         Mr. Ortiz was not in a good place mentally, was he?

20  A.     No.

21  Q.     And in fact, if he was in that place when he was

22         actually interrogated and asked questions about a

23         crime, isn't it possible that his confession was a

**MCCANN & MCCANN REPORTING**

A-1666

```
                                                                      70

 1          false one?

 2   MR. FLYNN:            Object to the form.

 3   THE WITNESS:          Yes.  Excuse me?

 4   MR. FELLE:            They are just preserving their right

 5                         later on to talk to the judge about

 6                         the question.  Your answer is on the

 7                         record.

 8   THE WITNESS:          Yes.

 9   MR. FLYNN:            Form.  I am preserving my rights.

10

11   BY MR. FELLE:

12   Q.     Would it be a fair statement that somebody suffering

13          a psychotic, a severe psychotic episode or break,

14          would have some suggestibility with respect to the

15          interrogation process for a crime?

16   A.     That's possible.

17   Q.     Again, you don't know the circumstances around his

18          confession here, so I am not asking you if that's

19          exactly what happened here, I am asking you

20          generally speaking with a person in his mental state

21          be more adoptive, I guess, to suggested information?

22   MR. FLYNN:            Object to the form.

23   MR. FELLE:            Would he be susceptible to that?
```

A-1667

71

1   THE WITNESS:          Possibly, yes.

2

3   BY MR. FELLE:

4   Q.    And you talked about somebody with schizophrenia has

5         disorganized thoughts, correct?

6   A.    Yes.

7   Q.    In this case some hallucinations wherein voices may

8         be telling them certain things at certain times?

9   MR. FLYNN:          Object to the form.

10  THE WITNESS:          Yes.

11

12  BY MR. FELLE:

13  Q.    And some of those command hallucinations, those can

14        be a break from reality, it can be secondary

15        imaginary sources that are telling a person to do

16        things, correct?

17  MR. FLYNN:          Object to the form.

18  THE WITNESS:          Command hallucinations are usually

19                        not reality based.

20

21  BY MR. FELLE:

22  Q.    Would you agree with this statement, people with

23        schizotypal personality disorders such as

**MCCANN & MCCANN REPORTING**

A-1668

72

1              schizophrenia, delusional disorders or manic phase

2              of bipolar disorder may be prone to suggestibility?

3    MR. FLYNN:              Object to the form.

4    THE WITNESS:            Does it actually say schizotypal

5                            personality disorders such as

6                            schizophrenia?

7    MR. FELLE:              Correct, personality disorders comma

8                            schizophrenia.

9    THE WITNESS:            Okay.

10   MR. FELLE:              It's another form of?

11   THE WITNESS:            Well, those are separate conditions,

12                           but all of them, yes.

13

14   BY MR. FELLE:

15   Q.    They can make a person more prone or suggestible,

16         correct?

17   MR. FLYNN:              Object to form.

18   THE WITNESS:            Yes.

19

20   BY MR. FELLE:

21   Q.    And would you agree that those conditions are more

22         likely to produce imagined memories or

23         confabulation?

*MCCANN & MCCANN REPORTING*

73

```
 1   MR. FLYNN:              Object to form.

 2   THE WITNESS:            Sometimes, yes.

 3

 4   BY MR. FELLE:

 5   Q.    And especially if an interrogator asks particularly

 6         leading questions, correct?

 7   MR. FLYNN:              Object to form.

 8   THE WITNESS:            Probably, yes.

 9

10   BY MR. FELLE:

11   Q.    In other words, leading questions that indicate the

12         answer desired, correct?

13   MR. FLYNN:              Object to form.

14   THE WITNESS:            Yes.

15

16   BY MR. FELLE:

17   Q.    And doctor, in your profession and in your opinion,

18         can you tell me what is confabulation,

19         c-o-n-f-a-b-u-l-a-t-i-o-n?

20   MR. FLYNN:              Object to the form.

21   THE WITNESS:            Confabulation is filling in a memory

22                           deficit with a made-up event.

23
```

*MCCANN & MCCANN REPORTING*

74

1    BY MR. FELLE:

2    Q.    And it's defined in subtext as "confabulation is the

3          complex process of an individual reporting a false

4          memory that they believed occurred in reality, but

5          actually did not."  Would that be a fair statement?

6    MR. FLYNN:          Object to the form.

7    THE WITNESS:        Yes.

8

9    BY MR. FELLE:

10   Q.    And is there a list of confabulation in a person who

11         presented as Mr. Ortiz did with the various severe

12         psychotic illnesses and symptoms that he presented?

13   MR. FLYNN:          Object to the form.

14   THE WITNESS:        Yes.

15

16   BY MR. FELLE:

17   Q.    There is also a notation in the literature that drug

18         and alcohol use can increase the chances of

19         confabulation occurring, is that correct?

20   MR. FLYNN:          Object to the form.

21   THE WITNESS:        Yes.

22

23   BY MR. FELLE:

*MCCANN & MCCANN REPORTING*

A-1671

75

```
 1   Q.    Again, more impaired thought process, correct?

 2   MR. FLYNN:           Object to the form.

 3   THE WITNESS:         Yes.

 4

 5   BY MR. FELLE:

 6   Q.    Doctor, are you familiar with the phrase cognitive

 7         source-monitoring dilemma?

 8   A.    No.

 9   Q.    In the literature it says, "It's a failure to

10         differentiate between memories that arise from

11         direct personal experience and those that emanate

12         from his or her own thoughts, dreams or from

13         external but secondhand sources of information."

14   MR. FLYNN:           Object to form.

15   THE WITNESS:         Okay.

16

17   BY MR. FELLE:

18   Q.    How would you describe that, if not cognitive

19         source-monitoring dilemma?

20   MR. FLYNN:           Object to the form.

21   THE WITNESS:         Patients sometimes can't distinguish

22                        from events that have actually

23                        occurred from events that have been
```

*MCCANN & MCCANN REPORTING*

A-1672

76

1                              pieced together from what they have

2                              been told.

3

4    BY MR. FELLE:

5    Q.     It's difficult for a layperson to understand that,

6           but under these circumstances where Mr. Ortiz had

7           been hospitalized on the 15th of November 2004, the

8           next morning after the hospitalization that we

9           reviewed and behaviors he was exhibiting, the next

10          morning he goes to the funeral of the two people

11          killed in these murders and then later that evening

12          confesses to their murders?

13   MR. FLYNN:            Object to the form.

14

15   BY MR. FELLE:

16   Q.     Is it possible that a psychotic illness contributed

17          to that confession?

18   MR. FLYNN:            Object to the form.

19   THE WITNESS:          Yes.  We have all had this happen to

20                         us, if you ever had like a childhood

21                         story that has been told, something

22                         that happened in the family that is

23                         family lore, that you have heard the

**MCCANN & MCCANN REPORTING**

A-1673

77

1             story so many times and then

2             sometimes you are telling the story

3             and saying yeah, I was there, and

4             then your mother points out you were

5             not even born yet, but in your mind

6             you actually remember being there

7             because you have heard the story so

8             many times, every person has those

9             experiences.

10

11   BY MR. FELLE:

12   Q.    And in this case, unlike a family tale that is told

13         to you numerous times, it could have been the

14         details that Mr. Ortiz had observed or heard at the

15         funeral through the media sources or other forms of

16         information that created a memory that he

17         transferred to himself, is that correct?

18   MR. FLYNN:            Object to the form.

19   THE WITNESS:          Possibly, yes.

20

21   BY MR. FELLE:

22   Q.    And have you ever worked or consulted with the

23         Buffalo police department and/or the Erie County

**MCCANN & MCCANN REPORTING**

78

1           district attorney's office?

2    A.    Yes.

3    Q.    And have you ever consulted or given presentations

4          about the fear of a false confession and how to go

5          about avoiding that?

6    A.    No.

7    Q.    There are techniques though, are there not?

8    A.    Yes.

9    MR. FLYNN:              Form.

10

11   BY MR. FELLE:

12   Q.    And in this case, for example, Detective Stambach

13         who was with the Buffalo police department, was the

14         one that took a confession, the purported confession

15         of Mr. Ortiz, are you familiar with Detective

16         Stambach?

17   A.    No.

18   Q.    Are you aware of whether or not he has any training

19         or education with respect to dealing with --

20   A.    No.

21   Q.    -- people suffering from psychotic illnesses?

22   A.    I don't know anything about him.

23   Q.    Are you aware of any particular protocol when a

A-1675

79

```
 1              detective or police officer recognizes that a
 2              suspect is suffering from a psychotic illness on
 3              whether they should be referred to another
 4              professional for the sake of interrogation or
 5              questioning?
 6   MR. FLYNN:              Object to the form.
 7   THE WITNESS:            I am not sure of that.
 8
 9   BY MR. FELLE:
10   Q.    Have you ever been called in with respect to that?
11   A.    No.
12   Q.    By the Buffalo police department?
13   A.    No.
14   Q.    Are you familiar with the phrase brief reactive
15         psychosis?
16   A.    Yes.
17   Q.    And how would you define that phrase?
18   A.    A psychotic episode that is, I believe is less than
19         a month, that is triggered by a stressor such as
20         going to college, getting a job, getting married,
21         using drugs, loss of a loved one.
22   Q.    And maybe death in general of someone you know?
23   MR. FLYNN:              Object to the form.
```

A-1676

80

```
 1    THE WITNESS:          Yes.

 2

 3    BY MR. FELLE:

 4    Q.    And the fact that it's brief reactive psychosis

 5          doesn't necessarily mean it's brief in the sense of

 6          the layperson's terms, it could go on for a week or

 7          a month?

 8    MR. FLYNN:            Object to the form.

 9    THE WITNESS:          I think it's a month for that.

10

11    BY MR. FELLE:

12    Q.    And that can be treated, according to the

13          literature, pretty well with medication, correct?

14    MR. FLYNN:            Object to the form.

15    THE WITNESS:          Yes.

16

17    BY MR. FELLE:

18    Q.    But again, it doesn't ensure that it won't come back

19          with some stressors?

20    MR. FLYNN:            Object to the form.

21    THE WITNESS:          It could reoccur.

22

23    BY MR. FELLE:
```

*MCCANN & MCCANN REPORTING*

A-1677

81

```
 1   Q.      In fact, when you gave testimony at the competency

 2           hearing for Mr. Ortiz, the judge was clear to ask

 3           whether or not after your testimony if there could

 4           be a change in Mr. Ortiz's condition that would

 5           render him incapacitated, do you recall that?

 6   A.      No.

 7   Q.      It's common though, right?

 8   MR. FLYNN:          Object to the form.

 9   THE WITNESS:        Yes.

10

11   BY MR. FELLE:

12   Q.      Because there's a time span that goes between the

13           competency hearing and the trial, correct?

14   MR. FLYNN:          Object to the form.

15   THE WITNESS:        Yes.

16

17   BY MR. FELLE:

18   Q.      And often times the stressors caused by legal

19           proceedings can cause a relapse in a person's

20           psychotic condition, correct?

21   MR. FLYNN:          Object to the form.

22   THE WITNESS:        Yes.

23
```

**MCCANN & MCCANN REPORTING**

82

1  BY MR. FELLE:

2  Q.    And so even though a person's condition may appear

3        to be stabilized on one particular day, there is no

4        assurance that it is stabilized the day before or

5        day after, correct?

6  MR. FLYNN:          Object to the form.

7  THE WITNESS:        Correct.

8

9  BY MR. FELLE:

10 Q.    It all based on the stressors affecting the person

11       on that date and time?

12 MR. FLYNN:          Object to the form.

13 THE WITNESS:        Yes.

14

15 BY MR. FELLE:

16 Q.    Incidently, do you continue to work for the Erie

17       County Mental Health Services Department?

18 A.    Yes.

19 Q.    And do you still provide consultation services with

20       respect to individuals at the holding center?

21 A.    Yes.

22 Q.    And how involved are you now, more so than you were

23       in 2004?

**MCCANN & MCCANN REPORTING**

A-1679

83

1    A.    Yes, I am the chief now.

2    Q.    Congratulations.

3    A.    Thank you.

4    Q.    And so I assume that you now handle many more cases

5          than you had handled back in 2004, correct?

6    A.    Yes.

7    Q.    And often times lessons are learned from prior

8          experiences.  Is there any change in the policy and

9          procedures of how Erie County Mental Health Services

10         screens and/or treats patient with psychotic

11         illnesses with respect to the criminal prosecution

12         stages of a case?

13   MR. FLYNN:          Object to the form.

14   THE WITNESS:          Innumerable since then, yes.

15

16   BY MR. FELLE:

17   Q.    Any because of this case, Mr. Ortiz's case?

18   MR. FLYNN:          Object to the form.

19   THE WITNESS:          Not that I know of.

20

21   BY MR. FELLE:

22   Q.    Just so I am clear, during your treatment of

23         Mr. Ortiz, you are clear to state you had some

**MCCANN & MCCANN REPORTING**

84

```
 1           doubts about the veracity of whether he committed
 2           this crime and/or the confession.  Was there a
 3           mechanism whereby you could have brought that to the
 4           attention of anybody in the system?
 5  MR. FLYNN:           Objection to the form.
 6  THE WITNESS:         Not really, no.
 7
 8  BY MR. FELLE:
 9  Q.    Is there now?
10  A.    No, I mean, we don't get all that detail.  That's up
11        to the defense team.  We don't have all that.
12  Q.    When you say the defense team, you mean --
13  A.    We are not really tasked with that.  We are not
14        tasked with proving his case or not, you know, with
15        proving guilt or innocence, only with treating a
16        person who is mentally ill or saying whether or not
17        they are capable of proceeding with the court
18        process, not about what happened before.
19  Q.    Is there any other source for consultation with
20        respect to the veracity of a confession available
21        now in Erie County?
22  MS. ORTIZ-FOGG:       Object to the form.  Don't answer
23                        that.
```

*MCCANN & MCCANN REPORTING*

A-1681

85

```
 1   MR. FELLE:              That you are aware of.
 2   MS. ORTIZ-FOGG:         She's here giving her deposition on
 3                           the record as to her expertise as a
 4                           forensic psychiatrist.
 5   MR. FELLE:              My question, as she is aware of, and
 6                           I think it's a proper question, and
 7                           just so the record is clear, I don't
 8                           think you have a basis to instruct
 9                           her not to answer the question.  You
10                           can put your objection on the record.
11                           It might be a very short answer, by
12                           the way, she might just say no, but
13                           if she is aware, I think she's
14                           capable of telling me that.
15   THE WITNESS:            What's the question again?
16
17   BY MR. FELLE:
18   Q.    Is there an agency, an outside organization or some
19         unit that could provide some check or balance with
20         respect to a confession given by a suspect who is
21         suffering from mental illness?
22   MR. FLYNN:              Object to the form.  Your question
23                           was really about a policy.
```

*MCCANN & MCCANN REPORTING*

86

1    MR. FELLE:          Are you aware of whether there is

2                        such a policy?

3    THE WITNESS:        No --

4    MR. FLYNN:          I guess it's a difference of a policy

5                        and some outside agency.  I think

6                        that's where the confusion is.  You

7                        are asking about an Erie County

8                        policy and then an outside agency

9                        policy.

10   MR. FELLE:          Let me ask you this.

11

12   BY MR. FELLE:

13   Q.    Are you aware, as the director of the Erie County

14         Mental Health Services Department of Erie County,

15         are you aware of any check or balance with respect

16         to the arrest and prosecution of somebody who is

17         suffering from mental illness, other than the

18         defense attorney challenging --

19   MR. FLYNN:          Object to the form.

20   MR. FELLE:          -- the confession?

21   THE WITNESS:        The judge could also ask for an

22                       evaluation.

23

**MCCANN & MCCANN REPORTING**

A-1683

87

BY MR. FELLE:

2    Q.    Similar to what he did here?

3    A.    Well, I don't think they ever asked for anyone to

4          evaluate whether the validity of the confession, I

5          don't think anyone asked for that.

6    Q.    But you are aware that that can be done?

7    A.    Yes.

8    Q.    Are you aware whether it has ever been done?

9    A.    Yes, it's been done.

10   Q.    Other than the credentials that you told us about

11         earlier, do you have maintain a private practice

12         currently?

13   A.    Yes, I do.

14   Q.    And where is your private practice located?

15   A.    I work out of the same office, 120 West Eagle.

16   Q.    And is that affiliation with other doctors?

17   A.    No, I have a private forensic practice and I also

18         work for ECMC, if that's what you mean.

19   Q.    In ECMC, it's a clinical position?

20   A.    Yes.

21   MR. FELLE:          I think that's all I have.

22   MR. FLYNN:          I just have a couple of questions.

23

**MCCANN & MCCANN REPORTING**

A-1684

88

```
1    EXAMINATION BY MR. FLYNN:

2    Q.    Doctor, my name is Timothy Flynn.  I am an assistant

3          attorney general in New York State representing them

4          with respect to this Court of Claims action.  I am

5          just going to ask you a couple of questions and I

6          apologize, but will have to ask a couple on the

7          background questions.  I didn't have the background

8          of reading your competency hearing transcript prior

9          to today's testimony, I was not provided a copy of

10         it I don't think, but how long have you been

11         licensed to practice medicine in New York State?

12   A.    Since 1996.

13   Q.    Where did you get your MD from?

14   A.    SUNY Buffalo.

15   Q.    Do you have a specialty in your practice?

16   A.    Psychiatry and forensic psychiatry.

17   Q.    Are you board certified?

18   A.    Both, general psychiatry and forensic psychiatry.

19   Q.    I am going to hand you Exhibit 6, again, I think

20         that's your report to Judge Forma?

21   A.    Yes.

22   Q.    The letter is dated January 21st of 2005, correct?

23   A.    Yes.
```

**MCCANN & MCCANN REPORTING**

A-1685

89

1    Q.    And it's regarding your psychiatric evaluation, it

2          says Lawrence Smith, but it's really Mr. Ortiz?

