# 23-0352

# United States Court of Appeals

*for the*

# Second Circuit

———————◆———————

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## APPENDIX FOR DEFENDANT-APPELLANT
### Volume 8 (Pages A-1725 to A-1936)

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

# TABLE OF CONTENTS

**Page**

## Volume 1

District Court Docket List..........................................  A-1

Amended Complaint, dated March 27, 2019 ............  A-34

Answer to Amended Complaint,
　dated April 15, 2019 ...............................................  A-56

Notice of Motion to Dismiss, dated April 24, 2020...  A-80

Memorandum of Law in Support of Defendants'
　Motion to Dismiss, dated April 24, 2020...............  A-82

Supporting Declaration, dated April 24, 2020 ...........  A-107

Exhibit A to Declaration -
Affidavit of Lt. Salvatore Losi,
sworn to on April 15, 2020....................................  A-112

Exhibit B to Declaration -
P-73 of Mark R. Stambach, dated November 16,
2004, and Notes.....................................................  A-114

Exhibit C to Declaration -
Plaintiff's Deposition Transcript,
dated March 15, 2018............................................  A-117

## Volume 2

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019..........................................  A-241

ii

**Page**

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 ............................................ A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ......................................................................... A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 ............................................ A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................. A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ......................................................................... A-746

Exhibit I to Declaration -
Indictment ............................................................... A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ........................................ A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ......................................... A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction .............................................................. A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit ................................................. A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ....................................... A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ...................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing ................................................................... A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ...................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion ................................................................... A-983

Statement of Undisputed Facts,
dated April 24, 2020 .............................................. A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 ................................................. A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
Material Facts, dated July 3, 2020 ........................  A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.
Ortiz*, Indictment No. 02630-04 ...........................  A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ...............  A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ......................................  A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued)............................................................  A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019....................................  A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3............................  A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ...............................................................  A-1450

v

Page

### Volume 7

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................ A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ....................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 .............................................. A-1706

### Volume 8

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 .............. A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
  Defendants' Motion to Dismiss, and for
  Judgment on the Pleadings and/or Summary
  Judgment, dated July 5, 2020 ............................... A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
  Defendants' Motion to Dismiss,
  dated July 24, 2020 ................................................ A-1789

Decision and Order of the Honorable Elizabeth A.
  Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
  dated April 1, 2022 ................................................ A-1837

Defendants' Proposed Jury Instructions,
  dated April 1, 2022 ................................................ A-1861

Plaintiffs' Reply Motions in Limine,
  dated April 6, 2022 ................................................ A-1924

Defendant's Objections to Plaintiff's Proposed Jury
  Instructions, dated April 6, 2022........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022........ A-1937

Stipulation of Undisputed Facts,
  dated April 27, 2022 .............................................. A-1996

Trial Transcript, Preliminary Instructions and
  Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022........................... A-2053

vii

**Page**

Plaintiff's Witnesses:

    E. Coogins        Direct........................  A-2054
                            Cross...........................  A-2116

    J. Ortiz            Direct........................  A-2125

**Volume 10**

Trial Transcript, dated May 4, 2022
    (Cotinued) ............................................  A-2187

    M. Vaughn       Direct........................  A-2189
                            Cross...........................  A-2219
                            Redirect .....................  A-2225

    J. Lonergan    Direct........................  A-2229
                            Cross...........................  A-2281
                            Redirect .....................  A-2284
                            Recross .....................  A-2287

Trial Transcript, dated May 5, 2022........................  A-2297

    M. Stambach   Direct........................  A-2299
                            Cross...........................  A-2361
                            Redirect .....................  A-2384

    J. Ortiz            Direct........................  A-2393
                            Cross...........................  A-2426

**Volume 11**

Trial Transcript, dated May 6, 2022........................  A-2467

    M. Evans        Direct........................  A-2470
                            Cross...........................  A-2495

    M. Lauber      Direct........................  A-2504
                            Cross...........................  A-2518

Trial Transcript, May 9, 2022 ...................................  A-2554

viii

**Page**

| J. Ortiz | Direct | A-2599 |
| | Cross | A-2653 |
| | Redirect | A-2671 |
| | Recross | A-2674 |

Trial Transcript, Closing Arguments, May 9, 2022 ... A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
(Continued) ............................................................. A-2717

Jury Questionnaire, dated May 9, 2022 .................... A-2760

Jury Questionnaire, Damages, dated May 9, 2022 .... A-2764

Judgment in a Civil Case, dated May 10, 2022 ........ A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
dated May 20, 2022 ............................................... A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
Support of Motion, dated May 20, 2022................ A-2768

Exhibit A to Felle Declaration -
Ledger.................................................................. A-2773

Exhibit B to Felle Declaration -
Invoices for Services ........................................... A-2792

Plaintiff's Memorandum of Law in Support of his
Motion for Attorneys' Fees and Costs,
dated May 20, 2023 .............................................. A-2823

Notice of Motion, by Defendant, for Judgment as a
Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
new trial Pursuant to Fed. R. Civ. P. 59(a), and
for Remittur Pursuant to Fed. R. Civ. P. 59(e),
dated June 7, 2022 ................................................ A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
Defendant, in Support of Motion,
dated June 7, 2022 ................................................ A-2848

Exhibit A to Sahasrabudhe Declaration -
Trial Exhibits Entered by Counsel for
Plaintiff.................................................................. A-2862

Exhibit B to Sahasrabudhe Declaration -
Trial Exhibits Entered by Counsel for
Defendant ............................................................. A-2909

Memorandum of Law in Support of Motion for
Judgment as a Matter of Law Under Fed. R. Civ.
P. 50(b), dated June 7, 2022 ................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
to Plaintiff's Motion for Attorneys' Fees,
dated June 10, 2022 ............................................... A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion for Attorneys' Fees,
dated June 10, 2022 ............................................... A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
Opposition to Defendant's Post Trial Motion,
dated June 28, 2022 ............................................... A-3013

Plaintiff's Memorandum of Law in Opposition to
Defendant's Post Trial Motions,
dated June 28, 2022 ............................................... A-3023

Reply Memorandum of Law in Further Support of
Defendant's Motion for Judgment as a Matter of
Law, a New Trial, or Remittitur,
dated July 8, 2022 ................................................. A-3071

**x**

|  | Page |
|---|---|
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 ........................ | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 ......................................... | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 ..... | A-3159 |

A-1725

CITY OF BUFFALO - DEPARTMENT OF POLICE
**MAJOR CRIMES UNIT**

**TO: CAPTAIN MARK MORGAN**

**FROM: DETECTIVE MICHAEL F. ROOT**

**DATE: NOVEMBER 13, 2004**

**SUBJECT: HOMICIDE #04-242**
**RE: STATEMENT OF CARLOS OSARIO**

**ATTENTION: LIEUTENANT MARGARET SACK**

**SIR,**

On the above date at approximately 1645hrs, this writer was notified by Police Officer John Garcia the he and Police Leo McGrath had an individual in their vehicle who wished to give a statement relative to the above captioned case. It was agreed that they proceed directly to these offices, which they did, arriving at approximately 1655hrs. **CARLOS OSARIO PR/M DOB 9/29/67** of **863 NIAGARA ST.,** accompanied the Officers. This writer briefly interviewed Osario after which a sworn statement was taken. Police Officer John Garcia, who is fluent in Spanish, acted as an interpreter while this interview was conducted and a statement was obtained. Mr. Osario speaks no English. This statement is self-explanatory and is now a permanent part of this file.

Respectfully submitted,

*Michael F. Root*

Michael F. Root
Det.

EXHIBIT
17

CITY OF Buffalo Police Department
HOMICIDE SECTION

1
2                                                    DATE:      11/13/04
3                                                    FILE #:    04-242
4                                                    CD #:      04-3160879
                                                     STARTED:  1720hrs
5    STATE OF NEW YORK )
6    COUNTY OF ERIE        ) SS
7    CITY OF BUFFALO
8
9    NAME OF PERSON:  Carlos Osario
10   RACE/SEX:  PR/M
11   AGE: 37
12   D/O/B: 9/29/67
13   ADDRESS: 863 Niagara St.
14   PHONE: 886- 0913
15
16   The above named person being duly sworn, deposes and makes the following statement while in
17   the Buffalo Police Department Homicide Office.  The questions are asked by Det. Michael F.
18   Root , and the statement is typewritten by Det. Michael F. Root.  Police Officer John Garcia is
19   present and will interpret all questions and answers from English to Spanish.
20
21   Q.  Can you read and wite English?
22   A.  No.
23
24   Q.  How far have you gone in school?
25   A.  GED.
26
27   Q.  Where were you on Thursday, November 11, 2004 at about 2130hrs?
28   A.  On the porch of my house.
29
30   Q.  What is the address?
31   A.  863 Niagara St.
32
33   Q.  Were you  with anyone else?
34   A.  I was with Cano and my son.
35
36   Q.  What were you three doing?
37   A.  We were watching three men across the street.  I thought they were going to kill me.
38
39   Q.  Why did you think that?
40   A.  Because I have some problems with some people.
41
42   Q.  Can you tell me what you saw these three men do?
43   A.  They were standing on the porch of  an abandoned house across the street from me, for
44   about 15 minutes.  One of the guys was looking on the side of the porch toward the back of the
45   house.  One of the other guys was doing the same from the other  end of the porch.  They come
46   off the porch and start walking toward Zips.  Then they crossed the street and once they were
47   on the same side as my house, the Puerto Rican male with the black hoodie had a long barrel
48   rifle under his hoodie.  They went up the stairs where the two brothers live, and one of the
49   black males with a grey hoodie knocked on the door.  Then I heard a large bang on the door.
50   After that I saw two people, one with a grey hoodie and one with a black hoodied run back
51   across the street and go through  the back kitchen window at the corner house.  I never saw the
52   third guy.  Then I saw two light skinned Puerto Rican females with blonde hair and a young
53   male child come out screaming.  The police got there with 5 minutes.
54
55   Q.  How long  of a time was it between the loud bang on the door and when the two males ran
56   out?
57   A.  About 3 minutes.  Eveything happened in less than 5 minutes.
58
59   Q.  Did you hear any gunshots during this three or so minutes?
60   A.  I heard gunshots.  I heard about 3, then I didn't hear anything else.
61
62   Q.  Can you describe the 3 males that went into the house?
63
64

Case 23-352, Document 41, 06/23/2023, 3533150, Page14 of 223

A-1727

### CITY OF Buffalo Police Department
### HOMICIDE SECTION

Page 2 - statement of Carlos Osario

A. All three were short, they were young. One was a B/M with cornrows and a zippered grey hoodie. The other B/M also had a gey hoodie, and he's got thick eyebrows a wide noise and big lips. The PR/M had on a black hoodie and black pants. He's brown skinned and has trimmed eyebrows.

Q. Have you seen any of these three men before?
A. The PR/M I see at the Barber Shop on Niagara, across the street from Shoreline. I also have seen him before on 10th St., between Virginia and Carolina Sts. Earlier in the day I saw him and one of the B/M's arguing with the brothers in front of Zip's. The other B/M, the one with the cornrows has been on my porch before.

Q. Do you know the B/M who hass been on your porch's name?
A. No, but I can find out. I know where the two B/M live.

Q. When was this B/M on your porch?
A. He was on my porch November 7th. I remember that date because I'm in a program at 291 Elm, and they gave me a pass that day.

Q. Why was he on your porch?
A. He always hangs out on the porch with other kids and smoke maihuana.

Q. Where do the two B/M's live?
A. One lives right across the street from me. Next door to the Tailor. It's a brown brick house with a white door. He lives upstairs. Thats the guy with the cornrows. The other B/M lives next to the Pizzaria, with his brother. It's a green house with two front doors. To get to his apartment, use the right side door and it's upstairs on the right.

Q. Who is Cano?
A. I'll find out. I've known him since 2002.

Q. Was Cano with you the entire time you have described to me?
A. He was there the whole time.

Q. Do you know the two blonde PR/F that came out of the house?
A. I know them from seeing them around the nieghborhood.

Q. They came out of the house after the B/M and PR/M?
A. They came out screaming after the guys ran out and before the police came.

Q. Explain to me exactly where the two males went after exiting the house.
A. When the two males ran from the house, they ran across the street north and jumped through an open window on the southeast corner of the house at the southwest corner of Niagara and Massachustts.

Q. Do you know who lives in this house at the southwest corner of Niagara and Massachusetts?
A. I know a guy by the name of Tebo, that lives there.

Q. Do you know Tebo's full name?
A. No.

Q. Did you see Tebo that night?
A. Yes.

Q. Where did you see him?
A. About 10 minutes after the shooting he rode up on his bike, where the yellow tape was.

Q. Did you talk to him at this time?
A. No, but Cano talked to him.

Q. After the PR/M and B/M ran from the house, and after the PR/F with the child ran from the house, did anyone go into the house before the police arrived?

**CITY OF Buffalo Police Department**
**HOMICIDE SECTION**

1  page 3 - statement of Carlos Osario
2
3  A. No I didn't see anyone.
4
5  Q. Can you describe Tebo to me?
6  A. He's a Puerto Rican male-tall-white hair-light skin- about 38yoa.
7
8  Q. Is there anything else that you can tell me, to help in this investigation, that I havn't asked
9  you?
10  A. Nothing that I can think of.
11
12  Q. Is everything that you have told me in this statement the truth?
13  A. Yes.
14
15  Q. I am going to have Police Officer Garcia read this statement to you.  If it is true and
16  accurate, will you sign it?
17  A. Yes.
18
19
20  Statement ended at 1920 hrs.
21
22  I understand that any false statements made herein are punishable as a class "A"
23  Misdemeanor, pursuant to Section 210.45 of the Penal Law of the State of New York.
24
25  Subscribed and verified under penalty of perjury.
26
27  Signed: _Carlos Osario_
28
29  Witness: DET. _Michael F. Root_
30
31  Sworn and subscribed to before me, this day _13TH_ of _NOVEMBER_ . 19 _2004_
32
33  _Michael F. Root_                                    _12/04_
34  Commissioner of Deeds in and for the City of Buffalo, New York     My Commission expires
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64







A-1732

04-0929





ITEM 68 E

ID FROM WALLET

11/17/04   JM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                                    Plaintiff,

            vs.

RICHARD WAGSTAFF, MARY GUGLIUZZA,
MARK VAUGHN, MARK STAMBACH, and BPD
DOES 1-12, in their Capacity as Police Officers of
the CITY OF BUFFALO; BUFFALO POLICE
DEPARTMENT; CITY OF BUFFALO,

                                    Defendants.

Civil Action No.
16-CV-321
(EAW/HBS)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS, AND FOR JUDGMENT
ON THE PLEADINGS AND/OR SUMMARY JUDGMENT**

Respectfully Submitted:
*Attorneys for Plaintiff*

LAW OFFICES OF WAYNE C. FELLE, P.C.
Wayne C. Felle, Esq.
6024 Main Street
Williamsville, NY 14221
Tel: (716) 505-2700

- and -

HANCOCK ESTABROOK, LLP
Alan J. Pierce, Esq.
100 Madison St., Suite 1500
Syracuse, New York 13202
Tel: (315) 565-4500

Dated: July 5, 2020

{H3990376.1}

## PRELIMINARY STATEMENT

This Memorandum of Law ("MOL") is submitted by Plaintiff Josue Ortiz ("Ortiz" or "Plaintiff") in opposition to Defendants' motion to dismiss the Amended Complaint and for judgment on the pleadings and/or summary judgment pursuant to Fed.R.Civ.P. 12(b)(6), 12(c), and 56. Defendants' previously moved to dismiss the Complaint or for judgment on the pleadings in August 2017, which was resolved in this Court's March 2019 Decision & Order. [Dkt #56] *See Ortiz v. Wagstaff*, 2019 WL 1236336 (W.D.N.Y. March 18, 2019). Briefly stated, the Decision "grant[ed] Plaintiffs cross-motion for leave to file an amended complaint except to the extent Plaintiff seeks to assert an abuse of process claim or to assert claims against the City of Buffalo, [and] denie[d] as moot Defendants' motion for judgment on the pleadings ***." *Id.* at 2.

Defendants now move again essentially to dismiss without any substantive affidavits demonstrating there are no material issues of fact for trial on the following grounds: (1) this Court lacks personal jurisdiction over Mary Gugliuzza, Mark Stambach, and Mark Vaughn (this excludes Richard Wagstaff); (2) the Buffalo Police Department (hereinafter "BPD") lacks the capacity to be sued; (3) Plaintiff's *false arrest/imprisonment claims* are time barred; (4) Plaintiff has never identified Defendants Does 1-12 sufficiently; (5) the official capacity claims should be dismissed as duplicative; (6) Defendants are entitled to summary judgment on the *false arrest and malicious prosecution* claims based on the existence of probable cause; (7) the *false arrest and malicious prosecution claims* are barred as a matter of law by qualified immunity; and (8) there was no *Brady* violation.

Plaintiff's Amended Complaint contains the following five (5) causes of action under the Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983: (1) false arrest/imprisonment;

(2) malicious prosecution; (3) improper use of Plaintiff's statement in his criminal prosecution; (4) fabrication of evidence through use of his statement in his prosecution; and (5) a *Brady* violation for withholding or suppressing *Brady* material from Plaintiff's counsel prior to his guilty plea.

Notably, Ground 1 of Defendants' motion does not apply to Defendant Richard Wagstaff, who is not discussed by name at all in the motion.  Moreover, other than Grounds 1, 2, and 5 the motion does not discuss or address dismissal of Plaintiff's claims for improper use of Plaintiff's statement in his criminal prosecution and fabrication of evidence through use of his statement in his prosecution.

Defendants' motion should be denied for the reasons discussed below.

## STATEMENT OF RELEVANT FACTS

As the Court knows this action arises out of the 2014-2015 Decisions and Orders of Erie County Court vacating Plaintiff's conviction of the murder of brothers Nelson and Miguel Camacho on November 11, 2004 inside their apartment located on Niagara Street in Buffalo and dismissing the Indictment of Plaintiff on the grounds of actual innocence.  The real killers were discovered and prosecuted by the WDNY US Attorney, after a joint investigation of the US Attorney, the New York State Police, and the BPD, and are imprisoned in the federal prison system as a result of the 2011 investigation and 2012 Federal indictment of Efrain Hidalgo, Brandon Jonas, Misael Montalvo, and Frank Matias.

The relevant facts on this motion are as follows, many of which are not in substantial dispute as they are proven by documents and records and sworn testimony.  Those that re in dispute demonstrate questions of which for a jury trial in this matter.

A-1736

Plaintiff was arrested on November 16-17, 2004 (late the night of the 16th or early morning hours of the 17th) immediately after apparently signing a patently false alleged "confession."  Many facts are taken from the February 7, 2014 Decision & Order (**Defs Exh R**) of Erie County Judge Thomas Franczyk vacating Plaintiff's convictions and sworn testimony and documents relevant to this action:

## 2004

- On **November 11** the brothers Nelson and Miguel Camacho were murdered inside their apartment located on Niagara Street in Buffalo; among the evidence items recovered at the scene were 8 cartridge casings consistent with AK-47; a Ballistics Report dated 1/19/05 indicated that the eight cartridge cases were consistent in their rifling characteristics with SKS and AK style rifles; **Defs Exh R** at 7-8;

- On the day of the murders Detective Mary Gugliuzza of the BPD received a statement from Jeilyn Rosario (the girlfriend of murder victim Nelson Camacho that Misael Montalvo, one of the Federally indicted real killers, wanted to kill or hurt Nelson or Miguel Camacho.  No follow-up occurred by the BPD.  This information was in the BPD Homicide File before Ortiz's arrest; **P-Exh 4** (Evans Depo) at 115-117; **P-Exh 5; P-Exh 8** (Statement);

- The BPD Homicide File shows that on **November 12** the Homicide Bureau of the BPD received a call from an anonymous witness that provided information and identified, "Brandon, Cheko and Uda" as the perpetrators of the crime.  Other than Uda, who is the brother of real killer Misael, that caller gave the BPD information that turned out to be accurate and true as the real killers.  No follow-up on this information before the arrest of Ortiz is in the Investigation File.  **P- Exh 4** at 113-115.

- Carlos Osario told police in his sworn statement of **November 13** that he was on his

porch when he saw the three men standing on the porch of the abandoned house across the street. He observed "the Puerto Rican male with the black hoodie: carrying a long-barreled rifle under his hoodie. All three of them went up the stairs "where the two brothers live."  Osario then heard a loud bang on the door. About three minutes later, after hearing gunshots, he saw "two people, one with a grey hoodie and one with a black hoodie run back across the street and go through the back-kitchen window of the corner house."  The police arrived five minutes later.  He described all three suspects as "short, ... very young."  **Defs Exh R** at 10-11; **P-Exh 15** (Osario Statement);

•  On **November 15** two Detectives with the help of a Spanish speaking officer took a sworn statement from Misael Montalvo (one of the real killers) who came in because the Camacho family was supposedly blaming him for the murders of Nelson and Miguel which resulted in threats against him and his family.  Miseal Montalvo admitted to some involvement in the murders of the Camacho brothers.  After the interview and sworn statement he was released. *Id.* at 11; **P-Exh 3** at 52-53 at (Rondon Depo); **P-Exh 5** at 29   (Rondon Exhibit A, P-73 prepared by Detective Lobaugh re interview of Miseal Montalvo);

•  **Prior to November 15** seven (7) different witnesses gave the BPD description of three (3) men (not one) seen leaving the scene of the murders as young looking, light skinned individuals wearing dark hoodies and ranging in height from 5'5" to no more than 5' 11" and of average weight, not 6'6" and about 280-350 pounds like Ortiz. **Defs Exh R** at 6-12; **P-Exh 3** at 58-59;

•  According to a P-73 completed by Detective Mark Lauber, on **November 15** at 11 AM Plaintiff stopped and then jumped into a BPD patrol when he was not a suspect and told Officer Schreckenberger that

> *people were trying to kill him.  Subject Ortiz. was speaking Spanish and*
> *Rodriguez was interpreting for us.  Ortiz had told the Officers that person(s)*

*unknown were trying to kill him because they thought he was involved in the homicides of Nelson & Miguel Camacho. We talked with Ortiz and he stated he just came to Buffalo from Puerto Rico. Ortiz admitted that he had just smoked marihuana, his eyes were glassy and he exhibited signs of being under the influence of marihuana (dilated, red pupils and unsteady gait). He continued to state that unknown persons where attempting to kill him although he could not articulate the manner in which these attempts were being made, the location these attempts were occurring at, the identities or motives for those trying to kill him.* Ortiz stated he was scared and needed help. After consulting with the Officers and observing the behavior of Ortiz it was decided that he might be in need of medical and or physiciatric evaluation. Ortiz agreed to voluntarily go to the Buffalo General Hospital for these examinations and was taken there via Rural/Metro ambulance. **P-Exh 6**, at 10; **Defs Exh R** at 12-14;

• Later that day Ortiz was interviewed at Buffalo General Hospital by three officers (**Detectives Mark Vaughn, James Lonergan and James Lema**) and a Spanish speaking officer to translate, **Edwin Torres**. "[t]he detectives left [Plaintiff], not considering him to be either a suspect or a witness, and advised him that he should contact them after his release from the hospital if he had any further information. **Defs Exh R** at 13-14.

Ortiz was described as "very unsettled. Nervous. Jerky," "Jittery," "scared, frightened," and "out of sorts somewhat." **Defs Exh J** at 53, 64-65 (Torres Huntley testimony). According to a P-73 filed by Det. Vaughn:

[A]t approx. 1645 hrs., your writer received a phone call at the MCU office from Kevin Enburg. Mr. Enburg is the Emergency Room staff counselor for Psychiatric Services at Buffalo General Hospital. Mr. Enburg stated that a Hispanic male had been brought to the hospital for evaluation. The doctors had cleared him psychiatrically. During the evaluation, the Hispanic male claimed he had information on the recent double homicide that occurred at 879 Niagara. He further stated that he was in fear of his life because the killers were after him.

Through the interpreter, we asked Ortiz if he had any direct knowledge of the murders at 879 Niagara. He claimed he did not. *** Mr. Ortiz was definitely upset at the time of the interview. He was given a card with our names and phone numbers on it and asked to call us if he had any further information. Ortiz was

Case 23-352, Document 41, 06/23/2023, 3533150, Page26 of 223

A-1739

turned back over Mr. Enburg. Ortiz was going to be medically evaluated before being released from the hospital. **P-Exh 6** at 19-20 (Bates Nos. 1183-1184).

- On the following day, **November 16**, Officer David Sadlocha responded to a 911 call of unknown trouble on Grant Street. Upon arrival, he was advised that a young man was seeking help at the Native American Center and had walked away to 142 Germain. Sadlocha proceeded to that address and encountered Plaintiff who said that he had "something to say about" the murders. Sadlocha then drove Plaintiff to the Major Crimes Unit office. **P-Exh 6** at 10;

    Detectives **David Stambach** and **Lonergan** interviewed him with **Officer Torres** interpreting, beginning at 7:30 p.m. After being advised of the Miranda warnings and signing the rights card at 8:30 p.m., he gave a formal statement of confession commencing at 9:00 p.m. It was typed out, read to him and signed by him at 10:30 p.m. **Defs Exh R** at 14-15; **P-Exh 6** at 11 (Stambach P-73); **Defs Exh F** (Statement/Confession);

- Stambach's P-73 (**Defs Exh B, P-Exh 6**) states as follows regarding the interview and confession:

    Your writers did meet with P.O. David Sadiocha and P.O. John Lobaugh at the Major Crimes Unit Office. Both officers did have with them a Mr. Josue Daniel Ortiz. They responded to a call at 7:16 pm. P.O. Sadlocha, Car D432, indicated the subject was confessing about the homicide on Niagara Street.

    Mr. Josue Daniel Ortiz was placed into Sgt. Vivian's Office at 7:25pm. A formal interview was started at 7:30 pm. He gave information during this interview that indicated he was involved in the homicides. Present in the Interview Room was P.O. Edwin Torres of B District. He was used as an interpreter as he informed your writers he spoke only a little English.

    After listening to Mr. Ortiz explain what had happened, he was advised of his rights.

    P.O. Edwin Torres read a Spanish Rights Card to Mr. Ortiz. The rights were read at 8:25pm. He then signed the Rights Card. His waiver was read at 8:30pm. This

Rights Card shall now become a part of this file.

At 8:40pm, Mr. Ortiz was given a Coke, large fries and a sandwich from McDonald's .

At 9:00pm, a formal sworn statement was taken from him. Please see attached sworn statement for further details on this matter. This sworn statement will now become a part of this file. The statement was finished at 10:30 pm, whereas it was read back to him and he signed it.

• There are numerous serious inconsistencies about the events surrounding Ortiz's alleged confession to Stambach, including: First, Stambach testified that this was his first involvement with Ortiz and the murder case. **Defs Exh D**. He testified that he was not at the Buffalo Hospital on November 15, although he knew about Ortiz's visit there. *Id*. at 110-112, 192. Both Edwin Torres, the Spanish translator officer, and Det. Sergent James Lonergan, Stambach immediate Supervisor, testified that Stambach was either present for the interview of Ortiz at the Hospital the previous night of November 15 or they told him about that prior interview. **Defs Exh G** at 60-61, 120-121, 180-181 (Torres Depo); **Defs Exh J** at 62, 126 (Huntley Hearing testimony of Torres and Lonergan ["Q. Had you talked to Detective Stambach about your meeting with Mr. Ortiz of the 15th? A. I'm sure I did, yes sir. Q. Had you provided Detective Stambach with the details of that meeting prior to the taking of the statement on the 16th? A. Yes."]). Stambach did not recall if they told him about it. **Defs Exh D** at 112-117, 209. Stambach did not testify at the Huntley Hearing.

Second, Stambach admitted in his deposition that he questioned Ortiz for 30-40 minutes alone without Miranda warnings about his desire to confess to the murders before he called for Torres as a translator because Ortiz spoke broken English. *Id.* at 183-184. He "absolutely" focused on the crime itself, asked Ortiz questions and details about how the crime had been committed, and asked him his familiarity with the victims. *Id*. at 194. This occurred between

7:15 and 8:25 pm when Miranda warning were finally given. *Id*. at 201-203.

> Third, Stambach admitted he had access to the full homicide file on the double murder (*Id*. at 113), which would include hand-written P-73's even before they were typed (*id*. at 132-135, 144), but  he did not pull the homicide file and was not aware of the significant P-73's in the file or bother to look for them before taking Ortiz's confession. **Defs Exh D** at 144-149, *passim*. There were some exceptions, such as the fact that his notes of the interview of Ortiz reflect that he put down the name "Udah" who he knew before the Ortiz interview was a suspect in the murders, just like "Cheko" was a suspect.  *Id*. at 213-215.  He heard this verbally at shifts changes.  *Id*. at 216.  Stambach admitted that it would be "important" for him to have all of the investigation to date before his interview of Ortiz.  *Id*. at 145-146, 153-156, 159-160, 185-186, 224-225, 233.

> Fourth, there were serious inconsistencies between the confession and the facts known to BPD.  NYS Investigator Rondon testified that "the facts that were contained in" the confession "were inconsistent with how the crime had occurred." **P-Exh 3** at 106; see generally Defs Exh R.

> When asked "what other evidence did you have to link Mr. Ortiz to the crime other than a Statement" Stambach testified: "[h]is statement.  Did you have any other evidence that would link Mr. Ortiz to the crime? *** None whatsoever."  Defs Exh D at 249-250.  The Joint Buffalo, NYS and Federal Task Force that found the real killers, led by BPD Officer Mary Evans and NYS Investigator Rondon agreed that the alleged confession was the only evidence implicating Ortiz in the murders.  **P-Exh 3** at 68, 111 (Rondon Depo); **P-Exh 4** at 88-89 (Evans Depo);

- At the same time that Ortiz was being interviewed and giving his alleged confession to Stambach and Lonergan, at approximately 8 pm Officer Edwin Torres brought Osario to the Major Crime Office to be re-interviewed.  He was previously interviewed and gave a statement

on November 13. Osario came to the BPD and wanted to talk about the Camacho homicides.

