# 23-0352

## United States Court of Appeals

*for the*

## Second Circuit

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## BRIEF FOR DEFENDANT-APPELLANT
## AND SPECIAL APPENDIX

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ....................................................................1

JURISDICTIONAL STATEMENT .............................................................3

STATEMENT OF THE ISSUES..................................................................4

STATEMENT OF THE CASE......................................................................9

    A.    Pre-Trial Procedural History ................................................9

        1.    The Amended Complaint ..........................................9

        2.    Defendants' Answer to the Amended Complaint ....................10

        3.    The District Court's Summary Judgment Decision.................10

    B.    The Trial .............................................................................12

        1.    The Parties' Stipulation............................................12

        2.    The Testimony of Detective Mark Lauber ...............13

        3.    The Testimony of Detective Mark Vaughn ..............14

        4.    The Testimony of Detective Sergeant James Lonergan ..........16

        5.    The Testimony of Detective Stambach...................17

        6.    The Testimony of Police Officer Edwin Torres ......................20

        7.    The Testimony of Josue Ortiz...................................22

        8.    The Testimony of Dr. Evelyn Coggins ....................23

        9.    The Testimony of Detective Mary Evans .................24

        10.    The Jury's Verdict.....................................................25

    C.    Detective Stambach's Post-Verdict Motions ......................25

i

## <u>TABLE OF CONTENTS - cont'd</u>

<u>PAGE</u>

D. The District Court's Decision and Order on Detective Stambach's Post-Verdict Motions .......................................................................26

SUMMARY OF ARGUMENT ...............................................................27

ARGUMENT ........................................................................................32

POINT I. THE DISTRICT COURT UPHELD THE VERDICT BASED ON A THEORY THAT WAS NOT PRESENTED TO THE JURY AT TRIAL ........................................................................................32

POINT II. ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO ESTABLISH HIS MALICIOUS PROSECUTION CLAIM .............33

A. The Evidence Conclusively Established that that Ortiz did Confess, which Created Probable Cause for his Prosecution ............................34

B. Ortiz Failed to Overcome the Presumption of Probable Cause Under the "Competing Testimony Plus" Test................................................38

1. Ortiz offered no evidence contradicting Detective Stambach's version of events ......................................................................39

2. The District Court erred in holding that the parties' stipulation was sufficient to overcome the presumption of probable cause .................................................................................................40

C. Detective Stambach is Entitled to Qualified Immunity on the Malicious Prosecution Claim ..............................................................43

POINT III. ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO ESTABLISH HIS DUE PROCESS FABRICATION OF EVIDENCE CLAIM ........................................................................................45

A. There is no Evidence that the Confession was Fabricated.................46

B. There is no Evidence that Detective Stambach Intentionally Misled the Prosecutors who Charged Ortiz with the Camacho Murders........48

ii

# TABLE OF CONTENTS - cont'd

PAGE

POINT IV.  ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO
ESTABLISH HIS FIFTH AMENDMENT COERCION CLAIM .....49

    A.    There is no Evidence of Coercive Tactics by Detective Stambach ....50

    B.    Detective Stambach is Entitled to Qualified Immunity on Ortiz's Fifth
Amendment Coercion Claim.................................................................53

POINT V.  THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT
AS A MATTER OF LAW IN FAVOR OF DETECTIVE
STAMBACH ON THE ISSUE OF PUNITIVE DAMAGES ...........54

POINT VI.  IN THE ALTERNATIVE THE DISTRICT COURT ERRED IN
DENYING DETECTIVE STAMBACH'S MOTION FOR A NEW
TRIAL ....................................................................................................55

POINT VII.  THE DISTRICT COURT ERRED IN DENYING DETECTIVE
STAMBACH'S MOTION FOR REMITTITUR ...............................57

CONCLUSION .........................................................................................59

iii

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Cases**

*Atkins v. City of New York*,
    143 F.3d 100 (2d Cir. 2002) ........................................................32, 55

*Bennett v. Vidal*,
    267 F. Supp. 3d 487 (S.D.N.Y. 2017) ...............................................46

*Bermudez v. City of New York*,
    790 F.3d 368 (2d Cir. 2015) ............................................................35

*Blackmon v. Holder*,
    20-CV-524, 2022 WL 329256 (E.D.N.C. 2022), *appeal dismissed
    on other grounds*, 2023 WL 3863091 (4th Cir. Jun. 2023) ...................46, 47, 48

*Bonds v. City of New York*,
    No. 12-cv-1772, 2014 WL 2440542 (E.D.N.Y. May 2014) ........................38, 39

*Boyd v. City of New York*,
    336 F.3d 72 (2d Cir. 2003) ....................................................34, 38, 40

*Brady v. Maryland*,
    373 U.S. 83 (1963).........................................................................9, 11

*Brown v. City of New York*,
    No. 08-cv-5095, 2013 WL 1338785 (E.D.N.Y. Apr. 1, 2013)....................39, 40

*Colorado v. Connelly*,
    479 U.S. 157 (1986).........................................................................50

*Conte v. Emmons*,
    895 F.3d 168 (2d Cir. 2018) ..........................................33, 34, 45, 49

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,
    532 U.S. 424 (2001).........................................................................54

iv

## TABLE OF AUTHORITIES - cont'd

PAGE

*Dancy v. McGinley*,
    843 F.3d 93 (2d Cir. 2016) ................................................................57

*Dassey v. Dittmann*,
    877 F.3d 297 (7th Cir. 2017) ...........................................................44

*DeShawn E. by Charlotte E. v. Safir*,
    156 F.3d 340 (2d Cir. 1998) .............................................................50

*Farrior v. Waterford Bd. of Educ.*,
    277 F.3d 633 (2d. Cir. 2002) ...........................................................56

*Garnett v. Undercover Officer C0039*,
    838 F.3d 265 (2d Cir. 2016) .............................................................46

*Holeman v. City of New London*,
    425 F.3d 184 (2d Cir. 2005) .............................................................43

*King v. City of New York*,
    No. 99-cv-3669, 2007 WL 959696 (E.D.N.Y. Mar. 30, 2007) ...................51, 52

*Kirsch v. Fleet St. Ltd.*,
    148 F.3d 149 (2d Cir. 1998) .............................................................57

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996) .............................................................54

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009)...............................................................59

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2010) .............................................................44

*McClennon v. City of New York*,
    13-CV-128, 2018 WL 2943565 (E.D.N.Y. 2018) .............................................41

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006) .............................................................54

v

## TABLE OF AUTHORITIES - cont'd

PAGE

*Newton v. City of New York*,
　171 F. Supp. 3d 156 (S.D.N.Y. 2016) ........................................57, 58

*Pearson v. Callahan*,
　555 U.S. 223 (2009)...................................................................44, 53

*Peterson v. Regina*,
　935 F. Supp. 2d 628 (S.D.N.Y 2013) .........................................39, 40

*Pizarro v. City of New York*,
　14–CV–507, 2015 WL 5719678 (E.D.N.Y. 2015).......................41, 43

*Raedle v. Credit Agricole Indosuez*,
　670 F.3d 411 (2d Cir. 2012) ..............................................................56

*Ricciuti v. N.Y.C. Transit Authority*,
　124 F.3d 123 (2d Cir. 1997) ................................................41, 42, 43

*Sedunova v. City of New York*,
　13 CV 5262, 2015 WL 541408 (E.D.N.Y. 2015).............................35

*Sinclair v. Long Island R.R.*,
　985 F.2d 74 (2d Cir. 1993) ..........................................................32, 33

*Sulkowska v. City of New York*,
　129 F. Supp. 2d 274 (S.D.N.Y. 2001) ..............................................54

*Thomsen v. City of New York*,
　15-cv-2668, 2016 WL 590235 (S.D.N.Y. 2016) (Cote, J.) ..............35, 36, 37, 44

*United States v. Mack*,
　17-cr-6159, 2018 WL 8898465 (W.D.N.Y. 2018) ...........................50

*Washington v. Buraker*,
　322 F. Supp. 2d 702 (W.D. Va. 2004), *aff'd* 407 F.3d 274 (4th Cir.
　2005) ...........................................................................................*passim*

vi

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Williams v. County of Westchester*,
 171 F.3d 98 (2d Cir. 1999) ...................................................................34

**Statutes**

28 U.S.C.A. §§ 1291 and 1293 ...........................................................3

28 U.S.C. § 1331 ..................................................................................3

42 U.S.C. § 1983 ...........................................................................*passim*

**Other Authorities**

Fifth Amendment ........................................................................*passim*

Fed. R. Civ. P. 50(a)...........................................................................25

Fed. R. Civ. P. 50(b) ..........................................................3, 4, 25, 33

Fed. R. Civ. P. 59(e)...............................................................3, 25, 57

Fed. R. App. P. 4.................................................................................4

## PRELIMINARY STATEMENT

Although he did not commit the crime, Josue Ortiz confessed to the double homicide of Nelson and Miguel Camacho in November of 2004. There has never been any evidence which even suggests that Ortiz did not confess to the murders. Ortiz himself has never once denied that he confessed. In addition to his confession, Ortiz voluntarily pled guilty to the double homicide. Then a decade later when the crime was being re-investigated, Ortiz testified, under oath, that he did kill both men.

That the 2014 re-investigation of the Camacho murders revealed the three true perpetrators of the crime is no doubt sensational. Especially considering that, when questioned by the individuals re-investigating the crime, Ortiz initially maintained that he was in fact responsible for the murders. The law enforcement personnel and attorneys who uncovered the identity of the three true perpetrators deserve to be commended. And, we can all agree the reversal of Ortiz's conviction and his release from incarceration was a just outcome given the newly uncovered evidence obtained a decade after his confession. But the fact that a re-investigation revealed Ortiz's innocence does not automatically condemn the work of the police officers who took Ortiz's confession and arrested him in 2004. More to the point, that Ortiz was later determined to be innocent is not *prima facie* evidence of

heinous constitutional misconduct on the part of the homicide detective who took Ortiz's confession.

But that is what the District Court held in this matter. In sustaining the jury's verdict, the District Court held that the jury was permitted to infer that Detective Mark Stambach maliciously prosecuted Ortiz, fabricated evidence against him, and coerced him in violation of his Fifth Amendment rights simply by virtue of Ortiz's later-revealed innocence. In its Decision and Order upholding a $6,500,000 verdict rendered against Detective Stambach, the District Court expressly acknowledged that the only evidence supporting the jury's verdict was a pre-trial stipulation between the parties setting forth that Ortiz was exonerated based on the 2014 re-investigation.

The District Court's rationale in upholding the jury's verdict contradicts applicable precedent. To succeed, Ortiz was required to adduce actual evidence of constitutional misconduct by Detective Stambach. By holding that Ortiz could establish such misconduct without introducing any evidence other than a stipulation setting forth that he was ultimately found innocent, the District Court confirmed a jury verdict which was based entirely on sympathy and speculation. Sympathy and speculation, however, cannot be a substitute for actual evidence –

particularly when a retired police officer is being accused of reprehensible and unconstitutional conduct. Because ***the evidence*** adduced at trial does not begin to establish any unconstitutional misconduct on the part of Detective Stambach, the judgment entered in favor of Ortiz must be reversed. At the very least, this matter must be remanded to the District Court for a new trial.

### JURISDICTIONAL STATEMENT

The complaint in this action asserted multiple claims brought pursuant to federal law, and the three claims which survived summary judgment were federal claims. A-51-54. For these reasons, the District Court had federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

In this appeal, Appellant Mark Stambach challenges a final Decision and Order issued by the Honorable Elizabeth A. Wolford, Chief Judge of the United States District Court for the Western District of New York. Judge Wolford's Decision and Order denied Detective Stambach's post-trial motion brought pursuant to Fed. R. Civ. P. 50(b), 59(a), and 59(e), and partially granted the motion brought by Appellee Josue Ortiz for § 1988 attorneys' fees. Because Detective Stambach appeals from a final decision issued within the Western District of New York, this Court has appellate jurisdiction over this matter under 28 U.S.C.A. §§ 1291 and 1293.

3

Judge Wolford's Decision and Order was rendered on February 17, 2023. Detective Stambach filed a Notice of Appeal of Judge Wolford's Decision and Order on March 10, 2023. Detective Stambach's Notice of Appeal was timely under Rule 4 of the Federal Rules of Appellate Procedure, as it was filed within thirty days of Judge Wolford's determination of a Fed. R. Civ. P. 50(b) motion. This brief satisfies the prior order of this Court which set a June 23, 2023 deadline for Detective Stambach to file his appeal. (Dkt. No. 31).

## STATEMENT OF THE ISSUES

1. A District Court may not sustain a jury verdict based upon a theory which was neither presented nor argued to a jury. In sustaining the jury's verdict in this matter, the District Court theorized that Detective Stambach coerced Ortiz into confessing to the Camacho murders and that ***Ortiz subsequently repeated the confession in Spanish to a patrol officer named Edwin Torres later that evening.*** This theory was never presented to the jury at trial. Under these circumstances, did the District Court have a proper basis to uphold the jury's verdict?

2(a). A sworn confession creates probable cause for an arrest and prosecution, even if later the confession is determined to be false. Here, the evidence at trial established that Ortiz made a sworn statement confessing to the murder of Nelson and Miguel Camacho. The sworn confession was witnessed by

4

three police officers.  The District Court's decision even acknowledges that Ortiz confessed.  Was there probable cause for Ortiz's arrest and prosecution, which would be a complete defense to Ortiz's malicious prosecution claim?

2(b).   This Circuit applies the "competing testimony plus" test to determine whether a plaintiff has rebutted the presumption of probable cause created by a grand jury indictment.  Under this test, a plaintiff must do more than offer his own testimony of bad faith police misconduct.  A plaintiff must offer his own testimony or the testimony of another witness ***and offer additional corroborating evidence in addition to that testimony***.  Here, no testimony even remotely contradicted Detective Stambach's account of Ortiz's confession. Did Ortiz adduce sufficient evidence to overcome the presumption of probable cause under the "competing testimony plus" test?

2(c).   In 2004, no clearly established authority prohibited a police officer from using tactics during an investigation which might cause an individual to adopt a particular version of events –including a confession.  Recent authority from federal courts suggests that such conduct is in fact permissible.  Even accepting as true the District Court's premise that Detective Stambach engaged in

tactics which caused Ortiz to adopt and repeat a confession, is Detective Stambach nonetheless entitled to qualified immunity on Ortiz's malicious prosecution claim?

3(a).   Police officers may be held civilly liable for "fabrication of evidence" when they intentionally manipulate and mislead a prosecutor to bring criminal charges against an individual through the falsification of evidence.  Here, Ortiz's prosecution for the Camacho murders was based on his sworn confession. But there was no evidence introduced at trial even suggesting that the sworn confession was fabricated or made up by Detective Stambach –since two other witnesses confirmed that the sworn confession was in fact given by Ortiz.  Did Ortiz adduce sufficient evidence at trial to sustain his due process "fabrication of evidence" claim?

3(b).   To be held liable for "fabrication of evidence," a police officer must be shown to have intentionally misled the prosecutor who ultimately decides to bring criminal charges.  But Ortiz adduced no evidence that Detective Stambach interacted with any prosecutor at all.   Did Ortiz adduce sufficient evidence to sustain his "fabrication of evidence" claim notwithstanding that Ortiz presented no evidence of Detective Stambach encouraging a prosecutor to bring charges?

6

4(a).   A police officer's mere knowledge that a person he is interrogating suffers from mental illness is insufficient to establish the officer's individual liability for a Fifth Amendment violation.  In order to hold a police officer civilly liable for a Fifth Amendment violation, it must be shown that the officer employed interrogation tactics which were specifically designed to exploit that individual's mental illness.  Here, Ortiz introduced no evidence that Detective Stambach employed interrogation techniques designed to exploit his mental illness. Did Ortiz adduce sufficient evidence to establish his Fifth Amendment coercion claim against Detective Stambach?

4(b).   There is no federal authority establishing that a police officer may be held personally liable for a Fifth Amendment violation where the only evidence of "coercive" interrogation tactics is the officer's knowledge that the person he is questioning suffers from a mental illness.  Here, the only support for Ortiz's Fifth Amendment claim was evidence that Detective Stambach may have observed that Ortiz was suffering from mental illness at the time of his confession. Is Detective Stambach entitled to qualified immunity on Ortiz's Fifth Amendment claim?

7

5. In order to establish entitlement to punitive damages, a plaintiff must show that the defendant engaged in reprehensible conduct which was motivated by an evil intent. But there was no evidence of reprehensible conduct or an evil motive by Detective Stambach. The evidence showed only that Detective Stambach took a voluntary confession given by Ortiz. Did Ortiz adduce sufficient evidence to establish entitlement to punitive damages?

