# 23-0352

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

JOSUE ORTIZ,

*Plaintiff-Appellee,*

— v. —

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## APPENDIX FOR DEFENDANT-APPELLANT
### Volume 4 (Pages A-741 to A-982)

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

## TABLE OF CONTENTS

**Page**

### Volume 1

District Court Docket List...........................................  A-1

Amended Complaint, dated March 27, 2019 .............  A-34

Answer to Amended Complaint,
   dated April 15, 2019 ................................  A-56

Notice of Motion to Dismiss, dated April 24, 2020...  A-80

Memorandum of Law in Support of Defendants'
   Motion to Dismiss, dated April 24, 2020..............  A-82

Supporting Declaration, dated April 24, 2020 ...........  A-107

Exhibit A to Declaration -
Affidavit of Lt. Salvatore Losi,
sworn to on April 15, 2020...................................  A-112

Exhibit B to Declaration -
P-73 of Mark R. Stambach, dated November 16,
2004, and Notes.....................................................  A-114

Exhibit C to Declaration -
Plaintiff's Deposition Transcript,
dated March 15, 2018............................................  A-117

### Volume 2

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019..........................................  A-241

ii

Page

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 ............................................ A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ........................................................................ A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 ............................................ A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................. A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ........................................................................ A-746

Exhibit I to Declaration -
Indictment ............................................................... A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ........................................ A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ......................................... A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction ............................................................... A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit ................................................. A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ...................................... A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ...................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing ................................................................... A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ...................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion ..................................................................... A-983

Statement of Undisputed Facts,
dated April 24, 2020 ............................................... A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 .................................................. A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
    Material Facts, dated July 3, 2020 ........................  A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.*
*Ortiz*, Indictment No. 02630-04 ...........................  A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ...............  A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ......................................  A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued)............................................................  A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019....................................  A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3............................  A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ...............................................................  A-1450

v

Page

### Volume 7

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................ A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ........................................ A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 ............................................... A-1706

### Volume 8

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 ............... A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
    Defendants' Motion to Dismiss, and for
    Judgment on the Pleadings and/or Summary
    Judgment, dated July 5, 2020 ............................... A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
    Defendants' Motion to Dismiss,
    dated July 24, 2020 ................................................. A-1789

Decision and Order of the Honorable Elizabeth A.
    Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
    dated April 1, 2022 ................................................. A-1837

Defendants' Proposed Jury Instructions,
    dated April 1, 2022 ................................................. A-1861

Plaintiffs' Reply Motions in Limine,
    dated April 6, 2022 ................................................. A-1924

Defendant's Objections to Plaintiff's Proposed Jury
    Instructions, dated April 6, 2022 ........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022 ........ A-1937

Stipulation of Undisputed Facts,
    dated April 27, 2022 ............................................... A-1996

Trial Transcript, Preliminary Instructions and
    Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022 ........................... A-2053

vii

**Page**

Plaintiff's Witnesses:

    E. Coogins        Direct.........................  A-2054
                        Cross...........................  A-2116

    J. Ortiz            Direct.........................  A-2125

**Volume 10**

Trial Transcript, dated May 4, 2022
    (Cotinued) ...........................................  A-2187

    M. Vaughn        Direct.........................  A-2189
                        Cross...........................  A-2219
                        Redirect .....................  A-2225

    J. Lonergan      Direct.........................  A-2229
                        Cross...........................  A-2281
                        Redirect .....................  A-2284
                        Recross ......................  A-2287

Trial Transcript, dated May 5, 2022.........................  A-2297

    M. Stambach    Direct.........................  A-2299
                        Cross...........................  A-2361
                        Redirect .....................  A-2384

    J. Ortiz            Direct.........................  A-2393
                        Cross...........................  A-2426

**Volume 11**

Trial Transcript, dated May 6, 2022.........................  A-2467

    M. Evans        Direct.........................  A-2470
                        Cross...........................  A-2495

    M. Lauber       Direct.........................  A-2504
                        Cross...........................  A-2518

Trial Transcript, May 9, 2022 ..................................  A-2554

viii

**Page**

| J. Ortiz | Direct | A-2599 |
| | Cross | A-2653 |
| | Redirect | A-2671 |
| | Recross | A-2674 |

Trial Transcript, Closing Arguments, May 9, 2022 ... A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
(Continued) ............................................................. A-2717

Jury Questionnaire, dated May 9, 2022 ..................... A-2760

Jury Questionnaire, Damages, dated May 9, 2022 .... A-2764

Judgment in a Civil Case, dated May 10, 2022 ......... A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
dated May 20, 2022 ................................................ A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
Support of Motion, dated May 20, 2022................ A-2768

    Exhibit A to Felle Declaration -
    Ledger.................................................................. A-2773

    Exhibit B to Felle Declaration -
    Invoices for Services ........................................... A-2792

Plaintiff's Memorandum of Law in Support of his
Motion for Attorneys' Fees and Costs,
dated May 20, 2023 ............................................... A-2823

Notice of Motion, by Defendant, for Judgment as a
Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
new trial Pursuant to Fed. R. Civ. P. 59(a), and
for Remittur Pursuant to Fed. R. Civ. P. 59(e),
dated June 7, 2022 ................................................. A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
   Defendant, in Support of Motion,
     dated June 7, 2022 ................................................ A-2848

   Exhibit A to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Plaintiff .................................................................. A-2862

   Exhibit B to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Defendant .............................................................. A-2909

Memorandum of Law in Support of Motion for
   Judgment as a Matter of Law Under Fed. R. Civ.
   P. 50(b), dated June 7, 2022 .................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
   to Plaintiff's Motion for Attorneys' Fees,
     dated June 10, 2022 ................................................ A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
   Plaintiff's Motion for Attorneys' Fees,
     dated June 10, 2022 ................................................ A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
   Opposition to Defendant's Post Trial Motion,
     dated June 28, 2022 ................................................ A-3013

Plaintiff's Memorandum of Law in Opposition to
   Defendant's Post Trial Motions,
     dated June 28, 2022 ................................................ A-3023

Reply Memorandum of Law in Further Support of
   Defendant's Motion for Judgment as a Matter of
   Law, a New Trial, or Remittitur,
     dated July 8, 2022 .................................................. A-3071

**x**

|  | Page |
|---|---|
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 ........................ | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 ......................................... | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 ..... | A-3159 |

**particular** [2] - 57:5, 57:18
**parties** [2] - 4:5, 139:9
**parts** [4] - 41:18, 89:23, 126:16
**party** [3] - 26:6, 31:23, 186:14
**passed** [1] - 182:8
**past** [1] - 60:21
**Patrick** [4] - 149:5, 151:12, 157:21, 158:1
**patrol** [1] - 185:1
**peace** [1] - 28:6
**peaceful** [1] - 28:6
**people** [11] - 36:22, 53:23, 54:8, 54:17, 56:3, 130:19, 153:18, 161:3, 176:21, 177:20, 178:9
**people's** [1] - 68:3
**percent** [1] - 163:14
**perfect** [1] - 5:23
**period** [4] - 16:7, 57:7, 57:8, 118:19
**perpetrator** [1] - 134:23
**perpetrators** [8] - 132:22, 135:5, 135:13, 153:11, 154:22, 155:7, 160:17, 161:15
**person** [7] - 23:12, 69:3, 149:19, 166:5, 171:6, 171:7, 177:7
**personal** [1] - 11:10
**personally** [1] - 81:3
**persons** [3] - 20:12, 28:8, 175:5
**pertaining** [2] - 26:10, 158:14
**pertains** [1] - 25:2
**Philip** [2] - 7:17, 87:7
**phone** [1] - 5:16
**phonetically** [1] - 70:5
**photograph** [3] - 38:19, 39:14, 39:15
**photographs** [2] - 38:14, 41:5
**phrased** [1] - 142:9
**phraseology** [1] - 126:21
**physical** [5] - 20:13, 113:23, 132:4, 132:14, 161:22, 162:1
**physically** [1] - 145:14
**picked** [1] - 56:9
**picture** [1] - 39:5

**pictures** [2] - 38:8, 38:17
**piece** [2] - 126:12
**place** [6] - 78:6, 140:12, 164:10, 166:14, 174:22, 186:10
**placed** [4] - 98:9, 136:3, 137:8, 140:20
**placing** [2] - 162:14, 164:13
**Plaintiff** [2] - 1:5, 2:4
**plural** [1] - 112:2
**point** [24] - 41:22, 42:4, 60:21, 63:15, 74:6, 76:15, 76:20, 82:10, 96:10, 98:1, 98:10, 107:20, 108:2, 109:15, 112:14, 117:4, 119:12, 122:22, 123:23, 124:12, 125:9, 141:16, 142:1, 151:19
**points** [1] - 179:5
**Poleon** [4] - 87:16, 87:17, 87:18, 88:10
**POLEON** [1] - 87:17
**Police** [44] - 7:8, 7:18, 8:3, 9:2, 9:11, 9:18, 10:11, 12:13, 12:19, 14:21, 17:13, 18:2, 18:18, 18:23, 19:3, 19:22, 22:17, 22:21, 26:18, 27:13, 28:17, 32:10, 36:20, 37:5, 44:9, 46:19, 54:6, 67:19, 69:7, 87:19, 89:2, 94:17, 135:13, 144:15, 151:22, 170:20, 172:10, 172:17, 173:3, 173:5, 175:4, 176:20, 184:22, 185:1
**police** [37] - 7:1, 7:12, 10:2, 10:3, 11:11, 12:15, 12:17, 16:20, 20:2, 20:20, 21:17, 25:10, 26:4, 26:8, 26:20, 32:1, 44:12, 46:18, 86:3, 86:18, 87:9, 87:12, 87:16, 88:2, 88:14, 88:15, 89:12, 98:8, 106:14, 106:21, 106:22, 143:15, 161:18, 163:2, 165:4, 165:19, 177:8
**policies** [5] - 26:19,

44:10, 67:18, 172:18, 173:4
**portion** [5] - 27:2, 27:5, 27:6, 53:2, 59:17
**portions** [1] - 50:18
**posed** [2] - 117:2, 118:7
**posing** [1] - 109:17
**position** [2] - 9:2, 118:10
**positions** [2] - 7:11, 10:3
**possible** [4] - 17:2, 135:12, 144:13
**post** [1] - 19:14
**Practice** [1] - 1:12
**preparation** [2] - 30:14, 30:22
**prepare** [7] - 31:9, 32:14, 42:6, 44:11, 100:7, 159:3, 185:4
**prepared** [6] - 63:23, 67:7, 135:19, 140:10, 157:20, 167:11
**present** [7] - 5:12, 39:13, 140:7, 144:21, 144:22, 178:17, 180:3
**preserve** [5] - 22:9, 145:2, 153:6, 162:7, 171:10
**pretty** [1] - 21:7
**previous** [1] - 52:21
**previously** [1] - 26:23
**primary** [2] - 63:10, 63:12
**printed** [1] - 179:3
**private** [1] - 7:5
**problem** [2] - 51:9, 162:22
**problematic** [1] - 142:8
**procedure** [2] - 55:19, 175:9
**procedures** [6] - 26:19, 27:13, 44:10, 67:18, 172:18, 173:4
**proceed** [1] - 5:22
**proceedings** [1] - 45:7
**process** [1] - 170:21
**produced** [4] - 107:5, 109:19, 132:6, 135:11
**professional** [1] - 19:1
**proficient** [1] - 20:1
**prohibit** [1] - 162:11
**proper** [5] - 155:16, 156:23, 162:23,

171:15, 175:9
**property** [1] - 28:4
**protect** [3] - 28:4, 28:18, 165:20
**protected** [1] - 173:18
**protocol** [3] - 176:20, 177:6, 177:10
**provide** [12] - 12:18, 13:3, 17:9, 19:11, 36:3, 56:3, 56:14, 62:18, 65:21, 77:10, 78:14, 107:2
**provided** [14] - 16:21, 45:5, 49:14, 51:7, 61:5, 67:8, 67:10, 68:10, 89:1, 95:23, 111:20, 115:17, 138:21, 177:6
**providing** [2] - 20:19, 66:5, 153:10
**psychiatric** [4] - 93:9, 93:19, 120:22, 177:4
**psychological** [4] - 54:9, 175:16, 176:22, 177:15
**psychologically** [1] - 176:5
**psychotic** [3] - 176:2, 176:22, 177:16
**Public** [8] - 1:16, 186:5, 186:20
**pulled** [1] - 57:8
**purely** [1] - 106:18
**purpose** [8] - 42:20, 63:2, 65:10, 78:13, 79:9, 137:6
**purposes** [2] - 19:12, 42:9
**pursuant** [2] - 1:11, 186:10
**put** [3] - 5:9, 124:13, 179:16

**Q**

**quality** [2] - 28:9, 31:3
**quantities** [1] - 70:9
**questioned** [5] - 46:22, 118:17, 119:3, 172:17, 177:8
**questioning** [9] - 32:2, 38:15, 48:9, 66:7, 80:17, 80:22, 130:18, 135:20, 140:11
**questions** [41] - 4:9, 15:6, 15:11, 15:20, 15:22, 21:11, 22:11, 48:5, 51:8, 81:15, 83:6, 109:17,

114:11, 117:2, 117:6, 118:7, 121:12, 121:14, 121:17, 121:23, 122:12, 123:1, 123:2, 126:13, 126:14, 129:18, 129:23, 130:8, 131:4, 142:18, 142:21, 143:2, 143:23, 145:5, 154:15, 156:23, 162:20, 162:21, 162:23, 171:13
**quick** [1] - 38:9
**quite** [1] - 39:19

**R**

**random** [1] - 54:21
**range** [1] - 43:11
**reach** [1] - 32:22
**reached** [3] - 37:8, 37:14, 52:17
**read** [16] - 14:5, 23:15, 23:19, 27:3, 27:7, 27:14, 27:21, 27:23, 50:18, 50:21, 50:23, 55:7, 58:18, 65:1, 68:3, 69:10, 69:15, 71:2, 71:12, 75:8, 81:23, 83:8, 83:15, 89:13, 89:22, 90:22, 94:3, 94:5, 96:3, 96:6, 97:15, 99:1, 102:4, 103:17, 116:7, 116:11, 117:12, 117:22, 119:18, 119:20, 123:5, 123:13, 123:16, 124:5, 126:10, 126:11, 126:12, 129:17, 130:9, 131:2, 135:21, 150:5, 150:7, 155:19, 155:20, 155:23, 156:1, 156:2, 156:20, 163:2, 169:4
**reading** [8] - 51:14, 55:8, 69:13, 73:19, 124:9, 125:11, 141:21, 142:20
**reads** [1] - 125:8
**real** [2] - 40:8, 178:3
**reality** [1] - 176:6
**really** [1] - 68:20
**reason** [10] - 41:21, 49:10, 56:13, 63:3, 110:23, 112:16,

157:19, 167:3, 167:10, 167:21
**reasons** [1] - 57:9
**receive** [1] - 36:2
**received** [5] - 9:1, 35:9, 52:9, 55:8, 55:10
**receiving** [2] - 8:7, 26:18
**recess** [1] - 86:11
**recognize** [1] - 176:5
**recognizing** [1] - 177:14
**recollection** [21] - 16:4, 16:15, 37:21, 39:17, 39:20, 40:12, 42:9, 46:2, 53:12, 61:10, 61:12, 71:3, 72:1, 78:18, 78:19, 99:8, 101:19, 103:10, 109:5, 119:9, 140:14
**record** [26] - 4:17, 5:9, 6:2, 15:23, 21:22, 22:9, 23:19, 24:17, 24:21, 31:17, 31:19, 51:10, 64:19, 69:12, 77:15, 77:20, 78:4, 83:15, 86:14, 105:21, 109:14, 145:3, 150:7, 164:11, 171:10, 174:6
**recorded** [8] - 50:3, 90:15, 122:4, 123:3, 138:6, 185:7
**recording** [4] - 138:12, 138:20, 139:12, 139:17
**recordings** [1] - 16:6
**records** [1] - 53:11
**redirect** [1] - 83:7
**refer** [5] - 50:15, 58:15, 96:2, 116:4, 150:1
**Referee** [1] - 4:6
**reference** [5] - 68:18, 75:18, 76:8, 79:16, 108:12
**referenced** [3] - 67:6, 68:11, 80:9
**referencing** [3] - 40:4, 51:11, 90:10
**referring** [18] - 29:21, 30:10, 30:13, 48:18, 64:17, 64:21, 68:1, 75:19, 76:21, 92:19, 100:13, 100:18, 128:17, 147:2, 150:19, 151:10,

169:2, 169:3
**reflect** [4] - 51:10, 64:19, 69:12, 78:4
**reflects** [1] - 92:6
**refrain** [1] - 79:5
**refresh** [15] - 29:2, 50:19, 53:3, 60:23, 78:18, 78:19, 100:14, 109:5, 109:10, 119:9, 128:5, 128:8, 130:1, 140:13, 150:4
**refreshed** [1] - 16:15
**refresher** [2] - 20:5, 20:6
**refreshes** [2] - 61:3, 61:10
**refreshing** [1] - 61:12
**regarding** [16] - 5:3, 21:16, 31:11, 54:23, 71:16, 77:23, 80:23, 87:3, 90:8, 95:2, 159:22, 160:5, 161:23, 173:4, 180:12
**regards** [1] - 46:23
**regular** [1] - 58:6
**regularly** [2] - 58:2, 58:4
**relate** [1] - 65:9
**related** [3] - 122:14, 177:16, 186:14
**relating** [7] - 29:17, 37:7, 48:9, 64:1, 64:13, 86:3, 86:18
**relation** [1] - 7:19
**relationship** [1] - 18:22
**relative** [9] - 36:4, 67:19, 111:9, 129:20, 142:21, 144:14, 149:19, 153:11, 160:16
**release** [2] - 35:18, 45:8
**relevance** [3] - 21:15, 22:4, 26:12
**relevancy** [1] - 184:5
**relevant** [8] - 11:13, 15:18, 107:3, 107:7, 159:13, 159:14, 159:18, 168:4
**reliable** [1] - 176:12
**rely** [1] - 181:14
**remember** [15] - 5:4, 16:5, 40:18, 40:19, 40:22, 52:1, 53:16, 53:22, 58:11, 67:2, 82:20, 105:2, 143:2, 147:14, 166:17

**remembers** [1] - 77:18
**remind** [2] - 109:2, 142:3
**Renaldo** [1] - 37:12
**rented** [1] - 70:6
**repeat** [11] - 19:17, 23:14, 44:23, 80:18, 87:21, 91:7, 136:16, 149:22, 161:10, 172:22, 181:4
**repeated** [2] - 65:14, 65:15
**report** [2] - 56:12, 87:8
**reported** [1] - 158:22
**REPORTER** [1] - 4:16
**reporter** [2] - 23:19, 150:7
**reports** [2] - 34:7, 35:8
**request** [1] - 105:22
**requested** [1] - 57:1
**require** [2] - 68:2, 171:11
**required** [7] - 21:2, 26:20, 28:17, 98:3, 98:16, 133:21, 134:5
**requirement** [1] - 165:5
**reserve** [1] - 153:2
**reserved** [1] - 4:9
**reside** [1] - 10:6
**respect** [2] - 23:11, 25:8, 28:7, 37:15, 39:16, 43:14, 44:10, 47:7, 66:6, 68:19, 84:21, 113:23, 133:19, 134:15, 135:5, 139:18, 161:16, 168:18, 172:11, 173:14, 180:6
**respective** [1] - 4:5
**respond** [1] - 91:14
**responding** [4] - 20:20, 20:21, 26:4, 117:16
**response** [4] - 22:12, 84:8, 122:13, 145:5
**responsibilities** [1] - 12:17
**responsibility** [4] - 161:5, 163:4, 165:12, 165:20
**result** [2] - 171:13, 172:12
**resulted** [2] - 35:16, 170:21
**retail** [1] - 12:6
**retire** [1] - 6:9
**retired** [12] - 6:6, 6:18, 9:19, 11:9, 21:17,

47:21, 47:22, 89:4, 143:16, 172:7, 173:18, 182:9
**retirement** [8] - 6:11, 22:22, 25:4, 25:17, 25:18
**review** [11] - 29:2, 29:5, 29:10, 29:17, 31:10, 31:22, 36:22, 41:9, 65:13, 90:17, 179:8
**reviewed** [16] - 29:20, 30:5, 30:14, 30:22, 31:4, 31:9, 32:14, 39:18, 40:23, 41:5, 49:2, 49:13, 49:21, 93:6, 100:6, 125:2
**Rights** [1] - 22:5
**rights** [18] - 22:23, 23:11, 25:2, 25:3, 25:5, 25:22, 28:8, 97:16, 98:16, 99:2, 129:17, 131:3, 141:22, 145:13
**ring** [2] - 70:3, 70:6
**road** [2] - 7:4, 20:19
**Roberto** [3] - 10:1, 10:2, 17:9
**Rodriguez** [3] - 10:1, 17:9, 88:16, 88:17, 88:20
**role** [2] - 133:18, 141:14
**Rondon** [1] - 37:12
**room** [22] - 74:7, 82:18, 110:2, 114:9, 116:2, 120:2, 123:18, 136:4, 136:20, 137:9, 137:12, 137:17, 137:18, 138:3, 138:14, 145:16, 145:19, 148:16, 174:13, 174:22
**rooms** [4] - 136:5, 136:9, 138:6, 174:9
**roughly** [1] - 38:23
**Rules** [1] - 1:12
**rules** [6] - 15:14, 77:23, 162:11, 172:10, 172:13, 173:7
**running** [1] - 154:20, 156:16

**S**

**Sadlocha** [1] - 107:23
**SADLOCHA** [1] - 107:23

**safe** [1] - 12:5
**safeguard** [1] - 28:3
**safety** [1] - 175:12
**sandwich** [1] - 145:9
**saw** [7] - 7:16, 92:23, 95:4, 156:16, 178:6, 178:20, 183:2
**scale** [3] - 38:20, 39:2, 39:3
**scared** [3] - 72:11, 72:21, 74:21
**scene** [2] - 41:5, 132:4
**scenes** [1] - 43:11
**scheduled** [1] - 56:13
**school** [4] - 8:8, 8:13, 14:5, 14:7
**School** [2] - 8:15, 8:23
**Schreckenberger** [1] - 87:10
**SCHRECKENBERG ER** [1] - 87:11
**seal** [1] - 186:17
**second** [10] - 17:15, 17:20, 30:20, 38:8, 64:18, 65:7, 70:1, 102:7, 119:12, 152:2
**secondary** [1] - 17:14
**secured** [1] - 18:2
**security** [8] - 6:23, 7:1, 11:11, 17:16, 17:18, 17:22
**Sedita** [2] - 33:4
**see** [20] - 59:1, 65:19, 75:5, 79:15, 88:4, 92:13, 105:3, 105:23, 113:18, 114:9, 124:13, 128:11, 129:9, 129:12, 129:14, 151:16, 152:7, 155:2, 178:23, 184:12
**seeing** [4] - 88:3, 101:16, 149:9, 179:21
**seem** [1] - 73:14
**selling** [1] - 70:23
**seminars** [2] - 19:11, 19:23
**sent** [2] - 50:12, 184:13
**sentence** [5] - 64:18, 65:20, 70:12, 96:12, 156:19
**sentiment** [1] - 183:23
**Sergeant** [4] - 87:7, 140:12, 140:20, 147:13
**serve** [2] - 28:3, 182:5
**service** [1] - 20:20

**services** [7] - 12:18, 56:15, 57:13, 62:19, 63:4, 78:14, 185:9
**serving** [2] - 32:9, 45:9
**set** [3] - 74:10, 167:21, 186:10
**seven** [1] - 156:11
**several** [1] - 17:19
**share** [1] - 165:14
**sheet** [1] - 49:8
**shift** [3] - 103:7, 146:6, 146:9
**shipping** [1] - 8:6
**shooting** [1] - 64:14
**short** [6] - 42:8, 57:7, 86:8, 86:11, 86:15
**shorthand** [1] - 186:12
**shortly** [1] - 116:16
**shoulder** [1] - 155:23
**show** [14] - 26:22, 27:1, 30:9, 30:11, 38:5, 53:11, 54:21, 64:12, 64:16, 87:23, 114:17, 114:18, 151:1, 169:1
**showed** [1] - 30:23
**shown** [5] - 89:6, 90:16, 150:2, 150:10, 185:3
**shows** [1] - 92:4
**sick** [1] - 10:8
**Side** [1] - 46:20
**side** [2] - 8:16, 21:9
**sign** [3] - 126:7, 165:8, 170:2
**signature** [1] - 30:17, 125:16, 127:14, 127:15, 128:2, 128:9, 128:10, 128:15, 128:19, 134:6
**signatures** [1] - 129:1
**signed** [7] - 125:15, 125:19, 125:22, 126:1, 134:14, 145:12, 165:19
**signing** [1] - 4:6
**simple** [1] - 109:1
**simply** [3] - 15:16, 151:19, 168:5
**simultaneous** [1] - 163:7
**sits** [1] - 164:21
**sitting** [2] - 112:16, 113:18
**six** [1] - 39:1
**sixth** [1] - 142:13
**small** [1] - 182:12

**snow** [1] - 10:8
**solely** [1] - 143:22
**someone** [2] - 72:12, 75:7
**sometime** [3] - 102:16, 102:18, 103:19
**somewhat** [2] - 74:23, 75:1
**somewhere** [1] - 145:17
**sorry** [16] - 6:14, 13:16, 19:18, 58:22, 59:2, 67:9, 71:11, 73:23, 80:14, 94:1, 100:21, 127:1, 136:13, 136:16, 146:23, 183:19
**sort** [1] - 8:7
**sorts** [1] - 74:23
**sound** [1] - 145:22
**sources** [1] - 35:9
**span** [1] - 143:23
**Spanish** [22] - 12:18, 13:3, 14:3, 14:4, 14:6, 14:22, 16:21, 29:10, 56:15, 57:13, 62:18, 63:4, 65:21, 69:9, 89:1, 89:3, 110:2, 110:9, 110:19, 111:1, 116:20, 122:12
**Spanish/English** [2] - 14:1, 17:10
**speaking** [3] - 11:7, 11:20, 40:14
**speaks** [3] - 89:11, 119:12, 154:9
**specialized** [2] - 21:1, 21:3
**specific** [6] - 20:2, 20:9, 112:19, 141:13, 142:21, 173:17
**specifically** [10] - 27:14, 28:16, 33:15, 48:8, 57:2, 57:22, 64:16, 84:4, 87:5, 143:3
**specifics** [4] - 55:3, 119:8, 120:6, 130:5
**speculate** [4] - 62:6, 106:12, 124:4, 161:20
**speculation** [9] - 15:10, 56:7, 106:19, 115:5, 138:16, 143:10, 163:10, 165:10
**speculative** [1] - 39:8

**speed** [1] - 34:7
**spelled** [2] - 70:5, 87:10
**spoken** [4] - 33:3, 33:6, 110:19, 171:18
**Squad** [5] - 52:12, 55:12, 57:2, 57:6, 57:9
**squad** [1] - 36:21
**ss** [1] - 186:2
**stable** [1] - 20:12
**Stambach** [75] - 18:3, 18:15, 18:19, 31:14, 33:19, 57:23, 58:3, 60:10, 66:23, 104:15, 104:22, 106:1, 106:4, 107:2, 107:17, 107:22, 109:17, 110:8, 110:20, 111:4, 111:8, 111:15, 112:4, 112:15, 113:7, 114:10, 115:18, 115:22, 117:3, 117:4, 120:2, 120:10, 120:20, 121:13, 121:23, 122:11, 122:14, 123:10, 123:13, 123:21, 127:23, 128:3, 129:6, 129:19, 133:21, 134:4, 135:20, 137:7, 140:11, 141:2, 141:10, 142:2, 142:3, 144:1, 144:17, 146:14, 147:1, 147:5, 157:8, 158:11, 159:15, 160:19, 161:5, 161:18, 163:5, 165:6, 168:12, 180:8, 180:10, 180:21, 181:8, 181:15, 182:4, 183:16
**Stambach's** [2] - 18:10, 128:15
**stamp** [1] - 128:17
**stand** [1] - 155:22
**standing** [2] - 80:15, 126:20
**stars** [1] - 179:17
**start** [5] - 45:19, 59:3, 73:19, 79:23, 117:10, 117:21
**started** [6] - 26:17, 75:5, 103:7, 114:22, 140:22, 141:10
**starting** [7] - 73:18,

73:22, 81:17, 83:10, 102:5, 103:17, 175:3
**starts** [1] - 156:14
**State** [4] - 5:10, 37:11, 186:6, 186:21
**STATE** [3] - 1:1, 1:7, 186:1
**state** [3] - 4:16, 162:4, 173:22
**statement** [38] - 28:11, 29:6, 29:7, 29:21, 29:22, 30:9, 30:13, 33:18, 36:3, 37:9, 38:16, 50:10, 55:1, 69:11, 78:22, 100:14, 108:18, 109:3, 117:16, 125:8, 125:9, 125:12, 125:14, 126:4, 126:6, 128:22, 129:23, 138:13, 145:20, 158:18, 164:15, 165:8, 166:5, 166:15, 176:13, 179:14, 180:14, 180:20
**statements** [8] - 33:16, 33:17, 42:7, 95:4, 131:22, 132:21, 138:21, 175:17
**states** [1] - 69:7
**stature** [2] - 38:23, 132:22
**stay** [3] - 12:5, 18:14, 18:13
**stayed** [1] - 34:6
**stem** [1] - 145:5
**still** [2] - 145:16, 178:10
**stipulated** [1] - 4:4
**stipulations** [1] - 4:1
**stop** [1] - 108:23
**stopped** [2] - 125:10, 125:14
**stops** [1] - 20:12
**stored** [1] - 70:9
**stores** [2] - 17:19
**straight** [1] - 51:18
**street** [3] - 46:6, 46:10, 46:15
**Street** [12] - 1:13, 2:2, 12:11, 46:20, 47:8, 71:8, 71:17, 84:5, 149:21, 152:23, 156:16, 157:13
**Streets** [1] - 154:22
**strictly** [4] - 9:1, 118:14, 131:18,

133:18
**strong** [1] - 166:16
**stuff** [1] - 7:2
**subject** [4] - 9:8, 173:10, 180:17, 185:11
**submitted** [3] - 151:11, 151:12, 158:1
**subscribed** [1] - 186:17
**subsequent** [6] - 34:3, 35:14, 92:23, 170:10, 171:12, 182:2
**suffering** [4] - 175:15, 176:2, 176:21, 177:15
**summarize** [1] - 155:14
**Sunday** [1] - 14:5
**superseding** [2] - 35:16, 182:17
**supervisors** [1] - 19:8
**supposed** [2] - 158:11, 159:3
**surprise** [1] - 113:2
**surprised** [1] - 105:3
**surrounding** [3] - 157:11, 159:15, 168:22
**suspect** [12] - 23:12, 44:12, 95:14, 95:20, 96:10, 97:21, 98:11, 105:16, 112:20, 124:1, 141:19, 141:23
**suspects** [1] - 43:10
**suspensions** [1] - 21:13
**sweating** [1] - 72:2
**sweaty** [4] - 53:17, 73:7, 73:15, 77:9
**sworn** [3] - 4:13, 145:20, 186:9
**system** [2] - 139:11, 139:12

## T

**tail** [1] - 46:23
**talks** [1] - 130:5
**tall** [1] - 156:11
**taller** [1] - 40:18
**task** [1] - 22:18
**ten** [5] - 13:17, 147:21, 147:22, 182:6, 184:1
**tenure** [1] - 22:20
**terms** [4] - 11:10, 22:4, 23:1, 39:6

**testified** [17] - 4:14, 20:18, 42:22, 49:23, 61:20, 66:4, 73:1, 84:21, 96:4, 103:11, 106:17, 119:22, 137:11, 161:21, 164:2, 166:9, 169:5
**testify** [1] - 186:9
**testifying** [2] - 16:13, 142:10
**testimony** [64] - 5:3, 5:9, 23:9, 24:9, 25:23, 26:9, 31:10, 31:14, 31:22, 31:23, 32:23, 35:19, 39:19, 43:2, 45:6, 49:3, 49:9, 49:11, 49:13, 49:15, 50:16, 50:19, 51:7, 53:3, 58:16, 61:4, 61:11, 61:19, 73:17, 75:8, 77:19, 78:3, 78:5, 78:21, 81:18, 82:1, 83:9, 86:19, 95:1, 95:23, 97:3, 97:5, 102:3, 103:16, 105:13, 116:5, 119:4, 119:11, 119:13, 120:3, 120:4, 130:17, 132:13, 137:11, 141:21, 158:7, 165:7, 174:21, 176:13, 186:8, 186:9, 186:10, 186:10, 186:12
**THE** [146] - 1:7, 2:5, 4:16, 4:18, 12:1, 13:7, 14:15, 15:2, 17:5, 19:17, 20:4, 23:6, 23:14, 23:17, 25:14, 26:14, 27:9, 29:12, 32:18, 33:22, 34:13, 34:20, 35:4, 35:11, 36:7, 36:15, 37:2, 37:18, 40:18, 43:9, 43:21, 44:5, 45:11, 45:22, 46:22, 48:13, 51:14, 52:18, 53:22, 54:12, 55:3, 55:15, 55:23, 56:9, 57:15, 59:2, 59:10, 59:20, 62:9, 62:15, 63:6, 65:3, 65:16, 66:1, 67:2, 67:15, 68:1, 68:13, 70:18, 71:11, 74:6, 75:12, 76:4, 79:11, 79:20, 80:6, 80:14, 80:18, 81:3, 81:10, 82:3,

82:5, 83:19, 85:3, 85:20, 86:7, 88:20, 89:14, 89:16, 89:19, 91:14, 92:4, 93:14, 94:13, 96:19, 97:10, 97:18, 100:15, 103:1, 105:18, 108:13, 110:16, 111:12, 112:19, 113:4, 114:14, 120:6, 121:3, 124:5, 126:1, 127:1, 129:22, 130:21, 132:9, 132:17, 134:1, 134:11, 135:7, 136:16, 137:22, 139:2, 141:6, 142:23, 144:3, 144:10, 151:2, 153:14, 155:2, 157:15, 158:2, 159:9, 160:10, 160:23, 161:10, 163:12, 165:11, 166:10, 167:6, 167:14, 168:15, 169:12, 169:20, 170:4, 171:23, 172:2, 172:22, 174:16, 175:21, 176:15, 177:23, 179:10, 180:16, 181:4, 181:22, 182:8, 183:8, 183:19, 184:6
**themselves** [1] - 40:15
**thereafter** [1] - 186:11
**thereof** [1] - 186:15
**third** [5] - 38:8, 69:5, 127:15, 128:2, 139:8
**three** [18] - 10:18, 13:10, 22:3, 38:7, 45:14, 61:1, 61:6, 61:20, 74:9, 129:5, 148:3, 152:11, 153:17, 153:20, 154:19, 155:6, 156:9, 156:15
**three-page** [1] - 38:7
**throughout** [3] - 20:4, 34:16, 127:14
**Thursday** [1] - 1:14
**Tim** [1] - 5:15
**TIMOTHY** [1] - 2:5
**Timothy** [1] - 5:10
**title** [1] - 12:13
**today** [29] - 5:14, 12:8, 15:16, 30:14, 30:22, 31:9, 32:9, 32:15, 32:23, 33:2, 36:10,

39:21, 41:4, 41:6, 49:19, 50:20, 66:4, 77:18, 78:17, 96:3, 100:7, 105:13, 125:3, 166:16, 179:3, 179:20, 182:3, 185:4
**today's** [2] - 5:11, 29:1
**together** [2] - 120:3, 121:6
**Tom** [1] - 33:9
**tonight** [1] - 96:3
**took** [6] - 9:3, 9:16, 14:6, 140:12, 166:14, 174:22
**topic** [1] - 11:16
**Torre** [3] - 7:17, 8:1, 87:7
**TORRE** [1] - 7:17
**Torres** [12] - 4:18, 4:22, 8:1, 69:8, 151:22, 155:19, 157:2, 157:7, 162:16, 171:11, 171:18, 184:21
**TORRES** [2] - 1:11, 3:3
**total** [1] - 7:7
**touch** [1] - 18:14
**tour** [1] - 146:8
**trained** [1] - 177:14
**training** [17] - 8:23, 13:23, 19:10, 19:12, 19:23, 20:5, 20:6, 20:13, 21:1, 21:3, 21:8, 170:19, 175:3, 175:5, 175:14, 176:18
**transcribed** [1] - 186:11
**transcript** [12] - 4:7, 31:8, 49:3, 49:6, 50:1, 50:3, 50:13, 50:16, 55:9, 76:3, 107:15, 116:5
**transcription** [1] - 186:12
**translate** [5] - 14:2, 62:23, 79:17, 122:1, 134:5
**translated** [1] - 122:12
**translating** [14] - 107:17, 111:4, 113:1, 115:20, 116:1, 120:1, 122:6, 131:14, 131:18, 132:6, 133:18, 137:7, 140:18, 146:12
**translation** [23] -

12:18, 13:3, 14:9, 14:22, 16:21, 17:10, 49:23, 56:4, 56:15, 57:13, 62:19, 63:4, 65:21, 66:5, 77:11, 78:14, 79:9, 89:2, 109:16, 115:18, 141:11, 181:17, 185:9
**translator** [5] - 14:12, 115:8, 115:12, 118:14, 141:15
**translators** [1] - 16:19
**transported** [3] - 93:21, 94:20, 177:4
**treat** [1] - 176:21
**treated** [1] - 175:10
**treatment** [1] - 94:10
**Trial** [1] - 1:10
**trial** [1] - 4:10
**trick** [1] - 15:15
**tried** [2] - 78:18, 164:12
**tripi** [2] - 47:11, 48:1
**Tripi** [2] - 47:12, 171:20
**Tripi's** [1] - 182:17
**true** [5] - 35:17, 79:8, 119:5, 158:15, 186:12
**trust** [1] - 181:18
**trusting** [1] - 158:10
**truth** [4] - 61:12, 186:9, 186:9
**truthful** [2] - 49:14, 61:19
**truthfulness** [1] - 167:10
**try** [1] - 167:21
**trying** [13] - 15:18, 54:1, 54:9, 54:17, 72:12, 75:7, 78:2, 78:4, 80:3, 119:9, 151:1, 177:21, 178:9
**turn** [1] - 103:15
**turns** [1] - 98:11
**twelfth** [1] - 8:12
**twenty** [1] - 148:1
**two** [16] - 40:8, 48:13, 48:17, 48:21, 61:14, 69:19, 99:23, 128:23, 129:4, 139:6, 157:8, 159:5, 161:3, 165:22
**two-way** [1] - 139:6
**type** [5] - 124:20, 126:4, 130:6, 139:18, 146:4
**typed** [7] - 29:22,

33:16, 38:16, 108:17, 109:3, 122:2, 170:2
**typewriting** [1] - 186:11
**typewritten** [2] - 124:13, 134:5
**typos** [1] - 50:7

**U**

**Uber** [2] - 6:15, 6:16
**ultimately** [2] - 45:14, 89:10
**under** [13] - 5:19, 22:5, 27:2, 31:1, 36:12, 49:14, 53:18, 83:7, 86:1, 86:16, 98:9, 149:2, 176:11
**understood** [2] - 11:17, 115:11
**uniform** [1] - 60:14
**uniforms** [1] - 6:23
**Unit** [32] - 41:10, 41:12, 43:17, 54:23, 55:12, 58:7, 61:2, 66:9, 75:20, 77:11, 101:15, 104:4, 104:12, 105:22, 108:3, 111:16, 112:17, 113:18, 136:2, 136:6, 137:3, 138:20, 140:4, 146:4, 170:1, 174:11, 178:7, 178:21, 180:7, 180:14, 181:11
**unit** [4] - 64:13, 87:3, 147:11, 150:18
**Units** [2] - 87:8, 104:7
**up** [26] - 7:13, 8:16, 9:15, 14:3, 14:6, 15:14, 22:9, 22:11, 34:6, 42:3, 51:8, 54:21, 55:18, 60:19, 63:15, 70:4, 74:10, 107:20, 122:2, 124:20, 145:3, 162:10, 162:17, 165:19, 167:21, 170:2
**upper** [1] - 70:7
**US** [2] - 35:14, 47:12

**V**

**varies** [1] - 177:9
**various** [2] - 94:16, 132:20
**Vaughn** [17] - 44:22,

45:3, 60:9, 64:1,
65:10, 66:21, 67:7,
69:7, 69:11, 80:10,
80:22, 81:7, 84:18,
91:22, 94:22, 112:7,
112:13
**VAUGHN** [2] - 44:22,
64:1
**vehicle** [2] - 20:21,
26:5
**vendetta** [1] - 167:17
**veracity** [4] - 166:4,
167:4, 167:10,
175:18
**verbal** [1] - 123:1
**verbally** [2] - 122:6,
122:8
**verbatim** [3] - 121:14,
121:15, 155:20
**version** [2] - 126:18,
127:5
**versions** [1] - 44:18
**versus** [1] - 61:12
**victims** [1] - 41:7
**violated** [1] - 25:5
**violation** [3] - 23:10,
25:2, 25:3
**violence** [2] - 20:11,
28:7
**Vivian** [1] - 140:2
**Vivian's** [4] - 140:13,
140:15, 140:20,
174:23
**voluntary** [1] - 25:17
**vs** [1] - 1:6

## W

**wait** [4] - 27:8, 38:11,
65:1, 89:15
**waive** [1] - 5:14
**waived** [2] - 4:6, 4:8
**waiver** [1] - 145:13
**walk** [1] - 38:1
**walked** [1] - 111:7
**wall** [1] - 39:6
**warnings** [14] - 98:4,
119:19, 119:20,
120:22, 123:5,
123:14, 123:16,
124:6, 124:10,
130:13, 133:20,
133:22, 142:20,
143:19
**Wayne** [6] - 1:13, 5:1,
59:18, 146:23,
155:11, 156:20
**wayne** [1] - 154:12
**WAYNE** [2] - 2:1, 2:1
**waynefelle@**

**waynefellelaw.com**
[1] - 2:3
**weak** [1] - 28:5
**well-being** [1] - 54:10
**west** [1] - 8:16
**West** [1] - 46:20
**whatsoever** [1] -
158:4
**WHEREOF** [1] -
186:16
**whole** [8] - 90:11,
90:16, 90:17, 90:22,
126:11, 171:4,
179:8, 186:9
**wife** [1] - 10:21
**wife's** [2] - 11:13,
11:22
**Wiles** [1] - 12:2
**Williamsville** [2] -
1:14, 2:2
**Wilson** [1] - 8:5
**wise** [1] - 24:7
**wish** [1] - 16:12
**witness** [24] - 51:12,
64:22, 77:22, 89:6,
96:10, 108:21,
109:7, 109:8, 118:7,
118:10, 118:20,
118:22, 129:2,
131:22, 132:21,
150:1, 150:9, 151:1,
156:15, 162:9,
163:18, 166:1,
169:1, 186:8
**WITNESS** [147] - 3:2,
4:18, 12:1, 13:7,
14:15, 15:2, 17:5,
19:17, 20:4, 23:6,
23:14, 23:17, 25:14,
26:14, 27:9, 29:12,
32:18, 33:22, 34:13,
34:20, 35:4, 35:11,
36:7, 36:15, 37:2,
37:18, 40:18, 43:9,
43:21, 44:5, 45:11,
45:22, 46:22, 48:13,
51:14, 52:18, 53:22,
54:12, 55:3, 55:15,
55:23, 56:9, 57:15,
59:2, 59:10, 59:20,
62:9, 62:15, 63:6,
65:3, 65:16, 66:1,
67:2, 67:15, 68:1,
68:13, 70:18, 71:11,
74:6, 75:12, 76:4,
79:11, 79:20, 80:6,
80:14, 80:18, 81:3,
81:10, 82:3, 82:5,
83:19, 85:3, 85:20,
86:7, 88:20, 89:14,

89:16, 89:19, 91:14,
92:4, 93:14, 94:13,
96:19, 97:10, 97:18,
100:15, 103:1,
105:18, 108:13,
110:16, 111:12,
112:19, 113:4,
114:14, 120:6,
121:3, 124:5, 126:1,
127:1, 129:22,
130:21, 132:9,
132:17, 134:1,
134:11, 135:7,
136:16, 137:22,
139:2, 141:6,
142:23, 144:3,
144:10, 151:2,
153:14, 155:2,
157:15, 158:2,
159:9, 160:10,
160:23, 161:10,
163:12, 165:11,
166:10, 167:6,
167:14, 168:15,
169:12, 169:20,
170:4, 171:23,
172:2, 172:22,
174:16, 175:21,
176:15, 177:23,
179:10, 180:16,
181:4, 181:22,
182:8, 183:8,
183:19, 184:6,
186:16
**witness's** [1] - 109:5
**witnesses** [1] - 128:23
**witnessing** [1] - 170:1
**word** [3] - 107:7,
122:18, 137:21
**wording** [1] - 112:20
**words** [5] - 108:14,
108:17, 111:12,
112:1, 132:12
**workforce** [1] - 12:6
**wow** [1] - 9:9
**write** [2] - 14:5, 36:3
**writing** [4] - 39:6,
117:5, 179:3, 179:7
**writings** [1] - 179:5
**written** [7] - 50:1,
97:10, 117:1, 122:7,
123:2, 179:17,
184:13
**wrongful** [8] - 37:7,
37:16, 45:9, 170:22,
171:21, 172:19,
173:7, 173:14
**wrongfully** [1] - 36:12
**wrote** [1] - 179:13

## Y

**year** [1] - 9:4
**years** [22] - 7:9, 7:10,
10:16, 14:4, 17:12,
18:1, 18:17, 18:22,
19:21, 21:12, 22:16,
25:4, 34:17, 46:18,
143:15, 143:17,
156:4, 164:1,
170:20, 176:2,
182:6, 184:1
**yesterday** [1] - 5:16
**YORK** [3] - 1:1, 1:7,
186:1
**York** [8] - 1:14, 2:2,
2:8, 4:19, 5:10,
37:11, 186:6, 186:21
**yourself** [5] - 27:3,
27:7, 89:13, 155:14,
162:14

## Z

**zeros** [1] - 148:3

**WENDY ROYCE McCANN - COURT REPORTER**

City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 15, 2004

Sir:

    On the above date at approx. 1645 hrs., your writer
received a phone call at the MCU office from Kevin Enburg.
Mr. Enburg is the Emergency Room staff counselor for
Psychiatric Services at Buffalo General Hospital.  Mr.
Enburg stated that a Hispanic male had been brought to the
hospital for evaluation.  The doctors had cleared him
psychiatrically.  During the evaluation, the Hispanic male
claimed he had information on the recent double homicide
that occurred at 879 Niagara.  He further stated that he was
in fear of his life because the killers were after him.
    Your writer and Det. James Lema proceeded to Buffalo
General.  Det/Sgt. James Lonergan and P.O. Edwin Torres of
B-District met us there.  Torres was there to act as an
interpreter.
    At 1715 hrs., Mr. Enburg placed the four of us in the
family conference room on the first floor just off the
emergency room.  He brought the Hispanic to the room.  This
male identified himself as Josue Ortiz, d.o.b. ██████/81 of
19 Hoyt, rear.  Ortiz stated that he spoke some English but
was more comfortable speaking Spanish.  P.O. Torres told us
the following after conversing in Spanish with Ortiz.
    Ortiz knew the deceased Camacho brothers.  They were
members of a cocaine ring that was headed up by Justo and
Jose Caranzo (phonetically spelled).  Ortiz was also a
member of this ring.  The Caranzo brothers rented an
apartment in Ortiz's name at 142 Germain, upper.  Ortiz
lived there until moving to 19 Hoyt.  Ortiz claims the

00001183

A-747

Caranzo's stored large quantities of cocaine at the Germain
address.  The Caranzo's also had an apartment at 46 Blum.
     Through the interpreter, we asked Ortiz if he had any
direct knowledge of the murders at 879 Niagara.  He claimed
he did not.  He said that it was his opinion that the
Camacho brothers were killed because of jealousy due to
their drug selling.
     When asked whom he was specifically afraid of, Ortiz
gave the name, Rinaldo Valesquez.  When asked why he was
afraid of Valesquez, Ortiz stated it was because he had a
shotgun.  Ortiz did not claim that Valesquez had anything to
do with the above murders.
     Mr. Ortiz was definitely upset at the time of the
interview.  He was given a card with our names and phone
numbers on it and asked to call us if he had any further
information.  Ortiz was turned back over Mr. Enburg.  Ortiz
was going to be medically evaluated before being released
from the hospital.
     Your office will be kept apprised of any new
developments in this case.


                              Respectfully submitted,

                              Det. Mark Vaughn

00001184

A-748

COUNTY COURT  :  ERIE COUNTY

THE PEOPLE OF THE STATE OF NEW YORK

        against               Indictment No. 02630-2004

JOSUE ORTIZ

       THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

       FIRST COUNT:  MURDER IN THE FIRST DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County, with intent to cause the death of NELSON CAMACHO, caused the death of NELSON CAMACHO by shooting him, and as part of the same criminal transaction, with intent to cause the death of MIGUEL CAMACHO, caused the death of MIGUEL CAMACHO.

       SECOND COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

       MURDER IN THE SECOND DEGREE, in that he, the said JOSUE ORTIZ, being intentionally aided by others, on or about the 11th day of November, 2004, in this County, with intent to cause the death of NELSON CAMACHO, caused the death of NELSON CAMACHO by shooting him.

       THIRD COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

       MURDER IN THE FIRST DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County,

with intent to cause the death of MIGUEL CAMACHO, caused the death of MIGUEL CAMACHO by shooting him, and as part of the same criminal transaction, with intent to cause the death of NELSON CAMACHO, caused the death of NELSON CAMACHO.

FOURTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

MURDER IN THE SECOND DEGREE, in that he, the said JOSUE ORTIZ, being intentionally aided by others, on or about the 11th day of November, 2004, in this County, with intent to cause the death of MIGUEL CAMACHO, caused the death of MIGUEL CAMACHO by shooting him.

FIFTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

MURDER IN THE FIRST DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County, with intent to cause the death of NELSON CAMACHO, caused the death of NELSON CAMACHO while in the course of committing or attempting to commit and in furtherance of Robbery and/or Burglary in the first degree or second degree or in the course of and furtherance of immediate flight after committing or attempting to commit any such crime.

SIXTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

MURDER IN THE SECOND DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County,

A-750

acting either alone or with one or more other persons, committed the crimes of Robbery and/or Burglary, and, in the course of and in furtherance of such crimes or of immediate flight therefrom, caused the death of NELSON CAMACHO, who was not a participant in the crime.

SEVENTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

MURDER IN THE FIRST DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County, with intent to cause the death of MIGUEL CAMACHO, caused the death of MIGUEL CAMACHO while in the course of committing or attempting to commit and in furtherance of Robbery and/or Burglary in the first degree or second degree or in the course of and furtherance of immediate flight after committing or attempting to commit any such crime.

EIGHTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

MURDER IN THE SECOND DEGREE, in that he, the said JOSUE ORTIZ, on or about the 11th day of November, 2004, in this County, acting either alone or with one or more other persons, committed the crimes of Robbery and/or Burglary, and, in the course of and in furtherance of such crimes or of immediate flight therefrom, caused the death of MIGUEL CAMACHO, who was not a participant in the crime.

A-751

NINTH COUNT:  AND THE GRAND JURY OF THE COUNTY OF ERIE, by this indictment, accuses JOSUE ORTIZ of the following crime:

BURGLARY IN THE FIRST DEGREE, AN ARMED FELONY, in that he, the said JOSUE ORTIZ, being intentionally aided by others, on or about the 11th day of November, 2004, in this County, knowingly and unlawfully entered the dwelling of NELSON CAMACHO and MIGUEL CAMACHO with intent to commit a crime therein, and while in the dwelling, a participant was armed with a deadly weapon, to wit: a rifle.

FRANK J. CLARK
DISTRICT ATTORNEY OF ERIE COUNTY

**DEC 8  2004**

02630-2004

No .............

**ERIE COUNTY**

COUNTY COURT

12-B ............... Term, 20 .04.

**THE PEOPLE**

AGAINST

JOE ORTIZ

Arraigned the ........... day of ........ 20 .....

Plead ..................... Guilty.

Counsel ........................................

Filed .... 8-th .. day of Dec., 20 0.4

............. Ruby Oline .....

Clerk

A-752

Document 69-11    Filed 04/24/20    Page 6 of 6

Case 1:16-cv-00324-JJM-JJR

**INDICTMENT**

MURDER IN THE FIRST DEGREE, P.L. §125.27(1)(a)(viii)(2 COUNTS)
MURDER IN THE FIRST DEGREE, P.L. §125.27(1)(a)_(vii)(2 COUNTS)
MURDER IN THE SECOND DEGREE, P.L. §125.25(1),20.00 (2 COUNTS)
MURDER IN THE SECOND DEGREE, P.L. §125.25(3)(2 COUNTS)
BURGLARY IN THE FIRST DEGREE, AN ARMED FELONY, P.L. §140.30(1), 20.00

**FRANK J. CLARK**

District Attorney

A TRUE BILL

....................... Foreperson

DA-10 (Rev. 6/00) ECDA

Original pgs 1-6



STATE OF NEW YORK : COUNTY COURT
COUNTY OF ERIE : CRIMINAL TERM : PART 22
_____

THE PEOPLE OF THE STATE OF NEW YORK

   - vs -                INDICTMENT # 04-2630

JOSUE ORTIZ,

      Defendant.
_____


                           25 Delaware Avenue
                           Buffalo, New York
                           August 30, 2005


B e f o r e :
        HONORABLE JOSEPH S. FORMA
           Supreme Court Justice


A p p e a r a n c e s :

        FRANK J. CLARK III, ESQ.
        Erie County District Attorney
        BY:  KENNETH F. CASE, ESQ.
        Assistant District Attorney
        Appearing for the People.

        JOHN R. NUCHERENO, ESQ.,
        Appearing for the Defendant.


P r e s e n t :

        JOSUE ORTIZ,
        Defendant.

        ANNA BRIGNONI-WALICZEK,
        Court Interpreter.

CLERK'S OFFICE
ERIE COUNTY
2006 SP 15 PM 12:48
FILED


             LYNN S. DULAK, RPR, CRR
             Official Court Reporter

2

*People v. Ortiz*

1  
2      THE COURT:  All right.  This is 04-02663, People

3  versus Josue Ortiz, who requires an interpreter.  We

4  have here in court Anna Brignoni-Waliczek, and you

5  will be serving as interpreter this morning, will

6  you?

7      MS. BRIGNONI-WALICZEK:  Yes, Your Honor.

8      THE COURT:  You are duly certified and qualified

9  to serve as an interpreter?

10      MS. BRIGNONI-WALICZEK:  Yes, Your Honor.

11      THE COURT:  And you have been sworn to interpret

12  truthfully in this court for this term of court?

13      MS. BRIGNONI-WALICZEK:  Yes, Your Honor.

14      THE COURT:  Very well.  So please interpret the

15  proceedings for the defendant.

16      Present is Mr. Case; and the defense is here,

17  Mr. Nuchereno and Miss Calvo-Torres.  The matter is

18  scheduled for a Huntley hearing this morning.  Okay.

19  So we're scheduled for a Huntley hearing.  People are

20  ready?

21      MR. CASE:  Your Honor, I have had more trouble

22  having witnesses appear for this hearing than I think

23  I have in the other 12 years that I've been an

24  Assistant DA.  I do, however, and I apologize to this

25  Court, I had believed that I had two witnesses who

LYNN S. DULAK, RPR, CRR  
Official Court Reporter

3

*People v. Ortiz*

1   would have been available to at least start the

2   hearing today.  One of them was Detective Lauber who,

3   after speaking with him, I realized is not necessary

4   for this hearing.  The other is Detective Stambach,

5   who was called out of town unexpectedly and will be

6   gone for a couple of days.

7       In light of that development, Your Honor, I have

8   obtained Detective Sergeant Lonergan, who was present

9   during the time that Detective Stambach took the

10  statement from this defendant, and I believe I can go

11  forward with the hearing using Detective Sergeant

12  Lonergan.  However, he was not available this

13  morning, either.

14      I have Detective Lonergan, Officer Sadlocha, and

15  Officer Torres coming to my office at 9 o'clock

16  tomorrow morning, and with the Court's indulgence I

17  would be prepared to start and finish this Huntley

18  hearing at the Court's convenience tomorrow.

19      THE COURT:  Defense, any objection or position?

20      MR. NUCHERENO:  No, Your Honor.  We're prepared

21  to proceed.

22      THE COURT:  Very well.  Defense is ready, so

23  we'll grant the People a one-day adjournment until

24  tomorrow.  We looked at the calendar, it's very

25

LYNN S. DULAK, RPR, CRR
Official Court Reporter

4

*People v. Ortiz*

1  hectic, but if we start at 10:30, I guess we can flow

2  between other scheduled matters.  The matter of the

3  hearing will be adjourned until tomorrow morning at

4  10:30.

5  I would note the Court had requested that an

6  update on the defendant's competency, his psychotic

7  situation.  The DA was good enough, I think, to

8  follow through on that request.  I know we have

9  talked to Mr. Nuchereno, and he has indicated he sees

10  no deterioration, in his view, and it doesn't raise a

11  competency issue.  But we do have a letter from Dr.

12  Evelyn Coggins dated August 25, '05 in which she

13  indicates that she has reassessed the defendant on

14  8/25, he having been under her care since December of

15  '04 as we learned at the hearing, and she says he is

16  stable and competent to proceed.

17  I'm going to have this original letter from Dr.

18  Coggins marked as a court exhibit in evidence, we'll

19  put it in the court file.  I have two copies for

20  counsel if you need it, or you don't.  I don't have

21  another copy for myself -- but if you want it, Lori

22  will make a copy for you.  I had made two, but now

23  that I had the brainstorm of putting this in the

24  file, in the court record.

25

LYNN S. DULAK, RPR, CRR
Official Court Reporter

A-757

5

*People v. Ortiz*

Okay, we'll mark that letter Court Exhibit number 1, I believe it will be. Anything else?

MR. NUCHERENO: No, thank you, Judge.

MR. CASE: No, thank you.

THE COURT: We'll see you tomorrow morning around 10:30. Will you be available to us tomorrow morning, or some interpreter?

MS. BRIGNONI-WALICZEK: Some interpreter will be available, yes, Your Honor.

THE COURT: Very good. Thank you.

The following was marked for identification:
COURT EXH. 1 - 8/25/05 letter to Justice Forma from Evelyn M. Coggins, M.D.

* * *

LYNN S. DULAK, RPR, CRR
Official Court Reporter

6

C E R T I F I C A T I O N

Date: _9-14-06_

   I certify that the foregoing 5 pages are a correct transcription of the proceedings recorded by me in this matter.

LYNN S. DULAK, RPR, CRR,
Official Court Reporter.

LYNN S. DULAK, RPR, CRR
Official Court Reporter

A-759

11

2      that Mr. Nuchereno will elicit that by cross

3      examination, if not by necessarily calling him

4      himself and that's part of the ball game.  I assume

5      it has some impact on what he may or may not have

6      done on the 16th.

7          MR. NUCHERENO:  Your Honor, if I may, I think

8      for Mr. Case, from hearing him, that he's not going

9      to call Detective-sergeant Lonergan and I had

10     thought that that's what we were adjourning for

11     today, that he would be called in lieu of Detective

12     Stambach.

13         MR. CASE:  That was my belief, your Honor, and

14     he was in my office this morning with Officer

15     Torres, and then after discussing this subject

16     matter, Detective Lonergan said actually, Officer

17     Torres was there for the entire interview and

18     taking of the statement, he -- he can -- there's

19     nothing I could add that he couldn't tell you

20     and --

21         THE COURT:  Well, you certainly didn't mention

22     this meeting at the hospital with police, I mean I

23     think that's got an impact, potential impact on

24     what happened on the 16th.  If Mr. Nuchereno wants

25     Lonergan, I -- he'll either, he can call him as his

A-760

D. Sadlocha - Direct                                    14

the whole truth and nothing but the truth so help

you God?

THE WITNESS:  I do.

THE CLERK:  You may be seated.  Please state

your name and spell your last name for the record.

D A V I D   S A D L O C H A, being duly called and

sworn as a witness on behalf of the People, took the stand

and testified as follows:

THE CLERK:  Thank you.

THE COURT:  You may proceed, Counselor.

DIRECT EXAMINATION

BY MR. CASE:

Q.      Thank you, your Honor.  Officer, how long have

you been with the Buffalo Police Department?

A.      Since January, 1984.

Q.      And what is your current assignment?

A.      Police officer, D District.

Q.      And how long have you been a police officer at D

District?

A.      Ten years.

Q.      And were you working in your capacity as a police

officer in D District on November 16th of the year 2004?

A.      Yes.

Q.      And at approximately seven sixteen p.m. on that

A-761

```
1                    D. Sadlocha - Direct                    15

2   day, were you working?

3        A.     Yes.

4        Q.     And what shift or tour of duty were you working,

5   do you recall?

6        A.     Fifteen thirty to zero one thirty hours.

7        Q.     And at approximately seven sixteen p.m., did you

8   respond to a call of unknown trouble at 1005 Grant Street?

9        A.     Yes.

10       Q.     And did you immediately respond to that call?

11       A.     Yes, I did.

12       Q.     And upon arriving there, what, if anything, did

13  you do?

14       A.     I encountered an individual that said that a guy

15  was looking for help and he said that he would be at 142

16  Germain Street, so I left the area and I went to 142 Germain.

17       Q.     And how far is 142 Germain from that location?

18       A.     Just around the block.

19       Q.     Did you immediately then proceed to 142 Germain?

20       A.     Yes.

21       Q.     And upon your arrival there, what if anything

22  occurred?

23       A.     An individual came out of the driveway and

24  approached me when I came out of the car.

25       Q.     And the individual that approached you, was it
```

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
1                    D. Sadlocha - Direct              16

2   male or female?

3        A.      Male.

4        Q.      Do you see that person in the courtroom today?

5        A.      Yes.

6        Q.      And can you point to him and identify something

7   he's wearing?

8        A.      With the orange outfit.   (Pointing)

9                 MR. CASE:  May the record reflect the

10              identification of the Defendant.

11               THE COURT:  Yes.

12       Q.      And you were still in a patrol vehicle?

13       A.      No, I was outside of the vehicle.

14       Q.      And had you to -- had you gotten to 142 Germain

15   Street in a marked or unmarked patrol vehicle?

16       A.      Marked vehicle.

17       Q.      And so when you arrived at 142 Germain Street,

18   the Defendant started to come towards your police vehicle?

19       A.      Yes.

20       Q.      And you exited your vehicle?

21       A.      Yes.

22       Q.      And then what happened?

23       A.      I said the words of, what's up, and he responded

24   19

25   by saying do you know what happened on Niagara.  I put my
```

A-763

```
1                    D. Sadlocha - Direct              17

2   hands up, I go wait a second, don't say nothing and I left it

3   at that.

4        Q.    And at that point in time, did you know what he

5   was referring to?

6        A.    Through news accounts, I got a feeling I knew

7   what he was talking about.

8        Q.    And what was that?

9        A.    That there was a shooting up on Niagara Street.

10       Q.    And so you told him at that point not to say

11  anything further to you?

12       A.    Right.

13       Q.    And why did you do that?

14       A.    Well, I don't think it was in my authority to

15  start questioning the individual so I needed a higher up.

16       Q.    And did you indicate that to the Defendant in

17  some way?

18       A.    Yes.  I had told him, I said that I want you to

19  talk to a detective.

20       Q.    And what happened then?

21       A.    I notified radio that I would like to get in

22  contact with a detective from Major Case Squad.

23       Q.    And were you able to do so?

24       A.    Yes.

25       Q.    And then what happened?
```

1                    D. Sadlocha - Direct                    18

2      A.      The individual got in the vehicle and took him

3  down to police headquarters.

4      Q.      And at that time did you tell the Defendant that

5  he was under arrest?

6      A.      No, I didn't.

7      Q.      Did -- did you handcuff him?

8      A.      No.  I believe not.

9      Q.      And did he appear to willingly enter your police

10  vehicle?

11      A.      Yes.

12      Q.      And you brought him to police headquarters?

13      A.      Yes.

14      Q.      Did he at any point make any objection to being

15  in the police vehicle?

16      A.      No.

17      Q.      Or indicate that he did not want to go to police

18  headquarters?

19      A.      No.

20      Q.      When you brought him into police headquarters,

21  was he handcuffed?

22      A.      No.

23      Q.      And did you at any point make any threats or

24  promises to the Defendant in order to get him to go to police

25  headquarters?

A-765

```
1                    D. Sadlocha - Direct              19

2       A.    No.

3       Q.    At the point in time when you transported him to

4  police headquarters, did you know whether or not he was a

5  witness or an informant or a suspect regarding that double

6  homicide on Niagara Street?

7       A.    I didn't know what he was.  But when he mentioned

8  Niagara Street, I thought maybe he knew something, or saw

9  something, or was -- I -- I just wanted to take him to

10  somebody else to let him talk.

11      Q.    And when you got him to police headquarters, did

12  you turn him over then to Major Case detectives?

13      A.    Yes.

14      Q.    And would that have been Detective Mark Stambach?

15      A.    I believe so, yes.

16      Q.    And Detective-sergeant James Lonergan, was he

17  also present?

18      A.    Yes, he was.

19      Q.    And are you familiar with Police Officer Edwin

20  Torres?

21      A.    Yes, I am.

22      Q.    And was he also present at that time?

23      A.    Yes.

24            MR. CASE:  I believe that's all I have with

25       this witness, your Honor.  Thank you.  Thank you,
```

A-766

1                      D. Sadlocha - Cross                    20

2          Officer.

3                 THE COURT:  Cross examination.

4    CROSS EXAMINATION

5    BY MR. NUCHERENO:

6          Q.    Thank you, your Honor.  Good morning, Police

7    Officer.

8          A.    Good morning.

9          Q.    Call came out on police radio on November 16th at

10   about seventeen forty-one hours indicating a possible

11   harassment at 1005 Grant Street, true?

12         A.    I believe so.  I would have to --

13         Q.    Okay.  And the call that came out, you heard that

14   call, didn't you, sir?

15         A.    Yes.

16         Q.    And the call came out that --

17                THE COURT:  Okay, you said seven --

18                MR. NUCHERENO:  Seventeen forty-one hours.

19                THE COURT:  Twelve forty-one in the afternoon?

20                MR. NUCHERENO:  Five forty-one.

21                THE COURT:  Five forty-one.  Okay.

22         Q.    And the call that came out from radio indicated,

23   did it not, harassment, a young guy saying someone's trying

24   to kill me, that was the call you heard, wasn't it, Officer?

25         A.    I don't have the paper in front of me, I would

A-767

```
 1                    D. Sadlocha - Cross              21

 2    like to see if that's what it said but I'll believe you,

 3    Okay.

 4         Q.    Do you recall the case?

 5         A.    Not that -- no.

 6         Q.    Okay.  And did you hear more of the call that

 7    this was a twenty-three year old male saying someone's trying

 8    to kill me and that he was in the school?

 9         A.    I don't recall.

10         Q.    Okay.  And in any event, what you did do was you

11    drove over to 1005 Grant Street in Buffalo, true?

12         A.    Yes.

13         Q.    And -- and you had the occasion to get out of

14    your police car and speak to a man there from the Native

15    American Center, true?

16                    THE COURT:  What time is this you're alleging

17              or questioning about?

18                    MR. NUCHERENO:  Seventeen fifty-two,

19              fifty-three.

20                    THE WITNESS:  Yes.

21         Q.    You got out of your car and you spoke to an

22    individual from the Native American Center, correct?

23         A.    I don't know if I got out of the vehicle, but I

24    did speak to a person from that center.

25         Q.    Okay.  Now did you try to find out what the
```

1                    D. Sadlocha - Cross                    22

2    harassment was?

3        A.    As far as I recall, the person told me that the

4    guy said he was going to 142 Germain Street, and I said thank

5    you and left the area.

6        Q.    Okay.  But did you inquire generally --

7              THE COURT:  Okay, let me make inquiry because

8    I'm confused.  Are we talking about an incident two

9    hours prior to the fact, the time you picked this

10   Defendant up?  Or are we all talking about the same

11   time?

12             MR. NUCHERENO:  Same time, your Honor.

13             THE COURT:  I thought it was seven sixteen

14   p.m., not five forty-one p.m.

15             MR. NUCHERENO:  Seventeen hundred fifty-two.

16             THE COURT:  Seventeen hundred.  Is that what

17   you elicited?  Rather than seven sixteen p.m.,

18   Mr. Case?

19             MR. CASE:  I'm looking.

20             THE COURT:  Let's talk civilian time, okay,

21   so --

22             MR. NUCHERENO:  Yes, Judge.

23             THE COURT:  -- so a simpleminded judge can

24   follow.  So your testimony was that this occurred,

25   Mr. Case, at what, five sixteen p.m., he got the

D. Sadlocha - Cross                     23

1

2   call, trouble at 1005 Grant, is that what your

3   position, your testimony was?  Well, go right to

4   the horse -- Officer Sadlocha.  What time did you

5   get this call of trouble at 1005 Grant Street?

6       THE WITNESS:  I would have to look at my P-73

7   to see what I --

8       THE COURT:  What is it, Mr. Case?  We better

9   elicit it from the officer, Mr. Case then, cause I

10  thought I did the calculation on military time, I'm

11  either wrong or you're wrong, one or the other.

12  Maybe you can help him out there, Mr. Nuchereno.

13      MR. CASE:  I misspoke, your Honor, I believe I

14  did say to the officer seven sixteen p.m., it was

15  military, and it was seventeen --

16      THE COURT:  Sixteen so that would be --

17      MR. CASE:  Seventeen forty-one, I'm sorry.

18      THE COURT:  Now it's seventeen forty-one.

19  Okay.  Which would be five forty-one p.m.?

20      MR. CASE:  That's correct.  I apologize.

21      THE COURT:  Do you agree with that, Officer

22  Sadlocha?

23      THE WITNESS:  Yes.

24      THE COURT:  You got the call at five forty-one

25  and that's the same call now that Mr. Nuchereno was

D. Sadlocha - Cross                           24

1
2    referring to as a call about a harassment, some
3    twenty-three year old male is involved saying
4    someone would kill me.  We're all talking about the
5    same radio call?
6           THE WITNESS:  Yes, we're talking about the
7    same thing.
8           THE COURT:  Okay.  And you arrived at the
9    Native American Center at what time?  Counselors
10    agree as to a time that he got a radio call or
11    something?
12           MR. NUCHERENO:  We agree with the seventeen
13    forty-one, Judge, and we agree that it was very
14    shortly thereafter he arrived.
15           MR. CASE:  Correct, your Honor.
16           THE COURT:  Okay.  We'll put five forty-two
17    p.m. for the officer did arrive at the Native
18    American Center.  All right, we're all on the same
19    page now.  Go ahead.
20    Q.    We are.  Now when you arrived at the Native
21    American Center, Mr. Josue Ortiz was not present, was he?
22    A.    No, he wasn't.
23    Q.    And you had -- you, of course, wanted to inquire
24    as to the basis for the harassment call, true?
25    A.    The complainant himself, yes, I was looking for a

A-771

```
 1                    D. Sadlocha - Cross                25

 2   complainant.

 3        Q.    All right.  And were you ever able to identify

 4   who made the 911 call alleging harassment?

 5        A.    No.

 6        Q.    Okay.  And in speaking to the individual at the

 7   Native American Center, did you find out any information

 8   about a harassment?

 9        A.    No.

10        Q.    Okay.  So you had no details about a harassment,

11   correct?

12        A.    Right.

13        Q.    And -- and instead --

14              THE COURT:  Excuse me just a moment, Counsel.

15          When we finish this witness, which I don't think --

16          I do not expect to be lengthy, if you have your DA

17          at hand, I'll immediately attend to your matter.

18              MR. GLENN MURRAY:  I appreciate that, your

19          Honor, and I'll let him know.

20              THE COURT:  Go ahead, Mr. Nuchereno.

21        Q.    Thank you, Judge.  So not having any knowledge

22   of -- of the source of the harassment complaint or the nature

23   of it, you obtained some information that there was a man

24   down on Germain Street, true?

25        A.    Correct.
```

A-772

D. Sadlocha - Cross                                26

1

2    Q.    And -- and preliminarily you didn't have any

3    information as to what the man on Germain Street wanted,

4    true?

5    A.    Correct.

6    Q.    And preliminarily, you didn't know if he was even

7    involved in the harassment call, true?

8    A.    True.

9    Q.    Okay.  So you drove down to 142 Germain Street,

10   correct?

11   A.    Yes.

12   Q.    Okay.  And you have no present recollection that,

13   that there was even a call alleging someone was trying to

14   kill me, true?

15   A.    Yeah.  I can't recall that.

16   Q.    Okay.  So then you pulled down to 142 Germain in

17   your marked patrol car, correct?

18   A.    Yes.

19   Q.    Did you have a partner with you?

20   A.    No, I didn't.

21   Q.    You had backup that day at 142 Germain, however,

22   did you not?

23   A.    Yes.

24   Q.    And the backup was also a marked patrol car, that

25   was the patrol car operated by John Lobough?

A-773

```
 1                    D. Sadlocha - Cross                27

 2        A.    Yes.

 3        Q.    L-o-b-o-u-g-h?

 4        A.    Yes.

 5        Q.    Okay.  And to get -- did you arrive at

 6   approximately the same time, you and Officer Lobough?

 7        A.    I believe I arrived first.

 8        Q.    All right.  And when you arrived, you saw Josue

 9   Ortiz in the driveway on Germain, correct?

10        A.    Yes.

11        Q.    And you had never seen him before, true?

12        A.    Never seen him before.

13        Q.    And you do not speak Spanish, do you, sir?

14        A.    No, I don't.

15        Q.    And when you got out of your car, did you pull it

16   on the street, or in the driveway on Germain?

17        A.    . On the street.

18        Q.    And you exited your patrol vehicle?

19        A.    Yes.

20        Q.    And you saw Mr. Ortiz?

21        A.    Yes.

22        Q.    Now you didn't have a description of the

23   individual that you were seeking on Germain Street, did you?

24        A.    Correct.

25        Q.    You had no idea if it was even male or female,
```

Case 23-352, Document 52, 06/27/2023, 3534010, Page45 of 253

A-774

```
1                    D. Sadlocha - Cross              28

2   true?

3        A.     True.

4        Q.     And Mr. Ortiz, did he come towards you as you

5   came towards him?

6        A.     Yes.

7        Q.     And you spoke first?

8        A.     Yes.

9        Q.     And you indicated that you said the equivalent of

10  what's up?

11       A.     Correct.

12       Q.     Did you say it in English?

13       A.     Yes.

14       Q.     Okay.  And what did Mr. Ortiz say to you?

15       A.     He said you know something about Niagara Street.

16       Q.     Okay.

17              THE COURT:  He spoke in English?

18              THE WITNESS:  Yes.

19              THE COURT:  And you were able to understand

20        him as he spoke in English?

21              THE WITNESS:  Yes sir.

22              THE COURT:  Go ahead.

23       Q.     So the words that he said to you were, he knows

24  something about Niagara Street?

25       A.     Yes.
```

                    D. Sadlocha - Cross                  29

1

2      Q.    Now you had knowledge that there had been a

3  double homicide occurring on Niagara Street back on November

4  11th, 2004, true?

5      A.    Yes.

6      Q.    Okay.  And now this was five days later, true?

7      A.    Yes.

8      Q.    All right.  And where you were on Germain Street

9  was close to Niagara Street, correct?

10     A.    I don't think it's close to Niagara Street.

11     Q.    So there was an indication that this individual

12 knew something about Niagara Street, correct?

13     A.    Correct.

14     Q.    And you -- you took that to mean the double

15 homicide?

16     A.    I didn't know if it was a homicide, I knew there

17 was -- something happened on Niagara Street through news

18 accounts, yes.

19     Q.    Okay.  And you chose not to ask Mr. Ortiz if it

20 involved that incident, correct?

21     A.    Correct.

22     Q.    Okay.  And not knowing what Mr. Ortiz was

23 referring to, you asked him to get in the police car, true?

24     A.    Yes.

25     Q.    Now he didn't ask to get in the police car and go

A-776

```
                    D. Sadlocha - Cross                    30
 1
 2   with you downtown, did he, sir?
 3        A.    No.
 4        Q.    He didn't ask to talk to the police about Niagara
 5   Street, did he?
 6        A.    No.
 7        Q.    Okay.  He didn't ask to see a detective from
 8   Major Case Squad, did he?
 9        A.    No.  No.
10        Q.    And there's no rule or regulation that prevents
11   you from asking Mr. Ortiz what do you mean you know something
12   about Niagara Street, true?
13        A.    True.
14        Q.    Now you placed him in the back seat of the police
15   car, correct?
16        A.    Yes.
17        Q.    And -- and you drove him downtown, true?
18        A.    Yes.
19        Q.    So the only words that were spoken by Mr. Ortiz
20   on that day in your presence on Germain Street was, I know
21   something about Niagara Street?
22        A.    Correct.
23        Q.    Okay.  He didn't say another word, did he, sir?
24        A.    No.
25        Q.    Okay.  And he didn't say a word to you while you
```

A-777

```
1                    D. Sadlocha - Cross                    31
2    drove him down to headquarters, correct?
3         A.     Correct.
4         Q.     By the way, his physical appearance, did he
5    appear agitated?
6         A.     I believe not.
7         Q.     Did he appear upset?
8         A.     No.  I believe not.
9         Q.     Did he appear frightened?
10        A.     Sure.
11        Q.     He did.  Yes?  True?
12        A.     True.
13        Q.     Okay.  Now did you ask Mr. Ortiz if he was the
14   individual complaining of harassment?
15        A.     No.
16        Q.     Okay.  Now the call that you went to 1005 Grant
17   Street had to do with a harassment complaint, correct?
18        A.     Correct.
19        Q.     Did you ask Mr. Ortiz if anybody was harassing
20   him?
21        A.     No.
22        Q.     Did you ask Mr. Ortiz if people were threatening
23   to kill him?
24        A.     No.
25               THE COURT:  Your answer to that?  Did you
```

A-778

```
1              D. Sadlocha - Cross              32

2     answer that or not?

3              THE WITNESS:  I said no.

4              THE COURT:  You did not ask him about that?

5              THE WITNESS:  No.

6              MR. NUCHERENO:  And after Mr. Ortiz indicated

7     he knew something about Niagara Street, your

8     response was, words to the effect of, do not say

9     anything else to me at this point, correct?

10             THE WITNESS:  Yes.

11             MR. NUCHERENO:  Thank you, Judge.

12             THE COURT:  Very well.  Any redirect?

13             MR. CASE:  No, your Honor.

14             THE COURT:  Thank you, Officer Sadlocha, you

15    may step down.

16             THE WITNESS:  Thank you.

17             THE COURT:  I have a pretrial apparently,

18    gentlemen, so take a ten minute recess, and once we

19    get Torres on, I expect to work with him until we

20    complete him right into the lunch hour and then

21    we'll see if we need Lonergan, but Lonergan will be

22    here at two?

23             MR. CASE:  Yes.

24             THE COURT:  Thank you.

25    (Whereupon, a recess was taken at 11:39 a.m.)
```

A-779

33

2    (Counsel and Interpreter present at 11:56 a.m.)

3        THE COURT:  Resuming the hearing of People

4    versus Ortiz.  Can we have Ortiz?

5    (Defendant is present)

6        THE COURT:  All right.  So resuming the

7    testimony in People versus Ortiz.  Defendant is

8    present with his interpreter.  We have defense

9    counsel, DA.  We completed witness Sadlocha.  You

10    may call your next witness, Mr. Case.

11        MR. CASE:  Thank you, your Honor.  At this

12    time the People call Police Officer Edwin Torres.

13        THE CLERK:  You do solemnly swear that your

14    testimony in the case of the People of the State of

15    New York against Josue Ortiz shall be the truth,

16    the whole truth and nothing but the truth so help

17    you God?

18        THE WITNESS:  I do.

19        THE CLERK:  You may be seated.  Please

20    state your name and spell your last name for the

21    record.

22    E D W I N     T O R R E S, being duly called and sworn as

23    a witness on behalf of the People, took the stand and

24    testified as follows:

25        THE CLERK:  Thank you.

A-780

```
 1              E. Torres - Direct              34
 2  DIRECT EXAMINATION
 3  BY MR. CASE:
 4      Q.    Thank you, your Honor.  Officer Torres, how long
 5  have you been with the Buffalo Police Department?
 6      A.    Eighteen years.
 7      Q.    And what is your current assignment?
 8      A.    Police officer, B District, 695 Main.
 9            THE COURT:  B as in boy?
10            THE WITNESS:  Yep.
11      Q.    And on November 16th of 2004, in the early
12  evening hours, were you at Buffalo police headquarters?
13      A.    Yes, I was.
14      Q.    And do you recall for what purpose you were
15  there?
16      A.    I was called by the detectives to assist with
17  translating an individual who didn't speak English well.
18      Q.    And is that why you had gone to police
19  headquarters or were you there for some other purpose?
20      A.    Originally I had brought in an individual who
21  came to the station and had information in a homicide.  I had
22  brought him down to the Major Case office.  I was on my way
23  out when I was notified by the detectives to stay longer with
24  another individual.
25      Q.    And so the person you had brought in originally
```

```
1                    E. Torres - Direct              35

2    they weren't interested in, but they wanted you to help them

3    with someone else?

4         A.     That's correct.

5         Q.     And did you, in fact, then meet with a particular

6    individual with the Major Crimes detectives?

7         A.     Yes, I did.

8         Q.     And do you see that individual in this courtroom?

9         A.     Yes, I do.

10        Q.     Can you point to him and identify something he's

11   wearing?

12        A.     He's the person here wearing orange, Josue Ortiz.

13   (Pointing).

14        Q.     And do you recall what Major Crimes detectives or

15   detective-sergeants you may have been with at that time?

16        A.     Yes.   It was Detective Lonergan and -- Detective

17   Lonergan and Detective Stambach.

18        Q.     And when you first encountered the Defendant, was

19   the Defendant handcuffed?

20        A.     No.

21        Q.     In the time that you spent with the Defendant,

22   was he ever told that he was under arrest?

23        A.     No.

24        Q.     Was he ever told that he was not free to leave?

25        A.     No.
```

A-782

```
 1                    E. Torres - Direct              36

 2         Q.     At some point were you in a separate room with

 3    the Defendant?

 4         A.     Yes.  The Defendant was in Detective Vivian's

 5    office, and I was asked to go there and assist the detectives

 6    in interviewing the Defendant.

 7         Q.     And was there a particular reason why they asked

 8    you to get involved?

 9         A.     I speak Spanish and they said that he had --

10    doesn't speak English well.

11         Q.     And were you born in the United States?

12         A.     Yes, I was.

13         Q.     Do you have relatives in another --

14         A.     Yes, I do, my parents are originally from

15    Puerto Rico.

16         Q.     Which is actually part of the United States.

17         A.     That's right.

18         Q.     And are you fluent in Spanish?

19         A.     I learned Spanish through my mother who spoke

20    Spanish exclusively at home.  I also learned to read and

21    write Spanish in Spanish church.  I took it up in high

22    school, also.

23         Q.     And so you were -- were you in a room with just

24    Detective Stambach or with Detective-sergeant Lonergan

25    initially if you recall?
```

```
1                    E. Torres - Direct                  37

2        A.      Initially, they would -- Lonergan would come in

3   and out, but originally I was with Lonergan, Stambach and

4   Josue Ortiz.

5        Q.      And you -- you had some conversation then with

6   the Defendant?

7        A.      Stambach started a series of questions, and I

8   translated into Spanish.

9        Q.      And -- and then did you translate back to English

10  for Detective Stambach?

11       A.      Yes, I did.

12       Q.      And during that period of time, did the Defendant

13  ever ask to -- to leave?

14       A.      No.

15       Q.      Did he ever ask for an attorney?

16       A.      No.

17       Q.      Did he ever indicate to you in Spanish or in

18  English that he did not want to speak with these detectives?

19       A.      No, he did not.

20       Q.      Did he understand that they were police

21  detectives?

22       A.      Yes.

23       Q.      And were you in your uniform at that time?

24       A.      Yes, I was.

25       Q.      And when he first began speaking with you, do you
```

A-784

```
 1                    E. Torres - Direct                    38
 2    recall what he was saying to you?
 3         A.    Yes.
 4         Q.    And -- and in sum and substance, what was that?
 5         A.    Well, I had introduced myself to him, and the
 6    detectives started a series of questions.  I translated.  And
 7    he would answer to me in Spanish and I would state it to the
 8    detective.
 9         Q.    And the -- at that time when you first started
10    talking to him, had he been advised of any Miranda rights or
11    warnings?
12         A.    Not at that time.
13         Q.    At some point he was advised of his rights?
14         A.    Yes.
15         Q.    And did -- was that done in English or in
16    Spanish?
17         A.    Spanish.
18         Q.    And who did that if you know?
19         A.    I did.
20         Q.    And did you read those rights off of a particular
21    card or from memory?
22         A.    I read it off a card, Miranda warnings which were
23    written in Spanish.
24              MR. CASE:  May I have these marked, your
25              Honor?
```

A-785

1           E. Torres - Direct                    39

2           THE COURT:  Surely.

3    (Whereupon, People's Exhibits 1 and 2 were

4     marked for identification.)

5           MR. CASE:  May I approach?

6           THE COURT:  Yes, you may.  You need not ask

7     permission, either counsel.

8           MR. CASE:  Thank you, your Honor.  Officer,

9     showing you People's 1 for identification, can you

10    tell the Court what that is?

11          THE WITNESS:  These are the Miranda warnings

12    that I read to him.  They're in Spanish.

13          THE COURT:  Is that the card?  Is that a card?

14          THE WITNESS:  Yes.

15   Q.    And Officer, did -- did, during the course of

16   your conversation, would the Defendant, did it appear that

17   he, or was he able to understand some English or speak in any

18   English that you were aware?

19   A.    Occasionally he would make a, say something, make

20   a sentence in English.  Occasionally.

21   Q.    And was there anything when he answered questions

22   that indicated to you that he understood some English?

23   A.    There was a couple times when the detective,

24   excuse me, asked a question for me to translate, he would

25   answer before I translated.

A-786

1                    E. Torres - Direct                    40

2              THE COURT:  You say occasionally.  A couple

3         times?

4              THE WITNESS:  Couple times, yep.

5         Q.    And Officer, when you advised him of his Miranda

6    warnings, did you read directly from that card that's now

7    marked People's 1?

8         A.    Yes, I did.

9         Q.    And how do you know that that's the card that you

10   used?

11        A.    Detective Stambach checked off each section as I

12   read it.  I asked the Defendant did he understand them, and

13   he would check off each sentence.  I also signed the card.

14        Q.    And do you recall when you read the warnings to

15   him, did you read the entire front of the card, or did you

16   read one line at a time?

17        A.    One line at a time.

18        Q.    And -- and when Detective Stambach placed the

19   check mark then next to each line, was it after you asked the

20   questions?

21        A.    Yes.

22        Q.    Or after the Defendant acknowledged that he

23   understood?

24        A.    Oh, after he acknowledged.

25        Q.    So you would read the first -- the first

A-787

|   |   |   |
|---|---|---|
| 1 | E. Torres - Direct | 41 |

2  statement to the Defendant and -- and ask the Defendant if he

3  understood that?

4       A.     That's correct.

5       Q.     In Spanish?

6       A.     Yes.

7       Q.     And he -- he then acknowledged to you that he

8  understood what you were saying?

9       A.     Yes.

10      Q.     And at that point, Detective Stambach put a check

11 mark next to the line?

12      A.     That's correct.

13      Q.     What was the first line that you read to him?

14      A.     Do you want me to state it in English or --

15             THE COURT:  All right, I believe it speaks for

16             itself.  I mean I have an ability to understand

17             that those are Spanish rights.  Well, all right,

18             let me observe People's No. 1.  All right, the

19             Court is observing what appears to be a rights

20             card.  I can't understand it word for word,

21             aviso -- okay, advice of suspect's rights.  That's

22             what it is, okay.  All right.  So it speaks for

23             itself.  It's in evidence, and unless Mr. Nuchereno

24             develops some particular issue about an individual

25             right, I think we can proceed.  Go ahead.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A-788

```
1                    E. Torres - Direct                42

2              MR. CASE:  Thank you, your Honor.

3              MS. CALVO-TORRES:  Well, Judge, I'm sorry, I

4       need to object at this point; I don't believe that

5       the People have moved that into evidence.

6              MR. CASE:  We have not.  I mean I can

7       certainly, I think a foundation has been laid.

8              THE COURT:  What are you doing?  What is the

9       question before us?  You have a question now?  You

10      have asked him to do what?

11             MR. CASE:  No, I think she said that, your

12      Honor, because you had indicated it was in evidence

13      and it's not in evidence yet.  That's all.

14             THE COURT:  It soon will be if you move it.

15             MR. CASE:  Correct.

16             THE COURT:  I trust.  We'll see.

17      Q.     Okay.  Well, in English then, Officer, what

18  was -- what is the interpretation of the first statement that

19  you read to him?

20      A.     You have the right to remain silent.

21      Q.     And you asked him in Spanish if he understood

22  that?

23      A.     Yes.

24      Q.     And did he indicate to you that he did?

25      A.     Yes, he did.
```

A-789

1                    E. Torres - Direct                    43

2        Q.     And what was the next thing that you asked or

3   advised him?

4        A.     Anything you say can used -- can and will be used

5   against you in a court of law.

6        Q.     And did he understand that?

7        A.     Yes.

8        Q.     And did he verbally tell you he understood?

9        A.     Yes.

10        Q.     And in Spanish or in English?

11        A.     I believe it was in Spanish.

12        Q.     Okay.  And what was the next?

13        A.     You have a right to speak to an attorney and to

14   have him present while you're being interrogated.

15        Q.     And did he understand that?

16        A.     Yes, he did.

17        Q.     And anything else?

18        A.     The fourth question is, if you cannot afford a

19   lawyer, one would be appointed to you if you request.

20        Q.     And did he indicate to you that he understood

21   that as well?

22        A.     Yes, he did.

23        Q.     And when you read those four statements to him in

24   Spanish, did he ever indicate to you that he didn't

25   understand any part of those?

A-790

```
 1                    E. Torres - Direct                  44

 2        A.    No.

 3        Q.    After you read those warnings to him, what did

 4   you do?

 5        A.    Well, the detective began the, writing the, a

 6   written sworn statement.

 7        Q.    And well, let me ask you this.  Did you do

 8   anything else with that card?

 9        A.    Oh, yes.  He was asked to sign it, the Defendant,

10   Josue Ortiz, and he did sign it indicating that he

11   understands -- understood his rights and the Detective, Mark

12   Stambach, also signed it.

13        Q.    And is there a, any writing on the backside of

14   that card?

15        A.    There's the, it's partly in English here, two

16   other questions that were given to the Defendant.

17        Q.    And what were those?

18        A.    Did you understand each and every rights that

19   were explained to you.

20        Q.    And did he indicate that he understood that?

21        A.    Yes.

22        Q.    Okay.  And -- and did he say that yes, he did

23   understand?

24        A.    Yes, he did.

25        Q.    Okay.  And what is the next thing?
```

E. Torres - Direct                    45

1

2      A.      Having read your rights, would you now speak with

3   us or wait for an attorney.

4      Q.      And did he indicate that he was willing to speak

5   with you?

6      A.      Yes, he did.

7      Q.      And he was willing to waive his rights under

8   Miranda?

9      A.      That's correct.

10     Q.      And was it after you had read the backside of

11  that card -- incidentally, are there check marks on the back

12  of the card, also?

13     A.      Yes, there is.

14     Q.      And were those placed there by Detective Stambach

15  after each of the, those last two statements were read to

16  him?

17     A.      Yes.

18     Q.      And was that in Spanish?

19     A.      Yes.

20     Q.      And again, did he ever indicate he didn't

21  understand what you were saying to him?

22     A.      No, he did not.

23     Q.      Or ask you to explain anything to him?

24     A.      No.

25     Q.      Did he indicate at that time that he was willing

```
 1                    E. Torres - Direct                    46

 2   to waive his rights and speak with you and Detective

 3   Stambach?

 4        A.    Yes.

 5        Q.    And at that time, was he handcuffed?

 6        A.    No.

 7        Q.    Or told he was under arrest?

 8        A.    No.

 9        Q.    Or told that he could not leave at that time?

10        A.    No.

11        Q.    And then you said that, that you then reduced the

12   questions and answers to writing?

13        A.    Yes.

14        Q.    And was he told that that was going to be done?

15        A.    Yes.

16        Q.    And did you tell him that?

17        A.    Yes, I did.

18        Q.    In Spanish?

19        A.    Yes.

20        Q.    And did he indicate that that was okay with him?

21        A.    Yes, he did.

22        Q.    And again, after advising him of those rights,

23   did he ever say that he wanted to -- to speak with an

24   attorney?

25        A.    No, he did not.
```

A-793

```
 1              E. Torres - Direct              47

 2      Q.    Or that he did not wish to speak with you any

 3   further?

 4      A.    No.

 5      Q.    And, in fact, he agreed to have what he had said

 6   to you reduced to writing?

 7      A.    Yes.

 8      Q.    And during the time that you spent with the

 9   Defendant, were his answers to your questions appropriate?

10      A.    Yes, they were.

11      Q.    You understand what I mean by that?

12      A.    Yes.

13      Q.    Okay.

14            THE COURT:  Maybe you ought to amplify that,

15            Counselor, for the Court as to exactly what you

16            mean by appropriate.

17      Q.    And what I mean by that, were his answers

18   responsive to the questions that you were asking?

19      A.    Yes, they were.

20      Q.    And, in fact, were the questions and answers then

21   reduced to a written statement?

22      A.    Yes.

23      Q.    And so when that was done, Detective Stambach

24   would ask a question in English, correct?

25      A.    Yes.
```

```
1                    E. Torres - Direct                    48

2        Q.      And you would then ask the Defendant that

3   question in Spanish?

4        A.      Correct.

5        Q.      And he responded to you in Spanish?

6        A.      Yes.

7        Q.      You then gave that answer to Detective Stambach?

8        A.      Correct.

9        Q.      And he typed it on the -- on the statement?

10       A.      Yes.

11       Q.      And showing you People's 2 for identification,

12   can you tell the Court what that is?

13       A.      This is a sworn written statement taken by

14   Detective Stambach.  I did the translating.  The answers were

15   given by the Defendant.

16       Q.      And is that the statement that you just referred

17   to in your testimony?

18       A.      Yes, it is.

19       Q.      And how do you know that that's the same

20   statement?

21       A.      I signed the last sheet.

22       Q.      And there appear to be at the bottom of the first

23   page, there appear to be three separate sets of what look

24   like are initials.  Do you know what those are?

25       A.      Yes, they are -- yes, I do.  I'm sorry.
```

A-795

```
 1              E. Torres - Direct              49
 2      Q.      What are they?
 3      A.      My initials, the Defendant's initials, and
 4   Detective Stambach's initials.
 5      Q.      And those were all placed at the bottom of page
 6   one in your presence?
 7      A.      Yes.
 8      Q.      And that was done for what purpose, Officer?
 9      A.      He was asked if all the answers he provided and
10   the questions were correct, and he acknowledged that they
11   were.  In other words, the first page was correct.
12              THE COURT:  Wait just a minute.  I didn't even
13              know we had another case, I thought we were done.
14              This is a brand new pretrial conference?
15              MR. JOHN JOSEPH:  It's a time waiver they
16              wanted to put on the record.
17              THE COURT:  That's all.
18              MR. JOHN JOSEPH:  Mr. Lazarus got a little
19              delayed.
20              THE COURT:  Well, I would like to run a
21              pretrial.  Can you be back at two?  Your client is
22              in custody?
23              MR. LAZARUS:  Yes, he is, your Honor.
24              THE COURT:  Is he up here?
25              MR. LAZARUS:  Yes.
```

A-796

```
1              E. Torres - Direct                    50

2              MS. ROSANNE JOHNSON:  Yes.

3              THE COURT:  Well, let's just do the time

4      waiver, we'll schedule a pretrial later I guess.

5      05-1702, People versus -- come back at two o'clock.

6      Come back at two o'clock.  We got a Defendant in a

7      homicide, moving people around.  Please come back

8      at two o'clock.

9              MS. ROSANNE JOHNSON:  Thank you, Judge.

10             THE COURT:  All right.  So I'm sorry to

11     interrupt you, Mr. Case.

12             MR. CASE:  That's all right.

13             THE COURT:  I thought I could accomplish

14     something but the logistics didn't permit it.

15     Okay, you may proceed.

16     Q.      Thank you, your Honor.  And so Officer, did you

17     read page one to the Defendant or was the Defendant able to

18     read page one for himself?

19     A.      No, I read it to him.

20     Q.      Okay.  And when you say that you read it to him,

21     you read page -- page one of that statement to the Defendant

22     in Spanish?

23     A.      Yes.

24     Q.      Is that correct?  And did you translate exactly

25     the words from page one in English into Spanish?
```

A-797

1                    E. Torres - Direct                    51

2      A.      Yes.

3      Q.      And at some point during your discussion with the

4  Defendant, did he indicate to you that he was from Puerto

5  Rico?

6      A.      Yes, he did.

7      Q.      And -- and are you also Puerto Rican?

8      A.      Yes.

9      Q.      Did you have any difficulty understanding what he

10 was saying to you in Spanish?

11     A.      No, I understood him very well.

12     Q.      And did he ever indicate to you that he was

13 having difficulty understanding what you were saying?

14     A.      No.

15     Q.      So you read page one to him and translated it

16 into Spanish and he put his initials at the bottom of the

17 page to indicate that it was, the questions and answers were

18 accurate?

19     A.      Yes.

20     Q.      And you then did the same thing for page two and

21 page three, is that correct?

22     A.      That's correct.

23     Q.      And again he placed his initials and you placed

24 yours and Detective Stambach placed his at the bottom of page

25 two and page three?

```
1                    E. Torres - Direct                  52

2         A.      Correct.

3         Q.      For the same purpose?

4         A.      Correct.

5         Q.      And in addition to that, there are three

6  signatures on the last page.  Do you know whose signatures

7  those are?

8         A.      My signature, Detective Lonergan's and Josue

9  Ortiz.

10        Q.      And again, were those placed there in your

11 presence?

12        A.      Yes.

13        Q.      And that was to indicate that pages one, two and

14 three, the entire statement, was -- was accurate?

15        A.      Yes.  And also Detective Stambach also signed it.

16        Q.      Did you have an opportunity on November 15th, the

17 day before, to encounter the Defendant?

18        A.      Yes.

19        Q.      And where did you encounter him?

20        A.      Buffalo General Hospital.

21        Q.      And did you have an opportunity at that time to

22 have any conversation with the Defendant?

23        A.      Yes.

24        Q.      Do you recall if your conversation at that time

25 was the same as it was on November 16th?
```

A-799

```
                        E. Torres - Direct                   53
1
2        A.       He indicated he had information on a homicide.
3   However, we couldn't get any more from him other than that.
4   He wasn't specific with his information.
5        Q.       And did he on November 15th while at Buffalo
6   General Hospital, ever indicate his own involvement in the
7   homicide at 879 Niagara Street?
8        A.       I don't believe he did.  No.
9        Q.       So -- and when you saw him on November 15th at
10  Buffalo General Hospital, he indicated he had some knowledge
11  of that homicide at 879 Niagara Street?
12       A.       Correct.
13       Q.       But no mention of any involvement on his part?
14       A.       Correct.
15       Q.       And when you saw him on the 15th, did he appear
16  to you the same as he did on November 16th?
17       A.       No.
18       Q.       Would you be kind enough to tell the Court how
19  his appearance was different to you on the -- on November
20  15th versus November 16th?
21       A.       He appeared to be very unsettled.  Nervous.
22  Jerky.
23       Q.       And that would be on which date?
24       A.       At Buffalo General, the 15th.
25       Q.       Yes.  And -- and then when you saw him on the
```

```
 1              E. Torres - Direct              54

 2  16th, did he exhibit any of those qualities?

 3      A.    No, not at all.  He was calm.

 4      Q.    And after -- well, let me -- did you leave the

 5  Defendant at Buffalo General Hospital on the 15th?

 6      A.    Yes.

 7      Q.    And during that conversation, he was never

 8  handcuffed, was he?

 9      A.    No.

10      Q.    And never told that he was under arrest?

11      A.    No.

12      Q.    Never told he was a suspect in the Niagara Street

13  homicide, was he?

14      A.    No.

15              THE COURT:  Was he a suspect as far as you

16         know?

17              THE WITNESS:  On the 15th?

18              THE COURT:  On the 15th at the hospital.

19              THE WITNESS:  No.

20              THE COURT:  Thank you.

21              MR. CASE:  Your Honor, I would respectfully

22         move People's 1 and 2 into evidence.

23              THE COURT:  No objection?

24              MS. CALVO-TORRES:  Judge, I would object to

25         People's 1, lack of foundation.
```

A-801

1          E. Torres - Direct                    55

2          THE COURT:  Rights card?

3          MS. CALVO-TORRES:  Yes.

4          THE COURT:  Overruled.  In evidence.  No

5     objection to 2?  Also in evidence.

6     (Whereupon, People's Exhibits 1 and 2 for

7      identification were received and marked into

8      evidence.)

9          MR. CASE:  With that, I don't believe I have

10    any further questions of this witness.

11         THE COURT:  Cross examination.  Hopefully we

12    can finish -- are you going to do it, Miss Torres?

13         MS. CALVO-TORRES:  Yes, your Honor.

14         THE COURT:  Go ahead.

15         MS. CALVO-TORRES:  Good afternoon, Officer

16    Torres, it's a great last name you have.

17         THE WITNESS:  Yes, it is.

18         THE COURT:  Please move the microphone --

19         MS. CALVO-TORRES:  Sure.

20         THE COURT:  -- for the counselor there.  You

21    are kind of soft-spoken.

22         MS. CALVO-TORRES:  I'll speak up.  I'll speak

23    up.

24         THE COURT:  You can move that rostrum over a

25    bit.  You have six inches.  Why don't you move that

A-802

```
 1                    E. Torres - Cross                    56

 2            tighter to the table and/or move the table,

 3            whatever we got to do.  I think you need to speak

 4            right into it.  Go ahead.

 5                  MS. CALVO-TORRES:  Is this better, Judge?

 6                  THE COURT:  That's better.

 7   CROSS EXAMINATION

 8   BY MS. CALVO-TORRES:

 9      Q.    Okay.  Now before I start asking you any

10   questions, Officer Torres, do you have any notes relative to

11   this investigation?

12      A.    No, I don't.

13      Q.    So you didn't take any notes throughout your

14   contact with Mr. Ortiz on the 15th?

15      A.    No.

16      Q.    And you didn't take any notes during your contact

17   with Mr. Ortiz on the 16th?

18      A.    No, I did not.

19      Q.    Now before coming to court today, did you review

20   the sworn statement that was entered into evidence as

21   People's Exhibit No. 2?

22      A.    Yes.

23      Q.    And you indicated during direct examination that

24   you are Hispanic?

25      A.    Yes.
```

A-803

```
 1                        E. Torres - Cross                    57

 2        Q.      Correct?  And you speak Spanish, correct?

 3        A.      Yes.

 4        Q.      So you grew up speaking Spanish?

 5        A.      In my home, yes.

 6        Q.      Okay.  And how far did you go in school?

 7        A.      High school.

 8        Q.      High school?

 9        A.      Yep.

10        Q.      Okay.  And you studied it in high school,

11   correct?

12        A.      Yes.

13        Q.      Okay.  And -- but you never studied it beyond

14   that point, is that correct?

15        A.      That's correct.

16        Q.      Now you were asked to be a part of this

17   investigation because you do speak Spanish, correct?

18        A.      Correct.

19        Q.      Not because you're part of the Homicide Squad?

20        A.      Correct.

21        Q.      And not because you normally would investigate

22   this type of crime?

23        A.      That's correct.

24        Q.      You were simply asked to be a part of this

25   investigation because of your perceived ability to speak
```

```
 1                    E. Torres - Cross                    58

 2    Spanish?

 3         A.     Correct.

 4         Q.     Now you indicated that -- well, actually I don't

 5    think you even got into it.  You said that you were with the

 6    Buffalo Police Department for about eighteen years?

 7         A.     Yes.

 8         Q.     All right.  And so you have participated in court

 9    proceedings before?

10         A.     Yes.

11         Q.     So you're familiar with the role that an

12    interpreter would play?

13         A.     Yes.

14         Q.     Such as the one that we have here today?

15         A.     Yes.

16         Q.     Her role would be, for example, to hear what is

17    said in court, correct?

18         A.     Yes.

19         Q.     To somehow absorb that, right?

20         A.     Yes.

21         Q.     And then translate it to the Defendant?

22         A.     Yes.

23         Q.     All right.  And -- and there are certain

24    requirements, I'm sure you know, in order to be a court

25    certified interpreter, correct?
```

A-805

```
 1                    E. Torres - Cross              59

 2       A.      I'm sure there is.

 3       Q.      Okay.  They actually, and you would agree with

 4    me, that they are tested?

 5       A.      I -- I don't know.

 6               THE COURT:  I understand the role of an

 7            interpreter, Counselor.

 8       Q.      But you would agree with me that they are tested?

 9       A.      Yeah.

10       Q.      And there are certain certifications that goes

11    into with being sworn and the purpose of that would be to

12    ensure the accuracy of their translation?

13       A.      Correct.

14       Q.      Correct?  And part of that would be to ensure

15    that the Defendant understands everything that is taking

16    place in court?

17       A.      Correct.

18       Q.      And that he understands what rights he may be

19    given, correct?

20       A.      Correct.

21       Q.      Or giving up?  Correct?

22       A.      Correct.

23       Q.      And you would agree with me that the translator

24    plays a very important part in court proceedings?

25       A.      Absolutely.
```

A-806

```
 1                    E. Torres - Cross                60

 2      Q.      And again, you're not certified in translating,

 3   correct?

 4      A.      I have never been certified.

 5      Q.      Okay.

 6      A.      No.

 7      Q.      Now you indicated that your first contact with

 8   Mr. Ortiz was on November 15th?

 9      A.      Correct.

10      Q.      Do you remember that date?

11      A.      Yes, I do.

12      Q.      And that was at a hospital?

13      A.      Yes.

14      Q.      What hospital was that?

15      A.      Buffalo General.

16      Q.      Now how was it that you came to be there?

17      A.      I received a call from my dispatch, from the --

18   indicating to go to the hospital along with meet the, excuse

19   me, detectives from the Major Case Squad about information on

20   a homicide, an individual there that may have information on

21   a homicide.

22      Q.      And -- and was that information relayed to you

23   through a radio call or telephone?

24      A.      Police dispatch.  Radio, yes.

25      Q.      Okay.  And do you remember about what time that
```

```
 1                    E. Torres - Cross                    61

 2   radio transmission came over the air?

 3        A.       Not exactly.  I really don't recall.

 4        Q.       Do you remember about what time you arrived?

 5        A.       No.

 6        Q.       Would you agree with me if I said about four

 7   forty-five p.m.?  Does that ring a bell?

 8        A.       I couldn't exactly say what time I got there.

 9                 THE COURT:  What are we talking about now?

10                 MS. CALVO-TORRES:  That was November 15th,

11        your Honor.

12                 THE COURT:  You can't verify the time at all?

13                 THE WITNESS:  I would have to look at my logs.

14           Honestly --

15        Q.       Sometime in the afternoon?

16        A.       Yeah.  I work the afternoon shift.

17        Q.       And it could have been four forty-five p.m.?

18        A.       Sure.

19        Q.       And when you arrived there, were other officers

20   there?  Actually other detectives were there?

21        A.       Yes.

22        Q.       And one of those detectives was Detective

23   Lonergan?

24        A.       Yes.

25        Q.       Who else was there?
```

Case 23-352, Document 52, 06/27/2023, 3534010, Page79 of 253

A-808

```
 1              E. Torres - Cross                    62

 2      A.      Detective Vaughn.  I believe Detective Stambach.

 3      Q.      Any other detectives?

 4      A.      Not that I recall.

 5      Q.      And when you arrived, were you in uniform?

 6      A.      Yes.

 7      Q.      And what about the other detectives, did they

 8  have badges on them?

 9      A.      They're plainclothes.  I don't know if they

10  were -- had their badges exposed.  I don't recall that.

11      Q.      You don't remember seeing badges?

12      A.      No.

13      Q.      Do you remember seeing guns?  Did they have guns

14  on them?

15      A.      I don't know -- I don't know if I looked to see,

16  to look for guns.  I don't know.

17      Q.      But normally detectives would carry a badge on

18  them, correct?

19      A.      Yes.

20      Q.      And they would carry a gun on them, correct?

21      A.      Yes.

22      Q.      And they wouldn't necessarily be hiding those

23  items.

24      A.      Sometimes they do.  Like I said, I don't --

25      Q.      But sometimes --
```

A-809

```
1              E. Torres - Cross                63

2    A.      Detectives carry --

3            THE COURT:  Let's just talk about 11/15.

4            THE WITNESS:  They're armed.  They are armed.

5            THE COURT:  Do you see or do you recall seeing

6    badges displayed by the detectives?

7            THE WITNESS:  No.

8            THE COURT:  Okay.  Thank you.  Go ahead,

9    Counselor.

10   Q.      Now when you arrived, you were given some

11   background information about why you were there?

12   A.      Yes.

13   Q.      And that was provided to you by whom?

14   A.      I don't know the name.  It was someone from the

15   hospital.

16   Q.      And what about the detectives that were there,

17   did they provide you with any background information?  If you

18   recall.

19   A.      Not that I recall.  Not that I recall.

20   Q.      So at some point, by one of the hospital staff

21   people, you were informed that there was a Hispanic male

22   there, correct?

23   A.      Yes.

24   Q.      And that this Hispanic male claimed to have

25   information about a double homicide that occurred at 879
```

```
1                    E. Torres - Cross                 64
2    Niagara Street, correct?
3         A.     By who did you say that --
4         Q.     Staff person from the hospital.
5         A.     Not from the staff.  Just about information on a
6    homicide.  They weren't specific.  They weren't that
7    specific.
8         Q.     Okay.  And did they indicate to you that this
9    gentleman had indicated to them that he was in fear for his
10   life?
11        A.     Yeah.
12        Q.     And he was in fear for his life because the
13   killers were after him?
14        A.     I didn't get that from staff.
15        Q.     Well, at some point Mr. Ortiz comes into a room?
16        A.     Yes.
17        Q.     That you along with the three other detectives
18   were set up in?
19        A.     Correct.
20        Q.     Can you describe his appearance when he first
21   came in?
22        A.     Casual.  And if I say anything else about it I
23   would be guessing.  I don't know anything else.
24        Q.     What about his demeanor?
25        A.     He was very nervous.
```

A-811

```
1                    E. Torres - Cross              65

2        Q.    Jittery?

3        A.    Jittery, yes.

4        Q.    He seemed scared, frightened?

5        A.    Yes.

6        Q.    Out of sorts somewhat?

7        A.    Yes, somewhat.

8        Q.    And then at that point, everyone introduced

9   themselves?

10       A.    Yes.

11       Q.    Yes?

12       A.    Yes.

13       Q.    So each detective introduced himself?

14       A.    Yes.

15       Q.    And you introduced yourself?

16       A.    Yes.

17       Q.    And did you do so in English or in Spanish?

18       A.    I don't exactly recall.

19       Q.    At some point you started to speak Spanish to

20  him?

21       A.    Yes.

22       Q.    And the two of you had some type of conversation

23  in Spanish?

24       A.    Yes.

25       Q.    Okay.  In fact, you had a pretty lengthy
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
1                    E. Torres - Cross                    66

2   conversation in Spanish?

3        A.    Lengthy?  We had a conversation.

4        Q.    Okay.  And -- and this all took place in the

5   Spanish language, not English?

6        A.    Correct.

7        Q.    Now did you explain to him why you were there?

8        A.    I believe so.

9        Q.    And you explained to him that your goal would be

10  to interpret?

11       A.    Yes.

12       Q.    Now this conversation that you had with him,

13  during this conversation he indicated to you that he knew the

14  Camacho brothers, correct?

15             THE COURT:  Are we talking about the 15th?

16             MS. CALVO-TORRES:  Yes, your Honor, we are

17             still talking about the 15th.

18             THE COURT:  Is any of that incorporated on the

19             710.30 or not?

20             MS. CALVO-TORRES:  It is not, your Honor.

21             THE WITNESS:  I don't know if we got into

22             details of names.

23       Q.    Did he indicate to you that, that they were

24  members of a cocaine ring?

25       A.    I don't recall.
```

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1              E. Torres - Cross              67

 2      Q.      And he gave you some other information about the

 3   Camacho brothers, do you recall that?

 4      A.      It didn't get any further than he indicated  that

 5   he knew information and then it just pretty much trailed off.

 6      Q.      Okay.  Did he share with you his theory as to why

 7   the Camacho brothers were killed?

 8      A.      I honestly don't recall.

 9      Q.      Do you know if this conversation was memorialized

10   anywhere?

11      A.      What do you mean?

12      Q.      Was it written down somewhere?  Did someone

13   memorialize it in some way?  In other words, did they

14   document this conversation somewhere?

15      A.      I believe the detectives were taking some

16   information.  I was not.

17              MS. CALVO-TORRES:  I would like to have an

18          exhibit marked, your Honor.

19              THE COURT:  Yes, go right ahead.

20          (Whereupon, Defendant's Exhibit A was marked

21           for identification.)

22              MS. CALVO-TORRES:  Permission to approach.

23              THE COURT:  Yes, surely you may.  You needn't

24          ask permission.  Go right ahead, just don't camp

25          out on the witness' shoulder.  Go ahead.
```

```
 1              E. Torres - Cross                    68
 2              MS. CALVO-TORRES:  Officer Torres, do you
 3      recognize that document I just handed you?
 4              THE WITNESS:  No, this is the first I have
 5      seen it.
 6              THE COURT:  What is that now, Defense Exhibit
 7      A?
 8              MS. CALVO-TORRES:  Yes, your Honor.
 9              THE COURT:  What does it purport to be?
10              MS. CALVO-TORRES:  It purports to be a memo,
11      an interoffice memo written by one of the
12      detectives that was present during this interview
13      on November 15th.  That, in fact, memorializes the
14      conversation that Officer Torres purports to have
15      translated.
16              THE COURT:  Go ahead.
17              THE WITNESS:  I'm sorry, is there a question?
18      Q.      Could you review that to yourself, please?
19      A.      Review it to myself?
20      Q.      Yes.
21      A.      Okay.
22      Q.      And it's two pages, Officer.
23      A.      Okay.
24      Q.      Now Officer, after reviewing that, do you now
25      recall what the nature of the conversation was with
```

```
 1                    E. Torres - Cross                    69

 2   Mr. Ortiz?

 3         A.      A homicide.  A homicide.

 4         Q.      Okay.  And during that conversation, he indicated

 5   to you, I'll ask you again, that he knew the Camacho

 6   brothers, correct?

 7         A.      I don't recall the conversation exactly, but if

 8   you're asking me based on this statement, then yes, the

 9   answer would be yes.

10         Q.      And that they were members of a cocaine ring,

11   correct?

12         A.      Correct.

13         Q.      And that then he gave you some other information

14   about the Camacho brothers, like where they had apartments,

15   where they stored this cocaine, et cetera, et cetera,

16   correct?

17         A.      Yes.

18         Q.      And then he shared with you his theory as to why

19   the Camacho brothers were killed?  In fact, he goes on to say

20   that he believed that it was because of jealousy of how well

21   their drug sales were going, correct?

22         A.      I'm reading that now, yes.

23         Q.      So he did give you some specifics?

24         A.      According to this, yes.  I don't recall.

25         Q.      Okay.  And at some point, you asked him very
```

A-816

```
 1                    E. Torres - Cross                    70

 2    directly if he had knowledge of the murders at 879 Niagara?

 3        A.      Yes.

 4        Q.      Correct?

 5        A.      Yes.

 6        Q.      And he said he did not, right?

 7        A.      Correct.

 8        Q.      Now when you first came into the room, there was

 9    some indication that this Hispanic male was afraid for his

10    life, right?  Remember that?

11        A.      Yes.

12        Q.      Did you ever ask Mr. Ortiz why he was afraid?

13        A.      Don't exactly recall.

14        Q.      But he did seem frightened, jittery --

15        A.      Yes.

16        Q.      -- out of sorts, and he was never asked if -- if

17    he knew who these killers were?

18        A.      According to this statement he was asked.

19        Q.      Okay.  And what was his response?

20        A.      His response here was yes, that he was

21    specifically afraid of a Rinaldo Velasquez.

22        Q.      So he shared his fear with you?

23        A.      Yes, according to this statement.

24                    MR. CASE:  I would just object, your Honor,

25                that's not exactly what that statement says.
```

A-817

```
 1              E. Torres - Cross                    71
 2              THE COURT:  Well, it's not exactly what the
 3         statement said.  Well, the statement is not in
 4         evidence.  You're using it to refresh his
 5         recollection.  I guess you can clarify it on
 6         redirect if it's significant.
 7              MR. CASE:  Thank you, your Honor.
 8         Q.   Now Officer Torres, after this conversation with
 9    Mr. Ortiz, he was allowed to go back to the patient area, was
10    he not?
11         A.   Yes.
12         Q.   So he wasn't detained?
13         A.   Correct.
14         Q.   He wasn't arrested?
15         A.   Correct.
16         Q.   And at this time he still seemed frightened and
17    jittery?
18         A.   Yes.
19         Q.   Now that document that you have in front of you,
20    that wasn't written by you, correct?
21         A.   Correct.
22         Q.   And that was a document that was created, a
23    memorialization of this conversation by whom?
24         A.   Detective Mark Vaughn.
25         Q.   So it was done at a later time?
```

A-818

```
 1              E. Torres - Cross              72

 2     A.    I -- it was not done at the scene.  Correct.

 3     Q.    Okay.  And it was done by someone else?

 4     A.    Correct.

 5     Q.    And basically it was a synopsis of the

 6  conversation that you purported to translate?

 7     A.    By Detective Mark Vaughn.

 8     Q.    Okay.  So some of the details that the recorder

 9  could not remember may not be in there, correct?

10     A.    I'm sorry?

11     Q.    Some of the details that the recorder of this

12  document may not have recalled, may not be in there, correct?

13  In other words, he may have left some details out because it

14  was done at a later time?

15     A.    I don't know.  I don't know.

16           MR. CASE:  I think that's speculative.

17           THE COURT:  Yeah.  Sustained.

18     Q.    Now you had a second encounter with my client and

19  that was on November 16th?

20     A.    Correct.

21     Q.    And do you recall what time that encounter was?

22     A.    Later on in the evening I believe, twenty hundred

23  hours.  Eight o'clock.  Or actually twenty-one hundred is

24  nine o'clock.  Eight.  Sometime after eight I believe.

25     Q.    Sometime after eight?
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1                    E. Torres - Cross              73

 2      A.     I believe.  I'm not sure.

 3             THE COURT:  Eight p.m.?

 4             THE WITNESS:  Yes.

 5             THE COURT:  Go ahead.

 6      Q.     What time did you arrive at the station?

 7      A.     At the detective's office?

 8      Q.     Yes sir.

 9      A.     I was there for a while because I had brought in

10      another individual.

11      Q.     Okay.  So you were there a little while before

12      Mr. Ortiz arrived?

13      A.     I didn't see Ortiz at all.  I was --

14      Q.     When he arrived?

15      A.     I was in another office with another individual.

16      Q.     Okay.  What time did you first encounter

17      Mr. Ortiz at the Homicide Squad?

18      A.     The interview with the person that I had with the

19      detectives was pretty brief because -- because they had

20      spoken to him a couple days prior to that.  So --

21      Q.     That wasn't my question, Police Officer Torres,

22      my question was what time did you first encounter Mr. Ortiz?

23      A.     I don't know the exact time.

24      Q.     You don't recall?

25      A.     No.
```

A-820

```
1                    E. Torres - Cross                    74

2                    THE COURT:  Didn't you just say around eight

3         p.m.?

4                    THE WITNESS:  I would estimate around eight

5         p.m.

6                    THE COURT:  After eight p.m.?

7                    THE WITNESS:  Yes.

8                    THE COURT:  Okay.

9         Q.    So when you arrived into the Homicide Squad, who

10        did you meet up with?

11        A.    Detective Lonergan, another detective, I can't

12        remember his name.

13        Q.    Detective Stambach?

14        A.    No, it was someone else, I just can't remember

15        his name.

16        Q.    And at what point did you come into contact with

17        Detective Stambach?

18        A.    Shortly after my time with the first individual I

19        had, which was probably ten, fifteen minutes long.

20        Q.    And was it Detective Stambach that requested that

21        you stay behind?

22        A.    Yes.

23        Q.    To assist in translating?

24        A.    Yes.

25        Q.    And he told you that Mr. Ortiz could not speak
```

A-821

```
 1                    E. Torres - Cross                    75

 2    English, correct?

 3         A.    He stated -- he asked me to help in translating.

 4         Q.    Okay.  And that was because Mr. Ortiz could not

 5    speak English, correct?

 6         A.    I believe so, yes.

 7         Q.    Now did you and the detectives have a

 8    conversation before going into a room with Mr. Ortiz?

 9         A.    No.

10         Q.    You weren't provided with any background as to

11    why you were there?

12         A.    No.  As a matter of fact, I was surprised to see

13    him, Mr. Ortiz.

14         Q.    So when you walked into the room, you had no idea

15    who you were going to be dealing with?

16         A.    Correct.

17         Q.    Okay.  You were simply translating for yet

18    another Hispanic?

19         A.    Correct.

20         Q.    So when you walked in, you reintroduced yourself?

21         A.    Yes.

22         Q.    And did you explain to him why you were there?

23         A.    Yes.

24         Q.    So you explained to him that you were there to

25    translate?
```

A-822

```
 1                  E. Torres - Cross                    76

 2        A.     Correct.

 3        Q.     And that that would be your role during this

 4   evening?

 5        A.     Right.

 6        Q.     And this was done in Spanish?

 7        A.     Yes.

 8        Q.     So you told him you would be acting as an

 9   interpreter?

10        A.     Correct.

11        Q.     Okay.  And that part of the conversation is not

12   in -- in that statement that you have in front of you,

13   correct?

14        A.     Which statement?

15        Q.     People's Exhibit 2.

16        A.     No, it's not.

17        Q.     I'm sorry?

18        A.     No, it's not.

19        Q.     Okay.  Now this time when you were asking

20   questions, were they being recorded?

21        A.     Recorded?  No.

22        Q.     Yes.  They weren't being recorded?  They weren't

23   being memorialized, written down?

24        A.     Initially, no.

25        Q.     So before this statement was produced, there was
```

A-823

```
 1              E. Torres - Cross              77

 2   a conversation between you and Mr. Ortiz?

 3       A.    Yes.

 4       Q.    And did that conversation include Detective

 5   Stambach?

 6       A.    I believe so, yes.

 7       Q.    So Detective Stambach was feeding you questions?

 8       A.    Yes.

 9       Q.    And so Detective Stambach is talking to you in

10   this one ear and you're trying to absorb what he's saying,

11   correct?

12       A.    Yep.

13       Q.    And then you think about what you're going to say

14   in Spanish and then you tell Mr. Ortiz?

15       A.    Correct.

16       Q.    And this is pretty much the process that goes on

17   throughout the night?

18       A.    Yes.

19       Q.    Where was Detective Stambach sitting in relation

20   to you?

21       A.    I believe he was behind the desk.

22       Q.    Okay.  And you were where?

23       A.    I think there was two or three chairs in the

24   room.  I was seated at one, he was seated at the other,

25   Mr. Ortiz.
```

A-824

```
1                    E. Torres - Cross                    78

2        Q.      Okay.  So we have a desk and are you on one side

3    of the desk, and Detective Stambach is on the other side?

4        A.      I believe I was seated next to Mr. Ortiz.

5        Q.      Were you all on the same side of the desk?

6        A.      Ortiz and I were in front of the desk.

7        Q.      Okay.

8        A.      I believe Stambach was behind the desk.

9        Q.      Was behind the desk.  So we have Detective

10   Stambach on one side of the desk and you and Mr. Ortiz on the

11   other side of the desk?

12       A.      Correct.

13       Q.      Where's the other detective?  Not Lonergan.

14       A.      Which other detective are you referring to?

15       Q.      Detective Lonergan.

16       A.      Lonergan would pop in and out.

17       Q.      Okay.  And when he would pop in, where would he

18   go?

19       A.      I think he was standing.

20       Q.      So he wasn't sitting anywhere?

21       A.      I don't recall him, seeing him sitting.

22       Q.      Okay.  So he wasn't there during the entire

23   conversation, correct?

24       A.      He popped in and out.

25       Q.      So he wasn't there during the entire
```

```
1                    E. Torres - Cross                    79
2   conversation?
3       A.      Correct.  Yes.
4       Q.      So we have somewhat of a triangle effect here
5   going on during this translation, correct?  Stambach speaks
6   to you, you think it over, translate it in your brain, give
7   it over to Ortiz, Ortiz then responds in Spanish, you absorb
8   it, translate it somehow and then give it back to Stambach?
9       A.      Correct.
10      Q.      And --
11              THE COURT:  We're not going to the weight to
12          be accorded to the words recorded so please move
13          along.  We're going to be having to take a break
14          for the lunch hour recess, so move it along,
15          please, Miss Calvo-Torres.  Thank you.  You're
16          doing now a jury kind of material quite frankly.
17          Go ahead.
18      Q.      Now when you were translating, you knew that this
19  statement was going to be recorded at some point, correct?
20      A.      Yes.
21      Q.      Okay.  It was going to be written down I mean,
22  correct?
23      A.      Yes.  Yes.
24      Q.      And you knew that other people would be reading
25  it, correct?
```

A-826

```
 1                    E. Torres - Cross                    80

 2         A.      Sure.

 3         Q.      So you knew that it would be important to be as

 4    accurate as possible?

 5         A.      Yes.

 6         Q.      And you attempted to translate as accurately as

 7    you knew how?

 8         A.      Yes.

 9         Q.      And one of the reasons among many others for that

10    accurate translation would be to ensure that Detective

11    Stambach and Mr. Ortiz understood one another, correct?

12         A.      Correct.

13         Q.      Now about three questions into the interrogation,

14    you asked him, have you lived in the U.S. for how long, do

15    you recall that question?

16         A.      Yes.

17         Q.      And he answered this is my first time.

18         A.      Yes.

19         Q.      Now that's not a responsive answer to the

20    question, is it?

21         A.      What do you mean?

22         Q.      Well, you asked him how long have you lived in

23    the U.S., correct?

24         A.      Right.

25         Q.      And he answered this is my first time.
```

A-827

|   |   |   |
|---|---|---|
| 1 | E. Torres - Cross | 81 |

2  A.  Okay, I see what you mean.  Yes.

3  Q.  Okay.  So that was not a responsive question --

4 answer to the question, correct?

5  A.  Correct.

6  Q.  And that wasn't indicative of him understanding

7 the question, correct?

8  A.  Possibly.

9  Q.  And you didn't bother to clarify that, did you?

10  A.  No.

11  Q.  Now at the beginning of this interrogation, you

12 asked the Defendant if he could read and write, correct?

13  A.  Yes.

14  Q.  And his answer was so-so with English, correct?

15  A.  Yes.

16  Q.  And you never followed up to see if he could read

17 and write in Spanish, did you?

18  A.  No.

19  Q.  And you never -- and then you asked him if he

20 went to school, correct?  How far -- you asked him how far

21 did you go in school, correct?

22  A.  Correct.

23  Q.  And he answered eleventh grade?

24  A.  Yes.

25  Q.  And you never asked him where he went to school,

```
 1              E. Torres - Cross                82
 2   did you?
 3        A.    No.
 4        Q.    Nor did you ask him what language he studied in?
 5        A.    No.
 6        Q.    Now I'd like to talk a little bit about the
 7   Miranda warnings, that card that was marked as People's
 8   Exhibit 1.
 9        A.    Okay.
10        Q.    You indicated that you read the rights to
11   Mr. Ortiz?
12        A.    Correct.
13        Q.    And that was done from the card?
14        A.    Correct.
15        Q.    And that was done verbatim?
16        A.    Correct.
17        Q.    You didn't translate that?
18        A.    To Josue?
19        Q.    Right.
20        A.    No.
21        Q.    You didn't interpret it?  You read exactly what
22   was on the card, correct?
23        A.    Correct.
24        Q.    Do you have an English version of the Miranda
25   card by any chance?
```

E. Torres - Cross                    83

2    A.    Not on me, no.

3    Q.    No.  But you would agree with me that there is

4  some part in the English version that says if you cannot

5  afford an attorney, one will be appointed to represent you

6  free of charge?

7    A.    That is in the English version, yes.

8    Q.    I'm sure that's something that you have committed

9  to memory at this point so --

10   A.    I can remember it sometimes.

11   Q.    Okay.  Okay.  Now that's different from the

12  Spanish version you have in front of you, isn't it?

13   A.    What do you mean?  I'm sorry.

14   Q.    Well, I'll give you an example.  There's no

15  mention in the Spanish version of the attorney being provided

16  free of charge, correct?  Can you look at section four?

17   A.    That's what I'm looking at and it says, if you

18  cannot afford one, one will be appointed to represent.

19              THE COURT:  That's what it says in Spanish?

20              THE WITNESS:  On number four.

21              THE COURT:  Okay.

22   Q.    And there's no mention of that attorney being

23  free of charge in there, correct?

24   A.    It doesn't say free of charge, it just mentions

25  if you cannot afford one.

A-830

```
1                    E. Torres - Cross                    84

2        Q.        Okay.  So you would agree with me that there's no

3    mention of the attorney being free of charge in the Spanish

4    version?

5        A.        Doesn't say free of charge.

6        Q.        Okay.

7                  THE COURT:  But it does say one will be

8             provided?

9                  THE WITNESS:  Yes.

10       Q.        Well, actually it says one will be appointed,

11   correct?  Doesn't say one will be provided.

12       A.        Correct.

13       Q.        Now on the back of the card, if you would just

14   turn it over, there's some instructions, correct?

15       A.        Yes.

16       Q.        And those instructions are in English?

17       A.        Yes.

18       Q.        And those instructions are for you, correct?

19       A.        Correct.

20       Q.        And basically it leads you, or gives you some

21   guidance as to how to get an agreement out of the Defendant,

22   correct?

23       A.        Correct.

24       Q.        And that was not translated for Mr. Ortiz, was

25   it?
```

|   |   | 85 |
|---|---|---|

1            E. Torres - Cross

2     A.    No.

3     Q.    Now you indicated that as you read these Miranda

4 rights and these warnings, Detective Stambach would check

5 each line, correct?

6     A.    Correct.

7     Q.    So it wasn't Mr. Ortiz who checked each line,

8 correct?

9     A.    Correct.

10     Q.    Okay.  And then on the front of the card you

11 have, I don't recall it, signatures or initials?

12     A.    Signatures.

13     Q.    Signatures.  And you have your signature,

14 correct?

15     A.    Yes.

16     Q.    You have Detective Stambach's signature, correct?

17     A.    Correct.

18     Q.    And you have my client's, Mr. Ortiz' signature,

19 correct?

20     A.    Yes.

21     Q.    Now switch over to the other side of the card.

22 Whose signatures are back there?

23     A.    Mark Stambach's.

24     Q.    So my client's signatures are not on the back of

25 that card?

A-832

```
1                    E. Torres - Cross                 86

2        A.      Not on the back.

3        Q.      Okay.  And on the back of that card is where

4   these questions are contained, correct?

5        A.      There are two more questions on the reverse

6   side, yes.

7        Q.      Well, specifically he's being asked are you

8   willing to speak to us without an attorney present, correct?

9        A.      Yes.

10        Q.      So he's being asked to continue speaking to

11   officers without an attorney present, correct?

12        A.      Correct.

13        Q.      His signature is not next to that, is it?

14        A.      No.

15        Q.      Okay.  And then he's being asked -- what else is

16   he being asked?

17        A.      Do you understand all your rights read to you.

18        Q.      Okay.  And his signature is not next to that,

19   either.

20        A.      No.

21        Q.      Is he asked another question?

22        A.      Not on this side, no.

23        Q.      Okay.  Is he asked do you want to wait for an

24   attorney?

25        A.      I don't know.
```

```
 1                    E. Torres - Cross                    87

 2        Q.    Last question.

 3        A.    I don't know if that was asked.

 4        Q.    Okay.  But it's on there, correct?  Would you

 5   like to wait for your attorney?

 6        A.    That was read to him.

 7        Q.    Okay.

 8        A.    It was read in its entirety.

 9        Q.    Okay.  That wasn't my question.  My question is,

10   is that the question that is contained on that card?

11        A.    Yes.

12        Q.    Okay.  And his signature is not next to that,

13   either?

14        A.    That's correct.

15        Q.    Now at some point he's asked a very long question

16   and that's about four questions into the statement.

17                    THE COURT:  Okay.  Are you done with the

18             rights card aspect of your --

19             MS. CALVO-TORRES:  Yes.

20                    THE COURT:  How much longer do you expect to

21             have on the statement?  More than five minutes?

22             MS. CALVO-TORRES:  Yes, Judge, more than five

23             minutes.

24                    THE COURT:  All right, we'll take our luncheon

25             recess, Counselors, and Officer, please be back in
```

```
1                    E. Torres - Cross                    88

2       court -- well, confer with the District Attorney,

3       two o'clock.  We'll recess until two o'clock.  How

4       much more do you have with this witness?

5               MS. CALVO-TORRES:  I would imagine at least

6       another half hour, Judge.

7               THE COURT:  All right.

8               MS. CALVO-TORRES:  Thank you, your Honor.

9               THE COURT:  Stambach is going -- or Lonergan

10      is going to be available?

11              MR. CASE:  Yes, your Honor.

12              THE COURT:  Okay.  Court is in recess until

13      two p.m.

14      (Whereupon, a lunch recess was taken at 1:00 p.m.)

15      (Counsel present at 2:20 p.m.)

16              THE COURT:  Thank you for coming back.  We are

17      now prepared to continue with the Huntley hearing

18      regarding Josue Ortiz.  Miss Calvo-Torres is cross

19      examining.  Recall the witness, Police Officer

20      Torres.

21      (Defendant is present)

22              THE COURT:  Josue Ortiz is now in court.

23      Where is our interpreter?

24              MS. CALVO-TORRES:  She stepped out for a

25      moment.  She was here.
```

```
1                    E. Torres - Cross                    89

2               MR. CASE:  She was here.

3               THE COURT:  Okay, find the interpreter.  There

4          we got the officer.

5          (The interpreter is present)

6               THE COURT:  Here is the interpreter,

7          Mrs. Arzac.  Mrs. Arzac is present, all Counsel

8          present, Defendant present.  Officer Torres is on

9          the stand.  I remind you you remain under oath,

10         sir, do you understand?

11              THE WITNESS:  Yes sir.

12              THE COURT:  Very good.  You may continue, Miss

13         Torres.

14              MS. CALVO-TORRES:  Thank you, your Honor.

15     E D W I N    T O R R E S, previously sworn, resumed the

16     stand and testified further as follows:

17     CROSS EXAMINATION

18     BY MS. CALVO-TORRES:  (Continued)

19         Q.     Good afternoon once again, Officer Torres.

20         A.     Good afternoon.

21         Q.     As you will recall before we took a recess, I had

22     asked you a number of questions regarding the Miranda

23     warnings.

24         A.     Correct.

25         Q.     Do you remember that?
```

1              E. Torres - Cross                    90

2        A.    Yes.

3        Q.    Yeah.  The one thing that I didn't ask you was,

4   when exactly did you read these rights and warnings to

5   Mr. Ortiz?

6        A.    When?

7        Q.    Yes.

8        A.    On the 16th.

9        Q.    On the 16th?

10       A.    Yeah.

11       Q.    Do you recall what time?

12       A.    I'd be guessing.

13       Q.    Is there anything I can show you that would

14   refresh your recollection?

15       A.    Sure.

16       Q.    What would that be?

17       A.    If the time was placed on the Miranda warnings.

18       Q.    Okay.

19            THE COURT:  On the statement?  Show him the

20       statement.  Show him the card.  See what refreshes

21       his recollection.  Here they are.  Please.  Thank

22       you.

23            MS. CALVO-TORRES:  Thank you.  Officer, I'm

24       showing you what's already been marked as I believe

25       that was Defense Exhibit 1 -- no, People's Exhibit

1        E. Torres - Cross                    91

2      No. 1.  That's the Miranda rights?

3          THE WITNESS:  Correct.

4          MS. CALVO-TORRES:  Okay.  And I'm also

5      handing you People's No. 2.  Having reviewed that,

6      has your recollection been refreshed as to what

7      time these Miranda warnings were purportedly read

8      to Mr. Ortiz?

9          THE WITNESS:  Excuse me.  The time on the

10     Miranda warnings was placed as eight twenty-five

11     p.m.

12         THE COURT:  Eight two five?  Eight twenty-five

13     p.m.?

14         THE WITNESS:  Correct.

15         THE COURT:  Okay.  I'll go right to the heart

16     of it.  What time did you pick him up?  Did you say

17     what time did you -- well, more significantly, what

18     time did you meet him in Homicide?  You testified

19     it was after eight p.m.?

20         THE WITNESS:  Yes.

21         THE COURT:  And that's when you first met him

22     in, was it Homicide or Major Crime?

23         THE WITNESS:  Major Crimes at that time.

24         THE COURT:  Okay.  Major Crimes at a little --

25     after rather, after eight p.m.  You couldn't be

A-838

```
1                    E. Torres - Cross                92

2           more specific?

3                    THE WITNESS:  No.

4                    THE COURT:  Okay.  Go ahead, Miss

5           Calvo-Torres.

6      Q.     So you met Mr. Ortiz sometime after eight p.m. on

7   the 16th, correct?

8      A.     Yes.

9      Q.     Okay.  And that could have been eight-o-five,

10  correct?

11     A.     Yes.

12     Q.     Anytime between eight-o-five and eight

13  twenty-five p.m., correct?

14     A.     Correct.

15     Q.     Okay.  You indicated you met him at Major Crimes

16  Unit?

17     A.     Office, yes.

18     Q.     Okay.  And is that different from the Homicide

19  Squad?

20     A.     No.

21     Q.     Okay.  It's one and the same?

22     A.     Just changed their names.

23     Q.     Okay.  But it's the same office?

24     A.     Yes.

25     Q.     Now these Miranda rights, they're supposed to be
```

```
 1                    E. Torres - Cross                   93

 2   read before custodial interrogation, correct?

 3        A.     I'm sorry?

 4        Q.     These Miranda rights that you read at eight

 5   twenty-five p.m. on November 16th, they're supposed to be

 6   read before a custodial interrogation takes place?

 7                MR. CASE:  Objection, your Honor.

 8                THE COURT:  Yeah.  I don't think he's the

 9                counsel for the police department.  I'll sustain

10                the objection.

11        Q.     When would you usually read these Miranda rights

12   to a Defendant?

13        A.     Prior to being placed under arrest.

14        Q.     So before he's placed in custody, correct?

15        A.     Correct.

16        Q.     And would you normally read these questions

17   before you ask any questions of the Defendant?

18        A.      It's not unusual to ask questions beforehand.

19                THE COURT:  Well, was he in custody at eight

20                twenty-five when you gave him the rights?  Or

21                more -- let me ask this.  Was he in custody shortly

22                after eight o'clock as you first came in contact

23                with him at Major Crime?

24                THE WITNESS:  I -- I don't believe he was

25                under arrest.
```

```
 1                    E. Torres - Cross                    94

 2                    THE COURT:  Okay.  Thank you.

 3     Q.    Was he free to leave?

 4     A.    Yes.

 5     Q.    He was?

 6     A.    I believe he was.

 7     Q.    Okay.  He was free to leave at eight-o-five?

 8     A.    I believe so.

 9     Q.    Okay.  And then shortly after that, you indicated

10   that you had had some conversation with Mr. Ortiz?

11     A.    Correct.

12     Q.    And that was in the Spanish language, correct?

13     A.    Yes.

14     Q.    Now that part of the conversation had -- was not

15   being written down, correct?

16     A.    Those were questions I posed to him that were

17   given to me by Detective Stambach.

18     Q.    But at that point, Detective Stambach or any

19   other detective was not writing these questions down,

20   correct?

21     A.    I don't believe so.

22     Q.    Okay.  He wasn't typing them or anything like

23   that?

24     A.    No.

25     Q.    At that point?
```

A-841

```
 1                      E. Torres - Cross                    95

 2        A.     No.  Initially, no.

 3        Q.     So you had had -- you started to have some

 4    conversation with Mr. Ortiz and during this conversation, he

 5    indicated to you his involvement in the crime, correct?

 6        A.     Correct.

 7        Q.     Okay.  And at that point, was he free to leave?

 8        A.     I --

 9               MR. CASE:  Judge, I'll just object.  I don't

10          know if it's -- the Huntley hearing is to determine

11          if the Defendant believed under the circumstances

12          he was free to leave, not if this police officer

13          believed that he was free to leave.

14               THE COURT:  Well, his -- he may testify as to

15          factors which would give rise for the Court's

16          ability to judge whether the Defendant realized he

17          was in custody.  In any event, you testified just

18          now that in this, you called it series of questions

19          before the rights, did you just say the Defendant

20          admitted the homicide or admitted being involved,

21          what was your --

22               THE WITNESS:  Questions were posed to him.  He

23          wasn't --

24               THE COURT:  About the homicide, right?

25               THE WITNESS:  Right.  It wasn't my position to
```

```
 1                    E. Torres - Cross                    96
 2          allow him to stay or leave, that wasn't me, I was
 3          strictly as a translator.
 4                 THE COURT:  I understand that, but --
 5                 MS. CALVO-TORRES:  Okay.
 6                 THE COURT:  -- was he questioned about the
 7          homicide in that twenty minute approximately,
 8          approximately twenty minute period?
 9                 THE WITNESS:  Yes.
10                 THE COURT:  Did he admit that he did the
11          killings?
12                 THE WITNESS:  Yes.
13                 THE COURT:  Okay.
14      Q.     So at that point, he was not free to leave,
15   correct?
16      A.     Probably not.
17      Q.     And it's not until eight twenty-five that the
18   Miranda rights are read to him, correct?
19      A.     Correct.
20      Q.     And then sometime after eight twenty-five, you
21   began to ask him another series of questions?
22      A.     Correct, which were typed into a statement.
23      Q.     And these questions again were being fed to you
24   by Detective Stambach?
25      A.     Correct.
```

A-843

1                    E. Torres - Cross                    97

2        Q.       Prior to these questions being asked, the ones

3   that were memorialized, he had been asked about his

4   involvement in the homicide, correct?

5        A.       Yes.

6        Q.       And he had indicated his participation, correct?

7        A.       Correct.

8        Q.       And he had given you some detail as to what that

9   participation was?

10       A.       Yes.

11       Q.       And that was between eight p.m. and eight

12  twenty-five p.m.?

13       A.       Approximately.

14       Q.       Prior to Miranda rights being read, correct?

15       A.       Correct.

16       Q.       And prior to him signing the front of that card?

17       A.       Yes.

18       Q.       And then we go into the written statement.  And

19  at this point he's in custody, correct?

20       A.       Correct.

21       Q.       And then at some point, about three or four

22  questions into the written statement he's asked a very long

23  question.

24       A.       Excuse me?

25       Q.       I think it's the fourth question down.  It's a

```
 1              E. Torres - Cross                    98

 2   question that contains two very long sentences and a shorter

 3   one.  Do you see that there?  Starts with the police, the

 4   Buffalo Police Department.

 5        A.     Yes.

 6        Q.     Now I won't read the entire question but you have

 7   it in front of you.

 8              THE COURT:  Does anybody have a copy of that

 9         for my benefit?

10              MS. CALVO-TORRES:  I do.

11              THE COURT:  Do you have an extra copy of that

12         statement?

13              MR. CASE:  Yes, your Honor.

14              THE COURT:  Do we have one in our file?  Okay,

15         I've got it here.  Go ahead.

16        Q.     Thank you, Judge.  And you would agree with me

17   that that question contains the name of the victims, correct?

18        A.     Yes, it does.

19        Q.     And it contains the date of the crime, correct?

20        A.     Yes.

21        Q.     The time of the crime?

22        A.     Yes.

23        Q.     The location of the crime?

24        A.     Yes.

25        Q.     And this is a question that was posed by
```

A-845

```
 1                    E. Torres - Cross                99

 2    Detective Stambach, correct?

 3         A.    Yes.

 4         Q.    These were not Mr. Ortiz' words, correct?

 5         A.    Correct.

 6         Q.    And the answers elicited from Mr. Ortiz was in

 7    response to the facts contained in that question, correct?

 8         A.    Yes.

 9         Q.    Okay.  So again at the risk of sounding

10    redundant, while this question is being asked, you have

11    Detective Stambach speaking to you on one side, on one side

12    of the triangle, correct?

13         A.    Yes.

14         Q.    Because you're still in the same position as you

15    described before?

16         A.    Yes.

17         Q.    Okay.  You're taking in the question, absorbing

18    it, translating it mentally and then translating it verbally?

19         A.    Correct.

20         Q.    Correct?

21         A.    Correct.

22         Q.    And then you're getting a response from

23    Mr. Ortiz, correct?

24         A.    Correct.

25         Q.    And that response is in Spanish?
```

```
 1                    E. Torres - Cross                    100

 2        A.    Yes.

 3        Q.    Correct?  You're taking in that Spanish response,

 4   absorbing it, translating it somehow and then repeating it as

 5   best you can to Detective Stambach?

 6        A.    Correct.

 7        Q.    So sometimes it becomes a little confusing to

 8   keep up with the conversation, does it not?

 9              THE COURT:  Again, you know, you're cross

10              examining him as to the accuracy and the contents.

11              That may be material for the jury but it's not in a

12              Huntley hearing.

13        Q.    Understood, your Honor.  Now I'd like to know,

14   were there ever times when Mr. Josue -- Mr. Ortiz did not

15   understand a question you asked?  Where you had to clarify

16   something?  A word, a phrase?  Repeat something?

17        A.    Yes.

18        Q.    Yes?

19        A.    Sure.

20        Q.    And that clarification is not contained in the

21   statement, correct?

22        A.    Probably not.

23        Q.    Well, I mean you have the statement in front of

24   you.

25        A.    Correct.
```

```
 1                    E. Torres - Cross                 101

 2        Q.    Is it contained in the statement, your

 3   clarification of certain words or phrases?

 4        A.    No.

 5        Q.    And there were times when Detective Stambach

 6   would not understand something that you translated back, some

 7   word or some phrase?

 8        A.    That I translated back to him?

 9        Q.    Yes.

10        A.    I don't think there was a problem with that.

11        Q.    But whatever clarifications you provided along

12   the way to either Detective Stambach or to Mr. Ortiz would

13   not be contained in that statement, correct?

14        A.    I'm sorry?

15        Q.    Whatever clarification you provided to either

16   Mr. Josue or Detective Stambach would not be contained in

17   that statement, correct?

18        A.    Correct.

19        Q.    And you indicated before that you have no other

20   notes with respect to this investigation?

21        A.    That is correct.

22        Q.    Now in response to that very long question,

23   Mr. Ortiz responded in part, we went over there to assault

24   them.  Do you see that there?

25        A.    Where?
```

Case 23-352, Document 52, 06/27/2023, 3534010, Page119 of 253

```
 1                    E. Torres - Cross                102

 2    Q.      About two or three sentences into his response.

 3    A.      Which sentence?

 4    Q.      About two or three.

 5            MR. CASE:  Judge, it seems to me this is

 6    dealing again with accuracy.

 7            THE COURT:  I agree.  Sustained.

 8            MS. CALVO-TORRES:  Do you recall what word he

 9    used with respect to assault them in Spanish?

10            MR. CASE:  Same objection, your Honor.

11            THE COURT:  Sustained.  Now what did you ask

12    for, what Spanish words he used?

13            MS. CALVO-TORRES:  Yes.

14            THE COURT:  What's the purpose and intent of

15    that question?

16            MS. CALVO-TORRES:  Well, Judge, it goes to the

17    Defendant's statement, whether it's accurate,

18    whether it's truthful.  We have no way of knowing

19    unless we know what was asked of our client.

20            THE COURT:  Again, I don't think that's the

21    issue in the Huntley hearing.  The Huntley hearing

22    is whether or not he was administered appropriate

23    rights, if there was custodial interrogation and

24    issues of that variety pursuant to People versus

25    Huntley, and as to whether there's truth or
```

E. Torres - Cross                              103

2  accuracy or the statements themselves are accurate

3  or not would be matters appropriate, I believe, for

4  cross examination at the trial so I'll sustain the

5  objection.

6        MS. CALVO-TORRES:  Well, Judge, I have here a

7  case that's entitled People versus David that

8  indicates that there can be no meaningful

9  explanation of this issue, exploration without

10  reference to the substance and content of the

11  statement itself.  The statement -- I would be

12  happy to provide to the Court and the People with a

13  copy of it.

14        THE COURT:  All right.  So what is the point

15  you wish to make with that question?

16        MS. CALVO-TORRES:  Judge, I would like to get

17  to what it was that my client actually said and I

18  cannot do that without asking the police officer

19  what word was used.

20        MR. CASE:  Judge, it's the same objection.

21  It's in written -- it's in writing, we're not

22  talking about oral statements, she has what we're

23  claiming he said in his writing.  There's no issue.

24        THE COURT:  Sustained.

25        MS. CALVO-TORRES:  Do you recall what the name

```
                    E. Torres - Cross                    104

 1    of the two brothers -- of the two Camacho brothers

 2    were that were given to you on the 15th?  Do you

 3    recall that?

 4         THE WITNESS:  I'd have to look at the

 5    statement.

 6         MS. CALVO-TORRES:  Do you recall if it was,

 7    let's see, Nelson --

 8         MR. CASE:  Same objection.  I don't know what

 9    relevance it has.

10         THE COURT:  Let her finish her question.  Let

11    the Counselor finish her question.  What is your

12    question, Miss Torres?

13         MS. CALVO-TORRES:  Do you recall what the

14    names of the brothers were that were given to you

15    on the 15th?

16         MR. CASE:  Objection, your Honor.

17         THE COURT:  What is your objection?

18         MR. CASE:  I don't see the relevance of it for

19    a Huntley hearing.  This question, your Honor --

20         THE COURT:  What's the purpose of that

21    question?

22         MS. CALVO-TORRES:  If I'm allowed one more

23    question, I think it will become clear to the

24    Court.
```

Line numbers: 1 through 25 as shown.

```
 1                    E. Torres - Cross                    105

 2              THE COURT:  All right, I'll give you that

 3         leeway.  One more question.

 4              MS. CALVO-TORRES:  You don't recall?

 5              THE WITNESS:  No, I'd have to refresh my

 6         memory with the statement.

 7              MS. CALVO-TORRES:  All right.  Do you recall

 8         what the names were that were given to you by Josue

 9         on the 16th?

10              MR. CASE:  Same objection, your Honor.

11              THE COURT:  Sustained.

12              MS. CALVO-TORRES:  Were those names Floco and

13         Lobo?

14              THE WITNESS:  Those were the names.

15              MR. CASE:  Objection, your Honor.

16              THE COURT:  Sustained.

17              MS. CALVO-TORRES:  How do you spell Floco?

18              MR. CASE:  Objection, your Honor.

19              THE COURT:  Sustained.

20              MS. CALVO-TORRES:  If you go through the

21         statement, you'll notice that Floco is spelled

22         F-l-o-c-o throughout the statement.  Is that true?

23              THE WITNESS:  Where?

24              MR. CASE:  Objection, your Honor.

25              THE COURT:  Sustained.
```

```
 1              E. Torres - Cross              106
 2              MS. CALVO-TORRES:  Throughout the entire
 3    statement.
 4              THE COURT:  I have sustained this line of
 5    objection.  I sustained the objection to this line
 6    of questioning I should say.
 7              MS. CALVO-TORRES:  By the way, Officer, can
 8    you tell me what Mr. Ortiz' demeanor was during the
 9    investigation -- during this interrogation on the
10    16th?
11              THE COURT:  Can you specify the time period?
12              MS. CALVO-TORRES:  During the interrogation on
13    the 16th.
14              THE COURT:  Go ahead.
15              THE WITNESS:  Calm.  A little scared.
16     Q.       Little scared?  Did he seem calmer than the day
17    before?
18     A.       Yes.
19     Q.       And at this time, he was surrounded by officers,
20    correct?
21     A.       16th?
22     Q.       Yes.
23     A.       Yes.
24     Q.       And he was in the police station, correct?
25     A.       Yes.
```

```
 1                    E. Torres - Redirect                107

 2        Q.      Inside the police station?

 3        A.      Yes.

 4        Q.      With respect to the Miranda rights, were they

 5   given at the end of the verbal statement?  That is, before

 6   the written statement was taken?

 7        A.      I believe so.

 8              MS. CALVO-TORRES:  Nothing further of this

 9         witness.

10              THE COURT:  Very well.  Redirect examination,

11         if any?

12              MS. CALVO-TORRES:  I'm sorry, Judge?

13              MR. CASE:  Detective --

14              THE COURT:  Redirect.

15   REDIRECT EXAMINATION

16   BY MR. CASE:

17        Q.      Detective, when you met with the Defendant on the

18   15th at Buffalo General Hospital, do you recall that?

19        A.      Yes.

20        Q.      He didn't -- at that point he gave you the name

21   of an individual that he thought was -- that he was afraid

22   of, is that correct?

23        A.      Yes.

24        Q.      And then you specifically asked him was that

25   person, this one person you are afraid of, was that person
```

A-854

```
 1                    E. Torres - Redirect              108
 2   involved in the homicide at 879 Niagara, and do you recall
 3   what he said about that?
 4        A.    I believe his answer was no.  Excuse me.
 5        Q.    Is your memory of that conversation as good as
 6   your memory of the conversation on November 16th?
 7        A.    No.
 8        Q.    Why is that, Officer?
 9        A.    It just seemed like we couldn't get anywhere with
10   him as far as with the information that he was giving us.
11        Q.    On the 15th?
12        A.    Correct.
13        Q.    On the 15th, did you ask him specifically do you
14   have any direct knowledge of the murders at 879 Niagara
15   Street?
16        A.    I -- I believe I did ask him that question.
17        Q.    And what was his response?
18        A.    No.
19        Q.    He had no direct knowledge, correct?
20        A.    Correct.
21        Q.    And is that why your memory of that conversation
22   wasn't as good?
23        A.    Correct.
24        Q.    In fact, then he wasn't -- he wasn't a suspect at
25   that point, he wasn't even a witness that could be used,
```

|     | E. Torres - Redirect                                109 |
|-----|

1                    E. Torres - Redirect                    109

2   correct?

3        A.     Correct.

4        Q.     And so you and the detectives kind of brushed it

5   off so to speak?

6        A.     Exactly.

7        Q.     But on the 16th he confessed to you his

8   involvement and that is something you specifically recall?

9        A.     Correct.

10       Q.     And Miss Torres asked you about his statement

11   about, that there was one thing that was nonresponsive she

12   said, that you asked have you lived in the United States for

13   how long, he said this is my first time, do you recall that?

14       A.     Yes.

15       Q.     And she said that's not really responsive, but

16   the question and answer right before that is, how long have

17   you lived here in Buffalo, New York, and his answer was four

18   or five months, I got here in May, and he had told you he got

19   here from Puerto Rico in May, right?

20       A.     Correct.

21       Q.     And that's why when you said and how long have

22   you been in the United States, when he said this is my first

23   time, he meant when I came to Buffalo was the first time I

24   came to the United States?

25       A.     Correct.

E. Torres - Recross                                    110

1

2      Q.     So, in fact, that answer was responsive, wasn't

3 it?

4      A.     Correct.

5      Q.     And although the Spanish version of the Miranda

6 rights card anyway does not indicate that the, specifically

7 state that the attorney is for free, it's preceded by if you

8 cannot afford an attorney, one will be appointed for you,

9 correct?

10     A.     Correct.

11     Q.     And Officer, you recall with regard -- well,

12 strike that.  And at the -- at the hospital on the 15th, he

13 never indicated to you during your questioning that he was

14 afraid of the killers from 879 Niagara Street, correct?

15     A.     I don't exactly recall.

16     Q.     And because he didn't have direct knowledge of

17 the homicide, that's what he told you on the 15th, you were

18 surprised to see him on the 16th?

19     A.     Correct.

20            MR. CASE:  Thank you.  I have nothing further.

21 RECROSS EXAMINATION

22 BY MS. CALVO-TORRES:

23     Q.     Briefly, Judge.  Now Officer Torres, you

24 indicated that on the 15th, Mr. Ortiz provided you the name

25 of the individual with -- of whom he was afraid, correct?

A-857

E. Torres - Recross                    111

1

2    A.    Yes.

3    Q.    Did you ask him who else he was afraid of?

4    A.    I don't recall asking him that.

5    Q.    Did you ask him if he was afraid of anybody else?

6    For example, the Camacho brothers?

7    A.    I can't recollect.

8    Q.    But you do recall him saying he was afraid of the

9    killers, plural?

10         MR. CASE:  Objection.  I don't know that that

11         was --

12         THE COURT:  I'm sorry, I was referring to my

13         own notes to try and follow Miss Calvo-Torres.

14         What was the question?

15         MS. CALVO-TORRES:  But you do remember that he

16         indicated he was afraid of the killers and that's

17         in the statement and that was his testimony before.

18         THE COURT:  What's your objection?

19         MR. CASE:  I don't believe that that's --

20         that's not in the statement that he translated.

21         That's incorrect.

22         THE COURT:  The statement that he translated.

23         Well, you're referring -- you're utilizing

24         information from Vaughn's memo, Defendant's A?

25         MS. CALVO-TORRES:  Correct, your Honor.

A-858

```
                          E. Torres - Recross                    112

 1

 2              THE COURT:  All right.  Can you answer the

 3        question if you know it?

 4              THE WITNESS:  Repeat the question.

 5        Q.    But you do remember that he said he was afraid of

 6   the killers and that's in that memo by Detective Vaughn?

 7        A.    I'd be guessing if I would go either way with it.

 8   I just, I honestly don't recall.

 9        Q.    So you don't recall if he said one killer or two

10   killers or thirty killers?

11        A.    Correct.

12        Q.    So there could have been more than one, correct?

13        A.    Sure.

14        Q.    Did he appear truthful to you on the 15th?

15              THE COURT:  What was your question?  I didn't

16        hear it.

17              MS. CALVO-TORRES:  Did he appear truthful to

18        you when you spoke to him on the 15th?

19              MR. CASE:  I think I object to the form of the

20        question.

21              THE COURT:  Objection.  I'll sustain it.

22              MS. CALVO-TORRES:  Now when you spoke to

23        Mr. Ortiz on the 15th, you knew about the double

24        homicide that had occurred on the 11th, correct?

25              THE WITNESS:  Correct.
```

A-859

```
1                    E. Torres - Redirect                113

2              MS. CALVO-TORRES:  That's all.  Thank you,

3         Judge.

4    REDIRECT EXAMINATION

5    BY MR. CASE:

6         Q.    Very briefly, your Honor.  On the 15th at Buffalo

7    General Hospital, he told you he had no direct knowledge of

8    the homicides at 879 Niagara Street?

9         A.    That is correct.

10        Q.    So he couldn't possibly then know who the killers

11   were, isn't that correct?

12              MS. CALVO-TORRES:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  I -- I don't know.

15        Q.    So the -- and you were there with

16   Detective-sergeant Lonergan, correct?

17        A.    Yes.

18        Q.    And Detective Vaughn?

19        A.    Correct.

20        Q.    And was Detective Lema also there?  If you

21   recall.

22        A.    I believe so.  I'm not sure.

23              MR. CASE:  That's all.  Thank you.

24              THE COURT:  Thank you, Officer, you may step

25        down.  People rest or what's your position?
```

```
 1              E. Torres - Redirect              114

 2          MR. CASE:  People rest, your Honor.

 3          THE COURT:  People rest.

 4          MR. CASE:  I do have Detective-sergeant

 5    Lonergan available.

 6          THE COURT:  People rest and Detective-sergeant

 7    Lonergan is available.  Defense?

 8          MR. NUCHERENO:  Yes, we would call

 9    Detective-sergeant Lonergan.

10          THE COURT:  Call him to the stand.

11          THE CLERK:  You do solemnly swear that your

12    testimony in the case of the People of the State of

13    New York against Josue Ortiz should be the truth,

14    the whole truth and nothing but the truth so help

15    you God?

16          THE WITNESS:  I do.

17          THE CLERK:  You may be seated.

18          THE WITNESS:  Thanks.

19          THE CLERK:  Please state your name and spell

20    your last name for the record.

21    J A M E S    L O N E R G A N, being duly called and

22    sworn as a witness on behalf of the Defendant, took the stand

23    and testified as follows:

24          THE CLERK:  Thank you.

25          THE COURT:  Go ahead.
```

```
1                    J. Lonergan - Direct              115

2      DIRECT EXAMINATION

3      BY MR. NUCHERENO:

4           Q.     Good afternoon, Detective-sergeant.

5           A.     Good afternoon.

6           Q.     By whom are you employed?

7           A.     City of Buffalo.

8           Q.     In what capacity?

9           A.     Detective-sergeant with the Homicide Squad.

10          Q.     And how many years have you worked within the

11     Homicide Squad?

12          A.     Approximately ten years.

13          Q.     Directing your attention to November 11th of

14     2004, did you investigate on that date the double homicide

15     that took place on Niagara Street in the City of Buffalo?

16          A.     I'm not sure of that date.

17          Q.     November 11th, 2004.

18          A.     Yes.

19          Q.     And you have worked on that case from November

20     11th up until the present date as a detective-sergeant, true?

21          A.     True.

22          Q.     Now as -- and by the way, as of this date,

23     there's been one arrest, is that true?

24          A.     True.

25          Q.     And Detective, in commencement of your
```

A-862

J. Lonergan - Direct                                    116

1

2  investigation of the case, did you become aware of a witness

3  who had indicated that three Puerto Rican males ran from the

4  scene of Niagara Street shortly after the homicide?

5       A.    Yes sir.

6       Q.    Okay.  And as of November 15, 2004, was Mr. Josue

7  Ortiz a suspect in conjunction with the homicides?

8       A.    No sir.

9       Q.    All right.  On November -- by the way, had you

10  ever met prior to November 15th, 2004, Josue Ortiz?

11      A.    No sir.

12      Q.    Now you had occasion to meet with Mr. Ortiz after

13  the November 11th homicides, true?

14      A.    True.

15      Q.    And when was that, sir?

16      A.    November 15th.

17      Q.    And where was that?

18      A.    Buffalo General Hospital.

19      Q.    And what was the occasion for the meeting?

20      A.    Detective Vaughn received a call, phone call at

21  the Homicide Office from a counselor at the Buffalo General

22  Hospital who stated there was an individual there that may

23  have information on a homicide.

24      Q.    And, in fact, did that individual indicate in

25  particular what homicide he might have information

|     | J. Lonergan - Direct                                    117 |
| --- | --- |

1

2    concerning?

3         A.    Yes sir.

4         Q.    And that was what, sir?

5         A.    The homicide on Niagara Street.

6         Q.    All right.  And at the Buffalo General Hospital,

7    who from the police department other than yourself was

8    present?

9         A.    Detective Vaughn, Detective Lema and Police

10   Officer Torres.

11        Q.    Now Detective-sergeant, you had occasion then to

12   speak with Mr. Ortiz, correct, on November 11th -- 15th?

13        A.    Yes sir.

14        Q.    And could you describe for the Court the

15   appearance of Mr. Ortiz emotionally?

16        A.    He appeared to me to be very frightened.

17        Q.    And how -- how could you tell that he was very

18   frightened?

19        A.    Just by looking at him.  I mean he looked like he

20   was very frightened.

21        Q.    Did he tell you that he was frightened?

22        A.    Yes.

23        Q.    Did he tell you why he was frightened?

24        A.    Yes.

25        Q.    Did he tell you that his life had been

```
 1                  J. Lonergan - Direct              118
 2    threatened?
 3         A.    No.
 4         Q.    Did he tell you that people had threatened to
 5    kill him?
 6         A.    No.
 7              THE COURT:  What did he say that led you to
 8         believe that he was frightened?  Don't lead the
 9         witness.  He's your witness now, Mr. Nuchereno.
10         Why -- how did he convey that he was frightened?
11              THE WITNESS:  He stated he was afraid of an
12         individual named Rinaldo Velasquez.  When asked
13         why --
14              THE COURT:  Rinaldo?
15              THE WITNESS:  Velasquez.
16              THE COURT:  Velasquez?
17              THE WITNESS:  Yes sir.  When asked why he was
18         afraid of Rinaldo Velasquez, he stated because he
19         had a shotgun.
20         Q.    Did Mr. Ortiz then provide any information
21    concerning the Camacho brothers who had died?
22         A.    Yes.
23         Q.    What information did he provide?
24         A.    He stated that they were dealing narcotics.
25         Q.    Now when he says they, did he refer by name to
```

```
                      J. Lonergan - Direct                    119

 1
 2    the individuals?

 3        A.    Camacho brothers I believe is what he stated, yes

 4    sir.

 5        Q.    Did he provide you information as to how he knew

 6    the Camacho brothers?

 7        A.    That I don't recall.

 8        Q.    Did he provide information that he had ever been

 9    over to the Camacho brothers' home or residence prior to

10    November 11th of '04?

11        A.    I don't recall.

12              THE COURT:  Let me just interrupt, interject

13              if I may.  He's telling you he's frightened of

14              Rinaldo Velasquez who has a shotgun?

15              THE WITNESS:  That's correct.

16              THE COURT:  How does the conversation switch

17              over to Camacho brothers or how does it begin with,

18              in that respect?

19              THE WITNESS:  When asked about the homicide on

20              Niagara Street, that's when Josue states that he

21              knew the Camacho brothers who were the victims of

22              the homicide.

23              THE COURT:  Okay.  I missed your answer.

24              When --

25              THE WITNESS:  We asked Mr. Ortiz if he had any
```

A-866

```
 1              J. Lonergan - Direct              120

 2         information on this homicide on Niagara Street.

 3              THE COURT:  Okay.  What triggered you to

 4         connect him to the Niagara Street homicide?

 5              THE WITNESS:  That was the phone call received

 6         to the Homicide Office.

 7              THE COURT:  The phone call.  I got it now.

 8              THE WITNESS:  Yes.

 9              THE COURT:  Okay.

10    Q.      Did he provide you any other information relative

11    to the Camacho brothers?

12    A.      Not that I recall, sir, no.

13    Q.      Did he provide you any information regarding

14    activities that they were involved in?

15    A.      Yes.

16    Q.      What kind of activities?

17    A.      Cocaine dealing.

18    Q.      Did he provide you with information as to who

19    they were dealing with?

20    A.      Not that I recall, no sir.

21    Q.      Did he provide you information about individuals

22    renting an apartment in his name?

23    A.      Yes sir.

24    Q.      What information was that?

25    A.      He stated there were two individuals, I don't
```

```
 1                    J. Lonergan - Direct              121

 2    recall the names, that rented the apartment that Josue was

 3    living at on Germain Street and placed it in Josue's name.

 4         Q.    And did Mr. -- did Mr. Ortiz provide you with a

 5    possible motive for the death of the Camacho brothers?

 6         A.    Yes.

 7         Q.    What was that, sir?

 8         A.    He stated they may have been killed because

 9    someone may have been jealous because they were making a lot

10    of money.

11         Q.    All right.  Now the discussion that you had with

12    Mr. Ortiz on November 15th, was that in English or in

13    Spanish?

14         A.    Spanish.

15         Q.    Do you speak Spanish, sir?

16         A.    No sir.

17         Q.    Okay.  Then how did that information come to you?

18         A.    Police Officer Torres, Buffalo police officer,

19    was used as an interpreter.

20         Q.    And did you try to converse with Mr. Ortiz in

21    English?

22         A.    No sir.

23         Q.    Did you hear Mr. Ortiz speak English on the 15th

24    of November?

25         A.    Not that I recall, no sir.
```

A-868

|  |  |  |
|---|---|---|
| 1 | | J. Lonergan - Direct                    122 |
| 2 | Q. | All right.  Now how long were you in the presence |
| 3 | | of Mr. Ortiz on November 15th? |
| 4 | A. | Approximately thirty minutes. |
| 5 | Q. | Mr. Ortiz, was he arrested after that? |
| 6 | A. | No sir. |
| 7 | Q. | On that day? |
| 8 | A. | No sir. |
| 9 | Q. | He was not.  Did you come to see Mr. Ortiz again? |
| 10 | A. | Yes. |
| 11 | Q. | When was that? |
| 12 | A. | The following day. |
| 13 | Q. | And where did you see him? |
| 14 | A. | Police headquarters, the Major Crimes Unit |
| 15 | | office. |
| 16 | Q. | And what was the occasion for that meeting? |
| 17 | A. | He was transported to our office by Police |
| 18 | | Officers Sadlocha and Lobough regarding the homicide on |
| 19 | | Niagara Street. |
| 20 | Q. | Now do you know through your investigation how it |
| 21 | | came to be that those officers located Mr. Ortiz? |
| 22 | A. | Yes. |
| 23 | Q. | How was that? |
| 24 | A. | There were several calls placed to 911. |
| 25 | Q. | And what was the nature of the calls? |

```
 1                    J. Lonergan - Direct              123

 2        A.    An individual had information on those homicides.

 3        Q.    And what time did Mr. Ortiz arrive at police

 4   headquarters?

 5        A.    Approximately seven fifteen p.m.

 6        Q.    And were you present when he arrived?

 7        A.    Yes.

 8        Q.    Did you speak to him at that time?

 9        A.    No sir.

10        Q.    And when did you first speak to Mr. Ortiz on the

11   16th of November?

12        A.    At approximately nine p.m.

13        Q.    And in what room was that?

14        A.    Detective-sergeant Thomas Vivian's office.

15        Q.    And what was the purpose of that discussion and

16   that meeting?

17        A.    To obtain a typewritten sworn statement from

18   Mr. Ortiz.

19        Q.    All right.  Now that was at nine p.m. on the

20   16th, correct?

21        A.    Yes sir.

22        Q.    All right.  Now prior to nine p.m., were you

23   present with Mr. Ortiz and Detective Stambach and Police

24   Officer Torres for a verbal interview?

25        A.    No sir.
```

A-870

```
1                    J. Lonergan - Direct              124
2         Q.      So you came into the room at approximately nine
3    o'clock is your testimony?
4         A.      Yes sir.
5         Q.      All right.  Now what was the purpose in your
6    being present at nine p.m.?
7         A.      To obtain a typewritten sworn statement.
8         Q.      Okay.  Now what part did you play in obtaining
9    that typewritten sworn statement?
10        A.      I witnessed the statement.
11        Q.      All right.  Now were you asked to witness it for
12   any particular reason?
13        A.      It's just policy.  Whenever a statement is taken
14   in the Homicide Office, there's always two homicide
15   detectives present.
16        Q.      Were you present at the time that Mr. Ortiz was
17   read his Miranda warnings?
18        A.      No sir.
19        Q.      As of nine o'clock at night was -- when you
20   entered that room, was Mr. Ortiz free to go?
21        A.      At nine o'clock?
22        Q.      Yes sir.
23        A.      No sir.
24        Q.      Okay.  Was he in police custody?
25        A.      Yes.  At that point, yes sir.
```

A-871

J. Lonergan - Direct                          125

1

2     Q.    Do you know what time the Miranda warnings were

3  read?  If you know.

4     A.    I know it was eight twenty p.m.

5     Q.    Now at nine p.m., did the -- is that the time, or

6  excuse me, what time did the process of the written statement

7  begin?

8     A.    Nine p.m.

9     Q.    And could you tell us what the process was?

10    A.    Yes.  Detective Mark Stambach was typing the

11 questions.  He would type his question, he would read the

12 question to Police Officer Torres, who in turn would

13 translate it to Mr. Ortiz, and then Police Officer Torres in

14 English would give Mr. Ortiz' answer.

15    Q.    Now could you describe for the Court Mr. Ortiz'

16 demeanor during this statement.

17    A.    He was calm.

18    Q.    Was there a difference between his demeanor on

19 the 16th versus the 15th?

20    A.    Yes.

21    Q.    How so?

22    A.    He was a lot calmer.  On the 15th he would seem

23 to be agitated.  He was very calm and responsive on the 16th.

24    Q.    During the written statement that you witnessed,

25 Detective-sergeant, was Mr. Ortiz provided with any

```
1              J. Lonergan - Direct              126

2    information concerning the homicide on Niagara Street?

3         A.    No sir.

4         Q.    Was he given the names of the victims?

5         A.    I believe so, yes sir.

6         Q.    Was he given the address of the homicide?

7         A.    Yes.

8         Q.    Was he given the time of the homicide?

9         A.    I believe so in the heading, yes.

10        Q.    He was given the location of the homicide?

11        A.    Yes sir.

12        Q.    Did you hear Mr. Ortiz speak any English during

13   the taking of this statement?

14        A.    Yes.

15        Q.    And do you recall what you heard Mr. Ortiz say in

16   English?

17        A.    No sir.

18        Q.    Now did -- I'm sorry, I didn't mean to cut you

19   off.

20        A.    No sir.

21        Q.    Did you take any notes of that meeting?

22        A.    No.

23        Q.    Did you take any notes of the meeting of the 15th

24   with Mr. Ortiz?

25        A.    No sir.
```

1                    J. Lonergan - Direct                    127

2        Q.      On the 16th during this statement, did you

3    formulate any questions?

4        A.      No sir.

5        Q.      Had you talked to Detective Stambach about your

6    meeting with Mr. Ortiz of the 15th?

7        A.      I'm sure I did, yes sir.

8        Q.      Had you provided Detective Stambach with the

9    details of that meeting prior to the taking of the statement

10   on the 16th?

11       A.      Yes.

12       Q.      Going back for a second, Detective-sergeant, were

13   you aware, if you were, of the nature of the 911 call on the

14   16th, that there was a complaint of harassment?  Were you

15   aware of that?

16       A.      No sir.

17       Q.      At the end of the typing of the statement by

18   Detective Stambach, what took place?

19       A.      A Police Officer Torres read the statement to

20   Mr. Ortiz in Spanish and asked him if he would like to make

21   any corrections.

22       Q.      Now how -- how do you know that he asked him if

23   he would like to make any corrections?

24       A.      Cause that's typed on the statement.

25       Q.      Okay.  Did you hear him say those words, sir?

```
 1              J. Lonergan - Cross              128

 2      A.      I don't understand Spanish.

 3      Q.      Detective -- Detective -- Police Officer Torres

 4  spoke to the Defendant in Spanish, did he not?

 5      A.      Yes sir.

 6      Q.      The entire time, true?

 7      A.      True.

 8      Q.      At what point to your knowledge was the Defendant

 9  handcuffed?

10      A.      After the taking of the typewritten sworn

11  statement.

12      Q.      And Detective-sergeant, did you have the

13  opportunity to ask any questions during the written statement

14  on November 16th?

15      A.      No sir.

16      Q.      Is it your role, your testimony that you were

17  there as an observer?

18      A.      As a witness, yes sir.

19      Q.      So my final question then, safe to say you were a

20  nonparticipating observer, true?

21      A.      True.

22              MR. NUCHERENO:  Thank you, Judge.

23              THE COURT:  Cross examination?

24  CROSS EXAMINATION

25  BY MR. CASE:
```

```
 1              J. Lonergan - Cross                129

 2        Q.    Briefly, your Honor.  Detective-sergeant, you

 3   said the rights were read to the Defendant around eight

 4   twenty or eight twenty-five?

 5        A.    Yes sir.

 6        Q.    And -- and then you said that the formal written

 7   statement was taken at nine.  Do you know what was happening

 8   in between those two times?

 9        A.    I believe Mr. Ortiz was being interviewed by

10   Detective Stambach with --

11              THE COURT:  What were the times that you're

12        using?

13        Q.    Well, I'm sorry.  Let me ask, since this is cross

14   examination, the Miranda rights were read to him at eight

15   twenty-five p.m., is that correct?

16        A.    Yes sir.

17        Q.    And -- and the waiver at eight thirty p.m.,

18   approximately?

19        A.    Yes sir.

20        Q.    At eight forty p.m., Mr. Ortiz was given coke,

21   large fries and a sandwich from McDonald's was he?

22        A.    Yes sir.

23        Q.    And that's why the formal written statement

24   wasn't taken until nine p.m., correct?

25        A.    To allow him to eat the sandwich, yes.
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A-876

|     | J. Lonergan - Cross                                    | 130 |
| --- | ----------------------------------------------------- | --- |

1

2    Q.    And when you met with Mr. Ortiz on November 15th

3 at Buffalo General Hospital, this person, Rinaldo Velasquez,

4 that he claimed he was afraid of, he was afraid of him

5 because he said he owned a shotgun, right?

6    A.    Yes.

7    Q.    He never said -- matter of fact, he was

8 specifically asked if Rinaldo Velasquez was involved in that

9 shooting at 879 Niagara and he said no.

10    A.    That's correct.

11    Q.    And he, in fact, said that although he had some

12 explanation for a motive and some background information he

13 believed on the Camacho brothers, he had no direct knowledge

14 of the homicides that occurred at 879 Niagara, correct?

15    A.    Correct.

16    Q.    In which case he really wasn't even going to be a

17 witness for you, was he?

18    A.    No sir.

19    Q.    And he certainly at that point was not a suspect,

20 fair to say?

21    A.    Fair to say.  Yes sir.

22    Q.    And there was a call at seventeen forty-one hours

23 on -- on the 16th of some unknown trouble over at -- on Grant

24 Street?

25    A.    Yes sir.

1              J. Lonergan - Cross              131

2      Q.      And that's -- that's in what district?

3      A.      D as in David district.

4      Q.      And Buffalo -- and did you recall hearing that

5 broadcast, that call broadcast on the radio?

6      A.      Yes.

7      Q.      Was a call broadcast on Grant Street?

8      A.      Yes sir.

9      Q.      And when Buffalo police responded at that time to

10 that call, did they have an opportunity to speak with Josue

11 Ortiz?

12     A.      Not that I'm aware of.

13     Q.      In fact, when they got there, they couldn't find

14 this person they were supposed to speak with at that time,

15 correct?

16     A.      Correct.

17     Q.      So that would have been, in layman's terms, five

18 forty-one p.m.?

19     A.      Yes sir.

20     Q.      Okay.  But when they went to that location, they

21 couldn't find Mr. Ortiz?

22     A.      There was no complainant on the call, yes sir.

23     Q.      There was then another call at approximately

24 eighteen forty-six, that's six forty-six, almost seven

25 o'clock p.m., correct?

A-878

1                      J. Lonergan - Cross                    132

2        A.       Correct.

3        Q.       And they responded to that call and that's the

4   call that Officer Sadlocha after speaking with someone on

5   Grant Street, ends up going to 142 Germain, correct?

6        A.       Yes, he does.

7        Q.       And it's at that point, in response to that call,

8   he actually arrives at 142 Germain Street at approximately

9   seven fifteen p.m?  Is that correct?

10       A.       I believe so, yes sir.

11       Q.       And contacts Major Case, of which you were the

12  Detective-sergeant?

13       A.       Yes.

14       Q.       And said I have someone who I think might be

15  confessing to the murders on Niagara Street?

16       A.       Yes sir.

17       Q.       And someone from Major Case instructed him to

18  bring this individual right down?

19       A.       That's correct.

20       Q.       So although Officer Sadlocha may have responded

21  to the call at five forty-one, Mr. Ortiz wasn't found at that

22  call, he wasn't found until approximately seven fifteen p.m.

23  and brought immediately to Major Case?

24       A.       Yes sir.

25       Q.       And if Mr. Ortiz at Buffalo General Hospital had

```
 1                    J. Lonergan - Redirect              133

 2   ever indicated to you that he was afraid of the killers that

 3   committed the double homicide on Niagara Street, wouldn't you

 4   have asked him who those killers were?

 5        A.    Absolutely.

 6        Q.    And he never made that statement, did he,

 7   Detective-sergeant?

 8        A.    No sir.

 9        Q.    So you didn't have to ask him that question?

10        A.    That's correct.

11             MR. CASE:  I have nothing further.  Thank you.

12             MR. NUCHERENO:  Very briefly, Judge.

13             THE COURT:  Sure.

14   REDIRECT EXAMINATION

15   BY MR. NUCHERENO:

16        Q.    Detective-sergeant, by the way, from the time

17   that you went in that room on the 16th at nine o'clock until

18   the time that the statement was signed, did you leave the

19   room?

20        A.    Yes.

21        Q.    How many times?

22        A.    Several times I believe.

23        Q.    And for how long?

24        A.    Just minutes.  I would go get water for

25   Mr. Ortiz.
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

J. Lonergan - Redirect                    134

1

2    Q.    Mr. Case just asked you a question and I just

3    want to address it.  I believe he indicated that you, you had

4    knowledge from a police officer on the street who had picked

5    Mr. Ortiz up on Germain and was bringing him down and

6    notified personnel that he might have someone confessing to

7    the crime on Niagara?

8    A.    Yes.

9    Q.    And therefore, you were alerted to the fact that

10   you might have an individual who was on his way down to

11   confess, true?

12   A.    True.

13   Q.    Now what led you to believe, sir, that the

14   individual was going to confess?

15   A.    Police radio transmission.

16   Q.    And what did that say?

17   A.    I'm not sure of the exact words, but one of the

18   delta district cars, I believe Officer Sadlocha got on the

19   air and informed the dispatcher that he had an individual who

20   may be involved in the murders on, double murders on Niagara

21   Street.

22   Q.    Okay.  And did he provide you with information as

23   to how he knew he was involved?

24   A.    No.

25   Q.    But that was the information that you received?

A-881

```
 1              J. Lonergan - Redirect              135
 2      A.      That's what I heard over the police radio, yes
 3   sir.
 4              MR. NUCHERENO:  Thank you.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  That's it?
 7              MR. CASE:  Detective-sergeant, but you had
 8      spoken with that same individual the day before and
 9      although he had information concerning the
10      individuals that were murdered, he didn't have any
11      direct knowledge of the homicides, correct?
12              THE WITNESS:  That's correct, sir.
13              MR. CASE:  Thank you.  I have nothing further.
14              THE COURT:  Thank you.  You may step down,
15      Detective-sergeant Lonergan.
16              THE WITNESS:  Thank you.
17              THE COURT:  Defense rests?
18              MR. NUCHERENO:  Yes, your Honor.  Thank you.
19              THE COURT:  Defense rests.  The record is
20      closed in terms of this Huntley hearing.  All
21      right, Counselors, I assume you want an opportunity
22      to brief the case as opposed to oral argument here
23      now?
24              MR. NUCHERENO:  Yes.  Thank you, Judge, we
25      would.
```

A-882

STATE OF NEW YORK
SUPREME COURT   :   COUNTY OF ERIE
_____

THE PEOPLE OF THE STATE OF NEW YORK

           v

JOSUE ORTIZ
                   Defendant
_____

**ANSWERING AFFIDAVIT**

Indictment   No. 02630-2004

STATE OF NEW YORK  )
COUNTY OF ERIE        )  ss.
CITY OF BUFFALO      )

       KENNETH F. CASE, being duly sworn, deposes and says:

       1.   Your deponent is an attorney duly admitted to the practice of law in the State of New York.

       2.   Your deponent is an Assistant District Attorney, appearing of counsel to FRANK J. CLARK, District Attorney of Erie County, on behalf of the People of the State of New York.

       3.   Your deponent makes this Answering Affidavit in response to the affidavit of JOHN NUCHERENO ESQ., attorney for defendant, dated December 19, 2005, and received in the District Attorney's Office on January 03, 2005.

       4.   Unless otherwise stated herein, this affidavit is made upon information and belief, the source of which is your deponent's investigation of the confidential file of the District Attorney's Office, records of all the proceedings heretofore had, a reading of the moving papers filed herein, and conversations with witnesses hereto.

**GENERAL DENIAL**

5.   Defendant's moving papers are insufficient in law and in fact to authorize the granting of the relief requested therein.

6.   Defendant's motion is untimely in all respects.

7.   If the Court determines that defendant's motion is timely made, the People submit, as their answer to defendant's motion, the balance of this affidavit.

8.   Attached please find:

a)   Phone records for (716) 812-6408) (7);

b)   Phone records for (716) 228-3344; (716) 830-2659) & (716)316-9086 (9);

c)   Dr. Liebergall Article 730 Report (11/29/04);

d)   Mugshot of defendant;

e)   Spanish Rights Card;

f)   Body Map (Miguel Camacho)(2);

g)   Certification of Death (Miguel Camacho);

h)   Body Map (Nelson Camacho);

i)   Certification of Death (Nelson Camacho);

j)   Evidence Collection Unit File (74);

k)   P-73's List (11/11/04);

l)   Det. Wagstaff P-73 (11/11/04)(2);

m)   Det. Gugliuzza P-73 (11/11/04)(5);

n)   Det. Salamone Autopsy P-73 (11/12/04)(Nelson);

o)   Det. Salamone Autopsy P-73 (11/12/04)(Miguel);

- 2 -

p)   Det. Cook P-73 (11/12/04);

q)   Det. Root P-73 (11/12/04);

r)   Det. Root P-73 (11/12/04);

s)   Det. Bursie P-73 (11/13/04)(2);

t)   Det. Bursie P-73 (11/13/04);

u)   Det. Root P-73 (11/13/04);

v)   Det. Vaughn P-73(11/15/14)(2);

w)   P.O. Sadlocha P-73 (11/16/04);

x)   Miscellaneous report (11/11/04);

y)   Incident History Detail (11/11/04)(3);

z)   Certificate of Death (Miguel Camacho);

aa)   Autopsy Authorization (Miguel Camacho);

bb)   Body Map;

cc)   Certificate of Death;

dd)   Autopsy Authorization (Nelson Camacho);

ee)   Body Map;

ff)   Miguel Camacho Florida license;

gg)   Permission to Search - 142 Germain, Upper;

hh)   Permission to Search - 19 Hoyt, Rear;

ii)   Incident History Detail (11/16/04);

jj)   Arrest Data Report;

kk)   Felony Complaint;

ll)   710.30 Notice from Buffalo City Court;

mm)   Case history;

- 3 -

nn)   Evidence/Reports/Requests;

oo)   Incident Report (2);

pp)   Control/Sign-In sheet (3);

qq)   Call History for (716)228-3344;

rr)   Call History for (816)316-9086;

ss)   Address Book (3);

tt)   Statements and Photo identifications

uu)   Det. Stambach P-73 (11/16/04);

vv)   Det. Gugliuzza P-73 (11/12/04);

ww)   Det. Vaughn P-73 (11/17/04);

xx)   Det. Lauber P-73 (11/15/04);

yy)   P.O. Ronald Jentz P-73 (11/12/04);

zz)   Incident History Detail (11/17/04).

## DISCOVERY

9.   The People previously have served on the defendant and filed with the Court a notice of intention pursuant to CPL 710.30, and the People are aware of no other information which falls within the purview of CPL 240.20-1(a).

10.   The People shall make available for inspection upon prior appointment the photographs or drawings relating to the criminal action or proceeding.

11.   The People shall make available for inspection upon prior notice the following property seized from the defendant, or a co-defendant to be tried jointly:

- 4 -

a)  All items of evidence described on BPD Evidence tag numbered 67,68 and 69, copies of which are attached hereto and made a part hereof.

12.  The People shall make available for inspection and copying any tapes or other electronic recordings which the prosecutor intends to introduce at trial.

13.  The People are not in possession of any material required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the constitution of this state or of the United States.

14.  The acts attributed to the defendant occurred on or about November 11, 2004, at approximately 9:44 p.m. in the vicinity of 879 Niagara Street, Buffalo, New York.

15.  Defendant was arrested on or about November 17, 2004, at approximately 2:15 a.m. in the vicinity of 74 Franklin Street, Buffalo, New York.

16.  Defendant is not entitled, pursuant to CPL 240.20, to any further material sought in paragraph "A-D" of defense counsel's affidavit.

**BRADY**

17.  There is no exculpatory material known to the District Attorney's Office at this time.  The People are fully aware of our duty under Brady v Maryland (373 US 83 [1963]) and

- 5 -

will furnish the defense with any information which comes into our possession which we are required to furnish under the said concept.

18.   The People oppose other items sought by the instant motion under the classification of <u>Brady</u> material as being excessive and beyond the scope of <u>Brady v Maryland</u> (<u>supra</u>).

19.   After the jury has been sworn, and before the prosecutor's opening address, the People shall disclose to the defense all known prior criminal records or pending criminal cases of any witnesses (CPL 240.45-1).   The People will thereafter request of the defense that it comply with CPL 240.45-2.

<u>SANDOVAL</u>

20.   The People respectfully submit that the People should be allowed to cross-examine defendant, should defendant take the witness stand, on all prior vicious, immoral, criminal or bad acts.   The People consent to a hearing to determine to what extent the People will be permitted to so cross-examine defendant.

21.   Defendant's moving papers do not list the specific matters on which defendant seeks to prevent the People from cross examining defendant at trial.

22.   The People request that prior to any such hearing, the Court order the defendant to supply to the Court and the People a list of all prior vicious, immoral, criminal, or bad acts which defendant wishes the Court to rule upon on the grounds urged by defendant for precluding cross examination.

- 6 -

WHEREFORE, the People respectfully request that an Order be granted denying defendant's motion in all respects, except for those items specifically consented to herein, and granting the People's motion in all other respects.

KENNETH F. CASE
ASSISTANT DISTRICT ATTORNEY

Subscribed and Sworn to before me this 22nd day of February, 2005.

Notary Public, State of New York
Qualified in Erie County
My Commission Expires on

KATHLEEN C. KASPER
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 04/20/20 06

- 7 -

*Original pg 1-12*

1

```
1                              Plea

2    COUNTY COURT OF THE STATE OF NEW YORK

3    COUNTY OF ERIE :   CRIMINAL TERM :   PART 7
     - - - - - - - - - - - - - - - - - - - -
4
     THE PEOPLE OF THE STATE OF NEW YORK
5
                                  Indictment
6                                 No. 02630-2004

7
          - against -            Plea
8
     JOSUE ORTIZ,
9
              Defendant.
10   - - - - - - - - - - - - - - - - - - - -
                                  25 Delaware Ave.
11                                Buffalo, New York 14202
                                  March 22, 2006
12
     B e f o r e:
13
                 HON. MICHAEL L. D'AMICO,
14               Erie County Court Judge.

15   A p p e a r a n c e s:

16               FRANK J. CLARK, ESQ.
                     District Attorney, Erie County
17               BY:  KENNETH F. CASE, ESQ.,
                 Assistant District Attorney
18               Appearing for the People.

19
                 JOHN R. NUCHERENO, ESQ.,
20               BETTY CALVO-TORRES, ESQ.
                 Appearing for the Defendant.
21

22
                         Philip A. Sterlace, C.S.R.
23                       Senior Court Reporter.

24

25
```

ERIE COUNTY
CLERK'S OFFICE

2006 SP 21   AM 11:17

FILED

2

1        Plea

2        MR. CASE:  Thank you, your Honor.  Your

3    Honor, the next matter before this Court is

4    indictment number 02630-2004.  It's People

5    versus Josue Ortiz.  Mr. Ortiz is present in

6    court with his attorneys, Ms. Betty

7    Calvo-Torres and Mr. John Nuchereno as well as

8    an interpreter who may need to be sworn.

9        THE COURT:  Swear the interpreter, please.

10       (Whereupon, the interpreter was sworn.)

11       THE CLERK:  State and spell your name.

12       THE INTERPRETER:  Anna Brignoni,

13    B-R-I-G-N-O-N-I.

14       THE CLERK:  Thank you.

15       MR. CASE:  With that, your Honor, it's my

16    understanding at this time that the defendant

17    will withdraw his not guilty plea and enter a

18    plea of guilty under the first and third counts

19    of the indictment and under each of those

20    counts would enter a plea to the lesser

21    included offense of manslaughter in the first

22    degree, that being penal law section 125.20

23    paragraph one, in that under count 1 on or

24    about the eleventh day of November, 2004 in

25    this county with intent to cause serious

A-891

```
                                                            3
 1                        Plea
 2    physical injury to Nelson Camacho caused the
 3    death of the Nelson Camacho by shooting him and
 4    under count 3, that on or about November 11th
 5    of 2004 in this county with intent to cause
 6    serious injury to Miguel Camacho, caused the
 7    death of Miguel Camacho by shooting him.
 8            We would respectfully, your Honor, reserve
 9    our right to withdraw the plea if the Court
10    were inclined to sentence the defendant to
11    anything less than 25 years and we would ask
12    that if the defendant takes this plea that he
13    would waive all rights for appeal.
14            THE COURT:  Okay, Mr. Nuchereno.
15            MR. NUCHERENO:  Good morning, your Honor.
16            THE COURT:  Good morning.
17            MR. NUCHERENO:  It's my understanding we do
18    wish to proceed as proposed.  We have discussed
19    the sentencing parameters and I have discussed
20    with our client waiver of his right to appeal.
21            THE COURT:  Mr. Ortiz, good morning.
22            THE DEFENDANT:  Good morning.
23            THE COURT:  Is that how you want to proceed
24    here today?
25            THE DEFENDANT:  Yes.
```

4

Plea

1

2     THE COURT:  Okay, swear the defendant.

3     (Whereupon, the defendant was sworn.)

4     THE CLERK:  State your name please.

5     THE DEFENDANT:  Josue Ortiz.

6     THE CLERK:  Your date of birth?

7     THE DEFENDANT:  ▆▆▆▆▆▆ 1981.

8     THE CLERK:  Thank you.

9     MR. CASE:  Your Honor, I would also ask

10    that he waive any motions or withdraw any

11    pending motions with regard to this plea.

12    THE COURT:  I presume that's not a problem?

13    MR. NUCHERENO:  Not an issue, your Honor.

14    THE COURT:  Withdrawing?

15    MR. NUCHERENO:  So withdrawn.

16    THE COURT:  Mr. Ortiz, how old are you now?

17    THE DEFENDANT:  24.

18    THE COURT:  Can you read and write in

19    Spanish?

20    THE DEFENDANT:  Spanish, yeah.

21    THE COURT:  Do you speak some English?

22    THE DEFENDANT:  A little bit.

23    THE COURT:  How far did you go in school?

24    THE DEFENDANT:  Eleventh grade.

25    THE COURT:  Was that in Puerto Rico?

A-893

5

1              Plea

2          THE DEFENDANT:  In Puerto Rico.

3          THE COURT:  How long have you been in the

4     states?

5          THE DEFENDANT:  Like two years.

6          THE COURT:  So you understand pretty much

7     what I'm saying but the interpreter helps?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Are you seeing a doctor for any

10    reason?

11         THE DEFENDANT:  Now?

12         THE COURT:  Now.

13         THE DEFENDANT:  Yeah.

14         THE COURT:  What?

15         THE DEFENDANT:  For my mental condition.

16         THE COURT:  How about physically, any

17    physical problems?

18         THE DEFENDANT:  No.

19         THE COURT:  Okay, I'm familiar with your

20    mental history and the examinations that were

21    done and the hearings that were held.  Are you

22    taking medication now?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay, and how do you feel

25    today?

6

Plea

1

2       THE DEFENDANT:  I feel good.

3       THE COURT:  You feel good physically and

4   mentally?

5       THE DEFENDANT:  Yes.

6       THE COURT:  And now you understand what you

7   are doing here today?

8       THE DEFENDANT:  Yes.

9       THE COURT:  You understand the charges in

10   the indictment?

11       THE DEFENDANT:  Yes.

12       THE COURT:  You understand the charges to

13   which you are pleading guilty?

14       THE DEFENDANT:  Yes.

15       THE COURT:  Have you had enough time to

16   discuss this plea with your attorneys?

17       THE DEFENDANT:  Yes.

18       THE COURT:  Are you satisfied with their

19   services?

20       THE DEFENDANT:  Yes.

21       THE COURT:  Do you now plead guilty,

22   Mr. Ortiz, under indictment 04-2630 to two

23   counts of manslaughter in the first degree,

24   that would be a class B violent felony.  Those

25   are B felonies, violent.  Plead guilty?

7

1                              Plea

2           THE DEFENDANT:  Yes.

3           THE COURT:  Now, you understand you don't

4    have to plead guilty to those crimes, you could

5    go to trial if you wished?

6           THE DEFENDANT:  Yes.

7           THE COURT:  You understand if you went to

8    trial you have the right to have these

9    attorneys represent you free of charge if you

10   could not afford to pay them?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you understand that you have

13   other rights?  You have the right to remain

14   silent, the right to confront those who accuse

15   you of committing these crimes and the right to

16   force the prosecutor, Mr. Case here, to prove

17   his case against you by presenting evidence

18   which must be legally sufficient?

19          THE DEFENDANT:  Yes.

20         .THE COURT:  Do you understand that you have

21   the right to have a jury, that's twelve people,

22   hear and decide your case and must agree

23   unanimously, all twelve must agree before you

24   could be found guilty?

25          THE DEFENDANT:  Yes.

8

1                           Plea
2           THE COURT:  And finally, do you understand
3       that by pleading guilty to these crimes it is
4       the same as though you had been convicted of
5       them after trial?
6           THE DEFENDANT:  Yes.
7           THE COURT:  Is anybody forcing you or
8       threatening you or influencing you against your
9       will in order to get you to plead guilty here
10      today?
11          THE DEFENDANT:  No.
12          THE COURT:  Are you entering this plea
13      voluntarily?
14          THE DEFENDANT:  Yes.
15          THE COURT:  Now, you have already heard
16      something about sentence and I know that your
17      attorneys have talked to you about the class B
18      violent felonies carry with them a mandatory
19      minimum period of incarceration of 25 years.
20      There is a maximum period of incarceration, I'm
21      sorry minimum period of 5 years, a maximum
22      period of 25 years, plus a period of post
23      release supervision of 5 years.  After
24      discussions with your attorney and the
25      Assistant District Attorney every one has

9

1        Plea

2    agreed that the sentence will be 25 years

3    determinate in state prison plus 5 years post

4    release supervision, which is like parole.  In

5    other words, the sentences for each of these

6    homicides will run concurrently, do you

7    understand that?

8         THE DEFENDANT:  Yes.

9         THE COURT:  They will run together.

10        THE DEFENDANT:  Yes.

11        THE COURT:  Anyone make any other promises

12   to you?

13        THE DEFENDANT:  No.

14        THE COURT:  It's my understanding that as

15   part of this plea arrangement you are giving up

16   your right to appeal this conviction, is that

17   correct?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Do you understand that means

20   you cannot come back to this court or to any

21   court to set aside this conviction once I

22   accept the plea?

23        THE DEFENDANT:  Yes.

24        THE COURT:  Talk to your attorney about

25   that as well?

10

1        Plea

2        THE DEFENDANT:  Yes.

3        THE COURT:  Mr. Nuchereno, are there any

4   promises or commitments that you are aware of

5   other than what's on this record?

6        MR. NUCHERENO:  None, your Honor.

7        THE COURT:  Mr. Case?

8        MR. CASE:  No, your Honor.

9        THE COURT:  Now, Mr. Ortiz, I can only

10  accept your plea if you are guilty of these

11  crimes.  There is apparently two separate

12  victims, Miguel Camacho and Nelson Camacho,

13  November 11th, 2004, do you remember that day?

14       THE DEFENDANT:  Yes.

15       THE COURT:  What did you do on that day?

16  Did you intend to cause some injury to the two

17  of those people?

18       THE DEFENDANT:  Yes.

19       THE COURT:  In fact, you intended to cause

20  serious physical injury to those people, right?

21       THE DEFENDANT:  Yes.

22       THE COURT:  Meant to kill them?

23       THE DEFENDANT:  Yes.

24       THE COURT:  And you did?

25       THE DEFENDANT:  Yes.

11

1                                Plea

2        THE COURT:  Did that happen in Buffalo?

3        THE DEFENDANT:  Yes.

4        THE COURT:  We are under sub 1, right?

5        MR. CASE:  Yes, Your Honor.

6        THE COURT:  What was the weapon?

7        THE DEFENDANT:  A rifle, rifle, shotgun.

8        THE COURT:  Would you like reasons for the

9    plea on the record, Mr. Case?

10        MR. CASE:  Not unless the Court would

11    prefer that.  I can certainly put some on.

12        THE COURT:  You don't need to.  I think

13    it's pretty obvious.  He is going to be serving

14    a 25 year sentence, the interests of justice is

15    served by the plea and I will accept it.

16        MR. CASE:  Thank you.

17        THE COURT:  He is remanded.  We need a

18    sentence date.

19        THE CLERK:  June 16th.

20        THE COURT:  How is that for you, Mr.

21    Nuchereno?

22        MR. NUCHERENO:  That's fine, Judge.

23        THE COURT:  June 16th, 9:30.

24        MS. CALVO-TORRES:  That's fine for me too.

25        THE COURT:  Did you want to say anything

12

1              Plea

2        here on the record, Ms. Calvo-Torres?  I didn't

3        mean to slight you there.  Okay, we will see

4        you then.

5

6

7

8

9                      - o -

10

11   I hereby certify that the foregoing 12 pages are a true

12   and accurate transcription, to the best of my ability,

13   of my stenographic notes.

14

15

16

17         _Philip A. Sterlace_

18         PHILIP A. STERLACE, CSR.

19

20

21

22

23

24

25

A-901

*Original pp 1-10*

1

1              Sentence

2   COUNTY COURT OF THE STATE OF NEW YORK

3   COUNTY OF ERIE :  CRIMINAL TERM  :  PART 7
    - - - - - - - - - - - - - - - - - - - -

4

5   THE PEOPLE OF THE STATE OF NEW YORK

6                              Indictment
                               No. 02630-2004

7                              NYSID # 4572376K

8        - against -

9   JOSUE ORTIZ,                Sentence

10          Defendant.
    - - - - - - - - - - - - - - - - - - - -

11                             25 Delaware Ave.
                               Buffalo, New York 14202

12                             June 16th, 2006

13  B e f o r e :

14          HON. MICHAEL L. D'AMICO,
            Erie County Court Judge.

15  A p p e a r a n c e s :

16          FRANK J. CLARK, ESQ.
            District Attorney, Erie County

17          BY:  KENNETH F. CASE, ESQ.,
            Assistant District Attorney

18          Appearing for the People.

19

20          JOHN R. NUCHERENO, ESQ.,
            BETTY CALVO-TORRES, ESQ.

21          Appearing for the Defendant.

22                             Philip A. Sterlace, C.S.R.
                               Senior Court Reporter.

23

24

25

A-902

2

Sentence

1
2      MR. CASE:  Your Honor, the next matter

3  before this Court is indictment number

4  02630-2004.  It's People versus Josue Ortiz.

5  He's in court today with an interpreter as well

6  as his counsel John Nuchereno and Betty

7  Calvo-Torres.

8      THE COURT:  Let's swear the interpreter.

9      (Whereupon, the interpreter was sworn.)

10      THE CLERK:  State your name please.

11      THE INTERPRETER:  Barbara Duarte,

12  D-U-A-R-T-E.

13      THE CLERK:  Thank you.

14      MR. CASE:  Your Honor, we are scheduled

15  today for sentencing.  As this Court is aware

16  the defendant entered a plea to two counts of

17  manslaughter in the first degree in

18  satisfaction of this indictment and that was

19  for the killing of Nelson Camacho and his

20  brother Miguel Camacho back on November 11th,

21  2004.  I have had an opportunity to review the

22  pre-sentence report and I have nothing to add

23  to the report.

24      Your Honor, the plea and the sentence were

25  negotiated in this case for many reasons which

3

Sentence

1
2   include giving the Camacho family closure and
3   they have been fully apprised of the plea and
4   the sentence.  However, with the Court's
5   permission I would just note for the Court that
6   the last two rows of the gallery here today are
7   all family members of Miguel and Nelson Camacho
8   many of whom have come from Puerto Rico for
9   this proceeding today.  The brother of Nelson
10  and Miguel Camacho had asked me today if he
11  could read a very brief statement to the Court
12  in spite of the fact that the plea and sentence
13  have already been negotiated.  I mentioned that
14  to Mr. Nuchereno.  He had previously expressed
15  to me that he did not feel that he would be
16  able to speak today.
17          THE COURT:  I mean, as you know there is a
18  notice requirement.  Do you have an objection
19  to it Mr. Nuchereno?
20          MR. NUCHERENO:  No, Your Honor.
21          THE COURT:  So it's okay.
22          MR. CASE:  Okay.
23          THE COURT:  Good morning.
24          MR. CAMACHO:  Good morning, sir.  My name
25  is Louis Camacho and I'm the brother of Nelson

A-904

4

1        Sentence

2   Camacho and Miguel Camacho.  I would like you

3   guys to take into consideration that two lives

4   were taken away from us.  You can give the to

5   life for us and I was, I want to tell you guys

6   whatever happened a year and one-half ago is

7   still giving pain and suffering to us.  And I'm

8   going to read this and try to - -

9        THE COURT:  If you want to do it in Spanish

10  through the interpret.  Would you prefer that?

11  I trust you can interpret?

12       THE INTERPRETER:  Yes.

13       THE COURT:  You can do it the other way,

14  right?  So why don't you do that if you are

15  more comfortable.

16       MR. CAMACHO:  Although, I know that I will

17  never again share with my brothers, I am very

18  happy that it was not them that had killed

19  another person.  Because I didn't know the pain

20  that their family would suffer.  Either,

21  neither that it would be a mother or a father

22  that would kiss their photo every day, that

23  would kiss the picture of a son that would

24  never return.  Never see again as what happened

25  a year and one-half ago.  What happened a year

5

Sentence

1

2       and one-half ago is still causing damage, even

3       as of last night.  My younger sister that was

4       expecting a baby she lost her baby last night.

5           THE COURT:  You guys are really something.

6       I don't mean to minimize, but would you say

7       that again?  You say?

8           MR. CAMACHO:  She lost a baby last night

9       thinking that she would have to go through the

10      same thing a third time.  Because the guys were

11      buried here and then we disburied (sic) them

12      again and we buried them in Puerto Rico and

13      again we have to be here in court.  That's it.

14      Thank you very much.

15          THE COURT:  Thank you.  Mr. Case.

16          MR. CASE:  Your Honor, with that I would

17      respectfully move this matter ready for

18      sentence and I thank the Court for its

19      indulgence.

20          THE COURT:  Mr. Nuchereno.

21          MR. NUCHERENO:  Thank you, your Honor.

22      First, prior to addressing the sentencing

23      itself I have advised the Court in chambers

24      this plea was taken back on March 22, 2006.

25      And the plea came about as a result of our

6

Sentence

1
2    client contacting us and advising us on his own
3    that he wished to enter that plea.  And since
4    March 22nd until the present I have heard
5    nothing from our client other than the fact
6    that he was satisfied with the plea until
7    yesterday when I received a letter that
8    ostensibly was written by Mr. Ortiz with help
9    from another inmate that implicated that he had
10   changed his mind and wished to withdraw the
11   plea.  I notified Mr. Case by leaving a message
12   and went to see the client.

13       In spending the time with him I can report
14   this to the Court, that his sole basis for
15   wanting to withdraw the plea was that he had
16   changed his mind.

17       Accordingly, there was no allegation and no
18   claim that it wasn't a knowing and voluntary
19   plea at the time that it was entered back in
20   March so I could not submit an affidavit to the
21   contrary.  There is no allegation whatsoever
22   that the plea was a product of undue pressure
23   by counsel, by family or friends, absolutely
24   none.  It's simply a case of he wanted to
25   withdraw the plea because he had changed his

7

Sentence

mind and I advised Mr. Ortiz that that was not
a legal basis for withdrawing the plea although
the Court has some discretion and I asked him
to reconsider.  This morning he reported again
that he wished to withdraw the plea.  I again
asked if there was any reason upon reflection
over the night other than he had changed his
mind for the withdrawal and he again reported
that there was no other reason.  And it's no
more then a simple change, so on behalf of
Mr. Ortiz and at his specific request I do make
that motion, your Honor.

If the Court were to give me more time to
obtain a transcript, the minutes of the plea
colloquy, I don't believe there would be
anything in that that would add to an affidavit
that I would submit that would say nothing more
than he wishes to change his mind.

THE COURT:  Did you want to respond?

MR. CASE:  I don't believe I need to
respond.

THE COURT:  No, I don't believe you do
either.  There is no basis for that motion and
that motion is denied.  Now, let's go on to

A-908

8

Sentence

2  sentence.

3      MR. NUCHERENO:  Thank you, Judge.  Your

4  Honor, I have submitted to the Court a

5  pre-sentence memorandum on behalf of our client

6  because there was considerable concerns that

7  this was an individual who had been

8  demonstrating signs of a serious mental illness

9  before he came to New York State untreated, he

10  was diagnosed with a serious mental illness as

11  outlined in the records that had been submitted

12  with the memorandum and referred to in the

13  pre-sentence report.  I would hope that through

14  the Correction's Law I referenced section 402

15  of the Corrections Law that at least we would

16  appreciate if the Court would issue an

17  advisory, if it can, to the Department of

18  Corrections that he be considered for mental

19  health care and treatment while confined in a

20  state facility.  Thank you, Judge.

21      THE COURT:  Thank you, Mr. Nuchereno.  Ms.

22  Torres, did you want to add anything or say

23  anything?

24      MS. CALVO-TORRES:  No, Your Honor.  I have

25  nothing further to add.  Thank you.

9

Sentence

1

2 THE COURT:  Mr. Ortiz, anything you want to

3 say here on the record?

4 THE DEFENDANT:  No.

5 THE COURT:  Nothing to say.  Well, first of

6 all, you know my sympathies to the family here

7 because this is obviously a tragedy for you.

8 There is no question about it.  And I guess

9 that Mr. Ortiz's problem and probably the

10 reason why he's made the request to withdraw

11 the plea is that he's just easily led and I

12 think that's what happened on this night.  You,

13 in my estimation, Mr. Ortiz, will probably

14 spend the rest of your life in prison, either

15 for this event or for something else.  But I'll

16 tell you you aren't getting a big break because

17 of your condition.

18 It is the judgment of this Court on each of

19 these felony convictions you be sentenced to a

20 determinate sentence of 25 years imprisonment

21 plus a period of post release supervision of

22 5 years.

23 I'm directing that you be delivered to the

24 custody of the New York State Department of

25 Correctional services at their facility in

A-910

10

1
Sentence

2      Alden, New York there to be dealt with in

3      accordance with the laws pertaining to your

4      sentence.  The sentences are to run

5      concurrently.  There is a surcharge, $250, a

6      $20 crime victim's fee and you have 30 days to

7      appeal this sentence.

8           MR. CASE:  Thank you, your Honor.

9           MR. NUCHERENO:  Thank you, your Honor.

10          MS. CALVO-TORRES:  Thank you, your Honor.

11

12

13                    - o -

14

15

16     I hereby certify that the foregoing 10 pages are a true

17     and accurate transcription, to the best of my ability,

18     of my stenographic notes.

19

20

21

22                        _____

23                        PHILIP A. STERLACE, CSR.

24

25

A-911

04-2630

# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1465**
**KA 06-01983**

FILED

2009 FEB 29 10.08

PRESENT: HURLBUTT, J.P., SMITH, CENTRA, GREEN, AND PINE, JJ.

CLERK'S OFFICE

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                               MEMORANDUM AND ORDER

JOSUE ORTIZ, DEFENDANT-APPELLANT.

---

THE LEGAL AID BUREAU OF BUFFALO, INC., BUFFALO (NICHOLAS T. TEXIDO OF COUNSEL), FOR DEFENDANT-APPELLANT.

FRANK J. CLARK, DISTRICT ATTORNEY, BUFFALO (MICHAEL J. HILLERY OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Erie County Court (Michael L. D'Amico, J.), rendered June 16, 2006. The judgment convicted defendant, upon his plea of guilty, of manslaughter in the first degree (two counts).

It is hereby ORDERED that the judgment so appealed from be and the same hereby is unanimously affirmed.

Memorandum: Defendant appeals from a judgment convicting him upon his plea of guilty of two counts of manslaughter in the first degree (Penal Law § 125.20 [1]). We note at the outset that the plea proceedings and sentencing were conducted by County Court and that the hearings that preceded the plea were conducted by Supreme Court (Joseph S. Forma, J.).

We conclude that the evidence presented at the competency hearing conducted by Supreme Court pursuant to CPL 730.30 supports the court's determination that defendant was at that time fit to proceed (see *People v Brown*, 4 AD3d 886, 886-887, *lv denied* 3 NY3d 637; *see also People v Mendez*, 1 NY3d 15, 20). Contrary to defendant's contention, the court complied with the requirements of CPL 730.30 and was not required to order additional competency examinations. Nothing in the record suggests that defendant's condition deteriorated between the time of the psychiatric examinations and the time of the competency hearing (see *People v Lewis*, 302 AD2d 322, 323, *lv denied* 100 NY2d 540) and, contrary to defendant's contention, the court did not fail to comply with CPL article 730 when it made an informal request for an update of defendant's condition from defendant's treating psychiatrist (see *People v Conforti*, 263 AD2d 513, *lv denied* 94 NY2d 878; *People v Sims*, 217 AD2d 912, *lv denied* 87 NY2d 851).

We agree with defendant that his waiver of the right to appeal is



A-912

-2-

1465
KA 06-01983

invalid because County Court, in conducting the plea proceedings, did not "engage [him] in an adequate colloquy to ensure that the waiver . . . was a knowing and voluntary choice" (*People v Kemp*, 255 AD2d 397, 397). Thus, the contention of defendant that Supreme Court erred in refusing to suppress his statements to the police is properly before us (*cf. People v Kemp*, 94 NY2d 831, 833). Nevertheless, we reject that contention. The record of the *Huntley* hearing supports the court's conclusions that defendant was not in custody before he made incriminatory statements (*see People v Flores*, 23 AD3d 194, 195, *lv denied* 6 NY3d 775; *People v Rivera*, 4 AD3d 131, *lv denied* 2 NY3d 805), *Miranda* warnings were properly given after such statements were made, and defendant validly waived his rights before making further statements (*see People v Zeigler*, 299 AD2d 910, 911, *lv denied* 99 NY2d 586). Finally, the sentence is not unduly harsh or severe.

Entered:   December 21, 2007

JoAnn M. Wahl
Clerk of the Court

**N&N**

## NUCHERENO & NAGEL
### ATTORNEYS AND COUNSELORS-AT-LAW
www.NucherenoNagel.com

JOHN R. NUCHERENO
Also admitted in Louisiana
JNuchereno@NucherenoNagel.com

CATHERINE E. NAGEL
CNagel@NucherenoNagel.com

July 17, 2013

Hon. Thomas P. Franczyk, J.C.C.
Erie County Courthouse
25 Delaware Avenue
Buffalo, NY 14202

RE:   **PEOPLE V. JOSUE ORTIZ**
      **INDICTMENT NO. 02630-2004**

Dear Judge Franczyk:

        Enclosed herein please find Defendant's Reply Affirmation to the People's Opposing Affidavit for the above-reference case.

Very truly yours,

**JOHN R. NUCHERENO**

JRN/mrv
Enclosure
cc: Donna A. Milling, Esq., ADA (With copy of enclosure)

2503 Niagara Street, Buffalo, New York 14207 • Tel. (716) 875-2503 • Fax (716) 873-1780

6524 East Quaker Road, Orchard Park, New York 14127 • Tel. (716) 667-2503 • Fax (716) 873-1780

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

---

PEOPLE OF THE STATE OF NEW YORK
                   Plaintiff

                                     **REPLY TO THE PEOPLE'S**
                                     **OPPOSING AFFIDAVIT**
                                     **Indictment No. 02630-2004**

          -vs-

                                     *Assigned To:*
                                     *Hon. THOMAS P. FRANCZYK, J.C.C.*

**JOSUE ORTIZ**
                           Defendant

---

       **JOHN R. NUCHERENO, ESQ.,** an attorney admitted to practice before the

Courts of this State, affirms the following as true under penalties of perjury:

       1.     I am admitted to the practice of law in the State of New York, am not a

party to this action, and have been assigned to represent the Defendant, JOSUE ORTIZ,

in the above captioned matter.

       2.     As counsel assigned to represent the Defendant in the above entitled case,

I am familiar with the facts and pleadings. Unless otherwise stated, my allegations in this

Affirmation are based upon information and belief, the sources of my information and the

grounds for my belief being my review of the documents and Reports contained in my

files, my contacts with persons having information about the case, and my personal

knowledge of these proceedings.

       3.     This affirmation is filed in response to the People's Opposing Affidavit

dated July 12, 2013 and received by defense counsel on July 15, 2013.

4.　　Unless expressly acknowledged, defense counsel disclaims, disputes, and contests each and every allegation and representation contained in the People's Opposing Affirmation.

5.　　JOSUE ORTIZ moved to Buffalo, New York from Puerto Rico in May of 2004. He struggled with English and his manifesting psychosis at this time.

6.　　Just months later, on November 11, 2004, the CAMACHO brothers were murdered at their home.

7.　　JOSUE ORTIZ was charged with four counts of first degree murder in violation of Penal Law §§ 125.27[1][a][vii] and 125.27[1][a][viii], four counts of second degree murder in violation of Penal Law §§ 125.25[1], 20.00, and 125.25[3], and one count of first degree burglary in violation of Penal Law §§ 140.30[1] and 20.00 after he falsely confessed to these assassination-style murders.

8.　　JOSUE ORTIZ pleaded guilty to two counts of first degree manslaughter in violation of Penal Law § 125.25[1] on March 22, 2006. He was sentenced to twenty five years determinate in prison and five years of post-release supervision on June 16, 2006 after expressing that he wished to withdraw his plea. His two "accomplices" remained at large.

9.　　The Fourth Department affirmed Mr. ORTIZ's conviction and the Court of Appeals denied leave to appeal (*People v. Ortiz*, 46 AD3d 1409 [4th Dept 2007], *lv denied* 10 NY3d 769).

10.　　JOSUE ORTIZ filed a motion to vacate his conviction and defense counsel filed an affirmation in support of that motion on April 23, 2013. The motion and Affirmation urge the Court to vacate JOSUE ORTIZ's conviction in light of newly

2

discovered evidence, under CPL § 440.10[1][g], and JOSUE ORTIZ's actual innocence, under CPL § 440.10[1][h].

    11.    The People then replied with an Opposing Affidavit dated July 12, 2013. Said affidavit was received by defense counsel on July 15, 2013.

**Factual Background**

    12.    As the People noted in their Point 10, "this is not a case where defendant was convicted by a jury after a bitterly contested trial." Perhaps if there were a "bitterly contested trial" JOSUE ORTIZ would not have spent the last eight (8) years in prison. Rather, this was a case where a young, schizophrenic man, incapable of making rational decisions, and new to Buffalo from Puerto Rico falsely confessed to two (2) brutal murders. This is a case where the People's means for opposing Mr. ORTIZ's claims of actual innocence and newly discovered evidence is the very plea Mr. ORTIZ wished to withdraw.

    13.    MIGUEL and NELSON CAMACHO were murdered in their home at 879 Niagara Street in Buffalo on November 11, 2004. NELSON CAMACHO was shot in the face and arm towards the front of the house. MIGUEL CAMACHO was should in the upper right arm, both right and left chest, and lower chest area towards the rear of the house.

    14.    Just days later, on November 15, 2004, JOSUE ORTIZ required medical attention at Buffalo General Hospital because of his psychosis and fear that the CAMACHO brothers' murderers were pursuing him (**Exhibit 5**, numbered exhibits refer to those used in defense counsel's Affirmation from April 23, 2013). While at Buffalo

3

General Hospital, Mr. ORTIZ was questioned by Detectives LONERGAN, VAUGHN, and STAMBACH with Officer TORRES acting as a translator (Huntley Hr'g 61:22-25, 62:2, Aug. 31, 2005- **Exhibit 24**). At this point, by the People's own admission, "The Buffalo Police had every reason to think that the defendant was not even a witness to the Niagara Street homicides, much less a suspect" (District Attorney's Mem. of Law, Oct. 3, 2005, 5-6- **Exhibit 25**). Even Officer TORRES and Detective LONERGAN admitted that Mr. ORTIZ was not considered a suspect or even a potential witness to the homicides because of his lack of information on November 15, 2004 (Huntley Hr'g 108:24-25, 109:1-3, 130:11-21- **Exhibit 24**).

15.     After being released from Buffalo General Hospital, JOSUE ORTIZ attended the CAMACHO brothers' funeral/wake. It was there that he learned the details of the CAMACHO brothers' murders. The details that he did not have the night prior when the police and experienced detectives did not even consider him a witness.

16.     After learning the details of the assassination-style murders from the funeral/wake and succumbing to his psychosis, Mr. ORTIZ irrationally confessed to the CAMACHO brother's murders with his newfound knowledge.

17.     JOSUE ORTIZ's false, irrational confession to Detective MARK STAMBACH was dissected in the previous Affirmation. As Assistant United States Attorney JOSEPH TRIPI pointed out, there are "many details in [the confession] which are patently incorrect when compared to the crime scene." (**Exhibit 26**, 20:18-19).

18.     The People point to a statement from RONNIE WILLIAMS, a fellow inmate, to corroborate JOSUE ORTIZ's story (**Exhibit 9**). JOSUE ORTIZ did not tell RONNIE WILLIAMS any details that could not have been learned from the funeral or

4

the streets. He did not tell RONNIE WILLIAMS anything beyond his false, irrational

confession to police. He did not tell RONNIE WILLIAMS any details like those elicited

in front of the Federal Grand Jury.

19.     JOSUE ORTIZ pleaded guilty to two (2) counts of first degree

manslaughter despite his innocence on March 22, 2006. On June 16, 2006 he was

sentenced to twenty-five (25) years in prison despite his wish to withdraw his guilty plea

because, at the time, he did not have a legal basis for doing so.

20.     To support Mr. ORTIZ's irrational confession and subsequent guilty plea,

the People, in their Point 16, look to the defendant's statements of "I know I did wrong,

but everybody makes mistakes" made during treatment at a psychiatric center, and his

acknowledgement that "he made a bad decision and has to deal with the consequences."

His irrational confession was his mistake. His irrational confession was the bad decision

he has to deal with the consequences of. Indeed, JOSUE ORTIZ repeatedly proclaimed

his innocence to Dr. EVELYN COGGINS throughout treatment in 2005. The doctor

remembered "He always said that. That day and every other day." (**Exhibit 30**).

21.     The People reiterate the aspects of Mr. ORTIZ's July 21, 2011 Federal

Grand Jury testimony that are consistent with his initial, irrational confession. They did

not acknowledge or address the extensive amount of blatant falsehoods and/or

inconsistencies in that testimony as compared to the crime scene and Mr. ORTIZ's initial,

irrational confession. Among other things, Mr. ORTIZ testified three types of guns were

fired even though the crime scene reveals only one was used, he testified "JUNE"

(UDA's bro)

Hidalgo was present, he made first mention of UDA HIDALGO driving that night in a

green Toyota Corolla. The more details Mr. ORTIZ attempted to provide, the more questionable his knowledge about the murders became. *(Confessed what? drug dealing?)*

22.     Mr. ORTIZ finally confessed to the Federal Grand Jury on September 23, 2012, after understanding that he could not be charged in federal court for drug crimes, that he had nothing to do with the CAMACHO brothers' assassination-style murders (**Exhibit 31**).


## Newly Discovered Evidence

23.     According to the Court of Appeals, "once the submission of evidentiary facts creates an issue as to the validity of the judgment, the defendant is *entitled* to a hearing to determine the truth of his allegations, unless his claim has been *conclusively* refuted by documentary evidence." (*People v. Sessions*, 34 NY2d 254, 256 [1974] [emphasis added]).

24.     The independent Federal Investigation, proffer from an Assistant United States Attorney, sworn testimony by thirteen (13) witnesses before a Federal Grand Jury, and subsequent Federal Indictment of three men is newly discovered evidence that creates an issue as to the validity of Mr. ORTIZ's conviction. Mr. ORTIZ's irrational confession and subsequent plea cannot conclusively refute the allegations in all of the aforementioned newly discovered evidence. Thus, Mr. ORTIZ is entitled to a hearing.

25.     The hearing court has the discretionary power to vacate a judgment of conviction in light of newly discovered evidence (*People v. Salemi*, 309 NY 208, 215 [1955], *People v. Tanleff*, 49 AD3d 160, 178 [2nd Dept. 2007]).

6

26.     The People question the newly discovered evidence, in their Point 23, as being "of dubious origin and reliability." According to this assertion, an independent Federal Investigation, the sworn testimony before a Federal Grand Jury of thirteen (13) witnesses, an extensive proffer of an Assistant United States Attorney, and a Federal Indictment are "dubious" and of questionable reliability. In reality, the most dubious and unreliable piece of evidence relevant to this case was the backbone of the People's case and the Defendant's conviction: the confession of a young, scared, schizophrenic man.

27.     The People argue Mr. ORTIZ is precluded from bringing the instant motion as far as it is based on newly discovered evidence because he was convicted after a guilty plea rather than after trial. However, the Court of Appeals stressed "a hearing should be held to promote justice if the issues raised by the motion are sufficiently unusual and suggest searching investigation." (*People v. Crimmins*, 38 NY2d 407, 416 [1975]; *People v. Nicholson*, 222 AD2d 1055, 1056 [4th Dept. 1995]; *see also People v. Arata*, 254 NY 565, 565-66 [1930]; *People v. Shilitano*, 218 NY 161, 169-70 [1916]). This situation is incredibly unusual and the promotion of justice warrants a hearing and "searching investigation." A hearing to determine the validity of Mr. ORTIZ's allegations based on the newly discovered evidence cannot harm the justice system. Especially when compared to the amount of harm done by incarcerating the actually innocent.

28.     A defendant is not precluded from bringing a motion under CPL 440.10(g-1), which Mr. ORTIZ has subsequently filed supplemental to his original motion, after a guilty plea. As the People aptly noted in their Point 25, it is a "fact that some innocent defendants plead guilty due to mental and emotional infirmities and to avoid the prospect of a higher sentence following a guilty verdict." Despite this telling acknowledgment, the

7

People inexplicably failed to address Mr. ORTIZ's extensive mental health history and entertain the notion that this was precisely the situation for JOSUE ORTIZ. The People then went on to say that "[b]ad decisions should not irrevocably condemn those who are actually innocent." Yet, Mr. ORTIZ's "bad decision" to confess to two (2) murders he did not commit after learning the details at the funeral and succumbing to his mental illness has left him "irrevocably condemned" to twenty-five (25) years in prison despite his evidence of actual innocence.

29.     The remaining arguments raised in the People's Affidavit as they relate to DNA evidence have been addressed in Defendant's Supplemental Notice of Motion to Vacate Judgment of Conviction and supporting Affirmation.

30.     Mr. ORTIZ has established that the independent Federal Investigation, sworn Grand Jury testimony of thirteen (13) witnesses, the Assistant United States Attorney's proffer, and Federal Indictment of three (3) different men is newly discovered evidence that would have affected the outcome of his case if presented at a trial and warrants vacatur of his conviction.

*The extensive newly discovered evidence would probably change the result if a new trial is granted*

31.     The People argue the Federal Grand Jury testimony of over a dozen witnesses would not change the result if a new trial were granted because the testimony contains some inconsistencies as to who murdered the victims. The testimony perfectly consistent in one regard—Mr. ORTIZ was not implicated as one of the victims' murderers. The only person who corroborated Mr. ORTIZ's initial, irrational confession,

8

a fellow inmate named RONNIE WILLIAMS, could merely corroborate the few details JOSUE ORTIZ uncovered at the CAMACHO brothers' funeral/wake and subsequently reported to police. The extensive newly discovered evidence provides reasonable doubt as to who murdered the CAMACHO brothers and the validity of a young, scared, schizophrenic man's confession and conviction.

32.    The People claim the extensive newly discovered evidence cannot overcome a young, scared Schizophrenic man's initial confession, his plea colloquy based on that confession, and his sworn Federal Grand Jury testimony riddled with inconsistencies and made out of fear of additional charges. The People do not account for Mr. ORTIZ's sworn Federal Grand Jury testimony proclaiming his innocence. While the Federal Grand Jury testimony contains inconsistencies as to who murdered the CAMACHO brothers, as one might expect from the flow of information on the streets, JOSUE ORTIZ is not implicated.

33.    Defendant is asking the Court not "to disregard the applicability of CPL 440.10(1)(g) to a 'verdict of guilty after trial,'" but rather to utilize its power and discretion to, at least, conduct a hearing "to promote justice" in this "sufficiently unusual" situation because it warrants a "searching investigation." (*People v. Crimmins*, 38 NY2d 407, 416 [1975]).

34.    The People argue LUIS CAMACHO's testimony that he saw two men running from his brothers' house on November 11, 2004 corroborates Mr. ORTIZ's Federal Grand Jury testimony where he claimed to have separated from UDA HIDALGO and his brother, "JUNE," his alleged co-conspirators, once they left the home. This argument is misguided. As stated in defense counsel's Affirmation from April 23, 2013,

UDA HIDALGO was not present for these murders. UDA HIDALGO does not have a brother named "JUNE." Not a single piece of evidence from the Federal Investigation or Federal Grand Jury supports that "JUNE" HIDALGO exists. Nor does any evidence support that EFRAIN "CHEKO" HIDALGO goes by the name "JUNE." Further, while LUIS CAMACHO's testimony has wavered between seeing two and three men, the People effectively ignored the five (5) sworn witnesses who testified they saw three (3) men fleeing from the CAMACHO brothers' home. BEVERLY LABORGNE saw three men (Exhibit 34, 3:3-8). FRANK COPPOLA saw three men (Exhibit 35, 3:11-14). ESTEBAN ACEVEDO saw three (3) men (Exhibit 17). ESTEBAN ACEVEDO even corroborated FRANK MATIAS testimony about the commission of the crime when he stated "I saw CHEKO [HIDALGO] and MACHO [FRANK MATIAS] and BRANDON [JONAS] came out last." (Exhibit 18). STEVEN ACEVEDO and CARMELO MERCADO both saw three (3) men (Exhibit 19).

***The extensive newly discovered evidence could not have been discovered before the trial by exercising due diligence***

35.     The evidence uncovered by the independent Federal Investigation and subsequent Federal Grand Jury was discovered years into JOSUE ORTIZ's prison sentence. It was not uncovered by the Buffalo Police Department. It surely could not have been uncovered by a catatonic schizophrenic young man and his counsel.

36.     The People argue Mr. Ortiz's claim that he was "in fear of his life because the killers were after him" (People's Exhibit A) supports the notion that this evidence could have been uncovered by defense counsel. This is one of many statements that

10

homicide detectives and police officer heard the night of November 15, 2004 that led

them to believe JOSUE ORTIZ was not a suspect in the CAMACHO brothers' murders.

They found his statements that night so incredible that Mr. ORTIZ was not even

considered a witness. Further, Mr. ORTIZ's statement that "the killers were after him"

does not necessarily support the finding that this young, schizophrenic man even knew

the true murderers' identities. As Dr. EVELYN COGGINS aptly pointed out, Mr. ORTIZ

"absolutely" may have been psychotic at this point (Huntley Hr'g 42:10-15, May 4,

2005- **Exhibit 24**). Indeed, Mr. ORTIZ was described by multiple mental health

practitioners as catatonic (**Exhibits 1, 2, and 3**). He was effectively unable to assist his

attorneys in his own defense.

     37.     The People also point to TIMOTHY ERNLE's implication of UDA

HIDALGO (**Exhibit 39**, p.7) to counter the facts that UDA HIDALGO and JOSUE

ORTIZ do not know each other and that UDA HIDALGO has not been indicted, in state

or federal court, for the CAMACHO brother's murder. TIMOTHY ERNLE learned of

UDA HIDALGO's "participation" in these murders from MISAEL MONTALVO

sometime between February and July of 2012 (*Id.* at 4:16-23). This statement was not

discoverable before Mr. ORTIZ entered his plea in 2006. Further, MISAEL

MONTALVO met JOSE ESCALERA in the Erie County Holding Center (**Exhibit 41**,

6:9-11), and told him "[H]e wants to see what comes out in court. He is throwing lies so

people would, you know, mix things up." (*Id.* at 10:19-20).

11

*The extensive newly discovered evidence is material to the issue*

38.     As the People appropriately stated in their Point 36, "None of the witnesses in the federal investigation called to testify by federal prosecutors implicated defendant in the murders." This is material to the issue of his guilt and to the validity of his false, irrational admissions of guilt.

39. To support the argument that the extensive newly discovered evidence is not material, the People cite to RONNIE WILLIAMS's statement where JOSUE ORTIZ recited a watered-down version of his false, irrational confession to him (**Exhibit 9**), defense counsel's impression of Mr. ORTIZ at a time when Defendant was frequently catatonic, and the Court's opinion that Mr. ORTIZ is "just easily led." This vague statement and these opinions do not change value of the extensive newly discovered evidence. A Federal Investigation, proffer from an Assistant United States Attorney, sworn testimony from a dozen witnesses before a Federal Grand Jury, and a Federal Indictment did not implicate JOSUE ORTIZ in these murders. This extensive evidence relates to the true identity of the CAMACHO brothers' murderers and thus, it is material (*People v. Malik*, 81 AD3d 981, 982 [2nd Dept. 2011] [holding evidence of a false identification in a police report is material]).

40.     To further support the contention that this extensive newly discovered evidence is not material, the People point to two statements Mr. ORTIZ made while receiving treatment for his chronic psychosis. Mr. ORTIZ stated in 2008 "I know I did wrong but everybody makes mistakes" (People's Exhibit D) and in 2009 he agreed "he made a bad decision and has to deal with the consequences" (People's Exhibit E). As

12

stated in Point 20 above, Mr. ORTIZ's irrational confession was his mistake. His

irrational confession was the bad decision he has to deal with the consequences of.

41.    It has been argued Mr. ORTIZ's lack of post-conviction motions up until

this point is further evidence supporting the notion that the extensive newly discovered

evidence is not material to the issue. This argument is misguided. Mr. ORTIZ and

counsel did not file frivolous post-conviction motions on scraps of evidence. Rather, Mr.

ORTIZ and counsel waited until a separate Federal Investigation was conducted. As

stated by the Second Department in a similar case:

The defendant's investigation resulted in a body of new evidence which required time to
accumulate. He should not be penalized for waiting to amass all of the new evidence and
then presenting it cumulatively to the County Court. Such conduct avoided separate
motions upon the discovery of each witness, obviated the squandering of resources, and
preserved judicial economy.

(*People v. Tankleff,* 49 A.D.3d 160, 180 [2007]).

*This extensive newly discovered evidence is not cumulative to the former issue and is*

*not merely impeaching or contradicting the former evidence*

42.    The extensive newly discovered evidence amassed during the independent

Federal Investigation is not cumulative to the former issue nor merely impeaching or

contradicting the former evidence. Rather, this extensive newly discovered evidence

completely undermines the former evidence and the validity of Mr. ORTIZ's conviction.

43.    The People referenced a 2004 police interview with MISAEL

MONTALVO, in which he provided an alibi, to support their argument in opposition.

However, no notes from this interview were provided. While allegedly MONTALVO's

alibi was corroborated, MONTALVO has admitted his participation in the CAMACHO

13

brothers' murders before. He told KEVIN WALSH he was the driver that night (**Exhibit 42**, 10:15-18). He told TIMOTHY ERNLE he gave CHEKO HIDALGO the location of the CAMACHO brothers' home as a good target for a robbery (**Exhibit 39**, 10:8-15).

44.   It should be noted for distinction purposes that "the Ortiz home" referenced in the People's Point 41 and thereafter is that of SAMMY ORTIZ, Jr., not JOSUE ORTIZ.

45.   While at SAMMY ORTIZ, Jr.'s home, UDA HIDALGO testified he overheard a "fat Puerto Rican dude" and CHEKO HIDALGO talking. He was not involved in the murders and did not deal with the "fat Puerto Rican dude" who told the CHEKO HIDALGO about the CAMACHO brothers. However, UDA HIDALGO did testify that the "fat Puerto Rican dude" was back at SAMMY ORTIZ, Jr.'s house immediately after the murders (**Exhibit 29**, 22:20-23). It was there that CHEKO HIDALGO and BRANDON JONAS accused the "fat Puerto Rican dude" of setting them up and threatened him with a knife (*Id.* at 24:8-20). FRANK MATIAS testified CHEKO HIDALGO and BRANDON JONAS fought with MISAEL MONTALVO about being set up and threatened to kill him (**Exhibit 28**, 75:2-3, 77:4-6). MISAEL MONTALVO is the "fat Puerto Rican dude" from Uda Hidalgo's testimony. Indeed, UDA HIDALGO was picked up for questioning by Buffalo Police on November 17, 2004 and shown a picture of JOSUE ORTIZ—he did not identify him as the "fat Puerto Rican dude" (**Exhibit 29**, 38:25, 39:1-6, 22-24).

46.   Esteban ACEVEDO was able to identify all three (3) shooters for federal investigators. JOSUE ORTIZ was not one of them.

14

47.     Regardless of any inconsistencies the People note within FRANK
MATIAS's testimony, one very important fact remains steadfast throughout his lengthy
testimony—he in no way implicates JOSUE ORTIZ. It implicates the same four (4) men:
FRANK MATIAS, CHEKO HIDALGO, BRANDON JONAS, and MISAEL
MONTALVO. In fact, FRANK MATIAS inquired as to how it is even possible someone
else was convicted of his own crime (**Exhibit 28**, 85:12-13).

48.     According to the People's Opposing Affidavit, UDA HIDALGO passed a
polygraph test on November 12, 2012 in which he denied being present at the
CAMACHO brothers' home during their assassination-style murder. The People aptly
point out that this test contradicts JOSUE ORTIZ's statement to the Buffalo police and
his testimony before the Federal Grand Jury on July 21, 2011. This test, like the
overwhelmingly extensive newly discovered evidence, contradicts JOSUE ORTIZ's
statement to Buffalo police and July 21, 2012 Federal Grand Jury testimony. This
polygraph test further supports Mr. ORTIZ's contention that his November 16, 2004
"confession," and any adherence to it, was false, irrational, and a result of his chronic
psychosis.

49.     The People also point to TIMOTHY ERNLE's testimony implicating
UDA HIDALGO as being inconsistent with UDA HIDALGO's polygraph results.
However, as previously stated in Point 37 above, TIMOTHY ERNLE heard of UDA
HIDALGO's participation through MISAEL MONTALVO (**Exhibit 39**). MISAEL
MONTALVO has admitted to feeding different people different accounts of the
CAMACHO brothers' murders to "mix things up" and see what comes out in court
(**Exhibit 41**).

15

50.    To contradict the possibility that MONTALVO has believed either BRANDON JONAS or FRANK MATIAS to be UDA HIDALGO, the People claim "Montalvo identified a photograph of Brandon Jonas as Cheko Hidalgo's cousin, indicating that he knew that Jonas was not Uda Hidalgo" in a November 15, 2004 interview with Buffalo police. First, based on the People's statement, it appears MONTALVO identified BRANDON JONAS as "Cheko Hidalgo's cousin" and not by his name. Thus, this statement does not rule out the possibility that MONTALVO believed "Cheko Hidalgo's cousin" was named UDA HIDALGO. Second, it remains possible that MISAEL MONTALVO believes FRANK MATIAS is UDA HIDALGO. MONTALVO's confusion as to UDA HIDALGO's identity further corroborates UDA HIDALGO's inability to name MISAEL MONTALVO as the "fat Puerto Rican dude" discussed above.

51.    Contrary to the People's contention, "[e]vidence that Uda Hidalgo, Cheko Hidalgo, Frank Matias, Brandon Jonas and Misael Montalvo killed the victims" reveals Mr. ORTIZ's confession to police was indeed false and irrational. While the People correctly noted that JOSUE ORTIZ was charged as an accomplice, knowing that two or three men were involved in these murders, the evidence elicited from these "accomplices" does not inculpate JOSUE ORTIZ at all. Rather, the "accomplices" and those with knowledge of the crime did not inculpate JOSUE ORTIZ in these murders because he did not participate in them.

52.    It has also been argued that JOSUE ORTIZ was not identified as one of the shooters because, as he claimed to police in one of his false, irrational admissions, he "split up from the other two" when they fled. This is against the evidence. Most witnesses

16

said they observed three (3) men fleeing the CAMACHO brothers' home that night. Further, most witnesses described these men as average or skinny. Mr. ORTIZ was six (6) foot six (6) inches at the time of the murders and three-hundred (300) pounds. He was neither average nor skinny. Mr. ORTIZ was not identified because he was not one of the shooters.

53.     The People challenge the notion that JOSUE ORTIZ learned the details of the CAMACHO brothers' murders at the funeral. The details Mr. ORTIZ did not know the previous night when homicide detectives did not even consider him a suspect. LUIS CAMACHO discussed the details of his brothers' murders for a long time at the funeral (Exhibit 33, 8:18-21). EDUARDO RIVERA testified he heard LUIS CAMACHO discussed details at the funeral (Exhibit 36, 12:17-20). RIVERA even learned one brother "got shot somewhere in the head area where it came out of his face and his brothers was found somewhere in the back of the door like almost trying to open the door." (*Id.* at 12:22-25). Details were openly discussed at the funeral.

54.     The People claim the "defendant has provided no reasonable explanation why he admitted to a crime, he now claims he did not commit." In making that claim, the People ignored the extensive mental health history and supporting exhibits included in defense counsel's Affirmation from April 23, 2013.

55.     The People pointed out "it is difficult to fathom that someone would admit to a crime they were not involved in based on sleep deprivation." Naturally it is difficult for rational, reasoned thinkers to fathom confessing to a crime they did not commit—yet, it happens. As the People noted in Point 25, it is a "fact that some innocent defendants plead guilty due to mental and emotional infirmities and to avoid the prospect of a higher

17

sentence following a guilty verdict." Further, VINAYAK S. GOKHALE, M.D stressed
JOSUE ORTIZ "had *no* capacity to make *any* rational, informed decision" (**Exhibit 1**)
(emphasis added).

56.     The People characterized Mr. ORTIZ's statement before the Federal
Grand Jury that Detective MARK STAMBACH provided him with UDA HIDALGO's
name as "at best specious." Yet, as the Court opined at sentencing, the Mr. ORTIZ is
likely "just easily led." Mr. ORTIZ's claim that he was fed this information is further
corroborated by the fact that none of his "accomplices" to these murders claimed to know
him and UDA HIDALGO could not identify JOSUE ORTIZ on November 17, 2004
(**Exhibit 29**, 38:25, 39:1-6, 22-24).

57.     Defendant's extensive newly discovered evidence is not cumulative nor
does it merely impeach or contradict the former evidence. The extensive newly
discovered evidence is derived from a separate Federal Investigation, an Assistant United
States Attorney's proffer, sworn Federal Grand Jury testimony from over a dozen
witnesses, and a Federal Indictment. The former evidence is derived from the false,
irrational confession of a young, schizophrenic man who struggled with English. This
extensive newly discovered evidence completely undermines the former evidence and the
validity of JOSUE ORTIZ's conviction.

58.     The People argue there is not a sufficient "'train of facts or circumstances'
which tend to 'clearly' point out that defendant is not the guilty party" under *People v.
Schulz*, 4 NY3d 521, 529 [2005] in order to show third-party culpability. *Schulz* must be
distinguished. The defendant in *Schulz* did not have the extensive evidence JOSUE
ORTIZ has. The defendant in *Schulz* had a Newsday article (*Id.* at 528). In *Schulz*, the

18

defendant attempted to bring a CPL 440 motion under newly discovered evidence and intended to show a photograph of a different man as the actual perpetrator. However, the defendant did not offer any evidence of the man's modus operandi, a witness who saw this man at the crime scene, or a connection between the man and the getaway car used (*Id.*). That is not the case here. Mr. ORTIZ's extensive newly discovered evidence clearly lays out the chain of events that led to the CAMACHO brothers' murders. The evidence demonstrates MISAEL MONTALVO wanted revenge on the CAMACHO brothers. The evidence demonstrates MONTALVO recruited CHEKO HIDALGO to unknowingly carry out his revenge. The evidence demonstrates MONTALVO drove CHEKO HIDALGO, BRANDON JONAS, and FRANK MATIAS to the CAMACHO brothers' home and BRANDON JONAS killed the brothers with an AK-47. None of these "accomplices" implicated JOSUE ORTIZ. None of them even claimed to know who he is. This train of events and circumstances sheds substantial light on the former evidence and questions JOSUE ORTIZ's conviction.

**JOSUE ORTIZ is actually innocent**

59.     JOSUE ORTIZ's actual innocence was demonstrated through a separate Federal Investigation, a dozen sworn Federal Grand Jury witnesses, an Assistant United States Attorney's extensive proffer, and a Federal Indictment charging the actual murderers with the crimes JOSUE ORTIZ falsely confessed to.

60.     The People contend JOSUE ORTIZ is not actually innocent because he confessed to the murders, after previously having no knowledge of them, pleaded guilty based on that confession, and recited his confession to the Federal Grand Jury on July 21,

19

2011 (**Exhibit 32**). While there are some inconsistencies among the thirteen (13) Grand Jury witnesses, there is one piece of information that remains constant—JOSUE ORTIZ had nothing to do with these murders. Other than the occasion before the Grand Jury on July 21, 2011 when he recited his initial, irrational confession because he feared the possibility of federal charges, JOSUE ORTIZ was in no way implicated.

61.    JOSUE ORTIZ's own admissions are inconsistent with each other and the crime scene. The very evidence used to convict JOSUE ORTIZ and oppose this Motion is inconsistent with the crime scene and an extensive Federal Investigation. The People alleged there was a "total failure to address his sworn admissions of guilty" in Defendant's Motion. On the contrary, the Defendant's Motion dissected his irrational confession and subsequent recitation to the Grand Jury and analyzed these admissions against the extensive evidence from the Federal Investigation. Further, the People largely failed to address Mr. ORTIZ's extensive mental health history and the undeniable possibility that it may have served as the basis for his irrational confession. As Dr. COGGINS noted, Mr. ORTIZ "absolutely" may have been psychotic at this point (Huntley Hr'g 42:10-15, May 4, 2005- **Exhibit 24**). Indeed, his psychosis and the information he learned at the funeral served as the basis for turning him from someone experienced detectives did not even consider a witness into the only man convicted in a three-suspect double homicide.

**Conclusion**

62.    Mr. ORTIZ's Motion need not be automatically denied because of his guilty plea. Rather, the Court may conduct a hearing "to promote justice" because the

20

issues raised in his Motion are "are sufficiently unusual and suggest searching investigation." (*People v. Crimmins*, 38 NY2d 407, 416 [1975]). Mr. ORTIZ's judgment of conviction should be vacated in light of this extensive newly discovered evidence.

63.     Mr. ORTIZ has demonstrated, by clear and convincing evidence, that he is actually innocent. Mr. ORTIZ is not asking the Court "to ignore his knowing, voluntary and intelligent plea," but rather to consider the value of a young, schizophrenic man's irrational confessions as compared to an extensive Federal Investigation that exculpates him. Mr. ORTIZ's judgment of conviction should be vacated in light of the extensive evidence of his actual innocence.


**WHEREFORE**, it is respectfully requested that Defendant's judgment of conviction be vacated in light of this extensive newly discovered evidence and his actual innocence.


Dated: July 17, 2013

Respectfully submitted,

JOHN R. NUCHERENO, ESQ.
*Attorney for Defendant,*
*JOSUE ORTIZ*
*Office & P.O. Address*
Nuchereno & Nagel
2503 Niagara Street
Buffalo, NY 14207
Tel. No. (716) 875-2503

*Motion Preparation Assistance*
*Provided By:*
MARTEN VIOLANTE,
*University at Buffalo Law Student*

21

STATE OF NEW YORK
COUNTY COURT  :  COUNTY OF ERIE

_____

THE PEOPLE OF THE STATE OF NEW YORK

        v

JOSUE ORTIZ
               Defendant

_____

             **OPPOSING AFFIDAVIT**

             Indictment No. 02630-2004

STATE OF NEW YORK   )
COUNTY OF ERIE      )  ss.
CITY OF BUFFALO     )

DONNA A. MILLING, being duly sworn, deposes and says:

1.     I am an attorney duly admitted to the practice of law in the State of New York.

2.     I am an Assistant District Attorney, appearing of counsel to FRANK A. SEDITA, III, District Attorney of Erie County, on behalf of the People of the State of New York.

3.     This affidavit is submitted in opposition to defendant's motion to vacate his conviction pursuant to CPL 440.10[1][g][h] and the affidavit of JOHN R. NUCHERENO ESQ., attorney for defendant, dated April 23, 2013, and received in the District Attorney's Office on April 23, 2013.

4.     Unless otherwise stated herein, this affidavit is made upon information and belief, the source of which is my review of the confidential file of the District Attorney's Office, records of prior proceedings and a reading of the defendant's motion papers.

5.     Unless expressly acknowledged, the People disclaim, dispute and contest each and every allegation and representation contained in defendant's motion and counsel's affirmation.

6.     Under the instant indictment, defendant was charged with four counts of first degree murder (Penal Law §§ 125.27[1][a][vii] and 125.27[1][a][viii]), four counts of second

degree murder (Penal Law §§ 125.25[1], 20.00, and 125.25[3]), and one count of first degree burglary (Penal Law §§ 140.30[1], 20.00).   The charges arose from defendant's participation in the murders of Nelson and Miguel Camacho on November 11, 2004 in the city of Buffalo.

7.    On March 22, 2006, defendant pleaded guilty to two counts of first degree manslaughter (Penal Law § 125.20[1]) and waived his right to appeal.   He was sentenced on June 16, 2006 to a determinate term of twenty five years imprisonment, followed by a five year period of post release supervision.

8.    Defendant's conviction was unanimously affirmed and leave to appeal was denied (*People v Ortiz*, 46 AD3d 1409 [4th Dept 2007], *lv denied* 10 NY3d 769).

9.    As grounds for the instant motion, defendant claims that he is in possession of newly discovered evidence which merits vacatur of his conviction.   Specifically, he argues that a 2011 independent federal investigation which resulted in a federal grand jury indictment of Misael Montalvo, Efrain Hidalgo and Brandon Jonas for the murders of Nelson and Miguel Camacho is newly discovered evidence that he did not commit the murders for which he pleaded guilty.   In a related claim, he argues that the testimony of witnesses before the federal grand jury and the resulting indictment are proof of his actual innocence.   Defendant's contentions are without merit and his motion may be denied because allegations of fact essential to support the motion are contradicted by a court record -- the plea transcript (CPL 440.30[4][d]).

*Factual Background*

10.    This is not a case where defendant was convicted by a jury after a bitterly contested trial, and has filed numerous post verdict state and federal motions professing his innocence.   Rather, defendant, represented by experienced counsel, pleaded guilty, under oath,

admitting that he "intended to cause serious physical injury" to Nelson and Miguel Camacho "meant to kill them" and did so. Additionally, throughout the years, in multiple forums, defendant has repeatedly admitted his crime.

11.    At approximately 9:44 p.m. on November 11, 2004, Nelson and Miguel Camacho were brutally murdered in their home at 879 Niagara Street in the city of Buffalo by three assailants. The motive for the crime was robbery. It was believed that the Camacho brothers were drug dealers and had drug money in the home and had recently won a large sum of money playing the lottery. Nelson Camacho sustained a gun shot wound to the face and left arm pit area. Miguel Camacho sustained four gun shot wounds- the right upper arm, right chest, left chest and lower chest near his abdomen. The medical examiner opined that both had probably been shot with a "rifle or really powerful gun". There were no signs of gun powder on the bodies. On arrival, the police found the body of Nelson Camacho on the living room floor in the front of the house. A large television on an entertainment center in the living room was still on. A Raven 25 caliber semi automatic handgun was on the floor next to Nelson's body. It was recovered loaded with four rounds in the magazine and none in the chamber. Miguel Camacho was found in the kitchen, laying against the rear door leading into a back hallway. Eight fired cartridge cases     from a high powered rifle- an AK-47- were recovered from the scene.

12.    Five days after the crime, on November 16, 2004, defendant gave a sworn statement to Buffalo police Detectives Mark Stambach and James Lonergan admitting his role in the crime. Defendant told them that he went to the victims' home accompanied by Uda and Cheko Hidalgo to steal money and drugs. All three were armed - a shot gun, an AK-47 and a pistol. Defendant had the AK-47. Defendant stated that when he kicked in the front door, he first encountered Nelson. He could see Miguel in the rear of the home. A large television was

on.   Defendant admitted that he struggled with Nelson, tried to take his chain and shot him in the face and chest.   He also admitted to shooting Miguel in the belly with the AK-47.

13.   While housed at the Erie County Holding Center, pending trial, defendant befriended inmate Ronnie Williams and again admitted his role in the Camacho murders. Defendant told Williams that he kicked the front door in and shot both brothers.   He related that he was accompanied by two others and that the motive had been robbery based on information that the Camachos were drug dealers and had a winning lottery ticket.

14.   On March 22, 2006, defendant again admitted in role in the murders.   This time, under oath, and accompanied by two experienced attorneys, one of whom is now a judge, defendant pleaded guilty to two counts of first degree manslaughter for his role in the murders, acknowledging his use of a rifle in the commission of the crime.   Counsel (John Nuchereno, Esq.) admitted that he had discussed the sentencing parameters and the waiver of right to appeal with defendant and he wished to plead guilty.

15.   On the day of sentencing, Mr. Nuchereno advised the court that defendant's guilty plea was entered because he "advised us on his own that he wished to enter that plea" (S 6; numbers in parentheses preceded by "S" refer to pages of the sentence transcript).   He noted that since the entry of the plea on March 22, 2006 defendant expressed satisfaction with his plea. Nuchereno explained that on the day before sentencing, he received a letter "ostensibly written by defendant" that he changed his mind and wished to withdraw his plea.   Counsel further noted that he immediately visited defendant and learned that the sole basis for wanting to withdraw his plea was that "he had changed his mind" (S 6).   Counsel stated that he could not submit an affidavit because there was no allegation that the plea was not knowing and voluntary, or the product of undue pressure by counsel, family or friends (S 6).   Defendant's motion was

on. Defendant admitted that he struggled with Nelson, tried to take his chain and shot him in the face and chest. He also admitted to shooting Miguel in the belly with the AK-47.

13.     While housed at the Erie County Holding Center, pending trial, defendant befriended inmate Ronnie Williams and again admitted his role in the Camacho murders. Defendant told Williams that he kicked the front door in and shot both brothers. He related that he was accompanied by two others and that the motive had been robbery based on information that the Camachos were drug dealers and had a winning lottery ticket.

14.     On March 22, 2006, defendant again admitted in role in the murders. This time, under oath, and accompanied by two experienced attorneys, one of whom is now a judge, defendant pleaded guilty to two counts of first degree manslaughter for his role in the murders, acknowledging his use of a rifle in the commission of the crime. Counsel (John Nuchereno, Esq.) admitted that he had discussed the sentencing parameters and the waiver of right to appeal with defendant and he wished to plead guilty.

15. On the day of sentencing, Mr. Nuchereno advised the court that defendant's guilty plea was entered because he "advised us on his own that he wished to enter that plea" (S 6; numbers in parentheses preceded by "S" refer to pages of the sentence transcript). He noted that since the entry of the plea on March 22, 2006 defendant expressed satisfaction with his plea. Nuchereno explained that on the day before sentencing, he received a letter "ostensibly written by defendant" that he changed his mind and wished to withdraw his plea. Counsel further noted that he immediately visited defendant and learned that the sole basis for wanting to withdraw his plea was that "he had changed his mind" (S 6). Counsel stated that he could not submit an affidavit because there was no allegation that the plea was not knowing and voluntary, or the product of undue pressure by counsel, family or friends (S 6). Defendant's motion was

summarily denied.

16.    Two years after his guilty plea, while being treated at the Central New York Psychiatric Center, defendant admitted "I know I did wrong, but everybody makes mistakes". In November 2009, while still receiving treatment, defendant acknowledged that "he made a bad decision and has to deal with the consequences".

17.    Since about 2011, a federal grand jury convened to address narcotics trafficking, enterprise corruption and homicides relating to these crimes.  Targets of this federal investigation include Misael Montalvo, Efrain Hidalgo, and Brandon Jonas.  Five years after the imposition of his sentence, defendant appeared before the federal grand jury, and for the *sixth time*, defendant again admitted his role in the murders of the Camacho brothers.  Defendant repeated his confession made to Detectives Stambach and Lonergan.  He told the federal grand jury that he went to the victims' home with Uda and Cheko Hidalgo to rob them of drug money and the proceeds of a lottery ticket. He was armed with an AK-47.  He kicked the front door in and found Nelson and tried to take his chain.  Defendant stated that he shot Nelson in the face and arm and also shot Miguel.   By this time, defendant had now confessed five times, in five different forums, each time admitting his guilt.

18.    Defendant's admissions of guilt are inconsistent with the federal government's theory of the case, which relies upon the claims of convicted felons and informants of dubious credibility who have received valued consideration in exchange for their testimony.  If defendant's conviction is allowed to stand, the federal indictment is in jeopardy of being exposed as being built on a house of cards.

19.    After coaxing by federal authorities, defendant appeared before the federal grand jury and for the first time since the crime, testified that he was not involved in the murders.  The

U.S. Attorney eventually turned over the information gleaned from the federal grand jury to the Erie County District Attorney, which was then immediately provided to John Nuchereno, Esq. who filed the instant motion.

20.    Defendant bears the evidentiary burden in questioning a presumptively valid judgment of conviction (*see, People v Sessions*, 34 NY2d 254 [1974]). A judgment of conviction is presumed valid, and the party challenging its validity has a burden of coming forward with allegations sufficient to create an issue of fact (*People v Richetti*, 302 NY 290, 298 [1951]). Once the submission of evidentiary facts creates an issue as to the validity of the judgment, the defendant is entitled to a hearing to determine the truth of his allegations, unless his claim has been conclusively refuted by documentary evidence (*see, People v White*, 309 NY 636, 640 [1956]). Defendant's conviction is based on his sworn admission of guilt on March 22, 2006 that he "intended to cause serious physical injury" to the victims, "meant to kill them" and did so (P. 10-11; numbers in parentheses preceded by "P" refer to pages of the plea transcript), and his sworn admission to former Buffalo Police Detective Mark Stambach, five days after the murders on November 16, 2004.

*Newly Discovered Evidence*

21.    Defendant argues that the 2011 federal investigation which resulted in a federal grand jury indictment of Misael Montalvo, Efrain Hidalgo and Brandon Jonas for the murders of the Camacho brothers, is newly discovered evidence that he did not commit the murders for which he pleaded guilty.   The evidence upon which defendant relies is neither newly discovered, nor can it be used to vacate his conviction based upon his plea of guilt.

22.    The power to vacate a judgment of conviction upon the ground of newly

discovered evidence and concomitantly grant a new trial, rests within the discretion of the hearing court (*see, People v Salemi,* 309 NY 208, 215 [1955], *cert denied* 348 US 845; *People v Tankleff,* 49 AD3d 160, 178 [2nd Dept 2007]). Vacatur of a judgment of conviction on this ground is expressly conditioned upon the existence of a verdict of guilt after **trial** (emphasis added; CPL 440.10[1][g]). In the absence of such a verdict, as when a defendant enters a plea of guilty and forgoes trial, relief is precluded (*People v Sides,* 242 AD2d 750 [3rd Dept 1997], *appeal denied* 91 NY2d 836; *People v Latella,* 112 AD2d 321 [2nd Dept 1985], *lv denied* 65 NY2d 983).

23. Even if such relief was not foreclosed by defendant's guilty plea, it is well settled that newly discovered evidence which serves merely to impeach or contradict former evidence is not enough to set aside a judgment of conviction (*People v Salemi* at 221). Here, the newly discovered evidence, *i.e.,* the federal grand jury testimony and statements of convicted felons, informants and "witnesses" with pending cases who have signed proffer agreements, is of dubious origin and reliability and is insufficient, insofar as it serves to only impeach or contradict "former evidence", *i.e.,* defendant's written statement to the police, his plea allocution and his July 21, 2011 federal grand jury testimony where he again admitted that he killed the victims.

24. Defendant concedes that newly discovered evidence under CPL 440.10[1][g] is not applicable to a guilty plea, but argues that his case is "unusual" and this Court should conduct a hearing "to promote justice". In support of this assertion, he points to the amendment to CPL 440.10, now permitting forensic DNA testing of evidence in cases of defendants convicted after a guilty plea, if the court determines that defendant has demonstrated a substantial probability that defendant was actually innocent of the offense of which he was convicted (CPL 440.10[g-1]). Defendant argues that the purpose of the amendment was to "promote justice", and justice would

be promoted here, where there is evidence and a federal indictment of different men for the same crime.   Even if this Court considers a newly discovered evidence claim applicable to defendant's guilty plea, his motion should be denied.

25.   Effective August 1, 2012, the Legislature enacted CPL 440.10(g-1) allowing for forensic DNA testing in cases where defendant is convicted after a guilty plea of a homicide offense, felony sex offense, or violent felony defined in Penal Law § 70.02 (CPL 440.30[1-a][2]). The legislative history reveals that the rationale for the amendment lay in the fact that some innocent defendants plead guilty due to mental and emotional infirmities and to avoid the prospect of a higher sentence following a guilty verdict (see N.Y. Sponsor's Memo, 2012 A.B. 2908).   Bad decisions should not irrevocably condemn those who are actually innocent.

26.   Granting forensic DNA testing to a defendant who pleaded guilty and whose results indicate that defendant is innocent can be distinguished from the instant case.   The fact that informants, convicted felons and witnesses of dubious credibility have testified that defendant was not present at the crime scene is not the same as DNA results which exclude a defendant.   DNA results, unlike the testimony present here, do not contain inconsistences and is not susceptible to falsehoods.   Notably, CPL 440.30[1-a], [2][ii] permits a court to deny defendant's motion for forensic DNA testing where the defendant has made his motion more than five years after entry of the judgment of conviction, with tolling exceptions.

27.   A defendant may move to vacate a judgment of conviction in a criminal action on the ground that new evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the

defendant (CPL 440.10[1][g]).

28.   Newly discovered evidence in order to be sufficient must fulfill all the following requirements: 1) It must be such as will probably change the result if a new trial is granted; 2) It must have been discovered since the trial; 3) It must be such as could have not been discovered before the trial by the exercise of due diligence; 4) It must be material to the issue; 5) It must not be cumulative to the former issue; and, 6) It must not be merely impeaching or contradicting the former evidence (*People v Salemi* at 215-216; *People v Priori*, 164 NY 459, 472 [1900]). Implicit in this ground for vacating a judgment of conviction is that the evidence must not be incredible (*People v Donald*, 107 AD2d 818 [2nd Dept 1985]), unreliable (*People v Cintron*, 306 AD2d 151 [1st Dept 2003], *lv denied* 100 NY2d 641), or untrustworthy (*People v Balan*, 107 AD2d 811 [2nd Dept 1985]).   The power to grant an order for a new trial based on newly discovered evidence is purely statutory and may be exercised by the court only when the requirements of the statute have been satisfied.   The determination of whether such requirements have been met rests with in the sound discretion of the court.

29.   Defendant has failed to meet his burden of demonstrating that the testimony elicited in the federal grand jury is "newly discovered evidence" which would have affected the outcome of his case and warrant vacatur of his conviction.

*The evidence is not such as will probably change the result if a new trial is granted*

30.   The federal grand jury testimony would not change the result if a new trial is granted because of the numerous inconsistencies as to who murdered the victims, and because it cannot overcome defendant's sworn admissions of guilt.

31.   A reading of the statements and grand jury testimony provided in defendant's

exhibits reveal that the victims were murdered by:

    a. Uda and Efrain "Cheko" Hidalgo (per Josue Ortiz)

    b. Efrain "Cheko" Hidalgo, Frank "Macho" Matias and Brandon Jonas (per Uda Hidalgo , Esteban Acevedo, Frank Matias)

    c. Misael "Misa" Montalvo, Uda Hidalgo and Efrain "Cheko" Hidalgo (per Timothy Ernle)

    d. Brandon Jonas and Efrain "Cheko" Hidalgo (per Jose Escalera)

    e. Josue Ortiz (per Josue Ortiz)

    f. Brandon Jonas and Frank Matias (per Esteban Acevedo)

    g. Misael "Misa" Montalvo, Efrain "Cheko" Hidalgo, Brandon Jonas, Frank Matias (per Frank Matias).

Such numerous, inconsistent and varied versions of who murdered the victims does not overcome defendant's sworn statement to the police, his sworn admission of guilt during the plea colloquy and his sworn federal grand jury testimony admitting his role in the crime.

    32.   Defendant's reliance on *People v Tankleff,* 49 AD3d 160 [2nd Dept 2007] and *People v Deacon,* 96 AD3d 965 [2nd Dept 2012], *lv granted* 19 NY3d 1025, *appeal dismissed* (20 NY3d 1046) must be distinguished.  Both *Tankleff* and *Deacon* involved cases where defendants were convicted after **jury trials** and newly discovered evidence led to vacatur of their convictions.  Here, defendant is asking this Court to disregard the applicability of CPL 440.10(1)(g) to a "verdict of guilty after trial" and apply it to his **guilty plea**.  Notably, defendant has cited no cases where this has been done.

    33.   Luis Camacho, the brother of the victims testified in the federal grand jury that en route to his brothers' home, he was at a stop light at Niagara Street when he saw "two guys

coming out of the house running fast".   He recalled that he knew defendant and he was not one

of the two men he saw running that night (Defendant's Exhibit 33, pg 5, 6).   Camacho did not

see defendant because as defendant testified in his second appearance before the federal grand

jury, he, Uda and Junior "split up" once they got outside.   He crossed Niagara Street while the

others ran in the opposite direction down Massachusetts Street (Defendant's Exhibit 32 pg 20).

Furthermore, this is the first time that Luis Camacho has made this claim.   In his testimony, in

the state grand jury, Camacho identified a photograph of defendant as an individual who had

recently arrived from Puerto Rico and who frequented a bar where Puerto Ricans "hang out".

Luis Camacho did not know if defendant had ever been in his brothers' house.   In fact Mr.

Camacho mentioned nothing about "seeing two men" running across Niagara Street on his arrival

at his brothers' home.      In contrast, in his statement to the Buffalo Police on November 12,

2004, Camacho stated that when he passed the light at Massachusetts Street, he saw "three

people" running towards Massachusetts.   He was only able to describe a "yellow shirt" and

"skinny".

***The evidence could have been discovered before the trial by exercising due diligence***

34.      Defendant claims that the "newly discovered evidence" supplied by the federal

investigation could not have been discovered prior to his guilty plea.   His contention lacks merit.

Defendant was aware of the identity of his co-defendants with whom he committed the crime.

In his statement to Detective Mark Vaughn at Buffalo General Hospital on November 15, 2004,

defendant stated that he was "in fear of his life because the killers were after him" (People's

Exhibit A).   Defendant could have disclosed the names of his associates and an investigation

could have been conducted by defense counsel, or counsel could have provided the information

to the prosecutor and the police for further investigation.   Instead, defendant chose to take responsibility for his actions under oath on three separate occasions.

35.   Defendant claims that while his confession implicated Uda Hidalgo, Uda told the police that he did not know defendant and Uda Hidalgo has not been charged with the murders. However, despite Uda Hidalgo's disclaimer, he has also been implicated in the murders by Timothy Ernle (Defendant's Exhibit 39, pg 7).

### The evidence is not material to the issue

36.   None of the witnesses in the federal investigation called to testify by federal prosecutors implicated defendant in the murders.   However, defendant's sworn admission of guilt on three separate occasions and the fact that he held fast to his admission of guilt (until coaxed by federal investigators), cannot be ignored.   While at the Erie County Holding Center, and prior to his guilty plea, defendant admitted to fellow inmate Ronnie Williams that he killed the Camacho brothers, one of whom was named "Flaco", with the help of two others who were outside (People's Exhibit B).   A review of defendant's Pre-Sentence Memorandum,   reveals that it was counsel's belief that "defendant may well have been recruited to participate in the offense for reasons that remain unknown", and that "upon information and belief, the details provided (in defendant's statement) matched with accuracy the details of the crime scene" (People's Exhibit C).   At sentencing, the court opined that defendant tried to withdraw his guilty plea "because he's just easily led and I think that's what happened on this night" (S 9; numbers in parentheses preceded by "S" refer to pages of the sentence transcript).

37.   Notations in defendant's medical records from the Central New York Psychiatric Center indicate that defendant continued to acknowledge his guilt three years after his plea.   On

Frank Matias testified in the federal grand jury that he was driven to the crime scene with Cheko

Hidalgo and Brandon Jonas by Montalvo in his yellow car.

39.    The following day, on November 12, 2004, the police interviewed Frank Coppola

who told them he was walking home south on Niagara Street when three males wearing dark

hoodies, all about six feet tall ran by him on the sidewalk, headed north.  One threw something

in the yard next to his house.  Upon looking in the area, he found a metal baseball bat which he

pointed out to the police (People's Exhibit H).  In the federal grand jury, Coppola recalled that

the three men were "young, average build, average height" (Defendant's Exhibit 35).

Accomplice Frank Matias testified that Cheko Hidalgo was armed with a bat en route to the

crime scene (Defendant's Exhibit 28).

40.    On November 15, 2004, the police interviewed Misael Montalvo who provided an

alibi for the night of the crime.  He recalled that he was with his girlfriend Carmen Justiniano

at the home of his father-in-law, Segundo Justiano.  Accomplice Frank Matias testified that

Montalvo drove him, Cheko Hidalgo and Jonas to the crime scene but did not get out.  Timothy

Emle testified that Montalvo, who he met in the Erie County Holding Center, told him that Uda

and Cheko Hidalgo murdered the victims and he set up the murders because he was angry with

the victims about drugs and Nelson's girlfriend, Jeilyn.  Montalvo admitted that he drove the

Hidalgo brothers to the crime scene and waited in the car.  The police also spoke to Montalvo's

father-in-law and girlfriend who corroborated his alibi for the time of the murders.

41.    Uda Hidalgo was interviewed by the police on November 17, 2004.  He denied

shooting the victims or knowing them, and did not know the whereabouts of his brother Cheko,

on the night of the crime.  In the federal grand jury, Uda admitted that he lied to the Buffalo

police and did not tell them what he knew.  In fact, his brother Cheko stole an AK-47, and in

early 2004, he overheard him talking to "a fat Puerto Rican dude" about a "lick"- $90,000 in cash and a kilo of cocaine.  On the night of the murders, he saw on the news that two people were killed and went to the Ortiz home, to see if his brother was hurt.  There, he saw Jonas, Matias, his brother and the Puerto Rican.  Cheko was arguing with the Puerto Rican claiming they had been set up to do his dirty work.  In inquiring into who leaked his name to the police, he discovered that it was Matias.  Cheko told Matias to shut his mouth and leave town (Defendant's Exhibit).  The "fat Puerto Rican dude" has not been identified but defendant is Puerto Rican and is 6'5" and wears size 14 shoes (Defendant's Exhibit 31, pg 15).

42.  Esteban Acevedo a/k/a Tebo was also interviewed by the Buffalo police on the night of the crime.  Acevedo revealed that he had just returned home at 53 Massachusetts when he saw three men and "something in their hand".  One wore a gray hoodie and the other two, dark hoodies.  He did not see their faces and refused to come to police headquarters to give a statement.  Eight years after his statement, Acevedo in statements to federal investigators on December 19, 2012 and December 28, 2012 was able to identify the three men he saw on the night of the crime as Cheko Hidalgo, Frank Matias and Brandon Jonas.

43.  Accomplice Frank Matias testimony inculpating himself, Cheko Hidalgo and Brandon Jonas and exculpating defendant is riddled with inconsistencies and refuted by statements of other federal grand jury witnesses.  Matias testified that Jonas shot both victims and all three ran from the home with Jonas carrying the gun.  Cecilio Medina in a statement to a federal investigator, noted that Cheko Hidalgo told him that Jonas gave the gun to Matias, because he was small and ran fast as they fled the scene.  Matias also testified that Jonas threw the gun in the bushes four to five houses away from the crime scene.  Federal grand jury witness Jose Escalera testified that Misael Montalvo told him that Jonas and Cheko Hidalgo came to

Sammy Ortiz' house where they stashed the guns and left. Matias recalled that they all ran to Sammy Ortiz' house where Sammy's mother Sonya took everyone's clothing which had no blood on them. Sammy then put the clothing in a hole in the basement wall. Uda Hidalgo testified that Jonas told him that he threw his clothes in someone's garbage can, while Jose Escalera recalled that Misael Montalvo told him that while he was at the Ortiz house, Cheko Hidalgo and Jonas came over "full of blood".

44.     Upon information and belief, Uda Hidalgo passed a polygraph test administered on November 12, 2012, wherein he denied that he was present at the crime scene. This contradicts defendant's statements to the Buffalo police, his testimony before the federal grand jury on July 21, 2011 and the testimony of Timothy Ernle that Misael Montalvo told him that Uda and Cheko Hidalgo killed the victims. Upon information and belief, the government has opined that while Montalvo was the master-mind of the murders, he believed that both Brandon Jonas' and Frank Matias was Uda Hidalgo. This opinion is refuted by the interview of Misael Montalvo conducted by the Buffalo police on November 15, 2004 where Montalvo identified a photograph of Brandon Jonas as Cheko Hidalgo's cousin, indicating that he knew that Jonas was not Uda Hidalgo.

45.     Evidence that Uda Hidalgo, Cheko Hidalgo, Frank Matias, Brandon Jonas and Misael Montalvo killed the victims does not make defendant's admission that he was present and participated in the murders any less likely. Defendant was charged as an accomplice with the murders of Nelson and Miguel Camacho. Early investigation of the crime revealed that witnesses saw two or three men fleeing the scene. Defendant was not identified because as he told the police, he split up from the other two and ran in the opposite direction down Massachusetts Street.

46.     In his testimony before the federal grand jury on September 13, 2012, defendant recalled that he was not involved with the murders and was not present at the crime scene.  He revealed that the details he provided to the police were gathered from conversations he heard at the funeral of the victims.  Notably, other than stating that Luis Camacho mentioned that his brother Miguel (Flaco) called him during the crime and told him "they" were killing Lobo (Nelson), the identity of the other individuals whose conversations he overheard was never revealed.  Defendant testified that he lied to the police about the three weapons used (AK-47, pistol and shotgun), about seeing money and drugs in the home and about taking Nelson's (Lobo's) chain.

47.     The detail and specificity of the information defendant provided to the police five days after the crime could only have come from a participant in the crime.  Thus, defendant's admission to the police was made based on his participation or this court must believe that his accomplices attended the funeral and discussed their roles in the crime.  While certain details may have become public knowledge by the time of the funeral, *i.e.*, the number of participants and what Luis Camacho saw when he discovered his brothers, no one who was not a participant would have had knowledge of the victims' specific location in the house when the door was kicked in or that a chain was taken from Nelson Camacho's neck.  Defendant in his statement to the police identified his accomplices as Uda Hidalgo and "Uda's brother".  While not named, Cheko Hidalgo is Uda Hidalgo's brother.  Frank Matias testified in the grand jury that Cheko Hidalgo "ripped something" from Nelson Camacho's neck.  Defendant also told the police that Miguel Camacho (Flaco) was in the rear of the home and was armed with a gun.  Accomplice Frank Matias told the grand jury that Cheko Hidalgo broke down a door in the rear of the home and encountered Miguel Camacho who pointed a handgun at his chest (Matias).

48.     To date, defendant has provided no reasonable explanation why he admitted to a crime, he now claims he did not commit.  Even in the grand jury, defendant noted that it was "hard to explain why he said he was involved" (Defendant's Exhibit 31, pg 28).   While attributing it to a lack of sleep, it is difficult to fathom that someone would admit to a crime they were not involved in based on sleep deprivation (Defendant's Exhibit 31, pg 28).  Defendant has never addressed his statement to fellow inmate Ronnie Williams, or explained where Williams would have acquired the information.    While defendant told Ronnie Williams that he was "high" when he killed the victims, the pre-sentence report notes that it was "unknown" whether drugs were used at the offense.  Additionally, he has offered no explanation for why he would inculpate Uda and Cheko Hidalgo as his accomplices, while now claiming he did not know them. Defendant's claim that Detective Mark Stambach provided him Uda's name and told him Uda's brother was present too is at best specious.   Upon information and belief, an anonymous caller to the police tip line stated that Uda was involved in the murders.  Even if defendant is to be believed that Detective Stambach provided him Uda's name, he offers no explanation for the information naming Uda's brother and the details of the crime to which he was privy.  Clearly, the tip line caller did not provide the details defendant gave to the police.

49.     Tellingly, defendant declined to make a statement to the probation officer for the pre-sentence investigation.  While he told the probation officer that he had decided to withdraw his guilty plea, he did not assert his innocence to the probation officer.

50.     When defendant's alleged newly discovered evidence is viewed against the record, the most that can be said concerning it is that at best, it is cumulative or designed merely to impeach or contradict the former evidence.  It throws no new light on the issue (*People v Priori*, 164 NY 459 [1900]).

51.   "The admission of third-party culpability may not rest on mere suspicion or surmise" (*People v Primo*, 96 NY2d 351, 357 [2005]).   While evidence tending to show that another party might have committed the crime would be admissible,  before such testimony can be received there must be such proof of connection with it, such a train of facts or circumstances as tend to clearly point out someone besides the prisoner as the guilty party (*People v Schulz*, 4 NY3d 521, 529 [2005]).   Here, there is no "train of facts or circumstances" which tend to "clearly" point out that defendant is not the guilty party.   At best, the only thing that is unclear is the identity of defendant's accomplices.

### Defendant is not actually innocent

52.   In a related claim, defendant argues that he is actually innocent of the crimes to which he pleaded guilty.   Specifically, he avers that his "innocence" is derived from the testimony of the federal grand jury witnesses exculpating him and the federal indictment of Misael Montalvo, Efrain "Cheko" Hidalgo and Brandon Jonas for the murders of Nelson and Miguel Camacho.   Defendant's contention is without merit.

53.   To date, while several trial courts to address the issue have concluded that a free-standing claim of actual innocence may be raised under CPL 440.10[1][h], (*see, People v Cole*, 1 Misc.3d 531 [Sup Ct. Kings County 2003]; *People v Bermudez*, 25 Misc.3d 1226(A)[Sup Ct. New York County]), there is no appellate authority expressly holding that a free-standing claim of actual innocence can be raised under CPL 440.10[1][h]. (*see, People v Tankleff*, 49 AD3d 160 [2nd Dept 2007]; *People v Deacon*, 96 AD3d 965 [2nd Dept 2012], *lv granted* 19 NY3d 1025, *appeal dismissed*  20 NY3d 1046).   Nevertheless, where recognized, a defendant must, in order to establish actual innocence, demonstrate by clear and convincing evidence that

he is in fact actually innocent of the crimes of which he was convicted. In other words, no reasonable juror could convict defendant of the crime for which he was found guilty. Under this standard, defendant has not met his burden.

54. First, defendant admitted under oath that he killed the victims. He maintained his guilt in statements to correctional facility hospital personnel and again before the federal grand jury. The testimony of the witnesses before the federal grand jury, while exculpating defendant, is riddled with inconsistencies and is incredible. In fact, despite testimony inculpating Uda Hidalgo in the murders, he was not indicted. Most of the witnesses are either convicted felons or are facing indictment on other unrelated charges. The government's "star" witness, Frank "Macho" Matias has been offered immunity from prosecution for his role in the murders, in exchange for "truthful" testimony.

55. Defendant's motion must be denied because his request for vacatur of his conviction on the ground of newly discovered evidence is based on the entry of a judgment based upon a verdict of guilty after a trial, and is not applicable to defendant's guilty plea. His claim of actual innocence should also be rejected because defendant has failed to demonstrate by clear and convincing evidence that he is in fact actually innocent. Defendant is asking this Court to ignore his knowing, voluntary and intelligent guilty plea and the Fourth Department's decision that he was competent to proceed. Pursuant to CPL 440.30[4][d], this Court may deny defendant's motion without conducting a hearing, if "an allegation of fact essential to support the motion (i) is contradicted by a court record or other official document and (ii) under these and all other circumstances attending the case, there is no reasonable possibility that such allegation is true".

56. The testimony elicited in the federal grand jury from informants, convicted felons

and witnesses with pending cases, consists of inconsistent versions of the murders and the events preceding and post dating them.   Perhaps, the most striking feature of defendant's motion is his total failure to address his sworn admissions of guilt, as if it does not bear on the question before this Court.   The evidence against defendant is overwhelming.   He has admitted his guilt on numerous occasions and his statement to the police corresponds to the evidence discovered at the scene.   Against this overwhelming and conclusive evidence of his guilt, defendant has offered nothing to support his claim that he is actually innocent or that what he characterizes as "newly discovered evidence" merits vacatur of his conviction.

WHEREFORE, in light of defendant's failure to raise any meritorious grounds for relief, it is respectfully requested that defendant's motion be denied in its entirety.

DONNA A. MILLING
ASSISTANT DISTRICT ATTORNEY

Subscribed and sworn to before me
this 12th day of July, 2013.

MICHAEL J. HILLERY
Notary Public, State of New York
Qualified in Erie County
My commission expires on 3/29/2014.

STATE OF NEW YORK
COUNTY COURT  :  COUNTY OF ERIE

THE PEOPLE OF THE STATE OF NEW YORK,
                    Respondent                          AFFIDAVIT OF SERVICE

                    v                                    Indictment No.
                                                         02630-2004
JOSUE ORTIZ,
                    Defendant-Appellant

STATE OF NEW YORK  )
COUNTY OF ERIE      )  SS:
CITY OF BUFFALO     )

          KRISTY A. SWANSON, being duly sworn, deposes and says:

          That she is over the age of twenty-one (21) years and is
employed by the County of Erie at the Erie County District
Attorney's Office; that on July 12, 2013, she served the within
Opposing Affidavit upon JOHN R. NUCHERENO, ESQ., attorney for
defendant-appellant, addressed to JOHN R. NUCHERENO, ESQ., at his
office located at 2503 NIAGARA STREET, BUFFALO NY 14207, by
depositing a true copy of same, securely enclosed in a postpaid
wrapper, in a Post Office box regularly maintained by the United
States Postal Service at the Erie County Hall in the City of
Buffalo, New York in the above-captioned matter.

                                        _____
                                        KRISTY A. SWANSON

Subscribed and sworn to before
me on July 12, 2013.

_____
     DONNA A. MILLING
Notary Public, State of New York
Qualified in Erie County
My Commission Expires February 9, 2016.

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

THE PEOPLE OF THE STATE OF NEW YORK

**SUPPLEMENTAL
OPPOSING AFFIDAVIT**

v

JOSUE ORTIZ,
                                    Defendant

Indictment No. 02630-2004

STATE OF NEW YORK    )
COUNTY OF ERIE        )  ss.
CITY OF BUFFALO       )

DONNA A. MILLING, being duly sworn, deposes and says:

1.       I am an attorney duly admitted to the practice of law in the State of New York.

2.       I am an Assistant District Attorney, appearing of counsel to FRANK A. SEDITA, III, District Attorney of Erie County, on behalf of the People of the State of New York.

3.       This supplemental affidavit is submitted in opposition to defendant's supplemental motion to vacate his conviction pursuant to CPL 440.10(g-1) and the affidavit of JOHN R. NUCHERENO ESQ., attorney for defendant, dated July 17, 2013, and received in the District Attorney's Office on July 17, 2013.

4.       Unless otherwise stated herein, this affidavit is made upon information and belief, the source of which is my review of the confidential file of the District Attorney's Office, records of prior proceedings and a reading of defendant's supplemental motion papers.

5.   Unless expressly acknowledged, the People dispute and contest each and every allegation and representation contained in defendant's motion and counsel's affirmation.

6.   By motion papers dated April 23, 2013, defendant moved to vacate his conviction pursuant to CPL 440.10[1],[g,][h].  Specifically, defendant alleged that newly discovered evidence

-1-

unearthed during a federal investigation and which has resulted in a federal indictment of three individuals for murders he has admitted to committing, should result in vacatur of his conviction. In a related claim, he argued that this newly discovered evidence also proves that he is actually innocent of the crimes to which he pleaded guilty.

7. The People filed an opposing affidavit on July 12, 2013. Oral argument of the motion is scheduled on July 29, 2013.

8. As grounds for his supplemental motion, defendant claims that DNA testing performed since the entry of the judgment demonstrates a substantial probability that he is actually innocent of the offense of which he was convicted (CPL 440.10(g-1). In reliance on the lab reports (Defendant's Exhibits A, B, C), defendant argues that DNA testing on the handle and barrel of a baseball bat, a necklace and driver's license has excluded him as a contributor to genetic material on the items. Defendant also requests that should this Court decide to deny his motion in reliance on the motion papers submitted by both parties, he requests that a hearing be granted. Defendant's supplemental motion should be denied.

9. Defendant's request for a hearing should his motion be denied on the papers is not supported by the statute. CPL 440.30[1][a] states that "after all papers of both parties have been filed...... the court must consider the same for the purpose of ascertaining whether the motion is determinable without a hearing to resolve questions of fact". CPL 440.30[4][d] states that a court *may* deny the motion *without* conducting a hearing where "an allegation of fact essential to support the motion is (i) contradicted by a court record or other official document" - here, defendant's plea allocution. It is only if the court does not determine the motion pursuant to CPL 440.30 (2),(3) or (4), that it must conduct a hearing and make findings of fact essential to the determination thereof (CPL 440.30[5]).

-2-

Case 23-352, Document 52, 06/27/2023, 3534010, Page230 of 253

A-959

10. Traditionally, CPL 440.10 relief was limited to a judgment of conviction after a trial. Effective August 1, 2012, CPL 440.10(g-1) carved out a narrow exception when DNA testing clearly and unequivocally calls into question defendant's guilty plea. To prevail, a defendant convicted after a guilty plea must demonstrate "a substantial probability that he was actually innocent of the offense of which he was convicted". The statute does not provide an exception for a divergent or competing federal theory of a defendant's case.

11. The DNA results on which defendant relies for vacatur of his conviction are equivocal and, at best, inconsequential, to the question of defendant's guilt. This case does not present the classic DNA case where semen from a rape kit excludes the convicted rapist because the genetic profile is that of another, or a murder case where DNA on the murder weapon excludes the convicted murderer and inculpates another.

12. Ironically and disturbingly, the DNA results strongly support that the testimony of Frank "Macho" Matias, the federal government's immunized star witness was untruthful. Indeed, the DNA results, coupled with the multiple admissions made by defendant (as recently as July 21, 2011 before the federal grand jury), strongly suggests that the federal government secured the indictment of the wrong person or persons in connection with the homicides of the Camacho brothers.

13. The DNA results excluding defendant are inconsequential and indeed a red herring, because the absence of defendant's DNA is on a weapon defendant never wielded - a baseball bat. However, the absence of DNA on the baseball bat is relevant as to Frank "Macho" Matias because he claimed in his grand jury testimony that he wielded that bat.

14. Contrary to defendant's contention, the DNA results do not demonstrate a substantial probability that he was actually innocent of the murders of the Camacho brothers to which he pleaded guilty. A federal indictment has charged defendants Misael "Misa" Montalvo,

-3-

A-960

Efrain "Cheko" Hidalgo and Brandon Jonas with the murders of Nelson and Miguel Camacho. Prior to its investigation and the filing of the federal indictment, the federal government was aware that defendant had pleaded guilty as an accomplice to the murders of the Camacho brothers. Since that time, defendant has confessed to the murders in five additional forums, including once before the same federal grand jury that indicted Montalvo, Hidalgo and Jonas.

15. Defendant's Exhibit A, dated May 25, 2012, eleven months before defendant filed his initial motion, reveals that DNA testing was performed on the handle of a bat allegedly used in the crime. Testing reveals that the DNA of both Camacho brothers is present on the bat and that Luis Camacho and Uda Hidalgo are excluded as contributors to the genetic material on the handle of the bat. Defendant's DNA was not compared to the genetic material on the handle of the bat and as a result, he cannot be excluded.

16. In his sworn statement to the police admitting his role in the murders, in his sworn plea colloquy and in his sworn grand jury testimony on July 21, 2011, defendant never mentioned the use of a bat during the crime.

17. Defendant's Exhibit A also notes that no DNA profile was obtained from the swab of a necklace. Presumably, this is the necklace that defendant told the police in his sworn statement and testified in the federal grand jury that he "tried" to take from Nelson Camacho when he (defendant) confronted Nelson inside the front door of the home.

18. Defendant's Exhibit B, a lab report dated December 14, 2012, four months *before* defendant filed his initial motion indicates that DNA testing on the handle of the baseball bat revealed male DNA with activity from at least two individuals. Defendant, Brandon Jonas and Frank "Macho" Matias have been excluded as contributors to the genetic material on the handle of the bat. Defendant points to his exclusion as a contributor to the DNA on the bat handle, but conveniently

-4-

ignores the problem that the exclusion of Frank "Macho" Matias, the federal government's star witness and the lynchpin of their indictment, poses.

19. On the night of the crime, Detective Richard Wagstaff responded to the scene and interviewed Steven Acevedo, a/k/a Tebo (People's Exhibit H). Acevedo reported that he had just come home when he saw three men and "they had something in their hand". He was unable to see their faces. Eight years later and with a pending federal indictment, Acevedo now recalls that of the three men he saw that night, one was Frank "Macho" Matias, one, he "don't really know", and the other, he "could not remember his name, but his brother killed his girl". Efrain "Cheko" Hidalgo's brother, Uda Hidalgo is serving a 25 year sentence for killing his girlfriend Helyna Rivera. Acevedo also remembered that one man had a bat which he threw in the yard behind his house and one had a long gun (Defendant's Exhibit 17).



20. Convicted felon and admitted accomplice, Frank "Macho" Matias testified in the federal grand jury that he participated in the murders of the Camacho brothers with Efrain "Cheko" Hidalgo and Brandon Jonas. (Defendant's Exhibit 28). Matias recalled that all three were driven to the scene by Misael Montalvo, at which time Cheko exited the car, wearing gloves and armed with a baseball bat (pg 57). At the front door to the home, Cheko handed the bat to Matias, while Cheko kicked in the door. Once inside, Cheko took the bat back from Matias (Pg 65). Matias recalled that he was already on the curb outside when he heard the final shot inside the home (pg 71). Minutes later, Jonas ran past him with the gun, but "there was no bat to be seen" (pg 72). Matias assumed that Cheko "tossed" it. (pg 72).

21. Defendant's exclusion from the genetic material on the handle of the baseball bat can be explained because defendant has never stated that a bat was used by him or any of his co-defendants. What cannot be explained is the exclusion of Matias who testified under oath that he had the bat at some point during the crime.

Case 23-352, Document 52, 06/27/2023, 3534010, Page233 of 253

A-962

22. A driver's license, the identity and relevance of which has not been explained, has also been subjected to DNA testing and excludes, the Camacho brothers, Jonas, defendant and Uda Hidalgo as contributors. Since there has never been any testimony concerning a driver's license, defendant's exclusion is irrelevant.

23. DNA testing on the barrel of the baseball bat indicates the presence of genetic material belonging to Nelson Camacho. Notably, there has been no testimony that a bat was used to inflict injury on Nelson Camacho. Miguel Camacho, Luis Camacho, Jonas, Matias, defendant and Uda Hidalgo have all been excluded from the genetic material on the barrel of the bat. Frank Matias who admittedly was armed with the bat has been excluded.

24. Defendant's Exhibit C, dated June 17, 2013, indicates that DNA testing performed on the handle and barrel of the baseball bat and the driver's license have excluded Efrain "Cheko" Hidalgo as a contributor to the genetic material. Efrain "Cheko" Hidalgo has been indicted for the murders of the Camacho brothers based on the testimony of informants and convicted felons. Specifically, the federal government's star witness Frank Matias, testified that Hidalgo was armed with the bat while inside the home and disposed of it as he fled the scene. Defendant has provided no explanation for Hidalgo's exclusion from an item which he allegedly was in possession of on the night of the crime.

25. While defendant is correct that the reports do not connect him to the murders, they also do not connect two of the indicted defendants (Hidalgo and Jonas), or Matias, the admitted accomplice. Far from demonstrating a substantial probability that he is innocent of the crimes of which he was convicted, the reports show that defendant's conviction is the chief impediment to the federal government's prosecution which appears to be a house of cards with a foundation of quicksand.

-6-

A-963

26. The difference between the grounds for vacatur of a judgment premised on a verdict after trial and a guilty plea is understandable. Plainly, in the guilty plea situation, the defendant has in open court said he was in fact guilty and is seeking to vacate the conviction on the grounds that subsequent DNA testing proves he falsely admitted his guilt. Thus, the requirement for vacatur of a judgment after a guilty plea is that there be a "substantial probability" that the defendant was "actually innocent" (William C. Donnino, Practice Commentary, Mckinney's Cons Laws of N.Y., 2012 Electronic Update, Penal Law § 440.10). In recommending this standard, the Justice Task Force "recognized the need to provide a formal mechanism to exonerate the innocent post-plea, while also acknowledging the importance of preserving the integrity of the plea process, maintaining a level of finality in the system and attempting to prevent frivolous petitions from guilty defendants seeking to take advantage of the system" (Task Force Recommendations).

27. Defendant has confessed to the murders of Nelson and Miguel Camacho in six different forums. The DNA results from the bat and driver's license excluding him and which defendant relies on for vacatur of his motion, can be explained by defendant's various admissions which make no mention of a bat or a driver's license. Importantly, defendants Jonas and Hidalgo who have been indicted for the murders have been excluded. Clearly, the evidence on which defendant is asking this Court to rely to prove his innocence and for vacatur of his conviction is seriously flawed and cannot be believed.

28. Defendant has failed to demonstrate a substantial probability that he was actually innocent of the crime of which he was convicted. It is respectfully requested that his motion be denied in its entirety.

A-964

**WHEREFORE,** the People respectfully request that an Order be granted denying defendant's motion.

DONNA A. MILLING
ASSISTANT DISTRICT ATTORNEY

Subscribed and sworn to before me
this 25th day of July, 2013.

MICHAEL J. HILLERY
Notary Public, State of New York
Qualified in Erie County
My commission expires on March 29, 2014.

A-965



OFFICE OF THE ERIE COUNTY DISTRICT ATTORNEY

FRANK A. SEDITA, III
DISTRICT ATTORNEY

December 4, 2013



HON. THOMAS P. FRANCZYK
ERIE COUNTY COURT PART 20
ERIE COUNTY COURTHOUSE
BUFFALO NY 14202

      Re:    People v JOSUE ORTIZ
             Indictment No.  02630-2004

Dear Judge Franczyk:

      Enclosed is a Supplemental Opposing Affidavit and an affidavit of service in the above-referenced matter.

             Very truly yours,

             FRANK A. SEDITA, III
             DISTRICT ATTORNEY

      By:   DONNA A. MILLING
           Assistant District Attorney
           Chief, Appeals Bureau

DAM/sc
Enc.
c:  John R. Nuchereno, Esq.

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

THE PEOPLE OF THE STATE OF NEW YORK

                                              **SUPPLEMENTAL**
                                              **OPPOSING AFFIDAVIT**

                             v

JOSUE ORTIZ,                                  Indictment No. 02630-2004
                            Defendant

STATE OF NEW YORK    )
COUNTY OF ERIE       ) ss.
CITY OF BUFFALO      )

DONNA A. MILLING, being duly sworn, deposes and says:

1.      I am an attorney duly admitted to the practice of law in the State of New York.

2.      I am an Assistant District Attorney, appearing of counsel to FRANK A. SEDITA, III, District Attorney of Erie County, on behalf of the People of the State of New York.

3.      This supplemental affidavit is submitted in opposition to defendant's motion to vacate his conviction pursuant to CPL 440.10[1][g][h] dated April 23, 2013, the affidavit of EMILY TROTT, ESQ. dated August 28, 2013, defendant's second Supplemental Affidavit dated September 19, 2013 and defendant's third Supplemental Affidavit dated October 1, 2013, received in the District Attorney's Office on September 5, 2013, September 23, 2013 and October 3, 2013 respectively.

4.      Unless otherwise stated herein, this affidavit is made upon information and belief, the source of which is my review of the confidential file of the District Attorney's Office, records of prior proceedings and a reading of defendant's motion papers and exhibits.

5.      Unless expressly acknowledged, the People disclaim, dispute and contest each and every allegation and representation contained in defendant's motion papers, counsel's affirmation and the Trott affidavit.

A-967

6.   The Trott affidavit submitted to this Court by defendant further cements the People's argument that the federal government has been cajoling witnesses since 2011 in its quest for evidence to support its theory of the Camacho homicides.  It also sheds light on what could be characterized as the less than meaningful representation provided by Ms. Trott, and the federal government's failure to reveal its true intentions.

7.   Ms. Trott admits that she met defendant for the first time on July 14, 2011, when she was asked to represent him in preparation for his testimony in the federal grand jury.  After fifteen minutes of conversation with defendant who told her that the case in which he was about to testify involved drug dealing, defendant entered the grand jury room (Paragraphs 2, 4).  Trott noted that defendant entered and left the grand jury on eight occasions that day after refusing to testify (Paragraphs 4, 6, 9, 13, 14).  The proceedings were ultimately adjourned that day, to ascertain whether defendant would be granted immunity for his testimony.

8.   Trott candidly admitted that despite conversations with AUSA Tripi, she was unaware that the federal grand jury was investigating the Camacho murders, and that she had no information concerning defendant's manslaughter conviction, and had not had sufficient time to address defendant's reluctance to testify (Paragraph 10).  Clearly, Ms. Trott, like defendant, had become another pawn in the federal government's game.  Without full knowledge of the federal government's undertaking, Ms. Trott was not in a position to properly represent her client.

9.   On July 21, 2011, after defendant was granted immunity, he testified in the grand jury again admitting his role in the murder of the Camacho brothers.  Approximately, one year later on September 13, 2012, defendant appeared before the grand jury for a third time, this time testifying that he had lied in his July 21, 2011 testimony, and was not present nor had any role in the murder of the Camacho brothers.

10.  According to Ms. Trott's affidavit, it appears that a factor in defendant's sudden "innocence" was proof provided by the federal government that DNA evidence had exonerated him.

Additionally, defendant "feared" that "the brother" who had revealed details of the crime to him would kill him had he gone to trial (Paragraph 31).

 11. While "the brother" is not identified, defendant claimed that he learned the details of the crime from Luis Camacho who discussed it at the funerals. However, defendant fails to explain why Luis Camacho would want to kill him because he chose to go to trial. While speculative, it can be argued that Luis Camacho would be interested in seeing that the person who murdered his brothers would be held responsible for his actions.

 12. Notably, the DNA evidence which so "thrilled" defendant (Paragraph 26) and led to his claim of innocence, is at best equivocal. Defendant is excluded from a baseball bat he never wielded, and a driver's license whose connection to the case is unexplained. Disturbingly, those same DNA results which defendant claims exonerate him, also exculpate Frank Matias and Cheko Hidalgo, the two people, who according to Matias, wielded the bat. The DNA results also exculpate Brandon Jonas and Cheko Hidalgo, both of whom have been indicted by the federal government for the murders.

 13. Defendant's second supplemental affidavit dated September 19, 2013, revisits his argument that he learned of the details of the murder which he provided to Detective Mark Stambach in his sworn statement, from Luis Camacho at the funerals and from the streets. These arguments have been addressed in the People's prior opposing affidavits and during oral argument of the motion.

 14. Additionally, defendant notes that in his statement, he made no mention of the use of a baseball bat at the crime scene. He claims that he was not privy to this information because Luis Camacho (from whom he learned the details) was also not privy to this information because when he arrived at the scene, the bat had already been taken by Cheko Hidalgo. What defendant ignores is that DNA testing has excluded Cheko Hidalgo from the baseball bat.

 15. In his third supplemental affidavit dated October 1, 2013, defendant contends that Esteban Acevedo identified Cheko Hidalgo as the man he saw with Frank "Macho" Matias and

Brandon Jonas in front of his house on the night of the murders, and who he saw run out of the Camacho brothers' house after shots were fired. Defendant acknowledges that Acevedo was unable to positively identify Brandon Jonas as the man he saw that night, but did not connect defendant or Uda Hidalgo to the crime.

16.   On the night of the crime, Buffalo police interviewed Esteban Acevedo. Mr Acevedo who refused to give a statement or go to police headquarters, told them that he saw three men with something in their hands. One wore a gray hoody and the other two wore dark hoodies. **He did not see their faces** (People's Exhibit H). Eight years later on December 19, 2012, Acevedo gave a statement that he saw three men, one of whom was Matias. One man had a bat which he threw in the yard behind his house and one had a long gun. He recalled that **his sons told him that Jonas was the shooter** (Defendant's Exhibit 17).

17.   Nine days later, after another interview with the F.B.I., Acevedo was now able to state that the three men he saw that night were Cheko, Matias and Brandon (Defendant's Exhibit 18). The information he provided, he claimed he learned from Cheko and Matias. Notably, hours after the crime, Acevedo stated that he did not see the faces of the three men. Eight years later, and time spent in the presence of federal agents allowed him to exculpate defendant and Uda Hidalgo and inculpate Cheko Hidalgo and Frank Matias.

18.   The People continue to rely on prior opposing affidavits filed and respectfully request that defendant's motion be denied in its entirety.

DONNA A. MILLING
ASSISTANT DISTRICT ATTORNEY

Subscribed and sworn to before me
this 4th day of December, 2013.

MICHAEL J. HILLERY
Notary Public, State of New York
Qualified in Erie County
My commission expires on March 29, 2014.

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

---

THE PEOPLE OF THE STATE OF NEW YORK,
                                    Respondent

                    v

JOSUE ORTIZ,
                                    Defendant

---

AFFIDAVIT
OF SERVICE

Indictment No.
02630-2004

STATE OF NEW YORK )
COUNTY OF ERIE    ) SS:
CITY OF BUFFALO   )

SYLVIA COLLINS, being duly sworn, deposes and says:

That she is over the age of twenty-one (21) years and is employed by the County of Erie at the Erie County District Attorney's Office; that on December 4, 2013, she served the within Supplemental Opposing Affidavit upon John R. Nuchereno, Esq., attorney for defendant-appellant, addressed to John R. Nuchereno, Esq., at his office located at 2503 Niagara Street, Buffalo, New York, 14207 by depositing a true copy of same, securely enclosed in a postpaid wrapper, in a Post Office box regularly maintained by the United States Postal Service at the Erie County Hall in the City of Buffalo, New York in the above-captioned matter.

SYLVIA COLLINS

Subscribed and sworn to before
this 4th day of December, 2013.

DONNA A. MILLING
Notary Public, State of New York
Qualified in Erie County
My Commission Expires February 9, 2016.

**A-971**



## OFFICE OF THE ERIE COUNTY DISTRICT ATTORNEY

### FRANK A. SEDITA, III
#### DISTRICT ATTORNEY

January 21, 2014

HON. THOMAS P. FRANCZYK, J.C.C.
ERIE COUNTY COURT PART 20
ERIE COUNTY COURTHOUSE
BUFFALO NY 14202

Re:   People v Josue Ortiz
Indictment No.: 02630-2004

Dear Judge Franczyk:

That Defendant Josue Ortiz murdered the Camacho brothers was never called into question until that fact inconveniently interfered in a theory developed by the United States Attorney's Office investigation into gang violence on Buffalo's West Side. Mr. Ortiz maintained his guilt in his confession, his sessions with his psychiatrists, conversations with fellow inmates, and, presumably, with his attorney. (While of course we are not privy to those attorney/client consultations, there is no way Mr. Nuchereno, a revered trial lawyer, would have permitted his client to plead guilty were there any doubt in his mind.)

In the motion before this Court, defendant has moved for vacatur of his conviction on the grounds of newly discovered evidence (CPL 440.10[1][g]) and on a claim of "actual innocence." The "newly discovered evidence" upon which defendant relies is the 2011 federal investigation which resulted in a federal grand jury indictment of Misael Montalvo, Efrain Hidalgo and Brandon Jonas for the November 11, 2004 murders of Nelson and Miguel Camacho. He also argues that the testimony of the witnesses before the grand jury and the resulting indictment are proof of his actual innocence. While defendant has moved for vacatur of his conviction under CPL 440.10[1][h], he has not alleged that he was denied *Brady* material prior to his guilty plea. Indeed, since neither the prosecutor nor the defense disputed the involvement of Mr. Ortiz, there was no exculpatory material to withhold from him. As it appears that extraneous facts have distracted the parties from the matter at issue, I will again articulate the People's position as it concerns defendant's motion.

Defendant was indicted by a grand jury and charged with four counts of first degree murder, four counts of second degree murder and one count of first degree burglary. The primary evidence against him was his confession; his principal defense centered on mental competency.

HON. THOMAS P. FRANCZYK, J.C.C.
January 21, 2014
Page 2


After negotiations between defense counsel and this office, he pleaded guilty to two counts of first degree manslaughter and received a bargained-for sentence on each count of twenty-five years imprisonment with five years post release supervision, to be served concurrently. Obviously, both sides recognized the risks inherent with proceeding to trial and negotiated a disposition satisfactory to all parties. I was able recently to speak with the trial prosecutor, now Erie County Court Judge Kenneth Case, who recalls that efforts were made by both the prosecution and defense to encourage defendant to co-operate and reveal the names of his accomplices, all to no avail. Defendant insisted that he would be harmed if he were to do so. Only after Luis Camacho, a brother of the victims insisted that we agree to a plea bargain did we consent. Indeed, by any measure, Mr Nuchereno obtained an outstandingly favorable result for Mr Ortiz.

A copy of the plea colloquy has previously been provided to this Court. In the seven years following his guilty plea, defendant has reaffirmed his guilt on no fewer than six occasions, including at least three times while under oath. For reasons not made known to the Erie County District Attorney's Office, the U.S. Attorney's office has advanced a theory that others, not including defendant, participated in the murders of the Camacho brothers, and in an effort to secure an indictment, granted immunity to Frank Matias, one of the alleged participants. When brought before a federal grand jury investigating potential federal crimes connected to narcotics offenses and the murders of the Camacho brothers, Mr Ortiz, not surprisingly, again testified that he was one of the principals. Eventually, after eight years, and several visits by federal authorities, he succumbed and provided the U.S. Government a version of events consistent with its theory.

Upon learning about the federal government's new theory, the People reviewed the testimony and documents provided to Mr Nuchereno by the federal government and determined that while the defendants named in the federal indictment may have participated in the murder, there is no credible evidence to support any theory of culpability which excludes Mr Ortiz. Assuming their accuracy, any inferred contradiction with defendant's sworn written confession, testimony and guilty plea is easily explained by his description of his flight from the scene, to wit: his accomplices ran in one direction, he ran alone in the opposite direction. Luis Camacho, the brother of Nelson and Miguel, who was the first person on the scene after responding to Miguel's call for help, observed two men come running out of the house, neither of which was defendant (Defendant's Exhibit 33). Defendant was not one of the two men, because, by his own account, he ran in the opposite direction from his companions.

Trial prosecutor Kenneth Case fulfilled his obligations under the *Brady* doctrine. It appears that this Court may be directing its focus on the varying height descriptions of men seen fleeing the crime scene and whether defense counsel was privy to this information prior to defendant's guilty plea. A guilty plea generally represents a compromise bargain struck after negotiation between defendant and the People. As such, it marks the end of a criminal case, not a

HON. THOMAS P. FRANCZYK, J.C.C.
January 21, 2014
Page 3

gateway to further litigation.  More than a confession, a guilty plea signals defendant's "intention
not to litigate the question of his guilt, and necessarily involves the surrender of certain constitutional
rights (*People v Taylor*, 65 NY2d 1[1985]; *People v Lynn*, 28 NY2d 196, 201-202[ 1971]).  By
pleading guilty, defendant waived any claim of a *Brady* violation (*see People v Day*, 150 AD2d
595[2nd Dept 1989]; *People v Knickerbocker*, 230 AD2d 753[2nd Dept 1996], *lv denied* 89 NY2d
943; *People v Philips*, 30 AD2d 621[2nd Dept 2006], *lv denied* 8 NY3d 949 *reconsideration denied*
8 NY3d 989).  To be considered exculpatory and therefore subject to disclosure under *Brady*, the
withheld evidence must actually bear on the issue of the defendant's guilt or innocence.  The varying
descriptions provided by the witnesses are not a description of defendant, but of men they saw
fleeing the scene.  Even if the People had an obligation under *Brady* to turn over these statements
and that they were relevant to defendant's participation in the crime, if anything this information
goes to the issue of factual guilt which while appropriate for litigation at trial, was waived by his
guilty plea (*People v Day*, at 596).  The law does not allow defendant to disavow his confessions to
his factual guilt merely because the People may have had a case weaker than anticipated (*Brady v
United States*, 397 US at 757[ 1970]).  The defendant's guilty plea was not tainted by non-disclosure
and represents a just and sound result which must stand because his counseled allocution was legally
sound.

          Fortunately for this Court, while the story may be interesting, it is irrelevant to this
proceeding.  As this Court is aware, newly discovered evidence, whether truly newly discovered or
not, has no material relevance to a motion brought pursuant to CPL 440.10[1][g], unless the
judgment of conviction resulted in a "verdict of guilt after trial."  What is not in dispute here is
that the judgment of conviction at issue is the result of a knowing, voluntary and intelligent plea of
guilty by defendant who was most ably assisted by his accomplished attorney.

          While the concept of "actual innocence" is a bewitching specter, defendant has not
met his burden of establishing by clear and convincing evidence that he is innocent.  On January
15, 2014, the Second Department became the first appellate court in New York State to recognize
a claim of actual innocence under CPL 440.10(1)(h) (*People v Hamilton*,  - AD3d-, 2014  WL
128496).  Unlike Mr. Ortiz, defendant Hamilton was convicted of second degree murder after a jury
trial and moved to vacate his conviction on the ground of actual innocence. The Second Department
remitted the matter for a hearing on defendant's claims. While so doing, the Second Department
noted that "mere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to
defendant's guilt, is insufficient, since a convicted defendant no longer enjoys the presumption of
innocence, and in fact is presumed to be guilty" (*Hamilton* at 9; *see Schlup v Delo*, 513 US 298, 326
n.42).

          As this office has consistently demonstrated in the past, our policy, indeed the policy
of every District Attorney in New York,  is to take immediate remedial action when presented with

A-974

HON. THOMAS P. FRANCZYK, J.C.C.
January 21, 2014
Page 4

evidence of actual innocence. We have done so in the past (*see People v Anthony Capozzi*, Indictment No.: 85-1379-001; *People v Douglas Pacyon*, Indictment No.: 84-0766-001; *People v Jerome Thagard*, Indictment No.: 01052-2009; *People v Charles Tubbins*, Indictment No.: 02315-2012) and will continue to honor our commitment in the future in this case and all others.

Pursuant to your letter dated January 2, 2014, enclosed please find copies of Mr. Nuchereno's Discovery Demand and Omnibus Motion and the People's Answering affidavits. I have reviewed the People's file and it does not contain any correspondence indicating that the statements of Carlos Osario, Frank Coppola and Pedro Ramos Vega were provided to Mr Nuchereno. Judge Case has no independent recollection of providing these statements to defense counsel. Judge Case advised me that while he turned over discovery material in response to counsel's demand, he considered these and other statements as potential *Rosario* material (*People v Rosario*, 9 NY2d 286[1961]), not required to be turned over until "after the jury has been sworn and before the prosecutor's opening address" (CPL 240.45[1][a]). He observed that there was nothing inconsistent with the defendant's admissions and recitation of facts known only to the killers, and he also reminded me that descriptions have a margin of error, especially in light of the fact that the perpetrators were all in motion at the time of the sightings. He also recalled that there was evidence that one of the perpetrators left the home through the back door (perhaps the defendant) and it was his belief that the descriptions pertained to the perpetrators who ran out the front door of the home.

In your correspondence referencing the above statements, you note that Osario, Coppola and Vega provide the police varying descriptions of the three men they observe running from the scene on the night of the murders, and that none of the descriptions match defendant's height. In inquiring whether defense counsel was in possession of these statements prior to defendant's guilty plea, you reference *Brady* (*Brady v Maryland*, 373 US 83[1963]). As we have demonstrated, Judge Case fulfilled all of his obligations. Tellingly, neither Carlos Osario nor Pedro Ramos Vega, whose statements you obtained from an Assistant US Attorney and reference, was called by the Government to testify before its grand jury.

In prior correspondence dated December 3, 2013 and December 9, 2013, this Court requested additional materials from the federal prosecutor. The People are concerned that the Court has taken an interest in this matter far beyond and irrelevant to the simple issue brought before it. The communication with the federal prosecutor (who clearly has an interest in promoting his theory which is at odds with the defendant's confession, guilty plea, and sworn testimony), suggests that the Court has become concerned with issues that are beyond the scope of resolving the motion and is conducting its own investigation sympathetic to the position of the US Attorney and the defendant. The law is clear that defendant's application must be denied and extraneous facts dehors the record have no relevance to the fair, proper and lawful disposition of this motion.

HON. THOMAS P. FRANCZYK, J.C.C.
January 21, 2014
Page 5


   As the law unambiguously supports our position, the People rely on our prior submissions to this Court, oral argument of the motion, and respectfully request that defendant's motion be denied.

      Very truly yours,

      FRANK A. SEDITA, III
      DISTRICT ATTORNEY


  By:  DONNA A. MILLING
      Assistant District Attorney
      Chief, Appeals Bureau


DAM/sc
Enclosures
c:  John R. Nuchereno, Esq.

**A-976**

# City Of Buffalo - Department Of Police
## Major Crimes Unit

**To:**       Captain Mark Morgan
             Crimes Against Persons Bureau

**From:**     P.O. David Sadlocha
             D District

**Subject:**  File #04-242

**Date:**     11/16/04

Sir;

    On 11-16-4, while working 1530-0130 tour in D-District, sector D432 did receive 911 radio of Unknown Trouble call at 1005 Grant St. Upon arrival I spoke with person from Native American Center who stated a man was seeking help and walk away. This person said the young man stated he would be at 142 Germain St. I went to said address with assistance from P.O. John Lobaugh and encounter an individual outside residence. The individual did state to me that he had something to say regarding "Niagara St." I told him not to say anything else to me at this point and I notified 911 Dispatch that I needed to speak with someone working Major Case Squad. Suspect was placed in patrol vehicle #333 and transported to Police Headquarters and given to Major Case Detectives.

Respectfully Submitted,

*P.O. David Sadlocha*

P.O. David Sadlocha

00001185

STATE OF NEW YORK
SUPREME COURT:     COUNTY OF ERIE

THE PEOPLE OF THE STATE OF NEW YORK

     -vs-                            INDICTMENT NO. 2004-2630

Josue Ortiz

_____

                      Hon. Frank J. Clark III
                      Erie County District Attorney
                      By Kenneth Case, Esq.
                      Assistant District Attorney

                      John R. Nuchereno, Esq.
                      Betty Calvo-Torres, Esq.
                      Attorneys for Defendant

## MEMORANDUM AND ORDER

**FORMA, J.**

     The defendant has moved for suppression of oral and written statements. The Court conducted a hearing and at the conclusion invited the parties to submit memoranda regarding the issues developed at the hearing. The Court now makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

     A double homicide occurred at a residence on Niagara Street in the City of Buffalo on November 11th, 2004. On November 15th, 2004 homicide detectives from BPD interviewed a man at Buffalo General Hospital. They had been summoned because a patient claimed to have information on this homicide. After a short interview through an interpreter, the detectives concluded this patient, the Defendant, was neither a suspect in the homicide or a witness. The next day there were police radio calls of unknown trouble at a couple of different locations. Officer David Sadlocha

A-978

answered the last call and was eventually directed to the Defendant who approached his police vehicle. Sadlocha asked what's up and the Defendant responded he knew something about the Niagara Street business. Sadlocha immediately interrupted and advise the Defendant that he should talk to detectives. Sadlocha knew about the homicide and felt the major case squad should deal directly with the information. Sadlocha transported the Defendant to headquarters after advising by radio that he was bringing someone with information about the homicide. The Defendant voluntarily accompanied the officer and was not considered a suspect or a witness.

Upon arrival at headquarters the Defendant was immediately recognized as the same "patient" from the previous day. Since the Defendant failed to provide and first hand information of the homicide at the hospital the police were genuinely surprised to see him. After again securing the interpretive services of Officer Torres, the police again interviewed him beginning around 8:00 P.M. Initially the Defendant was not advised of his "Rights" as he was not considered a suspect or even a witness. During the conversation the Defendant began to incriminate himself. The Defendant was unrestrained and free to leave or terminate the conversation at any point prior to his confession. At approximately 8:25 P.M. he was advised of his *Miranda Warnings* and knowingly, voluntarily and intelligently waived his rights. He was not handcuffed, threatened, tricked, coerced or improperly induced to make any statements. He never asked for the services of a lawyer. The Defendant was provided with food, drink and rest for approximately thirty minutes. At approximately 9:00 P.M. his oral confession was memorialized in a written statement again through the interpretive services of Officer Torres. The written statement was completed and signed by the Defendant at approximately 10:30 P. M.

## CONCLUSIONS OF LAW

The Defendant contends he was "in custody" the moment he entered Officer Sadlocha's patrol car. He argues his conversation with any police after that point was the result of custodial interrogation which should have been preceded by *Miranda Warnings*. The Defendant is mistaken in this belief. There were no indicia of custody, arrest or detention until after the Defendant had confessed at headquarters. The entire encounter was precipitated by the Defendants actions, not just once but on three occasions he initiated contact with police authorities. He never was treated as a suspect until after he incriminated himself. The police never "converted" the Defendants status into custody until he had let the cat out of bag by confessing. The time line proposed by the Defendant citing a missing hour in which to convert the interview into custodial interrogation is erroneous. The police acted appropriately and properly throughout the entire sequence of events. Not only were the police surprised when he appeared at headquarters with Officer Sadlocha, they were equally surprised when he started to incriminate himself. Until he began to admit to his own criminal conduct, the Defendant was merely a persistent citizen with information that was not very helpful in solving a multiple homicide. The Defendant was someone who had to be dealt with, but without any particular focus.

Defendant's characterization of the radio message and Detective Lonergan's expectations are not firmly based in the record. Even assuming the correctness of his propositions, they are merely single factors for consideration and not determinative of custody. Defendant's cited authorities are either factually distinguishable or not contrary to the Courts findings and conclusions.

Defendant's remaining arguments are similarly without merit. His contention that he was "seized" withing the meaning of either the Fourth, Fifth or Sixth Amendment when he confronted Officer Sadlocha on Germain Street is clearly erroneous as previously discussed. The DeBour

3

analysis is clearly off point. *(People v. DeBour, 40 N.Y. 2d 210)* The Defendant approached the police, not vice versa. Officer Sadlocha did not "seize" the Defendant, merely conveyed him to the proper authorities to fulfill the public security function of his job. Sadlocha was merely performing his duties in an expedited manner to transfer citizen information directly to the detectives in charge of the criminal investigation.

The Defendant's contention that the *Miranda Warnings*, given to him in Spanish were inadequate is equally without foundation in the record. The Defendant's argument that the Defendant was not adequately advised concerning the assistance of counsel and that counsel would be free is completely specious. The Court concludes the Defendant was properly advised of his Miranda Warnings and effectively waived them. Moreover, he never asked for the assistance of counsel and questioned whether one would be free or not.

Therefor, Defendant's motion to suppress oral and written statements is denied in all respects. The decision herein constitutes the Order of the Court.

Joseph S. Forma
Supreme Court Justice

Dated: Buffalo, New York
      October 31, 2005

GRANTED

Nov 1, 2005

Susan Moran

4

P-1302

EXHIBIT

9-30-2005

C.O.I.S.

C.A.B.                    NELSON  COMACHO

                          MIGUEL  COMACHO

Det. M.R.S.

                          FILE 2004-242

Attn: U.K.M.B.


Sir:

        I'm continuing the investigation
of the homicides of
        Your writer did meet with
MR. RONNIE WILLIAMS a BM whose
D.O.B. is ████-47

        MR. WILLIAMS was interviewed
at the Erie County Holding Center
located at 10 Delaware Avenue.

        He stated the following
that he was in the Delta wing
at the E.C.H.C. That he was housed
with JOSHUE /JOSUHA/ORTIZ. MR. ORTIZ
told him the following. That he was
from PUERTO-RICO. That MR. ORTIZ
does speak and understand english.
That he did kill the CAMACHO brothers
That he was only acting like he was
crazy. He told MR. WILLIAMS that
he had fooled them suckers. His
attorney asked him if he wanted
to plea. He was high right before
the homicide. He stated he

P-1302

kicked the door in. He shot them. He said he killed them both. He said he was only acting crazy. He said he was not going to accept the plea. A couple of his friends told him they had money, were dealing and had a winning LOTTO ticket. The other two guys that helped him were outside. He also ~~contacted~~ ~~said~~ said one of the brothers was FLOCKO.

MR. WILLIAMS presents himself well. He is soft spoken and articulate. He would make a good witness on this case

Respect

MRS