# 23-0352

# United States Court of Appeals

*for the*

# Second Circuit

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

**APPENDIX FOR DEFENDANT-APPELLANT**
**Volume 5 (Pages A-983 to A-1232)**

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

# TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Docket List ........................................... A-1

Amended Complaint, dated March 27, 2019 ............. A-34

Answer to Amended Complaint,
    dated April 15, 2019 ................................................ A-56

Notice of Motion to Dismiss, dated April 24, 2020 ... A-80

Memorandum of Law in Support of Defendants'
    Motion to Dismiss, dated April 24, 2020 ............... A-82

Supporting Declaration, dated April 24, 2020 ........... A-107

Exhibit A to Declaration -
Affidavit of Lt. Salvatore Losi,
sworn to on April 15, 2020 .................................... A-112

Exhibit B to Declaration -
P-73 of Mark R. Stambach, dated November 16,
2004, and Notes ..................................................... A-114

Exhibit C to Declaration -
Plaintiff's Deposition Transcript,
dated March 15, 2018 ............................................ A-117

**Volume 2**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 .......................................... A-241

ii

Page

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 ............................................ A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ........................................................................ A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 ............................................ A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................. A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ........................................................................ A-746

Exhibit I to Declaration -
Indictment ............................................................... A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ....................................... A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ......................................... A-882

iii

                                                                    **Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction .................................................................  A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit .................................................  A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ......................................  A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ......................................  A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing ...................................................................  A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ......................................  A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion .....................................................................  A-983

Statement of Undisputed Facts,
dated April 24, 2020 ................................................  A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 ...................................................  A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
    Material Facts, dated July 3, 2020 ........................  A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.
Ortiz*, Indictment No. 02630-04 ...........................  A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ...............  A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 .......................................  A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued)............................................................  A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019....................................  A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3............................  A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ...............................................................  A-1450

v

Page

**Volume 7**

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................ A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ....................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................. A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ....................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 .............................................. A-1706

**Volume 8**

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 .............. A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
  Defendants' Motion to Dismiss, and for
  Judgment on the Pleadings and/or Summary
  Judgment, dated July 5, 2020 ................................ A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
  Defendants' Motion to Dismiss,
  dated July 24, 2020 .................................................. A-1789

Decision and Order of the Honorable Elizabeth A.
  Wolford, dated February 26, 2021 ........................ A-1800

Plaintiffs' Proposed Jury Instructions,
  dated April 1, 2022 .................................................. A-1837

Defendants' Proposed Jury Instructions,
  dated April 1, 2022 .................................................. A-1861

Plaintiffs' Reply Motions in Limine,
  dated April 6, 2022 .................................................. A-1924

Defendant's Objections to Plaintiff's Proposed Jury
  Instructions, dated April 6, 2022 ........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022 ........ A-1937

Stipulation of Undisputed Facts,
  dated April 27, 2022 ................................................ A-1996

Trial Transcript, Preliminary Instructions and
  Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022 .......................... A-2053

vii

**Page**

Plaintiff's Witnesses:

| | | |
|---|---|---|
| E. Coogins | Direct | A-2054 |
| | Cross | A-2116 |
| J. Ortiz | Direct | A-2125 |

**Volume 10**

Trial Transcript, dated May 4, 2022 (Cotinued) ... A-2187

| | | |
|---|---|---|
| M. Vaughn | Direct | A-2189 |
| | Cross | A-2219 |
| | Redirect | A-2225 |
| J. Lonergan | Direct | A-2229 |
| | Cross | A-2281 |
| | Redirect | A-2284 |
| | Recross | A-2287 |

Trial Transcript, dated May 5, 2022 ... A-2297

| | | |
|---|---|---|
| M. Stambach | Direct | A-2299 |
| | Cross | A-2361 |
| | Redirect | A-2384 |
| J. Ortiz | Direct | A-2393 |
| | Cross | A-2426 |

**Volume 11**

Trial Transcript, dated May 6, 2022 ... A-2467

| | | |
|---|---|---|
| M. Evans | Direct | A-2470 |
| | Cross | A-2495 |
| M. Lauber | Direct | A-2504 |
| | Cross | A-2518 |

Trial Transcript, May 9, 2022 ... A-2554

viii

|  |  | **Page** |
|---|---|---|
| J. Ortiz | Direct | A-2599 |
|  | Cross | A-2653 |
|  | Redirect | A-2671 |
|  | Recross | A-2674 |

Trial Transcript, Closing Arguments, May 9, 2022 ... A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
(Continued) .............................................................. A-2717

Jury Questionnaire, dated May 9, 2022 .................... A-2760

Jury Questionnaire, Damages, dated May 9, 2022 .... A-2764

Judgment in a Civil Case, dated May 10, 2022 ........ A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
dated May 20, 2022 ............................................... A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
Support of Motion, dated May 20, 2022 ................ A-2768

Exhibit A to Felle Declaration -
Ledger .................................................................. A-2773

Exhibit B to Felle Declaration -
Invoices for Services ........................................... A-2792

Plaintiff's Memorandum of Law in Support of his
Motion for Attorneys' Fees and Costs,
dated May 20, 2023 ............................................... A-2823

Notice of Motion, by Defendant, for Judgment as a
Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
new trial Pursuant to Fed. R. Civ. P. 59(a), and
for Remittur Pursuant to Fed. R. Civ. P. 59(e),
dated June 7, 2022 ................................................. A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
  Defendant, in Support of Motion,
    dated June 7, 2022 ................................................ A-2848

  Exhibit A to Sahasrabudhe Declaration -
  Trial Exhibits Entered by Counsel for
  Plaintiff .................................................................... A-2862

  Exhibit B to Sahasrabudhe Declaration -
  Trial Exhibits Entered by Counsel for
  Defendant .............................................................. A-2909

Memorandum of Law in Support of Motion for
  Judgment as a Matter of Law Under Fed. R. Civ.
  P. 50(b), dated June 7, 2022 .................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
  to Plaintiff's Motion for Attorneys' Fees,
    dated June 10, 2022 ............................................... A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
  Plaintiff's Motion for Attorneys' Fees,
    dated June 10, 2022 ............................................... A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
  Opposition to Defendant's Post Trial Motion,
    dated June 28, 2022 ............................................... A-3013

Plaintiff's Memorandum of Law in Opposition to
  Defendant's Post Trial Motions,
    dated June 28, 2022 ............................................... A-3023

Reply Memorandum of Law in Further Support of
  Defendant's Motion for Judgment as a Matter of
  Law, a New Trial, or Remittitur,
    dated July 8, 2022 ................................................. A-3071

**x**

|  | Page |
|---|---|
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 | A-3159 |

A-983

STATE OF NEW YORK
COUNTY OF ERIE
ERIE COUNTY COURT

PEOPLE OF THE STATE OF NEW YORK

v.                                         **DECISION & ORDER**
                                           **INDICTMENT # 2004-2630**

JOSUE ORTIZ
                    DEFENDANT

APPEARANCES:        Donna A. Milling, ADA
                    Chief, Appeals Bureau
                    Erie County District Attorney's Office
                    25 Delaware Avenue
                    Buffalo, NY 14202
                                        For the People

                    John R. Nuchereno, Esq.
                    2503 Niagara Street
                    Buffalo, NY 14202
                                        For the Defendant

The defendant brings this motion pursuant to CPL 440.10 1 (g), (g-1) and (h) for an order

vacating his conviction entered upon his guilty plea on March 22, 2006 to two counts of

Manslaughter 1st degree (PL 125.20 [1]) for which he was sentenced on June 16, 2006 to

concurrent determinate terms of imprisonment of 25 years followed by five years of post release

supervision (PRS).

He bases his motion upon claims of: 1) newly discovered evidence consisting of sworn

testimony of witnesses in a Federal Grand Jury in 2011 and 2012 establishing that four

-1-

individuals other than himself (Brandon Jonas, Efrain "Cheko" Hidalgo, Frank "Macho" Matias and Misael "Misa" Montabo) were responsible for the homicides for which he pled guilty, 2) DNA evidence which excludes him from the crime scene as well as from items of evidence found at or near the scene, and 3) actual innocense. He contends that his guilty plea was based upon a false and erroneous confession given to the Buffalo Police at a time when he was suffering from a severe psychotic break from reality, exacerbated by sleep deprivation, drug use and a limited command of the English language.

The People oppose the defendant's motion arguing first that CPL 440.10 (g) provides no avenue for relief where, as here, the judgment derives from a guilty plea rather than a guilty verdict (People v. Sides 242 AD 2d 750 [3rd dept. 1997]). They also contend that the so-called new evidence, consisting, in their view, of inconsistent if not incredible testimony from a curious collection of criminals, immunized witnesses and other deal seekers: 1) would not change the result, 2) could have been discovered with due diligence (since he supposedly knew his co-defendants), 3) is not material in view of his sworn on-the-record admission of guilt both at the time of his guilty plea and in the Federal Grand Jury on July 21, 2011 (CPL 440.30 [4] [a]), 4) is cumulative and 5) merely contradictory of former evidence. (People v. Salemi 309 NY 208 [1955], People v. Tankleff 49 AD 3d 160 [2nd dept. 2007]).

The People argue that the DNA evidence (i.e. the absence of the defendant's DNA from the crime scene and certain items of physical evidence including a chain removed from one of the victim's neck and a baseball bat reportedly handled by two of the perpetrators) not only fails to create a substantial probability of innocence (CPL 440.10 [g-1]), but casts doubt on the testimony of one of the key witnesses (Frank Matias) who purports to exonerate him by exclusion. (Matias,

A-985

an immunized witness, testified in the Federal Grand Jury that Cheko Hidalgo who was wearing gloves, handed him the bat before kicking in the door to the victim's house. Matias' DNA was not found in the swabbing from the bat).

The People also contend that any claim of actual innocence is belied by the defendant's detailed and specific confession to the police, his sworn guilty plea, initial Federal Grand Jury testimony and other acknowledgments of culpability to both a jail house informant and psychiatric staff.

<u>The Victims and the Homicides</u>

Nelson "Lobo" Camacho and his brother Miguel "Flaco" Camacho were West side drug dealers who resided in the first floor apartment at 879 Niagara Street near Massachusetts Avenue in Buffalo. On November 11, 2004 shortly after 9:30 p.m., three men kicked in their front door and stormed into the dwelling. Upon encountering Lobo in the front hallway, one of the intruders shot him in his upper left back (with an AK-47 automatic rifle) nearly severing his left arm from his body. The shooter removed a gold chain from his neck and dropped it to the floor.

As Lobo lay there bleeding, the other two intruders, one of whom was wielding a bat, encountered Flaco in a back room pointing a chrome .25 caliber handgun. They called out to the gunman who joined them and then fired multiple shots into Flaco's chest and abdomen which propelled him into the wall and then onto the floor where he fell into a crumpled, dying heap.

After unsuccessfully searching the premises for a large stash of drugs and money that they had been led to believe would be there for the taking, the intruders fled through the front door one after the other. As he exited (and realizing that they had gone there for nothing), the shooter fired a killing shot into the right side of Nelson Camacho's face. The bullet exited the top of his

head and apparently burrowed through the floor into the basement.

Luis "Canario" Camacho was home with his girlfriend, Yvette Moldonado when he received a phone call from his brother Miguel who asked him to come over because something had happened to Nelson who was down.  Upon arriving at the scene in his vehicle at Niagara, Luis observed two guys (described as pretty skinny, not big, and wearing hoodies, one possibly yellow), running very fast from the house across the street and heading toward Massachusetts.  Luis went into the house and observed his brother Nelson (whom he identified from his ring), laying on the floor with his face nearly blown off.  He proceeded to the back and found Miguel, barely breathing and holding a gun.  Luis called 911.  Shortly thereafter, the police arrived, ordered Luis to drop the gun and took him to the ground.

Pertinent entries in the BPD complaint log reveal the following: 9:46 p.m. - "Two brothers are shot." 9:51 p.m. - "3 PM's, 2 in black hoodies, 1 in gray...all 3 running on 7th." 9:54 p.m. - "AK 47 used in the shooting." 9:58 p.m. - "3 men took off, also had a bat, dropped bat, man showed police where it is." 10:07 p.m. - "3 males were skinny, one was wearing yellow shirt, headed to Niagara."

<u>The Buffalo Police Investigation</u>

Detective Mary Gugliuzza (BPD Major Crimes Unit [MCU]) was called to the scene at 10:00 p.m.  Upon arrival, she met with other detectives and officers who were already there.  In her report of November 11, 2004, she noted that the front door and frame showed signs of damage  consistent with a forcible entry.  She observed a broken gold chain on the dining room floor and noticed that the television was turned on in the living room.  She saw apparent brain matter on a couch and the carpet and observed the body of a deceased male (Nelson Camacho),

wearing a white t-shirt, blue shorts, white socks and no shoes. He had obvious gun shot wounds to his face and left bicep. She also saw the small caliber, nickel plated handgun. A large caliber bullet casing was observed to the right of the victim's leg. A bullet hole leading to the basement was also found in the floor.

A bullet hole was also observed in the wooden door of the back hallway. A large caliber casing was on the floor. A bullet was removed from the bedroom door frame. Brain matter appeared on the floor, ceiling and window of the bedroom. A pool of blood, loose slacks, several $20 bills and red stained shoe prints were observed in the bedroom. The body of the second victim (Miguel Camacho) was observed in a white t-shirt and boxer shorts, lying on his side against the door. Bullet gouge marks were observed in the kitchen wall. Blood spatters and shoe prints were seen on the kitchen floor.

The detective also observed six bullet holes in the rear metal door leading to the backyard. A second television was turned on in an adjacent rear bedroom. Splintered wood from the door was found on the bed along with a holster, a cell phone, pills and drug paraphernalia, including baggies, a scale and a spoon with residue. Bullets and bullet fragments were found in a rear hallway. Another officer (Schulz) reported observing red shoe prints and holes in the rear door as he approached from the outside.

As part of her investigation, Detective Gugliuzza also interviewed Beverly Laborgne, the resident of the upper apartment. She also spoke to Jeilyn Rosario (Nelson Camacho's girlfriend) who, when asked if anyone wanted to kill Nelson and Miguel, replied "Misael Montalbo." She explained that Montalbo had come on to her about a month earlier and threatened to kill Nelson. She stated that he lived on Hudson Street and drove a yellow car.

Detective Richard Wagstaff (BPD/MCU) arrived at 879 Niagara and was advised by Detective James Lonergan that there may be relevant evidence in the yard at 53 Massachusetts. He went there and observed a blue baseball bat. He interviewed one Steven Acevedo of that address who said that he had seen three guys (two in dark hoodies and one in a gray hoodie) with something in their hand.

A Carmelo Mercado of 97 Rhode Island stated that he was standing outside the store at Massachusetts and Niagara when he saw three Spanish looking dudes (two in black or dark blue hoodies and on in a gray hoodie). The one in the gray hoodie (with jeans) was coming out of the walkway next to 53 Massachusetts. He described these individuals as being about 5'5" to 6" tall and of medium build. He said that they ran down Massachusetts to Seventh Street toward Rhode Island.

<u>Evidence at the Scene</u>

Detective James Maroney documented the scene and collected evidence. Some of the many items observed included a gold chain on the living room floor near Nelson Camacho's body, two cartridge casings (consistent with an AK-47) at his feet, a cell phone on the living room floor, a .25 caliber handgun on the living room floor, two cartridge casings (consistent with an AK-47) in the hallway between the living room and kitchen, cartridge case (consistent with an AK-47 on the kitchen floor, splintered frame from the door frame of the rear bedroom, cell phone in the rear bedroom, drug paraphernalia in the rear bedroom, lottery ticket in the front bedroom, bloody shoe prints on an envelope and a bank envelope in first bedroom, cartridge case (consistent with an AK-47) on the hallway floor, multiple blood stained shoe prints on the kitchen floor, apparent blood stains in the rear hall, three deformed rifle bullets in back hall, a

deformed bullet from the doorway of the first bedroom, keys and several drawing numbers found in a leather jacket on the living room couch, $2,320.00 in cash and personal papers of Nelson Camacho in grey jeans found in the first bedroom, Nelson Camacho's bloody clothing (white t-shirt, blue/grey gym shorts, blue/white boxers, white socks), Miguel Camacho's bloody clothing (white t-shirt, blue jeans, orange gym shorts, blue/white boxers, white socks), two cartridge casings (consistent with AK-47) on living room floor (during secondary search), three .9 mm cartridges in watch pocket of jeans found on the floor of the first bedroom. The police also retrieved a driver's license of one Kadeejah Kirk along the curb outside 879 Niagara.

<u>Ballistics Report</u>

A CPS Laboratory ballistics report (dated 1/19/05) indicated that eight cartridge cases retrieved from the scene, all of Russian make, were consistent in their rifling characteristics with an SKS and AK style rifles.  Submitted bullets and bullet jacket fragments were also consistent with these rifles.  The Raven P-25 semi-automatic pistol which contained four cartridges in the magazine was found to be operable.

<u>DNA Reports</u>

CPS Laboratory reports dated May 25, 2012, December 14, 2012 and June 17, 2013 regarding DNA analysis of swabbings taken from the handle and barrel of the bat indicated the Nelson Camacho was the source of the major DNA profile (with additional DNA activity from at least three individuals), and that Miguel Camacho could not be excluded as a possible source of the minor DNA profile.  Luis Camacho, Uda Hidalgo, Brandon Jonas, Frank Matias, Efrain Hidalgo and the defendant were all excluded as possible sources of DNA.

A swabbing of the necklace found at the scene yielded no DNA profile.

A driver's license whose connection to the case is unknown (perhaps the one found at the curb), revealed DNA from three unknown individuals. (All of the above-named individuals were excluded). The defendant's DNA was found on his own clothing (shirt and sweater).

### Jeilyn Rosario

In a sworn statement given to police on November 11, 2004, Jeilyn Rosario indicated that she went over to 879 Niagara at around 10:00 p.m. with her sister-in-law's baby when she saw the police on the scene and learned from "Cucado" who was on the stairs crying that Nelson and Miguel had been killed. She denied that they sold drugs. She mentioned that Misael Montalbo may have wanted to harm them over an argument that they had at a barbershop on West Ferry over Montalbo's previous advances upon her. She described Montalbo as being 5'4" tall, 200 lbs. and residing at 35 Hudson.

### The Autopsies

On the morning of November 12, 2004, Detective Timothy Salamone attended the autopsies of Nelson and Miguel Camacho. He observed the entrance wound on Nelson's right cheek with exit hole at the top of his head and a bullet wound in the area of his left arm from the armpit to his forearm. Miguel had four entrance wounds on various locations on his chest with corresponding exit wounds on his back.

### Luis Camacho

Later that day, Detectives Michael Mordino and Michael Acquino interviewed Luis Camacho who recounted the call from Miguel the night before. Although Miguel asked him to come armed (a fact not mentioned to Detective Wagstaff), he did not do so because he did not own a gun. He said that he and his brothers used drugs but did not sell them. (Luis was

-8-

questioned further by Detective Michael Root that evening). He said he had not brought the .25 caliber gun to the scene.

At 7:20 p.m. on November 12, 2004, Detective Joseph Cook received an anonymous tip from a female caller who reportedly had heard on the street that the three individuals responsible for the shooting were "Brandon," "Cheko," and "Macho." The caller thought that Brandon may live on Helen Street and had heard that the shooting was over a large quantity of money.

### Frank Coppola

In a sworn statement given to police in the early morning hours of November 12, 2004, Frank V. Coppola said that he was leaving his house at 886 Niagara to go to Zip's store at Niagara and Massachusetts when he heard a "pop." He went into the store, bought cigarettes and was walking back home, southbound on Niagara, when he saw three males, "wearing dark hoodies, all about six feet tall," run by him on the sidewalk heading north and then turn west on Massachusetts. As they ran by, he saw one of them throw something in the yard next door to his house and heard a "klunk." He went there and found a metal baseball bat which he later pointed out to the police.

### Pedro Vega

The following day, the police took a statement from Pedro Ramos Vega aka "Cano" of 76 Barton Street. On the night of November 11, 2004, he was fixing a car at Zip's on Niagara after which he went to the Pizza Shop. When he got there, he observed three guys standing across the street in front of a vacant store. At he exited, Vega now observed them walking towards Zip's. They then went on to the porch of an abandoned house and were pacing and looking across the street. They headed toward Zip's and crossed the street. At that point, Vega noticed that one of

-9-

them was carrying what appeared to be a big gun. They walked toward the corner of Niagara and Massachusetts and went into a house just before the antique store.

Vega noticed one of the individuals run out of the house, looking up and down Niagara. He then went back inside. Vega then heard what sounded like a loud shot. He and his friend, Carlos then went inside Carlos' house. He later heard the sound of a woman screaming and crying.

Vega described the three suspects as young looking and light skinned, wearing dark colored hoodies and jeans. He described the one with the gun as the tallest of the three (i.e. "at lease 5' 11"). The other two were "around 5' 8."

<u>Carlos Osario</u>

Carlos Osario told police in his sworn statement of November 13, 2004 that he was on his porch with Cano when he saw the three men standing on the porch of the abandoned house across the street. They then crossed the street toward Zip's. Osario observed "the Puerto Rican male with the black hoodie" carrying a long barreled rifle under his hoodie. All three of them went up the stairs "where the two brothers live" and "one of the black males with a grey hoodie knocked on the door." Osario then heard a loud bang on the door. About three minutes later, after hearing gunshots, he saw "two people, one with a grey hoodie and one with a black hoodie ...run back across the street and go through the back kitchen window of the corner house" (where Tebo lives). He did not see the third guy but later did see "two light skinned Puerto Rican females whom he recognized from the neighborhood with blonde hair and a young male child coming out screaming." The police arrived five minutes later.

Osario described all three suspects as "short,...very young." The other "B/M had a g(r)ey

hoodie," and had "thick eyebrows and a wide nose and big lips." The PR/M had on a black

hoodie and black pants" and appeared "brown skinned (with) trimmed eyebrows." He said that

he had previously seen the Puerto Rican male at a barbershop on Niagara Street and on Tenth

Street. He also saw him and one of the black males earlier in the day "arguing with the brothers

in front of Zip's." The one with the corn rows had also been on his porch before. He said that

this individual lives next to the pizzeria.

About ten minutes after the shooting, Osario saw Tebo (Esteban Acevedo) ride up to the

scene on his bicycle. He described him as a tall, roughly 38 year-old Puerto Rican male with

white hair and light skin.

### Misael Montalvo

On November 15, 2004, Detectives Charles Aronica and Philip Torre (with the help of a

Spanish speaking officer) took a sworn statement from Misael Montalvo who came in because

the Camacho family was supposedly blaming him for the murders of Nelson and Miguel which

resulted in threats against him and his family. He explained that the problem started when he had

asked Nelson to return to him the title to a vehicle that belonged to him. Nelson refused to oblige

and threatened to have his brothers jump him. They did not resolve their differences but only

ignored each other thereafter. The last time they had spoken before November 11th was when

they argued over the title in the barbershop.

Montalvo described Jeilyn Rosario as "a real good friend of our family's" and denied ever

trying to kiss her or having words with her. As for his whereabouts on the night of the homicide,

he said that he was at his father-in-law, Segundo Justiniano's house on Niagara Street near Porter

Avenue watching wrestling from 9:00 to 10:00 p.m. with Samuel Ortiz, Montalvo's girlfriend,

-11-

Carmen Justiano, her son and Ortiz's daughter. Earlier at 7:00 p.m., he and Sammy Ortiz picked up Sonia Ruiz from work, then picked up her kids on Fargo and dropped them all off at 482 7th Street. From there, at about 8:00 p.m., he went to the "24 hr. store on Niagara and Massachusetts to check out the lottery numbers" after which he went to his father-in-law's place at about 8:15 p.m. He claimed that he left his father-in-law's at about 10:15 p.m. and drove Sammy and his daughter home. He denied any involvement in the Camacho murders.

### Segundo Justiniano

Detectives Mary Gugliuzza and Mark Lauber interviewed Segundo Justiniano who recalled watching wrestling with Montalvo and his girlfriend (Justiniano's daughter) from 9:00 p.m. to 10:00 p.m. on the night in question. At 10:00 p.m., he saw on the news that there had been a shooting at Niagara and Massachusetts. Carmen Justiniano also supported Montalvo's statement regarding his whereabouts when the homicides occurred. She also stated that Montalvo and Nelson Camacho had argued over the automobile title and had not spoken to each other since their fist fight. She also said that one of the Camacho's had threatened to bring the whole family over to assault her and Montalvo replied that he would kill them. She said it was a hollow threat because he was not capable of killing anyone. She also mentioned threats having been made to Montalvo's family in Puerto Rico.

### Enter the Defendant

At around 11:00 a.m. on November 15, 2004, Detectives Lauber and Torre responded to a call from Officer Marie Schreckenberger who advised that the defendant (who reportedly resided at 142 Germain Street) had jumped into her patrol car at Hampshire and 19th Street and reported that unknown people were trying to kill him because they believed that he was involved in the

A-995

Camacho brothers' homicides.  The defendant, who presented with glassy eyes and admitted to having smoked marijuana, could not articulate where, how or by whom such threats had been made.  Deciding that the defendant may be in need of psychiatric help, the officers arranged to have the defendant transported to Buffalo General Hospital (BGH) by ambulance.

Later that afternoon, Detective Mark Vaughn received a call from a staff counselor at the BGH Psychiatric Department advising that the defendant claimed to have information about the double homicide at 879 Niagara Street.  He also expressed fear that the killers were after him.  Detectives Vaughn, James Lonergan and James Lema went to the hospital and spoke to the defendant with the assistance of a Spanish speaking officer, Edwin Torres.

The defendant identified himself as Josue Ortiz (DOB ███ 81) of 19 Hoyt Street.  He said that he knew the Camacho brothers, claiming that they were members of a cocaine ring headed by Justo and Jose Caranzo who rented an apartment in his name at 142 Germania where he used to live before moving to Hoyt Street.  The defendant also said that he was a member of this drug ring.

When asked if he had any direct knowledge of the murders, the defendant said no.  He surmised, however, that the Camacho brothers were killed over jealousy about their drug dealing.  He said that the person he feared was one Rinaldo Velasquez because he had a shotgun. (He did not suggest, however, that Velasquez had anything to do with the killings).

The detectives described the defendant as being upset throughout the interview. (The BGH Mental Health Assessment report indicates that the defendant said, "I'm scared. People are trying to kill me."  He further said that he believes he knows the perpetrators of the double homicide on Niagara Street and claims, "they're after me.").  At a Huntley hearing held on

A-996

August 31, 2005, Officer Torres described the defendant as "unsettled, very nervous and jerky." Detective Lonergan described him as "very frightened." The detectives left the defendant, not considering him to be either a suspect or a witness, and advised that he should contact them after his release from the hospital if he had any further information.

The following day, Officer David Sadlocha responded to 911 call of unknown trouble on Grant Street. Upon arrival, he was advised that a young man was seeking help at the Native American Center and had walked away to 142 Germain. Sadlocha proceeded to that address and encountered the defendant who said that he had "something to say about Niagara Street." Sadlocha told the defendant, "say no more," at which point he drove him to the Major Crimes Unit office to speak with detectives.

<u>The Defendant's Confession</u>

Detectives Mark Stambach and James Lonergan interviewed the defendant, with Officer Torres interpreting, beginning at 7:30 p.m. This time, the defendant claimed involvement in the homicides. After being advised of the Miranda warnings and signing the rights card at 8:30 p.m., the defendant gave a formal statement commencing at 9:00 p.m. It was typed out, read to him and signed by him at 10:30 p.m.

After stating that he'd dropped out of the eleventh grade in Puerto Rico and had been living in Buffalo for about five months, the defendant was informed by the detectives that they were "investigating the shooting death of... Miguel Camacho and...Nelson Camacho...(who) were victims of a homicide...on 11-11-04...at about 9:44 p.m. at 879 Niagara Street." When asked to relate his knowledge of the homicides the defendant said, "...about 9:30 p.m.,...we...(meaning) (m)e, Udah and Udah's brother...got there and did what we did. (We)...got in...(b)ecause we

-14-

heard that they were making money. We went over there to assault them only. He opened the door. I mean I did. Udah kicked the door in. We entered (and)...got in. All three of us entered...and BAM. Fired shots. Forced our way in and fired a shot. Then we heard the other brother yell out, (")they are killing my brother.(") They jumped on Floco. Udah's brother fired the nine millimeter. No, the rifle I mean. Shot fired at Floco. Floco came and Udah's brother came and Pow. They (sic) we run (sic) off."

He further answered that they entered through the front door and again said, "(w)e kicked in the door, I did." He said they all had weapons (he brought a shotgun), and Lobo was the first person that he saw. He also said that he struggled with Lobo and when asked, "(d)id anyone try to take anything from Lobo," he said, "(y)es I did, his chain." He said that he also saw "El-Flaco" standing in the rear of the apartment with a gun in one hand and a cell phone in the other. He was saying on the phone, "they are killing Lobo." When asked if he'd seen a television (big or small, on or off), he replied that it was big and turned on.

In reply to whether he went there for drugs or money, the defendant said, "both." He also said that he saw money and drugs there. When questioned further about guns, the defendant stated that Udah's brother brought the AK and was firing it in the house. Then when asked, "(d)id you have the AK-47," the defendant said, "(y)es I did." He was then asked, "(d)id you do the shooting," he said, "(y)es" and when specifically asked, "(d)id you shoot El-Flaco with the AK," he said, "yes." When asked where he shot him, he said, "(i)n the belly." As to Lobo, he replied that he shot him in the "(f)ace, chest, I did a couple when he was on the floor." (Lobo did not have any weapon when they entered the house). Earlier in the statement, when asked how many shots were fired in the house he said, "(a) couple. It was rapid and real fast." He also said

-15-

A-998

that they brought three types of guns in the house including a shotgun, pistol and an AK. The defendant said that they didn't take anything from the apartment because they were scared. When asked why he first said he had a shotgun instead of the AK 47, the defendant replied that he did so because he was scared. (The defendant's motion to suppress statements was denied on November 1, 2005).

### Felony Complaint

The defendant was charged with two counts of Murder 2nd degree. The booking form lists him a 6' 3" tall and 280 lbs. (Other records list him as tall as 6' 5" or 6' 6" tall and 330 lbs.). At 12:30 a.m. on November 17, 2004, detectives seized a carving knife, cell phone, clothing (size 42 jeans, plaid shirt XL, size 13 black sneakers, white socks), a wallet with personal papers and three cents from the defendant. He gave the police permission to search 142 Germain where they seized two pairs of size 13 white sneakers, one pair of size 13 black sneakers, size 13 black "Lugz" shoes, size 44 jeans, a grey "Cyberteck" jacket (XL) and a plastic Foot Locker bag. The defendant was arraigned on the felony complaint later that morning.

### Uda Hidalgo

At 3:50 p.m. on November 17, 2004, Detectives Gugliuzza and Torre took a sworn statement from "Urayoun Hidalgo." Upon being informed of the subject of the inquiry, he said that at the time of the shooting, he was with his girlfriend, Helyna Rivera (whom he would later be convicted of killing), and their daughter at his house at 403 Prospect Avenue watching wrestling on television. He then learned of the killing on the 10 o'clock news. He could not account for the whereabouts of his brother, Efrain (Cheko) Hidalgo. He also said he did not know Josue Ortiz. He denied shooting the Camachos and said he had neither met them nor been

to their house. He claimed to have no knowledge of who committed the crime.

## Competency Proceedings

On November 22, 2004, the defendant was ordered by the court to undergo a CPL 730

competency examination. On November 29th, the director of the Office of Forensic Mental

Health Services requested that the examination be delayed until the defendant could be stabilized

with medication. In his letter to the court of December 3, 2004, the director noted that the

defendant had presented to the Holding Center on 11/17 in an apparently perplexed and

frightened state. Though responsive, his answers seemed irrelevant and he displayed a blunt

affect. His demeanor vacillated from combative to silent.

The defendant was transferred to the CPEP Unit at ECMC Hospital on November 23

where his behavior went from agitated to catatonic. The hospital notes describe him, by turns, as

suicidal, bizarre, in need of physical and chemical restraints, irrational, illogical, preoccupied and

psychotic. His history reflected chronic depression and both alcohol and substance abuse. As of

early December, 2004, he was diagnosed as suffering from a psychotic mental illness and was

deemed to be "incompetent."

The attending physician diagnosed the defendant on November 30, 2004 as having

undifferentiated schizophrenia. He also found the defendant to be incompetent. Regarding the

homicides, the attending doctor notes that "the patient was friends with the 2 people whom he is

accused of murdering." He reportedly saw them "socially" and had attended their funeral.

"However, for some reason after that,...without any warning, (he) confessed to police about

committing these murders." The defendant was prescribed Zyprexa and further psychiatric

treatment.

-17-

<u>Erie County Grand Jury Proceedings</u>

The Grand Jury heard testimony from the Medical Examiner (cause and manner of death), Officer Torres, Detectives Stambach (confession), and Maroney (evidence collection) and Luis Camacho.  Luis testified that Flaco called him requesting that he come over fast and armed because something happened to Lobo.  He went to the house and found Lobo, turned him over, determined it was him and then went into the kitchen where Flaco was laying on the floor with a gun in his hand.  Flaco gave the gun to Luis who was on the phone with 911.  He screamed out for the lady upstairs (Beverly LaBorgne) and waited for the police to arrive.  Upon arrival, the officer ordered him to drop the gun whereupon he was thrown to floor and handcuffed.

Luis Camacho identified a photograph of the defendant who, he said, had come from Puerto Rico a few months ago and whom he'd met at a neighborhood bar.  He mentioned that the defendant had attended his older brother's birthday party and had been at Luis' house visiting his family.  He did not know the defendant's name.  The defendant was indicted on December 6, 2004 and charged with four counts of Murder 1st degree, four counts of Murder 2nd degree and Burglary 1st degree.

Several weeks later, on December 29, 2004, the defendant was discharged from the hospital and returned to the Holding Center.  Evelyn Coggins, MD, saw him on January 13, 2005 and observed that while still unfocused, he appeared more relaxed and appropriate.  He was doing much better when she saw him again on January 21, 2005.  She noted that his thoughts were organized but he complained of hearing voices saying, "it was you."  He was no longer overtly suicidal.  Dr. Coggins diagnosed him as suffering from psychosis, possible schizo-affective disorder/bipolar, but found that he was no longer incapacitated under Article 730.

At a competency hearing held in May, 2005, Dr. Coggins testified that the defendant had professed his innocense of the charges in their meeting of January 21st. In fact, he told her that he'd had nothing to do with the murders every time they spoke. Dr. Coggins opined that the defendant could have been suffering from a serious mental illness as of November 11, 2004 and may have been experiencing his first psychotic break from reality. (The defendant was found by the court to be competent on July 20, 2005).

<u>Ronnie Williams</u>

Two months later, on September 3, 2005, one Ronnie Williams, a jailhouse informant claiming to have been housed with the defendant at the Holding Center, reported to Detective Stambach that the defendant had admitted (in English) to killing the Camacho brothers. The defendant reportedly said that he was only "acting like he was crazy" and had "fooled them suckers." He also said that he was high when he kicked in the door and shot them both. He had learned from friends that the Camachos were drug dealers who reportedly had money and a winning lottery ticket. The other two guys who helped him stayed outside. He also mentioned that his attorney had asked him if he was going to plea and he said that he was not going to take a plea. (Why the defendant would jump into the lap of law enforcement and gratuitously confess to two murders when he wasn't even a suspect and then brag about fooling the police by feigning crazy is entirely unclear).

<u>The Defendant Pleads Guilty</u>

In any event, on March 22, 2006, the defendant pled guilty to two counts of Manslaughter 1st degree upon a sentence commitment of 25 years concurrent determinate and five years PRS. Before entering the plea, the defendant (with the help of an interpreter), stated that he was 24

-19-

A-1002

years old, spoke a little bit of English, went as far as the eleventh grade and was taking medication but felt good mentally and physically. After claiming to understand the charges and the likely consequences, the defendant acknowledged that he "intended to cause serious physical injury ...to kill... (Miguel and Nelson Camacho), and killed them by means of "a rifle, rifle, shotgun."

In his pre-sentence memorandum, defense counsel recounted the strange circumstances of the defendant's confession and psychiatric break down and surmised that he may have been recruited for this crime because of his size (6' 5" tall and 295 lbs. according to the Pre-Sentence Report [PSR]) and susceptibility to intimidation. The PSR indicates that the defendant declined to make any statement to the Probation Department about the offenses and reported that "he had made a decision to withdraw his guilty plea." He also reported a "history of ...mental health disorders" beginning in 2000 which included hearing voices and seeing people who were not there. He claimed to have been prescribed Paxil, Deserol and Vysturel. He said that he had been taking no medications since coming to Buffalo up to the time of his incarceration. Although he reported no history of illegal drug use, the forensic records indicate a history of alcohol, marijuana and Xanax abuse.

<u>Sentencing</u>

At sentencing on June 16, 2006, defense counsel reminded the court that the plea had come about as a result of the defendant's having advised counsel on his own that he wished to do so. Then, on the day before sentencing, counsel received a letter from the defendant (possibly written with the help of another inmate), indicating that he had changed his mind and wanted to withdraw his plea. Since there was no claim that the plea had been coerced or otherwise forced

-20-

upon the defendant, counsel saw no legal basis to move to withdraw. The defendant repeated his desire to withdraw his plea but offered no reason other than his change of mind. Counsel made a pro-forma motion to withdraw the plea which the court summarily denied. Noting that the defendant was someone who appeared to be "easily led," the court imposed the promised sentence.

<u>Subsequent Psychiatric Records</u>

Records from the Central New York Psychiatric Center described the defendant in 2007 as being 6' 5" tall and having below average intelligence. On January 29, 2008, he said, "I know I did wrong but everybody makes mistakes." Ten months later on November 23, 2008, he reportedly exposed himself, relieved himself on the floor and was babbling in Spanish and English. He appeared to be "constantly...responding to internal stimuli." A year after that, on November 18, 2009, he wondered how he could turn out the way he did when he was raised in a good, hard working family. He said that he had "made a bad decision and has to deal with the consequences." (Whether he meant killing the Camachos or pleading guilty to crimes he didn't commit is unclear).

<u>The Federal Investigation</u>

While the defendant was marking time as a sentenced prisoner, the United States Attorney's Office was investigating a variety of criminal activities (RICO violations, drug dealing, murder) on the west side of Buffalo including the Camacho homicides with a particular focus on Misael (Misa) Montalvo, Efrain (Cheko) Hidalgo, Brandon Jonas and Carmen (Millie) Justiniano (Montalvo's girlfriend). Testimony was presented to a Federal Grand Jury on multiple dates in 2011 and 2012 resulting in an indictment for the above-named individuals on November

A-1004

8, 2012. Montalvo, Hidalgo and Jonas were charged with the murders of Nelson and Miguel Camacho. Noticeably absent from this indictment was the defendant.

<u>Interview of Defendant at Auburn Correctional Facility</u>

On June 29, 2011, Buffalo Police Detective Mary Evans and State Police Investigator Geraldo Rondon interviewed the defendant at the Auburn Correctional Facility. He said that he did not want to discuss the details or be a snitch. When asked if he felt that the other participants were after him, he said, "no." They asked about the AK-47, a .9 mm handgun and a shotgun and the defendant said that he ran to 7th Street after the homicides. He added that he "lost my mind for awhile. I don't know why."

The detectives showed the defendants photos of various individuals including Cheko Hidalgo and Sammy Ortiz. He only said that Ortiz looked like he might be familiar.

Two weeks later, on July 14, 2011, the detectives interviewed the defendant in the presence of the federal prosecutor. He recounted that he'd moved to Buffalo after spending a lot of time in jail in Puerto Rico. He got involved with the same type of people on 7th Street as he did in Puerto Rico. He said that two of them were with him during the murders of Nelson and Miguel Camacho. He had heard that they had won the lottery and were making a lot of money. When they went to the house, he could see someone inside through the window. He hit the door and it opened. One male was by the front and a second male emerged from the back carrying a cell phone and saying something about "killing my brother." He originally thought it was a gun. He had an AK-47 and the others had a .9mm and a shotgun. The male at the front was shot first and then he shot the male with the cell phone. He also tried to rip a gold chain from one of the victim's necks. After all the shots were fired, they scanned the apartment for money and drugs

-22-

but did not take anything. The then left the apartment and he ran to 7th Street where he was living.

The defendant was then shown photo arrays which included Brandon Jonas (he identified two others in that array as people he recognized but not Jonas), Uda Higalgo (no hit) but he did say he'd met Uda at Ashley's or LaLuna; and Cheko Hidalgo ("I recognized him. He lived near me on 7th Street") but did not know his name. He did not wish to sign any of the photo arrays and expressed concern about being shown photos in the Grand Jury.

<u>Defendant's Federal Grand Jury Appearances</u>

The defendant was presented to the Federal Grand Jury on July 14, 2011, and was asked without counsel or promise of immunity about his activities since arriving in Buffalo in May of 2004. Upon being asked if he had met an individual named "Uda," he requested an attorney. The prosecutor than advised him of the nature of the investigation (RICO, VICAR, Hobbs Act, Robbery), and of his right against self-incrimination and to have counsel. He then said that he had met Uda. However, when asked if he and Uda had planned to "rob some guys," he repeated his request for counsel.

The defendant re-appeared before the Grand Jury, this time with assigned counsel and testified pursuant to a written immunity agreement with the government. He repeated that he had met Uda and his brother "June" (last name unknown) at a west side bar. He stated that he had heard on the street about two brothers who were making a lot of money and who had hit the lottery. So, he decided to "step up to try to find some money and drugs." Figuring that they would be "a good target to rob," he discussed the idea with the other two guys who lived somewhere in the Seventh Street area. He said that the plan was "not to hurt the victims,

-23-

A-1006

(b)ut...everything became wrong." (i.e. they were expecting to find something but it wasn't there).

The defendant stated that Uda and his brother picked him up at his apartment at 550 7th Street in a green Toyota Corolla. Uda drove them and the defendant brought an AK-47. Uda had a shotgun and his brother had a .9 millimeter. They drove a couple of blocks and parked on Seventh Street near Massachusetts and Niagara by Zip's Store. When asked what they were wearing, the defendant said, "I remember I used to have a black hoodie (which was up), a pair of pants, but I used to get like a costume dress to cover my weapon." He said he put the AK-47 down his baggy jeans and tied it over his belt. As to the brothers, he said, "...you can say they got the same clothes. They ain't got the costume dress, but I believe he got a big army coat." The brothers also wore hoodies.

The defendant went on to say that at around 9:30 p.m., they crossed the street and went to the house which was "like three or four houses over on Massachusetts and Niagara," where, through the window, he "saw one of the Camacho brothers...sitting down, watching TV or whatever it is." He had met them before at the Famous Corner Bar. The defendant said that he was going to knock on the door but kicked it. He went in, "they looked at me...and I started talking to them in Spanish, (saying), where's the money?" He added, "we didn't find none, (h)e's fighting and everything, we came there, so I shot them."

When the defendant entered with his gun out, Uda and his brother were behind him holding guns as well (he believed). The defendant pushed past the first victim and "bring him to the floor and I did what I did." When asked if he had any jewelry that he tried to take, the defendant replied, "(y)es, he got a nice chain," which fell to the ground. He described the first

-24-

victim as being, "a little scared and...tough." The defendant said, "where is the money and drugs," to which he replied, "I don't know what you're talking about." At that point, Uda and his brother were searching for drugs and money at his direction.

The defendant turned the AK-47 on the first victim and shot him "in the face...and his arm, I believe," because he was a little angry and frustrated. As the other two were running through the house, he heard the other victim's voice saying, "we was killing his brother." Specifically, he said, "(y)o come here, they're killing Lobo." When asked what happened next, the defendant said, "I ain't gonna lie. I felt a little concerned, not scared,...because I don't know if somebody is going to get a pistol and shoot at me or something. (W)hen he was coming out of the room, I ...seen his hand (and)...thought it was a gun, but basically, I thought it was a cell phone, but it looked like a gun because it was a little darker, (s)o I decided to shoot him too." (The .25 caliber gun found at the scene was reportedly silver or chrome).

When asked if Uda and his brother were also shooting, the defendant said, "I think yeah, you can say that, yeah." The prosecutor then asked him that "if the crime scene indicated that all three guns were used, would you agree with that assessment, that everyone was shooting?" the defendant eventually said yes. (Why the prosecutor said this is not clear inasmuch as the ballistic evidence suggests that only one type of gun, an AK-47, was fired).

After shooting the second victim, they quickly searched the apartment and ran out the front door. The defendant said they split up with him running back to his apartment and the others (he believed) got into the Corolla and also went to meet him at his apartment. He then said that he crossed Niagara Street and turned left onto Seventh Street while the others went the opposite way toward Massachusetts (in the opposite direction of the car). He was then asked,

-25-

A-1008

"(s)o there would've been two people running down Massachusetts in one direction and one person running down Massachusetts in the other direction?" The defendant replied, "Massachusetts and Seventh Street, yeah. But the car...was on Seventh Street." So, even though the defendant ran toward the car, he didn't get in but made a left turn and ran down Seventh Street. (Why he said the others ran away from the car down Massachusetts after previously saying that they had gotten into the car is not clear).

Regarding the AK-47, the defendant testified that he "tried to cover it the most I can but I didn't put it in my pants." He repeated that he returned to his apartment (where he kept the gun) but did not know where Uda and his brother went (contrary to his earlier claims). He did say, however, that he met them there sometime after and they remarked how "everything came wrong." Uda said, "it's my fault" because he'd led them to believe that there would be a ton of money and drugs. Uda and his brother later told the defendant that the guns were safe.

When asked if he'd told the police that he'd thought that the second victim had a gun in one hand and a cell phone in the other, the defendant said "yes" but added that it was dark. He "believed" he may have also told the police that he'd thought Uda and his brother were going to come after him. (BPD police reports do not indicate the defendant mentioning any names other than Ricardo Velasquez in this regard).

The defendant, described Uda as being light-skinned, 5' 7" to 5' 8" tall with short and tight hair (like the defendant's) and normal (not chubby) build. He estimated his weight to be between 170 and 180 lbs. (A Federal Marshall's booking from 6/5/12 lists Uda Hidalgo as being 5" 6" tall and 220 lbs., DOB ███████34).

The other brother, according to the defendant was "more shorter than him." He was also

-26-

A-1009

light-skinned but older and wearing a "blow top" hair style. (It is not clear who "June" is but a Federal Marshall's booking form for Efrain Hidalgo dated 5/31/11 lists him as 5' 10" tall, 225 lbs., DOB ▮▮▮▮6).

The defendant was shown a photo array and asked if he recognized #2 to which he said that he "used to meet him before he got busted...(he) used to live all the way down Seventh Street...(u)sed to call him Chello." (The record does not so indicate but it is believed that this photo was of Cheko Hidalgo). The prosecutor asked the defendant if this individual was with him that night and the defendant said, "no." When asked if he was being "100 percent honest about that," he replied, "100 percent." At that point, the prosecutor warned him that dishonesty could invalidate their agreement and he said that he understood.

The prosecutor then showed the defendant another photo array (believed to contain a photo of Uda Hidalgo). When he said with "100% honesty" that he did not recognize anyone, and specifically "did not see Uda there," the prosecutor invited him out of the Grand Jury.

### Luis Camacho - Grand Jury Appearance

On November 3, 2011, Luis Camacho appeared in the Grand Jury and testified that Flaco called and asked him to come over with a weapon because "something happened to Lobo." Luis (along with his girlfriend and her child) drove over and came to a stop at the traffic light at Niagara and Massachusetts when he saw two guys (pretty skinny and fast, not big) in hoodies (one yellow) running across the street, in front of a truck, toward Massachusetts. He went into the house and saw Lobo face down and then proceeded to the back where Miguel was laying against a door holding a little gun. He gave the gun to Luis, the cops came, pinned him down and took him to headquarters.

-27-

A-1010

Luis said that he had met the defendant a couple of times but did not believe that he was one of the two guys running across the street. He said that the defendant is tall and big while the two runners were small (120 - 130 lbs.), and he would have known if it was the defendant. He was unaware if the police had found drugs or money at the house and said that Nelson only sold drugs to friends. He claimed that he and his brothers were occasional users. He said that the police gave him the gold chain found on the floor (which he later returned to Detective Evans) and $3,700.00 in cash. He also stated that Lobo had told him that Misael (Montalvo) had tried to "turf" (i.e. hit on) his girlfriend and that he (Luis) had slapped him (Montalvo) at a bar.

<u>Jeilyn Rosario Grand Jury Appearance</u>

Jeilyn Rosario also testified on November 3, 2011. She resided at 879 Niagara and was generally aware that Nelson and Miguel were involved with drugs which they (along with Pedro Salsa, Misael, Canario [Luis Camacho]) would discuss on a weekly basis in the back room.

About a year before the killings, Misael had tried to kiss Jeilyn who reported this to Canario. He and Lobo called Montalvo and a couple of months later, Lobo punched him out in a barber shop. After that, Montalvo stopped coming over to 879 Niagara Street.

On November 11, 2004, Jeilyn was home all morning with Lobo and Flaco and Canario who had been partying for a couple of days. She got into an argument with Lobo over her cooking so she went to her sister's house. Lobo then called her and, after a scheduled pool game was cancelled, invited her back over to watch movies. When she got there, she saw the police and was advised by her friend "Poocha," that Lobo had been killed.

Jeilyn said that she heard that a guy named Josue Ortiz had taken a plea in connection with her boyfriend's murder. She noted that he had signed the funeral book (as did Tito, Misael

-28-

A-1011

and Luis) but said that she had "never seen him around Misa, Lobo, Flaco or Canario before." She agreed that he was a "tall guy" and said that he looked familiar "when she had seen him in court.

### Further Police Contact with Misael Montalvo

According to a police report of November 21, 2011, State Police investigators (Geraldo Rondon and Josh Keats) interviewed Misa Montalvo on November 19, 2011 after he had been pulled over on the Thruway while driving from New York to Buffalo in a rental car loaded with cocaine. He said that he'd left Buffalo in 2004 because there were no jobs available and people were spreading rumors that he was involved in the deaths of the Camacho brothers. He also said that he and Nelson argued over a rumor about him and Nelson's girlfriend. He said that they were like brothers but things had gotten out of hand and they never made things right between them.

He mentioned that he had spoken to the police about the rumors and he was told that "everything was ok." He recalled that "someone" had gotten arrested and was doing time for the murders. When asked if he knew that person, he said, "no." He also said that he had heard of Uda Hidalgo but did not know him. (He did not identify him from a photo array). Upon being shown a photo of Cheko Hidalgo, he nervously replied, "he's Cheo, Chemo, Cheko, who was arrested for being a leader of the 7th Street Gang." He denied every having any dealings with Cheko and said he was not involved in "hurting others." He recognized a photo of Brandon Jonas (Cheko's cousin who was always with him in the neighborhood). He said that at the time of the homicides, he was driving a yellow Toyota Tercel which people referred to as the "Sponge Bob" mobile. He stated that he did not go to the Camacho brothers' funeral because of threats

-29-

against him and his family. (He denied any knowledge of the drugs found in his trunk).

### Angel Rivera  Grand Jury Appearance

On January 19, 2012, Angel Rivera testified (pursuant to a proffer agreement with the government) that he had dealt heroin with Cheko, Uda (brother) and Frank (father) Hidalgo on the west side of Buffalo. He met Misael Montalvo in October, 2011 at the ECHC. Montalvo explained how he was transporting coke back and forth from Queens to Buffalo in Enterprise rental cars until he had gotten pulled over with cocaine in the vehicle. He also mentioned driving a couple of guys "back in the 90's" on Niagara Street for what was supposed to be "a little armed robbery" but ended up with "somebody getting killed." Rivera recalled Montalvo saying that he had a yellow car. (The prosecutor confirmed that Rivera's cooperation would be conveyed to local prosecutors in connection with a state indictment pending against him).

### Kevin Walsh  Grand Jury Appearance

Another jail house informant, Kevin Walsh, testified (pursuant to a proffer agreement on a federal marijuana case) on February 2, 2012 that Montalvo spoke to him about his intrastate drug dealing activities. He also told Walsh that he'd moved to New York City because he was worried about being brought up on murder charges. He explained that about a month before the killing, he'd had a falling out with an individual who had threatened him and his family. Walsh said, "who cares," whereupon Montalvo said, "I was the driver." He said, "I dropped him off at the deli." He also told Walsh that he had "done business with the guy" from 1988 to 2004 until they had a falling out and the guy threatened him and his family.

Montalvo expressed concern about some jail house "keep aways" that included "the

-30-

shooter." He also mentioned that one guy had gone to the funeral and "kind of flipped out...and...kind of took responsibility for it," but "he's not the guy. He's not the shooter." He said the actual shooter was at the ECHC and the guy who took responsibility was "messed up in the head." Montalvo said "that guy just killed somebody in Puerto Rico previously and he was kind of loopy, (but) he was not the shooter."

<u>Timothy Ernle Grand Jury Appearance</u>

On August 9, 2012, Timothy Ernle testified (pursuant to a proffer agreement in connection with a bank robbery charge) that he shared jail space with Montalvo from February to July 2012. Montalvo was "frantic" about a possible indictment on the murders. He said there were two sets of brothers and that "Uda and Cheko committed the murder and pulled the trigger." Montalvo further explained that he was friends with Lobo and Miguel but had gotten into an altercation with them about a female. He was copping drugs from one brother (Miguel) and made a move on the other one's (Lobo) girl. The brothers then told him that their relationship was over and he needed to pay them what he owes and keep walking.

Following the altercation, Miguel was pressing him for money, so he approached the other two brothers and made up a story out of anger. He reportedly told Uda and Cheko that there was a large amount of money and drugs in the house and if they helped him take care of this problem, he would allow them to keep the money and split the drugs. He said that they lived on Niagara Street between Rhode Island and Massachusetts near the "Town Pizza" Shop.

Montalvo recounted that he, Cheko and Uda drove there, the two brothers went into the house with a shotgun (while he was outside in the car). They shot them once in the head and in the body but there was no money or drugs. Uda came out and threatened to kill Montalvo

-31-

Case 23-352, Document 53, 06/27/2023, 3534012, Page43 of 261

because there was no money or drugs in the house. Montalvo said he spoke to the police that night and started getting threats from both the victim's family and the killers. So, he moved to New York City. He also explained that he'd spoken to the police to take the heat off himself and had managed to do so for a number of years.

<u>Frank "Macho" Matias Grand Jury Appearance</u>

Frank "Macho" Matias appeared before the Grand Jury on August 30, 2012 pursuant to a grant of immunity for his involvement in the Camacho homicides. He stated that he was visiting his friend, Sammy Ortiz (Machito), at Sammy's father (Sammy Ortiz aka Loco's) house on Seventh Street when Cheko and Brandon came over carrying packages. Once inside the house, they pulled out an AK-47 and an SKS rifle. They removed the clips and wiped off the bullets. Then, Sammy Loco came in with Misa and they all went into the kitchen. Misa started talking about Lobo and a lottery ticket. He also said he was going to drop them off. Cheko then pulled Macho aside and said, "you're going with me." Macho asked where and Cheko said, "don't worry about it."

Brandon grabbed the AK-47 and walked out with Cheko and Macho. They then got into Misa's "yellow old school" Toyota. Misa drove, Cheko sat in the front passenger seat and Brandon got in the back seat with the AK-47 along with Macho who had no weapon and was wearing black jeans, a black or royal blue hoodie and black Nike sneakers. Brandon and Cheko wore the same kind of sneakers, but white in color. Cheko wore a gray, zip up hoodie and Brandon had a "throw over gray hoodie."

En route to the house, Misa told Cheko that there would be a bag containing five kilos and up to $20,000.00 in cash just inside whereupon it dawned on Macho that they were about to

Case 23-352, Document 53, 06/27/2023, 3534012, Page44 of 261

do a stick up. Macho, who was 15 year-old, started to panic and Brandon sat there with the gun, "calm as the sea." They also planned to "flip mattresses" for drugs and the money was supposed to be there because they had supposedly just won the lottery. Cheko asked how many people would be there and Misa said, "one." He then proposed to drop them off on Massachusetts and meet them all later at Sammy's house on Seventh Street.

They drove as far as Zip's store where the three of them (Brandon with the rifle, Cheko with a bat and wearing gloves), got out of the vehicle. Shortly after that, they were confronted by Gennick Catalan's father (Tebo) of 53 Massachusetts Avenue who told them to get away from his house. Macho said, "hey, it's me," and they walked onto Niagara and crossed the street to go to Pizza Town. Before doing so, Brandon put the rifle down and Cheko laid down the bat by an abandoned house. Cheko bought some pizza and wings after which they went back across the street. Cheko explained that they were waiting for somebody to get to the house. Macho stated that he had cold feet and Brandon got angry and threatened to blow his head off if he backed out. Cheko said, "if you don't (go through with it), I can't stop him (Brandon) from doing anything." So, Macho decided to stick it out and it would be his job to rummage through the house.

Cheko warned Brandon not to shoot anyone because he's trigger happy. As they were talking, a black car pulled up and a male (wearing a hoodie, shorts, slippers and socks) and a girl walked into the house. Cheko handed Macho the bat and broke the door down with his shoulder. Macho heard a guy inside screaming, "what's going on," and Brandon stormed in with the AK-47. Cheko grabbed the bat from Macho and pulled him inside.

Brandon fired a shot and the guy was "leaning down (as) blood was leaking from his arm." Macho said, "Cheko we have to help this man," Cheko said, "nobody gets to say names."

-33-

Case 23-352, Document 53, 06/27/2023, 3534012, Page45 of 261

Cheko grabbed "some other guy's necklace and ripped it off and pulled me into the room...and said look around." Cheko flipped a mattress but nothing was there. He also searched a closet, some drawers and broke the door down into the kitchen where another man (the one who had entered the house a few minutes earlier) was located. That individual had a silver gun in his hand and was pointing it at Macho's chest. He pulled the trigger but the gun did not fire. (Matias assumed that he did not release the safety).

Cheko called out to Brandon who confronted the guy with the gun saying, "you think you crazy?" He then squeezed the trigger on the AK-47 and the guy was "bouncing up on the wall and...just slid down." Macho then ran out of the house. On the way out, he passed by the first guy who had been shot. As he approached the curb he heard another gunshot. He then ran up Niagara to Massachusetts and then headed toward Columbus Parkway. Brandon, who still had the gun, ran past Macho along with Cheko who no longer had the bat. As they came to Porter Avenue, Brandon tossed the gun into some bushes a few houses down from the gas station at Columbus.

When they got to Seventh Street between Porter and Jersey, a police car drove by and turned its lights off. They acted as if nothing was wrong. They ran through some yards, still aware of the police car, and went to back to Sammy Ortiz' house. When they got inside, Sonya (Sammy's wife) Ortiz took their bloody clothes, tied them up and took them into the basement and ditched them in a hole in the wall. (On November 19, 2012, police investigators performed a "cadaver search" of the basement at 482 Seventh Street and while the canine alerted them to the west side wall near a crawl space, there were "no visible articles of human remains.").

Shortly thereafter, Misa arrived followed by the police who asked Sonya whether anyone

-34-

A-1017

had run by the house. She said, "no, the kids were here the whole time," and the police left. When Sammy entered with Misa, Brandon and Cheko "went crazy." Brandon grabbed him and said, "I'm going to kill you. You set us up. There wasn't shit in there, you stupid motherfucker." Cheko said, "(t)hey both fucking dead and you set us the fuck up." Misa replied, "I swear, there was only supposed to be one guy," but Cheko and Brandon wouldn't hear it.

Sammy stepped in with the SKS and told everyone to calm down but Brandon was still pacing and talking trash. Both he and Cheko told Misa, "you better leave Buffalo because you're going to die too." They then turned to Macho and said, "(i)f you say anything, you're going to disappear." Macho then called Germick to pick him up. After he did so, Macho told him what had happened and Germick said he already knew because his father (Tebo) told him that he'd seen him earlier in front of his house.

Macho said that they did not enter the very back room of the house and he did not know whatever became of the female who went into the house with the male before they entered.

After the homicides, Macho laid low at his baby's mother's house in Niagara Falls. A few weeks later, he returned to the West Side and was confronted at a Chinese restaurant by Cheko who said that they'd all been questioned and wondered if he had been squeezed as well. Macho said no and Cheko said, "if you're talking, you're going to disappear too."

He later ran into Uda who said that he had been taken downtown with his girlfriend by police. He said he told the police that he didn't know anything about the homicides. He then asked Macho what happened and Macho said, "I really can't talk about it." From that point forward, everyone pretty much kept their mouths shut.

Matias recalled hearing on the street that someone got arrested and convicted of these

-35-

killings. When he learned it was someone other that Cheko or Brandon, he was in shock. As for the defendant, he said, "I don't know what he looks like." He insisted that no one other than the three of them (and Montalvo) were involved. He later heard that Cheko was glad that someone else got picked up so "we don't got nothing to worry about." He also said that he didn't know who the hell the guy was and that he was dumb for admitting something like that.

Macho also said he believed that the AK-47 had been destroyed. He did not recall any of them having or using duct tape during the crimes. On August 16, 2012, Matias viewed photo arrays and identified Cheko, Misa (the man with the plan), Brandon (the shooter) and Uda.

<u>Frank Coppola Grand Jury Appearance</u>

Also on August 30, 2012, Frank Coppola testified that he had left his home at 31 Rich Place and was heading for Zip's to buy cigarettes when he heard muffled gunshots. After purchasing the cigarettes, he left the store, he saw three young men with hoodies up running diagonally across the street very fast. As they passed him, one of them threw something in a yard and they proceeded down Niagara and turned left on Massachusetts toward Busti. He observed an aluminum baseball bat and when he reached his front door, someone came out the house across the street screaming.

Coppola called 911 and pointed the bat out to the police when they arrived. (Evidence records reflect that police collected a blue aluminum bat in the yard at 53 Massachusetts). He described the suspects as appearing to be Hispanic and of average build and height.

<u>Beverly Laborgne Grand Jury Appearance</u>

Beverly Laborgne, the upstairs resident at 879 Niagara Street testified on August 30, 2012

that she was playing games on her computer of November 11, 2004 in the front room when she heard rustling and banging sounds of people kicking in the front door and coming inside. She then heard people arguing in Spanish followed by "a good seven rounds" of gunshots. Her husband got up and called 911.

Laborgne looked out her front window and saw "(t)hree guys going one-by-one (in a straight line one right after the other) down the front stairs and the third one was holding a rifle the long way...up against his leg." She described them as wearing "baggy clothes and hoodies." She did not see their faces, nor could she tell how tall they were. They ran across Niagara Street and proceeded to the right toward Massachusetts.

Laborgne and her husband went downstairs and found Nelson on the floor with a gunshot wound to his face, eye and leg. She also observed Nelson's brother (Luis) who arrived before the police. She did not go far enough inside to see Miguel.

### Peter Delgado Grand Jury Appearance

Peter Delgado, a parolee recently released from prison on drug charges, testified in the Grand Jury on September 13, 2012 that in 2004, he and Angel Torres (since deceased) had acquired an AK-47 (brown and black) and an SKS which they kept at Delgado's brother-in-law, Waldemar Ramos' house in a closet at Busti and Jersey. The guns were stolen and Delgado had been told by Hiram Rosado (Chiquito) as they were driving by 879 Niagara that Cheko had stolen the AK-47 and used it in the murder of the brothers on Niagara.

### Eduardo "Beko" Rivera Grand Jury Appearance

The defendant's former housemate, Eduardo Rivera also testified on September 13, 2012.

Case 23-352, Document 53, 06/27/2023, 3534012, Page49 of 261

He said that he and the defendant sold drugs out of 19 Hoyt Street for Justo and Juan Galarza. Rivera described the defendant as someone who really didn't know his way around the neighborhood. He'd get lost going to the corner store. He recalled that the defendant ("Joey") took Xanax and did cocaine.

Rivera learned of the Camacho murders when Justo (Canario's best friend) came over the following morning and advised him and the defendant that they had been killed. The word on the street was that one of the brothers (Lobo) was shot in the face and the other was at the back door. The perpetrators were supposedly caught on Zip's store camera running from the scene. The defendant started pacing around and Rivera asked him what was wrong. The two of them then went to the store and en route the defendant jumped into a police car that had pulled up. A female police officer asked, "what's wrong with this man," Rivera said, "what is you talking about," and the defendant blurted out, "I did it." Rivera said, "Joey, do you even know what you is talking about?"

Detectives arrived and asked why he was saying that and Rivera said, "I don't know, I don't know what's wrong with him." Rivera then called the defendant's cousin, Valeria and said, "your cousin flipped out and is talking nonsense saying he killed Lobo and his brother over there on Niagara." The police then put him in a car and drove him away. He eventually ended up at ECMC where he wouldn't speak to anyone.

Rivera said "there is no way" the defendant could have done the killings because the two of them were always together at 19 Hoyt and kept track of each other and the house cameras did not show him leaving on the night in question. He surmised that everything the defendant told the police was based on what he had heard. He also opined that the defendant was angry at God

Case 23-352, Document 53, 06/27/2023, 3534012, Page50 of 261

over the death of his mother and must have gone crazy and blamed himself for the homicides.

## The Defendant Revisited

On July 11, 2012, Detective Evans and an investigator met with the defendant at Attica State Prison. He asked them why they keep asking him questions and said he had nothing more to say about the homicides. Nevertheless, they asked him whether he had left the house from the front or back door. He asked why they wanted to know and they said because it would be helpful to the investigators.

Investigator Rondon then asked, "(w)ere you even there," to which the defendant, seemingly surprised, asked, "(d)id you find my DNA at the scene?" The investigator said he didn't know but if the defendant recalled touching anything, the lab could compare it.

They then asked him why he attended the Camacho wake and he replied that in Puerto Rico, people go to see who attends to try to determine who may have committed the crime. He said that the Camacho brothers were not bad people.

## The Defendant Claims He is Innocent

A follow-up interview which included the federal prosecutor occurred at Attica on September 6, 2012. They informed the defendant that people were claiming that he did not commit these crimes and that certain details did not match up with what he had told police in 2004. (They advised him that they had spoken to his friend, Eduardo Rivera). The defendant recalled "moving with him" out of 19 Hoyt Street.

The defendant then said, "OK, I'm innocent." The prosecutor asked him why he had said what he did back in 2004 and he replied, "(y)ou could say that I was scared...but I didn't know what I was scared of. Back then, I kinda lost my mind for awhile. I'm not gonna lie. I did some

-39-

things in Puerto Rico. I was in Buffalo about four or five months at that time. I was doing a lot of coke, lortab bars and marijuana. I heard some stuff in the street (about the homicides). I think people said it was over a lottery ticket or something. When I spoke with the detectives I had been up for three days."

The defendant said that he was not in the house at all when the homicides took place. He believed that someone (he could not recall who), had told him about the homicides. When asked if he had ever heard of "Uda," he said, "no." He said he had heard of Cheko but did not know him. He also claimed not to know or to have heard of Sammy "Loco" Ortiz, Sr., Sammy "Machito" Ortiz, Jr., Sonia Ruiz or Misa. He was not familiar with 482 Seventh Street (Ortiz' house) but said that he used to stay at 550 Seventh. When asked if he had heard that one of the victims had made a phone call during the break-in, he replied, "(y)eah, you heard a lot of shit in the street."

The investigator asked the defendant if he ever wanted to take back what he had told the detectives and he said, "(y)eah. I told my lawyer I wanted to take it to trial." When asked if he thought he would "beat it" at trial, he said, "(y)eah, they offered me (four) pleas. The first was 30 to life, I said no. (T)he second was 25 to life. I said no. (T)he third was 20 years. I said give me a week and a half to think about it. I said OK. When my lawyer told the DA, they said, 'no, it's 25.' I told them I wanted to take it back but they told me it was too late."

Describing his feelings after being sentenced to prison, he said, (o)nce it was done I figured there was nothing I could do about it. I felt like I did when my mother died. It was something horrible that I knew I had to live with." He recalled ending up at ECMC and had heard on the street that a shotgun had been used to commit the homicides. He also recalled

-40-

Case 23-352, Document 53, 06/27/2023, 3534012, Page52 of 261

having spoken to the detectives in Spanish since he spoke no English at that time.  He said he had

been to the (victims') house one time with a friend but he had stayed out on the front porch.

While in prison, he took medications until 2010 and stopped because it was tearing up his

stomach.  He then asked, "(s)o now what?"  He was advised that he would need to tell the Grand

Jury the truth and that many things needed to be done.  They asked if he was now telling the truth

and he said, "yes."  He also said that he understood the difference between the truth and a lie.

### The Defendant's Return to the Grand Jury

On September 13, 2012, the defendant testified that he had lied in 2011 by taking

responsibility for something that he did not do.  He recounted that he had come to Buffalo in

May of 2004 to have a "better life" after he'd gone out of control with drugs in Puerto Rico

following his mother's death in 2001.  After coming to his uncle's house, he and his cousin,

Reynaldo Velasquez started selling drugs out of 19 Hoyt Street.  He met Lobo and Flaco at the

Famous Bar where he saw them a lot.  He'd been to their house one time in August or September

of 2004 but had never gone inside.

The defendant testified that he had gone to the Camacho funeral with his cousins.  Many

people there, including Luis (Canario) Camacho spoke about what had happened.  In particular,

Luis said that Flaco had called him and said, "they was killing Lobo."  Luis went there but

arrived too late.  The defendant had also heard that the incident "was for a lottery ticket,

something like that," and that "they used a shotgun or something."  The defendant described

himself as standing 6' 5" tall and wearing a size 14 shoe.

The defendant said he was losing his mind after several days without sleep.  He recalled

walking with Beko and screaming when a police car arrived and he jumped into the vehicle.  He

Case 23-352, Document 53, 06/27/2023, 3534012, Page53 of 261

was then taken by ambulance to the hospital where he spoke to the police. After being released, he returned to 19 Hoyt. He bugged out again and called the police. He was transported to headquarters where he spoke to Detective Stambach (with Officer Torres interpreting).

Stambach asked questions and the defendant said, "I would really like to confess." They asked if he had something to do with the murder and he said, "yes." They gave him the name Uda, whom he didn't know, and his brother. After that, "they made me talk. They gave me food and a cigarette and I was talking and they were writing. When I finished, they read me my rights...and put me in the holding center..."

The defendant said that the detectives interviewed him for about 25 minutes before they typed up his statement. He acknowledged giving the answers set forth on the statement. When asked where he'd gotten that information, he said that the brother (Luis) was saying a lot at the funeral. "Everybody was talking about that." He also heard about it on the street.

One of the things the defendant said he'd heard was that Flaco and Lobo were making money dealing drugs and he'd also heard about a lottery ticket. He explained that his friends, the Galarzas, were friends with the victims and that is how he learned this. He had only thought at that time that the perpetrator had gone over there to assault the victims and the information about Flaco hearing the other brother yell reportedly had come from Canario at the funeral.

As for why he named three different weapons, the defendant said, "(a)ctually, I lied. At that point, I only heard about the shotgun part...I didn't know what weapons they used." When asked why he had told the police that he tried to take Lobo's chain, the defendant said, "I don't know." His statement about seeing money and drugs was not true and he said that he never went into the apartment. He thought he may have known Cheko, did not recall if he knew "Frank,"

said he never met Uda and he didn't know Brandon.  He did not know Sammy "Loco" Ortiz but believed he knew Sonya Ortiz.  He did not know Misael Montalvo.

The defendant was asked to explain why he had said he was involved and he said, "It's hard because I understand that I already put myself in this situation.  Nobody telling me nothing but I started to lose my mind without sleep for three and a half days...the real truth is that I never killed nobody and that's the real truth."

When asked why he pled guilty, the defendant said his lawyer always had bad news and told him that he'd spend the rest of his life in jail if he went to trial and lost.  He explained that they were going to "finish" him with the "detailed confession" and "they have somebody (the other lady) that saw me after the shooting running, which I didn't know."  So, rather than spend the rest of his life in jail, he decided to take the plea.  (In his pre-sentence memorandum, counsel states that the defendant advised him on his own that he wished to plead guilty).

On the day of sentencing, the defendant told his lawyer that he wanted to take back his plea and go to trial because he didn't do it.  The attorney said "let's see what happens...but the judge said it was too late." (In the pre-sentence memorandum, counsel states that the defendant had simply changed his mind).

The defendant explained that at the time of his confession, he was under the influence of coke, pills and marijuana and operating for several days without sleep.  He could not really account for scrapes and cuts on his body. ("I was walking and scratching on somebody's side, I don't know.").

The defendant testified that he received some mental health treatment in prison and initially took medication (Zyprexa, Remeron, Trazodone, Zoloft) but eventually stopped doing

so.

When asked why he didn't proclaim his innocence to the Grand Jury in July 2011, the defendant said, "I don't know...I should have said I'm innocent and I don't know nothing but I just ...keep quiet. I was a follower and I had decided to say a lot things that's not true." The prosecutor then asked, "(d)id you thank that regardless of what you said, you were still going to serve your 25 years?" The defendant replied, "(y)es I did. I always think about that, regardless if I say I'm guilty or not guilty, I wasn't thinking. One day I am going to come out. I am sentenced to 25 years so it doesn't matter if I say anything right now."

Asked if he was worried about "being a snitch in prison," the defendant said, "I ain't snitching." The defendant also expressed confidence that his DNA would not be on any evidence connected with the homicides. The defendant said that on the night of the homicides, he was at 19 Hoyt "with my man, Beko."

The defendant acknowledged telling Detective Stambach that he had shot Flaco "in the belly" and Lobo "in the face (and) chest (and) did a couple when he was on the floor." He said "(m)ost of the time, I am a follower. I don't blame him because I take my responsibility but when he asked me some questions I said yeah or whatever." He added that he'd heard at the funeral that Lobo was shot in the face.

### Defendant's Federal Counsel's Involvement

In an affidavit submitted on August 28, 2013, Emily Trott, Esq. described her involvement in the defendant's Federal Grand Jury appearances thusly: On July 14, 2011, she was called in by the Federal Public Defender's Office to represent an un-named individual who was scheduled to testify before the Grand Jury. Three hours later, she met the defendant who

was accompanied by a Buffalo Police detective and a State Police investigator. She then met with the federal prosecutor who advised that the defendant had been "cooperating with law enforcement for several months on a particular case but had suddenly become a very reluctant witness." The prosecutor expressed concerns about possible perjury charges and asked counsel to instruct him on the legal consequences. Counsel was not informed about the nature of the Grand Jury investigation or that her client had previously pled guilty to Manslaughter in connection with it.

Counsel then spoke to the defendant with an interpreter for 10 to 15 minutes. At first, the defendant advised that the case was about drug dealing and that he had no problem giving testimony. (This appears to contradict his other counsel's argument that he'd falsely restated his involvement in the Camacho murders for fear that, by changing his story, he would somehow be charged federally in a drug conspiracy notwithstanding the grant of immunity that he received on July 21, 2011).

According to Ms. Trott, the defendant appeared more concerned about testing her knowledge of the streets than describing his testimony. After being advised of the penalties for perjury, the defendant returned to the Grand Jury only to be let out several minutes later. Counsel asked if there was a problem, and the defendant said that he was confused. He returned to the Grand Jury only to be escorted back out. The prosecutor informed counsel that the defendant was "now testifying in complete opposition to prior statements and was in danger of being indicted himself." Counsel then warned the defendant that it was foolish to think that the feds would not take action if he didn't cooperate. After further discussion with counsel and the prosecutor, the defendant returned to the Grand Jury.

The defendant was brought back out and the prosecutor advised counsel that his testimony was critical to the indictment of persons involved in a double homicide of two drug dealers. Counsel was informed that the defendant had information about their business operations and about the homicides but was refusing to testify about it. Counsel stated that up to this point, she had not had sufficient opportunity to address the "real reason" behind the defendant's reluctance to provide truthful information.

Counsel reminded the defendant of the implications of non-cooperation and stressed the importance of being truthful. She then asked if he had been threatened. He said no but was very reluctant to share details of the homicide with counsel. He inquired about the secrecy of Grand Jury proceedings wondering who might know of his cooperation and how it might be discovered. Counsel advised him of the "enormous protections" given to cooperating federal witnesses and he returned to the Grand Jury only to be escorted out yet again (and four more times thereafter). The defendant reconsidered cooperating and asked, without elaborating, about "additional crimes and future cooperation in Federal Court." Proceedings were then adjourned to work out an immunity agreement.

A written agreement was reached on July 20, 2011. Counsel met with the defendant the following day, reviewed the agreement with him (which he signed) and back to the Grand Jury he went. Twenty minutes later, the defendant came back out and the prosecutor was confounded by his testimony which was now "completely different." (How and from what it was differing is not entirely clear inasmuch as the defendant continued to implicate himself along with Uda and his brother, June. It was only when he was not able or willing to identify Cheko and Uda from photo arrays that the prosecutor showed him the door).

-46-

The defendant apologized for wasting counsel's time but said that he would rather sit in jail than endanger his life and the lives of his family and friends. He said that if he testified, these "people" would eventually find out and have him killed. Counsel asked why he had not said this sooner and he shook his head and said that it was better to be "safe in jail than dead on the street." He refused to cooperate further. Counsel warned him that he could be indicted and he replied that he was "safely serving a manslaughter conviction and federal charges were of little concern to him." (Again, this seems to contradict his other attorney's argument that he was untruthful on account of fear of federal drug prosecution). As previously noted, up to this point, Ms. Trott was "completely unaware" that the Grand Jury was investigating the very case in which the defendant had pled guilty seven years earlier. (Why she was kept in the dark by her client and by the government is entirely unclear).

One year later, counsel received word from the federal prosecutor that the defendant would be testifying in the Federal Grand Jury under "very different circumstances." Counsel met with the defendant whose command of English was markedly improved. He apologized for having misled counsel and stated that "dangerous people" were involved. He said that his knowledge of the homicides had come from the victim's brother who spoke about it at the funeral and he had tried to "play it cool" when he was told of the "terrible things about the murders after they had happened."

The defendant reportedly was "thrilled" that DNA would be exonerating him and that he would not be responsible for "snitching." According to counsel, in the defendant's mind, science had somehow revealed the true killers so he would not be telling on anyone. The defendant inquired how long it would take to clear him. He still felt wary of the real killers but felt safer

-47-

now that he had been excluded from involvement in the crime by the DNA and the federal
investigation.

Through further conversation with the defendant, counsel was now aware of the state case
and learned that he had taken a plea "against his attorney's advice." The defendant explained
that his former attorney had "strongly advised him against taking the plea...but he (did) so
because he was terrified that the brother who had (spoken about) the case would kill him had he
gone to trial." (In his statement to Buffalo Police on November 15, 2002, he said he was afraid of
Reynoldo Velasquez because he had a shotgun). In any event, the defendant explained that he
was not cooperative with his former counsel because he didn't trust a non-paid lawyer who he
surmised "must have been working with the District Attorney's Office.

The defendant also expressed his concern that the safety of his family and friends would
be jeopardized if he had not taken a plea. He said that he'd never intended to tell the truth to
anyone because he knew that Montalvo and Hidalgo were not afraid to commit another murder.
In counsel's view, the real reason for the defendant's guilty plea was lack of trust of anyone and
fear for his life.

The defendant returned to the Grand Jury and testified without any further interruption or
delay. He also provided a DNA sample for comparison purposes.

<u>Luis Camacho Return to Grand Jury</u>

Luis Camacho returned to the Grand Jury on November 8, 2012, and stated that he was at
home on School Street watching television with his girlfriend when Miguel called and said
"come real fast and come armed, something happened to Lobo." Luis and his girlfriend, Yvette
Maldonado, (and stepson) jumped in the car and drove over to Niagara. When he got to the stop

light, he saw two guys come out of the house very fast and run across the street by two big trucks.

Luis said he knew a big guy named "Joey" (about 6'6" tall) but he was not one of the two guys he saw running from the house. Luis then went inside and found Nelson with his face blown off and some of his jewelry (chain) on the floor. He then went into the kitchen and found Miguel laying by the door. He handed the gun to Luis who started looking for Lobo's girlfriend. The police came, knocked him down, took the gun and put him in a patrol car.

When asked if he'd told friends and family at the funeral what had happened he said, "I might, yeah. It's been a long time, but I don't recall it, but I believe I did, you know." The prosecutor asked, "it was a topic of discussion," and he said, "(y)up, yup." He mentioned that Yvette did not go in the house but stood on the porch screaming. He did not remember whether the upstairs neighbor came down.

<u>Jose Escalera Grand Jury Appearance</u>

Jose Escalera testified pursuant to a proffer agreement in connection with federal drug charges on November 8, 2012. He spoke of meeting Misael Montalvo at the Holding Center at a time when he (Montalvo) had gotten in a fight with an inmate whom he suspected was ratting on him. Over time, Montalvo spoke about his New York to Buffalo drug activity (reportedly amounting to ten grand a week) and that he'd been pulled over with ten to fifteen ounces of cocaine in his vehicle.

They also had a conversation about the brothers who were killed. Montalvo said that he was at Sammy Loco's house and two guys (Cheko and Brandon) came over full of blood. (After refreshing his memory with a report of an earlier interview, Escalera said the other name mentioned by Montalvo was "Brandon." They stashed the guns and were talking about burning

-49-

their clothes and getting rid of the weapons. Montalvo also said that he was scared about getting indicted and mentioned that he'd been throwing out lies so people would mix things up and he'd see what came out in court.

Montalvo also told Escalera that he was "messing with one of their girls," and they got into an argument. The reason they were killed was for a lottery ticket worth $80,000.00. He also said that he was close friends and did business with Sammy Ortiz, Sr.

He added that Cheko and Brandon came over to Sammy's full of blood and said that they had killed somebody.

### Uda Hidalgo Grand Jury Grand Jury Appearance

Uda Hidalgo, who was ten months into a 25 year sentence on a manslaughter conviction for killing his girlfriend, testified pursuant to a proffer agreement on November 8, 2012. (At his state sentencing in Erie County Court on January 10, 2012, his counsel complained that two FBI agents and a Buffalo Police detective had visited his client without his knowledge the week before and promised to help him out with his case if he cooperated in the federal investigation. The state prosecutor stated that no one had authority to make such promises. The federal prosecutor informed defense counsel that he was not aware of nor did he sanction any promises to Mr. Hidalgo by the FBI).

Uda said that Cheko and Brandon had stolen Waldemar's AK-47 after he refused to sell it to them. They also had an SKS rifle that they had gotten from Cheko's friend, Paco. In November, 2004, Uda saw Cheko in front of Sammy Ortiz' house talking to a "fat Puerto Rican dude" about a "lick" that he had for Cheko where there would only be one person present. (Booking information from a 11/19/11 arrest of Misael Montalvo lists him as 5'6" and 225 lbs.).

-50-

A-1033

A day or two later, Cheko invited Uda to join in and promised him a cut of $3,000.00 He said it would be an easy lick with an expected $90,000.00 haul along with a kilo of cocaine. Uda declined the offer because his cut was too light, so Brandon promised him a bigger piece. Uda was aware that another guy was supposed to be involved but he didn't know who it was. A couple of weeks later, Brandon asked him to borrow some duct tape.

On November 11, 2004, Uda was at Sammy Ortiz' house during the day but went home to watch wrestling (apparently very popular programming on the West side) in the evening. He learned from the TV news that two people had been killed in their house. He went to Sammy's house and saw Sammy, Sr., Efrain (Cheko), Brandon (B), Macho (Frank Matias) and the same fat Puerto Rican dude (Misael Montalvo) that he'd seen talking to Cheko about the lick a couple weeks earlier.

Efrain was arguing with the fat Puerto Rican exclaiming, "it was all a set up. There was only supposed to be one guy, not two." Cheko slammed him down on the table and Brandon picked up a butcher knife. Uda and Sammy stepped in and said, "chill" and Brandon who had blood on his pants and Nike sneakers said, "(h)e played us." Cheko said, "you sent me there (for nothing) to handle your dirty work." The fat dude said, "I didn't know, sorry." Sammy broke things up and Cheko said, "It's coming out of your pocket. I didn't go there for nothing." The fat dude said "I'll pay." At that point, Uda went home.

The following day, Uda spoke to Macho who said, "it wasn't supposed to down like that." He said that as soon as they broke the door down, Brandon shot the first guy. Macho and Cheko searched the house for drugs and money while Brandon kept watch on the first guy. He said that there was only supposed to be one guy and no one was supposed to get hurt. The

A-1034

second guy came out with a gun and started shooting, so Brandon shot him. Macho said the guy had a chrome gun. Before shooting the second guy, Brandon said, "you want to get crazy, I can get crazy too," and opened fire. Macho then told him that they took off running down 7th Street and Brandon and Cheko threw the gun into a nearby bush. After that, they returned to Sammy's when Uda showed up.

Cheko later told Uda at their father's house that they had been set up by the dude who'd sent them there to do his dirty work. He said that there were no drugs or money and "stupid B" opened fire. He said it was a mistake to let him have the gun. Macho was the first to run out of the house.

Cheko also said that he forced open the door to the back room and encountered the dude with the gun who pointed it but it didn't go off. So, Cheko tried to whack at it with the bat. The dude cocked the gun, Cheko yelled for Brandon. The dude cut into a side room and opened fire and Brandon did so as well. He shot the dude several times saying, "if you wanna get crazy, I can get crazy too."

As they headed out, Brandon said to the first guy, "so we came for nothing." He replied, "yeah, nothing." Brandon then shot him in the back of the head and they took off running down 7th Street. They were passing the gun back and forth and Brandon, who was lagging behind, said "if you don't slow down, I'll start shooting in the street." They stuffed the gun in some bushes and ran to Sammy's. He said they later cut up the gun and got rid of it.

The next day, Uda told Brandon what Cheko had told him. Brandon said, "it wasn't like that." When they broke open the door, he yelled at the first guy to stay put. The guy spoke in Spanish but Brandon didn't understand him. The guy continued to come forward, reached

-52-

around the door frame and Brandon, thinking he might have a gun, shot him in the arm. He was bleeding a lot so Brandon gave him a blanket. He then heard Efrain scream, "he's got a gun." The second guy was pointing a gun and ducking behind a wall and opened fire. He came back out and fired two shots so Brandon stepped around the corner with the AK-47 and "let it rip." The guy slid down the wall. He mentioned that he could have run but Efrain is his blood and if he had left, Efrain would have died, "I saved his life."

On the way out, he put the gun to the first guy's head and said, "here for nada?" The guy said, "nada." Efrain said that "names" were mentioned (he called out to Brandon by name), "do what you gotta do," and "blam," Brandon shot the guy in the head. He said the AK-47 was a Russian military rifle that was stolen from Waldie's house (note CPS ballistics report). He described it as having a cherry frame and a 60 round banana clip. According to Uda, Brandon said he'd thrown out his clothes in someone's garbage can.

Uda testified that the Buffalo Police had picked him up for questioning on November 17, 2004. They told him that his name had been mentioned in connection with the double homicide. They showed him a photograph of the defendant and Uda said, "I've never seen him before." They also showed him a photo of Brandon whom he identified as his cousin. The cops said they wanted to talk to him but he said he wasn't sure where he was. He did say that he could get hold of Cheko.

Uda later spoke to Cheko at his father's house on Busti and informed him about his discussion with the police. He told him about the picture of the guy (defendant) that the police had shown him and Cheko asked if Uda had said anything. He said no. He also had not told the police about the robbery plan or the altercation at Sammy's house after the killings.

-53-

A couple of days later, Cheko apparently spoke to the police. Uda asked him, "why are they questioning me about something I wasn't involved in" and he said that he would find out. Uda figured that either Brandon or Macho had "put his name in there." He then spoke to a girl on Prospect, Francesca (Poncha) who said that Macho had implicated him along with Cheko and Brandon. Uda confronted Macho who said that Poncha was lying and if he did say anything, he must have been drunk or high on coke.

Uda then called Cheko and told him what Macho had said and instructed him to talk to Macho "because I'm not involved in that shit." Cheko then told Macho that he should leave town. Brandon told Macho that it was the best thing because "I'd hate to have to knock you off." Macho then said he'd go to New York City where his father was living.

Uda said he argued with Cheko about being implicated and Cheko said, "(Y)ou were involved no matter how you look at it (because) you gave us the duct tape." (Macho did not recall seeing any duct tape). Uda later heard from Sammy Ortiz, Jr. that some guy had gotten convicted for the killings. He spoke to Cheko and wondered why the guy would admit to such a thing. Cheko said he didn't know, "maybe Macho said he was drunk." Uda said, "that's fucked up," and Cheko replied, "that's not fucked up. He's the dummy that went in there and told them that he did it."

<u>Federal Indictment</u>

Misael Montalvo, Efrain Hidalgo, Brandon Jonas were indicted for the Camacho homicide on November 8, 2012. The following day, the Federal District Court signed an order authorizing release of the Grand Jury minutes to the District Attorney's Office. (A subsequent order granted release to the defendant's original counsel on March 7, 2013).

At a detention hearing for Montalvo before the Federal Magistrate on November 12, 2012, the prosecutor summarized the evidence against them and described the defendant's 2006 guilty plea as a "red herring" lacking in any physical evidence or eyewitness testimony to back it up. He pointed out that the defendant was suffering from a major mental illness when he confessed to the police and argued that the details that he provided had been obtained from Luis Camacho at the victims' wake.

Asserting that the defendant, based on their independent investigation had "zero role in this offense," the prosecutor expressed his hope that the District Attorney's Office would come to the same conclusion and pave the way to clear him without further litigation.

### Cecilio Medina Interview

FBI investigators interviewed Cecilio Medina pursuant to a proffer agreement. He stated that he hung out with Uda and Cheko Hidalgo since about 1999. Shortly after the Camacho homicides, Cheko showed up at his house. Medina asked, "did you do it," and Cheko said, "don't ask stupid questions." Later, in 2006, Cheko stated that he, Brandon and Macho had been told that the Camacho's had a significant amount of cocaine. Brandon had a "K" (AK-47) and Cheko had a bat. Cheko kicked in the door and Brandon immediately shot the first brother. They ran into the back of the house, the second brother pulled the trigger of his gun but it did not go off. Brandon shot and killed him. Macho started to get sick. They searched the house and only found a little money. Brandon gave the gun to Macho because he was small and fast (a booking form dated 6/8/11 listed him at 5'8" and 185 lbs.). They all ran out of the house and across the street. Cheko said there was a female hiding in the house who had seen all of their faces. He said that they had gone there looking for kilos of coke, money and firearms.

-55-

Later in 2006, Brandon told Medina on 18th Street that when they kicked the door in, he saw the first brother reaching for something so he shot him. He then saw the second brother pointing a silver handgun at Cheko so he shot him as well (from the groin up). He said the victim looked "gory" and he had never seen anything like that before.

<u>Return to Tebo</u>

Detective Evans re-interviewed Esteban "Tebo" Acevedo (now a federal probationer) at his house on December 19, 2012. He said that he had seen the three suspects before and after the killings. They knew him and he know Macho (his son's brother-in-law), the one (Cheko) whose brother (Uda) killed his girlfriend, and the third he really didn't know. Before the homicides, he had seen them on his home surveillance camera and asked why they were in front of his house. They said they were chilling and he told them to move on which they did.

Acevedo then rode around the corner, heard a shot and saw the three suspects running from the house. One had a long gun and the other threw a bat in his yard. Acevedo went into the house and a heavy set woman was screaming, "they killed them." He saw one brother on the floor with his face blown off and the other one was in the back. He told the woman that the cops would be coming soon and he left.

Acevedo's sons told him that Brandon was the shooter. He didn't know him but had seen him around. He said the "set up guy" was not there and the one who said he did it had nothing to do with it. He surmised that "he must've been doing drugs or something." He said that he was related to Reinaldo Velasquez who had since died. He said, "I should've said something before because I knew who did it. That was terrible." (Although he had spoken to Detective Wagstaff on the night of the murders, he had apparently refused to go to police headquarters to give a

-56-

A-1039

formal statement).

He described the suspects as all being about 5'8" tall. (Detective Evans promised to inform the U.S. Attorney's Office of their interview).

Investigator Rondon and Detective Evans interviewed Acevedo yet again on December 27, 2012 at the U.S. Attorney's Office in the presence of his counsel. He said that the three suspects (Cheko, Macho and Brandon) outside of his house were all wearing hoodies. After he told them to leave, they proceeded south on Niagara and he took a ride to run errands around the block when he heard a shot followed by more shots. He headed back home and saw them leaving the house across the street. ("I saw Cheko and Macho and then Brandon came out last (with) a long gun (that)...he looked like he was trying to hide...by putting (it) to the side."). They ran past Acevedo's house and then down the street. He then heard someone crying outside the house and observed a lady (Luis Camacho's girlfriend), crying on the porch saying, "someone killed them."

Acevedo tried to calm her down and then went to the front door where he saw Nelson on the floor with his face blown away. He went back outside and told the lady that the police were on the way.

Acevedo also said that he had spoken to both Cheko and Macho who expressed their happiness that the defendant, whom he did not know, had taken the blame. They said they'd heard that he was "on drugs or something." These conversations reportedly had taken place in Acevedo's garage on Breckenridge Avenue where Cheko and Macho would bring cars to be fixed. They explained that "the guy was supposed to have a lot of money from hitting the lotto or something like that." Brandon entered the house with the gun, one of the victims looked like he

was reaching for something and Brandon shot him. Macho said they had been told the guys had money but they only found about $125.00 in a pair of pants.

The detective showed Acevedo photo arrays and he: 1) recognized Brandon saying, "(h)e looks familiar but I'm not sure," 2) identified Macho saying, "he's my son's brother-in-law," and 3) identified Cheko, "I know him and his father. His brother is the one who killed his girlfriend."

<u>The Defendant's Appeal</u>

On December 21, 2012, the Fourth Department affirmed the defendant's conviction determining that the trial court complied with CPL 730 and properly found him fit to proceed. They also found that his motion to suppress statements (though un-preserved) was properly denied.

<u>Procedural History of this Motion</u>

The defendant brought this motion on April 23, 2013. The People responded on July 12, 2013 and served a supplemental reply with attachments on July 16, 2013. The defendant then submitted a supplemental affidavit based on DNA lab reports dated 5/25/2012, 12/14/12 and 6/17/13 (received from the U.S. Attorney's Office on June 23, 2013) along with a reply to the People's opposition on July 17, 2013. The People submitted a supplemental opposing affidavit (based on DNA reports) on July 25, 2013. Oral argument was heard on July 29, 2013. The defense then provided an affidavit of Emily Trott, Esq. (defendant's counsel in the Federal Grand Jury) dated September 3, 2013 and another supplement to the original motion on October 17, 2013. The People submitted a response to the Trott affidavit on December 4, 2013.

On December 2, 2013, the People provided the court, per its request, with the State Grand Jury minutes, the BPD Homicide files and Evidence file regarding the crime scene. On

-58-

December 6, 2013, the U.S. Attorney's Office, in response to a request form the court, provided

the court and counsel with various documents including: report of BPD interview with the

defendant at Buffalo General Hospital on November 16, 2004, report of BPD interview with the

defendant on November 16, 2004 at the homicide office, detectives notes of November 16, 2004

interview with the defendant, defendant's written statement of November 16, 2004, transcript of

defendant's plea colloquy of March 22, 2006, report of interview of the defendant at Auburn

Correctional Facility on June 29, 2011, report of interview of the defendant at the U.S.

Attorney's Office on July 14, 2011, detectives notes regarding photo arrays shown to defendant

on July 14, 2011, photo array including Brandon Jonas, photo array including Uda Hidalgo,

photo array including Cheko Hidalgo, transcript of the defendant's July 14, 2011 Grand Jury

testimony, defendant's immunity agreement of July 21, 2011, report of July 21, 2011 interview

of the defendant at the U.S. Attorney's Office, transcript of the defendant's July 21, 2011 Grand

Jury testimony, BPD report of July 11, 2012 interview with defendant at Attica Correctional

Facility, BPD report of September 6, 2012 interview with the defendant at Attica Correctional

Facility and transcript of the defendant's September 13, 2012 Grand Jury testimony.

Thereafter, in response to a further request from the court, the U.S. Attorney's Office

provided the court and counsel with firearms and ballistics reports on December 20, 2013.  On

January 2, 2014, the court sent a letter to counsel inquiring whether the statements of Pedro

Ramos Vega and Carlos Osorio (which were in the People's file provided to the court on

December 2, 2013), had been provided to the defendant prior to his guilty plea.  On January 9,

2014, defendant's counsel advised that he did not have possession of those statements at the time

of the defendant's plea.  On January 21, 2014, the People provided copies of the defendant's

discovery demands, omnibus motion and People's answering affidavit.  As far as they could tell, the Vega and Osorio statements had not been handed over to the defense.  The People deemed the statements to be Rosario material, not Brady material as there was "nothing inconsistent with the defendant's admissions and recitation of facts known only to the killers."  They also took the position that even if the varying descriptions of individuals observed fleeing the scene were relevant to the defendant's involvement, this "goes to the issue of factual guilt which...was waived by his guilty plea." (People v. Day 150 AD 2d 595 [2nd dept. 1989]).

On January 21, 2014, the defendant submitted a supplemental affidavit arguing that the failure to turn over those statements constituted a Brady violation which deprived him of the opportunity for "effective use" of the information in deciding whether to plead guilty, and that this issue was not waived by his plea. (People v. Delarosa 48 AD 3d 1098 [4th dept. 2008], People v. Pelchat 62 NY 2d 97 [1993]).

### The Defendant's Arguments

The defendant argues, first, that the Federal Indictment and the testimony upon which it is based constitutes new, material, non-cumulative (and not merely impeaching) evidence discovered since his conviction which could not have been found with due diligence beforehand and which would, in all probability, result in a more favorable outcome. (CPL 440.10 (g), People v. Salemi 309 NY 208 [1955], People v. Tankleff 49 AD 3d 160 [2nd dept. 2007]).

He also contends that the DNA evidence which excludes him from the crime scene and from physical evidence connected with it creates a substantial probability of innocence (CPL 440.10 1 - g) notwithstanding his guilty plea which he describes as irrational and inconsistent with the crime scene, eyewitness descriptions of persons fleeing the house, and the accounts

-60-

A-1043

provided by the actual perpetrators.  In the defendant's view, the conviction is this case is precisely the kind of circumstance (guilty plea by a mentally ill person undertaken to avoid a harsher result) which prompted the legislature to amend the statute to permit innocent persons who have pled guilty to undo their convictions upon DNA evidence which exonerates them.

The defendant's overriding argument however, is that his conviction cannot stand on account of his actual innocence, and that his continued imprisonment violates his due process rights under CPL 440.10 (1) (h) (citing, inter alia, People v. Bermudez 23 Misc. 2d 1226 [Sup. Ct. NY County [2009], People v. Cole 1 Misc. 3d 531 [Sup. Ct. Kings County 2003], People v. Wheeler-Whichard 25 Misc. 3d 690 [Sup. Ct. Kings County 2009]).

<u>The People's Argument in Response</u>

The People contend that the defendant's motion should be summarily denied because it is conclusively refuted by unquestionable documentary proof and record evidence of his guilt contained in his guilty plea in March, 2006 in County Court and sworn testimony in the Federal Grand Jury in 2011. (CPL 440.30 4 [c], [d]).

Regarding the defendant's claim of new evidence, the People point out that any such argument is entirely unavailable under CPL 440.10 (g) which, by its terms, applies only to convictions that are based upon "a verdict of guilty after trial." (See People v. Sides 242 AD 2d 750 [3rd dept. 1997], People v. Latella 112 AD 2d 321, 322 [2nd dept. 1985], "the power to grant...a new trial upon newly discovered evidence is purely statutory and such power may be exercised...only when the requirements of the statute have been satisfied."). They contend that the defendant's motion does not meet the <u>Salemi</u> test in any event.

With respect to the DNA evidence, the People argue that the absence of defendant's DNA

-61-

from a bat that he never even mentioned much less wielded and from a license whose connection to the case is unknown, hardly creates a substantial probability of his innocence. Moreover, in their view, the absence of Cheko Higalgo and Frank Matias' DNA from a bat which Matias claimed they both handled, casts serious doubt upon the veracity of his (Matias') testimony before the Federal Grand Jury. (None of the other federal defendants are implicated by DNA evidence).

As for the defendant's claim of actual innocence, the People contend that the defendant's sworn confession of guilt to the police on November 16, 2004, his sworn guilty plea on March 22, 2006 and his detailed sworn reiteration of guilt before the Federal Grand Jury on July 21, 2011 should not be upended by the suspect testimony of self-serving criminals and the defendant's belated 2012 recantation which, in the People's view, was orchestrated by a heavy-handed effort by federal prosecutors to remove a significant obstacle to the prosecution of Brandon Jonas, Efrain Hidalgo and Misael Montalvo.

Analysis and Conclusion

At oral argument, the prosecutor aptly described this case as a "hot mess." On the one hand, the defendant walked into the arms of law enforcement and, in a nascent psychotic, drug affected and sleep deprived state, confessed to two grisly murders of which he was not even suspected and to which there was no other evidence to connect him. His confession, though detailed as to matters of motive and modus operandi, is curiously incomplete (no clear identification of his co-conspirators or recognition of him by them, no mention of the bat reportedly used and recovered by the police), equivocal (who kicked the door in, who had what weapon) and demonstrably inaccurate (multiple guns including an AK-47, a .9 mm and shotgun

A-1045

supposedly fired when ballistics only support an AK-47 or SKS; description of Flaco's handgun as "darker" than a cell phone when the gun found at the scene was chrome colored).

From a prosecutorial perspective, the defendant's confession was a dead end insofar as it appears to have furnished no useful leads or basis to prosecute anyone else for these killings. Right from the start, the police had reason to believe that three people were involved yet the state prosecution concluded, for all intents and purposes, with his guilty plea.

While the state prosecutors urge that the defendant's guilty plea be upheld, federal prosecutor's insist upon his innocense based, in large measure, upon the testimony of cooperating criminals. They argued in Federal Court that far too many details (e.g. car used, people involved, weapons fired) cast too much doubt on the defendant's confession while the People contend that the defendant's guilt can be gleaned from the very details (e.g. statement of motive, TV on, attempted removal of victim's chain, location of victims, description of victim on cell phone, and where victims were shot) which, in their estimation, only an actual participant would have known.

For his part, the defendant argues that the details that he gave came from Luis Camacho at the funeral and from talk on the street. Moreover, those details that Luis could not have known due to his arrival after the fact, were, coincidentally, not mentioned by him.

While the defendant's detailed account may be explained by exposure to outside sources, more difficult to comprehend is his sworn reiteration of guilt before the Federal Grand Jury in July, 2011. His counsel argues that he maintained his false claim of complicity because he trusted no one and feared that he would be implicated in a federal drug prosecution. He was savvy enough, however, to stop answering questions in the Grand Jury until he was assigned an

-63-

attorney and granted a written immunity agreement. He was also advised on the record that he would not be prosecuted for anything he might say so long as he gave truthful testimony.

Also unclear to this court is why federal prosecutors, if they believed in the defendant's actual innocense, would have put him in the Grand Jury when they knew from earlier debriefings of him by their investigators, that he continued to claim involvement in the homicides. Even more perplexing is why they would not tell the defendant's lawyer (who would not have even been involved had the defendant not requested counsel), that they were investigating, among other things, the very crime to which this defendant had pled guilty five years earlier. Moreover, it was only after the defendant would not or could not identify the other suspected co-conspirators (Uda and Cheko) that he was shown the door and reminded of the risks of perjury.

Then, a year later, after being informed, apparently for the first time, that federal prosecutors believed him to be innocent, and, believing that there was DNA evidence that exonerated him, the defendant was now willing to go on the record and proclaim his innocense. Although, at the prosecutor's suggestion, he claimed to have lied in 2011 about his involvement because he figured he'd still have to serve out his state sentence no matter what he said, the more plausible explanation, as he also suggested, was that he really didn't have one.

It could also be that he truly feared some type of harm from others, real or imagined, or that he now felt that by testifying, he would only be clearing himself rather than implicating others. While not entirely logical, it is no more or less logical than claiming out of the blue to have knowledge about murders (only to tell the police nothing of value one day), and then seeking out police the next day and claiming to have been involved.

Perhaps, as defense counsel suggests, the defendant's confession and reaffirmation of

A-1047

guilt before the Grand Jury can only be explained by the fact of the defendant's mental illness. Or perhaps, as the People suggest, it can be explained by his involvement in the crimes to which he confessed with no scarcity of detail.

What has concerned this court from the start, however, is that several people observed three suspects fleeing the scene, none of whom even remotely fit the defendant's physical characteristics. The day after the murders, Frank Coppola described seeing three males, all about six feet tall, wearing dark hoodies, run by him northbound on Niagara Street toward Massachusetts. Coppola described them in the Grand Jury as appearing to be Hispanic and of average height and build.

On November 13, 2004, Pedro Vega described the suspects as young looking, light skinned males in dark hoodies (one carrying a large gun), ranging in height from 5'8" to 5'11" or more. His friend, Carlos Osorio described them as being short, young and Puerto Rican/black and wearing dark hoodies. He also noticed Esteban Acevedo ride up to the scene after the fact on his bicycle.

For his part, Acevedo told detectives that he had seen three guys (two in dark hoodies and one in a gray hoodie) carrying something. In 2012, he said that he had seen and confronted three individuals (Macho, Cheko and Brandon) hanging out in front of his house at 53 Massachusetts just before the shootings. He then rode his bike around the corner and saw them (one with a long gun and another with a bat), running from the house. He described them all as being in the 5'8" range.

Carmelo Mercado told police that he saw three medium built, Spanish looking dudes (two in black or blue hoodies and one in a gray hoodie), in the range of 5'5" to 5'6" tall. The one in the

-65-

gray hoodie was coming out of the walkway at 53 Massachusetts (where the bat was found).

Beverly Laborgne observed three guys wearing baggy clothes and hoodies run out the front door, one after the other. The last one out was carrying a rifle lengthwise by his leg. She saw them run across Niagara toward Massachusetts. While her testimony corresponds, to some degree, with the defendant's description of his clothing and manner of carrying the gun, conspicuously absent from her testimony is any description of shapes or sizes of the suspects. It would seem that the defendant's 6'5", 350 pound presence would not have gone entirely unnoticed.

Luis Camacho claimed only to have seen two skinny, smallish suspects in hoodies running across the street toward Massachusetts. The People argue that he didn't see the much larger defendant (whom he knew) because the defendant, by his own admission, split off from the others. However, several witnesses, as noted above, observed three suspects, none of whom matched the defendant, run in the same direction towards Massachusetts. (While the People suggest that someone may have run out of the back door, there has never been any indication that more than three suspects entered the home). It also doesn't make sense that the defendant would describe the other suspects as running back toward the car (which he said had been parked on 7th Street) when three suspects were seen running together toward Massachusetts.

The People also argue that the "fat Puerto Rican dude" observed by Uda speaking to Cheko outside Sammy Loco's house about the "lick" could have been the defendant. This is belied, however, by Uda's Grand Jury testimony which clearly points to Misael Montalvo who not only fits this description but was threatened by Cheko and Brandon at Sammy's house (where Montalvo admitted he went) after the killings for setting them up to do his dirty work. (Frank

-66-

Matias' testimony also supports this scenario and Montalvo's admissions to different jail house informants tends to confirm his culpability as the one who put the others up to hit the Camacho home on the promise of a big pay day after they (Camacho's) exiled him from their drug operation).

It is also not insignificant that none of those implicated in the federal indictment (Cheko Hidalgo, Brandon Jonas, Misael Montalvo) or those who have cooperated in their prosecution (Uda Hidalgo, Frank Matias) claimed even to know of the defendant before he came in off the street and, to their astonishment, claimed responsibility for these killings. And, as noted above, although the defendant did implicate Uda by name, he did not identify his photograph (nor could Uda identify him) and, though not admissible at a trial, Uda reportedly passed a polygraph examination wherein he denied involvement in the homicides.

This court agrees with the People that there is no basis for relief under CPL 440.10 (g) inasmuch as the defendant's conviction derives from a guilty plea rather than a verdict after trial. (People v. Sides supra, People v. Latella supra).

This court also agrees that while the DNA evidence is somewhat helpful to the defendant's case, it is hardly dispositive because it does not create a substantial probability of innocence. (CPL 440.10 [g-1]). While the People consider the absence of the defendant's DNA from the bat to be a red herring, it is of no particular significance one way or the other since there is no claim that he ever touched it. What is significant, however, is that the defendant never even mentioned the bat when it seems pretty clear that it was carried into the house, brought out and discarded in the yard at 53 Massachusetts. It is curious that the defendant would mention multiple weapons (shotgun, .9 mm handgun) that had no demonstrable connection to the case yet

-67-

say nothing about a weapon that was involved.

The presence of both victims' DNA on the bat is unexplained inasmuch as no one claims that either of them touched it or were struck by it. Cheko reportedly wielded it to discourage Miguel from shooting his gun but there is no testimony that he actually hit him with it. Whether their DNA got there from secondary transference or otherwise is unknown.

The absence of Brandon's DNA from the bat is not particularly surprising since no one claims he touched it and, as for Cheko, the lack of his DNA on the bat could be explained by the fact that he wore gloves. The absence of Macho's DNA is problematic since he claims to have handled the bat (with no claim of wearing gloves), while Cheko was crashing in the front door. Whether this means that Macho was lying about handling the bat or can be explained scientifically is unclear.

What seems reasonably clear, though, is that the bat, as noted above, was involved and discarded by one of the fleeing suspects. Moreover, Macho's detailed testimony about the meeting at Sammy Loco's with Cheko, Brandon and Montalvo, the drop off by Montalvo in the yellow car, the clothing they wore (gray and black hoodies), Montalvo's claim about significant amounts of cash and drugs in the house, the confrontation with Esteban Acevedo, entering the home behind Brandon (with the AK-47) and Cheko (with the bat), grabbing a necklace from one of the victims, Brandon shooting the first victim in the arm, the second victim possessing a silver handgun, Brandon shooting the second victim, "bouncing him off the wall until he slid to the floor," hearing a shot as he reached the curb, running towards Massachusetts to Columbus Parkway, Brandon still carrying the gun and Cheko no longer with the bat, Brandon tossing the gun into the bushes, returning to Sammy's home where Brandon and Cheko threatened to kill

Montalvo for setting them up, Germick Catalan telling Macho he already know what had happened from his father (Esteban Acevedo), the subsequent threats by Cheko, Uda's reporting that he had been questioned by the police, hearing that the defendant, whom he did not know or recognize, had taken the fall to the delight of Cheko who described him as "dumb for admitting something like that," cannot simply be dismissed out of hand for lack of his DNA on the bat.

Turning to the defendant's claim of actual innocence, while a number of trial courts have concluded that the New York State constitution provides a procedural mechanism for an incarcerated defendant to bring a post-conviction motion to vacate under CPL 440.10 (h) upon a so-called free standing claim of innocense (see for example, People v. Bermudez 25 Misc. 3d 1126A [Sup. Ct. NY County 2011], People v. Cole 1 Misc. 3d 531 [Sup. Ct. Kings County 2003]), it was not until just recently that an appellate court answered the question in the affirmative. In People v. Hamilton NYS 2d WL128496 Slip. Op. 00238 (2nd dept. 2014), the Second Department held that a free standing claim of innocense is indeed cognizable under CPL 440.10 (h). The court noted that such claim is based upon an acknowledgment that an innocent person has a "liberty interest in remaining free from punishment" and should not be incarcerated for a crime he did not commit (citing People v. Tankleff supra and People v. Cole supra).

The court also noted that a defendant advancing a claim of actual innocence, whether or not upon newly discovered evidence, bears the burden of establishing his innocense by clear and convincing evidence. However, as the People point out in their submission of January 26, 2014, "mere doubt as to the defendant's guilt or a preponderance of conflicting evidence as to the defendant's guilt is insufficient, since a convicted defendant no longer enjoys the presumption of innocense, and, if fact, is presumed to be guilty." (Id. At p. 9).

-69-

A-1052

In Hamilton, the court determined, based on evidence of a credible alibi (not considered by the trial court in an earlier 440 motion), "indications of witness intimidation and recantation, that the defendant had made a sufficient showing of possible merit to warrant a further a further exploration" and remanded the case for a hearing.

With respect to other suspects, it appears from the People's discovery response of February 18, 2005, that the defense was provided with several police reports including, inter alia, Detective Wagstaff's P-73 of November 11, 2004 which mentions an interview of Steven Acevedo (with no size description); an interview of Carmelo Mercado (describing the fleeing suspects as 5' 5" to 5' 6" tall); Detective Gugliuzza's P-73 of November 11, 2004, in which she mentions speaking to the upstairs residents (Beverly and David Laborgne); Detective Cook's P-73 of November 12, 2004, referencing an anonymous tip implicating "Brandon, Cheko and Uda;" Detective Bursie's P-73 report of November 13, 2004, referencing information relayed to Officer Montalvo from an arrestee who named a West side gang banger with an AK-47; Detective Root's P-73 of November 12 and November 13, 2004, referencing information relayed by an informant to Officer Garcia that the victims had an altercation outside of Zip's with a Hispanic teenager who then recruited two black males to commit the homicide with him; community information from Officer Quintana that a Puerto Rican named "Tawa" may have been involved, reference to a "self explanatory" statement taken from Carlos Osorio on November 12, 2004. (Neither the statement itself nor a report of Detective Judge's November 15, 2004 follow-up interview with Osorio, who now described the fleeing suspects as dark skinned Hispanic males, all about 5' 7" tall, appear to have been provided. The Vega statement was also not disclosed).

The People note that the defendant had not (prior to receiving copies of the Osorio and

-70-

Vega statements from the court), raised any Brady claims which, in their view, go to the issue of factual guilt which they contend is waived by his guilty plea. (Citing People v. Day 150 AD 2d 595 [2nd dept. 1989], People v. Knickerbocker 203 AD 2d 753 [2nd dept. 1996]).

The People also argue that such information constitutes, at most, the type of conflicting evidence that does not rise to the level of warranting relief under CPL 440.10 1 (h) (People v. Hamilton supra).  In the People's view, the defendant's guilty plea to lesser charges upon the advice of experienced counsel was not tainted by any non-disclosure and should mark the end of the case rather than a gateway to further litigation. (People v. Taylor 65 NY 2d 1 [1985]).  It should be noted, however, that in the context of a free standing claim of innocence under CPL 440.10 (1) (h), "actual innocence means factual innocence" (People v. Hamilton supra at p. 6), and new evidence may be considered whether or not it meets the Salemi factors under CPL 440.10 (1) (g). (Id at p. 12).  Moreover, as noted in People v. Delarosa 48 AD 3d 1098 (4th dept. 2008), Brady material must be disclosed in time for its effective use at trial or at a plea proceeding.  Nor is it waived by a guilty plea. (People v. Pelchat 62 NY 2d 97 [1993]).

In this court's view, evidence from multiple witnesses describing three suspects fleeing from the scene, none of whom match the defendant's physical appearance (when considered in light of other evidence excluding him altogether), is not nearly as extraneous or irrelevant as the People suggest.  This is especially so where the only evidence of guilt was a detailed but divergent confession of a mentally ill individual who was experiencing an apparent psychotic break from reality.

In People v. Campbell 8 AD 3d 1257 (4th dept. 2011), the court held that it was error not to hold a hearing where the defendant (who had pled guilty to Murder 2nd degree) raised an issue

of fact that his trial counsel was aware of but did not advise him of potentially exculpatory evidence consisting of information from an inmate who advised prosecutors about a plot by others, not including the defendant, to murder the victim.  Also, in People v. Deacon 96 AD 3d 965, 969 (2nd dept. 2012), the court, while not reaching the defendant's free standing claim of innocense, held that it was error for the trial court not to grant a new trial when the cumulative effect of newly discovered evidence (including a recantation by a witness who initially described the perpetrator as being 19 years old and 5'7" tall when the defendant was 34 years old and 6 foot tall) established a reasonable probability of a more favorable outcome.

In sum then, in order to prevail on a free standing claim of innocense, the defendant must establish his innocense by clear and convincing evidence, including all reliable evidence, whether or not it is admissible at trial due to some procedural bar (Hamilton supra at p. 9). (See People v. Cole supra, People v. Bozella 25 Misc. 1215 (A) [Dutchess County Court 2009], failure to turn over police report containing victim description of assailant fitting someone other than the defendant warranted a new trial).  As noted in Caruso v. Russell P. Lefrois Building Co. 217 AD 2d 256 (4th dept. 1995), proof by clear and convincing evidence is proof that creates a high probability or reasonable certainty that a party's claim represents what actually happened.

Here, while the defense's explanation for the defendant's reiteration of guilt before the 2011 Federal Grand Jury is difficult to reconcile, the court finds that the totality of evidence including sworn testimony before the Federal Grand Jury, the multiple eyewitnesses who observed three fleeing suspects not matching the defendant, the inconsistencies in and omissions from his confession, apparently made while under the influence of mental illness, provides a sufficient showing of possible merit to warrant a fuller exploration. (People v. Hamilton supra,

A-1055

see also People v. Crimmins 222 AD 2d 1055, 1057 [4th dept. 1995], a hearing should be held to promote justice if the issues raised by the motion are sufficiently unusual and suggest a searching investigation).

Accordingly, the defendant is hereby granted a hearing to determine whether his claims can be supported by clear and convincing evidence.

This decision shall constitute the order of the court.

Thomas P. Franczyk
Erie County Court Judge

dated:   FEB 0 7 2014

**GRANTED**

FEB 0 7 2014

BY *Kimberly King*
KIMBERLY KING
COURT CLERK

-73-

A-1056

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| **JOSUE ORTIZ,** | **STATEMENT OF** |
|  | **UNDISPUTED** |
| **Plaintiff,** | **MATERIAL FACTS** |
|  |  |
| **vs.** | **Index No.: 16-cv-00321** |
|  |  |
| **RICHARD WAGSTAFF, MARY GUGLIZUAA,** | |
| **BPD DOES 1-12 in their capacity as Police** | |
| **Officers of the CITY OF BUFFALO,** | |
| **BUFFALO POLICE DEPARTMENT, MARK** | |
| **STAMBACH, and MARK VAUGHN,** | |
|  |  |
| **Defendants.** | |

_____

The Defendants submit this Statement of Undisputed Material Facts in support of

their Motion to Dismiss and/or for Summary Judgment, pursuant to Local Rule of Civil

Procedure 56(a)(1).

1.      This action arises out of the arrest and criminal prosecution of Josue Ortiz

(hereinafter "Plaintiff") for the November 11, 2004 murder of Nelson and Miguel

Camacho.  Plaintiff's conviction for such murders was ultimately vacated. *See generally*

Dkt. No. 59.

2.      On November 11, 2004, Nelson and Miguel Camacho were murdered while

in the first floor apartment at 879 Niagara Street, Buffalo, New York.  Ex. R at 5.

3.      Buffalo Police Department (hereinafter "BPD") officers and detectives

responded to the scene and investigated the murders.  Ex. R at 6.

1

A-1057

4.     BPD secured the scene, collected evidence, and conducted a number of witness interviews.  Ex. R at 7-8.

5.     On November 16, 2004, two BPD officers brought Plaintiff to police headquarters to meet with Detective Mark Stambach.  Ex. D at 83; Ex. O.  Plaintiff was brought "[t]o speak with [BPD] if he was a witness or he was a participant in the homicide."  Ex. D at 166.  Stambach understood that Plaintiff "wanted to speak with the homicide squad."  Ex. D at 167; *see also* Ex. D at 185.  This was Stambach's only interaction with Plaintiff.  Ex. D at 83, 107.

6.     Stambach had no involvement in the investigation prior to taking Plaintiff's statement.  Ex. D at 217.  Stambach played no role in the collection and analysis of any evidence.  Ex. D at 34.  He did not have any supervisory role of any of the other BPD detectives investigating the murders.  Ex. D at 35.

7.     Plaintiff did not speak much English.  Ex. D at 115-116.  Stambach did not speak Spanish.  Ex. D at 37.

8.     Officer Edwin Torres assisted with Spanish translation.  Ex. D at 53, 106, 115; Ex. G at 115-116.  Torres did not review any files or photographs prior to acting as an interpreter.  Ex. G at 41.  He had no involvement with the physical evidence in the investigation.  Ex. G at 113-114.  Aside from translation, he had no other involvement with the investigation. Ex. G at 131, 133, 185.

9.     Miranda rights were administered to Plaintiff in Spanish.  Ex. D at 200; Ex. F; Ex. G at 119, 123-124.

2

10.     During the questioning, Stambach asked Plaintiff specific questions in which his answers could be verified with information known to someone present during the homicides.  Ex. D at 175, 177.  Plaintiff claimed that he killed the Camacho borthers during this questioning.  Ex. G at 118.  Stambach typed his questions and Plaintiff's responses.  Ex. D at 204.  Torres went through the statement with Plaintiff by reading it before Plaintiff was asked to sign it.  Ex. G at 126, 134.  Plaintiff initialed each page and singed the last page.  Ex. D at 220; Ex. F.

11.     Plaintiff appeared frightened during Stambach's meeting with him.  Ex. D at 165, 195.  Plaintiff claimed that someone wanted to kill him.  Ex. D at 195.  However, Plaintiff did not exhibit any "behavioral and/or psychiatric illnesses or conditions" while with Stambach.  Ex. D at 195.

12.     Plaintiff does not recall going to police headquarters on that day.  Ex. C at 39, 40, 54.  He does not recall giving a statement to police on November 16, 2004.  Ex. C at 53, 66.  Plaintiff does not recall his typed and signed statement.  Ex. C at 50.  He does not recall signing this statement.  Ex. C at 53.  However, Plaintiff does recognize the initials and signature on the statement as his.  Ex. C at 51-53.

13.     Stambach arrested Plaintiff for the murder of the Camacho brothers after Plaintiff's sworn statement.  Ex. D at 240.  BPD "obtained permission from the District Attorney's Office after they reviewed the file or what was in the file at the time to arrest and charge" Plaintiff.  Ex. D at 241.  The District Attorney's Office thought the statement was sufficient to charge Plaintiff.  Ex. D at 247.  The District Attorney's Office gave BPD the charges to place against Plaintiff. Ex. D at 243.

3

14.     Plaintiff does not recall his arrest.  Ex. C at 40.

15.     The District Attorney's Office handled the criminal prosecution, including disclosure of any *Brady* information to Plaintiff's defense counsel.  Ex. D at 152-153.

16.     Plaintiff was indicted by a Grand Jury for the murders.  Ex. I.

17.     A *Huntley* hearing to determine the admissibility of Plaintiff's statements found no Constitutional violations warranting suppression of the statements.  Ex. E, J, P.

18.     On March 22, 2006, Plaintiff plead guilty to two counts of manslaughter in the first degree relating to the deaths of the Camacho brothers.  Plaintiff recalls entering this plea.  Ex. C at 48-49, 68.  He did attempt to withdraw this plea, but was not allowed by the Court.  Ex. C at 49, 68.

19.     On June 16, 2006, the Court sentenced Plaintiff to twenty-five years in prison with five years post release supervision.  Ex. C at 49.

20.     Mark Stambach retired from BPD employment on June 26, 2006.  Ex. A, D at 7.  Mary Gugliuzza retired from BPD employment effective December 31, 2012.  Ex. A.  Mark Vaughn retired from BPD employment effective June 23, 2009.  Ex. A.

Dated:  April 24, 2020
        Buffalo, New York

                        Timothy A. Ball, Esq.
                        Corporation Counsel
                        Attorney for Defendants

              By:       */s/ Maeve E. Huggins*
                        Maeve E. Huggins
                        Assistant Corporation Counsel
                        1112 City Hall
                        65 Niagara Square
                        Buffalo, New York 14202

A-1060

Telephone: (716) 851-4317
Facsimile: (716) 851-4105
E-Mail: mhuggins@city-buffalo.com

A-1061

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

JOSUE ORTIZ,

                    Plaintiff,

vs.

RICHARD WAGSTAFF, MARY GUGLIUZZA
BPD DOES I-12 in their Capacity as Police Officers
of the CITY OF BUFFALO, BUFFALO POLICE
DEPARTMENT, MARK STAMBACH, and
MARK VAUGHN,

                    Defendants.

**CERTIFICATE OF SERVICE**

Index No. 16-CV-321

        I, Maeve E. Huggins, hereby certify that on April 24, 2020, I electronically filed the foregoing Notice of Motion to Dismiss, Memorandum of Law, Statement of Undisputed Material Facts, Declaration in Support, and accompanying Exhibits in support on behalf of the Defendants, **RICHARD WAGSTAFF, MARY GUGLIUZZA, BPD DOES 1-12 in their Capacity as Police Officers of the CITY OF BUFFALO, BUFFALO POLICE DEPARTMENT, MARK STAMBACH, and MARK VAUGHN,** with the Clerk of the District Court using the EM/ECF system which would then electronically notify the following participants in this case:

Wayne Felle, Esq.
6024 Main Street
Williamsville, New York  14221
waynefelle@waynefellelaw.com

Alan J. Pierce, Esq.
HANCOCK ESTABROOK, LLP
100 Madison Street, Suite 1500
Syracuse, New York  13202
apierce@hancocklaw.com

        I certify under penalty of perjury that the foregoing is true and correct.

Dated:    April 24, 2020
              Buffalo, New York

TIMOTHY A. BALL, ESQ.
Corporation Counsel

A-1062

*/s/ Maeve E. Huggins*
By: Maeve E. Huggins
Assistant Corporation Counsel
65 Niagara Square, 11th Floor
Buffalo, New York 14202
Tel.: (716) 851-4317
mhuggins@city-buffalo.com

- 2 -

A-1063

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOSUE ORTIZ, <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD WAGSTAFF, MARY GUGLIUZZA, MARK VAUGHN, MARK STAMBACH, and BPD DOES 1-12, in their Capacity as Police Officers of the CITY OF BUFFALO;  and BUFFALO POLICE DEPARTMENT, <br><br> Defendants. | **DECLARATION** <br><br> Civil Action No.: 16-cv-321 (EAW/HBS) |

**ALAN J. PIERCE, ESQ.,** a partner in Hancock Estabrook, LLP, under penalty of perjury and pursuant to 28 U.S.C. § 1746, hereby declare the following to be true and correct:

1.      I am an attorney licensed to practice law in the Courts of the State of New York and the United States District Court for the Western District of New York, and I am now co-counsel for Plaintiff Josue Ortiz ("Plaintiff") in this matter with Wayne C. Felle, Esq.

2.      I submit this Declaration in opposition to Defendants' motion to dismiss, for judgment on the pleadings or summary judgment dismissing the Amended Complaint in this matter.

3.      Attached hereto as **Exhibit "1"** are copies of Orders of Hon. Thomas Franczyk dated December 9, 2014 and May 8, 2015 in *People v. Ortiz*, Indictment No. 02630-04.

{H4031919.1}                                   1

4.      Attached hereto as **Exhibit "2"** is Defendants' Response to Plaintiff's First Interrogatories and First Request for Production of Documents dated February 24, 2017.

5.      Attached hereto as **Exhibit "3"** is the Transcript of the deposition of Geraldo Rondon taken on March 13, 2019.

6.      Attached hereto as **Exhibit "4"** is the Transcript of the deposition of Mary Evans taken on January 24, 2019.

7.      Attached hereto as **Exhibit "5"** are the documents in Exhibit B, Part 3 of the documents produced by Defendants in this action.

8.      Attached hereto as **Exhibit "6"** are  the P-73 forms contained in Stambach Deposition Exhibit 6.

9.      Attached hereto as **Exhibit "7"** is the BPD Synopsis of the Camacho Murder Investigation prepared by BPD Detective Mary Evans found in Stambach Deposition Exhibit 4.

10.      Attached hereto as **Exhibit "8"** is the statement of witness Jexlyn Mary Rosario given to the BPD on November 12, 2004.

11.      Attached hereto as **Exhibit "9"** is the Declaration of Hon. Kenneth Case (former ADA) submitted in March 2018 in the companion case *Ortiz v. Case*, 16-CV-322.

12.      Attached hereto as **Exhibit "10"** is the Declaration of Hon. Frank Sedita (former DA) submitted in March 2018 in the companion case *Ortiz v. Case*, 16-CV-322.

13.      Attached hereto as **Exhibit "11"** are the documents in Exhibit B, Parts 1 & 2 of the documents produced by Defendants in this action.

A-1065

14.     Attached hereto as **Exhibit "12"** is the Transcript of the deposition of Dr. Evelyn Coggins taken on October 1, 2018.

15.     Attached hereto as **Exhibit "13"** is Defendants' Initial Disclosures in this action dated February 24, 2017.

16.     Attached hereto as **Exhibit "14"** is Josue Ortiz's Verified Claim filed in the New York Court of Claims.

17.     Attached hereto as **Exhibit "15"** are Stambach Deposition Exhibits 2 and 17.

I swear under penalties of perjury that the foregoing is true and correct.

Dated: July 3, 2020

_____
Alan J. Pierce, Esq.

A-1066

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSUE ORTIZ,<br><br>                                      Plaintiff,<br><br>            vs.<br><br>RICHARD WAGSTAFF, MARY GUGLIUZZA,<br>MARK VAUGHN, MARK STAMBACH, and<br>BPD DOES 1-12, in their Capacity as Police Officers<br>of the CITY OF BUFFALO;  and BUFFALO<br>POLICE DEPARTMENT,<br><br>                                      Defendants. | Civil Action No.<br><br>16-CV-321<br>(EAW/HBS) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS**

Plaintiff, by and through his attorneys, Hancock Estabrook, LLP, as and for his

Response to Defendants' Statement of Material Facts and short and concise counter-

statement of additional material facts as to which it is contended there exists a genuine

issue to be tried pursuant to Local Rule 56(a)(1), states as follows:

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Denied.  Plaintiff was not brought to the police headquarters to specifically meet

with Detective Mark Stambach. P-Exh 5, 6, 11.  Plaintiff was brought to speak with BPD

as he stated he had information about the homicide.  P-Exh 5, 11.  Plaintiff denies and has

no way of nothing what "Stambach understood" about Plaintiff.  This was not

Stambach's only interaction with Plaintiff.  At the very least he interacted with Plaintiff

{H4031921.1}

on November 17, 2004 re arrest, filing of felony complaint, searches and seizures, and filing and service of a Notice of Intention to Offer Evidence at Trial pursuant to CPL 710.30 and 700.70 and Identification of Defendant as well.  P-Exh 11.

6.      Denied.  See P-Exhs 1-15.

7.      Admitted.

8.      Denied as incomplete.  At the very least Officer Torres also participated in the interview of Josue Ortiz on the prior day, November 15, 2004 with Detectives Mark Vaughn, James Lonergan and James Lema.  **P-Exh 5** and **P-Exh 12**.  Further information of Officer Torres's involvement is found in Defendants' Exhibits G and J.

        In addition, as noted in Nos. 12 and 14 of Defendants' Statement of Material Facts Plaintiff has no recollection of the events of his involvement with any members of the Buffalo Police Department ("BPD") in November 2004 so he cannot admit or deny any statements that are not reflected in documents and testimony upon which he can reply.

9.      Admitted.

10.     Denied to the extent set forth in response to No. 8 above.

11.     Denied to the extent set forth in response to No. 8 above.

12.     Admitted.

13.     Denied.  See **P-Exh 10** and **P-Exh 11**.

14.     Admitted.

15.     Denied to the extent of the disclosure of *Brady* material.  The DA could only disclose Brady material provided to it by the BPD.

16.     Admitted.

{H4031921.1}                                          - 2 -

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Plaintiff can neither admit nor deny these statements as no information or

documentation of the retirement of these BPD officers was ever provided prior to the

filing of this motion.


Dated:  July 3, 2020                    *Attorneys for Plaintiff*
                                        LAW OFFICES OF WAYNE C. FELLE, ESQ.
                                        Wayne C. Felle, Esq.
                                        6024 Main St.
                                        Williamsville, New York 14221
                                        Tel: (716) 505-2700

                                            - and -

                                        HANCOCK ESTABROOK, LLP


                                        By: _____
                                                Alan J. Pierce, Esq.


                                        100 Madison St., Suite 1800
                                        Syracuse, New York 13202
                                        Tel.:  (315) 565-4546

A-1069

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

THE PEOPLE OF THE STATE OF NEW YORK

                                  ORDER
                                    Indictment No. 02630-04

       vs.

       JOSUE ORTIZ,

                          Defendant.

      Whereas, Defendant, Josue Ortiz, has moved to dismiss the above-captioned indictment, upon review of Defendant's motion dated January 26, 2015, for the reasons stated on the record on January 30, 2015, and upon due consideration, it is hereby,

      **ORDERED**, that Defendant's motion is GRANTED, and the indictment is dismissed,

      **SO ORDERED.**

_____
HON. THOMAS P. FRANCZYK

DATED:   Buffalo, New York
           May 8__, 2015

**GRANTED**

MAY 0 8 2015

BY _Kimberly King_
    KIMBERLY KING
    COURT CLERK

A-1070

STATE OF NEW YORK
COUNTY OF ERIE
ERIE COUNTY COURT

THE PEOPLE OF THE STATE OF NEW YORK

vs.

**ORDER**
Indictment # 04-2630

JOSUE ORTIZ

Upon filing a motion to vacate a conviction pursuant to CPL 440.10 by the defendant, **JOSUE ORTIZ,** and having heard from James Bargnesi and Donna Milling of counsel to the Erie County District Attorney's Office and defense counsel, Jeremy Schwartz and James Auricchio, it is hereby ordered by this court that the defendant's motion has been granted and it is further that the defendant be released on his own recognizance.

Thomas P. Franczyk
Erie County Court Judge

dated:   DEC 0 9 2014

# GRANTED

DEC 0 9 2014

BY _Kimberly King_
KIMBERLY KING
COURT CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                    Plaintiff,

    vs.

RICHARD WAGSTAFF, MARY GUGLIUZZA,
MARK VAUGHN, MARK STAMBACH, and BPD
DOES 1-12, in their Capacity as Police Officers
of the CITY OF BUFFALO; BUFFALO POLICE
DEPARTMENT; CITY OF BUFFALO,

                    Defendants.

**ANSWER TO
INTERROGATORIES**

**Docket No. 16-CV-00321**

Defendants, above-named, by their undersigned attorney, submit this response to the interrogatories propounded by Plaintiff pursuant to Fed.R.Civ.P. 33, with the understanding that the answers stated below are not an admission of any fact or allegation assumed or set forth in the interrogatories:

1.    **Request**: Any and all records, notes, documents, logs, reports or forms describing any aspect of the events leading up to and the arrest of Plaintiff on November 16, 2004.

    **Response**: Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity. Defendants further object to the demand as vague, overbroad, not reasonably calculated to lead to discoverable materials, and to the extent protected by privilege, statute and/or court

1

order.  Defendants are aware of two (2) court orders issued by the Honorable Richard J. Arcara, United States District Judge for the Western District of New York, issued on November 9, 2012 and March 7, 2013, respectively.  Those court orders, attached hereto as **Exhibit A**, permitted the disclosure of certain documents to Plaintiff and his criminal counsel for the limited purpose of the enforcement of New York State Penal and Criminal Procedure Laws and vacate Plaintiff's conviction.  To the extent that Plaintiff is already in possession with documents sought, Defendants further object.  Without waiving this objection and to the extent that a further response is required, Defendants incorporate herein by reference their responses to Plaintiff's specific requests below. Defendants note that we are in possession of portions of the unsealed court file that were obtained from Plaintiff's counsel.

2.     **Request:** Tapes and all calls, including all 911 tapes, radio run tapes, and any other kind of recording, and any materials, print-outs, and documents or the written counterparts of these tapes and materials concerning the instant matter, including but not limited to any calls made to or from any precinct house, dispatcher, police officer, or "911", or Buffalo Police Department communications operator regarding Josue Ortiz and the underlying crime from November 11, 2004 until the date [o]f his arrest on November 16, 2004.

    **Response:**  Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, overbroad, not reasonably calculated to lead to discoverable materials, and to

2

A-1073

the extent protected by privilege, statute and/or court order.  Upon information and belief, Defendants do not generally record or preserve our telephone calls.  City of Buffalo and Buffalo Police Department does not maintain 9-1-1 and police radio recordings.  Upon information and belief, those "calls" are maintained by Erie County Central Police Services.  Without waiving these objections and to the extent that a further response is required, Defendants will produce the written copies of the 9-1-1 and police radio recordings within Defendants' possession.

3.    **Request:**  All Buffalo Police Department records, including but not limited to, complaint reports, investigation notes, property vouchers, arrest reports, video recordings, witness statements, identification reports regarding the murder which occurred on November 11, 2004 at 879 Niagara Street plaintiff, Josue Ortiz, relevant to his arrest on November 16, 2004.

**Response:**  Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and to the extent that documents may be protected by privilege, statute and/or court order.  To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object.  Without waiving these objections and to the extent that a further response is required, Defendants will produce materials relevant to the arrest of Plaintiff in Defendants' possession, attached hereto as **Exhibit B (various documents) and Exhibit E (disk of photographs).**

4.    **Request:** All Buffalo Police Department policy and procedure materials, including Police Academy texts, Patrol Guide sections, Buffalo Police Department manuals, or similar materials, and all memoranda or training materials on the subject of investigation of a homicide, including DNA collection, confessions, obtaining statements from individuals with compromised mental capacity and appropriate testing time, witness identification procedures, physical evidence collection and coordination, interrogation procedures.

  **Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, overbroad, not reasonably calculated to lead to discoverable materials, seeks irrelevant documents, and is unduly burdensome.  Without waiving these objections and to the extent that a further response is required, Defendants will produce to Plaintiff's attorney the pertinent sections from the current Buffalo Police Department Manual of Procedure, attached hereto as **Exhibit C**.

5.    **Request:** All Buffalo Police Department memo book entries for any officer, detective or employee involved in the investigation of crimes committed on November 11, 2004 for which claimant was arrested, convicted and incarcerated from November 11, 2004 to present, by all Buffalo Police Department employees who were present at any stage of the Plaintiff's investigation, interrogation, arrest, sentencing, appeal, post-conviction motions, and 440 motion.  This request includes, but is not

limited to, the following individuals: Officer Richard Wagstaff, Officer Mary Gugliuzza, Officer Mark Vaughn, Officer Mark Stambach.

     **Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, unclear, overbroad, not reasonably calculated to lead to discoverable materials, and to the extent protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object. Without waiving these objections and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

    6.    **Request:** All precinct logs, comment logs, desk logs, duty roster, roll call sheets and supervisor logs, or similar documents, from any police of the Buffalo Police Department from November 11, 2004 to November 16, 2004, regarding investigation, interrogation, arrest and criminal proceedings surrounding the murder which occurred November 11, 2004 at 879 Niagara Street, Buffalo New York.

     **Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, unclear, overbroad, irrelevant, not reasonably calculated to lead to discoverable materials, and to the extent protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object. Without waiving these objections and to the

extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

     7.    **Request:** All photographs, including but not limited to, photo arrays related to the investigation of the murder that occurred on November 11, 2004 at 879 Niagara Street, Buffalo, New York.

     **Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, unclear, overbroad, irrelevant, not reasonably calculated to lead to discoverable materials, and to the extent protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object. Without waiving these objections and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

     8.    **Request:** Provide copies of any signed or recorded statements, videos of statements, interrogations and confessions regarding the murder that took place at the 879 Niagara Street, Buffalo, New York on November 11, 2004.

     **Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, unclear, overbroad, irrelevant, not reasonably calculated to lead to discoverable materials, and to the extent protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession with documents sought pursuant to Judge

Arcara's orders, Defendants further object. Without waiving these objections and to the

extent a response is required, Defendants refer Plaintiff to the documents attached

hereto in **Exhibit B** and **Exhibit E**.

9.     **Request:** Any and all Buffalo Police Department documents that are part

of the personnel file, including the disciplinary record, and any other documents

concerning the hiring, training, duties, performance, assignments, and mental and

physical condition of each and every Buffalo Police Department employee involved in

any stage of the investigation, interrogation, arrest and/or criminal proceeding for the

murder which occurred on November 11, 2004 at 879 Niagara Street, Buffalo New York.

This request includes, but is not limited to the following individuals: Officer Richard

Wagstaff, Officer Mary Gugliuzza, Officer Mark Vaughn, Officer Mark Stambach.

**Response:** Defendants object to this demand on the ground that it does

not describe the documents sought with reasonable particularity and the demand is

overbroad, irrelevant, unclear, ambiguous, and on the ground that the information

sought is confidential under N.Y. Civil Rights Law §50-a among other privacy statutes.

10.     **Request:** Any and all Buffalo Police Department documents concerning,

or in any way relevant to, any formal or informal complaint made against or about any

BPD employee present at any stage of Plaintiff's investigation, interrogation, arrest

and/or criminal proceedings, including but not limited to, the officers listed in request

No. 9 above, from any source and concerning any subject matter. This includes, but is

not limited to: A) Documents concerning all complaints and/or disciplinary or police

7

review of police officer by the Internal Affairs Bureau/Divisions, or its BPD counterpart; B) The complete documents and materials concerning each incident listed on the police officer's disciplinary record; C) The complete documents and materials concerning all complaints and other Disciplinary or internal police review of activities by the police officers maintained by the BPD.

Response: Defendants object to this demand on the ground that it does not describe the documents sought with reasonable particularity and the demand is overbroad, irrelevant, unclear, ambiguous, and on the ground that the information sought is confidential under N.Y. Civil Rights Law §50-a among other privacy statutes.

11.    Request:  All documents, transcripts, notes, memoranda, reports and materials of whatever kind and nature, in the possession, custody, and control concerning civilian complaints involving Buffalo Police Department employees involved in the investigation of the murder which occurred on November 11, 2004 at 879 Niagara Street, Buffalo New York, specifically including the investigation of Josue Ortiz.

Response: Defendants object to this demand on the ground that it does not describe the documents sought with reasonable particularity and the demand is overbroad, irrelevant, unclear, ambiguous, and on the ground that the information sought is confidential under N.Y. Civil Rights Law §50-a among other privacy statutes, and to the extent protected by privilege and/or court order.

12.   **Request:**  All materials, including Police Academy text, Buffalo Police Department manuals, or similar materials, and memoranda or training materials concerning police policy, custom and/or practice, including, but not limited to, guidelines, policy statements, and/or procedures, in any form of any type, regarding: 1) Discipline of the officers generally; 2) Discipline for the violation of constitutional rights; 3) Discipline for false arrest; 4) Obtaining statements or confessions from mentally compromised individuals; and 5) False arrests based on improper interrogations or confession procedures.

**Response:**  Defendants object to this demand on the ground that it does not describe the documents sought with reasonable particularity and the demand is overbroad, irrelevant, unclear, and ambiguous.  Without waiving this objection, Defendants will produce the pertinent chapter of the current Buffalo Police Department Manual of Procedure dealing with discipline of officers, attached hereto as **Exhibit D**.

13.   **Request:**  Any and all documents and material concerning the Plaintiff Josue Ortiz, contained in the Buffalo Police Department files, of whatever kind or nature.

**Response:**  Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity, is overly broad, vague, irrelevant, unclear as to time, and to the extent that documents sought may be protected by privilege, statute and/or court order.  To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants

further object. Without waiving these objections and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

14. **Request:** All statements, videos recordings, photographs of the Plaintiff, Josue Ortiz, contained in the BPD files, of whatever kind or nature.

**Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity, is overly broad, vague, irrelevant, unclear as to time, and to the extent that documents sought may be protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object. Without waiving these objections and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

15. **Request:** All documents describing the policy of the defendant, regarding the investigation of suspects which are mentally compromised or suffer from mental issues.

**Response:** Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity and the demand is vague, overbroad, not reasonably calculated to lead to discoverable materials, seeks irrelevant documents, and is unduly burdensome. Without waiving these objections and to the extent that a further response is required, Defendants will produce to

Plaintiff's attorney the pertinent sections from the current Buffalo Police Department Manual of Procedure, attached hereto as **Exhibit C.**

16.     **Request:**  Pursuant to Rule 26(e)(1), all insurance policies, cover sheets and other documents regarding any insurance policies, cover sheets and other documents regarding any insurance coverage or other indemnification agreement which may be available to satisfy all or part of any judgment in this action.

**Response:**  The City of Buffalo is self-insured and therefore Defendants are not in possession of any insurance policy responsive to this demand.

17.     **Request:**  All reports regarding internal investigations of the members of the Buffalo Police Department involved in the investigation and arrest of Josue Ortiz from 2004 to present.

**Response:**  Defendants object to this demand as overbroad, irrelevant, unclear, ambiguous, and on the ground that the information sought is confidential under N.Y. Civil Rights Law §50-a among other privacy statutes.

18.     **Request:**  A copy of any and all surveys, polls, studies, investigations, correspondence, questionnaires, etc. from any source whatsoever to which the BPD responded or conducted with respect to false arrest, false imprisonment, or the violation of constitutional rights by police officers and the investigation of same or other allegations of police misconduct.

**Response:**  Defendants object to this demand as overboard, irrelevant, unclear, and may seek information that is confidential under N.Y. Civil Rights Law §50-

11

a.  Subject to and without waiving said objections, Defendants, upon information or belief, are not in possession of any materials which may be responsive to this demand specifically regarding surveys, polls, studies, and questionnaires.

19.    **Request:**  A copy of any and all notes, records and/or reports contained in Buffalo Police Department files which identify possible suspects to the crimes committed on November 11, 2004, at issue herein, other than Josue Ortiz.

**Response:**  Defendants object to this demand on the grounds that it does not describe the documents sought with reasonable particularity, is overly broad, vague, irrelevant, unclear as to time, and to the extent that documents sought may be protected by privilege, statute and/or court order.  To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants further object.  Without waiving these objections and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

20.    **Request:**  A copy of the physical evidence collection log pertaining to the crime scene at/or around 879 Niagara Street, Buffalo, New York, for November 11, 2004.

**Response:**  To the extent that Plaintiff is already in possession with documents sought pursuant to Judge Arcara's orders, Defendants object.  Without waiving this objection and to the extent a response is required, Defendants refer Plaintiff to the documents attached hereto in **Exhibit B** and **Exhibit E.**

## RESPONSE TO PLAINTIFF'S WRITTEN INTERROGATORIES TO DEFENDANTS

1.   **Interrogatory:**  State the full name, address and job position of the person answering these interrogatories and each person who has provided information or otherwise assisted in answering these interrogatories.

**Answer:**  Maeve E. Huggins, Esq., of counsel to Timothy A. Ball, Corporation Counsel for the City of Buffalo and attorney for the Defendants is answering these interrogatories.   Detective Richard Wagstaff, 74 Franklin Street, Buffalo, NY 14202; Detective Mary Gugliuzza, 74 Franklin Street, Buffalo, NY 14202; and Detective Mary Evans, 74 Franklin Street, Buffalo, NY 14202, assisted in providing information.

2.   **Interrogatory:**  Identify all Buffalo Police Department employees who responded to, investigated, assisted in any way and/or were present at any stage during the investigation and subsequent arrest of Josue Ortiz on November 16, 2004, outlined in the Complaint to this action.

**Answer:**   There were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV.

3.      **Interrogatory:**  Identify the Buffalo Police Department employee who was the ranking officer at the scene of 879 Niagara Street, Buffalo, New York on November 11, 2004, investigating the murder that Josue Ortiz was subsequently arrested for on November 16, 2004.

      **Answer:**    There were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV. Upon information and belief, James Lonergan was the ranking officer at the scene, though there were numerous Buffalo Police Department members present and consulted.

4.      **Interrogatory:**  Identify the BPD employee who was the ranking officer in charge of the investigation of the murder at 879 Niagara Street, Buffalo, New York committed November 11, 2004.

      **Answer:**    There were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV.

5.      **Interrogatory:**  Identify the Buffalo Police Department employee who was the ranking officer in charge at the precinct or location where Josue Ortiz was taken into custody and charged with murder on November 16, 2004.

**Answer:** There were numerous members of the Buffalo Police Department involved in the investigation and present when Plaintiff was taken into custody, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV.

6.   **Interrogatory:** Identify the following regarding the investigation of the November 11, 2004 murder at 879 Niagara [S]treet, Buffalo, New York on November 11,2004: a) when the investigation began; b) the names of all individuals who conducted or contributed the investigation; c) the names of all leads, suspects, persons of interest, and/or identified persons associated with the criminal investigation; and d) the names of all persons who called or provided information to Buffalo Police Department related to the criminal investigation.

**Answer:** The investigation began on November 11, 2004 when the Buffalo Police Department was notified and responded to 879 Niagara Street, Buffalo, New York. There were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV. Defendants object to subparts "c" and "d" of the interrogatory as vague, ambiguous, and may be protected by privilege, statute and/or court order. To the extent that Plaintiff is already in possession of this information pursuant to the two court orders issued by Judge Arcara,

the Defendants further object.  Notwithstanding said objections, upon information and belief, the Plaintiff voluntarily confessed, was arrested, indicted for second-degree murder and plead guilty to the crimes of November 11, 2004 but those convictions were subsequently vacated.

7.      **Interrogatory:** State whether any of the individual defendant and/or any member of the BPD that were involved in the subject investigation have ever received any discipline from the City of Buffalo and/or BPD as a result of the incident described in the Complaint.  If yes, state: a) the nature of the discipline; b) the facts of which such discipline was based; c) who ordered and who administrated the disciplinary action.

**Answer:**  Defendants object to this interrogatory as overboard, unclear, irrelevant, and may seek information that is confidential under N.Y. Civil Rights Law §50-a.

8.      **Interrogatory:**  For every civil rights case filed against the City of Buffalo or a Buffalo Police Officer from 2004 to[] present, state the case name including the court in which it was filed, docket number, the name of the plaintiff's attorney, the substance of the allegations and the current status of the case, including any verdict or settlement.

**Answer:**  Defendants object to this interrogatory as irrelevant, overbroad, unreasonable, and unduly burdensome and to the extent that this information may be a public record.

16

9.     **Interrogatory:**  State the number of complaints filed against the Buffalo from January 2004 to[] present, including the type of allegation or complaint (e.g., false arrest, unlawful search, etc.).  [I]nclude the number of complaints resolved and their resolution, stating this separately for each category of complaint.

**Answer:**  Defendants object to this interrogatory as irrelevant, overbroad, unreasonable, and unduly burdensome and to the extent that this information may be a public record.  Defendants note that the subject incident occurred on November 11, 2004 and further object to any inquiry into complaints prior to that date as irrelevant.

10.     **Interrogatory:**   Describe  the  internal  procedures  and  practices  for handling complaints of police misconduct leading to false arrest concerning Buffalo Police Officers.  This should include, but is not limited to, a description of any changes in formal or informal policy of the City and/or Buffalo Police Department in handling such complaints since 2004.

**Answer:**  The Buffalo Police Department Manual of Procedure (MOP) at Chapter 15 covers discipline of officers.  Upon information and belief, the MOP was revised in or around the year of 2011.  Chapter 15 of the current version of the MOP is incorporated herein by reference and is attached hereto as **Exhibit D**.

11.     **Interrogatory:**  Identify all persons present and/or participating in any discussion, conversation, statement, interrogating and/or confession of the claimant, Josue Ortiz.

**Answer:**  Defendants object to this Interrogatory to the extent that information may be protected by privilege, statute and/or court order.  To the extent that Plaintiff is already in possession of this information sought pursuant to Judge Arcara's orders, Defendants further object.  Without waiving these objections and to the extent that a further response is required, Defendants refer Plaintiff to the documents, attached hereto as **Exhibit B** and **Exhibit E**.  There were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV.

12.   **Interrogatory:**   Identify each person likely to have discoverable information relevant to the disputed facts alleged in this case including their name, address and telephone number, and identifying the subject of the information likely to be known by the witness.

**Answer:**  Defendants object to the term "disputed facts" as vague and unclear and refer Plaintiff to their Initial Rule 26 Disclosure.  In addition, there were numerous members of the Buffalo Police Department involved in the investigation, who are identified in the documents relating to this matter, attached hereto as **Exhibits B and E**, and who have been identified by the Erie County Defendants in the related action bearing docket number 1:16-cv-00322-LJV.  There are also numerous witnesses identified in the documents relating to this matter.

A-1089

13.   **Interrogatory:**  State whether the Buffalo Police Department and/or its officers have been sued in the past 10 years for negligence, negligent supervision, training or hiring, or false arrest.  If your answer is yes, state the Case number, Title, Court where the action was brought, and the final disposition of each claim.

**Answer:**  Defendants object this interrogatory as irrelevant, overbroad, unreasonable, and unduly burdensome and to the extent that this information may be a matter of public record.   Defendants note that the subject incident occurred on November 11, 2004 and further object to any inquiry into complaints prior to that date as irrelevant.

14.   **Interrogatory:** List all medical, psychiatric and/or to other specialists that met with or opined on Mr. Josue Ortiz['s] mental health, cognitive ability and/or his ability to give a statement, confession or stand trial.

**Answer:**   Defendants object this interrogatory as this is information wholly in the possession of Plaintiff.

Defendants reserve the right to supplement or correct these disclosures and answers to interrogatories as appropriate under Fed. R. Civ. P. 26(e).

Dated:        February 24, 2017
              Buffalo, New York

                              Yours, ect.,

                              Timothy A. Ball
                              Corporation Counsel

19

A-1090

Attorney for Defendants

By:  *s/Maeve E. Huggins*
Assistant Corporation Counsel
City of Buffalo Dept. of Law
65 Niagara Square, 1112 City Hall
Buffalo, New York 14202
Phone: (716) 851-4317
Fax: (716) 851-4105
E-Mail: mhuggins@city-buffalo.com

To:   Wayne C. Felle, Esq.
The Law Offices of Wayne C. Felle, P.C.
Attorneys for Plaintiff
6024 Main Street
Williamsville, New York 14221

cc.   Jennifer C. Persico, Esq. (w/o exhibits)
Mark C. Davis, Esq.  (w/o exhibits)
Lippes Mathias Wexler Friedman LLP
Attorneys for Defendants in Associated Action 1:16-cv-00322-LJV
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202

1

1 | STATE OF NEW YORK

2 | COURT OF CLAIMS

3 | -----------------------------------------------

4 | JOSUE ORTIZ,

5 |                    Plaintiff,

6 |    -vs-                 Claim No: 126292

7 | THE STATE OF NEW YORK,

8 |                    Defendant.
    -----------------------------------------------

9 |

10 |         Examination Before Trial of

11 | GERALDO RONDON, held pursuant to Article 31 of the

12 | Civil Practice Law and Rules, at the Law Office of

13 | Wayne C. Felle, P.C., 6024 Main Street,

14 | Williamsville, New York, commencing on Wednesday,

15 | March 13th, 2019 at 10:00 A.M., before Denise C.

16 | Burger, Notary Public.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

2

```
 1  APPEARANCES:  WAYNE C. FELLE, P.C.,
                  BY: WAYNE C. FELLE, ESQ.,
 2                6024 Main Street,
                  Williamsville, New York 14221,
 3                (716) 505-2700,
                  e-mail: waynefelle@waynefellelaw.com,
 4                Attorneys for the Plaintiff.

 5                LETITIA JAMES,
                  STATE OF NEW YORK OFFICE OF THE
 6                ATTORNEY GENERAL,
                  BY: TIMOTHY J. FLYNN, ESQ.,
 7                ASSISTANT ATTORNEY GENERAL,
                  BUFFALO REGIONAL OFFICE,
 8                Main Place Tower,
                  Suite 300A,
 9                350 Main Street,
                  Buffalo, New York 14202,
10                (716) 853-8437,
                  e-mail: Timothy.Flynn@ag.ny.gov.
11                Attorneys for the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23
```

**MCCANN & MCCANN REPORTING**

3

1                          **E X H I B I T S**

2     **EXHIBIT NO:**                                    **PAGE**

3     A - P-73 prepared by Detective Lobaugh.            53

4     B - Statement by Efrain Hidalgo.                   56

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

4

1        THE REPORTER:  Will this be the usual

2 stipulations?

3        MR. FLYNN:  We will read and sign, 45 days.

4

5 The following stipulations were entered into by

6 counsel:

7

8        It is hereby stipulated by and between the

9 attorneys for the respective parties hereto that

10 the oath of the Referee is waived, that signing,

11 filing and certification of the transcript are not

12 waived and that all objections, except as to the

13 form of the questions, are to be reserved until the

14 time of trial.

15

16        **G E R A L D O   R O N D O N,**

17        having been first duly sworn, was examined

18 and testified as follows:

19

20        THE REPORTER:  Can you state your name and

21 address for the record, please.

22        THE WITNESS:  My name is Geraldo Rondon,

23 spelled G-E-R-A-L-D-O, Rondon is R-O-N-D-O-N.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

5

1   Stationed at SP Batavia, which is Two Bay

2   headquarters in Batavia, New York.

3

4   **EXAMINATION BY MR. FELLE:**

5        **Q.**   Good morning, officer.

6        **A.**   Good morning.

7        **Q.**   My name is Wayne Felle.  And I know we

8   met off the record, but just before we go into our

9   discussion today, and really that's all today is,

10  we're going to have a discussion, the only thing

11  that makes it more formal is that there is a court

12  reporter here who is writing down everything that

13  we say.

14       **A.**   Okay.

15       **Q.**   So some game rules, if you will,

16  because of that, which is to keep our answers and

17  our questions audible.

18       **A.**   Okay.

19       **Q.**   And then to just let each other finish

20  either our question or our answer so the reporter

21  can take it down, okay?

22       **A.**   Okay.

23       **Q.**   I imagine you have given deposition

**MCCANN & MCCANN REPORTING**

A-1096

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

6

1  testimony or trial testimony in the past?

2       **A.**    Trial testimony, yeah.

3       **Q.**    Okay, it's pretty much the same thing,

4  other than all the theatrics around us, right.  So

5  I am here to talk to you today about a murder,

6  multiple murders of the Camacho brothers that

7  occurred back in November of 2004.

8       **A.**    Okay.

9       **Q.**    Are you familiar with that murder?

10      **A.**    I am familiar with the murder.

11      **Q.**    Okay.  And at some point in time, in

12 your capacity as a New York State Police

13 investigator, did you become involved in the review

14 of that case?

15      **A.**    Yes.

16      **Q.**    Okay.  Do you have, as you testify

17 today, do you have an independent recollection of

18 Josue Ortiz?

19      **A.**    Independent recollection, what do you

20 mean, like I remember him?

21      **Q.**    Yeah, that's what I mean.

22      **A.**    Yeah, he's about 6' 5", Puerto Rican

23 male.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

7

1        Q.    Okay.

2        A.    Darker than I am.  Bald headed.

3        Q.    Okay.

4        A.    Raspy voice.  Speaks English and

5   Spanish.

6        Q.    Okay.  Through -- throughout our

7   discussion today I'll ask you various questions --

8        A.    Okay.

9        Q.    -- your response might be based on your

10  independent recollection and interaction with Mr.

11  Ortiz, or it might be based on written documents

12  that you reviewed, other things that refresh your

13  memory you have been shown.

14       A.    Okay.

15       Q.    Okay, so just let us know what that is.

16  I am going to primarily ask you about your

17  independent recollection of things, okay, so if

18  you're able to answer questions about the

19  investigation, about the things that you learned,

20  observed, we'll ask you those things.  If you're

21  not sure based on your independent recollection,

22  then we'll look at some documents and see if those

23  help refresh your memory, okay?

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

8

1       **A.**    Okay, thank you.

2       **Q.**    The first thing I want to show you is a

3   document that we have marked as Exhibit 2 back on

4   January 23rd of '19.  And this is a document --

5       MR. FLYNN:  Go off one second.

6

7       (Discussion of the record.)

8

9   BY MR. FELLE:

10      **Q.**    I am going to show you again what's

11  been marked as Exhibit 2 at an earlier deposition.

12  These are just some photographs of -- photographs

13  of Mr. Ortiz.

14      **A.**    Okay.

15      **Q.**    Two photographs.  These are from the

16  date he was booked --

17      **A.**    Oh, okay.

18      **Q.**    -- and arrested for the crimes.

19      **A.**    All right.

20      **Q.**    And is that Mr. Ortiz, based on your

21  recollection of him?

22      **A.**    Yeah, that's him.

23      **Q.**    Okay.  The second page?

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

9

 1      **A.**   The second page.  Yes.

 2      **Q.**   That's of him, correct?

 3      **A.**   Yes.

 4      **Q.**   And then it looks like when he was

 5   booked, he was put up against a wall chart, gives

 6   his height, a little over 6'6", according to the

 7   picture?

 8      **A.**   Well, yeah, about 6'6".  I said about

 9   -- I said approximately about 6'5", but --

10      **Q.**   Okay.

11      **A.**   That's him.

12      **Q.**   So let me talk a little bit, before we

13   get into the details of what you can recall --

14      **A.**   Okay.

15      **Q.**   -- of the investigation, let's talk a

16   little bit about you.  How long have you been

17   employed with the New York State Police?

18      **A.**   Eighteen years.

19      **Q.**   Okay.

20      **A.**   Came out of New York State Police

21   October 30th, 2000.

22      **Q.**   And I think from the records I saw,

23   your shield number is 1020?

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1          A.    That's correct, sir.

2          Q.    Okay.  Have you always been assigned to

3    Batavia?

4          A.    No.

5          Q.    When you first started with the police,

6    where were you assigned?

7          A.    First assigned at the academy and then

8    after the academy I went to Fulton, New York to

9    train.  And then from Fulton, New York I was

10   stationed at SP Liberty, which is Liberty, New

11   York, Troop F.  And then from there I went to SP

12   Wurtsboro.  From SP Wurtsboro I went to SP

13   Waterloo, which is in Troop E, close to Rochester.

14   And then from Waterloo, I went to SP Jamestown as a

15   uniformed trooper still.

16         Q.    Okay.

17         A.    I was also, as a uniformed trooper, I

18   was assigned to do various cases.  And from SP

19   Jamestown I went to SP Niagara, in Niagara Falls.

20   And in 2006 I was promoted to investigator.

21         Q.    And with that promotion were you

22   reassigned and relocated?

23         A.    Yes, I was relocated to Amity, which is

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

11

1   in Allegany County.  From there I went to -- back

2   to SP Niagara as an investigator, which is in

3   Niagara Falls.  From Niagara Falls I went to

4   Clarence, New York, SP Clarence.  All stations

5   start with SP, State Police.  And then from

6   Clarence I went -- I got assigned to the Counter

7   Intel -- Counterterrorism Intelligent Unit, Source

8   Development Unit.

9       And now I am currently assigned to Major

10  Crimes, Troop A Major Crimes, assigned as a task

11  force officer with the FBI Safe Street Task Force.

12  Primarily work gangs and organized crime and drugs.

13      **Q.**   Okay.  And when did that assignment

14  occur?  When did you go to Troop A, Major Crimes

15  Units?

16      **A.**   2000, I believe.  2000.  To Major

17  Crimes I went in 2015.  Approximately 2015.

18      **Q.**   Okay.

19      **A.**   But Safe Streets, I was assigned there

20  in 2014.

21      **Q.**   And with the Counter -- Counter

22  Intelligent Terrorism work that you did, was that

23  also with the FBI?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
12

1      **A.**    No, it wasn't with the FBI, it was with

2   the State.  But so I am under SDU, which is Source

3   Development Unit, so while I was under that unit,

4   under CTIU, which is Counterterrorism --

5   Counterterrorism Intelligence Unit, I was assigned

6   to work with a -- a collaborative effort with

7   Buffalo PD Homicide and the FBI --

8      **Q.**    All right.

9      **A.**    -- on a gang case in the lower West

10  Side, the West Side of Buffalo.

11     **Q.**    And I saw that I think for about two

12  years you were involved in the investigation of

13  gang activities on the West Side of Buffalo,

14  correct?

15     **A.**    Five years.

16     **Q.**    Five years?

17     **A.**    Yeah, I started in September, September

18  21st of 2009.

19     **Q.**    Okay.  And it took you until about

20  2014?

21     **A.**    Yes, approximately '14, yes.

22     **Q.**    And during your involvement with that

23  joint task force between Buffalo and the State and

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

13

1    the Federal branch, if you will, of the FBI and the

2    Attorney General's Office, did that investigation

3    result in various convictions?

4         **A.**    Yes.

5         **Q.**    And did it also involve an opening of

6    an old case that -- the murders of the Camacho

7    brothers, which resulted in a conviction of Josue

8    Ortiz?

9         **A.**    Yes.

10        **Q.**    Okay.  And was that done, the review of

11   a closed, essentially a closed case in that murder

12   investigation, was that done based on information

13   you had obtained in your involvement in this task

14   force related to West Side gang activity?

15        **A.**    Yes, sir.

16        **Q.**    Okay.  I had seen a couple, besides

17   materials I have read, the task force, when you say

18   it involved also the FBI, I believe it was

19   Palmer --

20        **A.**    Yes.

21        **Q.**    -- correct?  And Flowers?

22        **A.**    Tom Palmer and Chris Flowers.

23        **Q.**    Okay.  Were there others that were --

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

14

```
 1          A.   And later -- later Jason Galley.

 2          Q.   Okay.

 3          A.   Yes.

 4          Q.   And from the city side, it involved

 5   Mary Evans, correct?

 6          A.   Mary Evans and Detective Noreen Walsh.

 7   She's retired now.

 8          Q.   What do you recall about the

 9   involvement with Noreen Walsh in that task force

10   investigation?

11          A.   Through the whole investigation?

12          Q.   Yeah.

13          A.   She was very -- a very productive part

14   of the team.  We call it the team.  I started with

15   her in 2009.  She -- she was part of homicide.

16          Q.   And when do you recall that she

17   retired?

18          A.   Wow.

19          MR. FLYNN:  If you know.  Don't guess.

20

21   BY MR. FELLE:

22          Q.   Correct.

23          A.   I really don't know.  I am --
```

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
15

1  approximately 2012.   2000 -- yeah, approximately

2  2012 or '13.

3        **Q.**   Okay.

4        **A.**   I'm sorry, I am not --

5        **Q.**   That's okay.

6        **A.**   I don't -- I don't really don't know

7  the exact date or time.

8        **Q.**   And I certainly appreciate your best

9  estimate, so I do appreciate when you tell us.

10       **A.**   Okay.

11       **Q.**   And certainly, we're not going to hold

12  you to the exactness of that.   You're doing the

13  best you can.   But it's fair to say that she had

14  retired before the investigation had been closed?

15       **A.**   Had been closed?

16       **Q.**   Yeah.

17       **A.**   Oh, the whole investigation?   Like the

18  gang investigation?

19       **Q.**   Correct, at least your involvement, you

20  said it went until '14?

21       **A.**   Yeah, she was retired before we

22  finished.   Yeah, we were done with the trials and,

23  yeah.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

16

```
 1        Q.    I guess what I am trying to make sure,
 2   I appreciate, is when Mary Evans got involved, did
 3   she get involved because Noreen Walsh was retiring
 4   or had she already been involved from the
 5   inception?
 6        A.    No.  Mary -- Mary Evans was involved
 7   from the beginning also.
 8        Q.    What years were you at the Clarence
 9   barracks?
10        A.    What year was I at SP Clarence?
11        Q.    Year or years, yeah.
12        A.    2007 to 2008.
13        Q.    And were you a patrol officer at that
14   point?
15        A.    No, I was an investigator.
16        Q.    Investigator.  Prior to working with
17   the New York State Police, did you -- did you work?
18        A.    Yes.
19        Q.    Okay, what kind of work did you do?
20        A.    I worked at -- well, I was in the
21   United States Coast Guard, active duty from 1998 to
22   2000.  I also worked for People Incorporated.
23        Q.    Prior to 1998?
```

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

17

1          **A.**    I believe after.  After I left.  When I

2     came back from the Coast Guard, because I was

3     overseas, when I came back in 2000, I worked at

4     People Incorporated for a little bit until I got

5     called by the New York State Police.

6          **Q.**    Okay.  While holding your position,

7     whatever that position might have been with the New

8     York State Police since October 30th of 2000, have

9     you ever maintained other employment outside of

10    State Police?

11         **A.**    Other employment outside --

12         **Q.**    Yeah.

13         **A.**    -- of the State Police?

14         **Q.**    Yeah.

15         **A.**    I played music.  I am a musician.

16    Percussionist.

17         **Q.**    Were you ever with a group that they

18    charged to play?

19         **A.**    Any group that charged to play?

20         **Q.**    Yeah, I guess I am asking if you played

21    recreationally, just for --

22         **A.**    Just recreationally mostly, yeah.

23         **Q.**    Any other jobs you have held outside of

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

18

1   the New York State Police?

2         **A.**   No.

3         **Q.**   Ever an investigator or private

4   investigator with anyone?

5         **A.**   No.   State Police doesn't allow -- our

6   agency doesn't allow you to have -- become a

7   private investigator or do outside jobs like that.

8   I don't --

9         **Q.**   Okay.

10        **A.**   The only thing I asked permission with

11  the State Police was to continue to be a musician,

12  that's about it.

13        **Q.**   In -- in your capacity as a New York

14  State investigator, do you work with private

15  investigators in the area?

16        **A.**   No.

17        **Q.**   No?

18        **A.**   I never have.

19        **Q.**   Are you familiar with the retired

20  detective, Mark Stambach?

21        **A.**   I am familiar with the name.

22        **Q.**   Okay.

23        **A.**   But I haven't seen him in years.   I

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

19

1    think maybe since, wow, 2000 -- 2009 or 2010.

2         Q.    Okay.  We'll talk about that.  I guess

3    the only reason I bring it up is he runs a private

4    investigation firm --

5         A.    Okay.

6         Q.    -- out in Amherst and he does employ --

7         A.    Okay.

8         Q.    -- retired, you know, FBI agency told

9    us, retired police officers --

10        A.    Okay.

11        Q.    -- and things of that nature.

12        A.    I didn't know that.

13        Q.    And I guess I am just asking you if you

14   ever did any work with him in that capacity?

15        A.    No, never.

16        Q.    Okay.  While working with the New York

17   State Police throughout the 18 years, what awards

18   and accreditations have you received?

19        A.    I am sorry, but I got some

20   certificates, but I just don't recall all of the

21   awards.

22        Q.    Okay.  I know that when we spoke with

23   Mary Evans and she said that she had received an

MR. RONDON   -   MR. FELLE   -   3/13/2019

20

1  accreditation for her work involved in the West

2  Side gang activity investigation and convictions.

3  Did you also receive an accreditation for that?

4      A.   I got one, yeah, in 2010.

5      Q.   Okay.

6      A.   From the FBI.

7      Q.   Do you recall what your award was

8  entitled?

9      A.   No.  What it was called, sir?

10     Q.   Yeah.  Yeah.

11     A.   No, I don't remember.

12     Q.   Okay.  I appreciate your modesty.

13     A.   It was -- and it was like --

14     Q.   He doesn't want to talk.

15     A.   No, it's not that I don't want to talk

16  about it, it was kind of like right in the

17  beginning of what -- we had a lot more work to do.

18     Q.   Okay.

19     A.   You know, it was regarding the 10th

20  Street Gang --

21     Q.   Okay.

22     A.   -- arrest.

23     Q.   All right.

MR. RONDON   -   MR. FELLE   -   3/13/2019

21

1          A.    You know, so.

2          Q.    Back on November 11th of 2004, which

3    was the date of the Camacho brothers' murders on

4    the West Side of Buffalo, where were you stationed

5    then, if you recall?

6          A.    In Jamestown, sir.   SP Jamestown.

7          Q.    Okay.   Prior to your work with the task

8    force that we have described, and in particular,

9    Mary Evans was involved from the City of Buffalo

10   capacity?

11         A.    Yes.

12         Q.    Had you ever had an familiarity or

13   involvement in the murder investigation into the

14   Camacho murders of November 11th, 2004?

15         A.    No.

16         Q.    You were never called in to assist with

17   any part of that initial investigation?

18         A.    In 2004, no --

19         Q.    Okay.

20         A.    -- I was not.

21         Q.    Okay.   I know that you said in 2004 you

22   were in Jamestown, were you a patrol officer at

23   that point?

*MR. RONDON  -  MR. FELLE  -  3/13/2019*
22

```
 1          A.    Yes, sir, I was in uniform.

 2          Q.    Okay.  And that was for about another

 3   two years until 2006 when you became an

 4   investigator and were assigned to Amity in Allegany

 5   County?

 6          A.    Yeah.  Yes.

 7          Q.    When you first became an investigator,

 8   what types of crimes were you assigned to?

 9          A.    I worked everything from homicides on.

10   Deaths.  Burglaries.  Larcenies.  All crimes.  We

11   handled everything.

12          Q.    Okay.  You made a distinction when you

13   talked about going to Troop A in approximately 2015

14   and you were assigned to Major Crimes, but you had

15   already been essentially working on Major Crimes,

16   correct?

17          A.    Yeah.

18          Q.    Okay.

19          A.    Basically, yes.

20          Q.    It was just more of a designation at

21   that point?

22          A.    Yes.

23          Q.    More official?
```

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

23

1      **A.**   Yes.

2      **Q.**   Okay, good.  And with respect to Major

3  Crimes, it would be similar, these are all levels

4  of felonies, including, like you have described,

5  homicides or murders, correct?

6      **A.**   Yes.

7      **Q.**   So you're familiar with the

8  investigation of a murder crime scene?

9      **A.**   Yes.

10     **Q.**   And you're familiar with the

11  procedures, if you will, that investigators follow

12  in trying to solve a crime?

13     MR. FLYNN:  Is that for the State Police

14  policies or the Buffalo PD policies?

15

16  BY MR. FELLE:

17     **Q.**   Correct, with respect to the State --

18     **A.**   Yes.

19     **Q.**   -- we're talking about.  Okay.  And are

20  there times throughout your career as an

21  investigator with the New York State Police, that

22  you have worked in conjunction with the local

23  police, albeit city or town police?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

24

1        **A.**    Yes, like this example now, I mean, it

2   was a collaborative effort of working gangs in the

3   City of Buffalo.

4        **Q.**    Okay.  Did you, when you reviewed the

5   case involving the Camacho brother murders, did you

6   become aware that there was a state investigator

7   that was working collaboratively with Buffalo at

8   the time of the murder investigation?

9        **A.**    At the time of the murder?  When you

10  say State investigator, with the State Police?

11       **Q.**    Correct.

12       **A.**    A member of the New York State Police?

13       **Q.**    Correct.

14       **A.**    I don't recall that.

15       **Q.**    Okay.

16       **A.**    In 2004, sir, right, you're asking?

17       **Q.**    Or subsequent.  So when you -- when you

18  got involved in this case, we'll call it the Cold

19  Case Review at that point, for you and Detective

20  Evans --

21       **A.**    Okay.

22       **Q.**    -- when you first became involved in

23  looking at the details surrounding the murder

A-1115

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

25

1    investigation into the Camacho brother murders of

2    November 2004 --

3         **A.**    Okay.

4         **Q.**    -- when you reviewed the matter, did

5    you see that anyone from the State level in the

6    State Police had been involved in any way in that

7    investigation?

8         **A.**    During 2004?

9         **Q.**    And subsequent up to the conviction of

10   Mr. Ortiz.

11        **A.**    Because my partner, I had a partner

12   with me, Josh Keats --

13        **Q.**    Okay.

14        **A.**    -- during the time that I was reviewing

15   that case folder.

16        MR. FLYNN:  I think what he really wants to

17   know, and I can clarify --

18        THE WITNESS:  I'm sorry.

19        MR. FLYNN:  -- from the time of the

20   homicides of '04 up until when you came in on '09

21   --

22        THE WITNESS:  Did I -- did I have knowledge?

23        MR. FLYNN:  -- did anyone from the State

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

26

1   Police who was working on that investigation, yes.

2          THE WITNESS:  No, I didn't --  I don't

3   recall that.

4          MR. FLYNN:  Okay.

5

6   BY MR. FELLE:

7          **Q.**   Okay.

8          **A.**   I don't recall that.

9          **Q.**   Okay.

10         MR. FLYNN:  And Keats was your partner from

11   '09 forward?

12         THE WITNESS:  Yeah.  '09 -- '09 to 2012

13   Keats was one of my partners.

14         MR. FLYNN:  Okay.

15

16   BY MR. FELLE:

17         **Q.**   Okay.

18         **A.**   For the team there, yes.

19         **Q.**   I'm just trying to clarify that you

20   just said that there are times that that happens

21   where a state investigator may work with a town or

22   city involving a crime, and I am trying to see if

23   at any time did you -- did you recognize that one

Case 23-352, Document 53, 06/27/2023, 3534012, Page146 of 261

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

27

1  of your former colleagues had been working this

2  murder case?

3       **A.**    Okay.  I don't recall that.

4       **Q.**    Okay.  And I see from the records that

5  I have -- that I have read, that you speak Spanish,

6  correct?

7       **A.**    I do.

8       **Q.**    Okay.  And are you certified to

9  translate Spanish to English?

10       **A.**    Certified by whom?  I am --

11       **Q.**    Any certification?

12       **A.**    No, I don't have no certification.

13       **Q.**    Okay.  And do you, in your capacity as

14  a New York State Police Investigator, provide

15  translation work from Spanish to English involved

16  with the investigation of Major Crimes?

17       **A.**    I do.  To assist with investigations,

18  yes, I do.

19       **Q.**    Okay.  And I believe the record I saw,

20  that you did that involving the investigation of

21  West Side gang activity for the five years that you

22  were involved, correct?

23       **A.**    Yes.

**MCCANN & MCCANN REPORTING**

MR. RONDON   -   MR. FELLE   -   3/13/2019

28

```
 1        Q.    And that involved various things, such
 2   as wiretaps and things of that nature, correct?
 3        A.    Yes.
 4        Q.    And you provided the translation from
 5   what was on the wiretap to English, correct?
 6        A.    Right.  What I heard audio into
 7   English, yep.
 8        Q.    Okay.  Are you familiar with a Buffalo
 9   Police Officer Edwin Torres?
10        A.    I have heard the name, sir.  But I'm
11   not -- I don't -- I can't see the face, so I don't
12   know him, you know.
13        Q.    Okay.
14        A.    I don't know him.  Like never worked
15   with him on cases.
16        Q.    Okay.
17        A.    I have heard the name, but I don't know
18   the guy.
19        Q.    With respect to the investigation into
20   the murders of the Camacho brothers --
21        A.    Okay.
22        Q.    -- Officer Torres provided some Spanish
23   translation and I am just wondering if you had a
```

Case 23-352, Document 53, 06/27/2023, 3534012, Page148 of 261

1  chance to review any of his work in that

2  investigation?

3       **A.**   So let me -- I just want to make sure I

4  got the question correct that you're asking me.

5  Are you saying that -- are you asking me that he

6  took Spanish, written down Spanish documentation

7  and translated it to English?

8       **Q.**   He -- he did most of it verbally, so I

9  am asking you when I talk about the work that he

10 did, it may be a recorded statement of Mr. Ortiz

11 in Spanish?

12      **A.**   I didn't hear a recorded statement

13 during that investigation.  And I don't recall ever

14 seeing written down, handwritten down document or

15 report by somebody speaking in Spanish or writing

16 down in Spanish and then being later translated to

17 English, I don't -- I don't recall that, sir.

18      **Q.**   Okay.  And was there ever a time that

19 you spoke, I know you said you have never -- you

20 can't recall ever meeting Mr. Torres, or Officer

21 Torres, but do you recall ever speaking to him

22 about his involvement --

23      **A.**   No.

MR. RONDON  -  MR. FELLE  -  3/13/2019

30

1      Q.    -- in that murder investigation?

2      A.    No.

3      Q.    Okay.

4      A.    I didn't mean to cut you off like that,

5   sir.

6      Q.    That's okay.  I kind of keep it --

7      A.    I just don't, I don't know the guy.

8      Q.    Okay.

9      A.    I don't know.  I have heard the name

10   though.

11      Q.    He was scheduled for today and because

12   of the sickness of the other attorney, he won't be

13   in today.

14      A.    Okay.

15      Q.    But it is an important aspect of the

16   case and we'll get into when we talk later about

17   the investigation into this.  Prior to coming in

18   today for this deposition, what documents did you

19   review?

20      MR. FLYNN:  Other than the conversation you

21   and I had.

22      THE WITNESS:  Just -- yeah, just the

23   conversation we had yesterday, that's it.  Nothing.

**MCCANN & MCCANN REPORTING**

A-1121

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

31

1  BY MR. FELLE:

2       **Q.**   Did you review any documents,

3  photographs, anything involving this case?

4       MR. FLYNN:  Did I show you anything?

5       THE WITNESS:  No.

6

7  BY MR. FELLE:

8       **Q.**   Earlier in the deposition, I believe of

9  Detective Evans, we had marked Exhibit 4 on January

10  25th, Detective Evans described this as a summary.

11  I am going to show it to you.  It's a synopsis of

12  the murder investigation that she had prepared with

13  respect to reviewing the cold case; is that a fair

14  statement?

15       **A.**   Is it okay if I read some of this?

16       **Q.**   Sure.  Of course it is.

17       **A.**   I don't remember ever seeing this

18  document.  Is this -- is this something that was

19  submitted by us?

20       **Q.**   It's something -- my next question was

21  going to be if you contributed to it, but Detective

22  Evans said she prepared this and utilized in your

23  review of the investigation?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

32

1        **A.**    No.

2        **Q.**    You don't recall seeing this before

3    today?

4        **A.**    No, I didn't -- I didn't see this.

5        **Q.**    Okay.

6        **A.**    When did she submit this?  The 13th.

7    No, I do recall -- I do recall that there was a

8    synopsis and we would go back and forth on the

9    synopsis and look at it.  But prior to this

10   meeting, meeting you here today, I don't -- I don't

11   remember seeing it, you know, since I have been

12   notified to come here to see you.

13       **Q.**    Okay.

14       **A.**    But probably during the investigation,

15   sir, I probably did see this, I just don't recall

16   it, you know.

17       **Q.**    Okay.

18       **A.**    Because we were doing so many things,

19   this wasn't the only case we were working on.

20       **Q.**    Sure.  Sure.

21       **A.**    We were answering so many phone calls

22   for so many families.

23       **Q.**    I understand.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

33

1     **A.**     So many victims, you know.

2     **Q.**     Sure.  My question to you though is, as

3  much as you vaguely recall that you were going back

4  and forth discussing the synopsis --

5     **A.**     Okay.

6     **Q.**     -- did you ever contribute to any part

7  of that synopsis where you made an entry?

8     **A.**     Where I made an entry myself?

9     **Q.**     Yeah, added information.

10     **A.**     No, not myself, but maybe this is

11  information that maybe me and Josh and Mary

12  developed and maybe was put into the synopsis.

13     **Q.**     Okay.  I don't want you to speculate --

14     **A.**     So that way it's easier to review, you

15  know --

16     **Q.**     Exactly.

17     **A.**     -- and follow.  Follow, you know.

18  Follow the case, so.

19     **Q.**     Okay.  Let me just take a look then.

20  And outside of looking at any documents and/or

21  photos, things of that nature, and not -- I am not

22  asking you about conversations with your attorney,

23  but have you spoken to anyone else about what your

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

34

1  testimony would be today?

2       **A.**   No.

3       **Q.**   Did you talk to any of the other

4  officers involved in the investigation into this

5  matter?

6       **A.**   The only one I talked to is Mary.  We

7  got notified to talk to the Attorney General's

8  Office and to talk to you and that was it.  I have

9  been so busy with -- I haven't been able to really

10  have like, you know, a regular life outside of work

11  and my family, you know.

12       **Q.**   Okay.

13       **A.**   Yeah, but no, I didn't get to talk to

14  her about anything.

15       **Q.**   Okay.  And just so I am specific, did

16  she talk to you at all since she gave testimony in

17  the case?

18       **A.**   She called me about a source that

19  wanted to give information, that was about it.

20       **Q.**   Okay.

21       **A.**   On something else, you know, a

22  potential criminal activity, that was about it.

23       **Q.**   During that conversation, did she say

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
35

1   anything about her meeting with me or discussing

2   this case at a deposition?

3          **A.**   She said that she met with the AG's

4   Office and that -- that was it.

5          **Q.**   Okay.

6          MR. FLYNN:  I think just for clarification,

7   I think with the Buffalo PD.

8          THE WITNESS:  Oh, yeah, the Buffalo PD,

9   yeah.

10

11  BY MR. FELLE:

12         **Q.**   Okay.

13         **A.**   Yeah.

14         **Q.**   And anyone --

15         MR. FLYNN:  Or counsel, I apologize.

16         MR. FELLE:  I'm sorry.

17         MR. FLYNN:  Buffalo PD counsel.

18         THE WITNESS:  Oh, I'm sorry, I didn't mean

19  to say it like that.  I thought it was the same.

20

21  BY MR. FELLE:

22         **Q.**   No, it's different, a different

23  attorney.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

36

1          MR. FLYNN:  I don't want Mr. Felle to think

2    I met with Ms. Evans before her testimony.  She had

3    her own counsel.

4          MR. FELLE:  That would be interesting.

5          THE WITNESS:  I apologize, I thought it was

6    the same.

7

8    BY MR. FELLE:

9          Q.    Okay.  That's okay.

10          A.    We never -- we haven't talked.

11          Q.    Yeah.  Yeah.  Fair enough.  But Ms.

12    Evans didn't -- Detective Evans didn't tell you

13    anything about the content of what we spoke about,

14    did she?

15          A.    No.  No.

16          Q.    Okay.  So sir, I want to get back to

17    our discussion about the idea that you and

18    Detective Evans, Officer Keats, Detective Walsh, at

19    some point collaboratively --

20          A.    It's Investigator Keats.  He's also

21    State Police also.

22          Q.    Okay.

23          A.    Yeah.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

37

1     **Q.**   Collectively at some point based on the

2     information you received in the -- into the

3     investigation of the West Side gang activity --

4         **A.**   Okay.

5         **Q.**   - there was a decision made that you

6     should pull the conviction of Josue Ortiz

7     surrounding the Camacho brothers' murders, correct?

8         **A.**   That's correct.  It wasn't made by me,

9     but some --

10        **Q.**   Were you involved in that review?

11        **A.**   You mean like the decision or just

12    notifying the U.S. Attorney's Office?

13        **Q.**   Well, I saw --

14        **A.**   That we believe that maybe -- are you

15    saying -- what are you saying?

16        MR. FLYNN:  Do you understand the question

17    though?

18        THE WITNESS:  I really don't understand it.

19    Can you --

20

21    BY MR. FELLE:

22        **Q.**   Sure.

23        **A.**   Was I part of the review?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

38

1        **Q.**   You can't keep asking me questions.
2   You just asked me the once and I can --
3        **A.**   I'm sorry.
4        MR. FLYNN:  Just let him ask a question and
5   if you don't understand it, tell him.
6        THE WITNESS:  Okay.
7        MR. FLYNN:  Don't ask him another question.
8   Tell him "I don't understand your question".
9        THE WITNESS:  I apologize.
10
11  BY MR. FELLE:
12       **Q.**   That's all right.
13       MR. FLYNN:  Sorry to interrupt.
14
15  BY MR. FLYNN:
16       **Q.**   My reading of the notes indicate that
17  you accompanied Detective Evans when she met with
18  Mr. Ortiz on a number of occasions; is that
19  correct?
20       **A.**   That's correct.
21       **Q.**   My question to you now is, when the
22  decision was made to look into the conviction of
23  Josue Ortiz for the Camacho brothers' murders, were

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

39

1   you involved from the inception of that review?

2           A.    Yes.

3           Q.    Okay.  And how were you involved?

4           A.    We continued our investigation because

5   we were developing information that there was other

6   people involved in the homicides.

7           Q.    And based on the information you

8   received through your investigation into the gang

9   activity of the West Side --

10          A.    Okay.

11          Q.    -- wiretaps and other evidence, did you

12  become suspicious that the conviction of Mr. Ortiz

13  was wrongful?

14          MR. FLYNN:  Objection.  That's a legal

15  conclusion.  You can just -- what you know about

16  the conviction, not -- not whether it was wrongful

17  or not, whether someone else was involved or

18  something like that.  He can't make a legal

19  conclusion like that.

20          MR. FELLE:  Well, hold on a minute.  First

21  of all, no speaking objections, technically.  I

22  gave you some leeway obviously, but -- but he's an

23  investigator and he comes with conclusions.  He

**MCCANN & MCCANN REPORTING**

A-1130

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

40

1  makes decisions.

2       MR. FLYNN:  Sure.

3       MR. FELLE:  It's -- it's his job.

4       MR. FLYNN:  It's the court to determine

5  whether the conviction was unjustful or not.

6       MR. FELLE:  I said did he become suspicious

7  that it was a wrongful conviction.  And that's not

8  a legal conclusion.

9       MR. FLYNN:  That question was different.

10 That one he can ask.  You asked if he was involved

11 in the determination that the conviction was

12 unlawful or not.

13      MR. FELLE:  Okay, well, the record will

14 speak for itself.

15

16 BY MR. FELLE:

17      Q.  But you can answer the question.  Did

18 you become suspicious that the conviction of Mr.

19 Ortiz was wrongful?

20      MR. FLYNN:  Objection.  You can answer.  You

21 can answer.

22      THE WITNESS:  Oh.  We developed additional

23 information that there was other people involved,

**MCCANN & MCCANN REPORTING**

MR. RONDON   -   MR. FELLE   -   3/13/2019

41

1   so we wanted to explore that more and that's why we

2   came into contact with your client.

3

4   BY MR. FELLE:

5           Q.   Okay, initially before coming into

6   direct contact with my client, you pulled the

7   investigation case file, correct?

8           A.   That's correct, sir.

9           Q.   And did you physically sit down with

10  Detective Evans and others and look at that file?

11          A.   We did.

12          Q.   Do you recall being with Detective

13  Evans when the initial closed case was pulled?

14          A.   No, I wasn't with her.  She -- Mary

15  Evans advised me and Investigator Keats that she

16  found it.

17          Q.   Okay.  Do you recall her telling you

18  that it was marked as a closed --

19          A.   Yes.

20          Q.   -- case?

21          A.   I remember that.

22          Q.   Did that strike you as odd?

23          A.   That it was closed?

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

42

```
 1          Q.    Correct.

 2          A.    Well, yes, it struck -- it struck us as

 3   odd, but we knew we had more work to do because we

 4   were getting information that people that we were

 5   looking into at the time, were involved in some

 6   kind of incident, we just were trying to find out

 7   which one.

 8          Q.    But you also knew based on even your

 9   preliminary review, that there were three suspects

10   for those murders, correct, with the

11   identification, other things indicated, three

12   perpetrators of the murders, correct?

13          MR. FLYNN:   Objection.   I don't think he

14   testified to that at all.

15

16   BY MR. FELLE:

17          Q.    No, did you know that?

18          A.    That's after we reviewed the file and

19   we got additional information during, you know what

20   I am saying, during the -- during the investigation

21   that we were already doing.   We didn't even know

22   who your client was, Josue Ortiz --

23          Q.    Okay.
```

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

43

1       **A.**    -- at the time, so we were getting

2    additional information that these individuals, some

3    individuals were part of, you know, shootings and

4    homicides, which were -- we were already

5    investigating over a 150 nonfatal shootings and

6    over five homicides at the time.

7       **Q.**    Okay.

8       **A.**    So, you know, you know, do you

9    understand what I am saying, sir?

10      **Q.**    I do.

11      **A.**    We're -- we're in the -- we're -- we're

12   actually just investigating all these different

13   nonfatal shootings and homicides.  All these acts

14   of violence in this small area of Western New York

15   and we're getting flooded with information.

16      MR. FLYNN:  Just -- just let him ask.

17

18   BY MR. FELLE:

19      **Q.**    So what I want to do today, Officer,

20   Investigator, I want to stick to this case.

21      **A.**    Okay.

22      **Q.**    I understand you have got a lot going

23   on.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

44

1       **A.**    Okay.

2       **Q.**    And your attorney doesn't want you to

3   get into those things.  I certainly don't want you

4   to reveal anything about other investigations that

5   might be sensitive, I just want to probe your

6   knowledge, your memory, of your involvement in this

7   investigation.

8       **A.**    Okay.

9       **Q.**    So once you pulled the closed case --

10      **A.**    Okay.

11      **Q.**    -- it's marked as an inactive closed

12  case, correct?  It was inactive, right?  Nobody was

13  working the case still?

14      **A.**    Right, it was closed, yeah.

15      **Q.**    And once you review the file, did you

16  -- did you recognize that there were, by way of all

17  of the witness accounts, there were more than one

18  perpetrator of that crime?

19      MR. FLYNN:  And I think, just to help him,

20  when you first reviewed the file, I think the time

21  when you first looked at it --

22      THE WITNESS:  Yes.

23      MR. FLYNN:  -- you, at that point, what, and

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

45

1   correct me if I'm wrong, at what point do you learn

2   there are later people involved, when you first

3   reviewed it or later?

4          THE WITNESS:  When we first reviewed it.

5          MR. FLYNN:  Okay.

6

7   BY MR. FELLE:

8          Q.    Great, and that's what I'm asking, when

9   you first reviewed it --

10         A.    Yeah.

11         Q.    -- you came to recognize that it was

12   more than one perpetrator of the crime, the

13   murders, correct?

14         A.    Yet.

15         Q.    And I suppose it's at that point that I

16   am asking you, wasn't it odd that there was only

17   one conviction, all indications were more than one

18   perpetrator of the crime, so why would the case

19   have been marked as inactive and closed?

20         A.    I don't know.  I am not, you know, I am

21   not a member of that agency, so I don't know what

22   their policy is.

23         Q.    Okay, I understand.

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

46

1        **A.**    I don't know.

2        **Q.**    But -- but it shouldn't have been,

3    right?  It should have been an open case because

4    there was more than one perpetrator and only one

5    conviction?

6            MR. FLYNN:  Only if you know that answer.

7            THE WITNESS:  I don't know that answer.  I

8    really don't.

9

10   BY MR. FELLE:

11       **Q.**    Based on the policies and procedures of

12   the New York State Police Department and the

13   Investigation Bureau, would a crime of that nature

14   have been closed and inactive?

15       **A.**    I -- no, I think we would continue to

16   try to do what we can.

17       **Q.**    And when you say do what you can, do

18   what you can to identify the other perpetrators,

19   correct?

20       **A.**    Yeah, if we could.

21       **Q.**    All right.  So there are still loose

22   ends to that murder investigation?

23       **A.**    It's a possibility there was loose

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

47

1   ends, yeah.  I wasn't there in '04, so I don't

2   know.

3        **Q.**   There was no indication that had you

4   not stumbled upon that information pertaining to

5   that '04 murder, that that file would have remained

6   closed, correct?

7        **A.**   Can you say the question again, I am

8   sorry.

9        **Q.**   Sure.  If you were task force

10  involvement --

11       **A.**   Okay.

12       **Q.**   -- in gang activity on the West Side

13  and stumbled upon some information pertaining to

14  that '04 murder --

15       **A.**   Right.

16       **Q.**   -- that file with the Buffalo Police

17  Department, being marked inactive and closed, would

18  have remained there, correct?

19       **A.**   Correct.

20       **Q.**   So we talked about the overall task

21  force, obviously the energy of that task force is

22  toward solving crime related to gang activity on

23  the West Side of Buffalo, correct?

**MCCANN & MCCANN REPORTING**

A-1138

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

48

1 **A.** Yes.

2 **Q.** Information reveals something that now

3 diverts your attention to something else, the '04

4 murder investigation, correct?

5 **A.** Right.

6 **Q.** So I imagine not the whole task force

7 assigned to gang activity is not working on that,

8 so tell me specifically who is working on review of

9 the '04 murder investigation?

10 **A.** All the agents that I -- that I named,

11 so it would be me, Mary Evans, Josh Keats, Tom

12 Palmer, and I believe Jason Galley was involved

13 too.  I don't remember Chris Flowers being involved

14 in that one, because I think he was gone by -- he

15 was transferred by -- I don't recall the year.  No,

16 he was there in 2011 for a little bit, yeah, he

17 would be involved too.

18 **Q.** Okay.

19 **A.** Yeah.

20 **Q.** So they were all involved in some

21 aspect in the review of the old 2004 murders of the

22 Camacho brothers?

23 **A.** Yes, sir.

MR. RONDON   -   MR. FELLE   -   3/13/2019

49

1      Q.    Okay.  And just so I can clear my

2  notes, Josh Keats, he's still with the New York

3  State Police, correct?

4      A.    Yes, sir, he is.

5      Q.    Is he also assigned with you?

6      A.    No, he's assigned to -- he's assigned

7  to SP Boston.  He's a senior investigator there.

8      Q.    And that's not Boston, like the

9  township, that's like Boston --

10     A.    Town of Boston.

11     Q.    Town of Boston?

12     A.    Yeah.

13     Q.    Okay, fair enough.  So who was in

14 charge, if there was anyone in particular, in

15 charge of the review of that investigation from

16 '04?

17     A.    I think Buffalo PD, Mary Evans, she's

18 the homicide detective.

19     Q.    Was there ever a time where you, being

20 a state officer, state investigator, were asked to

21 reanalyze any of the physical evidence that was

22 taken from that crime scene?

23     A.    Me specifically, I don't recall, sir.

MR. RONDON   -   MR. FELLE   -   3/13/2019

50

1   The FBI, they might be able to answer that, but I

2   don't recall me specifically.  And I don't recall

3   the State Police doing anything.

4         Q.   Do you recall that the FBI took certain

5   physical evidence to analyze it further?

6         A.   I do recall they took -- they took

7   evidence.  They transferred evidence, evidence from

8   Buffalo PD to their evidence locker, I believe, but

9   I don't know what they did with that, sir.

10         Q.   Do you recall specifically which of the

11   FBI agents was in charge of that transfer?

12         A.   I believe it was Tom Palmer.

13         Q.   Can you take me, maybe this will help

14   our discussion, from the point in time that you

15   opened this closed inactive case involving the

16   Camacho brothers' murders from '04, can you tell

17   me, just take me step by step about your

18   involvement in that investigation of the '04

19   murder.  Not --

20         A.   Just that, okay.  Sorry, so what we did

21   was try to conduct interviews, and one of the main

22   interviews we wanted to conduct was to talk to

23   Josue Ortiz to see if we can get any additional

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

51

1  information.

2       **Q.**   Before -- before you did that, did you

3  look at the various statements that were taken by

4  Buffalo Police closer to the time of the actual

5  crime?

6       **A.**   Yeah.  Yes, we did.

7       **Q.**   And so did you look at the case file,

8  as we call it?

9       **A.**   Yes, we looked at the case file.

10       **Q.**   Okay.  And when you looked at that case

11  file, did you recognize that Buffalo Police

12  Detectives had taken a statement from a Miseal

13  Montalvo?

14       **A.**   What is his name, Miseal?  Miseal

15  Montalvo, yes.

16       **Q.**   Okay.  It's spelled M-I-S-E-A-L,

17  Montalvo, M-O-N-T-A-L-V-O, did you recognize that

18  they had taken a statement from him?

19       **A.**   Yes.

20       **Q.**   Now just so the record is clear, at

21  some point in your involvement in the gang activity

22  on the West Side, you became aware that Miseal, I

23  am just saying it --

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

52

 1         **A.**    Miseal.

 2         **Q.**    -- in English, okay, I can't say that.

 3         **A.**    Oh, I'm sorry.  I'm sorry.

 4         **Q.**    I am just reading it phonetically,

 5    Miseal Montalvo had admitted to some involvement in

 6    the crime and murders of the Camacho brothers,

 7    correct?

 8         **A.**    During the file -- I mean, reviewing

 9    the file, the Buffalo file, sir?

10         **Q.**    No, involving your investigation into

11    gang activity, there were conversations that were

12    recorded where Miseal Montalvo admitted to some

13    involvement in the murders of the Camacho brothers,

14    correct?

15         **A.**    Yes.

16         **Q.**    And so that was one of the things that

17    led you and Detective Evans and others to go back

18    into that investigation, correct?

19         **A.**    Yes.

20         **Q.**    So did you find it surprising that back

21    then, on November 15th, 2004, four days after the

22    murders were committed, that Miseal Montalvo was

23    interviewed by Buffalo Police detectives and

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1    released?

2         **A.**    Yes.

3         **Q.**    And --

4         MR. FELLE:  I am just going to have this

5    marked, please.

6

7         (The following was marked for identification.)

8                        Exhibit A.

9

10   BY MR. FELLE:

11        **Q.**    So Investigator Rondon, I have had

12   marked as Exhibit A, it appears to be a P-73

13   prepared by Detective Lobaugh.  Have you had a

14   chance to review that?

15        **A.**    Yes.

16        **Q.**    It appears to paraphrase an interview

17   that Buffalo Police Officers and detectives had

18   with Miseal Montalvo, correct?

19        **A.**    Yes.

20        **Q.**    And that conversation took place about

21   four days after the murders?

22        **A.**    Yes.

23        **Q.**    And based on your involvement in the

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

54

1   investigation and evidence obtained through that

2   investigation through the joint task force and to

3   the gang activities of the West Side of Buffalo,

4   were you able to obtain enough evidence to prove

5   that Miseal Montalvo was involved in that murder?

6           **A.**   Yes.

7           **Q.**   And was he ultimately convicted for

8   that murder in Federal Court?

9           **A.**   No, he hasn't been convicted for that

10  murder.  To my knowledge, I think it's still

11  pending on a decision by Judge Arcara.

12          **Q.**   I thought the sentencing was -- was

13  continued, but I thought the conviction took place?

14          MR. FLYNN:  If you know.

15          THE WITNESS:  I don't know the status, I am

16  sorry.

17

18  BY MR. FELLE:

19          **Q.**   Okay.

20          **A.**   But from my recollection, it was still

21  pending.

22          **Q.**   Okay.

23          **A.**   But I know others were convicted.

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

55

1      Q.    Okay.

2      A.    So --

3      Q.    When you reviewed the investigation

4   file of the City of Buffalo pertaining to the

5   murder of the Camacho brothers, did you see any

6   other follow-up or interviews with Miseal Montalvo?

7      A.    Not that I can recall, sir.

8      Q.    And in any event, before your

9   involvement in this matter, there was no complaint

10  levied, no charges filed against Mr. Montalvo

11  involving those murders, correct?

12     A.    Correct.

13     Q.    Sir, during your involvement in the

14  West Side Gang activities, did you become familiar

15  with an Efrain Hidalgo, H-I-D-A-L-G-O.

16     A.    Efrain Hidalgo?

17     Q.    Yes.

18     A.    Yeah, Cheko, right?

19     Q.    Cheko, correct?

20     A.    Yes.

21     Q.    Did you become familiar with him?

22     A.    Oh, yeah.

23     Q.    And did you develop evidence during

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

56

1   your investigation into the West Side Gang activity

2   that implicated Efrain Hidalgo in the murders of

3   the Camacho brothers in '04?

4       **A.**   Yes.

5       **Q.**   When you reviewed the City of Buffalo

6   file pertaining to the conviction of Mr. Ortiz, did

7   you notice that Mr. Hidalgo, Efrain Hidalgo, Cheko,

8   was interviewed by the Major Crime Bureau on

9   November 19th of '04?

10      **A.**   Yes.

11      **Q.**   And so that would have been essentially

12  eight days post?

13      **A.**   Okay.

14      **Q.**   Post murders, did you see that?

15      **A.**   I don't recall when he got interviewed,

16  but I remember seeing the statement, sir, I mean

17  the document.

18      MR. FELLE:   Okay, mark that as B, please.

19

20    (The following was marked for identification.)

21              Exhibit B.

22

23  BY MR. FELLE:

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

57

1        **Q.**    Investigator Rondon, I want to show you

2    what we have marked as Exhibit B, just take a quick

3    look at that two-page document, 8 and a half by 14.

4    Okay, I know you answered this before, but you are

5    familiar with then that statement that was given by

6    Efrain Hidalgo, referred to as Cheko, on November

7    19th of '04 to Buffalo Police, correct?

8        **A.**    Yes.

9        **Q.**    And I just wanted to turn your

10   attention to page 2 of that statement, does the

11   statement state at line 93, did the detective ask,

12   did you or your brother or kill, I don't know if

13   it's a misprint, kill Miguel or Nelson Camacho at

14   879 Niagara Street on 11/11/04, do you see that

15   question by the police?

16       **A.**    Yes, I do see the question.

17       **Q.**    And what does Efrain, or Cheko, what

18   does he respond?

19       **A.**    No.

20       **Q.**    Okay.  Did you develop evidence in your

21   investigation that proved that answer was false?

22   Was wrong?

23       **A.**    Yes.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

58

```
 1        Q.    And ultimately did you develop enough

 2   evidence against Efrain Cheko Hidalgo to charge and

 3   convict him for those murders?

 4        A.    Yes.

 5        Q.    When you review the Buffalo Police

 6   Department case file, did you see that there was a

 7   follow-up by the Buffalo Police Department with

 8   respect to charging or arresting Efrain Cheko

 9   Hidalgo?

10        A.    No.

11        Q.    In fact, when you reviewed the case,

12   did you recognize that there were various witnesses

13   who had seen the perpetrators running from the

14   property, standing in front of the property, before

15   they entered, had you -- do you recall that?

16        A.    I do recall reading some -- some

17   documents stating -- reporting that they saw people

18   leave that residence.

19        Q.    And --

20        A.    I just don't recall the names of them.

21        Q.    Fair enough, it was a long time ago,

22   but -- but my review of the file indicates that

23   there were at least six witnesses that all
```

MR. RONDON   -   MR. FELLE   -   3/13/2019

59

1   identified the perpetrators of the crime, at least

2   by physical description, size, height, things of

3   that nature, do you recall seeing various

4   identifications from witnesses in the file?

5        A.   I do recall that.

6        Q.   And one of the striking things is, in

7   reviewing all of the descriptions, none of the

8   descriptions have the perpetrators over 5' 11",

9   correct?

10       A.   Correct.

11       Q.   Did you find that suspicious in your

12  review?

13       A.   In my review, after I met your client,

14  yes.

15       Q.   And as an investigator with the New

16  York State Police, having worked there for 18

17  years, if there was such a glaring inconsistency in

18  the size of somebody, again, based on the six

19  witness identifications, would -- would you

20  question that person's involvement in the crime if

21  it didn't fit with respect to all those witness

22  accounts?

23       A.   Yes.

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

60

1        **Q.**    And in this case, do you recall seeing
2   a P-73 that at the time Mr. Ortiz was allegedly
3   confessing to the crime, that they had another
4   individual in an interview room who was giving them
5   information about the perpetrators of the crime?
6        **A.**    I don't recall that, sir.
7        **Q.**    Let me start, before I ask you that
8   question, let me show you what we had marked as
9   Exhibit 14 on 1/23, was this the alleged confession
10  that was taken of my client?  You have seen this
11  before, during your review of the investigation of
12  the file, correct?
13       **A.**    Can I review it?
14       **Q.**    Of course.
15       **A.**    Okay.
16       **Q.**    But did you see the purported
17  confession of Mr. Ortiz?
18       **A.**    Yes, I did see it.
19       **Q.**    Okay, just take a quick --
20       **A.**    Thank you.
21       **Q.**    For now I am not going to ask you about
22  the content.  I simply want to ask you about the
23  date and time.  Do you see the date and time there

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

61

1   of the statement?

2          A.   November 16th, 2004.

3          Q.   Okay.  I will show it to you again if

4   we want to get into the content.  At the bottom of

5   Exhibit 14, really the third page, does it say that

6   the statement stopped at 10:30 p.m.?

7          A.   Yes, it says that the statement stopped

8   at 10:30 p.m., sir.

9          Q.   I don't see any start time on the

10  document.  Do you see anything where it says when

11  the statement started?

12         MR. FLYNN:  Check up in this maybe

13  (indicating).  I don't know.

14         THE WITNESS:  Okay.  No.

15

16  BY MR. FELLE:

17         Q.   Okay.  Is it your practice in the State

18  -- of the New York State Police Investigation Unit

19  to mark the start and end time of a statement taken

20  from a suspect?

21         A.   Yes.

22         Q.   So would you agree that that is a

23  irregularity, that there's no start time to a

MR. RONDON   -   MR. FELLE   -   3/13/2019

62

1   confession statement provided, if you know?

2          MR. FLYNN:  According to the State Police or

3   Buffalo PD?

4          THE WITNESS:  According to the State Police?

5

6   BY MR. FELLE:

7          Q.   Yes.

8          A.   Yes, usually we like to show a start

9   and end time.

10         Q.   I want to now show you --

11         A.   Here you go, sir.

12         Q.   Thank you.

13         A.   You're welcome.

14         Q.   I want to show you what we had marked

15   previously as Exhibit 6 on January 23rd of '19.

16   This is the evidence unit case file from the

17   Buffalo Police Department and I want to

18   specifically bring your attention to a P-73 from

19   November 16th, '04, the same date that Mr. Ortiz

20   allegedly provided a confession, right, November

21   16th of '04, correct?

22         A.   Okay, yes, that's correct.

23         Q.   Because we established, even though we

MR. RONDON   -   MR. FELLE   -   3/13/2019

63

1   don't know what time it started, we know the whole

2   statement, the whole interview ended at 10:30 p.m.,

3   correct?

4        A.   Correct, sir.

5        Q.   So looking at the P-73 of Detective

6   Patrick Judge, do you happen to know Detective

7   Judge?

8        A.   Yes.

9        Q.   Okay.   I am going to have you just

10  review it first and then I am going to ask you some

11  questions about it.   Detective, does this P-73

12  indicate --

13       A.   Okay, this -- just this one, right

14  (indicating)?

15       Q.   One page.

16       A.   Just this one page, correct.   Yep.

17       Q.   Does that indicate that Detective Judge

18  was interviewing an individual who was both a

19  witness to the perpetrators at the date -- date and

20  time of the crime and it also was telling

21  detectives that he had again seen those

22  perpetrators and was giving a physical description

23  of them to the Buffalo Police Department, does it

MR. RONDON   -   MR. FELLE   -   3/13/2019

64

1  say that?

2       A.   Yes.

3       Q.   And that was the same night that Mr.

4  Ortiz had allegedly confessed to these crimes,

5  correct?

6       A.   Yes.

7       Q.   Is this information consistent with

8  arresting Mr. Ortiz?

9       MR. FLYNN:  If you know.

10

11  BY MR. FELLE:

12       Q.   None of the information there points to

13  him, correct?

14       A.   No, not the descriptions, no.

15       Q.   And let me ask you this, with respect

16  to your involvement with the review of a Buffalo

17  Police Department arrest and prosecution, you're

18  familiar with the -- the rules, the policies and

19  procedures, in an investigation for the Buffalo

20  City Police, correct?

21       A.   For the Buffalo City Police?

22       Q.   Correct.

23       A.   No, I am not.  I am not.  I am a New

MCCANN & MCCANN REPORTING

A-1155

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
                                                    65

1   York State Trooper, so I don't -- I am not familiar

2   with their rules.

3        **Q.**   Okay.  Are you -- are you testifying

4   that the rules of a murder investigation are

5   different for the State Police than they are for

6   the City of Buffalo Police Department?

7        **A.**   No, I am not.  I am not trying to be a

8   problem, sir, I'm just saying that I just don't

9   know their regulations.  I know mine, but they

10   should be the same.

11        **Q.**   Okay.  So we have Detective Stambach,

12   who is interviewing Mr. Ortiz in one room.

13        **A.**   Okay.

14        **Q.**   Detective Judge in another room --

15        **A.**   Okay.

16        **Q.**   -- interviewing a witness to the

17   crimes, giving a physical description of the

18   assailants, Detective Stambach says that he is

19   completely unaware that that is taking place --

20        **A.**   Okay.

21        **Q.**   -- would that be, if it were based on

22   state regulations, would that be a violation of the

23   policies and procedures of your department?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

66

1      **A.**   Well, it depends.  I wasn't there, so,

2   I mean, if they're involved in an interview with a

3   subject, you know, regarding a case like this, a

4   homicide case, a homicide investigation, that means

5   they would have to disrupt the interview.  Someone

6   would have to disrupt the interview to communicate,

7   let them know, you know, what's going on.  What

8   they have.  So I don't know, I wasn't there, so --

9      **Q.**   Yeah.

10      **A.**   But so --

11      **Q.**   What if I told you that the Spanish

12   translator was the same in both interviews, so

13   there wouldn't be any interruption, right, that

14   translator --

15      **A.**   Okay.

16      **Q.**   -- was the Buffalo Police Officer,

17   would know that this involves the same crime --

18      **A.**   Okay.

19      **Q.**   -- wouldn't you expect there to be some

20   communication about two things in the same office

21   going on about the same murder?

22      MR. FLYNN:  If you know what the Buffalo

23   Police expectations are.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

67

1  BY MR. FELLE:

2       **Q.**   As an investigator?

3       **A.**   As an investigator?

4       **Q.**   Yeah, in a murder.

5       **A.**   Yes, we should be able -- be able to

6  communicate.

7       **Q.**   Yeah.  And did there come a point in

8  time during your involvement of reviewing the

9  arrest and conviction of Mr. Ortiz that you doubted

10  that he was, in fact, the perpetrator of the

11  murders?

12       **A.**   Yes.

13       **Q.**   And I think you told us earlier that

14  you set out to interview him, correct, Mr. Ortiz?

15       **A.**   Yeah, that was before we doubted that

16  he was, you know, involved, but --

17       **Q.**   Okay.

18       **A.**   -- we wanted to learn if we could get

19  more information about who -- who he was with,

20  because the information in the statement, he's

21  saying, at the time that we're reviewing it, he's

22  saying that, you know, people were involved.

23       **Q.**   Let me ask you this though --

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

68

```
 1          A.    We wanted to get more information about

 2   that.

 3          Q.    -- outside of your interviews with Mr.

 4   Ortiz, and we're going to go through those in a

 5   minute, the dates and things --

 6          A.    Yeah.

 7          Q.    -- but outside of your interviews with

 8   Mr. Ortiz, based upon your review of this

 9   investigation, the murders of the Camacho brothers

10   from November 11th of '04, did you see any evidence

11   that would link Mr. Ortiz to those crimes?

12          A.    The confession.

13          Q.    Anything else?

14          A.    Not that I can recall.

15          Q.    Do you recall ever getting any results

16   back from the FBI with respect to the transfer of

17   evidence and any analysis they had done on DNA and

18   any other items at the scene?

19          A.    I don't specifically recall that I

20   received it, but maybe Buffalo PD did or the FBI

21   did, I just never -- I don't recall reviewing any

22   results.

23          Q.    Okay.  Let me ask you this, we talked
```

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

69

1  about the task force --

2       **A.**    Yes, sir.

3       **Q.**    -- but at some point U.S. Assistant

4  Attorney General Joseph Tripi --

5       **A.**    Yes.

6       **Q.**    -- became involved in the case,

7  correct?

8       **A.**    Yes.

9       **Q.**    At what juncture did he become involved

10 and aware of your review of the Ortiz conviction?

11      **A.**    Well, we were working with Joseph Tripi

12 since September 21st, 2009 all the way through

13 2014.

14      **Q.**    But primarily with respect to gang

15 related activity on the West Side of Buffalo,

16 correct?

17      **A.**    Right.

18      **Q.**    And was he also though aware of your

19 review of the Ortiz conviction?

20      **A.**    Yes.  Yes.

21      **Q.**    Was he aware at the inception that

22 that's what you were doing?

23      **A.**    Yes.

**MCCANN & MCCANN REPORTING**

A-1160

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

70

```
 1        Q.    Okay.

 2        A.    Yes.

 3        Q.    Did -- did he provide any oversight or

 4   guidance with respect to how to go about that

 5   investigation?

 6        A.    Yes, you know, advise, maybe we should

 7   go talk to this person or that person, we would do

 8   it as a team, you know.

 9        Q.    Okay.

10        A.    Is that -- is that what you mean?

11        Q.    It is exactly what I mean.

12        A.    All right.

13        Q.    So I guess I am wondering, at any time,

14   did he, Joe Tripi, indicate to you that the

15   evidence or information he was getting back from

16   the FBI indicated that Mr. Ortiz was not part of

17   the crime, do you recall that?

18        A.    I would say yes, because of the

19   information we were given from -- from the

20   investigation, we were developing during the

21   investigation.

22        Q.    Okay.  So at some point there was an

23   indication from Joseph Tripi that --
```

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1      **A.**   Not only him, but as a team we were

2   like, maybe there's a possibility this guy wasn't

3   part of it.

4      **Q.**   Okay.

5      **A.**   Okay.  During the investigation, sir.

6      **Q.**   Correct.  Ultimately, through the

7   remaining part of your investigation, you came to

8   the conclusion that he was not, in fact, involved

9   at all in the crime, correct?

10      **A.**   Correct.

11      **Q.**   And let me talk to you, first talk

12   about the 440 Motion, and again, Mr. Ortiz'

13   exoneration, and I want to find out your

14   involvement in that, before we do that, based on

15   your review of the file, the things we talked about

16   already --

17      **A.**   Okay.

18      **Q.**   -- did you or anyone on the task force,

19   that you're aware of, reach out to talk with

20   Detective Mark Stambach?

21      **A.**   Not that I am aware of.

22      **Q.**   Were there any notes or P-73s', anything

23   in that review that would indicate that you

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
72

1  reached out, you or anyone on the task force

2  reached out to Detective Mark Stambach?

3       **A.**   I can't recall, sir, because I know I

4  didn't.

5       **Q.**   Okay. Maybe a better question is to

6  step back.  So up to now we talked about the

7  synopsis of the review of the homicide

8  investigation basically and brought it to '13,

9  brought it current basically, was there any other

10  file that was kept by the task force, specific,

11  outside of the file that was kept by the Buffalo

12  Police Department, involving your interview of that

13  investigation?

14       **A.**   There's a possibility there was a file.

15  I -- I mean, I know we submitted a lot of reports

16  together, I mean, me and Mary to the U.S.

17  Attorney's Office.

18       **Q.**   Okay.  Usually in an investigation

19  procedure, would be to keep copies of

20  correspondence directed to another part of the

21  investigation, do you recall you or Detective Evans

22  keeping a file with respect to those reports that

23  were submitted?

A-1163

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

73

1      **A.**    I think all the files were kept, were

2   either Buffalo PD or the U.S. Attorney's Office,

3   because everything we submitted was kept in the

4   homicide file, I believe --

5      **Q.**    Okay.

6      **A.**    -- when we reopened it.

7      **Q.**    So when you say homicide file, are you

8   referring to the evidence case file that the City

9   of Buffalo, Buffalo Police Department, had

10   maintained already?

11      **A.**    I believe so. Does that make -- I don't

12   know, do you understand what I am saying?

13      MR. FLYNN:  Just let him ask a question.

14      THE WITNESS:  Okay.

15

16   BY MR. FELLE:

17      **Q.**    It does.  It's just that we have asked

18   for that document and we have not gotten anything

19   with respect to what you indicated, so I am

20   wondering if they defined it differently or if

21   somebody made an error in not getting us all of the

22   information, I'm just trying to clarify --

23      **A.**    See, I wouldn't know that.

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 53, 06/27/2023, 3534012, Page193 of 261

MR. RONDON  -  MR. FELLE  -  3/13/2019

74

```
 1        Q.    -- through you?
 2        A.    I wouldn't know.
 3        Q.    So when you were involved in the
 4   ongoing review of the Camacho brothers' murders --
 5        A.    Okay.
 6        Q.    -- outside of that Buffalo Police
 7   Department file, are you testifying today that
 8   there was not a separate file that was kept by you
 9   with respect to communications with other task
10   force members?
11        A.    State Police didn't keep a file for
12   that case.  We didn't keep a file.  We submitted
13   every -- so I am speaking on behalf of me and my
14   partner, State Police, we submitted everything to
15   our investigator -- our partner, Mary Evans.
16        Q.    Okay.
17        A.    So she would have all that stuff.
18        Q.    Okay.
19        A.    Or -- or somebody would have that.
20   Buffalo PD or U.S. Attorney's Office would have it.
21        Q.    When you say partner, you're referring
22   to Josh Keats, correct?
23        A.    He's my partner also, Josh Keats.  Mary
```

**MCCANN & MCCANN REPORTING**

MR. RONDON   -   MR. FELLE   -   3/13/2019
75

1  is my partner also, but --

2      Q.   Right, but I think you indicated you

3  and your partner would not have kept any files,

4  your partner being Josh Keats?

5      A.   No, we don't keep any files.  Yeah, we

6  didn't keep any files.

7      Q.   Did you, or are you aware of anyone

8  else in the task force or U.S. Attorney General's

9  Office that interviewed or spoke to Detective

10 Sergeant Lonergan involving this homicide

11 investigation?

12     A.   I am not aware of it, because I didn't

13 speak to him.

14     Q.   Okay.

15     A.   But I am not aware of it though.

16     Q.   And you don't recall seeing any

17 correspondence that would document an interview or

18 information obtained from the Detective Sergeant

19 Lonergan?

20     A.   No, I don't recall sir.

21     Q.   Okay.  Did you, or are you aware of

22 anyone else in the task force or the U.S. Attorney

23 General's Office that interviewed Police Officer

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
76

 1  Edwin Torres involving --

 2       **A.**   No, I'm not aware of it.  I didn't know

 3  anybody interviewed him.

 4       **Q.**   Okay.

 5       **A.**   Anything.

 6       **Q.**   Okay.  Let me ask you this, at some

 7  point in time during your review of this case, you

 8  became aware that Mr. Ortiz was not involved in the

 9  crime, you have already told us that?

10       **A.**   Okay.

11       **Q.**   It would only make sense at that point

12  that you would question, there was a confession

13  that he was involved when he wasn't, is that a fair

14  statement?  Did you come to question how it was

15  that he would have confessed to a crime that he did

16  not commit?

17       **A.**   Yes.

18       **Q.**   And did you or anyone else in the task

19  force do anything to question that purported

20  confession?

21       **A.**   Yeah, by talking to your -- your

22  client, Josue, by trying to talk to him.

23       **Q.**   Okay.  And I appreciate that, but did

Case 23-352, Document 53, 06/27/2023, 3534012, Page196 of 261

A-1167

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

77

1  you do anything, so once it was ascertained that he

2  did not commit the crime, yet you have a confession

3  that says he did --

4       **A.**   Okay.

5       **Q.**   -- that raises some serious doubts,

6  would you agree, as to the police conduct in the

7  investigation?

8       MR. FLYNN:  Only if you know.

9       THE WITNESS:  I don't know.  I don't -- I

10  mean, I -- let me see, what are you saying that --

11  can you ask me the question, because I don't

12  understand it.  I'm sorry.

13       MR. FLYNN:  Don't ask him a question back.

14  If you don't understand it, tell him.

15       THE WITNESS:  I don't understand the

16  question.

17

18  BY MR. FELLE:

19       **Q.**   All right.

20       **A.**   I'm not trying to be difficult with

21  you.

22       **Q.**   You told us two things, you told us

23  that through your involvement in the investigation,

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

78

1   you and the task force came to the conclusion that

2   Mr. Ortiz did not commit these murders, correct?

3        **A.**   Yes.

4        **Q.**   You have also told us, it's your

5   testimony upon review of the file pertaining to the

6   homicides of the Camacho brothers, that there was

7   no other evidence linking Mr. Ortiz to the crime

8   other than his confession, correct?

9        **A.**   That is correct, sir.

10       **Q.**   So when you come to the conclusion that

11  an innocent man was convicted of a crime, the only

12  way he was convicted of that crime was the

13  confession, what do you do to question how that

14  confession came about?

15       **A.**   I guess interview some of the -- some

16  of the case agents on the case that conducted the

17  interviews, the police officers that were part of

18  the case back in 2004.

19       **Q.**   Okay.  And I just asked you that, we

20  went through --

21       **A.**   I'm sorry, I didn't understand it the

22  first time, but --

23       **Q.**   That's okay.  We went through the names

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

79

1  of the detectives that were specifically

2  involved --

3          **A.**   Okay.

4          **Q.**   -- in that confession?

5          **A.**   And who were they?

6          **Q.**   Detective Mark Stambach is the one who

7  took the confession.

8          **A.**   Okay.

9          **Q.**   His sergeant, Detective Sergeant

10  Lonergan --

11          **A.**   Okay.

12          **Q.**   -- came in at the end of it, and the

13  translator, Police Officer Edwin Torres.

14          **A.**   Okay.

15          **Q.**   Those were the only three people that

16  were involved in any way with respect to the

17  confession that was purportedly taken from my

18  client?

19          **A.**   Right.

20          **Q.**   And so I come back to the question, did

21  you record -- did you get any statements from them?

22          **A.**   No, I did not.  I did not, no.

23          **Q.**   Did anyone in the task force ever go

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
80

1   back and question them about how it was that

2   confession came about?

3       **A.**   I can't recall if anybody from the --

4   from the team did.  I can't recall that, sir.

5       **Q.**   Did -- did the task force, including

6   U.S. Attorney General, Assistant Attorney General

7   Joseph Tripi, ever discuss pressing charges against

8   any of the police officers involved in the taking

9   of that confession?

10       **A.**   No.

11       **Q.**   But was it ever referred to Internal

12   Affairs of the Buffalo Police Department?

13       **A.**   To my knowledge, no.

14       **Q.**   Okay.

15       **A.**   I don't remember hearing any of that.

16       **Q.**   Do you remember the officers in the

17   bureau?

18       **A.**   I'm sorry, what?

19       **Q.**   Internal Affairs of Buffalo, do you

20   know any of those officers?

21       **A.**   No.

22       **Q.**   Do you know an Officer Richard Ortiz?

23       **A.**   Richard Ortiz, no.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

81

1       **Q.**   Do you know an Officer Christopher

2 Mendola?

3       **A.**   Mendola, no.

4       **Q.**   Okay.  So let me just go back then to

5 the question about what was done from the

6 perspective of the task force to try to find out

7 how an innocent man had gone to jail with respect

8 to these murders, other than exonerating him and

9 releasing him for something he didn't do, did

10 anyone go to the root of the problem to try to

11 question it or try find out how it had happened --

12       **A.**   To my knowledge, I don't know.

13       **Q.**   -- that you're aware?  Is there still

14 an open file pertaining to any aspect of this?

15       **A.**   I -- to my knowledge, I don't know.

16       **Q.**   And you're not aware of any discussion

17 wherein the task force members discussed any

18 penalties, charges, demotions, anything involving

19 the two detectives and one police officer that I

20 just mentioned --

21       **A.**   No.

22       **Q.**   -- correct?  At any time during your

23 investigation into this crime, did you talk with or

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

82

1 are you aware of whether any other task member,

2 including U.S. Attorney, Assistant Attorney General

3 Joseph Tripi, spoke with Ken Case?

4          **A.**    No, I am not aware.

5          **Q.**    Okay.  He was the DA that prosecuted

6 the case, did anyone talk with him?

7          **A.**    That, I am not aware of.  That, I am

8 not aware of that.

9          **Q.**    Did anyone talk to Tom Burton?

10          **A.**    Who is that?

11          **Q.**    Do you know Tom Burton?

12          **A.**    I am some sorry, I don't know who that

13 is.

14          **Q.**    He's the attorney in charge of the

15 Buffalo Benevolent Association.  He's the attorney

16 that Buffalo Police Officers talk to if there's any

17 problems, internal problems.

18          **A.**    I don't even know him.

19          **Q.**    He's on TV all the time.

20          **A.**    I see him on TV.

21          **Q.**    Tom Burton?

22          **A.**    I don't even know the guy.

23          **Q.**    All right, so I guess your answer is

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 53, 06/27/2023, 3534012, Page202 of 261

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
83

1  no.  But you're not aware of anyone in this case or

2  task force indicating that anyone was speaking with

3  Tom Burton regarding the case?

4        **A.**   No, I am not aware of that.

5        **Q.**   How about Joe Marusak, did anyone ever

6  talk with him, the former DA?

7        **A.**   I don't even know who that is.  I never

8  heard that name.

9        **Q.**   Okay.

10       **A.**   No, I am not aware, I'm sorry.       .

11       **Q.**   He was homicide chief, bureau chief --

12       **A.**   Okay.

13       **Q.**   -- for a number of years and I am

14  wondering if anyone spoke to him about what had

15  happened here?

16       **A.**   No, sir, I am not aware of that.

17       **Q.**   Okay.  And how about Jim Bargnesi, are

18  you familiar with, either yourself or anyone else

19  in your task officer, including Joseph Tripi, speak

20  with Mr. Bargnesi about his involvement in the

21  prosecution of Mr. Ortiz?

22       **A.**   I am not aware of that either.

23       **Q.**   Okay.  So when I look at the synopsis,

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1   it indicates that your first interview with Mr.

2   Ortiz was on June 29th of 2011 at the Auburn

3   Correctional Facility, do you recall that?

4          **A.**   I recall meeting him, yeah.

5          **Q.**   Okay.  And I think you're aware --

6          **A.**   I don't recall the date.  I recall

7   meeting your client.

8          **Q.**   Okay.  Do you remember it being at the

9   Auburn Correctional Facility?

10         **A.**   Yes, sir.

11         **Q.**   And do you recall, other than yourself

12   and Detective Evans, who else was present for that?

13         **A.**   Sir, I don't recall who was present

14   with us.  I remember Mary being with me, but if you

15   have any paperwork, documentation that can refresh

16   my memory, that would be helpful.

17         MR. FELLE:  We can take a short break.

18

19          (Whereupon a short recess was taken.)

20

21         MR. FELLE:  So back on the record.

22

23   BY MR. FELLE:

---

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

85

1      **Q.**   Investigator Rondon, we were talking

2   about your first interview with Josue Ortiz back on

3   June 29th of 2011, and I am basing the dates off of

4   the synopsis we have talked about earlier --

5      **A.**   Okay.

6      **Q.**   -- that was marked as Exhibit 4 during

7   Detective Evans --

8      **A.**   Yeah.

9      **Q.**   -- deposition.  So I --

10      **A.**   Okay.

11      **Q.**   -- just turn to the summary for the

12   sake of the date, June 29th, 2011 at the Auburn

13   Correctional Facility?

14      **A.**   Yes, sir.

15      **Q.**   And were notes taken during that

16   interview with Mr. Ortiz?

17      **A.**   Is it okay to read this real quick?

18      **Q.**   Yeah, you can read it to yourself,

19   yeah, go right ahead.

20      **A.**   I believe we took some notes.  I don't

21   have any copies.  I can't recall.  I am sorry, I

22   can't recall if we -- wow, is this the summary of

23   the report maybe or --

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

86

1        **Q.**   In the synopsis, it appears to be just

2   a very loose paraphrase of some of the things that

3   were said, but I am wondering if it was either

4   recorded --

5        **A.**   It was not recorded.  I know that.  It

6   was not recorded, sir.

7        **Q.**   So no video or voice recording?

8        **A.**   No video, no voice, no.

9        **Q.**   Okay.  And so then I asked if notes

10  were taken and I think you said you don't recall?

11       **A.**   I don't recall.

12       **Q.**   It would be common practice to take

13  notes, would it not --

14       **A.**   Yes, it would.

15       **Q.**   -- if you talk to someone?

16       **A.**   We probably did, but if you have any

17  other documentation or anything to show me, let me

18  know.

19       **Q.**   I'm just wondering if, again, we're

20  going back to, there were some reports submitted to

21  the U.S. Attorney General's Office, different task

22  members, and then there may have been notes that

23  were taken, and again, I am going to come back to

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

87

1  the same question with you, maybe it will jog your

2  memory, was a separate file, sleeve, or folder kept

3  with respect to your review of the Camacho brothers

4  --

5          **A.**   Me personally?

6          **Q.**   -- conviction?  You or anyone else you

7  know in the task force that you guys were operating

8  from?

9          **A.**   I don't know.

10          **Q.**   Okay.  Okay.  So the synopsis basically

11  just gives us a summary, right, of the interaction?

12          **A.**   Is it okay if I read this?

13          **Q.**   To yourself, yeah.

14          MR. FLYNN:  Just let him ask a question when

15  you're done.

16

17  BY MR. FELLE:

18          **Q.**   Just referring to June 29th of 2011.

19          **A.**   Oh, I'm sorry.

20

21  BY MR. FELLE:

22          **Q.**   My only question is, is that -- is that

23  a summary of the interaction with Mr. Ortiz?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
88

1          **A.**   Right here (indicating)?

2          MR. FLYNN:  Right here (indicating).

3          THE WITNESS:  I'm sorry, I'm pointing at the

4    wrong one.

5

6    BY MR. FELLE:

7          **Q.**   That's okay, it may go on to the next

8    page.

9          MR. FLYNN:  I think he looked at something

10   June 6th.

11         THE WITNESS:  I looked at the wrong -- sorry

12   about that.  I do remember that.

13

14   BY MR. FELLE:

15         **Q.**   Okay.  And I think the notes indicate

16   that it was you and Detective Evans?

17         **A.**   Yea.

18         **Q.**   Does it jog your memory --

19         **A.**   Yes.

20         **Q.**   -- as to whether anyone else was there?

21         **A.**   It was just me and Mary Evans.  We

22   traveled out to Auburn Correctional, old prison.

23         **Q.**   Okay.  Was that at the direction of Joe

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

89

1  Tripi?

2       **A.**   No, it was our decision.

3       **Q.**   Okay.  And the synopsis, Exhibit 4,

4  indicates that the next time that there was an

5  interaction with Mr. Ortiz was on July 14th of 2011

6  when he was brought to the U.S. Attorney General's

7  Office, do you see that?

8       **A.**   Yes, I see it.

9       **Q.**   Were you present for that?

10       **A.**   Yes, I was present.  I am sorry, yes, I

11  was present.

12       **Q.**   Okay.  Remember what I said at the very

13  beginning of this, I said I am going to ask you

14  questions and I am going to presume that it's based

15  on your independent recollection, and if it's not,

16  and you can review documents and let us know if it

17  refreshes your memory.  As I ask you questions, and

18  the record won't pick this up, you are reviewing

19  the synopsis, correct?  You were reviewing it as I

20  asked you the question?

21       **A.**   Yes, I was.

22       **Q.**   So my question to you is, do you recall

23  meeting with Mr. Ortiz on that date?

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

90

```
 1        A.    Yes.

 2        Q.    Great.   And I think the synopsis goes

 3   on, it states that there was an interview with Mr.

 4   Ortiz on July 11th, 2012 at Attica State prison, do

 5   you see that?

 6        A.    July 11th, 2012.   July 11th, 2012.

 7   Yes.

 8        Q.    Do you see that?   And do you see the

 9   brief summary contained in the synopsis, Exhibit 4?

10        A.    Is it okay to read it?

11        Q.    To yourself, sure.

12        A.    Yes, okay.   July --

13        MR. FLYNN:   If you don't -- I didn't mean to

14   interrupt you.

15        THE WITNESS:   July 11, 2012.   That's okay.

16   Okay, I remember.

17

18   BY MR. FELLE:

19        Q.    Great.   And anyone other than you and

20   Detective Evans in that interview?

21        A.    I am sorry, I don't recall.

22        Q.    Okay.   Do you know why it was that you

23   went to Attica State prison to see Mr. Ortiz?
```

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

91

1          **A.**    To see if we can get more information

2     from him, because he was -- he was difficult to

3     talk to.  He was not difficult to understand, he

4     spoke clear Spanish and English.  Yeah, to obtain

5     more information, if he had any.

6          **Q.**    So that meeting at Attica State prison

7     comes approximately a year after the July 14th,

8     2011 interview at the U.S. Attorney General's

9     Office?

10         **A.**    Yes.

11         **Q.**    Did your task force develop more

12    information during that year that indicated that

13    Mr. Ortiz was not involved in the crime?

14         **A.**    Yes.

15         **Q.**    And, in fact, as you go through the

16    synopsis more, do you see on 9/6 of 2012, Mr. Ortiz

17    was brought to the U.S. Attorney General's Office

18    again?  Page 39, I believe.

19         **A.**    Thank you.  What was the date again,

20    I'm sorry, you said page 29?

21         MR. FLYNN:  39.

22         THE WITNESS:  There's no 39.

23

A-1182

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

92

1  BY MR. FELLE:

2        Q.    I's sorry, I might wrong.

3        A.    What was the date, sir?

4        Q.    September 6th of 2012?

5        A.    Okay.  I remember this visit.

6        Q.    And was that interview recorded?

7        A.    That interview was not recorded, sir.

8        Q.    Okay.

9        A.    To my knowledge.

10       Q.    And does Exhibit 4, does it indicate

11  that on that date, during that interview, that Mr.

12  Ortiz emphatically declared that he was innocent of

13  the crimes that he was convicted?

14       A.    Yeah.  Yes.

15       Q.    And if we take that just a little

16  further to November 8th of 2012, do you see that

17  entry?

18       A.    November 8th of 2012.  November 8th?

19       Q.    Correct, November 8th of 2012, so two

20  months later?

21       A.    No, we have November 12th.

22       Q.    November 8th?

23       A.    We have --

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

93

1          MR. FLYNN:  It goes October 12th, 2012 to

2    November 12th, 2012.

3          THE WITNESS:  Yeah.

4

5    BY MR. FELLE:

6          **Q.**    Flip it and see if it shows up, if it

7    shows up anywhere?

8          **A.**    Okay.

9          MR. FLYNN:  Okay, so somewhere at the top.

10   November 15th and then December 17th, 2012.

11         MR. FELLE:  Okay.

12

13   BY MR. FELLE:

14         **Q.**    Is there an entry in the synopsis for

15   November 9th of 2012?

16         **A.**    November 9th?

17         **Q.**    Correct.

18         **A.**    No, sir.

19         MR. FLYNN:  Let me see.

20         THE WITNESS:  Can I look at maybe a

21   different page, maybe it got shuffled around or

22   something, you know.

23

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

94

1   BY MR. FELLE:

2         **Q.**   Yeah, let me look at it.

3         **A.**   So.

4         **Q.**   Incidentally, on that September 6th of

5   2012 --

6         **A.**   Okay, September 6th.

7         **Q.**   Yeah, September 6th --

8         **A.**   Okay.

9         **Q.**   -- of 2012 entry, does that indicate

10   that Joe Tripi traveled to Attica with you and

11   Detective Evans?

12         **A.**   Yes.

13         **Q.**   Anyone else that attended that

14   interview?

15         **A.**   To my recollection, I -- I don't

16   remember.  It -- I don't remember anybody else.

17         **Q.**   Okay.  Does that refresh your memory at

18   all as to whether or not that interview was

19   recorded either?

20         **A.**   Is it okay if I read this?

21         **Q.**   Of course it is.

22         **A.**   Okay, I know I didn't record.

23         **Q.**   Okay.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

95

1          A.    I didn't record the interview.

2          Q.    Yep.

3          A.    But --

4          Q.    I am just asking if you're aware that

5    it was?

6          A.    No, I was not.

7          Q.    With Joe Tripi being involved, it just

8    lends itself to the idea that maybe it was recorded

9    as opposed to just a casual encounter?

10          A.    I wasn't aware it was recorded, no.

11          Q.    And it doesn't appear to be recorded in

12    Exhibit 4, correct?

13          A.    Correct.

14          Q.    The records indicate that on November

15    8th of 2012, November 8th, 2012 --

16          A.    November.

17          Q.    -- is when the Federal Grand Jury

18    indicted Miseal Montalvo, Efrain Hidalgo and

19    Brendan Jones?

20          A.    Jonas.

21          Q.    Jonas, excuse me, for the murders of

22    Nelson and Miguel Camacho; is that correct?

23          A.    Yes.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1       **Q.**   And the notes also reflect that the day

2   following, on November 9th of 2012, that the

3   Federal Grand Jury minutes, along with the

4   indictment, were provided to the Erie County

5   District Attorney's office, do you know that to be

6   the case?

7       **A.**   No, I don't know that.

8       **Q.**   Once the superseding indictments came

9   down through the Federal Grand Jury in November,

10   November 9th of 2012 -- excuse me, November 8th of

11   2012 --

12       **A.**   Okay.

13       **Q.**   -- your investigation was not concluded

14   at that point, correct?

15       **A.**   No.

16       **Q.**   You still had information relative to

17   Mr. Ortiz that exonerated him from being involved

18   in that crime, correct?

19       **A.**   Yes.

20       **Q.**   And did you provide any information to

21   any other agency, including Erie County District

22   Attorney's office, that would help vindicate Mr.

23   Ortiz and help secure his release from prison?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

97

1      **A.**   I didn't personally provide anything.

2   I don't know, I am not -- I am not aware that it

3   was provided to them when.

4      **Q.**   Were you involved at all in that

5   decision?

6      **A.**   No.

7      **Q.**   And other than knowing that Mr. Ortiz

8   was eventually released, do you have any other

9   knowledge about the fact or circumstances that led

10  to his release?

11     **A.**   Only what I read in the paper.

12     **Q.**   Okay.  Now there was -- there was a

13  point in time that he, he, Mr. Ortiz, through an

14  attorney, had filed a 440 Motion, which is

15  basically asking that the court review the

16  circumstances and release him from incarceration

17  based on newly discovered evidence.  Do you know

18  that to be the case?

19     **A.**   No.

20     **Q.**   During that hearing, Detective Evans

21  was called in to give testimony, do you know that?

22     **A.**   No, I didn't know that.

23     **Q.**   Were you ever present in any part of

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

98

1  that hearing?

2      **A.**   No.

3      **Q.**   Did anyone --

4      **A.**   Where was that at?

5      **Q.**   It was conducted in front of --

6      THE WITNESS:  I'm sorry.

7      MR. FLYNN:  Okay, just don't ask him a

8  question.

9

10  BY MR. FELLE:

11      **Q.**   Yeah, well, if it helps refresh your

12  memory, I don't mind helping.

13      **A.**   Sorry.

14      **Q.**   It was conducted in front of Judge

15  Fronczak, Tim Fronczak, if you recall this, in Erie

16  County Court, and various witnesses were brought in

17  to talk about the murder investigation, and

18  ultimately, after a couple of years, it resulted in

19  Mr. Ortiz being released from jail.  My question to

20  you is, did you have any involvement at all in that

21  440 Motion?

22      **A.**   No, sir.

23      **Q.**   Were you ever given a subpoena and/or

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

99

1  requested to come in and provide testimony in that

2  440 hearing?

3      **A.**   No.

4      **Q.**   Detective Evans testified that she was

5  called and she explained what she felt was the

6  result of her investigation, which was that the

7  evidence exonerated Mr. Ortiz?

8      **A.**   Okay.

9      **Q.**   Had you been called to the stand in

10 that 440 Motion, would you have testified the same?

11     **A.**   Yes.

12     **Q.**   When was your involvement with the

13 criminal investigation into the Camacho brothers'

14 murders, when was your involvement concluded?

15     **A.**   I think after Efrain Hidalgo and

16 Brandon Jonas were arrested or -- yeah, when they

17 were arrested for the homicide.

18     **Q.**   Is that to say when the grand jury came

19 down with its indictment?

20     **A.**   Pretty much, yeah.  No, a little bit

21 after that.  I think -- I don't recall the exact

22 date, sir, but probably shortly after the

23 indictments came down.  I just don't recall the

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
100

1  date.  I am sorry, I don't have an exact date for

2  you.

3      **Q.**   Okay.

4      **A.**   You know.

5      **Q.**   My understanding is that there is still

6  some ongoing investigation into gang activities on

7  the West Side?

8      **A.**   Yes.

9      **Q.**   And that some of these individuals, you

10 know, may have information about that.  I am not

11 asking you about names or any information other

12 than to ask you if you're still involved in the

13 development of information through these three

14 charged individuals for the murders of the Camacho

15 brothers, are you involved in cultivating any more

16 evidence from them?

17     **A.**   Right now at this time, no.

18     **Q.**   Are you aware if the task force, any

19 other members of the task force are involved --

20     **A.**   No --

21     **Q.**   -- in cultivating --

22     **A.**   I am not aware of that.

23     **Q.**   Upon your conclusion with respect to

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

101

1   your involvement in the murders of the Camacho

2   brothers, did you prepare a report, a final report

3   about your involvement into that investigation?

4        **A.**   No.

5        **Q.**   Did you sign off on any other reports?

6        **A.**   On any other reports?

7        **Q.**   Surrounding the conclusions that you

8   and the task force drew based on your involvement

9   in the investigation of the Camacho brothers'

10  murders?

11       **A.**   Not that I can recall, unless you have

12  something that can -- not that I can recall.

13       **Q.**   I have asked if you ever gave any

14  testimony with respect to the exoneration hearings

15  of Mr. Ortiz, but to be more specific, did you ever

16  provide any kind of documents, any type of opinion

17  or statement, relative to your conclusions as to

18  the innocence of Mr. Ortiz?

19       **A.**   The only reports -- any -- any reports

20  that I was present with Mary Evans, I probably

21  signed off, signed off on.  And I think there was

22  one where we just reviewed.  It was an interview

23  with him at one of the prisons.

A-1192

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

102

1    **Q.**   Okay.

2    **A.**   So is that what you're asking me?

3    **Q.**   No, I am just asking you if you ever

4  reported to anyone else outside of the task force,

5  your findings and conclusions --

6    **A.**   No.

7    **Q.**   -- relative to the innocence of Mr.

8  Ortiz?

9    **A.**   No.

10    **Q.**   Okay.

11    **A.**   No.

12    **Q.**   Were you ever called in to speak with

13  anyone, and by anyone, I mean, not just the judge

14  or maybe it was a Parole Board or hearing officer,

15  anyone, about your opinion as to the innocence or

16  guilt of Mr. Ortiz?

17    **A.**   No.

18    **Q.**   Have you provided any statements or

19  testimony, any opinions whatsoever, to any board,

20  relative to the conduct of any other detective or

21  police officer involved in the investigation into

22  the Camacho murders?

23    **A.**   No.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

103

1          **Q.**    Have you ever been called in to any

2    kind of hearing relative to the conduct of any

3    detective or officer involved in this

4    investigation?

5          **A.**    No, sir.

6          **Q.**    So the Federal Grand Jury indictment

7    came down, as we talked about, in early November of

8    2012, the specific date, November 8th of 2012,

9    that's when the Federal Grand Jury handed down an

10   indictment against Montalvo, Hidalgo and Jonas, not

11   withstanding, it wasn't until December 8th of 2014,

12   December 8th of 2014, a little over two years, that

13   the Erie County District Attorney's office agreed

14   to release Mr. Ortiz.  During that approximately

15   two year, one month period of time, did you have

16   any involvement in the decision by the Erie County

17   District Attorney's Office, not to release Mr.

18   Ortiz?

19         **A.**    No.

20         **Q.**    Were you aware of that, what I just

21   told you?

22         **A.**    That what?

23         **Q.**    That he remained in jail for two years

**MCCANN & MCCANN REPORTING**

MR. RONDON   -   MR. FELLE   -   3/13/2019

104

1   following the indictments?

2        A.    Yes, I was aware.

3        Q.    Okay.  And did you ever speak up and

4   talk to anyone about -- about why that was the

5   case?

6        A.    No, I did not.

7        Q.    Did you ever speak up or tell anyone

8   about your opinions and the conclusions of all the

9   evidence that you found in your investigation that

10  exonerated Mr. Ortiz?

11       A.    No.

12       Q.    But again, it would be a fair statement

13  that when the indictment was handed down, if not

14  even before then, based upon your investigation,

15  there was no evidence to find that Mr. Ortiz was

16  involved in the murders of the Camacho brothers,

17  correct?

18       A.    Correct.

19       Q.    In the various meetings that you had

20  with Mr. Ortiz, they were face-to-face meetings,

21  correct?

22       A.    Yes.

23       Q.    And it sounds like there was at least

A-1195

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

105

1  three or four of those meetings, correct?

2        A.    Yes.  Well, four, yeah.

3        Q.    Four meetings?

4        A.    Approximately four.

5        Q.    Correct.  During any of those meetings,

6  did Mr. Ortiz ever act in a violent manner?

7        A.    Never.

8        Q.    The -- as part of your investigation,

9  did you review scenes from the crime?

10       A.    I did, sir.

11       Q.    And you saw the victims as they were

12  found at the crime scene?

13       A.    Yes, I did.

14       Q.    And they had multiple wounds to them

15  each --

16       A.    Yes.

17       Q.    -- correct?  Would you agree with me

18  that this was a violent crime?

19       A.    Yes, it was.

20       Q.    When you reviewed the history

21  pertaining to Mr. Ortiz, the involvement he had

22  with the Buffalo Police Department early on at the

23  time he was arrested, during the prosecution, at

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

106

1   any time during the scope of your investigation

2   into the murders of the Camacho brothers, did you

3   see anything in the file that would indicate that

4   Mr. Ortiz was ever violent?

5        **A.**    No.

6        **Q.**    Incidentally, when you looked at the

7   confession, we looked at that earlier, the

8   confession that was purportedly taken by Detective

9   Stambach, did you look at the facts that were

10  contained in that?

11       **A.**    In the statement?

12       **Q.**    Correct.

13       **A.**    Yes.

14       **Q.**    Having been an investigator reviewing

15  this crime, did you find that certain of the facts

16  contained in the confession were inconsistent with

17  how the crime had occurred?

18       **A.**    Yes.

19       **Q.**    Did it raise some suspicion that this

20  might not have been an individual at the crime

21  scene?

22       **A.**    During the course of the investigation?

23       **Q.**    Correct.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
107

1      **A.**    Yes.

2      **Q.**    Based on the facts that you learned and

3   then looking at this confession, did you have some

4   reasons to doubt that this man was ever at the

5   scene?

6      **A.**    Yes.

7      **Q.**    And did you ever question how those

8   facts would have -- would have come to be in that

9   document -- that confession?

10     **A.**    Yes.

11     **Q.**    And who -- who did you raise those

12  doubts to or concerns to?

13     **A.**    To my partners.

14     **Q.**    Within the task force?

15     **A.**    Mary.  Yeah.  Mary, Josh, yes.

16     **Q.**    Okay.  Did you also inform the FBI

17  agents that were involved in that task force?

18     **A.**    Yes.

19     **Q.**    Did there -- did there -- excuse me,

20  was there a universal consensus by all the

21  individuals in the task force that Mr. Ortiz was

22  innocent of the crimes?

23     **A.**    During the course of the whole

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1   investigation?

2          Q.   Correct.

3          A.   Yes.

4          Q.   And so there was no disagreement within

5   the task force about that, correct?

6          A.   Correct, sir.

7          Q.   So it's one thing to say that there

8   might be other perpetrators of a crime, right, that

9   only one individual was prosecuted, convicted, but

10  now we found others?

11         A.   Right.

12         Q.   But that wasn't your conclusion or the

13  task force conclusion, right, your conclusion was

14  not only that there were three individuals that

15  committed the crimes, but also that the individual

16  who had been arrested and convicted, Josue Ortiz,

17  he was innocent of committing the crimes, correct?

18         A.   Yes, sir.

19         Q.   Since November of 2012, when the grand

20  jury indictments came down, I think you said you

21  concluded your involvement around that time?

22         A.   Around that time.  I am not sure the

23  exact date.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1      **Q.**    Have you ever -- have you had any

2   contact at all with Josue Ortiz?

3      **A.**    Yeah, he called me.

4      **Q.**    Okay.

5      **A.**    He called me after he got released.

6      **Q.**    Okay.

7      **A.**    And he was talking to me in Spanish, he

8   told me how he was thankful that I was part of the

9   case and he was just -- he was just saying, hey, I

10  just want to thank you.  My family thanks you.  I

11  really appreciate the hard work that you and Mary

12  did and can you please tell Mary I said hello.  I

13  don't know how he got my number, but --

14     **Q.**    Yeah.

15     **A.**    -- he had my number.

16     **Q.**    Did he call you at the barracks, the

17  troopers' barracks?

18     **A.**    What's that?

19     **Q.**    I was wondering, did he call the

20  troopers' barracks?

21     **A.**    No, I don't know.  He called my cell

22  phone.

23     **Q.**    Oh, okay.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1       **A.**    Yeah.

2       **Q.**    I know there's a time after he was

3    released and he was living at the City Mission, do

4    you recall where he called you from?

5       **A.**    No, I don't recall.

6       **Q.**    Okay.  Any other contact with Mr.

7    Ortiz?

8       **A.**    No.

9       **Q.**    Overall, Mr. Ortiz spent ten years and

10   22 days in prison for the murder of the Camacho

11   brothers.  Based on your investigation into those

12   crimes, he was an innocent man, correct?

13      **A.**    Yes.

14      **Q.**    And he was an innocent man who spent

15   all those years and days in jail wrongfully,

16   correct?

17      MR. FLYNN:  Object.  You can answer.

18

19   BY MR. FELLE:

20      **Q.**    You can answer.

21      MR. FLYNN:  Object.  You can answer the

22   question if you know.

23      THE WITNESS:  What was the --

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

111

```
 1  BY MR. FELLE:

 2       Q.   He was an innocent man that spent ten

 3  years and 22 days in jail wrongfully, correct?

 4       MR. FLYNN:  Objection.  You can answer.

 5       THE WITNESS:  I don't know, wrongfully, I

 6  mean, he gave a confession, but I just -- he didn't

 7  -- he didn't commit the crime.

 8

 9  BY MR. FELLE:

10       Q.   And no other evidence that you saw in

11  this investigation, nothing else pointed to him as

12  the perpetrator of the crime other than this --

13  this purported confession, correct?

14       A.   Other than his confession, correct.

15       Q.   In fact, you would agree with me that

16  all of the evidence surrounding the crime, witness

17  statements, physical evidence, information that the

18  perpetrator of the crime would know, all of that is

19  inconsistent, inconsistent with Mr. Ortiz having

20  been involved in the crime, correct?

21       A.   Correct.

22       Q.   Detective Stambach, as you reviewed

23  this case, did you see that the first involvement
```

**MCCANN & MCCANN REPORTING**

A-1202

*MR. RONDON    -    MR. FELLE    -    3/13/2019*

112

1   that the Buffalo Police had had with Mr. Ortiz was

2   on November 15th, when he was brought to Buffalo

3   General Hospital for psychiatric evaluation?

4         **A.**    I don't recall.  Do you have some

5   paperwork?  I just don't recall that.  Was that --

6         **Q.**    I'll take a look.

7         **A.**    Okay, thank you.

8         **Q.**    Are you familiar with the Buffalo

9   Police Department, the investigation or interview

10   area?

11         **A.**    In 2004, no, I am not familiar with it,

12   but in 2009 on, yes.

13         **Q.**    Okay.  Were you familiar back in 2004

14   there was a period of time, about eight or nine

15   months, where the homicide bureau was pulled into

16   the Major Crimes Bureau more globally, do you

17   recall that at all?

18         **A.**    No, sir, I am sorry.

19         **Q.**    That's all right.

20         **A.**    Yeah.

21         **Q.**    You weren't necessarily there?

22         **A.**    Yeah, I wasn't working with the Buffalo

23   PD then.

**MCCANN & MCCANN REPORTING**

A-1203

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

113

1        **Q.**    I am going to get back to the question

2    I wanted to ask you in a second.  But I am going to

3    show you Exhibit 6, this is the department of

4    evidence unit case file from Buffalo Police

5    Department Detective Bureau and I want to show you

6    the P-73 of Detective Joseph Cook dated November

7    12th of '04, November 12th?

8        **A.**    November 12th of 2004, sir?

9        **Q.**    Of '04, correct?

10        **A.**    Okay.

11        **Q.**    The day after the murder of the Camacho

12    brothers.

13        **A.**    Okay.

14        **Q.**    Sir, what does that P-73, what does it

15    document?

16        **A.**    It documents that there was an

17    anonymous call, an anonymous tip regarding the

18    double homicide of Nelson Camacho and Miguel

19    Camacho and the caller was a female.  She would not

20    give her name.  She stated that she heard on the

21    street that three individuals were responsible for

22    the shooting.  She further stated that the three go

23    by the names of Brandon, Cheko and Uda.

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 53, 06/27/2023, 3534012, Page233 of 261

MR. RONDON   -   MR. FELLE   -   3/13/2019

114

1       Q.   And in fact, Brandon is Brandon Jonas,

2  who was ultimately convicted --

3       A.   Brandon Jonas.

4       Q.   -- convicted of this murder, correct?

5       A.   Yes, sir.

6       Q.   Cheko is Efrain Hidalgo; correct?

7       A.   Cheko is Efrain, Efrain Hidalgo, yes.

8       Q.   And what was the third name that they

9  gave you?

10      A.   Uda.

11      Q.   Uda.

12      A.   It's the same name that Ortiz was

13  mentioning.

14      Q.   Okay.  And Uda is the brother of

15  Miseal, correct?

16      A.   Montalvo, no.  No.  Uda is actually Uda

17  Hidalgo.  He is the brother of Efrain Hidalgo.

18      Q.   I see.

19      A.   Yes, sir.

20      Q.   Okay.  So that call had basically

21  brought to the attention to Buffalo Police

22  Officers, that the day after the murders, two of

23  the three individuals who had, in fact, committed

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

115

1  the murders, correct?

2      **A.**   Yes.

3      **Q.**   When you reviewed this homicide

4  investigation, did you see any follow-up with

5  respect to that tip?

6      **A.**   I don't recall.

7      **Q.**   Now even though --

8      **A.**   To this -- to this tip right here

9  (indicating)?

10     **Q.**   Correct, the document in the P-73 from

11  November 12th?

12     **A.**   I do recall Buffalo PD interviewing

13  Efrain Hidalgo and I think we went over that

14  already, I just --

15     **Q.**   Okay.

16     **A.**   -- don't recall the date.

17     **Q.**   And we -- we said, when we looked at

18  that recorded statement, that he was asked if he

19  committed the crimes and he said no --

20     **A.**   Correct, sir.

21     **Q.**   -- correct?

22     **A.**   Yes.

23     **Q.**   And so here we have another piece of

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

116

1  evidence where a caller is stating that he was

2  involved in the crime, and my question is, did you

3  see anything to suggest that it was followed up to

4  -- followed up on independently to find out who

5  that person is and how they knew that information?

6      **A.**    No, I don't remember any of the

7  information that I saw that was followed up on.

8  Yeah.

9      **Q.**    So based on that, the Buffalo Police

10  Department was aware, at least two of the three

11  real perpetrators of this murder, but yet there was

12  no conviction brought upon by the Buffalo Police

13  Department with respect to those individuals for

14  the crimes, correct?

15      **A.**    Correct.

16      **Q.**    Mislead, correct?  This is a lead in a

17  criminal investigation and nobody followed up on

18  this, correct?

19      **A.**    Well, they interviewed Efrain Hidalgo,

20  but I don't know about if anybody interviewed

21  Brandon or Uda --

22      **Q.**    Okay.

23      **A.**    -- because I haven't seen -- I don't

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1 | know, is there any other --

2 |       MR. FLYNN:  Let him ask, okay.

3

4 | BY MR. FELLE:

5 |       **Q.**   Ultimately, based on your investigation

6 | into the homicide of the Camacho brothers, what did

7 | you find that the motive was for the murders, was

8 | it over money?

9 |       **A.**   Yeah, money and drugs.

10 |       **Q.**   Did you see that on your review of the

11 | homicide investigation file, that the same night

12 | that Mr. Ortiz provided this purported confession,

13 | that he also gave full permission to search his

14 | apartment, do you recall seeing that?

15 |       **A.**   I do recall seeing that.

16 |       **Q.**   And do you recall that a full

17 | inspection didn't reveal any evidence that would

18 | have tied him to the crime?

19 |       **A.**   I don't recall that, but I do remember

20 | reviewing that, that, you know, that we were able

21 | to search his apartment.

22 |       **Q.**   Okay.  And do you recall he gave them

23 | consent to do that, correct?

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
118

1     **A.**    Yes, I do remember that.

2     **Q.**    Okay.

3     **A.**    I do remember that.

4         **Q.**    Incidentally, when you reviewed this

5    investigation, did you recognize that there were

6    notations in the records surrounding the police

7    involvement with Mr. Ortiz, that he was having

8    psychiatric problems?

9     **A.**    Yes.

10        **Q.**    Do you recall that the first encounter

11   that the police had with Mr. Ortiz, when he was

12   stating that people were trying to kill him, do you

13   remember seeing that in the P-73?

14    **A.**    Yes, I remember that.

15        **Q.**    And do you recall that based on that

16   interaction, the Buffalo Police brought him to the

17   Buffalo psychiatric ward?

18    **A.**    I don't know where they took him, I

19   thought it was just the hospital.  I remember Ortiz

20   saying he was taken to the hospital or something

21   like that.

22        **Q.**    Okay.  And do you recall the timing of

23   that?  Do you recall that hospitalization was the

MR. RONDON   -   MR. FELLE   -   3/13/2019

119

```
 1   same day or days or weeks?
 2          A.    It was -- it was after the homicide.
 3          Q.    Correct, but with reference to the --
 4          A.    I'm sorry.
 5          Q.    -- confession, they purportedly took
 6   from him, do you know how much time had elapsed
 7   from the time that Mr. Ortiz was in the psychiatric
 8   ward of the hospital and the time that the
 9   confession was taken?
10          A.    No, I'm sorry I don't.
11          Q.    Based on the -- based on the records,
12   it was the next day.
13          A.    It was, okay.
14          Q.    Okay.  So -- so the night of the 15th,
15   he's brought to Buffalo General Hospital by
16   ambulance at the request of the Buffalo Police?
17          MR. FLYNN:  If you know that.
18          MR. FELLE:  It's in evidence.
19          MR. FLYNN:  It's not -- if he knows.
20          THE WITNESS:  I just don't recall it.
21          MR. FLYNN:  You're characterizing evidence
22   that he hasn't testified to or that he said he
23   knows about.  You can ask him if he has seen it or
```

**MCCANN & MCCANN REPORTING**

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

1  that.

2

3  BY MR. FELLE:

4      **Q.**   In the following day he's brought to

5  Buffalo Police, he meets with Detective Stambach

6  and my question to you is, it would be important

7  for Detective Stambach to know that there was an

8  encounter with Mr. Ortiz the day before this

9  purported confession, would it not?

10      MR. FLYNN:  Objection.  You can answer.

11      THE WITNESS:  Yes.

12

13  BY MR. FELLE:

14      **Q.**   That, in fact, the records state that

15  three Buffalo Police Officers, one officer, two

16  detectives, met with Mr. Ortiz at Buffalo General

17  Hospital asking him questions about the crime, that

18  would be important for Detective Stambach to know

19  the next day when he purports to take a confession

20  from Mr. Ortiz, correct?

21      MR. FLYNN:  Objection.  You can answer.

22      THE WITNESS:  I don't know that.  I mean, I

23  wasn't there.

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*
121

1   BY MR. FELLE:

2        **Q.**    The policies -- some -- some of this is

3   just common sense and some of it is just based on

4   regulations, and I understand you're with the

5   State, but when you review an investigation with

6   the City, Detective Stambach tells us that the P-73

7   wasn't in the file?

8        **A.**    Okay.

9        **Q.**    He wasn't aware of the interactions of

10   the day before until after he takes the confession

11   of Mr. Ortiz, but yet it contains information very

12   important, because Detective Stambach says Ortiz

13   knew certain information about the crimes that he

14   wouldn't know otherwise, do you understand what I

15   am saying?  So my question to you is, based on your

16   18 years in the New York State Police Department

17   and as an investigator, wouldn't it be important

18   for an investigator to be aware of all the

19   information pertaining to a suspect before taking a

20   confession?

21        **A.**    Yes.

22        **Q.**    And if I were to tell you that the

23   Buffalo Police Officer who met with Mr. Ortiz on

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 53, 06/27/2023, 3534012, Page241 of 261

A-1212

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

122

1  the 15th at Buffalo General Hospital, was the same

2  police officer that met with him on the 16th when

3  he gave this confession, would it surprise you that

4  that police officer would not have told the

5  detective that he had seen that subject the night

6  before?

7       MR. FLYNN:  Object.  You can answer if you

8  know.

9       THE WITNESS:  I don't know.

10

11 BY MR. FELLE:

12      Q.   Do you recall seeing, in your

13 investigation and review of the file, that on the

14 15th, when Mr. Ortiz was asked questions about the

15 crime by the Buffalo Police Officers and

16 detectives, that he said he knew nothing about the

17 crime, do you remember seeing that?

18      A.   I don't recall that, sir.

19      Q.   Okay.

20      A.   Do you have something?

21      Q.   Yeah, I am going to look for the

22 document now.

23      MR. FELLE:  So I am going to take a short

**MCCANN & MCCANN REPORTING**

A-1213

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

123

 1  break and get that.

 2          THE WITNESS:  Okay.

 3

 4          (Whereupon a short recess was taken.)

 5

 6  BY MR. FELLE:

 7          Q.    Thank you for your patience, officer.

 8          A.    You're welcome.

 9          Q.    Showing you Exhibit 6, again, the

10  evidence unit case file, we had just been talking

11  about November 15th of '04?

12          A.    Okay.

13          Q.    And I just want to show you the P-73

14  prepared by Detective Mark Lobaugh on that date.

15  Just take a look at it and read it to yourself,

16  please.

17          MR. FLYNN:  What's the date?

18          THE WITNESS:  November 15th, 2004.

19          MR. FLYNN:  You can look at it.

20          THE WITNESS:  Okay.

21

22  BY MR. FELLE:

23          Q.    And so we had just been talking about

**MCCANN & MCCANN REPORTING**

Case 23-352, Document 53, 06/27/2023, 3534012, Page243 of 261

*MR. RONDON  -  MR. FELLE  -  3/13/2019*

124

1  the idea that the day before this purported

2  confession Mr. Ortiz was taking, that he was -- had

3  interaction with the Buffalo Police Department?

4      **A.**   Okay.

5      **Q.**   And do you see there in the fourth

6  paragraph that at that time he was brought to

7  Buffalo General Hospital --

8      **A.**   Yes, sir.

9      **Q.**   -- Mr. Ortiz?  And did the -- the

10  information above there indicates that he was

11  acting out of sorts?

12      **A.**   Yes.

13      **Q.**   That the officers were concerned for

14  him and that's why they had to call for an

15  ambulance to bring him to the hospital, correct?

16      **A.**   Correct.

17      **Q.**   And it also says in there that people

18  were trying to kill him, correct?

19      **A.**   Correct.

20      **Q.**   And there's nothing in this that would

21  indicate Mr. Ortiz knew anything about the crime,

22  the murders of the Camacho brothers, that he was

23  involved in them, correct?

MR. RONDON    -    MR. FELLE    -    3/13/2019

125

```
1         A.    It says here Ortiz told the officers

2   that persons unknown were trying to kill him

3   because they thought he was involved in the

4   homicides of Nelson and Miguel Camacho.

5         Q.    They thought he was involved, and

6   certainly, just by way of that summary, that he

7   wasn't involved, right, that's why he was afraid.

8   The fact that Mr. Ortiz had been hospitalized at

9   Buffalo General Hospital on the 15th, would that be

10  important to know on the 16th when he was brought

11  in and interrogated about the crimes?

12        A.    Yes.

13        Q.    There was a point in time during the

14  prosecution of Mr. Ortiz, that the Erie County

15  District Attorney's Office, specifically Detective

16  Mark Stambach, claimed that there was a jailhouse

17  informant, do you recall that information?

18        A.    No.

19        Q.    Do you recall seeing any file that

20  Buffalo Police investigated and took a statement,

21  Detective Mark Stambach took a statement from a

22  Ronnie Williams, who was then incarcerated?

23        A.    No, I don't remember that.
```

A-1216

*MR. RONDON  -  MR. FELLE  -  3/13/2019*
126

1      **Q.**    Claimed to be a jailhouse informant?

2      **A.**    I do not remember that, but if you have

3  the paperwork I would like to see it.

4      **Q.**    Yeah.

5      MR. FELLE:  All right, take one more break.

6

7      (Whereupon a short recess was taken.)

8

9      MR. FELLE:  Let's go back on the record.

10

11  BY MR. FELLE:

12      **Q.**    So Investigator Rondon, I was asking

13  you about information pertaining to a jailhouse

14  informant by the name of Ronnie Williams, are you

15  familiar with that name?

16      **A.**    No, I am not.

17      **Q.**    During the course of your review of the

18  investigation into the Camacho brother murders, do

19  you recall seeing that -- that Ronnie Williams had

20  provided a statement wherein he claimed Mr. Ortiz

21  had confessed to the murders?

22      **A.**    I don't recall that.

23      **Q.**    We talked earlier that there was really

**MCCANN & MCCANN REPORTING**

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

127

1   no other evidence to link Mr. Ortiz to these crimes

2   other than his confession.  This jailhouse

3   informant, the report was provided, you know,

4   months after of course --

5          **A.**   Okay.

6          **Q.**   -- Mr. Ortiz was arrested, and he

7   claims that while Mr. Ortiz was in jail he may have

8   confessed to the crimes, do you recall seeing that?

9          **A.**   I don't recall --

10         **Q.**   The records indicate --

11         **A.**   -- seeing that.

12         **Q.**   -- that that same person, Ronnie

13  Williams, was initially convicted by Detective Mark

14  Stambach, do you recall knowing that?

15         **A.**   I don't even remember the name, sir.

16         **Q.**   Okay.  Did you ever interview that

17  individual?  I mean, he had information contrary to

18  what your investigation was telling you, did you

19  interview him?

20         **A.**   No, I didn't.

21         **Q.**   Are you aware of anyone else on the

22  task force that interviewed him?

23         **A.**   No, I am not aware of that.

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

1    **Q.**   Do you recall there being a discussion

2    within the task group to dismiss his statement?

3    **A.**   To dismiss it?

4    **Q.**   Correct.

5    **A.**   I don't even recall his name being

6    mentioned.

7    **Q.**   Do you recall there being a jailhouse

8    informant being involved in the case?

9    **A.**   I don't recall that.

10   **Q.**   Okay.  And other than my referencing

11   the name Ronnie Williams with respect to the Ortiz

12   conviction --

13   **A.**   Okay.

14   **Q.**   -- have you ever heard that name in any

15   other context or any other criminal investigation

16   that you're aware of?

17   **A.**   I don't recall ever hearing that name.

18   **Q.**   We had talked about the idea that the

19   three individuals that were charged back on

20   November 8th of 2012 --

21   **A.**   Okay.

22   **Q.**   -- by way of a Federal Grand Jury

23   indictment, that those individuals were being

Case 23-352, Document 53, 06/27/2023, 3534012, Page248 of 261

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

129

1  charged with the murders, but we weren't sure of

2  the procedural posture of those criminal

3  convictions, right?  I think I asked you about

4  Montalvo and you said you weren't sure if he was

5  actually convicted or if that's still pending?

6       **A.**  Yeah, I wasn't sure.

7       **Q.**  Okay.  How about the other two

8  individuals, have they been convicted and

9  sentenced?

10       **A.**  I believe so.

11       **Q.**  Okay.

12       **A.**  I don't know if they have been

13  sentenced.  I think they have been convicted.  I

14  don't know -- they have been convicted.  I know

15  they have been convicted, so --

16       **Q.**  Okay.  You're not sure about sentencing

17  on them?

18       **A.**  I don't, yeah.  I am not sure about

19  that.

20       **Q.**  And with respect to Montalvo, you're

21  not sure if he's even been convicted yet?

22       **A.**  Right, I am not sure.

23       **Q.**  Okay.  Have any other individuals been

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

130

1   implicated in those murders?

2         **A.**    Implicated, like named?

3         **Q.**    Correct.

4         **A.**    I think -- I think Ortiz mentioned Uda.

5         **Q.**    Okay.  And who is Uda?

6         **A.**    That's Efrain Hidalgo's brother.

7         **Q.**    Okay.  Was he implicated in the

8   murders?

9         **A.**    He wasn't charged, but he was named by

10   Ortiz.

11        **Q.**    Correct.  I guess I am asking you,

12   relative to your investigation and the outcome of

13   that investigation, other than the three

14   individuals that have been indicted by a Federal

15   Grand Jury, are any other individuals currently

16   being investigated for the commission of those

17   murders?

18        **A.**    No.

19        **Q.**    I thought I saw in one of the captions

20   that Jeilyn Rosario, J-E-I-L-Y-N, Rosario, was also

21   charged in the federal case, do you know that to be

22   the case?

23        **A.**    No, Jeilyn Rosario is -- is one of the

*MR. RONDON   -   MR. FELLE   -   3/13/2019*

131

1  decedent's girlfriend's I believe.

2       **Q.**   Okay.  And she wasn't charged in the

3  case as far as you know?

4       **A.**   No, she wasn't charged.

5       **Q.**   Okay.

6       **A.**   No.

7       **Q.**   Do you recall seeing a statement from

8  Jeilyn Rosario in your investigation of the crime?

9       **A.**   I do recall seeing some documentation

10  with Jeilyn Rosario's name.

11       **Q.**   As far as you know, is there any other

12  individual, as we talked today, you told us about a

13  joint task force --

14       **A.**   Yes.

15       **Q.**   -- are there any individuals from any

16  agency, that you're aware of, that are still

17  investigating the murder of the Camacho brothers

18  from '04?

19       **A.**   No.

20       **Q.**   Where is the file, relative to that

21  investigation, maintained currently?

22       **A.**   I don't know.

23       **Q.**   The last you knew, was the file

A-1222

132

1   transferred to the FBI?

2        A.    No, that was -- that was like evidence

3   we talked about, but I don't know where the file

4   is.

5        Q.    Okay.

6        MR. FELLE:  That's all I have.  Thank you

7   very much.  Appreciate it.

8        THE WITNESS:  Okay.

9        MR. FELLE:  Any questions?

10       MR. FLYNN:  I have none.  We're all done.

11

12  (Whereupon, the deposition concluded at 12:27 p.m.)

13                *            *            *

14

15

16

17

18

19

20

21

22

23

A-1223

133

```
 1  STATE OF NEW YORK)

 2                     )  ss.

 3  COUNTY OF ERIE    )

 4

 5         I, Denise C. Burger, Notary Public, in and
 6  for the County of Erie, State of New York, do
    hereby certify:
 7

 8         That the witness whose testimony appears
    hereinbefore was, before the commencement of their
 9  testimony, duly sworn to testify the truth, the
    whole truth and nothing but the truth; that said
10  testimony was taken pursuant to notice at the time
    and place as herein set forth; that said testimony
11  was taken down by me and thereafter transcribed
    into typewriting, and I hereby certify the
12  foregoing testimony is a full, true and correct
    transcription of my shorthand notes so taken.
13

14         I further certify that I am neither counsel
    for nor related to any party to said action, nor in
15  any way interested in the outcome thereof.

16

           IN WITNESS WHEREOF, I have hereunto
17  subscribed my name and affixed my seal this 17th
    day of _____April_____, 2019.
18

19  _Denise C. Burger_____
20  Denise C. Burger,
    Notary Public,
21  State of New York, County of Erie
    My commission expires 7/25/19
22

23
```

A-1224

134

1  CASE NAME: Josue Ortiz v. State of New York

2  DEPONENT:  Geraldo Rondon

3  DATE TAKEN:3/13/2019

4  STATE OF   )

5              SS:

6  COUNTY OF  )

7  I wish to make the following changes, for the

8  following reasons:

9  PAGE   LINE    CHANGE:_____

10

11  _____CHANGE:_____

12  _____REASON:_____

13

14  _____CHANGE:_____

15  _____REASON:_____

16

17  _____CHANGE:_____

18  _____REASON:_____

19

20  _____CHANGE:_____

21  _____REASON:_____

22

23  _____CHANGE:_____

135

```
 1                     REASON: _____

 2   _____

 3   _____ CHANGE: _____  ___ ___

 4   _____ REASON: _____

 5   _____

 6   _____ CHANGE: _____

 7   _____ REASON: _____

 8   _____

 9   _____ CHANGE: _____

10   _____ REASON: _____

11   _____

12   _____ CHANGE: _____

13   _____ REASON: _____

14   _____

15   _____ CHANGE: _____

16   _____ REASON: _____

17   _____

18   Signature:_____

19   Subscribed and sworn to before me this

20   ____day of _____2019

21

22   _____ Notary Public

23
```

1

'04 [19] - 25:20, 47:1, 47:5, 47:14, 48:3, 48:9, 49:16, 50:16, 50:18, 56:3, 56:9, 57:7, 62:19, 62:21, 68:10, 113:7, 113:9, 123:11, 131:18
'09 [4] - 25:20, 26:11, 26:12
'13 [2] - 15:2, 72:8
'14 [2] - 12:21, 15:20
'19 [2] - 8:4, 62:15

**1**

1/23 [1] - 60:9
1020 [1] - 9:23
10:00 [1] - 1:15
10:30 [3] - 61:6, 61:8, 63:2
10th [1] - 20:19
11 [2] - 59:8, 90:15
11/11/04 [1] - 57:14
11th [6] - 21:2, 21:14, 68:10, 90:4, 90:6
126292 [1] - 1:6
12:27 [1] - 132:12
12th [7] - 92:21, 93:1, 93:2, 113:7, 113:8, 115:11
13th [2] - 1:15, 32:6
14 [3] - 57:3, 60:9, 61:5
14202 [1] - 2:9
14221 [1] - 2:2
14th [2] - 89:5, 91:7
150 [1] - 43:5
15th [9] - 52:21, 93:10, 112:2, 119:14, 122:1, 122:14, 123:11, 123:18, 125:9
16th [5] - 61:2, 62:19, 62:21, 122:2, 125:10
17th [1] - 93:10
18 [3] - 19:17, 59:16, 121:16
1998 [2] - 16:21, 16:23
19th [2] - 56:9, 57:7

**2**

2 [3] - 8:3, 8:11, 57:10
2000 [8] - 9:21, 11:16, 15:1, 16:22, 17:3, 17:8, 19:1
2004 [16] - 6:7, 21:2, 21:14, 21:18, 21:21,

24:16, 25:2, 25:8, 48:21, 52:21, 61:2, 78:18, 112:11, 112:13, 113:8, 123:18
2006 [2] - 10:20, 22:3
2007 [1] - 16:12
2008 [1] - 16:12
2009 [5] - 12:18, 14:15, 19:1, 69:12, 112:12
2010 [2] - 19:1, 20:4
2011 [7] - 48:16, 84:2, 85:3, 85:12, 87:18, 89:5, 91:8
2012 [27] - 15:1, 15:2, 26:12, 90:4, 90:6, 90:15, 91:16, 92:4, 92:16, 92:18, 92:19, 93:1, 93:2, 93:10, 93:15, 94:5, 94:9, 95:15, 96:2, 96:10, 96:11, 103:8, 108:19, 128:20
2014 [5] - 11:20, 12:20, 69:13, 103:11, 103:12
2015 [3] - 11:17, 22:13
2019 [3] - 1:15, 133:17, 135:20
21st [2] - 12:18, 69:12
22 [2] - 110:10, 111:3
23rd [2] - 8:4, 62:15
25th [1] - 31:10
29 [1] - 91:20
29th [4] - 84:2, 85:3, 85:12, 87:18

**3**

300A [1] - 2:8
30th [2] - 9:21, 17:8
31 [1] - 1:11
350 [1] - 2:9
39 [3] - 91:18, 91:21, 91:22

**4**

4 [6] - 31:9, 85:6, 89:3, 90:9, 92:10, 95:12
440 [5] - 71:12, 97:14, 98:21, 99:2, 99:10
45 [1] - 4:3

**5**

5 [2] - 6:22, 59:8
505-2700 [1] - 2:3
53 [1] - 3:3

56 [1] - 3:4

**6**

6 [4] - 6:22, 62:15, 113:3, 123:9
6'5 [1] - 9:9
6'6 [1] - 9:6
6'6" [1] - 9:8
6024 [2] - 1:13, 2:2
6th [5] - 88:10, 92:4, 94:4, 94:6, 94:7

**7**

7/25/19 [1] - 133:21
716 [2] - 2:3, 2:10

**8**

8 [1] - 57:3
853-8437 [1] - 2:10
879 [1] - 57:14
8th [12] - 92:16, 92:18, 92:19, 92:22, 95:15, 96:10, 103:8, 103:11, 103:12, 128:20

**9**

9/6 [1] - 91:16
93 [1] - 57:11
9th [4] - 93:15, 93:16, 96:2, 96:10

**A**

A.M [1] - 1:15
able [7] - 7:18, 34:9, 50:1, 54:4, 67:5, 117:20
academy [2] - 10:7, 10:8
accompanied [1] - 38:17
according [4] - 9:6, 62:2, 62:4
accounts [2] - 44:17, 59:22
accreditation [2] - 20:1, 20:3
accreditations [1] - 19:18
act [1] - 105:6
acting [1] - 124:11
action [1] - 133:14
active [1] - 16:21
activities [4] - 12:13, 54:3, 55:14, 100:6

activity [13] - 13:14, 20:2, 27:21, 34:22, 37:3, 39:9, 47:12, 47:22, 48:7, 51:21, 52:11, 56:1, 69:15
acts [1] - 43:13
actual [1] - 51:4
added [1] - 33:9
additional [4] - 40:22, 42:19, 43:2, 50:23
address [1] - 4:21
admitted [2] - 52:5, 52:12
advise [1] - 70:6
advised [1] - 41:15
Affairs [2] - 80:12, 80:19
affixed [1] - 133:17
afraid [1] - 125:7
AG's [1] - 35:3
agency [5] - 18:6, 19:8, 45:21, 96:21, 131:16
agents [4] - 48:10, 50:11, 78:16, 107:17
ago [1] - 58:21
agree [4] - 61:22, 77:6, 105:17, 111:15
agreed [1] - 103:13
ahead [1] - 85:19
albeit [1] - 23:23
Allegany [2] - 11:1, 22:4
alleged [1] - 60:9
allegedly [3] - 60:2, 62:20, 64:4
allow [2] - 18:5, 18:6
ambulance [2] - 119:16, 124:15
Amherst [1] - 19:6
Amity [2] - 10:23, 22:4
analysis [1] - 68:17
analyze [1] - 50:5
anonymous [2] - 113:17
answer [7] - 5:20, 7:18, 40:17, 40:20, 40:21, 46:6, 46:7, 50:1, 57:21, 82:23, 110:17, 110:20, 110:21, 111:4, 120:10, 120:21, 122:7
answered [1] - 57:4
answering [1] - 32:21
answers [1] - 5:16
apartment [2] - 117:14, 117:21
apologize [3] - 35:15, 36:5, 38:9

appear [1] - 95:11
APPEARANCES [1] - 2:1
appreciate [7] - 15:8, 15:9, 16:2, 20:12, 76:23, 109:11, 132:7
Arcara [1] - 54:11
area [3] - 18:15, 43:14, 112:10
arrest [3] - 20:22, 64:17, 67:9
arrested [6] - 8:18, 99:16, 99:17, 105:23, 108:16, 127:6
arresting [2] - 58:8, 64:8
Article [1] - 1:11
ascertained [1] - 77:1
aspect [3] - 30:15, 48:21, 81:14
assailants [1] - 65:18
assigned [16] - 10:2, 10:6, 10:7, 10:18, 11:6, 11:9, 11:10, 11:19, 12:5, 22:4, 22:8, 22:14, 48:7, 49:5, 49:6
assignment [1] - 11:13
assist [2] - 21:16, 27:17
ASSISTANT [1] - 2:7
Assistant [3] - 69:3, 80:6, 82:2
Association [1] - 82:15
attended [1] - 94:13
attention [4] - 48:3, 57:10, 62:18, 114:21
Attica [4] - 90:4, 90:23, 91:6, 94:10
ATTORNEY [2] - 2:6, 2:7
attorney [7] - 30:12, 33:22, 35:23, 44:2, 82:14, 82:15, 97:14
Attorney [13] - 13:2, 34:7, 69:4, 75:8, 75:22, 80:6, 82:2, 86:21, 89:6, 91:8, 91:17
Attorney's [9] - 37:12, 72:17, 73:2, 74:20, 96:5, 96:22, 103:13, 103:17, 125:15
Attorneys [2] - 2:4, 2:11
attorneys [1] - 4:9
Auburn [4] - 84:2,

84:9, 85:12, 88:22
**audible** [1] - 5:17
**audio** [1] - 28:6
**award** [1] - 20:7
**awards** [2] - 19:17, 19:21
**aware** [39] - 24:6, 51:22, 69:10, 69:18, 69:21, 71:19, 71:21, 75:7, 75:12, 75:15, 75:21, 76:2, 76:8, 81:13, 81:16, 82:1, 82:4, 82:7, 82:8, 83:1, 83:4, 83:10, 83:16, 83:22, 84:5, 95:4, 95:10, 97:2, 100:18, 100:22, 103:20, 104:2, 116:10, 121:9, 121:18, 127:21, 127:23, 128:16, 131:16

**B**

**bald** [1] - 7:2
**Bargnesi** [2] - 83:17, 83:20
**barracks** [4] - 16:9, 109:16, 109:17, 109:20
**based** [27] - 7:9, 7:11, 7:21, 8:20, 13:12, 37:1, 39:7, 42:8, 46:11, 53:23, 59:18, 65:21, 68:8, 71:14, 89:14, 97:17, 101:8, 104:14, 107:2, 110:11, 116:9, 117:5, 118:15, 119:11, 121:3, 121:15
**basing** [1] - 85:3
**Batavia** [3] - 5:1, 5:2, 10:3
**Bay** [1] - 5:1
**became** [6] - 22:3, 22:7, 24:22, 51:22, 69:6, 76:8
**become** [6] - 6:13, 18:6, 24:6, 39:12, 40:6, 40:18, 55:14, 55:21, 69:9
**beginning** [3] - 16:7, 20:17, 89:13
**behalf** [1] - 74:13
**Benevolent** [1] - 82:15
**best** [2] - 15:8, 15:13
**better** [1] - 72:5
**between** [2] - 4:8,

12:23
**blt** [5] - 9:12, 9:16, 17:4, 48:16, 99:20
**Board** [1] - 102:14
**board** [1] - 102:19
**booked** [2] - 8:16, 9:5
**Boston** [5] - 49:7, 49:8, 49:9, 49:10, 49:11
**bottom** [1] - 61:4
**branch** [1] - 13:1
**Brandon** [6] - 99:16, 113:23, 114:1, 114:3, 116:21
**break** [3] - 84:17, 123:1, 126:5
**Brendan** [1] - 95:19
**brief** [1] - 90:9
**bring** [3] - 19:3, 62:18, 124:15
**brother** [7] - 24:5, 25:1, 57:12, 114:14, 114:17, 126:18, 130:6
**brothers** [20] - 6:6, 13:7, 28:20, 48:22, 52:6, 52:13, 55:5, 56:3, 68:9, 78:6, 87:3, 100:15, 101:2, 104:16, 106:2, 110:11, 113:12, 117:6, 124:22, 131:17
**brothers'** [7] - 21:3, 37:7, 38:23, 50:16, 74:4, 99:13, 101:9
**brought** [13] - 72:8, 72:9, 89:6, 91:17, 98:16, 112:2, 114:21, 116:12, 118:16, 119:15, 120:4, 124:6, 125:10
**BUFFALO** [1] - 2:7
**Buffalo** [74] - 2:9, 12:7, 12:10, 12:13, 12:23, 21:4, 21:9, 23:14, 24:3, 24:7, 28:8, 35:7, 35:8, 35:17, 47:16, 47:23, 49:17, 50:8, 51:4, 51:11, 52:9, 52:23, 53:17, 54:3, 55:4, 56:5, 57:7, 58:5, 58:7, 62:3, 62:17, 63:23, 64:16, 64:19, 64:21, 65:6, 66:16, 66:22, 68:20, 69:15, 72:11, 73:2, 73:9, 74:6, 74:20, 80:12, 80:19, 82:15, 82:16,

105:22, 112:1, 112:2, 112:8, 112:22, 113:4, 114:21, 115:12, 116:9, 116:12, 118:16, 118:17, 119:15, 119:16, 120:5, 120:15, 120:16, 121:23, 122:1, 122:15, 124:3, 124:7, 125:9, 125:20
**bureau** [2] - 80:17, 83:11, 112:15
**Bureau** [4] - 46:13, 56:8, 112:16, 113:5
**Burger** [3] - 1:16, 133:5, 133:20
**burglaries** [1] - 22:10
**Burton** [4] - 82:9, 82:11, 82:21, 83:3
**busy** [1] - 34:9
**BY** [53] - 2:1, 2:6, 5:4, 8:9, 14:21, 23:16, 26:6, 26:16, 31:1, 31:7, 35:11, 35:21, 36:8, 37:21, 38:11, 38:15, 40:16, 41:4, 42:16, 43:18, 45:7, 46:10, 53:10, 54:18, 56:23, 61:16, 62:6, 64:11, 67:1, 73:16, 77:18, 84:23, 87:17, 87:21, 88:8, 88:14, 90:18, 92:1, 93:5, 93:13, 94:1, 98:10, 110:19, 111:1, 111:9, 117:4, 120:3, 120:13, 121:1, 122:11, 123:6, 123:22, 126:11

**C**

**caller** [2] - 113:19, 116:1
**Camacho** [37] - 6:6, 13:6, 21:3, 21:14, 24:5, 25:1, 28:20, 37:7, 38:23, 48:22, 50:16, 52:6, 52:13, 55:5, 56:3, 57:13, 68:9, 74:4, 78:6, 89:7, 95:22, 99:13, 100:14, 101:1, 101:9, 102:22, 104:16, 106:2, 110:10, 113:11, 113:18, 113:19, 117:6, 124:22,

125:4, 126:18, 131:17
**capacity** [5] - 6:12, 18:13, 19:14, 21:10, 27:13
**captions** [1] - 130:19
**career** [1] - 23:20
**Case** [2] - 24:19, 82:3
**case** [55] - 6:14, 12:9, 13:6, 13:11, 24:5, 24:18, 25:15, 27:2, 30:16, 31:3, 31:13, 32:19, 33:18, 34:17, 35:2, 41:7, 41:13, 41:20, 43:20, 44:9, 44:12, 44:13, 45:18, 46:3, 50:15, 51:7, 51:9, 51:10, 58:6, 58:11, 60:1, 62:16, 66:3, 66:4, 69:6, 73:8, 74:12, 76:7, 78:16, 78:18, 82:6, 83:1, 83:3, 96:6, 97:18, 104:5, 109:9, 111:23, 113:4, 123:10, 128:8, 130:21, 130:22, 131:3
**CASE** [1] - 134:1
**cases** [2] - 10:18, 28:15
**casual** [1] - 95:9
**cell** [1] - 109:21
**certain** [3] - 50:4, 106:15, 121:13
**certainly** [4] - 15:8, 15:11, 44:3, 125:6
**certificates** [1] - 19:20
**certification** [3] - 4:11, 27:11, 27:12
**certified** [2] - 27:8, 27:10
**certify** [3] - 133:6, 133:11, 133:14
**chance** [2] - 29:1, 53:14
**CHANGE** [11] - 134:9, 134:11, 134:14, 134:17, 134:20, 134:23, 135:3, 135:6, 135:9, 135:12, 135:15
**changes** [1] - 134:7
**characterizing** [1] - 119:21
**charge** [5] - 49:14, 49:15, 50:11, 58:2, 82:14
**charged** [9] - 17:18, 17:19, 100:14,

125:4, 126:18, 131:17
**capacity** [5] - 6:12, 18:13, 19:14, 21:10, 27:13
**charges** [3] - 55:10, 80:7, 81:18
**charging** [1] - 58:8
**chart** [1] - 9:5
**check** [1] - 61:12
**Cheko** [10] - 55:18, 55:19, 56:7, 57:6, 57:17, 58:2, 58:8, 113:23, 114:6, 114:7
**chlef** [2] - 83:11
**Chris** [2] - 13:22, 48:13
**Christopher** [1] - 81:1
**circumstances** [2] - 97:9, 97:16
**city** [3] - 14:4, 23:23, 26:22
**City** [10] - 21:9, 24:3, 55:4, 56:5, 64:20, 64:21, 65:6, 73:8, 110:3, 121:6
**Civil** [1] - 1:12
**Claim** [1] - 1:6
**claimed** [2] - 125:16, 126:1, 126:20
**CLAIMS** [1] - 1:2
**claims** [1] - 127:7
**Clarence** [4] - 11:4, 11:6, 16:8, 16:10
**clarification** [1] - 35:6
**clarify** [3] - 25:17, 26:19, 73:22
**clear** [3] - 49:1, 51:20, 91:4
**client** [8] - 41:2, 41:6, 42:22, 59:13, 60:10, 76:22, 79:18, 84:7
**close** [1] - 10:13
**closed** [15] - 13:11, 15:14, 15:15, 41:13, 41:18, 41:23, 44:9, 44:11, 44:14, 45:19, 46:14, 47:6, 47:17, 50:15
**closer** [1] - 51:4
**Coast** [2] - 16:21, 17:2
**Cold** [1] - 24:18
**cold** [1] - 31:13
**collaborative** [2] - 12:6, 24:2
**collaboratively** [2] - 24:7, 36:19
**colleagues** [1] - 27:1
**collectively** [1] - 37:1
**coming** [2] - 30:17, 41:5
**commencement** [1] -

3

133:8
commencing [1] -
1:14
commission [2] -
130:16, 133:21
commit [4] - 76:16,
77:2, 78:2, 111:7
committed [4] - 52:22,
108:15, 114:23,
115:19
committing [1] -
108:17
common [2] - 86:12,
121:3
communicate [2] -
66:6, 67:6
communication [1] -
66:20
communications [1] -
74:9
complaint [1] - 55:9
completely [1] - 65:19
concerned [1] -
124:13
concerns [1] - 107:12
concluded [4] - 96:13,
99:14, 108:21,
132:12
conclusion [10] -
39:15, 39:19, 40:8,
71:8, 78:1, 78:10,
100:23, 108:12,
108:13
conclusions [5] -
39:23, 101:7,
101:17, 102:5, 104:8
conduct [5] - 50:21,
50:22, 77:6, 102:20,
103:2
conducted [3] - 78:16,
98:5, 98:14
confessed [4] - 64:4,
76:15, 126:21, 127:8
confessing [1] - 60:3
confession [34] - 60:9,
60:17, 62:1, 62:20,
68:12, 76:12, 76:20,
77:2, 78:8, 78:13,
78:14, 79:4, 79:7,
79:17, 80:2, 80:9,
106:7, 106:8,
106:16, 107:3,
107:9, 111:6,
111:13, 111:14,
117:12, 119:5,
119:9, 120:9,
120:19, 121:10,
121:20, 122:3,
124:2, 127:2
conjunction [1] -

23:22
consensus [1] -
107:20
consent [1] - 117:23
consistent [1] - 64:7
contact [4] - 41:2,
41:6, 109:2, 110:6
contained [3] - 90:9,
106:10, 106:16
contains [1] - 121:11
content [3] - 36:13,
60:22, 61:4
context [1] - 128:15
continue [2] - 18:11,
46:15
continued [2] - 39:4,
54:13
contrary [1] - 127:17
contribute [1] - 33:6
contributed [1] -
31:21
conversation [4] -
30:20, 30:23, 34:23,
53:20
conversations [2] -
33:22, 52:11
convict [1] - 58:3
convicted [17] - 54:7,
54:9, 54:23, 78:11,
78:12, 92:13, 108:9,
108:16, 114:2,
114:4, 127:13,
129:5, 129:8,
129:13, 129:14,
129:15, 129:21
conviction [20] - 13:7,
25:9, 37:6, 38:22,
39:12, 39:16, 40:5,
40:7, 40:11, 40:18,
45:17, 46:5, 54:13,
56:6, 67:9, 69:10,
69:19, 87:6, 116:12,
128:12
convictions [3] - 13:3,
20:2, 129:3
Cook [1] - 113:6
copies [2] - 72:19,
85:21
correct [118] - 9:2,
10:1, 12:14, 13:21,
14:5, 14:22, 15:19,
22:16, 23:5, 23:17,
24:11, 24:13, 27:6,
27:22, 28:2, 28:5,
29:4, 37:7, 37:8,
38:19, 38:20, 41:7,
41:8, 42:1, 42:10,
42:12, 44:12, 45:1,
45:13, 46:19, 47:6,
47:18, 47:19, 47:23,

48:4, 49:3, 52:7,
52:14, 52:18, 53:18,
55:11, 55:12, 55:19,
57:7, 59:9, 59:10,
60:12, 62:21, 62:22,
63:3, 63:4, 63:16,
64:5, 64:13, 64:20,
64:22, 67:14, 69:7,
69:16, 71:6, 71:9,
71:10, 74:22, 78:2,
78:8, 78:9, 81:22,
89:19, 92:19, 93:17,
95:12, 95:13, 95:22,
96:14, 96:18,
104:17, 104:18,
104:21, 105:1,
105:5, 105:17,
106:12, 106:23,
108:2, 108:5, 108:6,
108:17, 110:12,
110:16, 111:3,
111:13, 111:14,
111:20, 111:21,
113:9, 114:4, 114:6,
114:15, 115:1,
115:10, 115:20,
115:21, 116:14,
116:15, 116:16,
116:18, 117:23,
119:3, 120:20,
124:15, 124:16,
124:18, 124:19,
124:23, 128:4,
130:3, 130:11,
133:12
Correctional [4] -
84:3, 84:9, 85:13,
88:22
correspondence [2] -
72:20, 75:17
counsel [5] - 4:6,
35:15, 35:17, 36:3,
133:14
Counter [3] - 11:6,
11:21
Counterterrorism [3] -
11:7, 12:4, 12:5
COUNTY [2] - 133:3,
134:6
County [10] - 11:1,
22:5, 96:4, 96:21,
96:16, 103:13,
103:16, 125:14,
133:6, 133:21
couple [2] - 13:16,
98:18
course [7] - 31:16,
60:14, 94:21,
106:22, 107:23,
126:17, 127:4

Court [2] - 54:8, 98:16
court [3] - 5:11, 40:4,
97:15
COURT [1] - 1:2
crime [48] - 11:12,
23:8, 23:12, 26:22,
44:18, 45:12, 45:18,
46:13, 47:22, 49:22,
51:5, 52:6, 59:1,
59:20, 60:3, 60:5,
63:20, 66:17, 70:17,
71:9, 76:9, 76:15,
77:2, 78:7, 78:11,
78:12, 81:23, 91:13,
96:18, 105:9,
105:12, 105:18,
106:15, 106:17,
106:20, 108:8,
111:7, 111:12,
111:16, 111:18,
111:20, 116:2,
117:18, 120:17,
122:15, 122:17,
124:21, 131:8
Crime [1] - 56:8
crimes [17] - 8:18,
22:8, 22:10, 64:4,
65:17, 68:11, 92:13,
107:22, 108:15,
108:17, 110:12,
115:19, 116:14,
121:13, 125:11,
127:1, 127:8
Crimes [9] - 11:10,
11:14, 11:17, 22:14,
22:15, 23:3, 27:16,
112:16
criminal [5] - 34:22,
99:13, 116:17,
128:15, 129:2
CTIU [1] - 12:4
cultivating [2] -
100:15, 100:21
current [1] - 72:9
cut [1] - 30:4

**D**

DA [2] - 82:5, 83:6
darker [1] - 7:2
DATE [1] - 134:3
date [22] - 8:16, 15:7,
21:3, 60:23, 62:19,
63:19, 84:6, 85:12,
89:23, 91:19, 92:3,
92:11, 99:22, 100:1,
103:8, 108:23,
115:16, 123:14,
123:17
dated [1] - 113:6

dates [2] - 68:5, 85:3
days [8] - 4:3, 52:21,
53:21, 56:12,
110:10, 110:15,
111:3, 119:1
deaths [1] - 22:10
decedent's [1] - 131:1
December [3] - 93:10,
103:11, 103:12
decision [7] - 37:5,
37:11, 38:22, 54:11,
89:2, 97:5, 103:16
decisions [1] - 40:1
declared [1] - 92:12
Defendant [2] - 1:8,
2:11
defined [1] - 73:20
demotions [1] - 81:18
Denise [3] - 1:15,
133:5, 133:20
Department [19] -
46:12, 47:17, 58:6,
58:7, 62:17, 63:23,
64:17, 65:6, 72:12,
73:9, 74:7, 80:12,
105:22, 112:9,
113:5, 116:10,
116:13, 121:16,
124:3
department [2] -
65:23, 113:3
DEPONENT [1] -
134:2
deposition [7] - 5:23,
8:11, 30:18, 31:8,
35:2, 85:9, 132:12
described [3] - 21:8,
23:4, 31:10
description [3] - 59:2,
63:22, 65:17
descriptions [3] -
59:7, 59:8, 64:14
designation [1] -
22:20
details [2] - 9:13,
24:23
Detective [43] - 3:3,
14:6, 24:19, 31:9,
31:10, 31:21, 36:12,
36:18, 38:17, 41:10,
41:12, 52:17, 53:13,
63:5, 63:6, 63:17,
65:11, 65:18, 71:20,
72:2, 72:21, 75:9,
75:18, 79:9, 84:12,
85:7, 88:16, 90:20,
94:11, 97:20, 106:8,
113:5, 113:6, 120:5,
120:7, 120:18,
121:6, 121:12,

123:14, 125:15, 125:21, 127:13
**detective** [11] - 18:20, 49:18, 57:11, 63:11, 65:14, 79:6, 99:4, 102:20, 103:3, 111:22, 122:5
**Detectives** [1] - 51:12
**detectives** [7] - 52:23, 53:17, 63:21, 79:1, 81:19, 120:16, 122:16
**determination** [1] - 40:11
**determine** [1] - 40:4
**develop** [4] - 55:23, 57:20, 58:1, 91:11
**developed** [2] - 33:12, 40:22
**developing** [2] - 39:5, 70:20
**Development** [2] - 11:8, 12:3
**development** [1] - 100:13
**different** [7] - 35:22, 40:9, 43:12, 65:5, 86:21, 93:21
**differently** [1] - 73:20
**difficult** [3] - 77:20, 91:2, 91:3
**direct** [1] - 41:6
**directed** [1] - 72:20
**direction** [1] - 88:23
**disagreement** [1] - 108:4
**discovered** [1] - 97:17
**discuss** [1] - 80:7
**discussed** [1] - 81:17
**discussing** [2] - 33:4, 35:1
**discussion** [7] - 5:9, 5:10, 7:7, 36:17, 50:14, 81:16, 128:1
**Discussion** [1] - 8:7
**dismiss** [2] - 128:2, 128:3
**disrupt** [2] - 66:5, 66:6
**distinction** [1] - 22:12
**District** [5] - 96:5, 96:21, 103:13, 103:17, 125:15
**diverts** [1] - 48:3
**DNA** [1] - 68:17
**document** [13] - 8:3, 8:4, 29:14, 31:18, 56:17, 57:3, 61:10, 73:18, 75:17, 107:9, 113:15, 115:10, 122:22

**documentation** [4] - 29:6, 84:15, 86:17, 131:9
**documents** [9] - 7:11, 7:22, 30:18, 31:2, 33:20, 58:17, 89:16, 101:16, 113:16
**done** [7] - 13:10, 13:12, 15:22, 68:17, 81:5, 87:15, 132:10
**double** [1] - 113:18
**doubt** [1] - 107:4
**doubted** [2] - 67:9, 67:15
**doubts** [2] - 77:5, 107:12
**down** [15] - 5:12, 5:21, 29:6, 29:14, 29:16, 41:9, 96:9, 99:19, 99:23, 103:7, 103:9, 104:13, 108:20, 133:11
**drew** [1] - 101:8
**drugs** [2] - 11:12, 117:9
**duly** [2] - 4:17, 133:9
**during** [31] - 12:22, 25:8, 25:14, 29:13, 32:14, 34:23, 42:19, 42:20, 52:8, 55:13, 55:23, 60:11, 67:8, 70:20, 71:5, 76:7, 81:22, 85:6, 85:15, 91:12, 92:11, 97:20, 103:14, 105:5, 105:23, 106:1, 106:22, 107:23, 125:13, 126:17
**duty** [1] - 16:21

### E

**e-mail** [2] - 2:3, 2:10
**early** [2] - 103:7, 105:22
**easier** [1] - 33:14
**Edwin** [3] - 28:9, 76:1, 79:13
**effort** [2] - 12:6, 24:2
**Efrain** [18] - 3:4, 55:15, 55:16, 56:2, 56:7, 57:6, 57:17, 58:2, 58:8, 95:18, 99:15, 114:6, 114:7, 114:17, 115:13, 116:19, 130:6
**eight** [2] - 56:12, 112:14
**eighteen** [1] - 9:18
**either** [6] - 5:20, 73:2,

83:18, 83:22, 86:3, 94:19
**elapsed** [1] - 119:6
**emphatically** [1] - 92:12
**employ** [1] - 19:6
**employed** [1] - 9:17
**employment** [2] - 17:9, 17:11
**encounter** [3] - 95:9, 118:10, 120:8
**end** [3] - 61:19, 62:9, 79:12
**ended** [1] - 63:2
**ends** [2] - 46:22, 47:1
**energy** [1] - 47:21
**English** [9] - 7:4, 27:9, 27:15, 28:5, 28:7, 29:7, 29:17, 52:2, 91:4
**entered** [2] - 4:5, 58:15
**entitled** [1] - 20:8
**entry** [5] - 33:7, 33:8, 92:17, 93:14, 94:9
**Erie** [8] - 96:4, 96:21, 98:15, 103:13, 103:16, 125:14, 133:6, 133:21
**ERIE** [1] - 133:3
**error** [1] - 73:21
**ESQ** [2] - 2:1, 2:6
**essentially** [3] - 13:11, 22:15, 56:11
**established** [1] - 62:23
**estimate** [1] - 15:9
**evaluation** [1] - 112:3
**Evans** [32] - 14:5, 14:6, 16:2, 16:6, 19:23, 21:9, 24:20, 31:9, 31:10, 31:22, 36:2, 36:12, 36:18, 38:17, 41:10, 41:13, 41:15, 48:11, 49:17, 52:17, 72:21, 74:15, 84:12, 85:7, 88:16, 88:21, 90:20, 94:11, 97:20, 99:4, 101:20
**event** [1] - 55:8
**eventually** [1] - 97:8
**evidence** [34] - 39:11, 49:21, 50:5, 50:7, 50:8, 54:1, 54:4, 55:23, 57:20, 58:2, 62:16, 68:10, 68:17, 70:15, 73:8, 78:7, 97:17, 99:7, 100:16, 104:9, 104:15, 110:10, 111:16,

111:17, 113:4, 116:1, 117:17, 119:18, 119:21, 123:10, 127:1, 132:2
**exact** [4] - 15:7, 99:21, 100:1, 108:23
**exactly** [2] - 33:16, 70:11
**exactness** [1] - 15:12
**EXAMINATION** [1] - 5:4
**Examination** [1] - 1:10
**examined** [1] - 4:17
**example** [1] - 24:1
**except** [1] - 4:12
**excuse** [3] - 95:21, 96:10, 107:19
**Exhibit** [17] - 8:3, 8:11, 31:9, 53:8, 53:12, 56:21, 57:2, 60:9, 61:5, 62:15, 85:6, 89:3, 90:9, 92:10, 95:12, 113:3, 123:9
**EXHIBIT** [1] - 3:2
**exonerated** [3] - 96:17, 99:7, 104:10
**exonerating** [1] - 81:8
**exoneration** [2] - 71:13, 101:14
**expect** [1] - 66:19
**expectations** [1] - 66:23
**expires** [1] - 133:21
**explained** [1] - 99:5
**explore** [1] - 41:1

### F

**face** [3] - 28:11, 104:20
**face-to-face** [1] - 104:20
**Facility** [3] - 84:3, 84:9, 85:13
**fact** [10] - 58:11, 67:10, 71:8, 91:15, 97:9, 111:15, 114:1, 114:23, 120:14, 125:8
**facts** [4] - 106:9, 106:15, 107:2, 107:8
**fair** [7] - 15:13, 31:13, 36:11, 49:13, 58:21, 76:13, 104:12
**Falls** [3] - 10:19, 11:3
**false** [1] - 57:21
**familiar** [17] - 6:9, 6:10, 18:19, 18:21, 23:7, 23:10, 28:8,

55:14, 55:21, 57:5, 64:18, 65:1, 83:18, 112:8, 112:11, 112:13, 126:15
**familiarity** [1] - 21:12
**families** [1] - 32:22
**family** [2] - 34:11, 109:10
**far** [2] - 131:3, 131:11
**FBI** [16] - 11:11, 11:23, 12:1, 12:7, 13:1, 13:18, 19:8, 20:6, 50:1, 50:4, 50:11, 68:16, 68:20, 70:16, 107:16, 132:1
**federal** [1] - 130:21
**Federal** [9] - 13:1, 54:8, 95:17, 96:3, 96:9, 103:6, 103:9, 128:22, 130:14
**Felle** [3] - 1:13, 5:7, 36:1
**FELLE** [69] - 2:1, 2:1, 5:4, 8:9, 14:21, 23:16, 26:6, 26:16, 31:1, 31:7, 35:11, 35:16, 35:21, 36:4, 36:8, 37:21, 38:11, 39:20, 40:3, 40:6, 40:13, 40:16, 41:4, 42:16, 43:18, 45:7, 46:10, 53:4, 53:10, 54:18, 56:18, 56:23, 61:16, 62:6, 64:11, 67:1, 73:16, 77:18, 84:17, 84:21, 84:23, 87:17, 87:21, 88:6, 88:14, 90:18, 92:1, 93:5, 93:11, 93:13, 94:1, 98:10, 110:19, 111:1, 111:9, 117:4, 119:18, 120:3, 120:13, 121:1, 122:11, 122:23, 123:6, 123:22, 126:5, 126:9, 126:11, 132:6, 132:9
**felonies** [1] - 23:4
**felt** [1] - 99:5
**female** [1] - 113:19
**file** [45] - 41:7, 41:10, 42:18, 44:15, 44:20, 47:5, 47:16, 51:7, 51:9, 51:11, 52:8, 52:9, 55:4, 56:6, 58:6, 58:22, 59:4, 60:12, 62:16, 71:15, 72:10, 72:11, 72:14, 72:22, 73:4, 73:7, 73:8, 74:7, 74:8,

74:11, 74:12, 78:5, 81:14, 87:2, 106:3, 113:4, 117:11, 121:7, 122:13, 123:10, 125:19, 131:20, 131:23, 132:3
**filed** [2] - 55:10, 97:14
**files** [4] - 73:1, 75:3, 75:5, 75:6
**filing** [1] - 4:11
**final** [1] - 101:2
**findings** [1] - 102:5
**finish** [1] - 5:19
**finished** [1] - 15:22
**firm** [1] - 19:4
**first** [16] - 4:17, 8:2, 10:5, 10:7, 22:7, 24:22, 39:20, 44:20, 44:21, 45:2, 45:4, 45:9, 63:10, 71:11, 78:22, 84:1, 85:2, 111:23, 118:10
**fit** [1] - 59:21
**five** [4] - 12:15, 12:16, 27:21, 43:6
**flip** [1] - 93:6
**flooded** [1] - 43:15
**Flowers** [3] - 13:21, 13:22, 48:13
**FLYNN** [63] - 2:6, 4:3, 8:5, 14:19, 23:13, 25:16, 25:19, 25:23, 26:4, 26:10, 26:14, 30:20, 31:4, 35:6, 35:15, 35:17, 36:1, 37:16, 38:4, 38:7, 38:13, 38:15, 39:14, 40:2, 40:4, 40:9, 40:20, 42:13, 43:16, 44:19, 44:23, 45:5, 46:6, 54:14, 61:12, 62:2, 64:9, 66:22, 73:13, 77:8, 77:13, 87:14, 88:2, 88:9, 90:13, 91:21, 93:1, 93:9, 93:19, 98:7, 110:17, 110:21, 111:4, 117:2, 119:17, 119:19, 119:21, 120:10, 120:21, 122:7, 123:17, 123:19, 132:10
**folder** [2] - 25:15, 87:2
**follow** [7] - 23:11, 33:17, 33:18, 55:6, 58:7, 115:4
**follow-up** [3] - 55:6, 58:7, 115:4

**followed** [4] - 116:3, 116:4, 116:7, 116:17
**following** [5] - 4:5, 53:7, 56:20, 96:2, 104:1, 120:4, 134:7, 134:8
**follows** [1] - 4:18
**force** [38] - 11:11, 12:23, 13:14, 13:17, 14:9, 21:8, 47:9, 47:21, 48:6, 54:2, 69:1, 71:18, 72:1, 72:10, 74:10, 75:8, 75:22, 76:19, 78:1, 79:23, 80:5, 81:6, 81:17, 83:2, 87:7, 91:11, 100:18, 100:19, 101:8, 102:4, 107:14, 107:17, 107:21, 108:5, 108:13, 127:22, 131:13
**Force** [1] - 11:11
**foregoing** [1] - 133:12
**form** [1] - 4:13
**formal** [1] - 5:11
**former** [2] - 27:1, 83:6
**forth** [3] - 32:8, 33:4, 133:10
**forward** [1] - 26:11
**four** [6] - 52:21, 53:21, 105:1, 105:2, 105:3, 105:4
**fourth** [1] - 124:5
**Fronczak** [2] - 98:15
**front** [3] - 58:14, 98:5, 98:14
**full** [3] - 117:13, 117:16, 133:12
**Fulton** [2] - 10:8, 10:9

**G**

**Galley** [2] - 14:1, 48:12
**game** [1] - 5:15
**Gang** [3] - 20:20, 55:14, 56:1
**gang** [16] - 12:9, 12:13, 13:14, 15:18, 20:2, 27:21, 37:3, 39:8, 47:12, 47:22, 48:7, 51:21, 52:11, 54:3, 69:14, 100:6
**gangs** [2] - 11:12, 24:2
**General** [10] - 69:4, 80:6, 82:2, 112:3, 119:15, 120:16, 122:1, 124:7, 125:9

**GENERAL** [2] - 2:6, 2:7
**General's** [8] - 13:2, 34:7, 75:8, 75:23, 86:21, 89:6, 91:8, 91:17
**Geraldo** [2] - 4:22, 134:2
**GERALDO** [2] - 1:11, 4:23
**girlfriend's** [1] - 131:1
**given** [4] - 5:23, 57:5, 70:19, 98:23
**glaring** [1] - 59:17
**globally** [1] - 112:16
**Grand** [7] - 95:17, 96:3, 96:9, 103:6, 103:9, 128:22, 130:15
**grand** [2] - 99:18, 108:19
**great** [3] - 45:8, 90:2, 90:19
**group** [3] - 17:17, 17:19, 128:2
**Guard** [2] - 16:21, 17:2
**guess** [5] - 14:19, 16:1, 17:20, 19:2, 19:13, 70:13, 78:15, 82:23, 130:11
**guidance** [1] - 70:4
**guilt** [1] - 102:16
**guy** [4] - 28:18, 30:7, 71:2, 82:22
**guys** [1] - 87:7

**H**

**H-I-D-A-L-G-O** [1] - 55:15
**half** [1] - 57:3
**handed** [2] - 103:9, 104:13
**handled** [1] - 22:11
**handwritten** [1] - 29:14
**hard** [1] - 109:11
**headed** [1] - 7:2
**headquarters** [1] - 5:2
**hear** [1] - 29:12
**heard** [7] - 28:6, 28:10, 28:17, 30:9, 83:8, 113:20, 128:14
**hearing** [7] - 80:15, 97:20, 98:1, 99:2, 102:14, 103:2, 128:17
**hearings** [1] - 101:14
**height** [2] - 9:6, 59:2

**held** [2] - 1:11, 17:23
**hello** [1] - 109:12
**help** [5] - 7:23, 44:19, 50:13, 96:22, 96:23
**helpful** [1] - 84:16
**helping** [1] - 98:12
**helps** [1] - 98:11
**hereby** [3] - 4:8, 133:6, 133:11
**herein** [1] - 133:10
**hereinbefore** [1] - 133:8
**hereto** [1] - 4:9
**hereunto** [1] - 133:16
**Hidalgo** [18] - 3:4, 55:15, 55:16, 56:2, 56:7, 57:6, 58:2, 58:9, 95:18, 99:15, 103:10, 114:6, 114:7, 114:17, 115:13, 116:19
**Hidalgo's** [1] - 130:6
**history** [1] - 105:20
**hold** [2] - 15:11, 39:20
**holding** [1] - 17:6
**Homicide** [1] - 12:7
**homicide** [16] - 14:15, 49:18, 66:4, 72:7, 73:4, 73:7, 75:10, 83:11, 99:17, 112:15, 113:18, 115:3, 117:6, 117:11, 119:2
**homicides** [9] - 22:9, 23:5, 25:20, 39:6, 43:4, 43:6, 43:13, 78:6, 125:4
**Hospital** [6] - 112:3, 119:15, 120:17, 122:1, 124:7, 125:9
**hospital** [4] - 118:19, 118:20, 119:8, 124:15
**hospitalization** [1] - 118:23
**hospitalized** [1] - 125:8

**I**

**I's** [1] - 92:2
**idea** [4] - 36:17, 95:8, 124:1, 128:18
**identification** [3] - 42:11, 53:7, 56:20
**identifications** [2] - 59:4, 59:19
**identified** [1] - 59:1
**identify** [1] - 46:18
**imagine** [2] - 5:23,

48:6
**implicated** [4] - 56:2, 130:1, 130:2, 130:7
**important** [8] - 30:15, 120:6, 120:18, 121:12, 121:17, 125:10
**IN** [1] - 133:16
**inactive** [6] - 44:11, 44:12, 45:19, 46:14, 47:17, 50:15
**incarcerated** [1] - 125:22
**incarceration** [1] - 97:16
**inception** [3] - 16:5, 39:1, 69:21
**incident** [1] - 42:6
**incidentally** [3] - 94:4, 106:6, 118:4
**including** [5] - 23:4, 80:5, 82:2, 83:19, 96:21
**inconsistency** [1] - 59:17
**inconsistent** [3] - 106:16, 111:19
**incorporated** [2] - 16:22, 17:4
**independent** [6] - 6:17, 6:19, 7:10, 7:17, 7:21, 89:15
**independently** [1] - 116:4
**indicate** [12] - 38:16, 63:12, 63:17, 70:14, 71:23, 88:15, 92:10, 94:9, 95:14, 106:3, 124:21, 127:10
**indicated** [5] - 42:11, 70:16, 73:19, 75:2, 91:12
**indicates** [4] - 58:22, 84:1, 89:4, 124:10
**indicating** [4] - 63:14, 83:2, 88:1, 115:9
**indicating)** [2] - 61:13, 88:2
**indication** [2] - 47:3, 70:23
**indications** [1] - 45:17
**Indicted** [2] - 95:18, 130:14
**indictment** [8] - 96:4, 99:19, 103:6, 103:10, 104:13, 128:23
**indictments** [4] - 96:8, 99:23, 104:1, 108:20
**individual** [7] - 60:4,

6

63:18, 106:20,
108:9, 108:15,
127:17, 131:12
**individuals** [16] - 43:2,
43:3, 100:9, 100:14,
107:21, 108:14,
113:21, 114:23,
116:13, 128:19,
128:23, 129:8,
129:23, 130:14,
130:15, 131:15
**inform** [1] - 107:16
**informant** [5] -
125:17, 126:1,
126:14, 127:3, 128:8
**information** [44] -
13:12, 33:9, 33:11,
34:19, 37:2, 39:5,
39:7, 40:23, 42:4,
42:19, 43:2, 43:15,
47:4, 47:13, 48:2,
51:1, 60:5, 64:7,
64:12, 67:19, 67:20,
68:1, 70:15, 70:19,
73:22, 75:18, 91:1,
91:5, 91:12, 96:16,
96:20, 100:10,
100:11, 100:13,
111:17, 116:5,
116:7, 121:11,
121:13, 121:19,
124:10, 125:17,
126:13, 127:17
**initial** [2] - 21:17,
41:13
**innocence** [3] -
101:18, 102:7,
102:15
**innocent** [6] - 78:11,
81:7, 92:12, 107:22,
108:17, 110:12,
110:14, 111:2
**inspection** [1] -
117:17
**Intel** [1] - 11:7
**Intelligence** [1] - 12:5
**Intelligent** [2] - 11:7,
11:22
**interaction** [6] - 7:10,
87:11, 87:23, 89:5,
118:16, 124:3
**interactions** [1] -
121:9
**interested** [1] - 133:15
**interesting** [1] - 36:4
**Internal** [2] - 80:11,
80:19
**internal** [1] - 82:17
**interrogated** [1] -
125:11

**interrupt** [2] - 38:13,
90:14
**interruption** [1] -
66:13
**interview** [26] - 53:16,
60:4, 63:2, 66:2,
66:5, 66:6, 67:14,
72:12, 75:17, 78:15,
84:1, 85:2, 85:16,
90:3, 90:20, 91:8,
92:6, 92:7, 92:11,
94:14, 94:18, 95:1,
101:22, 112:9,
127:16, 127:19
**interviewed** [9] -
52:23, 56:8, 56:15,
75:9, 75:23, 76:3,
116:19, 116:20,
127:22
**interviewing** [4] -
63:18, 65:12, 65:16,
115:12
**interviews** [7] - 50:21,
50:22, 55:6, 66:12,
68:3, 68:7, 78:17
**investigated** [2] -
125:20, 130:16
**investigating** [3] -
43:5, 43:12, 131:17
**investigation** [98] -
7:19, 9:15, 12:12,
13:2, 13:12, 14:10,
14:11, 15:14, 15:17,
15:18, 19:4, 20:2,
21:13, 21:17, 23:8,
24:8, 25:1, 25:7,
26:1, 27:16, 27:20,
28:19, 29:2, 29:13,
30:1, 30:17, 31:12,
31:23, 32:14, 34:4,
37:3, 39:4, 39:8,
41:7, 42:20, 44:7,
46:22, 48:4, 48:9,
49:15, 50:18, 52:10,
52:18, 54:1, 54:2,
55:3, 56:1, 57:21,
60:11, 64:19, 65:4,
66:4, 68:9, 70:5,
70:20, 70:21, 71:5,
71:7, 72:8, 72:13,
72:18, 72:21, 75:11,
77:7, 77:23, 81:23,
96:13, 98:17, 99:6,
99:13, 100:6, 101:3,
101:9, 102:21,
103:4, 104:9,
104:14, 105:8,
106:1, 106:22,
108:1, 110:11,
111:11, 112:9,

115:4, 116:17,
117:5, 117:11,
118:5, 121:5,
122:13, 126:18,
127:18, 128:15,
130:12, 130:13,
131:8, 131:21
**investigation** [2] -
46:13, 61:18
**investigations** [2] -
27:17, 44:4
**investigator** [27] -
6:13, 10:20, 11:2,
16:15, 16:16, 18:3,
18:4, 18:7, 18:14,
22:4, 22:7, 23:21,
24:6, 24:10, 26:21,
39:23, 49:7, 49:20,
57:1, 59:15, 67:2,
67:3, 74:15, 85:1,
106:14, 121:17,
121:18
**investigator** [6] -
27:14, 36:20, 41:15,
43:20, 53:11, 126:12
**investigators** [2] -
18:15, 23:11
**involve** [1] - 13:5
**involved** [51] - 6:13,
12:12, 13:18, 14:4,
16:2, 16:3, 16:4,
16:6, 20:1, 21:9,
24:18, 24:22, 25:6,
27:15, 27:22, 28:1,
34:4, 37:10, 39:1,
39:3, 39:6, 39:17,
40:10, 40:23, 42:5,
45:2, 48:12, 48:13,
48:17, 48:20, 54:5,
66:2, 67:16, 67:22,
69:6, 69:9, 71:8,
74:3, 76:8, 76:13,
79:2, 79:16, 80:8,
91:13, 95:7, 96:17,
97:4, 100:12,
100:15, 100:19,
102:21, 103:3,
104:16, 107:17,
111:20, 116:2,
124:23, 125:3,
125:5, 125:7, 128:8
**involvement** [32] -
12:22, 13:13, 14:9,
15:19, 21:13, 29:22,
44:6, 47:10, 50:18,
51:21, 52:5, 52:13,
53:23, 55:9, 55:13,
59:20, 64:16, 67:8,
71:14, 77:23, 83:20,
98:20, 99:12, 99:14,

101:1, 101:3, 101:8,
103:16, 105:21,
108:21, 111:23,
118:7
**involves** [1] - 66:17
**involving** [11] - 24:5,
26:22, 27:20, 31:3,
50:15, 52:10, 55:11,
72:12, 75:10, 76:1,
81:18
**irregularity** [1] - 61:23
**items** [1] - 68:18
**itself** [2] - 40:14, 95:8

## J

**jail** [6] - 81:7, 98:19,
103:23, 110:15,
111:3, 127:7
**jailhouse** [5] - 125:16,
126:1, 126:13,
127:2, 128:7
**JAMES** [1] - 2:5
**Jamestown** [5] -
10:14, 10:19, 21:6,
21:22
**January** [3] - 8:4,
31:9, 62:15
**Jason** [2] - 14:1, 48:12
**Jeilyn** [4] - 130:20,
130:23, 131:8,
131:10
**JEILYN** [1] - 130:20
**Jim** [1] - 83:17
**job** [1] - 40:3
**jobs** [2] - 17:23, 18:7
**Joe** [5] - 70:14, 83:5,
88:23, 94:10, 95:7
**jog** [2] - 87:1, 88:18
**joint** [3] - 12:23, 54:2,
131:13
**Jonas** [6] - 95:20,
95:21, 99:16,
103:10, 114:1, 114:3
**Jones** [1] - 95:19
**Joseph** [7] - 69:4,
69:11, 70:23, 80:7,
82:3, 83:19, 113:6
**Josh** [8] - 25:12,
33:11, 48:11, 49:2,
74:22, 74:23, 75:4,
107:15
**Josue** [11] - 6:18,
13:7, 37:6, 38:23,
42:22, 50:23, 76:22,
85:2, 108:16, 109:2,
134:1
**JOSUE** [1] - 1:4
**Judge** [8] - 54:11,
63:6, 63:7, 63:17,

65:14, 98:14
**judge** [1] - 102:13
**July** [7] - 89:5, 90:4,
90:6, 90:12, 90:15,
91:7
**juncture** [1] - 69:9
**June** [5] - 84:2, 85:3,
85:12, 87:18, 88:10
**jury** [2] - 99:18, 108:20
**Jury** [7] - 95:17, 96:3,
96:9, 103:6, 103:9,
128:22, 130:15

## K

**Keats** [11] - 25:12,
26:10, 26:13, 36:18,
36:20, 41:15, 48:11,
49:2, 74:22, 74:23,
75:4
**keep** [8] - 5:16, 30:6,
38:1, 72:19, 74:11,
74:12, 75:5, 75:6
**keeping** [1] - 72:22
**Ken** [1] - 82:3
**kept** [7] - 72:10, 72:11,
73:1, 73:3, 74:8,
75:3, 87:2
**kill** [5] - 57:12, 57:13,
118:12, 124:18,
125:2
**kind** [6] - 16:19, 20:16,
30:6, 42:6, 101:16,
103:2
**knowing** [2] - 97:7,
127:14
**knowledge** [8] -
25:22, 44:6, 54:10,
80:13, 81:12, 81:15,
92:9, 97:9
**knows** [2] - 119:19,
119:23

## L

**larcenies** [1] - 22:10
**last** [1] - 131:23
**Law** [2] - 1:12
**lead** [1] - 116:16
**learn** [2] - 45:1, 67:18
**learned** [2] - 7:19,
107:2
**least** [5] - 15:19,
58:23, 59:1, 104:23,
116:10
**leave** [1] - 58:18
**led** [2] - 52:17, 97:9
**leeway** [1] - 39:22
**left** [1] - 17:1
**legal** [3] - 39:14,

39:18, 40:8
**lends** [1] - 95:8
**LETITIA** [1] - 2:5
**level** [1] - 25:5
**levels** [1] - 23:3
**levied** [1] - 55:10
**Liberty** [2] - 10:10
**life** [1] - 34:10
**LINE** [1] - 134:9
**line** [1] - 57:11
**link** [2] - 68:11, 127:1
**linking** [1] - 78:7
**living** [1] - 110:3
**Lobaugh** [3] - 3:3, 53:13, 123:14
**local** [1] - 23:22
**locker** [1] - 50:8
**Lonergan** [3] - 75:10, 75:19, 79:10
**look** [16] - 7:22, 32:9, 33:19, 38:22, 41:10, 51:3, 51:7, 57:3, 83:23, 93:20, 94:2, 106:9, 112:6, 122:21, 123:15, 123:19
**looked** [8] - 44:21, 51:9, 51:10, 88:9, 88:11, 106:6, 106:7, 115:17
**looking** [5] - 24:23, 33:20, 42:5, 63:5, 107:3
**looks** [1] - 9:4
**loose** [3] - 46:21, 46:23, 86:2
**lower** [1] - 12:9

**M**

**mail** [2] - 2:3, 2:10
**main** [1] - 50:21
**Main** [4] - 1:13, 2:2, 2:8, 2:9
**maintained** [3] - 17:9, 73:10, 131:21
**Major** [10] - 11:9, 11:10, 11:14, 11:16, 22:14, 22:15, 23:2, 27:16, 56:8, 112:16
**male** [1] - 6:23
**man** [5] - 78:11, 81:7, 107:4, 110:12, 110:14, 111:2
**manner** [1] - 105:6
**March** [1] - 1:15
**Mark** [8] - 18:20, 71:20, 72:2, 79:6, 123:14, 125:16, 125:21, 127:13

**mark** [2] - 56:18, 61:19
**marked** [16] - 8:3, 8:11, 31:9, 41:18, 44:11, 45:19, 47:17, 53:5, 53:7, 53:12, 56:20, 57:2, 60:8, 62:14, 85:6
**Marusak** [1] - 83:5
**Mary** [22] - 14:5, 14:6, 16:2, 16:6, 19:23, 21:9, 33:11, 34:6, 41:14, 48:11, 49:17, 72:16, 74:15, 74:23, 84:14, 88:21, 101:20, 107:15, 109:11, 109:12
**materials** [1] - 13:17
**matter** [3] - 25:4, 34:5, 55:9
**mean** [19] - 6:20, 6:21, 24:1, 30:4, 35:18, 37:11, 52:8, 56:16, 66:2, 70:10, 70:11, 72:15, 72:16, 77:10, 90:13, 102:13, 111:6, 120:22, 127:17
**means** [1] - 66:4
**meeting** [8] - 29:20, 32:10, 35:1, 84:4, 84:7, 89:23, 91:6
**meetings** [5] - 104:19, 104:20, 105:1, 105:3, 105:5
**meets** [1] - 120:5
**member** [3] - 24:12, 45:21, 82:1
**members** [4] - 74:10, 81:17, 86:22, 100:19
**memory** [9] - 7:13, 7:23, 44:6, 84:16, 87:2, 88:18, 89:17, 94:17, 98:12
**Mendola** [2] - 81:2, 81:3
**mentioned** [3] - 81:20, 128:6, 130:4
**mentioning** [1] - 114:13
**met** [8] - 5:8, 35:3, 36:2, 38:17, 59:13, 120:16, 121:23, 122:2
**might** [8] - 7:9, 7:11, 17:7, 44:5, 50:1, 92:2, 106:20, 108:8
**Miguel** [4] - 57:13, 95:22, 113:18, 125:4
**mind** [1] - 98:12
**mine** [1] - 65:9

**minute** [2] - 39:20, 68:5
**minutes** [1] - 96:3
**Miseal** [13] - 51:12, 51:14, 51:22, 52:1, 52:5, 52:12, 52:22, 53:18, 54:5, 55:6, 95:18, 114:15
**MISEAL** [1] - 51:16
**mislead** [1] - 116:16
**misprint** [1] - 57:13
**Mission** [1] - 110:3
**modesty** [1] - 20:12
**money** [2] - 117:8, 117:9
**Montalvo** [16] - 51:13, 51:15, 51:17, 52:5, 52:12, 52:22, 53:18, 54:5, 55:6, 55:10, 95:18, 103:10, 114:16, 129:4, 129:20
**MONTALVO** [1] - 51:17
**month** [1] - 103:15
**months** [3] - 92:20, 112:15, 127:4
**morning** [2] - 5:5, 5:6
**most** [1] - 29:8
**mostly** [1] - 17:22
**Motion** [4] - 71:12, 97:14, 98:21, 99:10
**motive** [1] - 117:7
**MR** [129] - 4:3, 5:4, 8:5, 8:9, 14:19, 14:21, 23:13, 23:16, 25:16, 25:19, 25:23, 26:4, 26:6, 26:10, 26:14, 26:16, 30:20, 31:1, 31:4, 31:7, 35:6, 35:11, 35:15, 35:16, 35:17, 35:21, 36:1, 36:4, 36:8, 37:16, 37:21, 38:4, 38:7, 38:11, 38:13, 38:15, 39:14, 39:20, 40:2, 40:3, 40:4, 40:6, 40:9, 40:13, 40:16, 40:20, 41:4, 42:13, 42:16, 43:16, 43:18, 44:19, 44:23, 45:5, 45:7, 46:6, 46:10, 53:4, 53:10, 54:14, 54:18, 56:18, 56:23, 61:12, 61:16, 62:2, 62:6, 64:9, 64:11, 66:22, 67:1, 73:13, 73:16, 77:8, 77:13, 77:18, 84:17, 84:21, 84:23, 87:14,

87:17, 87:21, 88:2, 88:6, 88:9, 88:14, 90:13, 90:18, 91:21, 92:1, 93:1, 93:5, 93:9, 93:11, 93:13, 93:19, 94:1, 98:7, 98:10, 110:17, 110:19, 110:21, 111:1, 111:4, 111:9, 117:2, 117:4, 119:17, 119:18, 119:19, 119:21, 120:3, 120:10, 120:13, 120:21, 121:1, 122:7, 122:11, 122:23, 123:6, 123:17, 123:19, 123:22, 126:5, 126:9, 126:11, 132:6, 132:9, 132:10
**multiple** [2] - 6:6, 105:14
**murder** [31] - 6:5, 6:9, 6:10, 13:11, 21:13, 23:8, 24:8, 24:9, 24:23, 27:2, 30:1, 31:12, 46:22, 47:5, 47:14, 48:4, 48:9, 50:19, 54:5, 54:8, 54:10, 55:5, 65:4, 66:21, 67:4, 98:17, 110:10, 113:11, 114:4, 116:11, 131:17
**murders** [46] - 6:6, 13:6, 21:3, 21:14, 23:5, 24:5, 25:1, 28:20, 37:7, 38:23, 42:10, 42:12, 45:13, 48:21, 50:16, 52:6, 52:13, 52:22, 53:21, 55:11, 56:2, 56:14, 58:3, 67:11, 68:9, 74:4, 78:2, 81:8, 95:21, 99:14, 100:14, 101:1, 101:10, 102:22, 104:16, 106:2, 114:22, 115:1, 117:7, 124:22, 126:18, 126:21, 129:1, 130:1, 130:8, 130:17
**music** [1] - 17:15
**musician** [2] - 17:15, 18:11

**N**

**name** [21] - 4:20, 4:22,

5:7, 18:21, 28:10, 28:17, 30:9, 51:14, 83:8, 113:20, 114:8, 114:12, 126:14, 126:15, 127:15, 128:5, 128:11, 128:14, 128:17, 131:10, 133:17
**NAME** [1] - 134:1
**named** [3] - 48:10, 130:2, 130:9
**names** [4] - 58:20, 78:23, 100:11, 113:23
**nature** [5] - 19:11, 28:2, 33:21, 46:13, 59:3
**necessarily** [1] - 112:21
**Nelson** [4] - 57:13, 95:22, 113:18, 125:4
**never** [9] - 18:18, 19:15, 21:16, 28:14, 29:19, 36:10, 68:21, 83:7, 105:7
**NEW** [4] - 1:1, 1:7, 2:5, 133:1
**New** [30] - 1:14, 2:2, 2:9, 5:2, 6:12, 9:17, 9:20, 10:8, 10:9, 10:10, 11:4, 16:17, 17:5, 17:7, 18:1, 18:13, 19:16, 23:21, 24:12, 27:14, 43:14, 46:12, 49:2, 59:15, 61:18, 64:23, 121:16, 133:6, 133:21, 134:1
**newly** [1] - 97:17
**next** [5] - 31:20, 88:7, 89:4, 119:12, 120:19
**Niagara** [8] - 10:19, 11:2, 11:3, 57:14
**night** [4] - 64:3, 117:11, 119:14, 122:5
**nine** [1] - 112:14
**NO** [1] - 3:2
**nobody** [2] - 44:12, 116:17
**none** [3] - 59:7, 64:12, 132:10
**nonfatal** [2] - 43:5, 43:13
**Noreen** [3] - 14:6, 14:9, 16:3
**Notary** [4] - 1:16, 133:5, 133:20, 135:22
**notations** [1] - 118:6

**WENDY ROYCE McCANN - COURT REPORTER**