# 23-0352

# United States Court of Appeals

*for the*

# Second Circuit

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

**APPENDIX FOR DEFENDANT-APPELLANT
Volume 13 (Pages A-2987 to A-3160)**

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

## TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Docket List..........................................  A-1

Amended Complaint, dated March 27, 2019 ............  A-34

Answer to Amended Complaint,
    dated April 15, 2019 ...............................................  A-56

Notice of Motion to Dismiss, dated April 24, 2020...  A-80

Memorandum of Law in Support of Defendants'
    Motion to Dismiss, dated April 24, 2020...............  A-82

Supporting Declaration, dated April 24, 2020 ...........  A-107

    Exhibit A to Declaration -
    Affidavit of Lt. Salvatore Losi,
    sworn to on April 15, 2020....................................  A-112

    Exhibit B to Declaration -
    P-73 of Mark R. Stambach, dated November 16,
    2004, and Notes......................................................  A-114

    Exhibit C to Declaration -
    Plaintiff's Deposition Transcript,
    dated March 15, 2018............................................  A-117

**Volume 2**

    Exhibit D to Declaration -
    Mark Stambach's Deposition Transcript,
    dated January 23, 2019..........................................  A-241

ii

Page

**Volume 3**

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 .......................................... A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ....................................................................... A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 .......................................... A-543

**Volume 4**

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................ A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ....................................................................... A-746

Exhibit I to Declaration -
Indictment .............................................................. A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ....................................... A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ........................................ A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction ..................................................... A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit .................................................. A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ....................................... A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ..................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing .................................................................. A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 ..................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion .................................................................. A-983

Statement of Undisputed Facts,
dated April 24, 2020 .............................................. A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 ................................................. A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
Material Facts, dated July 3, 2020 ........................ A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.
Ortiz*, Indictment No. 02630-04 ........................... A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ............... A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ...................................... A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued)............................................................. A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019 ..................................... A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3 ............................. A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ................................................................. A-1450

v

**Page**

### Volume 7

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................ A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 .................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ...................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 .............................................. A-1706

### Volume 8

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 ............... A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
    Defendants' Motion to Dismiss, and for
    Judgment on the Pleadings and/or Summary
    Judgment, dated July 5, 2020 ............................... A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
    Defendants' Motion to Dismiss,
    dated July 24, 2020 ................................................ A-1789

Decision and Order of the Honorable Elizabeth A.
    Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
    dated April 1, 2022 ................................................ A-1837

Defendants' Proposed Jury Instructions,
    dated April 1, 2022 ................................................ A-1861

Plaintiffs' Reply Motions in Limine,
    dated April 6, 2022 ................................................ A-1924

Defendant's Objections to Plaintiff's Proposed Jury
    Instructions, dated April 6, 2022 ........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022........ A-1937

Stipulation of Undisputed Facts,
    dated April 27, 2022 ............................................. A-1996

Trial Transcript, Preliminary Instructions and
    Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022.......................... A-2053

vii

| | | Page |
|---|---|---|

Plaintiff's Witnesses:

| | | | |
|---|---|---|---|
| E. Coogins | Direct | .......................... | A-2054 |
| | Cross | .......................... | A-2116 |
| J. Ortiz | Direct | .......................... | A-2125 |

**Volume 10**

| | | | |
|---|---|---|---|
| Trial Transcript, dated May 4, 2022 (Cotinued) | | .......................... | A-2187 |
| M. Vaughn | Direct | .......................... | A-2189 |
| | Cross | .......................... | A-2219 |
| | Redirect | .......................... | A-2225 |
| J. Lonergan | Direct | .......................... | A-2229 |
| | Cross | .......................... | A-2281 |
| | Redirect | .......................... | A-2284 |
| | Recross | .......................... | A-2287 |
| Trial Transcript, dated May 5, 2022 | | .......................... | A-2297 |
| M. Stambach | Direct | .......................... | A-2299 |
| | Cross | .......................... | A-2361 |
| | Redirect | .......................... | A-2384 |
| J. Ortiz | Direct | .......................... | A-2393 |
| | Cross | .......................... | A-2426 |

**Volume 11**

| | | | |
|---|---|---|---|
| Trial Transcript, dated May 6, 2022 | | .......................... | A-2467 |
| M. Evans | Direct | .......................... | A-2470 |
| | Cross | .......................... | A-2495 |
| M. Lauber | Direct | .......................... | A-2504 |
| | Cross | .......................... | A-2518 |
| Trial Transcript, May 9, 2022 | | .......................... | A-2554 |

viii

| | | Page |
|---|---|---|
| J. Ortiz | Direct | A-2599 |
| | Cross | A-2653 |
| | Redirect | A-2671 |
| | Recross | A-2674 |

Trial Transcript, Closing Arguments, May 9, 2022 ... A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022 (Continued) ............................................................. A-2717

Jury Questionnaire, dated May 9, 2022 ..................... A-2760

Jury Questionnaire, Damages, dated May 9, 2022 .... A-2764

Judgment in a Civil Case, dated May 10, 2022 ......... A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees, dated May 20, 2022 ................................................ A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in Support of Motion, dated May 20, 2022................ A-2768

   Exhibit A to Felle Declaration - Ledger.................................................................... A-2773

   Exhibit B to Felle Declaration - Invoices for Services ............................................. A-2792

Plaintiff's Memorandum of Law in Support of his Motion for Attorneys' Fees and Costs, dated May 20, 2023 ................................................ A-2823

Notice of Motion, by Defendant, for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a new trial Pursuant to Fed. R. Civ. P. 59(a), and for Remittur Pursuant to Fed. R. Civ. P. 59(e), dated June 7, 2022 ................................................. A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
   Defendant, in Support of Motion,
      dated June 7, 2022 ................................................. A-2848

   Exhibit A to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Plaintiff.................................................................... A-2862

   Exhibit B to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Defendant ............................................................... A-2909

Memorandum of Law in Support of Motion for
   Judgment as a Matter of Law Under Fed. R. Civ.
   P. 50(b), dated June 7, 2022 ................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
   to Plaintiff's Motion for Attorneys' Fees,
      dated June 10, 2022 ............................................. A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
   Plaintiff's Motion for Attorneys' Fees,
      dated June 10, 2022 ............................................. A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
   Opposition to Defendant's Post Trial Motion,
      dated June 28, 2022 ............................................. A-3013

Plaintiff's Memorandum of Law in Opposition to
   Defendant's Post Trial Motions,
      dated June 28, 2022 ............................................. A-3023

Reply Memorandum of Law in Further Support of
   Defendant's Motion for Judgment as a Matter of
   Law, a New Trial, or Remittitur,
      dated July 8, 2022 ................................................ A-3071

x

                                                                    **Page**

Decision and Order of the Honorable Elizabeth A.
    Wolford, dated February 17, 2022 ........................  A-3090

Transcript of Oral Argument,
    dated January 31, 2023 .........................................  A-3112

Notice of Appeal, by Defendant, March 10, 2023 .....  A-3159

A-2987

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                              Plaintiff,

          v.                                    1:16-cv-00321-EAW-MJR

MARK STAMBACH,

                            Defendants.

# DEFENDANTS' MEMORANDUM OF LAW IN
# <u>OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES</u>

**HODGSON RUSS LLP**
*Attorneys for Defendant Mark Stambach*
Hugh M. Russ, of counsel
Adam W. Perry, of counsel
Peter A. Sahasrabudhe, of counsel
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................1

I.     THE COURT SHOULD DEFER RULING ON PLAINTIFF'S
       MOTION, WHICH IS LIKELY TO BE MOOTED ....................................................2

II.    PLAINTIFF IS ONLY ENTITLED TO ATTORNEYS' FEES
       INCURRED IN *THIS* PROCEEDING ........................................................................3

       A.     Plaintiff is not entitled to attorneys' fees incurred in
              entirely unrelated matters, such as social security and
              disability proceedings ..........................................................................................4

       B.     Plaintiff is not entitled to attorneys' fees incurred in
              other, parallel cases against other defendants .....................................................5

       C.     Plaintiff is not entitled to attorneys' fees incurred in
              his Section 440 action .........................................................................................7

III.   ANY REMAINING HOURS SHOULD BE SLASHED BY 65% ..............................8

       A.     Plaintiff's award should be reduced across-the-board
              because of deficient time-keeping practices ..........................................................9

       B.     Plaintiff is not entitled to attorneys' fees for public
              relations appearances .........................................................................................11

       C.     Plaintiff is not entitled to attorneys' fees for mendacious
              motion practice or disqualified expert witnesses ................................................12

       D.     Plaintiff's failures and numerous frivolous claims
              warrant a fee reduction ......................................................................................14

IV.    PLAINTIFF HAS A BASIS TO RECOVER NO MORE THAN
       $1,800.12 OF THE $37,638.00 IN THE BILL OF COSTS ......................................14

V.     THE PROPOSED HOURLY RATES ARE UNREASONABLE
       BECAUSE MR. FELLE IS NOT AN EXPERIENCED CIVIL
       RIGHTS ATTORNEY, AND THIS IS NOT A NYC CASE....................................15

       A.     In 2010, the Supreme Court specifically rejected the use of
              the *Johnson* factors proposed by Plaintiff...........................................................15

A-2989

## <u>TABLE OF CONTENTS</u>

**Page**

B.    The Court should apply the rates prevailing in Buffalo
to this Buffalo action involving Buffalo attorneys ................................................16

CONCLUSION.................................................................................................................18

**TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Adorno v. Port Auth. of New York & New Jersey,*
685 F. Supp. 2d 507 (S.D.N.Y. 2010)..................................................................16

*Anderson v. Rochester-Genesee Regional Transp. Auth.,*
388 F. Supp. 2d 159 (W.D.N.Y. 2005) (Larimer, J.)...........................................8, 9

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany*
*Cnty. Bd. of Elections,*
522 F.3d 182 (2d Cir. 2008)...............................................................................15

*Barrella v. Vill. of Freeport,*
56 F. Supp. 3d 169 (E.D.N.Y. 2014) ................................................................2, 3

*Biondo v. Kaleida Health,*
No. 15-CV-362G(F), 2016 WL 2752032 (W.D.N.Y. May 12, 2016) ....................16

*Brantley v. M.F. Surles, ETC., et al.,*
804 F.2d 321 (5th Cir. 1986) ...............................................................................8

*CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.,*
No. 18-CV-81689, 2021 WL 3361172 (S.D. Fla. Jan. 12, 2021)..........................11

*Clark v. Stach,*
674 F. Supp. 969 (D. Conn. 1987)......................................................................12

*Cole-Hoover v. New York Dep't of Corr. Servs.,*
No. 02-CV-00826 M, 2014 WL 576176 (W.D.N.Y. Feb. 12, 2014).................9, 10

*Costa v. Sears Home Improvement Prods., Inc.,*
212 F. Supp. 3d 412 (W.D.N.Y. 2016) ...............................................................17

*Davis v. San Francisco,*
976 F.2d 1536 (9th Cir. 1992) ...........................................................................12

*DeLew v. Nevada,*
No. 2:00-CV-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010).................7

*Devito v. Hempstead China Shop, Inc.,*
831 F. Supp. 1037 (E.D.N.Y. 1993) ...................................................................10

- iii -

*Doe ex rel. Doe v. E. Lyme Bd. of Educ.*,
    2014 WL 4370504 (D. Conn. Sept. 2, 2014) ....................................................2, 3

*Figueroa v. KK Sub II, LLC*,
    2019 WL 1109864 (W.D.N.Y. 2019) .......................................................17

*Francois v. Mazer*,
    523 F. App'x 28 (2d Cir. N.Y. 2013) ......................................................9

*Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*,
    No. 6:09-CV-6043 MAT, 2014 WL 1404902 (W.D.N.Y. Apr. 10, 2014) ...............2

*Green v. Torres*,
    361 F.3d 96 (2d Cir. 2004) .................................................................10

*Handschu v. Police Dep't of the City of N.Y.*,
    679 F. Supp. 2d 488 (S.D.N.Y. 2010) ...................................................14

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ........................................................................14

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) .........................................................15, 16

*Johnson v. New Bern Transp. Corp.*,
    2020 WL 6736861 (W.D.N.Y. 2020) ......................................................17

*Kassim v. City of Schenectady*,
    415 F.3d 246 (2d Cir. 2005) .............................................................16

*Kirsch v. Fleet Street, Ltd.*,
    148 F.3d 149 (2d Cir. 1998) .............................................................10

*Lexjac, LLC v. Bd. of Trustees of the Inc. Vill. of Muttontown*,
    No. CV 07-4614 (ARL), 2015 WL 13001537 (E.D.N.Y. Mar. 20, 2015) ...............7

*Matusick v. Erie County Water Auth.*,
    739 F.3d 51 (2d Cir. 2014) .............................................................10

*Matusick v. Erie County Water Auth.*,
    774 F. Supp. 2d 514 (2011) ............................................................10

*Mhany Mgmt., Inc. v. Inc. Vill. of Garden City*,
    44 F. Supp. 3d 283 (E.D.N.Y. Sept. 11, 2014) .........................................3

*Miller v. Metro-North Railroad Company*,
    658 F.3d 154 (2d Cir. 2011) ............................................................16

*Murray ex rel Murray v. Mills*,
   354 F. Supp .2d 231, 239 (E.D.N.Y. 2005) ..................................................4, 5, 6

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983)............................................................................12

*Ortiz v. Case*,
   No. 1:16-CV-00322 EAW, 2019 WL 1236413 (W.D.N.Y. Mar. 18, 2019),
   *aff'd*, 782 F. App'x 65 (2d Cir. 2019)...........................................................5, 6

*Ortiz v. Stambach*,
   No. 1:16-CV-00321 EAW, 2022 WL 1746771 (W.D.N.Y. May 31, 2022).....................13, 18

*Ortiz v. Wagstaf*,
   523 F. Supp. 3d 347 (W.D.N.Y. 2021) ......................................................3, 5, 7

*Perdue v. Kenny A. ex rel. Winn*,
   559 U.S. 542 (2010) ..........................................................................................16

*Rabin v. Wilson-Coker*,
   425 F. Supp. 2d 269 (D. Conn. 2006) ...............................................................9

*Razzano v. Cnty. of Nassau*,
   No. CV 07-3983 ADS AKT, 2012 WL 1004900 (E.D.N.Y. Feb. 27, 2012)............................7

*Rozell v. Ross-Holst*,
   576 F. Supp. 2d 527 (S.D.N.Y. 2008) ..............................................................16

*Rum Creek Coal Sales, Inc v. Caperton*,
   31 F.3d 169 (4th Cir. 1994) ..............................................................................11

*Scott v. City of New York*,
   626 F.3d 130 (2d Cir. 2010)...............................................................................10

*Swan v. Daniels*,
   917 F. Supp. 292 (D. Del. 1995).......................................................................14

*Taylor v. Delta-Sonic Car Wash Sys., Inc.*,
   2017 WL 436045 (W.D.N.Y. 2017) ..................................................................17

*Tubbins v. Hackbush*,
   No. 14-CV-00403F, 2016 WL 5420734 (W.D.N.Y. Sept. 29, 2016).....................18

*Tucker v. City of N.Y.*,
   704 F. Supp. 2d 347 (S.D.N.Y. 2010)................................................................8

*United States v. Ortiz,*
   No. 16-cr-00077-LJV (W.D.N.Y. Nov. 4, 2016)..........................................................4

*Vilkhu v. City of New York,*
   No. 06-CV-2095 CPS (JO), 2009 WL 1851019 (E.D.N.Y. June 26, 2009),
   vacated and remanded 372 F. App'x 222 (2d Cir. 2010)........................................17

*Ward v. Brown,*
   899 F.Supp. 123 (W.D.N.Y. 1995) ............................................................................10

*Warr v. Liberatore,*
   No. 13-CV-6508MWP, 2022 WL 969528 (W.D.N.Y. Mar. 31, 2022)...........................14, 17

*Webb v. Board of Educ. of Dyer County, Tenn.,*
   471 U.S. 234 (1985).........................................................................................4, 6, 7

*Westchester Legal Servs., Inc. v. Cnty. of Westchester,*
   No. 85 CIV. 3115 (SWK), 1987 WL 6160 (S.D.N.Y. Jan. 27, 1987) ....................................11

*White v. Sutherland,*
   No. CIV S-03-2080 CMK, 2005 WL 1366487 (E.D. Cal. May 6, 2005)........................12, 13

**State Cases**

*Ortiz v. State,*
   203 A.D.3d 1731 (4th Dep't 2022) ............................................................................6

A-2994

**PRELIMINARY STATEMENT**

Defendant Mark Stambach ("Detective Stambach") submits this memorandum of law in opposition to the motion for attorneys' fees submitted by Plaintiff Josue Ortiz. Not only would a decision on Plaintiff's motion be premature—Defendant's post-trial dispositive motion is currently pending before the Court—it also seeks a vastly excessive amount of fees.

Plaintiff's motion is an attempt to charge Defendant for all of Plaintiff's legal fees across every matter and proceeding in which Plaintiff's counsel represented him. This includes hundreds of hours in matters that either have no connection to the facts of this case, or were separate actions in which Plaintiff was not the prevailing party. It also includes egregious instances of block billing, vague entries, excessive time spent on conferences and clerical tasks, and billing on problems caused by errors committed by Plaintiff's counsel. To cap it off, it relies on a grossly inflated hourly rate for Plaintiff's counsel, which was apparently based on prevailing rates in New York City, and then attempts to stick Defendant with the costs for experts that this Court precluded and printing in other cases.

The Court should defer ruling on Plaintiff's motion for attorneys' fees until Defendant's pending motion is resolved, or, in the alternative, substantially reduce the requested amount with an across-the-board reduction of at least 85% of the fees requested.

**ARGUMENT**

42 U.S.C. § 1988 permits the court, "in its discretion" to grant "a reasonable attorney's fee as part of the costs" to the prevailing party "[i]n any action … to enforce a

provision of [§ 1983]." But Plaintiff's status as prevailing party is currently being challenged, and even if it were not, the proposed costs and attorneys' fees are not reasonable.

## I.   <u>The Court should defer ruling on Plaintiff's motion, which is likely to be mooted</u>

This Court should defer ruling on Plaintiff's § 1988 motion for attorneys' fees (Dkt. 167) until, at the very least, it has ruled on Defendant's pending post-trial briefing (Dkt. 177).

Defendant's post-trial motion for judgment as a matter of law (Rule 50(b)), a new trial (Rule 59(a)), and remitter (Rule 59(e)) is pending before the Court.  Dkt. 177.  If either of the first two branches of Defendant's motion are granted, Plaintiff would no longer have an enforceable judgment.[1]  This would moot Plaintiff's motion for attorneys' fees and costs, because Plaintiff "would no longer be the prevailing party entitled to such fees." *Barrella v. Vill. of Freeport*, 56 F. Supp. 3d 169, 172-73 (E.D.N.Y. 2014).

When a pending dispositive motion or appeal on the merits threatens to moot a motion for attorneys' fees, courts "defer[] a ruling on the motion for attorney's fees" until the dispositive motion or appeal has been resolved, and thus the identity of the prevailing party is no longer in question.  *Doe ex rel. Doe v. E. Lyme Bd. of Educ.*, 2014 WL 4370504, at *2 (D. Conn. Sept. 2, 2014) (citing *Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, No. 6:09-CV-

---

[1]   Nor would this necessarily finalize proceedings—a decision by the Court may be followed by an appeal by the losing party.

A-2996

6043 MAT, 2014 WL 1404902, at *1 (W.D.N.Y. Apr. 10, 2014)).  At this point, "the Court only has to address the motion for attorneys' fees by the party that ultimately prevails."[2]  *Id.*

Moreover, Plaintiff is not likely to be the prevailing party.  Before trial, this Court dismissed the majority of Plaintiff's claims, except for three—malicious prosecution, fabrication of evidence, and self-incrimination—against Detective Stambach. *Ortiz v. Wagstaf*, 523 F. Supp. 3d 347, 377 (W.D.N.Y. 2021).  In permitting those claims to proceed, the Court specifically noted that certain testimony could allow a jury to find in Plaintiff's favor on the malicious prosecution claim. *Id.* at 364-65.  As discussed in more detail in Defendant's Rule 50 motion, Plaintiff ultimately did not elicit that testimony at trial—and was unable to present any other evidence supporting those elements to the jury.

Thus, to avoid adjudicating on a potentially moot issue, the Court should defer ruling on Plaintiff's motion for attorneys' fees until after it resolves Defendant's motion.

## II.  <u>Plaintiff is only entitled to attorneys' fees incurred in *this* proceeding.</u>

If this Court entertains Plaintiff's motion, it should reject all time entries that do not clearly relate to this proceeding.  Plaintiff's counsel—the Law Offices of Wayne C. Felle (the "Felle Office") seeks fees in *all* the matters in which they represent Plaintiff.  This includes

---

[2]     The only common exception to this approach is when the motion pending before the Court is a supplemental motion for attorneys' fees. *Compare Barella*, 56 F. Supp. 3d at 173 (declining to defer ruling on **supplemental** motion for attorneys' fees, since it had already ruled on a principal motion for attorneys' fees) *with Mhany Mgmt., Inc. v. Inc. Vill. of Garden City*, 44 F. Supp. 3d 283, 286 (E.D.N.Y. Sept. 11, 2014) (granting motion to defer ruling on **initial** motion for attorneys' fees until appeal had concluded).  This is Plaintiff's first motion for attorneys' fees, not a supplemental one.

3

multiple proceedings against other defendants in which Plaintiff was not the prevailing party. As set forth in the June 10, 2022 Declaration of Peter A. Sahasrabudhe ("Decl."), this amounts to **hundreds of hours** that clearly relate to other cases—many of which occurred well before a federal action was contemplated—and hundreds more in entries that are so vague that it cannot be determined to which proceeding they were billed.

"Congress only authorized the district courts to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce § 1983"—a requirement that necessarily excludes attorney's fees incurred in other actions, especially those in which the party seeking fees did not prevail. *Murray ex rel Murray v. Mills*, 354 F. Supp .2d 231, 239 (E.D.N.Y. 2005) (citing *Webb v. Board of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 241 (1985)). The Defendant in **this** proceeding should not be required to pay the fees relating to **other** proceedings that did not involve him.

A.    **Plaintiff is not entitled to attorneys' fees incurred in entirely unrelated matters, such as social security and disability proceedings**

The most obvious subset of billing entries for which Plaintiff should not be allowed to collect attorney's fees are those that have no relation to this case or Plaintiff's underlying conviction. *See* Decl., at ¶¶ 10, 11, Table 1. This includes time billed securing social security benefits, state disability benefits, Medicare or Medicaid benefits, addressing a lien or loan, and helping Plaintiff with housing and employment. It also includes several entries relating to Ortiz's attempted purchase of a firearm in 2015 and subsequent conviction for unlawful possession of firearm under 18 U.S.C. § 922(g)(1) (unlawful possession of. *See United States v. Ortiz*, No. 16-cr-00077-LJV (W.D.N.Y. Nov. 4, 2016). Although a more comprehensive list of

4

these entries in included in Table 2 of the attached declaration, several entries are included as examples below:

| 12/16/2014 | Meeting w/ client, calls to assist w/ housing, employment | 2.5 |
| 1/23/2015 | Client Meeting, Rcvd app from PSS re. loan (WCF 1.2)(BEC .6) | 1.8 |
| 3/5/2015 | Phone call with Client; moved to City Mission | 0.5 |
| 3/12/2015 | Phone call from Social Security office; Talked to client | 0.5 |
| 3/31/2015 | Ltr to client, re SSD appts (WCF .5)(BEC .8) | 1.3 |
| 12/4/2015 | Rcvd letter from Medicaid re. lien (WCF .2)(BEC.3) | 0.5 |
| 2/5/2016 | Attended Court- Federal legal proceedings, reqd NFMMC records (WCF 4.6)(BEC 1.3) | 5.9 |
| 8/5/2019 | Rcvd ltr from PSS re. lien (WCF .2)(BEC .4) | 0.6 |

Notably, Plaintiff represents that the Felle Office did not include bills for many of these entries, recognizing these bills' lack of connection to this proceeding. Dkt 167-4, page 16 ("time … assisting Ortiz with housing, employment and medical treatment … is not billed."). Plaintiff should be held to this standard, and all of the irrelevant activities should be struck, as they are, in any case, ineligible for fee-shifting under § 1988. *See Murray*, 354 F. Supp. 2d at 239.

**B.      Plaintiff is not entitled to attorneys' fees incurred in other, parallel cases against other defendants.**

The Court should also reject Plaintiff's attempt to collect attorneys' fees incurred in unsuccessful, parallel proceedings that were not necessary to the prosecution of Plaintiff's § 1983 claims in this action. At the same time that Plaintiff initiated *Wagstaff*, he initiated a separate proceeding—deliberately filed as a separate matter—against the Erie County District Attorney Office and various prosecutors. *Ortiz v. Case*, No. 1:16-CV-00322 EAW, 2019 WL 1236413, at *1 (W.D.N.Y. Mar. 18, 2019) (granting summary judgment to defendants), *aff'd*,

5

A-2999

782 F. App'x 65 (2d Cir. 2019).  And Plaintiff had already initiated a third proceeding in the New York Court of Claims against the State of New York.  *See Ortiz v. State*, 203 A.D.3d 1731 (4th Dep't 2022) (affirming order granting defendant's motion for summary judgment on all claims).  None of these cases have any defendants in common, and Plaintiff was not the prevailing party in the other two proceedings.

Approximately half of the time entries included by the Felle Office—amounting to hundreds of hours—are clearly attributable to the separate proceedings in *Ortiz v. Case* and *Ortiz v. State*.[3]  *See* Decl. at ¶¶ 14, 15, Tables 2 and 3.  The Felle Office ledger contains hundreds more hours in entries that are so vague that it is impossible to determine which proceeding they relate to, such as (but hardly limited to) the following:

| | | |
|---|---|---|
| 6/5/2019 | Court Conference | 2 |
| 8/4/2018 | meeting w/ AP, prep | 2.5 |
| 7/17/2021 | Drafting brief | 12 |
| 7/18/2021 | Drafting brief | 15 |

Plaintiff should not be permitted to recover for any of them, and Defendant, who was only named in **this** action, should not be required to cover the attorneys' fees for Plaintiff's two other lawsuits.  Defendant is not a party to those lawsuits, and Plaintiff, who lost those cases, has no right to collect attorneys' fees expended in either in any case.  *See Murray*, 354 F. Supp. 2d at 239 (E.D.N.Y. 2005) (citing *Webb*, 471 U.S. at 241).  The Court should not allow Plaintiff

---

[3]       Likewise, and as discussed below, approximately 80% of the printing and transcript costs included in Plaintiff's Bill of Costs are specifically for Plaintiff's proceedings in *Ortiz v. State*.

6

A-3000

to backdoor these ineligible time charges, and all of the Felle Office entries that cannot be clearly identified as arising from *Ortiz v. Wagstaf* should be struck.

**C.**     **Plaintiff is not entitled to attorneys' fees incurred in his Section 440 action.**

The Court should also reject the Felle Office's attempt to bill for attorneys' fees apparently incurred in connection with vacating Plaintiff's conviction well before this action commenced.  These entries are included in Table 1 of the Sahasrabudhe Declaration.

"Although 'Congress … authorized the district courts to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce § 1983,' fees incurred in connection with a related state or administrative law proceeding[] are generally not recoverable." *Lesjac, LLC v. Bd. of Trustees of the Inc. Vill. of Muttontown*, No. CV 07-4614 (ARL), 2015 WL 13001537, at *4 (E.D.N.Y. Mar. 20, 2015) (quoting *Razzano v. Cnty. of Nassau*, No. CV 07-3983 ADS AKT, 2012 WL 1004900, at *4 (E.D.N.Y. Feb. 27, 2012)) (rejecting attempt to recover, via § 1988, "a great deal of work in connection with the parallel state action"); *see also Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 243 (1985) ("[T]he District Court correctly held that all of the administrative work was not compensable.").

Although there are exceptions to this general rule, such "where a plaintiff was required to exhaust his administrative remedies before bringing the federal [§ 1983] lawsuit," Plaintiff has not identified any exception applicable here.  *Razzano*, 2012 WL 1004900, at *4. Plaintiff's § 440 proceeding may have been a "necessary condition precedent" to this action, in that the outcome "provided the basis" for Plaintiff's current § 1983 claims.  *DeLew v. Nevada*, No. 2:00-CV-00460-LRL, 2010 WL 11636127, at *6 (D. Nev. Jan. 7, 2010).  But it was "not a

7

proceeding to enforce a § 1983 claim," and those fees are not recoverable under § 1988. *Id.* (citing *Brantley v. M.F. Surles, ETC., et al.*, 804 F.2d 321, 325 (5th Cir. 1986)).  The Court should reject Plaintiff's attempt to shift the costs for the preceding proceedings, which necessarily include all time incurred before March 2016, when this action appears to have been first contemplated.[4]

### III.  Any remaining hours should be slashed by 65%.

If Plaintiff ultimately prevails on any of his few remaining claims against Defendant, in addition to being limited as discussed above, the requested attorneys' fees award should be further reduced by at least 65% to account for the unreasonable billing practices engaged in the Felle Office, and various costs arising from Plaintiff's counsels own errors and inefficiencies.  There is no justification for Plaintiff's bloated fee request.

Courts routinely chop fee awards in these circumstances.  "[E]xcessive, redundant, or unnecessary hours are to be excluded from a fee award."  *Anderson v. Rochester-Genesee Regional Transp. Auth.*, 388 F. Supp. 2d 159, 163 (W.D.N.Y. 2005) (Larimer, J.) (citation omitted) (reducing fee award by 20%).  This includes multiple attorneys billing for depositions, field trips, and internal conferences.  *Tucker v. City of N.Y.*, 704 F. Supp. 2d 347, 356 (S.D.N.Y. 2010) (basing reduction of 50% for one attorney and one-third for the other, in part, on two attorneys taking a field trip to the location and internal communications between

---

[4]    The following are the first two entries potentially relating to Plaintiff's § 1983 proceeding:

| | |
|---|---|
| 3/17/2016 | email/ register w/ Fed Ct (WCF .4)(BEC .6) |
| 4/16/2016 | prep Complaint fed ct (WCF 3)(BEC 1.2) |

8

**A-3002**

attorneys).  Vague time entries and evidence of estimation rather than contemporaneous billing practices also justify a a sharp reduction in fees.  *Anderson*, 388 F. Supp. 2d at 166; *see also Rabin v. Wilson-Coker*, 425 F. Supp. 2d 269, 273 (D. Conn. 2006) (reducing fees by 5% due to vague time entries, such as "work on brief" and imposing additional reductions for multiple attorneys billing for proceedings).  Entries such as "conference with," "call to," or "letter" are insufficient—and comprise the overwhelming majority of Plaintiff's time entries.  *Cole-Hoover v. New York Dep't of Corr. Servs.*, No. 02-CV-00826 M, 2014 WL 576176, at *6 (W.D.N.Y. Feb. 12, 2014).

The attached Declaration details the ways in which Plaintiff's attorneys have submitted vague and inaccurate entries that reflect excessive time spent on routine tasks, frivolous briefing, unnecessary client conferences, or tasks that are not reasonably billable to a client.  As explained in the next section, all of these factors call for the Court to reduce Plaintiff's requested fees by a significant across-the-board percentage.  Defendant should not be required to bear fees inflated by Plaintiff's counsel's inefficiencies.

A.   **Plaintiff's award should be reduced across-the-board because of deficient time-keeping practices.**

This Court should issue an across-the-board reduction to Plaintiff's requested hours because his time entries demonstrate widespread block-billing, excessively vague time-entries, and are suggestive of either deliberate over-estimation or a failure to maintain contemporaneous records.

Plaintiff's vague entries and block-billing practices provide additional support for an across the board reduction.  *See Francois v. Mazer*, 523 F. App'x 28 (2d Cir. N.Y. 2013)

9

(finding 40% across-the-board reduction in claimed hours to be appropriate); *Matusick v. Erie County Water Auth.*, 774 F. Supp. 2d 514, 532 (2011) (finding 50% across-the-board reduction in claimed hours to be appropriate), aff'd in relevant part, rev'd in part, 739 F.3d 51 (2d Cir. 2014) (affirming portion of decision addressing attorneys' fees); *Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004) (affirming 20% reduction "to account for plaintiff's pursuit of inflated claims [and] to allow the fee award to accurately reflect the partial success obtained by the plaintiff"); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (affirming adjustment of hourly rate and additional 20% reduction for "vagueness, inconsistencies, and other deficiencies in the billing records"); *Devito v. Hempstead China Shop, Inc.*, 831 F. Supp. 1037, 1045 (E.D.N.Y. 1993) (reducing fee request by 40%).