3    A.    Yes.

4    Q.    At the Erie County Holding Center on January 20th.

5          If you look at the second page of the document under

6          competency, under diagnostic impression, I

7          apologize, second last paragraph, did you state

8          there his symptoms have improved substantially with

9          anti-psychotic medication?

10   A.    Yes.

11   Q.    Zyprexa?  Did I say it right?

12   A.    Yes.

13   Q.    And next in the competency opinion, did you write

14         while mentally ill, Josue Ortiz is not an

15         incapacitated person as defined under Article 730

16         CPL?

17   A.    Yes.

18   Q.    Is that the Criminal Procedure Law?

19   A.    Yes.

20   Q.    Did you further write that he's further competent to

21         proceed with the adjudication process?

22   A.    Yes.

23   Q.    And the he you are referring to is Mr. Ortiz?

A-1686

90

1   A.    Yes.

2   Q.    Exhibit 9, the report was the report of Dr. Joseph

3         to Judge Forma dated January 24th of 2005, do you

4         see that?

5   A.    Yes.

6   Q.    If you go to the second to last full paragraph, that

7         being said, would you read that?

8   A.    On the first page?

9   Q.    On the first page.

10  A.    This being said, he seems at least at this point of

11        being capable of going forward meaningfully with the

12        adjudication process and hopefully with the use of

13        medication this current emotional stability can be

14        maintained.

15  Q.    What does the next sentence say?

16  A.    It's the opinion of this examiner that the defendant

17        is not an incapacitated person as defined under

18        Article 730 CPL.

19  Q.    And that's consistent with your opinion from Exhibit

20        8, correct?

21  A.    Yes.

22  Q.    I want to show you what we marked as Exhibit 3 from

23        Mr. Ortiz's deposition of March 15, 2018.  That's

**MCCANN & MCCANN REPORTING**

91

```
1          the deposition date, the little sticker has March
2          15, 2018.  Do you mind if you I come over by you?  I
3          only have the one copy.  Can you take a look at it.
4          What's that document?
5    A.    An update.
6    Q.    Is it by you?
7    A.    Yes.
8    Q.    And did you in there make an opinion with respect to
9          Mr. Ortiz whether he remained competent to proceed?
10   A.    Yes.
11   Q.    And what was that opinion you gave August 25th of
12         2005?
13   A.    That Mr. Ortiz remained competent to proceed with
14         the adjudication process.
15   Q.    Were you aware at all -- you mentioned a couple of
16         times that Mr. Ortiz maintained his innocence to
17         you, correct?
18   A.    Yes.
19   Q.    Were you aware that when he was incarcerated he was
20         maintaining his guilt, that he committed the crimes?
21   MR. FELLE:          Object.
22   THE WITNESS:        While in prison you mean?
23   MR. FLYNN:          Yes.
```

**MCCANN & MCCANN REPORTING**

A-1688

92

1    THE WITNESS:          No.

2

3    BY MR. FLYNN:

4    Q.    Were you aware when he was questioned by federal

5          authorities some ten years later that he was still

6          admitting his guilt to these crimes?

7    A.    No.

8    MR. FELLE:          Form.

9    MR. FLYNN:          That's all I have for you.

10   MR. FELLE:          Thank you for coming in.

11

12                       (Whereupon, proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

93

## CERTIFICATE OF REPORTER

1

2

3   I, **WENDY ROYCE McCANN**, hereby certify that I did report in

4   machine shorthand the foregoing proceeding had in the

5   above-entitled matter, at the time and place hereinbefore

6   set forth; I do further certify that the transcript

7   consisting of 92 pages, is a true and correct transcript of

8   my said stenographic notes.

9

10

11

12   WENDY ROYCE McCANN

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

## 1

1 [13] - 1:14, 4:3, 5:4, 15:7, 23:2, 23:3, 23:18, 26:7, 27:5, 28:5, 28:22, 29:5, 29:10
1/24/05 [1] - 4:11
10 [3] - 4:12, 61:21, 61:22
11 [2] - 4:13, 5:5
11/26/04 [1] - 4:6
11/29/04 [1] - 4:7
11/30/04 [1] - 4:8
12/3/04 [1] - 40:15
120 [1] - 87:15
125 [1] - 6:1
126292 [1] - 1:6
13 [1] - 62:23
14202 [3] - 2:7, 2:12, 6:2
14221 [1] - 2:2
15 [2] - 90:23, 91:2
15th [3] - 23:5, 26:2, 76:7
16 [1] - 63:8
1634 [1] - 2:12
16th [1] - 15:14
17 [1] - 19:13
18 [1] - 63:8
1996 [1] - 88:12
19th [8] - 12:2, 21:6, 22:20, 28:9, 30:23, 49:11, 55:21, 63:5, 63:14
1:00 [1] - 1:15
1st [1] - 40:7

## 2

2 [5] - 4:4, 19:4, 19:6, 22:3, 47:12
20 [2] - 17:1, 5:22
2004 [30] - 6:23, 7:19, 8:7, 8:20, 9:7, 10:9, 10:17, 11:20, 12:2, 19:13, 30:12, 30:15, 33:19, 37:4, 38:23, 41:7, 44:15, 45:22, 47:9, 52:21, 53:1, 55:21, 57:8, 63:5, 63:14, 64:13, 69:17, 76:7, 82:23, 83:5
2004-2005 [1] - 6:9
2005 [12] - 13:17, 50:1, 53:7, 54:16, 58:10, 58:20, 58:21, 58:23, 62:1, 88:22, 90:3, 91:12
2006 [1] - 37:3

2015 [1] - 14:17
2016 [1] - 14:17
2018 [3] - 1:14, 90:23, 91:2
20th [2] - 58:20, 89:4
21st [7] - 50:1, 53:21, 54:16, 58:15, 58:21, 58:22, 88:22
22 [2] - 33:19, 65:3
22nd [3] - 30:10, 31:1, 37:10
23 [6] - 16:14, 21:21, 24:2, 25:3, 34:5, 37:3
24 [1] - 58:23
24th [3] - 58:10, 59:21, 90:3
25th [1] - 91:11
26 [2] - 4:7, 41:7
26th [1] - 30:15
29 [2] - 38:22, 45:22
29th [2] - 45:21, 47:3

## 3

3 [5] - 4:5, 15:3, 15:8, 47:7, 90:22
300A [1] - 2:7
30th [3] - 39:9, 41:13, 44:20
31 [1] - 1:12
350 [1] - 2:6
3rd [3] - 47:2, 47:9, 49:12

## 4

4 [7] - 4:4, 4:6, 29:14, 30:7, 30:17, 31:6, 41:6
42 [2] - 63:18, 63:22
43 [1] - 64:4
45 [1] - 64:8
49 [1] - 64:12
4th [1] - 61:23

## 5

5 [14] - 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 38:2, 38:5
56 [2] - 63:9
57 [1] - 63:9

## 6

6 [7] - 3:3, 4:8, 40:11, 41:1, 41:14, 45:13, 88:19

6024 [2] - 1:13, 2:2

## 7

7 [4] - 4:9, 45:18, 45:19, 48:20
730 [2] - 89:15, 90:18

## 8

8 [6] - 4:10, 49:23, 54:16, 56:14, 58:21, 90:20
88 [1] - 3:4

## 9

9 [5] - 4:11, 58:8, 58:10, 58:21, 90:2
911 [2] - 29:8, 29:11
92 [1] - 93:7
95 [1] - 2:11

## A

ability [1] - 66:1
able [3] - 34:1, 43:10, 43:12, 57:1
above-entitled [1] - 93:5
according [3] - 26:10, 43:2, 80:12
accused [2] - 34:11, 43:1
acknowledge [1] - 59:22
acknowledged [1] - 34:11
action [1] - 88:4
actions [1] - 22:10
actual [1] - 38:3
addition [2] - 18:9, 48:7
address [1] - 5:22
adequately [1] - 48:21
adjourned [1] - 47:2
adjudication [1] - 89:21, 90:12, 91:14
adjustment [1] - 29:4
admission [1] - 19:14, 23:4, 30:19, 31:16, 33:19, 34:2, 37:9, 41:2, 42:2, 44:19, 45:14
admissions [2] - 11:22, 33:18
admitted [5] - 8:19, 30:8, 30:14, 38:17, 47:4
admitting [2] - 30:18,

92:6
adoptive [1] - 70:21
advise [1] - 31:3
affect [2] - 16:20, 33:6
affecting [1] - 82:10
affiliated [1] - 23:11
affiliation [3] - 8:7, 57:8, 87:16
affiliations [1] - 6:22
afraid [3] - 27:8, 27:12, 63:6
afternoon [1] - 6:5
age [1] - 25:3
agency [3] - 85:18, 86:5, 86:8
agitated [3] - 34:12, 36:16, 36:17
agitation [1] - 47:13
ago [2] - 14:17, 53:15
agree [10] - 10:23, 33:20, 37:5, 62:17, 64:2, 66:13, 66:17, 67:22, 71:22, 72:21
agreed [2] - 45:4, 59:10
ajar [1] - 37:15
alcohol [3] - 16:18, 68:1, 74:18
almost [1] - 32:21
alternating [1] - 47:12
ambulance [1] - 24:4
answer [6] - 57:14, 70:6, 73:12, 84:22, 85:9, 85:11
answers [2] - 6:18, 62:13
anti [1] - 89:9
anti-psychotic [1] - 89:9
anxiety [3] - 25:8, 25:14, 25:20
anxious [1] - 25:18
apologize [6] - 18:2, 19:4, 53:12, 66:7, 88:6, 89:7
appear [4] - 31:7, 44:6, 44:13, 82:2
APPEARANCES [1] - 2:1
appeared [1] - 42:4
appearing [4] - 2:3, 2:8, 2:13, 25:3
applies [1] - 50:6
apply [1] - 50:5
appreciate [1] - 42:11
approach [1] - 9:14
appropriately [1] - 25:4
area [2] - 31:14, 36:10
areas [1] - 43:18

arise [1] - 75:10
arrest [6] - 15:19, 50:22, 63:21, 64:1, 68:6, 86:16
arrested [1] - 15:13
arrests [1] - 20:16
arrival [1] - 46:8
Article [2] - 1:12, 89:15
article [1] - 90:18
assertiveness [1] - 65:20
assessment [3] - 10:1, 45:3, 68:9
assignment [1] - 18:5
assist [2] - 9:16, 11:7
assistant [1] - 88:2
ASSISTANT [2] - 2:6, 2:11
association [1] - 44:5
assume [1] - 83:4
assurance [1] - 82:4
attacked [1] - 48:13
attempt [1] - 22:9
attended [1] - 43:4
attending [4] - 8:11, 9:4, 31:8, 34:1
attention [6] - 38:7, 45:18, 61:21, 62:21, 68:21, 84:4
attired [1] - 25:5
ATTORNEY [4] - 2:5, 2:6, 2:10, 2:11
attorney [7] - 13:21, 48:23, 62:9, 62:10, 63:19, 86:18, 88:3
attorney's [1] - 78:1
attorneys [1] - 62:8
audible [1] - 6:19
auditory [5] - 16:21, 33:8, 51:21, 52:23, 59:22
August [1] - 91:11
authored [1] - 49:23
authorities [1] - 92:5
authorize [1] - 35:5
autonomic [1] - 42:5
available [2] - 20:5, 84:20
avoiding [1] - 78:5
aware [16] - 33:15, 49:6, 78:18, 78:23, 85:1, 85:5, 85:13, 86:1, 86:13, 86:15, 87:6, 87:8, 91:15, 91:19, 92:4

## B

background [4] -

42:14, 42:16, 88:7
**backwards** [3] - 19:5, 23:6, 65:10
**bad** [2] - 13:7, 68:19
**balance** [2] - 85:19, 86:15
**BARBARA** [1] - 2:4
**based** [3] - 24:13, 71:19, 82:10
**basic** [1] - 36:6
**basis** [2] - 7:4, 85:8
**became** [4] - 15:19, 30:1, 37:5, 42:17
**become** [3] - 32:17, 32:23, 49:6
**becomes** [2] - 46:20, 51:18
**beginning** [2] - 12:14, 24:21
**behavior** [7] - 30:20, 31:4, 34:7, 34:16, 36:18, 36:21, 37:9
**behaviors** [3] - 45:15, 55:5, 76:9
**believes** [1] - 24:18
**belong** [1] - 31:15
**below** [5] - 20:11, 22:13, 22:16, 25:6, 25:19
**better** [4] - 7:6, 13:8, 51:6, 51:22
**between** [5] - 5:9, 18:11, 30:23, 75:10, 81:12
**bipolar** [2] - 54:18, 72:2
**bit** [4] - 20:4, 43:18, 53:11, 64:19
**bizarre** [4] - 30:20, 34:7, 34:13, 51:2
**blank** [1] - 26:5
**blunt** [1] - 16:20
**board** [1] - 88:17
**born** [1] - 77:5
**bottom** [3] - 21:19, 36:7, 47:17
**break** [16] - 31:20, 32:4, 32:8, 45:4, 48:5, 48:16, 52:6, 52:9, 52:12, 52:17, 55:19, 60:22, 61:11, 68:3, 70:13, 71:14
**breaks** [1] - 67:7
**brevity** [1] - 6:22
**Brian** [1] - 57:7
**brief** [3] - 79:14, 80:4, 80:5
**briefly** [1] - 6:6
**bring** [1] - 68:2
**bringing** [2] - 41:14,

49:11
**brother** [1] - 43:3
**brought** [4] - 14:10, 24:4, 68:21, 84:3
**Buffalo** [18] - 2:7, 2:12, 4:3, 6:2, 8:7, 8:19, 14:16, 23:11, 25:22, 26:6, 26:8, 68:22, 77:23, 78:13, 79:12, 88:14
**bunch** [1] - 57:6
**BY** [53] - 2:1, 2:5, 2:10, 3:2, 6:4, 27:7, 53:20, 55:17, 61:20, 65:9, 65:16, 65:23, 66:6, 67:1, 67:21, 70:11, 71:3, 71:12, 71:21, 72:14, 72:20, 73:4, 73:10, 73:16, 74:1, 74:9, 74:16, 74:23, 75:5, 75:17, 76:4, 76:15, 77:11, 77:21, 78:11, 79:9, 80:3, 80:11, 80:17, 80:23, 81:11, 81:17, 82:1, 82:9, 82:15, 83:16, 83:21, 84:8, 85:17, 86:12, 87:1, 88:1, 92:3

## C

**C/O** [1] - 24:6
**cannot** [2] - 34:13, 48:21
**capable** [3] - 84:17, 85:14, 90:11
**capacity** [4] - 48:22, 54:3, 58:6, 68:9
**care** [5] - 12:14, 12:18, 13:20, 28:2, 56:13
**case** [15] - 8:22, 9:19, 10:6, 14:6, 53:16, 58:3, 64:23, 68:14, 71:7, 77:12, 78:12, 83:12, 83:17, 84:14
**cases** [1] - 83:4
**casually** [1] - 25:4
**catatonia** [1] - 32:15
**catatonic** [7] - 15:20, 30:1, 32:17, 32:21, 46:22, 47:13, 51:2
**caused** [1] - 81:18
**causes** [1] - 67:15
**center** [12] - 9:10, 18:6, 19:19, 24:10, 30:9, 34:15, 34:19, 39:17, 41:9, 61:16, 82:20, 89:4
**Center** [4] - 17:20,

34:7, 41:3, 41:13
**certain** [2] - 71:8
**certainly** [10] - 10:17, 24:13, 28:10, 36:15, 36:19, 37:20, 50:5, 54:15, 61:15, 62:13
**CERTIFICATE** [1] - 93:1
**certification** [1] - 5:13
**certified** [1] - 88:17
**certify** [2] - 93:3, 93:6
**chair** [1] - 35:2
**challenge** [2] - 65:12, 66:2
**challenging** [1] - 86:18
**chances** [1] - 74:18
**change** [2] - 81:4, 83:8
**characterized** [1] - 61:4
**charged** [3] - 14:15, 14:19, 69:1
**charges** [2] - 20:18, 22:9, 57:1
**chart** [2] - 34:3, 40:19
**check** [2] - 85:19, 86:15
**chemical** [5] - 34:14, 34:20, 35:3, 35:15, 35:22
**chief** [5] - 23:22, 27:8, 34:5, 41:18, 83:1
**childhood** [1] - 76:20
**christian** [1] - 8:13
**chronic** [3] - 60:21, 61:3, 61:7
**CID** [1] - 17:2
**circumstances** [6] - 13:10, 29:19, 29:21, 36:21, 70:17, 76:6
**Civil** [1] - 1:12
**Claim** [1] - 1:6
**claims** [2] - 22:1, 88:4
**CLAIMS** [1] - 1:2
**clarify** [1] - 17:16
**clarity** [1] - 15:16
**clear** [1] - 10:20, 41:1, 44:10, 47:18, 48:21, 54:3, 57:2, 81:2, 83:22, 83:23, 85:7
**cleared** [1] - 65:4
**clinical** [1] - 87:19
**Coggin's** [1] - 4:10
**coggins** [1] - 6:5
**COGGINS** [3] - 1:11, 3:3, 5:19
**Coggins** [2] - 2:13, 6:1
**Coggins'** [1] - 4:13