Detectives Lema and Patrick Judge interviewed him.  Osario said that the three-individuals who

he saw running from 879 Niagara Street on the night of the homicides assaulted him last night

(11/15/04) at 11 pm.  Osario now had a better description of the three men, who now said were

all about 5'7'' tall.  **P-Exh 5** at 35; **P-Exh 15** (Osario Statement);

- Stambach filed his Arrest/Booking Report for Ortiz's arrest on the morning of November

17, as well as a Notice of Intention to Offer Evidence at Trial of the written statement and an

Identification of Ortiz through a "show up" identification (**P-Exh 11** at 30-35);

- After the confession the BPD investigation was "closed" or "cleared" even though it was

clearly established that there were three (3) perpetrators involved and Ortiz was the only person

arrested by the BPD for the murders.  **P-Exh 3** at 41-45; **P-Exh 4** at 66-67; **Defs Exh D** at 259;

- Later that morning of **November 17** Stambach filed a Felony Complaint charging Ortiz

with two counts of felony murder and later in the day he was arraigned.  **Defs Exh R** at 16; **P-Exh 11** at 32.  After this Stambach did nothing else on the arrest and murder investigation until

September 2005;

- On **November 22** Ortiz was ordered by the County Court to undergo a CPL 730

competency examination.  In his letter to the court of December 3, 2004, the director noted that

the defendant had presented to the Holding Center on 11/17 in an apparently perplexed and

frightened state. Though responsive, his answers seemed irrelevant and he displayed a blunt

affect. His demeanor vacillated from combative to silent. The defendant was transferred to the

CPEP Unit at ECMC Hospital on November 23 where his behavior went from agitated to

catatonic. The hospital notes describe him, by turns, as suicidal, bizarre, in need of physical and

chemical restraints, irrational, illogical, preoccupied and psychotic. His history reflected chronic

depression and both alcohol and substance abuse. As of early December 2004, he was diagnosed as suffering from a psychotic mental illness and was deemed to be "incompetent." The attending physician diagnosed the defendant on November 30 as having undifferentiated schizophrenia. He also found the defendant to be incompetent. Regarding the homicides, the attending doctor notes that "the patient was friends with the 2 people whom he is accused of murdering." He reportedly saw them "socially" and had attended their funeral. "However, for some reason after that ... without any warning, (he) confessed to police about committing these murders." The defendant was prescribed Zyprexa and further psychiatric treatment. **Defs Exh R** at 17;

- On **December 8** Ortiz was indicted by an Erie County grand jury. The indictment charged Ortiz with multiple counts of Murder in the First Degree, multiple counts of Murder in the Second Degree, and one count of Burglary in the First Degree. **Defs Exh R** at 18;

- On **December 29** Ortiz was discharged from the hospital and returned to the Holding Center. **Defs Exh R** at 18;

**2005**

- At a competency hearing held in **May 2005**, Dr. Coggins testified that Ortiz told her that he had nothing to do with the murders every time they spoke. Dr. Coggins opined that he could have been suffering from a serious mental illness as of November 11, 2004 and may have been experiencing his first psychotic break from reality. On **July 20** Ortiz was found by the court to be competent. *Id*. at 18-19;

- In September 2005 Stambach attempted to bolster the confession with claims of another confession by Ortiz to a criminal Stambach knew well for 30 years, Ronnie Williams, who allegedly claimed he had been housed with Lopez at the Holding Center and that Lopez had admitted in English to killing the Camacho brothers, that he was only "acting like he was crazy"

and had "fooled them suckers," and "said that he was high when he kicked in the door and shot them both." *Id*. at 19; **Defs Exh D** at 260-268;

- As Judge Franczyk stated: "Why the defendant would jump into the lap of law enforcement and gratuitously confess to two murders when he wasn't even a suspect and then brag about fooling the police by feigning crazy is entirely unclear." **Defs Exh R** at 19;

**2006**

- On March 22 Ortiz pled guilty to two counts of Manslaughter 1st degree. *Id*. at 19;

- Ortiz was sentenced on June 16.  During the pre-sentencing period Ortiz said he decided to withdraw his plea and unsuccessfully attempted to do so at sentencing, but it was rejected.

**ARGUMENT**

**DEFENDANTS' MOTION SHOULD BE DENIED**

Defendants' MOL generally sets forth the correct legal standards of review for their motion.

**1.     This Court Does Not Lack Personal Jurisdiction Over Mary Gugliuzza, Mark Stambach, And Mark Vaughn**

Defendants rely on service of the Complaint on these three Defendants on the "legal steno clerk City of Buffalo City Corporation Counsel of defendant corporation" (Def MOL at 8, citing Dkt. No. 5) allegedly after they were retired from the PBD.  According to Defendants that meant that the City and BPD could no longer be considered their place of employment for service of process, citing only *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298 (3d Cir. 1995).  This case is neither controlling nor persuasive since it does not involve a municipality in New York, but rather an Oklahoma corporation.

Notably, in their Initial Disclosure required by Rule 26 dated February 24, 2017 (after service of the Answer) Defendants listed the address of each of these Defendants as "Buffalo

Police Department, 74 Franklin Street, Buffalo, NY 14202; 716-851-4444." **P-Exh 13**.

**2.      This Court Previously Keep The BPD In The Case In The 2019 Decision**

In Defendants' 2017 motion to dismiss they sought to dismiss the BPD on the same grounds raised on this new motion to dismiss.  This Court's March 2019 Order did not dismiss the BPD.  *See Ortiz v. Wagstaff.*   That is the law of the case and is determinative of this branch of the current motion.

**3.      Plaintiff's False Arrest And False Imprisonment Claims Are Not Time Barred**

Defendant asserts that (1) a claim made under § 1983 must be filed within three years of the date upon which the claim accrued; (2) a claim accrues when the plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); and (3) "[t]he statute of limitations for a claim of false imprisonment — and for claims of false arrest, which is a species of false imprisonment — begins to run when the alleged false imprisonment ends," which is when "the victim becomes held pursuant to [legal] process — when, for example, he is bound over by a magistrate or arraigned on charges."  Defs MOL at 10-11, citing *Alvarez v. Peters*, et al., 2020 WL 1808901, at *3 (E.D.N.Y. Apr. 9, 2020) and *Wallace,*  549 U.S. at 389.

Although the statute of limitations period is determined by reference to state law, the determination of when a claim accrues is governed by federal law.  *See Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994).  What Defendants have ignored, however, is that the accrual point of a section 1983 claim for false arrest depends on whether or not the plaintiff's prevailing on the claim would render her conviction invalid.  *See Covington v. City of New York*, 171 F.3d 117, 123 (2nd Cir. 1999); *see also Preston v. State of New York*, 223 F.Supp.2d 452, 467 (S.D.N.Y. 2002).  Under *Covington*, a wrongful arrest claim would not necessarily undermine a criminal

conviction, and would therefore accrue at the time of the arrest, "if there were independent

evidence upon which a conviction could be obtained that was not in any way tainted by the

unlawful arrest." 171 F.3d at 123.  Stated another way, cases hold that under *Covington* the claim

does not accrue at the time of the arrest if the "any evidence used against her at her criminal trial

was gathered subsequent to, and thus as a result of, her arrest.  *Mitchell v. Home*, 377 F. Supp.

2d 361, 371-372 (S.D.N.Y. 2005); *see Preston*, 223 F.Supp.2d at 467 (finding that accrual date

of Section 1983 false arrest claim was date of arrest where evidence relied on at trial was

obtained from sources other than plaintiff's arrest, and dismissing claim as time-barred).

As demonstrated in the undisputed facts set forth above in the Statement of Relevant

Facts, in this case there was no "independent evidence upon which a conviction could be

obtained that was not in any way tainted by the [false confession and] unlawful arrest."

*Covington*, 171 F.3d at 123.  Lopez's conviction was based entirely on his unlawful arrest and

confession and his *conviction was vacated based on actual innocence*.  In short, it was not until

this conviction was vacated, well within three (3) years of the commencement of this action on

April 25, 2016 (Dkt. No. 1), that the statute of limitations on Plaintiff's false arrest and

imprisonment claims accrued when his conviction was vacated.

This follows directly from the Second Circuit's analysis and discussion of *Heck v.*

*Humphrey,* 512 U.S. 477 (1994) and *Woods v. Candela,* 47 F.3d 545 (2d Cir. 1995) ("*Woods II*")

in *Covington*.  In *Heck*, the Supreme Court stated that "the statute of limitations poses no

difficulty while state challenges are being pursued, since the § 1983 claim has not yet arisen."

512 U.S. at 489. The Court held that "a § 1983 cause of action for damages attributable to an

unconstitutional conviction or sentence does not accrue until the conviction or sentence has been

invalidated." *Id.* at 489-490.  In short, the Court in *Heck* explained that "when a state prisoner

seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed *unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated*." *Id.* at 487 (emphasis supplied).

In *Woods II*, this Court applied the intervening Supreme Court decision in *Heck* to its prior holding in *Woods I* (*Woods v. Candela,* 13 F.3d 574, 575-576 (1994)) and reversed its *Woods I* decision dismissing the plaintiff's *Fourth and Fifth Amendment claims for false arrest* and the illegal search arising therefrom based on New York's three year statute of limitations. On remand, the Second Circuit observed that the New York state decision had "reversed Woods' conviction and dismissed the indictment after ruling that his suppression motion should have been granted, due to defendant Candela's lack of a reasonable suspicion on which to detain and question Woods and thereafter search his vehicle." *Woods II,* 47 F.3d at 546.  As stated by the Second Circuit in *Covington,* 171 F.3d at 123:

> Following the reasoning of *Heck,* we held that Woods's § 1983 claim (based on his false arrest) *did not accrue prior to the reversal of his conviction,* and was therefore not time-barred, because, as made evident by the decision of the New York state court, "Woods's present Fourth and Fifth Amendment claims, which rest on the very same grounds, necessarily imply that his conviction was unlawful, and thus could not have been raised prior to the ... reversal of his conviction." *Id.* This Court, therefore, has already held that a Section 1983 claim which is grounded in false arrest does not arise (in some circumstances) until such time as a criminal proceeding has been terminated in the plaintiff's favor. (Emphasis in original).

The Court in *Covington* addressed the dissent in that case as follows:

> The dissent recognizes, at page 10, that the rationale for tolling the statute of limitations is to "avoid parallel litigation over the issues of probable cause and guilt ***."  It goes on to state that "in this case there can be no possibility of creating two conflicting resolutions arising out of the same or identical transactions."  That, of course, is true now that the criminal proceeding has been dismissed.  So long as the criminal case remained pending, however, a parallel §

> 1983 case based upon a false arrest and wrongful search claim would create the
> distinct possibility of an inconsistent result if the prosecutor's evidence was
> dependent upon a valid arrest. That is the reason why the § 1983 cause of action
> could not accrue during the pendency of the criminal case.

*Id.* at 124. Defendants' counsel must be aware of this well-established law in this Circuit. *See,*

*e.g., Wiggins v. Buffalo Police Dep't*, 320 F.Supp.2d 53 (W.D.N.Y. 2004) (citing *Heck* and

*Covington* in allowing pro se plaintiff to file amended complaint), later opinion 2005 WL

1243314 (W.D.N.Y. May 23, 2005) (dismissing false arrest claim as time barred "[b]ecause

plaintiff has not alleged that the conviction has ever been invalidated," citing *Heck* and

*Covington*); Docket No. 04-cv-0085E.

Accordingly, these claims are timely.

**4.     Defendant Does 1-12 Have Been Sufficiently Identified In Discovery And Include Edwin Torres**

Defendants are fully aware of Judge Franczyk's Decisions and Orders, and the Decision

sets forth the facts and involvement of each of the individually named Defendants in Plaintiff's

arrest, prosecution, conviction, and continued incarceration after the actual murders were

identified and prosecuted by the US Attorney's Office in the Western District of New York.

Here, the undisputed facts show that Officer Edwin Torres and Detective James

Longergan are two of the John Does in this action. They were intricately involved in the

interviewing, arrest and obtaining of Ortiz's confession.

**5.     The Official Capacity Claims Should Not Be Dismissed At This Time**

As Defendants recognize the Defendants other than BPD are sued in both their individual

and official capacities. Plaintiff agrees that the official capacity claims against these Defendants

is a claim against the relevant municipality-employer, either the City of the BPD. As noted by

Defendants in their MOL on this motion, page 13, fn2: "By Decision and Order, dated March 18,

2019, Hon. Elizabeth A. Wolford ordered that *any Monell claim* against the City of Buffalo

cannot proceed. Dkt. No. 56 at 10-11, 16." (emphasis supplied).  This does not mean that the City cannot be liable for the officer's actions in their official capacities.  Moreover, the BPD was not dismissed by this Court in the 2019 Decision, but Defendants again seek to dismiss the BPD in this motion (see above).  If the BPD is dismissed now then these official capacity claims should not be dismissed so that the BPD remains as liable for the actions of these officers in their official capacity.  If the BPD is not dismissed, the official capacity claims should still remain because of the possibility of a reversal on appeal.

**6.      Plaintiff's Claims Cannot Be Dismissed On The Grounds That Defendants Had Probable Cause For His Arrest And Prosecution**

Defendants' MOL asserts that contrary to the allegations of Plaintiff's Amended Complaint for violation of his Constitutional rights, "there was no Constitutional violation because ample probable cause to arrest, charge, and prosecute Plaintiff exist based upon his voluntary statement to Stambach.  The record is devoid of any evidence of any Fourth or Fifth Amendment violation."  Defs MOL at 13.  However, Defendants proceed to only discuss the claims for false arrest and malicious prosecution.  Id. at 14-19.

Defendants' primary argument is that the existence of probable cause based on the confession and indictment defeats these two claims, but they also assert other minor arguments to support this argument, including the actions of the DA office broke the casual chain, collateral estoppel based on the Huntley Hearing ruling and appeal, and lack of actual malice.  These issues will be addressed here in order.

As to probable cause, as Defendants well know Plaintiff's conviction was vacated and the Indictment dismissed on the grounds of actual innocence, not some technicality.  Defs Exh R; P Exh 1.  Generally speaking, probable cause is a defense to claims for false arrest and imprisonment and malicious prosecution, *except where, as here, probable cause is overcome*

*when the conviction stemming from the arrest etc is overturned or vacated.* As Plaintiff

previously asserted in response to Defendants' prior motion to dismiss in *Weyant v. Okst*, 101

F.3d 845 (2d Cir. 1996) the Second Circuit wrote:

> A § 1983 claim for false arrest, resting on the Fourth Amendment right of
> an individual to be free from unreasonable seizures, including arrest without
> probable cause *** is substantially the same as a claim for false arrest under New
> York law ***. The existence of probable cause to arrest constitutes justification
> and "is a complete defense to an action for false arrest" *** whether that action is
> brought under state law or under § 1983.
>
> ***
>
> If, following the arrest, the plaintiff was convicted of the charges against
> him, that conviction normally "would be conclusive evidence of probable cause."
> *** But *this is so only if the conviction "survives appeal." *** A conviction that
> has been reversed on appeal is no evidence of the existence of probable cause; to
> the contrary, "evidence of a subsequent dismissal, acquittal or reversal on appeal
> would *** be admissible to refute *** justification."*

*Id*. at 852 (emphasis supplied); *see Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) (in §

1983 action for false arrest, malicious prosecution, and false imprisonment summary judgment

dismissing malicious prosecution claim reversed; finding genuine issues of fact whether criminal

prosecution was supported by probable cause and officers acted with actual malice where

plaintiff's statement, the only evidence that plaintiff knew the vehicle was stolen, was excluded

in underlying criminal proceedings, and indictment dismissed); *Colon v. City of Rochester*, 419

F. Supp. 3d 586, 596 (W.D.N.Y. 2019) ("In *Weyant*, though the plaintiff was convicted, later

proceedings rendered that conviction a "nullity" and the criminal proceedings against him

"entirely void." *Id.* at 853. The court concluded that under those circumstances, the fact that the

criminal proceedings did not yield a result affirmatively indicating the plaintiff's innocence did

not bar his federal false arrest claim."); *Kogut v. County of Nassau*, 2009 WL 5033937, at *7-9

(E.D.N.Y. Dec. 11, 2009) (a conviction vacated under NY CPL 440 is invalid and defeats

probable cause and establishes favorable termination for a malicious prosecution claim under

section 1983), *certification of appeal denied* 2010 WL 844745 (E.D.N.Y. March 8, 2010),

*decision after trial* 2013 WL 3820826, at *5 (E.D.N.Y. July 22, 2013) (dismissing Kogut's

action after trial; granting in part co-defendants post-trial motion for new trial; Kogut's

confession not admissible or relevant so jury never should have considered the Kogut confession

in determining whether defendants had *probable cause or acted with actual malice* on Halstead

and Restivo's section 1983 claims at trial), *aff'd* 789 F.3d 36 (2d Cir. 2015), *sub nom. Restivo v.*

*Hessemann*, 2015 WL 7734100 (E.D.N.Y. 2015) (entering judgment on jury verdict in co-

plaintiffs' favor, and granting motion for attorney fees), *aff'd* 846 F.3d 547 (2d Cir. 2017).[1]

Defendants also argue that the actions of the DA office broke the casual chain here.  This

argument is scattered in the MOL.  At page 15 it states, without any record support, that

"[i]mportantly, the decision to arrest and charge Plaintiff was made following consultation with

the District Attorney's Office."  In fact, this statement is flatly contradicted by the DA's office in

the companion action against the prosecutors.  See below.  Defendants argue "a plaintiff bringing

a malicious-prosecution claim must rebut [the] presumption" that "the prosecutor exercised

independent judgment in deciding whether to initiate the criminal proceeding and that the

arresting officer therefore did not 'initiate' the proceeding," "for example by showing that the

arresting officer created false information likely to influence a jury's decision and forwarded the

information to prosecutors or that *the arresting officer withheld relevant and material*

*information*.  Absent an officer misleading prosecutors or continuing to be involved in the

criminal prosecution following the plaintiff's arrest and charge, once a prosecutor institutes

formal charges the link between the officer and the prosecution is severed and the officer may

---

[1]      Moreover, probable cause cannot be based on a coerced confession. *See Matthews v. City*
*of New York*, 889 F.Supp.2d 418, 440 (E.D.N.Y. 2012).

not be held liable for malicious prosecution." *Id.* *LaFontaine v. City of New York*, Slip Copy, 2009 WL 3335362 (S.D.N.Y. 2009); *Williams v. City of New York*, Slip Copy, 2003 WL 22434151 (S.D.N.Y. 2003); *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). Later, the MOL at 17 states "[l]ikewise, Plaintiff cannot show that the Defendants initiated or continued the criminal proceeding against the Plaintiff because the independent actions of the District Attorney's Office while charging Plaintiff, later at the Huntley hearing, and during the course of the criminal prosecution broke any causal chain."

This argument is meritless. Substantial and undisputed evidence demonstrates this, including Judge Franczyk Decision & Order and the proof in this case and in the companion case against the DA's office, which made a successful motion for summary judgement. *See Ortiz v. Case*, No. 1:16-CV-00322 (EAW), 2019 WL 1236413 (W.D.N.Y. March 18, 2019), *aff'd* 782 F.App'x 65 (2d Cir. 2019).

Defendants have submitted an affidavit of ADA Kenneth Case from February 22, 2005 during the criminal proceeding that has no bearing on this issue or Defendants' motion; it responds to Lopez's motion for discovery in the criminal proceeding. In his March 2018 Declaration (**P-Exh 9**) supporting summary judgment in the companion action (16-cv-322) Case stated:

> 5.      Based on his admission, Ortiz was arrested by the Buffalo Police on November 16, 2004. A copy of Josue Ortiz's Arrest/Booking Report is attached as Exhibit B.

> 6.      I was the lead prosecutor in the criminal case against Josue Ortiz.

> 7.      *As the lead prosecutor, I evaluated the evidence obtained by the Buffalo Police Department, including Ortiz's confession. However, the Erie County District Attorney's Office ("ECDAO") played no role in investigating the Camacho brothers' murders. The Buffalo police were the lead investigators and gathered all evidence without any assistance from anyone at the ECDAO. No one from the ECDAO participated in obtaining Ortiz's statement or his arrest.*

8.      I acted only as a prosecutor in this matter.

9.      Ortiz was indicted on December 8, 2004. The indictment charged Ortiz with multiple counts of Murder in the First Degree, multiple counts of Murder in the Second Degree, and one count of Burglary in the First Degree.

As relevant here, on the same summary judgment motion former DA (now Judge) Frank

Sedita stated in his Declaration:

5.      On or about November 16, 2004, the Plaintiff, Josue Ortiz (hereinafter referred to as "Plaintiff" or "Ortiz"), gave a sworn statement to Buffalo police detectives admitting his role in the Camacho brothers' murders. A copy of Josue Ortiz's statement is attached as Exhibit A.

6.      Based on his sworn confession, Ortiz was arrested by the Buffalo Police on November 16, 2004. A copy of Josue Ortiz's Arrest/Booking Report is attached as Exhibit B.

There is nothing in the Arrest/Booking Report (**P-Exh 10**) showing any involvement or

activity by the DA Office; it is a BPD document.  As noted in the Case Declaration he was

involved with Ortiz's Indictment on December 8, 2004 with multiple counts of Murder in the

First Degree, multiple counts of Murder in the Second Degree, and one count of Burglary in the

First Degree; several competency evaluations, multiple competency hearings, a Huntley hearing,

motion practice, and plea negotiations and ultimately a plea of guilty and sentencing.  All of this

DA activity was the fruit of Defendants' arrest of Ortiz without probable cause.  As noted above

all of these proceedings have no relevance because the conviction was vacated and the

Indictment dismissed.

There is no break in the causal nexus.  Defendant Stambach, not the DA, filed a Felony

Complaint (**P-Exh 11**) against Plaintiff on November 17, 2004 after his arrest and Plaintiff was

arraigned on that Felony Complaint later that day.  **Defs Exh R** at 16.  There is no indication the

DA office was involved in this arraignment.  It was only involved in the arraignment after the

Grand Jury Indictment in December.  Additional documents produced by Defendants in this

A-1754

action regarding its investigation of the murders and the arrest of and filing the Felony

Complaint against Ortiz are found in **P-Exh 5** and **11**.  What the DA office did here was just

follow and use the confession and false information provided by the police, including the

exculpatory evidence hidden by Defendants.

The cases cited by Defendants do not support their argument here on false arrest and

malicious prosecution.  Notably, in *Townes,* the Second Circuit specifically noted that "Townes

does not plead conduct tantamount to malicious prosecution or false imprisonment" on the very

page cited by Defendants.  176 F.3d at 147.  The Court did hold, in the context of the plaintiff's

Fourth Amendment claim (not at issue as argued by Defendants here) that "the chain of

causation between a police officer's unlawful arrest and a subsequent conviction and

incarceration is broken by the intervening exercise of independent judgment" such as the

"intervening decisions of prosecutor, grand jury, judge, and jury" "in the absence of evidence

that the police officer misled or pressured the official who could be expected to exercise

independent judgment."  *Id.*  Contrary to this case, in Townes "there [was] no claim of such

evidence."  *Id.*  Moreover, the Second Circuit added to *Townes*' break of the causal connection in

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).  The Court held that the chain of causation is

broken not only if the police officer "deceived the subsequent decision maker" but also if the

police "could reasonably foresee that his misconduct [would] contribute to an 'independent'

decision that results in a deprivation of liberty."  *Id*. at 352.  The Second Circuit applied and

explained this analysis from *Townes* and *Zaphrey* further in *Higazy v. Templeton*, 505 F.3d 161

(2d Cir. 2007), where the Court, in reversing an award of summary judgment, held that "[w]hen

the facts are viewed in the light most favorable to Higazy, we cannot conclude as a matter of law

that there are sufficient superseding causes to cut off Templeton's liability."  *Id*. at 177.

As to Defendants claim of collateral estoppel, they argue only the general rules under New York law, not the specific law applicable where, as here, the prior criminal conviction was vacated on a post-judgment 440 motion after the state court previously upheld the voluntariness of the confession in the direct criminal proceedings, including an affirmance on direct appeal. The court in *Kogut,* 2009 WL 5033937, at *10, addressed this very question and found that collateral estoppel does not apply, holding that "a vacated judgment, by definition, cannot have any preclusive effect in subsequent litigation. *Boston Firefighters Union v. Boston Police Patrolmen's Ass'n,* 468 U.S. 1206, 1211 (1984); *United States v. Lawson,* 736 F.2d 835 (*citing United States v. Ayres,* 76 U.S. 608 (1869))."  Just like here the defendants in *Kogut* argued that "the confession (1) was determined to be voluntary in prior state court proceedings, (2) established probable cause for Plaintiffs' arrests and prosecutions, (3) cannot be relitigated because of the doctrine of collateral estoppel, and (4) provides a defense against many of Plaintiffs' claims here."  *Id*. at *9.

As for actual malice, "[o]nce we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well. A lack of probable cause generally creates an inference of malice.  Summary judgment for the defendants cannot be granted on this element either."  *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003), citing *Ricciuti*, 124 F.3d at 131.  This alone rebuts Defendants' argument that "probable cause is presumed.  Defs MOL at 16.

Finally, Stambach's admissions in his deposition that he questioned Ortiz without Miranda warnings for 30-40 minutes alone and about the murders means that the confession should have been suppressed in the criminal proceedings.  Because Stambach did not testify at the Huntley Hearing this was hidden.  Defs Exh D at 183-184, 194, 201-203.

**7.      Defendants Are Not Entitled To Summary Judgment Based On Qualified Immunity**

Defendants discuss the established rules on what are established constitutional rights, but ultimately reply solely on the argument that qualified immunity here is based on the existence of either "probable cause" or "arguable probable cause."   Probably cause has been destroyed above.

We turn to "arguable" probable cause, of which there is at least a question of fact on the incredible record here.  This is not just an "after the fact" or "Monday Morning Quarterbacking" case where everything pointed to Ortiz's guilt when he gave his false confession and was arrested, convicted, and sentenced for murders he did not commit.  Here, there was nothing but the false confession that did not match the facts of the murder investigation at all or the BPD's interaction with Ortiz the day before on November 15, 2005.

Defendants' MOL (at 21) states that "[t]his doctrine shields police officers from liability for civil damages if "if there was arguable probable cause at the time of the arrest—*that is, if officers of reasonable competence could disagree on whether the probable test was met*."  (Emphasis supplied). As the Second Circuit has stated:

> "Arguable" probable cause should not be misunderstood to mean "almost" probable cause. The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed. *See Anderson*, 483 U.S. at 644, 107 S.Ct. 3034; *Saucier*, 533 U.S. at 207, 121 S.Ct. 2151 (section 1983 claims under the Fourth Amendment are evaluated for objective reasonableness). There should be no doubt that probable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.
>
> ***
>
> Thus, under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable. *See Cerrone*, 246 F.3d at 199; *Dillard*, 51 A.D.2d at 435, 381 N.Y.S.2d 913. If, however, on the undisputed facts the officer would be unreasonable in concluding probable

cause existed, or if the officer's reasonableness depends on material issues of fact,
then summary judgment is inappropriate for both New York and federal false arrest
claims.

*Jenkins v. City of New York*, 478 F.3d 76, 87-89 (2d Cir. 2007) (arguable probable cause not found;

"A district court may not grant summary judgment if there exists a genuine issue of material

fact. *** On the defendants' motion for summary judgment, the district court was obligated to

construe this factual ambiguity in Jenkins' favor."); *see Zellner v. Summerlin*, 494 F.3d 344 (2d

Cir. 2007) ("Arguable probable cause did not exist for protestor's arrest on charge of obstructing

traffic under New York law, and thus officers were not entitled to qualified immunity on

protestor's false arrest civil rights claim under Fourth Amendment."); *Chillemi v. Town of

Southampton*, 2017 WL 6520722, at *20 (E.D.N.Y. Dec. 20, 2017) ("given the disputed issues of

fact in the record regarding the alleged fabrication of evidence by Sickles and Kiernan to support

Chillemi's arrest, the motion for summary judgment on qualified immunity grounds is denied.");

*Brown v. G.A. Hoffman*, 122 A.D.3d 1149, 1150 (3d Dept. 2014) ("Based upon the record before

us, we find that defendant failed to meet his burden of establishing, as a matter of law, that he

had arguable probable cause to arrest plaintiff for either criminal trespass or disorderly

conduct.").

Notably, Defendants do not cite any cases involving a confession and arguable probable

cause.  Even where there is an alleged confession  arguable probable cause is not necessarily

present.  *See, e.g., Ricciuti v. N.Y.C. Transit Auth*., 124 F.3d 123 (2d Cir. 1997) (district court

erred in granting summary judgment in favor of the police officers on qualified immunity

grounds with respect to the alleged fabrication of evidence. Qualified immunity unavailable

because conspiring to fabricate and forward to prosecutors a known false confession "violates an

accused's clearly established constitutional right, and no reasonably competent police officer

could believe otherwise."); *Blake v. Race,* 487 F. Supp. 2d 187 (E.D.N.Y. 2007) (Police officers

were not entitled to qualified immunity on a § 1983 plaintiff's claims that they participated in the fabrication of evidence to establish probable cause to arrest and prosecute him, in violation of his Fourth Amendment rights; reasonable officers would not have disagreed on the constitutionality of such conduct); *Torres v. Jones*, 26 N.Y.3d 742, 766-767 (2016) (" Accordingly, when viewed in the light most favorable to plaintiff, *the inconsistencies between the crime scene evidence and the confession,* as well as plaintiff's account of the detectives' invention of the confession, revealed that the detectives knew that the confession was false and that therefore it could not have reasonably contributed to their suspicion of plaintiff at all.  Thus, the evidence gave rise to a triable issue of fact as to whether the detectives falsified plaintiff's confession and brazenly arrested her without even arguable probable cause, and defendants were not entitled to summary judgment on her false arrest claim.").

Here, there are questions fact on arguable probable cause.

**8.      Plaintiff's Brady Claim Raises Questions Of Fact**

Again, Defendants rely on the alleged actions of the DA in the criminal proceedings to escape their own failures to provide the trove of exculpatory evidence that was discovered in the Task Force investigation by Mary Evans and NYS Investigator Rondon and on the 440 motion. This included the Vega and Osorio statements that were never handed over to the defense.  **Defs Exh R** at 60.  As Judge Franczyk noted y *Brady* material must be disclosed in time for its "effective use at trial or at a plea proceeding. Nor is it waived by a guilty plea. (People v. Pelchat 62 NY 2d 97 [1993]."  *Id*. at 71.[2]

**CONCLUSION**

---

[2]      Stambach Deposition Exhibit 1 is provided with this MOL as **Plaintiff's Exhibit 16.**

Case 23-352, Document 41, 06/23/2023, 3533150, Page46 of 223

A-1759

For all the foregoing reasons, we respectfully request that this Court issue an Order denying Defendants' motion, together with such other and further relief as to the Court seems just and equitable.

Dated:  July 5, 2020

Respectfully Submitted,
*Attorneys for Plaintiff*

HANCOCK ESTABROOK, LLP

By: _____
        Alan J. Pierce, Esq.

100 Madison St., Suite 1500
Syracuse, New York 13202
Tel No.:  (315) 565-4500

        -and-

LAW OFFICES OF WAYNE C. FELLE, ESQ.
Wayne C. Felle, Esq.
6024 Main St.
Williamsville, New York 14221
Tel: (716) 505-2700

A-1760





# CITY OF BUFFALO

## DEPARTMENT OF LAW

# EXHIBIT

# D

## CHAPTER 15: DISCIPLINE AND DISCHARGE

### CONTENTS

**1.0   DISCIPLINE - GENERALLY**
1.1   Policy
1.2   Discipline - Definition
1.3   Law Enforcement Code of Ethics
1.4   Police Officer's Bill of Rights
1.5   Time Limitations
1.6   Disciplinary Penalties
1.7   Supervisor/Superior Officer Responsibilities
1.8   Probationary Employees

**2.0   INTERNAL AFFAIRS DIVISION**
2.1   Policy
2.2   IAD to Report Directly to Commissioner
2.3   Cooperation With Labor Relations Division
2.4   IAD Investigations
2.5   Civil Law Suits and Claims
2.6   Authority of IAD
2.7   Confidential Records
2.8   Annual Reports
2.9   IAD Assistance to Other Units
2.10  Blatantly False Claims

**3.0   INVESTIGATING COMPLAINTS AND VIOLATIONS**
3.1   Policy
3.2   Where Complaints May be Received
3.3   Subordinates to Notify Supervisor/Superior Officer
3.4   Citizen Complaints - Supervisor/Superior Officer Responsibilities
3.5   Handling Minor Violations
3.6   Complaints Against Superior Officers
3.7   Determining Which Command is to Investigate the Complaint
3.8   Conducting the Investigation
3.9   Lines of Authority
3.10  Conclusions of Fact

**4.0   SUSPENSIONS PRIOR TO DISCIPLINARY HEARINGS**
4.1   Policy
4.2   Authority to Suspend From Duty
4.3   Procedure for Suspending an Employee
4.4   Return of Benefits if Charges Not Sustained

**5.0   CHARGES AND HEARINGS**
5.1   Policy

5.2      Preparing the Charges
5.3      Serving the Charges
5.4      Answer to Charges
5.5      Amendments to the Charge
5.6      Informal Conference
5.7      Uniforms to Be Worn
5.8      Rights of the Accused Employee
5.9      Subpoenas
5.10     Adjournment: Absence of Witnesses
5.11     Recording the Formal Hearing
5.12     Rules of Evidence
5.13     Review of the Hearing Officer's Decision
5.14     Termination Conference
5.15     Seeking Intercession on Behalf of the Accused
5.16     Affect of Finding of Guilt Limited to Two Years
5.17     Resignations, Separation for Cause

**6.0      PREVENTING DISCRIMINATION BASED ON RACE, COLOR,
            RELIGION, SEX OR NATIONAL ORIGIN IN THE WORKPLACE**
6.1      Policy
6.2      Complaint Procedure
6.3      Timeliness for Initiating Complaints or Grievances
6.4      Internal Affairs Division as Central Repository
6.5      Investigation
6.6      Commissioner's Determination
6.7      Responsibility of Supervisors/Superior Officers

**7.0      PREVENTING SEXUAL HARASSMENT IN THE WORKPLACE**
7.1      Policy
7.2      Definition of Sexual Harassment
7.3      Conduct Constituting Sexual Harassment
7.4      Complaint Procedure
7.5      Timeliness of Initiating Complaints of Grievances
7.6      Internal Affairs Division as Central Repository
7.7      Investigation
7.8      Commissioner's Determination
7.9      Responsibility of Supervisors/Superior Officers
7.10     Consistency with the City Of Buffalo Sexual Harassment Policy

## 1.0   DISCIPLINE - GENERALLY

### 1.1   POLICY

It is the policy of the Buffalo Police Department to maintain a highly disciplined work environment that induces individual employees to reach their fullest potential; that creates a sense of esprit de corps; and that gains the trust and respect of the community.