6. A motion for a new trial should be granted where a jury's verdict is against the weight of the evidence. At trial, there was no evidence –none– supporting Ortiz's claim that Detective Stambach engaged in bad faith misconduct. The only evidence established that Detective Stambach took a sworn confession given by Ortiz, and that the confession was procedurally proper in all respects. Should the District Court have granted Detective Stambach's motion for a new trial?

7. Given that there was no actual evidence of conscious wrongdoing on the part of Detective Stambach, and no detailed testimony specifying any economic damages or emotional distress suffered by Ortiz, did the District Court err in its decision to deny Detective Stambach's motion for remittitur?

8

## STATEMENT OF THE CASE

**A.    Pre-Trial Procedural History**

   1.    The Amended Complaint

Ortiz commenced this action in 2016, but subsequently amended his complaint on March 27, 2019 after being granted leave to amend.  A-34-55. Ortiz's amended complaint asserted five causes of action against multiple defendants.  A-51-54.  The defendants named in the amended complaint were: Richard Wagstaff, Mary Gugliuzza, twelve unidentified BPD officers, the City of Buffalo, the Buffalo Police Department, Mark Vaughn, and Detective Stambach. A-34-35.

Ortiz brought five causes of action were each brought under 42 U.S.C. § 1983, and all causes of action were asserted against each of the named defendants.  A-51-54.  The five causes of action asserted in the amended complaint were: false arrest/false imprisonment; malicious prosecution; an alleged violation of Ortiz's Fifth Amendment right against self-incrimination; an alleged violation of Ortiz's due process right to be free from fabrication of evidence; and, an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  A-51-54.

Ortiz's amended complaint generally alleged that he was wrongfully convicted for the double homicide of Nelson and Miguel Camacho.  In essence,

Ortiz alleged that each of the named defendants violated his constitutional rights thereby leading to his conviction for the Camacho murders.

2.    Defendants' Answer to the Amended Complaint

Defendants filed an answer to the amended complaint on April 15, 2019.  A-56-79.  As relevant here, Defendants asserted qualified immunity as an affirmative defense.  A-73-74.   Defendants ultimately did not object to the District Court's decision not to ask the jury special interrogatories on the issue of qualified immunity.  However, Defendants, including Detective Stambach, have never withdrawn their qualified immunity defense.   Another affirmative defense asserted by Defendants was that there was probable cause for Ortiz's arrest and prosecution.  A-73.

3.    The District Court's Summary Judgment Decision

After the close of discovery, Defendants moved for summary judgment on each of Ortiz's five claims.  A-80-81.  On February 26, 2021, the District Court issued a Decision and Order which granted in part and denied in part Defendants' motion for summary judgment.  A-1800-36.  The District Court granted summary judgment as to all five claims against Richard Wagstaff, Mary Gugliuzza, twelve unidentified BPD officers, the City of Buffalo, the Buffalo

10

Police Department, and Mark Vaughn. Accordingly, each of those defendants was dismissed from the case. A-1835-36.

As to Detective Stambach, the District Court held that summary judgment was warranted in his favor on Ortiz's *Brady* claim and false arrest/imprisonment claim. A-1835. The District Court held, however, that there were triable issues of fact with respect to Ortiz's malicious prosecution claim against Detective Stambach. In denying summary judgment in favor of Detective Stambach on the malicious prosecution claim, the District Court held that Ortiz had "pointed to evidence from which a rational jury could conclude that Stambach knew that the confession he had extracted from [Ortiz] was false and that he nonetheless used it to set [Ortiz's] prosecution in motion." A-1826 (emphasis added). The District Court also denied summary judgment as to Detective Stambach on Ortiz's due process fabrication of evidence and Fifth Amendment claims. A-1833-34. The District Court's basis for denying summary judgment in favor of Detective Stambach on those two claims was that "Defendants offered no arguments specific to those claims." A-1833.

Accordingly, three of Ortiz's claims were permitted to proceed to trial against Detective Stambach only: (1) the malicious prosecution claim; (2) the due

11

process fabrication of evidence claim; and (3) the Fifth Amendment claim.  A-1835.

**B.    The Trial**

   1.    <u>The Parties' Stipulation</u>

        The initial evidence introduced to the jury were certain facts which the parties stipulated to prior to trial.  As relevant here, the parties stipulated that Ortiz was indicted for the murder of Nelson and Miguel Camacho, which took place on November 11, 2004 on the west side of the City of Buffalo.  A-2019.  The parties further stipulated that Ortiz was convicted of two counts of manslaughter in the first degree in connection with the Camacho murders after he pled guilty to those charges on March 22, 2006. A-2020.  The parties further stipulated that, on June 16th, 2006, Ortiz was sentenced to a term of imprisonment of twenty-five years after he entered his guilty plea.  A- 2019.  Further, the parties stipulated that Ortiz was incarcerated from November 17, 2004 to December 9, 2014.  (*Id.*).

        The parties also stipulated that the United States Attorney's Office for the Western District of New York, the New York State Police, and the Buffalo Police Department conducted a joint re-investigation of the Camacho murders in or around 2014.  A-2020.  The parties further stipulated that, ***as a result of the re-investigation***, those law enforcement agencies determined that Ortiz was not

12

involved with the Camacho murders. (*Id.*) (emphasis added). Finally, the parties stipulated that, as a result of the re-investigation, three other individuals were determined to be the perpetrators of the Camacho murders. (*Id.*). Ortiz's conviction was vacated and he was released from custody in December of 2014. (*Id.*).

       2.     The Testimony of Detective Mark Lauber[1]

      In November of 2004, Mark Lauber was a detective in BPD's Major Crimes Unit ("MCU"), which was the unit primarily responsible for investigating the Camacho murders. A-2505. On November 15, 2004, the MCU was still investigating the Camacho murders, as only four days had passed since the murders had been committed. A-2902. During the afternoon of November 15, 2004, Detective Lauber received word from a patrol officer that an individual had climbed into a police car and claimed to have information about the Camacho murders. A-2511-12, A-2515. With the assistance of a Spanish-speaking patrol officer, Detective Lauber interviewed the individual who had jumped into the

---

[1]    Witnesses were called at trial based upon their availability. The testimony is presented described here to demonstrate the actual chronological order of relevant events as opposed to the order in which evidence was presented at trial.

police car, who Detective Lauber subsequently identified as Josue Ortiz. A-2513, 2902.

Upon speaking with Ortiz, Detective Lauber determined that Ortiz was under the obvious influence of marijuana and was not making sense. A-2513-16, 2902. Detective Lauber further determined that Ortiz had no credible information to give regarding the Camacho murders at that moment. A-2514, A-2516. Detective Lauber offered to call Ortiz an ambulance if Ortiz wished to receive medical care. A-2514-15, 2902. Ortiz agreed to seek medical care and voluntarily went to Buffalo General Hospital in an ambulance. A-2515, 2902.

Although Ortiz did not relay any relevant information at the time of this interaction, Detective Lauber testified that Ortiz was nonetheless "on the radar" as someone who may have information about the Camacho murders. A-2516. Detective Lauber memorialized his interaction with Ortiz in a police report, but did not have any conversations with Detective Stambach regarding the interaction. A-2507-08, 2902.

3. The Testimony of Detective Mark Vaughn

Mark Vaughn was also a detective with the MCU in November of 2004. A-2192-93. Detective Vaughn testified that, during the evening of

14

November 15, 2004, he received a call at the MCU office. A-2202, 2910-11. An individual who worked at Buffalo General Hospital relayed that a patient in the hospital's psychiatric unit claimed to have information on the Camacho murders. A-2202, 2910-11. Detective Vaughn was not aware of Detective Lauber's prior interaction with Ortiz that afternoon. A-2209-10, A-2212-13.

Upon receiving the call, Detective Vaughn drove to Buffalo General Hospital with his partner, Detective James Lema and their supervisor, Detective Sergeant James Lonergan. A-2201-04, 2910-11. Upon arriving at Buffalo General Hospital, the three detectives learned that the individual who claimed to have information on the Camacho murders was Josue Ortiz. A-2202; 2910-11. Detective Vaughn was also accompanied by a patrol officer named Edwin Torres, who was called in to help translate due to the fact that he was fluent in Spanish. A-2203; 2910-11. According to Detective Vaughn, the three MCU detectives determined that Spanish was Ortiz's first language and they summoned Torres. A-2203.

After speaking with Ortiz through Officer Torres, Detective Vaughn determined that Ortiz did not have any relevant information to give at that time. A-2205-06. Detective Vaughn, however, observed that Ortiz was able to

15

effectively communicate with Officer Torres, and that Ortiz did not appear to be in a manic or psychotic state. A-2223-25. Detective Vaughn testified that, in his many years spent in law enforcement, he had encountered many individuals suffering from severe psychological distress. A-2223. However, Ortiz did not appear to Detective Vaughn to be suffering from such a condition. A-2223-2224. Detective Vaughn did not discuss with Detective Stambach what had taken place during his discussions with Ortiz. A-2851.

4.    The Testimony of Detective Sergeant James Lonergan

Detective Sergeant James Lonergan was assigned to the MCU in November of 2004. A-2230. At the time, Detective Sergeant Lonergan was Detective Stambach's direct supervisor. A-2232. He was also Detective Vaughn's direct supervisor. (*Id.*). Detective Sergeant Lonergan testified that he was present with Ortiz when he was interviewed at Buffalo General Hospital on November 15, 2004. A-2249; 2255

Detective Sergeant Lonergan also testified that, the next day, on November 16, 2004, he received a call from two patrol officers who claimed that an individual was confessing to the Camacho murders. A-2259. At the time, Detective Sergeant Lonergan did not realize that the individual the patrol officers were describing was Ortiz, but Detective Sergeant Lonergan recognized Ortiz

16

when the patrol officers brought him to the MCU's offices in Downtown Buffalo. A-2263.  After Ortiz was interviewed for a brief time by Detective Stambach, Detective Sergeant Lonergan witnessed a formal statement given by Ortiz which began at 9:00 p.m. on November 16, 2004. A-2267-68; 2912-14. In his formal statement, Ortiz confessed to the Camacho murders. A-2268; 2912-14.  Detective Sergeant Lonergan witnessed the signatures on Ortiz's confession, one of which was given by Ortiz himself.  A-2267-69; 2914.  The other signature was given by Officer Torres, who had again been called in to translate for Ortiz.  A-2371; 2914. After witnessing the confession, Detective Sergeant Lonergan agreed that Ortiz should be arrested and charged with the Camacho murders.  A-2267-69; 2280

> 5.  The Testimony of Detective Stambach

Detective Stambach was assigned to the MCU in November of 2004. A-2299-300.  His first involvement in the investigation of the Camacho murders was the evening of November 16, 2004.  A-2310.  Detective Stambach testified that, on that evening, a call came through to the MCU office from two patrol officers.  A-2311; A-2902. The patrol officers stated that an individual was confessing to the Camacho murders.  A-2092.  Those same patrol officers then brought Ortiz into the MCU's office.  A-2335.  Detective Stambach played no role in transporting Ortiz to the police station on the evening in question.  A-2313.

17

After Ortiz arrived at the MCU headquarters, Detective Stambach interviewed him in the office of an off-duty supervisor for approximately forty minutes. A-2335-36; 2902. During this forty-minute conversation, Ortiz made statements which implicated himself as the perpetrator of the Camacho murders. (*Id.*). Ortiz voluntarily offered information tending to show he was involved in the murders in response to non-leading, open-ended questions by Detective Stambach. A-2335-36; 2378; 2902.

Because Stambach's interview revealed that Ortiz was a native of Puerto Rico and that his first language was Spanish, Stambach called for the assistance Officer Torres to ensure that there were no issues with communication once Ortiz was to deliver a sworn, *Mirandized* statement. A-2350; 2902. After Officer Torres arrived at MCU headquarters, he read Ortiz his *Miranda* rights in Spanish. A-2334; 2902; 2915. Ortiz was then given food from McDonalds. A-2334; 2902. After Ortiz had been given food, his formal sworn statement commenced at approximately 9:00 p.m. (*Id.*).

During Ortiz's formal, *Mirandized* interview, Detective Stambach asked questions, which Officer Torres translated. A-2370. Sometimes, Ortiz did not need Torres to translate, and he would simply respond to Detective Stambach's

18

question in English.  (*Id.*).  Based on Ortiz's answers to his questions and Torres's translation, Detective Stambach typed Ortiz's confession.  A-2370; 2912-2914.

After the confession was transcribed, Officer Torres, Detective Stambach, and Ortiz added their initials to each page of the confession.  A-2371-73, 2912-2914.  Officer Torres and Ortiz also signed the confession, along with Detective Sergeant Lonergan, who gave his signature as well.  (*Id.*).

According to Detective Stambach, Ortiz did not exhibit any behavior which led him to suspect that Ortiz was suffering from a mental health crisis.   A-2373-74.  Detective Stambach found Ortiz's confession to be credible, and he believed after the confession that Ortiz was involved in the Camacho murders. A-2379, 2382-83.

After Detective Stambach took the confession, he followed protocol and notified the Erie County District Attorney's Office about the statement.  A-2381-82.  An Assistant District Attorney later instructed Detective Stambach to charge Ortiz with the Camacho murders based on the confession.  (*Id.*).  No evidence was introduced, however, of Detective Stambach encouraging a prosecutor to bring charges against Ortiz or trying to convince the prosecutor that Ortiz was in fact guilty.  A-2385-86.

19

Detective Stambach did not close the investigation file for the Camacho murders after Ortiz's confession. A-2382-83. In fact, Detective Stambach testified that the investigation remained open after Ortiz had confessed. (*Id*.).

      6.    <u>The Testimony of Police Officer Edwin Torres</u>

Officer Torres was a BPD patrol officer in November of 2004. A-2600-01. He grew up speaking Spanish, could easily switch back and forth between Spanish and English, and was effective at translating for Spanish speakers throughout his career as a police officer. A-2656; A-2658.

Officer Torres testified that, on November 16, 2004, he was called into the office of the MCU, where he translated Ortiz's sworn confession. A-2628; A-2666-68; A-2912-14; A-1461-62. During the entirety of the process, Officer Torres had no problems understanding Ortiz and Ortiz had no problems understanding him. A-2663-64.

Officer Torres read Ortiz his *Miranda* rights from a Spanish *Miranda* card. A-2915. Officer Torres testified that both he and Ortiz signed the *Miranda* card. A-2665-66. Ortiz appeared to understand his rights. A-2665. Officer

Torres would not have signed the card if he felt that Ortiz did not understand what had been read to him. A-2665.

After Ortiz gave a formal statement confessing to the Camacho murders, Officer Torres reviewed every page of the confession and added his initials to each page. A-2666-67. Officer Torres also signed the confession. A-2914-15. He testified that he would not have added his initials or signature if he had any doubts about the accuracy of the written confession. A-2667-68.

Officer Torres testified that he left the confession convinced that Ortiz had committed the Camacho murders. A-2668-69. He was convinced by Ortiz's statement, and not by anything that Detective Stambach did or said. A-2669.

Officer Torres testified that Detective Stambach's demeanor was professional during the entire confession. A-2669-70. According to Officer Torres, Detective Stambach did not raise his voice to Ortiz or do anything that could be described as manipulative or coercive. A-2669-70; A-2670-71. Officer Torres testified that Detective Stambach accurately transcribed Ortiz's statement. Detective Stambach did not fabricate any part of the statement. A-2670.

21

In concluding his testimony, Officer Torres certified that there was nothing improper or inappropriate about the confession given by Ortiz on November 16, 2004.  A-2674-75.

7.  <u>The Testimony of Josue Ortiz</u>

Ortiz did not testify about Detective Stambach's conduct at all.  A-2152-79; A-2393-2465.  Ortiz told the jury that he did not remember his interactions with Detective Stambach or any other member of the Buffalo Police Department before his arrest and conviction. A-2164; A-2435.  Ortiz attributed his inability to remember his interactions with BPD to what he claimed was his "first psychotic break."  A-2164-66; A-2169; A-2441; A-2457-58.

Ortiz confirmed that he signed a *Miranda* waiver card that was read to him. A-2915; A-2436-38.  He further admitted his signature is present on his sworn statement confessing to the Camacho murders. A-2912-14; A-2438-41.  In addition, Ortiz confirmed that he pled guilty to the Camacho murders despite being represented by two highly respected defense lawyers.  A-2442.  Ortiz made the decision to plead guilty even after his alleged psychological distress had subsided.  A-2442-45.  Further, Ortiz also confirmed that he testified in front of a federal grand jury that he was responsible for the Camacho murders --approximately seven years after his initial confession.   A-2453-54; A-2459-60.

22

8.    The Testimony of Dr. Evelyn Coggins

Dr. Evelyn Coggins did not give any testimony related to Detective Stambach.  A-2053-2131.  Her testimony offered nothing concerning Detective Stambach's involvement in the underlying investigation that led to Ortiz's conviction.  A-2053-2131.