Moreover, contemporaneous time records are a mandatory requirement for an attorneys' fees application within the Second Circuit. *See Scott v. City of New York*, 626 F.3d 130 (2d Cir. 2010). As observed by Magistrate Judge McCarthy, "[t]hat rule was meant to have teeth." *Cole-Hoover v. N.Y. Dep't of Corr. Servs.*, 2014 WL 576176, at *6 (W.D.N.Y. Feb. 12, 2014) (citing *Ward v. Brown*, 899 F.Supp. 123, 130 (W.D.N.Y. 1995). Although the Felle Office "ledger" is purportedly made up of contemporaneous entries, there are indications that it involves routine estimation or over-reporting for various tasks.

The "Client Meeting" entries make for particularly egregious examples. Where not block-billed with other entries, "Client Meeting" are the only words present, with no additional information, and they are invariably billed in round increments of 0.5 hours, 1 hour, or 2 hours. Decl., at ¶ 17, Table 5. And the Felle Office routinely took half an hour to complete other mundane tasks, such as filing already-drafted motions, or sending reports. Decl. at ¶ 24.

10

Notably, over the course of eight years of representation, there are only three instances in which Mr. Felle of the Felle Office has ever recorded a task as taking 0.1 hours. Nor has Mr. Felle *ever* recorded a time entry ending in .9 hours, which suggests that he is rounding up to the nearest hour. *See CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.*, No. 18-CV-81689, 2021 WL 3361172, at *11 (S.D. Fla. Jan. 12, 2021) (reducing fees by 20% because absence of entries ending in 0.4 and 0.9 indicated practice of rounding to the nearest hour or half hour). The Felle Office's unusual use of round numbers and other time-keeping discrepancies are suggestive of a failure to consistently maintain contemporaneous records.

Given the especially vague time entries in this case, and the fact that many of the entries relate to other proceedings, thus preventing the Court from evaluating the reasonableness of the entries, Defendant submits that an across-the-board 75% reduction of the remaining amount is warranted in this case. The need for a substantial across-the-board reduction is especially heightened in this case because of the likelihood that Mr. Felle's entries include time spend on other cases, which would not be eligible for fee-shifting.

**B.    Plaintiff is not entitled to attorneys' fees for public relations appearances.**

The Felle Office has also included a variety of extra-legal activities involving press conferences and other public relations efforts. Decl. at ¶ 16, Table 4. There is absolutely no basis to award fees or costs in connection with these activities, which are not "hours expended on the litigation" and are "not legal work recoverable under section 1988." *Westchester Legal Servs., Inc. v. Cnty. of Westchester*, No. 85 CIV. 3115 (SWK), 1987 WL 6160, at *4 (S.D.N.Y. Jan. 27, 1987); *see also Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994) (affirming denial of hours expended on press conferences, and noting that even jurisdictions that

11

permit them require a showing that the public relations efforts "directly and substantially" contributed "to the attainment of [the] litigation goals") (quoting and distinguishing *Davis v. San Francisco*, 976 F.2d 1536 (9th Cir. 1992)).  Plaintiff's public relations efforts could not—legally or chronologically—have had any effect on the outcome of this case.

> **C.    Plaintiff is not entitled to attorneys' fees for mendacious motion practice or disqualified expert witnesses.**

A significant portion of the Plaintiff's claimed attorneys' fees transparently arise from the Felle Office's failure to comply with the Federal Rules of Civil Procedure, and pre-trial motions that the Court rejected as "gamesmanship."  Dkt. 138.

Generally speaking, Courts do not permit prevailing parties to shift costs for unnecessary and frivolous activities, especially additional time rendered necessary by errors committed by the prevailing parties' own counsel.  *Clark v. Stach*, 674 F. Supp. 969, 971 (D. Conn. 1987) ("The Court will not compel the defendant to bear the costs arising from the plaintiff's lack of diligence."); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983) (refusing to allow cost-shifting for 118 hours spent on motion for attorneys' fees, noting that the "inordinate amount of time plaintiffs' attorneys spent on the fee application was a direct result of their failure to keep better records").  This is because, if it would be unreasonable to bill a client for an activity—as is the case when an attorney is attempting to correct his own errors—it is equally unreasonable to shift those costs to the other party.  *See White v. Sutherland*, No. CIV S-03-2080 CMK, 2005 WL 1366487, at *11 (E.D. Cal. May 6, 2005) (denying cost-shifting of fees relating to expert witness because the court "cannot

12

imagine that an attorney billing a private client would include the cost for an expert who could not be used at trial due to the failure of the attorney to properly disclose the expert").

Although counsel for Defendant was retained shortly before trial, it is clear that even within that span, Plaintiff is seeking to shift costs that arose from Plaintiff's counsel's own lack of diligence and meritless opposition to Defendant's motions.  For example, Defendant moved to preclude Plaintiff's expert witnesses (Rachel Duchon, Dr. Reiber, Dr. Redlich, Dr. Coggins, and Dr. Joseph) because Plaintiff failed to provide timely expert disclosures for those experts, some of whom were first identified a few weeks before trial.  The Court precluded all of them, noting Plaintiff had made "numerous inconsistent statements regarding the expert disclosures," including inaccurately representing that they had been made, and ultimately had "no reasonable explanation for the failure to comply with the expert disclosure requirements." *Ortiz v. Stambach*, No. 1:16-CV-00321 EAW, 2022 WL 1746771, at *5-*6 (W.D.N.Y. May 31, 2022).  The absence of any "reasonable explanation" underscores the lack of merit of Plaintiff's opposition to those motions.  After the Court precluded these experts, the Felle Office attempted to seek a last-minute adjournment of the trial, which the Court recognized as "a disguised attempt to allow additional time to cure the deficiencies in Plaintiff's expert disclosures" and denied as "gamesmanship."  Dkt. 138.  Plaintiff should not be permitted to shift these costs to Defendant.  *See Sutherland*, 2005 WL 1366487, at *11.

Likewise, Plaintiff should not be permitted to shift costs to Defendant for the lengthy fiasco involving the termination of former co-counsel, or the subsequent dispute over former co-counsel's fees, which are block-billed as part of five separate entries.

13

**D.      Plaintiff's failures and numerous frivolous claims warrant a fee reduction**

Plaintiff asserted numerous claims against numerous defendants which failed to pass muster at various stages of the litigation.  All of the defendants except for Detective Stambach were dismissed from the case prior to trial.  This includes three other named individual defendants (Wagstaff, Gugliuzza, and Vaughn), the City of Buffalo, the City of Buffalo Police Department, and twelve unnamed "BPD DOES."  And two of the five claims against Detective Stambach were also dismissed.

Caselaw supports eliminating or reducing fees where the plaintiff is unsuccessful with respect to a majority of defendants, even if the dismissed claims were not frivolous. *Handschu v. Police Dep't of the City of N.Y.*, 679 F. Supp. 2d 488, 499 (S.D.N.Y. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *Swan v. Daniels*, 917 F. Supp. 292, 300-01 (D. Del. 1995) (reducing award by 85% based, in part, on the dismissal of several defendants on summary judgment).

**IV.     Plaintiff has a basis to recover no more than $1800.12 of the $37,638.00 in the Bill of Costs**

The Felle Office's Bill of Costs includes $27,899.50 in expert witness fees, $450.00 in "fees of the clerk," $450.00 in "Fees for service of summons and subpoena," $4,331.15 for transcripts, and $4,507.63 for printing.  Dkt. 167-3, p. 2.  Plaintiff is not entitled to the overwhelming majority of these fees.

First, none of the expert witness fees are eligible for fee shifting.  Section 1988 does not provide for fee-shifting of expert fees in § 1983 actions; § 1988(c) applies only to § 1981 and § 1981a actions. *Warr v. Liberatore*, No. 13-CV-6508MWP, 2022 WL 969528, at *3

14

A-3008

(W.D.N.Y. Mar. 31, 2022). Second, even if § 1988 did permit those fees, the $27,899.50 in expert witness fees relates to the four expert witnesses that the Court *precluded*. *See* Decl. ¶ 6.

And the overwhelming majority ($7788.67) of Plaintiff's other alleged costs ($9,738.78) were, according to Plaintiff's own evidence, actually for Plaintiff's proceedings in *Ortiz v. State of New York*—primarily Plaintiff's unsuccessful appeals to the Fourth Department. *See* Decl. ¶ 8. Only $1,800.12 appear attributable to this case.[5] They should also not be permitted.

## V.   **The proposed hourly rates are unreasonable because Mr. Felle is not an experienced civil rights attorney, and this is not a NYC case.**

In calculating any "reasonable attorneys' fees," the Court should reject the proposed non-lodestar standard for calculating reasonable rates, and reduce the Felle Office's proposed rates to be in line with those within the Western District in civil rights actions.

### A.   **In 2010, the Supreme Court specifically rejected the use of the *Johnson* factors proposed by Plaintiff.**

A significant portion of Plaintiff's brief is devoted to the "*Johnson*" factors and why they justify a larger attorneys' fee. The *Johnson* factors were a list of case-specific discretionary factors proposed by the Fifth Circuit as an alternative to the "lodestar" approach. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). Plaintiff's argument cites two Second Circuit decisions in support of preferentially applying the *Johnson* factors: one from 2008, and one from 2005. *Arbor Hill Concerned Citizens Neighborhood Ass'n*

---

[5] There is no evidentiary basis provided for $149.99 of the fees.

15

*v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008); *Kassim v. City of Schenectady*, 415 F.3d 246, 255-56 (2d Cir. 2005).

These cases are no longer good law for that proposition. In 2010, the Supreme Court specifically rejected the use of the *Johnson* factors for § 1988 motions and endorsed the lodestar approach, putting the conflict to rest. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-53 (2010) (noting "strong presumption" that lodestar figure is reasonable, to be overcome only in "rare circumstances"); *see also Biondo v. Kaleida Health*, No. 15-CV-362G(F), 2016 WL 2752032, at *2 (W.D.N.Y. May 12, 2016) (declining to apply *Johnson* factors in light of *Perdue*) (citing *Miller v. Metro-North Railroad Company*, 658 F.3d 154, 166 (2d Cir. 2011) as recognizing that *Perdue* requires use of the lodestar method).

**B.      The Court should apply the rates prevailing in Buffalo to this Buffalo action involving Buffalo attorneys.**

Plaintiff is currently proposing rates of $425/hour for Mr. Felle, $335 and $325 for his associates, and $125 for his paralegal. In support of these rates, he represented to the Court that prevailing rates in the Western District are "$250 to $600 for partners, and $200 to $350 for associates," citing three cases that he specifically claims applied "prevailing Western District rates." Dkt. 167-4, p. 8. All of these cases actually discuss prevailing rates in New York City, outside the Western District—two of them are plainly **Southern** District cases. *Adorno v. Port Auth. of New York & New Jersey*, 685 F. Supp. 2d 507, 510 (S.D.N.Y. 2010); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 535 (S.D.N.Y. 2008). And the third—which Plaintiff specifically identified as applying "prevailing Western District rates" (Dkt. 167-4, at 8)—was an **Eastern** District case that *also* applied the rates prevailing within the Southern District—and the

16

district court's order was vacated and remanded for doing so!  *Vilkhu v. City of New York*, No. 06-CV-2095 CPS (JO), 2009 WL 1851019, at *1 (E.D.N.Y. June 26, 2009), vacated and remanded 372 F. App'x 222 (2d Cir. 2010) (noting that district court erred by applying Southern District rates instead of the lower rates common in the Eastern District, where the case occurred).

The Felle Office and this litigation are both located in the Western District, where rates are significantly lower.  *Liberatore*, 2022 WL 969528, at *5 (rejecting $350 hourly rate as "unreasonable" and concluding that $275 is more commensurate with prevailing local rates); *Johnson v. New Bern Transp. Corp.*, 2020 WL 6736861, *4-5 (W.D.N.Y. 2020) (finding $300 hourly rate reasonable given relevant experience); *Figueroa v. KK Sub II, LLC*, 2019 WL 1109864, *10 (W.D.N.Y. 2019) (setting hourly rates for experienced attorneys in the district between $250 and $300); *Taylor v. Delta-Sonic Car Wash Sys., Inc.*, 2017 WL 436045, *7 (W.D.N.Y. 2017) ("An hourly rate of $250 for legal services ... [is] fair and reasonable given ... the hourly rate employed by comparable attorneys here in the Western District"); *Costa v. Sears Home Improvement Prods., Inc.*, 212 F. Supp. 3d 412, 420 (W.D.N.Y. 2016) ("[t]he hourly rates generally allowed in this District ... are in the range of $225-$250 for partner time or senior associate time, $150-$175 for junior associate time, and $75 for paralegal time").  Notably, defense counsel was compensated at an hourly rate of $289 in this action, well within this range. See Decl. at ¶ 28.

Mr. Felle's purported expertise does not support a different outcome.  He is, according to his own firm website, primarily experienced in "Personal Injury, Auto Accident and

17

Child Injury Law."[6]  CM/ECF and NYSCEF searches make it clear that this has near-exclusively been a state-court practice, involving limited trial experience.  Prior to this action, he had only one case in the Western District of New York, which was dismissed on summary judgment after this action was commenced.  *Tubbins v. Hackbush*, No. 14-CV-00403F, 2016 WL 5420734, at *4 (W.D.N.Y. Sept. 29, 2016).  In fact, to excuse various procedural errors, Mr. Felle has specifically represented to this Court that he lacks federal court experience.  *Stambach*, 2022 WL 1746771, at *6 ("Mr. Felle, who filed this action on Plaintiff's behalf, has represented that Mr. Pierce was retained due to Mr. Felle's lack of federal court experience.").  He cannot now make claims to the contrary.

Using these rates as a baseline, the Court should reduce Mr. Felle's hourly rate to $275, and the rates of his associates and paralegal from $335, $325, and $125 to $205, $185, and $100, respectively.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court defer any decision on Plaintiff's application.  Alternatively, the Court should strike all of Plaintiff's non-case-related entries, apply an across-the-board reduction of 65% to the remaining hours, and then calculate a "reasonable rate" using a more regionally-appropriate hourly rate, as well as any other relief the Court deems appropriate.

---

[6]     https://waynefellelaw.com/, last accessed June 8, 2022.

A-3012

Dated:      Buffalo, New York
            June 10, 2022

                    **HODGSON RUSS** LLP
                    *Attorneys for Defendant Mark Stambach*

                  By: <u>//s Peter A. Sahasrabudhe</u>
                      Hugh M. Russ, III
                      Peter A. Sahasrabudhe
                  The Guaranty Building
                  140 Pearl Street – Suite 100
                  Buffalo, New York  14202
                  Telephone:  (716) 856-4000

19

A-3013

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                              Plaintiff,                         1:16-cv-00321-EAW-MJR

        v.

MARK STAMBACH

                              Defendant.

## DECLARATION IN OPPOSITION TO
## DEFENDANT'S POST TRIAL MOTION

        WAYNE C. FELLE, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares

the following to be true and correct;

        1.      I am an attorney with the Law Offices of Wayne C. Felle, P.C., attorney for

plaintiff, Josue Ortiz. I submit the following in response to Defendants Declaration in Support of

Post-Trial Motions, including for Summary Judgment, a new trial and/ or remitter of the jury's

verdict. (Dkt. No. 177-1)

        2.      Defendant's Declaration merely paraphrases the trial testimony, in a self-serving

and incomplete manner, to suggest merit to the relief requested. This Court is well aware of the

totality of the testimony and evidence and should not be persuaded by the defendant's

incomplete version of the testimony. Significantly, counsel does not argue any error of law or

improper decision of the Court as a basis to request the jury's verdict be set aside, or that a new trial is warranted.

3.    Defense counsel does not reference the Stipulation entered into by the parties until ¶ 66 of his Declaration. For reasons set forth herein and in Plaintiff's Memorandum of Law, the Stipulation, agreed to by the Defendant, narrowed the issues in this case and reduced the jury's function to deciding specific elements of the claims, which essentially hinged on whether the confession prepared by Defendant Stambach contained statements or admissions which were known and made by Plaintiff, or was in fact manufactured to secure a wrongful conviction. (Dkt. No. 148), see also attached Memorandum of Law.

4.    This Court considered, extensively, the issues in the case and through the Decision and Order granted February 26, 2022, (Dkt. No. 82) determined that certain issues were properly to be determined by a jury. Defendant did not file a Notice of Appeal to that decision. After hearing the evidence, the jury has decided those issues, based on proper legal principals and supporting evidence.

5. The Court's Decision and Order narrowed the claims to be decided by the jury to: malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination against defendant Stambach. These claims necessarily required that the jury determine whether the elements of those claims is supported by evidence. The elements are: (Dkt. No. 176)

    Malicious Prosecution:

        a)  Defendant initiated prosecution against Plaintiff

        b)  Prosecution pursued without probable cause to believe would succeed.

    c)  Prosecution began with malice

    d)  Matter terminated in favor of Plaintiff.


Fabrication of Evidence:

    a)  Defendant was an investigating officer

    b)  Defendant fabricates information

    c)  Information was likely to influence jury

    d)  Defendant forwarded information to prosecutors

    e)  Plaintiff suffers deprivation of liberty as a result.


Violation of the Right Against Self-Incrimination:

    a)  Coercion applied to obtain waiver/ inculpatory statement

    b)  Statement used against Plaintiff in criminal proceeding.


6.       As to the malicious prosecution claim, insofar as the defendant entered into a

Stipulation which agreed that defendant was the police officer that obtained the purported

"confession", which was the basis of the case against plaintiff, element one is satisfied, and there

was no trial dispute. . (Dkt. No. 148, ¶ 3) The defendant also conceded and stipulated that Mr.

Ortiz was fully exonerated of the crimes for which Defendant charged him, and which resulted in

his imprisonment. (Dkt. No. 148, ¶ 14) So, again there was no trial dispute about this issue.

7.       Therefore, the elements remaining for jury decision were whether the prosecution

began with malice and then was pursued without probable cause to believe the prosecution

would succeed. The jury considered the facts surrounding the interrogation of Plaintiff, and the

resulting purported "confession", in deciding intent and state of mind of the Defendant when he

interrogated, prepared a "confession", and arrested/ prosecuted the Plaintiff.  See Memorandum

of Law attached hereto.

8.     As a matter of law, any presumption of probable cause was overcome, as

evidence exists that the "confession" prepared by Stambach contained a false version of events,

detailing information which would only be known by someone who committed the murders.

(Dkt. No. 165, at pgs. 82-84, 88, 90). As Defendant conceded in the Stipulation "Ortiz was not

involved in the murders" (Dkt No.148 ¶ 9). Therefore, the jury was proper in deciding that

Defendant manufactured a "confession" upon which the entire prosecution was based. (Dkt No.

148 ¶3). Defendant admitted that no other evidence existed which linked Plaintiff to the crime.

(Dkt. No. 165, at pgs. 58, 59, 89). Such proof is sufficient to overcome any presumption claimed

by Defendant as to element two of a malicious prosecution claim, and to refute the argument of

defendant that no evidence was presented as to element three.

9.     As to the Fabrication of evidence claim there is no dispute and it was stipulated

that defendant was the investigating officer and that the purported confession he prepared was

provided to prosecutors for use in the case against plaintiff, and which threatened a trial to prove

plaintiff's guilt. (Dkt. No. 148, ¶ 4) And finally, Defendant agreed and stipulated that plaintiff

served ten years and twenty-two days in jail for those crimes. (Dkt. No. 148, ¶ 8) Therefore,

elements one, three, four and five were agreed and stipulated to by the parties, without objection.

10.    The only remaining element of the claim of fabrication of evidence was whether

the defendant in fact fabricated information. Since defendant agreed and stipulated that plaintiff

was in fact innocent of the crimes charged and the 440 motion of plaintiff was granted on

grounds of "actual innocence" (Dkt. No. 148, ¶ 14), and that "Ortiz was not involved in the murders" (Dkt No.148 ¶ 9), the plaintiff could not and did not know the facts contained in the confession. The jury properly determined that the defendant was the only person in the room that knew those facts (Defendant admitted to reviewing the investigation and crime scene file during his interview with Ortiz, Dkt. No. 165, pgs. 28, 30) and therefore the confession contained information which Defendant included in the purported "confession" and attributed to the plaintiff. The Defendant himself admitted that the "confession" was the only evidence linking Ortiz to the crime, and that he made no efforts to corroborate his guilt. (Dkt. No 165, pg. 57-59, 89). When asked at trial what other evidence linked Ortiz to the crime Defendant testified "none whatsoever." (Dkt. No. 165, pg. 58, 59, 89). The jury was within its province to conclude that the defendant fabricated the evidence, ie. the "confession". See Memorandum of Law attached hereto.

11.     As to the violation of plaintiff's 5th amendment right against self-incrimination the second element of that claim is not at issue. Defendant agreed and stipulated that the purported "confession" of plaintiff was used against him in the prosecution's case. (Dkt. No. 148, ¶ 4). That left only the issue of whether coercion was applied to obtain the waiver or the "confession".

12.     During the trial, the investigation file of the Buffalo Police Department, and P-73 reports contained therein, established that Buffalo Police had multiple dealings with Plaintiff just prior to his meeting with Defendant. See "Exhibit A" attached to Defendant's moving papers. Those same reports also established that all interviewing police officers and/or detectives concluded that Plaintiff was suffering from mental illness and was unreliable and uninvolved in the subject crime. The testimony of former detective Lonergan, Vaughn and former police officer Torres all confirmed that Ortiz was neither a suspect nor a person with credible

information about the crimes. (Dkt. Nos. 173, pgs. 172-176; pg. 127; and 176, pg. 29,

respectively) This evidence was properly considered by the jury when determining whether the

Defendant acted with ill intent to take advantage of the Plaintiff given his serious medical and

psychiatric impairment. The jury was proper to conclude that if these seven officers so readily

recognized plaintiff's mental illness and innocence, so did defendant, and instead of getting Mr.

Ortiz treatment for his mental condition defendant decided to take advantage of Plaintiff through

manipulative and inherently coercive tactics.

13.    The jury's decision was supported by evidence, specifically the testimony of

Defendant himself that he did not speak Spanish (Dkt. No. 165, pgs. 9, 19), Ortiz did not speak

English (Dkt. No. 176, pg. 26; Dkt. No. 165, pg. 37) and that he interviewed Ortiz for 30-40

minutes, without an interpreter, wherein he confessed to involvement in the crime(s). (Dkt. No.

165, pgs. 40, 52, 54).  Stambach admitted that he did not read Ortiz his Miranda warnings until

after his admissions, when he called for a Spanish translator. (Dkt. No. 165, pgs. 37, 54).

Defendant admitted that Plaintiff was brought to the Major Crimes Unit that day "to confess

about the murders" (Dkt. No. 165, pg. 36), and yet did not provide him with Miranda warnings

until 8:30pm, after Defendant questioned Plaintiff from 7:25 to 8:05 alone, and after he

"confessed". (Dkt. No. 37, 41, 42, 54).  What happened in that room for 30-40 minutes led to a

false confession and the jury was proper to evaluate the testimony of the Defendant along with

the admission of defense counsel that Ortiz was not involved in the crime to conclude that

defendant must have acted improperly. (Dkt. No. 148; Dkt. No. 165, pgs. 18, 39).

14.     Coercion is measured by the totality of the circumstances including the vulnerabilities of the Plaintiff. Here, Plaintiff was in the throughs of a serious psychotic break from reality on the date when the purported "confession" was taken. (Dkt. No. 157). Officer Torres testified that when he, and other officers, left Ortiz at Buffalo General Hospital late on November 15, 2004, he was "in need of further treatment" (Dkt No. 176, pg. 31). He repeated to officers that people were trying to kill him and that he was in fear for his life. (Dkt. No. 176, pg. 27; Dkt. No. 165, pgs. 11, 20, 53). Dr. Coggins, who provided active treatment to Mr. Ortiz upon his arrest, testified that he was in the midst of a psychotic break from reality at the time he was interviewed by Defendant. (Dkt. No. 157, pgs. 28, 76). The jury was proper to consider that Defendant knew, or should have known, that Plaintiff was susceptible and particularly vulnerable to agreeing to false information and incriminating statements. Therefore, the jury's finding of coercion is supported where the Defendant, who knowing Plaintiff lacked capacity, had him sign a false statement, that he never corroborated or reevaluated.

15.     It was proper for the jury to conclude based upon the testimony of Buffalo Police Officers, the P-73 reports which documented Plaintiff's interviews before his meeting with Defendant, and the testimony of Dr. Coggins (Dkt. No. 157, pgs. 28, 76) that Defendant interrogated plaintiff while he was psychotic and suffering from severe mental illness. The totality of the circumstances was properly considered by the jury

16.     This Court properly charged the jury on the elements of the claims, and the admissions of parties which narrowed those elements requiring jury determination, without any objection from defense counsel. (Dkt. No. 176). In fact, the Charge was given after discussion with all parties, and consent and agreement from both sides.

17.     As set forth in Plaintiff's Memorandum of Law filed herewith the elements of "malice" and "coercion" are satisfied where the evidence demonstrates that the Defendant knowingly falsified evidence and manipulates the suspect into signing a statement containing facts the suspect does not freely or knowingly provide and uses that evidence to prosecute that person. Here, Defendant admitted while on the stand that the "confession" was the only evidence linking Plaintiff to the crime and that he did nothing to corroborate the information contained on the alleged "confession". (Dkt. Nos. 165, pgs. 57, 65) In fact, Defendant testified that when he heard that Mr. Ortiz was determined to be innocent of the crimes he had been imprisoned for, he did nothing to re-examine the file to find out how that could have happened. (Dkt. No 165, pg. 65). Taken together this evidence can lead a reasonable jury to conclude that Defendant acted intentionally and knew what he had done therefore there was no reason to re-examine the file.

18.     The trial evidence, taken together with the Stipulation, provides ample legal basis for the jury's determination on liability and award of damages, and therefore this Court should deny Defendant's motion for judgment as a matter of law, and to set aside the jury's verdict.

19.     The Plaintiff spent ten years and twenty-two days wrongfully incarcerated. (Dkt. No. 148, ¶ 8). He testified about his experience while in prison, the daily threats of violence, the strip searches, the isolation, the assaults at the hands of inmates and guards, and his attempt to take his own life. (Dkt. No. 175, pgs. 226-233). He also cried when recalling how his grandmother passed away while he was in prison, thinking he was a heart less murderer. (Dkt. No. 175, pgs. 240-242).

20.     In *Peacock v. City of Rochester*, No. 6:13-CV-6046-MAT (August 5, 2016) Judge Michael A. Telesca, of the Western District Court, awarded a Plaintiff who had been wrongfully

incarcerated from 07/23/1976 to 05/13/1982, almost 6 years, 5 million dollars in compensatory

damages. In his decision he opined that Courts must properly consider the three prongs

established in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) and recognize the

appropriateness of "damages attributable to loss of liberty include damages for the loss of the

fundamental right to be free, lost opportunities to engage in everyday activities while confined,

personal humiliation, impairment of reputation, and for the mental anguish that accompanies the

loss of liberty… the mental anguish suffered by an inmate while he is in prison encompasses his

discomfort, fear, lack of privacy and degradation. … mental distress of one unjustly imprisoned

is obviously different and greater than one justly in jail . . ." Here, the jury considered these

principles and rendered a verdict completely consistent with the Court's rationale. See Plaintiff's

Memorandum of law attached hereto.

21.     The amount awarded to the Plaintiff by this jury is fair and reasonable given the

anguish, suffering and torment that an innocent man, left to rot in prison, during the prime of his

life, would experience. As this Court instructed the jury, it was their province to award a sum of

money to Plaintiff that would fairly and justly compensate him for his pain and suffering, they

did exactly as they were instructed. (Dkt. No. 176). The award should not be vacated or reduced.

See Memorandum of Law attached hereto.

22.     The jury determined that the Defendant falsified evidence, obtained after violation

of the Plaintiff's 5th amendment rights and then used that evidence to prosecute and jail an

innocent man. (Dkt. No. 160). That Defendant knew Plaintiff was innocent when he framed him

for a crime he did not commit. As such, there is no greater miscarriage of justice, and no greater

threat to our continued trust and confidence in our system of justice. The jury was correct to

punish such conduct, and to award a sum for punitive damages to deter others from acting in the

same manner. The amount was reasonable and calculated, this was not an irrational award given

the amount awarded for compensatory damages and the extremely offensive conduct of

Defendant. See Memorandum of Law attached hereto.

23.     For the forgoing reasons, and legal support asserted in Plaintiff's Memorandum of

Law, attached herewith, Plaintiff respectfully requests that this Court deny Defendant's Post-

Trial Motions in their entirety, and allow this jury's verdict to stand.

Dated:        Williamsville, New York
              June 28, 2022                    **Law Offices of Wayne C. Felle, P.C.**
                                               ***Attorney for Plaintiff, Josue Ortiz***


                                               By:     *s// Wayne C. Felle*
                                                       Wayne C. Felle
                                               5839 Main Street
                                               Williamsville, New York 14221
                                               Telephone: (716) 505-2700

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

                              Plaintiff,                    1:16-cv-00321-EAW-MJR

          v.