**cognitive** [3] - 66:17, 75:6, 75:18
**colleagues** [4] - 10:22, 11:4, 57:13, 58:1
**college** [1] - 79:20
**colon** [4] - 22:8, 22:10, 30:20, 36:6
**coming** [3] - 35:17, 56:16, 92:10
**comma** [3] - 48:21, 56:16, 72:7
**command** [5] - 52:7, 56:19, 64:9, 71:13, 71:18
**commencing** [1] - 1:15
**commensurable** [1] - 55:4
**comment** [3] - 17:21, 36:19, 37:2
**commenting** [1] - 17:17
**comments** [4] - 11:4, 15:21, 34:13, 39:6
**commission** [2] - 56:7, 65:5
**commit** [1] - 13:11
**committed** [3] - 68:15, 84:1, 91:20
**committing** [3] - 43:6, 44:7, 69:12
**common** [6] - 9:7, 10:8, 10:19, 19:21, 32:6, 81:7
**communicate** [1] - 41:23
**communicated** [1] - 42:22
**Competency** [1] - 4:12
**competency** [14] - 13:16, 16:2, 17:2, 17:18, 17:22, 18:10, 61:23, 62:4, 62:11, 81:1, 81:13, 88:8, 89:6, 89:13
**competent** [5] - 45:11, 53:23, 89:20, 91:9, 91:13
**complain** [1] - 51:5
**complained** [2] - 16:16, 56:16
**complains** [6] - 16:15, 24:6, 24:7, 25:7, 27:12
**complaint** [3] - 23:22, 27:8, 34:5
**complaints** [2] - 41:16, 41:18
**complete** [1] - 19:22

**completed** [1] - 50:11
**complex** [1] - 74:3
**concluded** [1] - 92:12
**conclusion** [1] - 59:10
**concurred** [1] - 45:7
**condition** [12] - 11:2, 33:11, 33:17, 46:7, 46:12, 55:23, 61:15, 63:21, 69:16, 81:4, 81:20, 82:2
**conditions** [3] - 62:10, 72:11, 72:21
**conducted** [1] - 61:23
**confabulation** [5] - 72:23, 73:18, 74:2, 74:10, 74:19
**CONFABULATION** [1] - 73:19
**Confabulation** [1] - 73:21
**confessed** [1] - 43:6
**confesses** [1] - 76:12
**confession** [18] - 13:3, 44:15, 63:22, 65:12, 68:10, 69:8, 69:13, 69:23, 70:18, 76:17, 78:4, 78:14, 84:2, 84:20, 85:20, 86:20, 87:4
**confuse** [1] - 6:13
**confused** [2] - 18:20, 41:21
**confusion** [1] - 86:6
**congratulations** [1] - 83:2
**consider** [1] - 11:2
**considered** [2] - 42:6, 49:3
**consistency** [1] - 44:6
**consistent** [8] - 24:21, 33:4, 52:9, 53:1, 60:17, 90:19
**consistently** [1] - 12:20
**consisting** [1] - 93:7
**constant** [1] - 22:12
**consult** [1] - 59:13
**consultant** [2] - 35:16, 57:12
**Consultation** [1] - 4:5
**consultation** [3] - 15:18, 82:19, 84:19
**consulted** [2] - 77:22, 78:3
**consulting** [2] - 7:1, 57:20
**contact** [1] - 7:14
**content** [1] - 16:21
**context** [1] - 28:14
**continue** [6] - 18:18,

34:8, 46:11, 46:14,
52:19, 82:16
**continued** [2] - 17:1,
51:5
**continuing** [1] - 59:22
**contractor** [1] - 7:4
**contributed** [1] -
76:16
**conversations** [3] -
13:19, 14:4, 14:8
**convey** [1] - 46:5
**conviction** [1] - 13:3
**copies** [1] - 38:10
**copy** [4] - 26:15,
38:16, 88:9, 91:3
**correct** [94] - 7:21,
9:11, 9:17, 11:5,
11:8, 12:21, 16:10,
19:1, 19:2, 19:15,
22:18, 22:20, 22:23,
23:12, 24:14, 26:3,
28:1, 29:10, 29:17,
30:6, 30:15, 32:11,
32:17, 37:22, 38:12,
40:8, 44:16, 44:21,
45:1, 45:5, 45:8,
45:16, 46:3, 46:20,
48:5, 49:4, 49:17,
50:12, 50:23, 51:7,
51:10, 51:13, 51:14,
51:18, 52:8, 52:17,
53:8, 54:6, 54:13,
54:19, 55:6, 55:13,
55:14, 56:2, 56:11,
56:12, 57:4, 58:16,
59:11, 60:11, 60:18,
61:10, 62:11, 62:14,
62:19, 63:3, 63:6,
63:11, 63:16, 64:6,
64:10, 64:15, 67:2,
67:8, 68:16, 71:5,
71:16, 72:7, 72:16,
73:6, 73:12, 74:19,
75:1, 77:17, 80:13,
81:13, 81:20, 82:5,
82:7, 83:5, 88:22,
90:20, 91:17, 93:17
**counsel** [2] - 5:10,
14:9
**counselor** [4] - 39:14,
39:16, 40:5, 50:18
**counselor's** [1] -
15:21
**counselors** [1] - 16:6
**counts** [1] - 15:19
**COUNTY** [3] - 1:2,
2:10, 2:11
**County** [17] - 6:9,
17:20, 18:6, 34:6,
39:16, 39:18, 40:1,

41:9, 41:13, 43:15,
57:10, 82:17, 83:9,
84:21, 86:13, 86:14,
89:4
**county** [14] - 7:1, 7:7,
7:11, 9:6, 10:4, 30:9,
38:3, 38:9, 41:2,
41:10, 57:16, 57:21,
77:23, 86:7
**couple** [8] - 11:22,
42:3, 62:21, 65:17,
87:22, 88:5, 88:6,
91:15
**course** [3] - 6:11,
13:21, 29:22
**COURT** [1] - 1:2
**court** [13] - 6:18, 10:6,
18:8, 18:10, 46:5,
58:9, 58:13, 58:16,
59:1, 62:4, 62:7,
84:17, 88:4
**courtroom** [1] - 49:1
**CPK** [1] - 42:7
**CPKs** [1] - 42:4
**CPL** [2] - 89:16, 90:18
**create** [1] - 68:2
**created** [1] - 77:16
**credentials** [2] - 6:21,
87:10
**credible** [2] - 60:5,
60:14
**crime** [7] - 56:8,
68:16, 69:7, 69:12,
69:23, 70:15, 84:2
**crimes** [4] - 14:18,
68:7, 91:20, 92:6
**criminal** [1] - 83:11
**Criminal** [1] - 89:18
**cure** [1] - 61:9
**curious** [1] - 68:13
**current** [3] - 20:16,
20:19, 90:13
**custody** [3] - 6:8,
13:11, 63:15

**D**

**d/w** [1] - 34:5
**DA's** [1] - 68:22
**date** [10] - 25:3, 40:14,
40:23, 47:1, 47:2,
56:1, 56:2, 58:15,
82:11, 91:1
**dated** [8] - 4:6, 10:7,
19:12, 37:2, 45:20,
47:8, 88:22, 90:3
**days** [8] - 21:5, 23:7,
30:3, 37:3, 37:4,
58:8, 58:9, 58:13,
65:3

**dead** [2] - 51:7, 51:22
**dealing** [1] - 78:19
**death** [3] - 48:10,
64:14, 79:22
**deaths** [1] - 42:18
**December** [6] - 40:7,
47:2, 47:8, 49:11,
52:21, 53:1
**decisions** [1] - 66:2
**decompensation** [1] -
50:22
**DEF** [1] - 20:13
**Defazio** [3] - 8:13,
8:18, 9:4
**defazio** [1] - 9:2
**defendant** [4] - 1:8,
59:7, 63:23, 90:16
**defense** [4] - 62:9,
84:11, 84:12, 88:18
**deferred** [1] - 20:15
**deficit** [1] - 73:22
**deficits** [1] - 66:14
**define** [1] - 79:17
**defined** [1] - 74:2,
89:15, 90:17
**definitely** [1] - 12:19
**delusional** [1] - 72:1
**delusions** [3] - 61:5,
67:3
**demanded** [1] - 51:23
**demeaning** [1] - 57:17
**demonstrate** [1] -
48:22
**demonstrates** [1] -
66:18
**demonstrating** [2] -
47:19, 55:5
**denied** [2] - 16:23,
20:10
**denotes** [1] - 40:18
**department** [14] - 7:2,
7:6, 7:7, 7:8, 8:8,
9:6, 23:14, 31:15,
41:11, 68:23, 77:23,
78:13, 79:12, 86:14
**Department** [4] - 7:11,
38:10, 40:1, 82:17
**deposition** [3] - 85:2,
90:23, 91:1
**depression** [3] -
16:15, 22:14, 63:2
**deprivation** [1] - 68:1
**describe** [1] - 75:18
**described** [1] - 45:14
**desired** [1] - 73:12
**detail** [1] - 84:10
**details** [2] - 69:15,
77:14
**detective** [2] - 78:12,
79:1

**Detective** [1] - 78:15
**deteriorated** [2] -
29:22, 46:7
**diagnosed** [1] - 60:18
**diagnoses** [1] - 33:10
**diagnosis** [9] - 11:8,
21:7, 29:3, 30:18,
31:18, 32:14, 33:20,
45:7, 62:23
**diagnostic** [2] - 25:19,
89:6
**difference** [1] - 86:4
**different** [8] - 9:7,
10:8, 10:10, 10:12,
10:15, 52:1, 52:15,
54:5
**differentiate** [2] -
51:16, 75:10
**difficult** [3] - 21:21,
67:13, 76:5
**difficulty** [2] - 15:23,
65:20
**dilemma** [2] - 75:7,
75:19
**direct** [1] - 75:11
**directed** [1] - 45:22
**directing** [1] - 48:23
**director** [2] - 57:20,
86:13
**discharge** [5] - 31:7,
31:17, 32:14, 33:18,
43:14
**discharged** [1] - 49:9
**discipline** [1] - 32:3
**discuss** [1] - 57:1
**discussed** [2] - 34:4,
34:5
**discussions** [1] -
44:11
**disorder** [10] - 29:4,
30:21, 54:18, 61:4,
61:6, 63:1, 66:9,
66:10, 72:2
**disorders** [4] - 71:23,
72:1, 72:5, 72:7
**disorganized** [3] -
41:21, 51:2, 71:5
**distinction** [1] - 60:5
**distinguish** [1] - 75:21
**distinguishing** [1] -
66:22
**district** [1] - 78:1
**Doctor** [1] - 88:2
**doctor** [16] - 8:11,
8:15, 9:1, 10:10,
10:15, 18:12, 19:8,
31:12, 35:6, 35:8,
35:11, 35:14, 35:20,
73:17, 75:6
**doctors** [5] - 7:20,

10:8, 57:7, 60:16,
87:16
**document** [15] - 15:4,
19:5, 20:2, 23:3,
26:18, 27:5, 30:8,
38:5, 45:19, 49:23,
54:16, 58:11, 62:16,
89:5, 91:4
**documented** [2] -
37:11, 49:16
**documents** [8] -
13:14, 23:10, 28:11,
53:13, 53:18, 64:18
**done** [7] - 9:20, 12:16,
19:8, 30:2, 87:6,
87:8, 87:9
**door** [2] - 37:15, 37:18
**dose** [3] - 54:23, 55:2,
55:3
**doubt** [3] - 44:7,
44:14, 68:14
**doubts** [2] - 13:2, 84:1
**down** [7] - 25:16,
27:15, 32:21, 35:1,
36:5, 39:8, 39:12
**DR** [2] - 1:11, 3:3
**Dr** [45] - 2:13, 4:9,
4:10, 4:13, 6:5, 7:8,
7:12, 7:15, 7:19,
7:23, 8:13, 8:16,
8:18, 9:20, 9:22,
18:23, 19:10, 19:21,
20:5, 21:9, 23:6,
31:8, 33:20, 35:9,
35:18, 40:22, 44:23,
45:7, 45:10, 45:20,
46:5, 47:8, 48:19,
57:7, 57:8, 57:12,
57:19, 57:22, 58:3,
58:9, 58:14, 58:21,
59:2, 59:20, 90:2
**dreams** [1] - 75:12
**drug** [1] - 74:17
**drugs** [2] - 67:23,
79:21
**duly** [1] - 5:19
**duration** [1] - 55:12
**Durford** [1] - 8:16
**DURFORD** [1] - 8:16
**during** [6] - 6:11,
29:22, 37:21, 41:11,
83:22
**dysphoric** [1] - 16:20

**E**

**Eagle** [2] - 6:1, 87:15
**early** [6] - 10:6, 11:18,
32:4, 44:15, 49:20,
68:13

easier [1] - 36:11
ECMC [11] - 4:6, 4:7, 4:8, 8:3, 8:15, 38:8, 40:19, 45:14, 47:4, 87:18, 87:19
education [1] - 78:19
educational [1] - 42:15
effect [1] - 25:17
either [5] - 19:8, 21:4, 28:4, 37:14, 52:18
elevated [1] - 42:4
eleven [1] - 5:3
elsewhere [1] - 33:10
emanate [1] - 75:11
emergency [1] - 38:16
emotional [2] - 67:15, 90:13
employee [1] - 57:10
end [9] - 27:9, 27:18, 30:19, 31:17, 39:5, 47:11, 56:17, 56:21, 64:14
ended [1] - 36:3
enforcement [1] - 37:13
english [4] - 17:12, 21:22, 22:1, 22:2
English [1] - 21:22
ensure [2] - 10:19, 80:18
entered [1] - 5:8
entire [1] - 62:16
entitled [5] - 19:14, 22:4, 26:19, 38:5, 93:5
episode [5] - 48:5, 55:9, 55:11, 70:13, 79:18
episodes [1] - 48:2
ER [2] - 8:15, 24:4
ERIE [3] - 1:2, 2:10, 2:11
Erie [28] - 6:9, 7:1, 7:6, 7:11, 9:5, 10:4, 17:20, 18:5, 30:9, 34:6, 38:3, 38:9, 39:16, 39:18, 39:23, 41:2, 41:9, 41:10, 41:13, 43:15, 77:23, 82:16, 83:9, 84:21, 86:7, 86:13, 86:14, 89:4
especially [1] - 73:5
ESQ [5] - 2:1, 2:4, 2:5, 2:9, 2:10
essentially [3] - 37:3, 37:4, 59:9
eval [1] - 17:3
evaluate [2] - 46:14,

87:4
evaluated [1] - 22:20
evaluation [8] - 12:1, 29:15, 34:7, 50:11, 50:17, 58:6, 86:22, 89:1
evaluations [2] - 18:8, 18:10
Evelyn [2] - 2:13, 6:1
EVELYN [3] - 1:11, 3:3, 5:19
evening [1] - 76:11
event [1] - 73:22
events [3] - 42:21, 75:22, 75:23
eventually [1] - 14:14
evidence [2] - 43:8, 47:20
exact [1] - 65:3
exactly [1] - 70:19
exam [6] - 16:2, 16:19, 17:5, 50:15, 58:14, 58:19
Examination [1] - 1:11
examination [8] - 11:4, 15:10, 17:13, 17:17, 33:16, 37:5, 56:15, 59:9
EXAMINATION [2] - 6:4, 88:1
EXAMINED [1] - 3:2
examined [5] - 5:20, 11:13, 21:5, 33:15, 55:21
examiner [1] - 90:16
examining [1] - 59:15
example [4] - 9:19, 57:19, 68:22, 78:12
except [1] - 5:15
excuse [3] - 15:8, 27:18, 70:3
EXHIBIT [1] - 4:2
exhibit [45] - 15:3, 15:7, 15:8, 19:4, 19:6, 19:12, 22:3, 23:17, 24:16, 24:17, 26:11, 26:15, 27:5, 28:5, 28:22, 29:5, 29:10, 29:14, 30:17, 37:8, 38:1, 38:2, 38:22, 41:6, 41:14, 45:13, 45:18, 45:19, 47:7, 48:20, 49:22, 53:10, 54:16, 56:14, 58:8, 58:10, 58:21, 61:21, 61:22, 88:19, 90:2, 90:19, 90:22
Exhibit [8] - 23:2, 23:3, 26:7, 30:7, 31:6, 38:5, 40:10,

41:1
exhibiting [2] - 45:15, 76:9
exhibits [3] - 5:3, 15:3, 69:18
Exhibits [1] - 5:4
exonerated [3] - 14:14, 14:18, 46:53
exoneration [1] - 69:11
experience [1] - 75:11
experienced [1] - 50:21
experiences [2] - 77:9, 83:8
experiencing [1] - 41:17
expertise [2] - 64:20, 85:3
explosive [1] - 36:18
extent [1] - 38:9
external [1] - 75:13

**F**

face [2] - 12:8
face-to-face [1] - 12:8
Facility [1] - 6:9
facing [1] - 33:12
fact [12] - 11:7, 29:2, 29:5, 32:7, 42:14, 47:6, 54:8, 60:16, 66:17, 69:21, 80:4, 81:1
facts [2] - 69:3, 69:7
failure [2] - 68:19, 75:9
fair [5] - 65:7, 67:10, 67:18, 70:12, 74:5
fall [1] - 11:19
false [3] - 70:1, 74:3, 78:4
familiar [10] - 8:13, 8:17, 20:1, 20:6, 31:11, 42:18, 43:16, 75:6, 78:15, 79:14
family [6] - 34:11, 42:22, 43:21, 76:22, 76:23, 77:12
far [3] - 7:18, 15:12, 26:6
fear [2] - 48:13, 78:4
fearful [5] - 25:18, 27:15, 27:20, 27:22
fearfulness [2] - 25:10, 25:14
federal [1] - 92:4
felle [2] - 6:6, 70:23
Felle [1] - 1:13
FELLE [68] - 2:1, 2:1,