### 1.2   DISCIPLINE - DEFINITION

Discipline in its broadest sense means all those methods that can be used to train employees to fully comport with Department rules, regulations and procedures and which encourage employees to perform their jobs to the fullest extent of their natural talents. Discipline may be either positive or negative in nature. Positive discipline entails teaching, training and encouragement. Negative discipline involves the use of punitive measures to gain compliance.

### 1.3   LAW ENFORCEMENT CODE OF ETHICS

Rules, regulations and procedures generally establish the minimum level of conduct and performance that the Department can tolerate. In contrast, the Law Enforcement Code of Ethics sets the ideal standards which all members should strive to attain.

## LAW ENFORCEMENT CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret   unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before

God and to my chosen profession...law enforcement.

### 1.4   POLICE OFFICER'S BILL OF RIGHTS
By agreement with the PBA the Police Officer's Bill of Rights has been adopted as part of the collective bargaining agreement. It establishes guidelines to be followed by superior officers in conducting investigations arising from a member's conduct as a police officer.

A.  Informing the Member
1. The member shall be informed of the rank, name, and command of the officer in charge of the investigation, as well as the rank, name and command of the interrogating officer, and all persons present during the investigation. If a member is directed to leave his/her post and report for interrogation to another command, his/her own command shall be promptly notified of his/her whereabouts.

2. The member shall be informed of the nature of the investigation before any interrogation begins, including the name of the complainant. The addresses of the complainant and/or witnesses need not be disclosed. However, the member shall be given sufficient information to reasonably apprise him/her of the allegations.

3. If it is known that the member is to be interrogated only as a witness, (s)he shall be so informed at the initial notification to appear.

4. If the member is under arrest, or is likely to be ( that is, if (s)he is a suspect or the target of a criminal investigation), (s)he shall be informed of, and given, all his/her rights, pursuant to the "Miranda" decision as set forth by the Supreme Court of the United States.

B.  Conduct of the Investigation
1. These guidelines shall be observed by all superior officers in conducting investigations of actions of members of the police force.

2. The interrogation of a member shall be at a reasonable hour, preferably when the member is on duty, unless the exigencies of the investigation dictate otherwise. Where practicable, interrogations should be scheduled for the daytime and the reassignment of the member to the day shift should be employed.  If any time is lost, the member shall be compensated.

3. The interrogation shall take place at a location designated by the investigating Officer.  Usually it will be at the command to which the investigating Officer is assigned, or at the District stationhouse within which the incident allegedly occurred.

4. The questioning shall not be overly long. Reasonable respites shall be

allowed. Time shall be provided for personal necessities, meals, telephone calls, and reasonable rest periods.

5.  The member shall not be subjected to offensive language, nor shall (s)he be threatened with transfer, dismissal, or other punishment. No promises or reward shall be made as an inducement to answer questions.

6.  The complete interrogation shall be recorded, either mechanically or by a stenographer. There will be no "off the record" questions. All recesses called during the questioning shall be recorded.

7.  If a member so requests, (s)he shall be given the opportunity to consult with counsel before being questioned concerning a serious violation of the Departmental rules, provided the interrogation would not be delayed unduly thereby. In such cases, the interrogation may not be postponed past 1000hrs of the day following the notification of the interrogation. Counsel, if available, and a representative of a line organization may be present during the interrogation.

8.  Members represented by the PBA and covered by the collective bargaining agreement shall not be ordered to submit to a polygraph test.

C.  <u>Minor Violations</u>
In cases of investigations of minor violations of Departmental rules, requests to consult with legal counsel or with a line organization representative will be denied unless sufficient reasons are advanced. In cases of minor violations, the investigating officer shall have discretion as to whether or not the interrogation shall be recorded.

D.  <u>Disciplinary Action</u>
In any case, the refusal to answer pertinent questions may result in disciplinary action.

1.5   <u>TIME LIMITATIONS</u>
No disciplinary proceeding shall be commenced more than one year after the occurrence of the wrongdoing complained of or its discovery, if later.  However, such limitation shall not apply where the wrongdoing complained of would, if proved in a court of appropriate jurisdiction, constitute a crime.

1.6   <u>DISCIPLINARY PENALTIES</u>
A permanent employee shall be subjected to departmental discipline, and termination where appropriate, as provided for in the respective collective bargaining agreements, departmental regulations, and applicable laws.   A permanent employee subjected to disciplinary charges shall be afforded all rights to a hearing process as established in the respective collective bargaining

agreements, departmental regulations, and applicable laws. Sworn members are also subject to removal for a conviction for any felony, or any crime involving moral turpitude as provided in the Public Officers Law, or any other violation of law that carries a mandatory forfeiture of employment as a remedy.  Examples of mandatory forfeiture include, but are not limited to, residency violations as outlined in the NYS Public Officers Law.

Disciplinary actions or measures shall consist only of the following in accordance with existing collective bargaining agreements and appropriate laws:

1.  Reprimand,
2.  A fine not to exceed one hundred dollars ($100.00) to be deducted from salary or wages,
3.  Suspension without pay not to exceed sixty (60) days,
4.  Demotion in grade and title,
5.  Dismissal from the service.

As a guideline in determining the form of discipline and/or severity of punishment, if any, the department should consider all relevant factors. Minimally, those factors should include:

1.  the severity of the transgression and the extent of injury or damage to any victim;
2.  the extent of damage to the professional reputation of the department;
3.  the employee's past work record including any past disciplinary action and  any instances of meritorious work;
4.  the impact of the discipline on other members of the department;
5.  the affect of the discipline in deterring the offending employee from engaging in future acts of misconduct.

### 1.7   SUPERVISORS/SUPERIOR OFFICER RESPONSIBILITIES

Department Rules and Regulations
Refer to Chapter VII of the Buffalo Police Department Rules and Regulations.

For Whom Supervisors/Superiors Must Initiate Disciplinary Action
1.  Whenever the level of performance falls below acceptable limits, supervisors/superior officers are responsible for initiating disciplinary action if:

a.  the employee is assigned to their command; or
b.  the employee is temporarily assigned to their command, however briefly;  or
c.  the employee is assigned to another command but the substandard  performance occurred in the supervisor's/superior officer's presence.

A-1767

2. Whenever facts come to the supervisor's/superior officer's attention that indicate that the standards of conduct of the department have been violated by an employee of another command, the supervisor/superior officer shall prepare an Inter-Departmental memorandum detailing the nature of the employee's conduct, and shall forward the memorandum through channels to IAD, with one copy being sent to the command of the employee who is alleged to have violated the Department standards of conduct.

Positive Discipline

A supervisor/superior officer can implement positive discipline by using all the means at his/her disposal to teach, train and encourage employees to become the best employees that their natural talents allow. This is a constant and continuing process that requires the supervisor/superior officer to be aware of the employee's daily performance. Positive discipline shall be used in cases in which an employee's performance is somehow deficient or it may be used when there are minor violations of Department rules, regulations and procedures..

Formal Discipline

The formal disciplinary process shall be invoked for all major violations of department standards of conduct, for cases in which a disciplinary may be an appropriate remedy, for cases involving complex investigations or when further investigation is required. The formal disciplinary process requires that IAD open a case file; that a thorough and complete investigation be undertaken; and that there be a conclusion of fact at the end of the investigation. In such cases the supervisor/superior officer shall:

1. inform the employee of the nature of the substandard performance, telling him/her that it is unacceptable, and provide remedial instruction so that conduct of a similar nature is not repeated in the future;
2. prepare a memorandum, or in the case of a complaint from a citizen, a Citizen Complaint Form, detailing the nature of the violation of Department standards of conduct;
3. Call upon IAD for assistance and guidance as to suspend the employee when required. IAD can always be contacted through the 911 Communications Lt.

E. Major vs Minor Violations

It is difficult to draw a clear line distinguishing minor violations of Department standards of conduct from major ones. Major violations will tend to seriously impair the on going operation of the unit or they may have a substantial adverse impact on the Department. Major violations include allegations of criminal conduct, moral turpitude, insubordination, misuse of Department property or equipment, or repeated documented minor violations of Department standards of conduct. Minor violations might include slovenly appearance, coarse or

A-1768

harsh language, tardiness, poor service, etc. Supervisors/superior officers must use their best judgment in determining these distinctions. IAD is available for assistance as to determining major or minor violations as they case may be.

1.8     PROBATIONARY EMPLOYEES
A probationary employee is not guaranteed continued employment but merely has an expectation of appointment to a permanent position. The department has wide latitude in deciding to either retain or dismiss these employees while they are serving their probationary period.

Monitoring
During an employee's period of probation his/her performance shall be closely monitored by his/her immediate supervisor. The supervisor shall immediately correct deficiencies and shall periodically report on the probationary employee's progress to the Police Academy and other departmental units as determined by the Commissioner from time to time on the appropriate forms as the case may be.

Police Academy
The Police Academy shall be responsible for the oversight of all probationary employees. They shall prepare and disseminate forms designed to assess the progress of such employees. They shall carefully review completed progress reports and shall stay in close contact with the supervisor of any probationary employee who is exhibiting sub-standard performance levels.

Termination
Probationary employees who the Commissioner believes will not be able to raise their performance to an acceptable level may have their appointment to the position rescinded at any time prior to the expiration of the probationary period. Such probationary employee shall be given the opportunity to address the Commissioner on his/her own behalf prior to such rescission. All Departmental property, identification and equipment must be promptly returned by any employee who has had his/her appointment rescinded.

Department of Human Resources
The Commissioner's office shall promptly notify the Department of Human Resources in writing whenever a probationary employee is dropped from the rolls.

2.0     **INTERNAL AFFAIRS DIVISION**

2.1     POLICY
It is the policy of the Buffalo Police Department to maintain a Internal Affairs Division whose primary function is to ensure that all Department personnel achieve high standards of personal integrity, discipline and professional conduct.

2.2     I.A.D. TO REPORT DIRECTLY TO COMMISSIONER
Because of the sensitivity and potential impact of investigations involving the internal affairs of the Department, the commanding officer of IAD shall report

Case 23-352, Document 41, 06/23/2023, 3533150, Page56 of 223

A-1769

directly to the Commissioner.

The commanding officer of IAD shall keep the Commissioner informed of the nature and progress of all on going investigations.

The commanding officer of IAD shall immediately notify the Commissioner of:

1. any credible allegation of a Department employee's commission of a crime, or any offense involving moral turpitude;
2. any incident allegedly involving misconduct by a Department employee which is likely to generate substantial public attention.

Based on the investigation of the internal affairs incident and the recommendation of IAD, the Commissioner shall determine the appropriate disposition of each such incident.

2.3    COOPERATION WITH LABOR RELATIONS DIVISION
In cases involving discrimination in the workplace based on race, color, religion, sex or national origin, or cases involving sexual harassment, or disciplinary cases in which Departmental charges are preferred, IAD shall keep the Division of Labor Relations informed and shall extend to that Division their fullest cooperation.

2.4    I.A.D. INVESTIGATIONS
IAD shall coordinate the investigation of disciplinary infractions. They may designate the offending employee's command to conduct the investigation of minor violations. The employee's command will report the results of the investigation to IAD and recommend appropriate remedial measures.

All major violations shall be investigated by IAD. Investigations that are particularly complex or that involve allegations of discrimination based on race, color, religion, sex or national origin, or that involve allegations of sexual harassment, shall be investigated by IAD.

Subject to review by the Commissioner, the Commanding Officer of IAD shall have the authority to determine which departmental unit is to conduct employee investigations.

2.5    CIVIL LAW SUITS AND CLAIMS
Refer M.O.P. Chapter 6.

2.6    AUTHORITY OF I.A.D.
In pursuit of employee investigations, the Commanding Officer of IAD is authorized to transgress District and Division boundaries and lines of authority and (s)he shall be given complete cooperation by all department employees.

2.7   CONFIDENTIAL RECORDS
The Internal Affairs Division shall maintain a record of all complaints against the Department or its employees and shall be the central repository for all such complaints. These records shall be kept confidential and shall be separate and apart from regularly maintained personnel files.

All records concerning allegations of violations of Department standards of conduct which do not result in the lodging of Department charges shall be expunged after five years. In cases in which the employee is a party to a law suit involving his/her employment with the City or the City is also a named party, IAD records shall be maintained until the law suit has been concluded or until five years have expired from the date of the complaint, whichever is later.

Records concerning violations of Department standards of conduct which result in the preferring of Department charges, shall be maintained permanently in the employee's IAD file.

2.8   ANNUAL REPORTS
The Internal Affairs Division shall annually prepare statistical summaries of the activities of the unit.

2.9   I.A.D. ASSISTANCE TO OTHER UNITS
IAD is always available for advice and assistance. The 911 Communication Lt. shall be contacted when circumstances arise outside normal business hours. The 911 Communications Lt. may contact the on-call IAD investigator for further assistance should circumstances so require.

2.10   BLATANTLY FALSE COMPLAINTS
In those instances in which there are grossly or blatantly false accusations concerning employee misconduct and there exists evidence of intentional misrepresentation or the filing of false statements, the Commanding Officer of IAD shall recommend to the Commissioner that criminal action be pursued against the complainant.

**3.0   INVESTIGATING COMPLAINTS AND VIOLATIONS**

3.1   POLICY
It is the policy of the Buffalo Police Department to thoroughly investigate **ALL** complaints, from whatever source derived, and to investigate all allegations of misconduct or infractions of department standards of conduct. Each such investigation shall result in an appropriate disposition.

3.2   WHERE COMPLAINTS MAY BE RECEIVED
Citizen complaints concerning Department employees will be accepted at **ALL** police facilities in which sworn members are assigned regardless of whether the

employee who is the subject of the complaint is assigned to that facility. Complaints may be made in person or over a telephone or through the mail, fax, departmental website, or in some instances through a third party as the case may be.

3.3    SUBORDINATES TO NOTIFY SUPERVISOR/SUPERIOR OFFICER
Subordinates becoming aware of complaints regarding an employee of the department, in whatever manner received, shall immediately notify his/her supervisor/superior officer.

3.4    CITIZEN COMPLAINTS - SUPERVISOR/SUPERIOR OFFICER RESPONSIBILITIES
It is the responsibility of every supervisor/superior officer to personally accept citizens' complaints concerning employees of the department. In those circumstances in which the supervisor/superior officer is away from the building/office, (s)he shall be requested to return immediately.

In every case in which a citizen makes a complaint concerning an employee of the department, the complainant shall be provided with the pamphlet entitled "How the Buffalo Police Department Complaint Process Works." The complainant shall also be allowed to read and review the departmental copy of the IAD Complaint Investigation Manual located at each District.

Often a complaint may result from a lack of understanding of the law or of police procedures. Complaints of this nature in which there is no basis for an allegation of misconduct or where there is obviously no violation of department standards of conduct, shall be resolved by the supervisor/superior officer if possible. The supervisor/superior officer need not prepare a Citizen Complaint Form (P-294) if the citizen is satisfied with the resolution and there are no grounds for further investigation. If the citizen cannot be satisfied or there may be a reason for further investigation, the supervisor/superior officer shall complete and forward a Citizen Complaint Form.

In cases in which a citizen alleges conduct by a department employee and the conduct, if true, would constitute any violation of department standards of conduct, the supervisor/superior officer must complete a Citizen Complaint Form.

    A. If the alleged conduct of the employee would constitute a minor violation but it is not of a repetitive nature, the supervisor/superior officer shall attempt to resolve the complaint. If (s)he is able to successfully resolve the complaint and the citizen is satisfied with the disposition, the supervisor/superior shall note his/her actions on the Citizen's Complaint Finding Form (P-294b).

    B. In cases alleging infractions of law, major violations of Department standards of conduct, minor violations of a repetitive nature, or other misconduct, the supervisor/superior shall complete and forward the Citizen Complaint Form to the Internal Affairs Division and no attempt

shall be made to resolve the complaint at this time.

C. In cases in which the allegations, if proven, would constitute a crime (i.e. misdemeanor or felony), the supervisor/superior officer shall also prepare an incident report.

When a Citizen Complaint Form is completed concerning conduct of an employee not of the supervisor/superior officer's command, the supervisor/superior officer shall also forward a copy of the form to the employee's command.

Citizens shall not routinely be referred to IAD concerning a complaint against a departmental employee without first having completed a Citizen Complaint Form.

3.5   HANDLING MINOR VIOLATIONS
Minor violations of Department standards of conduct which are isolated incidents and which are not the subject of a citizen complaint may be handled with positive discipline.

In cases of minor violations of Department standards of conduct which are not isolated instances, supervisor/superior officer shall:

1. Prepare a memorandum detailing the incident. Upon giving remedial instruction, the supervisor/superior officer will include in the memorandum the nature of the remedial instruction provided;

2. A copy of the memorandum shall be issued to the employee. The employee may choose to respond in writing and the employee's response will be attached to each copy of the supervisor/superior officer's memorandum.

3. The memorandum shall be forwarded to IAD through the chain of command. The memorandum shall include a suggested disposition of the case from each of the superior officers in the chain of command including the initiating supervisor/superior officer. The memorandum and the employee's response, if any, will be filed in IAD.

4. The Commanding Officer of IAD will decide whether a IAD case file will be opened and the formal disciplinary process invoked.

3.6   COMPLAINTS AGAINST SUPERIOR OFFICERS
If a subordinate employee becomes aware that a superior officer has violated department standards of conduct, the subordinate shall notify IAD either in writing or in person. This does not permit subordinate employees to initiate complaints that they know are capricious, unjustifiable and without any basis in fact.

If a citizen attempts to lodge a complaint against a superior officer:

1. The Superior Officer who is the subject of the complaint shall refer the complaint to an on-duty Supervisor of a higher rank than (s)he assigned to that command; or

2. If no Supervisor of a higher rank assigned to that command is on duty, the Duty Officer or Captain assigned as the Duty Officer should investigate the complaint; or

3. If there is no Duty Officer or Captain assigned as the Duty Officer on Duty, the complainant shall be referred to IAD.

3.7  DETERMINING WHICH COMMAND IS TO INVESTIGATE THE COMPLAINT

Upon receipt of a Citizen Complaint Form or a Department memorandum detailing allegations of substandard conduct, IAD will review the documents and determine which would be the best unit to handle the investigation. If accusations of a serious nature are alleged, IAD will investigate the case. The employee's command may be designated to investigate complaints that are minor in nature. The Commanding Officer of IAD, subject to the review of the Commissioner, shall determine which unit handles the investigation.

3.8  CONDUCTING THE INVESTIGATION

A. When an employee investigation is assigned to the employee's command, the Chief or superior in charge of that command will be responsible for its completion. The Chief or superior in charge may delegate authority to lesser ranking superior officers of his/her command to pursue the investigation however, the ultimate responsibility for its completion rests with the Chief or superior in charge.

B. All investigations targeting sworn members of the department must be conducted in conformance with the Police Officer's Bill of Rights. Investigations shall also be conducted as determined by the IAD Office Investigation Manual.

C. All evidence must be thoroughly evaluated and witnesses must be carefully interviewed. Statements of witnesses shall be taken in appropriate cases.

D. In all cases, the complainant will be contacted and apprised of the results of the investigation. This may be done in writing or telephonically. A record of such contact must be noted on form P-294b.

E. All superior officers in the employee's chain of command will submit in writing their recommendations concerning the disposition of the case. In cases of

citizen complaints this will be done on form P-294b. For non-citizen complaints the recommendations will be forwarded on an Intra-Departmental memorandum.

F.  Cases shall be resolved within thirty (30) days. If additional time is required, a request in writing must be submitted to the Commanding Officer of IAD and approved by the Commissioner.

**NOTE:** If an employee's command conducts the investigation, the Command Officer conducting the investigation must speak with the complainant as part of their investigation.

3.9    LINES OF AUTHORITY
The Commanding Officer of IAD shall have authority to transgress District and Division boundaries, and lines of authority. In pursuit of such investigations, (s)he shall be given complete cooperation by department employees. Chiefs and other Superior Officers should not encroach on the command of their peers except in emergency circumstances (e.g. when the police purpose or good order of the department would be jeopardized by failure to take immediate action).

When minor complaints affect more than one command, the investigation shall be conducted by one Chief or superior in charge of the command, with the active cooperation of other affected Chiefs or superior in charge of the command. Recommendations shall reflect the combined thinking of the concerned Chiefs or superior's in charge of the commands.

3.10   CONCLUSIONS OF FACT
At the completion of each formal investigation the department shall reach one of the following conclusions of fact concerning the allegations:

SUSTAINED - Sufficient evidence exists to clearly prove the allegations.

EXONERATED - The alleged facts did occur but were justified and proper.

NOT SUSTAINED - Insufficient evidence exists to clearly prove the allegations.

UNFOUNDED - The alleged facts did not occur or the accused officer was not involved.

**4.0    SUSPENSIONS PRIOR TO DISCIPLINARY HEARINGS**

4.1    POLICY
Whenever there is an allegation of misconduct against a Department employee, it is the policy of the Buffalo Police Department to suspend that employee from duty prior to a disciplinary hearing, consistent with existing collective bargaining agreements, if the employee's continued presence on the job will disrupt the operations of the unit to which (s)he is assigned; or it will have an adverse impact

on the Department; or the alleged violation is of a serious nature.

4.2   AUTHORITY TO SUSPEND FROM DUTY

Prior to Service of Charges
All officers of the rank of lieutenant and above are authorized to immediately suspend a subordinate for violations of department standards of conduct which are deemed to be of a serious nature including appearing for duty under the influence of alcohol. Such suspensions shall be with pay pending service of departmental charges.

1.   Consistent with the Department Drug Testing policy, sworn members appearing for duty under circumstances in which there exists reasonable cause to believe that they are under the influence of drugs shall be directed to submit to a "reasonable cause" drug test. They shall be relieved from duty and placed on administrative leave of absence with pay pending receipt of test results and the completion of any investigation conducted by the City. Refer to the Buffalo Police Department Drug Testing Policy.

After Service of Charges
After service of Departmental charges an employee may be suspended without pay for a period not to exceed thirty (30) days. Such suspension shall be at the direction of the Commissioner.

1.   Employees represented by Local 264 may be suspended without pay after service of charges only if their continued presence on the job would represent a potential danger to persons or property or would severely interfere with operations.

2.   All other employees of the Department may be suspended without pay after service of charges if their continued presence on the job would have an adverse impact on the Department.

4.3   PROCEDURE FOR SUSPENDING AN EMPLOYEE

Suspension With Pay Prior to Service of Charges - Civilian Employees
If a civilian employee is immediately suspended with pay prior to service of charges, the superior officer making the suspension shall inform the employee that (s)he is suspended and the reason therefore.

Suspension With Pay Prior to Service of Charges - Sworn Members
Supervisors/superior officers contemplating suspending an employee prior to service of charges shall, absent exigent circumstances, first consult with IAD. If a sworn member of the Department is to be suspended prior to service of charges, the superior officer that suspends the sworn member shall:

Case 23-352, Document 41, 06/23/2023, 3533150, Page63 of 223

A-1776

1. inform the sworn member that (s)he is suspended and the reason therefore;

2. obtain the sworn member's badge and identification card;

3. if possible, ascertain if the sworn member has a valid pistol permit;
   a. if no permit is presented, obtain all handguns owned by the sworn member,
   b. if a valid permit is presented, obtain all Department issued weapons only;

4. prepare forms P10 and/or P-10a for the officer's weapons, badge and identification and deliver the property to the Property Office consistent with current directives;

5. notify IAD if IAD personnel are on duty, or notify the 911 Communications Lieutenant. when no IAD personnel are working and in such case the 911 Communications Lt. will notify the on-call IAD investigator;

6. prepare a memorandum detailing the conduct or activities for which the employee was suspended. Copies of the memorandum must be forwarded to IAD prior to the expiration of the suspending officer's tour of duty. A copy shall also be forwarded through the normal chain of command.

<u>Suspension Without Pay After Service of Charges</u>
Employees who are to be suspended without pay after service of charges shall first be served with the charges. The employee shall be allowed to review them and cite any inaccuracies before the suspension occurs.

4.4   <u>RETURN OF BENEFITS IF CHARGES ARE NOT SUSTAINED</u>
If the charges are not sustained, the accused person shall be restored to his/her position with full pay for any period of suspension less the amount of compensation for that period:

A.  which (s)he may have earned in any other occupation or employment;
B.  received from unemployment benefits

5.0   **CHARGES AND HEARINGS**

5.1   <u>POLICY</u>
When disciplinary charges are to be lodged against a Department employee, it is the policy of the Buffalo Police Department to prepare and serve the charges on the accused employee and to present evidence concerning the charges before the hearing officer designated to try the case.

Case 23-352, Document 41, 06/23/2023, 3533150, Page64 of 223

A-1777

5.2   <u>PREPARING THE CHARGES</u>

<u>Commissioner's Determination</u>

If after a thorough and complete employee investigation, the conclusion of fact results in a finding of "sustained," the Commissioner may direct, in his/her sole discretion, that Departmental charges be preferred against the accused employee. If the Commissioner determines that departmental charges are not to be preferred, (s)he shall direct that appropriate action be taken to insure that the employee's conduct is corrected and that the likelihood of recurrence is minimized. Any action directed by the Commissioner shall be consistent with the terms of the applicable collective bargaining agreement.

<u>Charges and Specifications Defined</u>

1. The charge is the designation of the specific standard of conduct which the accused is charged with violating.

2. The specification is a statement of facts which in law constitute the offense charged. Specifications should be drawn in clear and concise language and should contain the following information:

   a. rank, name and command of the accused;
   b. date, time and place of the alleged offense, (approximate entries will be acceptable);
   c. if the offense was committed more than once, or in more than one way, there shall be distinct specifications;
   d. each specification shall be complete in itself and not refer to facts or particulars of other specifications;
   e. specifications under each charge shall be numbered consecutively.

5.3   <u>SERVING THE CHARGES</u>

IAD shall prepare a "Notice of Charges" which shall be attached to the charges.

IAD shall issue or cause to be issued to the accused employee, a copy of the charges and "Notice of Charges."

If the charges are issued in person to the accused employee, the employee shall acknowledge receiving the charges by signing his/her name and the date thereon. If the charges are not issued in person to the accused employee, the officer delivering the charges shall certify in writing on the original copy, the time, date, place and manner in which the charges were delivered. If the charges cannot be personally issued to the accused employee, charges may be issued by:

1. delivering the charges personally to some person of suitable age and discretion at the accused employee's place of residence; or

Case 23-352, Document 41, 06/23/2023, 3533150, Page65 of 223

2.  if the place of residence cannot be located, then by personally posting the charges in a conspicuous place in the stationhouse or office to which the accused employee is assigned.

In all cases, the employee's collective bargaining agent must also be served with the charges.

5.4  ANSWER TO CHARGES

The accused employee shall have ten (10) days, exclusive of the date of service, in which to answer the charges.

The answer must be in writing and must be served on the Commissioner.

Failure to serve a written answer within the time provided shall be deemed an admission of the charges. However, where the accused defaults in answering, (s)he shall be permitted to show matters in mitigation of any punishment which may be imposed.

5.5  AMENDMENTS TO THE CHARGE

After charges have been preferred, they may be altered or amended by the Commissioner, or (s)he may cause new charges to be prepared.  Slight errors in names, dates and amounts may be corrected by the Commissioner on motion.

All causes for complaints against the accused employee arising from the same incident and not covered by the original or amended charges shall be forever barred.

5.6  INFORMAL CONFERENCE

Within ten (10) days after the receipt of the written answer to the charges preferred, or if the accused employee defaults in answering, within ten (10) days after his/her time to answer has expired, the Commissioner shall conduct an informal conference upon the charges. At such conference the accused employee shall have the opportunity to be represented by his/her collective bargaining agent or by legal counsel. (S)he may,  if (s)he desires, present witnesses on his/her behalf. The Commissioner shall have the power to dismiss or withdraw the charges if the conference so warrants, or accept a plea of guilty.

In all cases where the accused employee enters a plea of guilty, the Commissioner shall receive evidence showing all the circumstances of mitigation or aggravation which accompanied the offense, unless they are fully disclosed in the specifications.

In the event that the charges are not withdrawn or dismissed after such conference or if a plea of guilty has not been entered, a formal hearing shall then be held upon the charges before a hearing officer mutually selected by the parties. Such hearing officer shall be deemed to be the person designated by the Commissioner for that purpose within the meaning Section 75 of the Civil Service Law of the State of New York. In the case of a sworn member, where the parties are unable to agree upon a hearing officer, or, where the hearing officer agreed upon is or becomes unable or

to act, then the parties shall mutually apply to the Supreme Court of the State of New York for the appointment of a hearing officer.

5.7   UNIFORMS TO BE WORN
Uniformed employees of the Department shall appear at the Informal Conference and/or Formal Hearing and shall do so in uniform.

Officers assigned to Detective or plainclothes duty, Officers on long time sick and IOD status and non-uniform civilian employees, need not appear in uniform at the Informal Conference and/or Formal Hearing however, shall appear in acceptable attire as if attending court. (See M.O.P. Chapter 6)

5.8   RIGHTS OF THE ACCUSED EMPLOYEE
The accused employee is entitled to the following, as a matter of right:

A reasonable time in which to prepare for trial;

To be present at the trial;

To be heard in person and by counsel and to give and furnish evidence in  his/her defense;

To reasonable adjournments in order to be able to prepare for trial;

(S)he shall not be compelled in advance of the trial to disclose the names of any of his/her proposed witnesses;

Upon application, the Commissioner shall issue blank subpoenas in which the accused or his/her attorney may insert the name of any person (s)he desires to attend and give evidence.

The burden of proving the charges shall rest with the Department.

5.9   SUBPOENAS
The Commissioner shall have the power to administer oaths and issue subpoenas. In case any witness shall refuse to appear or answer any proper question, (s)he may be ordered to do so by a justice of any court of record, and punished for his/her disobedience of any such order in accordance with law.

The impartial hearing officer selected to conduct the formal hearing shall be vested with all the powers of the Commissioner in conducting the hearing.

5.10   ADJOURNMENT: ABSENCE OF WITNESSES
Upon application by the accused for adjournment of the formal hearing because of the absence of a witness for the accused, it should distinctly appear upon his/her oath that:

The witness is material, and why;

The accused employee has used due diligence to require the attendance of the witness;

The accused has reasonable grounds to believe that (s)he will be able to procure such attendance within a reasonable time. If the absence of a witness is caused by sickness, the accused employee must produce a certificate from the attending physician to that effect.