Dr. Coggins testified that she first saw Ortiz on November 19, 2004, approximately three days after Ortiz's confession.  A-2066.  Dr. Coggins testified that she concluded Ortiz was schizophrenic and was in the middle of the onset of a psychotic break when she first evaluated him on November 19, 2004.  A-2077; A-2079; A-2904-05.  She further testified that, in her opinion, the psychotic break had been continuing for "some days."  A-2128.

Dr. Coggins acknowledged, however, that she could not testify as to Ortiz's exact mental state on November 16, 2004.  A-2131.  Nor could she say that Ortiz had not experienced "clarity" at the time or that Ortiz failed to understand his confession.  A-2119-2120.  Dr. Coggins also testified that, during Ortiz's criminal proceedings, she rendered an opinion that he was competent to stand trial.  A-2126.

23

9.    The Testimony of Detective Mary Evans

Detective Mary Evans eventually re-evaluated the Camacho murders in connection with information she received when investigating gang activity on the west side of Buffalo.  A-2476.  Detective Evans did not offer any testimony regarding Detective Stambach's investigative involvement with Ortiz in 2004.  A-2469-2502.  In fact, she testified that her careful review of the investigation file for the Camacho murders years later did not reveal any misconduct by Detective Stambach.  A-2500.

Detective Evans testified that, based on confessions and witness statements that were not available in 2004, she and other investigators eventually determined that Ortiz was not involved in the Camacho murders.  A-2500.  When Detective Evans first confronted Ortiz with the determination of his non-involvement, Ortiz refused to speak.  A-2499.  Only after considerable persuasion on her part did Ortiz finally admit that his 2004 confession was fraudulent.  A-2499.  Detective Evans offered no testimony regarding any information known to Detective Stambach at the time of Ortiz's confession that would have tended to suggest Ortiz's innocence.  A-2500.

24

10.    The Jury's Verdict

Based on the testimony described above and a few documentary exhibits, a jury found Detective Stambach liable on each of Ortiz's three remaining claims.  A-2760-66.  The jury awarded Ortiz $5,000,000 in compensatory damages and $1,500,000 in punitive damages.  (*Id.*)  In total, the jury issued a verdict in Ortiz's favor in the amount of $6,500,000.  (*Id.*)

C.    **Detective Stambach's Post-Verdict Motions**

At the close of Plaintiff's proof and all proof generally, Detective Stambach moved pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law on each of Plaintiff's three remaining claims as well as on the issue of punitive damages.  A-2675-76.  After Detective Stambach made this oral application, which was opposed by Ortiz, the District Court informed Detective Stambach that it intended to reserve decision on the motion.  A-2676-77.

After the jury rendered its verdict, Detective Stambach renewed his Rule 50 motion pursuant to Fed. R. Civ. P. 50(b).  A-2757, A-2846-2986, A-3071-3089.  Detective Stambach also moved in the alternative for a new trial pursuant to Fed. R. Civ. P. 59(a) and for remittitur pursuant to Fed. R. Civ. P. 59(e).  A-2757, A-2846-2986, A-3071-3089.

25

**D.** **The District Court's Decision and Order on Detective Stambach's Post-Verdict Motions**

The District Court denied Detective Stambach's post-trial motions in all respects. A-3112-3113. In upholding the jury's verdict and in denying Detective Stambach's Rule 50 motion, the District Court focused heavily on the parties' pre-trial stipulation. A-3117-3118, A-3094-96. Specifically, the District Court emphasized the fact that the parties had stipulated that Ortiz was determined to be innocent as a result of a re-investigation of the Camacho murders years after his arrest and conviction. (*Id.*).

The District Court reasoned that, based on the parties' pre-trial stipulation, a jury could infer that Detective Stambach coerced Ortiz into adopting the confession during the forty minutes the two were alone together on November 16, 2004. A-3118-3119, A-3095-96. If Ortiz was not involved in the murders, the District Court surmised, then the jury could infer that Detective Stambach manipulated Ortiz into adopting details of the crime which were not publicly known, which Ortiz then subsequently repeated in Spanish to Officer Torres. (*Id.*). According to the District Court, if the jury made these findings based on the parties' pre-trial stipulation, the jury was entitled to find Detective Stambach liable on each of Ortiz's three remaining claims. A-3117-3119.

26

Notably, counsel for Ortiz never once argued to the jury that Detective Stambach coerced Ortiz into adopting non-public facts which Ortiz then repeated to Officer Torres in Spanish. A-2928-2932. That theory or explanation of the events leading up to Ortiz's arrest and conviction was never put to the jury. (*Id.*).

In addition to denying Detective Stambach's Rule 50 motion, the Court also denied Detective Stambach's motion for a new trial and motion for remittitur. A-3128-34, A-3158. The District Court also granted in part and denied in part Ortiz's application for § 1988 attorneys' fees. A-3158.

## SUMMARY OF ARGUMENT

1. The District Court erred in upholding the jury's verdict based on a theory that was not presented at trial. Ortiz never argued to the jury that he was coerced to adopt a confession by Stambach which he then later repeated in Spanish to Officer Torres. The District Court's decision to sustain the jury verdict based upon a theory that the jury did not hear trial requires, at the very least, that this matter be remanded back to the District Court for a new trial.

2(a.) The District Court erred in denying Detective Stambach's motion for judgment as a matter of law on Ortiz's malicious prosecution claim. Because the uncontradicted evidence established that Ortiz confessed to the

27

Camacho murders, there was probable cause for Ortiz's arrest and prosecution. Federal courts which have dealt with this issue have all held that a sworn confession creates probable cause, even if it turns out later on that the confession is untruthful or inaccurate. For this simple reason, Detective Stambach was entitled to judgment as a matter of law on the malicious prosecution claim.

       2(b.) Detective Stambach was entitled to judgment as a matter of law on the malicious prosecution claim because Ortiz failed to adequately rebut the presumption of probable cause created by the grand jury indictment issued against him. To rebut the presumption of probable cause, Ortiz was required to offer testimony contradicting Detective Stambach's version of events *plus* corroborating evidence. Here, Ortiz offered no testimony which contradicted Detective Stambach, whose version of events was universally corroborated and unchallenged. Moreover, in previous false confession cases from within this Circuit, Courts have required far stronger evidence than that which was offered by Ortiz for a plaintiff to rebut the presumption of probable cause. Accordingly, the District Court erred in holding that the parties' stipulation as to Ortiz's innocence was alone sufficient for Ortiz to rebut the presumption of probable cause created by the grand jury indictment.

28

2(c.)  Even accepting the District Court's premise for upholding the jury's verdict on Ortiz's malicious prosecution claim, Detective Stambach is nonetheless entitled to qualified immunity on that cause of action.  In 2004, no federal authority which clearly prohibited bringing charges against an individual who had confessed to a crime where the confession was brought about by leading questions or manipulative tactics.  Thus, even though there is no evidence to support the District Court's theory for upholding the verdict on the malicious prosecution claim, Detective Stambach would nonetheless be entitled to qualified immunity were the District Court's theory supported by the evidence adduced at trial.

3(a.)  The District Court erred in denying Detective Stambach's motion for judgment as a matter of law on Ortiz's due process fabrication of evidence claim.  There was no evidence adduced at trial suggesting that Ortiz was prosecuted based on anything other than his sworn statement confessing to the Camacho murders.  Because the uncontradicted evidence at trial demonstrated that Ortiz did in fact confess to the Camacho murders, during his sworn, Detective Stambach was entitled to judgment as a matter of law on Ortiz's fabrication of evidence claim.

29

3(b.)  Detective Stambach was entitled to judgment as a matter of law on Ortiz's due process fabrication of evidence claim because Ortiz did not present any evidence that Detective Stambach intentionally misled the prosecutors who ultimately charged Ortiz with the Camacho murders.  The evidence showed only that, after reviewing the sworn confession, the prosecutor in charge of the case decided to go forward Ortiz's prosecution.  There was no evidence that Detective Stambach mischaracterized the confession or even discussed the confession at all with any prosecutor.  For this reason, Detective Stambach was entitled to judgment as a matter of law on Ortiz's due process fabrication of evidence claim.

4(a.)  The District Court erred in denying Detective Stambach's motion for judgment as a matter of law on Ortiz's Fifth Amendment coercion claim.  To meet his prima facie burden on his Fifth Amendment claim, Ortiz could not rely on the mere fact that he may have been suffering from mental illness at the time of his confession, especially because he did not remember the encounter. Ortiz was required to show that Detective Stambach employed tactics which were intentionally designed to exploit Ortiz's mental illness.  Because no such evidence was offered by Ortiz, Detective Stambach is entitled to judgment as a matter of law on the Fifth Amendment claim.

30

4b.   There is no federal authority holding that a defendant may be held individually liable for a Fifth Amendment violation based solely on the defendant's knowledge that an individual they questioned suffered from a mental illness.  For this reason, Detective Stambach is entitled to qualified immunity on Ortiz's Fifth Amendment claim.

5.   Because Ortiz adduced no evidence of conscious wrongdoing or reprehensible conduct on the part of Detective Stambach, Detective Stambach was entitled to judgment as a matter of law on the issue of punitive damages.  Punitive damages were not warranted, because the unchallenged evidence showed that Detective Stambach was motivated only by a desire to bring the perpetrator of the Camacho murders to justice.

6.   In the alternative, because the verdict was against the weight of the evidence, the District Court should have granted Detective Stambach's motion for a new trial.

7.   Given that there was no affirmative evidence of wrongdoing or misconduct by Detective Stambach, it was also error for the District Court to deny the motion for remittitur, especially in the absence of detailed evidence of economic injury or emotional distress.

31

## **ARGUMENT**

## **POINT I.  THE DISTRICT COURT UPHELD THE VERDICT BASED ON A THEORY THAT WAS NOT PRESENTED TO THE JURY AT TRIAL**

This Court applies an "abuse of discretion" standard when reviewing a district court's decision on a motion for a new trial brought pursuant to Fed. R. Civ. P. 59(a). *Atkins v. City of New York*, 143 F.3d 100, 102 (2d Cir. 2002). However, this Court will quickly remand a case for a new trial where a district court sustains a jury verdict based upon a theory of liability which was not presented at trial. *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77-78 (2d Cir. 1993) (holding that jury verdict issued in favor of plaintiff could not be upheld based on theory that was "never presented to the jury").

In denying Detective Stambach's post-trial motions, the District Court sustained the jury's verdict based upon the theory that Detective Stambach coerced Ortiz into adopting a confession–which Ortiz then repeated to Officer Torres in Spanish later the same evening during his sworn, *Mirandized* interview.  A-3118-19.  That theory, however, was never presented to the jury.  Ortiz's counsel never argued at trial that Ortiz repeated the confession in Spanish to Officer Torres after he was forced to adopt the confession by Detective Stambach.  Instead, Ortiz's

32

counsel argued that the entire confession was completely "manufactured" or made up.

Because the district court sustained the verdict based upon a theory never presented at trial, the Court must remand this matter for a new trial. *Sinclair*, 985 F.2d at 77-78 (setting forth remedy of new trial where verdict is sustained based on theory which was not presented to the jury). In other words, if the Court does not reverse the District Court's denial of Detective Stambach's Rule 50 motion for the reasons discussed in Points II-V *infra*, then at the very least a new trial is warranted. *Id.*

## POINT II. ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO ESTABLISH HIS MALICIOUS PROSECUTION CLAIM

In reviewing a district court's denial of a post-verdict Rule 50(b) motion for judgment as a matter of law, this Court applies the same standard of review that should be applied at the district court level. *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). In other words, this Court reviews the same trial record as the district court to determine whether the evidence was insufficient to permit a reasonable juror to have found in the non-movant's favor. *Id.* To make this determination, this Court looks to whether there is a "complete absence of evidence supporting the verdict such that the jury's findings could only have been

33

the result of sheer surmise and conjecture." *Id.* (citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997)); *see also Williams v. County of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999).

Applying this standard, this Court must overturn the jury's finding of liability on Ortiz's malicious prosecution claim. The jury could not reasonably have concluded, based on the actual evidence presented, that probable cause for Ortiz's prosecution did not exist. The jury must have resorted to speculation and conjecture in concluding that Ortiz was able to rebut the presumption of probable cause created by the grand jury indictment which was issued against him. The District Court erred in holding otherwise. Detective Stambach was entitled to judgment as a matter of law on Ortiz's malicious prosecution claim.

## A. The Evidence Conclusively Established that Ortiz did Confess, which Created Probable Cause for his Prosecution

To recover on his claim for malicious prosecution, Ortiz had the burden to show that a prosecution was initiated against him, that it was brought with malice but without probable cause to believe that it could succeed, and that the prosecution terminated in his favor. *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). The existence of probable cause is an absolute defense to a claim

34

of malicious prosecution.  *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015).

Here, there was probable cause for Ortiz's prosecution because, as the District Court's decision even acknowledges –Ortiz confessed to the Camacho murders in front of Officer Torres.  A-3118-3119.  This acknowledgement that Ortiz did in fact confess to the crime dooms his malicious prosecution claim. *Sedunova v. City of New York*, 13 CV 5262, 2015 WL 541408, at \*3 (E.D.N.Y. 2015) (malicious prosecution dismissed where plaintiff could not plausibly allege that confession was not his own); *Thomsen v. City of New York*, 15-cv-2668, 2016 WL 590235, at \*7 (S.D.N.Y. 2016) (Cote, J.).

*Thomsen*, a decision issued from the Untitled States District Court for the Southern District of New York, is particularly instructive on this point.  There, a foreign teacher with a limited grasp of the English language was accused of engaging in illegal sexual acts with students at the school where he worked.  *Id.* at \*1-\*3.  Although the teacher had no memory of abusing children, he confessed to committing such abuse.  *Id.* at \*2.  He confessed in response to a detective's representation that there was a video depicting him abusing children at the school, even though no such video existed.  *Id.*  When the detective asked the teacher to

35

add detail to a written statement wherein the teacher confessed to the abuse, the

teacher complied.  *Id.*  Later, it was determined that the teacher was innocent.  *Id.*

at *3.  The District Attorney's office concluded that the detective interviewing the

teacher caused him to give a false confession to a serious crime when she lied

about the evidence she had against him.  *Id.*  As a foreigner who was unfamiliar

with the ways of our criminal justice system, the teacher was "particularly

vulnerable to this interrogation technique."  *Id.*

      Notwithstanding these facts, *Thompsen* nonetheless held that the

teacher's confession created probable cause for the teacher's prosecution, which

barred his subsequent claim for malicious prosecution.  *Id.* at *7-*8.  In dismissing

the teacher's malicious prosecution claim, Judge Cote explained:

> Probable cause existed to arrest and prosecute Thomsen,
> despite the fact that his prosecution was later dismissed
> because the DA Defendants determined that there was
> not sufficient evidence to support the case against him.
> Kefalas's report led Gomez to question Thomsen.
> Thomsen wrote out a clear, if hesitant, confession to
> sexual wrongdoing involving children. ***Although
> Thomsen is innocent of any inappropriate conduct
> involving children at IPS, Gomez at the time had
> sufficient facts available to her to render her decision to
> arrest Thomsen objectively reasonable***.

*Id.* at *7.

This case resembles *Thomsen*. Ortiz did in fact make a sworn confession to the Camacho murders during his sworn, *Mirandized* interview with Officer Torres present. A-3118-3119. Just like the teacher's confession in *Thomsen*, Ortiz's confession establishes probable cause and bars Ortiz from recovering on his malicious prosecution claim. Even if Detective Stambach employed manipulative tactics to get Ortiz to confess, which he did not, *Thomsen* teaches that Ortiz's confession nonetheless creates probable cause. When Ortiz was later determined to be innocent like the teacher was in *Thomsen*, this finding still does not vitiate the probable cause created by the confession. 2016 WL 590235, at *7

Under this precedent, the District Court's acknowledgment that Ortiz did in fact confess to the crime entitles Detective Stambach to judgment as a matter of law on Ortiz's malicious prosecution claim. Given the undisputed evidence that Ortiz confessed to the Camacho murders, no reasonable jury could have concluded that there was no probable cause to arrest and prosecute him. *Thomsen*, 2016 WL 590235, at *7. The District Court's denial of Detective Stambach's Rule 50 motion as to the malicious prosecution claim must therefore be reversed.

37

**B.** **Ortiz Failed to Overcome the Presumption of Probable Cause Under the "Competing Testimony Plus" Test**

Ortiz stipulated that he was indicted by a grand jury, which creates a presumption of probable cause, a presumption which was his burden to overcome for his malicious prosecution claim. *Bonds v. City of New York*, No. 12-cv-1772, 2014 WL 2440542, at *7 (E.D.N.Y. May 2014) (citing *Boyd*, 336 F.3d at 76); A-2019. To overcome the presumption of probable cause created by the grand jury indictment, Ortiz was required to prove that the indictment was secured by fraud, perjury, or other bad faith police conduct. *Boyd*, 336 F.3d at 77. Fraud and perjury have never been at issue in this case, and thus Ortiz was required to demonstrate "bad faith" by Detective Stambach.