MARK STAMBACH

                              Defendant.
_____

**PLAINTIFF'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANTS POST TRIAL MOTIONS</u>**

**LAW OFFICE OF WAYNE C. FELLE, P.C.**
***Attorney for Plaintiff Josue Ortiz***
Wayne C. Felle, Esq., of counsel
5839 Main Street
Williamsville, New York 14221
Telephone: (716) 505-2700

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ……………………………………….............1

STATEMENT OF FACTS ……………….………………….…….….……........2

ARGUMENT ………………………………………………………….........4

I.    THERE IS NO MERIT TO DEFENDANTS MOTION TO VACATE
      THE JUDGEMENT PURSUANT TO SECTION 50(b) ……….…..….……....…......4

      A.    Standard of Review……………………………………………….......4

      B.    Defendant's Judicial Admissions are Legally Conclusive and Binding.…......7

      C.    The Evidence Supports the Jury's Verdict as to Malicious Prosecution…….10

      D.    The Jury Properly Returned a Verdict Finding Defendant Fabricated
            Evidence Against the Plaintiff.……………………………………….......13

      E.    Proof that Defendant Violated Plaintiff's Fifth Amendment Right
            Against Self-Incrimination was Substantial and Legally Sufficient…….…..16

II.   THE DEFENDANT'S MOTION TO GRANT A NEW TRIAL PURSUANT
      TO RULE 59(A) FAILS TO MEET THE STANDARD REQUIRED FOR SUCH
      DRASTIC RELIEF.…………………………………….......….…..……….........23

      A.    Standard of Review……………………………………………….23

      B.    The Jury's Decision is Supported and Should Not be Vacated………..…..25

III.  THE JURY AWARD TO COMPENSATE THE PLAINTIFF FOR HIS
      WRONGFUL INCARCERATION OF TEN YEARS AND TWENTY-TWO
      DAYS, FROM THE AGES OF TWENTY-THREE TO THIRTY-THREE WAS
      FAIR AND CERTAINLY NOT UNCONSCIONABLE……………….…………........26

      A.    Standard of Review…………………………….……………….….…..26

      B.    The Defendant Waived any Objection to the Jury Verdict Amount………..…27

      C.    The Verdict is Fair Given that Plaintiff Served Ten years and Twenty-Two
            Days Incarcerated for Crimes He Did Not Commit……………….……….29

IV.   THE JURY WAS WARRANTED IN GRANTING PUNITIVE DAMAGES………..37

CONCLUSION……………………………………………….…………....41

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

Abdell v. City of New York, No. 05 Civ. 8453 (RJS), 2014 WL 3858319,
(S.D.N.Y. Aug. 5, 2014)..............................................................................34

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)...........................................6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)......................................5

Anderson v. Osborne, No. 17-CV-539, 2020 WL 6151249, (S.D.N.Y. Oct. 20, 2020).......38

Arnold v. Geary, 981 F. Supp 266 (S.D.N.Y 2013)...............................................20

Atkins v. New York City, 143, F.3d 100, 102 (2d Cir. 1998)....................................24

Baba-Ali v. State of New York, 24 Misc. 3d 576 (N.Y. Misc. 2009)...................29, 30, 31

Banks v. Yokemick, 214 F. Supp 2d 401, 405 (S.D.N.Y 2002)....................................8

Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528 (2d Cir. 1985)..............9

BMW of North American Inc. v. Gore, 517 U.S. 559, 575 (1996) ..............................37

Bracey v. Board of Education of City of Bridgeport, 368, F.3d 108, 117 (2d Cir. 2004).......7

Bseirani v. Mahshie, 881 F. Supp 778, 784 (N.D.N.Y. 1995)...............................27, 28

Campbell v. State of New York, 186 Misc. 586, 590-591, 62 N.Y.S.2d 638)...................33

Carter v. State, 528 N.Y.S.2d 292, 297 (Ct. Cl. 1988),
aff'd, 546 N.Y.S.2d 648 (2d Dept. 1989) ...............................................29, 31

Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011).....................................5, 6

Cruz v. Local Union No. 3 of the Int'l Brotherhood of Electrical Workers,
34 F.3d 1148, 1154 (2nd Cir. 1994)................................................................6

Colorado v. Connelly, 479 U.S. 157, 167 (1986)...............................................16

Deshawn E. by Charlotte v. Safir, 156, F.3d 340, 346 (2d Cir. 1998)..........................20

DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir.2003)..........................................29, 38

Dominion Freight Line Inc., 397, F.3d 77, 83 (2d Cir. 2004)....................................6

## TABLE OF AUTHORITIES- cont'd

Page(s)

Energy Transp. Grp., Inc. v. William Demant Holding A/S, 697 F.3d 1342,
1357 (Fed. Cir. 2012)…………………………………………...…………….…...…..29

Francis v. City of New York, No. 15 Civ. 7997 (VSB) (S.D.N.Y. Nov. 12, 2019)…………... 34

Fincher v. County of Westchester, 979 F. Supp. 989, 1000…………………………………..12

Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276,
289 (2d Cir. 1998)…………………………………………………………………………...5, 6

Gardner v. Federated Dep't Stores, Inc., 907 F2d 1348 (2d Cir. 1990)…………..……………..33

Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974)……………………………………..26, 30

Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003)………………………………..6

Green v. Scully, 850, F.2d 894, 901 (2d Cir. 1988)……………………………………....19, 22

Goossens v. Dept. of Environmental Conservation, 08-CV-00446F (W.D.N.Y. 2011)…….…..22

Gonzalez v. State, 26 Misc.3d 1212(A), 2009 Slip Op. 52714, 2009 WL 5457856……………33

Gristwood v. State, 990 NYS2d 386, 119 AD3d. 1414 (4th Dept. 2014)…………..………...32

Hart v City of New York, 186 A.D.2d 398, 588 N.Y.S 2d 1012 (1st Dept. 1992)……………...11

Haywood v. Bureau of Immigration, 372 Fed. Appx. 122, 124 (2d Cir. 2010)………………….9

Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir.2007)……………………………………...20

Hoodho v. Holder, 558 F. 3d 184, 191 (2nd Cir. 2009)………………………………….…..8

Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990)……………………………………..…..36

Jackson v. Tellado, No. 11-CV-3028, 2018 WL 4043150, (E.D.N.Y. Aug. 24, 2018)……...…..35

Jarvis v. Ford Motor Co., 283 F.3d 33, 56-57 (2d Cir.2002)……………………………….28

Jennings v. Yurkiw, 18 F.4th 383 (2d Cir. 2021)…………………………………………39

Jocks v. Tavernier, 316 F.3d 128, 138 (2d Cir. 2003)……………..……………........20, 23, 24

**TABLE OF AUTHORITIES- cont'd**

Page(s)

Kerman v. City of N.Y., 374 F.3d 93, 124 (2d Cir. 2004)......................................26, 35

Kirsch v. Fleet St. Ltd., 148 F.3d 149, 165 (2d Cir. 1998)....................................27, 36

Klein v. City of New York, No. 48884/81 (1st Dept. 1982)..........................................35

Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 83 (2d Cir. 2006)...............................28

Kregler v. City of New York, 821 F. Supp. 2d 651, 656 (S.D.N.Y 2011)......................8, 9

Ladenburg Thalmann & Co., Inc. v. Modern Continental Const. Holding Co., Inc.
408 Fed. Appx. 401, 403-04 (2d Cir. 2010)...............................................................5

Lavoie v. Pac. Press &Shear Co., 975 F.2d 48, 55 (2d Cir. 1992).................................28

Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996)....................................................38

Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)...........................24

Lovitch v. Lovitch, No. 11 Civ. 2536 (ER) (S.D.N.Y. Mar. 10, 2015)...........................34

Malte v. New York, 125 A,D, 2d. 958, 510 N.Y.S. 2d. 353 (4th Dept. 1986).....................35

Martinez v. Gayson, No. 95-CV-3788 (ILG), 1998 WL 564385,
(E.D.N.Y. June 30, 1998)....................................................................................34

Martinez v. Port Auth. of N.Y. and N.J., No. 01 Civ. 721 (PKC), 2005 WL 2143333,
(S.D.N.Y. Sept. 2, 2005)...................................................................................34

Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)....................................................30

Maxwell v. City of New York, 156 A.D.2d 28, 33, 554, N.Y.S.2d (1st Dept. 1990).............11

Medina v. The City of New York, Civ Action 20 Civ. 797 (VEC)(SLC)
(S.D.N.Y. January 12, 2022.................................................................................34

McLaughlin v. State of New York, NYLJ October 27, 1989...........................................29

Memphis Comm. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06 (1986)....................26, 36

Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992)....................................23

Moran v. Burbine, 475 U.S. 412, 421 (1986)...........................................................19

**TABLE OF AUTHORITIES- cont'd**

Page(s)

Munoz v. City of New York, 18 N.Y.2d 6, 9. 271 N.Y.S 2d 645, 218 N.E. 2d 527 (1966)……..12

Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997)…………………………………….....19

Noonan v. Midland Capital Corp., 453 F.2d 459, 461 (2d Cir. 1972)…………………….......7

Orndorff v. De Nooyer Chevrolet, Inc., 117 A.D.2d 365, 503 N.Y.S.2d. 444
(3d Dept. 1986)…………………………………………………………………………….35

Palmquist v. City of Albany, 112 A.D.2d. 624, 492 N.Y.S.2d. 487 (3d Dept. 1985)…………..35

Peacock v. City of Rochester, No. 6:13-CV-6046-MAT (August 5, 2016)………………......3, 30

Peterson v. County of Nassau, 995 F. Supp 305, 318 (E.D.N.Y. 1998)…………………..……....24

Piesco v. Koch, 12 F.3d 332, 343 (2nd Cir. 1993)…………………………………………….6

Promega Corp. v. Life Tech. Corp., 875 F.3d 651, 666 (Fed. Cir. 2017)………………….....29, 37

Raedle v. Credit Agricole Indosuez, 670 F. 3d 411, 413 (2d Cir. 2012)……………………….24

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120
S. Ct 2097, 147 L.Ed.2d 105 (2000)………………………………………………………....5

Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)…………………………..20

Robinson v. Holder, No.07 Civ. 5992), 2008 WL 2875291, (S.D.N.Y. July 22, 2008)………...35

Sanabria v. State of N.Y., 29 Misc.3d 988, 994 (N.Y. Ct. Cl. 2010)…………………………..29

Sec. Ins. Co. of Hartford v Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)…..6

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)……………………..…………………..20

Sir Speedy, Inc. v. L P Graphics, Inc., 957 F.2d, 1033, 1039 (2d Cir. 1992)…………………..5

Song v. Ives Labs., Inc. 957 F2d 1041, 1047 (2d Cir. 1992)……………………………...…5, 23

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003)…………………….…38

Steven v. Rite Aid Corporation, 851 F.3d 224, 228 (2d Cir. 2017)………………………….6

Theodat v. City of N.Y., No. 16-CV-3977, 2019 WL 4385794 (E.D.N.Y Sept. 13, 2019)……..39

This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)……………………………….....6

## TABLE OF AUTHORITIES- cont'd

Page(s)

Thomas v. Kelly, 903 F.Supp.2d 237, 265 (S.D.N.Y 2012)......................................38, 39

Tolbert v. Queens College, 242 F.3d 58, 70 (2d. Cir. 2001)............................................7

United States v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987)..............................................19

United States v. Kaba, 999 F.2d 47, 51 (2d Cir. 1993)..................................................19

United States v. Landau, 155 F. 3d 93, 104 (2d Cir. 1998)...........................................24

United States v. Taylor, 745 F.3d 15, 24 (2d Cir 2014)................................................23

Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991).............................................5

Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).............6

Weaver v. Brenner, 40 F.3d 527, 535 (2d Cir. 1994).................................................20

Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,
930 F.2d 1021, 1027 (2d Cir. 1991)...................................................................36

Williams v. County. of Westchester, 171 F.3d 98, 101 (2d Cir. 1999)..........................5, 6

Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).........................................6

Woodard v. City of Albany, 81 A.D.2d. 947, 439 N.Y.S.2d. 701 (3d Dept. 1981)..............35

Zahrey v. Coffey, 221 F. 3d 342, 352 (2d Cir. 2000).................................................20

**Statues and Rules:**

42 U.S.C. §1983...................................................................................20, 26, 30

Fed. R. Civ. Proc. 50..................................................................................5, 6,

Fed. R. Civ. Proc. 50(a)..............................................................................4,6,7

Fed. R. Civ. Proc. 50(b)................................................................................7

Fed. R. Civ. Proc. 56(f)................................................................................6

Fed. R. Civ. Proc. 59(a)...............................................................................23

## PRELIMINARY STATEMENT

Defendant requests that this court disregard the verdict of the jury, when pointing to no errors of law, while also attempting to avoid the legal impact of the judicial admissions made by Defendant, which the jury was proper to consider. This case was about the credibility of the parties and whether the "confession" allegedly taken by Defendant was in fact made by Plaintiff. In the Stipulation entered into by the parties, Defendant admitted "that Ortiz was not involved in the murders" (Dkt No. 148, ¶13) but yet argued that Ortiz admitted to facts and details that only someone involved in the crime could have known. (Dkt. No. 165, pgs. 82-84, 88, 90); also, Dkt. No. 173, at pgs. 188-190). Defendant also admits that the arrest and prosecution of Ortiz "was based solely on the alleged confession" (Dkt No. 148, ¶3). Certainly, the jury was proper to consider the inconsistency in determining credibility, and liability, and was warranted in returning a verdict finding that Defendant fabricated evidence, violated the Plaintiff's 5th Amendment rights and then maliciously prosecuted the Plaintiff.

A liability finding as to any civil rights violation by the Defendant allowed the jury to consider damages. Defendant focuses mainly on the liability finding related to a 5th Amendment Rights violation which Defendant argues was lacking the request proof related to coercion. However, as set forth herein coercion includes manipulative techniques which preclude knowing and voluntary admissions of a defendant. Here, there was a clear language barrier and Plaintiff was suffering from significant psychiatric impairment, which produced an admittedly false confession, the jury was proper to consider these factors in finding that coercion existed. The other two claims are also well established in the record and the jury was properly supported in their verdict.

1

The damages awarded by the jury are proper given the conduct of Defendant and the significant pain and suffering experienced by the Plaintiff having been deprived of the best days of his life, and subjected to daily humiliation, threats, and mental anguish.

## STATEMENT OF FACTS

Plaintiff, Josue Ortiz, filed this action alleging that, on the night of November 16, 2004, Defendant, Mark Stambach, a retired detective of the BPD, recognized his compromised mental state and manipulated him into signing an admittedly false confession. Defendant now admits that Ortiz was not involved in the crimes he was charged, having been found "completely innocent". (See Stipulation of Defendant, Dkt. No. 148). This case represents classic questions of credibility given that the "confession" advanced by Defendant contained facts which could only be known by the perpetrator of the crimes (See Stambach testimony, Dkt. No. 165, at pgs. 82-84, 88, 90; also, Lonergan testimony, Dkt. No. 173, at pgs. 188-190), or someone with access to the criminal investigation file. Defendant admits "that Ortiz was not involved in the murders" (Dkt. No. 148, ¶13) thus he could not have known the details contained in the "confession". Defendant also admits that "Stambach initiated the prosecution of Ortiz … based solely on the alleged confession" (Dkt. No. 148, ¶3). To be sure Defendant admitted to the jury that there was no other evidence to corroborate the involvement of Ortiz in the crime(s) "none whatsoever" (Dkt. No. 165, at pgs. 58, 59, 89).  For reasons set forth herein, the jury's decision as to liability and damages is properly based on the evidence presented during trial, including the admissions of Defendant contained in the Stipulation, and should stand.

2

A-3032

The jury was tasked with deciding three separate and distinct claims of Constitution violations against the Defendant: (1) Whether Defendant maliciously prosecuted the Plaintiff; (2) Whether Defendant fabricated evidence against the Plaintiff; and/or (3) whether Defendant violated Plaintiff's Fifth Amendment right against self-incrimination. (Dkt. No. 160). In finding liability on the part of Defendant for any one violation the jury was warranted in turning to the issue of damages. On May 9, 2022, after a five-day trial, the jury rendered a unanimous verdict for Mr. Ortiz on each and every one of the constitutional violations he asserted and awarded him $5 Million in compensatory damages and $1.5 Million in punitive damages.

The Defendant now moves to set aside the jury's verdict, both as to liability and damages, which is repugnant to the foundational principals of our system of justice. The jury was warranted in finding Defendant prepared a false confession, which contained facts unknown to the Defendant, and then manipulated the Plaintiff who was clearly and obviously suffering from severe mental illness which was recognized by at least six of Defendants colleagues within twenty-four hours of the alleged "confession".  Defendant denies knowing about those interactions, Plaintiff's mental illness, or having any prior knowledge about the murder investigation – all questions of fact that the jury properly considered.

Having been wrongfully incarcerated for ten years and twenty-two days, through the ages of twenty-three to age thirty-three, the jury's award as to compensatory damages is proper, if not low. This very Court has judicially determined that a falsely imprisoned Plaintiff, having served six years in prison, was entitled to five million dollars (See *Peacock v. City of Rochester*, No. 6:13-CV-6046-MAT (August 5, 2016), decided by Judge Michael A. Telesca. Here, Plaintiff testified to life in prison, having been subjected to strip searches, assaults by inmates and guards,

3

and even attempting suicide. (Dkt. No. 175, pgs. 226-231). The evidence was compelling that

life in prison, for an innocent and hopelessly committed man, was mental and physical torture.

Common sense and rational thought would suggest that the jury was proper in awarding the

compensatory damages they did.

This jury was also proper to award punitive damages. Having decided that the proof

demonstrated that Defendant manufactured a "confession" and then used it to prosecute and

incarcerate an innocent man is without question one of the greatest abuses of power and

individual constitutional rights that an officer can commit. In finding police misconduct the jury

was proper to award punitive damages in an effort to deter such conduct in the future. And the

award is commensurate with common sense and deliberate thought, it is not an excessive amount

under the circumstances.

## ARGUMENT

### POINT 1.  THERE IS NO MERIT TO DEFENDANT'S MOTION TO VACATE THE JUDGMENT PURSUANT TO SECTION 50(b)

### A.  Standard of Review

The Second Circuit has held consistently "a court should grant a motion for judgment as

a matter of law after the jury has returned a verdict only when there is such a complete absence

of evidence supporting the verdict that the jury's findings could only have been the result of

sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the

4

movant that reasonable and fair-minded men could not arrive at a verdict against it." *Ladenburg Thalmann & Co., Inc. v. Modern Continental Const. Holding Co., Inc.* 408 Fed. Appx. 401, 403-04 (2d Cir. 2010), quoting from *Song v. Ives Labs, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992).

In reviewing a renewed motion for judgment as a matter of law, "the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. County. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999). "Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri-Ambrosini v. National Realty Development Corp.*, 136 F.3d 276, 289 (2d Cir. 1998); see also *Sir Speedy, Inc. v. L P Graphics, Inc.*, 957 F.2d, 1033, 1039 (2d Cir. 1992); *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir. 1991), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 50 generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). In making this determination, the court should review the record as a whole but "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, 120 S. Ct 2097, 147 L.Ed.2d 105 (2000). Where, as here, "the jury has

5

deliberated in the case and actually returned its verdict in favor of the non-movant," the moving party's burden is especially heavy. *Cash*, 654 F.3d at 333; see also *Williams v. County of Westchester*, 171 F.3d. 98, 101 (2nd Cir. 1999), *Cruz v. Local Union No. 3 of the Int'l Brotherhood of Electrical Workers*, 34 F.3d 1148, 1154 (2nd Cir. 1994).

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in light most favorable to the opposing party, is insufficient to permit a reasonable juror to find his favor." *Steven v. Rite Aid Corporation*, 851 F.3d 224, 228 (2d Cir. 2017), *Galdieri-Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 289 (2d Cir. 1998), and *Piesco v. Koch*, 12 F.3d 332, 343 (2nd Cir. 1993). "It is the movant's burden to show that no genuine factual dispute exists" *Vermont Teddy Bear Co. v. 1-800 Beargram* Co., 373 F.3d 241, 244 (2d Cir. 2004), *Wilson v. Nw. Mut. Ins. Co.,*625 F.3d 54, 60 (2d Cir. 2010), and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A rule 50(b) motion may be granted "only if the court, viewing the evidence in light most favorable to the non-movant, concludes that a reasonable juror would have been compelled to accept the view of the moving party." *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir. 2011). "If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sec. Ins. Co. of Hartford v Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

A rule 50(b) motion for judgment as a matter of law is decided according to the same standard as a motion for summary judgment under Rule 56(f). *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir. 1998). Evidence must be such that a reasonable juror would have been

compelled to accept the asserted position. In ruling on a motion for judgment as a matter of law, "the motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him" *Noonan v. Midland Capital Corp., 453 F.2d 459, 461 (2d Cir. 1972) cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.E.2d 333 (1972).

A Rule 50(a) motion made before submission of the case to the jury is a necessary predicate to a post-trial motion pursuant to Rule 50(b), *Bracey v. Board of Education of City of Bridgeport,* 368, F.3d 108, 117 (2d Cir. 2004), which essentially is a renewal of a Rule 50(a) motion after an unfavorable verdict on the grounds specifically raised in the Rule 50(a) motion, *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d. Cir. 2001), and, as such, is limited to those grounds that were specifically raised in the prior Rule 50(a) motion"

In the instant case, Defendant's 50(a) Motion for Summary Judgment raised specific issues which now limit the relief requested in the present 50(b) motion. (See Dkt. No. 69) That Motion was decided by this Court on February 26, 2021. (See Dkt. No. 82). No Appeal was taken from that Decision and Order.

## B.    Defendant's Judicial Admissions are Legally Conclusive and Binding

In this case the parties entered into a formal Stipulation, entered into the record on May 2, 2022. (Dkt. No. 148). The Stipulation admitted, among other things: (emphasis added)

- On November 17, 2004, Stambach initiated the prosecution of Ortiz by filing a Felony Complaint, based solely on the alleged confession.

7

- As a result of an investigation conducted by the Federal Bureau of Investigation and the United States Attorney's Office for the Western District of New York, and as a result of a re-investigation jointly conducted by the Buffalo Police Department and the New York State Police, law enforcement agencies **it was determined that Josue Ortiz was not involved in the murders of Nelson and Miguel Camacho.**

- The United States Attorney's Office for the Western District of New York, based upon facts learned from the investigation conducted by the Federal Bureau of Investigation, charged three other individuals with the murders of Nelson and Miguel Camacho.

- These three other individuals were convicted based on their admitted and corroborated involvement in the murders of Nelson and Miguel Camacho.

- After considering evidence, and after the Erie County District Attorney's Office **agreed that Ortiz was not involved in the murders, the indictment against Josue Ortiz was dismissed** by the Honorable Judge Thomas P. Franczyk.

- That, in ordering the dismissal of the indictment against Josue Ortiz, Judge Franczyk found that Mr. Ortiz had demonstrated that he was actually innocent of the murders of Nelson and Miguel Camacho.** Thus, the criminal proceedings brought against Ortiz, terminated in his favor.

Judicial admissions are formal concessions ... by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission is conclusive in the case. *Hoodho v. Holder*, 558 F. 3d 184, 191 (2nd Cir. 2009), quoting 2 McCormick on Evid. § 254 (6th ed. 2006).

Judicial admissions "obviate the need for debate, discussion, or discovery regarding particular factual issues because the parties make concessions or stipulations regarding those issues that remove them from dispute. *Banks v. Yokemick*, 214 F. Supp 2d 401, 405 (S.D.N.Y 2002). The significance of a judicial admission is precisely that it has the effect of withdrawing a fact from contention. *Kregler v. City of New York*, 821 F. Supp. 2d 651, 656 (S.D.N.Y 2011), aff'd, 604 Fed Appx 44 (2nd Cir. 2015).

8

When a party makes a judicial admission, that party "normally is bound by that admission throughout the course of the proceeding". *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

The Second Circuit has held that "absent egregious circumstances, a distinct and formal admission made before, during, or even after a proceeding by an attorney acting in his professional capacity binds his client as a judicial admission". *Kregler*, 821 F. Supp. 2d at 656; *Haywood v. Bureau of Immigration*, 372 Fed. Appx. 122, 124 (2d Cir. 2010).

Here Defendant admitted that Plaintiff was "actually innocent" and that he "was not involved in the murders". (Dkt. No. 148). It is therefore axiomatic that Plaintiff could not have provided the detailed and crime specific information contained in the "confession" as Defendant claims he did. This case might be as simple as that. The Defendant is bound to the admissions contained in the Stipulation and to now argue that no evidence supported that Defendant acted in bad faith or ill-will is disingenuous. Nor can the Defendant argue that Plaintiff presented no proof that the Defendant falsified the "confession". The Stipulation obviates the need for Plaintiff to present proof on the extensive federal, state and city investigation that proved conclusively that Plaintiff was not involved in the murders and was not at the scene which he would have had to have been to know the facts Defendant claims he told him. The stipulation in this case established that Ortiz had no involvement in the crimes he was charged. (Dkt No. 148). Stambach alleges Plaintiff provided details that only someone who committed the crime(s) would possess (Dkt No. 165, at pgs. 39, 40, 80), and that there was no other evidence to link

9

Plaintiff to the crime (Dkt. No. 165, pgs. 58, 59, 89). Det. Lonergan testified also that the "confession" contained details only someone at the crime scene would know, and that there was no other evidence to corroborate that Plaintiff was involved in the murders. (Dkt. No. 173, at pg. 189, 190)

As such, the Stipulation entered into by the Defendant is legally binding and conclusive on the issue of whether Plaintiff was at the scene of the crime or involved in any way whatsoever. (Dkt No. 148). The civil rights violation claims against Defendant are supported by the admissions contained in the Stipulation and the testimony provided to the jury during trial. The jury properly found that Defendant manufactured a confession and used that confession, exclusively, to arrest, prosecute and incarcerate an innocent man.

## C.    The Evidence Supports the Jury's Verdict as to Malicious Prosecution

As this Court properly charged the jury, without objection from Defendant, a finding of liability as to malicious prosecution requires proof of the following:

(1) The commencement or continuation of a criminal proceeding by the defendant against the plaintiff,

(2) The absence of probable cause for the criminal proceeding, and

(3) The termination of the proceeding in favor of the accused,

(4) Malice.

See Court Exhibit #3; Dkt. No. 176, at pgs. 19-21.

A-3040

This Charge was given after discussion with counsel during a "Charge Conference", and without objection. The Court then properly instructed the jury that elements one and three were not in dispute. (Dkt. No. 176). The charge was consistent with the Stipulation and was given only after the agreement of defense counsel. (Dkt. Nos. 148, 176). As a result, the jury was only required to consider elements two and four of the Malicious Prosecution claim.

As a matter of law, any presumption of probable cause was overcome, as evidence exists that the "confession" prepared by Stambach contained a false version of events, detailing information which would only be known by someone who committed the murders. (Dkt No. 165, at pgs. 82-84, 88, 90). He manufactured a "confession" upon which the entire prosecution was based. (Dkt No. 148 ¶3). Defendant admitted that no other evidence existed which linked Plaintiff to the crime. (Dkt. No. 165, at pgs. 58, 59, 89). Such proof is sufficient to overcome any presumption claimed by Defendant as to element two of a malicious prosecution claim.

In *Maxwell v. City of New York,* 156 A.D.2d 28, 33, 554, N.Y.S.2d (1st Dept. 1990) Court held that where a detective submitted two separate perjurious statements, which supported a fraudulent felony complaint causing the plaintiff to be detained and prosecuted, the court could not as a matter of law find that there was probable cause to prosecute, and no malice demonstrated. "When there is evidence, as there is in this case, that the defendant misrepresented or falsified evidence or otherwise acted in bad faith … the presumption of probable cause has been overcome, and it can no longer be held as a matter of law that defendant prosecuted plaintiff with probable cause and without malice." See *Maxwell*, at 34.

11

A-3041

See also, *Hart v City of New York*, 186 A.D.2d 398, 588 N.Y.S 2d 1012 (1st Dept. 1992), where the Court found sufficient evidence to support the jury's finding that the arresting officer had knowingly provided false testimony to the Grand Jury resulting in plaintiff's indictment and incarceration, which supported the jury's finding of civil liability for malicious prosecution.

And finally, in *Fincher v. County of Westchester,* 979 F. Supp. 989, 1000, the Court Found that summary judgment was inappropriate, holding probable cause may be overcome by evidence of bad faith such as fraud, perjury or falsification, misrepresentation, or withholding of evidence.  Likewise, in the instant case the jury could reasonably find that no probable cause existed for the arrest, and prosecution of plaintiff.

As the New York Court of Appeals has stated "in practice, 'malice' as here conjoined with 'prosecution' often comes to mean conscience falsity" *Munoz v. City of New York*, 18 N.Y.2d 6, 9. 271 N.Y.S 2d 645, 218 N.E. 2d 527 (1966). Here, there is evidence that Stambach manufactured a false confession and used that "confession" to initiate and continue a criminal prosecution, without any corroborating evidence. (Dkt. No. 148 ¶ 3)(Dkt. No. 165, at pgs. 58, 59, 89). The Defendant argues that no testimony contradicted the Defendant's version of events and that therefore there is no corroborating evidence of bad faith, but this argument side steps the impact of the Stipulation and the admissions made by Defendant. In addition, the testimony of the Defendant himself, is that he interviewed Plaintiff for 30-40 minutes, alone (Dkt. No. 165, pgs. 19, 53), when he did not speak Spanish (Dkt. No.  165, pgs. 9, 19) and Ortiz did not speak English (Dkt. No. 176, pg. 26), and that Ortiz confessed to involvement in the murders during that interview. (Dkt. No. 165, pg. 40, 52). Given the testimony the jury was required to determine who was telling the truth.

12

A-3042

Just as in the cases cited above, where the defendant acts in fraud or misrepresentation any presumption of probable cause is defeated. The issue of whether fraud or misrepresentation produced the "confession" was properly determined by the jury. Thus, a jury could reasonably find that Stambach acted with malice, and that element four was satisfied.

**D.      The Jury Properly Returned a Verdict Finding Defendant Fabricated Evidence Against the Plaintiff.**

As the Court properly, and without objection, charged the jury a finding of liability on the claim of fabrication of evidence requires:

1) The Defendant was an investigating officer,
2) Defendant fabricated evidence,
3) The fabricated evidence was likely to influence a jury's verdict,
4) The Defendant forwarded the fabricated evidence to the prosecutor, and
5) The Plaintiff suffered a deprivation of life, liberty or property as a result.

See Court Exh. #3 (Dkt. No. 176, at pgs. 21-23).

Here, the Court applied the Stipulation entered into by the defendant and instructed the jury, with consent of defense counsel, that elements one, four and five were not in dispute. (Dkt. Nos. 148, 176). As to element two the Court advised the jury that "fabrication means to make something up" and that "evidence is fabricated if it is false". Court Exh. #3 (Dkt. No. 176 at pg. 22). The Court went on to state as to element three that "False information is likely to influence a [criminal] jury's decision if the false information is material or important to the charges against the person". Court Exh. #3 (Dkt. No. 176 at pg. 23).

13

A-3043

In this case the judicial admission(s) of the defendant established that the Plaintiff was "actually innocent" of the crimes, and that "Ortiz was not involved in the murders". (Dkt. No. 148). Defendant argued that Plaintiff provided a detailed confession, which contained facts only someone who was at the crime scene (or who had access to the crime scene investigation file) would know. (Dkt. No. 165, at pgs. 82-84, 88, 90). This testimony was reiterated by detective Lonergan (Dkt. No. 173, pgs. 188-190). The jury properly considered the admission of Defendant, that "Ortiz was not involved in the murders" (Dkt. No. 148) and the testimony of Ortiz where he stated, unequivocally, that he was not involved in the murders, (Dkt. No. 173, at pgs. 94, 96, 97) to find that since Ortiz was not involved in the crime then he did not know the details which were part of the purported "confession". Therefore, the jury was proper to decide credibility of the respective arguments, and testimony, and find that Defendant must have fabricated the "confession" which he purported was given by Plaintiff. That is the only logical conclusion.

The Defendant himself admitted that the "confession" was the only evidence linking Ortiz to the crime, and that he made no efforts to corroborate his guilt. (Dkt. No 165, pg. 57-59, 89). When asked at trial what other evidence linked Ortiz to the crime Defendant testified "none whatsoever." (Dkt. No. 165, pg. 58, 59, 89).

It is also important to point out that Defendant was impeached before the jury on several important issues, including whether he reviewed witness statements or the investigation file prior to interviewing Plaintiff. (Dkt. No. 165, pgs. 31, 44-48, 50-52). Defendant admitted that he viewed the investigation file and scene photo's while engaged with Ortiz. (Dkt. No. 165, at pgs. 28, 30). This is critical because it demonstrated that Defendant could have known the facts that were paced in the "confession" from the investigation file.

14

The jury was also proper to consider that Defendant testified that he was unaware of the numerous Buffalo Police department contacts with Plaintiff the day prior. (Dkt. No. 165, pgs. 16, 17, 20-23, 33, 51). The testimony of former detectives Vaughn and Lauber established that they, along with numerous other officers, including, Lonergan, Lema, Torres and others, interviewed Ortiz and found he had no credible knowledge related to the murder investigation, and that he was never considered a suspect. (Dkt. No. 173 at pgs. 127, 172-176), see also, "Exhibit A" of Defendant's moving papers, Trial Exhibits, including the P-73 reports of detectives Vaughn and Lauber.

The testimony of Defendant, that he was unaware of Det. Lonergan and/or PO Torres interviewing Ortiz the night before, stretched the imagination when the evidence was considered together with the fact that both Lonergan and Torres were with Defendant on the night he claims Ortiz confessed. (Dkt. No. 165, pgs. 16, 17, 20, 23, 33, 51). The jury was proper to consider the credibility of the testimony and conclude that Defendant was told about the prior interactions, and falsely testified, or that he was in fact present at Buffalo General Hospital on the night of November 15, 2004, as PO Torres testified. (Dkt. No. 176, pgs. 22, 23, 44). Either way the position of Defendant lacked credibility, and the jury is empowered to decide questions pertaining to credibility.

What is absolutely certain through the testimony of the Defendant himself, is that he interviewed Plaintiff for 30-40 minutes, alone (Dkt. No. 165, pgs. 19, 53), when he did not speak Spanish (Dkt. No. 165, pgs 9. 19) and Ortiz did not speak English (Dkt. No. 176, pg. 26), and that Stambach claims Ortiz confessed to involvement in the murders during that interview. (Dkt. No. 165, pg. 40, 52). Given the totality of the circumstances that testimony, that position, is untenable, and the jury was proper to examine the truthfulness of Defendant's testimony and find it uncredible.

15

So, it is completely consistent with the evidence that the jury found defendant liable for fabricating evidence against the plaintiff.

**E.     Proof that Defendant Violated Plaintiff's Fifth Amendment Right Against Self-Incrimination was Substantial and Legally Sufficient.**

As in all claims of violation of a person's fifth amendment right against self-incrimination the plaintiff was required to prove through a preponderance of the evidence that defendant:

1) Applied coercion against him,
2) To obtain a waiver of his rights against self-incrimination and/or obtain an inculpatory statement, and
3) The statements thereby obtained were used against him in a criminal proceeding.

This Court properly charged the jury consistent with the law, and without objection by Defendant.  Court Exh. #3 (Dkt. No. 176, at pgs. 23, 24).  Here, the admission(s) entered into by counsel allowed the Court, without objection, to instruct the jury that element three was not in dispute. (Dkt. No. 148, 176). The jury was then instructed that the question of whether the "confession" was obtained by coercion was a question of fact for them to decide, which they did in the affirmative. (Dkt. No. 176 at pg. 23).

Miranda warnings are required when a suspect is subjected to custodial interrogation. *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003). Whether or not Miranda has been administered, to be admissible, a confession must be uncoerced and voluntary. See *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

A-3046

The jury's decision was supported by evidence, specifically the testimony of defendant

himself that he did not speak Spanish (Dkt. No. 165, pgs. 9, 19), Ortiz did not speak English

(Dkt. No. 176, pg. 26; Dkt. No. 165, pg. 37) and that he interviewed Ortiz for 30-40 minutes,

without an interpreter, wherein he confessed to involvement in the crime(s). (Dkt. No. 165, pgs.

40, 52, 54). Stambach admitted that he did not read Ortiz his Miranda warnings until after his

admissions, when he called for a Spanish translator. (Dkt. No. 165, pgs. 37, 54). Defendant

admitted that Plaintiff was brought to the Major Crimes Unit that day "to confess about the

murders" (Dkt. No. 165, pg. 36), and yet did not provide him with Miranda warnings until

8:30pm, after Defendant questioned Plaintiff from 7:25 to 8:05 alone, and after he "confessed".