3:3, 5:1, 6:4, 26:18, 27:4, 27:7, 53:8, 53:20, 55:17, 61:20, 65:7, 65:9, 65:16, 65:23, 66:6, 67:1, 67:18, 67:21, 70:4, 70:11, 71:3, 71:12, 71:21, 72:7, 72:10, 72:14, 72:20, 73:4, 73:10, 73:16, 74:1, 74:9, 74:16, 74:23, 75:5, 75:17, 76:4, 76:15, 77:11, 77:21, 78:11, 79:9, 80:3, 80:11, 80:17, 80:23, 81:11, 81:17, 82:1, 82:9, 82:15, 83:16, 83:21, 84:8, 85:1, 85:5, 85:17, 86:1, 86:10, 86:12, 86:20, 87:1, 87:21, 91:21, 92:8, 92:10
felt [4] - 17:11, 37:21, 55:4, 60:8
few [2] - 14:16, 30:3
field [1] - 64:20
fifth [5] - 24:23, 31:6, 33:23, 47:16, 48:20
fifty [1] - 50:15
file [6] - 4:7, 10:5, 24:8, 38:4, 38:20, 43:15
filing [1] - 5:12
filled [1] - 16:8
filling [1] - 73:21
first [37] - 5:19, 11:16, 12:1, 13:7, 15:2, 15:10, 15:15, 17:7, 17:9, 17:16, 18:17, 18:20, 18:21, 19:11, 20:18, 21:23, 23:17, 30:6, 30:17, 31:20, 32:4, 32:7, 36:11, 38:14, 45:3, 56:3, 56:6, 56:12, 60:2, 60:22, 61:11, 62:3, 63:5, 64:13, 68:8, 90:8, 90:9
flat [1] - 33:6
Florida [1] - 7:18
Flynn [1] - 88:2
fLYNN [1] - 53:4
FLYNN [54] - 2:5, 3:4, 26:13, 26:20, 55:15, 61:18, 65:6, 65:14, 65:21, 66:4, 66:20, 67:17, 70:2, 70:9, 70:22, 71:9, 71:17, 72:3, 72:17, 73:1, 73:7, 73:13, 73:20,

74:6, 74:13, 74:20, 75:2, 75:14, 75:20, 76:13, 76:18, 77:18, 78:9, 79:6, 79:23, 80:8, 80:14, 80:20, 81:8, 81:14, 81:21, 82:6, 82:12, 83:13, 83:18, 84:5, 85:22, 86:4, 86:19, 87:22, 88:1, 91:23, 92:3, 92:9
FOGG [3] - 2:10, 84:22, 85:2
folder [1] - 10:5
folks [2] - 39:23, 41:10
follow [1] - 22:13
follow-up [1] - 22:13
following [1] - 5:7
follows [1] - 5:20
foregoing [1] - 93:4
forensic [11] - 6:10, 6:23, 9:6, 9:16, 17:19, 17:23, 22:13, 85:4, 87:17, 88:16, 88:18
Forensic [1] - 4:5
form [50] - 5:15, 22:5, 53:4, 55:15, 61:18, 65:6, 65:14, 65:21, 66:4, 66:20, 67:17, 70:2, 70:9, 70:22, 71:9, 71:17, 72:3, 72:10, 72:17, 73:1, 73:7, 73:13, 73:20, 74:6, 74:13, 74:20, 75:2, 75:14, 75:20, 76:13, 76:18, 77:18, 78:9, 79:6, 79:23, 80:8, 80:14, 80:20, 81:8, 81:14, 81:21, 82:6, 82:12, 83:13, 83:18, 84:5, 84:22, 85:22, 86:19, 92:8
Form/Report [1] - 4:5
forma [2] - 88:20, 90:3
Forma [3] - 4:10, 4:11, 4:13
formal [1] - 61:6
forms [1] - 77:15
forth [1] - 93:6
fortitude [1] - 66:1
forward [1] - 90:11
four [5] - 19:5, 30:14, 37:3, 37:4, 45:19
fourteen [5] - 12:11, 13:1, 23:3, 26:18, 27:5
fourth [3] - 17:8, 38:7, 38:21
Franklin [1] - 2:11

frequent [2] - 34:14, 34:19
friends [2] - 42:23, 44:1
frightened [1] - 24:14
front [4] - 26:16, 41:14, 53:6, 53:7
full [1] - 90:6
funeral [3] - 43:4, 76:10, 77:15

**G**

GENERAL [2] - 2:5, 2:6
general [7] - 8:8, 25:22, 33:17, 38:15, 79:22, 88:3, 88:18
General [5] - 4:3, 8:19, 23:12, 26:6, 26:8
generally [3] - 33:14, 33:19, 70:20
given [7] - 31:3, 33:14, 33:20, 68:5, 69:16, 78:3, 85:20
Gokhale [5] - 7:23, 8:1, 31:8, 33:21, 44:23
GOKHALE [1] - 7:23
guarded [2] - 16:20, 63:6
guess [4] - 20:14, 58:18, 70:21, 86:4
guilt [3] - 84:15, 91:20, 92:6

**H**

Haldol [2] - 35:4, 42:3
half [1] - 57:11
hallucinate [1] - 52:19
hallucinations [16] - 16:21, 33:8, 51:9, 51:12, 51:21, 52:5, 52:7, 52:10, 52:23, 56:19, 59:22, 61:5, 64:9, 71:7, 71:13, 71:18
hand [1] - 88:19
handle [1] - 83:4
handled [1] - 83:5
handwriting [1] - 20:1
handwritten [2] - 10:7, 15:17
harmed [1] - 27:23
harming [2] - 27:17, 27:18
headed [1] - 7:8
Health [1] - 38:9
health [14] - 7:2, 7:7,

7:11, 9:6, 10:4, 28:2, 38:4, 40:1, 41:10, 43:15, 55:23, 82:17, 83:9, 86:14
heard [4] - 69:10, 76:23, 77:7, 77:14
Hearing [1] - 4:12
hearing [10] - 13:17, 16:16, 50:15, 51:5, 52:22, 56:16, 61:23, 81:2, 81:13, 88:8
held [1] - 1:11
help [3] - 13:14, 20:4, 20:20
hereby [2] - 5:9, 93:3
hereinbefore [1] - 93:5
hereto [1] - 5:11
high [3] - 42:8, 54:23, 55:3
highlighted [1] - 36:10
himself [1] - 77:17
hindsight [1] - 28:19
hired [1] - 57:12
Hispanic [1] - 34:6
hispanic [2] - 16:14, 25:3
historian [1] - 16:16
history [17] - 16:14, 16:17, 22:14, 24:2, 27:11, 28:15, 34:10, 41:19, 42:13, 43:19, 44:4, 47:18, 56:4, 58:18, 61:14, 64:9
history/medications [1] - 20:9
holding [12] - 9:10, 18:6, 19:19, 34:15, 34:19, 35:1, 39:16, 41:2, 41:9, 61:16, 82:20, 89:4
Holding [3] - 6:9, 17:20, 34:6
hoped [1] - 68:19
hopefully [1] - 90:12
hoping [1] - 40:2
hospital [20] - 8:2, 8:8, 11:19, 11:20, 11:21, 23:12, 25:23, 26:7, 26:9, 30:1, 38:8, 38:11, 38:13, 38:21, 39:20, 39:22, 40:19, 43:19, 49:9, 49:20
Hospital [4] - 4:3, 8:20
hospitalization [3] - 29:23, 50:23, 76:8
hospitalized [5] - 28:21, 29:16, 36:4, 63:16, 76:7
HS [1] - 4:7

hurt [1] - 48:13
hurting [2] - 16:23, 27:20
hydration [1] - 42:7

**I**

ID [1] - 20:11
Idea [3] - 14:6, 20:15, 67:6
identification [1] - 5:5
identify [4] - 26:13, 27:1, 51:15, 67:13
III [4] - 12:13, 13:9, 84:16, 89:14
illegal [1] - 67:23
illness [21] - 27:12, 31:23, 34:10, 37:1, 41:19, 47:20, 51:10, 51:13, 51:18, 54:6, 54:13, 54:18, 55:1, 56:2, 61:8, 61:15, 67:8, 76:16, 79:2, 85:21, 86:17
illnesses [4] - 44:21, 74:12, 78:21, 83:11
illogical [1] - 34:16
imaginary [1] - 71:15
imagination [2] - 67:2, 67:3
imagine [1] - 15:23
imagined [1] - 72:22
impaired [4] - 36:14, 36:15, 56:21, 75:1
impairment [2] - 66:10, 66:18
important [1] - 53:15
importantly [1] - 44:5
IMPR [1] - 42:3
impression [3] - 17:1, 25:20, 89:6
improved [2] - 16:2, 89:8
in-patient [2] - 42:1, 42:9
incapacitated [7] - 54:9, 59:3, 59:6, 59:7, 81:5, 89:15, 90:17
incarcerated [2] - 65:2, 91:19
incarceration [2] - 11:18, 48:7
incidently [1] - 82:16
incidently [2] - 7:14, 37:12
including [4] - 21:15, 21:20, 42:7, 63:2
incompetent [1] - 49:3
inconsistencies [1] -

44:4
incorporated [1] - 39:21
increase [1] - 74:18
independent [8] - 7:4, 11:12, 11:15, 12:12, 12:23, 13:4, 14:12, 29:20
independently [1] - 69:18
indicate [17] - 11:10, 12:20, 22:11, 22:22, 23:18, 23:21, 26:7, 29:11, 33:18, 34:18, 37:21, 46:22, 50:20, 52:4, 52:21, 59:2, 73:11
indicated [5] - 22:16, 25:1, 29:14, 60:7, 64:8
indicates [4] - 28:22, 29:6, 50:10, 62:7
indication [5] - 22:22, 23:22, 33:2, 33:9, 61:14
indications [1] - 25:17
indicative [1] - 52:5
indicator [1] - 51:12
indictment [1] - 68:12
individual [3] - 48:17, 67:11, 74:3
individuals [1] - 82:20
information [10] - 22:7, 27:23, 31:3, 56:4, 61:7, 66:9, 68:6, 70:21, 75:13, 77:16
initial [8] - 8:21, 9:20, 21:10, 21:16, 21:20, 29:15, 52:16, 62:23
injection [1] - 35:4
injections [1] - 42:3
inmate [2] - 9:9, 22:4
inmates [1] - 7:21
innocence [6] - 12:15, 12:21, 44:11, 57:4, 84:15, 91:16
innocent [1] - 63:11
innumerable [1] - 83:14
inpatient [1] - 42:23
inquire [2] - 14:21, 69:6
inquiry [1] - 69:3
inside [1] - 36:13
insight [6] - 36:14, 36:15, 36:20, 36:23, 37:1
instant [1] - 60:23
instead [1] - 42:18

instruct [1] - 85:8
intent [1] - 16:23
intention [1] - 6:12
interest [1] - 14:7
interpreter [4] - 17:2, 17:4, 17:10, 17:13
interrogated [1] - 69:22
interrogation [2] - 70:15, 79:4
interrogator [1] - 73:5
interview [1] - 21:21
interviewed [3] - 23:7, 23:8, 33:14
involved [5] - 9:8, 35:7, 39:23, 43:9, 82:22
involvement [5] - 8:21, 8:22, 13:5, 58:3, 58:4
irrational [2] - 34:16, 36:17
issues [1] - 16:1

**J**

jail [3] - 8:2, 30:3, 39:20
Janette [1] - 45:23
January [15] - 49:21, 50:1, 53:7, 53:21, 54:16, 58:10, 58:15, 58:20, 58:21, 58:22, 58:23, 59:21, 88:22, 89:4, 90:3
job [2] - 57:11, 79:20
Joe [2] - 13:23, 40:20
John [1] - 63:19
Joseph [11] - 35:9, 35:19, 57:7, 57:9, 57:22, 58:9, 58:14, 58:22, 59:2, 60:13, 90:2
Joseph's [2] - 58:3, 59:21
JOSUE [1] - 1:4
Josue [2] - 6:7, 89:14
Judge [4] - 4:9, 4:10, 4:11, 4:13
judge [7] - 45:23, 62:8, 70:5, 81:2, 86:21, 88:20, 90:3
judgement [4] - 36:13, 36:14, 36:15, 56:21
judicial [1] - 68:23
Julie [3] - 16:5, 39:14, 40:5

## K

keep [1] - 6:18
kept [2] - 18:11, 30:4
kill [2] - 24:8, 24:19
killed [2] - 48:14, 76:11
kind [5] - 19:18, 24:12, 34:4, 36:12, 52:5, 53:5
knowing [1] - 55:23
known [3] - 42:21, 48:10, 49:8

## L

lack [1] - 7:6
last [6] - 24:9, 29:5, 29:9, 29:10, 40:6, 55:12, 89:7, 90:6
late [2] - 44:19, 63:19
law [1] - 37:13
Law [3] - 1:12, 1:13, 89:18
LAW [1] - 2:1
Lawrence [2] - 50:2, 89:2
layman [1] - 32:2
layperson [1] - 76:5
layperson's [1] - 80:6
leading [3] - 44:19, 73:6, 73:11
learned [1] - 83:7
least [5] - 33:15, 43:20, 53:23, 68:12, 90:10
led [1] - 44:23
legal [6] - 6:16, 14:9, 14:13, 45:23, 53:23, 54:4, 59:4, 81:18
LESLIE [1] - 2:10
less [1] - 79:18
lessons [1] - 83:7
Letter [1] - 4:11
letter [12] - 4:9, 4:10, 4:13, 45:21, 45:22, 49:6, 49:12, 53:21, 58:14, 58:19, 59:1, 88:22
level [3] - 21:16, 21:20, 37:8
licensed [1] - 88:11
liebergall [7] - 7:8, 7:12, 7:20, 9:21, 18:23, 45:7, 45:20
Liebergall [18] - 4:9, 7:15, 9:22, 19:10, 19:21, 20:5, 21:9, 23:6, 40:12, 40:13, 40:23, 45:10, 46:5,

47:8, 48:19, 49:13, 57:12, 57:19
Liebergall's [2] - 13:23, 40:20
life [1] - 20:19
likely [2] - 49:9, 72:22
likewise [1] - 45:3
line [4] - 17:8, 20:12, 24:9, 36:9
lines [1] - 30:5
linked [1] - 69:7
links [1] - 69:12
list [1] - 74:10
literature [3] - 74:17, 75:9, 80:13
lives [1] - 20:21
located [1] - 87:14
look [15] - 10:3, 24:16, 25:16, 26:16, 26:21, 27:11, 29:14, 30:17, 32:13, 38:6, 46:18, 59:20, 65:12, 89:5, 91:3
looking [9] - 15:7, 17:6, 19:11, 23:10, 50:20, 53:21, 56:14, 59:1, 61:10
looks [4] - 10:7, 15:12, 30:14, 39:14
lore [1] - 76:23
loss [1] - 79:21
lottery [1] - 34:12
loud [1] - 6:19
loved [1] - 79:21

## M

machine [1] - 93:4
made-up [1] - 73:22
magnifying [1] - 60:11
Main [4] - 1:13, 2:2, 2:6, 2:7
maintain [2] - 44:10, 87:11
maintained [6] - 12:15, 12:21, 43:11, 57:3, 90:14, 91:16
maintaining [1] - 91:20
male [6] - 16:14, 21:21, 24:2, 25:3, 32:4, 34:6
malingering [2] - 60:8, 64:5
man [1] - 44:20
management [1] - 42:2
manic [1] - 72:1
manner [2] - 38:19, 57:2

March [1] - 90:23, 91:1
marijuana [2] - 16:18, 67:23
Mark [1] - 5:1
marked [6] - 5:4, 10:3, 19:4, 19:5, 23:2, 30:7, 40:10, 49:22, 90:22
married [1] - 79:20
Mary [1] - 40:17
matter [1] - 93:5
maximum [1] - 52:20
McCann [3] - 1:15, 93:3, 93:12
MD [1] - 88:13
mean [10] - 28:19, 32:19, 53:4, 57:16, 66:1, 80:5, 84:10, 84:12, 87:18, 91:22
meaningful [1] - 48:23
meaningfully [1] - 90:11
means [4] - 20:15, 32:21, 48:1, 48:2
meant [2] - 34:20, 61:2
mechanism [1] - 84:3
media [2] - 14:13, 77:15
medical [7] - 16:1, 16:17, 20:9, 20:10, 23:4, 30:9, 64:23
Medical [1] - 41:13
medication [10] - 18:18, 26:4, 26:5, 52:13, 52:18, 54:21, 67:22, 80:13, 89:9, 90:13
medications [7] - 18:14, 18:15, 19:1, 21:13, 26:1, 52:15, 54:1
medicine [3] - 42:8, 54:23, 88:11
meds [3] - 20:10, 28:3, 28:15
meet [1] - 37:12
meeting [4] - 11:17, 12:8, 12:12, 15:10
melodious [1] - 16:19
members [2] - 34:11, 43:21
memories [2] - 72:22, 75:10
memory [7] - 13:14, 53:2, 64:19, 66:14, 73:21, 74:4, 77:16
mental [24] - 7:1, 7:7, 9:6, 10:4, 16:18, 25:2, 28:2, 37:1,