5.11    RECORDING THE FORMAL HEARING
All formal hearings must be recorded.

If the accused employee is found guilty, a copy of the charges, his/her written answer, a transcript of the hearing, and the final determination itself shall be placed in the employee's personnel file. A copy thereof shall also be filed with the Municipal Civil Service Commission.

A copy of the transcript of the hearing shall, upon the request of an accused employee who has been found guilty, be furnished without charge.

5.12    RULES OF EVIDENCE
Compliance with the technical rules of evidence during a formal disciplinary hearing is not required.

5.13    REVIEW OF THE HEARING OFFICER'S DECISION
After the formal hearing, the impartial hearing officer shall make findings and recommendations which shall be referred to the Commissioner for review and decision. The judgment of the Commissioner will be set forth as an order or resolution and will become part of the record of the case.

If the PBA disagrees with the decision of the Commissioner of Police to change the decision recommended by the Hearing Officer concerning a sworn member of the Department, the PBA may seek review of such change in decision. The parties, through the American Arbitration Association and within seven days of the Commissioner's decision, shall mutually select an arbitrator to review the case. It is understood that such arbitrator shall not be authorized to conduct a rehearing of the matter, but only to review the record of the proceeding to determine whether the change in decision by the Commissioner was supported by substantial evidence in the record. If the arbitrator so determines, (s)he shall have the authority to award an appropriate remedy which shall be final and binding upon the parties and the sworn  member involved. It is further understood that the cost of such arbitration shall be shared equally between the parties.

Any employee believing himself/herself aggrieved by a penalty or punishment of

demotion in or dismissal from the service, or suspension without pay, or a fine imposed pursuant to the provisions of the collective bargaining agreement, may appeal from such determination either by an application to the Buffalo Municipal Civil Service Commission or by an application to the Supreme Court in accordance with the provisions of Article 78 of the Civil Practice Laws and Rules. If such person elects to appeal to the Commission, (s)he shall file such appeal, in writing within twenty (20) days after receiving written notice of the determination to be reviewed. In accordance with the provisions of Subdivision 76 of the Civil Service Law, the decision of the Commission shall be final and conclusive and not subject to further review in court.

5.14    TERMINATION CONFERENCE
If an employee's dismissal results from disciplinary action or for violation of the Department's Drug Testing Policy, a termination conference shall be held. At this conference the employee facing dismissal shall be:

Informed of the reason for the dismissal;

Informed of the effective date of the dismissal;

Informed of the status of fringe benefits and retirement benefits;

Informed of the contents of his/her personnel file as it relates to the cause of dismissal;

Required to return all Department property and equipment.

5.15    SEEKING INTERCESSION ON BEHALF OF THE ACCUSED
Employees against whom charges have been preferred, shall not in any manner, or at any time, cause any person to intercede for them, personally or otherwise.

5.16    AFFECT OF A FINDING OF GUILT LIMITED TO TWO YEARS
After a lapse of two (2) years, a determination that an accused employee was guilty of the charges preferred against him/her shall not be considered upon application for promotion made by him/her, nor shall it affect any right or privilege to which (s)he would otherwise be entitled were it not for such  determination. A lapse of two years shall be deemed to have occurred two years from the date that the Department accepts a plea of guilty to the charges, or two years after the Commissioner receives the findings and recommendations of the hearing officer.

5.17    RESIGNATIONS, SEPARATION FOR CAUSE
The Commissioner shall caused to be placed in the personnel file of any employee resigning or separating from the Department for cause, all the facts pertinent to the action.

6.0    **PREVENTING DISCRIMINATION IN THE WORKPLACE**

A-1782

6.1   <u>POLICY</u>
It is the policy of the Buffalo Police Department to treat all employees fairly and to seek out and prevent discrimination to or by its employees that is based upon race, color, religion, sex or national origin.

6.2   <u>COMPLAINT PROCEDURE</u>
Department employees who feel aggrieved because of discrimination that is based upon race, color, religion, sex or national origin, which occurs in the work place, may make their concerns known by any of the following means.

Aggrieved employees who feel comfortable doing so may directly inform the person engaging in the discriminatory conduct that the conduct is discriminatory and that it must stop.

Aggrieved employees who do not wish to communicate directly with the person engaged in the discriminatory conduct, or if direct communication with the offending party has proved unavailing, may contact either their own immediate supervisor or the offending party's immediate supervisor. The supervisor shall immediately prepare a memorandum detailing the allegations of the subordinate and have such report delivered to IAD prior to the start of the next business day. Copies of the memorandum shall be forwarded through the chain of command to the offending party's District/Division Chief or Commanding Officer. Minimally the report shall include:

1. the date of receipt of the complaint;
2. identification of the complainant;
3. identification of the party or parties and the action complained of, including all relevant background facts and circumstances;
4. a statement detailing the scope of the preliminary investigation that had been undertaken and the results thereof;
5. a statement of corrective measures pursued, the dates such measures were undertaken and the results achieved.

Aggrieved employees who do not wish to communicate directly with the person engaged in the discriminatory conduct and who do not chose to contact their own immediate supervisor or the offending party's immediate supervisor, may as an alternative, directly contact the Labor Relations Division.
Aggrieved employees who do not choose to directly confront the person engaging in the discriminatory conduct, or who do not choose to contact their own immediate supervisor or the offending party's immediate supervisor, or contact the Labor Relations Division, may prepare a memorandum detailing their allegations and forward the memorandum directly to IAD.

Aggrieved employees alleging discriminatory conduct by anyone with supervisory authority, or the failure by supervision to take immediate action on the employee's

Case 23-352, Document 41, 06/23/2023, 3533150, Page70 of 223

A-1783

complaint, may also file a formal grievance in accord with the provisions of the appropriate collective bargaining agreement grievance procedure.

6.3    TIMELINESS FOR INITIATING COMPLAINTS OR GRIEVANCES
There are no express time limits for initiating complaints under this policy, however, every effort should be made to file such complaints as soon as possible, while facts and potential testimony of witnesses, if any, are still fresh.

Employee grievance procedures under collective bargaining agreements have time limits. If the employee submits a grievance alleging discrimination based upon race, color, religion, sex or national origin and the grievance procedure outlined in the appropriate collective bargaining agreement is invoked, time limits must be observed.

Complaints to the Equal Employment Opportunity Commission must be filed within one hundred eighty (180) days.

6.4    INTERNAL AFFAIRS DIVISION AS CENTRAL REPOSITORY
IAD shall be the unit for channeling and recording all complaints against Department employees involving allegations of discrimination based upon race, color, religion, sex or national origin. IAD shall be responsible for insuring that all complaints are dealt with fairly, effectively, and in accord with Department policies and procedures.

Upon receipt of such a complaint, IAD shall immediately notify the Division of Labor Relations. IAD shall fully cooperate with the Division of Labor Relations in handling complaints of this nature.

IAD shall maintain such records, establish such systems, and adopt such procedures that are necessary to handle complaints involving allegations of discrimination in the workplace that are based on race, color, religion, sex or national origin.

If the Commissioner determines that a complaint would best be processed under the grievance procedures outlined in the respective collective bargaining agreements, (s)he shall refer the complaint to the appropriate collective bargaining agent.

6.5    INVESTIGATION
All complaints alleging discrimination in the workplace that are based upon race, color, religion, sex, or national origin shall be thoroughly and completely investigated by IAD. IAD shall interview all witnesses, Department personnel, persons named in the complaint, and any other person who may have pertinent information. All relevant evidence shall be carefully examined. At the completion of the investigation, IAD shall report their findings and make appropriate recommendations to the Commissioner. Cases shall be resolved within thirty (30) days, with extensions granted by the Commissioner based upon good cause.

The Commanding Officer of IAD shall keep the Commissioner informed at all times of the progress of the investigation.

The Commanding Officer of IAD shall have authority to transgress District and Division boundaries and lines of authority. In pursuit of such investigations (s)he shall be given complete cooperation by Department employees.

6.6    COMMISSIONER'S DETERMINATION
The Commissioner shall make a determination as to the validity of the complaint, based upon the report of IAD. If the Commissioner determines that the complaint may be valid, (s)he shall determine the best course of action.

The Commissioner's choices include, but are not limited to, preferring charges against employees violating Department standards of conduct; amending rules, regulations, policies and procedures; or referring the complainant to the grievance process outlined in the appropriate collective bargaining agreement if the time limits for filing the grievance have not yet expired. In every case, the complaining employee shall be provided with the written determination of the Commissioner.

6.7    RESPONSIBILITY OF SUPERVISORS/SUPERIOR OFFICERS
It is the responsibility of supervisors/superior officers to prevent, report and uncover instances in the workplace in which discrimination based on race, color, religion, sex or national origin occurs. They shall take prompt remedial measures commensurate with the level of authority vested in their rank and position. Such remedial measures shall be consistent with current directives and shall not breach the applicable collective bargaining agreement.

**7.0    PREVENTING SEXUAL HARASSMENT IN THE WORKPLACE**

7.1    POLICY
It is the policy of the City of Buffalo (hereafter "City") and the Buffalo Police Department to provide a business and employment environment free of unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct or communications, which have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment constituting sexual harassment as defined and otherwise prohibited by state and federal statutes.

7.2    DEFINITION OF SEXUAL HARASSMENT
The U.S. Equal Employment Opportunity Commission (EEOC) has issued guidelines interpreting Section 703 of Title VII as prohibiting sexual harassment (29 CFR 1604.11). Sexual harassment is defined in these guidelines as follows:

...Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual

harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Further, New York State Human Rights Law prohibits discrimination on the same basis as covered by Title VII, including sexual harassment.

7.3  CONDUCT CONSTITUTING SEXUAL HARASSMENT
An employee's engaging in sexual harassment in the workplace brings discredit to the Department as well as the offending employee and it is prejudicial to the Department's good order, discipline and reputation.   Sexual harassment is prohibited and employees shall not:

 1. Make sexual advances or request sexual favors when submission to, or rejection of, such advances or requests is the basis for either implicitly or explicitly recommending, imposing, granting, withholding or refusing terms and conditions that either favor or adversely affect the employment of the employee or individual;

 2. Recommend, impose, grant, withhold or refuse to take any personnel or other action consistent with the offending employee's duties and responsibilities because of sexual favors or as a reprisal against an employee or other individual who has rejected or reported sexual advances;

 3. Disregard and fail to investigate allegations of sexual harassment whether reported by the employee or individual who is the subject of the alleged harassment or a witness, and fail to take immediate corrective action in the event misconduct has occurred.

Employees shall not abuse any other person through conduct or communication of a sexual nature and constituting sexual harassment as defined in section M.O.P. Chapter 15 above. Whenever such conduct exists, prompt and corrective action is required.

Whenever there is reason to believe disciplinary action is warranted, the supervisor or other responsible individual is required to take prompt and corrective action commensurate with the authority vested in his/her rank and position. Such remedial action shall be consistent with Department directives     and shall not breach the applicable collective bargaining agreement.

The violation of this policy can result in discipline and discharge for employees pursuant to Section 75 of the Civil Service Law and the discipline clause of the

appropriate collective bargaining agreement, if applicable; and such penalties, sanctions and impositions against other individuals or parties     as may be available to the City, given the nature of the contractual or business relationship that may be established with such parties or individuals.

7.4    UNDERLINE COMPLAINT PROCEDURE

Department employees who feel aggrieved because of sexual harassment may make their concerns known by any of the following means.

Aggrieved employees who feel comfortable doing so may directly inform the person engaging in sexual harassment conduct or communications that the conduct is offensive and that it must stop.

Aggrieved employees who do not wish to communicate directly with the person whose conduct or communication is offensive, or if direct communication with the offending party has proved unavailing, may contact either their own immediate supervisor or the offending party's immediate supervisor. The supervisor shall immediately prepare a memorandum detailing the allegations of the subordinate and have such report delivered to IAD prior to the start of the next business day. Copies of the memorandum shall be forwarded through the chain of command to the offending party's District/Division Chief or Commanding Officer. Minimally the report shall include:

1. the date of receipt of the complaint;
2. identification of the complainant;
3. identification of the party or parties and the action complained of, including all relevant background facts and circumstances;
4. a statement detailing the scope of the preliminary investigation that had been undertaken and the results thereof;
5. a statement of corrective measures pursued, the dates such measures were  undertaken and the results achieved.

Aggrieved employees who do not wish to communicate directly with the person engaged in the sexual harassment conduct or communications and who do not chose to contact their immediate supervisor or the offending party's immediate supervisor, may as an alternative directly contact the Labor Relations Division.

Aggrieved employees who do not choose to directly confront the person engaging in the discriminatory conduct, or who do not choose to contact their immediate supervisor or the offending party's immediate supervisor, or contact the Labor Relations Division, may prepare a memorandum detailing their allegations and forward the memorandum directly to IAD.

Aggrieved employees alleging sexual harassment by anyone with supervisory authority, or the failure by supervision to take immediate action on the employee's complaint, may also file a formal grievance in accord with the provisions of the

appropriate collective bargaining agreement grievance procedure.

7.5   TIMELINESS FOR INITIATING COMPLAINTS OR GRIEVANCES
There are no express time limits for initiating complaints alleging sexual harassment however; every effort should be made to file such complaints as soon as possible, while facts and potential testimony of witnesses, if any, are still fresh.

Employee grievance procedures under collective bargaining agreements have time limits. If the employee submits a grievance alleging sexual harassment in the workplace and the grievance procedure outlined in the appropriate collective bargaining agreement is invoked, time limits must be observed.

Complaints to the Equal Employment Opportunity Commission must be filed within one hundred eighty (180) days.

7.6   INTERNAL AFFAIRS DIVISION AS CENTRAL REPOSITORY
IAD shall be the unit for channeling and recording all complaints against Department employees alleging sexual harassment in the workplace.  IAD shall be responsible for insuring that all complaints are dealt with fairly, effectively, and in accord with Department policies and procedures.

Upon receipt of such a complaint, IAD shall immediately notify the Division of Labor Relations. IAD shall fully cooperate with the Division of Labor Relations in handling complaints of this nature.

IAD shall maintain such records, establish such systems, and adopt such procedures that are necessary to handle complaints involving sexual harassment in the workplace.

7.7   INVESTIGATION
IAD shall conduct a thorough and complete investigation of all complaints alleging sexual harassment in the workplace. IAD shall interview all witnesses, Department personnel, persons named in the complaint, and any other person who may have pertinent information. All relevant evidence shall be carefully examined. At the completion of the investigation, IAD shall report their findings and make appropriate recommendations to the Commissioner. Cases shall be resolved within thirty (30) days, with extensions granted by the Commissioner for good cause.

The Commanding Officer of IAD shall keep the Commissioner informed at all times of the progress of the investigation.

The Commanding Officer of IAD shall have authority to transgress District and Division boundaries, and lines of authority. In pursuit of such investigations (s)he shall be given complete cooperation by Department employees.

7.8   COMMISSIONER'S DETERMINATION

The Commissioner shall make a determination as to the validity of the complaint, based upon the report of IAD. If the Commissioner determines that the complaint may be valid, (s)he shall determine the best course of action. The Commissioner's choices include, but are not limited to, preferring charges against employees violating Department standards of conduct; amending rules, regulations, policies and procedures; or referring the complainant to the grievance process outlined in the appropriate collective bargaining agreement if the time limits for filing the grievance have not yet expired. In every case, the complaining employee shall be provided with the written determination of the Commissioner.

7.9   <u>RESPONSIBILITY OF SUPERVISORS/SUPERIOR OFFICERS</u>
It is the responsibility of supervisors/superior officers to prevent, report and uncover instances in the workplace involving sexual harassment. They shall take prompt remedial measures commensurate with the level of authority vested in their rank and position. Such remedial measures shall be consistent with current directives and shall not breach the applicable collective bargaining agreement.

7.10   <u>CONSISTENCY WITH CITY OF BUFFALO SEXUAL HARASSMENT POLICY</u>
Nothing in the Police Department's Sexual Harassment Policy shall be construed to be inconsistent with the principles outlined in the City of Buffalo Sexual Harassment Policy. The Police Department's policy adapts the City policy to the needs peculiar to the Police Department.

A-1789

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

Plaintiff,

vs.

RICHARD WAGSTAFF, MARY GUGLIUZZA, BPD DOES 1-12 in their capacity as
Police Officers of the CITY OF BUFFALO, BUFFALO POLICE DEPARTMENT,
MARK STAMBACH, and MARK VAUGHN,

Defendants.
_____

Index No.: 16-CV-00321

REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANTS' MOTION TO DISMISS

TIMOTHY A. BALL, ESQ.
Corporation Counsel
*Attorney for Defendants*

By: Maeve E. Huggins
Assistant Corporation Counsel
1112 City Hall : 65 Niagara Square
Buffalo, New York 14202
Tel.: (716) 851-4317
Fax.: (716) 851-4105
E-mail: mhuggins@city-buffalo.com

A-1790

<u>PRELIMINARY STATEMENT</u>

The Defendants moved for judgment on the pleadings and dismissal of Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure (hereinafter "Rule") 4 and 12 and for summary judgment pursuant to Rule 56 (Dkt. No. 69). Relying on the pleadings, the Defendants' moving papers,[1] and the record before this Court, the Defendants respectfully submit this Reply Memorandum of Law in further support.

<u>PLAINTIFF'S AMENDED COMPLAINT MUST BE DISMISSED AND<br>DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW</u>

Incorporating all arguments from the initial moving papers, the Defendants respectfully submit that this Court lacks jurisdiction over several named defendants, Plaintiff neglected to identity sufficiently and timely the John Doe defendants, and the Plaintiff failed to raise a genuine issue of fact to defeat the Defendants' summary judgment motion. Accordingly, the Defendants' motion should be granted.

**I.      Plaintiff's untimely opposition should be disregarded.**

At counsel's request, this Court directed Plaintiff's opposition due by July 3, 2020 (Dkt. No. 77). At the latest, Plaintiff's opposition could be filed by July 6 due to the federal July 4 holiday. However, his memorandum of law in opposition was not filed until July 7, 2020. Accordingly, Plaintiff's opposition is untimely and the arguments contained within his memorandum of law should be disregarded.

**II.     Plaintiff failed to prove proper service over the retired Mary Gugliuzza, Mark Stambach, and Mark Vaughn and the Court must dismiss as to those parties for lack of jurisdiction.**

---

[1] Exhibits submitted in support of the Defendants' Motion are hereinafter referred to as "Def. Ex."

Plaintiff cites no authority supporting his claims that he effectuated proper service. Proper service is jurisdictional. It is undisputed that Mary Gugliuzza, Mark Stambach, and Mark Vaughn retired from City of Buffalo employment prior service of the summons and complaint (Def. Ex. A). Served well beyond the period of time to effectuate service of the summons and complaint under Rule 4, the Defendants' Rule 26 Initial Disclosures are of no consequence. The Defendants immediately raised the jurisdictional defense of improper service when they joined issue (Dkt. No. 6 at 12) and Plaintiff took no timely action to remedy his error. Therefore, this Court must dismiss all claims against Gugliuzza, Stambach, and Vaughn.

### III.   Lacking capacity to be sued, the Buffalo Police Department (hereinafter "BPD") is not a proper party to this action.

The Defendants moved to dismiss BPD from the action to the extent that the previous Decision and Order (Dkt. No. 56) was unclear as to BPD's status (Dkt. No. 69 at 10-11). BPD is a mere administrative arm of the City of Buffalo. The law is settled: administrative arms lack the capacity to be sued. *See Baker v. Willett*, 42 F.Supp.2d 192, 198 (N.D.N.Y. 1999); *Loria v. Town of Irondequoit*, 775 F.Supp. 599, 606 (W.D.N.Y. 1990); *Warner v. Village of Goshen Police Dep't*, 256 F.Supp.2d 171, 175 (S.D.N.Y. 2003); *Davis v. Lynbrook Police Dep't*, 224 F.Supp.2d 463, 477 (E.D.N.Y. 2002); *Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y. 2002); *Umhey v. Cnty. of Orange*, 957 F.Supp. 525, 530-31 (S.D.N.Y. 1997); *Wilson v. City of N.Y.*, 800 F.Supp. 1098, 1101 (E.D.N.Y. 1992); *see also Blyden v. N.Y.P.D.*, No. 05-cv-4740, 2005 WL 3388609, at *2 (E.D.N.Y. Dec. 12, 2005). Plaintiff previously conceded in his objections to Magistrate Judge Scott's Report &

Recommendation that BPD was not a proper party (Dkt. No. 47 at 3).  Therefore, all claims

against BPD must be dismissed to the extent that such claims were not already dismissed.

**IV.    All claims against BPD Does 1-12 must be dismissed because Plaintiff never timely identified the parties.**

It is well established that "[w]here a plaintiff names 'John Doe' as a placeholder

defendant because he does not know the identity of an individual defendant, he generally

is required to replace the placeholder with a named party within the applicable statute of

limitations."  *Abreu v. City of New York*, 657 F. Supp. 2d 357, 363 (E.D.N.Y. 2009).  "Courts

typically refrain from dismissing suits against 'John Doe' defendants 'until the plaintiff

has had some opportunity for discovery to learn of the identities of responsible officials'."

*Kearse v. Lincoln Hosp. (Bronx, N.Y.)*, 2009 U.S. Dis. LEXIS 52895, *4 (S.D.N.Y. 2009),

quoting *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).  However, "[w]here a plaintiff has

had ample time to identify a John Doe defendant but gives no indication that he has made

any effort to discover the [defendant's] name . . . the plaintiff simply cannot continue to

maintain a suit against the John Doe defendant."  *Cruz v. City of N.Y.*, 232 F. Supp. 3d 438,

448 (S.D.N.Y. 2017).

The Amended Complaint (Dkt. No. 59) is entirely vague regarding the identity of

the John Doe defendants.  The Defendants have no obligation to guess the identities of

BPD Does 1-12.  This matter has been pending since 2016 (Dkt. No. 1).  The Defendants

disclosed ample discovery.  Since amending his complaint (Dkt. No. 59), Plaintiff took no

action to identify the John Does in any meaningful manner notwithstanding voluminous

paper discovery and depositions.  Plaintiff bears the burden of identifying the parties he

3

intended to sue; the Defendants need not have to speculate.  Accordingly, all claims against BPD Does 1-12 must be dismissed.

**V.      No authority supports any official capacity claims.**

Plaintiff cites no authority supporting his claim that official capacity claims must survive.  His opposition appears to claim that the City of Buffalo can be liable for the officers' actions (Dkt. No. 79 at 17).  However, the City of Buffalo is no longer a party (Dkt. No. 56) and *respondeat superior* liability does not exist under 42 U.S.C. § 1983.  *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) (holding *respondeat superior* is not a proper ground for rendering municipalities liable under Section 1983 for the constitutional torts of their employees).  Therefore, all official capacity claims must be dismissed.

**VI.     The remaining Defendants are entitled to summary judgment because no genuine issues of fact bearing on the Defendants' liability exist.**

In his opposition, Plaintiff fails to identify with any specificity what evidence he claims to be "fabricated" or improperly withheld during the course of the initial investigation in the Camacho brothers' murder.  None of the purported "inconsistencies" discussed by Plaintiff (Dkt. No. 79 at 8) raise a genuine issue of fact that bears on the remaining Defendants' liability here.  Notably, the only remaining defendant Wagstaff is not mentioned as personally involved in the taking of Plaintiff's November 16, 2004 statement (Def. Ex. B, F).

Instead, Plaintiff makes broad and general allegations or mischaracterizes the record.[2]  For example, he claims that the investigating BPD detectives failed to follow up regarding the information provided in Jeilyn Rosario's statement (Dkt. No. 79 at 4). However, BPD detectives interviewed Misael Montalvo, who provided an alibi, and investigated his alibi through multiple interviews (Dkt. No. 78-6 at 30-31).  Plaintiff also notes the anonymous tip that was received (Dkt. No. 79 at 4).  Nevertheless, as he acknowledges, that tip was not entirely accurate (*id*.).  Likewise, he apparently relies on the interpretation of the BPD investigation by a New York State investigator, who was not present, involved, or consulted in any manner during the initial investigation done, provided years later with the benefit of newly discovered evidence obtained in a separate investigation (Dkt. No. 78-4 at 21).

Mostly importantly, Plaintiff failed to raise any genuine issues of fact regarding his November 16, 2004 statement to undermine it as the basis for his arrest and criminal prosecution.  He produced no evidence that his statement was coerced in any manner. Moreover, Plaintiff remains unable to dispute the circumstances of his statement.  He admits that he does not recall going to BPD headquarters on November 16, 2004 (Def. Ex. C at 39, 40, 54; Dkt. No. 78-1 at 2).  Plaintiff further admits to not recalling giving the statement (Def. Ex. C at 53, 66; Dkt. No. 78-1 at 2).  He admits that he does not recall the

---

[2] Oddly, Plaintiff's opposition repeatedly refers to the arrest and prosecution of an individual named "Lopez" (Dkt. No. 79 at 10, 13, 19).

statement itself (Def. Ex. C at 50; Dkt. No. 78-1 at 2).  Finally, Plaintiff admits to not recalling his arrest (Def. Ex. C at 40; Dkt. No. 78-1 at 3).

Moreover, no admissible evidence exists in the record to suggest Plaintiff conclusively suffered from mental health crisis on November 16, 2004 during the course of that statement.  BPD detectives understood Plaintiff to be psychiatrically cleared after evaluation by Erie County Medical Center doctors on November 15, 2004 (Dkt. No. 78-7 at 19).  Plaintiff never exhibited any signs of mental health crisis during his November 16, 2004 statement (Def. Ex. D at 195).  Any mental health evaluation or treatment rendered after Plaintiff's arrest is of no moment to the issues that bear on the Defendants' liability as Plaintiff did not manifest symptoms during the statement.

Notably, Plaintiff had ample opportunity, and indeed did, challenge the admissibility of his statement.  The record, including the lengthy *Huntley* hearing where both BPD detectives and officers as well as Plaintiff's mental health treatment providers testified, demonstrates that there was no Constitutional violation in the use of Plaintiff's statement.  There being no evidence to show otherwise, Plaintiff was fully aware of the circumstances of his statement at the time of the *Huntley* hearing.  His defense attorneys cross examined the *Huntley* hearing witnesses and had sufficient ability and opportunity to explore any delay in the administering of *Miranda* warnings fully.

On appeal, the Fourth Department upheld the trial court's decision, finding that Plaintiff was not in custody before he made incriminatory statements, *Miranda* warnings were properly given, and Plaintiff knowingly and intelligently waived his rights before making the statement that formed the basis of his arrest (Dkt. No. 78-11 at 2).  Affidavits

from former Assistant District Attorneys Kenneth F. Case and Frank A. Sedita (Dkt. Nos. 78-10, 78-11) do not explicitly dispute that BPD detectives consulted with the District Attorney's Office after Plaintiff's statement and before his arrest.

Despite Plaintiff's contention (Dkt. No. 79 at 21), BPD does not arraign any criminal defendant and the record does not support that claim.  A Grand Jury indicted Plaintiff for the murders (Def. Ex. I).  The record is devoid of evidence that the indictment was obtained through any improper means.  Certainly, the District Attorney's Office - not BPD - convened and presented the evidence that ultimately led to the indictment (*see* Dkt. No. 78-11 at 2).  The record, including affidavits from the prosecutors handling both the prosecution and post-conviction motion practice, contains no evidence that any BPD officer deceived the District Attorney's Office.  In fact, it was the District Attorney's Office initially opposed the vacatur of Plaintiff's conviction (Dkt. No. 78-11).

Plaintiff's opposition also neglects to acknowledge that he plead guilty with the assistance of two experienced criminal defense attorneys (Dkt. No. 78-11).  In fact, Plaintiff maintained his involvement in the murders for years that followed his conviction in both informal settings and in sworn testimony (Dkt. No. 78-11 at 3; *see e.g.* Def. Ex. C at 67).

As it relates specifically to Wagstaff, there is no evidence in the record that he violated Plaintiff's Constitutional rights.  Nor does Plaintiff's opposition point to any personal involvement by Wagstaff in the taking of Plaintiff's statement that ultimately formed the basis for Plaintiff's arrest supported by probable cause.  In conclusion, no genuine issues of fact exist as to the Defendants' liability and the Defendants are entitled

A-1797

to summary judgment.   Alternatively, based upon the record, the Defendants are shielded from liability by qualified immunity.

## **CONCLUSION**

The Defendants respectfully request that this Court grant their motion seeking dismissal of Plaintiff's Amended Complaint, Judgment on the Pleadings, and/or Summary Judgment in favor of the Defendants pursuant to Fed. R. Civ. P. Rule 4, 12, and/or 56, and dismiss Plaintiff's Amended Complaint, award costs in defending this action, and for such other and further relief that this Court deems necessary, just, and proper.

Dated:  July 24, 2020
         Buffalo, New York

                                        Timothy A. Ball, Esq.
                                        Corporation Counsel

                          By:    /s/ Maeve E. Huggins
                                 Maeve E. Huggins
                                 Assistant Corporation Counsel
                                 1112 City Hall
                                 65 Niagara Square
                                 Buffalo, New York 14202
                                 Telephone: (716) 851-4317
                                 Facsimile: (716) 851-4105
                                 E-Mail: mhuggins@city-buffalo.com

A-1798

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**JOSUE ORTIZ,**

                **Plaintiff,**

**vs.**

**RICHARD WAGSTAFF, MARY GUGLIUZZA**
**BPD DOES I-12 in their Capacity as Police Officers**
**of the CITY OF BUFFALO, BUFFALO POLICE**
**DEPARTMENT, MARK STAMBACH, and**
**MARK VAUGHN,**

                **Defendants.**

**CERTIFICATE OF SERVICE**

Index No. 16-CV-321

I, Maeve E. Huggins, hereby certify that on July 24, 2020, I electronically filed the foregoing Reply Memorandum of Law in support on behalf of the Defendants, **RICHARD WAGSTAFF, MARY GUGLIUZZA, BPD DOES 1-12 in their Capacity as Police Officers of the CITY OF BUFFALO, BUFFALO POLICE DEPARTMENT, MARK STAMBACH, and MARK VAUGHN,** with the Clerk of the District Court using the EM/ECF system which would then electronically notify the following participants in this case:

Wayne Felle, Esq.
6024 Main Street
Williamsville, New York  14221
waynefelle@waynefellelaw.com

Alan J. Pierce, Esq.
HANCOCK ESTABROOK, LLP
100 Madison Street, Suite 1500
Syracuse, New York  13202
apierce@hancocklaw.com

I certify under penalty of perjury that the foregoing is true and correct.

Dated:    July 24, 2020
             Buffalo, New York

                                    TIMOTHY A. BALL, ESQ.
                                      Corporation Counsel

A-1799

*/s/ Maeve E. Huggins*
By: Maeve E. Huggins
Assistant Corporation Counsel
65 Niagara Square, 11th Floor
Buffalo, New York 14202
Tel.: (716) 851-4317
mhuggins@city-buffalo.com

- 2 -

A-1800

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

                  Plaintiff,                     **DECISION AND ORDER**

            v.                           1:16-CV-00321 EAW

RICHARD WAGSTAFF, MARY GUGLIUZZA,
BPD DOES 1-12, BUFFALO POLICE
DEPARTMENT, THE CITY OF BUFFALO,
MARK STAMBACH, and MARK VAUGHN,

                  Defendants.

_____

## <u>INTRODUCTION</u>

       Plaintiff Josue Ortiz ("Plaintiff") has sued Defendants for violations of his civil rights related to his arrest and conviction for the murders of Nelson and Miguel Camacho, and his subsequent exoneration. (Dkt. 1). Currently pending before the Court is a motion to dismiss or for summary judgment filed by defendants Richard Wagstaff ("Wagstaff"), Mary Gugliuzza ("Gugliuzza"), the Buffalo Police Department ("BPD"), BPD Does 1-12, Mark Stambach ("Stambach"), and Mark Vaughn ("Vaughn") (collectively "Defendants"). For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

A-1801

## FACTUAL BACKGROUND

The following facts are taken from Defendants' Statement of Undisputed Material Facts (Dkt. 69-21), Plaintiff's response thereto (Dkt. 78-1), and the exhibits submitted by the parties. Unless otherwise noted, these facts are undisputed.