In order to demonstrate the type of bad faith misconduct required to overcome the presumption of probable cause, Ortiz's proof had to meet the requirements of the of the "competing testimony plus" test announced in *Boyd, supra*. 336 F.3d at 76. Under that standard, because there was no testimony contradicting Detective Stambach's account of the confession, and because there was no other corroborating evidence of bad faith, Ortiz's malicious prosecution claim failed as a matter of law.

38

1.    Ortiz offered no evidence contradicting Detective Stambach's version of events

To show the type of bad faith conduct under the competing testimony plus test, a plaintiff must offer testimony which contradicts the account given by a law enforcement as to why the plaintiff was arrested or prosecuted.  *Bonds*, 2014 WL 2440542, at *7; *Brown v. City of New York*, No. 08-cv-5095, 2013 WL 1338785, at *4 (E.D.N.Y. Apr. 1, 2013) (citing *Simmons v. N.Y.C. Police Dep't*, 97 F. App'x 341, 343 (2d Cir. 2004)).  Mere suspicions about a police officer's misconduct are insufficient.  The plaintiff must point to some concrete testimony which demonstrates bad faith.  *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y 2013) (holding that plaintiff's "mere suspicions" were insufficient to overcome presumption of probable cause).

Here, neither Ortiz nor any other witness offered a version of events that contradicted the account given by Detective Stambach.  So Ortiz failed the first prong of the "competing testimony" plus test.  Ortiz claimed only not to remember the confession.  Neither he nor any other witness claimed that the he did not in fact give the confession.  In fact, no witness even offered that he or she had suspicions regarding Detective Stambach's conduct.  The only suspicions offered were through his counsel's arguments.  But those remarks do not constitute

39

evidence.  Reviewing this record, Ortiz offered even less proof than the other plaintiffs who also failed to rebut the presumption of probable cause as a matter of law.  *See Peterson*, 935 F. Supp. 2d at 643; *Brown*, 2013 WL 1338785, at *4.  For this reason alone, Ortiz's malicious prosecution claim failed, and Detective Stambach was entitled to judgment as a matter of law.

2. <u>The District Court erred in holding that the parties' stipulation was sufficient to overcome the presumption of probable cause</u>

Despite no witness contradicting Detective Stambach's account of the confession, the District Court held that the parties' stipulation alone was sufficient to overcome the presumption of probable cause. In reaching this conclusion, the District Court ignored this Court's ruling in *Boyd, supra.* 336 F.3d at 76.  In addition, the District Court ignored prior precedent setting forth the type of evidence sufficient to overcome presumption of probable cause "false confession" cases.

In *Boyd*, this Court emphasized that, in order to overcome the presumption of probable cause created by a grand jury indictment, a plaintiff must adduce corroborating evidence in addition to, or ***in combination with***, testimony which contradicts a police officer's account of an arrest or prosecution.  *Id.* at 77. District courts applying Boyd have held that the presumption of probable cause is

40

not overcome where a plaintiff cannot even raise "a simple conflict of stories." *McClennon v. City of New York*, 13-CV-128, 2018 WL 2943565, at *20 (E.D.N.Y. 2018). This reasoning makes good sense. The presumption of probable cause would effectively be rendered meaningless if it could be overcome without any witness actually contradicting or challenging the account given by a law enforcement officer. The District Court erred in holding hold that Ortiz adduced sufficient evidence to overcome the presumption of probable cause. Ortiz had to offer testimony in addition to any evidence which allegedly corroborated his claim that Detective Stambach engaged in bad faith misconduct. He did not.

The District Court further erred in failing to consider the type of evidence which has been held sufficient to rebut the presumption of probable cause in previous "false confession" cases within this Circuit. *Cf. Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 126-27 (2d Cir. 1997); *Pizarro v. City of New York*, 14–CV–507, 2015 WL 5719678, at *6 (E.D.N.Y. 2015) (presumption rebutted where plaintiff pled that officer forced him to write out a confession word-for-word and then subsequently lied about the circumstances of the confession to prosecutors). In *Ricciuti*, for example, the plaintiff who allegedly confessed to a crime was able to rebut the presumption of probable cause because both he and his relative affirmatively testified that the confession was fabricated and that he never

41

in fact confessed. 124 F.3d at 126. In addition, there was no notation of any kind which memorialized the confession in the notebook of an officer who was indisputably present at the time the plaintiff supposedly confessed. *Id.* The officer testified that it would have been his practice to make a note of the confession had such a statement actually been made in his presence. *Id.* Given that evidence, this Court held that the presumption of probable cause had been sufficiently overcome. *Id.*

This case could not be more different than *Ricciuti*. Unlike the situation in *Ricciuti*, no witness claimed that Ortiz did not confess to the Camacho murders –not even Ortiz. In fact, Ortiz even identified his signature on the confession. All three officers present for the confession testified it was freely given and that it was properly recorded in all respects. By contrast, *Ricciuti* demonstrates how far away Ortiz was from rebutting the presumption of probable cause. The District Court erred in holding that Ortiz could rebut the presumption of probable cause without any evidence.

The District Court compounded this error holding that the parties' stipulation regarding Ortiz's innocence was sufficient to rebut the presumption of probable cause. No federal court has ever held that a determination of innocence

42

*decades* after a confession and guilty plea is sufficient circumstantial evidence to rebut the presumption of probable cause. Rather, to rebut the presumption of probable cause, Ortiz needed to introduce evidence which was probative of Detective Stambach's conduct at the time charges were brought against Ortiz. *Ricciuti*, 124 F.3d at 126-27 (evidence related to officers' conduct at time of alleged confession); *Pizarro*, 2015 WL 5719678, at *6 (same). The parties' stipulation expressly stated that Ortiz's innocence was determined by a re-investigation of the Camacho murder which took place nearly a decade after the confession. The stipulation had no bearing on what Detective Stambach actually did in 2004 which led to Ortiz's conviction. The stipulation could not have been the jury's basis for determining that Ortiz had rebutted the presumption of probable cause. For this reason, Detective Stambach should have been granted judgment as a matter of law on Ortiz's malicious prosecution claim.

## C.   Detective Stambach is Entitled to Qualified Immunity on the Malicious Prosecution Claim

This Court determines whether qualified immunity is warranted under a *de novo* standard of review. *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (citing *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003)). A police officer is entitled to qualified immunity when his conduct does not violate

43

clearly established statutory or constitutional rights of which a reasonable person
would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Even accepting the District Court's rationale for upholding the jury's
verdict as true, Detective Stambach is nonetheless entitled to qualified immunity as
it relates to Ortiz's malicious prosecution claim. In 2004, no federal law prohibited
a police officer from employing tactics designed to get an individual to confess to a
crime. *See Thomsen*, 2016 WL 590235, at \*7. Even recent federal authority
suggesting that such tactics are constitutionally permissible. *Dassey v. Dittmann*,
877 F.3d 297, 304 (7th Cir. 2017) (noting that the Supreme Court "has held that
officers may deceive suspects through appeals to a suspect's conscience, by posing
as a false friend, and by other means of trickery and bluff"). Even if Detective
Stambach did in fact employ tactics that resulted in Ortiz's adopting a confession
which he then repeated to Officer Torres, Detective Stambach would nonetheless
be entitled to qualified immunity unless he lied to prosecutors regarding the
circumstances of the confession. *Cf. Manganiello v. City of New York*, 612 F.3d
149, 161-163 (2d Cir. 2010).

Given that there was no evidence adduced at trial suggesting that
Detective Stambach ever spoke with a prosecutor regarding Ortiz's confession,

44

Detective Stambach is entitled to qualified immunity. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (where a prosecutor exercises independent judgment in deciding to prosecute and is not misled by a police officer, no claim for malicious prosecution can be maintained). For this additional, independent reason, judgment should be entered in Detective Stambach's favor on Ortiz's malicious prosecution claim.

## POINT III. ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO ESTABLISH HIS DUE PROCESS FABRICATION OF EVIDENCE CLAIM

Regarding the District Court's denial of judgment as a matter of law to Detective Stambach on Ortiz's due fabrication of evidence claim, this Court applies the same standard of review as that which is described in Point II, *supra. Conte,* 895 F.3d at 171. Detective Stambach was entitled to judgment as a matter of law on this claim, because there was no evidence tending to show that Ortiz's confession was fabricated. Moreover, there is no evidence that Detective Stambach intentionally misled or manipulated the prosecutors who ultimately decided to bring charges against Ortiz regarding the circumstances of the confession.

45

**A.     There is no Evidence that the Confession was Fabricated**

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Bennett v. Vidal*, 267 F. Supp. 3d 487, 498 (S.D.N.Y. 2017) (citing *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003)). "In order to succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must prove by a preponderance of the evidence that the officer ***created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision.***" *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279-80 (2d Cir. 2016) (emphasis added). Here, Detective Stambach was entitled to judgment as a matter of law on Ortiz's fabrication of evidence claim because there is no evidence suggesting that the confession was fabricated.

Two decisions from outside of this Circuit are particularly instructive here. *Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004), *aff'd* 407 F.3d 274 (4th Cir. 2005); *Blackmon v. Holder*, 20-CV-524, 2022 WL 329256, at *3-*5 (E.D.N.C. 2022), *appeal dismissed on other grounds*, 2023 WL 3863091

46

(4th Cir. Jun. 2023). Both of these cases involved due process fabrication of evidence claims stemming from confessions given by individuals who turned out to be innocent. In both cases, the Court determined that a fabrication of evidence claim could not be maintained simply because the confession was untrue. For example, in *Washington*, the Court held that the truth or accuracy of the plaintiff's confession was not relevant. *See* 322 F. Supp. 2d at 712. So long as the record supported the conclusion that the plaintiff answered to questions posed and confessed to the crime, the accuracy of the confession was not relevant in determining the defendants' liability. *Id.* Similarly, in *Blackmon*, the Court held that a plaintiff could not rely on the fact that his confession turned out to be false. 2022 WL 329256 at *4. The court explained that the plaintiff could not maintain his claim absent a showing that the defendants actually misrepresented or mischaracterized his confession. *Id.* In other words, so long as the plaintiff actually adopted the words contained within his confession, he could not rely on the fact of his ultimate innocence to support his fabrication of evidence claim. *Id.*

        Under the principles announced in *Washington* and *Blackmon*, the District Court's decision must be reversed as it relates to Ortiz's fabrication of evidence claim. The District Court upheld the jury's verdict on the fabrication of evidence claim based solely on the parties' stipulation that Ortiz was ultimately

47

found innocent. But *Washington* and *Blackmon* teach that a plaintiff's innocence is insufficient to establish liability for fabrication of evidence. Under *Washington* and *Blackmon*, Ortiz was required to show that the confession which formed the basis for his prosecution was fabricated or made up by Detective Stambach. 2022 WL 329256 at *4; 322 F. Supp. 2d at 712. But Ortiz made no such showing. As the District Court expressly acknowledged, the evidence demonstrated that Ortiz did in fact confess to the Camacho murders. 3118-3119. For this simple reason, Detective Stambach is entitled to judgment as a matter of law on Ortiz's fabrication of evidence claim and the District Court should be reversed.

**B.     There is no Evidence that Detective Stambach Intentionally Misled the Prosecutors who Charged Ortiz with the Camacho Murders**

*Washington* and *Blackmon* also emphasize that, in the context of "false confessions," a defendant may be found liable only where he deliberately misrepresents the circumstances of the confession to a prosecutor. 322 F. Supp. 2d at 712 (comparing potential lability of two officers and holding that one officer could not be held liable where he did not misrepresent or lie about the circumstances of the confession); 2022 WL 329256 at *5 (dismissing fabrication of evidence claim where there was no claim that "defendants distorted or affirmatively mischaracterized plaintiff's confession or any record of it"). In this

48

case, Ortiz failed to present any evidence that Stambach made any representations regarding the confession to the prosecutors who ultimately brought charges against Ortiz. Without this showing, Detective Stambach was entitled to judgment as a matter of law on Ortiz's fabrication of evidence claim.

There was no trial evidence suggesting that Detective Stambach even spoke with a prosecutor regarding Ortiz's confession. There was no testimony that Detective Stambach attempted to convince a prosecutor that Ortiz volunteered non-public information when in fact Ortiz had learned non-public information from Detective Stambach during the interview. *Cf. Washington*, 322 F. Supp. 2d at 712. The evidence showed only that, after reviewing the sworn confession without speaking to Detective Stambach, the prosecutor in charge of the case decided to go forward with Ortiz's prosecution. Ortiz's fabrication of evidence claim failed as matter of law, and the District Court's decision must be reversed.

## POINT IV. ORTIZ DID NOT ADDUCE SUFFICIENT EVIDENCE TO ESTABLISH HIS FIFTH AMENDMENT COERCION CLAIM

As to Detective Stambach's Rule 50 motion directed at Ortiz's Fifth Amendment claim, this Court applies the same standard it applies to Ortiz's malicious prosecution and due process fabrication of evidence claim. *See Conte*, 895 F.3d at 171. Detective Stambach was entitled to judgment as a matter of law

49

on the Fifth Amendment claim, because there was no evidence that he employed coercive tactics which were designed to exploit Ortiz's alleged mental illness.

## A.      There is no Evidence of Coercive Tactics by Detective Stambach

For claims brought pursuant 42 U.S.C. § 1983, "the key inquiry for Fifth Amendment purposes is whether the statement introduced in a judicial proceeding was obtained, not by failure to read a defendant *Miranda* warnings, but by coercion – an inquiry determined by the totality of the circumstances." *DeShawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).  "Courts have repeatedly rejected arguments that a statement made in response to law enforcement interrogation is involuntary solely due to the confessor's diminished mental state."  *United States v. Mack*, 17-cr-6159, 2018 WL 8898465, at *9 (W.D.N.Y. 2018) (citing *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1998) (explaining that, under Supreme Court precedent, "even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless the police exploited this weakness with coercive tactics")).  The Supreme Court has held that an officer's knowledge of an individual's diminished mental capacity is not evidence of a Fifth Amendment violation.  *Colorado v. Connelly*, 479 U.S. 157, 163-167 (1986).

Enforcing this principle, courts from this and other Circuits have held that a § 1983 Fifth Amendment claim cannot be maintained simply because the plaintiff who was interviewed had mental impairments. Plaintiffs must instead demonstrate that the interrogating officers employed tactics to take advantage of, or exacerbate, their weakened mental state. *King v. City of New York*, No. 99-cv-3669, 2007 WL 959696, at *12-*13 (E.D.N.Y. Mar. 30, 2007) (explaining that there was no evidence that the interrogating officers intentionally employed techniques to exacerbate or exploit the plaintiff's weakened state, so the plaintiff's Fifth Amendment claim failed as a matter of law; *Washington*, 322 F. Supp. 2d at 714 (explaining that mere questioning of a suspect who officers knew was mentally handicapped did not amount to Fifth Amendment coercion).

At trial, the jury heard testimony from three witnesses regarding Detective Stambach's conduct during Ortiz's confession: (1) Detective Stambach, (2) Detective Sergeant Lonergan, and (3) Officer Torres. Nothing in their testimony suggested any coercion or coercive tactics employed by Detective Stambach. The jury heard testimony only of appropriate police procedure.

Every other witness who testified had no personal knowledge and could not give any testimony about the actions or conduct of Detective Stambach

51

during Ortiz's confession. This list includes Dr. Evelyn Coggins, Detective Mark Vaughn, Detective Mark Lauber, and Detective Mary Evans. None of these witnesses' testimony could possibly support the jury's finding that Detective Stambach engaged in coercion. Dr. Coggins's testimony on Ortiz's mental state many days after the confession was not probative of any interrogation techniques employed by Detective Stambach. Dr. Coggins's testimony revealed nothing relevant to Detective Stambach. She provided no support for the jury's finding that Detective Stambach coerced Ortiz's confession. *See King*, 2007 WL 959696 at *13.

Put simply, the evidence was insufficient as a matter of law to support Ortiz's § 1983 Fifth Amendment claim because Ortiz failed to show that Detective Stambach employed interrogation tactics designed to exploit Ortiz's weakened state. *King*, 2007 WL 959696 at *13. The jury necessarily resorted to speculation in reaching the conclusion that Detective Stambach coerced Ortiz. Detective Stambach is entitled to judgment as a matter of law on Ortiz's Fifth Amendment claim and the District Court should be reversed to the extent that it denied that portion of Detective Stambach's Rule 50 motion.

52

**B.** **Detective Stambach is Entitled to Qualified Immunity on Ortiz's Fifth Amendment Coercion Claim**

To the extent that the District Court held Detective Stambach could be held liable for a Fifth Amendment violation based on the fact that he questioned Ortiz alone for forty minutes, Detective Stambach is entitled to qualified immunity. Again, a police officer is entitled to qualified immunity when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson*, 555 U.S. at 231. And here, there is no federal authority establishing that a suspect with mental illness has a constitutional right not to be questioned in a one-on-one interview for a brief period of time. Certainly, no such authority existed as of the 2004 events giving rise to this dispute.