(Dkt. No. 37, 41, 42, 54). What happened in that room for 30-40 minutes led to a false

confession and the jury was proper to evaluate the testimony of the defendant along with the

admission of defense counsel that Ortiz was not involved in the crime to conclude that defendant

must have acted improperly. (Dkt. No. 148; Dkt. No. 165, pgs. 18, 39).

The trial testimony of former police officer Torres added another wrinkle to the

credibility of the defense. Torres testified that throughout the entire night, during all his

involvement with Ortiz, he was in an Interview Room at the Major Crimes Unit, never Det.

Vivians office. (Dkt. No. 176, pgs. 39, 49, 50, 58). Torres testified "I was always in the

interview room" (Dkt. No. 173, pg. 50). In fact, Det. Lonergan testified Ortiz was always in Det.

Sgt. Vivian's office the entire time. (Dkt. No. 173, pgs. 198, 199). Defendant also testified and

reported in his P-73 describing the interview and confession of Plaintiff, that Ortiz was always in

Det. Vivians office. (Dkt No. 165, pgs. 12, 15, 16). His P-73, admitted as Plaintiff's Exhibit 6B

(Dkt. No. 177-2) stated that "Ortiz was placed into Sgt. Vivian's Office at 7:25pm ... present ...

was PO Edwin Torres of B district". The inconsistency in location is very significant given that Det. Lonergan testified that a witness in the Camacho murders, Carlos Osario, was being interviewed in the Interview Room at 8pm that same evening. (Dkt. No. 173, at pgs. 194-196). The testimony makes it entirely possible that Torres never saw Ortiz that night, rather confused his involvement with Mr. Osario, and not Mr. Ortiz. The testimony of officer Torres was unequivocal that he was always in the Interview Room that night.

Further, the testimony provided by Dr. Coggins (Dkt. No. 157) and through other detectives and their P-73 reports (Exhibits A & B attached to Defendant's moving papers), established that the plaintiff was suffering from a severe psychiatric impairment at the same time the false confession was taken, thus it was reasonable to conclude that defendant took advantage or influenced plaintiff to agree to a statement which was completely untrue.

Coercion is measured by the totality of the circumstances including the vulnerabilities of the Plaintiff. Here, Plaintiff was in the throughs of a serious psychotic break from reality on the date when the purported "confession" was taken. (Dkt. No. 157). Officer Torres testified that when he, and other officers, left Ortiz at Buffalo General Hospital late on November 15, 2004, he was "in need of further treatment" (Dkt No. 176, pg. 31). He repeated to officers that people were trying to kill him and that he was in fear for his life. (Dkt No. 176, pg. 27; Dkt. No. 165, pgs. 11, 20, 53). Dr. Coggins, who provided active treatment to Mr. Ortiz upon his arrest, testified that he was in the midst of a psychotic break from reality at the time he was interviewed by Defendant. (Dkt. No. 157, pgs 28, 76). The jury was proper to consider that Defendant knew, or should have known, that Plaintiff was susceptible and particularly vulnerable to agreeing to

18

false information and incriminating statements.  That his lack of thought and mental state made any statement suspect and unreliable. Therefore, coercion can be implied to the actions of Defendant who knowing Plaintiff lacked capacity still had him sign a false statement, that he never corroborated or reevaluated.

A confession is involuntary when the conduct of a government agent is such as to overbear one's will to resist and cause "confessions not freely self-determined." *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993), *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987). To be voluntary, a waiver must be "the product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). For a waiver to have been made knowingly and intelligently, the defendant must have a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" Id. at 422.

"No single criterion controls whether an accused's confession is voluntary; whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997), *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)). Factors include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." Ordinarily, a voluntariness inquiry is unsuitable for summary judgment because the inquiry is so fact intensive.

When a police officer creates false information and manufactures an alleged confession and forwards that information to prosecutors, the accused's constitutional right to a fair trial is violated. See *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). A § 1983 claim may arise if coercion was applied to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding. *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998), *Weaver v. Brenner*, 40 F.3d 527, 535 (2d Cir. 1994); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003).

The burden of proof for a § 1983 claim generally is met where a plaintiff alleges that a police officer utilized false evidence, which establishes an issue of fact as to proximate causation for false arrest and malicious prosecution. It is reasonably foreseeable that the defendant's use of false evidence will contribute to an independent decision of a judge or third person to deprive the plaintiff of his liberty. *Arnold v. Geary*, 981 F. Supp 266 (S.D.N.Y 2013), *Zahrey v. Coffey,* 221 F. 3d 342, 352 (2d Cir. 2000)*,* and reaffirmed in *Higazy v. Templeton,* 505 F.3d 161, 177 (2d Cir.2007).

"The test for whether a statement was improperly obtained by coercion is 'determined by the totality of the circumstances.'" *Higazy,* also see, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The circumstances to be considered in applying the totality of the circumstances test include:

      (1) the characteristics of the accused,

      (2) the conditions of the interrogation, and

      (3) the conduct of law enforcement officials.

20

The relevant characteristics of the individual who confessed are the individual's experience

and background, together with the suspect's youth and lack of education or intelligence. Here, the

Plaintiff was questioned by Defendant when he was severely psychiatrically compromised. (Dkt.

No. 157, pgs. 28, 76).  He was afraid that people were trying to kill him and wanted the police to

protect him. (Dkt. No. 176, pg. 27; Dkt. No. 165, pgs. 11, 20, 53). Multiple Buffalo Police

officers and detectives had met with Plaintiff, in the 24 hours before his alleged "confession",

and found that he needed mental health treatment, and that he had no credible information about

the subject murders. (Dkt. No. 173, pg. 127; Dkt. No. 176, pgs. 29, 31). The P-73 of former

Detective Mark Lauber stated: "Ortiz stated he was very scared and needed help ... [he] told

officers that person(s) unknown were trying to kill him" and that "it was decided [Ortiz] might

be in need of medical and psychiatric evaluation". (Dkt. No. 177-2). Det. Lauber also testified

that when he left that encounter with Ortiz he did not consider him a suspect or as having any

credible information about the crime. (Dkt. No. 181). In addition, the P-73 of former detective

Vaughn stated: "[Ortiz] stated that he was in fear for his life because the killers were after him ...

he was definitely upset at the time of the interview ... he was turned back over ... to be

medically evaluated before being released from the hospital", he also reported that "we asked

Ortiz if he had any direct knowledge of the murders ... he claimed he did not". (Dkt No. 177-2).

Det. Vaughn testified in this trial, that when he and the other detectives left Ortiz at Buffalo

General Hospital the evening of the 15th they did not consider him a suspect or a person with any

credible information about the crimes. (Dkt. No. 173, at pgs. 127, 128). The P-73's and the

testimony described encounters with Plaintiff the day prior to his alleged confession, and all

21

A-3051

officers are consistent that Plaintiff was obviously and noticeably mental compromised and did not have any knowledge about the crimes. This evidence clearly demonstrated that Plaintiff was suffering from mental illness at that time and was inconsistent with Defendant's testimony and the jury was proper to discredit his testimony.

The second circumstance, the conditions under which a suspect is questioned, include the place where an interrogation is held, and the length of the detention. The presence or absence of counsel is a significant condition because counsel can assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. *Goossens v. Dept. of Environmental Conservation*, 08-CV-00446F (W.D.N.Y. 2011). In the instant case, numerous officers of the Buffalo Police Department, including the Defendant's supervising officer (Lonergan) interviewed the Plaintiff and determined that he had no involvement, or credible information regarding, the crime being investigated. Nonetheless Defendant brought Plaintiff into a closed office, with no one else present, and claims Plaintiff confessed with details only a perpetrator would know. (Dkt. No. 165, pgs. 82-84, 88, 90). Defendant admitted that Plaintiff spoke Spanish and that he did not (Dkt No. 165, pgs. 9, 19, 37) but claims that Plaintiff provided details as to guns used and property taken during the crime. (See Confession attached to Defendants moving papers as "Exhibit A")(Dkt. No. 165, pgs. 82-84, 88, 90). The interrogation atmosphere weighs heavily in favor of Plaintiff's claim.

The final consideration is the law enforcement officer's conduct. The jury is proper to consider: "In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits". *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The plaintiff here points to numerous circumstances indicating that he did

not make a knowing and voluntary admission, rather it was Defendant's actions that a false confession was endorsed by Plaintiff. Such circumstances can provide a basis for the jury to find coercion predicated the statement. See *United States v. Taylor*, 745 F.3d 15, 24 (2d Cir 2014). Here, Plaintiff points to the untruthful nature of the admissions contained in the purported confession as evidence that he was tricked, psychologically taken advantage of or in other ways manipulated by Defendant. All of which can support a finding of coercion, under the law.

**POINT 2.   THE DEFENDANT'S MOTION TO GRANT A NEW TRIAL PURSUANT TO RULE 59(A), FAILS TO MEET THE STANDARD REQUIRED FOR SUCH DRASTIC RELIEF**

**A.   Standard of Review**

In comparison to the standard for judgment as a matter of law, a trial judge hearing a motion for a new trial is free to weigh the evidence and need not view it in the light most favorable to the verdict winner. *Song v. Ives Labs., Inc.* 957 F2d 1041, 1047 (2d Cir. 1992). However, a court should refrain from setting aside the verdict and granting a new trial when "the resolution of the issues depended on assessment of the credibility of witnesses" *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992). The Court should only grant a new trial if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *Song*, supra. 957 F. 2d at 1047, also adopted in *Jocks v. Tavernier*, 97 F. Supp. 2d 303 (E.D.N.Y. 2000)

23

In *Jocks*, supra the Court reasoned that where the plaintiff and defendant are the only two people to hear and see everything that happened in the underlying action, the resolution of the claim requires an assessment of credibility of the witnesses. This is strictly for the jury to decide. *Jocks*, at 314. The Court went on to opine that no miscarriage of justice occurred by the jury finding, and that defendants failed to carry the burden of showing the verdict is "so strongly against the weight of the evidence" that it may be deemed "a serious erroneous result". *Jocks* at 314, also see *Peterson v. County of Nassau*, 995 F. Supp 305, 318 (E.D.N.Y. 1998).

The Second Circuit has ruled consistently that "a motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a serious erroneous result or that the verdict is a miscarriage of justice." *Atkins v. New York City,* 143, F.3d 100, 102 (2d Cir. 1998), *quoting Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir. 1997). The Second Circuit has cautioned that to the extent a verdict is predicated on the jury's assessments of credibility, such verdict should not be disturbed to grant a new trial "except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F. 3d 411, 413 (2d Cir. 2012), citing from *United States v. Landau*, 155 F. 3d 93, 104 (2d Cir. 1998). Trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury. Where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case. *Raedle*, at 418-19.

24

A-3054

**B.     The Jury's Decision is Supported and Should Not be Vacated**

In the instant case it is significant that the defendant does not argue any errors in decisions or rulings of the Court during the trial of this matter. In fact, defendant has failed to demonstrate any objection made during trial which would preserve the issues now argued were erroneously decided. In fact, defendant voluntarily agreed and admitted many of the issues which were central to this case, through judicial admissions contained in the Stipulation of the parties. (Dkt. No. 148). As such, it is argued that the Defendant waived any argument in support of his current motion.

The Defendant's claims fail through examination of the evidence. As set forth above the Stipulation voluntarily entered into by Defendant admitted that the Plaintiff was "actually innocent" and had "no involvement in the murders" (See Stipulation of Defendant, Dkt. No. 148). This case represents classic questions of credibility given that the "confession" advanced by Defendant contained facts which could only be known by the perpetrator of the crimes (See Stambach testimony, Dkt. No. 165, at pgs. 82-84, 88, 90; also, Lonergan testimony, Dkt. No. 173, at pgs 188-190), or someone with access to the criminal investigation file. Defendant admits "that Ortiz was not involved in the murders" (Dkt. No. 148, ¶13) thus he could not have known the details contained in the "confession". Defendant also admits that "Stambach initiated the prosecution of Ortiz … based solely on the alleged confession" (Dkt. No. 148, ¶3). To be sure Defendant admitted to the jury that there was no other evidence to corroborate the involvement of Ortiz in the crime(s) "none whatsoever" (Dkt. No. 165, at pgs. 58, 59, 89).  For reasons set forth herein, the jury's decision as to liability and damages is properly based on the evidence presented during trial, including the admissions of Defendant contained in the Stipulation, and should stand.

25

**POINT 3.**     **THE JURY AWARD TO COMPENSATE THE PLAINTIFF FOR HIS WRONGFUL INCARCERATION OF TEN YEARS AND TWENTY-TWO DAYS, FROM THE AGES OF TWENTY-THREE TO THIRTY-THREE WAS FAIR AND CERTAINLY NOT UNCONSCIONABLE.**

## A.    Standard of Review

Title 42 U.S.C., Section 1983 "creates a species of tort liability in favor of persons who are deprived of rights. . . secured to them by the Constitution." *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 305-06 (1986) "Compensatory damages in Section 1983 cases may include compensation for injuries including 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* at 306*, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

"Where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Kerman v. City of N.Y.*, 374 F.3d 93, 124 (2d Cir. 2004). Compensatory damages arise from injury to reputation, personal humiliation, and mental anguish and suffering; they may include out-of-pocket expenses and other monetary harms. *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

While calculating damages is traditionally the province of the jury, the Second Circuit has held that an award can be amended or set aside as "excessive" in three different circumstances: (1) where the court identifies an error that resulted in the improper inclusion of a quantifiable amount, (2) where, although a particular error cannot be identified, the award is

A-3056

"intrinsically excessive," i.e., in excess of the amount any reasonable jury could have awarded, and (3) where the courts finds the amount of award "shock(s) the judicial conscience and constitutes a denial of justice." *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. *Virginian Ry. Co. v. Armentrout*, supra.

## B.    The Defendant Waived any Objection to the Jury Verdict Amount

In this case the Court properly instructed the jury, without any objection by defense counsel, as follows:

"If you find that the Plaintiff is entitled to recover from the Defendant, you must render a verdict for a sum of money that will justly and fairly compensate the Plaintiff for all the losses resulting from any injury or injuries he sustained". (Dkt. No. 165).

Here, defendant waived any objection to error as to damages by failing to offer any jury instruction on the issue, failing to object to the jury instructions or the verdict sheet, and failing to request that the jury be polled on the issue prior to discharging the jury. "The Second Circuit has frequently addressed waiver in cases involving challenges based on some logical inconsistency within a verdict." *Bseirani v. Mahshie*, 881 F. Supp 778, 784 (N.D.N.Y. 1995), aff'd, Nos. 95-9109, 95-9145, 1997 WL 3632 (2d Cir. Jan.3, 1997).

27

"It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir.2006); see also *Lavoie v. Pac. Press &Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992) ('Failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection."); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56-57 (2d Cir.2002). "The requirement of a timely exception is not merely a technicality. Its function is to give the court and the opposing party the opportunity to correct an error in the conduct of the trial." *Kosmynka*, 462 F.3d at 83; see also *Bseirani*, 881 F.Supp. at 784 ("Waiver is particularly appropriate where counsel is or should be aware of the inconsistency in the verdict, and where resubmission to the jury would resolve the ambiguity, because the purpose of the waiver is to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without resort to the presentation of evidence to a different body."

Here, defendants raise the excessive damages issue for the first time in their post-trial motions. All parties had multiple opportunities to submit proposed jury instructions and proposed verdict sheets prior to trial and prior to charging the jury. Moreover, the court held a charging conference during which all parties had yet another opportunity to request changes to the proposed jury charges and verdict sheet. Defendants failed to request an instruction or object to its omission.

Defendants' "failure to raise a timely objection deprived the court and the parties of their most effective and efficient means of resolving the issue" of whether the award was erroneous. *Bseirani*, 881 F. Supp. at 784-85. As such, the court should find consistent with precedent that defendants waived any objection to the jury award. See *Bseirani*, at 785.

28

Defendants have in effect waived their rights to remittitur, *Promega Corp. v. Life Tech.*

*Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("a party's right to remittitur may be waived"); *Energy*

*Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012).

## C.     The Verdict is Fair Given that Plaintiff Served Ten years and Twenty-Two Days Incarcerated for Crimes He Did Not Commit.

The New York Court of Claims has opined that "Liberty is absolute and the loss of it

irreplaceable" *McLaughlin v. State of New York*, NYLJ October 27, 1989, at 25, col 4, *Baba-Ali*

*v. State of New York*, 24 Misc. 3d 576 (N.Y. Misc. 2009). Here, Plaintiff's liberty from the age of

twenty-three to thirty-three years of age was stolen from him by the conduct of the Defendant.

"Damages attributable to loss of liberty include damages for the loss of the fundamental

right to be free, lost opportunities to engage in everyday activities while confined, and for the

mental anguish that accompanies the loss of liberty." *Sanabria v. State of N.Y.,* 29 Misc.3d 988,

994 (N.Y. Ct. Cl. 2010). "The mental anguish suffered by an inmate while he is in prison

encompasses his discomfort, fear, lack of privacy and degradation." *Baba-Ali v. State of N.Y,* 24

Misc.3d 576, 581-2 (N.Y. Ct. Cl. 2009), aff. in part, rev in part, 907 N.Y.S.2d 432 (2d Dept

2010), aff'd as modified, 19 N.Y.3d 627 (2012). As courts have noted, the "mental distress of

one unjustly imprisoned is obviously different and greater than one justly in jail . . ." *Carter v.*

*State,* 528 N.Y.S.2d 292, 297 (Ct. Cl. 1988), aff'd, 546 N.Y.S.2d 648 (2d Dept 1989).

A-3059

Various circumstances are relevant to the assessment of the mental anguish caused by imprisonment, including "the stigma attached to the type of conviction, whether the individual previously was incarcerated, the presence or absence of a significant criminal history prior to the unjust conviction and the basis for the prior conviction (a claimant who may not have been guilty of the crime charged but knew he was guilty of something else will suffer less than one who knows he is truly innocent of any wrongdoing." *Baba-Ali*, 24 Misc.3d at 580.

To determine whether an award is so high as to "shock the judicial conscience," the Court must "consider … the amounts awarded in other, comparable cases." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir.2003) also, *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997).

The most compelling case on the issue of what is a reasonable amount to award a wrongfully imprisoned plaintiff is the judicial determination of the Western District Court itself in *Peacock v. City of Rochester*, No. 6:13-CV-6046-MAT (August 5, 2016). In that case Judge Michael A. Telesca, pursuant to the settlement agreement of the parties to a § 1983 claim, agreed and stipulated to have this Court render a binding written decision on the issue of the damages to be awarded to Plaintiff by Defendants. In that case the Plaintiff had been wrongfully incarcerated from 07/23/1976 to 05/13/1982, almost 6 years.

Judge Telesca properly considered the three prongs established in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) and recognized the appropriateness of "damages attributable to loss of liberty include damages for the loss of the fundamental right to be free, lost opportunities to engage in everyday activities while confined, personal humiliation, impairment of reputation,

30

and for the mental anguish that accompanies the loss of liberty." See also, *Sanabria v. State of N.Y.,* 29 Misc.3d 988, 994 (N.Y. Ct. Cl. 2010). "The mental anguish suffered by an inmate while he is in prison encompasses his discomfort, fear, lack of privacy and degradation." *Baba-Ali v. State of N.Y.*, 24 Misc.3d 576, 581-2 (N.Y. Ct. Cl. 2009), 907 N.Y.S.2d 432 (2d Dept 2010), aff'd as modified, 19 N.Y.3d 627 (2012). As courts have noted, the "mental distress of one unjustly imprisoned is obviously different and greater than one justly in jail . . ." *Carter v. State*, 528 N.Y.S.2d 292, 297 (Ct. Cl. 1988), aff'd, 546 N.Y.S.2d 648 (2d Dept 1989). These principles and opinions were properly considered by Judge Telesco.

Just as Plaintiff argues in the instant case, Judge Telesca found that various circumstances are relevant to the assessment of the mental anguish caused by imprisonment, including "the stigma attached to the type of conviction, whether the individual previously was incarcerated, the presence or absence of a significant criminal history prior to the unjust conviction and the basis for the prior conviction (a claimant who may not have been guilty of the crime charged but knew he was guilty of something else will suffer less than one who knows he is truly innocent of any wrongdoing." *Baba-Ali*, 24 Misc.3d at 580.

Here, Plaintiff Ortiz had no known criminal history, and certainly had never been imprisoned or held by police. Having been charged with Murder he was stigmatized as an evil and heartless person, and as he testified, he was extremely distraught and disheartened that his grandmother, who raised him, would pass away thinking he was a hardened criminal. (Dkt No. 175, pgs. 240-242) This Court will recall the emotion evoked from the Plaintiff when discussing

31

A-3061

the shame, he felt thinking about his grandmother passing while he was still incarcerated, which was years after the fact. (Dkt. No. 175, pgs. 240-242). Mr. Ortiz testified about being attacked and assaulted by other inmates, and even guards. (Dkt. No. 175, pgs. 228-230). He showed the jury a facial scar he received when imprisoned after another inmate cut him in the face. He also testified about the hopelessness of being an innocent man in jail, and that he was without any power to do anything about it. (Dkt. No. 175, pg. 242). Mr. Ortiz attempted to commit suicide while wrongfully incarcerated which demonstrates how hopeless, he felt. (Dkt. No. 157). These factors, according to Judge Telesca are relevant in considering the amount of compensatory damages to be awarded.

**In Peacock, Judge Telesca ruled that Plaintiff was entitled to $5 million for loss of liberty and emotional distress during his wrongful incarceration for almost six years.** That is in fact, the exact award made by the jury in the instant case for Plaintiff who served over ten years in jail wrongfully. The award made by Judge Telesca was in 2016 and Plaintiff argues the award would be substantially higher based on time value of money.

In the case of *Gristwood v. State*, 990 NYS2d 386, 119 AD3d. 1414 (4th Dept. 2014) Plaintiff claimed he was wrongfully incarcerated for almost nine years, having been convicted of attempted murder. The jury concluded that the confession used to convict the Plaintiff was "not voluntarily made" but rather "was the product of police misconduct" *Gristwood*, at 1415. **The Appellate Division upheld a judicial award of compensatory damages in the sum of $5,485,394 for almost 9 years of wrongful incarceration.**

A-3062

In *Gristwood,* just as here, the Defendant claimed that the nonpecuniary damages awarded claimant were excessive, claiming it deviated materially from what would be reasonable compensation. The Appeals court opined that upon finding that the claimant is entitled to a judgment, the court "shall award damages in such a sum of money as the court determines will fairly and reasonably compensate him." The Court considered in its determination that the amount for non-pecuniary damages was proper given the grievous suffering, mental anguish, loss of liberty, degradation, loss of reputation, humiliation, and other injuries of those unjustly convicted and imprisoned." See also *Gonzalez v. State*, 26 Misc.3d 1212(A), 2009 Slip Op. 52714, 2009 WL 5457856; also see *Campbell v. State of New York*, 186 Misc. 586, 590-591, 62 N.Y.S.2d 638).

The law is clear that plaintiff may be awarded damages for psychological injuries, including damages for his depression, anxiety, paranoia, nightmares, and humiliation. See *Gardner v. Federated Dep't Stores, Inc.*, 907 F2d 1348 (2d Cir. 1990) at 1353. The Plaintiff in Gardner was detained by store security who falsely accused him of theft and then was released into police custody where he was incarcerated until bailed out hours later. In all he was in custody, both store and police, for 10 hours. The Second Circuit in Gardner upheld an award of $150,000 for pain, suffering and emotional damages and reduced the Jury award for deprivation of liberty to $50,000, where the plaintiff was in custody for 10 hours. Based on the 10 years and 22 days Plaintiff here was in custody, that award would equate to more than $400,000,000 dollars for the same deprivation.

33

Case 23-352, Document 54, 06/27/2023, 3534016, Page88 of 185

A-3063

In *Martinez v. Port Auth. of N.Y. and N.J.*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, (S.D.N.Y. Sept. 2, 2005) the Court upheld a damages award of $160,000 award after Plaintiff was held in custody for approximately 19 hours on lewdness charges he was then acquitted of. In the instant case, that award would equate to approximately $600,000,000 dollars, given the length of incarceration, of Plaintiff herein.

In the case of *Medina v. The City of New York*, Civ Action 20 Civ. 797 (VEC)(SLC) (S.D.N.Y. January 12, 2022, the Court decided the appropriateness of a jury award for wrongful incarceration. Ms. Medina's injuries include having spent approximately 18 hours in custody. The Court determined that, after accounting for inflation, as the Court must, approximately $2,160.00 per hour in custody is appropriate. That would equate to $190,000,000 dollars given Plaintiff's incarceration of over ten years. The Court referred to *Francis v. City of New York, No. 15 Civ. 7997 (VSB),* 2019 WL 8918743(S.D.N.Y. Nov. 12, 2019) (awarding $2,000 per hour of detention on inquest for plaintiff confined for 13.5 hours alleging that defendants supplied false information causing him to be arrested).

Likewise, in *Lovitch v. Lovitch*, No. 11 Civ. 2536 (ER) (S.D.N.Y. Mar. 10, 2015) an award of $10,000 in compensatory damages for a relatively brief period of custody, coupled with the fact that plaintiff did not suffer physical harm or public embarrassment in the course of arrest and detention, was found to be appropriate.

In *Martinez v. Gayson*, No. 95-CV-3788 (ILG), 1998 WL 564385, (E.D.N.Y. June 30, 1998) the Court remitted the jury verdict of $310,000 to $160,000 where plaintiff was verbally abused, knocked to the ground and held in custody for five hours. Given the time that Plaintiff herein was incarcerated that award would equate to almost 2 billion dollars.

34

A-3064

In *Robinson v. Holder*, No.07 Civ. 5992), 2008 WL 2875291, (S.D.N.Y. July 22, 2008), *Abdell v. City of New York*, No. 05 Civ. 8453 (RJS), 2014 WL 3858319, (S.D.N.Y. Aug. 5, 2014) the court concluded that an average hourly award for loss of liberty was $6,416. Here the award amounts to approximately $1,500 per day on wrongful incarceration, a very modest award in comparison to the Courts rationale, which would calculate to approximately 565,000,000 dollars in the case of Mr. Ortiz hourly incarceration.

In *Malte v. New York*, 125 A,D, 2d. 958, 510 N.Y.S. 2d. 353(4th Dept. 1986) the Court considered a verdict awarding $125,000 and reduced the award to $35,000 for teacher falsely arrested at school, strip searched, incarcerated 10 hours and characterized in news reports as child beater), *appeal denied,* 69 N.Y.2d 607, 507 N.E.2d 320, 514 N.Y.S.2d 1024 (1987); In *Orndorff v. De Nooyer Chevrolet, Inc.,* 117 A.D.2d 365, 503 N.Y.S.2d. 444 (3d Dept. 1986) the Court affirmed an award of $50,000 for false arrest where plaintiff held in custody for 12 hours and ridiculed in the newspaper; In *Palmquist v. City of Albany*, 112 A.D.2d. 624, 492 N.Y.S.2d. 487 (3d Dept. 1985) the Court affirmed an award of $18,500 for detention of 3 hours; In *Woodard v. City of Albany*, 81 A.D.2d. 947, 439 N.Y.S.2d. 701 (3d Dept. 1981) the Court considered an award of $16,000 and reduced the award to $7,500 for 5 hours in jail; finally in *Klein v. City of New York*, No. 48884/81 (1st Dept. 1982) the Court  reduced an award of $30,000 for false arrest to $15,000 for custody of 16 hours. All of these cases, if applied to the incarceration suffered by the Plaintiff here, would result in a sustainable award of much greater than the jury's verdict here.

A-3065

"Where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Kerman v. City of N.Y.*, 374 F.3d 93, 124 (2d Cir. 2004). Compensatory damages arise from injury to reputation, personal humiliation, and mental anguish and suffering; they may include out-of-pocket expenses and other monetary harms.

While calculating damages is traditionally the province of the jury, the Second Circuit has held that an award can be amended or set aside as "excessive" in three different circumstances: (1) where the court identifies an error that resulted in the improper inclusion of a quantifiable amount, (2) where, although a particular error cannot be identified, the award is "intrinsically excessive," i.e., in excess of the amount any reasonable jury could have awarded, and (3) where the courts finds the amount of award "shocks the judicial conscience and constitutes a denial of justice." *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998), *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

"Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). "A verdict shocks the judicial conscience only if it surpasses an upper limit, and whether that has been surpassed is not a

36

question of fact with respect to which reasonable person may differ, but a question of law."

*Jackson v. Tellado*, No. 11-CV-3028, 2018 WL 4043150, (E.D.N.Y. Aug. 24, 2018). This

Court's task on a motion for remittitur is to ascertain the highest amount within the jury's

discretion. See *Earl v. Bouchard Transp. Co.*, 917 F.2d. 1320 *(2d Cir. 1990)*(noting that "a

district court should remit the jury's award only to the maximum amount that would be held by

the district court as not excessive").

Additionally, it is argued that Defendant, in effect, waived their rights to remittitur,

through consent and agreement to the Court's charge and not having objected to the verdict,

polling the jury or making any motion to set the verdict aside. *Promega Corp. v. Life Tech.*

*Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("a party's right to remittitur may be waived"); *Energy*

*Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012).

The verdict rendered by the jury in the instant action was not unconscionable or

unreasonable given what Plaintiff endured being wrongfully incarcerated for more than ten

years. The Plaintiff testified to the daily mental and physical abuse he suffered while

incarcerated. That he was assaulted by inmates and guards, confined to isolation and subjected to

humiliation of strip searches and cavity examinations. (Dkt. No. 175, pgs. 226-233). The jury

properly evaluated the evidence and considered the pain and suffering Plaintiff endured due to

the actions of the Defendant

**POINT 4.    THE JURY WAS WARRANTED IN GRANTING PUNITIVE**
**            DAMAGES.**

37

The Supreme Court has established three guideposts to help determine the reasonableness of a punitive damages award (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the plaintiff's harm and the punitive damages award; and (3) the difference between the award and the criminal and civil penalties for the misconduct at issue. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996), *DiSorbo v. Hoy*, 343 F.3d 172, 186-87 (2d Cir. 2003). As with compensatory damages, the Second Circuit has further "found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." *Payne*, 711 F.3d at 104. Based on these factors, the Court in Payne sustained the jury's award of $2,675,000 in punitive damages, and stated it was not excessive.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The Second Circuit also has identified several "aggravating factors" from the Supreme Court's decision in Gore "that are associated with particularly reprehensible conduct and contribute to the sense that "some wrongs are more blameworthy than others." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Gore*, 517 U.S. at 575).

Just as there is no mathematical formula used to calculate punitive damages, "there are no rigid benchmarks that a punitive damages award may not surpass." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). "Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is so high as to shock the judicial conscience and constitute a denial of justice." *Thomas v. Kelly*, 903 F.Supp.2d 237, 265

38

(S.D.N.Y 2012) "The Second Circuit instructs that in gauging excessiveness, courts must keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future." *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, (S.D.N.Y. Oct. 20, 2020), also see *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996).

"In determining whether a punitive damages award is excessive, federal trial courts reviewing a jury's verdict should relate the facts of the underlying case, construed in the light most favorable to the nonmoving party, to the three guideposts used by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), *Thomas*, 903 F.Supp.2d at 266.

The Second Circuit has found there where a civil rights claim defendant "created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely" can be the basis for greater punitive damages. *Jennings v. Yurkiw*, 18 F.4th 383 (2d Cir. 2021). The Jennings Court found that because the jury accepted Plaintiff's version of events, it also necessarily found that Defendants lied repeatedly throughout those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct. See *Jennings v. Yurkiw*, 18 F.4th 383, 391 (2d Cir. 2021) ("The reprehensible nature of the officer' conduct is underscored by the elaborate steps they took to cover up their misconduct."); *Theodat v. City of N.Y.*, No. 16-CV-3977, 2019 WL 4385794 (E.D.N.Y Sept. 13, 2019) (evidence that defendant was "lying when he testified that he did not remember" the subject events of the lawsuit supported finding of deceit or malice), aff'd, 818 Fed. Appx. 79 (2d Cir. 2020).

This Court charged the Jury two times on the issue of punitive damages, without any objection by Defendant. In fact, the Court instructed the jury as follows:

"If you should find that the defendant is liable for the plaintiff's injuries, then you have the discretion to award, in addition to compensatory damages, punitive damages. The purpose of punitive damages is to punish a defendant for shocking conduct and to set an example in order to deter him and others from committing similar acts in the future. The awarding of punitive damages is within your discretion – you are not required to award them. Punitive damages are appropriate only for especially shocking and offensive misconduct. If you decide to award punitive damages, you must use sound reason without any influence by bias, prejudice, or sympathy toward any party"

It is argued that the jury followed this Court's instructions and made a fair and conscientious award. Given the compensatory damages award the jury was tempered and thoughtful in awarding 1.5 million dollars in punitive damages.