38:3, 39:18, 40:1, 41:10, 43:15, 47:20, 55:23, 56:14, 61:14, 66:1, 70:20, 82:17, 83:9, 85:21, 86:14, 86:17
Mental [2] - 7:11, 38:9
mentally [4] - 13:9, 69:19, 84:16, 89:14
mention [1] - 26:4
mentioned [2] - 57:7, 91:15
mentor [1] - 57:15
met [8] - 6:6, 11:12, 37:8, 37:12, 56:6, 63:5, 64:5, 64:13
MICHAEL [1] - 2:9
might [14] - 12:16, 18:9, 30:2, 35:1, 36:1, 36:14, 40:2, 43:8, 51:20, 51:22, 85:11, 85:12
milligrams [2] - 17:2, 55:3
mind [4] - 65:10, 68:15, 77:5, 91:2
mine [1] - 58:12
minute [2] - 10:4, 32:13
minutes [1] - 50:15
misconception [1] - 67:4
misinterpretation [1] - 67:5
mispronouncing [1] - 31:9
mistake [1] - 68:20
mistype [1] - 50:8
MNS [1] - 42:7
moment [5] - 12:4, 19:3, 19:11, 53:12, 59:1
Monday [1] - 1:14
money [1] - 34:12
monitor [1] - 46:11
monitoring [3] - 66:19, 75:7, 75:19
month [4] - 30:4, 79:19, 80:7, 80:9
mood [5] - 16:20, 25:17, 36:16, 36:17, 63:2
morning [2] - 76:8, 76:10
most [2] - 12:17, 28:10
mother [1] - 77:4
move [3] - 34:18, 39:8, 40:21
moved [1] - 7:18

movement [1] - 32:22
moving [1] - 23:5
MR [118] - 3:3, 3:4, 5:1, 6:4, 26:13, 26:18, 26:20, 27:4, 27:7, 53:4, 53:22, 55:15, 55:17, 61:18, 61:20, 65:6, 65:7, 65:9, 65:14, 65:16, 65:21, 65:23, 66:4, 66:6, 66:20, 67:1, 67:17, 67:18, 67:21, 70:2, 70:4, 70:9, 70:11, 70:22, 70:23, 71:3, 71:9, 71:12, 71:17, 71:21, 72:3, 72:7, 72:10, 72:14, 72:17, 72:20, 73:1, 73:4, 73:7, 73:10, 73:13, 73:16, 73:20, 74:1, 74:6, 74:9, 74:16, 74:20, 74:23, 75:2, 75:5, 75:14, 75:17, 75:20, 76:4, 76:13, 76:15, 76:18, 77:11, 77:21, 78:9, 78:11, 79:6, 79:9, 79:23, 80:3, 80:8, 80:11, 80:14, 80:17, 80:20, 80:23, 81:8, 81:11, 81:14, 81:17, 81:21, 82:1, 82:6, 82:9, 82:12, 82:15, 83:13, 83:16, 83:18, 83:21, 84:5, 84:8, 85:1, 85:5, 85:17, 85:22, 86:1, 86:4, 86:10, 86:12, 86:19, 86:20, 87:1, 87:21, 87:22, 88:1, 91:21, 91:23, 92:3, 92:8, 92:9, 92:10
MS [2] - 84:22, 85:2
MSE [1] - 36:6
multidisciplinary [2] - 9:14, 9:15
multiple [1] - 63:8
murder [1] - 15:19
murdered [1] - 43:21
murdering [1] - 43:1
murders [8] - 14:14, 34:11, 43:7, 43:9, 44:7, 65:5, 76:11, 76:12
must [1] - 17:10

## N

name [7] - 5:22, 6:5, 31:9, 39:5, 39:9,

40:6, 88:2
named [1] - 9:4
nature [2] - 61:8, 65:18
nearby [1] - 50:19
neater [1] - 16:10
necessarily [1] - 80:5
necessitating [1] - 50:22
need [2] - 17:18, 37:1
needed [2] - 10:14, 34:19
needing [1] - 34:14
needs [1] - 17:2
negative [1] - 66:13
never [1] - 60:8
NEW [2] - 1:1, 1:7
new [3] - 19:18, 31:23, 32:1
New [8] - 1:14, 2:2, 2:7, 2:8, 2:12, 6:2, 88:3, 88:11
news [1] - 43:7
News [1] - 14:16
next [11] - 36:2, 38:1, 39:8, 41:1, 45:18, 47:7, 49:19, 76:8, 76:9, 89:13, 90:15
night [1] - 35:18
nine [1] - 42:1
NO [1] - 4:2
non [1] - 66:23
normal [1] - 19:17
Notary [1] - 1:16
notation [3] - 24:13, 40:7, 74:17
note [12] - 15:9, 15:17, 17:9, 18:17, 34:2, 34:18, 37:9, 37:17, 37:19, 38:22, 39:2, 50:10
noted [1] - 60:17
notes [20] - 10:6, 11:4, 12:20, 22:22, 24:21, 24:23, 25:1, 25:22, 38:7, 39:13, 39:17, 39:23, 40:3, 43:20, 44:1, 52:4, 52:21, 53:5, 60:7, 93:8
noticed [1] - 35:22
notification [1] - 22:4
November [30] - 8:20, 11:20, 12:1, 19:13, 23:5, 28:9, 30:9, 30:15, 30:23, 31:1, 33:19, 37:3, 37:10, 38:22, 39:9, 41:6, 41:13, 44:15, 44:20, 45:21, 45:22, 47:3, 49:11, 55:21, 63:5,

63:14, 64:13, 69:16, 76:7
Nuchereno [1] - 63:19
number [1] - 48:4
numbers [1] - 67:11
numerous [1] - 77:13
nurse [1] - 35:10

O

oath [4] - 5:11, 63:23, 64:8, 64:12
object [32] - 53:4, 55:15, 65:6, 65:14, 66:20, 67:17, 70:2, 70:22, 72:3, 73:1, 73:7, 73:20, 74:13, 74:20, 75:14, 75:20, 76:13, 76:18, 77:18, 79:6, 79:23, 80:14, 81:8, 81:14, 81:21, 82:6, 82:12, 83:18, 84:22, 85:22, 86:19, 91:21
Object [11] - 65:21, 66:4, 71:9, 71:17, 72:17, 73:13, 74:6, 75:2, 80:8, 80:20, 83:13
Objection [1] - 84:5
objection [2] - 61:18, 85:10
objections [1] - 5:14
observation [1] - 22:12
observations [2] - 15:21, 22:8
observed [3] - 60:17, 66:18, 77:14
obviously [2] - 13:1, 57:20
occurred [2] - 74:4, 75:23
occurring [1] - 74:19
October [1] - 1:14
odd [1] - 32:2
OF [8] - 1:1, 1:2, 1:7, 2:1, 93:1
offense [1] - 60:23
office [3] - 68:22, 78:1, 87:15
Office [1] - 1:13
OFFICE [1] - 2:1
officer [1] - 79:1
officials [1] - 37:13
often [3] - 52:12, 81:18, 83:7
Ogden [2] - 4:9, 45:23
old [5] - 16:14, 21:21, 24:2, 25:3, 34:6

once [4] - 10:13, 15:5, 35:17, 46:19
one [25] - 10:10, 14:23, 15:4, 16:5, 17:10, 22:12, 26:11, 26:20, 33:16, 35:9, 37:22, 39:14, 40:12, 43:18, 50:17, 67:13, 70:1, 78:14, 79:21, 82:3, 91:3
one-on-one [3] - 33:16, 37:22, 50:17
onset [2] - 31:23, 32:1
operating [1] - 19:17
opined [1] - 45:10
opinion [8] - 28:17, 42:20, 55:8, 73:17, 89:13, 90:16, 90:19, 91:8, 91:11
opposed [2] - 51:17, 53:10
order [1] - 53:17
ordered [3] - 18:8, 35:10, 35:15
ordinarily [1] - 22:21
organization [1] - 85:18
orientation [1] - 36:7
ORTIZ [4] - 1:4, 2:10, 84:22, 85:2
Ortiz [45] - 6:7, 13:20, 14:14, 15:2, 15:11, 21:5, 22:20, 25:23, 28:9, 29:15, 33:12, 37:5, 38:11, 41:6, 41:16, 42:15, 44:10, 45:11, 45:14, 46:6, 45:19, 52:21, 52:22, 53:22, 56:15, 57:1, 58:22, 59:9, 59:21, 60:8, 62:23, 63:10, 64:4, 64:8, 65:1, 69:19, 74:11, 76:6, 77:14, 78:15, 81:2, 89:2, 89:14, 91:9, 91:16
ortiz [27] - 8:19, 8:21, 9:19, 11:13, 12:9, 13:6, 17:17, 23:5, 31:1, 32:17, 33:3, 33:15, 35:14, 37:20, 41:2, 46:1, 50:6, 50:21, 51:5, 54:17, 55:18, 59:3, 60:16, 68:6, 83:23, 89:23, 91:13
Ortiz's [8] - 62:4, 62:10, 63:13, 81:4, 83:17, 90:23
ortiz's [1] - 63:21

ORTIZ-FOGG [3] - 2:10, 84:22, 85:2
outpatient [1] - 23:19
outside [12] - 7:19, 12:23, 13:21, 14:9, 37:15, 37:18, 51:21, 56:4, 63:15, 85:18, 86:5, 86:8
overseeing [1] - 45:23
own [2] - 69:3, 75:12

P

P.M [1] - 1:15
page [53] - 15:4, 19:5, 21:12, 21:19, 22:3, 23:3, 23:17, 24:17, 24:23, 26:18, 26:20, 26:21, 26:22, 27:1, 27:4, 27:5, 29:5, 29:9, 29:10, 30:7, 30:17, 31:6, 33:23, 38:4, 38:7, 38:14, 38:21, 39:12, 42:12, 42:16, 45:19, 45:22, 46:2, 47:7, 49:23, 56:14, 58:11, 60:1, 60:2, 62:23, 63:9, 63:18, 63:22, 64:4, 64:8, 64:12, 89:5, 90:8, 90:9
PAGE [2] - 3:2, 4:2
pages [5] - 19:11, 26:14, 27:2, 63:8, 93:7
painful [1] - 33:1
paragraph [17] - 42:13, 42:16, 46:14, 46:17, 47:12, 47:16, 47:17, 48:20, 50:20, 56:21, 56:23, 59:20, 60:1, 60:2, 60:20, 89:7, 90:6
paranoid [5] - 24:12, 28:20, 60:21, 61:3, 61:5
parentheses [2] - 30:19
part [5] - 16:7, 20:8, 20:9, 21:2, 21:7
participate [1] - 48:22
participating [1] - 54:4
particular [3] - 65:20, 78:23, 82:3
particularly [1] - 73:5
parties [1] - 5:10
parts [3] - 41:20, 62:22, 69:16
passed [1] - 63:20

past [4] - 14:3, 16:17, 16:18, 28:2
patience [1] - 64:17
patient [36] - 6:8, 9:9, 10:10, 10:22, 11:3, 11:8, 16:7, 18:5, 18:12, 18:15, 19:18, 24:8, 34:3, 34:10, 34:12, 34:17, 35:14, 35:20, 35:22, 36:19, 38:17, 40:17, 42:1, 42:2, 42:6, 42:9, 42:17, 42:21, 42:23, 43:3, 43:5, 43:9, 43:10, 50:5, 59:15, 83:10
patient's [1] - 43:2
patients [5] - 9:17, 17:20, 18:7, 66:21, 75:21
pending [1] - 16:3
people [11] - 12:17, 24:7, 43:1, 43:4, 43:20, 52:19, 66:3, 66:11, 71:22, 76:10, 78:21
per [2] - 42:21, 43:7
performs [1] - 58:14
perhaps [2] - 60:22, 61:12
period [3] - 30:15, 31:4, 41:12
periods [1] - 47:13
perplexed [1] - 21:3
person [18] - 28:15, 32:21, 48:11, 51:15, 59:3, 59:6, 59:8, 65:19, 67:16, 70:20, 71:15, 72:15, 74:10, 77:8, 82:10, 84:16, 89:15, 90:17
person's [2] - 81:19, 82:2
personal [1] - 75:11
personality [3] - 71:23, 72:5, 72:7
pgs [2] - 4:4, 4:7
phase [1] - 72:1
phrase [3] - 75:6, 79:14, 79:17
physical [5] - 34:14, 34:20, 34:22, 42:10, 68:2
physician [1] - 31:8
pieced [1] - 76:1
Place [1] - 2:7
place [5] - 35:13, 51:16, 69:19, 69:21, 93:5
placed [2] - 25:23,

54:21
places [1] - 63:8
Plaintiff [2] - 1:5, 2:3
Plaintiff's [4] - 5:4, 23:3, 30:7, 38:5
PLAINTIFF'S [1] - 4:2
plan [3] - 16:23, 17:1, 29:2
point [14] - 28:18, 29:16, 33:16, 37:6, 40:17, 40:18, 45:10, 46:23, 47:19, 48:20, 54:15, 55:22, 60:4, 90:10
points [1] - 77:4
police [8] - 24:9, 29:7, 43:6, 68:23, 77:23, 78:13, 79:1, 79:12
policies [1] - 35:12
policy [7] - 35:21, 83:8, 85:23, 86:2, 86:4, 86:8, 86:9
poor [5] - 16:15, 16:16, 21:22, 22:1, 22:2
position [3] - 13:23, 57:16, 87:19
positive [3] - 15:22, 16:21, 16:22
possible [5] - 9:2, 10:17, 69:23, 70:16, 76:16
possibly [4] - 31:20, 47:1, 54:18, 71:1
Possibly [1] - 77:19
post [1] - 32:15
potentially [1] - 42:6
poverty [1] - 16:20
practice [5] - 87:11, 87:14, 87:17, 88:11, 88:15
Practice [1] - 1:12
practitioners [1] - 35:10
pre [1] - 5:4
pre-marked [1] - 5:4
precipitate [1] - 48:16
precipitated [1] - 48:3
preoccupied [2] - 34:17, 41:22
preparation [1] - 13:13
prepared [1] - 19:10
prescribe [2] - 18:14, 19:1
prescribed [3] - 18:22, 21:13, 26:5
prescription [1] - 26:8
present [4] - 17:10, 27:11, 34:10, 41:19

presentation [3] - 47:14, 47:18, 53:16
presentations [1] - 78:3
presented [7] - 38:12, 55:22, 61:16, 63:6, 64:14, 74:11, 74:12
presenting [2] - 21:1, 28:16
presents [2] - 34:12, 65:1
preserving [2] - 70:4, 70:9
presume [1] - 12:4
pretty [6] - 14:7, 54:23, 59:19, 60:17, 67:13, 80:13
previous [1] - 22:9
primary [1] - 63:13
prison [1] - 91:22
private [4] - 18:11, 87:11, 87:14, 87:17
privileges [1] - 8:9
problem [2] - 21:1, 66:15
problems [3] - 20:10, 29:6, 66:22
Procedure [1] - 89:18
procedure [2] - 19:17, 35:21
procedures [2] - 35:12, 83:9
proceed [3] - 89:21, 91:9, 91:13
proceeding [3] - 53:23, 84:17, 93:4
proceedings [8] - 6:17, 14:9, 14:13, 46:1, 54:4, 59:4, 81:19, 92:12
process [10] - 25:6, 36:17, 53:13, 70:15, 74:3, 75:1, 84:18, 89:21, 90:12, 91:14
processed [1] - 61:7
processing [1] - 66:10
produce [1] - 72:22
profession [3] - 32:20, 48:1, 73:17
professional [5] - 10:21, 11:3, 28:16, 55:8, 79:4
Professional [1] - 1:16
profile [1] - 44:19
progress [2] - 15:9, 46:15
progressively [2] - 37:6, 46:7
prone [2] - 72:2, 72:15

proper [1] - 85:6
proposition [1] - 66:3
prosecuting [1] - 62:9
prosecution [2] - 69:4, 83:11, 86:16
protocol [1] - 78:23
provide [4] - 6:23, 9:23, 82:19, 85:19
provided [6] - 6:10, 6:16, 7:21, 8:18, 10:1, 88:9
provider [2] - 38:15, 63:14
providers [1] - 46:11
provides [1] - 58:15
proving [2] - 84:14, 84:15
psych [2] - 8:5, 24:2
psychiatric [10] - 6:10, 7:1, 8:8, 8:18, 9:15, 16:9, 16:13, 46:19, 50:11, 89:1
psychiatrist [2] - 17:23, 85:4
psychiatrists [3] - 9:8, 9:23, 36:23
psychiatry [6] - 7:20, 42:1, 88:16, 88:18
psychological [2] - 44:18, 44:21
psychologist [3] - 9:22, 17:19, 18:1
psychologists [1] - 9:16
psychosis [2] - 79:15, 80:4
psychosocial [1] - 42:13
psychotic [42] - 28:20, 30:20, 31:23, 32:8, 34:17, 37:6, 45:4, 47:20, 48:2, 48:5, 48:16, 50:21, 51:10, 51:13, 51:18, 52:6, 52:9, 52:12, 52:17, 54:6, 54:13, 54:17, 54:23, 55:9, 55:11, 55:19, 56:2, 64:1, 67:7, 67:8, 68:3, 70:13, 74:12, 76:16, 78:21, 79:2, 79:18, 81:20, 83:10, 89:9
Public [1] - 1:16
Puerto [1] - 42:15
purported [4] - 63:22, 69:8, 69:13, 78:14
purposes [1] - 59:4
pursuant [1] - 1:12
purview [1] - 56:10
put [2] - 18:19, 85:10

putting [1] - 42:19

**Q**

questioned [1] - 92:4
questioning [2] - 6:12, 79:5
questions [12] - 5:16, 62:8, 63:18, 63:20, 64:22, 65:17, 69:22, 73:6, 73:11, 87:22, 88:5, 88:7
quicker [1] - 58:19
quite [3] - 47:17, 48:21, 57:2
quote [1] - 63:9
quotes [11] - 24:10, 27:8, 27:9, 27:13, 27:15, 27:18, 27:19, 52:22, 56:17, 64:14