On November 11, 2004, Nelson and Miguel Camacho were murdered while in the first-floor apartment at 879 Niagara Street, Buffalo, New York. (Dkt. 69-21 at ¶ 2; Dkt. 78-1 at ¶ 2). BPD officers responded to the scene and investigated the murders. (Dkt. 69-21 at ¶ 3; Dkt. 78-1 at ¶ 3).

On November 16, 2004, two BPD officers brought Plaintiff to police headquarters. (Dkt. 69-21 at ¶ 5; Dkt. 78-1 at ¶ 5). Plaintiff indicates that he was brought to police headquarters "as he stated he had information about the homicide." (Dkt. 78-1 at ¶ 5). The parties agree that Plaintiff spoke with Stambach, but dispute whether this was Plaintiff's only interaction with Stambach. (Dkt. 69-21 at ¶ 5; Dkt. 78-1 at ¶ 5).

Plaintiff did not speak much English and Stambach did not speak Spanish, so BPD Officer Edwin Torres ("Torres") assisted with translation. (Dkt. 69-21 at ¶¶ 7-8; Dkt. 78-1 at ¶¶ 7-8). Plaintiff was informed of his *Miranda* rights in Spanish. (Dkt. 69-21 at ¶ 9; Dkt. 78-1 at ¶ 9). Defendants state that Stambach then asked Plaintiff "specific questions in which his answers could be verified with information known to someone present during the homicides" and that "Plaintiff claimed that he killed the Camacho [brothers] during this questioning." (Dkt. 69-21 at ¶ 10). Plaintiff indicates that he "has no recollection of the

- 2 -

events of his involvement with any members of the Buffalo Police Department ('BPD') in November 2004" and therefore cannot admit or deny this claim. (Dkt. 78-1 at ¶¶ 8, 10). Defendants further claim that Stambach typed up a statement reflecting his questions and Plaintiff's answers, that Torres "went through the statement with Plaintiff by reading it before Plaintiff was asked to sign it," and that Plaintiff initialed each page of the statement and signed the last page. (Dkt. 69-21 at ¶ 10). Again, Plaintiff denies any recollection of these events. (Dkt. 78-1 at ¶¶ 8, 10). Defendants have submitted to the Court a copy of the statement. (Dkt. 69-8). Plaintiff recognizes the initials and signature on the statement as his. (Dkt. 69-21 at ¶ 12; Dkt. 78-1 at ¶ 12). Plaintiff was arrested on November 17, 2004, but does not recall his arrest. (Dkt. 69-7 at 2; Dkt. 69-21 at ¶ 14; Dkt. 78-1 at ¶ 14).

Plaintiff was indicted by a grand jury for the murders of the Camacho brothers. (Dkt. 69-21 at ¶ 16; Dkt. 78-1 at ¶ 16). A *Huntley* hearing[1] was held and no constitutional violations warranting suppression of Plaintiff's statements were found. (Dkt. 69-21 at ¶ 17; Dkt. 78-1 at ¶ 17). On March 22, 2006, Plaintiff pled guilty to two counts of manslaughter in the first degree relating to the deaths of the Camacho brothers. (Dkt. 69-21 at ¶ 18; Dkt. 78-1 at ¶ 18). Plaintiff recalls entering into the plea. (Dkt. 69-21 at ¶ 18; Dkt. 78-1 at ¶ 18). Plaintiff subsequently attempted to withdraw his plea, but the trial court did not

---

[1]     "In New York, a *Huntley* hearing is held if the prosecution intends to offer a defendant's confession. If the confession is challenged, a hearing is held in which the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant's statement was voluntary." *Thomas v. Lord*, 396 F. Supp. 2d 327, 335-36 (E.D.N.Y. 2005) (citing *People v. Huntley*, 15 N.Y.2d 72 (1965)).

permit him to do so.  (Dkt. 69-21 at ¶ 18; Dkt. 78-1 at ¶ 18).  On June 16, 2006, the trial

court sentenced Plaintiff to 25 years imprisonment, with five years of post-release

supervision.  (Dkt. 69-21 at ¶ 19; Dkt. 78-1 at ¶ 19).

During the course of an investigation into gangs operating in Buffalo, the Federal

Bureau of Investigation and the United States Attorney's Office discovered that three other

men—Misael Montalvo, Efrain Hidalgo, and Brandon Jonas (collectively the "Montalvo

Defendants")—and not Plaintiff were responsible for the Camacho murders.  *Ortiz v. Case*,

No. 16-CV-322, 2018 WL 8620414, at *2 (W.D.N.Y. May 18, 2018), *adopted*, 2019 WL

1236413 (W.D.N.Y. Mar. 18, 2019), *aff'd*, 782 F. App'x 65 (2d Cir. 2019).  In March 2013,

United States District Judge Richard J. Arcara entered two Orders releasing federal grand

jury minutes and material showing the involvement of the Montalvo Defendants in the

Camacho murders to the Erie County District Attorney and Plaintiff's criminal counsel.

*Id*.  On April 23, 2013, Plaintiff filed a motion to dismiss the indictment against him

pursuant to N.Y. Criminal Procedure Law 440 (the "440 Motion"); despite initially being

opposed by the Erie County District Attorney's Office, the 440 Motion was ultimately

granted in May 2015.  *Id*.

## PROCEDURAL BACKGROUND

The instant action was filed on April 25, 2016.  (Dkt. 1).  On July 29, 2016, Plaintiff

filed an affidavit of service indicating that he had served Defendants by leaving a copy of

the summons and complaint with "Janet Poydock," the "legal steno clerk" for the City of

Buffalo Corporation Counsel.  (Dkt. 5).

Defendants filed their answer to the complaint on August 15, 2016.  (Dkt. 6).  In their answer, Defendants asserted a defense that Plaintiff had "fail[ed] to obtain personal jurisdiction based on insufficient service of process."  (*Id.* at 12).

On August 17, 2017, Defendants filed a motion to dismiss or for judgment on the pleadings.  (Dkt. 32).  Plaintiff cross-moved for leave to file an amended complaint.  (Dkt. 37).  On March 18, 2019[2], the Court entered a Decision and Order granting Plaintiff's cross-motion for leave to file an amended complaint except to the extent that Plaintiff sought to assert an abuse of process claim or any claims against the City of Buffalo and denying Defendants' motion for judgment on the pleadings as moot.  (Dkt. 56).

Plaintiff filed his amended complaint on March 27, 2019.  (Dkt. 59).  The amended complaint asserts five causes of action pursuant to 42 U.S.C. § 1983: (1) a claim for false arrest and false imprisonment; (2) a claim for malicious prosecution; (3) a claim for violation of Plaintiff's fifth amendment right against self-incrimination; (4) a claim for a violation of Plaintiff's due process right to be free from fabrication of evidence; and (5) a claim for violation of the Defendants' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  Defendants filed their answer to the amended complaint on April 15, 2019.  (Dkt. 61).  In their answer to the amended complaint, Defendants again asserted insufficient service of process as a defense.  (*Id.* at 20-21).

---

[2]     This matter was originally assigned to a different district judge and was not transferred to the undersigned until February 11, 2019.  (*See* Dkt. 55).

A-1805

Defendants filed the instant motion to dismiss and/or for summary judgment on April 24, 2020. (Dkt. 69). At the request of the parties (Dkt. 76), the Court set Plaintiff's response deadline for July 3, 2020, and Defendant's reply deadline for July 24, 2020. (Dkt. 77). Plaintiff filed a declaration and numerous exhibits on July 3, 2020 (Dkt. 78), but did not file his memorandum of law in opposition to Defendants' motion until July 7, 2020. (Dkt. 79). Defendants filed their reply on July 24, 2020. (Dkt. 81).

## DISCUSSION

Defendants' motion seeks numerous forms of relief. First, Defendants seek dismissal of Plaintiff's claims against Gugliuzza, Stambach, and Vaugh for failure to properly serve. (Dkt. 69-1 at 9-10). Second, Defendants seek dismissal of all claims against the BPD because it lacks the capacity to be sued. (*Id*. at 10-11). Third, Defendants seek dismissal of Plaintiff's false arrest and false imprisonment claim on the basis that they are time-barred. (Id. at 11-12). Fourth, Defendants seek dismissal of all of Plaintiff's claims against BPD Does 1-12 because Plaintiff has failed to take any action to further identify or substitute these defendants despite having been provided with voluminous discovery. (*Id*. at 12-13). Fifth, Defendants seek dismissal of all official capacity claims on the basis that they are duplicative of Plaintiff's dismissed claims against the City of Buffalo. (*Id*. at 13-14). Sixth, Defendants seek summary judgment on all of Plaintiff's claims on the basis that there was no violation of his constitutional rights because "ample probable cause to arrest, charge, and prosecute Plaintiff exist[ed] based upon his voluntary

- 6 -

statement to Stambach." (*Id.* at 14-20). Seventh, Defendants argue that they are entitled to summary judgment on the basis of qualified immunity. (*Id.* at 20-24). Finally, Defendants seek summary judgment on the basis that there is no proof they withheld exculpatory evidence. (*Id.* at 24-25). The Court considers each of these requests below.

## I.    Timeliness of Plaintiff's Memorandum of Law

As an initial matter, Defendants argue that Plaintiff's memorandum of law was not timely filed and should be disregarded. (Dkt. 80 at 2). As set forth above, at the request of the parties, the Court set Plaintiff's response deadline for July 3, 2020. (Dkt. 77). Plaintiff nonetheless did not file his opposing memorandum of law until July 7, 2020. (Dkt. 79). Plaintiff's memorandum of law was thus untimely.

It is true that in 2020, the Fourth of July holiday was observed on July 3rd, which was a Friday. However, Federal Rule of Civil Procedure 6(a), which provides for the extension of certain deadlines that fall on weekends and/or holidays, is inapplicable where "the Court set[s] a specific, stated deadline." *Miller v. City of Ithaca*, No. 3:10-CV-597, 2012 WL 1589249, at *1 (N.D.N.Y. May 4, 2012); *see also Violette v. P.A. Days, Inc*., 427 F.3d 1015, 1018 (6th Cir. 2005) ("The language of Rule 6(a) does not address situations where litigants are required to file papers on a particular, stated, calendar date."). Where, as here, the Court has set a specific deadline, the fact that it falls on a holiday does not result in an automatic extension.

- 7 -

Nevertheless, the Court will not, as Defendants urge, disregard Plaintiff's legal arguments on the basis of the untimely filing of his memorandum of law.  The majority of Plaintiff's opposition papers were timely filed, and the Court in any event must assure itself that dismissal and/or summary judgment are warranted before granting such relief.  *See Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010) (holding that a court cannot grant a motion to dismiss "based on the insufficiency or absence of opposition"); *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) ("[E]ven when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.").

## II.    Insufficient Service of Process on Gugliuzza, Stambach, and Vaughn

The Court considers next Defendants' request for dismissal of the claims against Gugliuzza, Stambach, and Vaughn for failure to properly serve.  Defendants contend that this is a matter of jurisdiction, but "the defenses of lack of personal jurisdiction and insufficiency of service of process . . . while often related, are not identical."  *Santos v. State Farm Fire & Cas. Co.*, 902 F.2d 1092, 1095 (2d Cir. 1990).  More specifically, "[q]uestions of personal jurisdiction go to whether the controversy or defendant has sufficient contact with the forum to give the court the right to exercise judicial power over defendant," while  "questions of sufficiency of service concern the manner in which service

has been made and not . . . the court's power to adjudicate defendant's rights and liabilities." *Id*. (quotations omitted).  In other words, "[l]ack of personal jurisdiction and insufficiency of process provide two different but interrelated grounds for dismissal. In particular, adequate service of process is a prerequisite for a court's exercise of personal jurisdiction: 'Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.'" *Davis v. Mara*, 587 F. Supp. 2d 422, 424-25 (D. Conn. 2008) (quoting *Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd*., 484 U.S. 97, 104 (1987)).

Pursuant to Federal Rule of Civil Procedure 4(e), an individual within a judicial district of the United States may be served by "(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made" or by "(2) doing any of the following: (A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Here, Plaintiff claims to have served Defendants by delivering a copy of the summons and complaint to a clerk of the City of Buffalo Corporation Counsel in 2016.  (Dkt. 5).  However, Defendants have submitted evidence to the Court that Gugliazza retired from employment with the

BPD in 2013, Stambach retired from employment with the BPD in 2006, and Vaugh retired from employment with the BPD in 2009.  (Dkt. 69-3 at ¶ 5).

Defendants contend that because Gugliuzza, Stambach, and Vaughn were no longer employed by the BPD in 2016, the City of Buffalo Corporation Counsel was not their authorized agent for service of process, and they were accordingly never properly served. (Dkt. 69-1 at 9-10).  In opposition, Plaintiff contends that the case law cited by Defendants is inapposite and notes that "in their Initial Disclosure required by Rule 26 dated February 24, 2017, . . . Defendants list the address of each of these Defendants as 'Buffalo Police Department, 74 Franklin Street, Buffalo, Ny 14202[.]'"  (Dkt. 79 at 12-13).

The Court agrees with Defendants that Plaintiff never properly effectuated service on Gugliuzza, Stambach, and Vaughn.  Neither Rule 4(e) nor the New York State law incorporated therein by reference allows for service by delivery to a defendant's former employer.  *See, e.g., Barnes v. City of New York*, No. 13-CV-7283 GBD JLC, 2015 WL 4076007, at *21 (S.D.N.Y. July 2, 2015) (service of process on two detectives at police headquarters insufficient service on defendant who had retired from the police department more than two years prior to the date of service), *adopted*, 2015 WL 5052508 (S.D.N.Y. Aug. 26, 2015); *J&J Sports Prods., Inc. v. Byza Rest. Corp.*, No. 09-CV-1773 FB/ALC, 2010 WL 889259, at *6 (E.D.N.Y. Mar. 10, 2010)  (service on an individual present at the defendant's former place of business is not sufficient).

- 10 -

A-1810

However, the Court finds that Gugliuzza, Vaughn, and Stambach have waived their right to assert a defense based on insufficient service of process by failing to include it in their motion for dismissal or judgment on the pleadings filed on August 17, 2017.  Federal Rule of Civil Procedure 12(b)(5) provides that a party may assert the defense of insufficient service of process by motion.  Rule 12(h)(1)(A) then provides that "[a] party waives any defense listed in Rule 12(b)(2)-(5) by . . . omitting it from a motion in the circumstances listed in Rule 12(g)(2)."  Rule 12(g)(2) in turn provides that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  The cumulative effect of these provisions of Rule 12 is that "the Rule 12(b)(5) defense of insufficient service of process is waived if not raised in a Rule 12 motion made by the party."  *Capital Ventures Int'l v. The Republic of Argentina*, No. 05 CIV. 4085 (TPG), 2010 WL 1257611, at *3 (S.D.N.Y. Mar. 31, 2010) (further explaining that this rule applies even where the defendant argues that the Court lacks personal jurisdiction based on insufficient service of process); *see also Hooker v. Fulton Cty., Georgia*, No. CIVA105CV982GET, 2006 WL 2617142, at *11 (N.D. Ga. Sept. 12, 2006) ("Rules 12(g) and 12(h)(1)(A) mandate a finding that the defenses of insufficiency of process and insufficiency of service of process have been waived because they were omitted from Defendants' prior Rule 12(c) motion[.]").

- 11 -

A-1811

In this case, Defendants filed a motion in August 2017 for "judgment on the pleadings and dismissal of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, and/or Federal Rule of Civil Procedure 12(c), for judgment on the pleadings" (Dkt. 32-7 at 2), but made no mention therein of an insufficient service of process defense.  Accordingly, Defendants have waived their insufficient service of process defense.

Moreover, even if Defendants had not waived this defense by failing to include it in their earlier Rule 12 motions, the Second Circuit has held that a delay in seeking dismissal on the basis of improper service may constitute a waiver "even where, as here, the defense was asserted in a timely answer." *Datskow v. Teledyne, Inc., Cont'l Prod. Div*., 899 F.2d 1298, 1303 (2d Cir. 1990) (holding that "defendant's conduct bars it from complaining about the defective form of service.  Defendant attended the conference with the magistrate and participated in scheduling discovery and motion practice. Nothing was said about defective service of process.").  In particular, the defense of insufficient service of process can be waived, even if raised in an answer, where "several years and significant proceedings in the case have transpired in the interim[.]"  *Barclay v. Pawlak*, No. 3:09-CV-722 CSH, 2011 WL 577332, at *2 (D. Conn. Feb. 9, 2011); *see also Hamilton v. Atlas Turner, Inc*., 197 F.3d 58, 62 (2d Cir. 1999) (finding personal jurisdiction defense forfeited, notwithstanding the fact that it was included in the defendant's answer, where the defendant "participated in pretrial proceedings but never moved to dismiss for lack of

A-1812

personal jurisdiction despite several clear opportunities to do so during the four-year interval after filing its answer").

The facts of this case overwhelmingly support a finding of waiver.  In more than four years of litigation, Defendants took no action to assert an insufficient service of process defense beyond inclusion of a single sentence in their answers to the complaint and the amended complaint.  Defendants failed to include this defense in their prior Rule 12 motion.  As Plaintiff notes, Defendants' initial disclosures recite the address for the Buffalo Police Department as the address for Gugliuzza, Vaughn, and Stambach.  (*See* Dkt. 78-14 at 1).  Further, the statute of limitations has now expired, and the defect in service "could have been readily cured during the limitations period if defendant had promptly complained."  *Datskow*, 899 F.2d at 1303.  Under these circumstances, the Court finds that Defendants have forfeited their right to assert an insufficient service of process defense and denies their request for dismissal on this basis.

## III.   **Claims Against the BPD**

Defendants seek dismissal of all claims asserted against the BPD.  It is well-established that under New York law—which applies here pursuant to Federal Rule of Civil Procedure 17(b)(3)—a police department is an administrative arm of a municipality that lacks the capacity to sue or be sued.  *See Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities.").  Plaintiff conceded this fact in his opposition to

Defendants' motion for judgment on the pleadings.  (Dkt. 37-7 at 3 ("Plaintiff concedes

that . . . the Buffalo Police Department is not a proper party in this action under New York

law[.]")).  It was accordingly the understanding of the Court that Plaintiff did not intend to

assert claims against the BPD in his amended complaint.  (*See* Dkt. 44 at 17 ("[P]laintiff

would amend the Complaint to eliminate the Buffalo Police Department as a defendant.")).

Indeed, Plaintiff's proposed amended complaint did not list the BPD as a defendant in the

caption, and expressly stated that the municipal defendant was "the City of Buffalo . . .

acting through its administrative arm, the Buffalo Police Department."  (Dkt. 37-5 at 1);

*see also* Dkt. 37-6 at ¶¶ 10-12 (redlined version of proposed amended complaint showing

references to "Defendant BPD" being replaced with "Defendant CITY").

        However, when he filed his amended complaint, Plaintiff filed a document that

differs from the proposed amended complaint he had submitted to the Court.  Plaintiff

included the BPD as a defendant in the caption of the amended complaint and inserted the

BPD into paragraphs where it was not included in the proposed amended complaint.  To

give just one example, paragraph 42 of the proposed amended complaint states that

"Defendants WAGSTAFF, GUGLIUZZA, VAUGHN, STAMBACH and BPD DOES 1-

12 knowingly relied on false and inconsistent identification evidence and intentionally

failed or refused to turn over to the Erie County District Attorney's Office exculpatory and

constitutionally mandated material from the investigation that made clear the innocence of

ORTIZ in violation of Brady v. Maryland, 373 U.S. 83 (1963)" (Dkt. 37-5 at ¶ 42), while

paragraph 42 of the amended complaint actually filed by Plaintiff states that "Defendants

**BPD**, WAGSTAFF, GUGLIUZZA, VAUGHN, STAMBACH and BPD DOES 1-12

knowingly relied on false and inconsistent identification evidence and intentionally failed

or refused to turn over to the Erie County District Attorney's Office exculpatory and

constitutionally mandated material from the investigation that made clear the innocence of

ORTIZ in violation of Brady v. Maryland, 373 U.S. 83 (1963)" (Dkt. 59 at ¶ 42 (emphasis

added)).  It was, of course, patently improper for Plaintiff to file an amended complaint

that was inconsistent with the proposed amended complaint the Court had approved and

with his prior concession that he could not maintain his claims against the BPD.

Incredibly, in opposition to Defendants' motion, Plaintiff has made no mention of

his previous concession that the BPD is not a proper party, nor proffered any explanation

for the discrepancies between the proposed amended complaint approved by the Court and

the amended complaint that was actually filed.  Instead, Plaintiff asserts that "[t]his Court's

March 2019 Order did not dismiss the BPD. . . . That is the law of the case and is

determinative of this branch of the current motion." (Dkt. 79 at 13).  This argument strains

the bounds of reasonable advocacy.  The Court did not dismiss claims against the BPD in

its March 2019 Decision and Order because it granted Plaintiff leave to file an amended

complaint that did not list the BPD as a defendant.  In no way did the Court's prior Decision

and Order suggest that Plaintiff could maintain an action against the BPD; he plainly

cannot.

In any event, the "prudential and discretionary" doctrine of law of the case does not prevent a court from changing a ruling where there is a need to correct a clear error, *Laurent v. PriceWaterhouseCoopers LLP*, 963 F. Supp. 2d 310, 314 (S.D.N.Y. 2013), and would not prohibit the Court from dismissing claims against the BPD even had the Court previously permitted such claims to proceed.  To the extent Plaintiff is seeking to assert claims against the BPD, an entity he has conceded is not amenable to suit, those claims are dismissed.

## IV.   Statute of Limitations for False Arrest and False Imprisonment

Defendants seek summary judgment on Plaintiff's claim for false arrest and false imprisonment, on the basis that it is time-barred.  The Court agrees.

There is no dispute that for cases arising in New York, the statute of limitations for false arrest and false imprisonment claims under § 1983 is three years.  *See Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015).   However, the parties dispute when Plaintiff's false arrest and false imprisonment claim accrued.  Defendants argue that this claim accrued on December 16, 2004, when Plaintiff was arraigned.  (Dkt. 69-1 at 11).  Plaintiff contends that his false arrest and false imprisonment claim did not accrue until his conviction was vacated in 2015.  (Dkt. 79 at 14).

"[T]he accrual date of a § 1983 cause of action is a question of federal law[.]" *Wallace v. Kato*, 549 U.S. 384, 389 (2007).  In *Wallace*, the Supreme Court addressed the precise issue that is currently before the Court.  There, the plaintiff had been arrested on

January 19, 1994, in connection with a murder. *Id*. at 386. "After interrogations that lasted into the early morning hours the next day," the plaintiff confessed to the murder. *Id*. The plaintiff was convicted of first-degree murder and sentenced to 26 years in prison. *Id*. However, on direct appeal, the state courts determined that his arrest had been illegal and remanded for a new trial. *Id*. at 386-87. The charges against the plaintiff were ultimately dropped on April 10, 2002. *Id*. at 387. The plaintiff filed a federal lawsuit on April 2, 2003, asserting a § 1983 claim for false arrest and false imprisonment. *Id*.[3] The Supreme Court held that the plaintiff's claim had accrued "when legal process was initiated against him" and that the statute of limitations had thus expired. *Id.* at 390-91.

The *Wallace* court expressly rejected the argument that Plaintiff makes here—namely, that *Heck v. Humphrey*, 512 U.S. 477 (1994), "compels the conclusion that his suit could not accrue until the State dropped its charges against him." *Id.* at 392. As the *Wallace* court explained, *Heck* "delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn." *Id.* at 393. However, the *Wallace* court found that it would be a "bizarre extension of *Heck*" to apply it to a false arrest and false imprisonment claim, and further expressly held the statute of limitations for such a claim is not tolled pursuant to *Heck* once a conviction is obtained. *Id.* at 393-95.

---

[3]     As the *Wallace* court explained, "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." 549 U.S. at 388.

Case 23-352, Document 41, 06/23/2023, 3533150, Page104 of 223

*Wallace* compels the Court to reject Plaintiff's argument that his false arrest and false imprisonment claim did not accrue until his conviction was overturned in 2015. Plaintiff relies on *Covington v. City of New York*, 171 F.3d 117 (2nd Cir. 1999) and its progeny in support of his argument.  However, "[u]nfortunately for [Plaintiff], *Covington* has been overruled by the Supreme Court's decision in *Wallace*[.]"  *Jones v. City of New York*, No. 13-CV-929 (ALC), 2016 WL 1322443, at *3 (S.D.N.Y. Mar. 31, 2016); *see also Fonvil v. Cty. of Rockland*, No. 17 CV 2957 (VB), 2018 WL 357309, at *4 (S.D.N.Y. Jan. 9, 2018) ("*Covington* was overruled in 2007, by *Wallace*[.]"); *De Santis v. City of New York*, No. 10 CIV. 3508 NRB, 2011 WL 4005331, at *4 (S.D.N.Y. Aug. 29, 2011) ("Although [the plaintiff] is correct that previously, under the law of this Circuit, accrual of a false arrest claim could have been deferred in certain circumstances, that is no longer the case since the Supreme Court's 2007 decision, *Wallace . . .*, overruled the aspect of *Covington* on which he relies.").  Indeed, in *Watson v. United States*, 865 F.3d 123 (2d Cir. 2017), the Second Circuit noted that the "proper framework" for ascertaining the accrual of a false imprisonment claim is *Wallace*.  *Id*. at 130-31.

For all these reasons, the Court finds that Plaintiff's false arrest and false imprisonment claim is barred by the statute of limitations and must be dismissed.

**V.    Claims Against BPD Does 1-12**

In both his original and amended complaint, Plaintiff named John Doe defendants—specifically, BPD Does 1-12.  "Where a plaintiff names 'John Doe' as a placeholder

defendant because he does not know the identity of an individual defendant, he generally is required to replace the placeholder with a named party within the applicable statute of limitations period." *Abreu v. City of New York*, 657 F. Supp. 2d 357, 363 (E.D.N.Y. 2009). Defendants seek dismissal of the Claims against BPD Does 1-12 on the basis of Plaintiff's failure to identify them.

Plaintiff contends in opposition to Defendants' motion that the BPD Does were identified during discovery. (Dkt. 79 at 16). Plaintiff specifically states that "Officer Edwin Torres and Detective James Longergan are two of the John Does in this action." (*Id.*). However, Plaintiff does not identify any of the other 10 BPD Doe defendants. Further, Plaintiff has never moved to amend his complaint to name Torres or Longergan as defendants, nor have those individuals ever been served.

Nor could Plaintiff successfully move to amend his complaint to name Torres or Longergan at this stage of the proceedings. "John Doe substitutions [after expiration of the statute of limitations] . . . may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (quotation omitted). Here, the only provision of Rule 15(c) that could possibly allow for a John Doe substitution is Rule 15(c)(1)(A), which allows for such substitution if "the law that provides the applicable statute of limitations allows relation back."[4] More specifically,

---

[4] Rule 15(c)(1)(B) does not apply here because it governs the assertion of new claims against existing defendants, and the Second Circuit has expressly ruled that Rule 15(c)(1)(C) does not apply "where the newly added defendants were not named originally because the plaintiff did not know their identities," *Hogan*, 738 F.3d at 517.

because "§ 1983 derives its statute of limitations from state law," Rule 15(c)(1)(A) allows

for a John Doe substitution where the "more forgiving principle of relation back" set forth

in section 1024 of the New York Civil Practice Law and Rules ("CPLR") is satisfied.

*Hogan*, 738 F.3d at 518 (internal quotation marks omitted).  CPLR 1024 allows for *nunc

pro tunc* substitution of John Doe parties if two requirements are satisfied:  "First, the party

must exercise due diligence, prior to the running of the statute of limitations, to identify

the defendant by name.  Second, the party must describe the John Doe party in such form

as will fairly apprise the party that [he] is the intended defendant."  *Id.* at 519 (citations and

quotations omitted and second alteration in original).

Here, as Defendants correctly explain in their motion papers, the amended

complaint does not identify the BPD Does "in any meaningful manner."  (Dkt. 69-1 at 13).

In particular:

> No specific description is provided that apprises of the intended defendant.
> No physical description is provided of these individuals.  There is no factual
> allegation contained in the Amended Complaint other than "officers and/or
> detectives of the BPD."  At the time of the filing of Plaintiff's Amended
> Complaint, considerable paper discovery had been provided by the
> Defendants in this action as well as his separate action, Ortiz v. Case, Index
> No. 1:16-cv-00322.  Plaintiff took no action to further identify BPD Does 1-
> 12 despite the availability of voluminous BPD files. Moreover, there is no
> specific factual allegation regarding the individual conduct of BPD Does 1-
> 12 to aid in their identification either.

(*Id.*).  Accordingly, the requirements of CPLR 1024 are not satisfied, and Plaintiff therefore

has no available mechanism to seek substitution of any of the BPD defendants.

In sum, Plaintiff has not sought to amend his complaint to substitute any of the BPD Doe defendants, nor could he successfully do so at this stage of the litigation. Dismissal of the claims against these defendants is warranted. *See Gleeson v. Cty. of Nassau*, No. 15-CV-6487AMDRL, 2019 WL 4754326, at *12 (E.D.N.Y. Sept. 30, 2019) (dismissing claims against John Doe defendants where "even though they learned the identities of [the relevant individuals] through document discovery, . . . the plaintiffs have not sought to amend the complaint to name the 'John Doe' [defendants]" because the statute of limitations had run and there was no basis for relation back); *Dewitt v. Home Depot U.S.A., Inc.*, No. 10-CV-3319 KAM, 2012 WL 4049805, at *1 (E.D.N.Y. Sept. 12, 2012) (dismissing claims against John Doe defendants who had been identified during discovery where the plaintiff "never moved to amend his complaint to add these individual defendants and never served the complaint on these individual defendants").

## VI.   <u>Official Capacity Claims</u>

Defendants seek dismissal of all claims asserted against the individual defendants in their official capacities, because they are duplicative of Plaintiff's insufficient claims against the City of Buffalo. (Dkt. 69-1 at 13-14). The Court agrees that Plaintiff's claims against the individual defendants in their official capacities must be dismissed. "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself. Therefore, in order to assert a viable claim against a municipal employee in his official capacity, the plaintiff must have a viable *Monell* claim

against the municipality." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 671 (D. Conn. 2008).  In this case, the Court has already concluded that Plaintiff cannot maintain a *Monell* claim against the City of Buffalo.  (Dkt. 56 at 11-14).  Plaintiff thus also cannot maintain his official capacity claims; they must be dismissed.

**VII.**   **Defendants' Request for Summary Judgment as to All Remaining Claims**

Defendants next contend that they are entitled to summary judgment on Plaintiff's remaining claims, arguing that "there was no Constitutional violation because ample probable cause to arrest, charge, and prosecute Plaintiff exist based upon his voluntary statement to Stambach."  (Dkt. 69-1 at 14).  Defendants further argue that "the record is devoid of any evidence that Wagstaff, Gugliuzza, or Vaughn took any action that violated Plaintiff's Constitutional rights."  (*Id.* at 16).

**A.**   **Legal Standard for Summary Judgment Motion**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

- 22 -

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.      Claims Against Defendants Other Than Stambach

Defendants argue that "[t]he record is devoid of any evidence that Wagstaff, Gugliuzza, or Vaughn took any action that violated Plaintiff's Constitutional rights." (Dkt.

69-1 at 16).  The Court agrees, and accordingly finds that Wagstaff, Gugliuzza, and Vaughn are entitled to summary judgment.

A party seeking summary judgment may meet its burden by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").  At that point, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial."  *PepsiCo*, 315 F.3d at 105 (quotation omitted).