The reality is that police officers often question individuals who suffer from mental illness when they are investigating criminal wrongdoing. Mentally ill individuals witness and commit crimes. The District Court should have recognized that. It was reasonable for Detective Stambach to believe that he was not committing any constitutional violations when he questioned Ortiz alone for forty minutes. Detective Stambach is entitled to qualified immunity on Ortiz's Fifth Amendment claim, which is further reason why judgment should be entered in his

53

favor. *Pearson*, 555 U.S. at 244 ("principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law").

### POINT V. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT AS A MATTER OF LAW IN FAVOR OF DETECTIVE STAMBACH ON THE ISSUE OF PUNITIVE DAMAGES

In general, a federal appellate court reviews a trial court's punitive damages determination for abuse of discretion. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434 (2001). Punitive damages are meant to "punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 309 (S.D.N.Y. 2001) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 n.9 (1986)). "Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006)

(citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999) (internal quotation marks omitted)).

No evidence in the record showed that Detective Stambach's decision to take Ortiz's confession was motivated by evil motive or intent. Moreover, nothing from the record could be used to infer that Detective Stambach had any reason to harbor a personal animus toward Ortiz. In fact, the record showed that Detective Stambach had not met or known Ortiz prior to November 16, 2004. Ortiz's arrest was motivated by his own confession, not any evil motive or intent by Detective Stambach. This reality bars an award of punitive damages. At best, Detective Stambach was mistaken about the truth of Ortiz's confession, but that is not the type of intentional or reckless conduct that warrants punitive damages. Here, the District Court abused its discretion in declining to strike the jury's award of punitive damages. If judgment is not entered in Detective Stambach's favor on Ortiz's three remaining claims, then this Court should strike the punitive damages award.

**POINT VI. IN THE ALTERNATIVE THE DISTRICT COURT ERRED IN DENYING DETECTIVE STAMBACH'S MOTION FOR A NEW TRIAL**

This Court reviews a denial of a Rule 59 motion for a new trial under the abuse of discretion standard. *Atkins*, 143 F.3d at 102. As a general rule, a new

trial may be granted when the jury's verdict is against the weight of the evidence. *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d. Cir. 2002). In contrast to a Rule 50 motion, a court may weigh the evidence and the credibility of witnesses and "need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59(a) motion. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

A new trial is warranted in this matter for the reasons set forth in Point I, *supra*. But even if the District Court had not upheld the jury's verdict based on a theory that was not introduced at trial, a new trial would still be warranted, and it was still an abuse of discretion for the District Court not to have granted Detective Stambach's Rule 59(a) motion.

Again, there was no competing testimony or narratives offered by any of the witnesses called by Ortiz. There was absolutely no testimony of coercion, fabrication, or bad faith by Detective Stambach. Instead, all of the testimony supported a finding that Detective Stambach did not coerce Ortiz, accurately transcribed his confession, and acted in good faith during his limited involvement in the investigation of the Camacho murders. The overwhelming evidence weighed in Detective Stambach's favor. Given that all of the testimony and

56

evidence introduced at trial supported a finding for Detective Stambach on the issues disputed by the parties, this case constituted a rare instance where the jury's verdict should not have been permitted to stand and a new trial was warranted. If the Court does not rule that judgment should have been entered in Detective Stambach's favor, then the jury's verdict should still be set aside and a new trial should be granted.

**POINT VII.  THE DISTRICT COURT ERRED IN DENYING DETECTIVE STAMBACH'S MOTION FOR REMITTITUR**

This Court reviews a district court's decision on a motion for remittitur for abuse of discretion.  *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016) (citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014)). Pursuant to Fed. R. Civ. P. 59(e), the District Court had authority to enter a conditional order of remittitur, compelling Ortiz to choose between reduction of the excessive verdict and a new trial.  Remittitur is appropriate in two circumstances: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken;  and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded.  *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998); *Newton v. City of New York*, 171 F. Supp. 3d

57

156, 171 (S.D.N.Y. 2016).  Here, given the complete dearth of evidence demonstrating any wrongdoing on the part of Detective Stambach, the District Court abused its discretion in denying the motion for remittitur.

The jury's award was intrinsically excessive, particularly because there was no evidence of bad faith misconduct by Detective Stambach.  Moreover, Ortiz's testimony did not provide detailed information or accounts of his emotional distress and trauma in prison.  He provided no economic information.  Given the evidence that came out at trial, there is no basis for the jury's award of $5,000,000 of compensatory damages, which essentially amounts to $500,000 per year Ortiz spent incarcerated.

Although there have been cases holding that an award of $1,000,000 dollars per year spent in prison is a reasonable award in wrongful conviction cases, those cases contained detailed evidence of the plaintiff's emotional distress that are not present here.  In this case, the only evidence of emotional distress that Ortiz presented involved his pre-existing mental health problems and a few isolated incidents from his time spent in prison.  Moreover, cases upholding substantial damages in this context turn on concrete evidence of bad faith police misconduct which is simply absent from the record here.  *Cf. Newton*, 171 F. Supp. 3d at 172;

58

*see also Limone v. United States*, 579 F.3d 79, 106 (1st Cir. 2009) (noting that "the $1,000,000 per year baseline is extremely generous, and in cases involving non-economic damages we have counseled that special attention must be paid to the particular circumstances of each individual plaintiff"). The circumstances of this case do not call for the compensatory damages awarded by the jury, and the award should be reduced if judgment is not entered in Detective Stambach's favor.

## **CONCLUSION**

For these compelling reasons, the Court should reverse the District Court's decision insofar as it denied Detective Stambach's Rule 50 motion, and enter judgment in Detective Stambach's favor. Alternatively, the Court should remand this matter for a new trial, as the District Court upheld the jury's verdict based upon a theory which was not presented at trial. More generally, the Court should order a new trial because the great weight of the evidence supports Detective Stambach. Finally, if judgment is not entered in Detective Stambach's favor or a new trial is not ordered, the Court should strike the amount of punitive damages awarded to Ortiz. The Court should also significantly reduce the amount of compensatory damages which were awarded by the jury.

Dated:      Buffalo, New York
              June 23, 2023

**HODGSON RUSS LLP**
*Attorneys for Defendant-Appellant Mark Stambach*

By:   s/ Peter A. Sahasrabudhe
              Hugh M. Russ, III, Esq.
              Peter A. Sahasrabudhe, Esq.
Guaranty Building
140 Pearl Street – Suite 100
Buffalo, New York  14202
Telephone:  716-856-4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com

60

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(5). This brief also complies with the type-style requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared using Microsoft Word and a proportionally spaced, serif font (Times New Roman, 14 Point).

**HODGSON RUSS LLP**
*Attorneys for Defendant-Appellant Mark Stambach*

By:    s/ Peter A. Sahasrabudhe
         Hugh M. Russ, III, Esq.
         Peter A. Sahasrabudhe, Esq.
Guaranty Building
140 Pearl Street – Suite 100
Buffalo, New York 14202
Telephone: 716-856-4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com

61

i

## TABLE OF CONTENTS

**Page**

**Special Appendix**

Decision and Order of the Honorable Elizabeth A.
Wolford, dated February 17, 2022 ......................... SA-1

SA-1

**DECISION AND ORDER OF THE HONORABLE ELIZABETH A. WOLFORD,
DATED FEBRUARY 17, 2022 [SA-1 - SA-47]**

Case 1:16-cv-00321-EAW-MJR   Document 195   Filed 02/17/23   Page 1 of 47

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

                  Plaintiff,                   **DECISION AND ORDER**

           v.                          1:16-CV-00321 EAW

MARK STAMBACH,

                  Defendant.
_____

## <u>INTRODUCTION</u>

Plaintiff Josue Ortiz ("Plaintiff") sued defendant Mark Stambach ("Defendant") for violations of his civil rights related to his arrest and conviction for the murders of Nelson and Miguel Camacho, and his subsequent exoneration. (Dkt. 1). A jury found in Plaintiff's favor after a five-day trial, and awarded $5 million in compensatory damages and $1.5 million in punitive damages. (Dkt. 158).

Currently pending before the Court are several post-trial motions: (1) a motion for attorneys' fees filed by Plaintiff (Dkt. 167); (2) a motion for attorneys' fees filed by Plaintiff's former counsel, Hancock Estabrook LLP ("Hancock") (represented here by Alan Pierce, Esq.) (Dkt. 169); and (3) motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), for a new trial pursuant to Fed. R. Civ. P. 59(a), and for remittitur pursuant to Fed R. Civ. P. 59(e) filed by Defendant (Dkt. 177). For the reasons that follow, the

- 1 -

SA-2

Court denies Defendant's motions, grants in part and denies in part Plaintiff's motion for attorneys' fees, and grants in part and denies in part Hancock's motion for attorneys' fees.

## **BACKGROUND**

Familiarity with the prior history of this case—including particularly the Court's Decision and Order entered on February 26, 2021 (Dkt. 82), and the evidence adduced at trial—is assumed for purposes of the instant Decision and Order.   The Court has summarized the salient procedural background below.

Plaintiff commenced the instant action on April 26, 2015.  (Dkt. 1).  Following discovery and motion practice, the only claims that proceeded to trial were Plaintiff's claims against Defendant for malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination.  (*See* Dkt. 82 at 36; Dkt. 160).   The jury found in Plaintiff's favor on each of these claims.  (Dkt. 160).

Following entry of judgment, Plaintiff filed his motion for attorneys' fees on May 20, 2022.  (Dkt. 167).  This motion did not include a request for any fees by Hancock, which had been terminated by Plaintiff on the eve of trial.  (*See* Dkt. 140).  Hancock filed its separate request for attorneys' fees on May 23, 2022.  (Dkt. 169).  Defendant filed his motion for judgment as a matter of law, for a new trial, and for remittitur on June 7, 2022. (Dkt. 177).

- 2 -

SA-3

On June 10, 2022, Defendant filed his opposition to both of the pending motions for attorneys' fees. (Dkt. 179; Dkt. 180). Hancock filed reply papers on June 21, 2022. (Dkt. 182).

Plaintiff filed his opposition to Defendant's post-trial motions on June 28, 2022. (Dkt. 187). Defendant filed his reply on July 8, 2022. (Dkt. 192). The Court heard oral argument on January 31, 2023, and reserved decision. (Dkt. 194).

## DISCUSSION

### I.    Defendant's Post-Trial Motions

Because Plaintiff's entitlement to attorneys' fees turns on his status as a prevailing party, the Court considers first Defendant's challenges to the trial and the jury's verdict.

#### A.    Motion for Judgment as a Matter of Law

Pursuant to Rule 50, the Court may grant a motion for judgment as a matter of law in a jury trial if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request. Fed. R. Civ. P. 50(a). The same standard applies where, as here, a party renews its request for judgment as a matter of law after the trial is complete. *See* Fed. R. Civ. P. 50(b).

"In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. Cnty. of Westchester*, 171

- 3 -

SA-4

F.3d 98, 101 (2d Cir. 1999); *see also Stevens v. Rite Aid Corp*., 851 F.3d 224, 228 (2d Cir. 2017) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." (citation and alteration omitted)).  Accordingly, the Court may not grant judgment as a matter of law unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it."  *Williams*, 171 F.3d at 101 (alterations omitted and quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154 (2d Cir. 1994)); *see also Wierzbic v. Howard*, 331 F.R.D. 32, 45 (W.D.N.Y. 2019) ("In ruling on a motion for judgment as a matter of law, the motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." (quotation and alteration omitted)), *aff'd*, 836 F. App'x 31 (2d Cir. 2020).  This "standard places a particularly heavy burden on the movant where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant."  *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (quotations omitted).

- 4 -

Defendant contends that a reasonable jury could not have found for Plaintiff on any of the three causes of action that were presented at trial.  The Court disagrees, for the reasons that follow.

### 1.    <u>Malicious Prosecution</u>

The Court turns first to Plaintiff's claim for malicious prosecution.  "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997).  "The existence of probable cause is a complete defense to a claim of malicious prosecution . . ., and indictment by a grand jury creates a presumption of probable cause."  *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotations and citation omitted).  This presumption "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. at 162 (quotation omitted).

Defendant argues that the evidence at trial was insufficient to permit a reasonable jury to find that the presumption of probable cause had been rebutted in this case.[1]  In particular, Defendant argues that there was "no evidence, direct or circumstantial, of bad

---

[1]     It is undisputed that Plaintiff was indicted by a grand jury and that there was correspondingly a presumption of probable cause.

- 5 -

faith" on his part. (Dkt. 177-4 at 18).  However, Defendant ignores key evidence presented at trial, and improperly construes the facts in a manner favorable to his position.

More particularly, Defendant ignores or downplays the following critical evidence presented to the jury: (1) it is undisputed that Plaintiff was not involved in the murders of the Camacho brothers; (2) Dr. Evelyn Coggins testified that Plaintiff was "in the throes of a psychotic episode" during the relevant time period (Dkt. 157 at 45-47); (3) Plaintiff testified that he spoke very limited English at the relevant time period (Dkt. 173 at 25-26); (4) Defendant testified, and record evidence corroborated, that he was alone with Plaintiff for approximately 40 minutes prior to Plaintiff giving his confession, during which time he spoke to Plaintiff about the crime without advising him of his *Miranda* rights (Dkt. 165 at 18-19, 39-42); (5) Officer Edwin Torres, who had participated in an interview of Plaintiff at Buffalo General Hospital the day prior to his interview with Defendant[2], testified that Plaintiff was determined at that time not to have any credible information about the murders (Dkt. 176 at 30-32); (6) Officer Torres testified that Defendant's notes from his conversation with Plaintiff during the time that Plaintiff and Defendant were alone contained "details that would only be known by somebody who committed the crimes" (*id*. at 81); and (7) Officer Torres testified that those same details from Defendant's notes and

---

[2]      At the time of trial, Officer Torres was unable to recall whether Defendant was present during the interview of Plaintiff at Buffalo General Hospital.  (Dkt. 176 at 18). However, Officer Torres was impeached at trial with testimony he provided at the state court proceeding in 2005, identifying Defendant as being present during Plaintiff's interview at the hospital.  (*Id*. at 18-23).

SA-7

which would only have been known to the perpetrator were repeated by Plaintiff in his confession (*id.*).

Distilled to its essence, Defendant's argument is that this circumstantial evidence is insufficient because Plaintiff was unable to remember his interaction with Defendant and provide direct eyewitness testimony to contradict Defendant's account. However, Defendant has cited no authority holding that direct evidence is required to rebut a presumption of probable cause in a jury trial on a malicious prosecution claim. Defense counsel did point at oral argument to certain reported decisions in which such direct evidence was presented, but the fact that other plaintiffs in other, unrelated cases were able to present stronger evidence does not render the jury's verdict in this case unreasonable. To the contrary, it is well established that—even in the more demanding criminal context— "the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence, so long as the inference is reasonable, for it is the task of the jury, not the court, to choose among competing inferences." *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quotations and citations omitted).

In this case, while it is certainly not the only conclusion a jury could have drawn, it is a reasonable inference from the circumstantial evidence set forth above that Defendant deliberately fed Plaintiff information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on Plaintiff's fragile mental state and limited command of the English language to manufacture a false confession, which

- 7 -

Plaintiff then repeated in front of Officer Torres as a direct result of Defendant's conduct. While defense counsel contended at oral argument that Plaintiff might have somehow been aware of the particulars of the murders despite not having been involved therein, the jury was not obliged to engage in that kind of speculation.  Indeed, other than general references to Plaintiff having been associated with the Camacho brothers at the time of their murders, there was no other evidence presented at trial as to how Plaintiff, who was not at the crime scene, was able to provide accurate details regarding the murders in his confession.  And, as previously noted, the day before Defendant interviewed Plaintiff, Plaintiff had been interviewed at the hospital by Buffalo Police Department detectives and had been determined not to be a suspect because he lacked any credible information regarding the crimes.

"[A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment. *Manganiello*, 612 F.3d at 162.  Accordingly, a reasonable jury could have concluded, on the evidence presented at trial, that Defendant acted in bad faith and that the presumption of probable cause was accordingly overcome.