Based on the circumstances of this case, the jury was warranted to find that Defendant acted with malice and complete disregard for the liberty or life of Mr. Ortiz. Such deliberate actions on the part of a law enforcement official are offensive to our justice system and can have the impact of eroding confidence in the fairness of our process. The jury found that Stambach manufactured a "confession" and without any corroboration or investigation, had a mentally compromised victim sign off on that false statement. Stambach then used that "confession" to prosecute and incarcerate the Plaintiff, and never re-examined the statement or reconsidered the

40

guilt or innocence of the Plaintiff. If this was accepted by the jury the Defendant represents the most offensive or reprehensible underbelly of law enforcement and punitive damages would most certainly be warranted.

## CONCLUSION

For the reasons set forth above this Court should give proper deference to the jury's verdict and deny the Defendant's motion, in all respects. The jury properly considered the conflicting evidence and found, with legal basis, that the defendant fabricated the alleged "confession" he obtained after violation of Plaintiff's 5th Amendment rights and then used that "confession, without any corroborating evidence, to prosecute and wrongfully incarcerate the Plaintiff. The jury, once it found that Defendant framed the Plaintiff for a crime he did not commit, causing him to be falsely imprisoned for over ten years, was legally supported in awarding compensatory and punitive damages in the amount stated in their verdict.

Dated:     Williamsville, New York
           June 28, 2022

                          LAW OFFICES OF WAYNE C. FELLE, P.C.
                          *Attorney for Plaintiff Josue Ortiz*

                   By:    *s// Wayne C. Felle*
                          Wayne C. Felle, Esq., of counsel
                          5839 Main Street
                          Williamsville, New York 14221
                          Telephone: (716) 505-2700

41

A-3071

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                                   Plaintiff,

          v.                                          1:16-cv-00321-EAW-MJR

MARK STAMBACH

                                   Defendants.

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, A NEW TRIAL, OR REMITTITUR

**HODGSON RUSS LLP**
*Attorneys for Defendant Mark Stambach*
Hugh M. Russ, III of counsel
Peter A. Sahasrabudhe, of counsel
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
Telephone:  716.856.4000

A-3072

## **TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ...................................................................................1

POINT I.     THE PARTIES' STIPULATION DOES NOT BEAR ON THE
             ELEMENTS AT ISSUE ..........................................................................4

POINT II.    ORTIZ'S MALICIOUS PROSECUTION CLAIM FAILS AS A
             MATTER OF LAW, BECAUSE ORTIZ DID NOT OVERCOME THE
             PRESUMPTION OF PROBABLE CAUSE............................................5

      A.     Ortiz's malicious prosecution claim fails under the "competing testimony
             plus test," since his claim of a manufactured confession is based on
             complete conjecture .................................................................................5

      B.     Ortiz failed to introduce key evidence promised in his summary judgment
             papers and referenced in the Court's summary judgment decision ........7

      C.     The case-law cited by Ortiz is clearly distinguishable............................9

POINT III.   ORTIZ'S FABRICATION OF EVIDENCE CLAIM ALSO FAILS AS A
             MATTER OF LAW ...............................................................................10

POINT IV.    ORTIZ'S FIFTH AMENDMENT COERCION CLAIM FAILS AS A
             MATTER OF LAW ...............................................................................11

POINT V.     IN THE ALTERNATIVE, THE JURY'S AWARD OF PUNITIVE
             DAMAGES MUST BE STRICKEN.....................................................12

POINT VI.    IF JUDGMENT AS A MATTER OF LAW IS NOT AWARDED, THE
             COURT SHOULD GRANT DETECTIVE STAMBACH'S REQUEST
             FOR A NEW TRIAL, OR REDUCE THE DAMAGES AWARDED ................14

CONCLUSION..........................................................................................................15

i

A-3073

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Federal Cases**

*Bennett v. Vidal*,
  267 F.Supp.3d 487 (S.D.N.Y. 2017)..............................................................4

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996).......................................................................................13

*Deanda v. Hicks*,
  137 F. Supp. 3d 543 (S.D.N.Y. 2015)...........................................................4

*Delamota v. City of New York*,
  683 Fed. App'x 65 (2d Cir. 2017)..................................................................8

*Deshawn E. by Charlotte E. v. Safir*,
  156 F.3d 340 (2d Cir. 1998)...........................................................................4

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
  697 F.3d 1342 (Fed. Cir. 2012).....................................................................3

*Greene v. City of New York*,
  No. 08-cv-243, 2017 WL 1030707 (E.D.N.Y. Mar. 15, 2017)...................10

*Irish v. City of New York*,
  No. 09 Civ. 5568 2010 WL 5065896 (S.D.N.Y. 2010).............................6, 9

*Jennings v. Yrukiw*,
  18 4th 383 (2d. Cir. 2021)..............................................................................13

*King v. City of New York*,
  No. 99-cv-3669, 2007 WL 959696 (E.D.N.Y. Mar. 30, 2007)..............11, 12

*Kosmynka v. Polaris Inuds., Inc.*,
  462 F.3d 74 (2d Cir. 2006)..............................................................................3

*McClennon v. New York City*,
  13-CV-128, 2018 WL 2943565 (E.D.N.Y. 2018) (E.D.N.Y. 2018)............5

*McGregor v. Gibson*,
  219 F.3d 1245 (10th Cir. 2000) ....................................................................11

*Miller v. Dugger*,
  838 F.2d 1530 (11th Cir. 1998) ....................................................................11

A-3074

## TABLE OF AUTHORITIES - cont'd

PAGE

*Ortiz v. Wagstaf,*
   523 F. Supp. 3d 347 (W.D.N.Y. 2021)..................................................................8

*Peterson v. Regina,*
   935 F. Supp. 2d 628 (S.D.N.Y. 2013)..............................................................5, 7

*Savino v. City of New York,*
   331 F.3d 63 (2d Cir. 2003)....................................................................................8

*Stampf v. Long Island R. Co.,*
   761 F.3d 192 (2d Cir. 2014)................................................................................13

*United States v. Mack,*
   17-cr-6159, 2018 WL 8898465 (W.D.N.Y. 2018) .............................................11

*Washington v. Buraker,*
   322 F. Supp. 2d 702 (W.D. Va. 2004) ...............................................................11

*West v. Goodyear Tire & Rubber Co.,*
   973 F. Supp. 385 (S.D.N.Y. 1997).....................................................................13

*Williams v. County of Westchester,*
   171 F.3d 98 (2d. Cir. 1999)...................................................................................4

**Federal Statutes**

28 U.S.C. § 1291...........................................................................................................3

## PRELIMINARY STATEMENT

Josue Ortiz's opposition to Detective Stambach's Rule 50 motion fails for the same reason that he should not have received a favorable verdict in the first instance: The evidence is not sufficient to support his claims. Even after viewing Ortiz's evidence in a light most favorable to him, the Court should grant Detective Stambach's Rule 50 motion and dismiss the Complaint. Mere speculation and anti-police sentiment do not provide a sufficient basis to sustain the jury's verdict. Not a single witness questioned the validity of Ortiz's confession. Three Buffalo Police Officers testified that the confession was proper in all respects. Ortiz, himself, claimed not to remember giving the confession, but he did identify his initials and signature verifying that he made it. Ortiz presented no evidence supporting the claim that there was a problem with the confession or Detective Stambach's conduct.

In his opposition to Detective Stambach's motion, Ortiz has effectively conceded that the jury based its verdict only on speculation and conjecture. Apparently recognizing that he failed to introduce sufficient evidence to support the claims in his case-in-chief, Ortiz repeatedly emphasizes stipulations made by Detective Stambach. He cites Detective Stambach's stipulation that Ortiz in 2014 was found to be innocent of the crimes for which he was convicted. But his reliance on this fact misses the whole point of the trial. Detective Stambach's stipulation was not sufficient for Ortiz to carry his burden of proof at trial, since the trial concerned Detective Stambach's intent and conduct *at the time of the confession*, and not events years later.

Ortiz's position can be reduced to the following premise: Because he was ultimately found innocent of the murders of Nelson and Miguel Camacho, the jury was permitted to infer that Detective Stambach coerced his confession, fabricated evidence against him, and

A-3076

acted in bad faith.  The jury was not permitted to infer and speculate that Detective Stambach was liable for the three claims at issue simply because subsequent re-investigations revealed that Ortiz was not involved in the murders he confessed to committing.  Ortiz had the burden of adducing actual evidence of coercion, fabrication, and bad faith by Detective Stambach at the time Ortiz made the confession or at the time his prosecution was initiated.  He provided no such evidence.  The mere fact that Ortiz was ultimately determined not to have committed the murders and to have made a false confession has no real bearing on these critical issues.  The jury's verdict therefore cannot stand.

The undisputed evidence shows that on November 16, 2004, Ortiz voluntarily came to the Buffalo Police Department's Major Crimes Unit (Dkt. No. 165 at p. 15, 39).  While speaking with Detective Stambach for a brief time, Ortiz made statements which tended to indicate that he had committed the Camacho murders.  (*Id.* at p. 39-40).  After Ortiz implicated himself, Officer Edwin Torres was summoned in to read Ortiz his *Miranda* rights in Spanish and to translate a formal statement from Ortiz.  (*Id.* at p. 38, 54).  Ortiz had no difficulty understanding Officer Torres, and Officer Torres had no difficulty understanding Ortiz.  (Dkt No. 176 at p. 452-453).  Ortiz signed a Spanish *Miranda* card indicating that he understood and voluntarily waived his *Miranda* rights.  He then gave a sworn statement confessing to the murders of Nelson and Miguel Camacho, which he subsequently initialed and signed.  (*Id.* at p. 454-457).  All three police officers present during Ortiz's confession believed Ortiz.  *See, e.g.*, *id.* at p. 458.  Ortiz testified that he does not remember his confession, and he points to absolutely no evidence which contradicts the police officer's version of events.  Without any evidence to support Ortiz's claims, Detective Stambach's motion must be granted in its entirety.

2

## <u>INACCURACIES AND MISSTATEMENTS OF LAW IN PLAINTIFF'S OPPOSITION</u>

Ortiz's opposition misapprehends the Federal Rules of Civil Procedure.  Given the limited space permitted for this reply brief, we will only briefly address Ortiz's most glaring errors:

- Ortiz argues that the Court should deny the motion because defense counsel did not object to the charge read to the jury.  However, Detective Stambach's argument has never been that the jury charge was inadequate or legally flawed.  Rather, Detective Stambach's argument is that the evidence Ortiz adduced at trial was legally insufficient for the jury to find as it did under the instructions given by the Court.  Defense counsel's failure to object to the jury charge has no bearing on the Court's consideration of this motion or Detective Stambach's motion for a new trial.  The motions challenge the sufficiency of Ortiz's proof, rather than the adequacy of the jury charge.

- Ortiz argues that Detective Stambach waived his right to seek remittitur of the jury's verdict because defense counsel did not request to poll the jury after the verdict.  The case law he cites on this point is completely inapposite.  Those cases stand for the premise that a party may waive the right to challenge an *inconsistency* in a jury's verdict by failing to object to proposed jury charges or poll a jury.  *See, e.g., Kosmynka v. Polaris Inuds., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006).  But challenging an inconsistency in a jury's verdict is different than seeking remittitur of a jury's verdict because the amount awarded is not supported by the evidence introduced at trial.  To preserve his arguments for remittitur, Detective Stambach had only to raise them in his post-trial briefing, which indisputably occurred here.  *Cf. Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (explaining that way to preserve remittitur arguments is to raise them in a post-trial brief).  There was no waiver of Detective Stambach's right to seek remittitur.

- Ortiz faults Detective Stambach for not appealing the Court's denial of his Rule 56 summary judgment motion.  However, in federal practice, no interlocutory appeal lies as of right from the denial of a summary judgment motion. 28 U.S.C. § 1291.  Detective Stambach followed the appropriate procedure by proceeding to trial and then moving for judgment as a matter of law pursuant to Rule 50 at the close of Ortiz's proof and renewing the motion after the verdict.  Under this well settled procedure, the Court can now apply the appropriate legal standards to

3

A-3078

Ortiz's trial evidence to determine whether his claims fail as a matter of law. *Williams v. County of Westchester*, 171 F.3d 98, 102 (2d. Cir. 1999). The Court will recognize the additional misstatements of law, or inappropriate approaches advanced by Ortiz in his opposition.

## <u>ARGUMENT</u>

**POINT I.     THE PARTIES' STIPULATION DOES NOT BEAR ON THE ELEMENTS AT ISSUE**

Because the parties stipulated that he was found innocent of the Camacho murders in 2014, Ortiz argues, no further evidence was required to meet his burden of proof on any of his three claims. (Dkt. No. 187-1 at p. 7-10).[1] This argument demonstrates a fundamental misunderstanding of the ultimate issues at trial. Ortiz was required to show that probable cause did not exist to arrest and prosecute him based on the facts known to Detective Stambach *in 2004*, and that the investigative activities by Detective Stambach *in 2004* constituted coercion or fabrication of evidence. *See, e.g., Deanda v. Hicks*, 137 F. Supp. 3d 543, 547 (S.D.N.Y. 2015) (explaining that probable cause is determined by facts known to officer *at time prosecution is initiated*); *Bennett v. Vidal*, 267 F.Supp. 487, 497-498 (S.D.N.Y. 2017) (emphasizing that the key inquiry for fabrication of evidence claim is an officer's state of mind at the time evidence is forwarded to prosecutors); *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) (demonstrating that coercion is determined through evaluating techniques employed by officers at time of interrogation).

---

[1]     Ortiz asserts this argument as a basis for denial of both Detective Stambach's Rule 50 and Rule 59 motions. Regardless of which motion is being addressed, the argument is equally meritless.

That subsequent investigations revealed Ortiz's innocence has no bearing on these issues. This case has always concerned what Detective Stambach knew and did in 2004. The parties' stipulation that Ortiz was found to be innocent years after Detective Stambach's involvement in the investigation of the Camacho murders ended has no relevance to the issues at trial. Ortiz's heavy reliance on the parties' stipulation is designed to distract the Court from the glaring lack of evidence in the record. Instead, the Court should focus on the evidence of Detective Stambach's conduct and knowledge that was actually presented at trial. That evidence highlights the complete absence of proof required to sustain any of Ortiz's three remaining claims as a matter of law.

**POINT II.    ORTIZ'S MALICIOUS PROSECUTION CLAIM FAILS AS A MATTER OF LAW, BECAUSE ORTIZ DID NOT OVERCOME THE PRESUMPTION OF PROBABLE CAUSE**

Ortiz does not dispute that a presumption of probable cause existed for his prosecution since a grand jury indicted him. Ortiz points to absolutely no testimony or other evidence introduced at trial to overcome the presumption of probable cause. Detective Stambach is therefore entitled to judgment as a matter of law on Ortiz's malicious prosecution claim.

**A.    Ortiz's malicious prosecution claim fails under the "competing testimony plus test," since his claim of a manufactured confession is based on complete conjecture**

Ortiz did not overcome the presumption of probable cause under the "competing testimony plus test" applicable in this Circuit. *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013); *McClennon v. New York City*, 13-CV-128, 2018 WL 2943565 (E.D.N.Y. 2018) *19-*20 (E.D.N.Y. 2018).   In other words, because Ortiz's opposition provides no evidence that actually contradicts Detective Stambach's account of November 16, 2004, and because Ortiz

5

only offers speculative arguments concerning a "manufactured confession" that are unsupported by any evidence in the record, his malicious prosecution claim fails.

Despite dedicating a lengthy portion of his brief to his malicious prosecution claim, Ortiz offers surprisingly little argument focused on the evidence that was introduced at trial. Ortiz only argues that there was evidence suggesting he was unable to speak English very well. Evidence of his limitations with English, according to Ortiz, permitted the jury to infer that Detective Stambach "manufactured" Ortiz's confession in the thirty to forty minutes he spent alone with Ortiz before a formal statement was taken with a translator present. (Dkt. No. 187-1 at p. 19).[2]

Leaving aside that nothing Ortiz disclosed in the informal, unsworn portion of his interview was ever used against him in criminal proceedings, and leaving aside that the only evidence used against Ortiz was his statement made when a translator was present, Ortiz's limitations with English do not contradict Detective Stambach's account of what took place on November 16, 2004. Ortiz cites absolutely no testimony or other evidence contradicting Detective Stambach's testimony that, despite Ortiz's limitations with English, he made statements in the initial thirty to forty minute interview which tended to show he committed the

---

[2]     Apparently, Ortiz's position is that he and Detective Stambach could not have communicated effectively in the thirty to forty minutes before Officer Torres arrived, but then somehow after Officer Torres arrived Ortiz was able to recite Detective Stambach's allegedly manufactured confession in Spanish to Officer Torres. In other words, despite the fact that Detective Stambach only spoke English and Ortiz claims he "only" spoke Spanish, Ortiz suggests Detective Stambach was somehow able to trick or persuade Ortiz to confess to the crime in Spanish after Officer Torres arrived. Leaving aside that there is absolutely no evidence in the record to support his position, his position is also completely illogical and makes no sense. Such speculative musings are insufficient to overcome the presumption of probable cause. *See Irish v. City of New York*, No. 09 Civ. 5568 2010 WL 5065896, at *4 (S.D.N.Y. 2010) (conclusory and speculative arguments unsupported by evidence were insufficient to overcome the presumption of probable cause on the plaintiff's malicious prosecution claim).

Camacho murders.  (Dkt. No. 165 at p. 39-40).  Ortiz himself did not contradict or undermine

Detective Stambach's testimony on this subject, as he claims not to remember any interaction he

had with Detective Stambach.  (Dkt. No. 175 at p. 265).  The jury heard no other testimony

regarding what took place between Detective Stambach and Ortiz in the portion of the interview

before Office Torres arrived to act as a translator.  Nor does Ortiz now even attempt to argue that

there is evidence contradicting the testimony of Officer Torres and Detective Stambach

regarding his formal, sworn statement.  That testimony established that Ortiz's sworn confession

constitutes an accurate reflection of what Ortiz said during his formal interview.  (Dkt. No. 165

at p. 74; Dkt. No. 176 at p. 460).

Ortiz's failure to point to any record evidence contradicting Detective Stambach's

account of November 16, 2004 dooms his malicious prosecution claim.  *See Peterson*, 935 F.

Supp. 2d at 643.  The malicious prosecution claim should therefore be dismissed.

**B.**     **Ortiz failed to introduce key evidence promised in his summary judgment papers and referenced in the Court's summary judgment decision**

Ortiz curiously ignores Detective Stambach's point that key evidence the Court

referenced in its summary judgment decision was not introduced at trial.  (Dkt. No. 177-4 at p.

16-17).  As stated in Detective Stambach's initial motion papers, the Court provided a road map

in its decision as to how Ortiz would have to overcome the presumption of probable cause at

trial.  Specifically, the Court referenced evidence in the record on summary judgment showing

that details in Ortiz's confession were inconsistent with details of the Camacho murders known

to the Buffalo Police Department.  At summary judgment, the Court also referenced evidence

demonstrating that Detective Stambach was aware of other suspects or persons of interest prior

7

to Ortiz's confession. This evidence, according to the Court, was sufficient to create a triable

issue of fact as to whether Detective Stambach knew or should have known that Ortiz's

confession was false or unreliable before he forwarded it to the District Attorney's Office. *Ortiz*

*v. Wagstaf*, 523 F. Supp. 3d 347, 366 (W.D.N.Y. 2021).

   But Ortiz's counsel chose at trial not to introduce the evidence cited by the Court

on summary judgment. Ortiz offered no evidence to suggest that Detective Stambach knew or

should have known that the details given in Ortiz's confession were false, or that Ortiz was not

or could not have been involved in the murders. Instead of attempting to demonstrate that

Detective Stambach elicited information which he knew was false or unreliable, Ortiz's counsel

chose to proceed under a "manufactured confession" theory by arguing that the entire confession

was completely fabricated by Detective Stambach. No evidence supports this theory, and the

jury's acceptance of this wildly speculative argument cannot be allowed to stand. Because the

theory advanced by Ortiz's counsel at trial necessarily depended on conjecture and surmise,

rather than actual evidence, Ortiz failed to rebut the presumption of probable cause as a matter of

law. *See Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003) (holding that District Court

erroneously shifted burden to defendants by permitting the plaintiff to rebut the presumption of

probable cause with mere conjecture and surmise of bad faith).[3]

---

[3]   At best, Ortiz's proof suggested that Detective Stambach performed subpar police work, but proof of
subpar police work is insufficient to rebut the presumption of probable cause as a matter of law.
Negligence does not equal a constitutional violation. *Delamota v. City of New York*, 683 Fed. App'x 65, 66
(2d Cir. 2017).

A-3083

**C.     The case-law cited by Ortiz is clearly distinguishable**

The precedent Ortiz cites in support of his argument on his malicious prosecution claim is clearly inapposite.  Each of the cases upon which Ortiz relies involved an instance where there was concrete, non-speculative evidence of bad faith misconduct by a police officer.  In *Maxwell v. City of New York*, for example, there was sworn testimony demonstrating that interviews referenced in a police officer's felony complaint had not occurred by the time the felony complaint was submitted.  156 A.D.2d 28, 32 (1st Dep't 1990).  Similarly, in *Hart v. City of New York*, record evidence demonstrated that a police officer knowingly provided false testimony to a grand jury.  188 A.D.2d 398, 398 (1st Dep't 1992).  And finally, in *Fincher v. County of Westchester*, sworn testimony from a non-party witness established that a police officer had forged that witness's signature on a sworn statement which inculpated the plaintiff.  979 F. Supp. 989, 994 (S.D.N.Y. 1999).

In contrast to the cases cited by Ortiz, there is absolutely no proof that information contained in Detective Stambach's felony complaint was fabricated, that Detective Stambach provided false testimony (or even testified) to the grand jury, or that Detective Stambach forged the signatures of any witnesses.  Rather than referencing the kind of concrete evidence as did the plaintiffs in the cases he cites, Ortiz instead relies solely on his counsel's own arguments and suspicions.  The arguments and suspicions of an attorney do not constitute evidence.  And rumor and innuendo are insufficient to overcome the presumption of probable cause.  *See Irish*, 2010 WL 5065896, at *4.  For this reason, too, Detective Stambach is entitled to judgment as a matter of law on Ortiz's malicious prosecution claim.

9

A-3084

**POINT III.   ORTIZ'S FABRICATION OF EVIDENCE CLAIM ALSO FAILS AS A MATTER OF LAW**

No testimony or other evidence demonstrates that Ortiz's confession was fabricated, and Ortiz's fabrication of evidence claim fails as a matter of law.  On this point, Ortiz once again only relates his limited grasp of English to support his position that Detective Stambach completely fabricated each element of the confession before Officer Torres arrived to act as translator.  (Dkt. No. 187-1 at p. 16).  This argument defies common sense, because Ortiz would not have been able to recite the details of a "manufactured" confession in Spanish during his formal interview if he and Detective Stambach were completely unable to communicate before Officer Torres arrived given their alleged language barrier.

More to the point though, there has never been any evidence to suggest that Ortiz's confession was fabricated.  All of the evidence demonstrates that Ortiz did actually confess to the murders of Nelson and Miguel Camacho, and that he stood by that confession for nearly ten years.  Ortiz was free to argue that his confession was unreliable or that Detective Stambach should have known that the confession was false before he forwarded it to the District Attorney's Office, but he chose a different strategy.  Instead, Ortiz chose to present his case on the entirely speculative theory that the confession was placed into his mind by Detective Stambach.  Because that premise is not supported by any evidence and is based on complete speculation, the fabrication of evidence claim must be dismissed.  *Greene v. City of New York*, No. 08-cv-243, 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017) (granting summary judgment on a denial of the right to a fair trial claim because the contention that officers deliberately falsified evidence was based on "sheer speculation, and [did] not create a material issue of fact").

10

A-3085

**POINT IV.   ORTIZ'S FIFTH AMENDMENT COERCION CLAIM FAILS AS A MATTER OF LAW**

Ortiz introduced no evidence of coercive tactics employed by Detective Stambach, so Ortiz's Fifth Amendment coercion claim fails as a matter of law.  Although Ortiz's argument on this point is unclear, he seems to suggest that any questioning of him was coercive because of his impaired mental state.  This argument misstates what is required to show the type of coercion sufficient to establish a Fifth Amendment violation.

"Courts have repeatedly rejected the argument that a statement made in response to law enforcement interrogation is involuntary solely due to the confessor's diminished mental state."  *United States v. Mack*, 17-cr-6159, 2018 WL 8898465, at *9 (W.D.N.Y. 2018) (citing *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1998) (explaining that, under Supreme Court precedent, "***even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless the police exploited this weakness with coercive tactics***")).[4]  Enforcing this principle, courts have held that a § 1983 Fifth Amendment claim cannot be maintained simply because the plaintiff who was interviewed had mental impairments.  Plaintiffs must also demonstrate that the interrogating officers employed tactics to take advantage of or exacerbate their weakened mental state.  *King v. City of New York*, No. 99-cv-3669, 2007 WL 959696, at *12-*13 (E.D.N.Y. Mar. 30, 2007); *Washington v. Buraker*, 322 F. Supp. 2d 702, 714 (W.D. Va. 2004) (explaining that mere questioning of suspect who officers knew was mentally handicapped did not amount to Fifth Amendment coercion).

---

[4]   *See also McGregor v. Gibson*, 219 F.3d 1245, 1254 (10th Cir. 2000) ("Mr. McGregor's mental illness, without any evidence of police coercion, is insufficient to render his confession involuntary").

11

Ortiz presented no evidence of Detective Stambach's interview tactics, let alone that his tactics were somehow coercive.  When Ortiz arrived at the police station, Detective Stambach asked him open ended-questions in a relaxed, conversational manner.  (Dkt. No. 165 at p. 39-40).  No threats or tricks were employed, and no physical force was used.  Ortiz was even fed.  (*Id.* at p. 38).  Then, so that Ortiz's rights were appropriately observed and respected, a Spanish translator was called to read Ortiz his Miranda rights and to translate Ortiz's formal statement.  (*Id.* at p. 54).  The testimony of Officer Torres confirms that during Ortiz's formal statement, Detective Stambach was calm and professional.  He did not employ any manipulative or deceitful tactics.  (Dkt. No. 176 at p. 458-460).[5]  Detective Stambach simply transcribed what Ortiz relayed in the interview.  (*Id.* at p. 460).  Ortiz cites no authority to indicate this behavior could even remotely be described as coercive, and he cites no record evidence which contradicts the police officers' version of events.  For this reason alone, Ortiz's Fifth Amendment claim fails as a matter of law.

**POINT V.     IN THE ALTERNATIVE, THE JURY'S AWARD OF PUNITIVE DAMAGES MUST BE STRICKEN**

In the alternative, if Ortiz's remaining claims are not dismissed, the Court should strike the jury's award of punitive damages.  The standard required to show entitlement to

---

[5]     Ortiz argues that sufficient evidence exists to suggest that Officer Torres was never present with Ortiz on the night of the confession. (Dkt. No. 187-1 at p. 17-18).  This argument defies credulity, and does not require serious attention.  Torres unequivocally testified that he remembered being with Ortiz on the night of the confession and that he translated during the formal interview.  He also remembered signing the confession and reviewing it page for page.  Officer Torres unequivocally identified his signature and initials on the confession. That there may be confusion as to where the statement was taken does not in any way suggest that Officer Torres was not with Ortiz on November 16, 2004.  This is yet another example of Ortiz's tendency to resort to rampant speculation, as opposed marshaling evidence that actually exists in the record.

12

punitive damages is demanding, and Ortiz's proof does not come close to satisfying that

standard.  *See West v. Goodyear Tire & Rubber Co.*, 973 F. Supp. 385, 387 (S.D.N.Y. 1997).

In determining whether to strike or reduce a punitive damages award, the most

important factor for the Court to consider is the "reprehensibility" of Detective Stambach's

conduct.  *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (describing factors for

Court to consider in determining whether to reduce punitive damages) (citing *BMW of N. Am.,*

*Inc. v. Gore*, 517 U.S. 559, 575 (1996).  Here, there was no evidence of reprehensible conduct by

Detective Stambach.  Taking a statement from a witness who voluntarily comes into the police

station is not the type of reprehensible conduct that supports a $1,500,000 punitive damages

award.

In his opposition, Ortiz ignores record evidence and resorts to pure conjecture to

argue that punitive damages are warranted.  Ortiz repeats that the jury must have found that

Detective Stambach manufactured Ortiz's confession and manipulated Ortiz because of his

impaired mental state.  No evidence exists of Detective Stambach engaging in any such behavior.

Detective Stambach's conduct was witnessed and approved by his immediate supervisor, James

Lonergan, and the District Attorney's Office prosecuted Ortiz after having a full review of the

investigation file.  Detective Stambach did not withhold any information from his supervisor or

from the District Attorney's Office.  Ortiz presented no evidence of the type of misconduct

which would warrant punitive damages.  *Cf. Jennings v. Yrukiw*, 18 4th 383 (2d. Cir. 2021)

(awarding punitive damages when there was direct and uncontradicted evidence that officer

physically assaulted the plaintiff).  Because there is no evidence of reckless or malicious

misconduct by Detective Stambach, the jury's award of punitive damages should be stricken.

13

**POINT VI.   IF JUDGMENT AS A MATTER OF LAW IS NOT AWARDED, THE COURT SHOULD GRANT DETECTIVE STAMBACH'S REQUEST FOR A NEW TRIAL, OR REDUCE THE DAMAGES AWARDED**

Given the limitations on reply, Detective Stambach will rest primarily on the points raised in his opening papers regarding why he is entitled to a new trial pursuant to Fed. R. Civ. P. 59(a), and why he is entitled to remittitur pursuant to Fed. R. Civ. P. 59(e). But Ortiz's contention that Detective Stambach waived his right to make a motion for a new trial is incorrect. Detective Stambach's Fed. R. Civ. P. 59(a) motion is based on the insufficiency of the evidence introduced at trial as opposed to improper jury charges or inconsistencies in the jury's verdict. The motion is properly before the Court because it was made within twenty eight days after judgment against Detective Stambach was entered. Fed. R. Civ. P. 59(b). Bringing the motion for a new trial along with a renewed motion for a judgment as a matter of law is standard practice in this circumstance.

A-3089

## CONCLUSION

For all the foregoing reasons, the Court should grant Detective Stambach's Rule 50 motion and dismiss the Complaint.  In the alternative, the Court should order a new trial, or, at the very least, reduce the amount awarded in the jury's verdict.

Dated:        July 8, 2022

**HODGSON RUSS** LLP
*Attorneys for Defendant Mark Stambach*

By:  s/ Peter A. Sahasrabudhe
       Hugh M. Russ, III
       Peter A. Sahasrabudhe
The Guaranty Building
140 Pearl Street – Suite 100
Buffalo, New York  14202
Telephone:  (716) 856-4000

15

A-3090

1
         **UNITED STATES DISTRICT COURT**
         **WESTERN DISTRICT OF NEW YORK**

2

3 UNITED STATES OF AMERICA,    )
                              ) Case No. 1:16-CV-00321

4                             )       (EAW)(MJR)
            Plaintiff,   )

5                             )
  vs.                     ) January 31st, 2023

6                             ) 2:14 p.m.
  JOSUE ORTIZ,            )

7                             )
            Defendant.   )

8

9          **TRANSCRIPT OF ORAL ARGUMENT**
   **BEFORE THE HONORABLE ELIZABETH A. WOLFORD**

10      **CHIEF UNITED STATES DISTRICT JUDGE**

11
  <u>APPEARANCES</u>:

12

13 For the Plaintiff:  HANCOCK ESTABROOK, LLP
                      BY:  ALAN J. PIERCE, ESQ.

14                     1500 AXA Tower 1
                    100 Madison Street

15                     Syracuse, NY 13202

                    LAW OFFICE OF WAYNE C. FELLE, P.C.