**R**

rational [1] - 57:2
reach [1] - 14:21
reaction [1] - 67:15
reactive [4] - 47:22, 47:23, 79:14, 80:4
read [24] - 16:11, 16:12, 20:4, 20:17, 20:18, 20:22, 20:23, 21:1, 21:3, 22:8, 22:23, 24:4, 24:10, 34:1, 36:5, 36:12, 41:18, 42:10, 42:20, 45:13, 47:11, 47:17, 69:17, 90:7
reading [3] - 33:17, 69:14, 88:8
readmitted [1] - 41:12
reads [1] - 42:16
ready [1] - 19:7
real [1] - 67:3
reality [8] - 32:8, 51:17, 66:19, 66:22, 66:23, 71:14, 71:19, 74:4
really [4] - 84:6, 84:13, 85:23, 89:2
reason [5] - 15:18, 27:19, 30:19, 43:5, 62:6
reasoning [1] - 66:14
reasons [1] - 32:10
receive [1] - 26:7
received [1] - 22:7
recognize [7] - 14:12, 39:3, 39:4, 39:5, 39:9, 39:12, 40:2
recognizes [1] - 79:1

recognizing [1] - 39:3
recollection [6] - 11:12, 11:15, 12:6, 12:12, 12:23, 13:5, 49:13, 53:9
record [17] - 5:8, 5:23, 6:6, 10:2, 10:20, 16:12, 26:14, 28:5, 29:13, 38:16, 40:21, 54:15, 62:17, 70:7, 85:3, 85:7, 85:10
Records [2] - 4:3, 4:6
records [20] - 4:8, 11:10, 11:11, 12:1, 13:22, 14:2, 18:11, 26:6, 28:14, 28:22, 29:20, 33:2, 38:11, 38:13, 38:20, 39:22, 44:10, 49:16, 54:11, 55:2
redirected [1] - 34:14
Referee [1] - 5:11
reference [1] - 38:12
references [1] - 64:23
referral [1] - 16:8
referred [1] - 79:3
referring [3] - 26:23, 36:23, 89:23
refresh [2] - 13:14, 64:19
regarding [3] - 13:20, 62:4, 89:1
Registered [1] - 1:16
regressed [1] - 15:22
reiterate [1] - 62:22
reiterated [1] - 64:12
relapse [1] - 81:19
relatedness [1] - 66:11
release [1] - 26:8
released [3] - 28:23, 29:2, 41:6
reliability [1] - 10:21
reliance [1] - 11:3
rely [1] - 11:7
remained [2] - 91:9, 91:13
remaining [1] - 41:22
remember [17] - 6:8, 9:3, 12:4, 12:13, 12:14, 13:7, 14:16, 15:12, 33:11, 40:5, 68:17, 68:18, 69:14, 69:15, 77:6
remembered [2] - 13:2, 15:1
remind [1] - 6:7
render [1] - 81:5
reoccur [1] - 80:21
report [24] - 19:10,

20:6, 21:6, 22:19, 24:2, 24:9, 31:16, 36:5, 40:22, 45:20, 47:8, 52:3, 57:20, 57:22, 58:9, 58:13, 58:15, 59:17, 59:21, 88:20, 90:2, 93:3
**reported** [3] - 16:15, 56:19, 58:20
**reporter** [1] - 6:18
**REPORTER** [1] - 93:1
**Reporter** [1] - 1:16
**reporting** [2] - 18:9, 74:3
**reports** [6] - 21:21, 23:4, 43:7, 54:11, 58:23, 59:18
**representing** [2] - 6:7, 88:3
**request** [2] - 7:12, 39:15
**requested** [1] - 59:18
**reserved** [1] - 5:16
**resident** [1] - 9:2
**residents** [1] - 9:3
**respect** [21] - 6:17, 7:10, 10:2, 12:5, 13:5, 18:14, 44:7, 44:14, 55:18, 57:15, 65:4, 70:14, 78:19, 79:10, 82:20, 83:11, 84:20, 85:20, 86:15, 88:4, 91:8
**respective** [1] - 5:10
**response** [3] - 16:9, 16:13, 33:1
**responses** [1] - 20:12
**responsive** [1] - 46:20
**responsiveness** [1] - 32:22
**restraint** [4] - 35:2, 35:3, 35:15, 35:23
**restraints** [3] - 34:15, 34:20, 34:22
**retired** [1] - 7:18
**return** [1] - 46:19
**review** [7] - 13:13, 15:4, 19:6, 20:16, 21:7, 28:8, 31:17
**reviewed** [4] - 15:5, 34:3, 40:17, 76:9
**reviewing** [2] - 28:14, 47:18
**Rico** [1] - 42:15
**rights** [1] - 70:9
**rigid** [1] - 32:23
**RN** [1] - 40:17
**Ron** [1] - 13:22
**room** [6] - 22:12, 37:14, 37:15, 37:19,

38:16, 50:18
**Room** [1] - 2:12
**Royce** [1] - 1:15
**ROYCE** [2] - 93:3, 93:12
**rules** [1] - 6:17
**Rules** [1] - 1:12

## S

**sad** [1] - 16:15
**sake** [6] - 6:22, 15:16, 17:16, 18:10, 54:4, 79:4
**sat** [1] - 13:1
**saw** [14] - 11:18, 13:7, 17:7, 18:7, 28:9, 36:4, 41:11, 49:19, 55:2, 56:3, 56:12, 58:23, 60:16, 68:8
**scared** [4] - 24:5, 24:7, 24:14, 64:14
**scheduled** [1] - 36:3
**schizoaffective** [2] - 54:18, 63:1
**schizophrenia** [16] - 17:1, 31:18, 32:1, 45:1, 60:22, 61:3, 65:18, 65:19, 66:8, 66:14, 66:18, 66:21, 71:4, 72:1, 72:6, 72:8
**schizotypal** [2] - 71:23, 72:4
**Schoelerman** [1] - 13:23
**scope** [4] - 17:18, 17:21, 18:4, 56:10
**Screening** [1] - 4:4
**screening** [3] - 9:20, 19:14, 21:10
**screens** [1] - 83:10
**second** [19] - 21:19, 42:12, 42:13, 42:16, 45:22, 46:2, 46:14, 46:17, 47:4, 50:20, 56:23, 59:20, 60:1, 60:2, 89:5, 89:7, 90:6
**secondary** [2] - 51:17, 71:14
**secondhand** [1] - 75:13
**secretarial** [1] - 50:8
**secretary** [1] - 50:4
**section** [3] - 21:15, 25:16, 26:5
**security** [2] - 37:14, 50:19
**see** [33] - 9:19, 10:4,

10:10, 16:7, 20:11, 21:12, 22:5, 24:17, 25:1, 25:7, 25:8, 25:23, 26:4, 31:1, 31:17, 32:14, 33:8, 36:3, 36:11, 37:9, 38:20, 38:23, 42:9, 44:2, 46:1, 46:17, 47:7, 58:8, 59:23, 60:23, 64:23, 90:4
**seeing** [6] - 10:22, 11:16, 14:16, 28:6, 43:2, 46:13
**seem** [2] - 32:2, 60:21
**seemingly** [1] - 15:19
**sees** [1] - 58:22
**self** [3] - 27:17, 27:18, 27:20
**sense** [6] - 10:19, 20:20, 34:16, 40:3, 57:17, 80:5
**sent** [1] - 34:6
**sentence** [1] - 90:15
**separate** [1] - 72:11
**sequential** [1] - 53:17
**serious** [2] - 22:9, 44:21
**services** [14] - 7:2, 7:7, 9:6, 10:5, 17:19, 17:21, 38:10, 39:19, 40:1, 41:10, 43:15, 46:19, 82:19, 83:9
**Services** [4] - 7:11, 38:4, 82:17, 86:14
**set** [1] - 93:6
**seven** [1] - 30:7
**severe** [6] - 55:9, 55:11, 61:15, 67:15, 70:13, 74:11
**severity** [1] - 67:7
**shape** [1] - 13:7
**shedding** [1] - 44:13
**short** [1] - 85:11
**shorthand** [1] - 93:4
**show** [6] - 15:3, 19:3, 40:10, 40:22, 49:22, 90:22
**showing** [3] - 23:2, 30:6, 41:1
**sign** [1] - 51:10
**signature** [4] - 16:4, 31:6, 39:10, 39:12
**signatures** [1] - 40:3
**significance** [1] - 31:22
**significant** [3] - 28:11, 41:20, 63:2
**significantly** [1] - 13:8
**signing** [1] - 5:12
**similar** [2] - 58:4, 87:2

**SIRAGUSA** [1] - 2:9
**sister** [1] - 43:3
**situation** [3] - 20:19, 65:1, 65:11
**six** [1] - 38:4
**slash** [2] - 25:8, 25:14
**sleep** [2] - 16:16, 68:1
**slows** [1] - 32:21
**Smith** [2] - 50:2, 89:2
**socially** [1] - 43:2
**solving** [1] - 66:15
**someone** [3] - 24:18, 27:23, 32:3, 48:10, 79:22
**sometime** [3] - 11:19, 14:3, 49:20
**sometimes** [4] - 32:23, 73:2, 75:21, 77:2
**somewhat** [2] - 16:1, 42:4
**somewhere** [1] - 29:8
**sorry** [2] - 37:4, 62:5
**sound** [3] - 8:17, 12:5, 57:17
**sounds** [1] - 24:12
**source** [4] - 51:17, 75:7, 75:19, 84:19
**source-monitoring** [2] - 75:7, 75:19
**sources** [5] - 14:13, 56:4, 71:15, 75:13, 77:15
**span** [1] - 81:12
**Spanish** [1] - 17:14
**speaking** [3] - 33:14, 33:20, 70:20
**specialty** [1] - 88:15
**specifically** [1] - 52:2
**specify** [2] - 37:17, 37:18
**speech** [1] - 16:19
**stability** [1] - 90:13
**stabilized** [3] - 46:20, 82:3, 82:4
**stages** [1] - 83:12
**Stambach** [2] - 78:12, 78:16
**stand** [1] - 45:11
**standard** [1] - 59:19
**standpoint** [1] - 55:20
**staring** [1] - 33:3
**start** [1] - 61:2
**started** [2] - 35:17, 55:19
**starting** [3] - 45:21, 57:15, 62:22
**starts** [3] - 27:18, 36:10, 42:12

**STATE** [2] - 1:1, 1:7
**state** [17] - 5:22, 18:17, 22:7, 25:20, 27:12, 28:16, 30:18, 30:21, 46:8, 48:19, 56:15, 56:23, 57:3, 63:15, 70:20, 83:23, 89:7
**State** [3] - 2:8, 88:3, 88:11
**statement** [6] - 64:2, 67:18, 68:16, 70:12, 71:22, 74:5
**states** [7] - 15:18, 24:8, 31:20, 49:3, 57:3, 59:21, 60:20
**status** [4] - 16:19, 25:2, 32:15, 56:14
**STENOGRAPHER** [1] - 5:22
**stenographic** [1] - 93:8
**sticker** [1] - 91:1
**stiff** [1] - 42:4
**still** [8] - 7:14, 13:9, 31:14, 31:15, 46:22, 53:21, 82:19, 92:5
**stimuli** [1] - 33:1
**stipulated** [1] - 5:9
**stipulation** [1] - 5:7
**stops** [1] - 32:22
**stories** [1] - 43:7
**story** [4] - 76:21, 77:1, 77:2, 77:7
**Street** [4] - 1:13, 2:2, 2:6, 2:11
**stressor** [6] - 48:8, 48:10, 48:13, 67:14, 79:19
**stressors** [11] - 47:22, 47:23, 48:3, 48:4, 52:15, 67:6, 67:10, 68:2, 80:19, 81:18, 82:10
**strong** [1] - 66:2
**subjective** [1] - 24:18
**submitted** [1] - 10:5
**subsequent** [1] - 52:16
**substance** [1] - 16:17
**substantially** [1] - 89:8
**subtext** [1] - 74:2
**subtype** [1] - 54:19
**suffer** [1] - 60:21
**suffered** [2] - 54:12, 63:1
**suffering** [13] - 44:20, 45:1, 45:4, 52:23, 54:12, 54:17, 56:1,

65:19, 70:12, 78:21, 79:2, 85:21, 86:17
**sufficient** [1] - 43:8
**suggest** [3] - 28:3, 43:8, 44:23
**suggested** [1] - 70:21
**suggestibility** [2] - 70:14, 72:2
**suggestible** [1] - 72:15
**suicidal** [3] - 22:4, 34:7, 34:13
**suicide** [4] - 13:11, 16:22, 22:9, 22:16
**summaries** [1] - 33:18
**summarizing** [1] - 42:19
**summary** [6] - 4:4, 19:14, 19:18, 21:15, 21:19, 24:18, 31:7, 43:14, 50:21
**SUNY** [1] - 88:14
**supervision** [2] - 21:16, 21:20
**supplied** [1] - 14:2
**supposed** [1] - 42:7
**surrounding** [3] - 23:4, 68:6, 69:4
**susceptible** [1] - 70:23
**suspect** [2] - 79:2, 85:20
**suspected** [1] - 22:4
**sworn** [3] - 5:19, 62:14, 62:18
**symptoms** [8] - 41:16, 55:5, 60:11, 63:2, 66:8, 66:13, 74:12, 89:8
**system** [2] - 68:23, 84:4
**systematic** [1] - 51:18

**T**

**tale** [1] - 77:12
**talks** [2] - 20:16, 36:6
**tasked** [2] - 84:13, 84:14
**team** [5] - 34:4, 34:5, 84:11, 84:12
**techniques** [1] - 78:7
**ten** [3] - 65:2, 92:5
**tenth** [1] - 27:4
**terms** [2] - 9:13, 80:6
**tested** [1] - 56:7
**testified** [1] - 5:20
**testimonial** [1] - 48:22
**testimony** [9] - 6:16, 14:5, 41:5, 50:3,

62:3, 62:19, 81:1, 81:3, 88:9
**THE** [46] - 1:7, 2:1, 5:22, 6:1, 66:21, 67:19, 70:3, 70:8, 71:1, 71:10, 71:18, 72:4, 72:9, 72:11, 72:18, 73:2, 73:8, 73:14, 73:21, 74:7, 74:14, 74:21, 75:3, 75:15, 75:21, 76:19, 77:19, 79:7, 80:1, 80:9, 80:15, 80:21, 81:9, 81:15, 81:22, 82:7, 82:13, 83:14, 83:19, 84:6, 85:15, 86:3, 86:21, 91:22, 92:1
**theme** [1] - 43:18
**thereabouts** [1] - 62:1
**thinking** [2] - 36:22, 66:9
**third** [4] - 17:8, 22:3, 24:17, 60:20
**thoughts** [5] - 16:22, 16:23, 24:3, 71:5, 75:12
**threat** [1] - 34:8
**threatened** [1] - 37:21
**three** [4] - 23:7, 31:4, 58:8, 58:13
**thumb** [1] - 24:23
**timely** [1] - 38:18
**TIMOTHY** [1] - 2:5
**Timothy** [1] - 88:2
**today** [5] - 6:12, 13:13, 14:5, 14:10, 28:6
**today's** [1] - 88:9
**together** [1] - 76:1
**took** [2] - 30:1, 78:14
**top** [2] - 16:8, 47:3
**towards** [2] - 21:19, 36:7
**Tower** [1] - 2:7
**training** [1] - 78:18
**Transcript** [1] - 4:12
**transcript** [10] - 5:13, 13:15, 13:16, 26:22, 61:22, 62:7, 63:8, 88:8, 93:6, 93:7
**transcripts** [1] - 62:6
**transferred** [5] - 11:21, 42:1, 42:8, 63:15, 77:17
**treat** [1] - 31:14
**treated** [3] - 28:17, 52:13, 80:12
**treating** [5] - 17:19, 35:6, 35:13, 35:20, 68:5, 84:15

**treatment** [23] - 6:11, 7:21, 8:18, 9:8, 9:17, 9:23, 10:1, 11:8, 13:20, 18:7, 21:7, 29:2, 37:1, 38:15, 46:10, 51:3, 51:20, 52:20, 53:2, 53:9, 56:11, 63:13, 83:22
**treats** [1] - 83:10
**Trial** [1] - 1:11
**trial** [3] - 5:17, 45:11, 81:13
**trick** [1] - 6:12
**tried** [1] - 13:10
**trigger** [1] - 48:5
**triggered** [1] - 79:19
**true** [3] - 52:12, 65:19, 93:7
**truth** [1] - 62:14
**truthful** [2] - 62:13, 62:18
**trying** [4] - 24:7, 24:19, 56:12, 64:18
**turn** [4] - 22:3, 26:11, 38:1, 38:6, 42:11, 45:18, 47:16, 61:21, 62:21
**turning** [4] - 24:16, 33:23, 38:21, 63:18
**twenties** [1] - 32:4
**twenty** [1] - 38:4
**twenty-six** [1] - 38:4
**twice** [1] - 10:14, 35:18, 55:3
**two** [16] - 15:19, 19:11, 21:5, 21:12, 34:11, 42:1, 42:23, 43:18, 49:23, 56:14, 58:8, 58:11, 59:13, 59:18, 67:13, 76:10
**two-page** [3] - 21:12, 49:23, 58:11
**type** [2] - 17:13, 68:1
**typo** [1] - 50:4