Here, Defendants have pointed out to the Court that there is no evidence that Wagstaff, Gugliuzza, or Vaughn played any role in the taking of Plaintiff's statement, Plaintiff's arrest, or the initiation of the prosecution against Plaintiff.  In opposition, Plaintiff has failed to come forward with any specific facts tying these defendants to the alleged violation of his constitutional rights.  To the contrary, Plaintiff's memorandum of law sets forth only the following information regarding these defendants: (1) on the day of the Camacho murders, Gugliuzza took a statement from Jeilyn Rosario, Nelson Camacho's girlfriend, indicating that Misael Montalvo "wanted to kill or hurt Nelson or Miguel

Camacho," and this information was in the BPD's homicide file before Plaintiff was arrested; and (2) Vaughn participated in an interview of Plaintiff on November 15, 2004, at Buffalo General Hospital, after which "the detectives left Plaintiff, not considering him to be either a suspect or a witness, and advised him that he should contact them after his release from the hospital if he had any further information." (Dkt. 79 at 4, 6 (quotation and alterations omitted)). Notably, Plaintiff's memorandum of law is devoid of any information regarding the role Wagstaff allegedly played in the claimed violations of Plaintiff's constitutional rights.[5]

Plaintiff has not come forward with specific facts supporting any of his claims against Wagstaff, Gugliuzza, or Vaughn. These defendants' involvement in the BPD's investigation of the Camacho murders prior to Plaintiff's giving of his statement and subsequent arrest and prosecution would not permit a reasonable jury to conclude that they were liable to Plaintiff on any of his claims. Wagstaff, Gugliuzza, or Vaughn are entitled to summary judgment.

---

[5] Defendants have provided to the Court a copy of the state court decision granting Plaintiff's 440 Motion. (Dkt. 69-20). This decision indicates that Wagstaff was one of the BPD officers who responded to the scene of the Camacho murders and that he interviewed a witness who reported having seen "three guys . . . with something in their hand." (*Id.* at 7).

**C.**     **Remaining Claims Against Stambach**

The Court turns next to Plaintiff's malicious prosecution claim, due process fabrication of evidence claim, fifth amendment self-incrimination claim, and *Brady* violation claim against Stambach.

**1.**     **Malicious Prosecution Claim**

The bulk of Defendants' arguments relate to the malicious prosecution claim, and so the Court considers it first.  "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor."  *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997).

Defendants make numerous arguments as to why Plaintiff's malicious prosecution claim must fail.  First, Defendants argue that  Plaintiff's malicious prosecution claim is barred in its entirety by the existence of probable cause.  Second, Defendants argue that "Plaintiff cannot show that the Defendants initiated or continued the criminal proceeding against the Plaintiff because the independent actions of the District Attorney's Office while charging Plaintiff, later at the *Huntley* hearing, and during the course of the criminal prosecution broke any causal chain."  (Dkt. 69-1 at 18).  Third, Defendants argue that Plaintiff is barred by the principles of *res judicata* and collateral estoppel from challenging the voluntariness of his statement based on the *Huntley* hearing.  Finally, Defendants

contend that Plaintiff cannot establish malice. The Court has considered these arguments below and finds that they do not establish Stambach's entitlement to summary judgment on Plaintiff's malicious prosecution claim.

As to Defendants' probable cause argument, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotations and citation omitted). This presumption "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. at 162 (quotation omitted). Defendants contend that the grand jury indictment in this case creates a presumption of probable cause and that Plaintiff cannot rebut that presumption. (Dkt. 17-18). The Court disagrees.

"[A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment. *Manganiello*, 612 F.3d at 162. Here, Plaintiff has pointed to evidence from which a rational jury could conclude that Stambach knew that the confession he had extracted from Plaintiff was false and that he nonetheless used it to set Plaintiff's prosecution in motion. In particular, Plaintiff has pointed to evidence supporting the conclusion that: (1) Stambach either was present at the interview of Plaintiff at Buffalo General Hospital on November 15, 2004, or had at a minimum been informed

of the details of that interview (Dkt. 69-9 at 61; Dkt. 69-12 at 56-57)[6]; (2) Stambach questioned Plaintiff alone, without *Miranda* warnings, for 30-40 minutes before calling in a translator, despite the fact that Plaintiff spoke only broken English, during which time he specifically asked Plaintiff about the details of the Camacho murders and Plaintiff reported that he was afraid someone was trying to kill him (Dkt. 69-6 at 182-83, 193-94); (3) Stambach was aware that there were other suspects in the Camacho murders, but did not pull the homicide file or review the many witness statements contained therein before taking Plaintiff's confession (*id*. at 143-48, 212-14); (4) there were material inconsistencies between Plaintiff's confession and the facts known to the BPD about the Camacho murders (Dkt. 78-4 at 106-07); and (5) Stambach had no evidence "whatsoever" to link Plaintiff to the crime apart from his confession (Dkt. 69-6 at 247-48; *see also* Dkt. 78-4 at 68). A reasonable factfinder could conclude based on this evidence that Stambach knew that Plaintiff's confession was false and was the product of his psychiatric condition, yet nonetheless chose to procure a statement from Plaintiff setting forth that false confession and used that statement to initiate the criminal prosecution of Plaintiff, which could in turn support a finding in Plaintiff's favor on his malicious prosecution claim. *See Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's

---

[6]     Plaintiff had been taken to Buffalo General Hospital for psychiatric evaluation, and had reported to the staff that he had information about the Camacho murders and was in fear for his life. (Dkt. 69-12 at 59-59). He acted "very unsettled," "jerky," "jittery," and "out of sorts" during the interview. (*Id*. at 48, 60).

constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."); *Pizarro v. City of New York*, No. 14-CV-507 KAM VVP, 2015 WL 5719678, at *5 (E.D.N.Y. Sept. 29, 2015) (finding the plaintiff's claim that the defendants had coerced and falsified his confession sufficient to rebut the presumption of probable cause flowing from grand jury indictment).

Defendants' argument that Stambach had probable cause to arrest Plaintiff based on his statement (*see* Dkt. 69-1 at 18) is misplaced. "The Second Circuit has warned against 'conflating probable cause to arrest with probable cause to believe that plaintiff could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim.'" *Pizarro*, 2015 WL 5719678, at *4 (alterations omitted and quoting *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)).  As discussed above, a reasonable jury could find on the evidence before the Court that Stambach knew that Plaintiff's confession was false.  A known false confession does not provide probable cause to believe a criminal prosecution would be successful.  *Id.* at *5; *see also Ricciuti*, 124 F.3d at 131 (2d Cir. 1997) (finding district court erred in granting summary judgment on malicious prosecution claim as to defendant where "a jury could find that [the defendant] knowingly took part . . . in the distribution of a confession he knew to be false, and that he . . . lied about the circumstances surrounding [the plaintiff's] arrest").

- 29 -

A-1829

Defendants' contention that Stambach did not initiate the criminal prosecution fares no better. To satisfy this element of a malicious prosecution claim, a defendant must "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (alteration and citation omitted). Importantly, "[a] jury may permissibly find that a defendant initiated a prosecution where he 'filed the charges' or 'prepared an alleged false confession and forwarded it to prosecutors.'" *Id.* (original alterations omitted and quoting *Ricciuti*, 124 F.3d at 130). Here, as discussed above, a reasonable jury could find that Stambach forwarded a confession he knew to be false to the prosecutors. Further, it was Stambach who signed the Felony Complaint on November 17, 2004, accusing Plaintiff of murder in the second degree. (Dkt. 78-12 at 32).

Nor can the Court find as a matter of law that the causal chain was broken by the prosecutors' actions. "[I]f the prosecution relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows." *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016). Where this is the case, "the chain of causation . . . is broken by the intervening exercise of independent judgment." *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). However, the prosecutors cannot serve as a superseding cause where they relied on evidence fabricated by the defendant. *See Bermudez v. City of New York*, 790 F.3d 368, 375 (2d Cir. 2015). Inasmuch as a reasonable jury could find that the prosecutors relied on a false confession extracted

from Plaintiff by Stambach, they could also find that Stambach's actions were the cause of Plaintiff's prosecution.

*Res judicata* and/or collateral estoppel also do not bar Plaintiff's claims. "Principles of collateral estoppel may bar relitigation in a subsequent civil rights action in federal court of an issue that was determined in a state court criminal proceeding. The federal court must, however, apply the collateral estoppel rules of the state which rendered the judgment." *Owens v. Treder*, 873 F.2d 604, 607 (2d Cir. 1989) (citation omitted). "Under New York law, the doctrine of issue preclusion only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995) (footnote omitted).

Defendants claim that Plaintiff should be barred from challenging the circumstances of his confession because those issues were fully litigated during his criminal proceedings. However, "Defendants' interpretation of collateral estoppel seems plainly wrong—a vacated criminal conviction cannot have preclusive effect." *Dukes v. City of Albany*, 1:17-CV-865, 2018 WL 722414, at *5 (N.D.N.Y. Feb. 6, 2018) (collecting cases). "Neither the verdict of a jury nor the findings of a court in a prior action upon the precise point involved in a subsequent action between the same parties constitute a bar, unless followed by a judgment based thereon, or into which the verdict or findings entered." *Peterson v. Forkey*, 50 A.D.2d 774, 774 (1st Dep't 1975) (quoting *Rudd v. Cornell*, 171 N.Y. 114, 128-29

(1902)).  "The judgment is the bar, and not the preliminary determination of the court."

*Rudd*, 171 N.Y. at 129.  "Thus, when no order or final judgment has been entered on a

verdict or decision, <u>or when the judgment is subsequently vacated</u>, collateral estoppel is

inapplicable."  *Church v. N.Y. State Thruway Auth.*, 16 A.D.3d 808, 810 (3d Dep't 2005)

(emphasis added); *see Ruben v. Am. & Foreign Ins. Co.*, 185 A.D.2d 63, 65 (4th Dep't

1992) ("Because the judgment was vacated, the jury verdict lacks finality and cannot be

given collateral estoppel effect."); *see also Kogut v. County of Nassau*, No. 06-CV-6695

(JS)(WDW), 2009 WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (holding that the

principles of collateral estoppel did not bar a challenge to the voluntariness of a confession,

even though that issue had been necessarily decided in the prior action, where the plaintiff

had subsequently been acquitted (citing *Boston Firefighters Union Local 718 v. Boston

Chapter NAACP, Inc.*, 468 U.S. 1206, 1211 (1984) ("[A] vacated judgment, by definition,

cannot have any preclusive effect in subsequent litigation."))).  In other words, because

Plaintiff's judgment of conviction has been vacated, he is not barred from challenging the

circumstances under which his confession was obtained.

Finally, a rational jury could find that Stambach acted with malice.  "The absence

of probable cause 'raises an inference of malice sufficient for a claim of malicious

prosecution to withstand summary judgment.'"  *Bailey v. City of New York*, 79 F. Supp. 3d

424, 451 (E.D.N.Y. 2015) (quoting *Ricciuti*, 124 F.3d at 131).  Further "[f]alsifying

evidence is sufficient to show malice." *Id*.   The Court's conclusions as to Defendants'

probable cause argument also apply to this aspect of a malicious prosecution claim.

For all these reasons, the Court concludes that Stambach is not entitled to summary

judgment on Plaintiff's malicious prosecution claim against him.

### 2.    Claim for *Brady* Violation

Court next considers Plaintiff's *Brady* violation claim against Stambach.

Defendants argue that there is no evidence in the record to show that Stambach (or any of

the other defendants) withheld *Brady* information.   (Dkt. 69-1 at 24).   In opposition,

Plaintiff points to two witness statements that he claims were never provided to his criminal

defense attorneys.   (Dkt. 79 at 26).

 "Police officers can be held liable for *Brady* due process violations under § 1983

if they withhold exculpatory evidence from prosecutors."   *Bermudez*, 790 F.3d at 376 n. 4

(2d Cir. 2015).   "[A] police officer is only liable for *Brady* violations under § 1983 when

he intentionally suppresses exculpatory evidence. . . .   [F]or purposes of § 1983, a police

officer cannot be said to have suppressed *Brady* material that is not in his sole possession,

and which is readily available to the prosecutor."   *Valentin v. City of Rochester*, No. 11-

CV-6238 CJS, 2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018) (quotations and

original alteration omitted), *aff'd*, 783 F. App'x 97 (2d Cir. 2019).   In this case, there is no

evidence before the Court that Stambach was in sole possession of the witness statements

that Plaintiff claims were not turned over, nor is there any evidence before the Court that

these statements were withheld from the prosecution, as opposed to defense counsel. *See id.* ("[P]olice officers cannot be liable for a *Brady* violation where the prosecutor is aware of the allegedly-withheld *Brady* material."). Moreover, fabrication of evidence is not redressable as a *Brady* violation. *See Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011). On the record before the Court, no reasonable jury could find in favor of Plaintiff on his claim that Stambach violated *Brady*. Accordingly, Stambach is entitled to summary judgment on this claim.

### 3.   Fabrication of Evidence Claim and Violation of Right Against Self-Incrimination Claim

As to Plaintiff's claims against Stambach for fabrication of evidence and violation of the right against self-incrimination, the Court notes that Defendants have offered no arguments specific to these claims. Further, while Defendants have argued generally that there were no constitutional violations because of the presence of probable cause, lack of probable cause is not an element of either of these claims. *See Hoyos v. City of New York*, 650 F. App'x 801, 803 (2d Cir. 2016) ("The district court's statement that independent probable cause rules out the possibility that fabricated evidence proximately caused the deprivations stemming from [the plaintiff's] prosecution is not, as a general matter, correct."); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (the elements of a fabrication of evidence claim are that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or

property as a result"); *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("[A] § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiffs in a criminal proceeding.").   Because Defendants have failed to address the elements of these claims, they have failed to establish that Stambach is entitled to summary judgment thereon.

## VIII. **Qualified Immunity**

Finally, the Court turns to Defendants' qualified immunity argument.   "Qualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Defore v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The sole argument Defendants offer in support of their assertion that they are entitled to qualified immunity is that there was "arguable probable cause."   (Dkt. 69-1 at 23-24).   However, as noted above, absence of probable cause is not an element of either a fabrication of evidence claim or a claim for violation of the right against self-incrimination. Accordingly, the existence of "arguable probable cause" would not, in any event, establish that Stambach was entitled to qualified immunity on these claims.

A-1835

As to Plaintiff's malicious prosecution claim, the Second Circuit has held that no reasonable officer could believe it lawful to misrepresent evidence to the prosecution. *Managaniello*, 612 F.3d 149. Defendants' qualified immunity argument necessarily depends on the factual conclusion that Stambach did not knowingly procure a false statement of confession from Plaintiff and then pass that false statement on to the prosecution, but the facts as to Stambach's conduct are disputed and must be determined by a jury. Accordingly, summary judgment on the basis of qualified immunity is not warranted.

## **CONCLUSION**

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion to dismiss and/or for summary judgment. (Dkt. 69). Specifically, the Court denies Defendants' request that it dismiss Plaintiff's claims against Gugliuzza, Stambach, and Vaughn due to insufficient service of process, but grants Defendants' request that it dismiss Plaintiff's claims against the BPD and BPD Does 1-12, as well as Plaintiff's claim for false arrest and false imprisonment. The Court further denies Defendants' request for summary judgment as to Plaintiff's claims for malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination against Stambach, but grants Defendants' request for summary judgment as to Plaintiff's claim for a *Brady* violation against Stambach and as to all remaining claims against Wagstaff, Gugliuzza, and Vaughn.

- 36 -

A-1836

The Clerk of Court is instructed to terminate the BPD, BPD Does 1-12, Wagstaff, Gugliuzza, and Vaughn as defendants in this matter.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: February 26, 2021
       Rochester, New York

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSUE ORTIZ, <br><br> Plaintiff, <br><br> vs. <br><br> MARK STAMBACH, <br><br> Defendant. | **PLAINTIFFS' PROPOSED JURY INSTRUCTIONS** <br><br> Civil Action No.: <br> 16-CV-321 (ERW/JMR) |

Plaintiff Josue Ortiz respectfully requests that the Court give the following additional instructions/charges to the jury as to his claims and damages as set forth herein.

## TABLE OF CONTENTS

1.   Preliminary Instructions – Common Sense……………………………………2
2.   Preliminary Instructions – Conduct of the Jury……………………………… 3
3.   Weighing Testimony…………………………………………………………6
4.   Inferences……………………………………………………………………7
5.   Witness Pre-Trial Preparation………………………………………………8
6.   Plaintiff's Claims and Damages……………………………………………..9
7.   Malicious Prosecution………………………………………………………10
8.   Fabrication Of Evidence……………………………………………………..15
9.   Violation Of Right Against Self-Incrimination…………………………….17
10.   Damages
      A.   Compensatory Damages……………………………………………18
      B.   Punitive Damages……………………………………………….. 21
11.   Credibility Of Police Officers……………………………………………..23

A-1838

A-1839

**1.      Preliminary Instructions – Common Sense**

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

**Source**:
3 Fed. Jury Prac. & Instr. § 101:01 – not modified

### 2.       Preliminary Instruction – Conduct of the Jury

The Sixth Amendment of our Constitution guarantees a trial by an impartial jury. This means that, as jurors, you must decide this case based solely on the evidence and law presented to you here in this courtroom. Until all the evidence and arguments have been presented and you begin to deliberate, you may not discuss this case with anyone, even your fellow jurors After you start to deliberate, you may discuss the case, the evidence, and the law as it has been presented, but only with your fellow jurors. You cannot discuss it with anyone else until you have returned a verdict and the case has come to an end.  I'll now walk through some specific examples of what this means.

First, this means that, during the trial, you must not conduct any independent research about this case, or the matters, legal issues, individuals, or other entities involved in this case. You must not search or review any traditional sources of information about this case (such as dictionaries, reference materials, or television news or entertainment programs). **In addition. I know that some of you have cell phones, iPhones, and other devices with internet capabilities.** You also must not search the internet or any other electronic resources for information about this case or the witnesses or parties involved in it**, including for local news sources on the internet, like Syracuse.com, CNYCentral.com, pressconnects.com, or wbng.com.** The bottom line for the important work you will be doing is that you must base your verdict only on the evidence presented in this courtroom, along with instructions on the law that I will provide.

Second, this means that you must not communicate about the case with anyone until deliberations, when you will discuss the case with only other jurors. **This includes your friends and your family.** During deliberations, you must continue not to communicate about the case with anyone else. Most of us use smartphones, tablets, or computers in our daily lives to access the internet, for information, and to participate in social media platforms. To remain impartial jurors, however, you must not communicate with anyone about this case, whether in person, in writing, or through email, text messaging, blogs, or social

A-1841

media websites and apps (like Twitter, Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat).

Please note that these restrictions are about *all* kinds of communications about this case, even those that are not directed at any particular person or group. Communications like blog posts or tweets can be shared to an ever-expanding circle of people and can have an unexpected impact on this trial. For example, a post you make to your social media account might be viewable by a witness who is not supposed to know what has happened in this courtroom before he or she has testified. For these reasons, you must inform me immediately if you learn about or share any information about the case outside of this courtroom, even if by accident, or if you discover that another juror has done so.

**In addition, it is likely that there will be publicity about the case while the trial is going on. As a result, I must request that you avoid local news during your jury service. This includes any local news program that may be available on the internet or playing on television monitors in this building, including in the cafeteria. While you may watch or read about national or international news, you must avoid any state or local news.**

**In addition, if anyone tries to talk to you about the case, or if you happen to see any news or publicity pertaining to the case, please bring it to my attention the next time you come into court. Just raise your hand and say that you wish to speak with me.**

Because it is so important to the parties' rights that you decide this case based solely on the evidence and my instructions on the law, at the beginning of each day, I may ask you whether you have learned about or shared any information outside of this courtroom.

**Source:**

U.S. Courts, Proposed Model Jury Instructions, Use of Electronic Technology to Learn or Communicate about a Case (Prepared by the Judicial Conference Committee on Court Administration and Case Management),

A-1842

available at
https://www.uscourts.gov/sites/default/files/proposed_model_jury_instructions.pdf

Added or revised language in bold.

A-1843

**3.**    **Weighing Testimony**

The law does not require you to accept all of the evidence I shall admit. In deciding what evidence you will accept you must make your own evaluation of the testimony given by each of the witnesses, and decide how much weight you choose to give to that testimony. The testimony of a witness may not conform to the facts as they occurred because he or she is intentionally lying, because the witness did not accurately see or hear what he or she is testifying about, because the witness' recollection is faulty, or because the witness has not expressed himself or herself clearly in testifying. There is no magical formula by which you evaluate testimony. You bring with you to this courtroom all of the experience and background of your lives. In your everyday affairs you decide for yourselves the reliability or unreliability of things people tell you. The same tests that you use in your everyday dealings are the tests which you apply in your deliberations. The interest or lack of interest of any witness in the outcome of this case, the bias or prejudice of a witness, if there be any, the age, the appearance, the manner in which the witness gives testimony on the stand, the opportunity that the witness had to observe the facts about which he or she testifies, the probability or improbability of the witness' testimony when considered in the light of all of the other evidence in the case, are all items to be considered by you in deciding how much weight, if any, you will give to that witness' testimony. If it appears that there is a conflict in the evidence, you will have to consider whether the apparent conflict can be reconciled by fitting the different versions together. If, however, that is not possible, you will have to decide which of the conflicting versions you will accept.

**Source:**

1.    NY PJI 1:8 – not modified

**4.     Inferences**

You are to consider only the evidence in the case.  However, you are not limited to the statements of the witnesses.  You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

**Source:**
Kevin F. O'Malley, et al., Fed. Jury Prac. & Instr., Civil § 104:20 (6th ed.).

A-1845

**5.      Witness Pre-Trial Preparation**

You may have heard testimony about defense counsel speaking to various witnesses about the case before the witness testified at this trial.  The law permits an attorney to speak to a witness about the case before the witness testifies, and permits an attorney to review with the witness the questions that will or may be asked at trial, including the questions that may be asked on cross-examination.

You may have also heard testimony that a witness read or reviewed certain materials pertaining to this case before the witness testified at trial. The law permits a witness to do so.

Speaking to a witness about his or her testimony and permitting the witness to review materials pertaining to the case before the witness testifies is a normal part of preparing for trial. It is not improper as long as it is not suggested that the witness depart from the truth.

Source:
1.      N.Y. Unified Court System, NEW YORK CRIMINAL JURY INSTRUCTIONS AND MODEL COLLOQUIES, available at http://www.nycourts.gov/judges/cji/index.shtml.;
2.      *People v. Townsley*, 20 N.Y.3d 294 (2012); and
3.      *People v. Liverpool*, 262 A.D.2d 425 (2d Dep't 1999); People v. Fountain, 170 A.D.2d 414, 415 (2d Dept 1991).

**6.     Plaintiff's Claims and Damages**

Plaintiff brings this action seeking to recover for defendant's violation of his civil rights.  He asserts that defendant's arrest and filing of a felony complaint against him in November 2004 for the murder of the Camacho Brothers violated his civil rights and led to his conviction for the murders and his imprisonment for 10 years before it was determined in 2012 that three other individuals were the true perpetrators of the murders. Those individuals were subsequently charged, pleaded guilty, and were sentenced for the murders.  Plaintiff was released from NYS prison in December 2014 and in May 2015 plaintiff's conviction was officially vacated based on his innocence of the murders.

Plaintiff alleges that his wrongful conviction and imprisonment resulted from the wrongful and improper conduct of Defendant. Plaintiff's has three claims against defendant: (1) malicious prosecution; (2) violation of his right against self-incrimination; and (3) fabrication of evidence based on the creation of a false confession.

Plaintiff seeks significant damages for these claims, including:

1.     past, present, and future emotional, mental, and physical pain and suffering associated with and arising out of his wrongful conviction and imprisonment;

2.     costs and damages arising from the aggravation, exacerbation, and deterioration of plaintiff's mental and physical health due to his wrongful conviction and incarceration, including (a) comprehensive psychiatric evaluations; (b) psychological counseling; (c) medications and physician management; (d) supervised residential services;

3.     damages for loss of income, earning capacity, and employability; and

4.     punitive damages.

I will now give you instructions on each of these claims.

**7.     Malicious Prosecution**

Plaintiff claims that defendant violated plaintiff's civil rights by initiating the criminal prosecution of plaintiff for the murder of the Camacho Brothers. To establish this claim of malicious prosecution,  plaintiff must prove the following four things by a preponderance of the evidence:

First: Defendant initiated the criminal proceeding against plaintiff;
Second: Defendant lacked probable cause to believe the proceeding could succeed;
Third: The criminal proceeding ended in plaintiff's favor; and
Fourth: Defendant acted maliciously or for a purpose other than bringing plaintiff to justice.

In this case, the first and third of these elements are not in dispute: I instruct you that defendant initiated the criminal proceeding and that the criminal proceeding ended in plaintiff's favor with his conviction vacated because he was innocent of the murders.

*Alternative On Initiating The Prosecution*:
Plaintiff asserts that defendant started the criminal prosecution against him by filing a felony complaint against him within hours after defendant's arrest of plaintiff.  The criminal proceeding against plaintiff was in New York State.  Under New York State criminal procedure law a criminal action is commenced by the filing of an accusatory instrument with a criminal court, including a felony complaint.

Defendant contends that he did not initiate the criminal prosecution because the District Attorney's Office actions in obtaining an indictment against plaintiff and handling the prosecution of plaintiff after he filed the felony complaint broke the causal chain from his filing the felony complaint.

To satisfy this element of a malicious prosecution claim, plaintiff needs to prove by a preponderance of evidence that defendant played an active role in the prosecution.  You may find that defendant initiated the prosecution because he

filed the charges or prepared a false confession and forwarded it to prosecutors. Defendant admits that he signed the Felony Complaint on November 17, 2004 accusing plaintiff of the double murders.

If the District Attorney's office relied on independent, untainted information to indict and prosecute plaintiff, then defendant is not responsible for the prosecution. However, the DA's actions cannot relieve defendant of liability where they relied on evidence fabricated by defendant. If you find that the DA's office relied on a false confession extracted from plaintiff by defendant you will find that defendant initiated the criminal prosecution of plaintiff and move to the next element of the claim: lack of probable cause.

As to the second element of plaintiff's malicious prosecution claim, plaintiff must prove that defendant lacked probable cause to initiate the proceeding. To determine whether probable cause existed, you should consider whether the facts and circumstances available to defendant would warrant a prudent person in believing that plaintiff had committed the murders of the Camacho Brothers.

Whether probable cause existed depends upon whether a reasonably prudent person would have believed that the plaintiff was guilty of the crime charged on the basis of the facts known to the defendant at the time the prosecution was initiated or what he reasonably believed to be true. Here, the prosecution was started on November 17, 2004. The fact that the defendant personally believed that the plaintiff was guilty is not enough if a reasonably prudent person would not have believed that to be so.

Indictment by a grand jury creates a presumption of probable cause. This presumption may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. Defendant contends that the grand jury indictment of plaintiff in the state court criminal proceeding establishes probable cause. The indictment alone does not establish that there was probable cause to initiate the proceeding if plaintiff proves by a preponderance of the evidence that the indictment was based on a false confession or what a reasonable prudent person would see as a false confession or

that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.

Plaintiff asserts that defendant did not have probable cause because a reasonably prudent person in defendant's position would know that the confession he obtained from plaintiff was false and nonetheless used it to start plaintiff's prosecution. Plaintiff points to the following evidence in support of conclusion:

1.    defendant either was present at the interview of plaintiff at Buffalo General Hospital on November 15, 2004, or had at a minimum been informed of the details of that interview when BPD officers took plaintiff there for a psychiatric evaluation, was acting very unsettled, jerky, jittery, and out of sorts during the interview, and the police officers deemed plaintiff not to be a suspect in the Camacho Brothers' murder;

2.    defendant questioned plaintiff alone, without Miranda warnings, for 30-40 minutes before calling in a translator, despite the fact that plaintiff spoke only broken English, during which time he specifically asked plaintiff about the details of the Camacho murders and plaintiff reported that he was afraid someone was trying to kill him;

3.    defendant was aware that there were other specific suspects in the Camacho murders, but did not pull the homicide file or review the many witness statements contained therein before taking plaintiff's confession;

4.    there were material inconsistencies between plaintiff's confession and the facts known to the BPD about the Camacho murders at the time of the confession;

5.    defendant had no evidence to link plaintiff to the crime apart from his confession.

Defendant contends that he initiated the prosecution based on plaintiff's confession to the murders.  If you find that the facts as they reasonably appeared to defendant as he claims and that based on those facts a reasonably prudent person

would have believed that plaintiff had committed the murders based on plaintiff's confession, your finding will be that the defendant had probable cause for believing the plaintiff was guilty and you need proceed no further.

However, if you find, based on the evidence, that a reasonably prudent person would have believed that Plaintiff's confession was false and was the product of his psychiatric condition, yet nonetheless chose to procure a statement from Plaintiff setting forth that false confession and used that statement to initiate the criminal prosecution of Plaintiff, you may/will find that defendant lacked probable cause.

You will then proceed to consider whether the defendant acted maliciously in initiating the prosecution.

As to the fourth element of the malicious prosecution claim, plaintiff must prove by a preponderance of evidence that in initiating the criminal proceeding against plaintiff, defendant acted out of spite _or_ did not himself believe that the proceeding was proper _or_ that defendant initiated the proceeding for a purpose unrelated to bringing plaintiff to justice.

A prosecution is initiated maliciously if it is brought for a purpose other than bringing an offender to justice or out of personal ill will. If you find that the defendant did not have probable cause for believing that the plaintiff was guilty at the time he initiated the prosecution, you may, although you are not required to, infer from that fact alone that defendant acted maliciously. Also, if you find that defendant created a false confession that is enough to find malice.

If you find that the defendant brought the prosecution out of ill will or gave a false statement of the facts to the criminal court by offering plaintiff's confession, your finding will be that defendant acted maliciously.

If you find that defendant did not act maliciously, you will find for the defendant, even though you find that he did not have probable cause to believe that the plaintiff was guilty.

        If you find that plaintiff has proved both that defendant did not have
probable cause and that defendant acted maliciously, plaintiff is entitled to recover
and you will proceed to consider the question of damages after addressing the
questions on plaintiff's claims for fabrication of evidence and violation of his right
against self-incrimination.

        **Sources:**
        1.      Federal Jury Practice & Instructions; 4.13 Section 1983 — Malicious
Prosecution;
        2.      NY PJI 3:50 - Intentional Torts—Misuse of Legal Procedure—
Malicious Criminal Prosecution;
        3.      Decision and Order filed February 26, 2021 (Docket No. 82); and
        4.      N.Y. Crim. Proc. Law § 100.05 (McKinney)

        The proposed instruction is based on a combination of these sources.

**8.     Fabrication Of Evidence**

Plaintiff claims that Defendant violated his civil rights by fabricating evidence, namely plaintiff's confession, that was used against Plaintiff in the criminal case. To succeed on this claim, Plaintiff must prove each of the following elements by a preponderance of the evidence:

1.     an investigating official
2.     fabricated information
3.     that is likely to influence a jury's verdict,
4.     forwards that information to prosecutors, and
5.     plaintiff suffered a deprivation of life, liberty, or property as a result.

In this case, the first, fourth, and fifth of these elements are not in dispute: I instruct you that defendant is an investigating official and that he forwarded plaintiff's confession to the District Attorney's Office.

Probable cause that you addressed on the first claim of malicious prosecution is not an element of this claim for fabrication of evidence.

You must decide if plaintiff has proven by a preponderance of evidence that defendant fabricated information that is likely to influence a jury's verdict in the criminal proceeding against plaintiff in NYS court.

 If you find that Plaintiff has failed to prove either of these elements by a preponderance of the evidence, then you must decide for Defendant, and you will not consider the question of damages for this claim.