Defendant's arguments to the contrary miss the mark.  As previously noted, Defendant relies heavily on the fact that Plaintiff himself is unable to remember his interaction with Defendant, and was accordingly unable to offer his own version of what happened during their 40-minute, pre-written confession interaction.  According to

- 8 -

Defendant, this dooms Plaintiff's malicious prosecution claim, because he cannot satisfy "the 'competing testimony plus' test announced in *Boyd v. City of New York*[, 336 F.3d 72 (2d Cir. 2003).]" (Dkt. 177-4). Defendant overstates the holding in *Boyd*. There, the Second Circuit found, at the summary judgment stage, that "a jury could reasonably find that the indictment was secured through bad faith or perjury" based on the plaintiff's testimony as corroborated by a booking shoot. 336 F.3d at 77. Defendant reads this case to mean that the <u>only</u> way a plaintiff claiming malicious prosecution can demonstrate bad faith is through a combination of his own contradictory version of events and some corroborating evidence. (*See* Dkt. 192 at 9). However, while the *Boyd* court found that the evidence in that case was sufficient to create a triable issue of fact, it did not suggest that a plaintiff could never prove bad faith in some other fashion.

In other words, while *Boyd* and its progeny indicate that a plaintiff may not rely solely on "his version of events" to rebut the presumption of probable cause, *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (citation omitted), they do not establish that a plaintiff who cannot remember his interaction with the defendant can never prevail on a malicious prosecution claim. To the contrary, the situation presented here is essentially the opposite of what courts have found prohibited by *Boyd*—that is, rather than relying solely on his own version of events without corroborating evidence, Plaintiff relies on circumstantial corroborating evidence but is unable to offer his own eyewitness account.

This simply does not implicate the same prudential concerns as allowing the presumption to be overcome based solely on self-serving testimony.

Further, the jury was not required to find Defendant's version of events credible simply because Plaintiff was unable to offer his own recollection.  *See In re Dana Corp*., 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony"); *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007) ("A jury is under no obligation to find [a defendant] credible or find [his] explanation believable."). The jury could, and plainly did, conclude that Defendant was not being truthful about what happened during the time that he and Plaintiff were alone.  On a motion for judgment as a matter of law, the Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)).

It is further not dispositive that certain evidence cited by the Court in denying Defendant's motion for summary judgment on Plaintiff's malicious prosecution claim was not ultimately introduced at trial.  Defendant argues that "this Court's summary judgment decision required that certain evidence had to be introduced showing that [Defendant] knew that [Plaintiff] was not or could not have been a perpetrator at the time of the confession."  (Dkt. 177-4 at 21).  Defendant's argument misunderstands the task that a court undertakes in deciding whether summary judgment in favor of a defendant is

- 10 -

appropriate.  In assessing such a motion, a court need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial.  If the court is satisfied that at least one material factual dispute exists, summary judgment must be denied.  *See, e.g., Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 121 (S.D.N.Y. 1997) ("[I]t is basic, black-letter law that the existence of even one disputed issue of material fact renders a grant of summary judgment inappropriate. . . . Once this Court found that there existed one material issue of disputed fact regarding Count One, this Court did not need to consider any of [the defendant's] other alleged violations of the Factoring Agreement in order to deny summary judgment, and therefore, did not consider them. . . .  As a result, *all* of [the defendant's] conduct which was alleged by plaintiffs in Count One to violate the Factoring Agreement survived [the defendant's] summary judgment motion.").

Consistent with these principles, in its Decision and Order denying Defendant summary judgment on Plaintiff's malicious prosecution claim, the Court identified certain evidence that it found would allow a reasonable factfinder to conclude that Defendant had knowingly procured a false confession from Plaintiff and accordingly denied summary judgment.  (Dkt. 82 at 28).  The Court never held that some lesser quantum of evidence would be insufficient to sustain Plaintiff's burden of proof at trial, because it was not called upon to make such a determination at that time.  Nor did the Court grant partial summary judgment determining that any particular legal or factual theory of Plaintiff's as to this claim failed as a matter of law.  Accordingly, the fact that the evidence at trial did not line

- 11 -

SA-12

up precisely with the discussion in the Court's prior Decision and Order does not mean that Defendant is entitled to judgment in his favor.

For all these reasons, the Court cannot conclude that a reasonable jury would have been unable to find in Plaintiff's favor on his malicious prosecution claim, and Defendant's motion for judgment as a matter of law thereon is denied.

## 2.  Fabrication of Evidence

The elements of a fabrication of evidence claim are that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). A plaintiff "may rely on circumstantial evidence (and reasonable inferences drawn from such evidence)" to support a contention that a defendant engaged in the fabrication of evidence. *Anilao v. Spota*, 340 F. Supp. 3d 224, 251 (E.D.N.Y. 2018), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

Defendant argues that Plaintiff's fabrication of evidence claim is insufficient as a matter of law because "[t]here is no evidence whatsoever that [Plaintiff's] written confession is not an accurate account of what [Plaintiff] said to [Defendant] on November 16, 2004." (Dkt. 177-4 at 16). This argument fails for essentially the same reasons discussed above with respect to Plaintiff's malicious prosecution claim. Specifically, based on the evidence previously set forth, a reasonably jury could have concluded that

- 12 -

SA-13

Defendant created a false confession by providing Plaintiff, who was suffering from a psychotic episode, with the details of the murders and causing him to repeat those details in response to Defendant's subsequent questions.  Having reached such a conclusion, a reasonable jury could further have found in Plaintiff's favor on his fabrication of evidence claim.   The Court accordingly denies Defendant's Rule 50(b) motion as to this claim.

### 3.     <u>Violation of Right Against Self-Incrimination</u>

A plaintiff may recover "under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff[] in a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).  Whether a statement was obtained by coercion is determined by the totality of the circumstances. *Id.*; *see also Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.").  "[F]actors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). "Psychologically coercive tactics" may include "techniques such as brainwashing or

- 13 -

SA-14

promises of leniency or other benefits." *Green*, 850 F.2d at 902; *see also United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirmative misrepresentations or improper "trickery" can render a confession involuntary (alteration omitted)).

Although it is a closer question than those presented by Plaintiff's other claims, the Court finds that the jury could have reasonably concluded that Defendant engaged in coercive conduct during the 40 minutes that he was alone with Plaintiff prior to the taking of Plaintiff's written confession. In particular, the jury could have taken into account Plaintiff's limited understanding of English, Plaintiff's psychological state, and the fact that Plaintiff had a limited education. (*See* Dkt. 173 at 23-24 (Plaintiff testifying that he only completed the 11th grade and had been unsuccessful in obtaining his GED)). The jury also could have reasonably inferred that Defendant employed a psychologically coercive interrogation technique and/or engaged in improper trickery, based on the evidence that: (1) Plaintiff had no credible information about the murders when interviewed by law enforcement the previous day; (2) Plaintiff had no involvement in the murders; (3) during the 40-minute interval where he was alone with Plaintiff, Defendant created notes that included details of the murders that could only have been known by someone with inside knowledge; and (4) those same details were then repeated by Plaintiff during his answers to Defendant's questions during the creation of his written confession.

Defendant's emphasis on the law enforcement witnesses' testimony about his conduct while taking Plaintiff's written confession (*see* Dkt. 177-4 at 13-15) misses the

- 14 -

point.  As discussed above, the jury was free to disbelieve all or part of that testimony.

Further, it is entirely plausible that, having successfully employed psychological coercion

during the 40 minutes when he was alone with Plaintiff (an individual with a limited

education, little understanding of the English language, and a fragile mental state),

Defendant had no need to continue to do so in front of Officer Torres or Sergeant James

Lonergan (the other witness to Defendant's post-interview conduct).  While the jury

certainly was not compelled to reach that conclusion, it was permitted to do so.

Defense counsel also contended at oral argument that Defendant's version of events

was corroborated by the facts that Plaintiff pled guilty in his state court criminal

proceedings and reiterated his guilt years later before a federal grand jury.  However, this

argument again fails to consider the evidence in the light most favorable to Plaintiff.  As to

the former point, the evidence at trial was that Plaintiff attempted to withdraw his guilty

plea and that the state court judge denied that request.  (Dkt. 175 at 6).  As to the latter

point, Plaintiff explained at trial that when he testified before the federal grand jury, he was

afraid that he would be prosecuted federally if he claimed not to have committed the

murders.  (*Id*. at 66-67).  The jury was within its rights to credit this explanation.

In sum, the Court finds no basis to grant Defendant judgment as a matter of law on

Plaintiff's claim that Defendant violated his right against self-incrimination.

- 15 -

### 4.    Punitive Damages

Defendant contends that he is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages, because there was nothing shocking or offensive about his conduct, nor was there any evidence that he had an evil motive or intent or was acting based on personal animus.  (Dkt. 177-4 at 23-24).  The Court disagrees that a reasonable jury could not have awarded punitive damages in this case.

"Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)).  As detailed above, the jury in this case could have reasonably concluded that Defendant caused the fabrication of a false confession and then caused that false confession to be used to prosecute Plaintiff.  Such actions easily satisfy the standard for engaging in callous indifference to Plaintiff's constitutional rights.  Further, a reasonable jury could determine that such conduct was shocking, offensive, and sufficiently egregious to warrant an award of punitive damages.  *See, e.g., Niemann v. Whalen*, 928 F. Supp. 296, 300 (S.D.N.Y. 1996) (finding jury was warranted in awarding punitive damages where defendant coerced a false confession), *aff'd,* 107 F.3d 3 (2d Cir. 1997).

For all these reasons, the Court denies in its entirety Defendant's motion for judgment as a matter of law.

- 16 -

SA-17

B.      **Motion for a New Trial**

Defendant seeks in the alternative a new trial pursuant to Rule 59(a).  "As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotation and alterations omitted); *see also Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ("[A] decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice[.]"). "Rule 59(a) . . . has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (quotations and citation omitted).  "The legal standard for granting a new trial under Rule 59(a) calls for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice." *Top Ridge Invs., LLC v. Anichini, Inc.*, No. 5:16-CV-76, 2018 WL 11419657, at *1 (D. Vt. May 7, 2018).  Whether to grant a new trial under Rule 59(a) is entrusted to the Court's discretion.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 261 (2d Cir. 2002) ("This court reviews the grant of a new trial on the ground that the verdict was against the weight of the evidence for abuse of discretion.").

- 17 -

The Court does not find that this is a case in which the jury's verdict was seriously erroneous or a miscarriage of justice.  The resolution of this case turned largely on the jury's assessment of Defendant's credibility, and Second Circuit precedent "teach[es] . . . the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  Indeed, "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case[.]" *Id*. at 418-19  (reversing district court's grant of new trial where "[i]n the final analysis, the only testimony regarding what was actually said came from [one witness], and thus the entire case hinged on his credibility").

Here, the jury plainly concluded that Defendant was not being truthful about his interactions with Plaintiff, and there was support in the record for that conclusion.  For example, Defendant changed his testimony in some respects from his deposition testimony. (*See, e.g.,* Dkt. 165 at 45-47).  Perhaps most significantly, Defendant initially testified at trial that he did not have a conversation with Plaintiff during the 40 minutes they were alone.  (*Id*. at 39).  However, the jury subsequently learned that Defendant had testified at his deposition that he and Plaintiff had engaged in conversation during that time period, including conversation about the murders, and that Defendant had created two pages of notes during that time containing information specific to the crimes at issue.  (*Id*. at 40-44). After being confronted with his prior testimony, Defendant tried to claim that he had asked

SA-19

"[j]ust limited" questions of Plaintiff, but conceded on further cross-examination that he

had asked Plaintiff "questions and details about how the crime had been committed" before

a translator arrived and before Plaintiff was advised of his Fifth Amendment rights, and

that it was during that same time frame that Plaintiff supposedly gave the facts that "led

[Defendant] to believe he was the perpetrator of the crime[]." (*Id*. at 41-42).

  The Court does not consider it seriously erroneous or a miscarriage of justice for the

jury to have concluded that Defendant was not a credible witness, nor for the jury to have

drawn reasonable inferences based on the circumstantial evidence as to what actually

occurred during the 40 minutes that Plaintiff and Defendant were alone together prior to

Plaintiff's written confession.  Under the circumstances of this case, the Court does not

find it to be the rare occasion on which the jury's verdict should be disturbed.

  **C.**  **Motion for Remittitur**

  Defendant's final request is for remittitur pursuant to Rule 59(e).  The Second

Circuit has explained that:

> The district court has authority to enter a conditional order of remittitur,
> compelling a plaintiff to choose between reduction of an excessive verdict
> and a new trial, in at least two distinct kinds of cases: (1) where the court can
> identify an error that caused the jury to include in the verdict a quantifiable
> amount that should be stricken, and (2) more generally, where the award is
> intrinsically excessive in the sense of being greater than the amount a
> reasonable jury could have awarded, although the surplus cannot be ascribed
> to a particular, quantifiable error.

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotations and alterations

omitted).  In the latter case—where there is no particular discernable error—"generally . . .

- 19 -

a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice[.]" *Id.* (quotation omitted; *see also Newton v. City of New York*, 171 F. Supp. 3d 156, 171 (S.D.N.Y. 2016) ("[T]his Court must evaluate whether [the plaintiff's] Section 1983 award shocks the judicial conscience given that there is no particular discernable error that caused the jury to include in the verdict a quantifiable amount that should be stricken." (quotations and original alterations omitted)).

Defendant contends that the jury's award of $5 million in compensatory damages was intrinsically excessive.  (Dkt. 177-4 at 26).  The Court disagrees.  As Defendant concedes, "there have been cases holding that an award of $1,000,000 . . . per year spent in prison is a reasonable award in wrongful conviction cases."  (Dkt. 177-4 at 27); *see, e.g., Newton*, 171 F. Supp. 3d at 172-75 (collecting cases).  Here, Plaintiff spent 10 years in prison for a crime he did not commit, and so the $5 million award equates to $500,000 per year of wrongful confinement.  This is well within a permissible range.

Defendant argues that Plaintiff did not present "detailed evidence" of his emotional distress.  (Dkt. 177-4 at 27).  However, Plaintiff testified at trial about experiencing humiliating strip searches while imprisoned, about being attacked by other inmates, and about being assaulted by corrections officers.  (Dkt. 175 at 9-14).  He further expressly told the jury how difficult he found it to live in a cell, particularly in light of his mental health struggles.  (*Id.* at 15).  He also discussed feeling as though he constantly had to "watch[]

- 20 -

his back." (*Id.* at 16).  The jury could have reasonably concluded from this testimony that Plaintiff suffered significant emotional distress as a result of his wrongful conviction.

Defendant also argues that there was no "concrete evidence of a police officer's bad faith misconduct" in this case.  (Dkt. 177-4 at 27).  Of course, for the reasons discussed above, the Court disagrees with Defendant's assessment of the proof at trial that supported the jury's verdict.  While circumstantial, a reasonable jury had a legally sufficient evidentiary basis to find in favor of Plaintiff.  Moreover, the amount of compensatory damages does not depend on the presence of direct—as opposed to circumstantial—proof at trial.  So long as the proof was sufficient to support a verdict in Plaintiff's favor, which the Court has determined it was in this case, the jury was entitled to determine the amount that would compensate Plaintiff for his damages.

As to the punitive damages amount, "no objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (citation and alteration omitted).  However, there are three general "guideposts" a court may look to in reviewing whether a punitive damages award is excessive: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Id.* (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

Defendant focuses solely on the first of these guideposts in seeking remittitur, arguing that "there was no evidence of reprehensible conduct by" Defendant.  (Dkt. 177-4 at 27).  For the reasons discussed at length above, the Court disagrees.  The jury reasonably found that Defendant, a law enforcement officer, fabricated a false confession, and thereby caused an innocent man to be imprisoned for 10 years.  That is reprehensible conduct as that term is used in this context.  *See Stampf*, 761 F.3d at 209 (explaining that "[c]onduct that involves deceit or malice is more reprehensible than conduct involving mere negligence" and "conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages").  Defendant's argument relies on his contention that he did nothing more than take a statement from Plaintiff (Dkt. 177-4 at 27), but that is not what the jury found.

The Court further notes that the ratio of punitive damages to compensatory damages in this case is 1.5:5, which is less than the 1:1 ratio that the Second Circuit has said does not "raise a suspicious judicial eyebrow."  *Stampf*, 761 F.3d at 211 (quoting *Gore,* 517 U.S. at 582).  Further, at least one other federal court has apparently approved an "award of $13,000,000 in punitive damages for 31 years of incarceration based on [a] false confession."  *Burton v. City of New York*, No. 20-CV-9025 ATR WL, 2022 WL 9491955, at *14 (S.D.N.Y. Sept. 26, 2022) (citing *McCollum v. Robeson County*, No. 15-CV-00451, Dkt. No. 429 (E.D.N.C. May 14, 2021)).

In sum, Defendant has failed to persuade the Court that either the compensatory damages award or the punitive damages award in this case is greater than the amount a reasonable jury could have awarded.  Accordingly, the Court denies Defendant's request for remittitur.