16                     BY:  WAYNE C. FELLE, ESQ.
                    6024 Main Street

17                     Williamsville, NY 14221

18 For the Defendant:  HODGSON RUSS LLP
                      BY:  HUGH M. RUSS, III, ESQ.

19                         PETER A. SAHASRABUDHE, ESQ.
                    The Guaranty Building

20                     140 Pearl Street, Suite 100
                    Buffalo, NY 14202

21                     (Appearing telephonically)

22 Court Reporter:    MEGAN E. PELKA, RPR
                    Robert H. Jackson US Courthouse

23                     2 Niagara Square
                    Buffalo, NY 14202

24                     (716) 229-0880

25

A-3091

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

1

| | | |
|---|---|---|
| 01:46PM | 1 | THE CLERK:  On the record.  Ortiz v. Stambach, |
| 02:13PM | 2 | 16-CV-321.  We're here for oral argument.  Counsel, please |
| 02:13PM | 3 | state your name and who you represent. |
| 02:14PM | 4 | MR. FELLE:  Good afternoon, Your Honor.  Wayne Felle |
| 02:14PM | 5 | appearing with and on behalf of Mr. Ortiz. |
| 02:14PM | 6 | THE COURT:  Good afternoon, Mr. Felle. |
| 02:14PM | 7 | MR. FELLE:  Good to see you, Judge. |
| 02:14PM | 8 | THE COURT:  Nice to see you, too. |
| 02:14PM | 9 | MR. PEARSON:  Alan Pierce of Hancock Estabrook, |
| 02:14PM | 10 | former counsel to plaintiff Josue Ortiz. |
| 02:14PM | 11 | THE COURT:  All right.  Good afternoon.  And then, on |
| 02:14PM | 12 | the phone? |
| 02:14PM | 13 | MR. RUSS:  Good afternoon, Your Honor.  In Rochester, |
| 02:14PM | 14 | this is Hugh Russ.  And with me is my associate Peter |
| 02:14PM | 15 | Sahasrabudhe, and we represent Defendant Stambach. |
| 02:14PM | 16 | THE COURT:  All right.  Obviously, you must not have |
| 02:14PM | 17 | read the text order that indicated the location of this |
| 02:14PM | 18 | argument was in Buffalo. |
| 02:14PM | 19 | MR. RUSS:  We either didn't read it or didn't read it |
| 02:14PM | 20 | carefully, Your Honor.  Completely our fault.  I apologize. |
| 02:14PM | 21 | THE COURT:  I underlined it to make sure that |
| 02:14PM | 22 | everybody saw it, because I know the trial was held in |
| 02:14PM | 23 | Rochester, but so be it. |
| 02:14PM | 24 | It's -- what I'd like to do is spend most of our time on |
| 02:15PM | 25 | the motion directed to the jury verdict.  And I know that |

A-3092

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

2

| | | |
|---|---|---|
| 02:15PM | 1 | that's a defense motion.  And so, Mr. Russ or |
| 02:15PM | 2 | Mr. Sahasrabudhe, I'll ask you, why shouldn't I conclude that |
| 02:15PM | 3 | your argument necessarily requires me to assume that the jury |
| 02:15PM | 4 | would have had to have found Mr. Stambach truthful?  I mean, |
| 02:15PM | 5 | in other words, I think it's a fair conclusion that the jury |
| 02:15PM | 6 | in this case did not believe that Mr. Stambach testified |
| 02:15PM | 7 | truthfully. |
| 02:15PM | 8 | And why isn't that something that's properly within the |
| 02:15PM | 9 | purview of the jury in construing the facts in the light most |
| 02:15PM | 10 | favorable to Mr. Ortiz, as I have to at this stage?  Why |
| 02:16PM | 11 | shouldn't I reject the defense motion?  Go ahead, Mr. Russ or |
| 02:16PM | 12 | Mr. Sahasrabudhe. |
| 02:16PM | 13 | MR: SAHASRABUDHE:  Good afternoon, Your Honor.  This |
| 02:16PM | 14 | is Peter (inaudible) -- |
| 02:16PM | 15 | (An off-the-record discussion was held.) |
| 02:19PM | 16 | (Brief recess) |
| 02:27PM | 17 | THE COURT:  Can you hear us now? |
| 02:27PM | 18 | MR. SAHASRABUDHE:  Yes.  This is Peter Sahasrabudhe. |
| 02:27PM | 19 | Can you hear me? |
| 02:27PM | 20 | THE COURT:  Yeah, you're just on the phone here. |
| 02:27PM | 21 | We're having some trouble. |
| 02:27PM | 22 | MR. SAHASRABUDHE:  I'm on my cell phone and you can |
| 02:27PM | 23 | hear us.  Dawn is currently working with the IT staff in |
| 02:28PM | 24 | Rochester to set up a speaker in the conference room.  That's |
| 02:28PM | 25 | why I'm on here momentarily, but I think we can hear you and |

A-3093

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

3

| | | |
|---|---|---|
| 02:28PM | 1 | if you can hear us, we're ready to proceed. |
| 02:28PM | 2 | THE COURT: Yeah, we can, as long as our court |
| 02:28PM | 3 | reporter can hear. All right. Let's proceed in this manner. |
| 02:28PM | 4 | I've got a hard stop of 3 o'clock, so I don't want to waste |
| 02:28PM | 5 | any more time. So, Mr. Sahasrabudhe, do you remember my |
| 02:28PM | 6 | question? |
| 02:28PM | 7 | MR. SAHASRABUDHE: I do, Your Honor. And I think the |
| 02:28PM | 8 | answer to that is two-fold -- |
| 02:28PM | 9 | (An off-the-record discussion was held.) |
| 02:29PM | 10 | MR. SAHASRABUDHE: Can you still hear me? |
| 02:29PM | 11 | THE COURT: Yes. |
| 02:29PM | 12 | MR. SAHASRABUDHE: Okay. I think the answer, Your |
| 02:29PM | 13 | Honor, is two-fold. It's the plaintiff's burden at trial, at |
| 02:29PM | 14 | summary judgement, in any procedural posture, to introduce |
| 02:29PM | 15 | prima facie evidence sufficient to meet his burden. So, it's |
| 02:29PM | 16 | not just a question of whether or not the Court or the jury |
| 02:29PM | 17 | credits the testimony of Detective Stambach. |
| 02:29PM | 18 | If -- even if that testimony is not credited, was there |
| 02:29PM | 19 | any affirmative evidence introduced by the plaintiff in this |
| 02:29PM | 20 | case to suggest that Detective Stambach's account of what took |
| 02:29PM | 21 | place during the confession was untrue? And there was no |
| 02:29PM | 22 | evidence offered by the plaintiff contradicting Detective |
| 02:30PM | 23 | Stambach's account. |
| 02:30PM | 24 | THE COURT: Well, let, me -- |
| 02:30PM | 25 | MR. SAHASRABUDHE: His testimony -- |

A-3094

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

4

| | | |
|---|---|---|
| 02:30PM | 1 | THE COURT:  Let me interrupt you there, because why |
| 02:30PM | 2 | isn't it a sufficient circumstantial case that there's |
| 02:30PM | 3 | evidence introduced uncontested that Mr. Ortiz was not |
| 02:30PM | 4 | involved in the murder of the Camacho brothers? |
| 02:30PM | 5 | In addition, Mr. Stambach testified that he was alone with |
| 02:30PM | 6 | Mr. Ortiz during an approximate 40-minute time period.  And |
| 02:30PM | 7 | Mr. Stambach testified that, during that time period, he took |
| 02:30PM | 8 | handwritten notes of what Mr. Ortiz allegedly told him about |
| 02:30PM | 9 | the murders which Officer Torres testified only somebody who |
| 02:30PM | 10 | was the perpetrator would have had those details. |
| 02:30PM | 11 | So, why isn't that a sufficient circumstantial case by the |
| 02:30PM | 12 | plaintiff that, in fact, during that 30 to 40 minutes where |
| 02:31PM | 13 | Mr. Stambach was alone with Mr. Ortiz, who was in the throes |
| 02:31PM | 14 | of a mental breakdown, who spoke very limited English, that |
| 02:31PM | 15 | Mr. Stambach coerced, created, fabricated this confession on |
| 02:31PM | 16 | the part of Mr. Ortiz? |
| 02:31PM | 17 | MR. SAHASRABUDHE:  So, once again, the only evidence |
| 02:31PM | 18 | that the jury heard about the unsworn portion of the interview |
| 02:31PM | 19 | was Detective Stambach's account.  The only evidence offered |
| 02:31PM | 20 | by Mr. Ortiz is that he doesn't remember what occurred.  And |
| 02:31PM | 21 | that is insufficient; A, to create a question of fact and; B, |
| 02:31PM | 22 | to create sufficient prima facie evidence for Mr. Ortiz to |
| 02:31PM | 23 | meet his burden.  But it also, I would point out, is not just |
| 02:31PM | 24 | the testimony of Mark Stambach, because there was testimony |
| 02:31PM | 25 | from Edmond Torres as well that confirms that Mr. Ortiz made a |

A-3095

5

| | | |
|---|---|---|
| 02:32PM | 1 | free and voluntary statement that lined up with and matched up |
| 02:32PM | 2 | with the pre-sworn, non-Mirandized portion of the interview. |
| 02:32PM | 3 | So, it's not just that the jury would have had to believe Mark |
| 02:32PM | 4 | Stambach, they also would -- |
| 02:32PM | 5 | THE COURT:  But, Mr. Sahasrabudhe, let me interrupt |
| 02:32PM | 6 | you.  You're glossing over something, and that is, that |
| 02:32PM | 7 | Mr. Stambach's testimony is that Mr. Ortiz is sharing with him |
| 02:32PM | 8 | details of a murder that only the perpetrator could have |
| 02:32PM | 9 | known, and we know Mr. Ortiz wasn't the murderer. |
| 02:32PM | 10 | So, why isn't that a reasonable inference that the jury to |
| 02:32PM | 11 | conclude if they think Mr. Stambach is lying to also conclude |
| 02:32PM | 12 | that he's the one that put those details and coerced |
| 02:32PM | 13 | Mr. Ortiz, who was very vulnerable at the time, into this |
| 02:33PM | 14 | confession, so that when Officer Torres comes in the room 40 |
| 02:33PM | 15 | minutes later, he then sticks with what has been put into his |
| 02:33PM | 16 | mind by Mr. Stambach? |
| 02:33PM | 17 | I don't think there's any -- you tell me if there's a case |
| 02:33PM | 18 | out there that stands for the proposition that you have to |
| 02:33PM | 19 | have some eyewitness testimony of a -- words, direct evidence, |
| 02:33PM | 20 | essentially, of words being put into the plaintiff's mouth and |
| 02:33PM | 21 | forcing the confession? |
| 02:33PM | 22 | I mean, the circumstance -- this is a case of |
| 02:33PM | 23 | circumstantial evidence, no question about it, because of the |
| 02:33PM | 24 | fact that Mr. Ortiz did not recall what happened.  But there's |
| 02:33PM | 25 | nothing wrong with a jury inferring and concluding facts based |

A-3096

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

6

| | | |
|---|---|---|
| 02:33PM | 1 | on other facts that are established which, again, I go back |
| 02:33PM | 2 | to; number one, Mr. Ortiz was not involved in the murders; |
| 02:33PM | 3 | number two, it was him and Mr. Stambach alone in that room for |
| 02:34PM | 4 | about 40 minutes; number three, there are intimate details of |
| 02:34PM | 5 | the murders that are included in Mr. Stambach's notes that |
| 02:34PM | 6 | nobody would have known unless they were involved in the |
| 02:34PM | 7 | crime; and four, Mr. Ortiz spoke very limited English and was |
| 02:34PM | 8 | in this -- throes of this mental breakdown. |
| 02:34PM | 9 | So, go ahead. I'll let you respond. I won't interrupt |
| 02:34PM | 10 | you this time. |
| 02:34PM | 11 | MR. SAHASRABUDHE: Well -- so, there's a -- I think |
| 02:34PM | 12 | there's a distinction, Your Honor, between not being involved |
| 02:34PM | 13 | in the crime, not being the perpetrator, and not knowing |
| 02:34PM | 14 | information about the crime. And the only evidence that came |
| 02:34PM | 15 | in throughout the entirety of plaintiff's proof was that |
| 02:34PM | 16 | information about the crime that lined up with what was known |
| 02:34PM | 17 | of the crime scene was offered by Mr. Ortiz. |
| 02:34PM | 18 | Just because he ultimately was found not guilty of being a |
| 02:35PM | 19 | perpetrator does not mean that it was impossible for him to |
| 02:35PM | 20 | relay information about the crime scene in that area. And, on |
| 02:35PM | 21 | your question of direct and circumstantial evidence, I think |
| 02:35PM | 22 | the precedent in the Second Circuit on false confession, you |
| 02:35PM | 23 | know, confessions that turn out to be untrue or false, require |
| 02:35PM | 24 | very, very strong showing that a confession was not free -- |
| 02:35PM | 25 | was not given. |

**A-3097**

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

7

| | | |
|---|---|---|
| 02:35PM | 1 | And there's a couple cases -- and I know one Second |
| 02:35PM | 2 | Circuit case cited by the Court in its summary judgment |
| 02:35PM | 3 | decision is a decision entitled -- is -- the plaintiff's name |
| 02:35PM | 4 | was Rippuiti. And there, Your Honor, what you had was a |
| 02:36PM | 5 | plaintiff saying I never confessed directly through sworn |
| 02:36PM | 6 | testimony. You had his relative who was also a plaintiff in |
| 02:36PM | 7 | the case saying my relative never said that. |
| 02:36PM | 8 | And you also have the officer who allegedly took the |
| 02:36PM | 9 | confession acknowledging that, had he confessed, it would have |
| 02:36PM | 10 | been in my notes, and I failed to make a note of it in my memo |
| 02:36PM | 11 | book. That is not what occurred here. The evidence doesn't |
| 02:36PM | 12 | even come close to that level where the plaintiff was found to |
| 02:36PM | 13 | have, you know, submitted sufficient evidence to rebut the |
| 02:36PM | 14 | presumption of probable cause. |
| 02:36PM | 15 | I think the other decision you cited in your summary |
| 02:36PM | 16 | judgement decision was Pizzaro. And there, again, evidence of |
| 02:36PM | 17 | a, quote unquote, fabricated or made-up confession was deemed |
| 02:36PM | 18 | so much stronger than it was here in this case. You have |
| 02:37PM | 19 | direct testimony that the officer doing the interrogation |
| 02:37PM | 20 | literally word-for-word told the plaintiff in a coercive, |
| 02:37PM | 21 | threatening manner what to write in a statement and then made |
| 02:37PM | 22 | him sign it. |
| 02:37PM | 23 | There's no precedent whatsoever in this circuit that we |
| 02:37PM | 24 | found in our research, and certainly not ever cited by any of |
| 02:37PM | 25 | the parties in post-trial briefing, that says that mere lack |

**A-3098**

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

8

| | | |
|---|---|---|
| 02:37PM | 1 | of memory and an ultimate finding ten years later based on |
| 02:37PM | 2 | evidence that's developed ten years later is sufficient to |
| 02:37PM | 3 | show that even sufficient to meet the prima facie burden that |
| 02:37PM | 4 | a confession wasn't ultimately made. |
| 02:37PM | 5 | And, Your Honor, I would also point out here, too, in |
| 02:37PM | 6 | addition to Detective Stambach's testimony, we've already |
| 02:37PM | 7 | talked about the testimony of Edmond Torres, but other |
| 02:37PM | 8 | evidence the jury heard, in fact, supported the fact that the |
| 02:38PM | 9 | confession was made. |
| 02:38PM | 10 | We know that Mr. Ortiz pled guilty and didn't try to |
| 02:38PM | 11 | recant his confession when he pled guilty. We know he |
| 02:38PM | 12 | admitted under oath some 11 years later to a Federal Grand |
| 02:38PM | 13 | Jury that he was the perpetrator of the Camacho murders. So, |
| 02:38PM | 14 | the only affirmative evidence that was offered here suggests |
| 02:38PM | 15 | that Mr. Ortiz did, in fact, confess to this crime. |
| 02:38PM | 16 | And we would also argue that the mere fact that, ten years |
| 02:38PM | 17 | later, it's found that three other people were the |
| 02:38PM | 18 | perpetrators, that does not mean, and that is not even |
| 02:38PM | 19 | circumstantial evidence, that Mr. Ortiz made the statement |
| 02:38PM | 20 | that Mr. Stambach testified to, that Mr. Torres testified to, |
| 02:38PM | 21 | and that he stood by them, again, in various legal proceedings |
| 02:39PM | 22 | for a decade. |
| 02:39PM | 23 | THE COURT: All right. Anything else you want to |
| 02:39PM | 24 | argue, Mr. Sahasrabudhe, on this motion or this aspect of the |
| 02:39PM | 25 | pending motions? |

**A-3099**

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

9

02:39PM 1    MR. SAHASRABUDHE:  Yeah.  We would, you know -- we,

02:39PM 2  of course, had it in on our papers, but one thing that we do

02:39PM 3  want to point out here is I think the Court was careful in its

02:39PM 4  summary judgement decision to point to certain evidence that,

02:39PM 5  if introduced at trial, would have been sufficient for

02:39PM 6  Mr. Ortiz to rebut the presumption of probable cause.

02:39PM 7    And that evidence was not evidence, but supportive of a,

02:39PM 8  quote unquote, manufactured confession theory that was proved

02:39PM 9  at trial.  What the Court said was, there's sufficient

02:39PM 10  evidence before me on summary judgement to say that, based on

02:39PM 11  the statement that Mr. Ortiz made, a reasonable officer who

02:40PM 12  had reviewed the homicide file would have realized there were

02:40PM 13  material inconsistencies with the statement and the details

02:40PM 14  known about the crime; particularly the crime scene.

02:40PM 15    But, here, there was no evidence offered, whatsoever, of

02:40PM 16  the crime scene.  And the only thing the jury heard was

02:40PM 17  testimony from multiple police officers, not just Detective

02:40PM 18  Stambach, that everything Mr. Ortiz said, in fact, matched the

02:40PM 19  description of the crime scene and was consistent with what

02:40PM 20  the officer knew about the crime scene.

02:40PM 21    So, the jury, based on the evidence adduced at trial, has

02:40PM 22  concluded that, you know, if the statement was made, that a

02:40PM 23  reasonable officer would have known the statement was

02:40PM 24  unreliable or false.  The only thing the jury heard was that

02:40PM 25  the statement strongly indicated Mr. Ortiz was, in fact, the

| | | |
|---|---|---|
| 02:40PM | 1 | perpetrator of these murders. |
| 02:41PM | 2 | THE COURT: All right. Anything else? |
| 02:41PM | 3 | MR. SAHASRABUDHE: Very briefly, Your Honor, I would |
| 02:41PM | 4 | just like to say on the Fifth Amendment coercion claim, I |
| 02:41PM | 5 | think I cited in the papers the relevant case law in our |
| 02:41PM | 6 | brief, but the only evidence of, quote unquote, coercion here, |
| 02:41PM | 7 | which is required for Fifth Amendment claim that Mr. Felle |
| 02:41PM | 8 | cited in his papers, is potential knowledge that Mr. Ortiz was |
| 02:41PM | 9 | suffering from a mental illness. |
| 02:41PM | 10 | But the case law on that point is pretty clear. Mere |
| 02:41PM | 11 | knowledge of an interrogator that the person being interviewed |
| 02:41PM | 12 | or questioned has a mental illness is not sufficient to show a |
| 02:41PM | 13 | Fifth Amendment violation. There has to be a showing that, on |
| 02:41PM | 14 | top of knowledge, that the interviewee had mental illness, |
| 02:41PM | 15 | there were tactics intentionally employed to exploit those. |
| 02:42PM | 16 | And that comes directly from the Supreme Court, Your Honor, |
| 02:42PM | 17 | *Colorado v. Connelly*. |
| 02:42PM | 18 | And then, here, there's no evidence whatsoever of whether |
| 02:42PM | 19 | that's asked by Detective Stambach. He just -- the only |
| 02:42PM | 20 | evidence is he asked questions of Mr. Ortiz, but the law is |
| 02:42PM | 21 | pretty clear, you're allowed to ask someone suffering from a |
| 02:42PM | 22 | mental illness questions about the investigation because the |
| 02:42PM | 23 | reality, Your Honor, is, you know, people who have mental |
| 02:42PM | 24 | illnesses have information to give about ongoing |
| 02:42PM | 25 | investigations. And sometimes, they're perpetrators of |

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

11

02:42PM    1    crimes.  So, it can't be that a mere knowledge that someone

02:42PM    2    may have mental health issues is automatically a violation of

02:42PM    3    the Fifth Amendment and automatically renders the statement

02:42PM    4    involuntarily.

02:42PM    5            THE COURT:  All right.  Thank you, Mr. Sahasrabudhe.

02:42PM    6    I'm going to turn to Mr. Felle.

02:43PM    7            MR. FELLE:  Thank you, Judge.  I first want to thank

02:43PM    8    you, Judge, for making the decision to come here to Buffalo.

02:43PM    9    That was clearly for the benefit of lawyers and Mr. Ortiz, so

02:43PM   10    thank you.

02:43PM   11            THE COURT:  That was my original intent.

02:43PM   12            MR. FELLE:  It was, and I appreciate it.

02:43PM   13        Judge, I think the Court is right on point when you talk

02:43PM   14    about credibility being the issue in this trial.  Clearly, the

02:43PM   15    province of the jury to weigh the believability, under the

02:43PM   16    totality of the circumstances, to weigh what all of the

02:43PM   17    officers said.  We called six officers in this case, five

02:43PM   18    detectives, and the jury weighed the credibility of each of

02:43PM   19    those witnesses.

02:43PM   20        And what was overwhelming is that when six officers from

02:43PM   21    the same department as Defendant Stambach saw Mr. Ortiz the

02:43PM   22    night before at Buffalo General Hospital, they all agreed that

02:43PM   23    he was in need of psychiatric help, treatment, to stay at

02:43PM   24    Buffalo General Hospital.  But, more importantly, they all

02:43PM   25    determined that he was not a suspect and had no credible

| | | |
|---|---|---|
| 02:43PM | 1 | evidence to point to anything that involved this crime. |
| 02:43PM | 2 | Within 24 hours, he is now in a detective's office with |
| 02:44PM | 3 | Stambach alone, as Your Honor points out, for 30 to 40 |
| 02:44PM | 4 | minutes, to which Mr. Stambach concludes that, during that |
| 02:44PM | 5 | time, given all the factors that Your Honor has pointed out, |
| 02:44PM | 6 | the language barrier, the mental capacity issues, all of those |
| 02:44PM | 7 | things considered, Mr. Stambach says that after that 30 to 40 |
| 02:44PM | 8 | minutes, Mr. Ortiz had already confessed to the crime. |
| 02:44PM | 9 | So, Judge, I think this jury was certainly within its |
| 02:44PM | 10 | province. And, look, that's why we have jury systems in this |
| 02:44PM | 11 | country. It's fundamental to our system of justice, and it's |
| 02:44PM | 12 | for exactly a situation where you have a concern of the |
| 02:44PM | 13 | powerful over the powerless. And that's what this case came |
| 02:44PM | 14 | down to, and I think the jury listened to all the evidence. |
| 02:44PM | 15 | Judge, I can go on and on about the inconsistencies. |
| 02:44PM | 16 | Mr. Sahasrabudhe would like to see things his way, but |
| 02:44PM | 17 | clearly, clearly, there are many different views that the jury |
| 02:44PM | 18 | could have accepted here that all pointed to the culpability |
| 02:45PM | 19 | of Mr. Stambach. |
| 02:45PM | 20 | For example, in the summary judgement motion decision, |
| 02:45PM | 21 | Judge, you pointed to five factors that can be considered by |
| 02:45PM | 22 | this jury when determining the malicious prosecution claim. |
| 02:45PM | 23 | Any one of those would be sufficient to prove that Stambach |
| 02:45PM | 24 | violated Mr. Ortiz's constitutional rights. And you pointed |
| 02:45PM | 25 | to the case of Manganiello, and it was important to consider |

A-3103

| | | |
|---|---|---|
| 02:45PM | 1 | that case, because it talks about the lack of probable cause |
| 02:45PM | 2 | when you have a fabricated statement. And the defense would |
| 02:45PM | 3 | like to keep pointing to the idea there was probable cause |
| 02:45PM | 4 | here, but there wasn't. And when we look at the totality of |
| 02:45PM | 5 | the circumstances -- |
| 02:45PM | 6 | THE COURT: Well, there was a presumption of probable |
| 02:45PM | 7 | cause because of the indictment. |
| 02:45PM | 8 | MR. FELLE: Correct, but overcome by the idea that |
| 02:45PM | 9 | there was fraud or misrepresentation in the taking of the |
| 02:45PM | 10 | statement, which I think the jury was fair to weigh, but I |
| 02:45PM | 11 | think all of those circumstances were considered by the jury. |
| 02:46PM | 12 | You had a defendant who admitted he had information about |
| 02:46PM | 13 | the crime scene when he interviewed Mr. Ortiz. That |
| 02:46PM | 14 | information clearly got into the confession. The defense |
| 02:46PM | 15 | admitted that Mr. Ortiz had no involvement in the crime |
| 02:46PM | 16 | whatsoever. I don't understand the argument today for them to |
| 02:46PM | 17 | argue that he still could have known these things. There was |
| 02:46PM | 18 | no evidence of that. They didn't point to any of that. And |
| 02:46PM | 19 | the fact that they admitted that he had no involvement in the |
| 02:46PM | 20 | crime whatsoever also negates his argument that he pled guilty |
| 02:46PM | 21 | later on to this case. |
| 02:46PM | 22 | He was clearly in a bad mental and psychiatric state that |
| 02:46PM | 23 | would have allowed an innocent man to take a plea that would |
| 02:46PM | 24 | have spared his life in jail and only given him 25 years. I'm |
| 02:46PM | 25 | sure none of us can imagine that decision but, in any event, I |

**A-3104**

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

14

| | | |
|---|---|---|
| 02:46PM | 1 | think that the issues advanced by the defense are |
| 02:46PM | 2 | disingenuous. I think the evidence was clear. And, |
| 02:46PM | 3 | certainly, inferences that could be drawn properly by the jury |
| 02:46PM | 4 | should be protected. |
| 02:46PM | 5 | THE COURT: Let me ask you a question about your fee |
| 02:46PM | 6 | application. Do you have any authority, Mr. Felle, for the |
| 02:47PM | 7 | proposition that you're entitled to recover fees incurred in |
| 02:47PM | 8 | connection with matters other than this particular lawsuit? |
| 02:47PM | 9 | MR. FELLE: I don't, Your Honor. I could not find |
| 02:47PM | 10 | any law that talked to the issue of working on two |
| 02:47PM | 11 | simultaneous cases. I would simply state that those expenses |
| 02:47PM | 12 | were necessary for me to get to the point of bringing this |
| 02:47PM | 13 | case, this federal court case, to trial; such as deposition |
| 02:47PM | 14 | expenses, other expenses for experts that would have been |
| 02:47PM | 15 | required at trial. |
| 02:47PM | 16 | THE COURT: Is there any factual support for that, |
| 02:47PM | 17 | though, in the record? I mean, in other words, is there a |
| 02:47PM | 18 | record in front of me where I could say, oh, okay. This work |
| 02:47PM | 19 | that he engaged in in connection with the Court of Claims |
| 02:47PM | 20 | matter, I can see how that was necessary in connection with |
| 02:47PM | 21 | the litigation of this case against Mr. Stambach. I mean, I |
| 02:47PM | 22 | don't think I have that in this record before me. |
| 02:47PM | 23 | MR. FELLE: I guess I would -- I guess I thought it |
| 02:48PM | 24 | was, kind of, fundamental. For example, the depositions were |
| 02:48PM | 25 | utilized quite often in the trial in federal court. Those |

A-3105

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

15

| | | |
|---|---|---|
| 02:48PM | 1 | depositions, while they were conducted in the course of the |
| 02:48PM | 2 | state case, certainly was with the idea that we weren't going |
| 02:48PM | 3 | to do them twice in the federal case.  So, I think it was kind |
| 02:48PM | 4 | of -- I don't want to be presumptuous, but I thought it was |
| 02:48PM | 5 | agreed to by the parties that, in agreeing not to conduct |
| 02:48PM | 6 | duplicative depositions of parties including police |
| 02:48PM | 7 | officers -- |
| 02:48PM | 8 | THE COURT:  Yeah, but Mr. Stambach would have been a |
| 02:48PM | 9 | party to the Court of Claims matter. |
| 02:48PM | 10 | MR. FELLE:  Well, he was the acting officer for, at |
| 02:48PM | 11 | that point, the state.  The AG case would have involved a |
| 02:48PM | 12 | wrongful conviction case, which I had to still prove how that |
| 02:48PM | 13 | came about.  So -- |
| 02:48PM | 14 | THE COURT:  I don't think the -- I mean, at the time, |
| 02:48PM | 15 | it was Corporation Counsel's office representing Mr. Stambach. |
| 02:48PM | 16 | They weren't litigating the Court of Claims matter.  It was |
| 02:49PM | 17 | the state AG's office -- |
| 02:49PM | 18 | MR. FELLE:  Correct. |
| 02:49PM | 19 | THE COURT:  -- that handled that. |
| 02:49PM | 20 | MR. FELLE:  Yeah.  Correct.  I believe we have a |
| 02:49PM | 21 | letter from Maeve Huggins, at the time, who represented |
| 02:49PM | 22 | Corporation Counsel, who waived her right to be at the |
| 02:49PM | 23 | deposition, but -- |
| 02:49PM | 24 | THE COURT:  That's one thing to waive your right to |
| 02:49PM | 25 | be at the deposition.  It's another thing to make a statement |

A-3106

| | | |
|---|---|---|
| 02:49PM | 1 | that there was some affirmative agreement by the City of |
| 02:49PM | 2 | Buffalo to not conduct depositions in this case and have them |
| 02:49PM | 3 | go forward in the Court of Claims matter. I mean, I don't |
| 02:49PM | 4 | think I've seen anything to support that. You're not |
| 02:49PM | 5 | suggesting there's something in writing on that, are you? |
| 02:49PM | 6 | MR. FELLE: No, I'm not suggesting that, Your Honor. |
| 02:49PM | 7 | I really don't know that to be the case. And so, I would just |
| 02:49PM | 8 | rely on my papers with regard to that and the discretion of |
| 02:49PM | 9 | the Court. |
| 02:49PM | 10 | THE COURT: Okay. Let me ask Mr. Sahasrabudhe a |
| 02:49PM | 11 | question about the fee application. The defense makes the |
| 02:49PM | 12 | argument that the Johnson factors are no longer applicable. I |
| 02:50PM | 13 | don't want to misstate it. Hold on. |
| 02:50PM | 14 | MR. SAHASRABUDHE: Yes, Your Honor. It would not be |
| 02:50PM | 15 | a -- |
| 02:50PM | 16 | THE COURT: I'm just trying to find a point in my |
| 02:50PM | 17 | notes. There's an argument that the defense makes that the |
| 02:50PM | 18 | Supreme Court decision in Purdue specifically rejected the use |
| 02:50PM | 19 | of the Johnson factors for 1988 motions and that Arbor Hill |
| 02:50PM | 20 | is -- |
| 02:50PM | 21 | MR. SAHASRABUDHE: The -- |
| 02:50PM | 22 | THE COURT: Let me just finish -- and that Arbor Hill |
| 02:50PM | 23 | is no longer good law regarding the calculation of a |
| 02:50PM | 24 | reasonable hourly rate. My question for you is, are you |
| 02:50PM | 25 | familiar with the case of *Lily v. City of New York*? It's a |

**A-3107**

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

17

| | | |
|---|---|---|
| 02:50PM | 1 | 2019 Second Circuit case, 934 F.3d 222, which explained |
| 02:50PM | 2 | expressly that Purdue did not overrule Arbor Hill or otherwise |
| 02:51PM | 3 | prohibit district courts from considering the novelty or |
| 02:51PM | 4 | complexity of a case in determining the reasonable hourly rate |
| 02:51PM | 5 | or hours billed, and that the 12 Johnson factors remain |
| 02:51PM | 6 | important tools for helping district courts calculate the load |
| 02:51PM | 7 | star and, in exceptional cases, in determining whether an |
| 02:51PM | 8 | enhancement or cut to the load star is warranted. |
| 02:51PM | 9 | Are you familiar with the Lily case, because that seems to |
| 02:51PM | 10 | contradict the argument that the defense makes about the |
| 02:51PM | 11 | Johnson factors which, based on the defense argument, were |
| 02:51PM | 12 | never addressed, I don't think, in your papers. |
| 02:51PM | 13 | MR. SAHASRABUDHE:  Your Honor, I'm not familiar with |
| 02:51PM | 14 | that case currently.  When we briefed this back in, I think, |
| 02:51PM | 15 | June, we thought a fair reading of the Supreme Court precedent |
| 02:51PM | 16 | showed at the outset that the load star factor should be used |
| 02:51PM | 17 | instead of the factors, you know, proposed by Mr. Felle. |
| 02:52PM | 18 | But I think the main point on the fee application that I |
| 02:52PM | 19 | think the Count has in hand is, you know, Mr. Felle is not -- |
| 02:52PM | 20 | Mr. Ortiz is not entitled as the prevailing party in this case |
| 02:52PM | 21 | to recover for fees incurred for other matters in which he is |
| 02:52PM | 22 | not the prevailing party.  And, also, we would ask the Court |
| 02:52PM | 23 | to look at the circuit and district cases we cited setting |
| 02:52PM | 24 | forth, you know, reasonable Western District of New York rates |
| 02:52PM | 25 | for this kind of case.  It's clear that Mr. Ortiz is seeking, |

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

18

| | | |
|---|---|---|
| 02:52PM | 1 | you know, compensation for his fees at a rate that is more in |
| 02:52PM | 2 | line with downstate Southern District and Eastern District |
| 02:52PM | 3 | cases when the prevailing wage in the Western District of New |
| 02:52PM | 4 | York is substantially lower. |
| 02:53PM | 5 | And, so, with respect to the rate being imposed on fees |
| 02:53PM | 6 | are properly requested which, I think, as we put forth in our |
| 02:53PM | 7 | opposition, I think, over $150,000 worth of fees are for |
| 02:53PM | 8 | matters that had nothing to do with Detective Stambach and |
| 02:53PM | 9 | matters in which Mr. Ortiz was not the prevailing party. So, |
| 02:53PM | 10 | I apologize for not having knowledge of that Second Circuit |
| 02:53PM | 11 | case, but those are the two points that we wanted to emphasize |
| 02:53PM | 12 | here today with respect to Mr. Ortiz's fee application. |
| 02:53PM | 13 | THE COURT: Okay. Thank you. Mr. Felle, I'll give |
| 02:53PM | 14 | you two minutes to add anything else. You don't have to take |
| 02:53PM | 15 | the two minutes, but is there anything else that you'd like to |
| 02:53PM | 16 | argue? |
| 02:53PM | 17 | MR. FELLE: No, Your Honor. I'll rely on my papers. |
| 02:53PM | 18 | Thank you for your time. |
| 02:53PM | 19 | THE COURT: Mr. Pierce, I know you came all the way |
| 02:53PM | 20 | from Syracuse, anything that you want to add? |
| 02:53PM | 21 | MR. PIERCE: Very briefly, Your Honor. My |
| 02:54PM | 22 | application for attorney's fees was two-sided; one, that the |
| 02:54PM | 23 | plaintiff could agree to adopt it as part of the plaintiff's |
| 02:54PM | 24 | application. They have not done that. And, so, the second |
| 02:54PM | 25 | aspect of my motion was the charging lien under Judiciary Law |

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

19

02:54PM   1   475 which means, unfortunately means, that Mr. Ortiz and/or

02:54PM   2   Mr. Felle would pay the fees.  I think it's clear from our

02:54PM   3   papers we're entitled to fees based on the case law cited.