**U**

**ultimately** [1] - 25:19
**unable** [1] - 41:23
**unchanged** [2] - 40:18
**uncommon** [1] - 32:3
**under** [16] - 15:21, 22:10, 25:1, 28:14, 29:19, 35:22, 56:14, 63:23, 64:8, 64:12, 76:6, 89:5, 89:6, 89:15, 90:17
**undergoing** [1] - 46:6
**underproductive** [1] - 16:19

**understandable** [1] - 50:4
**UNDERWOOD** [1] - 2:4
**undifferentiated** [1] - 31:18
**unit** [1] - 85:19
**unknown** [1] - 16:17
**unless** [1] - 37:18
**unlike** [1] - 77:12
**unmanageable** [1] - 34:15
**unpredictable** [1] - 36:18
**unprescribed** [1] - 67:23
**unstable** [1] - 42:5
**up** [5] - 16:5, 22:13, 36:3, 73:22, 84:10
**update** [1] - 91:5
**upstate** [1] - 68:18

**V**

**vague** [1] - 21:22
**validity** [1] - 87:4
**various** [4] - 6:16, 38:11, 45:15, 74:11
**veracity** [4] - 44:14, 56:7, 84:1, 84:20
**verbalization** [1] - 21:3
**visit** [1] - 15:2
**voices** [7] - 16:16, 51:6, 51:15, 51:23, 52:22, 56:16, 71:7
**vs** [1] - 1:6

**W**

**waived** [2] - 5:12, 5:14
**wall** [1] - 33:3
**wants** [1] - 24:8
**warning** [1] - 43:6
**watch** [1] - 22:16
**Watson** [1] - 40:17
**Wayne** [3] - 1:13, 6:5, 26:13
**WAYNE** [2] - 2:1, 2:1
**week** [5] - 10:13, 10:14, 35:17, 35:18, 80:6
**WENDY** [2] - 93:3, 93:12
**Wendy** [1] - 1:15
**West** [2] - 6:1, 87:15
**whereabouts** [1] - 7:17
**whereby** [1] - 84:3
**wherein** [1] - 71:7

**whichever** [1] - 35:8
**whole** [2] - 13:9, 36:12
**wife** [1] - 20:21
**Williamsville** [1] - 1:14
**williamsville** [1] - 2:2
**WITNESS** [43] - 3:2, 6:1, 66:21, 67:19, 70:3, 70:8, 71:1, 71:10, 71:18, 72:4, 72:9, 72:11, 72:18, 73:2, 73:8, 73:14, 73:21, 74:7, 74:14, 74:21, 75:3, 75:15, 75:21, 76:19, 77:19, 79:7, 80:1, 80:9, 80:15, 80:21, 81:9, 81:15, 81:22, 82:7, 82:13, 83:14, 83:19, 84:6, 85:15, 86:3, 86:21, 91:22, 92:1
**wondering** [1] - 46:16
**word** [7] - 7:6, 20:18, 21:4, 21:23, 22:2, 25:9, 36:13
**words** [6] - 9:13, 11:2, 42:19, 73:11
**worried** [1] - 25:18
**worse** [1] - 37:6
**write** [3] - 59:5, 89:13, 89:20
**writes** [1] - 58:14
**writing** [1] - 20:7
**written** [3] - 40:22, 49:7, 49:12
**wrongdoing** [1] - 65:4
**wrote** [1] - 50:10

**X**

**Xanax** [2] - 16:18, 67:23

**Y**

**year** [5] - 16:14, 21:21, 24:2, 25:3, 34:6
**years** [6] - 12:11, 13:1, 14:17, 65:2, 92:5
**YORK** [2] - 1:1, 1:7
**York** [6] - 1:14, 2:2, 2:7, 2:8, 2:12, 6:2, 88:3, 88:11
**yourself** [2] - 7:19, 50:1

**Z**

**Zyprexa** [1] - 54:21
**zyprexa** [1] - 89:11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSUE ORTIZ,

              Plaintiff,

   -vs-

RICHARD WAGSTAFF, MARY GUGLIUZZA,
MARK VAUGHN, MARK STAMBACH, and
BPD DOES 1-12, in their Capacity as Police Officers
of the CITYOF BUFFALO; BUFFALO POLICE
DEPARTMENT; CITY OF BUFFALO,

           Defendants.

---

**INITIAL DISCLOSURE**

Docket No. 1:16-CV-00321

Pursuant to Fed.R.Civ.P. 26(a)(1)(A), Defendants, above-named, by their undersigned attorney, provide the following initial disclosure:

(i)    The name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

**Response:**   Mary Gugliuzza, Richard Wagstaff, Mark Vaughn, Mark Stambach, James Lonergan, Mary Evans; Buffalo Police Department, 74 Franklin Street, Buffalo, NY 14202; 716-851-4444. These witnesses may have information that is relevant to the investigation of the murders of Nelson and Miguel Camacho on November 11, 2004, at 879 Niagara Street, Buffalo, New York and Plaintiff's arrest. Upon information and

1

belief, there were numerous employees of the Buffalo Police Department who participated in the investigation of the November 11, 2004 crimes. Other than the named individual defendants, upon information and belief, discoverable information, will be in the possession of the City of Buffalo and its departments, agents and/or employees. Request for such information can be made through counsel for the City of Buffalo, which is the City of Buffalo Law Department, located on the eleventh floor of Buffalo City Hall, 65 Niagara Square, Buffalo, New York 14202. The Law Department can be reached by telephone at (716) 851-4317. Upon information and belief, other possibly discoverable information may be in the possession of Erie County District Attorney's Office employees, New York State Police employees, United States Attorney's Office for the Western District of New York employees, Federal Bureau of Investigation employees, and Bureau of Alcohol, Tobacco, Firearms and Explosives employees regarding Plaintiff's prosecution and subsequent release from custody.

(ii)     A copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

**Response:**   The Defendants may use relevant documents, data compilations, and tangible things to support its defenses in this matter. The categories of documents and things may be used to support its claims and defenses include:

2

A-1702

- Any and all records, documents, policies, and recordings relating to the initial complaint; any and all records, documents, recordings relating to the Defendants investigation; any and all records, documents, policies, and recordings relating to the actions of the Plaintiff; and any and all other official record in the custody and control of the City of Buffalo, its Departments, agents and/or employees. Upon information and belief, copies of records, documents, policies, and recordings relative to this litigation are maintained at Buffalo Police Headquarters, which is located at 74 Franklin Street, Buffalo, New York 14202.

- Any and all records, documents, evidence, photographs, and recordings relating to the Erie County Central Police Services' participation in the investigation and prosecution. Upon information and belief, each may be maintained at the Erie County Central Police Services Offices, which is located at is located at 45 Elm Street, Suite 1, in the City of Buffalo, New York.

- Any records, documents, evidence, photographs, and recordings relating to the criminal proceedings against Plaintiff. Upon information and belief, each may be maintained at the Erie County Court, which is located at is located at 25 Delaware Avenue in the City of Buffalo, New York. Upon information and belief, Plaintiff moved to unseal the relevant court file and has it in his possession.

3

- All additional records, documents, photographs, and recordings relating to Plaintiff's actions and allegations and Plaintiff's incarceration. Upon information and belief, such records may be in his possession.

- Upon information and belief, pursuant to two (2) court orders issued by the Honorable Richard J. Arcara, United States District Judge for the Western District of New York, issued on November 9, 2012 and March 7, 2013, respectively, relevant documentation may be in Plaintiff's possession regarding the investigation of the November 11, 2004 crimes and Plaintiff's subsequent release from custody.

(iii)   A computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Response:   Defendants do not claim any damages.

(iv)   For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

4

**Response:**   The City of Buffalo is self-insured.   If the Police Officers named as Defendants or other personnel employed by the City of Buffalo were acting within the course and scope of their employment, the City of Buffalo would indemnify those individuals for any liability, if any liability so attaches, to the extent required by the applicable provisions of law, contract and/or bargaining agreement.

Defendants reserve the right to supplement or correct this disclosure pursuant to Fed.R.Civ.P. 26(e).

Dated:          February 24, 2017
                Buffalo, New York

                                Yours, ect.,

                                Timothy A. Ball
                                Corporation Counsel
                                Attorney for Defendants

                       By:      /s/Maeve E. Huggins
                                Assistant Corporation Counsel
                                City of Buffalo Dept. of Law
                                65 Niagara Square, 1112 City Hall
                                Buffalo, New York 14202
                                Phone: (716) 851-4317
                                Fax: (716) 851-4105
                                E-Mail: mhuggins@city-buffalo.com

TO:     Wayne C. Felle, Esq.
        The Law Offices of Wayne C. Felle, P.C.
        Attorneys for Plaintiff
        6024 Main Street
        Williamsville, New York 14221

CC:   Jennifer C. Persico, Esq.
      Mark C. Davis, Esq.
      Lippes Mathias Wexler Friedman LLP
      Attorneys for Defendants in Associated Action 1:16-cv-00322-LJV
      50 Fountain Plaza, Suite 1700
      Buffalo, NY 14202

STATE OF NEW YORK: COURT OF CLAIMS

JOSUE ORTIZ,                                                    VERIFIED CLAIM

                              Claimant,

    v.                                                         Claim No.:

THE STATE OF NEW YORK,

                              Defendant.                       15-1960480    *RECEIVED*
                                                                              NYS OFFICE OF THE
                                                                              JUN 18 2015
                                                                              ATTORNEY GENERAL
                                                                              CLAIMS BUREAU

TO THE CLERK OF THE COURT OF CLAIMS:
TO THE ATTORNEY GENERAL OF THE STATE OF NEW YORK:

        The Claimant, **JOSUE ORTIZ**, by his attorneys, The Law Offices of Wayne C. Felle,

PC  (Wayne C. Felle, Esq., of counsel), alleges as follows:


        1.      The Claimant, JOSUE ORTIZ (hereinafter sometimes referred to as "JOSUE") is

a resident of the City of Buffalo, County of Erie and State of New York.  Claimant's mailing

address is 50 Shreck Avenue, Buffalo, New York 14215.

        2.      Request is hereby made that all correspondence relating to this claim be addressed

to Claimant's attorneys. The Claimant's attorneys are The Law Offices of Wayne C. Felle, P.C.

(Wayne C. Felle, Esq., of counsel), 6024 Main Street, Williamsville, New York 14221.

Telephone number: (716) 505-2700.

        3.      This claim is brought on behalf of JOSUE ORTIZ for damages arising under § 8-

b of the Court of Claims Act (known as the Unjust Conviction and Imprisonment Act) for the

unjust and wrongful conviction and imprisonment of JOSUE for crimes he did not commit.



EXHIBIT
6
3/15/18

## BACKGROUND

4.      On November 11, 2004 shortly after 9:30pm Nelson "Lobo" Camacho and his brother Miguel "Flaco" Camacho were violently murdered after three men kicked in their front door, stormed into their home and shot them to death. Buffalo Police officers responded to the crime scene and thereafter controlled the investigation into the perpetrator(s) of the murders.

5.      On November 16, 2004, JOSUE was arrested and subjected to custodial interrogation, by the Buffalo Police Department, in the City of Buffalo, State of New York, and remained in custody until his release from State prison on December 8, 2014. See "Certificate of Incarceration" attached as *"Exhibit A"*

6.      Witness statements were procured by Buffalo Police Detectives which described the perpetrators of the crime as three

7.      The physical evidence collected during the investigation by Buffalo Police Detectives pointed to Robbery as the motivation for the murders.

8.      During the interrogation and detention of JOSUE Buffalo  Police Detectives purported that he gave them a "confession", which contained facts that would only be known to the perpetrator, and arrested JOSUE for the Murder of Nelson and Miguel Camacho

9.      Based upon testimony and the "confession" of JOSUE, on December 6, 2004, an Erie County Grand Jury indicted JOSUE on two (2) counts of Murder in the First Degree in violation of New York Penal Law §125.27(1)(a)(viii); two (2) counts of Murder in the First Degree in violation of New York Penal Law §124.27(1)(a)(vii); two (2) counts of Murder in the Second Degree in violation of New York Penal Law §125.25(1), 20.00; two (2) counts of Murder in the Second Degree in violation of New York Penal Law §125.25(3); and one (1) count of

2

A-1708

Burglary in the First Degree, an Armed Felony in violation of New York State Penal Law §140.30(1), 20.00.  See Indictment attached hereto as "**Exhibit B**".

10.     During criminal proceedings JOSUE attempted suicide while in jail.

11.     JOSUE's attorney, John Nuchereno, Esq., challenged whether JOSUE was mentally fit to stand trial. The Honorable Joseph Forma, J.S.C. ruled that he was.

12.     On May 22, 2006 JOSUE, while facing the possibility of conviction for multiple counts of Murder in the 1st Degree, with the potential for the Death Penalty, accepted a plea offer and his conviction for two counts of manslaughter in the 1st degree was accepted by the Honorable Michael D'Amico, J.S.C..

13.     Thereafter, on or about June 16, 2006, JOSUE was sentenced to an indefinite term of twenty-five (25) years of imprisonment with five (5) years of post release supervision, and was directed to the custody of the New York State Department of Corrections (the "Judgment of Conviction).  See attached hereto as "**Exhibit C**".

14.     On March 17, 2005, JOSUE filed an appeal of his conviction to the Supreme Court of the State of New York, Appellate Division, Fourth Department.  The Judgment of Conviction was unanimously affirmed by the Appellate Division on December 21, 2007.  See attached hereto as "**Exhibit D**".

## BASIS FOR LIABILITY

15.     The wrongful arrest, conviction, or incarceration of JOSUE was the product of a gross miscarriage of justice and was the direct result of the intentional, grossly negligent and malicious actions of members of the Buffalo Police Department ("BPD") who manipulated, fabricated, altered, suggested and coerced a false confession from JOSUE a man whom they knew had a history of serious mental health problems at the time of his interrogation.

16.     Rather than properly investigating the crime to find the true perpetrator, Buffalo Police detectives manufactured the false evidence, to wit, the confession, against an innocent man by suggesting, manipulating and unfairly taking advantage of JOSUE's mental and emotional vulnerabilities by telling him non-public details of the crime, that later Buffalo Police Officers would suggest that only the police or the real perpetrator could have known, and by falsely claiming that the non-public details originated with JOSUE. Buffalo Police Officers nonetheless arrested JOSUE.

17.     At the time of JOSUE's arrest and detention there were significant inconsistencies between the "confession" that Buffalo Police Officers manufactured and the objective physical evidence that would have caused honest, objective and reasonable police officers to question its reliability, separate and apart from the "confession" being manufactured and coerced. Buffalo Police Officers nonetheless arrested JOSUE.

18.     In fact, witness statements that described the perpetrator of the crime described an individual that could under no reasonable and objective circumstances implicate JOSUE as the murderer. Buffalo Police Officers nonetheless arrested JOSUE.

19.    As a result of the actions of the Buffalo Police Officers JOSUE was prosecuted for crimes including multiple counts of Murder in the 1st Degree, which in the State of New York may be punishable by death, and given the weight of the purported "confession" in his prosecution he was essentially required, forced and again coerced into accepting a plea to ensure his life.

20.    JOSUE and his criminal defense attorney requested, urged and argued that the Erie County District Attorney's Office ("ECDA") consider the integrity of its evidence and the continued prosecution of JOSUE. The Erie County District Attorney's Office nonetheless continued its prosecution of JOSUE.

21.    JOSUE and his criminal defense attorney requested, urged and argued that the Erie County District Attorney's Office ("ECDA") consider the conflicting physical evidence and eye witness accounts and to discontinue its prosecution of JOSUE. The Erie County District Attorney's Office nonetheless continued its prosecution of JOSUE.

22.    The Erie County District Attorney's Office ("ECDA") failed to independently and objectively evaluate the evidence against JOSUE and instead accepted the purported "confession" when the Erie County District Attorney's Office ("ECDA") , through its officers, agents and employee's knew or should have known that the "confession" was procured through spurious, dishonest and constitutionally invalid methods. The Erie County District Attorney's Office nonetheless continued its prosecution of JOSUE.

23.    As a result of the actions of the Erie County District Attorney's Office  JOSUE was prosecuted for crimes including multiple counts of Murder in the 1st Degree, which in the State of New York may be punishable by death, and given the weight of the purported

"confession" in his prosecution he was essentially required, forced and again coerced into accepting a plea to ensure his life.

24.     JOSUE was sentenced to an indefinite term of twenty-five (25) years of imprisonment with five (5) years of post release supervision, and was directed to the custody of the New York State Department of Corrections (the "Judgment of Conviction). See attached hereto as "Exhibit C". After his Appeal to the Fourth Department was denied JOSUE was therefore left without any lawful means to challenge his wrongful conviction and he was left to sit in jail for a significant remainder of his life.

25.     However, and notwithstanding the efforts of Erie County District Attorney's Office, justice would prevail. Following an extensive and multi-agency law enforcement investigation conducted by the United States Attorney General's Office ("USAG"), the Federal Bureau of Investigation ("FBI") and the New York State Police ("NYSP") into the 10th Street and 7th Street gangs, along with examination of witness statements, physical evidence, possibility of false confession and DNA evidence surrounding JOSUE's conviction for the killings of the Camacho brothers, law enforcement officials determined that three different individuals (exclusive of JOSUE) were responsible for the murders of Nelson and Miguel Camacho.