If you find that Plaintiff has proved each of these two elements by a preponderance of the evidence, then you must decide for Plaintiff, and go on to consider the question of damages for this claim after considering plaintiff's third claim.

**Sources**:

A-1853

1.      *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016);

2.      Decision and Order filed February 26, 2021 (Docket No. 82).

The proposed instruction is based on a combination of these sources.

A-1854

**9.     Violation Of Right Against Self-Incrimination**

Plaintiff alleges that defendant violated his civil right to be free of a violation of his Fifth Amendment right against self-incrimination.  If you find that plaintiff has proven by a preponderance of evidence that defendant applied coercion or engaged in misconduct to obtain plaintiff's waiver of his right against self-incrimination and thus obtained plaintiff's confession, and the confession was used against plaintiff in the state court criminal proceeding you will find for plaintiff on this claim.

If you find that plaintiff has not proven these facts then you will find for defendant on this claim.

Probable cause that you addressed on the first claim of malicious prosecution is not an element of this claim for fabrication of evidence.

If you find for plaintiff on this claim you will proceed to the question of the damages to be awarded to plaintiff.

**Sources:**

1.     *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998);
2.     Decision and Order filed February 26, 2021 (Docket No. 82).

The proposed instruction is based on a combination of these sources.

10.   **Damages**

A.   **Compensatory Damages:**

If you find that plaintiff has proven one or more of his three claims you will then consider the measure of his damages.

Insofar as this action is under 42 U.S.C. § 1983 if plaintiff establishes defendant's liability on any claim he is entitled to recover some measure of damages, whether nominal or more.

If you decide that defendant is liable, plaintiff is entitled to recover a sum of money which will justly and fairly compensate him for any past and future injuries you find he has suffered resulting from defendant's conduct. You will award him such amount as, in the exercise of your good judgment and common sense, you find is fair and just compensation for plaintiff's injuries for loss of his reputation, humiliation and mental anguish, emotional pain and suffering, personal injuries suffered in prison, medical, psychological, and vocational care and treatment in the past and the future, and loss of income and earning capacity.

If you decide for the plaintiff on the question of liability, you must include in your verdict an award for past and future pain and suffering. That amount must include the amount for the injuries suffered and for the future effect of the injuries, if any.  Plaintiff claims pain and suffering including physical and mental injuries, fear, anxiety, depression, loneliness, loss of freedom and liberty, loss of family contact, loss of consortium, loss of personal and social development, inability to learn from experiences, loss of enjoyment in life, and loss of reputation and self-esteem.

In determining the amount to be awarded plaintiff for pain and suffering damages, you may properly consider the effect of the injuries on plaintiff's capacity to lead a normal life, and his loss of the enjoyment of life. Loss of enjoyment of life involves the loss of the ability to perform daily tasks, to participate in the activities which were a part of the person's life before the injury, and to experience

the pleasures of life. However, a person suffers the loss of enjoyment of life only if the person is aware, at some level, of the loss that (he, she) has suffered.

Based upon the evidence you may also include an award for each of the following items, separately divided into amounts intended to compensate the plaintiff for damages incurred before your verdict and amounts intended to compensate the plaintiff for damages to be incurred in the future:

1.   medical care and treatment;
2.   loss of earnings and impairment of earning ability;
3.   custodial care and treatment and rehabilitation services.

If you make an award for any item of damages to be incurred in the future, then for each such item, you must state the period of years over which the amount awarded is intended to provide compensation and the amount you fix must represent the full amount awarded to plaintiff for that item of damage for that future period without reduction to present value.

If you decide not to make an award as to any item, you will insert the word "none" as to that item.

With respect to loss of income and earning ability Plaintiff is entitled to be reimbursed for any earnings lost as a result of his injuries caused by Defendant's conduct from the time of plaintiff's arrest on November 16, 2004 to his release from prison on December 8, 2014. Moreover, if you find that as a result of those injuries Plaintiff has suffered a reduction in his capacity to earn money from December 2014 to the end of his work expectancy, then Plaintiff is also entitled to be reimbursed for loss of future earnings.

Any award you make for earnings lost from plaintiff's arrest until his release from prison must not be the result of speculation; any award must be calculated from the number of days that you find Plaintiff was prevented from working and the amount that you find Plaintiff would have earned had he not been imprisoned.

Any award you make for reduction of Plaintiff 's earning capacity after he was released from prison should be determined on the basis of Plaintiff's earnings before his arrest, the condition of Plaintiff's health, his prospects for advancement

and the probabilities with respect to future earnings before his arrest, the extent to which you find that those prospects or probabilities have been reduced by his imprisonment, and the length of time that you find Plaintiff would reasonably be expected to work, and any other circumstances which would have an effect on P's earning capacity.

Plaintiff is now 40 years of age and has a life expectancy according to the mortality tables of (36.2) years, and work life expectancy according to the work life expectancy tables of (20.4) years. Such tables are, of course, nothing more than statistical averages. They neither assure that Plaintiff will have the span of working life I have given you nor assure that Plaintiff's span will not be greater. The figures I have given you are not binding upon you, but may be considered by you together with your own experience and the evidence you have heard in determining what Plaintiff's life and work life expectancy is. If you find that Plaintiff is entitled to an award for reduction in earning capacity, you will fix the dollar amount of such reduction over the entire period that you find Plaintiff will suffer such reduction and include that amount in your verdict. In your verdict you will state separately the amount awarded for loss of earnings to date during Plaintiff's imprisonment, if any, and, if you make an award for loss of earning capacity, you will state in your verdict the amount awarded and the period of years over which such award is intended to provide compensation. Do not state an amount per year but only a total amount for the entire period.

**Sources**:
1. *Carey v. Piphus,* 435 U.S. 247 (1978);
2. NY PJI Civil 2:280 – Personal Injury – Injury and Pain and Suffering;
3. NY PJI Civil 2:284 –  Damages—Personal Injury—Emotional Distress and Physical Consequences Thereof;
4. NY PJI Civil 2:290 –  Damages—Personal Injury—Loss of Earnings—In General; and
5. NY PJI Civil 2:301 – Damages—Personal Injury—Collateral Sources—Itemized Verdict.

The proposed instruction is a combination of these sources.

### B.   Punitive Damages:

The damages I have discussed with you so far are called compensatory, because they are intended to compensate the plaintiff for the injuries to Plaintiff for defendant's conduct. In addition to awarding damages to compensate the plaintiff for his injuries, you may, but you are not required to, award Plaintiff punitive damages if you find that he has proven by a preponderance of evidence that the acts of defendant that caused plaintiff injuries and compensatory damages were malicious or constituted wanton and reckless conduct.  The purpose of punitive damages is not to compensate the plaintiff, but to punish defendant for malicious or wanton and reckless acts and thereby to discourage defendant and other people and police from acting in a similar way in the future.

An act is malicious when it is done deliberately with knowledge of the plaintiff's rights, and with the intent to interfere with those rights. An act is wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the health, safety, and rights of others. If you find that Defendant's acts were not wanton and reckless or malicious, you need proceed no further in your deliberations on this issue. On the other hand, if you find that Defendant's acts were wanton and reckless or malicious, you may award Plaintiff punitive damages.

In arriving at your decision as to the amount of punitive damages you should consider the nature and reprehensibility of what Defendant did. In considering the amount of punitive damages to award, you should weigh this factor heavily. This includes the character of the wrongdoing; whether Defendant's conduct demonstrated an indifference to, or a reckless disregard of, the health, safety or rights of others; whether the acts were done with an improper motive or vindictiveness; whether the act or acts constituted outrageous or oppressive intentional misconduct;  how long the conduct went on; Defendant's awareness of what harm the conduct caused or was likely to cause; any concealment or covering up of the wrongdoing; how often Defendant had committed similar acts of this type in the past; and the actual and potential harm created by Defendant's conduct, including the harm to individuals or entities other than plaintiff. However, although you may consider the harm to individuals or entities other than plaintiff in determining the extent to which Defendant's conduct was reprehensible, you may

A-1859

not add a specific amount to your punitive damages award to punish Defendant for the harm he caused to others.

The amount of punitive damages that you award must be both reasonable and proportionate to the actual and potential harm suffered by Plaintiff, and to the compensatory damages you awarded Plaintiff. The reprehensibility of Defendant's conduct is an important factor in deciding the amount of punitive damages that would be reasonable and proportionate in view of the harm suffered by Plaintiff and the compensatory damages you have awarded Plaintiff.

You may also consider defendant's financial condition and the impact your punitive damages award will have on Defendant. In reporting your verdict, you will state the amount awarded by you as punitive damages.

In reporting your verdict, you will state the amount, if any, awarded by you as punitive damages.

A-1860

**11.   Credibility Of Police Officers**

The witnesses in this case include police officers. You are to assess the credibility of these individuals in the same way that you assess the credibility of any other witnesses. That means that they are entitled to no more or less credibility than anybody else. You are to perform the duty of finding the facts without bias or prejudice as to any party.

**Source:**

Vida B. Johnson, *Bias in Blue: Instructing Jurors to Consider the Testimony of Police Officer Witnesses with Caution*, 44 Pepperdine L. Rev. 244 (Feb. 15, 2017)

*Plaintiff reserves the right to amend or supplement these charges or to submit additional charges or withdraw charges based upon the proof offered and developments at trial.*

Dated: April 1, 2022

*Attorneys for Plaintiff*
LAW OFFICES OF WAYNE C. FELLE, ESQ.
Wayne C. Felle, Esq.
6024 Main St.
Williamsville, New York 14221
Tel: (716) 505-2700

- and -

HANCOCK ESTABROOK, LLP

By: _____
       Alan J. Pierce, Esq.

100 Madison St., Suite 1800
Syracuse, New York 13202
Tel:  (315) 565-4546

A-1861

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                                Plaintiff,

        v.                                                    1:16-cv-00321-EAW-MJR

MARK STAMBACH,

                                Defendants.

## DEFENDANT'S PROPOSED JURY INSTRUCTIONS

        Defendant Mark Stambach, by and through his attorneys, Hodgson Russ LLP, submits these Requests to Charge pursuant to the Court's Amended pre-trial order, and to aid the Court in formulating its own charges to the jury.

        To satisfy the Court's Pretrial Order, Defendant Stambach includes with his Requests to Charge an index of charges.  Each charge is on a separate sheet of paper, in standard form, unless otherwise indicated, along with citations to the authority for each charge.

## TABLE OF CONTENTS

1.   Instructions at Beginning of Trial ...........................................................................1
2.   Juror Attentiveness.....................................................................................................7
3.   Role of the Court.........................................................................................................8
4.   Role of the Jury...........................................................................................................9
5.   Juror Oath..................................................................................................................11
6.   Jury to Disregard Court's View ..............................................................................12
7.   Conduct of Counsel...................................................................................................14
8.   Race, Religion, National Origin, Sex, or Age.........................................................15
9.   Sympathy ...................................................................................................................16
10.  Publicity—Preliminary Statement ..........................................................................17
11.  Publicity—Reminder ................................................................................................18
12.  Publicity—Final ........................................................................................................19
13.  Burden of Proof - General........................................................................................20
14.  Burden of Proof-Preponderance of the Evidence ...................................................21
15.  What Is and Is Not Evidence ...................................................................................23
16.  Direct and Circumstantial Evidence .......................................................................25
17.  Stipulation of Facts ...................................................................................................27
18.  Judicial Notice ..........................................................................................................28
19.  Similar Acts—Intent, Knowledge, Absence of Mistake........................................29
20.  Interrogatories and Depositions ..............................................................................30
21.  Inference Defined......................................................................................................31
22.  Effect of Inference on Burden of Proof ..................................................................32
23.  Uncalled Witness Not Equally Available ...............................................................33
24.  Evidence Not Equally Available..............................................................................34
25.  Witness Credibility ...................................................................................................35
26.  Bias ............................................................................................................................37
27.  Discrepancies in Testimony .....................................................................................38
28.  Right to See Exhibits and Hear Testimony; Communications with Court ..........39
29.  Duty to Deliberate/Unanimous Verdict ..................................................................40
30.  Deadlock Charge.......................................................................................................42
31.  Selection of Foreperson ...........................................................................................43
32.  Return of Verdict......................................................................................................44
33.  The Statute – 42 U.S.C .............................................................................................45
34.  Nature of the Action .................................................................................................46
35.  Essential Elements of a Section 1983 Claim ..........................................................47
36.  First Element—Action Under Color of State Law .................................................48
37.  Second Element—Deprivation of Right - General Instruction..............................49
38.  Malicious Prosecution-Specific Instruction............................................................50
39.  Probable Cause (Malicious Prosecution) ................................................................51
40.  Fabrication of Evidence ...........................................................................................52
41.  Fifth Amendment Violation......................................................................................53

42. Coercion (Fifth Amendment Claim) ........................................................54
43. State of Mind—General .........................................................................55
44. State of Mind—Intentional ....................................................................56
45. State of Mind—Recklessness .................................................................57
46. Third Element—Causation - Proximate Cause .......................................58
47. Consider Damages Only If Necessary ...................................................59

## <u>REQUEST TO CHARGE NO. 1</u>

<u>Instructions at Beginning of Trial.</u>  This case is now officially on trial and you are the jurors in the case.  A preliminary word about your duties and trial procedures:

I have already instructed you that the function of the jury is to decide the disputed factual issues in the case.  Obviously, in order to discharge this duty, it is important that you listen carefully to the witnesses as they testify and form no judgment with respect to any witness or the outcome of the case as the trial moves forward.  In short, it is important to keep an open mind throughout the entire trial.

I also usually suggest that it is equally important to observe the witnesses as they testify.  The reason for this is that the credibility of most witnesses, if not all, will be an issue.  You will be called upon to appraise the credibility or the truthfulness of a particular witness' testimony.  Often times it is not what a witness says, but how he says it that may give you a clue as to whether or not to accept his version of an incident or an event as credible or believable.  In short, his manner of testifying before you, his appearance—that is, his general demeanor—is a factor that may play an important part in your reaching a judgment as to whether or not you can accept the witness' testimony as reliable.

As the trial proceeds, you may have impressions of a witness or a subject, but you must not allow these impressions to become fixed or hardened because, if you do, in a sense you foreclose consideration of the testimony of other witnesses or other evidence that may come in subsequent to the witness you heard.  This would be unfair to one side or the other.

A case can be presented only step by step, witness by witness, before the totality of all evidence is before you.  We know from experience that frequently we will hear a person

- 1 -

give his version of an event which sounds most impressive and even compelling, and yet, when we hear another person's version of the same event or even the same witness cross-examined with respect to it—what seemed so very compelling and impressive may be completely dissipated or weakened.

I am simply saying or trying to say to you in very simple terms, remember that usually there may be another side to every story.  Think of the old adage:  There are usually two sides to every story and remember you will not have heard both sides of any version until all the evidence in the case has been presented.  Thus, it is important to keep an open mind throughout the taking of evidence.

In order to assure that you continue to keep an open mind, you are not—and the court now instructs you—to discuss the case among yourselves during the progress of the trial, to discuss the evidence or any aspect of the case, or talk to any of the witnesses in the case, or anyone about the case or permit anyone to talk to you about the case.  This instruction about not discussing the case with others or permitting others to talk to you about it extends to members of your own family, or friends.  It remains in effect whether I refer to it again or not.

The only time you are permitted to discuss or consider the case is when it is submitted for your final consideration, and that is after all the witnesses have been heard and after the lawyers who represent the parties have appeared before you and summed up, as we term it, giving their views as to what the evidence supports as to a fact finding—and after, of course, also importantly—the court's instructions as to the law.  It is only when the case is submitted to you for determination and you go into the jury room that you have the right to discuss or consider the evidence and make your fact determination.

If you want to take notes during the course of the trial, you may do so. If you do take notes, be sure that your taking of notes does not interfere with your listening to and consideration of all of the evidence. Also, if you take notes, do not discuss them with anyone before or during your deliberations. Your notes are to be used solely to assist you and are not to substitute for your recollection of the evidence in the case. The fact that a particular juror has taken notes entitles that juror's views to no greater weight than those of any other juror and your notes are not to be shown to any other juror during the course of deliberations. If, during your deliberations, you have any doubt as to any of the testimony, you will be permitted to request that the official trial transcript which is being made of these proceedings be read to you.

Defendant, his attorneys, the plaintiff, and his attorneys are now instructed not to speak to jurors or to speak about the case in your presence. Thus you should understand that if they fail to acknowledge your presence, if you should see them at times when the court is not in session, they are not impolite or discourteous, but simply following the order of the court.

Now, a word about publicity. I don't know, but there may be some publicity about this case. I am sure you understand from what I said during the selection of the jury that cases are tried in the courtroom under prescribed rules of procedure, and not in the press or on the radio or on television. You must not be influenced by anything you may have seen or heard outside of the courtroom.

You are in the best position of anyone to listen to what the witnesses testify to. You will see these witnesses sworn; they will take a solemn oath before you to tell you the truth, the whole truth and nothing but the truth. You will hear them on direct examination and every word that is said. You will hear them on cross-examination and every word that is said.

- 3 -

A-1867

Certainly there isn't anything that anyone can print, say over the radio, or televise that would give you more information than what you hear from the lips of the witnesses in this courtroom and such exhibits as come into the case under prescribed rules.

Often the news media will print matters which they deem are significant when truly they are not significant, and often a writer will emphasize a point which may even distort the testimony of a key witness, and sometimes in stories about a trial there are even inaccuracies. You are instructed not to read, listen to, or watch news reports concerning the case. If you should unavoidably see an item, disregard it and put it out of your mind.

The fact is that from your seat you are in the best position to hear and see what goes on here, and you get only the evidence you are entitled to take into account in deciding the fact issue in the case. This instruction, too, continues throughout the entire trial, whether or not I repeat it to you. Please remember that. Finally, if any person should attempt to communicate with you or talk to you about the case, it is your duty to report that immediately to me, and to no one else.

Now a word about trial procedure. The trial proper will start with what are called opening statements. The attorneys representing the plaintiff and the attorneys representing the defendants will, before any evidence is received, appear before you and make opening statements. This is a sort of framework or reference as to what the case is about—the issues in the case—and the attorneys will set forth what they believe—and I underscore the word believe—the evidence will show.

These statements by lawyers are made in good faith and on the basis of their preparation for trial. But I must caution you now, and probably will again during the course of

- 4 -

the trial, that, however helpful these opening statements may be so that we can follow the testimony with reference to the issues in the case, they are not a substitute for the evidence.

The only evidence that you may act upon is that which you will hear from a witness who will be sworn in your presence, takes an oath to tell the truth, and following his questioning on direct examination, is subject to cross-examination, and such documents or exhibits as are admitted in evidence.  The totality of the testimony of witnesses and the exhibits constitute the evidence upon which you will reach a verdict in the case.

So too, if during the course of the trial a lawyer for either the plaintiff or the defense should make any statement with reference to a fact matter or include a fact reference in a question, or eventually if his summation refers to fact matters, you will bear in mind that statements by the lawyers are not evidence.  The sole and only evidence is that to which I have already referred.

After the opening statements, the plaintiff will offer its proof—that is called the plaintiff's direct case.  Upon the conclusion of the plaintiff's case, the defendant may go forward with his case.  If there is any rebuttal, the plaintiff will offer rebuttal.

Defendant is not required to make an opening statement or offer any proof.  As I have already told you, defendant has no burden of proof; he is presumed to be innocent of the charges.  The sole burden of proof is upon the plaintiff, and to sustain his charges he must do so by a preponderance of the evidence.  If defendant decides not to make an opening statement or offer proof, in no respect may this be considered against the defendant.

A-1869

Upon the conclusion of all the testimony the lawyers will again address you.  This is called a summation and each will urge upon you the arguments that he or she believes supports their position.  You, will, of course, listen attentively to the lawyers.

The determination as to whether or not you accept any argument advanced by the plaintiff or the defense is entirely up to you.  You make the fact determination.  You may accept such arguments as appeal to you; if not, you reject them.  Following the lawyers' summation, the court will instruct you as to the law and it is then that you go into the jury room and undertake your fact-finding function.  The ultimate decision in finding the facts, deciding the facts, is yours.  This must be based upon the evidence presented before you.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 1-1 (2020).

A-1870

## REQUEST TO CHARGE NO. 2

Juror Attentiveness.  Ladies and gentlemen, before you begin your deliberations, I am now going to instruct you on the law.  You must pay close attention and I will be as clear as possible.

It has been obvious to me and counsel that until now you have faithfully discharged your duty to listen carefully and observe each witness who testified. Your interest never flagged and you have followed the testimony with close attention.

I ask you to give that same careful attention as I instruct you on the law.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-1 (2017)

## <u>REQUEST TO CHARGE NO. 3</u>

<u>Role of the Court.</u>  You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties.

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and apply them to the facts as you determine them, just as it has been my duty to preside over the trial and decide what testimony and evidence is relevant under the law for your consideration.

On these legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instruction that you must follow.  You should not single out any instruction as alone stating the law but you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned about the wisdom of any rule that I state.  Regardless of any opinion that you may have as to what the law may be—or ought to be— it would violate your sworn duty to base a verdict upon any other view of the law than that which I give you.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-2 (2017).

A-1872

## REQUEST TO CHARGE NO. 4

Role of the Jury.  As members of the jury, you are the sole and exclusive judges of the facts.  You pass upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

In determining these issues, no one may invade your province or functions as jurors.  In order for you to determine the facts, you must rely upon your own recollection of the evidence.  What the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions is not in evidence.  Nor is what I may have said—or what I may say in these instructions—about a fact issue evidence.  In this connection, you should bear in mind that a question put to a witness is never evidence, it is only the answer which is evidence.  But you may not consider any answer that I directed you to disregard or that I directed struck from the record.  Do not consider such answers.

Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be.  The ruling I have made during the trial are not any indication of my views of what your decision should be as to whether or not the plaintiff has proven his case.

I also ask you to draw no inference from the fact that upon occasion I asked questions of certain witnesses.  These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than

- 9 -

A-1873

any other witnesses.  You are expressly to understand that the court has no opinion as to the verdict you should render in this case.

As to the facts, ladies and gentlemen, you are the exclusive judges.  You are to perform the duty of finding the facts without bias or prejudice to any party.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-3 (2017).

A-1874

## REQUEST TO CHARGE NO. 5

Juror Oath.  In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice or sympathy and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 73-4 (2017).

## REQUEST TO CHARGE NO. 6

Jury to Disregard Court's View.  I have not expressed nor have I intended to intimate any opinion as to which witnesses are or are not worthy of belief, what facts are not established, or what inference or inferences should be drawn from the evidence. If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to disregard it. You are, I repeat, the exclusive, sole judges of all of the questions of fact submitted to you and of the credibility of the witnesses. Your authority, however, is not to be exercised arbitrarily: it must be exercised with sincere judgment, sound discretion, and in accordance with the rules of law which I give you. In making your determination of the facts in this case, your judgment must be applied only to that which is properly in evidence. Arguments of counsel are not in evidence, although you may give consideration to those arguments in making up your mind on what inferences to draw from the facts which are in evidence.

From time to time the Court has been called upon to determine the admissibility of certain evidence, although I have tried to do so, insofar as it was practicable, out of your hearing. You are to have no concern with the reason for any such rulings and you are not to draw inferences from them. Whether offered evidence is admissible is purely a question of law within the province of the Court and outside the province of the jury. In admitting evidence to which objections have been made, the Court does not determine what weight should be given to such evidence, nor does it assess the credibility of the evidence. Of course, you will dismiss from your mind completely and entirely any evidence which has been ruled out of the case by the Court, and you will refrain from speculation, conjecture or guesswork about the nature or effect of any colloquy or discussion between the Court and counsel held out of your hearing or sight.

- 12 -

A-1876

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-5 (2017).

A-1877

## <u>REQUEST TO CHARGE NO. 7</u>

<u>Conduct of Counsel.</u>  It is the duty of the attorneys on each side of a case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible.

Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All those questions of law must be decided by me, the Court. You should not show any prejudice against an attorney or his client because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked the Court for a ruling on the law.  As I already indicated, my rulings on the admissibility of evidence do not, unless expressly stated by me, indicate any opinion as to the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-13 (2017).

- 14 -

A-1878

## <u>REQUEST TO CHARGE NO. 8</u>

<u>Race, Religion, National Origin, Sex, or Age.</u>  Your verdict must be based solely upon the evidence developed at this trial, or the lack of evidence.

It would be improper for you to consider any personal feelings you may have about one of the parties' race, religion, national origin, gender, or age. It would be equally improper for you to allow any feelings you might have about the nature of the claim against the defendants to influence you in any way.

The parties in this case are entitled to a trial free from prejudice. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-16 (2017).

A-1879

## **REQUEST TO CHARGE NO. 9**

Sympathy.  Under your oath as jurors you are not to be swayed by sympathy. You should be guided solely by the evidence presented during the trial, without regard to the consequences of your decision.  You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy interfere with your clear thinking there is a risk that you will not arrive at a just verdict.  All parties to a civil lawsuit are entitled to a fair trial. You must make a fair and impartial decision so that you will arrive at the just verdict.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-10 (2017).

- 16 -

## <u>REQUEST TO CHARGE NO. 10</u>

<u>Publicity—Preliminary Statement.</u>  There may be some newspaper attention given to this case, or there may be some talk about it on the radio, television, or internet.  If there is that kind of media attention during the trial, you must insulate yourselves from all information about this case, except what comes to you in this courtroom through the rules of evidence.  So, when you leave here and go to your home and pick up the paper, if you see something about the case, you must put the paper down right away.  And if you see something on social media, or the internet, must ignore it.  Do not read the article.  Avoid listening to or watching any radio or television discussion of the case.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-12 (2017).

A-1881

### REQUEST TO CHARGE NO. 11

<u>Publicity—Reminder.</u>  Let me remind you once again not to read about the case on the Internet or the newspapers, watch any news concerning the case on television, or listen to any radio accounts of the case.  Please be mindful of my admonition that you must limit the information you get about the case to what comes to you in the courtroom through the rules of evidence.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-13 (2017).

A-1882

## REQUEST TO CHARGE NO. 12

<u>Publicity—Final.</u>  Your verdict must be based solely on the evidence presented in this courtroom in accordance with my instructions.  You must completely disregard any report which you have read in the press, watched on television, heard on the radio, or seen on the internet.  It would be unfair to consider such reports, because they are not evidence and the parties have no opportunity to contradict their accuracy or otherwise explain them away.  It would be a violation of your oath as jurors to allow yourselves to be influenced in any manner by such publicity.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 71-14 (2017).

- 19 -

A-1883

## REQUEST TO CHARGE NO. 13

Burden of Proof - General.  This is a civil case and as such the plaintiff has the burden of proving the material allegations of his complaint by a preponderance of the evidence. If after considering all of the testimony you are satisfied that the plaintiff has carried his burden on each essential point as to which he has the burden of proof, then you must find for the plaintiff on his claims.  If after such consideration you find the testimony of both parties to be in balance or equally probable, then the plaintiff has failed to sustain his burden and you must find for the defendant.

If you have determined that the defendant has sustained its burden of establishing its affirmative defense, then you should proceed no further and your verdict must be for the defendant.  If, however, you find that the plaintiff has established the essential elements of his case and the defendant has not sustained his burden of the affirmative defense, then you may proceed to consider the issue of damages.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 73-1; 87-67 (2021).

**<u>REQUEST TO CHARGE NO. 14</u>**

<u>Burden of Proof-Preponderance of the Evidence.</u>  The party with the burden of proof on any given issue has the burden of proving every disputed element of his claim to you by a preponderance of the evidence.  If you conclude that the party bearing the burden of proof has failed to establish his claim by a preponderance of the evidence, you must decide against him on the issue you are considering.

What does a "preponderance of evidence" mean? To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true that not true.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties—that it is equally probable that one side is right as it is that the other side is right—then you must decide that issue against the party having this burden of proof.  That is because the party bearing this burden must prove more than simple equality of evidence—he must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this burden of proof need prove no more than a preponderance.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof—that what the party claims is more likely true than not true—then that element will have been proved by a preponderance of the evidence.

- 21 -

A-1885

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial.  That requirement does not apply to a civil case such as this and you should put it out of your mind.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 73-2 (2019).

## REQUEST TO CHARGE NO. 15

What Is and Is Not Evidence.  The evidence in this case is the sworn testimony of the witnesses, the exhibits received in evidence, stipulations, and judicially noticed facts.

By contrast, the question of a lawyer is not to be considered by you as evidence. It is the witnesses' answers that are evidence, not the questions.  At times, a lawyer on cross-examination may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true.  If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

The famous example of this is the lawyer's question of a married witness:  "When did you stop beating your wife?"  You would not be permitted to consider as true the assumed fact that he ever beat his wife, unless the witness himself indicated he had, or unless there was some other evidence in the record that he had beaten his wife.

Testimony that has been stricken or excluded is not evidence and may not be considered by you in rendering your verdict.  Also, if certain testimony was received for a limited purpose—such as for the purpose of assessing a witness' credibility—you must follow the limiting instructions I have given.

Arguments by lawyers are not evidence, because the lawyers are not witnesses. What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

- 23 -

A-1887

To constitute evidence that may be considered by you, exhibits must be received in evidence.  Exhibits which have been marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness' recollection.

Finally, statements which I may have made concerning the quality of the evidence do not constitute evidence.  It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-1 (2017).

A-1888

<u>**REQUEST TO CHARGE NO. 16**</u>

<u>Direct and Circumstantial Evidence.</u>  There are two types of evidence which you may properly use in reaching your verdict.

One type of evidence is direct evidence.  Direct evidence is when a witness testifies about something he knows by virtue of his own senses—something he has seen, felt, touched, or heard.  Direct evidence may also be in the form of an exhibit where the fact to be proved is its present existence or condition.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts.  There is a simple example of circumstantial evidence which is often used in this courthouse.  Assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella which was dripping wet.  Then a few minutes later another person also entered with a wet umbrella.  Now, you cannot look outside of the courtroom and you cannot see whether or not it is raining.  So you have no direct evidence of that fact.  But on the combination of facts which I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.  Circumstantial evidence is of no less value than direct evidence; for, it is a general rule that the law makes no distinction between the two but simply requires that your verdict must be based on a preponderance of all the evidence presented.

- 25 -

A-1889

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-2 (2017).

A-1890

## <u>REQUEST TO CHARGE NO. 17</u>

<u>Stipulation of Facts</u>.  A stipulation of facts is an agreement among the parties that a certain fact is true. You must regard such agreed facts as true.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-4 (2017).

A-1891

### <u>REQUEST TO CHARGE NO. 18</u>

<u>Judicial Notice</u>.  I have taken judicial notice of certain facts which are not subject to reasonable dispute. I have accepted these facts to be true, even though no direct evidence has been introduced proving them to be true. You are required to accept these facts as true in reaching your verdict.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-3 (2017).

## REQUEST TO CHARGE NO. 19

Similar Acts—Intent, Knowledge, Absence of Mistake (in the event that similar acts evidence is offered).  You have heard evidence tending to show that on a different occasion the defendant engaged in conduct similar to the allegations in the complaint.  In that connection, let me caution you that the defendant is not on trial for committing an act that is not alleged in the complaint.  Nor may you consider this evidence that the defendant has a bad character.  The evidence of this other, similar act was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

If you determine that the defendant committed the acts alleged in the complaint and the similar acts as well, then you may, but you need not, draw an inference that in doing the acts that are the subject of this trial, the defendant acted knowingly and intentionally, and not because of some accident, mistake, or some other reason.

However, I must repeat that evidence of similar acts may not be considered by you for any other reason.  Specifically, you may not use this evidence to conclude that because the defendant committed the other act, he must also have committed the act alleged in the complaint.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-7 (2017).