## II.   <u>Plaintiff's Motion for Attorneys' Fees</u>

The Court turns next to Plaintiff's motion for attorneys' fees.  Pursuant to 42 U.S.C. § 1988, the Court may award the prevailing party in a § 1983 action a reasonable attorneys' fee.  *See Lilly v. City of New York*, 934 F.3d 222, 227 (2d Cir. 2019).  In determining what constitutes a reasonable fee, the Court must "calculate a presumptively reasonable fee by determining the appropriate billable hours expended and setting a reasonable hourly rate, taking account of all case-specific variables."  *Id*. at 229-30 (quotations omitted).  This constitutes the "lodestar figure," which "has, as its name suggests, become the guiding light of [federal] fee-shifting jurisprudence."  *Perdue v. Kenny A*., 559 U.S. 542, 551 (2010) (quotation omitted).

A reasonable hourly rate "is the rate a paying client would be willing to pay."  *Id*. (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008)).  "In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson*[3] factors; it should also

---

[3]     *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The twelve *Johnson* factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's

bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* "The determination of an award of attorney's fees under 42 U.S.C. § 1988 is committed to the sound discretion of the district court because the appropriate amount is dependent on the unique facts of each case." *Raja v. Burns*, 43 F.4th 80, 86 (2d Cir. 2022) (quotation omitted).

"The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Torcivia v. Suffolk Cnty.*, 437 F. Supp. 3d 239, 251 (E.D.N.Y. 2020). Here, Plaintiff seeks $538,032.50 in attorneys' fees and $37,638.28 in costs. (Dkt. 167-1 at ¶¶ 6-7). Plaintiff is a prevailing party in this case, and so the Court concludes that a fee award is appropriate. However, for the reasons set forth below, the Court will award $123,550.00 in attorneys' fees and $2,474.81 in costs, rather than the amounts requested by Plaintiff.

### A.   <u>Hours Expended</u>

#### 1.   <u>Fees Incurred in Other Matters</u>

Turning first to the determination of the appropriate billable hours expended, Plaintiff seeks compensation for 1065.4 hours expended by Wayne Felle, Esq., 150.8 hours expended by Edward Markarian, Esq., 24 hours expended by Elizabeth Bruce, Esq., and

---

customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 522 F.3d at 186 n.3.

190.7 hours expended by paralegal Briana Croce.  (Dkt. 167-1 at ¶ 6).  However, as Defendant correctly points out, Plaintiff has included in this request many hundreds of hours of time spent on other proceedings and legal matters to which Defendant was not a party.  This includes: proceedings in *Ortiz v. Case*, No. 1:16-cv-00322, a civil case in this District which was resolved in favor of the defendants; proceedings in the New York Court of Claims; proceedings in *United States of America v. Ortiz*, No. 1:16-cr-00077, a criminal case in this District wherein Plaintiff was convicted of being a felon in possession of a firearm; and Social Security, disability, and Medicare proceedings.

As the Second Circuit has recently explained, "[i]n section 1988, Congress authorized district courts only to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce section 1983."  *Raja*, 43 F.4th at 92 (quotation and alteration omitted).  Fees incurred in connection with related proceedings may generally be recovered only to the extent those proceedings were "useful and of a type ordinarily necessary to advance the civil rights litigation."  *Id.*  (quotation omitted).

Here, the Court largely agrees with Defendant that this standard has not been satisfied with respect to the other proceedings as to which Plaintiff seeks attorneys' fees, inasmuch as the other legal proceedings at issue were not sufficiently related to this action.  The exception is fees related to Plaintiff's "initial Section 440 proceeding to vacate his conviction."  (Dkt. 179 at ¶ 12).  Plaintiff could not pursue the instant action without first having his conviction vacated, or his claims would have been barred by *Heck v. Humphrey*,

- 25 -

512 U.S. 477 (1994).   Accordingly, the state court proceeding to vacate his criminal conviction was both useful and necessary to advance the instant § 1983 action.

Defendant relies on an unreported, out-of-Circuit case to support his argument that fees related to the § 440 proceeding are not recoverable under § 1988.  (*See* Dkt. 179-1 at 14-15 (citing *DeLew v. Nevada*, No. 2:00-CV-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010))).   However, the *DeLew* case is not on point, as it involved fees related to a wrongful death suit, not fees related to seeking the vacatur of a criminal conviction.  *See* 2010 WL 11636127, at *6.   Further, the *DeLew* court acknowledged that "attorney's fees may be available 'where a state proceeding is a necessary preliminary action to the enforcement of a federal claim[.]'"  *Id*. (quoting *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 255 (5th Cir. 2000)).   Again, Plaintiff could not have pursued his § 1983 claims without first having his conviction vacated in state court.

Defendant has identified 438.7 hours of legal fees that he claims should be struck as having been incurred in connection with miscellaneous other legal proceedings.  (Dkt. 179 at ¶ 13).   The Court has reviewed the entries identified by Defendant and notes that the entries from April 11, 2014, to January 15, 2015, are related to the § 440 proceedings in which Plaintiff's conviction was vacated.   These entries total 57.3 hours.   The Court agrees with Defendant that most of the remaining 381.4 hours are not recoverable.   However, the entry on September 21, 2021, for 1.8 hours appears on its face to be related to this matter,

SA-27

as does the entry on May 9, 2022, for 13 hours.  The Court has not excluded these two entries on this basis.

Defendant has further identified 465.9 hours in fees that he asserts are associated with the actions before the New York Court of Claims and Appellate Division, Fourth Department and 47.7 hours that are associated with the *Ortiz v. Case* matter.  (Dkt. 179 at ¶¶ 14-15).[4]  The Court has reviewed the entries identified by Defendant and agrees that they are not recoverable.  The Court also agrees with Defendant that time spent on public relations events should be struck, and has not included the identified public relations entries in its lodestar calculation.  (*See id*. at ¶ 16).

The Court was not persuaded by Plaintiff's counsel's contention at oral argument that certain of the hours expended in connection with the other litigation discussed above were meant to overlap with and also be used in connection with this litigation.  Plaintiff's counsel was unable to point to any record support for that contention, and as the party seeking fees, it is Plaintiff's burden to "submit sufficient evidence to support the hours worked[.]"  *Torcivia*, 437 F. Supp. 3d at 251.  Without some kind of evidentiary support (and absent any identification of the specific hours at issue), an attorney's general assertion does not satisfy this standard.

---

[4]      There is some overlap in the entries identified in paragraphs 13, 14, 15, and 16 of Defendant's declaration.  The Court has accordingly independently cross-referenced the identified entries with Plaintiff's counsel's billing ledger, and has performed its own calculation of the hours remaining for each timekeeper when the entries described in this Decision and Order are excluded.

2.     **Vague Entries**

Defendant next argues that the Court should strike 11 billing entries for "client meeting" or "meeting with client" as impermissibly vague.  (*Id*. at ¶ 17).  The Court agrees.  "Courts may deny compensation where the billing information submitted is too vague to sufficiently document the hours claimed."  *Decastro v. City of New York*, No. 16-CV-3850 (RA), 2017 WL 4386372, at *8 (S.D.N.Y. Sept. 30, 2017) (quotation omitted).  In the context of this case, where counsel was representing Plaintiff in connection with multiple actions, the phrases "client meeting" and "meeting with client" provide no useful information about the work done.  The Court accordingly will not include these entries in its calculation.  *See Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 3773856, at *3 (S.D.N.Y. Aug. 12, 2019) (describing "[c]alls with team and team meeting, call with client and review of additional documentation" as "exactly the type of descriptions that courts have found to be impermissibly vague in the context of recovering attorneys' fees").

3.     **Unnecessary Pre-trial Motion Practice**

Defendant further asks the Court not to award fees associated with pre-trial motion practice regarding Plaintiff's failure to disclose expert witnesses, Plaintiff's request for an adjournment of the trial date, and the termination of Hancock and withdrawal of Mr. Pierce.  (*See* Dkt. 179 at ¶¶ 18-21).  Defendant contends that these activities were unnecessary and

SA-29

incurred because of Plaintiff's counsel's own failure to comply with the Federal Rules of Civil Procedure. (Dkt. 179-1 at 19).

"In determining the number of hours reasonably expended on a case, a district court properly excludes documented hours that are excessive, redundant, or otherwise unnecessary." *Raja*, 43 F.4th at 87 (quotation omitted). Here, the Court does not agree that the motion practice regarding expert witnesses falls within that category. While the Court ultimately largely found in Defendant's favor on those motions, the Court cannot say that the associated motion practice was unnecessary.

However, the Court agrees that Defendant should not have to bear the costs of Plaintiff's request for an adjournment of the trial date, which was entirely without basis and which the Court noted was made in an attempt at gamesmanship. (*See* Dkt. 138). Defendant also should not have to bear the costs of the internal dispute between Plaintiff's lawyers, which could and should have been handled without resort to motion practice.

Plaintiff's counsel has included litigation of the motion for an adjournment and his work related to his dispute with Mr. Pierce in large, blocked-billed entries in April of 2022. The Court accordingly strikes from the requested fees a 12.5-hour entry on April 14, 2022, a 7.5-hour entry on April 19, 2022, a 6.8-hour entry on April 20, 2022, a 7.2-hour entry on April 21, 2022, and an 8.6-hour entry on April 26, 2022, each of which references work on these items. (*See* Dkt. 167-2 at 19).

### 4.   Paralegal Time Charged to Attorney

Defendant has identified three specific occasions on which Mr. Felle appears to have billed hours that were actually worked by his paralegal, Ms. Croce.  The first is an entry on June 3, 2019.  (Dkt. 167-2 at 12).   The time entry says: "Sent co-counsel transcripts and exhibits (WCF 1.5) (BEC 2)."  (*Id*.).  However,  the corresponding hours charge 3.5 hours to Mr. Felle and none to Ms. Croce.  This is clearly an error, as the time entry itself allocates 2 hours of work to Ms. Croce.  Similar errors can be seen in an entry from November 8, 2019, attributing 0.3 hours of Ms. Croce's work to Mr. Felle, and in an entry from April 29, 2022, attributing 6.5 hours of Ms. Croce's work to Mr. Felle.  (*Id*. at 12, 20).  The entry from November 8, 2019, has already been disallowed by the Court as related to state court litigation.  For the remaining misallocated 8.5 hours, the Court will apply Ms. Croce's rate and not Mr. Felle's rate.

### 5.   Block Billing and Other Deficient Time-Keeping Practices

In addition to the specific arguments made above, Defendant seeks an across-the-board reduction in the requested hours, arguing that counsel's "time entries demonstrate widespread block-billing, excessively vague time-entries, and are suggestive of either deliberate overestimation or a failure to maintain contemporaneous records."  (Dkt. 179-1 at 16).  Defendant specifically seeks an across-the-board 75% reduction in the remaining hours.  (*Id*. at 17).

"Block billing—. . . the practice of lumping multiple distinct tasks into a single billing entry—is generally disfavored because it can complicate the district court's task of determining the reasonableness of the billed hours." *Raja*, 43 F.4th at 87.  Nonetheless, "the practice is by no means prohibited in this Circuit because block billing will not always result in inadequate documentation of an attorney's hours." *Id*.  In particular, block billing is "permissible as long as the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Id*. (quotation omitted)  Here, while Plaintiff's counsel did engage in block billing, the Court does not find that the practice was so egregious as to prevent meaningful review of the requested hours.

However, the Court does agree that some reduction is appropriate due to the vagueness of the time entries and because they reflect excessive time spent on routine matters. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).  To give just a few example of excessive time spent on routine matters, an entry on April 25, 2016, reflects two hours of attorney time for "filed, paid—claims against City and County"; an entry on November 2, 2016, reflects 0.5 hours of attorney time for "[s]ent correspondence to defense attorneys with discovery responses and demands"; an entry on June 3, 2019, reflects 3.5 hours being spent simply to send transcripts and exhibits to co-counsel; an entry on September 9, 2020, reflects 0.4 hours being spent to fax a request for records; and an entry on March 2, 2021, reflects 0.7 hours being spent to "[e]mail page count for draft record." (Dkt. 167-2).  For examples of vague entries (and in addition to the "client meeting" and

- 31 -

"meeting with client" entries already discussed), an entry on March 16, 2016, states, "[p]hone call with client"; an entry on May 1, 2017, states "[p]hone call with client"; an entry on August 8, 2017, states "[e]mail to co-counsel"; an entry on October 15, 2018, states "ltr to AP, t/c w/ client"; an entry on February 24, 2021, states, "[m]essage to counsel"; an entry on April 21, 2021, states "[p]hone call with counsel; discussed next steps"; an entry on April 30, 2021, states "[p]hone call with counsel; email with counsel"; and an entry on November 10, 2021, states "[l]etter to Fed. Ct., t/c AP." (*Id.*). These lists are not exhaustive, but are representative of counsel's timekeeping practices.

"To address such redundancy or vagueness, 'the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" *Raja*, 43 F.4th at 87 (quoting *Kirsch*, 148 F.3d at 173). Here, the Court finds an across-the-board reduction of 15% sufficient to account for these time-keeping deficiencies. *See Mason Tenders Dist. Council Welfare Fund v. Gibraltar Contracting, Inc.*, No. 1:18-CV-3668-MKV, 2020 WL 6363960, at *2 (S.D.N.Y. Oct. 29, 2020) (applying 20% reduction to account for similar issues and collecting cases applying reductions between 15% and 30%).

Taking all these rulings together, the Court finds that, prior to any across-the-board reduction, the reasonable hours spent on this litigation are as follows: 449 hours by Mr. Felle, 2.1 hours by Mr. Markarian, 23.2 hours by Ms. Bruce, and 55.8 hours by Ms. Croce.

SA-33

Applying the 15% across-the-board reductions results in a total of 381.7 hours by Mr. Felle, 1.8 hours by Mr. Markarian, 19.7 hours by Ms. Bruce, and 47.4 hours by Ms. Croce.

**B.     Reasonable Hourly Rates**

Plaintiff seeks the following hourly rates: $425 per hour for Mr. Felle; $335 per hour for Mr. Markarian; $325 per hour for Ms. Bruce; and $125 per hour for Ms. Croce. (Dkt. 167-1 at ¶ 6). Defendant maintains that these rates are unreasonably high. (Dkt. 170-1 at 23-24). The Court agrees.

For purposes of calculating the lodestar figure, the Court applies "the prevailing hourly rate in the community," and "the community for purposes of this calculation is the district where the district court sits." *Arbor Hill*, 522 F.3d at 190 (quotations and alteration omitted). The Court may use an out-of-District hourly rate only "if it is clear that a reasonable, paying client would have paid those higher rates." *Id*. at 191. There is a presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally," and the burden is on the attorney seeking a higher rate to rebut that presumption. *Id*.

In the Western District of New York, the prevailing hourly rate for an experienced attorney in a civil rights matter is typically no more than $300 per hour, while less experienced attorneys typically have rates of no more $200 per hour. *See Warr v. Liberatore*, No. 13-CV-6508MWP, 2022 WL 969528, at *5 (W.D.N.Y. Mar. 31, 2022) (collecting cases and finding, in civil rights action, that $350 per hour rate for experienced

- 33 -

SA-34

attorney was unreasonable and should be reduced to $295 per hour).  The rates proposed by Plaintiff's counsel are far outside this range, and the Court finds no reason to apply out-of-District rates in this case.

The Court has considered the *Johnson* factors, among others, in making this determination.  As a threshold matter, the Court notes that Defendant contends that the Supreme Court's decision in *Perdue* "specifically rejected the use of the *Johnson* factors for § 1988 motions" and that *Arbor Hill* is "no longer good law" regarding calculation of a reasonable hourly rate.  (Dkt. 179-1 at 22-23).  However, the Second Circuit held to the contrary in *Lilly*, explaining that "*Perdue* . . . did not overrule *Arbor Hill* or otherwise prohibit district courts from considering the novelty or complexity of a case in determining the reasonable hourly rate or hours billed," and that "the twelve *Johnson* factors remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted."  934 F.3d at 232-33.  Accordingly, the Court rejects Defendant's invitation to ignore the *Johnson* factors.

As set forth above, the *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The Court has considered these factors and does not find that they support the imposition of a higher hourly rate in this case.

Plaintiff's arguments to the contrary are not persuasive. While counsel certainly expended significant time and labor, much of that time and labor (as set forth above) was spent on other legal proceedings. Plaintiff concedes that "this matter did not present significant novel legal questions." (Dkt. 167-3 at 13). The Court further does not find that this case required any unusual skill to pursue.

Counsel contends that he was unable to take on certain other paying matters "during the most intense periods of litigating this case[.]" (*Id*. at 14). While this may be true, those "intense periods" of litigation were relatively limited, and not out of the ordinary for a civil rights matter.

Counsel also contends that his customary hourly rate significantly exceeds the rates sought in the instant fee application. (*Id*. at 15). However, he has calculated his "hourly rate" by looking to contingent fee cases, which the Court does not find to be a useful comparison. The effective hourly rate in a contingent fee case is recompense for the risk of not being paid at all, and is not reflective of the hourly rate a paying client would agree to in a traditional attorney-client relationship. The Court further does not find the fact that

counsel will receive a contingent fee from Plaintiff a reason to depart from the prevailing hourly rates in this District.