02:54PM   4   And the opposition by the defendant, I read to be conditioned

02:54PM   5   on, if it was adopted as part of the plaintiff's fee

02:54PM   6   application.  It hasn't been, unless the Court has a basis to

02:54PM   7   order it as included as part of that.

02:54PM   8       So, as I sit here, I believe our motion, Hancock

02:54PM   9   Estabrook's motion, for a charging lien award is unopposed.

02:54PM  10           THE COURT:  All right.  Thank you, Mr. Pierce.

02:55PM  11       Mr. Sahasrabudhe, anything -- I'll let you have the final

02:55PM  12   word.

02:55PM  13           MR. SAHASRABUDHE:  On any motion, Your Honor, or just

02:55PM  14   on Mr. Pierce's application?

02:55PM  15           THE COURT:  On any motion.

02:55PM  16           MR. SAHASRABUDHE:  Okay.  So, very, very briefly,

02:55PM  17   with respect to Mr. Pierce's application, we would say that

02:55PM  18   Mr. Pierce and Hancock Estabrook are not the prevailing party.

02:55PM  19   They don't have standing to receive 1988 attorneys' fees from

02:55PM  20   the non-prevailing party.  It's just they feel entitled to

02:55PM  21   fees based on their arrangement with Mr. Ortiz or Mr. Felle.

02:55PM  22   They're certainly entitled to pursue those through other

02:55PM  23   avenues.

02:55PM  24       What I would say to conclude, Your Honor, is that, you

02:55PM  25   know, I think, upon hearing that someone was wrongfully

A-3110

ORTIZ v. STAMBACH, et al -- 01/31/2023 -- ORAL ARGUMENT

20

| | | |
|---|---|---|
| 02:55PM | 1 | convicted, or spent time in jail, or prison for a crime they |
| 02:55PM | 2 | ultimately were found not responsible for that reasonably |
| 02:56PM | 3 | engenders a great deal of sympathy for that individual. And, |
| 02:56PM | 4 | of course, we all feel sympathy for Mr. Ortiz and the ordeal |
| 02:56PM | 5 | that he went through, but Mr. Ortiz was not relieved of his |
| 02:56PM | 6 | obligation to offer affirmative proof showing tainted and |
| 02:56PM | 7 | unimaginable misconduct by Detective Mark Stambach, and we |
| 02:56PM | 8 | would submit that the evidence adduced at trial fell far, far |
| 02:56PM | 9 | short showing any misconduct by the detective. |
| 02:56PM | 10 | Thank you, Your Honor. |
| 02:56PM | 11 | THE COURT: All right. Thank you. All right. Thank |
| 02:56PM | 12 | you very much everybody. I'm going to reserve decision. I |
| 02:56PM | 13 | will get you a decision out just as soon as possible. Thank |
| 02:56PM | 14 | you. Have a good afternoon, everybody. |
| 02:56PM | 15 | MR. SAHASRABUDHE: Thank you. |
| 02:56PM | 16 | MR. FELLE: Thank you. |
| 02:56PM | 17 | (Proceedings concluded at 2:56 p.m.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1          *     *     *     *     *     *     *

2

3          I certify that the foregoing is a

4     correct transcription of the proceedings

5     recorded by me in this matter.

6

7

8

9                         s/ Megan E. Pelka, RPR

10                        Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

                    Plaintiff,                          **DECISION AND ORDER**

        v.                                              1:16-CV-00321 EAW

MARK STAMBACH,

                    Defendant.
_____

## INTRODUCTION

Plaintiff Josue Ortiz ("Plaintiff") sued defendant Mark Stambach ("Defendant") for violations of his civil rights related to his arrest and conviction for the murders of Nelson and Miguel Camacho, and his subsequent exoneration.  (Dkt. 1).  A jury found in Plaintiff's favor after a five-day trial, and awarded $5 million in compensatory damages and $1.5 million in punitive damages.  (Dkt. 158).

Currently pending before the Court are several post-trial motions: (1) a motion for attorneys' fees filed by Plaintiff (Dkt. 167); (2) a motion for attorneys' fees filed by Plaintiff's former counsel, Hancock Estabrook LLP ("Hancock") (represented here by Alan Pierce, Esq.) (Dkt. 169); and (3) motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), for a new trial pursuant to Fed. R. Civ. P. 59(a), and for remittitur pursuant to Fed R. Civ. P. 59(e) filed by Defendant (Dkt. 177).  For the reasons that follow, the

A-3113

Court denies Defendant's motions, grants in part and denies in part Plaintiff's motion for attorneys' fees, and grants in part and denies in part Hancock's motion for attorneys' fees.

## BACKGROUND

Familiarity with the prior history of this case—including particularly the Court's Decision and Order entered on February 26, 2021 (Dkt. 82), and the evidence adduced at trial—is assumed for purposes of the instant Decision and Order.   The Court has summarized the salient procedural background below.

Plaintiff commenced the instant action on April 26, 2015.  (Dkt. 1).  Following discovery and motion practice, the only claims that proceeded to trial were Plaintiff's claims against Defendant for malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination.  (*See* Dkt. 82 at 36; Dkt. 160).   The jury found in Plaintiff's favor on each of these claims.  (Dkt. 160).

Following entry of judgment, Plaintiff filed his motion for attorneys' fees on May 20, 2022.  (Dkt. 167).  This motion did not include a request for any fees by Hancock, which had been terminated by Plaintiff on the eve of trial.  (*See* Dkt. 140).  Hancock filed its separate request for attorneys' fees on May 23, 2022.  (Dkt. 169).  Defendant filed his motion for judgment as a matter of law, for a new trial, and for remittitur on June 7, 2022. (Dkt. 177).

On June 10, 2022, Defendant filed his opposition to both of the pending motions for

attorneys' fees.  (Dkt. 179; Dkt. 180).  Hancock filed reply papers on June 21, 2022.  (Dkt.

182).

Plaintiff filed his opposition to Defendant's post-trial motions on June 28, 2022.

(Dkt. 187).  Defendant filed his reply on July 8, 2022.  (Dkt. 192).  The Court heard oral

argument on January 31, 2023, and reserved decision.  (Dkt. 194).

## DISCUSSION

### I.   Defendant's Post-Trial Motions

Because Plaintiff's entitlement to attorneys' fees turns on his status as a prevailing

party, the Court considers first Defendant's challenges to the trial and the jury's verdict.

### A.   Motion for Judgment as a Matter of Law

Pursuant to Rule 50, the Court may grant a motion for judgment as a matter of law

in a jury trial if it finds "that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party" opposing the request.  Fed. R. Civ. P. 50(a).  The

same standard applies where, as here, a party renews its request for judgment as a matter

of law after the trial is complete.  *See* Fed. R. Civ. P. 50(b).

"In ruling on a motion for judgment as a matter of law, the court may not itself

weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to

the credibility assessments that may have been made by the jury and the reasonable factual

inferences that may have been drawn by the jury."  *Williams v. Cnty. of Westchester*, 171

F.3d 98, 101 (2d Cir. 1999); *see also Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." (citation and alteration omitted)).  Accordingly, the Court may not grant judgment as a matter of law unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Williams*, 171 F.3d at 101 (alterations omitted and quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154 (2d Cir. 1994)); *see also Wierzbic v. Howard*, 331 F.R.D. 32, 45 (W.D.N.Y. 2019) ("In ruling on a motion for judgment as a matter of law, the motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." (quotation and alteration omitted)), *aff'd*, 836 F. App'x 31 (2d Cir. 2020).  This "standard places a particularly heavy burden on the movant where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (quotations omitted).

- 4 -

Defendant contends that a reasonable jury could not have found for Plaintiff on any of the three causes of action that were presented at trial. The Court disagrees, for the reasons that follow.

### 1. <u>Malicious Prosecution</u>

The Court turns first to Plaintiff's claim for malicious prosecution. "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997). "The existence of probable cause is a complete defense to a claim of malicious prosecution . . ., and indictment by a grand jury creates a presumption of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotations and citation omitted). This presumption "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. at 162 (quotation omitted).

Defendant argues that the evidence at trial was insufficient to permit a reasonable jury to find that the presumption of probable cause had been rebutted in this case.[1]  In particular, Defendant argues that there was "no evidence, direct or circumstantial, of bad

---

[1]     It is undisputed that Plaintiff was indicted by a grand jury and that there was correspondingly a presumption of probable cause.

- 5 -

faith" on his part. (Dkt. 177-4 at 18).  However, Defendant ignores key evidence presented at trial, and improperly construes the facts in a manner favorable to his position.

More particularly, Defendant ignores or downplays the following critical evidence presented to the jury: (1) it is undisputed that Plaintiff was not involved in the murders of the Camacho brothers; (2) Dr. Evelyn Coggins testified that Plaintiff was "in the throes of a psychotic episode" during the relevant time period (Dkt. 157 at 45-47); (3) Plaintiff testified that he spoke very limited English at the relevant time period (Dkt. 173 at 25-26); (4) Defendant testified, and record evidence corroborated, that he was alone with Plaintiff for approximately 40 minutes prior to Plaintiff giving his confession, during which time he spoke to Plaintiff about the crime without advising him of his *Miranda* rights (Dkt. 165 at 18-19, 39-42); (5) Officer Edwin Torres, who had participated in an interview of Plaintiff at Buffalo General Hospital the day prior to his interview with Defendant[2], testified that Plaintiff was determined at that time not to have any credible information about the murders (Dkt. 176 at 30-32); (6) Officer Torres testified that Defendant's notes from his conversation with Plaintiff during the time that Plaintiff and Defendant were alone contained "details that would only be known by somebody who committed the crimes" (*id.* at 81); and (7) Officer Torres testified that those same details from Defendant's notes and

---

[2]     At the time of trial, Officer Torres was unable to recall whether Defendant was present during the interview of Plaintiff at Buffalo General Hospital.  (Dkt. 176 at 18). However, Officer Torres was impeached at trial with testimony he provided at the state court proceeding in 2005, identifying Defendant as being present during Plaintiff's interview at the hospital.  (*Id.* at 18-23).

which would only have been known to the perpetrator were repeated by Plaintiff in his confession (*id.*).

Distilled to its essence, Defendant's argument is that this circumstantial evidence is insufficient because Plaintiff was unable to remember his interaction with Defendant and provide direct eyewitness testimony to contradict Defendant's account.   However, Defendant has cited no authority holding that direct evidence is required to rebut a presumption of probable cause in a jury trial on a malicious prosecution claim.   Defense counsel did point at oral argument to certain reported decisions in which such direct evidence was presented, but the fact that other plaintiffs in other, unrelated cases were able to present stronger evidence does not render the jury's verdict in this case unreasonable. To the contrary, it is well established that—even in the more demanding criminal context— "the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence, so long as the inference is reasonable, for it is the task of the jury, not the court, to choose among competing inferences." *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quotations and citations omitted).

In this case, while it is certainly not the only conclusion a jury could have drawn, it is a reasonable inference from the circumstantial evidence set forth above that Defendant deliberately fed Plaintiff information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on Plaintiff's fragile mental state and limited command of the English language to manufacture a false confession, which

- 7 -

A-3119

Plaintiff then repeated in front of Officer Torres as a direct result of Defendant's conduct. While defense counsel contended at oral argument that Plaintiff might have somehow been aware of the particulars of the murders despite not having been involved therein, the jury was not obliged to engage in that kind of speculation. Indeed, other than general references to Plaintiff having been associated with the Camacho brothers at the time of their murders, there was no other evidence presented at trial as to how Plaintiff, who was not at the crime scene, was able to provide accurate details regarding the murders in his confession. And, as previously noted, the day before Defendant interviewed Plaintiff, Plaintiff had been interviewed at the hospital by Buffalo Police Department detectives and had been determined not to be a suspect because he lacked any credible information regarding the crimes.

"[A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment. *Manganiello*, 612 F.3d at 162. Accordingly, a reasonable jury could have concluded, on the evidence presented at trial, that Defendant acted in bad faith and that the presumption of probable cause was accordingly overcome.

Defendant's arguments to the contrary miss the mark. As previously noted, Defendant relies heavily on the fact that Plaintiff himself is unable to remember his interaction with Defendant, and was accordingly unable to offer his own version of what happened during their 40-minute, pre-written confession interaction. According to

- 8 -

A-3120

Defendant, this dooms Plaintiff's malicious prosecution claim, because he cannot satisfy "the 'competing testimony plus' test announced in *Boyd v. City of New York*[, 336 F.3d 72 (2d Cir. 2003).]" (Dkt. 177-4). Defendant overstates the holding in *Boyd*. There, the Second Circuit found, at the summary judgment stage, that "a jury could reasonably find that the indictment was secured through bad faith or perjury" based on the plaintiff's testimony as corroborated by a booking shoot. 336 F.3d at 77. Defendant reads this case to mean that the <u>only</u> way a plaintiff claiming malicious prosecution can demonstrate bad faith is through a combination of his own contradictory version of events and some corroborating evidence. (*See* Dkt. 192 at 9). However, while the *Boyd* court found that the evidence in that case was sufficient to create a triable issue of fact, it did not suggest that a plaintiff could never prove bad faith in some other fashion.

In other words, while *Boyd* and its progeny indicate that a plaintiff may not rely solely on "his version of events" to rebut the presumption of probable cause, *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (citation omitted), they do not establish that a plaintiff who cannot remember his interaction with the defendant can never prevail on a malicious prosecution claim. To the contrary, the situation presented here is essentially the opposite of what courts have found prohibited by *Boyd*—that is, rather than relying solely on his own version of events without corroborating evidence, Plaintiff relies on circumstantial corroborating evidence but is unable to offer his own eyewitness account.

A-3121

This simply does not implicate the same prudential concerns as allowing the presumption to be overcome based solely on self-serving testimony.

Further, the jury was not required to find Defendant's version of events credible simply because Plaintiff was unable to offer his own recollection. *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony"); *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007) ("A jury is under no obligation to find [a defendant] credible or find [his] explanation believable."). The jury could, and plainly did, conclude that Defendant was not being truthful about what happened during the time that he and Plaintiff were alone. On a motion for judgment as a matter of law, the Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).

It is further not dispositive that certain evidence cited by the Court in denying Defendant's motion for summary judgment on Plaintiff's malicious prosecution claim was not ultimately introduced at trial. Defendant argues that "this Court's summary judgment decision required that certain evidence had to be introduced showing that [Defendant] knew that [Plaintiff] was not or could not have been a perpetrator at the time of the confession." (Dkt. 177-4 at 21). Defendant's argument misunderstands the task that a court undertakes in deciding whether summary judgment in favor of a defendant is

- 10 -

appropriate.  In assessing such a motion, a court need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial.  If the court is satisfied that at least one material factual dispute exists, summary judgment must be denied. *See, e.g., Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 121 (S.D.N.Y. 1997) ("[I]t is basic, black-letter law that the existence of even one disputed issue of material fact renders a grant of summary judgment inappropriate. . . . Once this Court found that there existed one material issue of disputed fact regarding Count One, this Court did not need to consider any of [the defendant's] other alleged violations of the Factoring Agreement in order to deny summary judgment, and therefore, did not consider them. . . .  As a result, *all* of [the defendant's] conduct which was alleged by plaintiffs in Count One to violate the Factoring Agreement survived [the defendant's] summary judgment motion.").

Consistent with these principles, in its Decision and Order denying Defendant summary judgment on Plaintiff's malicious prosecution claim, the Court identified certain evidence that it found would allow a reasonable factfinder to conclude that Defendant had knowingly procured a false confession from Plaintiff and accordingly denied summary judgment.  (Dkt. 82 at 28).  The Court never held that some lesser quantum of evidence would be insufficient to sustain Plaintiff's burden of proof at trial, because it was not called upon to make such a determination at that time.  Nor did the Court grant partial summary judgment determining that any particular legal or factual theory of Plaintiff's as to this claim failed as a matter of law.  Accordingly, the fact that the evidence at trial did not line

- 11 -

up precisely with the discussion in the Court's prior Decision and Order does not mean that Defendant is entitled to judgment in his favor.

For all these reasons, the Court cannot conclude that a reasonable jury would have been unable to find in Plaintiff's favor on his malicious prosecution claim, and Defendant's motion for judgment as a matter of law thereon is denied.

### 2. Fabrication of Evidence

The elements of a fabrication of evidence claim are that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). A plaintiff "may rely on circumstantial evidence (and reasonable inferences drawn from such evidence)" to support a contention that a defendant engaged in the fabrication of evidence. *Anilao v. Spota*, 340 F. Supp. 3d 224, 251 (E.D.N.Y. 2018), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

Defendant argues that Plaintiff's fabrication of evidence claim is insufficient as a matter of law because "[t]here is no evidence whatsoever that [Plaintiff's] written confession is not an accurate account of what [Plaintiff] said to [Defendant] on November 16, 2004." (Dkt. 177-4 at 16). This argument fails for essentially the same reasons discussed above with respect to Plaintiff's malicious prosecution claim. Specifically, based on the evidence previously set forth, a reasonably jury could have concluded that

- 12 -

Defendant created a false confession by providing Plaintiff, who was suffering from a psychotic episode, with the details of the murders and causing him to repeat those details in response to Defendant's subsequent questions.  Having reached such a conclusion, a reasonable jury could further have found in Plaintiff's favor on his fabrication of evidence claim.   The Court accordingly denies Defendant's Rule 50(b) motion as to this claim.

### 3.     Violation of Right Against Self-Incrimination

A plaintiff may recover "under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff[] in a criminal proceeding." *Deshawn E. by Charlotte E. v. Scfir*, 156 F.3d 340, 346 (2d Cir. 1998).  Whether a statement was obtained by coercion is determined by the totality of the circumstances.  *Id*.; *see also Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.").  "[F]actors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics."  *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997).  "Psychologically coercive tactics" may include "techniques such as brainwashing or

promises of leniency or other benefits."  *Green*, 850 F.2d at 902; *see also United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirmative misrepresentations or improper "trickery" can render a confession involuntary (alteration omitted)).

Although it is a closer question than those presented by Plaintiff's other claims, the Court finds that the jury could have reasonably concluded that Defendant engaged in coercive conduct during the 40 minutes that he was alone with Plaintiff prior to the taking of Plaintiff's written confession.  In particular, the jury could have taken into account Plaintiff's limited understanding of English, Plaintiff's psychological state, and the fact that Plaintiff had a limited education.  (*See* Dkt. 173 at 23-24 (Plaintiff testifying that he only completed the 11th grade and had been unsuccessful in obtaining his GED)).  The jury also could have reasonably inferred that Defendant employed a psychologically coercive interrogation technique and/or engaged in improper trickery, based on the evidence that: (1) Plaintiff had no credible information about the murders when interviewed by law enforcement the previous day; (2) Plaintiff had no involvement in the murders; (3) during the 40-minute interval where he was alone with Plaintiff, Defendant created notes that included details of the murders that could only have been known by someone with inside knowledge; and (4) those same details were then repeated by Plaintiff during his answers to Defendant's questions during the creation of his written confession.

Defendant's emphasis on the law enforcement witnesses' testimony about his conduct while taking Plaintiff's written confession (*see* Dkt. 177-4 at 13-15) misses the

- 14 -

A-3126

point.  As discussed above, the jury was free to disbelieve all or part of that testimony.

Further, it is entirely plausible that, having successfully employed psychological coercion

during the 40 minutes when he was alone with Plaintiff (an individual with a limited

education, little understanding of the English language, and a fragile mental state),

Defendant had no need to continue to do so in front of Officer Torres or Sergeant James

Lonergan (the other witness to Defendant's post-interview conduct).  While the jury

certainly was not compelled to reach that conclusion, it was permitted to do so.

Defense counsel also contended at oral argument that Defendant's version of events

was corroborated by the facts that Plaintiff pled guilty in his state court criminal

proceedings and reiterated his guilt years later before a federal grand jury.  However, this

argument again fails to consider the evidence in the light most favorable to Plaintiff.  As to

the former point, the evidence at trial was that Plaintiff attempted to withdraw his guilty

plea and that the state court judge denied that request.  (Dkt. 175 at 6).  As to the latter

point, Plaintiff explained at trial that when he testified before the federal grand jury, he was

afraid that he would be prosecuted federally if he claimed not to have committed the

murders.  (*Id*. at 66-67).  The jury was within its rights to credit this explanation.

In sum, the Court finds no basis to grant Defendant judgment as a matter of law on

Plaintiff's claim that Defendant violated his right against self-incrimination.

- 15 -

A-3127

4.     **Punitive Damages**

Defendant contends that he is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages, because there was nothing shocking or offensive about his conduct, nor was there any evidence that he had an evil motive or intent or was acting based on personal animus.  (Dkt. 177-4 at 23-24).  The Court disagrees that a reasonable jury could not have awarded punitive damages in this case.

"Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)).  As detailed above, the jury in this case could have reasonably concluded that Defendant caused the fabrication of a false confession and then caused that false confession to be used to prosecute Plaintiff. Such actions easily satisfy the standard for engaging in callous indifference to Plaintiff's constitutional rights.  Further, a reasonable jury could determine that such conduct was shocking, offensive, and sufficiently egregious to warrant an award of punitive damages. *See, e.g., Niemann v. Whalen,* 928 F. Supp. 296, 300 (S.D.N.Y. 1996) (finding jury was warranted in awarding punitive damages where defendant coerced a false confession), *a,f'd,* 107 F.3d 3 (2d Cir. 1997).

For all these reasons, the Court denies in its entirety Defendant's motion for judgment as a matter of law.

- 16 -

B.     **Motion for a New Trial**

Defendant seeks in the alternative a new trial pursuant to Rule 59(a).  "As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotation and alterations omitted); *see also Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ("[A] decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice[.]"). "Rule 59(a) . . . has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (quotations and citation omitted).  "The legal standard for granting a new trial under Rule 59(a) calls for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice." *Top Ridge Invs., LLC v. Anichini, Inc.*, No. 5:16-CV-76, 2018 WL 11419657, at *1 (D. Vt. May 7, 2018).  Whether to grant a new trial under Rule 59(a) is entrusted to the Court's discretion.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 261 (2d Cir. 2002) ("This court reviews the grant of a new trial on the ground that the verdict was against the weight of the evidence for abuse of discretion.").

- 17 -

The Court does not find that this is a case in which the jury's verdict was seriously erroneous or a miscarriage of justice.  The resolution of this case turned largely on the jury's assessment of Defendant's credibility, and Second Circuit precedent "teach[es] . . . the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  Indeed, "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case[.]" *Id*. at 418-19  (reversing district court's grant of new trial where "[i]n the final analysis, the only testimony regarding what was actually said came from [one witness], and thus the entire case hinged on his credibility").

Here, the jury plainly concluded that Defendant was not being truthful about his interactions with Plaintiff, and there was support in the record for that conclusion.  For example, Defendant changed his testimony in some respects from his deposition testimony. (*See, e.g.*, Dkt. 165 at 45-47).  Perhaps most significantly, Defendant initially testified at trial that he did not have a conversation with Plaintiff during the 40 minutes they were alone.  (*Id*. at 39).  However, the jury subsequently learned that Defendant had testified at his deposition that he and Plaintiff had engaged in conversation during that time period, including conversation about the murders, and that Defendant had created two pages of notes during that time containing information specific to the crimes at issue.  (*Id*. at 40-44). After being confronted with his prior testimony, Defendant tried to claim that he had asked

"[j]ust limited" questions of Plaintiff, but conceded on further cross-examination that he

had asked Plaintiff "questions and details about how the crime had been committed" before

a translator arrived and before Plaintiff was advised of his Fifth Amendment rights, and

that it was during that same time frame that Plaintiff supposedly gave the facts that "led

[Defendant] to believe he was the perpetrator of the crime[]."  (*Id*. at 41-42).

The Court does not consider it seriously erroneous or a miscarriage of justice for the

jury to have concluded that Defendant was not a credible witness, nor for the jury to have

drawn reasonable inferences based on the circumstantial evidence as to what actually

occurred during the 40 minutes that Plaintiff and Defendant were alone together prior to

Plaintiff's written confession.  Under the circumstances of this case, the Court does not

find it to be the rare occasion on which the jury's verdict should be disturbed.

### C.    **Motion for Remittitur**

Defendant's final request is for remittitur pursuant to Rule 59(e).  The Second

Circuit has explained that:

> The district court has authority to enter a conditional order of remittitur,
> compelling a plaintiff to choose between reduction of an excessive verdict
> and a new trial, in at least two distinct kinds of cases: (1) where the court can
> identify an error that caused the jury to include in the verdict a quantifiable
> amount that should be stricken, and (2) more generally, where the award is
> intrinsically excessive in the sense of being greater than the amount a
> reasonable jury could have awarded, although the surplus cannot be ascribed
> to a particular, quantifiable error.

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotations and alterations

omitted).  In the latter case—where there is no particular discernable error—"generally . . .

- 19 -

a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice[.]" *Id*. (quotation omitted; *see also Newton v. City of New York*, 171 F. Supp. 3d 156, 171 (S.D.N.Y. 2016) ("[T]his Court must evaluate whether [the plaintiff's] Section 1983 award shocks the judicial conscience given that there is no particular discernable error that caused the jury to include in the verdict a quantifiable amount that should be stricken." (quotations and original alterations omitted)).

Defendant contends that the jury's award of $5 million in compensatory damages was intrinsically excessive.  (Dkt. 177-4 at 26).  The Court disagrees.  As Defendant concedes, "there have been cases holding that an award of $1,000,000 . . . per year spent in prison is a reasonable award in wrongful conviction cases."  (Dkt. 177-4 at 27); *see, e.g., Newton*, 171 F. Supp. 3d at 172-75 (collecting cases).  Here, Plaintiff spent 10 years in prison for a crime he did not commit, and so the $5 million award equates to $500,000 per year of wrongful confinement.  This is well within a permissible range.

Defendant argues that Plaintiff did not present "detailed evidence" of his emotional distress.  (Dkt. 177-4 at 27).  However, Plaintiff testified at trial about experiencing humiliating strip searches while imprisoned, about being attacked by other inmates, and about being assaulted by corrections officers.  (Dkt. 175 at 9-14).  He further expressly told the jury how difficult he found it to live in a cell, particularly in light of his mental health struggles.  (*Id*. at 15).  He also discussed feeling as though he constantly had to "watch[]

- 20 -

A-3132

his back." (*Id.* at 16). The jury could have reasonably concluded from this testimony that Plaintiff suffered significant emotional distress as a result of his wrongful conviction.

Defendant also argues that there was no "concrete evidence of a police officer's bad faith misconduct" in this case. (Dkt. 177-4 at 27). Of course, for the reasons discussed above, the Court disagrees with Defendant's assessment of the proof at trial that supported the jury's verdict. While circumstantial, a reasonable jury had a legally sufficient evidentiary basis to find in favor of Plaintiff. Moreover, the amount of compensatory damages does not depend on the presence of direct—as opposed to circumstantial—proof at trial. So long as the proof was sufficient to support a verdict in Plaintiff's favor, which the Court has determined it was in this case, the jury was entitled to determine the amount that would compensate Plaintiff for his damages.

As to the punitive damages amount, "no objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (citation and alteration omitted). However, there are three general "guideposts" a court may look to in reviewing whether a punitive damages award is excessive: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Id*. (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

- 21 -

Defendant focuses solely on the first of these guideposts in seeking remittitur, arguing that "there was no evidence of reprehensible conduct by" Defendant.  (Dkt. 177-4 at 27).  For the reasons discussed at length above, the Court disagrees.  The jury reasonably found that Defendant, a law enforcement officer, fabricated a false confession, and thereby caused an innocent man to be imprisoned for 10 years.  That is reprehensible conduct as that term is used in this context.  *See Stampf*, 761 F.3d at 209 (explaining that "[c]onduct that involves deceit or malice is more reprehensible than conduct involving mere negligence" and "conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages").  Defendant's argument relies on his contention that he did nothing more than take a statement from Plaintiff (Dkt. 177-4 at 27), but that is not what the jury found.

The Court further notes that the ratio of punitive damages to compensatory damages in this case is 1.5:5, which is less than the 1:1 ratio that the Second Circuit has said does not "raise a suspicious judicial eyebrow."  *Stampf*, 761 F.3d at 211 (quoting *Gore,* 517 U.S. at 582).  Further, at least one other federal court has apparently approved an "award of $13,000,000 in punitive damages for 31 years of incarceration based on [a] false confession."  *Burton v. City of New York*, No. 20-CV-9025 ATR WL, 2022 WL 9491955, at *14 (S.D.N.Y. Sept. 26, 2022) (citing *McCollum v. Robeson County*, No. 15-CV-00451, Dkt. No. 429 (E.D.N.C. May 14, 2021)).

A-3134

In sum, Defendant has failed to persuade the Court that either the compensatory damages award or the punitive damages award in this case is greater than the amount a reasonable jury could have awarded.  Accordingly, the Court denies Defendant's request for remittitur.

## II.   Plaintiff's Motion for Attorneys' Fees

The Court turns next to Plaintiff's motion for attorneys' fees.  Pursuant to 42 U.S.C. § 1988, the Court may award the prevailing party in a § 1983 action a reasonable attorneys' fee.  *See Lilly v. City of New York*, 934 F.3d 222, 227 (2d Cir. 2019).  In determining what constitutes a reasonable fee, the Court must "calculate a presumptively reasonable fee by determining the appropriate billable hours expended and setting a reasonable hourly rate, taking account of all case-specific variables."  *Id*. at 229-30 (quotations omitted).  This constitutes the "lodestar figure," which "has, as its name suggests, become the guiding light of [federal] fee-shifting jurisprudence."  *Perdue v. Kenny A*., 559 U.S. 542, 551 (2010) (quotation omitted).

A reasonable hourly rate "is the rate a paying client would be willing to pay."  *Id*. (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008)).  "In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson*[3] factors; it should also

---

[3]     *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The twelve *Johnson* factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's

bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* "The determination of an award of attorney's fees under 42 U.S.C. § 1988 is committed to the sound discretion of the district court because the appropriate amount is dependent on the unique facts of each case." *Raja v. Burns*, 43 F.4th 80, 86 (2d Cir. 2022) (quotation omitted).

"The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Torcivia v. Suffolk Cnty.*, 437 F. Supp. 3d 239, 251 (E.D.N.Y. 2020). Here, Plaintiff seeks $538,032.50 in attorneys' fees and $37,638.28 in costs. (Dkt. 167-1 at ¶¶ 6-7). Plaintiff is a prevailing party in this case, and so the Court concludes that a fee award is appropriate. However, for the reasons set forth below, the Court will award $123,550.00 in attorneys' fees and $2,474.81 in costs, rather than the amounts requested by Plaintiff.

A.   **Hours Expended**

1.   **Fees Incurred in Other Matters**

Turning first to the determination of the appropriate billable hours expended, Plaintiff seeks compensation for 1065.4 hours expended by Wayne Felle, Esq., 150.8 hours expended by Edward Markarian, Esq., 24 hours expended by Elizabeth Bruce, Esq., and

---

customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 522 F.3d at 186 n.3.