26.     On November 16, 2012, the U.S. Attorney for the Western District of New York, William J. Hochul, Jr., as well as Assistant U.S. Attorney, Joseph M. Tripi announced that a three count superseding indictment was returned by a Federal Grand Jury, on November 8, 2012, charging Efrain Hidalgo, Brandon Jonas and Misael Montalvo, with two counts of discharging a firearm causing death in furtherance of drug trafficking and violent crime for the murders of Nelson and Miguel Camacho, the same individuals JOSUE was convicted of killing and which caused him to be imprisoned.  See "Superseding Indictment" attached as "Exhibit E"

27.     Even then the Erie County District Attorney's Office ("ECDA"), when it had

knowledge that these three other men had been indicted by a Federal Grand Jury, and that federal

and state law enforcement officers, including USAG, FBI and NYSP, after conducting an

independent and objective investigation into the evidence against JOSUE,  legally established

that JOSUE was not the perpetrator of the murders, failed to accept the credible and

overwhelming evidence that JOSUE did not commit the crimes for which he was imprisoned and

obstructed his immediate release from prison. The Erie County District Attorney's Office

continued to prevent JOSUE's release from prison and thereby caused him to be intentionally and

unconscionably imprisoned for crimes he did not commit.

28.     Shortly after the Federal Grand Jury indictment charging Efrain Hidalgo, Brandon

Jonas and Misael Montalvo with the deaths of Nelson and Miguel Camacho, the U.S. Attorney's

Office, Assistant U.S. Attorney, Joseph Tripi, Esq. stated publically that the evidence obtained

during their investigation exonerated JOSUE, and the evidence procured from that investigation

was provided to the District Attorney's Office and established JOSUE's innocence.

Notwithstanding, the Erie County District Attorney's Office continued to prevent JOSUE's

release from prison and thereby caused him to be intentionally and unconscionably imprisoned

for crimes he did not commit.

29.     The evidence provided to the Erie County District Attorney was clear and

unequivocal that JOSUE was innocent of the crimes he was convicted and yet JOSUE still

remained in custody.

30.     In fact, due to the inaction, intentional neglect and unconscionable indifference of

the Erie County District Attorney's Office and his continued imprisonment for crimes he did not

commit, JOSUE was forced to file a Motion to Vacate the Claimant's Conviction which he filed on April 23, 2013.

31.    Astonishingly, after delaying proceedings until July of 2013 the Erie County District Attorney's office responded and opposed JOSUE's release, filing its response on July 12, 2013, with supplemental reply in opposition and attachments on July 16, 2013.

32.    JOSUE then submitted a supplemental affidavit based on DNA lab reports dated May 25, 2012, December 24, 2012 and June 17, 2013 along with a reply to the Erie County District Attorney's office opposition on July 17, 2013.

33.    Even after receiving the DNA evidence, knowing of the Federal and State investigation, knowing of the Federal indictments and the inconsistency of evidence against JOSUE the Erie County District Attorney's office submitted a supplemental opposing affidavit and continued to oppose JOSUE's release.

34.    JOSUE's Motion to Vacate was argued on July 29, 2013. At that time JOSUE provided the Court with an affidavit of Emily Trott, Esq. (JOSUE's counsel in the Federal Grand Jury) dated September 3, 2013. Thereafter JOSUE submitted another supplement to his original Motion, on October 17, 2013.

35.    Even after receiving the Affidavit of Attorney Trott, DNA evidence, knowing of the Federal and State investigation, knowing of the Federal indictments and the inconsistency of evidence against JOSUE the Erie County District Attorney's office submitted a supplemental opposing affidavit and continued to oppose JOSUE's release (submitting a response to the Trott affidavit on December 4, 2013).

36.    JOSUE's Motion to Vacate was based on newly discovered evidence, conflicts in identification evidence and physical evidence, likelihood of false confession, DNA evidence

which excludes JOSUE from the crime; and proves his actual innocence. The motion was based on the contention that JOSUE's guilty plea was based upon a false, erroneous and coerced confession provided to the Buffalo Police when JOSUE was suffering from a severe psychotic break from reality, including schizophrenia, exacerbated by sleep deprivation, drug use and a limited command of the English language.

37.   In preparing his Motion to Vacate JOSUE became aware that certain evidence was discovered, that was not turned over to him, or his attorney's, at the time of JOSUE's alleged confession, indictment, conviction and/or sentencing.

38.   Notwithstanding the clear and convincing evidence of JOSUE's wrongful conviction and incarceration, the Erie County District Attorney's Office continued to oppose the motion to vacate his conviction, ignoring the proof provided by other law enforcement officials and agencies, the evidence of inconsistent and doubtful proof supporting JOSUE's conviction and ignoring the overwhelming evidence that implicated Efrain Hidalgo, Brandon Jonas and Misael Montalvo in the murders of the Camacho brothers. That same evidence produced a Federal Grand Jury indictment.

39.   JOSUE continued to be wrongfully incarcerated from approximately November 16, 2012 to December 8, 2014 due to the Erie County District Attorney's unwillingness to accept federal law enforcement investigation results and the Federal Grand Jury indictment of the individuals responsible for the crimes at issue.

40.   Based upon the continued opposition to Plaintiff's Motion to Vacate and Supplemental Motion to Vacate, by the Erie County District Attorney's Office, on February 7, 2014, the Honorable Thomas J. Franczyk Ordered a hearing to determine whether by clear and convincing evidence the Claimant should have his conviction for the murders of the Camacho

brothers vacated. The Erie County District Attorney's Office continued to prevent JOSUE's release from prison and thereby caused him to be intentionally and unconscionably imprisoned for crimes he did not commit.

41.    JOSUE continued to be incarcerated during this time, rather than released on his own recognizance pending the hearing. The Erie County District Attorney's Office continued to prevent JOSUE's release from prison and thereby caused him to be intentionally and unconscionably imprisoned for crimes he did not commit.

42.    Thereafter the Erie County District Attorney's office maliciously and with deliberate indifference to the human suffering of JOSUE while wrongfully imprisoned, at numerous hearing dates scheduled by the Court for the purposes of deciding the Motion to Vacate JOSUE's conviction, the Erie County District Attorney's Office failed to present witnesses, and was in other ways not prepared to go forward with the Hearing ordered by the Honorable Thomas J. Franczyk which required that the hearing be delayed, and thereby JOSUE continued to be wrongfully imprisoned.

43.    Ultimately the Erie County District Attorney's office presented no evidence to rebut JOSUE's innocence. Notwithstanding the Erie County District Attorney's Office continued in a pattern of delay and indifference in their opposition to the Motion to Vacate, while JOSUE continued to be wrongfully imprisoned.

44.    The Erie County District Attorney's Office continued their opposition to JOSUE's Motion to Vacate until December 8, 2014, when for the first time the Erie County District Attorney conceded the innocence of the Plaintiff, allowing for the conviction entered on June 16, 2006 to be vacated, thereafter the Claimant was released from prison on his own recognizance pending dismissal of the underlying indictment. See Order as "Exhibit F"

10

45.    Thereafter, the Claimant brought a Motion to Dismiss the underlying Indictment for Murder and other charges.  On January 20, 2015, the 2004 indictment in The People v. Josue Ortiz, indictment number 02630-2004 in the New York State Court was dismissed. Finally JOSUE was exonerated for crimes he did not commit.

## JURISDICTION

46.    As a result of is unjust conviction JOSUE was incarcerated from November 16, 2004 to December 8, 2014. See "Certificate of Incarceration" attached as *"Exhibit A"*

47.    JOSUE did not commit any of the acts or crimes charged in the Indictment and he is completely innocent of all the charges in the Indictment.

48.    No act of JOSUE contributed to or caused his unjust, erroneous and unconscionable conviction and imprisonment.

49.    JOSUE was wrongfully convicted of two (2) counts of manslaughter in the 1st degree and was sentenced to an indefinite term of twenty-five (25) years of imprisonment with five (5) years of post release supervision for crimes he did not commit. He was wrongfully, unjustly and unconscionably imprisoned for ten (10) years and twenty-two (22) days. He has and will live under the stigma of being a convicted killer for the rest of his life.

50.    As previously stated, after strenuous and persistent legal efforts JOSUE's C.P.L.440 Motion was granted, the Judgment of Conviction against JOSUE was vacated and the Indictment dismissed by Order entered on May 8, 2015 of the Honorable Thomas P. Franczyk See "Exhibit F".

51.     From the day of his arrest until the day his Judgment of Conviction was vacated and the Indictment dismissed JOSUE, at all times maintained his innocence.

52.     JOSUE has prevailed in establishing by "clear and convincing" evidence all of the elements for liability required under the Court of Claims Act 8-b, including through DNA test results, a Federal Grand Jury Indictment of the real perpetrators, Federal and State and City law enforcement investigation results, his "actual innocence".

53.     This Claim is filed within two (2) years of the date that the Judgment of Conviction was vacated and the Indictment dismissed.

54.     Therefore, JOSUE has established a claim under 8-b of the Court of Claims Act and is entitled to monetary and compensatory damages.

A-1718

## INJURIES AND DAMAGES

55.     As a result of his unjust conviction, JOSUE has been wrongfully imprisoned for 10 years and twenty-two (22) days his life.  Further, he has lived with the stigma and humiliation of being looked upon by others as a murderer from the time of his conviction, to the time of his exoneration, and beyond.  He has been injured and damaged as follows:

### A.     JOSUE HAS BEEN DEPRIVED OF HIS LIBERTY, A LIFE WITH HIS FAMILY AND FRIENDS AS WELL AS ALL OF THE INCIDENTS OF LIFE THAT MOST PEOPLE TAKE FOR GRANTED.

56.     The injuries and damages sustained by JOSUE arising from his unjust conviction and imprisonment include, but are not limited to the following: personal injuries; pain and suffering; severe mental anguish; emotional distress; activation, precipitation and aggravation of posttraumatic stress disorder; loss of income; humiliation, indignities and embarrassment; degradation, including the day to day indignities, embarrassment and degradation of prison life, and life as a convicted murderer; injury to reputation; permanent loss of natural psychological development; subjection to physical and verbal attacks; abuse and harassment; restrictions on all forms of personal freedom, including, but not limited to, daily loss of freedom in movement from place to place, the loss of choice and opportunity with respect to diet, sleep, personal and social contact, as well as the loss of educational opportunity, vocational opportunity, adequate medical and/or psychiatric and/or psychological care by physicians and/or other medical personnel of his own choosing, athletic opportunity, personal fulfillment, sexual activity, family relationships,

13

socializing, reading, television, movies, travel, enjoyment and expression. As a direct result of his unjust conviction and imprisonment and loss of freedom, JOSUE will require ongoing medical and/or psychiatric and related treatment, therapy, rehabilitation and care into the indefinite future. He has been caused to suffer from and continues to suffer from posttraumatic stress disorder, nightmares and insomnia, anxiety, panic attacks, depressive disorder, sleep disturbance, nightmares and dysthymia.

57.    As a result of his incarceration, JOSUE was effectively sealed off from his family and friends. The only contact he had over ten (10) years was through limited supervised telephone calls and letters which took place under the stricture of prison life. On those occasions when he had visitors, as well as numerous other occasions, he was subjected to the indignity and embarrassment of being strip searched.

58.    In addition to being sealed off from his friends and family, while in prison, JOSUE, was, in effect, also sealed off from establishing new and meaningful relationships with others. As a result of the effects of his unjust conviction and incarceration, it is not likely he will ever have the ability to do so in the future.

59.    Not only was JOSUE caused to suffer the daily rigors, degradation, humiliation, abuse and loss of freedom, while in prison, he was also deprived of being able to do the simple things that most people take for granted such as driving, shopping, visiting friends and relatives, developing romantic relationships, turning on a television to watch a favorite show, taking a walk or even stopping at a restaurant for a cup of coffee.

60.    Since JOSUE's release he has been making many attempts to find employment, but as soon as he disclosed his past to prospective employers the position would become unavailable. JOSUE's attempts at employment have resulted in rejection after rejection. He has

been forced to rely on social services for his basic support and necessities. His ability to obtain meaningful employment in the future is basically nonexistent and it is unlikely that JOSUE will ever be employed.

61.    JOSUE can never regain the more than ten years if his life during which he was wrongfully incarcerated by the State of New York. At a minimum, he deserves some measure of compensation for the time he was robbed of and the damages he has suffered and continues to suffer as a result. By reason if the foregoing, JOSUE ORTIZ is entitled to damages in a sum in excess of TEN MILLION DOLLARS (10,000,000.00).

### B.    JOSUE'S UNJUST CONVICTION AND INCARCERATION WERE FRIGHTENING, TERRIFYING AND CONFUSING EVENTS FOR HIM.

62.    After his conviction, JOSUE was confined to numerous correctional facilities throughout New York State. During this period he suffered profoundly as a victim of the unjust and erroneous application of the Criminal Justice System of New York State. JOSUE had numerous family members pass away, and was unable to attend their funerals, or even be aware of when they passed away. In particular, JOSUE's grandmother passed away in 2009, and JOSUE was not told of her passing until 2012. JOSUE lives with the shame of his grandmother passing, while thinking he was a murderer.

63.    JOSUE was physically attacked by other inmates, one such occurrence resulted in JOSUE being stabbed in the face. Furthermore, because of his severe mental state, he was subject to horrific emotional abuse by the correctional officers, including throwing cold water on him and taking away his mattress and bedding for periods of time. Moreover, JOSUE was not only subject to physical abuse by other inmates but by correctional officers within the New York

15

State Department of Corrections. Further, because of the abuse and mental state JOSUE was in, he attempted to take his own life in 2005 by attempting to hang himself with a sheet. Throughout his incarceration, JOSUE lived in constant fear of being sexually assaulted, beaten, stabbed, burned or killed. He feared for his physical safety, indeed for his life.

64.     JOSUE can never regain the more than ten years if his life during which he was wrongfully incarcerated by the State of New York. At a minimum, he deserves some measure of compensation for the time he was robbed of and the damages he has suffered and continues to suffer as a result. By reason if the foregoing, JOSUE ORTIZ is entitled to damages in a sum in excess of TEN MILLION DOLLARS (10,000,000.00).

## C.     JOSUE'S ILLNESS HAS BEEN AGGRAVATED AND EXACERBATED AS A RESULT OF HIS UNJUST AND ERRONEOUS CONVICTION AND IMPRISONMENT.

65.     As a result of his unjust conviction and imprisonment, it was the perception of the community, the Department of Correction employees and other persons that JOSUE was a guilty of murdering two people assassination style. His condition was further aggravated in that his sense of reality was totally turned inside out.

66.     Due to JOSUE's unjust conviction and incarceration, his sense of reality, his self-confidence, his day to day living skills, his social skills, his trust in others, his trust in his own perceptions were severely eroded. He now feels that he has lost his life and has little hope for the future. It is unlikely that he will ever be able to live and manage his life independently.

67.     In addition to the pain and suffering sustained by JOSUE, he will require future comprehensive, psychiatric evaluations and treatment, medications, therapy and rehabilitation,

A-1722

including psychological counseling, case management services and supervised community residential services.

68.     JOSUE can never regain the more than ten years if his life during which he was wrongfully incarcerated by the State of New York. At a minimum, he deserves some measure of compensation for the time he was robbed of and the damages he has suffered and continues to suffer as a result. By reason if the foregoing, JOSUE ORTIZ is entitled to damages in a sum in excess of TEN MILLION DOLLARS (10,000,000.00).

### D.     LOSS OF INCOME AND BENEFITS AND LOSS OF ABILITY TO OBTAIN VOCATIONAL TRAINING AND EMPLOYMENT

69.     Had JOSUE not suffered from his wrongful conviction and incarceration, he would have had available to him the opportunity to be gainfully employed. As stated above, he is now virtually unemployable. As a result of his incarceration he has lost the past and future opportunity for employment and the economic value thereof.

**PRIORITY**

70.    The within Claim qualifies for "docket priority" as provided for in §8-b.2 of the

Court of Claims Act.


WHEREFORE, given that the Claimant, JOSUE ORTIZ, can never regain the more than

ten years of his life during which he was wrongfully incarcerated by the State of New York.

Justice requires at a minimum a fair measure of compensation for the time he was so unjustly

treated and confined along with the damages he has suffered and continues to suffer. By reason

of the foregoing Mr. Ortiz is entitled to damages, from the State of New York, as more fully

described and set forth above, in a sum in excess of TEN MILLION DOLLARS ($10,000,000).


_____
JOSUE ORTIZ


DATED:    May 13, 2015
          Williamsville, NY


                    Yours, etc.

                    **LAW OFFICES OF WAYNE C. FELLE, P.C.**


By: _____
          WAYNE C. FELLE, ESQ.
          *Attorney for Claimant*
          6024 Main Street
          Williamsville, NY 14221
          Tel. No. (716) 505-2700


18

## VERIFICATION

STATE OF NEW YORK          )
COUNTY OF ERIE             )   ss.:

JOSUE ORTIZ, being duly sworn, deposes and says:

That the deponent is the claimant in the within action and that he has read the foregoing Notice of Claim and Intention to Sue and knows the contents thereof to be true to his own knowledge except as to matters stated on information and belief and as to those matters, he believes it to be true.

JOSUE ORTIZ

Sworn to before me this 13
day of ___mAY___, 2015.

WAYNE C. FELLE
Notary Public, State of New York
Qualified in Erie County
Notary Public Commission Expires: 4/13/201C

19