- 29 -

A-1893

### REQUEST TO CHARGE NO. 20

Interrogatories and Depositions.  You have heard and seen evidence in this case which is in the form of interrogatories and deposition testimony.  Interrogatories are written questions posed by one side which call for written answers under oath from the other side. Both the questions and answers are made prior to trial after the case has begun in what is called pretrial discovery, and each side is entitled to seek such discovery from the other.

Some of the testimony before you is in the form of depositions which have been received in evidence. A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial. This is part of the pretrial discovery, and each side is entitled to take depositions. You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at trial.

You may consider a party's answers to interrogatories and a party's deposition testimony as evidence against a party who made the answer, just as you would any other evidence which has been admitted in this case.

In this regard, you are not required to consider a party's answers to interrogatories or during a deposition as true, nor are you required to give them more weight than any other evidence. It is up to you to determine what weight, if any, should be given to the interrogatory answers or the deposition testimony which has been admitted as evidence.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 74-13; 74-14 (2017).

- 30 -

## <u>REQUEST TO CHARGE NO. 21</u>

<u>Inference Defined.</u>  During the trial you have heard the attorneys use the term "inference," and in their arguments they have asked you to infer, on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical conclusion that a disputed fact exists on the basis of another fact which has been shown to exist.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence.  The plaintiff asks you to draw one set of inferences, while the defendant asks you to draw another.  It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction or conclusion which you, the jury, are permitted—but not required—to draw from the facts which have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 75-1 (2014).

- 31 -

Case 23-352, Document 41, 06/23/2023, 3533150, Page182 of 223

A-1895

## <u>REQUEST TO CHARGE NO. 22</u>

<u>Effect of Inference on Burden of Proof</u>.  The mere existence of an inference against the defendants does not relieve the plaintiff of the burden of establishing his case by a preponderance of the evidence. If the plaintiff is to obtain a verdict, you must still believe that he has sustained the burden cast upon him with credible evidence. If he has failed, then your verdict must be for the defendant. If you should find that all of the evidence is evenly balanced, then your verdict should be for the defendants, because if the evidence is balanced, the plaintiff has failed to sustain the burden of proof.  If and only if you determine, after carefully weighing all the evidence, that the facts favor the plaintiff by the standard I have articulated, then the plaintiff has met his burden of proof.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 75-2 (2014).

Case 23-352, Document 41, 06/23/2023, 3533150, Page183 of 223

A-1896

## REQUEST TO CHARGE NO. 23

<u>Uncalled Witness Not Equally Available.</u>  You have heard evidence about witnesses who have not been called to testify. Counsel for the plaintiff has argued that these witnesses could have given material testimony in this case, and that the defendants were in the best position to produce these witnesses.

If you find that these witnesses could have been called by the defendants, and that the defendants were in the best position to produce them, and that these witnesses would have given important new testimony, then you are permitted, but not required, to infer that the testimony of these witnesses would have been unfavorable to the defendants.

In deciding whether to draw this interference, you should consider whether the witnesses' testimony would merely have repeated other testimony and evidence already before you. You may also consider whether the defendants had a reason for not calling these witnesses which was explained to your satisfaction.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 75-7 (2017).

## <u>REQUEST TO CHARGE NO. 24</u>

<u>Evidence Not Equally Available.</u>  You have heard evidence about evidence, either testimony or documents, that have not been introduced as part of this trial.  Counsel for plaintiff has argued that this evidence was under the defendants' control and would have proven facts material to the matter in controversy.

If you find that the defendants could have produced the evidence, and the evidence was in their control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to the defendants.

In deciding whether to draw this interference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you.  You may also consider whether the defendants had a reason for not producing this evidence, which was explained to your satisfaction. Any inference you decide to draw should be based on all facts and circumstances in this case.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 75-7 (2017).

### REQUEST TO CHARGE NO. 25

Witness Credibility.  You have had the opportunity to observe all the witnesses.
It is now your job to decide how believable each witness was in his or her testimony.  You are
the sole judges of the credibility of each witness and of the importance of his testimony.

It must be clear to you by now that you are being called upon to resolve various
factual issues raised by the parties in the face of very different pictures painted by both sides.  In
making these judgments, you should carefully scrutinize all of the testimony of each witness, the
circumstances under which each witness testified, and any other matter in evidence which may
help you decide the truth and the importance of each witness' testimony.

How do you determine where the truth lies? You watched each witness testify.
Everything a witness said or did on the witness stand counts in your determination.  How did the
witness impress you?  Did he appear to be frank, forthright and candid, or evasive and edgy as if
hiding something?  How did the witness appear; what was his demeanor—that is, his carriage,
behavior, bearing, manner and appearance while testifying?  Often it is not what a person says
but how he says it that moves us.

You should use all the tests for truthfulness that you would use in determining
matters of importance to you in your everyday life.  You should consider any bias or hostility the
witness may have shown for or against any party as well as any interest the witness has in the
outcome of the case.  You should consider the opportunity the witness had to see, hear, and know
the things about which he testified, the accuracy of his memory, his candor or lack of candor, his
intelligence, the reasonableness and probability of his testimony and its consistency or lack of
consistency and its corroboration or lack of corroboration with other credible testimony.

A-1899

        In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given and all of the other evidence in the case.  Always remember that you should use your common sense, your good judgment and your own life experience.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 76-1 (2015).

A-1900

### REQUEST TO CHARGE NO. 26

Bias.  In deciding whether to believe a witness, you should specifically note any evidence of hostility or affection which the witness may have towards one of the parties. Likewise, you should consider evidence of any other interest or motive that the witness may have in cooperating with a particular party.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 76-2 (2015).

A-1901

## REQUEST TO CHARGE NO. 27

Discrepancies in Testimony.  You have heard evidence of discrepancies in the testimony of certain witnesses, and counsel have argued that such discrepancies are a reason for you to reject the testimony of those witnesses.  You are instructed that evidence of discrepancies may be a basis to disbelieve a witness' testimony.  On the other hand, discrepancies in a witness' testimony or between his testimony and that of others do not necessarily mean that the witness' entire testimony should be discredited.

People sometimes forget things and even a truthful witness may be nervous and contradict himself.  It is also a fact that two people witnessing an event will see or hear it differently.  Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance; but a willful falsehood always is a matter of importance and should be considered seriously.

It is for you to decide, based on your total impression of the witness, how to weigh the discrepancies in his or her testimony.  You should, as always, use common sense and your own good judgment.

Adapted from:

Sand, *et al.*, *Modern Federal Jury Instructions – Civil Rights*, Instruction 76-4 (2015).

A-1902

## REQUEST TO CHARGE NO. 28

Right to See Exhibits and Hear Testimony; Communications with Court.  You are about to go into the jury room and begin your deliberations.  If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room.  If you want any of the testimony read back to you, you may also request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact any communication with the court—should be made to me in writing, signed by your foreperson, and given to one of the marshals.  In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 78-1 (2016).

- 39 -

A-1903

## <u>REQUEST TO CHARGE NO. 29</u>

<u>Duty to Deliberate/Unanimous Verdict.</u>  You will now return to decide the case. In order to prevail, the plaintiff must sustain his burden of proof as I have explained to you with respect to each element of the complaint.  If you find that the plaintiff has succeeded, you should return a verdict in his favor on that claim.  If you find that the plaintiff failed to sustain the burden on any element of the claim, you should return a verdict against the plaintiff.  Likewise, if you find that that the defendant has failed to sustain his or her burden with respect to any element of the defendant's affirmative defense, you must return a verdict against that particular defense.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.  Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous.  Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors.  Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors.  No juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

A-1904

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 78-3 (2016).

## REQUEST TO CHARGE NO. 30

<u>Deadlock Charge.</u>  This case is important to the plaintiff and the defendant. Both parties, as well as the Court, have expended a great deal of time, effort, and resources in seeking a resolution of this dispute.

It is desirable if a verdict can be reached, but your verdict must represent the conscientious judgment of each juror.

While you may have honest differences of opinion with your fellow jurors during the deliberations, each of you should seriously consider the arguments and opinions of the other jurors. Do not hesitate to change your opinion if, after discussion of the issues and consideration of the facts and evidence in this case, you are persuaded that your initial position is incorrect. However, I emphasize that no juror should vote for a verdict unless it represents his or her conscientious judgment.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 78-4 (2016).

A-1906

## REQUEST TO CHARGE NO. 31

Selection of Foreperson.  When you retire, you should elect one member of the jury as your foreperson.  That person will preside over the deliberations and speak for you here in court.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 78-5 (2016).

A-1907

### REQUEST TO CHARGE NO. 32

Return of Verdict.  After you have reached a verdict, your foreperson will fill in the form that has been given to you, sign and date it and advise the marshal outside your door that you are ready to return to the courtroom.  I will stress that each of you should be in agreement with the verdict which is announced in court.  Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

Adapted from

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 78-6 (2016).

A-1908

## <u>REQUEST TO CHARGE NO. 33</u>

<u>The Statute – 42 U.S.C. § 1983.</u>  The law to be applied in this case is the federal civil rights law, which provides a remedy for individuals who have been deprived of their constitutional rights under color of state law.  Section 1983 of Title 42 of the United States Code states:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-65 (2021).

- 45 -

A-1909

## REQUEST TO CHARGE NO. 34

Nature of the Action.  Plaintiff alleges that the defendant deprived him of his rights and privileges secured and protected by the Constitution and Laws of the United States, namely, the right to due process.

The defendant, a police officer, denies that any of his actions during the time in question violated the plaintiff's rights.  He maintains that he was acting in good faith, with probable cause, and that his actions were reasonable.

Adapted from:

O'Malley, *et al., Federal Jury Practice & Instructions*, § 165:1 (6th Ed 2022).

**REQUEST TO CHARGE NO. 35**

<u>Essential Elements of a Section 1983 Claim.</u>  Plaintiff asserts three causes of action under § 1983.  I will instruct you on the specifics of each cause of action later on.  However, there are certain elements Plaintiff must prove for each cause of action that are the same across all of his § 1983 claims.  For each cause of action, Plaintiff must establish by a preponderance of the evidence, three elements:

First, that the acts complained of were committed by the defendant acting under color of state law;

Second, that in committing these acts, the defendant deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States; and

Third, that the defendant's conduct was the proximate cause of the injuries and damages sustained by the plaintiff.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-68 (2016);

Schwartz.

- 47 -

A-1911

## REQUEST TO CHARGE NO. 36

First Element—Action Under Color of State Law.  The first element is that the conduct complained of was committed by the defendant acting under color of state law.  An action under color of state law means that the defendant claims to be acting pursuant to authority given to him by the state, even if he is misusing that authority.  The "state" includes any political subdivision of a state, such as a county or a city, and also any state, county, or city agencies.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-69 (2021).

A-1912

## <u>REQUEST TO CHARGE NO. 37</u>

<u>Second Element—Deprivation of Right - General Instruction.</u>  The second element of the plaintiff's claim is that the defendant, in committing the acts complained of, intentionally or recklessly deprived the plaintiff of a federal or constitutional right.  In order for the plaintiff to establish this second element, he must show that it is more likely than not that the acts you have found defendant took under color of state law caused the plaintiff to suffer the loss of a federal or constitutional right.  He must further show that the defendant performed those acts intentionally or recklessly; it is not enough for a defendant to have merely acted accidentally.

Plaintiff claims that his rights were violated through three separate causes of action: (1) malicious prosecution; (2) fabrication of evidence; and (3) violation of his Fifth Amendment rights.  I will now address each of these separate causes of action in turn.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-74 (2017).

- 49 -

A-1913

### REQUEST TO CHARGE NO. 38

Malicious Prosecution-.   The plaintiff alleges malicious prosecution by the defendant.   To establish a claim of malicious prosecution, the plaintiff must prove by a preponderance of the evidence that the defendant caused him to be criminally prosecuted, and that the defendant did not have probable cause to cause the plaintiff to be criminally prosecuted.   The plaintiff must also show, by a preponderance of the evidence, that the defendant did so maliciously—for a bad purpose—and that the prosecution was eventually terminated in the plaintiff's favor, in a manner indicating that the plaintiff was not guilty of the charge.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-74E (2021).

A-1914

### REQUEST TO CHARGE NO. 39

Probable Cause (Malicious Prosecution Special Interrogatories).  The existence of probable cause is an absolute defense to Plaintiff's malicious prosecution claim.  Probable cause to arrest exists when officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.

Furthermore, an indictment by a grand jury creates a presumption of probable cause.  Thus, if you find that there was credible evidence that a grand jury indicted Plaintiff, then this creates a presumption that probable cause existed to arrest and prosecute him.

Plaintiff, however, can overcome this presumption by showing that he was indicted as a result of Defendant's lies, fraud, perjury, or forwarding information to prosecutors that Defendant knew to be false.  If you determine that Plaintiff was indicted by a grand jury, then you must answer the following questions to determine whether the presumption of probable cause has been rebutted:

1. Did Defendant knowingly forward false information to prosecutors to procure Plaintiff's indictment?

2. Did Defendant intentionally lie or commit fraud to procure Plaintiff's indictment?

3. Did Defendant commit perjury to procure Plaintiff's indictment?

Source: *Manganiello v. City of New York*, 612 F.3d 149, 161-162 (2d Cir. 2010).

A-1915

## REQUEST TO CHARGE NO. 40

<u>Fabrication of Evidence</u>.  To prevail on his claim of "fabrication of evidence," Plaintiff must prove that: (1) Defendant was an investigating official; (2) Defendant fabricated information; (3) that was likely to influence a jury's verdict; (4) Defendant forwarded that information to prosecutors; and (5) Plaintiff suffered deprivation of life, liberty, or property as a result.

Source: *Garnett v. Undercover Officer*, C0039 838 F.3d 265, 279 (2d Cir. 2016).

A-1916

## REQUEST TO CHARGE NO. 41

 Fifth Amendment Violation.  To prevail of Plaintiff's claim for a violation of his Fifth Amendment rights, he must prove that: (1) Defendant applied coercion against him; (2) to obtain a waiver of his right against self-incrimination and/or to obtain inculpatory statement; and (3) the statements thereby obtained were used against him in a criminal proceeding.

Source: *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).

- 53 -

A-1917

### REQUEST TO CHARGE NO. 42

Coercion (Fifth Amendment Claim).  In order to show that Defendant applied coercion in violation of Plaintiff's Fifth Amendment rights, you must determine if  Defendant's conduct was the kind of misbehavior that shocks the sensibilities of civilized society, and whether that conduct was such to overbear Plaitniff's will to resist and bring about a confession not freely given.

Source: *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).

A-1918

## REQUEST TO CHARGE NO. 43

State of Mind—General**.**  For plaintiff to prevail on each of the three causes of action that he brings pursuant to 42 U.S.C. 1983, the plaintiff must not only show that the defendant's acts deprived the plaintiff of a federal right but also that the defendant performed those acts intentionally or recklessly, rather than accidentally.  Thus, in order to find that Defendant is liable under any of the three causes of action, you must also find that Defendant acted with the requisite state of mind for liability to attach.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-75 (2021).

A-1919

### REQUEST TO CHARGE NO. 44

<u>State of Mind—Intentional.</u>   An act is intentional if it is done voluntarily and deliberately and not because of mistake, accident, negligence or other innocent reason.  Please note that intent can be proved directly or it can be proved by reasonable inference from circumstantial evidence.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-76 (2021).

- 56 -

A-1920

### REQUEST TO CHARGE NO. 45

State of Mind—Recklessness.  An act is reckless if done in conscious disregard of its known probable consequences.  In other words, if it was probable that the defendant's actions would deprive the plaintiff of his rights, and the defendant was aware that it was probable, and the defendant ignored that probability in acting, then the second essential element would be satisfied, even if the defendant's purpose was not to deprive the plaintiff of his rights.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-77 (2021).

- 57 -

A-1921

## REQUEST TO CHARGE NO. 46

<u>Third Element—Causation - Proximate Cause.</u>  Even if you find that Defendant committed <u>certain</u> acts with the requisite state of mind, you still must determine whether those acts were a proximate cause of the injuries sustained by plaintiff.  The third element of a § 1983 claim is that the defendants' acts were a proximate cause of injuries sustained by plaintiff.  If it was reasonably foreseeable that plaintiff's injury would be a consequence of defendant's act, and defendant's act was a substantial factor in making that injury occur, then the act proximately caused the injury.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 87-79 (2021).

A-1922

### <u>REQUEST TO CHARGE NO. 47</u>

<u>Consider Damages Only If Necessary.</u>  If plaintiff has proven by a preponderance of the credible evidence that the defendant is liable, then, and only then, must you determine the damages to which the plaintiff is entitled.  However, you should not infer that the plaintiff is entitled to recover damages merely because I am instructing you on the elements of damages.  It is exclusively your function to decide upon liability, and I am instructing you on damages only so that you will have guidance if you decide that the plaintiff is entitled to recover on his claim.

Adapted from:

Sand, *et al., Modern Federal Jury Instructions* – Civil Rights, Instruction 77-1 (2016).

- 59 -

Dated: April 1, 2022

**HODGSON RUSS LLP**
*Attorneys for Defendant*


By: /s/ Peter A. Sahasrabudhe
      Hugh M. Russ III
      Peter A. Sahasrabudhe
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: (716) 856-4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com

- 60 -

A-1924

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                                        Plaintiff,

                vs.

RICHARD WAGSTAFF, MARY GUGLIUZZA,
MARK VAUGHN, MARK STAMBACH, and
BPD DOES 1-12, in their Capacity as Police
Officers
of the CITY OF BUFFALO;  and BUFFALO
POLICE DEPARTMENT,

                                        Defendants.

Civil Action No.

16-CV-321
(EAW/MJR)

## PLAINTIFF'S REPLY MOTIONS IN LIMINE

Plaintiff, by and through his attorneys, Hancock Estabrook, LLP and Law
Offices of Wayne Felle, P.C., as and for his Trial Brief on Legal and Evidentiary
Issues and Motions In Limine for trial states as follows:

**A.   Defendant Should Be Precluded From Raising Any Issue Regarding
      Plaintiff's Unrelated Convictions In Puerto Rico Prior to 2004 And In
      The WDNY In 2016**

Defendant asserts the convictions are relevant for two reasons: (1)
impeachment on truthfulness and credibility; and (2) plaintiff's damages. We
disagree.

> **1.    *The More Than Ten-Year-Old Puerto Rican Conviction Is Not
>         Admissible***

Apparent, by his silence, Defendant admits that the Puerto Rican conviction
for assault that is more than 10 years old is not admissible on *credibility* under FRE

{H4720386.1}

609 and 403.  Moreover, Defendant wants to use it on Plaintiff's damages, but he has not addressed what he needs to prove to satisfy Rule 609(b) and 403 for this old conviction to be admissible on any basis, including damages.  The starting point of Rule 609(b) is that this conviction is not admissible unless Defendant proves that "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Defendant has done neither.

The Second Circuit has "recognized that Congress intended that convictions over ten years old be admitted 'very rarely and only in exceptional circumstances.' " *Zinman v. Black & Decker (U.S.), Inc*., 983 F.2d 431, 434 (2d Cir. 1993) (quoting S. Rep. No. 1277, 93d Cong., 2d Sess. &***). Courts reviewing the admission of convictions under Rule 609(b) must " 'make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice.' " *Jones v. N.Y. City Health & Hosps. Corp*., 102 F. App'x. 223, 226 (2d Cir. 2004), quoting *United States v. Mahler*, 579 F.2d 730, 734 (2d Cir. 1978). In conducting the necessary balancing test, "courts in this Circuit consider the following factors: '[1] the impeachment value of the prior crimes, [2] the date of the conviction and the [witness's] subsequent history, [3] the degree of similarity between the past crimes and this crime, [4] the centrality of the [witness's] credibility in this case, and [5] the

A-1926

importance of the [witness's] testimony.' " *Brown*, 606 F. Supp. 2d at 311-12 (citation omitted). "Although all of these factors are relevant, '[p]rime among them is [the first factor, i.e.] whether the crime, by its nature, is probative of a lack of veracity." *Id.* , quoting *U.S. v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977).

"[C]ourts in this Circuit have consistently admitted convictions over ten years of age when the prior crimes involved falsification and the credibility of the testifying witness was crucial to the outcome of the current case." *United States v. Chervin*, 2013 WL 124270, at *5 (S.D.N.Y. Jan. 10, 2013).  For example, in *Zinman*, the Second Circuit affirmed the district court's admission of Zinman's 17-year-old conviction for Medicare fraud.  938 F.2d at 434.

This case does not satisfy these standards.

## 2.     The 2016 WDNY Conviction Is Inadmissible For Any Reason Under Rules 609 And 403.

*First*, Defendant asserts that the 2016 WDNY conviction is admissible under FRE 609(a)(1) because "[t]his case will in large part turn on which party's version of events is credited by the jury, particularly with respect to Plaintiff's confession and the days leading up to it. Thus, the probative value of this conviction is high given the circumstances of this case. The Court should therefore allow the undersigned to, at a minimum, question Plaintiff on cross-examination regarding the name of the 2016 conviction, its date, and the sentence imposed." Def's MOL (Docket No. 120-3) at 4.

{H4720386.1}                                - 3 -

The problem with this argument is that it ignores the undisputed fact, as found by this Court on Defendant's summary judgment motion, that

> Plaintiff indicates that he "has no recollection of the events of his involvement with any members of the Buffalo Police Department ('BPD') in November 2004" and therefore cannot admit or deny this claim. (Dkt. 78-1 at ¶¶ 8, 10). Defendants further claim that Stambach typed up a statement reflecting his questions and Plaintiff's answers, that Torres "went through the statement with Plaintiff by reading it before Plaintiff was asked to sign it," and that Plaintiff initialed each page of the statement and signed the last page. (Dkt. 69-21 at ¶ 10). *Again, Plaintiff denies any recollection of these events.* (Dkt. 78-1 at ¶¶ 8, 10). Defendants have submitted to the Court a copy of the statement. (Dkt. 69-8). Plaintiff recognizes the initials and signature on the statement as his. (Dkt. 69-21 at ¶ 12; Dkt. 78-1 at ¶ 12). *Plaintiff was arrested on November 17, 2004, but does not recall his arrest.* (Dkt. 69-7 at 2; Dkt. 69-21 at ¶ 14; Dkt. 78-1 at ¶ 14).

*Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 352-353 (W.D.N.Y. 2021) (Emphasis supplied).

There is no credibility dispute between Plaintiff's version of the events of his arrest and related events in November 2004 and Defendant as Defendant asserts because Plaintiff has no recollection of the events.  Defendant's credibility is challenged by his actions vs. the information available to him from the BPD and its files, not by Plaintiff.  Thus, the 2016 conviction is not admissible on credibility even without considering whether its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

A-1928

cumulative evidence" under Rule 403.  It is, especially where, as here, Judge Vilardo treated it as a mistake and noted that Plaintiff was far more a victim than a criminal in sentencing him.

*Second*, with respect to damages the same analysis under 609 and 403 applies.  In addition, there should be proof that Plaintiff's employability was negatively impacted by his conviction before the 2016 conviction becomes relevant to damages.  There will be no such proof.

Notably, Defendant could not find any authority in this Circuit to support this argument, and relies solely on cases from the Sixth and Tenth Circuits and a District Court from Michigan.  There is no reason for this Court to make new law in this Circuit on this issue.

Moreover, the Sixth Circuit's decision in *Clark v. W & M Kraft, Inc*., 476 F. App'x 612, 617 (6th Cir. 2012) shows the inapplicability of these cases here. First, the issue was whether the defendant's *expert economist* could testify about several items, including "his prior substance abuse, physical injury, convictions and jail time, and failure to pay child support." The court found:

> the substance abuse and physical injury testimony, while unfavorable to Clark, was relevant to determining the amount of Clark's impairment attributable to the fall. Additionally, Clark's criminal history and failure to pay child support were relevant to the jury's future-earnings calculation. In fact, the Clarks opened the door for this testimony when they presented an economics expert's opinion predicting a robust future earning capacity despite Clark's previously spotty employment record. This expert attributed the recent birth of

**A-1929**

Clark's child as a basis for concluding that his future earnings would be more predictable and reliable, as Clark now had new familial obligations. This projection, however, failed to take into consideration a major reason for Clark's checkered employment record—his time spent incarcerated—and ignored Clark's history of nonsupport of a first child. The defendants' introduction of Clark's criminal history and failure to pay child support were relevant to the future-earnings calculation and to rebut the Clarks' economic expert's opinions.

The significant differences between Clark and this case include that (1) Defendant has no expert economist to evaluate and present this evidence to rebut Dr. Reiber; and (2) Clark's conviction effected his pre-incident earnings whereas Plaintiff's 2016 conviction is post-violation of his rights by Defendant and Plaintiff served no prison time for the 2016 conviction.

In *Jones v. City of Warren*, 2015 WL 3937608, at *4 (E.D. Mich. June 26, 2015) the court bifurcated liability and damages so the *possible* admission of the plaintiff's prior convictions would not prejudice the jury on the liability phase. The court held that the conviction evidence might come in on damages, but made no definitive ruling on the issue on the motions in limine: "Again, because it is unclear what testimony and/or exhibits Defendants may seek to introduce at trial on these issues, the Court will defer ruling on specific evidence offered for this purpose until the damages phase of the trial. *** Such evidence will be admitted, if at all, only in the damages phase of the trial and of course remains subject to exclusion based upon the Court's determination of its probative value balanced against its prejudicial effect. See Fed. R. Evid. 404(b)."

{H4720386.1}                                            - 6 -

*Baron ex. rel. White v. Sayre Mem. Hosp., Inc*., 221 F.3d 1351, at \*4 (10th Cir. 2000) concerned the application of Oklahoma law, the court referred to the criminal record being "related to the theory of hedonic damages," and the court found the admission harmless if not an error.  Hedonic damages mean "relating to or considered in terms of pleasant (or unpleasant) sensations."  Oxford Dictionary.

Finally, *Cobige v. City of Chicago*, 651 F.3d 780, 784 (7th Cir. 2011), is very different from this case.  It concerned proof of the decedent's criminal convictions and history as relevant to

> undermine [her son's] rosy view of the mother-son relationship by introducing evidence that [his mother the decedent] was a drug addict who had been in trouble with the law for much of her adult life and had spent multi-year stretches in prison. \*\*\* The excluded evidence would have undermined the favorable picture that Maurice Cobige painted of his mother's character and would have allowed defense counsel to ask just what kind of "role model" she could have been. Moreover, evidence that she was in prison for extended periods, and in thrall to heroin when not imprisoned, would have undermined testimony that she provided wise advice and support to her son: prisoners can't spend nearly as much time with their relatives as free persons do.

Notably, (1) none of these cases cited by Defendant has ever been cited by any court in the Second Circuit; and (2) as it is these cases focus on the prior incarceration and prison time of the plaintiff and here Plaintiff never spent any time in prison for either the assault conviction in Puerto Rico (Defendant's **Exh. A** at p 34) or the 2016 WDNY conviction.

**B.     Defendant's Defense Of Qualified Immunity**

The parties appear and this court held in its SJ Decision that the Court will decide the defense of qualified immunity after the jury verdict.  However, we certainly disagree with Defendant's Request to Charge 39.  It is improper and inconsistent with this Court's Decision.

It is possible but unlikely here that special interrogatories to the jury may be needed in order for the Court to determine Defendant's defense of qualified immunity.  "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir. 2007); *see also Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir. 2004). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." *Zellner*, 494 F.3d at 367.  "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court." *Id*. at 368. Plaintiff submits that this is the case here as the jury's findings on Plaintiff's three claims will allow the Court to determine the defense of qualified immunity as there will be "no dispute as to the material historical facts" once the jury determines the three claims here.

A-1932

"[I]f there is such a dispute," however, "the factual questions must be resolved by the factfinder." *Id*. (citing *Kerman,* 374 F.3d at 109); *see Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir. 1994) ("The District Court should have let the jury (a) resolve these factual disputes and (b) based on its findings, decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law when they detained the plaintiffs.").

Dated:  April 6, 2022

*Attorneys for Plaintiff*
LAW OFFICES OF WAYNE C. FELLE, ESQ.
Wayne C. Felle, Esq.
6024 Main St.
Williamsville, New York 14221
Tel: (716) 505-2700

- and -

HANCOCK ESTABROOK, LLP

By: _____
    Alan J. Pierce, Esq.

100 Madison St., Suite 1800
Syracuse, New York 13202
Tel:  (315) 565-4546

A-1933

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                              Plaintiff,

         v.                                                    1:16-cv-00321-EAW-MJR

MARK STAMBACH

                          Defendants.

**DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED JURY INSTRUCTIONS**

**HODGSON RUSS LLP**
*Attorneys for Defendant Mark Stambach*
Hugh M. Russ, of counsel
Peter A. Sahasrabudhe, of counsel
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
**716.856.4000**

**A-1934**

Defendant, Mark Stambach, by and through his undersigned attorneys, submits the following objections to Plaintiff's proposed jury instructions (Dkt. No. 117).

**First Objection:**  Detective Stambach objects Plaintiff's Request to Charge 7 to the extent that it does not instruct that a "knowing" or "intentional" *mens rea* is required to rebut the presumption of probable cause created by an indictment.   (Dkt No. 117 at p. 12.)  The relevant authorities set forth that, to rebut the presumption of probable cause, a plaintiff must prove that a police officer forwarded "known false evidence" to prosecutors.  *Maganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010).

**Second Objection**: Detective Stambach objects to the portion of Plaintiff's Request to Charge 7 that summarizes and characterizes evidence that Plaintiff hopes to introduce during trial.  (Dkt. No. 117 at p. 113).  In this portion of his proposed charge, Plaintiff is using language the Court used in its summary judgment decision, which was written and rendered when the Court was viewing the evidence in a light most favorable to Plaintiff.  If the Court is going to summarize evidence for the jury, Detective Stambach submits that such a summary should be based on evidence that actually comes out at trial, and should be done in a more neutral manner so as not to give the impression that the Court has adopted Plaintiff's interpretation or view of the evidence.

**Third Objection:**  Detective Stambach objects to the portion of Plaintiff's Request to Charge 7 that does not instruct that a 'knowing' or "intentional" *mens rea* is required to prove malice.  (Dkt. No. 117 at p. 14).   To prove malice, Plaintiff is required to show that the misconduct attributed to Detective Stambach was done intentionally and was motivated by actual malice.  *Brown v. City of New York*, 306 F. Supp. 2d 473, 480 (E.D.N.Y. 2004).

**Fourth Objection**: Detective Stambach objects to Plaintiff's Request to Charge 9 to the extent that it does not contain language indicating that Fifth Amendment coercion cannot be found absent a finding that Defendant's conduct was the kind of "misbehavior that shocks the sensibilities of civilized society." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998). This inquiry is necessary for a finding of a Fifth Amendment violation and is necessary for the Court to determine the merits of Defendant Stambach's qualified immunity defense to Plaintiff's Fifth Amendment claim.

**Fifth Objection**: Detective Stambach objects to Plaintiff's Requests to Charge 10 to the extent that it does not provide an instruction on the issue of proximate cause and to the extent that it does not sufficiently define the concept of nominal damages in the absence of proximate causation.

**Sixth Objection**: Detective Stambach objects to Plaintiff's Request to Charge 10(b) to the extent that Plaintiff plans to offer evidence of harm to individuals or entities other than Plaintiff when the "evidence" of such harm constitutes mere allegations, as opposed to claims that have actually been substantiated.

**General Objection:** Detective Stambach generally objects to Plaintiff's proposed jury instructions to the extent that they materially differ from any of the proposed instructions submitted by Detective Stambach.

A-1936

Dated:      Buffalo, New York
             April 6, 2022

           **HODGSON RUSS** LLP
           *Attorneys for Defendant Mark Stambach*
           By: //s Peter A. Sahasrabudhe
                Hugh M. Russ, III
                Peter A. Sahasrabudhe
          The Guaranty Building
          140 Pearl Street – Suite 100
          Buffalo, New York  14202
          Telephone:  (716) 856-4000