Counsel's argument that he was "tasked with conducting discovery and preparing for trial within an expedited timeframe" (Dkt. 167-4 at 15) is entirely belied by the history of this case. Discovery in this matter began in 2016 and did not close until 2020. (*See* Dkt. 68). Further, the Court resolved all dispositive motions by February 2021 (*see* Dkt. 82), and the trial did not occur until over a year later, in May of 2022. The Pretrial Order setting filing deadlines was entered in December of 2021, approximately five months before the trial occurred. (*See* Dkt. 98). This is not an expedited timeframe.

Counsel did obtain a significant award on behalf of his client. However, as discussed further below, there were also many unsuccessful claims brought in this action. Accordingly, the Court does not find that this factor warrants an upward adjustment in the hourly rate. The Court is further unpersuaded by counsel's arguments regarding his experience, inasmuch as counsel has previously represented to the Court that he is unexperienced in federal court matters such as this one.

Plaintiff's counsel argues that the case was "undesirable" because it is societally unpopular to sue law enforcement. (Dkt. 167-4 at 17-18). However, Plaintiff—who spent 10 years in jail for a crime he concededly did not commit—was a sympathetic litigant, and the potential damages were very high. The Court is not persuaded that this case was

SA-37

undesirable on the whole.  The Court also does not find this case out of the ordinary with respect to the nature of the professional relationship between counsel and client.

Finally, counsel has not cited any civil rights cases in this District where hourly rates in line with those sought here were awarded.  He has instead relied on cases from the Southern and Eastern Districts of New York, where the prevailing rates are significantly higher than in the Western District of New York.  Indeed, in one of the cases that Plaintiff cites, *Vilkhu v. City of New York*, No. 06-CV-2095 CPS (JO), 2009 WL 1851019 (E.D.N.Y. June 26, 2009), the Second Circuit vacated and remanded the decision specifically because the district court had applied Southern District prevailing rates, and not rates from the Eastern District.  *See Vilkhu v. City of New York*, 372 F. App'x 222, 224 (2d Cir. 2010).

The Court accordingly finds that the reasonable hourly rates in this case should be in line with the prevailing rates in this District.  Specifically, the Court finds that rates of $300 per hour for Mr. Felle, $200 per hour for his associates, and $100 per hour for his paralegal are what a reasonable paying client would have been willing to pay.  Multiplying these rates by the hours previously calculated by the Court results in a lodestar figure of $123,550.00.

**C.    Unsuccessful Claims**

Defendant asks the Court to reduce the fee award based on the fact that several claims and defendants were dismissed from this case prior to trial.  (Dkt. 179-1 at 21). "[P]laintiffs may receive fees under § 1988 even if they are not victorious on every claim.

A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011). Where "the plaintiff's claims involve a common core of facts or are based on related legal theories, and are therefore not severable, attorney's fees may be awarded for unsuccessful claims as well as successful ones." *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (quotations and alterations omitted). Nevertheless, "[a]lthough full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case." *Id*.

Here, the Court is not persuaded that a further reduction is warranted on this basis. In particular, in exercising its discretion, the Court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," and "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation[.]" *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983). Here, there is no question that Plaintiff obtained a very significant award in his favor, and he was fully successful on all the claims that proceeded to trial. The Court does not find that this is a case in which the lodestar figure should be reduced based on the presence of unsuccessful but intertwined claims.

- 38 -

SA-39

**D.    Costs**

The Court turns to Plaintiff's request for costs.  "The Second Circuit has held for a prevailing plaintiff, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Torcivia*, 437 F. Supp. 3d at 257 (quotation omitted).  In this case, Plaintiff seeks $37,638.00 in costs.  (Dkt. 167-1 at ¶ 7).  However, as Defendant has correctly noted, Plaintiff's fee request includes $27,899.50 for expert witness fees.  (*See* Dkt. 179 at ¶ 5).  "Section 1988 does not convey the authority to shift experts' fees to the losing party" in § 1983 cases.  *Stratakos v. Nassau Cnty.*, 574 F. Supp. 3d 154, 162 (E.D.N.Y. 2021) (quotation omitted); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006) ("'[C]osts' is a term of art that generally does not include expert fees." (citation omitted)).  Further, all four of the expert witnesses in question were precluded from testifying by the Court due to counsel's failures to comply with the Federal Rules of Civil Procedure, and the Court would not award their fees even if it had the authority to do so.

Additionally, and again as Defendant correctly points out (*see* Dkt. 179 at ¶ 8), the majority of the remaining costs sought by Plaintiff were incurred in connection with other actions.  For example, Plaintiff seeks reimbursement of his filing fee in the New York State Court of Claims, as well as service fees and transcripts associated with his state court proceedings and his federal criminal proceedings.  (*See* Dkt. 167-3).

Having reviewed the documentation presented by Plaintiff, the Court finds he is entitled to reimbursement of: $400 in filing fees; $100 in service fees; $808.10 in transcript fees; and $1,166.71 in printing fees.  This is a total of $2,474.81, which is awarded to Plaintiff as costs.

III.   **Hancock's Motion for Attorneys' Fees**

The Court turns finally to Hancock's motion for attorneys' fees.  Hancock seeks fees pursuant to § 1988.  (Dkt. 169-1 at ¶ 2).  In the alternative, Hancock asks to intervene in this matter and for the Court to confirm that it has a charging lien that is enforceable against either Plaintiff or Mr. Felle.  (*See* Dkt. 169-2 at 15).

A.   **Request under § 1988**

Under § 1988, "it is the prevailing party rather than the lawyer who is entitled to attorney's fees."  *Brown v. Gen. Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1011 (2d Cir. 1983).  Accordingly, a claim for attorneys' fees under § 1988 "must itself be made by the party rather than the attorney."  *Id*.; *see also Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 361 (2d Cir. 1997) ("This Court, noting § 1988's provision for fees to be awarded to the party, has interpreted § 1988 to mean that the person who is entitled to the award of attorneys' fees is the prevailing party rather than the lawyer." (quotations omitted)).  Accordingly, under § 1988, "a former attorney who withdrew as counsel lack[s] standing to claim attorney's fees from a defendant in his own name."  *Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 552 (S.D.N.Y. 2016); *see also Babcock*

- 40 -

SA-41

*v. Rezak*, No. 96-CV-0394E(SC), 2004 WL 1574623, at *1 (W.D.N.Y. June 23, 2004) (denying former attorney's request for fees under § 1988 for lack of standing).

Hancock acknowledges that "[c]ase authority provides that under section 1988 it is the party and not the party's attorney who is entitled to apply for and obtain an award of attorneys' fees and costs" (Dkt. 169-2 at 15), but suggests that *Brown* should be limited to its facts, citing *Malarkey v. Texaco, Inc*., 794 F. Supp. 1237 (S.D.N.Y. 1992).  However, *Malarkey* did not discuss *Brown* or consider the issue of standing.  Further, there is nothing in the *Malarkey* case suggesting that the plaintiff had not joined in the request for fees by her former counsel.  By contrast, the record in this case reflects that Plaintiff deliberately did not include Hancock's fees and costs in his § 1988 application.  (*See* Dkt. 170-3).

Under the circumstances of this case, Hancock lacks standing to seek attorneys' fees from Defendant under § 1988.   The right to do so belongs to Plaintiff, who has chosen to exercise it solely with respect to fees and costs incurred by Mr. Felle and his associates and paralegal.  Indeed, Mr. Pierce seemed to concede at oral argument that Hancock's request for fees under § 1988 was contingent upon Plaintiff having joined therein, which he has not done.  Accordingly, Hancock's request for fees under § 1988 is denied.

**B.    Requests to Intervene and for a Charging Lien**

The Court turns to Hancock's alternative requests to intervene and for a charging lien.  As an initial matter, the Court notes that it has jurisdiction over Hancock's alternative requests.  "Federal courts may exercise supplemental jurisdiction to hear fee disputes

- 41 -

between litigants and their attorneys when the dispute relates to the main action." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (quotation omitted).  The Second Circuit has "held, in an unbroken line of cases, that a fee dispute between a party and its attorneys shares a common nucleus of operative fact with the underlying action." *Shukla v. Sharma*, 586 F. App'x 752, 753-54 (2d Cir. 2014) (quotation omitted).

"A charging lien is a security interest in the favorable result of litigation, giving the attorney [an] equitable ownership interest in the client's cause of action and ensuring that the attorney can collect his fee from the fund he has created for that purpose on behalf of the client." *Charnow v. Charnow*, 134 A.D.3d 875, 876 (2d Dep't 2015) (citation omitted). "The Second Circuit has made clear that Section 475 [of the New York Judiciary Law] governs attorneys' charging liens in federal courts sitting in New York, and such liens are 'enforceable in federal courts in accordance with its interpretation by New York courts.'" *Stair v. Calhoun,* 722 F.Supp.2d 258, 267 (E.D.N.Y. 2010) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 449 (2d Cir. 1998)).

"The Second Circuit has not decided whether attorneys may intervene solely for the purpose of protecting their contractual rights to fees or to enforce a charging lien." *United States v. Salix Pharms., Ltd.*, No. 15CV706 (DLC), 2016 WL 4402044, at *3 (S.D.N.Y. Aug. 18, 2016).  Indeed, the Second Circuit has noted that "there are arguments both for and against allowing discharged attorneys to intervene to protect their legal fees" and that it is a "close question." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171,

176 (2d Cir. 2001); *see also Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 745-46 (2d Cir. 2017) (declining to reach issue of whether attorney's "asserted contractual interest and statutory charging lien on the proceeds from a judgment in favor of certain plaintiffs he used to represent" was "valid and sufficient to support intervention of right"). However, the Court does not find that intervention is required in order for Hancock to seek confirmation of its charging lien.   As noted above, the Second Circuit has made clear that Judiciary Law § 475 governs attorneys' charging liens in federal courts sitting in New York, and Judiciary Law § 475 empowers the Court "upon the petition of the client <u>or attorney</u>" to "determine and enforce the lien."   N.Y. Judiciary L. § 475 (emphasis added). Accordingly, in *Itar-Tass*, the Second Circuit held that former counsel may seek to enforce his lien even when permitted to withdraw as attorney of record.   140 F.3d at 451.   In other words, counsel who has "been an attorney of record" is "entitled to have . . . his charging lien determined by the district court under Section 475."   *Id*. at 452.   The Court thus denies Hancock's request for intervention as moot.

As to the request for confirmation of the charging lien, "attorneys who terminate their representation are . .  entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'"   *Stair*, 722 F. Supp. 2d at 267.   Here, while Mr. Felle apparently took the position at one time that Hancock had been discharged for cause (*see* Dkt. 170-5 at 4), Plaintiff did not file any opposition to Hancock's motion for attorneys' fees.   It is the client's burden to show a

- 43 -

SA-44

discharge for cause in opposition to an assertion of a charging lien.  *See Love & Madness, Inc. v. Claire's Holdings, LLC*, No. 21 CIV 1913 ATSLC, 2021 WL 4554058, at *4 (S.D.N.Y. Oct. 4, 2021).  Plaintiff has not done so here.

As to the amount of the charging lien, "the proper method of fixing the sum of the lien is through a *quantum meruit* analysis, which requires ascertaining the reasonable value of the services rendered." *Pettiford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1331918, at *3 (S.D.N.Y. Mar. 20, 2020) (quotation and alteration omitted), *aff'd*, 833 F. App'x 893 (2d Cir. 2020).  Much like determining an award under § 1988, this generally involves calculating the lodestar figure, "which is the product of a reasonable hourly rate and the reasonable number of hours required by the case."  *Id*. at *5 (quotation omitted).

Here, Hancock seeks $183,426.50 in fees.  (*See* Dkt. 169-1 at ¶ 12).  This consists of 439.3 hours expended by Mr. Pierce, 11.8 hours expended by associate Paul Tuck, 2.1 hours expended by associate Mary D'Agostino, 27.6 hours expended by associate William Hython, and 2.1 hours expended by paralegal Amy Cobb.  (*Id*.).  However, in reply, Hancock concedes that certain entries were included in its request that should not have been, as they related to the *Ortiz v. Case* matter or the New York Court of Claims matter. The Court has reviewed the billing records submitted by Hancock, and concludes that 22.7 hours charged by Mr. Pierce, two hours charged by Mr. Tuck, and 8.3 hours charged by Mr. Hython were on matters other than the instant case.   This brings the hours totals to 416.6 for Mr. Pierce, 9.8 hours for Mr. Tuck, and 19.3 hours for Mr. Hython.

- 44 -

SA-45

The Court further finds that a 15% across-the-board reduction is appropriate, due to the vagueness of certain time entries and excessive time spent on certain routine matters. A few examples of vague entries include: an entry on August 3, 2017, that states "[r]eviewed documents for case"; an entry on August 21, 2017, that states "[e]mails with Attorney Felle re case"; an entry on November 21, 2017, that states "[t]elephone conference with Attorney Felle"; and an entry on March 16, 2022, that states "[p]repared pretrial filings." (Dkt. 170).   As for examples of excessive time spent on routine matters: an entry on October 18, 2017, reflects 0.2 hours spent to "[r]eceive[] ECF notices re mediation"; an entry on November 12, 2019, reflects 0.3 hours spent on an email to opposing counsel "re extending schedule"; an entry on June 4, 2020, reflects 0.3 hours for "[r]eceived and reviewed notice of improper e-filing; re-filed letter to Judge Wolford; received extension grant from Judge"; and an entry on July 6, 2021, reflects 0.2 hours for receiving and reviewing a text order requiring the filing of a status report. (*Id*.).  Applying this reduction results in a total of 354.1 hours expended by Mr. Pierce, 8.3 hours expended by Mr. Tuck, 1.8 hours expended by Ms. D'Agostino, 16.4 hours expended by Mr. Hython, and 1.8 hours expended by Ms. Cobb.

As to the requested rates, for essentially the reasons discussed above with respect to Mr. Felle and his associates and paralegals, the Court finds that a reasonable rate for Mr. Pierce is $300 per hour, a reasonable rate for Mr. Tuck is the requested $185 per hour,  a reasonable rate for Ms. D'Agostino is $200 per hour, a reasonable rate for Mr. Hython is

SA-46

the requested $190 per hour, and a reasonable rate for Ms. Cobb is $100 per hour.[5]  This amounts to fees of $111,421.50.

Hancock also seeks $2,628.13 in disbursements.  A charging lien includes costs, so long as they are substantiated.  *See Winkfield v. Kirschenbaum & Phillips, P.C.*, No. 12 CIV. 7424 JMF, 2013 WL 371673, at *4 (S.D.N.Y. Jan. 29, 2013).  Here, Hancock has not substantiated its requests with documentation, but has simply submitted a list of purported disbursements with vague entries such as "travel."  (Dkt. 170-1 at 2-3).  The Court accordingly does not include the request for costs in its calculation of the charging lien. *See Winkfield*, 2013 WL 371673, at *4.

The Court rejects Hancock's alternative argument that it "is entitled to an award for its fees and costs from Mr. Felle under *Cheng v. Modansky Leasing Co., Inc*., 73 N.Y.2d 454, 458 (1989)."  (Dkt. 169-2 at 20).  The provision of *Cheng* Hancock relies upon applies when "the fee dispute is . . . between the discharged attorney and a subsequently retained attorney."  *Crout v. Haverfield Int'l, Inc.*, 348 F. Supp. 3d 219, 229 (W.D.N.Y. 2018). Here, there is no indication that the fee dispute is between Hancock and Mr. Felle, as

---

[5]    Hancock has cited to a few cases approving higher hourly rates for experienced partners outside the civil rights context.  (*See* Dkt. 169 at 10-11).  However, "the range of 'reasonable' attorneys' fee rates varies depending on the type of case," *Yash Raj Films (USA) Inc v. Bobby Music Co. & Sporting Goods Inc.*, No. 01 CV 8378 (JFB), 2007 WL 9706613, at *4 (E.D.N.Y. Sept. 5, 2007), and the Court has focused its analysis on the rates typically charged in this District for civil rights litigation.

SA-47

opposed to Hancock and Plaintiff.  Under the circumstances of this case, Hancock is entitled to a charging lien against its former client.

## CONCLUSION

For the reasons set forth above, the Court: (1) denies Defendant's motions for judgment as a matter of law, for a new trial, and for remittitur (Dkt. 177); (2) grants Plaintiff's motion for attorneys' fees pursuant to § 1988 (Dkt. 167) to the extent it awards Plaintiff $123,550.00 in attorneys' fees and $2,474.81 in costs, and otherwise denies Plaintiff's motion for attorneys' fees; and (3) grants Hancock's motion for attorneys' fees (Dkt. 169) to the extent that it confirms Hancock's charging lien against Plaintiff in the amount of $111,421.50, and otherwise denies Hancock's motion.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 17, 2022
        Rochester, New York

- 47 -