A-3136

190.7 hours expended by paralegal Briana Croce.  (Dkt. 167-1 at ¶ 6).  However, as Defendant correctly points out, Plaintiff has included in this request many hundreds of hours of time spent on other proceedings and legal matters to which Defendant was not a party.  This includes: proceedings in *Ortiz v. Case*, No. 1:16-cv-00322, a civil case in this District which was resolved in favor of the defendants; proceedings in the New York Court of Claims; proceedings in *United States of America v. Ortiz*, No. 1:16-cr-00077, a criminal case in this District wherein Plaintiff was convicted of being a felon in possession of a firearm; and Social Security, disability, and Medicare proceedings.

As the Second Circuit has recently explained, "[i]n section 1988, Congress authorized district courts only to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce section 1983."  *Raja*, 43 F.4th at 92 (quotation and alteration omitted).  Fees incurred in connection with related proceedings may generally be recovered only to the extent those proceedings were "useful and of a type ordinarily necessary to advance the civil rights litigation."  *Id*.  (quotation omitted).

Here, the Court largely agrees with Defendant that this standard has not been satisfied with respect to the other proceedings as to which Plaintiff seeks attorneys' fees, inasmuch as the other legal proceedings at issue were not sufficiently related to this action.  The exception is fees related to Plaintiff's "initial Section 440 proceeding to vacate his conviction."  (Dkt. 179 at ¶ 12).  Plaintiff could not pursue the instant action without first having his conviction vacated, or his claims would have been barred by *Heck v. Humphrey*,

- 25 -

512 U.S. 477 (1994).   Accordingly, the state court proceeding to vacate his criminal conviction was both useful and necessary to advance the instant § 1983 action.

Defendant relies on an unreported, out-of-Circuit case to support his argument that fees related to the § 440 proceeding are not recoverable under § 1988.  (*See* Dkt. 179-1 at 14-15 (citing *DeLew v. Nevada*, No. 2:00-CV-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010))).   However, the *DeLew* case is not on point, as it involved fees related to a wrongful death suit, not fees related to seeking the vacatur of a criminal conviction.  *See* 2010 WL 11636127, at *6.   Further, the *DeLew* court acknowledged that "attorney's fees may be available 'where a state proceeding is a necessary preliminary action to the enforcement of a federal claim[.]'"  *Id*. (quoting *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 255 (5th Cir. 2000)).   Again, Plaintiff could not have pursued his § 1983 claims without first having his conviction vacated in state court.

Defendant has identified 438.7 hours of legal fees that he claims should be struck as having been incurred in connection with miscellaneous other legal proceedings.  (Dkt. 179 at ¶ 13).   The Court has reviewed the entries identified by Defendant and notes that the entries from April 11, 2014, to January 15, 2015, are related to the § 440 proceedings in which Plaintiff's conviction was vacated.   These entries total 57.3 hours.   The Court agrees with Defendant that most of the remaining 381.4 hours are not recoverable.   However, the entry on September 21, 2021, for 1.8 hours appears on its face to be related to this matter,

A-3138

as does the entry on May 9, 2022, for 13 hours.  The Court has not excluded these two entries on this basis.

Defendant has further identified 465.9 hours in fees that he asserts are associated with the actions before the New York Court of Claims and Appellate Division, Fourth Department and 47.7 hours that are associated with the *Ortiz v. Case* matter.  (Dkt. 179 at ¶¶ 14-15).[4]  The Court has reviewed the entries identified by Defendant and agrees that they are not recoverable.  The Court also agrees with Defendant that time spent on public relations events should be struck, and has not included the identified public relations entries in its lodestar calculation.  (*See id*. at ¶ 16).

The Court was not persuaded by Plaintiff's counsel's contention at oral argument that certain of the hours expended in connection with the other litigation discussed above were meant to overlap with and also be used in connection with this litigation.  Plaintiff's counsel was unable to point to any record support for that contention, and as the party seeking fees, it is Plaintiff's burden to "submit sufficient evidence to support the hours worked[.]"  *Torcivia*, 437 F. Supp. 3d at 251.  Without some kind of evidentiary support (and absent any identification of the specific hours at issue), an attorney's general assertion does not satisfy this standard.

---

[4]     There is some overlap in the entries identified in paragraphs 13, 14, 15, and 16 of Defendant's declaration.  The Court has accordingly independently cross-referenced the identified entries with Plaintiff's counsel's billing ledger, and has performed its own calculation of the hours remaining for each timekeeper when the entries described in this Decision and Order are excluded.

### 2.    **Vague Entries**

Defendant next argues that the Court should strike 11 billing entries for "client meeting" or "meeting with client" as impermissibly vague. (*Id.* at ¶ 17). The Court agrees. "Courts may deny compensation where the billing information submitted is too vague to sufficiently document the hours claimed." *Decastro v. City of New York*, No. 16-CV-3850 (RA), 2017 WL 4386372, at *8 (S.D.N.Y. Sept. 30, 2017) (quotation omitted). In the context of this case, where counsel was representing Plaintiff in connection with multiple actions, the phrases "client meeting" and "meeting with client" provide no useful information about the work done. The Court accordingly will not include these entries in its calculation. *See Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 3773856, at *3 (S.D.N.Y. Aug. 12, 2019) (describing "[c]alls with team and team meeting, call with client and review of additional documentation" as "exactly the type of descriptions that courts have found to be impermissibly vague in the context of recovering attorneys' fees").

### 3.    **Unnecessary Pre-trial Motion Practice**

Defendant further asks the Court not to award fees associated with pre-trial motion practice regarding Plaintiff's failure to disclose expert witnesses, Plaintiff's request for an adjournment of the trial date, and the termination of Hancock and withdrawal of Mr. Pierce. (*See* Dkt. 179 at ¶¶ 18-21). Defendant contends that these activities were unnecessary and

- 28 -

A-3140

incurred because of Plaintiff's counsel's own failure to comply with the Federal Rules of Civil Procedure. (Dkt. 179-1 at 19).

"In determining the number of hours reasonably expended on a case, a district court properly excludes documented hours that are excessive, redundant, or otherwise unnecessary." *Raja*, 43 F.4th at 87 (quotation omitted). Here, the Court does not agree that the motion practice regarding expert witnesses falls within that category. While the Court ultimately largely found in Defendant's favor on those motions, the Court cannot say that the associated motion practice was unnecessary.

However, the Court agrees that Defendant should not have to bear the costs of Plaintiff's request for an adjournment of the trial date, which was entirely without basis and which the Court noted was made in an attempt at gamesmanship. (*See* Dkt. 138). Defendant also should not have to bear the costs of the internal dispute between Plaintiff's lawyers, which could and should have been handled without resort to motion practice.

Plaintiff's counsel has included litigation of the motion for an adjournment and his work related to his dispute with Mr. Pierce in large, blocked-billed entries in April of 2022. The Court accordingly strikes from the requested fees a 12.5-hour entry on April 14, 2022, a 7.5-hour entry on April 19, 2022, a 6.8-hour entry on April 20, 2022, a 7.2-hour entry on April 21, 2022, and an 8.6-hour entry on April 26, 2022, each of which references work on these items. (*See* Dkt. 167-2 at 19).

- 29 -

A-3141

### 4. Paralegal Time Charged to Attorney

Defendant has identified three specific occasions on which Mr. Felle appears to have billed hours that were actually worked by his paralegal, Ms. Croce.  The first is an entry on June 3, 2019.  (Dkt. 167-2 at 12).  The time entry says: "Sent co-counsel transcripts and exhibits (WCF 1.5) (BEC 2))." (*Id.*).  However, the corresponding hours charge 3.5 hours to Mr. Felle and none to Ms. Croce.  This is clearly an error, as the time entry itself allocates 2 hours of work to Ms. Croce.  Similar errors can be seen in an entry from November 8, 2019, attributing 0.3 hours of Ms. Croce's work to Mr. Felle, and in an entry from April 29, 2022, attributing 6.5 hours of Ms. Croce's work to Mr. Felle.  (*Id.* at 12, 20).  The entry from November 8, 2019, has already been disallowed by the Court as related to state court litigation.  For the remaining misallocated 8.5 hours, the Court will apply Ms. Croce's rate and not Mr. Felle's rate.

### 5. Block Billing and Other Deficient Time-Keeping Practices

In addition to the specific arguments made above, Defendant seeks an across-the-board reduction in the requested hours, arguing that counsel's "time entries demonstrate widespread block-billing, excessively vague time-entries, and are suggestive of either deliberate overestimation or a failure to maintain contemporaneous records."  (Dkt. 179-1 at 16).  Defendant specifically seeks an across-the-board 75% reduction in the remaining hours.  (*Id.* at 17).

- 30 -

A-3142

"Block billing—. . . the practice of lumping multiple distinct tasks into a single billing entry—is generally disfavored because it can complicate the district court's task of determining the reasonableness of the billed hours." *Raja*, 43 F.4th at 87.  Nonetheless, "the practice is by no means prohibited in this Circuit because block billing will not always result in inadequate documentation of an attorney's hours." *Id*.  In particular, block billing is "permissible as long as the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Id*. (quotation omitted)  Here, while Plaintiff's counsel did engage in block billing, the Court does not find that the practice was so egregious as to prevent meaningful review of the requested hours.

However, the Court does agree that some reduction is appropriate due to the vagueness of the time entries and because they reflect excessive time spent on routine matters. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).  To give just a few example of excessive time spent on routine matters, an entry on April 25, 2016, reflects two hours of attorney time for "filed, paid—claims against City and County"; an entry on November 2, 2016, reflects 0.5 hours of attorney time for "[s]ent correspondence to defense attorneys with discovery responses and demands"; an entry on June 3, 2019, reflects 3.5 hours being spent simply to send transcripts and exhibits to co-counsel; an entry on September 9, 2020, reflects 0.4 hours being spent to fax a request for records; and an entry on March 2, 2021, reflects 0.7 hours being spent to "[e]mail page count for draft record." (Dkt. 167-2).  For examples of vague entries (and in addition to the "client meeting" and

- 31 -

A-3143

"meeting with client" entries already discussed), an entry on March 16, 2016, states, "[p]hone call with client"; an entry on May 1, 2017, states "[p]hone call with client"; an entry on August 8, 2017, states "[e]mail to co-counsel"; an entry on October 15, 2018, states "ltr to AP, t/c w/ client"; an entry on February 24, 2021, states, "[m]essage to counsel"; an entry on April 21, 2021, states "[p]hone call with counsel; discussed next steps"; an entry on April 30, 2021, states "[p]hone call with counsel; email with counsel"; and an entry on November 10, 2021, states "[l]etter to Fed. Ct., t/c AP." (*Id.*). These lists are not exhaustive, but are representative of counsel's timekeeping practices.

"To address such redundancy or vagueness, 'the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" *Raja*, 43 F.4th at 87 (quoting *Kirsch*, 148 F.3d at 173). Here, the Court finds an across-the-board reduction of 15% sufficient to account for these time-keeping deficiencies. *See Mason Tenders Dist. Council Welfare Fund v. Gibraltar Contracting, Inc.*, No. 1:18-CV-3668-MKV, 2020 WL 6363960, at *2 (S.D.N.Y. Oct. 29, 2020) (applying 20% reduction to account for similar issues and collecting cases applying reductions between 15% and 30%).

Taking all these rulings together, the Court finds that, prior to any across-the-board reduction, the reasonable hours spent on this litigation are as follows: 449 hours by Mr. Felle, 2.1 hours by Mr. Markarian, 23.2 hours by Ms. Bruce, and 55.8 hours by Ms. Croce.

A-3144

Applying the 15% across-the-board reductions results in a total of 381.7 hours by Mr. Felle, 1.8 hours by Mr. Markarian, 19.7 hours by Ms. Bruce, and 47.4 hours by Ms. Croce.

**B.      Reasonable Hourly Rates**

Plaintiff seeks the following hourly rates: $425 per hour for Mr. Felle; $335 per hour for Mr. Markarian; $325 per hour for Ms. Bruce; and $125 per hour for Ms. Croce. (Dkt. 167-1 at ¶ 6).  Defendant maintains that these rates are unreasonably high.  (Dkt. 170-1 at 23-24).  The Court agrees.

For purposes of calculating the lodestar figure, the Court applies "the prevailing hourly rate in the community," and "the community for purposes of this calculation is the district where the district court sits."  *Arbor Hill*, 522 F.3d at 190 (quotations and alteration omitted).  The Court may use an out-of-District hourly rate only "if it is clear that a reasonable, paying client would have paid those higher rates."  *Id*. at 191.  There is a presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally," and the burden is on the attorney seeking a higher rate to rebut that presumption.  *Id*.

In the Western District of New York, the prevailing hourly rate for an experienced attorney in a civil rights matter is typically no more than $300 per hour, while less experienced attorneys typically have rates of no more $200 per hour.  *See Warr v. Liberatore*, No. 13-CV-6508MWP, 2022 WL 969528, at *5 (W.D.N.Y. Mar. 31, 2022) (collecting cases and finding, in civil rights action, that $350 per hour rate for experienced

attorney was unreasonable and should be reduced to $295 per hour).  The rates proposed by Plaintiff's counsel are far outside this range, and the Court finds no reason to apply out-of-District rates in this case.

The Court has considered the *Johnson* factors, among others, in making this determination.  As a threshold matter, the Court notes that Defendant contends that the Supreme Court's decision in *Perdue* "specifically rejected the use of the *Johnson* factors for § 1988 motions" and that *Arbor Hill* is "no longer good law" regarding calculation of a reasonable hourly rate.  (Dkt. 179-1 at 22-23).  However, the Second Circuit held to the contrary in *Lilly*, explaining that "*Perdue* . . . did not overrule *Arbor Hill* or otherwise prohibit district courts from considering the novelty or complexity of a case in determining the reasonable hourly rate or hours billed," and that "the twelve *Johnson* factors remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted."  934 F.3d at 232-33.  Accordingly, the Court rejects Defendant's invitation to ignore the *Johnson* factors.

As set forth above, the *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The Court has considered these factors and does not find that they support the imposition of a higher hourly rate in this case.

Plaintiff's arguments to the contrary are not persuasive. While counsel certainly expended significant time and labor, much of that time and labor (as set forth above) was spent on other legal proceedings. Plaintiff concedes that "this matter did not present significant novel legal questions." (Dkt. 167-3 at 13). The Court further does not find that this case required any unusual skill to pursue.

Counsel contends that he was unable to take on certain other paying matters "during the most intense periods of litigating this case[.]" (*Id*. at 14). While this may be true, those "intense periods" of litigation were relatively limited, and not out of the ordinary for a civil rights matter.

Counsel also contends that his customary hourly rate significantly exceeds the rates sought in the instant fee application. (*Id*. at 15). However, he has calculated his "hourly rate" by looking to contingent fee cases, which the Court does not find to be a useful comparison. The effective hourly rate in a contingent fee case is recompense for the risk of not being paid at all, and is not reflective of the hourly rate a paying client would agree to in a traditional attorney-client relationship. The Court further does not find the fact that

counsel will receive a contingent fee from Plaintiff a reason to depart from the prevailing hourly rates in this District.

Counsel's argument that he was "tasked with conducting discovery and preparing for trial within an expedited timeframe" (Dkt. 167-4 at 15) is entirely belied by the history of this case. Discovery in this matter began in 2016 and did not close until 2020. (*See* Dkt. 68). Further, the Court resolved all dispositive motions by February 2021 (*see* Dkt. 82), and the trial did not occur until over a year later, in May of 2022. The Pretrial Order setting filing deadlines was entered in December of 2021, approximately five months before the trial occurred. (*See* Dkt. 98). This is not an expedited timeframe.

Counsel did obtain a significant award on behalf of his client. However, as discussed further below, there were also many unsuccessful claims brought in this action. Accordingly, the Court does not find that this factor warrants an upward adjustment in the hourly rate. The Court is further unpersuaded by counsel's arguments regarding his experience, inasmuch as counsel has previously represented to the Court that he is unexperienced in federal court matters such as this one.

Plaintiff's counsel argues that the case was "undesirable" because it is societally unpopular to sue law enforcement. (Dkt. 167-4 at 17-18). However, Plaintiff—who spent 10 years in jail for a crime he concededly did not commit—was a sympathetic litigant, and the potential damages were very high. The Court is not persuaded that this case was

undesirable on the whole.  The Court also does not find this case out of the ordinary with respect to the nature of the professional relationship between counsel and client.

Finally, counsel has not cited any civil rights cases in this District where hourly rates in line with those sought here were awarded.  He has instead relied on cases from the Southern and Eastern Districts of New York, where the prevailing rates are significantly higher than in the Western District of New York.  Indeed, in one of the cases that Plaintiff cites, *Vilkhu v. City of New York*, No. 06-CV-2095 CPS (JO), 2009 WL 1851019 (E.D.N.Y. June 26, 2009), the Second Circuit vacated and remanded the decision specifically because the district court had applied Southern District prevailing rates, and not rates from the Eastern District.  *See Vilkhu v. City of New York*, 372 F. App'x 222, 224 (2d Cir. 2010).

The Court accordingly finds that the reasonable hourly rates in this case should be in line with the prevailing rates in this District.  Specifically, the Court finds that rates of $300 per hour for Mr. Felle, $200 per hour for his associates, and $100 per hour for his paralegal are what a reasonable paying client would have been willing to pay.  Multiplying these rates by the hours previously calculated by the Court results in a lodestar figure of $123,550.00.

**C.**     **Unsuccessful Claims**

Defendant asks the Court to reduce the fee award based on the fact that several claims and defendants were dismissed from this case prior to trial.  (Dkt. 179-1 at 21). "[P]laintiffs may receive fees under § 1988 even if they are not victorious on every claim.

A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011).  Where "the plaintiff's claims involve a common core of facts or are based on related legal theories, and are therefore not severable, attorney's fees may be awarded for unsuccessful claims as well as successful ones." *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (quotations and alterations omitted).   Nevertheless, "[a]lthough full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case." *Id*.

Here, the Court is not persuaded that a further reduction is warranted on this basis. In particular, in exercising its discretion, the Court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," and "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation[.]" *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983).  Here, there is no question that Plaintiff obtained a very significant award in his favor, and he was fully successful on all the claims that proceeded to trial.  The Court does not find that this is a case in which the lodestar figure should be reduced based on the presence of unsuccessful but intertwined claims.

A-3150

**D.    Costs**

The Court turns to Plaintiff's request for costs.  "The Second Circuit has held for a prevailing plaintiff, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *Torcivia*, 437 F. Supp. 3d at 257 (quotation omitted).  In this case, Plaintiff seeks $37,638.00 in costs.  (Dkt. 167-1 at ¶ 7).  However, as Defendant has correctly noted, Plaintiff's fee request includes $27,899.50 for expert witness fees.  (*See* Dkt. 179 at ¶ 5).  "Section 1988 does not convey the authority to shift experts' fees to the losing party" in § 1983 cases.  *Stratakos v. Nassau Cnty.*, 574 F. Supp. 3d 154, 162 (E.D.N.Y. 2021) (quotation omitted); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006) ("'[C]osts' is a term of art that generally does not include expert fees." (citation omitted)).  Further, all four of the expert witnesses in question were precluded from testifying by the Court due to counsel's failures to comply with the Federal Rules of Civil Procedure, and the Court would not award their fees even if it had the authority to do so.

Additionally, and again as Defendant correctly points out (*see* Dkt. 179 at ¶ 8), the majority of the remaining costs sought by Plaintiff were incurred in connection with other actions.  For example, Plaintiff seeks reimbursement of his filing fee in the New York State Court of Claims, as well as service fees and transcripts associated with his state court proceedings and his federal criminal proceedings.  (*See* Dkt. 167-3).

- 39 -

Having reviewed the documentation presented by Plaintiff, the Court finds he is entitled to reimbursement of: $400 in filing fees; $100 in service fees; $808.10 in transcript fees; and $1,166.71 in printing fees. This is a total of $2,474.81, which is awarded to Plaintiff as costs.

## III.    Hancock's Motion for Attorneys' Fees

The Court turns finally to Hancock's motion for attorneys' fees. Hancock seeks fees pursuant to § 1988. (Dkt. 169-1 at ¶ 2). In the alternative, Hancock asks to intervene in this matter and for the Court to confirm that it has a charging lien that is enforceable against either Plaintiff or Mr. Felle. (*See* Dkt. 169-2 at 15).

### A.    Request under § 1988

Under § 1988, "it is the prevailing party rather than the lawyer who is entitled to attorney's fees." *Brown v. Gen. Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1011 (2d Cir. 1983). Accordingly, a claim for attorneys' fees under § 1988 "must itself be made by the party rather than the attorney." *Id.*; *see also Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 361 (2d Cir. 1997) ("This Court, noting § 1988's provision for fees to be awarded to the party, has interpreted § 1988 to mean that the person who is entitled to the award of attorneys' fees is the prevailing party rather than the lawyer." (quotations omitted)). Accordingly, under § 1988, "a former attorney who withdrew as counsel lack[s] standing to claim attorney's fees from a defendant in his own name." *Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 552 (S.D.N.Y. 2016); *see also Babcock*

- 40 -

*v. Rezak*, No. 96-CV-0394E(SC), 2004 WL 1574623, at *1 (W.D.N.Y. June 23, 2004) (denying former attorney's request for fees under § 1988 for lack of standing).

Hancock acknowledges that "[c]ase authority provides that under section 1988 it is the party and not the party's attorney who is entitled to apply for and obtain an award of attorneys' fees and costs" (Dkt. 169-2 at 15), but suggests that *Brown* should be limited to its facts, citing *Malarkey v. Texaco, Inc.*, 794 F. Supp. 1237 (S.D.N.Y. 1992).  However, *Malarkey* did not discuss *Brown* or consider the issue of standing.  Further, there is nothing in the *Malarkey* case suggesting that the plaintiff had not joined in the request for fees by her former counsel.  By contrast, the record in this case reflects that Plaintiff deliberately did not include Hancock's fees and costs in his § 1988 application.  (*See* Dkt. 170-3).

Under the circumstances of this case, Hancock lacks standing to seek attorneys' fees from Defendant under § 1988.   The right to do so belongs to Plaintiff, who has chosen to exercise it solely with respect to fees and costs incurred by Mr. Felle and his associates and paralegal.  Indeed, Mr. Pierce seemed to concede at oral argument that Hancock's request for fees under § 1988 was contingent upon Plaintiff having joined therein, which he has not done.  Accordingly, Hancock's request for fees under § 1988 is denied.

**B.    Requests to Intervene and for a Charging Lien**

The Court turns to Hancock's alternative requests to intervene and for a charging lien.  As an initial matter, the Court notes that it has jurisdiction over Hancock's alternative requests.  "Federal courts may exercise supplemental jurisdiction to hear fee disputes

- 41 -

between litigants and their attorneys when the dispute relates to the main action." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (quotation omitted).  The Second Circuit has "held, in an unbroken line of cases, that a fee dispute between a party and its attorneys shares a common nucleus of operative fact with the underlying action." *Shukla v. Sharma*, 586 F. App'x 752, 753-54 (2d Cir. 2014) (quotation omitted).

"A charging lien is a security interest in the favorable result of litigation, giving the attorney [an] equitable ownership interest in the client's cause of action and ensuring that the attorney can collect his fee from the fund he has created for that purpose on behalf of the client." *Charnow v. Charnow*, 134 A.D.3d 875, 876 (2d Dep't 2015) (citation omitted). "The Second Circuit has made clear that Section 475 [of the New York Judiciary Law] governs attorneys' charging liens in federal courts sitting in New York, and such liens are 'enforceable in federal courts in accordance with its interpretation by New York courts.'" *Stair v. Calhoun,* 722 F.Supp.2d 258, 267 (E.D.N.Y. 2010) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 449 (2d Cir. 1998)).

"The Second Circuit has not decided whether attorneys may intervene solely for the purpose of protecting their contractual rights to fees or to enforce a charging lien." *United States v. Salix Pharms., Ltd.*, No. 15CV706 (DLC), 2016 WL 4402044, at *3 (S.D.N.Y. Aug. 18, 2016).  Indeed, the Second Circuit has noted that "there are arguments both for and against allowing discharged attorneys to intervene to protect their legal fees" and that it is a "close question." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171,

- 42 -

A-3154

176 (2d Cir. 2001); *see also Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 745-46 (2d Cir. 2017) (declining to reach issue of whether attorney's "asserted contractual interest and statutory charging lien on the proceeds from a judgment in favor of certain plaintiffs he used to represent" was "valid and sufficient to support intervention of right"). However, the Court does not find that intervention is required in order for Hancock to seek confirmation of its charging lien.   As noted above, the Second Circuit has made clear that Judiciary Law § 475 governs attorneys' charging liens in federal courts sitting in New York, and Judiciary Law § 475 empowers the Court "upon the petition of the client <u>or attorney</u>" to "determine and enforce the lien."   N.Y. Judiciary L. § 475 (emphasis added). Accordingly, in *Itar-Tass*, the Second Circuit held that former counsel may seek to enforce his lien even when permitted to withdraw as attorney of record.   140 F.3d at 451.   In other words, counsel who has "been an attorney of record" is "entitled to have . . . his charging lien determined by the district court under Section 475."   *Id*. at 452.   The Court thus denies Hancock's request for intervention as moot.

As to the request for confirmation of the charging lien, "attorneys who terminate their representation are . .  entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'"   *Stair*, 722 F. Supp. 2d at 267.   Here, while Mr. Felle apparently took the position at one time that Hancock had been discharged for cause (*see* Dkt. 170-5 at 4), Plaintiff did not file any opposition to Hancock's motion for attorneys' fees.   It is the client's burden to show a

- 43 -

discharge for cause in opposition to an assertion of a charging lien.  *See Love & Madness, Inc. v. Claire's Holdings, LLC*, No. 21 CIV 1913 ATSLC, 2021 WL 4554058, at *4 (S.D.N.Y. Oct. 4, 2021).  Plaintiff has not done so here.

As to the amount of the charging lien, "the proper method of fixing the sum of the lien is through a *quantum meruit* analysis, which requires ascertaining the reasonable value of the services rendered." *Pettford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1331918, at *3 (S.D.N.Y. Mar. 20, 2020) (quotation and alteration omitted), *aff'd*, 833 F. App'x 893 (2d Cir. 2020).  Much like determining an award under § 1988, this generally involves calculating the lodestar figure, "which is the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Id*. at *5 (quotation omitted).

Here, Hancock seeks $183,426.50 in fees.  (*See* Dkt. 169-1 at ¶ 12).  This consists of 439.3 hours expended by Mr. Pierce, 11.8 hours expended by associate Paul Tuck, 2.1 hours expended by associate Mary D'Agostino, 27.6 hours expended by associate William Hython, and 2.1 hours expended by paralegal Amy Cobb.  (*Id*.).  However, in reply, Hancock concedes that certain entries were included in its request that should not have been, as they related to the *Ortiz v. Case* matter or the New York Court of Claims matter. The Court has reviewed the billing records submitted by Hancock, and concludes that 22.7 hours charged by Mr. Pierce, two hours charged by Mr. Tuck, and 8.3 hours charged by Mr. Hython were on matters other than the instant case.   This brings the hours totals to 416.6 for Mr. Pierce, 9.8 hours for Mr. Tuck, and 19.3 hours for Mr. Hython.

- 44 -

The Court further finds that a 15% across-the-board reduction is appropriate, due to the vagueness of certain time entries and excessive time spent on certain routine matters. A few examples of vague entries include: an entry on August 3, 2017, that states "[r]eviewed documents for case"; an entry on August 21, 2017, that states "[e]mails with Attorney Felle re case"; an entry on November 21, 2017, that states "[t]elephone conference with Attorney Felle"; and an entry on March 16, 2022, that states "[p]repared pretrial filings." (Dkt. 170).   As for examples of excessive time spent on routine matters: an entry on October 18, 2017, reflects 0.2 hours spent to "[r]eceive[] ECF notices re mediation"; an entry on November 12, 2019, reflects 0.3 hours spent on an email to opposing counsel "re extending schedule"; an entry on June 4, 2020, reflects 0.3 hours for "[r]eceived and reviewed notice of improper e-filing; re-filed letter to Judge Wolford; received extension grant from Judge"; and an entry on July 6, 2021, reflects 0.2 hours for receiving and reviewing a text order requiring the filing of a status report. (*Id.*). Applying this reduction results in a total of 354.1 hours expended by Mr. Pierce, 8.3 hours expended by Mr. Tuck, 1.8 hours expended by Ms. D'Agostino, 16.4 hours expended by Mr. Hython, and 1.8 hours expended by Ms. Cobb.

As to the requested rates, for essentially the reasons discussed above with respect to Mr. Felle and his associates and paralegals, the Court finds that a reasonable rate for Mr. Pierce is $300 per hour, a reasonable rate for Mr. Tuck is the requested $185 per hour,  a reasonable rate for Ms. D'Agostino is $200 per hour, a reasonable rate for Mr. Hython is

the requested $190 per hour, and a reasonable rate for Ms. Cobb is $100 per hour.[5]  This

amounts to fees of $111,421.50.

Hancock also seeks $2,628.13 in disbursements.  A charging lien includes costs, so

long as they are substantiated.  *See Winkfield v. Kirschenbaum & Phillips, P.C.*, No. 12

CIV. 7424 JMF, 2013 WL 371673, at *4 (S.D.N.Y. Jan. 29, 2013).  Here, Hancock has not

substantiated its requests with documentation, but has simply submitted a list of purported

disbursements with vague entries such as "travel."  (Dkt. 170-1 at 2-3).  The Court

accordingly does not include the request for costs in its calculation of the charging lien.

*See Winkfield*, 2013 WL 371673, at *4.

The Court rejects Hancock's alternative argument that it "is entitled to an award for

its fees and costs from Mr. Felle under *Cheng v. Modansky Leasing Co., Inc.*, 73 N.Y.2d

454, 458 (1989)."  (Dkt. 169-2 at 20).  The provision of *Cheng* Hancock relies upon applies

when "the fee dispute is . . . between the discharged attorney and a subsequently retained

attorney."  *Crout v. Haverfield Int'l, Inc.*, 348 F. Supp. 3d 219, 229 (W.D.N.Y. 2018).

Here, there is no indication that the fee dispute is between Hancock and Mr. Felle, as

---

[5]     Hancock has cited to a few cases approving higher hourly rates for experienced
partners outside the civil rights context.  (*See* Dkt. 169 at 10-11).  However, "the range of
'reasonable' attorneys' fee rates varies depending on the type of case," *Yash Raj Films
(USA) Inc v. Bobby Music Co. & Sporting Goods Inc.*, No. 01 CV 8378 (JFB), 2007 WL
9706613, at *4 (E.D.N.Y. Sept. 5, 2007), and the Court has focused its analysis on the rates
typically charged in this District for civil rights litigation.

opposed to Hancock and Plaintiff.  Under the circumstances of this case, Hancock is entitled to a charging lien against its former client.

## CONCLUSION

For the reasons set forth above, the Court: (1) denies Defendant's motions for judgment as a matter of law, for a new trial, and for remittitur (Dkt. 177); (2) grants Plaintiff's motion for attorneys' fees pursuant to § 1988 (Dkt. 167) to the extent it awards Plaintiff $123,550.00 in attorneys' fees and $2,474.81 in costs, and otherwise denies Plaintiff's motion for attorneys' fees; and (3) grants Hancock's motion for attorneys' fees (Dkt. 169) to the extent that it confirms Hancock's charging lien against Plaintiff in the amount of $111,421.50, and otherwise denies Hancock's motion.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 17, 2022
        Rochester, New York

A-3159

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSUE ORTIZ,

                                        Plaintiff,

         v.                                              1:16-cv-00321-EAW-MJR

MARK STAMBACH

                                        Defendants.

## **NOTICE OF APPEAL**

         Defendant Mark Stambach appeals to the United States Court of Appeals for the

Second Circuit from the judgment in favor of Plaintiff, Josue Ortiz, entered by the Clerk of Court

for the Western District of New York on May 10, 2022 following a jury trial (Dkt. 164), and

from each and every order necessary to and encompassed by said judgment.  Defendant also

appeals from the portions of the District Court's order which granted in part Plaintiff's

application for attorney's fees pursuant to 42 U.S.C. § 1988.  This appeal is being noticed within

thirty days of final determination of a Fed. R Civ. P. 50(b) motion and is thus timely made

pursuant to Rule 4 of the Federal Rules of Appellate Procedure.

Dated:      Buffalo, New York
            March 10, 2023

                                   **HODGSON RUSS** LLP
                                   *Attorneys for Defendant Mark Stambach*

                                   By:  s/ Peter A. Sahasrabudhe
                                        Hugh M. Russ, III
                                        Peter A. Sahasrabudhe
                                   The Guaranty Building
                                   140 Pearl Street – Suite 100
                                   Buffalo, New York  14202
                                   Telephone:  (716) 856-4000

A-3160

- 2 -

TO:      **Law Office of Wayne C. Felle, P.C.**
         *Attorneys for Plaintiff*
         Wayne C. Felle, Esq.
         6024 Main Street
         Williamsville, New York  14221