# 23-0352

# United States Court of Appeals

*for the*

# Second Circuit

———◆———

JOSUE ORTIZ,

*Plaintiff-Appellee,*

– v. –

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE
DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY
OF BUFFALO, MARK VAUGHN,

*Defendants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (BUFFALO)

## APPENDIX FOR DEFENDANT-APPELLANT
### Volume 2 (Pages A-241 to A-490)

HODGSON RUSS LLP
Peter A. Sahasrabudhe, Esq.
*Attorneys for Defendant-Appellant*
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

i

## TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Docket List...........................................  A-1

Amended Complaint, dated March 27, 2019 ............  A-34

Answer to Amended Complaint,
    dated April 15, 2019 ...............................................  A-56

Notice of Motion to Dismiss, dated April 24, 2020...  A-80

Memorandum of Law in Support of Defendants'
    Motion to Dismiss, dated April 24, 2020...............  A-82

Supporting Declaration, dated April 24, 2020 ...........  A-107

    Exhibit A to Declaration -
    Affidavit of Lt. Salvatore Losi,
    sworn to on April 15, 2020....................................  A-112

    Exhibit B to Declaration -
    P-73 of Mark R. Stambach, dated November 16,
    2004, and Notes......................................................  A-114

    Exhibit C to Declaration -
    Plaintiff's Deposition Transcript,
    dated March 15, 2018.............................................  A-117

**Volume 2**

    Exhibit D to Declaration -
    Mark Stambach's Deposition Transcript,
    dated January 23, 2019..........................................  A-241

ii

**Page**

### Volume 3

Exhibit D to Declaration -
Mark Stambach's Deposition Transcript,
dated January 23, 2019 ........................................... A-491

Exhibit E to Declaration -
Criminal Case Court Proceedings Notes ............... A-535

Exhibit F to Declaration -
Plaintiff's Statement and Spanish Miranda Rights
Card ....................................................................... A-539

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019 ........................................... A-543

### Volume 4

Exhibit G to Declaration -
Edwin Torres' Deposition Transcript,
dated August 30, 2019
(Continued) ............................................................ A-741

Exhibit H to Declaration -
P-73 of Mark J. Vaughn, dated November 15,
2004 ....................................................................... A-746

Exhibit I to Declaration -
Indictment .............................................................. A-748

Exhibit J to Declaration -
Portions of *Huntley* Hearing Transcript Provided
by Plaintiff in Discovery ...................................... A-753

Exhibit K to Declaration -
Answering Affidavit of Assistant District
Attorney Kenneth F. Case,
dated February 22, 2005 ........................................ A-882

iii

**Page**

Exhibit L to Declaration -
Transcripts of Plaintiff's guilty plea on March
22, 2006 and sentencing on June 16, 2006 and
Memorandum and Order Affirming the
Conviction ......................................................... A-889

Exhibit M to Declaration -
Correspondence and Reply to the People's
Opposing Affidavit ................................................ A-913

Exhibit N to Declaration -
Moving Papers and Correspondence Filed in
Opposition to Plaintiff's CPL 440 Motion by the
District Attorney's Office ....................................... A-935

Exhibit O to Declaration -
P-73 of David Sadlocha,
dated November 16, 2004 ..................................... A-976

Exhibit P to Declaration -
Memorandum and Order Deciding *Huntley*
Hearing ................................................................ A-977

Exhibit Q to Declaration -
Mark Stambach Notes,
dated September 30, 2005 .................................... A-981

**Volume 5**

Exhibit R to Declaration -
Decision & Order Deciding Plaintiff's CPL 440
Motion .................................................................. A-983

Statement of Undisputed Facts,
dated April 24, 2020 ............................................. A-1056

Declaration of Alan J. Pierce, Esq.,
dated July 3, 2020 ................................................ A-1063

iv

**Page**

Plaintiff's Response to Defendants' Statement of
    Material Facts, dated July 3, 2020 ........................ A-1066

Exhibit 1 to Pierce Declaration -
Orders of Hon. Thomas Franczyk dated
December 9, 2014 and May 8, 2015 in *People v.*
*Ortiz*, Indictment No. 02630-04 ........................... A-1069

Exhibit 2 to Pierce Declaration -
Defendants' Response to Plaintiff's First
Interrogatories and First Request for Production
of Documents, dated February 24, 2017 ............... A-1071

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019 ...................................... A-1091

**Volume 6**

Exhibit 3 to Pierce Declaration -
Transcript of the Deposition of Geraldo Rondon,
taken on March 13, 2019
(Continued).............................................................. A-1233

Exhibit 4 to Pierce Declaration -
Transcript of the Deposition of Mary Evans,
taken on January 24, 2019 .................................... A-1238

Exhibit 5 to Pierce Declaration -
Documents in Exhibit B, Part 3 ............................ A-1372

Exhibit 6 to Pierce Declaration -
P-73 Forms Contained in Stambach Deposition
Exhibit 6 ................................................................. A-1450

v

Page

**Volume 7**

Exhibit 7 to Pierce Declaration -
BPD Synopsis of the Camacho Murder
Investigation ............................................................ A-1473

Exhibit 8 to Pierce Declaration -
Statement of Witness Jexlyn Mary Rosario given
to the BPD on November 12, 2004 ...................... A-1499

Exhibit 9 to Pierce Declaration -
Declaration of Hon. Kenneth Case, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1502

Exhibit 10 to Pierce Declaration -
Declaration of Hon. Frank Sedita, submitted in
March 2018 in the companion case *Ortiz v. Case*,
16-CV-322 ............................................................ A-1505

Exhibit 11 to Pierce Declaration -
Documents in Exhibit B, Parts 1 & 2 ................... A-1512

Exhibit 12 to Pierce Declaration -
Transcript of the Deposition of Dr. Evelyn
Coggins, taken on October 1, 2018 ...................... A-1597

Exhibit 13 to Pierce Declaration -
Defendants' Initial Disclosures,
dated February 24, 2017 ....................................... A-1700

Exhibit 14 to Pierce Declaration -
Josue Ortiz's Verified Claim,
dated May 13, 2015 .............................................. A-1706

**Volume 8**

Exhibit 15 to Pierce Declaration -
Stambach Deposition Exhibits 2 and 17 .............. A-1725

vi

**Page**

Plaintiff's Memorandum of Law in Opposition to
    Defendants' Motion to Dismiss, and for
    Judgment on the Pleadings and/or Summary
    Judgment, dated July 5, 2020 .............................. A-1733

City of Buffalo Department of Law, Exhibit D ......... A-1760

Reply Memorandum of Law in Further Support of
    Defendants' Motion to Dismiss,
    dated July 24, 2020 ................................................. A-1789

Decision and Order of the Honorable Elizabeth A.
    Wolford, dated February 26, 2021 ....................... A-1800

Plaintiffs' Proposed Jury Instructions,
    dated April 1, 2022 ................................................. A-1837

Defendants' Proposed Jury Instructions,
    dated April 1, 2022 ................................................. A-1861

Plaintiffs' Reply Motions in Limine,
    dated April 6, 2022 ................................................. A-1924

Defendant's Objections to Plaintiff's Proposed Jury
    Instructions, dated April 6, 2022 ........................... A-1933

**Volume 9**

Transcript of Proceedings, dated April 11, 2022 ........ A-1937

Stipulation of Undisputed Facts,
    dated April 27, 2022 ............................................... A-1996

Trial Transcript, Preliminary Instructions and
    Opening Statements, dated May 3, 2022 ............... A-2001

Trial Transcript, dated May 4, 2022 ........................... A-2053

vii

Page

Plaintiff's Witnesses:

    E. Coogins      Direct ........................ A-2054
                         Cross ......................... A-2116

    J. Ortiz      Direct ........................ A-2125

**Volume 10**

Trial Transcript, dated May 4, 2022
    (Cotinued) ............................................ A-2187

    M. Vaughn      Direct ........................ A-2189
                         Cross ......................... A-2219
                         Redirect ..................... A-2225

    J. Lonergan      Direct ........................ A-2229
                         Cross ......................... A-2281
                         Redirect ..................... A-2284
                         Recross ..................... A-2287

Trial Transcript, dated May 5, 2022 ........................ A-2297

    M. Stambach      Direct ........................ A-2299
                         Cross ......................... A-2361
                         Redirect ..................... A-2384

    J. Ortiz      Direct ........................ A-2393
                         Cross ......................... A-2426

**Volume 11**

Trial Transcript, dated May 6, 2022 ........................ A-2467

    M. Evans      Direct ........................ A-2470
                         Cross ......................... A-2495

    M. Lauber      Direct ........................ A-2504
                         Cross ......................... A-2518

Trial Transcript, May 9, 2022 .................................. A-2554

viii

| | | Page |
|---|---|---|
| J. Ortiz | Direct | A-2599 |
| | Cross | A-2653 |
| | Redirect | A-2671 |
| | Recross | A-2674 |

Trial Transcript, Closing Arguments, May 9, 2022 ... A-2594

**Volume 12**

Trial Transcript, Closing Arguments, May 9, 2022
(Continued) ............................................................. A-2717

Jury Questionnaire, dated May 9, 2022 .................... A-2760

Jury Questionnaire, Damages, dated May 9, 2022 .... A-2764

Judgment in a Civil Case, dated May 10, 2022 ......... A-2766

Notice of Motion, by Plaintiff, for Attorneys' Fees,
dated May 20, 2022 ................................................ A-2767

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
Support of Motion, dated May 20, 2022................ A-2768

  Exhibit A to Felle Declaration -
  Ledger.................................................................... A-2773

  Exhibit B to Felle Declaration -
  Invoices for Services ............................................ A-2792

Plaintiff's Memorandum of Law in Support of his
Motion for Attorneys' Fees and Costs,
dated May 20, 2023 ................................................ A-2823

Notice of Motion, by Defendant, for Judgment as a
Matter of Law Pursuant to Fed. R. Civ. P. 50(b), a
new trial Pursuant to Fed. R. Civ. P. 59(a), and
for Remittur Pursuant to Fed. R. Civ. P. 59(e),
dated June 7, 2022 ................................................. A-2846

ix

**Page**

Declaration of Peter A. Sahasrabudhe, Esq., for
   Defendant, in Support of Motion,
     dated June 7, 2022 ................................................ A-2848

   Exhibit A to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Plaintiff .................................................................. A-2862

   Exhibit B to Sahasrabudhe Declaration -
   Trial Exhibits Entered by Counsel for
   Defendant .............................................................. A-2909

Memorandum of Law in Support of Motion for
   Judgment as a Matter of Law Under Fed. R. Civ.
   P. 50(b), dated June 7, 2022 .................................... A-2918

Declaration of Peter A. Sahasrabudhe in Opposition
   to Plaintiff's Motion for Attorneys' Fees,
     dated June 10, 2022 ............................................... A-2946

**Volume 13**

Defendants' Memorandum of Law in Opposition to
   Plaintiff's Motion for Attorneys' Fees,
     dated June 10, 2022 ............................................... A-2987

Declaration of Wayne C. Felle, Esq., for Plaintiff, in
   Opposition to Defendant's Post Trial Motion,
     dated June 28, 2022 ............................................... A-3013

Plaintiff's Memorandum of Law in Opposition to
   Defendant's Post Trial Motions,
     dated June 28, 2022 ............................................... A-3023

Reply Memorandum of Law in Further Support of
   Defendant's Motion for Judgment as a Matter of
   Law, a New Trial, or Remittitur,
     dated July 8, 2022 ................................................. A-3071

**x**

|                                                                              | Page   |
| ---------------------------------------------------------------------------- | ------ |
| Decision and Order of the Honorable Elizabeth A. Wolford, dated February 17, 2022 ........................ | A-3090 |
| Transcript of Oral Argument, dated January 31, 2023 ......................................... | A-3112 |
| Notice of Appeal, by Defendant, March 10, 2023 ..... | A-3159 |

A-241

1

1    STATE OF NEW YORK
     COURT OF CLAIMS
2

3    ─────────────────────────────────

     JOSUE ORTIZ,
4
                    Plaintiff,
5
              -vs-
6
     THE STATE OF NEW YORK,
7
                    Defendant.
8    ─────────────────────────────────

9      Examination before trial of MARK R. STAMBACH,

10   taken pursuant to Notice under Article 31 of the

11   Civil Practice Law and Rules, at the Law Offices

12   of WAYNE C. FELLE, P.C., 6024 Main Street,

13   Williamsville, New York 14221, taken on January

14   23, 2019, commencing at 12:02 P.M., before DAWN M.

15   SITERS, Notary Public.

16

17

18

19

20

21

22

23

─────────────── *MCCANN & MCCANN REPORTING* ───────────────

A-242

<pre>
                                                    2
  1                   INDEX TO EXHIBITS

  2

  3   EXHIBITS                               PAGE

  4     Exhibit 1, City of Buffalo Department of

  5     Law policies and procedures          41

  6     document.......

  7     Exhibit 2, a four-page document........  80

  8     Exhibit 3, a gray folder/documents......  95

  9     Exhibit 4, a folder with a twenty-six

 10     page Buffalo Police Department document..  99

 11     Exhibit 5, a copy of a transcript........ 100

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

                ─MCCANN & MCCANN REPORTING─
</pre>

A-243

```
                                                          3
 1   APPEARANCES:       WAYNE C. FELLE, P.C.,
                        BY:  WAYNE C. FELLE, ESQ.,
 2                      6024 Main Street,
                        Williamsville, New York 14221,
 3                      Appearing for Josue Ortiz.

 4
                        TIMOTHY A. BALL, ESQ.,
 5                      CORPORATION COUNSEL,
                        BY:  ROBERT E. QUINN, ESQ.,
 6                      ASSISTANT CORPORATION COUNSEL,
                        100 City Hall,
 7                      Buffalo, New York  14202,
                        Appearing for City of Buffalo,
 8                      Mark R. Stambach.

 9
                        LETITIA JAMES,
10                      ATTORNEY GENERAL OF THE
                        STATE OF NEW YORK,
11                      BY:  TIMOTHY J. FLYNN,
                        ASSISTANT ATTORNEY GENERAL,
12                      Main Place Tower, Suite 300A,
                        Buffalo, New York  14202,
13                      Appearing for The State of New York.

14

15                      THE REPORTER:      Stipulations?

16                      MR. QUINN:         We'll take

17   read and sign.

18

19                      (Whereupon, the following

20   stipulations were entered into by all parties.)

21

22                      It is hereby stipulated by and

23   amongst counsel for the respective parties that the
```

*MCCANN & MCCANN REPORTING*

A-244

4

1    oath of the Referee is waived, that filing and

2    certification of the transcript are waived, and that

3    all objections, except as to the form of the

4    questions, are reserved until the time of trial.

5

6    M A R K   R.   S T A M B A C H, 23 Brompton Court,

7    Williamsville, New York  14221, after being duly

8    called and sworn, testified as follows:

9

10                  EXAMINATION BY MR. FELLE:

11

12   Q    Good morning, officer.  My name is Wayne Felle.

13        And as we spoke off the record, I introduced

14        myself and your counsel told you that I am the

15        attorney representing Josue Ortiz.

16   A    Correct.

17   Q    And do you recall your involvement in the

18        arrest and prosecution of a Josue Ortiz back

19        in 2004?

20   A    Yes, I do.

21                  MR. QUINN:         Object to the

22   form of the question.

23

────────── *MCCANN & MCCANN REPORTING* ──────────

A-245

5

BY MR. FELLE:

Q   Okay.  Now, before I ask questions, you heard
    your attorney just object to the form.  There
    will be certain times throughout our discussion
    today where your attorney may object and
    preserve his right to take up the question at a
    later time, okay?

A   That is correct.

Q   There may be other times when your attorney
    objects and instructs you not to answer.
    That's up to him and I to decide if that's
    rightful and/or if we need to call the judge
    to figure that out, okay?

A   Yes, sir.

Q   Now, being an officer for some years I'm sure
    you're familiar with how this kind of
    discussion goes.  But just for the record,
    please let me complete my full question before
    you give a response, okay?

A   Yes, sir.

Q   And then, if you would, keep all your responses
    audible and loud so that the court reporter can
    take them down, okay?

A-246

```
                                                                 6
 1   A    That would be correct.

 2   Q    Great.  So I was asking about whether you

 3        remembered your involvement in the

 4        investigation of Josue Ortiz back in 2004.

 5        You responded yes, correct?

 6                     MR. QUINN:        Object to the

 7   form.  You can answer.

 8                     THE WITNESS:      Yes.

 9                     MR. FELLE:        And I see in

10   front of you you've got spread out a number of

11   documents.  I'll get to those in a moment.  But for

12   now I'd ask you if you could please put those away,

13   because I want to talk to you about what you can

14   recall independent -- independent of any of the

15   records or reports from back then.

16                     MR. QUINN:        If you need to

17   review the records, you're more than welcome to do

18   that.

19                     MR. FELLE:        Absolutely.

20                     THE WITNESS:      Yes, sir.

21

22   BY MR. FELLE:

23   Q    And sir, can you appreciate the difference
```

*MCCANN & MCCANN REPORTING*

A-247

```
                                                           7
 1        between your independent recollection of events

 2        and your refreshed memory of events based on

 3        reports and things that you've read?

 4    A   Yes.

 5    Q   Okay.  And so I just want to flush that out

 6        before we get into the written documents, and

 7        then have a more thorough discussion, okay?

 8    A   Yes, sir.

 9    Q   Now, before we do that, I just want to go over

10        some basic things with you.  Can you start by

11        telling us, how long have you been employed by

12        the Buffalo Police Department?

13    A   I was employed since 1971 to 2006.  And I

14        retired on my 35th year exactly.  I did 35

15        years of service.

16    Q   And that was in 2006?

17    A   Yes, sir.

18    Q   Since 2006 have you taken on any other forms

19        of employment?

20    A   Yes, sir.

21    Q   And where do you work?

22    A   A year and a half later after that, it was in

23        2008, I became a confidential criminal
```

MCCANN & MCCANN REPORTING

8

1    investigator with the Erie County District
2    Attorney's Office.  And I served there for six
3    and one-half years.  I worked under Frank
4    Clark.  And I also worked under Frank Sedita.
5              I then left there.  I was gone for
6    a one-year period of time, and I started
7    working for the Inspector General's Office of
8    New York State.  And I worked there for
9    approximately one year.  And then I left that
10   office.
11   Q   What was your position with the Inspector
12       General's Office?
13   A   An investigator.  And my final -- my final rank
14       at all times was detective, not a police
15       officer.  I retired as a detective.
16   Q   Now, when you say that you retired as a
17       detective, your position with the Erie County
18       District Attorney's Office, was that as a
19       detective?
20   A   It's called a confidential criminal investigator.
21   Q   Okay.  And the title that you held at the
22       Inspector General's Office?
23   A   Investigator.

MCCANN & MCCANN REPORTING

A-249

9

1    Q    So would it be fair to say that you're now

2         officially retired?

3    A    No.

4    Q    Okay.  Where are you working now?

5    A    I have my own business.

6    Q    Okay.  And what's the name of that business?

7    A    Amherst Investigations, Incorporated.

8    Q    And for how long have you owned that company?

9    A    Thirty-two years.

10   Q    Do you have other employees in that company?

11   A    Yes, I do.

12   Q    Is it your practice to hire, in Amherst

13        Investigations, Incorporated, retired and/or

14        working police officers of the Buffalo Police

15        Department?

16   A    And also --

17                 MR. QUINN:        Object to the

18   form of the question.

19                 THE WITNESS:      I'm sorry?

20                 MR. QUINN:        Just wait

21   for -- if you could just pause after he asks a

22   question.

23                 THE WITNESS:      Sure.

*MCCANN & MCCANN REPORTING*

Case 23-352, Document 59, 06/27/2023, 3534106, Page21 of 261

10

1          MR. QUINN:          And then wait,

2    because she's got to take everything down, and we're

3    talking a little fast.  So if you could just do

4    that.

5               So I'll object to the form of the

6    question.  You can answer.

7          THE WITNESS:          Okay.  We hire

8    all retired officers or investigators or detectives.

9    Except for one exception, we hire physician

10   assistants.

11

12   BY MR. FELLE:

13   Q    Currently how many employees does Amherst

14        Investigations, Incorporated have?

15   A    One full time and about eight or nine part

16        time.

17   Q    And are you a passive owner of that company,

18        or do you -- do you work?

19   A    I don't work.  I'm the licensee.

20   Q    And what's the primary source of business of

21        that company?

22   A    Civil investigations.  Nursing homes, long-term

23        Workers' Compensation, accidents, accident

A-251

```
                                                        11
 1      injuries, and also, wrongful death investigations.
 2  Q   And just so the record's clear, that company
 3      was operating and doing business back in
 4      November of 2004, correct?
 5  A   Yes.
 6                  MR. QUINN:        Object to form.
 7                  THE WITNESS:      Let me turn
 8  this off.
 9                  (Discussion off the record.)
10
11  BY MR. FELLE:
12  Q   Prior to working at the Buffalo Police
13      Department, and I think you said you started in
14      1971, prior to that date did you hold any
15      employment?
16  A   Yes.
17  Q   What employment did you hold before you
18      started?
19  A   I was a campus police officer at Canisius
20      College.  And originally my main profession was
21      I was draftsman, an electrical draftsman at the
22      Westinghouse Corporation, which doesn't exist
23      anymore.
```

A-252

12

1   Q   How long did you work for Westinghouse?

2   A   From 1969 until 1971.

3   Q   And how long did you work at the Canisius

4       College?

5   A   Two years also, the same amount of time.

6   Q   And any other employment before becoming

7       employed at the Buffalo Police Department?

8   A   As a teenager, just various jobs.

9   Q   What's your highest level of education?

10  A   That would be high school.

11  Q   And where'd you graduate from?

12  A   Seneca Vocational High School.  But I did go to

13      night school at the Millard Fillmore College,

14      which is University of Buffalo nights.  But I

15      only took twenty-four hours of credit at

16      Millard Fillmore.

17  Q   What was the course of study that you entered

18      in?

19  A   General.

20  Q   Other than the twenty-four credits that you got

21      through Millard Fillmore College, the high

22      school diploma through Seneca Vocational, have

23      you gone to get any other forms of

*MCCANN & MCCANN REPORTING*

13

1       certifications and/or licenses?

2    A    Yes.

3    Q    And what are those?

4    A    I'm a New York State licensed police

5        instructor.  I'm also a Henry Williams

6        Associate with the New York State Police

7        Department for homicides and homicide

8        investigations.

9                I've had other training in regards

10       to the Reid School of Interrogation and

11       Interviewing, which I graduated from.  And just

12       various seminars that I've attended through the

13       years, in-service training.

14   Q    Okay.  And so just to break that down a little

15       bit, when did you obtain your license as a New

16       York State police instructor?

17   A    I would have to look that up.  I wouldn't be

18       able to say what it was.

19               MR. QUINN:        Just to the

20   best of your recollection.  If you can't --

21               THE WITNESS:      Maybe in the

22   '80s.  And I'm trying to be accurate.

23

—MCCANN & MCCANN REPORTING—

A-254

14

1   BY MR. FELLE:

2   Q    I appreciate that.  And for the sake of our

3        discussion, would you have accomplished that

4        prior to November of 2004?

5   A    Yes.

6   Q    With respect to going through the Henry

7        Williams homicide investigations instruction,

8        when did you attend that?

9   A    That was the first year that I was at the

10       homicide squad.  That would be in 1987.

11  Q    And what did that consist of?

12  A    One week of training with Dr. Henry Lee, Dr.

13       Michael Baden, B-A-D-E-N, and there's a doctor,

14       a physician, Werner, it's actually spelled

15       W-E-R-N-E-R, Spitzer, S-P-I-T-Z-E-R, and

16       various lectures in regards to homicides.  I

17       have the full course, but I don't have it here

18       with me.

19  Q    And when you say you have the full lecture, do

20       you have that in writing?

21  A    No.  The -- what happens is you have to attend

22       classes for a solid week.  And then you take

23       your testing.  And then they welcome you as an

—MCCANN & MCCANN REPORTING—

15

1   associate member of the Henry Williams

2   Association.  It's an accredited course that

3   the New York State Police Department gives to

4   investigators from small departments, large

5   departments, to help them with their

6   investigating process.

7  Q  Okay.  And after you graduate from that

8     one-week session, do you go to any continuing

9     courses with that organization?

10  A  No.

11  Q  And you said you attended there in about 1987?

12  A  Yes.

13  Q  How about the Reid School of Interrogation,

14     when did you attend that?

15  A  That would be in 1988 or 1989.

16  Q  And can you tell us what that consisted of?

17  A  Yes.  It's an interviewing process and also an

18     interrogation process that you learn to obtain

19     information in regards to an investigation.

20  Q  And what were you given by way of graduating

21     from that -- that course?

22  A  Just that you had graduated.

23  Q  During the course did they cover anything with

A-256

16

```
 1        respect to the interrogation or questioning of
 2        a psychologically impaired individual?
 3                    MR. QUINN:        Object to
 4   form.  You can answer.
 5                    THE WITNESS:      Impaired, no.
 6                    MR. FELLE:        After
 7   attending that school have you gone on to any
 8   continuing courses with respect to that -- that
 9   education and training?
10                    MR. QUINN:        Object to form.
11                    THE WITNESS:      Interviews and
12   interrogations, no, none.
13
14   BY MR. FELLE:
15   Q    When you first came on to the homicide
16        department in 1987, were you working under
17        anyone?
18   A    '86.  I'm sorry.  It was '86.
19   Q    '86.  Okay.
20   A    Yes.  I was working under -- well, we have a
21        chain of command.  We have a chief.  Then we
22        have detective sergeants for each individual
23        group, but it would be the chief of homicide.
```

MCCANN & MCCANN REPORTING

Case 23-352, Document 59, 06/27/2023, 3534106, Page28 of 261

17

```
 1        And then -- I've had about nine different
 2        chiefs of homicide.  And then each group is
 3        commanded by a detective sergeant.
 4   Q    Okay.  Going --
 5   A    Excuse me.  I'd like to help you out with that.
 6        We also have a lieutenant assigned who is an
 7        assistant chief.  They have since eliminated
 8        that position.  But there were assistants who
 9        were lieutenants that were assigned at the
10        homicide squad.
11   Q    Okay.  Going back to 1986, who was the chief of
12        homicide when you started?
13   A    It would be Richard T. Donovan, D-O-N-O-V-A-N.
14   Q    And he would have been the head of the
15        hierarchy, if you will, with respect to the
16        homicide department, correct?
17   A    That's correct.
18   Q    And then going down that chain, who would have
19        been your immediate supervisor?
20   A    I had two of them.  It would be Assistant Chief
21        Gregory Simonian, S-I-M-O-N-I-A-N.  And then
22        it would be the detective sergeant that was
23        assigned.  At that time it would be Melvin G.
```

*MCCANN & MCCANN REPORTING*

A-258

18

```
 1        Lobbett, L-O-B-B-E-T-T.
 2   Q    Incidentally, just for the sake of the court
 3        reporter, and I suppose for myself, the Reid
 4        School of Interrogation, how do you spell that?
 5   A    R-E-I-D.
 6   Q    When you first started with the homicide
 7        department were you classified as, say, in
 8        training for a certain period of time?
 9   A    No.  I was a detective assigned, but we were
10        not allowed to do very much.  We were acting as
11        observers for about a six-month period.
12   Q    Okay.  And were you tied to an acting detective
13        at that time?
14   A    A detective.  A group.
15   Q    A group?
16   A    In other words, I would sit in on an interview.
17        I would sit in on a formal statement.  I would
18        sit in on a photo array, filing reports, arrest
19        forms, making photo arrays, just their
20        procedures to make sure I was doing it right.
21   Q    Okay.  And at that time how many people would
22        you say worked within that group?
23   A    In my group, five.
```

MCCANN & MCCANN REPORTING

A-259

                                                                    19

1    Q    Would it be fair to say during those six months

2         that those five people in that group of

3         detectives help to train you for the job?

4    A    They do.

5    Q    Do you recall the names of those five people?

6    A    Absolutely.

7    Q    Go right ahead.

8    A    It's Robert M. Grabowski, G-R-A-B-O-W-S-K-I,

9         deceased.  It would be Daniel R. Dipirro,

10        D-I-P-I-R-R-O, deceased.  Patrick J. Murphy,

11        M-U-R-P-H-Y, deceased.  Stanley W. Suszak,

12        S-U-S-Z-A-K, deceased.  And the only one that

13        is still alive would be Melvin G. Lobbett,

14        L-O-B-B-E-T-T, and his rank was detective

15        sergeant.

16   Q    Do you know where Mr. Lobbett resides now?

17   A    Florida.

18   Q    While you were employed by the Buffalo Police

19        Department did you receive any awards or

20        accreditations?

21   A    Yes.

22   Q    And can you tell us what those were?

23   A    I was officer of the month two times, in

—————— MCCANN & MCCANN REPORTING ——————

A-260

20

1    1974 and '76.  I received the Mayoral Award

2    thirteen times.  I was -- I received the

3    President's Award from the Silver Shield

4    Association.  I was awarded the Medal of Honor,

5    Medal of Valor before I became a detective at

6    the homicide squad.

7               I got a full bunch of them.  I was

8    awarded -- I gave twenty-five gallons of blood

9    donations to the American Red Cross.

10              I have a whole list of them.  I

11    just can't -- I wouldn't be able to go through

12    them all.  But I have about fifty-nine

13    different accommodations for police work.

14  Q    And when you mentioned the Medal of Honor, did

15      you serve in the military at all, sir?

16  A    No.  It was a -- during a holdup.  We were

17      involved in a shooting.  I was involved in a

18      couple shootouts.

19  Q    Did you receive any awards or accreditations

20      with respect to your work in the homicide

21      department, and more specifically with respect

22      to your convictions and/or conviction rates?

23             MR. QUINN:        Object to form.

A-261

21

1          THE WITNESS:        No.

2          MR. FELLE:          While at the

3   Buffalo Police Department did you receive any

4   disciplinary actions, suspensions or demotions?

5          MR. QUINN:          Object to

6   form.  I'm going to object to this on 50A grounds.

7   I don't think it's appropriate.  This witness is

8   here pursuant to a subpoena to give testimony in

9   relation to an action pending against New York

10  State, that is my understanding, at least.  I don't

11  think this is a full deposition.  I don't think that

12  is an appropriate line of questioning.  And as I

13  stated, I believe that would be protected by 50A.

14          So I'm going to instruct you not

15  to answer.

16          50A of the New York State Civil

17  Rights Law.

18          MR. FELLE:          I'm going to

19  reserve my right to speak with the judge about it.

20  I'm not going to interrupt the deposition now for

21  the sake and courtesy to the officer.  But I am

22  going to take it up with the judge.

23          And we'll have to have you back,

—MCCANN & MCCANN REPORTING—

A-262

```
                                                            22

 1    sir, when the judge rules in our favor.

 2                  But for now, I'm going to go over

 3    that issue.

 4

 5    BY MR. FELLE:

 6    Q    On November 11th of 2004 what was your title

 7         with the Buffalo Police Department?

 8    A    Detective.

 9    Q    During your continued stay up through -- 2006,

10         I think you told us you retired -- did you ever

11         achieve any higher rank within the homicide

12         department?

13    A    No.

14    Q    Were you always titled a detective in the

15         homicide department?

16    A    Correct.

17    Q    And the homicide department, it's known by

18         different things, but it's also the major

19         crimes unit?

20    A    We were abolished for a very brief period of

21         time.  The homicide squad entirely was

22         abolished by the commissioner and the mayor for

23         a nine-month period.  And they thought that the
```

*MCCANN & MCCANN REPORTING*

23

```
 1        major case would be able to help out, or solve
 2        most of the homicides.  They wanted to take a
 3        new approach.  And it was not working very
 4        well.  So they re-instituted it right away,
 5        within a nine- or eleven-month period.
 6                      We always remained in the -- as a
 7        group in the homicide bureau.  There was also a
 8        major crimes unit that handled major crimes,
 9        but they did not handle homicides.  But we were
10        called the major crimes unit.
11   Q    Okay.  And so for about nine to eleven months,
12        the major crimes unit, it basically took into
13        itself the homicide department; would that be a
14        fair statement?
15   A    You're correct.  You're entirely correct.
16   Q    And when was that?
17   A    During this period of time.  I don't know the
18        exact dates.  I couldn't be accurate on it for
19        you.  I wish I could.
20   Q    Okay.  But in November of 2004, would it be a
21        fair statement that the homicide department was
22        acting through and as a part of the major
23        crimes unit of the Buffalo Police Department?
```

MCCANN & MCCANN REPORTING

A-264

24

1        MR. QUINN:        Object to

2   form.  You can answer.

3                THE WITNESS:        Yes.

4                MR. FELLE:        Prior to that

5   occurring, how many people would you say were in the

6   homicide department, roughly?

7                MR. QUINN:        You're talking

8   about detectives?

9                MR. FELLE:        Yeah, all the

10  detectives in the homicide squad.

11

12  BY MR. FELLE:

13  Q    So yeah, how many detectives were there,

14       including superior detectives?

15  A    Twenty detectives and maybe five detective

16       sergeants.  And I believe we had two report

17       technicians who were civilians.

18                THE WITNESS:        Can I use your

19  bathroom?

20                MR. FELLE:        Sure.  We'll

21  take a short break.

22                (A recess was then taken.)

23                MR. FELLE:        We're back.

*MCCANN & MCCANN REPORTING*

A-265

```
                                                        25
 1    So we were talking about that merge with the

 2    homicide department merging into the major crimes

 3    unit for about nine to eleven months, which was the

 4    time period when the investigation surrounding the

 5    murders we're here to discuss took place, correct?

 6                   MR. QUINN:          Object to

 7    form.  You can answer.

 8                   THE WITNESS:        You are correct.

 9

10    BY MR. FELLE:

11    Q    And when -- I think you told us before the

12         break that the homicide department prior to

13         that merge had roughly twenty-seven employees?

14    A    No.

15    Q    No?

16    A    I believe it was twenty-four employees.

17    Q    Twenty-four.  Okay.

18    A    You've got to forgive me.  I think it's

19         twenty-four.

20    Q    Okay.

21    A    And then we had four or five sergeants and two

22         report technicians.

23    Q    Okay.
```

A-266

26

1                    MR. QUINN:         Just so the

2    testimony is clear.  You believe there was

3    twenty-four detectives?

4                    THE WITNESS:       Detectives.

5                    MR. QUINN:         Five of --

6                    THE WITNESS:       And five

7    detective sergeants, and two report technicians.

8

9    BY MR. FELLE:

10   Q    Gotcha.  My notes say twenty before, but you

11        think it's twenty-four detectives?

12   A    I think it's either twenty or twenty-four,

13        because we had groups.

14   Q    Okay.

15   A    You know, you had a sergeant assigned, and then

16        you had certain manpower in each group.

17   Q    Okay.

18   A    And that fluctuated.

19   Q    And just to get a sense of how big this change

20        was, after the merge occurred, how many people

21        would have been in the major crimes unit?

22                    MR. QUINN:         Object to form.

23                    THE WITNESS:       I don't know.

MCCANN & MCCANN REPORTING

27

```
 1    And I -- I believe -- we broke up into different --

 2    if there was an armed robbery, the major crimes

 3    would go.  If a bank is held up, the major crimes

 4    would go.

 5              So then again, I -- we weren't

 6    even in the same office.  We are in adjoining

 7    offices.

 8

 9    BY MR. FELLE:

10    Q    Prior to that merge, were you partnered with

11         anyone else in the homicide --

12    A    I've had numerous partners throughout my whole

13         police career in the homicide bureau.

14    Q    Do you know who you were partnered with just

15         prior to that merge into the major crimes unit?

16    A    Prior to the merge?

17    Q    Yeah.

18    A    I believe it would be Grabowski, Lobbett,

19         Dipirro, McCarthy, Suszak and myself.

20    Q    After the merge took place were you still

21         partnered with them?

22    A    No.

23    Q    Did you take on new partners?
```

*MCCANN & MCCANN REPORTING*

28

```
 1   A    People retired.  People became deceased.

 2   Q    So I'm just talking about that nine-to-eleven

 3        month period.

 4   A    Oh.  No, I did not take on any -- excuse me.

 5        There was two additions.  There was an addition

 6        by the name of Michael D. Lyons, L-Y-O-N-S.

 7        Michael is deceased, also.  And there was a

 8        Patrick Judge, J-U-D-G-E, who worked with me on

 9        occasion.

10   Q    And just so the record's clear, are you saying

11        that was the case after the merge into the

12        major crimes unit?

13   A    During the merge.

14   Q    Okay.

15   A    But after the merge I had various -- I couldn't

16        even tell you -- begin to tell you unless I

17        looked at a roster or a P70 -- a P --

18             MR. QUINN:        If you don't

19   know, that's okay.

20             THE WITNESS:       Yeah, I

21   couldn't even -- I'd be willing to help you, but

22   I'd have to see which group -- we'd have to put

23   in a payroll and there's charts.
```

*MCCANN & MCCANN REPORTING*

```
                                                    29
1                    MR. QUINN:        If you can't
2    tell him, that's okay.
3                    THE WITNESS:       I don't know.
4    I'm sorry.
5                    MR. FELLE:         I guess I'm
6    just trying to get a sense -- would you describe
7    that time period, that nine to eleven months where
8    the homicide department was pulled into the major
9    crimes unit, was that a bit of hectic time for the
10   department?
11                   MR. QUINN:         Don't answer
12   that question.  He's here to testify about an
13   investigation as a nonparty pursuant to subpoena.
14   If you wanted to do a full deposition, you should
15   have -- I mean --
16                   MR. FELLE:         Are you saying
17   I'm not allowed to do a full deposition today?
18                   MR. QUINN:         He's here to
19   testify pursuant to a subpoena.
20                   MR. FELLE:         Correct.
21   We've gone through the courts.  We've talked to
22   Judge Hudson.  We've carved out a stipulation.
23   He's here to give me the full testimony about the
```

30

1   investigation and all the effects upon an

2   investigation in this matter.

3                   MR. QUINN:          I --

4                   MR. FELLE:          Okay.  I'm

5   giving you a little leeway, but if you keep cutting

6   into me, then we're just going to call the judge and

7   we're going to waste a lot more time.  I'm certainly

8   allowed to ask him about the function-ability of the

9   department at the time my client was convicted of a

10  crime he didn't commit.

11                  MR. QUINN:          You can ask

12  him questions, but you can't make arguments.  You

13  can't suggest things that he hasn't testified to.

14  You cannot --

15                  MR. FELLE:          That's not

16  even what I'm doing.

17                  MR. QUINN:          -- ask

18  inappropriate questions.

19                  MR. FELLE:          All right.

20                  MR. QUINN:          Object to the

21  form of the question.

22                  MR. FELLE:          Sir, my

23  question to you was, during that time frame when the

```
                                                        31
 1   homicide department was merged into the major crimes
 2   unit was that administratively was it a hectic time?
 3                  MR. QUINN:        Object to form.
 4                  THE WITNESS:      I would not be
 5   able to say.
 6
 7   BY MR. FELLE:
 8   Q    Okay.  Was your office moved?
 9   A    No.
10   Q    How were ongoing investigations impacted by
11        that merge?
12                  MR. QUINN:        You're talking
13   about this one specifically?
14                  MR. FELLE:        No.  Your
15   ongoing investigations at the time the merge took
16   place, which was before November of 2004, as we've
17   testified?
18                  MR. QUINN:        Well, I don't
19   know that that's the testimony, but you can answer.
20                  MR. FELLE:        The record
21   will speak for itself.
22                  At the time that merge took place
23   how were your ongoing investigations handled?
```

*MCCANN & MCCANN REPORTING*

A-272

32

1       MR. QUINN:       Object to

2   form.  You can answer.

3               THE WITNESS:       Good.  They

4   were consistent.  They were adequate.

5               MR. FELLE:       And at that

6   time was Frank Clark the DA?

7               MR. QUINN:       At what time?

8               MR. FELLE:       At the time of

9   merge, the nine-to-eleven-month period.

10              THE WITNESS:       No, he was not

11  the DA.

12

13  BY MR. FELLE:

14  Q    Do you recall who was?

15  A    Yes, Frank Clark.

16  Q    Was the DA?

17  A    He was the district attorney.

18              MR. QUINN:       Did you say

19  Sedita or Clark?  I'm sorry.  I got confused.

20              MR. FELLE:       I thought he

21  said Frank Clark.

22              THE WITNESS:       Yes, Frank

23  Clark was the district attorney at that time.

───── *MCCANN & MCCANN REPORTING* ─────

A-273

33

1          MR. QUINN:          Right.

2    There's two Franks.

3          THE WITNESS:        Okay.

4          MR. QUINN:          Correct.

5          MR. FELLE:          So back in

6    November of 2004 you played a role in the

7    investigation of Josue Ortiz with respect to a

8    murder, a double murder actually, that took place

9    on November 11th of 2004 involving victims Nelson

10   Camacho and Miguel Camacho, correct?

11         MR. QUINN:          Objection to

12   form.  You can answer.

13         THE WITNESS:        Yes, sir.

14

15   BY MR. FELLE:

16   Q    Now, prior to your involvement with that

17        investigation, did you have any training with

18        respect to evidence collection?  Is that part

19        of your job as a detective?

20   A    Yes.

21   Q    Did you play any role or function in the

22        evidence collection in the Ortiz investigation?

23         MR. QUINN:          Object to

─────── MCCANN & MCCANN REPORTING ───────

A-274

34

1    form, specifically evidence.  You can answer.

2                    THE WITNESS:        No.

3                    MR. FELLE:          And just so my

4    question is even more clear.  The double homicides

5    that took place on November 11th of 2004 involving

6    Nelson and Miguel Camacho, did you play any active

7    role in the crime scene and the collection of

8    evidence at the crime scene?

9                    MR. QUINN:          Object to

10   form.  You can answer.

11                   THE WITNESS:        No.

12                   MR. FELLE:          With respect

13   to the evidence that was collected at the crime

14   scene, did you play any role in the analysis of that

15   particular evidence that was collected?

16                   MR. QUINN:          Object to

17   form.  You can answer.

18                   THE WITNESS:        No.

19                   MR. FELLE:          With respect

20   to that same double homicide that occurred on 11/11

21   of '04, did you have any sort of supervisory

22   authority as a detective in that case?

23                   MR. QUINN:          Object to

A-275

35

1    form.  You can answer.

2                    THE WITNESS:        No, sir.

3

4    BY MR. FELLE:

5    Q    .Did you attend the autopsies of the two victims

6         in that crime?

7    A    No, I did not.

8    Q    Back in November of 2004 on other homicide

9         cases that you worked, did you ever perform the

10        oversight, if you will, of the autopsy or

11        postmortem examination?

12                   MR. QUINN:         Object to form.

13                   THE WITNESS:        No.  That's

14   not my job.  No.

15

16   BY MR. FELLE:

17   Q    Is that a job that requires specific training?

18   A    No.  But by state law we have to attend the

19        homicide or the postmortem examination with the

20        medical examiner's officer on Grider.

21   Q    Okay.

22   A    We have to be in attendance.  We sign in.  But

23        on this particular case, I did not attend the

*MCCANN & MCCANN REPORTING*

36

```
 1        autopsy or the postmortem.

 2   Q    Were there other cases that you had?

 3   A    Oh, absolutely.

 4   Q    Okay.  And in this case do you recall who did

 5        that?

 6   A    It would be in the record, but I don't recall.

 7   Q    Okay.  If I were to tell you that was Detective

 8        Timothy Salamone, would that refresh your

 9        memory?

10   A    That's a good guess.  I would say that would be

11        accurate, yes.

12   Q    And so while you didn't oversee this postmortem

13        examination or autopsy, you have in other cases

14        done that, correct?

15   A    Yes.

16   Q    And you're familiar with the autopsy

17        determinations of the physician who does

18        that autopsy?

19   A    Yes.  Cause of death, yes.

20                MR. QUINN:        Object to the

21   form.

22

23   BY MR. FELLE:
```

A-277

37

1   Q   And in addition to cause of death that autopsy

2        specifically identifies areas of wounds,

3        correct?

4   A   That is correct.

5   Q   Also, it can help describe the nature of the

6        weapon used to inflict those wounds, correct?

7   A   Sometimes, yes.

8   Q   It can also tell you if the bullet went through

9        the full body, correct?

10   A   Sometimes, yes.

11   Q   And as a result it can you tell you some things

12        about the distance of the firing of the weapon,

13        correct?

14   A   Yes, that is correct.

15   Q   Back in November of 2004, did you speak

16        Spanish?

17   A   No.

18   Q   Back in November of 2004, outside of owning

19        your own investigation company, did you do any

20        other outside work out of the Buffalo Police

21        Department?

22               MR. QUINN:        Object to

23   form.  You can answer.

MCCANN & MCCANN REPORTING

38

1           THE WITNESS:        Yes.  Civil

2     investigations, exactly.  My son is a physician's

3     assistant.  We were doing long-term Workers'

4     Compensation cases, injury cases, accidents, taking

5     statements just on civil cases.  I did not -- I was

6     precluded from doing anything that was criminal in

7     nature.

8

9     BY MR. FELLE:

10    Q     Okay.

11    A     Which I don't do to this day.

12    Q     Just so I'm clear, was all that work done

13          through your private investigation business?

14    A     Yes.  I had a client, several clients.

15    Q     None of that work would have been done by you

16          personally outside of that company, correct?

17    A     No.

18    Q     Okay.  So my question to you is, outside

19          of the work that you did through the

20          investigation company, did you hold any other

21          types of employment outside of your employment

22          with the Buffalo Police Department?

23    A     No.

*MCCANN & MCCANN REPORTING*

A-279

39

| | | |
|---|---|---|
| 1 | Q | Ever work for any local bars as security? |
| 2 | A | No. |
| 3 | Q | When you initially started your employment with |
| 4 | | the Buffalo Police Department, did you go over |
| 5 | | the Buffalo Police Department Policies and |
| 6 | | Procedure Manual? |
| 7 | A | Yes. |
| 8 | Q | And do you recall there being certain portions |
| 9 | | of that that went to the ethics and |
| 10 | | responsibilities of police officers of the |
| 11 | | department? |
| 12 | A | Yes, sir. |
| 13 | Q | Is that a requirement of employment that you |
| 14 | | would have read that manual? |
| 15 | A | It was given to everybody when they graduated |
| 16 | | from the academy. |
| 17 | Q | And did you agree with the policies and |
| 18 | | procedure manual and its various |
| 19 | | responsibilities that were placed on you by |
| 20 | | accepting employment with the Buffalo Police |
| 21 | | Department? |
| 22 | | MR. QUINN:          Object to |
| 23 | | form.  You can answer. |

*MCCANN & MCCANN REPORTING*

A-280

40

1           THE WITNESS:       I don't --
2    I'm not clear on what you're trying to say.
3           MR. FELLE:         Sure.
4           THE WITNESS:       I'm sorry.
5           MR. FELLE:         Sure.  Before
6    accepting employment with the Buffalo Police
7    Department you were given a certain policies and
8    procedures manual.  And when you reviewed that
9    manual did you agree to its terms?
10          MR. QUINN:         Object to form.
11          THE WITNESS:       I didn't agree
12   to it.  It was my manual that I had to follow.
13          MR. FELLE:         Okay.
14          THE WITNESS:       I mean, I
15   didn't sign a document that said I agree to every
16   one of these policies.
17          MR. FELLE:         Okay.
18   But by accepting employment you knew what the
19   responsibilities of the job were, correct?
20          MR. QUINN:         Object to
21   form.  You can answer.
22          THE WITNESS:       Yes, sir.
23          MR. FELLE:         And by

A-281

41

1    accepting employment you acknowledged your

2    responsibilities in the scope of your employment as

3    a Buffalo Police Department officer, correct?

4                    THE WITNESS:        Correct.

5                    MR. QUINN:          Object to

6    form.  You can answer.

7                    MR. FELLE:          And can we

8    have this marked as Exhibit 1.

9                    (Whereupon, Exhibit 1, a City of

10   Buffalo Department of Law policies and procedures

11   document, was then received and marked for

12   identification.)

13

14   BY MR. FELLE:

15   Q   Mr. Stambach, we've had marked a document that

16       was provided to us by the City of Buffalo

17       Department of Law.  We've marked it as

18       Deposition Exhibit Number 1 with today's date.

19       And this exhibit is the policies and procedures

20       manual given to the Buffalo Police Department,

21       specifically surrounding the responsibilities

22       of the officers while on duty.  Okay.  Fair

23       enough?

MCCANN & MCCANN REPORTING

A-282

42

1    A    Right.

2    Q    I'm going to show you --

3                    MR. QUINN:         We object to

4    the characterization, but you can show him the

5    document.

6                    MR. FELLE:         And it'll

7    speak for itself.  I don't mean to mischaracterize

8    it at all.  I'm trying to identify.

9    BY MR. FELLE:

10   Q    Chapter fifteen entitled discipline and

11        discharge, within that part of the policies

12        and procedures manual, and specifically at one

13        point three, it talks about the law enforcement

14        code of ethics; do you recall that?

15   A    No.

16   Q    I'm going to show you what's entitled at that

17        section Law Enforcement Code of Ethics, and

18        just ask you to read the first paragraph, which

19        is highlighted.

20                    MR. QUINN:         Are you asking

21   him to read it out loud or to himself?

22                    MR. FELLE:         I am.  Aloud,

23   please.

*MCCANN & MCCANN REPORTING*

43

1              THE WITNESS:      It says law

2    Enforcement Code of Ethics.  As a law enforcement

3    officer my fundamental duty is to serve mankind, to

4    safeguard lives and property, and protect the

5    innocent against deception, the weak against

6    oppression or intimidation, and the peaceful against

7    violence or disorder, and to respect the

8    constitutional rights of all persons to liberty,

9    equality and justice.

10             MR. FELLE:       Thank you,

11   officer.  And so would you agree with me that that

12   was your responsibility during the duration of time

13   that you were both a police officer and a detective

14   with the Buffalo Police Department?

15             MR. QUINN:       Object to form.

16             THE WITNESS:      Okay.  That

17   does not look like the manual of procedures that I

18   obtained in 1971.  And I don't know if there's been

19   revisions or there's a new manual.

20             I fully agree with that statement,

21   but I'm not quite sure that that's in my manual.  It

22   might be a little bit different.  But I agreed with

23   that statement wholeheartedly.

44

1              MR. FELLE:        Okay.  And

2    you agree that that was a responsibility that you

3    maintained in November of 2004, correct?

4              MR. QUINN:        Object to form.

5              THE WITNESS:      Yes.

6

7    BY MR. FELLE:

8    Q    Now, I apologize.  I'm going to take up a

9         little time just to ask you about your

10        familiarity with other individuals in the

11        department at that time.  Okay.  So you've been

12        a very good historian up to now, and so just

13        let me know if you can or cannot recall these

14        other individuals.

15             Do you recall Detective Sergeant

16        Lonergan?

17   A    Absolutely.

18   Q    Okay.  And what was his position in November of

19        2004?

20   A    Detective sergeant.

21   Q    Would he have been a supervisor to you?

22   A    Yes, sir.

23   Q    Would he have been your first immediate

─────────────MCCANN & MCCANN REPORTING─────────────

A-285

45

```
1        supervisor?
2    A   Yes, sir.
3    Q   And so you were his subordinate, correct?
4    A   Yes, sir.
5    Q   And at that time do you recall who else was
6        under his command?
7    A   No, I don't.
8    Q   And do you know if he's still with the Buffalo
9        Police Department?
10   A   He's retired and he's in extreme --
11            MR. QUINN:        Just --
12            THE WITNESS:      He's retired.
13            MR. QUINN:        He's retired.
14
15   BY MR. FELLE:
16   Q   And I was going to ask you next where is he
17       now, do you know?
18   A   Either in the hospital or in Florida.
19   Q   What's the last known address that you're
20       aware of for him?
21   A   I don't know his address.  I'm sorry.
22   Q   Do you know what town or city in Florida he
23       lived in?
```

*MCCANN & MCCANN REPORTING*

A-286

46

```
1    A    I believe it's Dunedin, Florida.
2                    MR. QUINN:         Do you need a
3    spelling?
4                    THE WITNESS:       That's one I
5    can't help you with.
6                    MR. FELLE:         And would it
7    be fair to say that last you heard of Detective
8    Sergeant Lonergan was that he was in ill health?
9                    MR. QUINN:         Just the only
10   concern is HIPAA violations and things like that.
11   I don't think that's where you're going, but I --
12   it's -- certainly, his medical condition must be
13   protected in some respect.  And I don't want the
14   detective to run afoul of that.
15                   MR. FELLE:         I appreciate
16   that.
17                   MR. QUINN:         I'm not trying
18   to give you a hard time.
19                   MR. FELLE:         I appreciate
20   that.  I'm just thinking from the standpoint of his
21   availability.  We also asked for him to come in and
22   talk about the case.
23                   You're shaking your head no.  Do
```

47

1   you think he'd be in a position to give testimony in

2   this case?

3                   MR. QUINN:        I don't know

4   how you can ask him.  I mean, he's not a doctor.

5   It's -- you asked him where he was, and he's given

6   you that information.  I think that's enough.  Like

7   I said --

8                   MR. FELLE:        I'm asking his

9   personal knowledge.  He's not going to violate

10  HIPAA.  Like you just said, he's not a doctor.

11                  I'm simply asking him, based on

12  your understanding, would Detective Lonergan be

13  available to give testimony in this matter?

14                  THE WITNESS:        No.

15

16  BY MR. FELLE:

17  Q    Do you recall Captain Mark Morgan?

18  A    Yes.

19  Q    What was his position back in November of 2004?

20  A    Captain of the homicide bureau.

21  Q    Okay.  And would you have been his subordinate?

22  A    Yes, sir.

23  Q    And would Detective Sergeant Lonergan been his

*MCCANN & MCCANN REPORTING*

Case 23-352, Document 59, 06/27/2023, 3534106, Page59 of 261

A-288

48

```
 1        subordinate?

 2   A    Yes.

 3   Q    He would have been in charge of the full

 4        department, correct?

 5   A    No.  He'd be in charge of just the homicide

 6        squad or the major crimes unit at that time.

 7   Q    Do you know if he's still with the Buffalo

 8        Police Department?

 9   A    No, he's retired.

10   Q    And do you know where he is now?

11   A    No, I do not.

12   Q    Do you know if he resides locally?

13   A    No, I do not.

14   Q    When would you say the last time was that you

15        spoke with Detective Mark Morgan?

16   A    Detective Mark Morgan doesn't exist.  Captain

17        Mark --

18   Q    Captain Mark Morgan?

19   A    Yeah, he's a captain.

20   Q    Okay.

21   A    Captain Morgan, and it was three years ago at

22        a retirement party, or longer.

23   Q    Okay.  Do you know a Detective Richard
```

*MCCANN & MCCANN REPORTING*

A-289

49

```
 1            Wagstaff?
 2     A      Yes, sir, I do.
 3     Q      Okay.  And what was his position in 2004
 4            November?
 5     A      Detective.
 6     Q      And were you his subordinate?
 7     A      No.
 8     Q      Was he another member of the homicide --
 9     A      At the time he was a major crimes unit person.
10     Q      Prior to the merge had he been in the homicide
11            department?
12     A      No.
13     Q      Do you know if he's still with the Buffalo
14            Police Department?
15     A      He's retired.
16     Q      And do you know where he is now?
17     A      No, I do not.
18     Q      Detective Michael Root, do you recall who he
19            is?
20     A      Yes.
21     Q      And do you recall what his position was in
22            November of 2004?
23     A      Detective.
```

*MCCANN & MCCANN REPORTING*

50

1    Q    Was he a subordinate, or another member of the

2         homicide bureau?

3    A    He was a member of the major crimes unit, but

4         he did not become a member of the homicide

5         bureau.

6    Q    And do you know where he is now?

7    A    No, I do not, sir.

8    Q    Does he still work for the Buffalo Police

9         Department?

10   A    He also is retired.

11   Q    How about Detective Mary Gugliuzza,

12        G-U-G-L-I-U-Z-Z-A?

13   A    She was a member of the major crimes unit, and

14        later became a member of the homicide squad.

15   Q    When you say later, would that have been after

16        the investigation was complete with respect to

17        the conviction of Josue Ortiz?

18   A    Yes.

19   Q    And do you know if she still works for the

20        Buffalo Police Department?

21   A    She is retired.

22   Q    And do you know where she lives now?

23   A    No, I do not.

A-291

51

| | | |
|---|---|---|
| 1 | Q | How about Detective Mark Vaughn, V-A-U-G-H-N? |
| 2 | A | I know him; yes. |
| 3 | Q | Do you know what his position was back in |
| 4 | | November of 2004? |
| 5 | A | Detective. |
| 6 | Q | Was he with the major crimes unit, or had he |
| 7 | | been with the homicide? |
| 8 | A | He started with the major crimes unit, and then |
| 9 | | later became a member of the homicide bureau. |
| 10 | Q | And by later, do you mean after the |
| 11 | | investigation surrounding Josue Ortiz and his |
| 12 | | conviction? |
| 13 | A | Yes. |
| 14 | Q | Do you know where -- do you know if he still |
| 15 | | works with the Buffalo Police Department? |
| 16 | A | He's retired. |
| 17 | Q | And do you know where he lives now? |
| 18 | A | I do not know where he lives. |
| 19 | Q | How about Detective Michael Morbino, |
| 20 | | M-O-R-B-I-N-O? |
| 21 | A | It's actually Mordino; M-O-R, D like in David, |
| 22 | | I-N-O. |
| 23 | Q | Thank you. |

*MCCANN & MCCANN REPORTING*

52

```
1    A    He just retired last week.
2    Q    And what was his position back in November of
3         2004?
4    A    Major crimes unit.
5    Q    And do you recall Detective Michael Acquino?
6    A    Yes, sir.
7    Q    And what was his position back in 2004 in
8         November?
9    A    He was a detective assigned to the major crimes
10        unit.
11   Q    And do you know if he still works with the
12        Buffalo Police Department?
13   A    He's retired.
14   Q    And do you know where he resides?
15   A    No, sir, I do not.
16   Q    Do you know Buffalo Police Officer Edwin
17        Torres?
18   A    Yes, I do.
19   Q    Okay.  And do you know what his position was
20        back in November of 2004?
21   A    He either was a police officer or a patrolman.
22        I believe they abolished the rank of patrolman,
23        but he was in uniform his career.
```

*MCCANN & MCCANN REPORTING*

A-293

53

1    Q    I saw in the records that there was also

2         another Officer Torres.  Certainly, that's a

3         common name.  But did he have a father that was

4         also in the department?

5    A    I don't know.

6    Q    Do you know if Officer Edwin Torres ever went

7         on to become a detective?

8    A    No, he did not.

9    Q    Do you know if he's still with the Buffalo

10        Police Department?

11   A    He's retired.

12   Q    Do you know where he resides?

13   A    No, sir, I do not.

14   Q    Back in November of 2004 did Officer Edwin

15        Torres assist the major crimes unit with

16        Spanish translation?

17                  MR. QUINN:        Object to

18   form.  You can answer.

19                  THE WITNESS:      Yes, he did.

20

21   BY MR. FELLE:

22   Q    And back in November of 2004 were there other

23        individuals that could be called upon for the

*MCCANN & MCCANN REPORTING*

54

1     sake of Spanish translation?

2   A   Yes, sir.

3   Q   And did you have a list for that purpose?

4   A   Not a list, just personal knowledge.

5   Q   Were you aware of any individuals back in

6       November of 2004 that were certified with

7       respect to Spanish translation?

8   A   I don't think that they're certified.  I think

9       that's their native language.  And we had a

10      large percentage of police officers that

11      actually were born in Puerto Rico.

12              One of my old partners was in the

13      United States Marine Corps during Vietnam, and

14      he also came from Puerto Rico, but he became a

15      sergeant.  And that would be Daniel Figueroa.

16              And we recruited a large amount of

17      Spanish speaking police officers.

18              So I mean, it's not that they were

19      certified, it was their native language.

20  Q   Okay.  I guess what I'm trying to determine is,

21      were you aware of the distinction between a

22      certified translator and a police officer who

23      could translate Spanish?

A-295

55

1             MR. QUINN:       Object to

2   form.  You can answer.

3             THE WITNESS:     No, I do not

4   know.

5             MR. FELLE:       Prior to

6   today's deposition who did you speak to to prepare

7   for the deposition?

8             MR. QUINN:       Excluding

9   counsel.

10            MR. FELLE:       Well, he can

11  say counsel, he just can't tell me the content, of

12  course.

13           THE WITNESS:     This gentleman

14  here today when he -- when we got here.

15           MR. FELLE:       Okay.

16           THE WITNESS:     And there was

17  another lady.  Just give me one second.  I have her

18  name on your subpoena.

19           MR. QUINN:       Both

20  individuals would be Corporation Counsel's office.

21  My name is Robert Quinn.  Her name is Maeve Huggins.

22  We both are attorneys.

23           THE WITNESS:     That's correct.

MCCANN & MCCANN REPORTING

A-296

56

```
1    BY MR. FELLE:

2    Q    Outside of the attorneys that you've mentioned,

3         did you speak with anyone else about your

4         testimony today?

5    A    No.

6    Q    At some point between November of 2004 and

7         today, did you come to discover that Josue

8         Ortiz was exonerated of the crimes for which

9         you arrested him in 2004?

10                  MR. QUINN:       Object to

11   the form.  And I do want to note that it's my

12   understanding that there is some type of protective

13   order generally pertaining to those proceedings.

14                  MR. FELLE:       Correct.

15                  MR. QUINN:       That question,

16   I believe is fair, but I do want for --

17                  MR. FELLE:       We're not

18   going to get into the Federal prosecution of those

19   individuals.  That's what our order limits us from

20   doing.  But it certainly doesn't limit us from the

21   knowledge that he was exonerated from the crime.

22                  MR. QUINN:       You can

23   answer.
```

A-297

57

1    BY MR. FELLE:

2    Q    Did you become aware of that?

3    A    Yes, sir.

4    Q    Okay.  When did you first become aware of that?

5    A    When it was in the newspapers.

6    Q    Okay.

7    A    And on TV.

8    Q    Okay.  At that time had you recalled your

9         involvement in that conviction and arrest?

10   A    Absolutely.  Yes.

11   Q    During the course of the 440 Motion to

12        exonerate Mr. Ortiz, were you ever called in

13        to give testimony?

14                MR. QUINN:        Object to the

15   form.

16                THE WITNESS:       No, sir.

17                MR. FELLE:        And upon

18   hearing from various media sources that Mr. Ortiz

19   had been exonerated of a crime for which you were

20   involved in his arrest, did you seek the advice or

21   reach out to anyone else about what you should

22   expect to occur in the future?

23                MR. QUINN:        Object to form.

MCCANN & MCCANN REPORTING

A-298

58

1        THE WITNESS:        Absolutely

2   not, no.

3

4   BY MR. FELLE:

5   Q    Did you speak with any of the other officers

6        that were involved in that investigation about

7        that, about that conviction?

8   A    About the conviction?

9   Q    Correct.

10  A    I would not be able to say.  I don't recall on

11       that.  I'm sorry.

12  Q    Did you ever reach out to --

13               MR. QUINN:        Object to the

14  form of the last question, specifically conviction.

15  That might have been unclear.  You're talking about

16  the exoneration?

17               MR. FELLE:        Correct.

18  About -- about the conviction.  So anybody involved

19  in the investigation which led to the arrest and

20  conviction of Josue Ortiz?

21               THE WITNESS:        I did speak

22  to one detective about it, and that was Detective

23  Patrick Judge.

─────────MCCANN & MCCANN REPORTING─────────

59

1    BY MR. FELLE:

2    Q    What do you recall about that conversation?

3    A    Just that he had been exonerated, and that two

4         other individuals had pled -- or had entered a

5         plea of guilty for that homicide.

6    Q    Okay.  Did that prompt you and/or Detective

7         Judge to reopen that file to examine how that

8         could have occurred?

9                    MR. QUINN:        Object to the

10   form.

11                   THE WITNESS:       No.

12                   MR. FELLE:        Did the

13   exoneration of Josue Ortiz in any way trigger a

14   process within the Buffalo Police Department to

15   open that case with your involvement?

16                   MR. QUINN:        Object to

17   form.

18                   MR. FLYNN:        Objection.

19                   THE WITNESS:       I don't know.

20                   MR. FELLE:        So upon

21   learning of Mr. Ortiz's exoneration, other than

22   talking to Detective Pat Judge, did you do anything

23   to look into the facts or circumstances which led

60

1    to his false arrest or conviction?

2                    MR. QUINN:        Object to the

3    form, specifically to false arrest and conviction.

4    I'd say that's inappropriate and borderline, you

5    know.  You can answer if you understand.

6                    THE WITNESS:       No, I did not.

7

8    BY MR. FELLE:

9    Q    Did you ever speak with the district attorney

10        on this case, a Ken Case?

11   A    Judge Case, I spoke to him about it.

12   Q    Okay.  And what was the sum and substance of

13        that discussion with Judge Case?

14   A    Just that his conviction was overturned.

15   Q    Okay.  Was there any discussion as to going

16        back and looking at the file to see how that

17        could have occurred?

18                    MR. QUINN:        Object to the

19   form.

20                    THE WITNESS:       No.

21                    MR. FELLE:        Was there

22   discussion with you and Judge Case about what you

23   would expect going forward with respect to Josue

61

1   Ortiz?

2                   MR. QUINN:        Object to

3   form.  You can answer.

4                   THE WITNESS:      No.

5                   MR. FELLE:        Were you

6   concerned at all about any civil and/or disciplinary

7   procedures?

8                   MR. QUINN:        Object to the

9   form.

10                  THE WITNESS:      Yes.  Yeah.

11  But -- yes and no, both.

12                  MR. FELLE:        Okay.  So

13  insomuch as you may have been concerned, did you

14  ever get confronted with any kind of civil -- other

15  than this action, civil and/or disciplinary actions

16  because of the false arrest and conviction of Mr.

17  Ortiz?

18                  MR. QUINN:        Object to

19  form.  I don't believe that he's a party to this

20  action that we're here for today.  This is against

21  New York State.

22                  THE WITNESS:      I'm a witness.

23  I didn't know -- are you saying that I'm a defendant

MCCANN & MCCANN REPORTING

Case 23-352, Document 59, 06/27/2023, 3534106, Page73 of 261

A-302

62

1  or a witness?

2                    MR. FELLE:       No.  No.  I'm

3  asking you, insomuch as you were concerned that

4  there might be disciplinary action and/or civil

5  action, did you seek the advice of counsel or anyone

6  else?

7                    THE WITNESS:      No.

8                    MR. QUINN:        Object to

9  form.  You can answer.

10                   MR. FELLE:        Did -- was

11 there, in fact, any disciplinary action as a result

12 of the arrest and conviction of Josue Ortiz?

13                   MR. QUINN:        Object to

14 form.  You can answer.

15                   THE WITNESS:      No.

16                   MR. FELLE:        Did you ever

17 seek the advice of Tom Burton?

18                   MR. QUINN:        That's

19 attorney/client.  I don't think that's an

20 appropriate line of questioning.

21                   MR. FELLE:        I'm not asking

22 him about the content, I'm asking --

23                   MR. QUINN:        Yeah, if it's

*MCCANN & MCCANN REPORTING*

A-303

```
                                             63

 1    advice, it's from an attorney.  I don't think it's

 2    appropriate.

 3                   MR. FELLE:        He can give me

 4    a yes or no answer.

 5                   MR. QUINN:        No, he can't.

 6                   MR. FELLE:        He's not his

 7    attorney.  He's the PBA attorney.

 8                   MR. QUINN:        You're asking

 9    him if he sought advice from an attorney.

10                   MR. FELLE:        Yes.

11                   MR. QUINN:        Advice is

12    attorney/client privilege, confidential material.

13                   MR. FELLE:        No.

14                   MR. QUINN:        He cannot

15    answer that.

16                   MR. FELLE:        All right.  If

17    that's your line we'll take a break and we will call

18    the judge, because the privilege does not invoke

19    protection against him answering the question of

20    whether or not he spoke to someone.

21                   MR. QUINN:        That's a

22    different question.

23                   MR. FELLE:        That protects
```

*MCCANN & MCCANN REPORTING*

A-304

```
                                                      64
 1   the content.  I'm asking him simply if he reached

 2   out to Tom Burton about this matter.

 3                   MR. QUINN:        That's a

 4   different question.

 5                   MR. FELLE:        All right.

 6   Well, then I'll ask it that way.

 7

 8   BY MR. FELLE:

 9   Q    Did you reach out to Tom Burton with respect to

10        Josue Ortiz?

11   A    No.

12   Q    And do you know who Tom Burton is?

13   A    Absolutely.

14   Q    Have you spoke to him on other matters outside

15        of this Josue Ortiz matter?

16                   MR. QUINN:        What's the

17   relevancy of that?  It's just an inappropriate

18   question.

19                   MR. FELLE:        I'm going to

20   show you --

21                   MR. QUINN:        He can

22   answered that he knows who he is.

23                   MR. FELLE:        Okay.  And?
```

A-305

65

1          **THE WITNESS:**       I've talked to

2   him on numerous occasions, yes.  I was a homicide

3   detective, he's a defense attorney.

4

5   BY MR. FELLE:

6   Q     Did you ever reach out to a homicide DA by

7         the name of Jim Bargnesi about the events

8         surrounding the Ortiz conviction and arrest?

9   A     Judge Bargnesi.

10  Q     Okay.

11  A     I have not talked to him about this particular

12        matter.

13  Q     Did you ever reach out and speak to a former

14        homicide detective -- or excuse me, a homicide

15        DA who may have been operating at the time, Joe

16        Marusak?

17              **MR. QUINN:**       You're asking

18  about this case?

19              **MR. FELLE:**       Correct.

20  Regarding the circumstances surrounding the false

21  arrest --

22              **THE WITNESS:**       I do not --

23              **MR. FELLE:**       -- and

A-306

```
                                                          66
 1   conviction --

 2                    THE WITNESS:       I do not

 3   believe that Chief Marusak was involved in this

 4   case.

 5                    MR. QUINN:        He's just

 6   asking if you reached out to him.

 7                    THE WITNESS:       No, I didn't.

 8   And nor did I talk to him about it.  Absolutely not.

 9   No.

10

11   BY MR. FELLE:

12   Q    Just so I'm clear, Joe Marusak was a DA, not a

13        chief in the department?

14   A    No, he was --

15   Q    Joe Marusak.

16   A    Joe Marusak was an assistant district attorney,

17        and he was the chief of homicide --

18   Q    Correct.

19   A    -- at the district attorney's office.  That

20        title was also given to Judge Case, Judge

21        Bargnesi and Judge Sedita.

22   Q    And again, just so I'm clear, you don't recall

23        ever speaking with Marusak, Chief Joe Marusak,
```

A-307

67

1          about the facts and circumstances surrounding

2          the false arrest and conviction of Josue Ortiz?

3                          MR. QUINN:         Object to

4     form, specifically false arrest and conviction.  I'm

5     going to object to every time you characterize it as

6     such.

7                          MR. FELLE:         Okay.

8                          MR. QUINN:         Let that be a

9     standing objection.

10                         THE WITNESS:       No, I did not.

11                         MR. FELLE:         Before we talk

12    about the file and the contents of things that you

13    brought today, other than what you brought in the

14    folder in front of you, did you review any other

15    documents surrounding the circumstances of Josue

16    Ortiz's investigation, arrest or conviction?

17                         MR. QUINN:         In relation to

18    his testimony today?

19                         MR. FELLE:         No, to help

20    prepare for today.

21                         MR. QUINN:         Right.

22                         THE WITNESS:       No.

23

─────────────── *MCCANN & MCCANN REPORTING* ───────────────

68

1   BY MR. FELLE:

2   Q   And the information that you brought today, why

3       did you bring that?

4   A   If there was a specific area that you wanted

5       cleared up, to refresh my recollection.  This

6       happened fifteen years ago.  I'm pretty good in

7       regards to my knowledge of my homicides, but if

8       there was something specific, I brought the

9       actual sworn statement, the P73, the arrest

10      warrant, so that I could refer to them just so

11      that we could be clear on what you're looking

12      for that I would tell you the actual -- what's

13      on the sworn statement.

14  Q   Okay.  And did you extract those forms from a

15      bigger file?

16  A   No, I did not.

17  Q   Did you ask that those particular forms be

18      extracted and provided to you?

19  A   No, I did not.

20  Q   How did you come about possessing those

21      documents?

22              MR. QUINN:          Provided to

23  him by counsel earlier today.

69

 1              THE WITNESS:        That's correct.

 2

 3   BY MR. FELLE:

 4   Q    At your request?

 5   A    No.

 6   Q    So the only documentation that you had brought

 7        with you today is documentation given to you by

 8        counsel, correct?

 9   A    Correct.

10   Q    Okay.  And just so that I'm clear and the

11        record's clear, prior to today have you given

12        any sworn or recorded testimony or statements

13        surrounding the investigation, arrest and/or

14        conviction of Josue Ortiz?

15              MR. QUINN:        Object to the

16   form.  You can answer.

17              THE WITNESS:        Did I give any

18   testimony?

19              MR. FELLE:        Yes, or

20   statements.

21              THE WITNESS:        No, nor

22   statements.  No.

23              MR. FELLE:        And is it fair

*MCCANN & MCCANN REPORTING*

                                                            70

1    to say that this is the first time that you've sat

2    down to answer questions about your involvement in

3    the arrest and prosecution and conviction of Josue

4    Ortiz?

5                   MR. QUINN:          Object to form.

6                   THE WITNESS:        No.

7                   MR. FELLE:          In what other

8    environment have you sat down to answer questions,

9    other than with your attorneys?

10                  MR. QUINN:          Object to the

11   form.  Why don't we go off the record for a second.

12                  MR. FELLE:          Okay.

13                  (Discussion off the record.)

14                  MR. QUINN:          We can go back

15   on the record.

16                  We had a brief discussion off the

17   record.  I'm not sure that we have reached any type

18   of resolution.  But our concern is that we get into

19   an area which is protected by the order which is

20   protecting certain aspects of what I understand to

21   be a federal investigation.

22                  I'm going to object to the

23   question that was asked to the extent that it

MCCANN & MCCANN REPORTING

A-311

71

1    infringes on that, but an answer has not been

2    provided.  I will reserve my right to object to any

3    further questioning depending on what the answer is.

4                        MR. FELLE:        All right.  So

5    you can answer the question.

6                        THE WITNESS:        Could you

7    repeat it?

8                        MR. FELLE:        Sure.

9    Actually, I'll have the reporter read it back.

10                       (The above-requested question was

11   then read by the reporter.)

12                       THE WITNESS:        I don't

13   believe that was the question, but --

14                       MR. FELLE:        The question

15   before that.

16                       (The above-requested question was

17   then read by the reporter.)

18                       MR. QUINN:        I'm going to

19   object to that and instruct the witness not to

20   answer because of my understanding of the -- the

21   order which would preclude and prevent him from

22   testifying about the aspects of the federal

23   prosecution.

MCCANN & MCCANN REPORTING

A-312

72

1            MR. FELLE:        Okay.

2    Without talking about the content of any of those

3    conversations, Detective Stambach, I want to ask

4    you, who did you meet to talk about these issues?

5            MR. QUINN:        I think that

6    would be covered by the order, specifically any --

7    the names of anyone.  If you want to ask him,

8    perhaps, some type of organization or something

9    like that.

10           MR. FELLE:        If you're

11   going to insist on that, we're going to take a

12   break and we'll call the judge because that is way

13   overbroad.  So first, I understand you were

14   involved in a stipulation to some extent, but

15   that is way overbroad.

16           MR. QUINN:        It wasn't

17   overbroad.  I mean --

18           MR. FELLE:        I'm entitled

19   to know if another statement exists of the person

20   I'm deposing relative to the same exact matters that

21   I'm deposing him about.

22           MR. QUINN:        All right.

23   And you're --

─────────── MCCANN & MCCANN REPORTING ───────────

```
                                                      73
 1                MR. FELLE:        So I'm not
 2    asking him about the content.  I'm asking him about
 3    who, when, where.  And I'm allowed to ask him those
 4    things since they're not privileged, and they're
 5    certainly not part of our stipulations.
 6                MR. QUINN:        I believe that
 7    you have asked him whether or not there were other
 8    statements or testimony given.
 9                MR. FELLE:        Are you
10    going --
11                MR. QUINN:        No, we're
12    going --
13                MR. FELLE:        -- about the
14    existence of these things?
15                MR. QUINN:        No.  We're
16    going to try to get to the bottom of it without
17    making this unproductive.  I'm indicating that it's
18    my understanding that the line of questioning that
19    you're preparing to go down is protected by the
20    order.
21                You previously asked him if he
22    gave any statements.  You previously asked him if
23    he's testified.  He's answered those questions.  To
```

74

1   go further, I believe, would violate the order.

2             If there are different questions

3   that you want to ask, again, you can ask them, but I

4   might object to them, depending on what they are.

5   We can try to go forward.  We can try to get around

6   this, but --

7             MR. FELLE:        No.  I just

8   think you continue -- it's a slippery slope, and you

9   continue to enlarge the stipulation.  This is

10  clearly a realm that I'm entitled to ask him

11  questions about.

12            MR. FLYNN:        There's

13  stipulations, two stipulations; one from the parties

14  in the Court of Claims regarding your deposition,

15  and there's also one, a stipulated order, a

16  confidential order by Judge Arcara directing them

17  not to discuss this.

18            MR. FELLE:        The Arcara

19  orders only have to go with Grand Jury matters,

20  first of all, and -- specifically.  So it has

21  nothing to do at all with what I'm asking here.

22  The stipulation that we have in the Court of

23  Claims --

─────MCCANN & MCCANN REPORTING─────

A-315

75

1          MR. FLYNN:          Well, we don't

2    know if you're going down in this area.  You're

3    asking him if he's given other statements or

4    testimony.  We don't know if this witness has

5    participated in a Grand Jury or not.  And I don't

6    think --

7          MR. FELLE:          That's not

8    accurate.  He's allowed to tell us if he has.  I'm

9    not asking about the content of his discussion at

10   this point.  I'm asking him when, where and how.

11         MR. FLYNN:          Well, that, I

12   think, was his -- Rob's concern is when you said at

13   this point, then you go down further and ask you

14   him.

15         MR. FELLE:          Well, I'm not

16   going to.  But either way then your objection is

17   premature.  We can acknowledge that.

18         MR. QUINN:          Oh, yeah.

19   Sure.

20         MR. FELLE:          At least let

21   him answer the question I posed as to who.

22         MR. FLYNN:          That's --

23         MR. FELLE:          When I cross

*MCCANN & MCCANN REPORTING*

76

1    the line, that's fair.  I'm not going to get into

2    content.  I've already told you that.  But you're

3    way more premature than that by telling him not to

4    answer the current question.

5                    MR. FLYNN:          Well, the

6    question, I think, is more of what you said of not

7    the question that was asked off the record where --

8    who, what, when or why.  To whom, that expanded your

9    question.

10                   MR. FELLE:          It expanded

11   it?  I think it limited it.  It limited the

12   direction in which I was going.

13                   MR. FLYNN:          The question

14   was what other environment.  And then off the record

15   you said I think I'm entitled to ask him who, what,

16   when, where and why.

17                   MR. FELLE:          Okay.

18                   MR. FLYNN:          So that

19   expanded the original question.

20                   MR. FELLE:          Who, what,

21   when --

22                   MR. FLYNN:          That's what I

23   think his concern with the objection is.

—————— *MCCANN & MCCANN REPORTING* ——————

A-317

77

1              MR. FELLE:          All right.  I

2    will not tie this up.  This is not -- this is pretty

3    simple stuff.  I'm asking just a rudimentary

4    question about who he spoke to.  He's talking about

5    the same exact substance we're talking about.  I'm

6    allowed to know that it exists.  I'm not going to

7    get into the content.  We can deal with that later

8    on with the judge.

9              MR. QUINN:          Okay.  You've

10   already asked questions.  We can try to move along,

11   because I don't want to waste --

12              THE WITNESS:        Can you give

13   me two minutes, gentleman?

14              MR. FELLE:          Sure.

15              (A recess was then taken.)

16              MR. FELLE:          So we're back

17   on the record.

18              Are you going to withdraw your

19   objection, I hope, and let him answer just the

20   question of who he spoke to?

21              MR. QUINN:          The objection

22   still stands.  And again, it is -- you know, I just

23   want to make sure we don't go down the route you --

MCCANN & MCCANN REPORTING

Case 23-352, Document 59, 06/27/2023, 3534106, Page89 of 261

A-318

78

1   Detective, you can answer the question, but I do

2   want to reiterate that there is this order there

3   that does protect certain information.

4                    THE WITNESS:        I did speak

5   with the U.S. Attorney's office.

6

7   BY MR. FELLE:

8   Q    Okay.  And approximately when was that?

9   A    Prior to him getting out and being exonerated.

10  Q    Okay.  Mr. Ortiz you're referring to?

11  A    Yes.

12  Q    Okay.  At the time that you had that meeting,

13       what information did you review?  Did you

14       review the case file --

15                    MR. QUINN:         Object to the

16  form.

·17                    MR. FELLE:         -- from the

18  Buffalo Police Department?

19                    MR. QUINN:         You can answer.

20                    THE WITNESS:        There was a

21  work file there at the U.S. Attorney's office

22  with -- that had to do with my participation in

23  the case.

─────────── MCCANN & MCCANN REPORTING ───────────

A-319

79

1               MR. QUINN:        He's asking

2   what you reviewed, though, as opposed to what you

3   saw.

4               THE WITNESS:      That's it.

5   And that's what's here today.

6

7   BY MR. FELLE:

8   Q   The sleeve that you brought today is part of

9       that, correct?

10   A   That's what I reviewed at the U.S. Attorney's

11       office.

12   Q   Okay.

13   A   This was my involvement, yes.

14   Q   Okay.  And that's all that you reviewed at

15       that point?

16   A   That's it.

17   Q   Okay.  Any other meetings with anyone else?

18   A   None.

19   Q   And just so I'm clear, at the time that you did

20       meet with somebody from the U.S. Attorney

21       General's office, did you give a statement

22       under oath, either signed in writing and/or

23       verbal?

80

1            MR. QUINN:        Object to

2    form.  You can answer.

3            THE WITNESS:      No.

4            MR. FELLE:        Just a

5    discussion off the record?

6            MR. QUINN:        Object to the

7    form.

8            THE WITNESS:      Correct.  Yes.

9

10   BY MR. FELLE:

11   Q    Yes.  So way back when we started this

12        discussion I told you that I would ask you

13        about your independent recollection of Mr.

14        Ortiz.  Do you have an independent recollection

15        of him?

16   A    Pretty much so.

17            MR. FELLE:        Okay.  I'm

18   going to have this marked as 2, please.

19            (Whereupon, Exhibit 2, a four-page

20   document, was then received and marked for

21   identification.)

22

23   BY MR. FELLE:

A-321

81

1    Q    So before we look at Exhibit 2, Detective --

2         you know, I keep struggling with the idea of

3         sir -- sir or detective?  I know you're

4         retired, but do you mind that I continue to

5         call you detective?

6    A    You can call me whatever you like, please.

7    Q    Okay.  Appreciate that.  I struggle with is it

8         mister or is it detective?

9    A    What you -- whatever you feel comfortable with.

10   Q    All right.  What do you recall about the

11        physical description of Josue Ortiz at the time

12        that you initially encountered him back in

13        November of 2004?

14                  MR. QUINN:          Object to the

15   form.  You're asking what he looked like?

16                  MR. FELLE:          Independent

17   recollection, yes.

18                  THE WITNESS:        Just that he's

19   a Hispanic male.  He was on the thin side.  Very

20   tall.  Polite.

21                  MR. QUINN:          He's just

22   asking what he looked like.

23                  THE WITNESS:        Oh.  Just very

─────────── MCCANN & MCCANN REPORTING ───────────

A-322

82

1    tall, thin.

2                    MR. FELLE:        And what do

3    you recall about his demeanor?  You said that you

4    found him polite.  What else can you recall about

5    his demeanor?

6                    MR. QUINN:        Object to the

7    form.  You can answer.

8                    THE WITNESS:        Well, a little

9    bit timid and a little bit scared.

10

11   BY MR. FELLE:

12   Q    And based on the timeline, did you first come

13        into contact with Mr. Ortiz on November 15th

14        of 2016 (sic)?

15   A    Again, I would have to check, if you don't

16        mind.  It would be the day of the arrest,

17        that's when I became involved with him.

18   Q    Okay.  So let me ask you this.  Based on your

19        independent recollection, was the time -- and

20        this kind of carries over, because I know it

21        happened after midnight -- but the date that

22        you first met with him was in an evening,

23        correct?

A-323

83

1          MR. QUINN:        Object to

2     form.  You can answer.

3                THE WITNESS:        I believe it

4     was in the afternoon, and maybe in the evening.

5

6     BY MR. FELLE:

7     Q    And where do you recall that encounter being?

8     A    It would be in the homicide squad office

9          interview room.

10    Q    Okay.  And he was brought to you by a Buffalo

11         Police Department officer?

12    A    Two police officers.

13    Q    Okay.  Was that the only time that you'd ever

14         met with Josue Ortiz?

15    A    Yes, sir.

16    Q    To the best of your recollection?

17    A    Yes, that is correct.

18    Q    Okay.  And showing you what's been marked as

19         Exhibit 2 --

20                MR. FLYNN:        Can you

21    identify what this is for the record?

22                MR. FELLE:        Sure.  I'm

23    actually going to have the detective look at it

—MCCANN & MCCANN REPORTING—

A-324

84

1   first and then identify it.

2                   MR. QUINN:          I will offer

3   this, I believe this is four photographs of some

4   kind and/or copies with some type of writing on the

5   four pages.

6                   MR. FELLE:          Well, let me

7   do a better job than that.

8                   MR. QUINN:          Okay.

9

10  BY MR. FELLE:

11  Q    Exhibit 2 is a four-page document, the first of

12       which is a cover sheet dated November 17, 2004,

13       describing Josue Daniel Ortiz. The second page

14       is a photograph of an individual. The third

15       page is a more close-up photograph of an

16       individual. And on the fourth page are some

17       identification documents pertaining to Josue

18       Ortiz.

19                   Detective, let me just have you

20       take a look at that real quick.

21                   MR. FELLE:          Off the record.

22

23                   (Discussion off the record.)

                    ── MCCANN & MCCANN REPORTING ──

A-325

```
                                                              85
 1   BY MR. FELLE:

 2   Q    Okay.  Detective, have you looked at those

 3        documents --

 4   A    Sure.

 5   Q    -- described as Exhibit 2.  Can you tell me,

 6        first of all, the two photographs of the

 7        individuals enclosed, is that Josue Ortiz, to

 8        your best recollection?

 9   A    Yes, it is.

10   Q    Okay.  And did you take those photographs?

11   A    No.  The police photographer takes these

12        photographs.

13   Q    Okay.  Were you present when they were taken?

14   A    Yes, I was.

15   Q    And do you recall when they were taken?

16   A    That would be before he's booked.

17   Q    And so when you encountered Mr. Ortiz for the

18        first and the time that you arrested him, is

19        that how he appeared?

20   A    Yes.

21   Q    Okay.  Turning --

22   A    Are you asking anything about this, or no?

23                  MR. QUINN:      Just wait for
```

*MCCANN & MCCANN REPORTING*

86

1    a question.

2                      THE WITNESS:        Okay.  I'm

3    sorry.

4

5    BY MR. FELLE:

6    Q    Sure.  The cover sheet indicates that it's

7         Josue Daniel Ortiz.  Is there something about

8         that?  It's dated November 17th of 2004,

9         correct?

10   A    Yes, sir.

11   Q    Okay.  And so the booking process extended

12        between the -- your meeting with Mr. Ortiz,

13        which started in the evening of 2016 (sic), and

14        extended to the early morning hours of 2000 --

15        excuse me, of November 17th, 2004, correct?

16                      MR. QUINN:         Object to the

17   form.  Specifically --

18                      THE WITNESS:        I believe so,

19   yes.

20

21   BY MR. FELLE:

22   Q    Okay.  And we'll look at the documents

23        pertaining to that in a moment.  But the face

*MCCANN & MCCANN REPORTING*

87

1        sheet to Exhibit 2, was that prepared by you?

2    A    No.  It's prepared by Detective Murphy, who is

3        a sergeant.  It's Patrick Murphy, Patrick J.

4        Murphy.  He's in charge of the evidence

5        collection unit.  This is a pegboard that's

6        written up by him, and it shows Detective

7        Judge, myself and him being present when the

8        police photographer comes in to take these two

9        photos.

10   Q    Excellent.  And the documents on page four,

11       whose writing is underneath those?

12   A    That's going to be Detective Murphy's.

13   Q    Okay.  And is he acknowledging that those two

14       forms of identification were taken from Mr.

15       Ortiz?

16   A    Yes.

17                   MR. QUINN:          Object to

18   form.

19                   THE WITNESS:        Yes.

20

21   BY MR. FELLE:

22   Q    And in fact, you were pointing to the stamped

23       case number, correct, on the --

88

1    A    That's not a case number.  That is a -- going

2         to be a property clerk's number.  There's

3         evidence, photographer and actual property.

4         But this is a property number.

5    Q    Would it be fair to say that when you booked

6         Mr. Ortiz that he had those forms of

7         identification with him?

8                   MR. QUINN:          Object to

9    form.  You can answer.

10                  THE WITNESS:        Yes.  They

11   were taken from him.

12

13   BY MR. FELLE:

14   Q    Okay.  And you had access to the information

15        contained on them, including his Social

16        Security number, and it looks an insurance

17        benefits card, correct?

18   A    Correct.

19   Q    Okay.  Incidentally, before we leave Exhibit 2,

20        you told us that your recollection of Mr. Ortiz

21        is that he was tall.  But according to the

22        second page of Exhibit 2, he's a little over

23        six foot, six inches tall, correct?

A-329

89

1    A    Yes, sir.

2    Q    Okay.  And I think you said he's thin.  You

3         recalled him being thin?

4    A    Yes, I felt like he was thin, that he appears

5         to be thin, but he looks a little chubby.

6    Q    And the arrest report has him at two hundred

7         and eighty pounds; would that be about right?

8              MR. QUINN:        Well, did you

9    happen to review the arrest report?

10

11   BY MR. FELLE:

12   Q    Independent recollection?

13   A    I don't recall.  I'm sorry.

14   Q    Now, prior to today's deposition, did you

15        review any photographs of the scene of the

16        crime?

17             MR. QUINN:        Object to the

18   form.

19             THE WITNESS:      No, I did not.

20             MR. FELLE:        Did you review

21   any photographs pertaining to the autopsy or

22   postmortem examination of the victims?

23             MR. QUINN:        Object to the

─MCCANN & MCCANN REPORTING─

A-330

```
                                                      90
 1   form.  You can answer.

 2                  THE WITNESS:       No, I did not.

 3                  MR. FELLE:         Did you review

 4   the major crimes unit case file?

 5                  MR. QUINN:         Object to form.

 6                  THE WITNESS:       No.

 7

 8   BY MR. FELLE:

 9   Q    Did you review the evidence unit case file?

10   A    No, I did not.  I don't -- no.  I'm sorry.

11   Q    You did review various reports that were

12        completed by you during the course of the

13        investigation, correct?

14   A    Yes, sir.

15   Q    And those you have in front of you?

16   A    Yes, sir.

17   Q    And did you review the purported confession of

18        Josue Ortiz in this case?

19                  MR. QUINN:         Object to form.

20                  THE WITNESS:       Yes, I did.

21

22   BY MR. FELLE:

23   Q    Is that part of the sleeve that you brought
```

*MCCANN & MCCANN REPORTING*

A-331

91

1        with you today?

2    A   Yes, it is.

3    Q   Did you review the testimony provided by three

4        officers of the Buffalo Police Department at

5        the Huntley Hearing conducted in this case?

6    A   No.

7    Q   Have you ever seen that testimony before today?

8    A   No, I have not.

9    Q   Have you seen that testimony before today?

10   A   I don't even remember it being held.  I'm

11       sorry.

12   Q   Do you recall giving testimony at that Huntley

13       Hearing?

14   A   No, I do not.

15   Q   Did you review any portion of the 440 Motion

16       and/or the order of Judge Franczyk on that

17       motion which exonerated Josue Ortiz?

18   A   I don't know what that is.  I'm sorry.  440?

19   Q   That's a motion for the release of Mr. Ortiz

20       from incarceration.

21   A   Of Judge Franczyk, no.

22   Q   Did you ever see any of the motion papers that

23       argued for Mr. Josue Ortiz's release from

MCCANN & MCCANN REPORTING

A-332

```
                                                   92
 1        incarceration and/or the order of the judge
 2        that ordered that he be released from
 3        incarceration from the crimes that you arrested
 4        and convicted him for?
 5   A    No, I --
 6                    MR. QUINN:        Object to the
 7   form.
 8                    THE WITNESS:      No, I did not.
 9                    MR. FELLE:        And I think
10   you told us earlier, but just so the record's clear,
11   have you seen or heard any media sources
12   reporting -- any media source reporting that's
13   related to the arrest and conviction of the real
14   perpetrators of these murders, which were Brandon
15   Jonas -- Brandon Jonas, Efron Hidalgo,
16   H-I-D-A-L-G-O, Frank Matias, M-A-T-I-A-S, and Misael
17   Montalvo, M-O-N-T-A-L-V-O?
18                    MR. QUINN:        Object to
19   form.  You can answer.
20                    THE WITNESS:      No.
21
22   BY MR. FELLE:
23   Q    Are you familiar with any of those names that
```

*MCCANN & MCCANN REPORTING*

93

1       I just read?

2   A   No, I'm not.

3   Q   And with respect to your becoming aware that

4       Mr. Ortiz was exonerated of these crimes, do

5       you recall becoming aware that they had

6       suspects that they had a superseding indictment

7       for in U.S. Federal Court?

8                    MR. QUINN:          Object to

9   form.  You can answer.

10                   THE WITNESS:        I'm not aware

11  of it, no.  I'm sorry.

12                   MR. FELLE:          And just so

13  I'm clear and the record's clear, did you ever

14  identify who the real perpetrators of those murders

15  were which you investigated back in November of

16  2004?

17                   MR. QUINN:          Object to

18  form.  I believe that's a completely objectionable

19  question.  I don't know how you want to --

20                   THE WITNESS:        I don't know

21  how to answer that.  Could you read that back to me

22  again, please?  I'm sorry.

23                   MR. FELLE:          Sure.

*MCCANN & MCCANN REPORTING*

A-334

94

1               (The above-requested question was

2     then read by the reporter.)

3               THE WITNESS:         2004, no.

4               MR. QUINN:          Object to the

5     form.

6               MR. FELLE:          Did you ever

7     follow up or research the media source reporting

8     relative to who was being arrested and/or

9     investigated for having perpetrated those crimes?

10              MR. QUINN:          Object to the

11    form.  You can answer.

12              THE WITNESS:         No.

13              MR. FELLE:          During your

14    career with the Buffalo Police Department, had you

15    ever used any of those individuals that I just named

16    as confidential informants?

17              MR. QUINN:          Object to

18    form.  I don't know -- I don't think that's an

19    appropriate question for reasons being that I have

20    no idea if those people are still confidential

21    informants, or what protections --

22              MR. FELLE:          I'm entitled

23    to ask.

*MCCANN & MCCANN REPORTING*

95

1              MR. QUINN:           -- what

2    protections they're entitled to.

3              MR. FELLE:           I'm certainly

4    entitled to ask him that question.  It goes to bias.

5              MR. QUINN:           It could also

6    disclose -- and I don't know the answer to this, but

7    my concern is that it would disclose the identity of

8    a confidential informant and put someone's life at

9    risk.

10                  But why don't we go off the record.

11                  (Discussion off the record.)

12             MR. QUINN:           Back on the

13   record.

14             THE WITNESS:         The answer to

15   that question is no.

16

17   BY MR. FELLE:

18   Q    Were any of these individuals ever a witness in

19        any aspect to a criminal investigation that you

20        oversaw?

21   A    No.

22   Q    Were you familiar, outside of -- with respect

23        to the murders of the Camacho brothers on

96

1          November 11th of 2004, were you familiar with

2          the names Brandon Jonas, Efrain Hidalgo, Frank

3          Matias or Misael Montalvo?

4                    MR. QUINN:        Object to

5    form.  You can answer.

6                    THE WITNESS:      No.

7                    MR. FELLE:        So at this

8    time I think what I'd like to do is mark your folder

9    so we can take a look at it together.

10                   (Whereupon, Exhibit 3, a gray

11   folder containing documents, was then received and

12   marked for identification.)

13

14   BY MR. FELLE:

15   Q    Okay.  Just identifying what's been marked now

16        as Exhibit 3 in front of counsel.  So what we

17        have is Exhibit 3, which is the -- a folder

18        that Detective Stambach presented with today

19        in front of him, and for which he testified he

20        reviewed in preparation for today's deposition.

21                   We see the three-page,

22        eleven-by-fourteen document which purports to

23        be the typewritten confession of Josue Ortiz,

A-337

```
                                                    97
 1         correct?

 2    A    Correct.

 3    Q    We also see a single page, which is, I'll call

 4         it -- is it a P73?

 5    A    It is the P73.

 6    Q    P73 dated November 16th of 2004 prepared by

 7         Detective Mark R. Stambach; is that correct?

 8    A    That's correct.

 9    Q    One page.  Next we have two pages, eight and a

10         half-by-fourteen, which purport to be

11         handwritten notes; is that true?

12    A    Yes.

13    Q    Next we have a single page which appears to be

14         Miranda Warnings in Spanish, one through four,

15         and then signed at the bottom and dated eight

16         twenty-five p.m., correct?

17    A    Yes, sir.

18    Q    And next we have the charging papers -- arrest

19         papers, I should say, arrest slash booking

20         report, which is one, two, three, four, five --

21         five pages long, correct?

22    A    Yes, sir.

23              MR. QUINN:           Object to form.
```

98

1          MR. FELLE:        Did you object
2   to the form?
3          MR. QUINN:        I did.
4          MR. FELLE:        Okay.  Is
5   that -- is this the arrest and booking report
6   information, five pages long?
7          MR. QUINN:        The objection
8   is I'm not sure if it's all one document or what's
9   contained in there.
10         THE WITNESS:      It is the
11  information complaint and the arrest forms, yes.
12
13  BY MR. FELLE:
14  Q    Okay.  And then we have --
15  A    I've never seen this before.  Let me just take
16       a look at it.
17  Q    Okay.  Within the folder that you presented
18       with today is now also three pages which are
19       eight and a half-by-eleven, which appear to be
20       handwritten notes, and then some kind of a
21       diagram.
22         THE WITNESS:      And his
23  testimony was that he believes he has not reviewed

MCCANN & MCCANN REPORTING

99

1    those prior to coming in here today.

2                    MR. FELLE:          Correct.  I'm

3    just saying they're right in the sleeve, Exhibit 3.

4                    THE WITNESS:         I have never

5    seen these before, and this is not -- I have a very

6    distinctive printing.  I don't know where these came

7    from.  I don't know what this is about.

8

9    BY MR. FELLE:

10   Q    So three pages, which consist of two pages of

11        handwritten notes, and then a diagram?

12   A    Yes.

13   Q    Can you tell us who authored those?

14   A    No, I cannot.

15   Q    Do you know what they are?

16   A    I have no idea.  I just noticed them in there

17        and -- as we're going through this discovery

18        process.

19                   MR. QUINN:          You didn't

20   review these, correct?

21                   THE WITNESS:         I did not

22   review these, no.

23                   MR. FELLE:          Fair enough.

*MCCANN & MCCANN REPORTING*

A-340

100

1          THE WITNESS:        I didn't even

2     know they were in the file.

3                    MR. FELLE:         Okay.  Fair

4     enough.   But I'm just acknowledging now what's in

5     Exhibit 3.

6

7     BY MR. FELLE:

8     Q    Next is just another copy of the Miranda

9          Warnings?

10    A    Yes, sir.

11    Q    A duplicate copy, it appears to be, right?

12    A    Yes.

13    Q    And lastly we have one single document, which

14         appears to be an arrest data report, correct?

15    A    Yes.  That's the P163.

16    Q    Okay.  Have you ever --

17                    (Whereupon, Exhibit 4, a folder

18    with a twenty-six page Buffalo Police Department

19    document, was then received and marked for

20    identification.)

21

22    BY MR. FELLE:

23    Q    Detective, I want to show you what we've had

101

1    marked as Exhibit 4.  And I just want to ask

2    you, this document is a twenty-six page

3    document entitled Synopsis of Buffalo Police

4    Department Homicide Investigation, Victims

5    Nelson Camacho and Miguel Camacho.

6                    And I just want to ask you, have

7    you ever seen that document before today?

8                    MR. QUINN:        Do you want

9    him to read the entire thing?

10                    THE WITNESS:        I'd like to,

11   if you don't mind.

12                    MR. FELLE:        I'm just

13   asking if you've ever seen that document before

14   today?

15                    (Discussion off the record.)

16                    (Whereupon, Exhibit 5, a copy of

17   a transcript, was then received and marked for

18   identification.)

19                    THE WITNESS:        I have never

20   seen this document before.

21                    MR. FELLE:        Okay.  And so

22   if I were to ask you who prepared it, would you know

23   who did?

─── *MCCANN & MCCANN REPORTING* ───

A-342

```
                                                              102
 1                    THE WITNESS:        Well, I think
 2   I can guess who the author is.
 3                    MR. QUINN:        Don't guess.
 4   I mean, if you know, you know; if you don't, you
 5   don't.
 6                    THE WITNESS:        I do not know.
 7
 8   BY MR. FELLE:
 9   Q    Based on your experience and employment with
10        the Buffalo Police Department as a homicide
11        detective, have you ever seen documents like
12        this pertaining to other investigations?
13   A    We don't do documents like that in the homicide
14        squad, no.
15   Q    Okay.  Is it your understanding this would be
16        from the cold case squad?
17   A    I believe it's from the U.S. Attorney's office.
18   Q    Okay.  But just so your testimony's clear,
19        you've never seen it before today?
20   A    Absolutely never, or became aware of it even.
21   Q    Okay.  Did you contribute to the creation of
22        this analysis?
23                    MR. QUINN:        Object to the
```

```
                                                           103
1    form.

2                    THE WITNESS:        No.

3

4    BY MR. FELLE:

5    Q    Nobody consulted with you while it was being

6         prepared?

7    A    No.

8    Q    Okay.  Next I want to show you what's been

9         marked as Exhibit 5.  This is a copy of the

10        transcript of the Huntley Hearing that was

11        conducted in the matter of People versus Josue

12        Ortiz on August 30th of 2005.  It seems to be

13        a hundred and thirty-five pages long, all bound

14        together under Exhibit 5.

15                    Have you ever seen this document

16        before today, sir?

17   A    If I could just ask one question to clear this

18        up for you.  Did I testify in this Grand Jury

19        proceeding?

20   Q    No.  I --

21   A    Okay.

22   Q    -- a Grand Jury proceeding, though.

23   A    Okay.  I've never seen this document before,
```

A-344

104

1        ever.

2   Q    Okay.

3   A    I do recognize the -- Josue Ortiz, and I

4        recognize John Nuchereno's name on it.  That's

5        the only reason --

6                    MR. QUINN:        Just so I'm

7   clear, you're referring to the first page, which

8   just lists --

9                    THE WITNESS:       The cover

10  sheet, which lists the witnesses or the proceeding.

11

12  BY MR. FELLE:

13  Q    Okay.  But just so I'm clear and the record's

14       clear, you've never seen this document before

15       today, correct?

16  A    That is correct.

17  Q    The Huntley Hearing consisted of testimony from

18       Police Officer Sadlocha, S-A-D-L-O-C-H-A; do

19       you know who that is?

20  A    Yeah, he's a -- I think he's -- I believe he's

21       deceased.  It would be David Sadlocha,

22       S-A-D-L-O-C-H-A.  He was a patrol officer in

23       D District at the time.

105

1    Q    Okay.  And I believe he was one of the officers

2         that brought Mr. Ortiz to you at the major

3         crimes unit?

4    A    With his partner.

5    Q    And that would have been the evening of

6         November 16th, 2004, correct?

7                   MR. QUINN:        Object to

8    form.  If you don't have a specific recollection to

9    that, if you need to refer to documents, you can.

10                  THE WITNESS:       That's the

11   officer that brought him to the homicide office for

12   the start of this, yes.

13

14   BY MR. FELLE:

15   Q    Okay.  And just so I'm clear, your testimony

16        earlier was when he brought Josue Ortiz on that

17        occasion that that was the first time that you

18        had ever met Josue Ortiz, correct?

19   A    That is correct.

20   Q    The other aspect of the Huntley Hearing was

21        testimony from Edwin Torres, who is a Buffalo

22        Police officer who provided Spanish

23        translation, correct?

A-346

106

1    A    Yes, sir.

2    Q    He provided Spanish translation with respect

3         to your interview and ultimate purported

4         confession by Mr. Ortiz on November 16th of

5         2004, correct?

6                   MR. QUINN:        Object to

7    form.  You can answer.

8                   THE WITNESS:      I believe so,

9    yes.

10

11   BY MR. FELLE:

12   Q    Had you ever worked with Edwin Torres before

13        that time?

14   A    No.

15   Q    Was that the first occasion you had worked with

16        him on a criminal investigation?

17   A    Yes.

18   Q    The last person to testify in that Huntley

19        Hearing was Officer Lonergan.  And Officer

20        Lonergan was a detective sergeant at the time,

21        correct?

22   A    Correct.

23   Q    And you were his subordinate, correct?

107

```
 1   A    Correct.

 2   Q    And he was present, at least in the offices of

 3        the major crimes unit, at the time that

 4        Mr. Ortiz was questioned, correct --

 5                    MR. QUINN:        Object to form.

 6                    MR. FELLE:        -- by you?

 7                    THE WITNESS:      Yes.

 8

 9   BY MR. FELLE:

10   Q    Now, you've given testimony a couple of times

11        that the first time you met Mr. Ortiz was when

12        Officer Sadlocha brought him to you at the

13        major crimes unit, correct?

14   A    Correct.

15   Q    Do you have a recollection of meeting Mr. Ortiz

16        at Buffalo General Hospital where he was under

17        psychiatric observation the day prior?

18                    MR. QUINN:        Object to the

19   form.

20                    THE WITNESS:      No, that did

21   not happen.

22                    MR. FELLE:        Referring to

23   Exhibit 5, which is the Huntley Hearing testimony,
```

*MCCANN & MCCANN REPORTING*

A-348

108

1    I'm going to show you pages sixty through sixty-two.

2    And I want to see if this refreshes your memory.

3    The testimony of Mister -- excuse me, Officer Edwin

4    Torres was that when he was at Buffalo General

5    Hospital he was present with a number of other

6    officers, and he specifically stated that Detective

7    Stambach was present.  I'll have you review that.

8    A    Sure.

9    Q    And I'll then ask you again if that refreshes

10        your memory as to being there?

11                   MR. QUINN:        Just for the

12    record, I know you just pointed to something, I

13    didn't read the entire thing, but it says something

14    to the effect of believe Officer Stambach.

15                   MR. FELLE:        Okay.  He can

16    look at it.

17                   THE WITNESS:        You want me

18    from sixty to sixty-five?

19

20    BY MR. FELLE:

21    Q    Two.

22    A    Sixty to sixty-two.  I'm sorry.

23    Q    Just where Officer Torres states that he

*MCCANN & MCCANN REPORTING*

```
                                                       109
1       believes that you were there at the Buffalo

2       General Hospital on that date when they met

3       with Josue Ortiz.  Do you see that?

4                       And I just want to ask you, having

5       reviewed that, does that refresh your memory as

6       to whether you met Mr. Ortiz on November 15th,

7       2004 the day before you questioned him at the

8       major crimes unit?

9    A   I was not there.

10                      MR. QUINN:        Object to form.

11                      THE WITNESS:        Yeah, I

12   definitely was not there.  Emphatically was not

13   there.

14                      MR. FELLE:        Okay.  Do you

15   recall having a discussion with Detective Sergeant

16   Lonergan prior to you questioning Mr. Ortiz about

17   Detective Sergeant Lonergan being at Buffalo General

18   Hospital with Mr. Ortiz the day preceding your

19   questioning of him?

20                      MR. QUINN:        Object to the

21   form.

22                      MR. FELLE:        Does that all

23   make sense?
```

MCCANN & MCCANN REPORTING

110

1                    MR. QUINN:        You can

2    answer.

3                    THE WITNESS:       It does make

4    sense.  But I did not have a conversation with him.

5    And I have no knowledge.  I don't believe that

6    Detective Lonergan met him there.  I believe, that's

7    only my opinion.

8                    MR. QUINN:        Just what you

9    know, to the best of your knowledge.

10                   THE WITNESS:       Okay.

11                   MR. FELLE:         And so just so

12   the record's clear, your testimony is that you don't

13   recall Detective Sergeant Lonergan speaking to you

14   about his encounter with Mr. Ortiz at Buffalo

15   General Hospital the day preceding your questioning

16   of him at the major crimes unit, correct?

17                   THE WITNESS:       I don't --

18                   MR. QUINN:        Object to

19   form.  You can answer.

20                   THE WITNESS:       I don't

21   believe he did.

22                   MR. FELLE:         I'm going to

23   show you again what's been marked as Exhibit 5,

111

1    which is the testimony from the Huntley Hearing,

2    specifically of Detective Sergeant Lonergan.  I'm

3    going to refer your attention to page twenty-seven,

4    and if you start with the second question it brings

5    into context what we're asking -- we're talking

6    about right now.

7                    MR. QUINN:        Page

8    twenty-seven or one twenty-seven?

9                    MR. FELLE:        One

10   twenty-seven.  I apologize if I misspoke.

11                   THE WITNESS:      Okay.

12

13   BY MR. FELLE:

14   Q    Does that refresh your testimony that --

15   A    Sure.

16   Q    -- Detective Sergeant Lonergan spoke to you

17        about his encounter with Mr. Ortiz the day

18        preceding?

19   A    I don't recall that.  In fact, I don't even

20        know if I was working on the day that he --

21        Detective Sergeant Lonergan, if he did have

22        contact with Mr. Ortiz, I don't even know if I

23        was working that day.

A-352

112

1              I know I did not appear at the

2    Buffalo General Hospital.

3    Q    Okay.

4    A    And I don't recall Detective Sergeant Lonergan

5         speaking to me indicating that he had

6         interviewed him first.  You'd have to ask

7         Detective Lonergan.

8    Q    Okay.  Well, through his testimony here, he was

9         sworn in court, this is the testimony that he

10        provided at the Huntley Hearing.  Based on what

11        his testimony was, does that refresh your

12        memory that you had a discussion with Detective

13        Sergeant Lonergan about that encounter?

14                   MR. QUINN:         Object to

15   form.  I believe he's already answered that

16   question.

17                   THE WITNESS:        I did not have

18   a conversation with him.

19

20   BY MR. FELLE:

21   Q    Detective Sergeant Lonergan?

22   A    That's correct.

23   Q    Okay.

*MCCANN & MCCANN REPORTING*

A-353

113

1    A    I don't recall that.

2    Q    Okay.  At the time you interviewed Mr. Ortiz,

3         did you have available to you the entire

4         evidence case file?

5                   MR. QUINN:        Object to the

6    form.  You can answer.

7                   THE WITNESS:        I had what was

8    prepared at that time, yes.

9

10   BY MR. FELLE:

11   Q    And did you also have the ongoing investigation

12        file or folder?

13   A    Yes.

14   Q    And so you would have had any P73s that were

15        previously filed up to that time, correct?

16                  MR. QUINN:        Object to the

17   form.  You can answer.

18                  THE WITNESS:        I don't know

19   if the file -- if they were prepared at that

20   particular point.  But I know that there were notes,

21   there were photos, which I used.  And I couldn't be

22   more clear than that, other than notes and photos,

23   but I believe I used the photos.

A-354

114

1            MR. FELLE:         And with

2    respect to your knowledge of whether -- your

3    knowledge of the fact that Mr. Ortiz was admitted

4    the today preceding your questioning at Buffalo

5    General Hospital, psychiatric evaluation and

6    treatment, did Officer Torres tell you that he was

7    also present on that date at Buffalo General

8    Hospital with Mr. Ortiz?

9            MR. QUINN:         Object to the

10   form.  You can answer.

11            THE WITNESS:       No.  He just

12   told me that he brought him from a hospital.  He

13   transported him, or he brought him from the street.

14   I'm not quite clear on that.

15

16   BY MR. FELLE:

17   Q   I'm not talking about Officer Sadlocha, that's

18       who brought him to you.

19   A   No.  Ortiz -- yeah, excuse me.  Who is the one

20       that reads him rights in Spanish?

21   Q   The Spanish translator I'm asking you about is

22       Police Officer Torres.

23   A   Are you indicating that he said -- I'm a little

─────MCCANN & MCCANN REPORTING─────

A-355

```
                                                         115
 1       confused on this.

 2   Q   All right.

 3   A   Let's slow down a little bit, if you can.

 4       I'll try to help you out as much as I can.

 5   Q   Could you just -- are you just confused on

 6       organizing your thoughts on this?

 7   A   Yeah.

 8   Q   My question to you --

 9   A   Okay.

10   Q   -- on November 16th of 2004 when you were

11       questioning Mr. Ortiz --

12   A   Okay.

13   Q   -- you were doing that through the aid of

14       Police Officer Torres, correct?

15   A   Yes.

16   Q   As your Spanish interpreter, correct?

17   A   Yes.

18                  MR. QUINN:          Object to the

19   form.

20                  MR. FELLE:          And this was

21   because Mr. Ortiz did not speak much English,

22   correct?

23                  MR. QUINN:          Object to the
```

*MCCANN & MCCANN REPORTING*

A-356

116

1   form, specifically much.  You can answer if you

2   understand.

3                    THE WITNESS:         Yes.

4

5   BY MR. FELLE:

6   Q    And during the course of that evening you were

7        together with Officer Torres and Mr. Ortiz for

8        a number of hours; would that be a fair

9        statement?

10  A    Yes.

11  Q    And during all that time did Mr. Torres,

12       Officer Torres, ever tell you that he had been

13       with Mr. Ortiz at Buffalo General Hospital the

14       day before that while Mr. Ortiz was under

15       psychiatric observation and treatment?

16                   MR. QUINN:         Object to the

17  form.  You can answer.

18                   THE WITNESS:         No.

19                   MR. FELLE:         Is it your

20  testimony today that when you met Mr. Ortiz on

21  November 16th, 2004 for the sake of questioning him

22  and/or taking his purported confession to the

23  crimes, that you had no knowledge at all that the

—— MCCANN & MCCANN REPORTING ——

A-357

117

1  day before he had been met and questioned by a

2  number of police officers while at Buffalo General

3  Hospital for the same crimes?

4               MR. QUINN:        Object to the

5  form.

6               THE WITNESS:      That's

7  incorrect.  I had some knowledge that he was either

8  talked to at a hospital or picked up from a

9  hospital.  But referring to my notes, it says that

10  he was picked up by Policer Officer John Lowball and

11  Sadlocha.

12               I'm a little bit not clear on

13  using the interpreter.  But I did believe that I did

14  know that there was a hospital mentioned during that

15  interview.  I don't recall the police officer who

16  was my interpreter saying specifically that he had

17  talked to him the day before at a hospital.

18               MR. FELLE:        Okay.

19               THE WITNESS:      At that

20  particular hospital that you're talking to me about.

21  But I know that there was mention of a hospital.

22  What it was?  I don't recall.  I could not help you

23  on that one.

*MCCANN & MCCANN REPORTING*

118

1           MR. FELLE:          Okay.  And do

2  you recall -- Detective Sergeant Lonergan, your

3  supervisor, do you recall him telling you that the

4  day before, on the 15th of November, when he

5  questioned Mr. Ortiz that he said he had no

6  knowledge at all of who was involved in the murders

7  of the Camacho brothers?

8           THE WITNESS:        I don't recall

9  Detective Sergeant Lonergan telling me that, no.

10           MR. QUINN:          Object to the

11  form.

12           MR. FELLE:          Earlier when I

13  asked you whether or not Detective Sergeant Lonergan

14  had met with Mr. Ortiz the day before on the 15th of

15  November, you said you had no knowledge of that,

16  correct?

17           MR. QUINN:          Object to

18  form.  You can answer.

19           THE WITNESS:        I believe

20  that's correct, yes.

21

22  BY MR. FELLE:

23  Q    But just so we're clear, when Mr. Ortiz was

MCCANN & MCCANN REPORTING

119

1    brought to the major crimes unit to speak with

2    you, he initially met with both you and

3    Detective Sergeant Lonergan when he came into

4    the building, correct?

5  A   No.

6  Q   No?  How was he brought into the building?

7  A   By two police officers, patrol officers.

8  Q   Okay.  And where -- to whom did they release

9        Mr. Ortiz?  Was it to both you and Detective

10       Sergeant Lonergan?

11  A   No, they brought him to me.  I was alone.

12  Q   Okay.  And you brought him to Detective

13       Vivian's office, correct?

14  A   I brought him into an interview room.

15  Q   You did?

16  A   Uh-huh.

17  Q   All right.  And he remained there the

18       remainder of the night?

19              MR. QUINN:          Object to form.

20              THE WITNESS:          We were in an

21  interview room.  We were in the general office

22  vicinity.  He was removed for some time.  I believe

23  he had something to eat.  But just in that area of

─── *MCCANN & MCCANN REPORTING* ───

A-360

```
                                                               121
 1    form.

 2                   MR. FELLE:         Did all the

 3    questioning that took place with my client, did it

 4    come through the Spanish translator?

 5                   MR. QUINN:         Object to

 6    form.  You can answer.

 7                   THE WITNESS:       No.

 8                   MR. FELLE:         Was there a

 9    conversation that you had with Mr. Ortiz before the

10    Spanish translator came?

11                   MR. QUINN:         Object to the

12    form.

13                   THE WITNESS:       Yes.

14

15    BY MR. FELLE:

16    Q    And for about how long a period of time was

17         that?

18    A    I wouldn't be able to say, but it was only

19         just a matter of minutes.

20    Q    And it was just the two of you alone?

21    A    Yeah.  Well, the other two police officers

22         present.

23    Q    That would have been the two police officers
```

A-361

122

1        that brought him to the major crimes unit?

2    A    Yes.

3                    (Whereupon, a recess was taken

4    until a replacement stenographer arrived.)

5

6                    *       *       *       *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MCCANN & MCCANN REPORTING

A-362

124

1    STATE OF NEW YORK)

2                              SS:

3    COUNTY OF ERIE)

4

5              I, DAWN M. SITERS, Notary Public

6    in and for the State of New York, County of Erie, DO

7    HEREBY CERTIFY that the foregoing portion of

8    deposition was taken down by me in a verbatim manner

9    on January 23, 2019; that the proceedings were taken

10   to be used in the above-entitled action.

11             I further CERTIFY that the

12   above-described transcript constitutes a true,

13   accurate and complete transcript of the testimony.

14

15

16

17   _____
     DAWN M. SITERS,
18   Notary Public.

19

20

21

22

23

A-363

125

1              PROPOSED ERRATA SHEET

2    PAGE #      LINE #

3    _____    _____      CHANGE:_____

4    REASON:_____

5
     _____    _____      CHANGE:_____
6
     REASON:_____
7

8    _____    _____      CHANGE:_____

9    REASON:_____

10
     _____    _____      CHANGE:_____
11
     REASON:_____
12

13   _____    _____      CHANGE:_____

14   REASON:_____

15
     _____    _____      CHANGE:_____
16
     REASON:_____
17

18   _____    _____      CHANGE:_____

19
     REASON:_____
20
     _____    _____      CHANGE:_____
21

22   REASON:_____

23

────────────MCCANN & MCCANN REPORTING────────────

MARK R. STAMBACH

```
1    STATE OF NEW YORK

2    COURT OF CLAIMS

3    - - - - - - - - - - - - - - - - - - - - - - - -

4    JOSUE ORTIZ,

5          Plaintiff,

6                          Claim No. 126292

7    v.

8    THE STATE OF NEW YORK,

8          Defendant.

9    - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12       Continued Deposition of MARK R. STAMBACH, held

13   before Lisa A. Peterson, Court Reporter and Notary

14   Public, at THE LAW OFFICES OF WAYNE C. FELLE, P.C.,

15   6024 Main Street, Williamsville, New York, taken on

16   Wednesday, January 23, 2019, commencing at 2:30

17   p.m., pursuant to Notice.

18

19

20

21

22

23
```

MCCANN & MCCANN REPORTING

Case 23-352, Document 59, 06/27/2023, 3534106, Page136 of 261

A-365

127

```
1              W I T N E S S     I N D E X

2

3    Name                                    Page

4    -----------------------------------------------------

5    MARK R. STAMBACH     BY MR. FELLE        132

6

7

8

9

10

11                      *       *       *

12

13

14

15

16

17

18

19

20

21

22

23
```

MCCANN & MCCANN REPORTING

A-366

128

## E X H I B I T S

| Exhibit | Description | ID |
|---------|-------------|-----|
| 6 | Evidence Unit Case File, LP Number 040929 | 132 |
| 7 | Evidence Unit Case File | 169 |
| 8 | City of Buffalo Department of Police Major Crime Unit document | 169 |
| 9-10 | Camacho Description/Photo | 170 |
| 11-12 | Autopsy Reports for Nelson Camacho and Miguel Camacho | 170 |
| 13 | Interview notes | 209 |
| 14 | Confession | 210 |
| 15 | Homicide Shooting Investigation | 225 |
| 16 | Arresting/Booking Report | 228 |
| 17 | Statement of Carlos Osario | 230 |
| 18 | Recorded typed Statement of Jeilyn Mary Rosario dated November 11th of 2004 | 249 |
| 19 | Handwritten notes regarding Ronnie Williams | 260 |
| 20 | P73 of Gugliuzza | 268 |

*       *       *

MCCANN & MCCANN REPORTING

129

1          **C E R T I F I E D    Q U E S T I O N S**

2

3      Question                                         Page
       ------------------------------------------------------

4      Had you had this Statement at the time
       you were interviewing Mr. Ortiz, would it
5      have changed your opinion to arrest him
       that night................................ 238
6

7

8

9
                              *        *         *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

                    MCCANN & MCCANN REPORTING

130

1    APPEARANCES:

2

3                    THE LAW OFFICES OF WAYNE C. FELLE,
                     P.C.
                     BY:  WAYNE C. FELLE, ESQ.
4                    6024 Main Street
                     Williamsville, New York 14221
5                    Telephone: (716) 505-2700
                     E-mail:
6                    waynefelle@waynefellelaw.com
                     Appearing for the Plaintiff.
7

                     CORPORATION COUNSEL
8                    TIMOTHY A. BALL, ESQ.
                     ASSISTANT CORPORATION COUNSEL
9                    BY:  ROBERT E. QUINN, ESQ.
                     Suite 1103 City Hall
10                   65 Niagara Square
                     Buffalo, New York 14202
11                   Telephone: (716) 851-4317
                     E-mail: rquinn@city-buffalo.com
12                   Appearing for the City of Buffalo
                     and Mark R. Stambach.
13

                     STATE OF NEW YORK
14                   OFFICE OF THE ATTORNEY GENERAL
                     LETITIA JAMES, ESQ.
15                   ASSISTANT ATTORNEY GENERAL
                     BY:  TIMOTHY J. FLYNN, ESQ.
16                   Suite 300A Main Place Tower
                     350 Main Street
17                   Buffalo, New York 14202
                     Telephone: (716) 853-8437
18                   E-mail: Timothy.Flynn@ag.ny.gov
                     Appearing for the Defendant.
19

20

21                            *   *   *   *

22

23

MCCANN & MCCANN REPORTING

1          COURT REPORTER:  Usual stipulations?

2          MR. FELLE:  Read and sign.

3

4                    (Whereupon the following stipulation

5                    was entered upon the record:

6                         It is hereby stipulated by and

7                    between the attorneys for the

8                    respective parties hereto, that the

9                    oath of the Referee is waived; that

10                   filing and certification of the

11                   transcript are waived, and that all

12                   objections except as to the form of

13                   the questions are to be reserved

14                   until the time of trial.)

15

16     **M A R K   R.   S T A M B A C H**, 23 Brompton Circle,

17     Williamsville, New York 14221, after having been

18     previously sworn, was examined and testified further

19     as follows:

20

21        MR. FELLE:  We were previously up to Exhibit 5,

22     so you're familiar.  I'll have you mark this as

23     Exhibit 6 for today's deposition date.

A-370

132

```
 1          (Whereupon the reporter marked Exhibit 6, an

 2      Evidence Unit Case File, LP Number 040929, for

 3      identification.)

 4

 5   CONTINUED EXAMINATION BY MR. FELLE:

 6

 7   Q.  Detective Stambach, we are back on the record in the

 8      continuation of your deposition.  Thank you for your

 9      patience.  We had a change in court reporters, as you

10      know.

11          I want to resume our discussion.  Before the

12      break, we were talking about what knowledge you had at

13      the time that you interviewed Josue Ortiz on November

14      16th, 2004, as to other encounters he may have had

15      with the Buffalo Police Department as part of the

16      investigation into the double homicides of the Camacho

17      Brothers on November 11th, 2004; okay?

18   A.  Yes, sir.

19   Q.  In that light, I asked you whether or not you had,

20      available to you, the Evidence Unit Case File at the

21      time that you interviewed Mr. Ortiz.  I think you told

22      us that you had access to that; correct?

23   A.  No, I think I stated, in my previous testimony, that I
```

MCCANN & MCCANN REPORTING

A-371

133

```
 1        had handwritten notes, the reports, I had photographs

 2        and I had -- it would be the CAD, Computer Assisted

 3        Dispatch sheets.

 4             I don't believe that I had a complete Evidence

 5        Unit Case File that was in the folder at the time.  I

 6        don't believe it existed.  I could be wrong.

 7   Q.   For example, the P73s that were completed before

 8        November 16th, 2004, relative to the investigation of

 9        that double homicide, they would have been available

10        to you in the case file; correct?

11             MR. QUINN:  Object to the form.  You can answer.

12             THE WITNESS:  They might not have been.  That

13        might have been handwritten notes.  They might not

14        have been transcribed at the time.  I'm not sure on

15        that.

16

17   BY MR. FELLE:

18   Q.   Okay.

19   A.   They both would be viable.  One would -- either it

20        would be handwritten notes or handwritten notes and

21        the P73.

22   Q.   Got you.  So irrespective of the form that it was in,

23        you would have had the P73s, either handwritten or
```

MCCANN & MCCANN REPORTING

```
 1          typed, that were taken or prepared before the time

 2          of -- that you sat down to question Mr. Ortiz;

 3          correct?

 4                MR. QUINN:  Object to the form.

 5                THE WITNESS:  Yes.

 6

 7     BY MR. FELLE:

 8     Q.  If we were to look at what we just had marked as

 9          Exhibit 6 -- let me, just for the record, just

10          indicate that this is a document entitled Evidence

11          Unit Case File, LP Number 040929, homicide, H-O-M

12          number, 04-242.  And it's a Bates stamped recording

13          document that on the bottom of it has the Bates Number

14          1010 and follows through with the number of documents

15          that don't appear to be in sequential order as

16          attachments.

17                Having said that, I'll have you take a look real

18          quick at that exhibit.

19                MR. QUINN:  Do you want him to look through the

20          whole thing?

21                MR. FELLE:  Just thumb through it, if you can.

22          Detective, we'll go through the relevant aspects of

23          that.  Not everything is significant to our
```

1   discussion.

2           THE WITNESS:  There are only two of these

3   reports that I recognize that were in the file at this

4   time.  That would be the CAD sheet, which is right

5   here (indicating.)

6           MR. QUINN:  Bates Number 1076 and 1075.

7

8   BY MR. FELLE:

9   Q. Would the second document be your report, your P73?

10  A. But this would have been handwritten after the arrest.

11     After the arrest -- this would have been generated

12     after the arrest of Josue Ortiz.

13  Q. Okay.

14  A. These other forms, again typewritten, they may not

15     have been prepared at the time or the notes might not

16     even have been in the file.

17  Q. Okay.  Let's start by talking about the P73 that is

18     contained in Exhibit 6, and it's prepared by Detective

19     Mark Lauber.

20           First of all, do you recall Detective Lauber?

21  A. Yes.

22  Q. Was he in the Major Crime Unit?

23  A. He was.

1    Q.  Was he also, prior to that, a Homicide Detective

2        before it merged with the Homicide Unit?

3    A.  No, he was not.

4    Q.  Just reviewing this P73 and his reporting from

5        November 15th of 2004; can you take a look at that and

6        then I'd like to ask you some questions about it.

7    A.  Okay.

8    Q.  First of all, according to your knowledge, is this the

9        first time that Mr. Ortiz had any encounters with

10       Buffalo Police superiors in any regard, that affected

11       the investigation of the double homicide of the

12       Camacho Brothers?

13   A.  Yes.

14           MR. QUINN:  Object to the form.

15           THE WITNESS:  Yes.

16           MR. FELLE:  It appears to be a random meeting

17       between Mr. Ortiz and the Buffalo Police Department;

18       correct?

19           MR. QUINN:  Object to the form.

20           THE WITNESS:  It is a report generated from

21       that, yes.

22

23   BY MR. FELLE:

1     Q.  Does this report indicate that on November 15th, 2004,

2          that Detective Mark Lauber was called to the scene to

3          talk with Josue Ortiz?

4     A.  It reflects it, yes.

5     Q.  Does it also report that at that time, he was

6          exhibiting bizarre, psychiatric behavior?

7               MR. QUINN:  You asking him what the report

8          indicates; correct?  It indicates --

9               THE WITNESS:  It indicates he exhibited some

10          problems.

11

12    BY MR. FELLE:

13    Q.  Does it also indicate that doctor -- excuse me,

14          Detective Lauber requested an ambulance to take

15          Mr. Ortiz to Buffalo General Hospital?

16    A.  That's what it says, yes.

17    Q.  Does that P73 of Detective Mark Lauber, does it also

18          state that Mr. Ortiz was claiming that unknown persons

19          were trying to kill him at that time?

20    A.  Yes.

21    Q.  Anywhere in that P73, does it indicate that Josue

22          Ortiz had stated anything to Detective Mark Lauber of

23          any relevance to the murders that had occurred on

MCCANN & MCCANN REPORTING

```
 1        November 11th of 2004 of the Camacho Brothers;

 2        correct?

 3            MR. QUINN:  I'm going to instruct you not to

 4        answer based on relevance.  It's probably a proper

 5        question, but it's not an appropriate question for

 6        this.  It's a legal determination made in some larger

 7        context.

 8            MR. FELLE:  In all fairness, it's a terrible

 9        objection.  He's the detective making the

10        determination to arrest somebody for a murder.  He

11        certainly is going to read and review the documents

12        pertaining to that person's guilt or innocence before

13        he arrests them; right?

14            MR. QUINN:  I'm not debating with you, I'm

15        objecting.

16            MR. FELLE:  I think, if you thought about that

17        longer, you would know that this -- that's not a good

18        legal argument why this detective can't discuss what

19        he reviewed prior to making a determination to arrest

20        him.

21            MR. QUINN:  I'm objecting to the question based

22        on the determination of relevance.  There are many

23        legal determinations I can go into.
```

MCCANN & MCCANN REPORTING

A-377

139

```
 1              THE WITNESS:  I have never seen this report.

 2       This was generated by Detective Lauber with Phil

 3       Torre.  They're in another office.  I don't even know

 4       when this came into our file.  I did not review this

 5       P73 prior to my arrest of Mr. Josue Ortiz.

 6              MR. FELLE:  Do you think that this P73 contains

 7       information that would be pertinent to your

 8       investigation of Mr. Ortiz the day following, for the

 9       murders of the Camacho Brothers on November 11th

10       of '04?

11              MR. QUINN:  Object to the form.

12              THE WITNESS:  Yes.

13              MR. FELLE:  And this goes to the mental state of

14       Mr. Ortiz the day before you arrested him; correct?

15              THE WITNESS:  Correct.

16              MR. QUINN:  Object to the form.

17              THE WITNESS:  You would have to talk to

18       Detective Lauber about that.  I didn't interview him

19       at this time.

20              MR. FELLE:  Normally, Detective, I'm assuming if

21       you had seen this P73, it detailed the information

22       that you see right now.  Reviewing Exhibit 6, Bates

23       Number 1189, would you have sought out Detective
```

MCCANN & MCCANN REPORTING

A-378

140

```
 1        Lauber to talk to him about what he witnessed of

 2        Mr. Ortiz on that day?

 3             MR. QUINN:  Object to the form.  It calls for a

 4        hypothetical.  You can answer if you understand.

 5             THE WITNESS:  Yes, I would have.

 6

 7   BY MR. FELLE:

 8   Q.  Do you recall ever speaking to Detective Lauber after

 9        you arrested Mr. Ortiz?

10   A.  No.

11   Q.  I'd like to now show you a P73 of Detective Mark

12        Vaughn; are you familiar with him?

13   A.  Yes, I am.

14   Q.  He was a coworker in the Major Crimes Unit; correct?

15   A.  Yes, he was.

16   Q.  And he prepared a P73 with respect to his interaction

17        with Mr. Ortiz on November 15th of 2004.  I'm showing

18        you what's been marked Exhibit 6, Bates Number 1183.

19             MR. FLYNN:  Is this Mark Vaughn; V-A-U-G-H-N?

20

21   BY MR. FELLE:

22   Q.  Okay.  Have you reviewed that two-page document, sir?

23        First of all, can you tell me is that P73 document a
```

MCCANN & MCCANN REPORTING

A-379

141

```
1          meeting between Detective Mark Vaughn and Mr. Ortiz?

2     A.  It is.

3     Q.  And what other officers of the Buffalo Police

4          Department were present?

5               MR. QUINN:  You're asking him?

6               MR. FELLE:  According to the P73.

7               THE WITNESS:  It says Detective James Lema,

8          L-E-M-A, middle initial "A".  He identifies Detective

9          Sergeant James Lonergan and Police Officer Edwin

10         Torres.

11

12    BY MR. FELLE:

13    Q.  Have you seen that P73 before today?

14    A.  No, sir.

15    Q.  Do you recall seeing it before you questioned

16         Mr. Ortiz on November 16th?

17    A.  No, I did not.

18    Q.  Does that document contain information relative to a

19         discussion that was had between Detective Sergeant

20         Lonergan, Officer Lema and Police Officer Torres with

21         Mr. Ortiz?

22    A.  No.

23              MR. QUINN:  Object to the form.  You can answer.
```

MCCANN & MCCANN REPORTING

A-380

142

```
 1              THE WITNESS:  No, I don't.

 2

 3    BY MR. FELLE:

 4    Q.  You don't know that or it doesn't?

 5    A.  I don't know.  I know that Detective Vaughn is the

 6        author of this report and I know he wrote it out.  I

 7        don't know when it was generated or I don't know when

 8        it was placed in the file, but I did not see this

 9        report.

10    Q.  At a minimum, we know Detective Vaughn spoke to

11        Mr. Ortiz; he documents that through this P73?

12              MR. QUINN:  Ask him what the P73 reflects.

13              MR. FELLE:  Correct.  What are the policies and

14        procedures of the Buffalo Police Department's

15        Detective Bureau on a documented conversation?

16              MR. QUINN:  I don't think it's an appropriate

17        question.  I'll object to the form.  You can answer if

18        you understand.

19              THE WITNESS:  Yes.  It does indicate that he did

20        have an interview with him.

21

22    BY MR. FELLE:

23    Q.  Okay.  Does it indicate that interview took place at
```

MCCANN & MCCANN REPORTING

A-381

143

```
 1        Buffalo General Hospital?
 2    A.  Yes, it does.
 3    Q.  Does it indicate that on November 15th of 2004, the
 4        day before you questioned and arrested Mr. Ortiz, does
 5        it state, "Through the interpreter" -- does it state
 6        that, "Through the interpreter, we asked Ortiz if he
 7        had any direct knowledge of the murders at 879
 8        Niagara.  He claimed he did not.  He said that it was
 9        his opinion that the Camacho Brothers were killed
10        because of jealousy due to their drug selling."
11            Do you see that?
12    A.  Yes, I do.
13    Q.  That's contained in the P73 of Detective Vaughn?
14    A.  Yes.
15    Q.  And Detective Vaughn was a coworker of yours back in
16        November of 2014?
17    A.  He was.
18    Q.  And this P73 would have become part of the Evidence
19        Unit Case File pertaining to the investigation of the
20        murders of the Camacho Brothers on November 11th,
21        2004; correct?
22            MR. QUINN:  Object to the form of the question.
23        You can answer.
```

1          THE WITNESS:  It was his report, yes.

2          MR. FELLE:  And it would have become part of

3     that file; correct?

4          MR. QUINN:  Object to the form.  You can answer.

5          THE WITNESS:  Yes.

6          MR. FELLE:  That's the Policies & Procedures of

7     the Buffalo Police Department Major Crimes Unit

8     Detective Bureau; Form P73 of the investigation placed

9     into the Evidence Unit Case File; correct?

10         MR. QUINN:  Object to the form.  You can answer.

11         THE WITNESS:  Yes.

12         MR. FELLE:  I think earlier you testified as

13    much as the typed version of the P73 might not have

14    been available to you, the handwritten notes

15    pertaining to that meeting would have been in the file

16    until they were typed up; correct?

17         MR. QUINN:  Object to the form.  I don't believe

18    that was the testimony.  You can answer if you

19    understand.

20         THE WITNESS:  I do not recall.  They should have

21    been, but I don't recall if they were in the file.  I

22    don't remember seeing his handwritten notes or that

23    typewritten report.

MCCANN & MCCANN REPORTING

A-383

145

```
 1              MR. FELLE:  Okay.  And you testified earlier
 2         that was also the case with the P73 of Detective
 3         Lauber; correct?
 4              MR. QUINN:  Object to the form.  You can answer.
 5              THE WITNESS:  Yes.
 6              MR. FELLE:  And just so that the record is clear
 7         you did, in fact, pull the Evidence Unit Case File
 8         before you questioned Mr. Ortiz; correct?
 9              MR. QUINN:  Object to the form.  That's a
10         leading question.
11              MR. FELLE:  You pulled that file before you
12         questioned --
13              THE WITNESS:  No.
14              MR. QUINN:  Object to the form.
15              THE WITNESS:  No, that's incorrect.
16
17    BY MR. FELLE:
18    Q.  You did not?
19    A.  No, I did not.
20    Q.  Did you make a determination that the ongoing
21         investigation and relative documents were not
22         important to your questioning of Mr. Ortiz?
23              MR. QUINN:  Object to the form.
```

MCCANN & MCCANN REPORTING

```
 1              THE WITNESS:  No, you're missing the point.

 2

 3     BY MR. FELLE:

 4     Q.  Okay.

 5     A.  You're asking if I pulled the Evidence File.  I pulled

 6          the file or the folder about the homicide.  Just

 7          because there's photos taken, they belong with the

 8          photographer.  The Evidence Collection Unit has a

 9          separate folder or file.  What you're referring to is

10          the Evidence Collection Unit File.  I don't have that.

11          That belongs up in the Evidence Collection Unit, which

12          is separate from the homicide squad.

13              What you're referring to is the two P73 or

14          handwritten notes.  They should have been in the

15          homicide file, if that all makes sense to everybody.

16          Everybody has different functions.  Evidence.

17          Photographer.  Statements.  Witnesses.  Interviews.

18              They should have been in -- you're asking me if

19          that report -- I pulled that report.  No, I pulled our

20          homicide file.

21     Q.  Excellent.  Thank you for correcting me.  It's a

22          matter of semantics.  I want to be very clear with

23          respect to the homicide file.  I call it the Evidence
```

MCCANN & MCCANN REPORTING

```
1          Unit Case File.  I appreciate you correcting me.

2               With respect to the homicide file P73s

3          pertaining to the investigation, those would be filed

4          in that; correct?

5               MR. QUINN:  Object to the form.

6               THE WITNESS:  They should be.  Sometimes there's

7          a delay from when they're handwritten on an officer's

8          desk, until the time that they're typed and prepared

9          and gathered by the report technician, given back to

10         the detective for signature before it gets placed into

11         the file.  That's the procedure.

12              MR. FELLE:  Okay.  And so when these

13         investigations happen, they are happening in realtime.

14         These things are developing quickly, as we see from

15         the homicide file in front of us; correct?

16              MR. QUINN:  Object to the form of the question.

17         Don't answer that.  It's a palpably improper question.

18              MR. FELLE:  Evidence on a murder investigation

19         compiled?

20              MR. QUINN:  You said -- it was the way you asked

21         the question.

22              MR. FELLE:  Would you agree with me that

23         evidence in a murder investigation can be accumulated
```

MCCANN & MCCANN REPORTING

A-386

148

```
 1        quickly?

 2             MR. QUINN:  Object to the form.  You can answer.

 3             THE WITNESS:  Yes.

 4             MR. FELLE:  And this is a multi-faceted

 5        investigation to the point that various detectives are

 6        doing parts of the investigation; albeit talking to

 7        witnesses, analyzing physical evidence.  Are they

 8        doing other things required by way of the

 9        investigation; correct?

10             MR. QUINN:  Object to the form.  You can answer.

11             THE WITNESS:  Yes.

12             MR. FELLE:  And is the vehicle with which those

13        detectives and officials working on that investigation

14        communicate with each other, is that by placing

15        information into the homicide file for others to see?

16             MR. QUINN:  Object to the form.  The only way?

17             MR. FELLE:  Is it a way that they communicate?

18             MR. QUINN:  Object to the form.  You can answer.

19             THE WITNESS:  Yes.

20             MR. FELLE:  Other than that, what other way do

21        they have to centralize their efforts in an

22        investigation for a homicide?

23             MR. QUINN:  Object to the form.  You can answer.
```

A-387

149

```
1              THE WITNESS:  Change of shifts; when one group
2         is coming on for duty, to follow up.  Enhancements.
3         Updates.  It's -- it just varies, you know, upon what
4         you're responding to or what you're working on at that
5         particular moment.
6              And there are gaps when people have off time, so
7         then when you come in, someone certainly has to give
8         something to you.  When you report for duty they say,
9         there's a new Statement in the file; you better catch
10        up with it.
11             MR. FELLE:  The date that's contained on the
12        P73, is that the date that the interaction took place
13        or the date that it was signed?
14             MR. QUINN:  Object to the form.
15             THE WITNESS:  I would say, yes.
16
17   BY MR. FELLE:
18   Q.  Which date is it?
19   A.  The date it was interacted.  It's not the date that it
20        was filed.
21   Q.  Is there a log that's contained in the homicide file
22        that pertains to when P73s get entered into it?
23             MR. QUINN:  Object to the form.  You can answer.
```

MCCANN & MCCANN REPORTING

```
 1              THE WITNESS:  I don't believe so, no.

 2

 3    BY MR. FELLE:

 4    Q.  We talked about the computerized system that

 5        documented all the individuals that appeared at the

 6        scene of the crime.  You and I talked about that;

 7        right?

 8    A.  Yes, that the CAD report.

 9    Q.  Correct.  That CAD report gives, by military time, the

10        time and date that any individual officers came to the

11        scene of the murders; correct?

12              MR. QUINN:  Object to the form.  I believe

13        that's leading.  I don't know that that's what's been

14        testified to.

15              MR. FELLE:  "Yes" or "no"?

16              MR. QUINN:  I don't think he said "every" -- or

17        "any".  You can answer if you understand.

18              THE WITNESS:  It's one of the reports that would

19        be in the file.  It speaks for itself.

20              MR. FELLE:  Correct.  I guess your attorney has

21        a problem with the term "every".  Is this the most

22        comprehensive report we have of the involvement of all

23        the police officers of the Buffalo Police Department,
```

A-389

151

```
 1          including detectives, that were involved at the scene

 2          of the crime?

 3              MR. QUINN:  Object to the form.  I don't know

 4          how you answer that.

 5              THE WITNESS:  It is, but I'm not sure of the

 6          accuracy of it.  I don't prepare that.  It gets

 7          entered by a man that's doing calls; the dispatcher.

 8          He could make a mistake on it.

 9              It's pretty accurate what is going on, what time

10          they're arriving, by the way they're calling in.  It

11          might not be entirely accurate.

12

13     BY MR. FELLE:

14     Q.  So correct me if I'm wrong; I think you testified

15          earlier, before you questioned Mr. Ortiz about the

16          murders, you referred to the CAD documents in the

17          file?

18     A.  It was in the file.

19     Q.  And you recall that it was in the file at that time?

20     A.  I certainly do, yes.

21     Q.  Now, going back to the P73 of Detective Mark Vaughn;

22          again, just so your testimony is clear, you don't

23          recall ever seeing this document before you arrested
```

MCCANN & MCCANN REPORTING

```
 1        Mr. Ortiz; correct?

 2    A.  That's correct.

 3    Q.  And this document states that when Detective Vaughn

 4        questioned Mr. Ortiz about the murders, that he denied

 5        any knowledge of who committed the murders; correct?

 6            MR. QUINN:  Object to the form.

 7            THE WITNESS:  Yes.

 8            MR. FELLE:  Is that exculpatory evidence?

 9            MR. QUINN:  Object to the form.  I mean,

10        that's --

11            THE WITNESS:  I don't know what "that" is.  I'm

12        sorry, I'm not following.

13            MR. FELLE:  Are you familiar with the Brady

14        Order in a criminal case that requires you to give any

15        exculpatory evidence obtained in the investigation of

16        a perpetrator to defense attorneys on that case?

17            MR. QUINN:  Object to the form.

18            THE WITNESS:  I believe that's the standard

19        practice for the District Attorney's Office.  I don't

20        get involved with it after the arrest.  The District

21        Attorney represents the victims and prosecutes the

22        case and gives it to a gentleman by the name of

23        Nuchereno.  He was the defense attorney for Mr. Ortiz;
```

A-391

153

1        John Nuchereno.

2              MR. FELLE:  Correct.  Would the information that

3        is contained in the P73 of Detective Mark Vaughn,

4        dated November 15th, 2004, have been pertinent and

5        important to know before you questioned Mr. Ortiz the

6        following day?

7              MR. QUINN:  Object to the form, specifically

8        "pertinent".  I think it's a really improper question.

9        You can answer if you understand it.

10             THE WITNESS:  I believe it would be, yes.

11             MR. FELLE:  As you testified today it's your

12       testimony, under oath, that you were not aware of this

13       P73 at the time that you arrested Mr. Ortiz?

14             MR. QUINN:  Object to the form.  You can answer.

15             THE WITNESS:  Yes, that's correct.

16

17    BY MR. FELLE:

18    Q.  Now that P73 of Detective Vaughn indicates that

19        Detective Sergeant Lonergan was at Buffalo General

20        Hospital along with him and Mr. Ortiz; correct?

21    A.  Yes.

22    Q.  You told us earlier then on the 16th, when Mr. Ortiz

23        came to your office, Detective Sergeant Lonergan was

```
 1      on duty; correct?

 2   A.  Yes.

 3   Q.  In fact, he was present at the Major Crimes Unit

 4       during the time frame that you were questioning and

 5       then arrested Mr. Ortiz; correct?

 6           MR. QUINN:  Object to the form.  You can answer.

 7           THE WITNESS:  Yes.

 8

 9   BY MR. FELLE:

10   Q.  I think I asked you, had you spoken to Detective

11       Sergeant Lonergan before you started to question

12       Mr. Ortiz?

13   A.  No.

14   Q.  Did you obtain any background information relative to

15       Mr. Ortiz from Detective Sergeant Lonergan, before you

16       began questioning Mr. Ortiz?

17   A.  No.

18   Q.  And in this Huntley testimony, which we've had marked

19       as Exhibit 5, Detective Lonergan -- Detective Sergeant

20       Lonergan, excuse me, testified in court that he had

21       spent approximately thirty minutes with Josue Ortiz

22       while at Buffalo General Hospital; do you recall him

23       telling you that?
```

A-393

155

```
 1    A.  No, I don't.

 2    Q.  I'm just going to show you Exhibit 5, page one

 3        twenty-two, and you'll see that the Detective Sergeant

 4        Lonergan was asked, while under oath at Court during

 5        the Huntley Hearing, "How long were you in the

 6        presence of Mr. Ortiz on November 15th?"; and his

 7        reply was what?

 8    A.  Approximately thirty minutes.

 9    Q.  Okay.  And prior to you questioning Mr. Ortiz, did

10        Detective Sergeant Lonergan tell you about the

11        demeanor of Mr. Ortiz the date preceding when he met

12        with him for thirty minutes?

13    A.  No.

14    Q.  Referring to the same Exhibit 5, page one seventeen;

15        do you see here where Detective Sergeant Lonergan was

16        asked about -- question is, "Could you describe for

17        the Court the appearance of Mr. Ortiz emotionally?"

18        You state that, "He appeared to be frightened; very

19        frightened."

20    A.  Yes.

21             MR. QUINN:  Object to the form.  Are you asking

22        him to read the document?

23             MR. FELLE:  I'm asking the question to confirm
```

MCCANN & MCCANN REPORTING

1          that's what Sergeant Lonergan testified to during a

2          Huntley Hearing.

3               MR. QUINN:  You're showing him a transcript and

4          asking him to read the transcript?

5               MR. FELLE:  Correct.

6               MR. QUINN:  That's the only question?

7               MR. FELLE:  There's going to be another one, you

8          just interrupted me.

9               MR. QUINN:  That's okay.

10              MR. FELLE:  That in addition to Detective

11         Lonergan's P73, which described Mr. Ortiz as very

12         frightened and that someone was trying to kill him,

13         along with what Detective Sergeant Lonergan testified

14         to at the Huntley Hearing; that on the 15th Mr. Ortiz,

15         while at the hospital, told him he was very

16         frightened -- appeared to be very frightened.

17              Does that information -- excuse me.  Would that

18         information be important to know before you questioned

19         Mr. Ortiz the following day.

20              MR. QUINN:  Object to the form.  You can answer

21         if you understand.

22              THE WITNESS:  Yes.

23

MCCANN & MCCANN REPORTING

A-395

157

```
 1    BY MR. FELLE:

 2    Q.  Incidentally, were you aware at all, when you met with

 3        Mr. Ortiz on the 16th, that he had been admitted for

 4        psychiatric care the day before you questioned him for

 5        a murder?

 6    A.  No.

 7    Q.  Did you ask him at any time, before questioning him,

 8        if he was under the influence of psychotropic

 9        medication?

10            MR. QUINN:  Object to the form.

11            THE WITNESS:  No.

12

13    BY MR. FELLE:

14    Q.  Did you ask him if he was under the influence of

15        drugs?

16    A.  No.

17    Q.  Turning your attention to Exhibit 6 and the P73 again,

18        Detective Mark Lauber, Bates Number 1189; do you see,

19        in the third paragraph of the P73, that Detective

20        Lauber describes Mr. Ortiz as being under the

21        influence of drugs?

22            MR. QUINN:  Well, are you asking him to read the

23        document?
```

A-396

158

1          MR. FELLE:  Correct.  I'm asking him; does a

2     detective in your Major Crimes Unit report that, on

3     the 15th of November, Mr. Ortiz appears to be under

4     the influence of drugs?

5          MR. QUINN:  That's not specifically what it

6     says.  Are you asking him just to read it?

7          MR. FELLE:  I'm pretty sure that's what it says.

8     Detective Lauber reported that Mr. Ortiz appeared to

9     be under the influence of drugs.

10          MR. QUINN:  That's not what it says, but you can

11     answer if you understand.

12          THE WITNESS:  Yes.

13          MR. FELLE:  And would that have been relevant

14     and pertinent to your investigation of Mr. Ortiz to

15     know, before you questioned him, about the murders in

16     that case?

17          MR. QUINN:  Object to the form.

18          THE WITNESS:  Yes.

19          MR. FELLE:  Is it your testimony, as you are

20     sworn in today, that you did not know about that

21     before you questioned Mr. Ortiz on the 16th?

22          MR. QUINN:  Object to the form.

23          THE WITNESS:  That's correct, yes.

A-397

159

```
 1    BY MR. FELLE:
 2    Q. Now, we talked about Detective Sergeant Lonergan, but
 3       with respect to Police Officer Edwin Torres, you met
 4       with Police Officer Edwin Torres at the Major Crimes
 5       Unit on November 16th, 2004, relative to your
 6       questioning of Mr. Ortiz; correct?
 7    A. Yes.
 8    Q. And do you recall what time it was that he came to
 9       meet with you and Mr. Ortiz?
10    A. No, I don't.
11    Q. At any time prior to your questioning of Mr. Ortiz,
12       did Police Officer Edwin Torres tell you about his
13       interaction with Mr. Ortiz on November 15th; the day
14       before?
15    A. No.
16    Q. Just so the record is clear; is it your testimony that
17       you had no knowledge at all, through Police Officer
18       Torres, that he had been with Josue Ortiz at the
19       Buffalo General Hospital psychiatric ward on November
20       15th, 2004?
21            MR. QUINN:  Object to the form.  You can answer.
22            THE WITNESS:  That's correct.
23            MR. FELLE:  And that information would have been
```

MCCANN & MCCANN REPORTING

1          important to know, prior to your questioning of

2          Mr. Ortiz for the murders that you were investigating;

3          correct?

4               MR. QUINN:  Object to the form.  Leading.

5               THE WITNESS:  That is correct.

6               MR. FELLE:  Based on your review now of the two

7          P73s provided by Detective Vaughn and Detective

8          Lauber, would it be a fair statement that after the

9          interaction that the detectives of the Buffalo Police

10         Department had with Josue Ortiz on November 15th,

11         2004, that he was not a suspect in the murder of the

12         Camacho Brothers on 11/11/04?

13              MR. QUINN:  Object to the form.  Don't answer

14         that question.  That's palpably improper.  You're

15         asking -- no.  Don't answer that question.  It's

16         palpably improper.

17              MR. FELLE:  Before Mr. Ortiz came in and met

18         with you on November 16th, 2004, was he a suspect in

19         that crime?

20              MR. QUINN:  Object to the form.  If you know.

21              THE WITNESS:  No.

22              MR. FELLE:  And the P73s that we've reviewed

23         indicate that on November 15th, 2004, Mr. Ortiz was

A-399

161

```
1     under the influence of drugs; correct?
2            MR. QUINN:  Again, it -- the document speaks for
3     itself and that's the only thing that you're asking
4     him, so I object to the form of the question.
5            THE WITNESS:  I've stated, "yes".
6            MR. FELLE:  It also documented that he was "very
7     frightened"; correct?
8            MR. QUINN:  Object to the form again.  The
9     document speaks for itself.
10           THE WITNESS:  Yes.
11           MR. FELLE:  And it also stated that when asked,
12    he remarked that he had no involvement in the murders;
13    correct?
14           MR. QUINN:  Object to the form.  You can answer.
15           THE WITNESS:  Yes.
16           MR. QUINN:  Again, the document speaks for
17    itself.
18           MR. FELLE:  Would you agree with me that based
19    on all that documentary evidence, that prior to the
20    time that you met with Mr. Ortiz on November 16th of
21    2004, that there would have been no reason to arrest
22    Mr. Ortiz for the crimes that were committed on
23    November 11th, 2004?
```

MCCANN & MCCANN REPORTING

A-400

```
1              MR. QUINN:  Don't answer that question.  It's a

2      palpably improper question.

3              MR. FELLE:  It's the same exact question.  I

4      just asked him if he was a suspect.  He said, "no".

5      This question is the same question.  I'm not sure why

6      you would object to this.  It's similar, very similar

7      in nature.

8              There would have been no reason to arrest

9      Mr. Ortiz based on the information that we just

10     reviewed in the P73s; correct?

11             MR. QUINN:  Don't answer that question.

12             MR. FLYNN:  I think you changed the dates.  What

13     you did, you asked him about November 15th, if he was

14     a suspect.  Now you changed the date to the 16th.

15             MR. FELLE:  That's the date he was a suspect;

16     just the date he met with him.

17             MR. FLYNN:  A couple of questions before, you

18     asked if he was a suspect on the 15th.

19             MR. FELLE:  I reserve my rights on the

20     objection.  Mr. Quinn should certainly know about the

21     rules pertaining to civil depositions.  He has no

22     right to instruct his client not to answer a question.

23     He can object to the form and preserve that objection
```

A-401

163

1          for legal argument, later review.

2                  He's chosen to obstruct my deposition and

3          instruct the witness not to answer the question.  I'll

4          reserve my rights later to bring the Detective back in

5          to answer the questions that Mr. Quinn will not let

6          him do now.

7                  MR. QUINN:  I object to the question being

8          palpably improper.  It's appropriate under the rules.

9          If you want to rephrase the question.  We're making

10         appropriate objections as to form and where

11         appropriate, as palpably improper and instructing him

12         not to answer.

13                 The deposition, I assume, will continue and

14         there's no reason to bring him back.

15                 MR. FELLE:  We'll leave that to a Judge to

16         decide.

17                 So moving forward with the deposition; on the

18         16th, when Police Officer Sadlocha was bringing

19         Mr. Ortiz to the Major Crimes Unit, what is the

20         understanding of why he was being brought to you?

21                 MR. QUINN:  Object to the form.  You can answer.

22                 THE WITNESS:  He was being chased.  He thought

23         that someone was trying to kill him and he said two

MCCANN & MCCANN REPORTING

A-402

164

```
 1        people were trying to kill him.
 2               MR. FELLE:  Did he identify who those people
 3        were?
 4               MR. QUINN:  If you need to refer to your notes,
 5        you can.
 6               THE WITNESS:  I would have to look at the Sworn
 7        Statement, please.
 8
 9    BY MR. FELLE:
10    Q.  Go back to your file, Exhibit 3.
11    A.  Yes.  I don't have that in my notes or the Sworn
12        Statement.
13    Q.  Do you have an independent recollection of hearing
14        that at the time that you questioned Mr. Ortiz?
15    A.  Yes.
16    Q.  Was that told to you by the officers that were
17        bringing him to you?
18    A.  Told to me by the witness, Mr. Ortiz.
19    Q.  During the course of your questioning?
20    A.  Correct.
21    Q.  That's not contained in any of the documents that you
22        have as part of Exhibit 3; correct?
23               MR. QUINN:  Object to the form.  You can answer.
```

A-403

165

```
1              THE WITNESS:  No, it is not.
2    BY MR. FELLE:
3    Q.  What document would that exist on?
4    A.  It doesn't exist.  I didn't write it down.
5    Q.  You're testifying today as to your independent
6        recollection in telling you that; is that correct?
7    A.  That's correct.
8    Q.  Would it be fair to say if he told you that he thought
9        two people were trying to kill him, that he was
10       frightened?
11             MR. QUINN:  Objection.  You're speculating for
12       him.
13             MR. FELLE:  Did he appear frightened when you
14       met with him?
15             MR. QUINN:  Object to the form.  You can answer.
16             THE WITNESS:  Yes.
17             MR. FELLE:  When Police Officer Sadlocha called
18       you that he was bringing Mr. Ortiz to meet with you,
19       did he tell you that Mr. Ortiz had indicated that he
20       had committed the murders?
21             MR. QUINN:  Object to the form.  You can answer.
22             THE WITNESS:  No.
23
```

```
 1    BY MR. FELLE:

 2    Q.  Did he tell you that he was coming in to confess to

 3         the murders?

 4    A.  No.

 5    Q.  So at the time that Mr. Ortiz was brought to you at

 6         the Major Crimes Unit for questioning, he was brought

 7         there for what reason?  You tell me.

 8              You learned about the two individuals looking to

 9         kill him after you started talking to him.  What was

10         the understanding of why he was being brought to you

11         at that time?

12              MR. QUINN:  Object to the form.  You can answer.

13              THE WITNESS:  To speak with us if he was a

14         witness or he was a participant in the homicide.

15

16    BY MR. FELLE:

17    Q.  Specific for that homicide or just crimes in general?

18    A.  That homicide of the Camacho Brothers.

19    Q.  And so, any other information that you had pertaining

20         to why Mr. Ortiz was coming in to talk with you on

21         November 16th?

22    A.  No.

23              MR. QUINN:  Object to the form.  You can answer.
```

A-405

167

```
 1              MR. FELLE:  And the knowledge that Mr. Ortiz, at
 2         least that it was stated that he would have, do you
 3         know what the basis of that knowledge was at the time
 4         it was radioed in to you?
 5              MR. QUINN:  Object.  I don't understand that
 6         question at all.
 7
 8    BY MR. FELLE:
 9    Q.  I apologize.  It's a pretty bad question.  When the
10         call came in to you that they were bringing in
11         Mr. Ortiz, you told me that he had some information
12         relative to the homicide?
13    A.  He wanted to speak with the homicide squad.
14    Q.  Okay.  At that time, it was your understanding that
15         this was the first time that it -- the Major Crimes
16         Unit had had any involvement with Mr. Ortiz pertaining
17         to that investigation; correct?
18              MR. QUINN:  Object to the form.  It's a leading
19         question.  You can ask him what his understanding was.
20         You can't ask a leading question.
21              MR. FELLE:  You understand it's the first time.
22              MR. QUINN:  Again, a leading question.
23              MR. FELLE:  It doesn't lead to any question.
```

MCCANN & MCCANN REPORTING

A-406

168

```
 1        You answer "yes" or "no".  Do you understand what a

 2     leading question is?

 3          MR. QUINN:  You don't need to insult me.  We're

 4     trying to get through this a second time.

 5          MR. FELLE:  You're obstructing my ability to ask

 6     the question.  It's not a leading question.  He can

 7     answer it either way.

 8          MR. QUINN:  You can ask him what his

 9     understanding was.  That's not what the question was.

10     Object to the form.

11          MR. FELLE:  You can answer the question, sir.

12          THE WITNESS:  So we can take a breather here;

13     what is the question, please?

14          MR. FELLE:  Would you read it back.

15       (Whereupon the reporter read back the requested

16        testimony.)

17          MR. QUINN:  Object to the form.

18          THE WITNESS:  Yes.

19          MR. FELLE:  So when you were told that he may

20     have some information regarding the homicide you

21     weren't aware, until the night before, Detective

22     Lonergan had spent thirty minutes talking to him about

23     that same homicide; you weren't aware?
```

MCCANN & MCCANN REPORTING

```
1            MR. QUINN:  Object to the form.
2            THE WITNESS:  No.
3            MR. FELLE:  You weren't aware of any
4     interactions he had with any other detective in the
5     Major Crimes Unit before he presented to you on the
6     16th?
7            MR. QUINN:  Objection to the form.
8            THE WITNESS:  Correct.
9            MR. FELLE:  Would it be fair to say during the
10    interactions, Mr. Ortiz may have learned certain facts
11    about the crime?
12           MR. QUINN:  Object to the form.  Don't answer
13    that question.  He can't speak to what Mr. Ortiz knew
14    or what he didn't know and when.
15           MR. FELLE:  Fair enough.  Before we go into that
16    interview, I just wanted to ask you some questions
17    relative to what physical evidence you were privy to.
18
19    (Whereupon the reporter marked Exhibit 7, an
20    Evidence Unit case file, for identification.)
21    (Whereupon the reporter marked Exhibit 8, a City of
22    Buffalo Department of Police Major Crime Unit
23    document, for identification.)
```

A-408

170

```
 1          (Whereupon the reporter marked Exhibits 9-10,

 2      Camacho Description/Photo, for identification.)

 3          (Whereupon the reporter marked Exhibits 11-12,

 4      Autopsy Reports for Nelson Camacho and Miguel

 5      Camacho, for identification.)

 6

 7          MR. FELLE:  All right.  Detective, I appreciate

 8      your patience.  I want to run through some documents,

 9      if I can.

10          Before that, can I have you close up your

11      folder.  We'll go back through that in a little bit.

12      I want to go through some evidence.  I don't want to

13      confuse them with what is in your folder.

14          I'm going to start by showing you Exhibit 7.

15      Exhibit 7 is also contained under a cover sheet of

16      Evidence Unit Case File.

17          MR. FLYNN:  Any distinction between the previous

18      one we marked as an evidence case file?

19          MR. FELLE:  No.  There's ten pages for this

20      document though as Exhibit 7.  When I make copies of

21      it, I'll keep it as one.

22          MR. QUINN:  Just so I'm clear; the first page of

23      that is Bates numbered; is that correct?
```

MCCANN & MCCANN REPORTING

```
 1              MR. FELLE:  Right.

 2              MR. QUINN:  The subsequent ones are not?

 3              MR. FELLE:  10, no.  These are hand -- some are

 4          handwritten and some are photographs.

 5              MR. QUINN:  Okay.

 6              MR. FELLE:  It's not Bates numbers.  I don't

 7          think they were entered yet.

 8              MR. QUINN:  And you're making some

 9          representation about what this is or not?  I don't

10          know at this point.

11

12      BY MR. FELLE:

13      Q.  Correct.  I'm going to establish that through the

14          witness.  It's just been marked.

15              Detective, I'm going to show you what's been

16          marked 7; a ten-page document containing a cover

17          sheet, a document with some writing on this and the

18          rest containing photographs.

19              First, turning to the three diagram pages.

20          First, do you recall seeing this in the homicide file?

21      A.  No.

22      Q.  Does it appear to be a diagram of the scene of the

23          crime?
```

A-410

172

```
1    A.  Yes.

2    Q.  Is this common practice?

3            MR. QUINN:  Object to the form.

4            THE WITNESS:  It's prepared by a Detective

5        Sergeant in the Evidence Collection Unit.  I've never

6        seen this one.

7

8    BY MR. FELLE:

9    Q.  Okay.  Kind of an aerial, if you will, of the inside

10       of the department, different evidence tags; correct?

11   A.  Yes.

12   Q.  And it shows the victims of the double homicide?

13   A.  Yes.

14   Q.  Fair to say that without holding you to the exact

15       location, that this is meant to be a reference guide

16       as to where the bodies were when police first got to

17       the scene and where he was at the time that he

18       entered?

19           MR. QUINN:  Object to the form.  You can answer.

20           THE WITNESS:  Yes.

21           MR. FELLE:  Would this normally be a part of the

22       homicide file?

23           MR. QUINN:  Object to the form.  You can answer.
```

A-411

173

```
1              THE WITNESS:  Sometimes "yes" and sometimes

2         "no".

3

4    BY MR. FELLE:

5    Q.  Would it be part of the Evidence File?

6    A.  It would be part of the Evidence File.

7    Q.  And do you recall -- I think I asked earlier and I

8         think you said earlier you did not pull the Evidence

9         File before you started talking to Ortiz?

10   A.  No, I did not.

11   Q.  Looking now at the photographs that are attached to

12        Exhibit 7, this appears to be just a walk-through of

13        the residence at 879 Niagara where these double

14        homicides occurred; is that correct?

15   A.  Yes, sir.

16   Q.  Is that the front entranceway?

17   A.  Yes, sir.

18   Q.  Is that a walk-through of the front entranceway and

19        then victim number one, Nelson Camacho, on the ground?

20            MR. QUINN:  Just so the record is clear, I

21        believe you flipped to the next page.  I don't know

22        what you're identifying.

23            MR. FELLE:  Second photograph.
```

```
 1              THE WITNESS:  That's the deceased, yes.

 2              MR. FELLE:  There were two deceased; would this

 3         be Nelson Camacho?

 4              THE WITNESS:  I believe it is, yes.

 5              MR. FELLE:  And then, as we enter closer, is

 6         that the body of the slain Nelson Camacho?

 7              MR. QUINN:  Again, you flipped the page.

 8              MR. FELLE:  Third page, correct.

 9              MR. QUINN:  And you see a photograph.

10

11    BY MR. FELLE:

12    Q.   Is this a closer picture -- the fourth picture -- the

13         fourth page of the photographs a closer picture of

14         Nelson Camacho that had been shot?

15    A.   Yes.

16    Q.   Does it appear to show gunshot inflictions to his

17         body?

18    A.   Yes.

19    Q.   You might see from the fourth -- excuse me, from the

20         third photograph, there's a hallway after passing

21         Nelson Camacho and that hallway extended down towards

22         the rear of the house; and then do you see the body of

23         the second victim of that crime?
```

MCCANN & MCCANN REPORTING

A-413

175

```
 1    A.  I do.

 2    Q.  Is that Miguel Camacho?

 3    A.  Yes.

 4    Q.  Does the last photograph contained in Exhibit 7 show a

 5        close-up of Miguel Camacho?

 6    A.  Yes.

 7    Q.  And would those photographs from the scene of the

 8        crime have been part of the Evidence File?

 9    A.  I believe they were prepared and were in the file,

10        yes.

11    Q.  Do you recall seeing photographs prior to talking to

12        Mr. Ortiz about the crime?

13    A.  Well, one of the questions that I asked him pertained

14        specifically to one of the deceased having a gun and a

15        phone in his hand.  And again, I used that to ask him

16        a specific question about that to find out if his

17        information was accurate and true, because that is

18        information that only someone who was at the event

19        would have known and that's contained in the

20        Statements.

21             I believe there's a lot of photos that are

22        missing, but I believe one of the photos had one of

23        the deceased with a phone and a gun in his hand, I
```

A-414

176

```
 1          believe.  You know, it's been fifteen years, but if we

 2          had the whole file here, I could go through that to be

 3          one hundred percent certain.  But I think that was one

 4          of the verifying questions that I asked Mr. Ortiz and

 5          he indicated that.  I said, "Did you see him?"

 6               MR. QUINN:  Just wait for a question.

 7               THE WITNESS:  So there are other photos that

 8          should be in that file.

 9

10     BY MR. FELLE:

11     Q.  That's fine.  You don't need to necessarily identify

12          the photos.  What is important though, at the time

13          that you questioned Mr. Ortiz you had knowledge of

14          those photos and the layout, if you will, of the crime

15          scene; correct?

16     A.  I would have used them, yes.

17     Q.  And you would have known, at that point, that one of

18          the victims had a cell phone in his hand; correct?

19     A.  I don't think it was a cell phone.  I think it was a

20          house phone.  This is fourteen or fifteen years ago.

21     Q.  You would have known he had a phone in his hand;

22          correct?

23     A.  And a gun.
```

```
 1    Q.  You would have known that?

 2    A.  I knew it.

 3              MR. QUINN:  Wait for a question.

 4

 5    BY MR. FELLE:

 6    Q.  How would you have known that?

 7    A.  By the photos.

 8    Q.  So when you went into the questioning of Mr. Ortiz on

 9        November 16th, you were aware of certain information

10        pertaining to the murders and the crime scene;

11        correct?

12    A.  Correct.

13    Q.  And you used some of that information to ask questions

14        of Mr. Ortiz; correct?

15    A.  Correct.

16    Q.  Now in that same note, do you recall me showing you

17        Exhibit 9 which is simply three colored copies; the

18        first being just the cover sheet from the Erie County

19        Morgue pertaining to Nelson Camacho.  I'm going to

20        have you look at that real quick; Exhibit 9.

21              Does that appear to show two pictures of Nelson

22        Camacho and the wounds inflicted from the crime?

23    A.  Correct.
```

1    Q.  All right.  And this would have been part of the

2         Evidence File?

3              MR. QUINN:  Objection to the form.

4              THE WITNESS:  Again, I don't know when it was

5         placed in there.  It might have been one of the ones

6         that were there, but I did not recall looking at that

7         prior to me questioning Mr. Josue Ortiz.

8

9    BY MR. FELLE:

10   Q.  Looking at Exhibit 10, this is also a four-page

11        document containing colored photos.  First is a cover

12        sheet of the Erie County Morgue pertaining to Miguel

13        Camacho and the postmortem examination.

14              If you can just look at those photographs and do

15        they document the wounds inflicted in this crime;

16        inflicted upon Miguel Camacho?

17   A.  Yes.

18   Q.  Do you remember whether or not if you would have seen

19        these photographs of Miguel Camacho before questioning

20        Mr. Ortiz?

21   A.  I believe they were in the file, but I don't believe I

22        used them, no.

23   Q.  Just to be clear; even though you may not have used

```
1     them, do you recall being aware of them?
2          MR. QUINN:  Object to the form.
3          THE WITNESS:  Well, again, the postmortem takes
4     effect soon after the deceased is found in an
5     investigation.  I don't know when the police
6     photographer posts those.  In other words, I know when
7     he takes them at the postmortem examinations.  I don't
8     know when those photos from the exam, the postmortem
9     examination, are placed in the file.
10          It could be some time.  It could be a week,
11     could be a month.
12          MR. FELLE:  Fair enough.  What about the P73 of
13     Detective Tim Salamone.  I have Exhibits marked 11 and
14     12.  Let me show you 11 first.
15          This is the P73 pertaining to Detective Timothy
16     Salamone and his attendance and recording of the
17     postmortem examination of Nelson Camacho.
18          MR. QUINN:  Wait for a question.
19          MR. FLYNN:  Was that Nelson Camacho?
20          MR. FELLE:  Nelson, Exhibit 11.
21          MR. FLYNN:  Thanks.
22
23     BY MR. FELLE:
```

MCCANN & MCCANN REPORTING

180

```
 1    Q.  You're welcome.  Does the front sheet of Exhibit 11,

 2        am I correct this -- strike that -- is a P73?

 3    A.  It is.

 4    Q.  And would this document have been placed in the

 5        homicide file?

 6            MR. QUINN:  Object to the form.

 7            THE WITNESS:  Yes.

 8            MR. FELLE:  And what is the date of that

 9        Statement?

10            MR. QUINN:  What is the date that is written on

11        the document?

12            THE WITNESS:  The date of the document is

13        11/12/04.

14            MR. FELLE:  Just the front sheet, I know there's

15        attachments underneath it that pertains to the

16        Certificate of Death and other supporting documents,

17        but I'm just asking you about the face sheet of

18        Exhibit 11.

19            Would you have had access to this document prior

20        to talking to Josue Ortiz?

21            MR. QUINN:  Object to the form.  You can answer.

22            THE WITNESS:  I don't remember it.

23
```

A-419

181

```
1    BY MR. FELLE:

2    Q. Okay.  Now earlier in your deposition, we established

3       that there are times that you would send and record a

4       postmortem examination?

5    A. Yes.

6    Q. And you report that in a P73; correct?

7    A. That is correct.

8    Q. And so what Detective Timothy Salamone did in this

9       case is just policies and procedures of the Major

10      Crimes Unit; correct?

11           MR. QUINN:  Object to the form.

12           THE WITNESS:  Yes, sir.

13           MR. FELLE:  And investigating a homicide, you

14      would know that this would exist in the homicide file

15      at some point; correct?

16           MR. QUINN:  Object to the form.

17           THE WITNESS:  Yes.

18           MR. FELLE:  And it describes where the wounds

19      were inflicted in this crime upon Nelson Camacho;

20      correct?

21           THE WITNESS:  Yes.

22           MR. QUINN:  Object to the form.

23           MR. FELLE:  And Exhibit 12, it's just the
```

182

```
 1        same -- essentially the same documentation, pertaining

 2        to Miguel Camacho; correct?

 3             MR. QUINN:  Well --

 4

 5   BY MR. FELLE:

 6   Q.  At least the front sheet of the P73, is it just a

 7        report of Detective Salamone from his attendance at

 8        the postmortem examination?

 9   A.  Yes.

10   Q.  And is it also a report showing where the wounds were

11        inflicted to Miguel Camacho at the time of the crime?

12   A.  Yes.

13   Q.  And likewise, this P73 would have been included in the

14        homicide file; correct?

15             MR. QUINN:  Object to the form.

16             THE WITNESS:  It would have been in the file,

17        yes.

18             MR. FELLE:  Do you have any recollection of

19        seeing this, "this" being Exhibit 12, the autopsy, the

20        P73, of Miguel Camacho before you questioned

21        Mr. Ortiz?

22             MR. QUINN:  Object to the form.  You can answer.

23             THE WITNESS:  No.
```

MCCANN & MCCANN REPORTING

A-421

183

```
 1          MR. FELLE:  At what point on January 16th of

 2     2004, were you made aware that Mr. Ortiz didn't speak

 3     English; that you needed a translator?

 4          MR. QUINN:  Object to the form.  That's a

 5     compound question.  Object to the form of the

 6     question.

 7          MR. FLYNN:  I think you have the wrong date.  I

 8     think you meant January '04.

 9          MR. FELLE:  November 16th of '04.

10          MR. QUINN:  Object to the form.

11          THE WITNESS:  I thought he spoke English.

12          MR. FELLE:  At some point, you made the decision

13     to bring in a Spanish translator; correct?

14          MR. QUINN:  Object to the form.  You can answer.

15          THE WITNESS:  Yes.

16

17     BY MR. FELLE:

18     Q.  Why was that?

19     A.  To be fair and equitable.  I knew he had problems with

20         English.  I even asked him that in the Sworn

21         Statement.  He was speaking to me in English; broken

22         English.  He has some problems.  I wanted to be fair

23         to him and make sure that it was a good Statement, so
```

```
 1          I wanted to bring in a Police Officer that is fluent
 2          in his native language; the officer.
 3               And sometimes the officer would interpret and
 4          sometimes he was not needed to interpret; I would ask
 5          a question and Mr. Ortiz would respond in English.
 6     Q.   For approximately how long did you speak with
 7          Mr. Ortiz before you made the determination he needed
 8          a translator?
 9               MR. QUINN:   Object to the form.
10               THE WITNESS:   I would not be able to say.  Maybe
11          within thirty or forty minutes.
12
13     BY MR. FELLE:
14     Q.   And during that time frame, was anyone else with you
15          and Mr. Ortiz?
16     A.   No.
17     Q.   Was any recording made of that questioning?
18     A.   No.
19     Q.   Thank you for your patience.  I'm going to show you
20          Exhibit 6 again and turn your attention to the P73
21          that you completed, relative to your inspection with
22          Mr. Ortiz on November 16th, 2004.
23               So you indicated earlier that your knowledge of
```

185

```
1          Mr. Ortiz coming into the Major Crimes Unit was

2          because two people were trying to kill him and that he

3          had some information about the crime; correct?

4              MR. QUINN:  Object to the form.  Prior testimony

5          speaks for itself.

6     BY MR. FELLE:

7     Q.  Fair enough.

8     A.  Yes.

9     Q.  As you review the P73, typically the first paragraph

10         of your prepared P73, does it indicate that when

11         Police Officer Sadlocha called in, he was bringing in

12         Josue Ortiz and that he indicated that the subject was

13         confessing about the homicide on Niagara Street?

14    A.  Correct.

15    Q.  Does that refresh your memory of the knowledge you had

16         when Mr. Ortiz came to your Major Crimes Unit?

17    A.  It does.

18    Q.  And so that's a bit different than having information;

19         correct?

20             MR. QUINN:  Object to the form.

21             THE WITNESS:  Correct.

22             MR. FELLE:  And we talked earlier before about

23         the idea of starting questioning of somebody about a
```

A-424

186

```
1          crime, that it was important to have all the

2          information pertaining to that crime, including other

3          P73s of other detectives; correct?

4                  MR. QUINN:  Object to the form.  The prior

5          testimony speaks for itself.

6                  MR. FELLE:  I don't believe that's been asked.

7          It would be important; correct?

8                  MR. QUINN:  Object to the form.

9                  THE WITNESS:  Yes.

10                 MR. FELLE:  And would you agree with me that --

11         would it be equally, if not more important, to have

12         that information from other detectives as to leads,

13         suspects, ongoing investigation material, before

14         taking a confession from somebody in that crime?

15                 MR. QUINN:  Object to the form.  Don't answer

16         that question.  It's a palpably improper question.

17

18    BY MR. FELLE:

19    Q.   Would it be important to have that information?

20    A.   It would be, yes.

21    Q.   The second paragraph of your P73 states that when

22         Mr. Ortiz arrives, he was placed in Sergeant Vivian's

23         office at seven-twenty-five p.m.; is that correct?
```

A-425

187

```
1    A. Yes.

2    Q. Now earlier when I asked you, you said that he was

3       brought to an interview room?

4    A. His office would be turned into an interview room.

5       It's just my wording.

6    Q. Okay.  Normal police interview rooms allow for other

7       people to view, there might be recording devices.

8       It's a different setup than a detective's office;

9       would it not be?

10          MR. QUINN:  Are you testifying to that or are

11      you asking him a question?

12          MR. FELLE:  I'm asking him a question.

13          THE WITNESS:  Not in our police office.  An

14      office could be an interview room.

15

16   BY MR. FELLE:

17   Q. When I asked you the question though, if he was

18      brought to Detective Vivian's office you said, "No, he

19      was brought to an interview room."  And the record

20      will speak for itself.  Were you mistaken then or as

21      you read this now, was he at some other time brought

22      to an interview room?

23   A. No, you're changing it.  Albeit, to be as complete as
```

MCCANN & MCCANN REPORTING

1      we both can; Detective Sergeant Vivian's office could

2      be determined an interview room.  That's what I termed

3      it.  "Brought and placed in an interview room."  We

4      don't have the luxury that a lot of the other larger

5      departments do.

6           It's a matter of me placing it onto the record.

7      It was Detective Sergeant Vivian's office, which I

8      deemed to be an interview room.

9  Q.  But you do have specific aspects of the Major Crimes

10     Unit that are, in fact, interview offices?

11 A.  We do have separate -- yes.

12          MR. QUINN:  Object to the form.

13          MR. FELLE:  And at any time -- when you

14     testified earlier, I think you said he was brought to

15     the Detective Interview Room; to Detective Vivian's

16     office?

17          MR. QUINN:  I think that's your --

18          MR. FELLE:  The transcript will speak for

19     itself.  Here's the question I want to ask you; from

20     the time he entered Detective Vivian's office, did he

21     ever leave there until -- did he leave there at any

22     time before he signed the typewritten confession that

23     you prepared?

A-427

189

```
 1                MR. QUINN:  Object to the form.

 2                THE WITNESS:  No.

 3                MR. FELLE:  The food that you say that you

 4     brought him from McDonald's, did he eat that in that

 5     same office?

 6                MR. QUINN:  Object to the form.

 7                THE WITNESS:  No.

 8                MR. FELLE:  The food was given to him after he

 9     signed the typewritten confession; correct?

10                MR. QUINN:  Object to the form.

11                THE WITNESS:  I would have to look at the report

12     one more time, if you don't mind, please.

13                MR. QUINN:  You can look at the report if you

14     need to.

15                MR. FELLE:  Sure.

16                THE WITNESS:  "He was given nourishment; a

17     sandwich, McDonald's fries and a Coke before the

18     formal Statement."  So again, this would be more

19     accurate than my recollection of what I just testified

20     to a few minutes ago.

21                MR. QUINN:  On your P73?

22                THE WITNESS:  My P73.

23
```

MCCANN & MCCANN REPORTING

1   BY MR. FELLE:

2   Q.  Okay.  Fair enough.  So would that food have been

3       brought to him in Detective Vivian's office?

4   A.  I believe it was.

5   Q.  Now in the second paragraph, you indicate that he

6       provided you information relative to the crime;

7       correct?

8   A.  Yes.

9   Q.  And that -- it concludes, in that second paragraph, by

10      stating that Police Officer Torres was present;

11      correct?

12  A.  Correct.

13  Q.  You told us earlier that for about thirty to forty

14      minutes, you were alone with Mr. Ortiz and asked him

15      questions; correct?

16          MR. QUINN:  I don't know that was the testimony.

17      You can answer the question.

18          MR. FELLE:  It speaks for itself.  Were you

19      present with Mr. Ortiz before you made the

20      determination he needed a translator after speaking to

21      him for thirty to forty minutes?

22          MR. QUINN:  Object to the form.

23          THE WITNESS:  I was.

```
 1              MR. FELLE:  When it was decided that he needed a
 2         translator, you called for Officer Torres; correct?
 3              MR. QUINN:  Object to the form.
 4              THE WITNESS:  Correct.
 5
 6    BY MR. FELLE:
 7    Q. Was it your understanding that Officer Torres was
 8         already in the building?
 9    A. Officer Torres?
10    Q. Correct.
11    A. No, he was not in the building.
12    Q. Did you specifically call for Officer Torres to
13         translate?
14    A. I don't recall.
15    Q. How was it that he came to assist you?
16    A. He would have been informed to report to the Homicide
17         Bureau.
18    Q. Do you know approximately what time it was that he got
19         there?
20    A. No.
21    Q. Before the time that he got there, had you been
22         questioning Mr. Ortiz about the crime?
23    A. Talking to him, interviewing him.  Yes.
```

192

1    Q.  At any time during that thirty to forty minutes, were

2        you made aware that he had spoken to Buffalo Police

3        Officers the day before?

4            MR. QUINN:  Object to the form.

5            THE WITNESS:  Absolutely not.

6

7    BY MR. FELLE:

8    Q.  He didn't tell you that?

9    A.  That is correct.

10   Q.  And again, so we're clear; when Police Officer Torres

11       told you that, he didn't tell you that either?

12   A.  He did not.

13   Q.  At no time during the night before you arrested

14       Mr. Ortiz, were you made aware that the day prior he

15       had been contacted and interviewed by numerous

16       detectives and police officers from the Buffalo Police

17       Department while at Buffalo General Hospital; correct?

18           MR. QUINN:  Object to the form.

19           THE WITNESS:  That's correct.

20           MR. FELLE:  During that thirty to forty minutes

21       that you were alone with Mr. Torres -- excuse me, with

22       Mr. Ortiz, did you start to question him about the

23       facts pertaining to how the crime was committed?

```
1              MR. QUINN:  Object to the form.

2              THE WITNESS:  No.

3

4    BY MR. FELLE:

5    Q.  And just so I'm clear on the record; for that entire

6        thirty to forty minutes, no one else was present,

7        correct?

8    A.  Again, you're saying "we're alone".  There's two

9        officers that are standing right at the doorway; that

10       would be Officer Sadlocha and Officer Lobaugh, but I

11       was alone with him inside the office.  The door is

12       open.

13   Q.  During that time, were you taking any notes?

14             MR. QUINN:  Object to the form.

15             THE WITNESS:  They might be in with the note

16       that you have here today.  I'm not quite sure.

17

18   BY MR. FELLE:

19   Q.  Okay.  I guess I'm trying to get a sense of what was

20       occurring within that thirty to forty minutes before

21       Police Officer Torres got there to be a Spanish

22       translator?

23   A.  Just casual conversation; who he was, his pedigree
```

```
 1          information, how old he was, where he lived, what

 2          information he wanted to give us.  Just casual

 3          information.

 4     Q.   And pertaining to the information that he wanted to

 5          give you, did you focus in on the crime itself?

 6     A.   Absolutely.

 7               MR. QUINN:  Object to the form.

 8               THE WITNESS:  Yes.

 9               MR. FELLE:  And asked him questions and details

10          about how the crime had been committed?

11               MR. QUINN:  Object to the form.

12               THE WITNESS:  That is correct.

13               MR. FELLE:  Did you ask him his familiarity with

14          the victims?

15               MR. QUINN:  Object to the form.

16               THE WITNESS:  Yes.

17

18     BY MR. FELLE:

19     Q.   During that time frame or at any time before Mr. Ortiz

20          got there and you knew he was on route, did you run a

21          background on him?

22     A.   No.

23     Q.   Did you run a criminal history background?
```

A-433

195

```
 1    A.  No.

 2    Q.  At the time that he walked in the door, did you know

 3        anything about him?

 4    A.  Nothing.

 5    Q.  We've established that when he did come in and you

 6        first met him, he appeared frightened; correct?

 7            MR. QUINN:  Object to the form.

 8            THE WITNESS:  He was frightened, yes.

 9            MR. FELLE:  And during that time frame of thirty

10        to forty minutes that you were alone with Mr. Ortiz,

11        did he reiterate that he was afraid that someone was

12        trying to kill him?

13            MR. QUINN:  Object to the form.

14            THE WITNESS:  Yes.

15            MR. FELLE:  Did he exhibit other psychiatric

16        illnesses during that thirty to forty minutes --

17        excuse me.  Not any others.  Did he exhibit any

18        behavioral and/or psychiatric illnesses or conditions

19        during that thirty to forty minutes that you were with

20        him alone?

21            MR. QUINN:  Object to the form.

22            THE WITNESS:  No, none at all.

23            MR. FELLE:  Incidentally, before November 16th
```

MCCANN & MCCANN REPORTING

A-434

196

1          of 2004, had you taken any special training in how to

2          question, interrogate or interview individuals that

3          are suffering from mental illness?

4                  MR. QUINN:  Object to the form.

5                  THE WITNESS:  No.

6                  MR. FELLE:  Do you know what the policy and

7          procedures are of the Buffalo Police Department as

8          they existed in November of 2004, pertaining to how to

9          interrogate and question someone who is suffering from

10         a mental illness?

11                 MR. QUINN:  Object to the form.  If you know.

12                 THE WITNESS:  I do not know.

13                 MR. FELLE:  Was there anyone that you were aware

14         of, at that time, that had specialized training that

15         would be called in, in situations like that?

16                 MR. QUINN:  Object to the form.

17                 THE WITNESS:  No, I don't think so.

18

19    BY MR. FELLE:

20    Q.  During his -- I can show you this or I can state it

21         and you can tell me if it's right or wrong.

22                 During the Huntley testimony, Officer Torre

23         indicated he arrived at the Major Crimes Unit to meet

MCCANN & MCCANN REPORTING

A-435

197

```
1         with you and Mr. Ortiz at about eight-o-five p.m.; do

2         you believe that to be the case?

3    A.   It might be referred in my P73, I want to make sure.

4         His recollection is eight-o-five.  I would say that's

5         fairly accurate.

6    Q.   Between the time that Police Officer Sadlocha and

7         Police Officer Lobaugh brought in Mr. Ortiz to meet

8         with you, was there ever a time that Mr. Ortiz was out

9         of your view?

10   A.   No.

11   Q.   Was there ever a time, between the time that Mr. Ortiz

12        presented to the Major Crimes Unit and the time of his

13        confession, that he met with Detective Sergeant

14        Lonergan?

15   A.   No.

16   Q.   Was Detective Sergeant Lonergan coming in and out of

17        the interview room?

18   A.   No.

19   Q.   Did Detective Sergeant Lonergan come in after the

20        typed, reported confession was prepared?

21   A.   He was standing in the doorway behind Mr. Ortiz.

22   Q.   Did you ask him to witness?

23   A.   I'm sorry?
```

MCCANN & MCCANN REPORTING

```
 1    Q.  Did you ask Detective Sergeant Lonergan to witness the
 2        typewritten reported confession?
 3    A.  He was in the doorway.  He overheard exactly what was
 4        being said and also he watched me type it and then he
 5        signed it as a witness to the Sworn Statement.  I
 6        believe his signature is on the Sworn Statement as a
 7        witness.
 8    Q.  And then, just so I'm clear; during that first thirty
 9        to forty minutes that you met with Mr. Ortiz alone,
10        was Detective Sergeant Lonergan in the doorway then?
11    A.  No.
12            MR. QUINN:  Object to the form.  I don't know
13        what period of time these questions are pertaining to.
14        At this point in time, it's very unclear.
15            MR. FELLE:  It's the only involvement, your
16        client testified to, when he was with my client.
17            MR. QUINN:  You're referring to the thirty to
18        forty minutes?
19
20    BY MR. FELLE:
21    Q.  When Mr. Ortiz came in and started talking for thirty
22        to forty minutes -- so there's no confusion, I'm going
23        to go sequentially.  When you got to the Major Crimes
```

MCCANN & MCCANN REPORTING

```
 1        Unit and brought him into Vaughn's office, thirty to
 2        forty minutes he was there?
 3   A.  Yes.
 4   Q.  During that time, Detective Lonergan was not in the
 5        doorway; correct?
 6   A.  That's correct.
 7   Q.  After Police Officer Torres got there at approximately
 8        eight-o-five, when did you believe the first time is
 9        that Detective Sergeant Lonergan came to the room and
10        was in the doorway?
11   A.  He came back to headquarters and he appeared in the
12        doorway.
13   Q.  At approximately what time?
14   A.  That would be when the Police Officer, the parole
15        officer, is there for the Spanish Rights card.
16   Q.  So that's Police Officer Torres?
17   A.  That is correct.
18   Q.  And is that when he started his translation; at about
19        eight-o-five?
20            MR. QUINN:  Object to the form.
21            THE WITNESS:  Once again, no.  There's a Rights
22        card involved also.
23
```

MCCANN & MCCANN REPORTING

BY MR. FELLE:

Q.  I understand.

A.  He got there, I believe, at about eight-o-five but we
    took a few minutes because we couldn't find a Spanish
    Rights card.  We have tons of Rights cards that are in
    English, but we took a few minutes to find a Rights
    Card that was in Spanish.

        Then he was administered the Rights card in
    Spanish, but once again, he spoke English.  I believe
    there are several questions and answers that he gave
    me that I asked a question and he answered it in
    English.  And the detective -- I mean the Police
    Officer, didn't even have to interpret.  He just had
    some difficulty with the language at that time.

Q.  Okay.  And that Miranda -- that Spanish Miranda card
    she included in your folder; Exhibit 3?

A.  It was there, yes.

Q.  And it's time dated as eight-twenty-five p.m.?

A.  Correct.

Q.  So is it your testimony that Detective Sergeant
    Lonergan came into the doorway of Detective Vivian's
    office at approximately eight-twenty-five p.m.?

A.  I believe he appeared there at that point, yes.

A-439

201

1    Q.  And for how long did he stay?

2    A.  He stayed for the whole interview and -- I mean, the

3        typewritten Sworn Statement.

4    Q.  So correct me if I'm wrong; as you're asking questions

5        of Mr. Ortiz while in Detective Vivian's office, are

6        you typing those questions as you're asking them?

7    A.  I'm the author.  I ask the question and type it and

8        then I type his response.

9    Q.  Okay.  And that all happened still while in Detective

10       Vivian's office; is that correct?

11   A.  Yes, that is correct.

12   Q.  And prior to that typewritten Statement recording of

13       Mr. Ortiz's responses to your questions, you had met

14       with Mr. Ortiz from approximately seven-fifteen to

15       approximately eight-twenty-five before the Miranda

16       Warnings were issued; correct?

17           MR. QUINN:  Object to the form.

18           THE WITNESS:  Yes.

19

20   BY MR. FELLE:

21   Q.  And at some point, before eight-twenty-five, you

22       determined that he was a suspect because you read him

23       his Miranda Warnings; correct?

MCCANN & MCCANN REPORTING

A-440

202

```
 1    A.  Correct.

 2    Q.  And that was based on the information that you

 3         elicited from him during your discussions and

 4         questions; correct?

 5              MR. QUINN:  Object to the form.

 6              THE WITNESS:  I didn't elicit, it's what he told

 7         me.

 8

 9    BY MR. FELLE:

10    Q.  Correct.  You asked him questions; correct?

11    A.  Sometimes questions he would answer.  Sometimes he

12         would give me information without even asking him a

13         question.

14    Q.  And all that information would have been elicited or

15         obtained from Mr. Ortiz between the seven-fifteen and

16         eight-twenty-five time frame; correct?

17              MR. QUINN:  Object to the form, specifically

18         "elicited", and you can answer.

19              THE WITNESS:  Yes.

20

21    BY MR. FELLE:

22    Q.  The Huntley Hearing, wherein Detective Sergeant

23         Lonergan testified, referring to Exhibit 5, page one
```

1    twenty-three, stated under oath that Mr. Ortiz arrived

2    at the police headquarters, the Major Crimes Unit, at

3    approximately seven-fifteen p.m.; I think we've

4    established that.

5         I just want to make sure; does that align with

6    your recollection of when he arrived?

7    A.  That's a good recollection, yes.

8    Q.  Okay.  And on that same page, one twenty-three, he was

9    asked, "When did you first speak with Mr. Ortiz on the

10   16th of November?"  And his response was, "At

11   approximately nine p.m."; would that also be a fair

12   Statement?

13   A.  Yes.

14   Q.  So was there some lag between the eight-twenty-five

15   time frame that the Miranda Warnings were signed and

16   the approximate nine o'clock that Detective Sergeant

17   Lonergan states that he came into the office?

18        MR. QUINN:  Object to the form.  I don't think

19   that's the testimony that you just referred to.  Just

20   so the record is clear; you have some document in

21   front of you that's not being shown to the witness.

22        MR. FELLE:  Exhibit 5, I'm going to refer you to

23   page one twenty-three.  You see the second portion

204

1      that I've highlighted?

2          THE WITNESS:  This is all right.  You have to

3      understand something, I'm doing the questions and

4      answers, face-to-face.  No detective or sergeant would

5      interrupt me.  He would stand there.

6          Lonergan did not ask any questions.  I asked all

7      the questions, typed them out and I got his response.

8      Therefore, he wouldn't be able to talk to him.

9          I mean, he would wave to me or give me a sign to

10     ask him a certain particular question, but he

11     certainly would not have talked to Mr. Ortiz until

12     about nine o'clock after I was finished, I believe,

13     with the Sworn Statement.  What time was the Sworn

14     Statement ended?  That would help us out; all of us.

15         MR. FELLE:  I'm trying to determine when this

16     started.  Is your testimony though you're making a

17     differentiation between the time Detective Sergeant

18     Lonergan spoke to Mr. Ortiz --

19         MR. QUINN:  Wait for a question.

20         THE WITNESS:  I can't speak for Sergeant

21     Lonergan.  I can only tell you that I would be -- I

22     had the interaction with Mr. Ortiz.  I'm the one that

23     is doing the questioning.  He's the one that is doing

MCCANN & MCCANN REPORTING

```
 1        the answering and then James, the Sergeant, was the

 2        actual witness to him signing after being sworn under

 3        oath.

 4

 5    BY MR. FELLE:

 6    Q.  I want to go back to your testimony that you recall

 7        Detective Sergeant Lonergan being in the doorway --

 8    A.  Absolutely.

 9    Q.  -- when the Miranda Warnings card was signed; correct?

10    A.  I believe so, yes.

11    Q.  He was there after your questioning of Mr. Ortiz,

12        after eight-twenty-five, up to the time that he signed

13        the purported confession?

14            MR. QUINN:  Object to the form.

15            THE WITNESS:  I believe, yes.

16            MR. FELLE:  You recall -- you have an

17        independent recollection of him being present during

18        that time frame?

19            MR. QUINN:  What time?

20            MR. FELLE:  Eight-twenty-five and thereafter.

21            THE WITNESS:  He was.

22            MR. QUINN:  Object to the form "thereafter".

23            MR. FELLE:  Eight-twenty-five?
```

A-444

206

```
1              THE WITNESS:  I believe so, yes.
2              MR. FELLE:  Now, I don't mean to beat a dead
3    horse certainly; I've asked you a number of times
4    whether or not Detective Lonergan told you about his
5    interrogation with Mr. Ortiz on November 15th, prior
6    to the time that you were questioning him on the 16th;
7    correct?
8              MR. QUINN:  Are you asking, have you?
9              MR. FELLE:  I've asked you a number of times;
10   haven't I?
11             THE WITNESS:  You have.
12             MR. FELLE:  And your answer always has been
13   "no".
14             MR. QUINN:  Object to the form.
15             THE WITNESS:  I do not recall.
16             MR. FELLE:  I'm going to show you again what's
17   been marked in Exhibit 5 on page one twenty-seven, to
18   see if this refreshes your memory.  Starting with --
19   well, let me just let you read it to yourself and I
20   can look.
21             MR. FLYNN:  What page?
22             MR. FELLE:  One twenty-seven.
23             MR. QUINN:  You want him to read one
```

```
 1        twenty-seven?

 2                THE WITNESS:  Yes.

 3

 4    BY MR. FELLE:

 5    Q.  Did Detective Lonergan tell you anything about his

 6        meeting with Josue Ortiz on the 15th?

 7    A.  No, he hasn't.

 8    Q.  You saw his testimony, Exhibit 5, at page one

 9        twenty-seven.  Do you see there where he states when

10        asked, "Had you talked to Detective Stambach about

11        your meeting with Mr. Ortiz on the 15th?", question

12        mark.  Your answer, line seven, "I'm sure I did.  Yes,

13        sir.", period.

14    A.  Not my answer, Sergeant Lonergan's answer.  You said,

15        "my answer".

16            MR. FELLE:  Not "answer".  I'm referring to --

17        I'm reading it from Exhibit 5.  Detective Sergeant

18        Lonergan's testimony during the Huntley Hearing

19        contained on page one twenty-seven and then it goes on

20        to state, at line eight, "Had you provided Detective

21        Stambach with the details of that meeting, prior to

22        the taking of the Statement on the 16th?"  His answer,

23        page one twenty-seven, line eleven, "Yes.", period.
```

```
 1            MR. QUINN:  That document is not in front of
 2       him.  You can show it to him.
 3            THE WITNESS:  Again, that is Detective
 4       Lonergan's Statement.
 5            MR. FELLE:  Correct.
 6            THE WITNESS:  That is what he's stating.  I
 7       don't recall that.
 8
 9  BY MR. FELLE:
10  Q.  Continuing to look at Detective Sergeant Lonergan's
11       testimony at the Huntley Hearing on page one
12       twenty-three, you and I have already talked about the
13       middle of page one twenty-three where Detective
14       Sergeant Lonergan said the first time he spoke to
15       Mr. Ortiz was at approximately nine o'clock.
16            I'm going to turn your attention to line
17       twenty-two of page one twenty-three; question and then
18       answer, and then I'll ask you a question.
19  A.  What line?  I'm sorry.
20  Q.  Right down here (indicating), starting with line
21       twenty-two.
22  A.  Okay.
23  Q.  Does it appear that the testimony of Detective
```

```
 1        Sergeant Lonergan, as demonstrated in Exhibit 5, page
 2        one twenty-three at lines twenty-two through
 3        twenty-five, that Detective Sergeant Lonergan states
 4        that he was never present with Mr. Ortiz and Detective
 5        Stambach and Police Officer Torres for the verbal
 6        interview prior to nine p.m.?
 7             MR. QUINN:  Object to the form.
 8
 9   BY MR. FELLE:
10   Q.  Is that what he says?
11   A.  That's what he says.
12   Q.  You recall him being there prior to nine p.m.?
13             MR. QUINN:  Object to the form.  The time has
14        all been very vague, but you can answer if you
15        understand.
16             THE WITNESS:  I do remember him being in the
17        doorway when I started the Sworn Statement.  I do
18        remember him arriving back at police headquarters, but
19        I do not remember him being there for the full, entire
20        interview; if that helps you.  I think that's what
21        he's testifying to.
22
23             (Whereupon the reporter marked Exhibit 13, Interview
```

A-448

210

```
 1          notes, for identification.)

 2          (Whereupon the reporter marked Exhibit 14, a

 3          Confession, for identification.)

 4

 5     BY MR. FELLE:

 6     Q.  Detective, I'm going to show you what's been marked

 7          Exhibit 13.  Would you review that and tell us what

 8          that document is.

 9     A.  Yes.  This is a P1302 and it's in my handwriting.  I'm

10          the author and it's some of the notes, the scribbles

11          that I made before I actually started the Sworn

12          Statement.

13     Q.  So Exhibit 13 is a two-page document; correct?

14     A.  Yes.

15     Q.  Eight and a half by fourteen page?

16     A.  Yes.

17     Q.  The writing that is recorded on there, the print of

18          the writing that we see on Exhibit 14, is that yours?

19     A.  Absolutely, yes.

20     Q.  When we look at the margins on the left side, there

21          looks to be some handwriting there; whose handwriting

22          is it?

23          MR. QUINN:  Specifically.
```

MCCANN & MCCANN REPORTING

```
 1              THE WITNESS:  The writing?  That's my writing.
 2              MR. QUINN:  What writing?
 3              THE WITNESS:  Here (indicating.)  This is
 4         printing, this is writing (indicating.)
 5
 6      BY MR. FELLE:
 7      Q. Bottom, left-hand corner of the first page you're
 8         referring?
 9      A. Correct.
10      Q. As we turn to the second page of the document after
11         you're done with the print, there appears to be a
12         paragraph with a star next to it.  Whose writing is
13         that?
14      A. That's my writing.
15      Q. Is there any writing that's on that two-page document
16         that's not your writing?
17      A. No.
18      Q. The stars that were written on there, is that in your
19         writing?
20      A. Yes.
21      Q. Okay.  These notes, did you start to prepare these
22         during your one-on-one interview with Mr. Ortiz before
23         Police Officer Torres came?
```

MCCANN & MCCANN REPORTING

```
 1              MR. QUINN:  Object to the form.

 2              THE WITNESS:  No, I believe they were done a

 3         little bit -- while I was sitting with him and also

 4         when Police Officer Torres came.

 5

 6    BY MR. FELLE:

 7    Q.  It might have started before Police Officer Torres

 8         came?

 9    A.  Might have been.

10    Q.  The information that appears in this Statement, there

11         appears to be different information pertaining to how

12         the crime was committed?

13              MR. QUINN:  Object to the form.  What Statement

14         are you referring to?

15              MR. FELLE:  Exhibit 13, the notes that you have

16         and some of the information pertains to the crime;

17         correct?

18              MR. QUINN:  Object to the form.

19              THE WITNESS:  I can answer?

20              MR. QUINN:  Yes.

21              THE WITNESS:  Yes.

22

23    BY MR. FELLE:
```

A-451

213

```
1    Q.  And it also pertains to how the victims were found at

2         the scene of the crime; correct?

3    A.  Yes.

4    Q.  And for example, you have here written, "a cell phone

5         was in hand"?

6    A.  Correct.

7    Q.  "A pistol in the other"?

8    A.  Correct.

9    Q.  Flaco had the pistol in hand?

10   A.  Correct.

11   Q.  You also have notes here pertaining to "Udah"?

12   A.  Udah.

13   Q.  What does that mean?

14   A.  Udah is a nickname.

15   Q.  Does that refer to a suspect in that investigation?

16            MR. QUINN:  Object to the form.

17            THE WITNESS:  Yes.

18

19   BY MR. FELLE:

20   Q.  And how were you aware, at the time that you

21        questioned Mr. Ortiz, that Udah was a suspect in that

22        crime?

23   A.  Prior to him coming into the office, there was one
```

MCCANN & MCCANN REPORTING

1      anonymous phone call that indicated Udah and there was

2      another name.  It was Udah and --

3          MR. QUINN:  If I could direct your attention to

4      your notes again.

5          THE WITNESS:  If I can look at the notes.  I

6      think both names are there.  Udah and somebody else.

7      I can't -- I know that Udah was mentioned in the

8      anonymous phone call.  I had previous knowledge of

9      Udah and he mentioned Udah to me and that's why it's

10     there on the paperwork.

11         MR. QUINN:  Josue Ortiz being the "he"?

12         THE WITNESS:  Yes.  Josue Ortiz tells me that

13     Udah was there, so I placed his name down in my notes.

14         MR. FELLE:  Referring your attention to Exhibit

15     6, Bates 1170, is this the P73 that you're referring

16     to; the anonymous tip?

17         MR. QUINN:  Object to the form.  I think that

18     was two questions in that question.

19         THE WITNESS:  No.  The -- I did not see this

20     particular P73, but Udah was one of the names and

21     Cheko was another one of the names and I think that

22     all came through one of the detectives.

23         Upon getting relieved, where you walk in the

```
 1        squad room and they say, "We got an anonymous call and

 2        the two guys that might be perpetrators are Udah and

 3        Cheko."

 4

 5   BY MR. FELLE:

 6   Q.   Okay.  Who is Udah referring to; do you know the full

 7        name?

 8   A.   One of the participants in the homicide.

 9   Q.   Other than a verbal Statement between shifts, was

10        there anything in the homicide file that you saw that

11        referred to other suspects including Udah?

12             MR. QUINN:  Object to the form.

13             THE WITNESS:  No.

14

15   BY MR. FELLE:

16   Q.   What time did you come on to duty that day on the

17        16th?

18   A.   I think at that time, we were assigned to -- I think

19        we were working ten-hour days.  They would change our

20        shifts.  I think it was like four o'clock in the

21        afternoon for ten hours or six o'clock to two.  I'm

22        really sorry to say I don't remember.  I think we had

23        gone into a ten-hour rotation.
```

1    Q.  Did you have a group meeting with respect to shift

2        changes?

3    A.  No.

4    Q.  So any verbal conversation about an investigation

5        would be kind of a one-on-one discussion?

6        MR. QUINN:  Object to the form.

7        THE WITNESS:  Sometimes, yes, or a note would be

8        left on your desk; a new Statement has been taken on

9        your case and it's in the file and then we would go

10       and read that particular Statement.

11       MR. FELLE:  And is it your recollection that

12       before speaking to Mr. Ortiz, that you had one of

13       these verbal discussions with another detective about

14       suspects in the Camacho murders?

15       MR. QUINN:  Object to the form.

16       THE WITNESS:  Yes.  I had two nicknames, that's

17       all.

18       MR. FELLE:  But you didn't get those from

19       writing, you got them from a verbal conversation;

20       correct?

21       MR. QUINN:  Object to the form.

22       THE WITNESS:  Yes.

23       MR. FELLE:  And before meeting with Mr. Ortiz at

1      approximately seven-fifteen on the 16th, you had no

2      involvement in that criminal investigation up to that

3      point; correct?

4              MR. QUINN:  Object to the form.  You can answer.

5              THE WITNESS:  That's correct.

6

7      BY MR. FELLE:

8      Q.  Who was the lead of that investigation?

9      A.  I believe it would be Sergeant Lonergan.  I believe it

10         was his crime scene.  I'm not sure.  I don't know who

11         came in on the call.  There was a call-in, I believe.

12     Q.  And would it be fair to say that on November 16th,

13         2004, you were the lead on other investigations

14         ongoing?

15     A.  Yes.

16     Q.  Okay.  During the time frame that you had Mr. Ortiz in

17         the Major Crimes Unit and the time frame with which

18         you took the notes contained in Exhibit 13, and before

19         Mr. Ortiz was read his Miranda Rights to which he

20         signed at about eight-twenty-five p.m. that evening,

21         at any time did you take a break to confirm any of the

22         details that were elicited from Mr. Ortiz during your

23         discussion?

```
 1              MR. QUINN:  Object to the form.

 2              THE WITNESS:  I would say, no.

 3

 4    BY MR. FELLE:

 5    Q.  At any time did you do a criminal background on

 6         Mr. Ortiz?

 7    A.  I've answered that before.  No, I did not.

 8    Q.  Did you do a gun check on Mr. Ortiz?

 9    A.  A gunshot residue test?

10    Q.  No.  Did you do a check to see if he was a registered

11         gun owner?

12    A.  No.  I would not do that, no.

13    Q.  Did you ask him if he had served in the military?

14    A.  No, I did not.

15    Q.  And we looked at -- prior to the identification

16         information that Mr. Ortiz provided you when he came

17         in as part of Exhibit 2, you had a copy of his Social

18         Security card; correct?

19              MR. QUINN:  At what point?  Object to the form.

20              MR. FELLE:  At the time he was interviewed.

21              THE WITNESS:  Actually, I didn't see that.  That

22         was taken by the Evidence Collection Unit and became

23         part of the file.  I never saw his Benefits Card or
```

```
 1          his Social Security.  That's the first time I'm seeing

 2          it.

 3

 4     BY MR. FELLE:

 5     Q.   Would you have taken that from Mr. Ortiz when you

 6          initially talked with him?

 7     A.   No, I did not.

 8     Q.   When you arrested him, would you have taken his

 9          personal artifacts from his person?

10               MR. QUINN:  Object to the form.

11               THE WITNESS:  His property would have been

12          turned in at Central Booking, but those two items I

13          have no knowledge about.  But you can clearly see that

14          it's taken, I believe, by the Evidence Control Unit as

15          evidence and there should be initials on it and

16          different writing.

17               MR. FELLE:  And so -- just so I understand your

18          procedures; after taking the notes that we see in

19          Exhibit 13, you then took that information and put it

20          into question form on the written purported confession

21          of Mr. Ortiz; correct?

22               MR. QUINN:  Object to the form.

23               THE WITNESS:  It's part of it, yes.
```

```
 1              MR. FELLE:  So the information from your notes

 2         was then utilized in the typewritten version of the

 3         confession that you questioned Mr. Ortiz with;

 4         correct?

 5              MR. QUINN:  Object to the form.

 6              THE WITNESS:  Yes.

 7

 8    BY MR. FELLE:

 9    Q.  And the typewritten version of the purported

10         confession is Exhibit 14 and that is a three-page

11         document, eight and a half by fourteen; correct?

12    A.  Yes, sir.

13    Q.  And on each of those pages, is the document initialled

14         and then on the last page is it signed by Mr. Ortiz?

15    A.  It is.

16    Q.  And so the record is clear; that document was prepared

17         by you; correct?

18    A.  I'm the author, yes.

19    Q.  And during the course of questioning Mr. Ortiz, did

20         you ever have to go back and change any of the

21         questions and answers in this document?

22    A.  No.

23              MR. QUINN:  Object to the form.
```

```
1              MR. FELLE:  Is this the first and only version
2         of the purported confession of Mr. Ortiz?
3              MR. QUINN:  Object to the form.
4              THE WITNESS:  That is the only one.
5              MR. FELLE:  Did you question Mr. Ortiz about
6         some of the discrepancies in this Statement?
7              MR. QUINN:  Object to the form.  You're asking
8         him to assume something or --
9              MR. FELLE:  No.  Did you recognize any
10        discrepancies in the Statement that Mr. Ortiz was
11        giving?
12             MR. QUINN:  Object to the form.
13             THE WITNESS:  Not at that point, no.
14
15   BY MR. FELLE:
16   Q.  He stated that you -- that the kind of gun -- excuse
17        me.  The question you asked, "What kind of gun did you
18        bring with you?"  And the answer that you've recorded
19        here is, "A shotgun.", period.
20             Do you remember that?
21   A.  Yes.
22   Q.  And then later in the Statement on the second page
23        towards the bottom you asked him, "Did you have an
```

```
 1        AK-47?"  His answer is, "Yes, I did."?

 2    A.  Correct.

 3    Q.  All right.  No inconsistencies in that?

 4            MR. QUINN:  Object to the form.

 5            THE WITNESS:  He could have brought two weapons

 6        to the home invasions.

 7            MR. FELLE:  So, let's talk about that for a

 8        moment.  Before you questioned Mr. Ortiz, did you

 9        review any of the seven Witness Statements that

10        identify perpetrators either going to the house or

11        coming from the house, right around the time that

12        shots were fired?

13            MR. QUINN:  Object to the form.

14            THE WITNESS:  No, I did not.

15

16    BY MR. FELLE:

17    Q.  Were you aware of any of the witnesses prior to

18        questioning Mr. Ortiz?

19    A.  I had no interaction with the other witnesses, no.

20    Q.  How about with respect to P73s that identified people

21        that saw the perpetrators of the crime either running

22        to the house or running from the house?

23            MR. QUINN:  Object to the form.
```

MCCANN & MCCANN REPORTING

```
 1    BY MR. FELLE:
 2    Q.  Do you recall seeing those before you questioned
 3         Mr. Ortiz?
 4    A.  No.
 5    Q.  Would the descriptions of witnesses of the
 6         perpetrators of a crime be relevant to your interview
 7         of a suspect to that same crime?
 8              MR. QUINN:  Object to the form.
 9              THE WITNESS:  Yes, it would.
10              MR. FELLE:  Why?
11              MR. QUINN:  Don't answer that.  He's not here to
12         talk about -- make legal determinations as to
13         relevancy which you are going to argue have some other
14         meaning than what he may be testifying to.  He's here
15         so that you can ask about fact observations.
16              MR. FELLE:  You are objecting to the form?
17              MR. QUINN:  Yes.
18              MR. FELLE:  You can answer the question.
19              MR. QUINN:  He's not going to answer the
20         question.
21              MR. FELLE:  He's a detective who made a legal
22         decision to place my client under arrest for a murder.
23         You're telling me the way he made that decision is
```

1    irrelevant?

2         MR. QUINN:  That's what I'm saying.  I'm saying

3    your question is inappropriate.  You're asking

4    questions about relevance; things that you are going

5    to argue have some other meaning for the future.  This

6    is what palpably improper is.  You're trying to trick

7    or confuse or mischaracterize things.

8         MR. FELLE:  My question is "why".  That was my

9    question.  I'm trying to confuse him with a question

10   of why?  That is absurd.

11        My question to you is; that the identification

12   information of witnesses that saw perpetrators coming

13   to or leaving the scene of a crime, that would be

14   germane and relevant to your investigation into that

15   crime; correct?

16        MR. QUINN:  Object to the form.

17        THE WITNESS:  It is correct.

18        MR. FELLE:  Correct.  And my question to you is,

19   why?  Why is it important -- that information is

20   important in solving a crime?

21        MR. QUINN:  Object to the form.

22        THE WITNESS:  It helps us with the solving of a

23   homicide.

1          MR. FELLE:  And when you have multiple witnesses

2     of the perpetrators of a crime, would you agree with

3     me that that might be more reliable then a sole or

4     single witness of perpetrators of a crime?

5          MR. QUINN:  Are you speaking in general or some

6     hypothetical?

7          MR. FELLE:  He's a detective for over thirty

8     years.  He can answer the question.

9          MR. QUINN:  Again, this is speaking in general

10    terms or some hypothetical?

11         MR. FELLE:  No.  Hypothetically speaking, when

12    you have multiple witnesses to the commission of a

13    crime, is that more reliable than a single witness to

14    a crime?

15         MR. QUINN:  Object to the form.

16         THE WITNESS:  Sometimes there are inaccurate

17    witnesses and sometimes they're very important.  It

18    does become one of the aspects of the case.

19

20      (Whereupon the reporter marked Exhibit 15, a

21      Homicide Shooting Investigation, for

22      identification.)

23

BY MR. FELLE:

1

2    Q.  Detective, I'm going to show you what's been marked

3        Exhibit 15.  It's a P73 prepared by Detective Richard

4        Wagstaff and it's dated 11/11/04; the date of the

5        commission of this crime that we're discussing.

6    A.  Okay.

7    Q.  And it's a two-page document and on the bottom of the

8        first page I've highlighted the names of two

9        individuals that are purported witnesses; do you see

10       that?

11   A.  Yes, I do.

12           MR. QUINN:  You're asking if he sees two

13       highlighted names?  He hasn't had an opportunity to

14       review the document in any way.

15

16   BY MR. FELLE:

17   Q.  Right.  Do you see that?

18   A.  I do.

19   Q.  Just for the record, I'm not trying to trick or

20       confuse the detective at all.  My question is just

21       what it is; do you see that?

22   A.  Yes, I do.

23   Q.  All right.  So at the time that you interviewed

1          Mr. Ortiz, do you recall seeing that document?

2     A.   No.

3     Q.   No.   Does the document P73, Exhibit 15, does it

4          describe two witnesses that were interviewed; the

5          first by the name of Steven Acevedo; A-C-E-V-E-D-O and

6          the second one Carmelo Mercado; M-E-R-C-A-D-O?

7               MR. QUINN:   You're asking him to read the

8          document into the record?

9

10    BY MR. FELLE:

11    Q.   Does that P73, does it contain an interview Statement

12         of the two individuals?

13    A.   It does.

14    Q.   Do they purport to be witnesses of the perpetrators of

15         the crime somewhat?

16    A.   It does.

17    Q.   Your testimony is that you did not see this document

18         before questioning my client?

19    A.   That's correct.

20    Q.   The second witness on the P73, Exhibit 15, he

21         describes three individuals who are the suspects, of

22         average height of five, five to six feet; medium

23         build, correct?

A-466

228

```
1                MR. QUINN:  You're asking him to read the

2        document?

3                MR. FELLE:  The last paragraph of the document,

4        last sentence.

5                THE WITNESS:  Yes.

6                MR. FELLE:  And we can agree that is not a

7        description of Mr. Ortiz; correct?

8                MR. QUINN:  Object to the form.  Leading.  He

9        has no idea of what that description is.  He's never

10       seen that document.  He doesn't know what that person

11       stated.

12

13   BY MR. FELLE:

14   Q.  Detective, Mr. Ortiz, when you arrested him, was over

15       six, six and two hundred eighty pounds; correct?

16   A.  He was six, six, yes.

17   Q.  Do you recall putting on his Arrest Report "two

18       hundred eighty pounds"?

19   A.  I don't recall that, no.

20

21           (Whereupon the reporter marked Exhibit 16, an

22           Arresting/Booking Report, for identification.)

23
```

MCCANN & MCCANN REPORTING

```
 1      BY MR. FELLE:

 2      Q.  Detective, showing you what's been marked Exhibit 16

 3          entitled the Arresting/Booking Report, can you look at

 4          the third section, Booking Information -- strike that.

 5          The first section, Personal Information and tell me;

 6          does that report the height and weight of Mr. Ortiz?

 7      A.  It does.

 8      Q.  And what does it purport for the weight?

 9      A.  It says two eighty; six foot, three.

10      Q.  Six foot three.  Why does it report six foot, three?

11              MR. QUINN:  Object to the form.

12              THE WITNESS:  I can answer that question and

13          help everybody out here.

14

15      BY MR. FELLE:

16      Q.  Sure.

17      A.  This is prepared by Marion Blady; B-L-A-D-Y.  She's a

18          report technician and she asks Mr. Ortiz, "How tall

19          are you?"  She then places it on the form.  "How much

20          do you weigh?"

21              This is information that Mr. Ortiz gave to the

22          report technician and I did not prepare this report

23          and I've never seen this report.
```

1    Q.  Okay.  But the height of six, three is incorrect?

2    A.  Absolutely.

3              MR. QUINN:  Object to the form.

4

5    BY MR. FELLE:

6    Q.  And more specifically when we look at Exhibit 2, we

7        see a picture of Mr. Ortiz next to a measurement;

8        right?  We know he's over six foot, six inches;

9        correct?

10   A.  I don't think he's over.  I think he's six foot, five;

11       six foot, six.  He's a tall guy.

12   Q.  In any event, he's not under six foot?

13   A.  That's correct.

14             MR. QUINN:  Object to the form.

15             MR. FELLE:  All right.  And -- strike that.

16       During -- actually, can we mark this first, please.

17

18             (Whereupon the reporter marked Exhibit 17, a

19             Statement of Carlos Osario, for identification.)

20

21   BY MR. FELLE:

22   Q.  Showing you what's been marked as Exhibit 17, and this

23       is a P73 from Detective Michael Root pertaining to a

```
1        witness, Carlos Osario; O-S-A-R-I-O.  Are you familiar

2        with that name at all?

3   A.   No, I'm not.

4   Q.   And on November 13th, 2004, the P73 and also an

5        attached Sworn Statement of Mr. Carlos Osario -- just

6        take a look at that for a moment.

7   A.   Sure.

8            MR. QUINN:  You want him to look through the

9        whole Statement in the P73?

10

11  BY MR. FELLE:

12  Q.   Just in general.  You can start with the caption, I

13       suppose.  I'm not asking him about the content of it

14       yet.

15  A.   Yes, sir.

16  Q.   In a general sense does Exhibit 17, between the P73

17       and the typewritten statement of Mr. Osario, does it

18       indicate that he was a witness of the suspects or

19       perpetrators of the crime as they were approaching the

20       victims?

21           MR. QUINN:  Object to the form.

22           THE WITNESS:  Yes.

23
```

A-470

232

```
 1    BY MR. FELLE:

 2    Q.  And does he identify three individuals as the people

 3         that he witnessed going into the house at the time

 4         that the murders were committed?

 5    A.  He does not.  He gives some limited information, but

 6         he doesn't identify them fully.

 7    Q.  But he identifies three males; correct?

 8    A.  Yes, three males.

 9    Q.  He says, through a three-page, typewritten Statement

10         attached to Exhibit 17, gives details to what he saw

11         with respect to the three perpetrators?

12    A.  Yes.

13              MR. QUINN:  Object to the form.  The document

14         speaks for itself.  Are you asking him to read it?

15              MR. FELLE:  Asking in a general sense, it gives

16         details about the three perpetrators; correct?

17              MR. QUINN:  Object to the form.  The document

18         speaks for itself; correct?

19              THE WITNESS:  It does.

20

21    BY MR. FELLE:

22    Q.  Prior to interviewing Mr. Ortiz, did you see these

23         documents?
```

A-471

233

```
1     A.  I saw the Sworn Statement, but I never saw the P73.

2     Q.  Okay.  So at the time that you questioned Mr. Ortiz,

3         were you aware that Mr. Osario was a witness to the

4         perpetrators of the crimes?

5     A.  I believe he was, yes.

6     Q.  And he expressed some information about the identities

7         of those perpetrators?

8             MR. QUINN:  Object to the form.

9             THE WITNESS:  He didn't know the identities, but

10        he was a witness.

11            MR. FELLE:  He had some identifying information

12        about them; correct?

13            MR. QUINN:  Object to the form.

14            THE WITNESS:  Some, yes.

15            MR. FELLE:  Okay.  And I think we established

16        earlier the witness descriptions of perpetrators is

17        important during the investigation of a crime;

18        correct?

19            MR. QUINN:  Object to the form.

20            THE WITNESS:  It is.

21            MR. FELLE:  And do you recall any further

22        interaction between Mr. Osario and the Major Crimes

23        Unit around -- surrounding the murders of the Camacho
```

MCCANN & MCCANN REPORTING

A-472

234

```
 1        Brothers on November 11 of 2004?

 2              MR. QUINN:  Object to the form.  If you know.

 3              THE WITNESS:  Just the Statement; the Sworn

 4        Statement that I've seen here today.

 5              MR. FELLE:  You're not aware of any other

 6        involvement that he had in the investigation; correct?

 7              MR. QUINN:  Object to the form.

 8              THE WITNESS:  No.

 9

10    BY MR. FELLE:

11    Q. During the evening of November 16th, 2004, while you

12        were interviewing and questioning Mr. Ortiz, are you

13        aware that Mr. Osario was also in the Major Crimes

14        Unit to be re-interviewed?

15    A. No.

16    Q. I'm going to show you what's been marked as Exhibit 6

17        and it's Bates 1186.  It's a P73 prepared by Detective

18        Patrick Judge and James Lema and it states that "on

19        11/16/04 at approximately two hundred hours" -- what

20        time would that be?

21    A. Two o'clock in the morning.

22    Q. "20:00"?

23    A. Eight o'clock at night.
```

MCCANN & MCCANN REPORTING

1    Q.  That's when you would have been meeting with

2        Mr. Ortiz?

3    A.  Correct.

4    Q.  Let me have you review that and then I want to ask you

5        questions about whether you were aware that that was

6        going on.

7            MR. QUINN:  Bates 1186.

8            MR. FELLE:  I put the number on the record.

9            THE WITNESS:  Okay.

10

11   BY MR. FELLE:

12   Q.  This is the first time that you've seen this document?

13   A.  Absolutely.

14   Q.  This document states that Mr. Osario, of which you

15       were aware of as being a witness to see the

16       perpetrators leave the scene of the crime, that he had

17       to come back to the Major Crimes Unit because he had

18       additional information about the identity of those

19       three suspects?

20           MR. QUINN:  Is that what you're asking him or is

21       that what it says?

22           MR. FELLE:  It speaks for itself.  It's been

23       marked and identified.  The striking thing is that the

```
1    A.  That's his Statement, yes.

2    Q.  So if you have Mr. Osario in the Major Crimes Unit at

3        the same time that you're interviewing Mr. Ortiz and

4        taking a purported confession from him, was there ever

5        a time that you became aware that Mr. Osario was there

6        so that you could corroborate his Statement and

7        identification of the suspects with Mr. Ortiz's and

8        the facts that he was giving you?

9            MR. QUINN:  Object to the form.  There's a lot

10       there.  The question is whether or not he was aware

11       that Mr. Osario purports, according to the Statement,

12       he was there at eight o'clock.  That's the only

13       question.

14           MR. FELLE:  Well, the Statement being -- yeah.

15       The Exhibit 6 P73 written by another detective, yes.

16           THE WITNESS:  I was not aware of this.  Sorry.

17

18   BY MR. FELLE:

19   Q.  Did you ever become aware of this?

20   A.  On that P73, no.

21   Q.  Does this P73 create doubt with respect to whether

22       Mr. Ortiz committed the crime --

23           MR. QUINN:  Don't answer that question.
```

MCCANN & MCCANN REPORTING

A-475

238

```
 1              MR. FELLE:  -- that you arrested him for?

 2              MR. QUINN:  Don't answer that question.  It's

 3      palpably improper.

 4              MR. FELLE:  You're kidding me?

 5              MR. QUINN:  I'm not.

 6              MR. FELLE:  I'm asking a detective that arrested

 7      a man whether or not the information provided to him

 8      by a witness, an eyewitness, which is different than

 9      the information that he -- in fact, he didn't have

10      this information at all.  If he had had it, would it

11      have created doubt?

12              That's not a fair question?

13              MR. QUINN:  That's a different question than the

14      one you just asked.

15              MR. FELLE:  Rob, be fair.  The guy was in jail

16      for ten years for a crime he didn't commit.  I'm

17      trying to find out why.  We know that's the case,

18      let's find out why.

19              Why are you obstructing me?  I'm asking him a

20      simple question.

21              MR. QUINN:  It's not a proper question.  I'm not

22      obstructing you.  You can change it any way you like.

23              MR. FELLE:  Had you had this Statement at the
```

A-476

239

```
 1          time you were interviewing Mr. Ortiz, would it have

 2          changed your opinion to arrest him that night?

 3               MR. QUINN:  Object to the form.

 4               MR. FELLE:  I'm going to mark that question.

 5          We're definitely going to see a Judge on that.  You

 6          will be back, unfortunately.  Are you instructing your

 7          client not to answer?

 8               MR. QUINN:  Yes.

 9

10    BY MR. FELLE:

11    Q.  All right.  Please mark that.

12               At any time during the evening of November 16th

13          of 2004, did you ever have any discussions with

14          Detective Patrick Judge?

15    A.  Yes.

16    Q.  Okay.  When and what was the substance of that

17          discussion?

18    A.  That we were arresting Josue Ortiz.

19    Q.  When you say "we", who are you referring to?

20    A.  Myself and Detective Lonergan.

21    Q.  And what did he say in response to that?

22    A.  Nothing.

23    Q.  Is it your testimony that he never told you that
```

MCCANN & MCCANN REPORTING

A-477

240

```
 1        Mr. Osario was in the Major Crimes Unit that evening?

 2   A.  No.

 3   Q.  Approximately what time did that conversation take

 4        place?

 5   A.  When he was being booked, after the whole procedure

 6        was done.  I informed him that we were arresting Josue

 7        Ortiz for the murder of the Camacho Brothers.

 8   Q.  And that would have been after eleven p.m.?

 9            MR. QUINN:  Object to the form.

10            THE WITNESS:  Much later.

11            MR. FELLE:  Much later.  Certainly after eight

12        p.m. when Detective Judge was interviewing Mr. Osario;

13        correct?

14            MR. QUINN:  Object to the form.

15            THE WITNESS:  Correct.

16

17   BY MR. FELLE:

18   Q.  Yet it was your testimony that he didn't tell you

19        anything about that interview with Mr. Osario;

20        correct?

21   A.  That is correct.  You would have to ask Detective

22        Judge.  I don't recall that at all.

23   Q.  Okay.  Just so I'm clear; you created the Felony
```

MCCANN & MCCANN REPORTING

A-478

241

```
 1        Complaint against Mr. Ortiz, correct?

 2             MR. QUINN:  Object to the form.

 3             THE WITNESS:  I believe so, yes.  I believe I

 4        signed it.

 5

 6   BY MR. FELLE:

 7   Q. And ultimately you made the decision to arrest him for

 8        the murder; correct?

 9   A. No, I did not.

10   Q. Ultimately whose decision was it?

11             MR. QUINN:  Object to the form.  You asking from

12        the District Attorney's Office or anybody?

13             MR. FELLE:  For making an arrest.  It's a Police

14        Officer decision.  I asked him who made it.  They

15        arrested him that night.

16             THE WITNESS:  We obtained permission from the

17        District Attorney's Office after they reviewed the

18        file or what was in the file at that time to arrest

19        and charge Josue Ortiz.

20             MR. FELLE:  When you say "the file", are you

21        referring to the homicide file?

22             MR. QUINN:  Object to the form.

23             THE WITNESS:  In the Statement, the Sworn
```

1        Statement, and the existing exhibits that were in the

2        homicide squad file at that time.

3            MR. FELLE:  And so you've testified today that

4        there were a number of documents that you were not

5        aware of at the time that you questioned Mr. Ortiz;

6        correct?

7            MR. QUINN:  Object to the form.  You can answer.

8            THE WITNESS:  That's correct.

9            MR. FELLE:  Would it be a fair statement then

10       that the DA's Office was also not made aware of those

11       documents?

12           MR. QUINN:  He can't testify what the DA was

13       aware of and not aware of.

14           MR. FELLE:  He presented the case to the DA, he

15       can answer.

16           THE WITNESS:  You have to ask the DA's Office

17       what was presented to them that night.

18           MR. FELLE:  Who was in charge of presenting it

19       to the DA's Office?

20           MR. QUINN:  Object to the form.  You can answer.

21           THE WITNESS:  I don't know.  I do know one of

22       the Bureau Chiefs from the District Attorney, whether

23       it would be one of the three, and I can't -- it would

A-480

243

```
 1        either be Frank Sedita, Ken Case -- Judge Sedita,

 2        Judge Case or else Joseph Maruzak, but they would have

 3        looked at the Sworn Statement and they would have

 4        looked at what information we had at that time and

 5        then they would have said "charge him" and would have

 6        given us the charges to place against him.

 7

 8   BY MR. FELLE:

 9   Q.   So my question to you was; who would have presented

10        that evidence to the Chief of the Homicide Bureau that

11        time?

12   A.   I believe it would be me and Detective Sergeant

13        Lonergan.

14   Q.   Okay.  It wouldn't be anybody else other than the two

15        of you?

16             MR. QUINN:  Object to the form.  If you know.

17             THE WITNESS:  It would have to be one of us; one

18        of us two.

19             MR. FELLE:  Okay.  And as you testify today, do

20        you know if that was you?

21             MR. QUINN:  Object to the form.

22             THE WITNESS:  No, I don't.  I'm sorry.

23
```

A-481

244

```
 1   BY MR. FELLE:

 2   Q.  And do you know specifically which of those Homicide

 3       Bureau Chiefs this case was discussed with?

 4   A.  Well, it would be, the day of the arrest, the Bureau

 5       Chief that's assigned to that would be noted in the

 6       District Attorney's file, but I don't know who it was.

 7   Q.  Is that all verbal; that -- the obtaining of

 8       authorization from the DA's Office to arrest somebody

 9       as you testified to?  Is that a verbal process?

10           MR. QUINN:  Object to the form.

11           THE WITNESS:  Yes.

12           MR. FELLE:  Do you scan and E-mail documents to

13       them?

14           MR. QUINN:  Object to the form.  At any point?

15

16   BY MR. FELLE:

17   Q.  Back then on that night, did you scan and E-mail

18       documents?

19   A.  No.

20   Q.  Did you fax them documents?

21   A.  No.

22   Q.  So the authority given by the DA's Office would have

23       been premised on the information that you verbally
```

MCCANN & MCCANN REPORTING

```
 1        gave them about the Statement of Mr. Ortiz and the

 2        investigation of the crime?

 3             MR. QUINN:  Object to the form.  I mean, you

 4        asked whether or not it was faxed, whether or not it

 5        was E-mailed.  He's already testified that they would

 6        have looked at these things.

 7

 8   BY MR. FELLE:

 9   Q.  Excluding the last question was to separate that it's

10        a verbal communication.

11   A.  He would be there.  He would give us the permission.

12   Q.  Would he physically come to the office?

13   A.  Absolutely.

14   Q.  And so is it your testimony that someone from the DA's

15        Office came to the Major Crimes Unit the evening of

16        November 16th, 2004 to review the documents

17        surrounding your request to arrest Mr. Ortiz?

18             MR. QUINN:  Object to the form.  It hasn't been

19        characterized as a request.  You can answer if you

20        know.

21             THE WITNESS:  I believe so.

22

23   BY MR. FELLE:
```

246

```
 1    Q.  Do you recall seeing that person?

 2    A.  I don't recall who it was.  I'm sorry.

 3    Q.  When they gave authorization to charge somebody, the

 4        District Attorney's Office, the Homicide Chief, did

 5        they sign anything?

 6    A.  No.

 7    Q.  Did they provide any written documentation of

 8        authority?

 9             MR. QUINN:  Object to the form.

10             THE WITNESS:  No.

11             MR. FELLE:  Is there anything to evidence that

12        that took place?

13             MR. QUINN:  You're saying that?

14             THE WITNESS:  It did take place; my testimony.

15             MR. FELLE:  Correct.  Anything to evidence that

16        in a written or evidentiary way?

17             THE WITNESS:  No.

18             MR. QUINN:  Object to the form.  You apparently

19        are saying that his testimony is not evidence; is that

20        your position?

21

22    BY MR. FELLE:

23    Q.  No.  First of all, he's telling me he didn't see a
```

```
 1        person there.  My question is now; did you know that
 2        it was authorized by the DA's Office if you didn't see
 3        the DA there?
 4     A. No.  The DA did appear there.  I've stated that
 5        several times just recently within the last minute or
 6        so.
 7     Q. It was one of three individuals?
 8     A. That is correct.  They thought that the Statement was
 9        sufficient enough for us to charge Mr. Ortiz.
10     Q. And just so that we're clear; you don't recall who the
11        Chief of the Homicide Bureau was at that time;
12        correct?
13     A. No, I'm sorry I don't.
14     Q. But whoever the Chief of the Homicide Bureau was at
15        that time is the person that would have come in to
16        authorize the arrest; correct?
17            MR. QUINN:  Object to the form.  You can answer.
18            THE WITNESS:  Correct.
19            MR. FELLE:  As a matter of Policies &
20        Procedures, is that something that a detective would
21        discuss with the Chief of the Homicide Bureau or would
22        it be the Detective Sergeant?
23            MR. QUINN:  Object to the form.
```

A-485

248

```
 1              THE WITNESS:  It could be either.

 2

 3    BY MR. FELLE:

 4    Q. Before going to the Homicide Bureau Chief for that

 5       authorization, would a detective need to discuss that

 6       with the Detective Sergeant?

 7    A. By your last question, I understand why you're getting

 8       confused.  You're talking about a Homicide Bureau

 9       Chief and I'm talking about the District Attorney

10       Homicide Bureau Chief.

11    Q. So am I.

12    A. You just misworded it in your last question.

13              MR. FELLE:  Let me rephrase it.

14              MR. QUINN:  He'll ask another question to clean

15       it up.

16              THE WITNESS:  Please.

17              MR. FELLE:  Before a case would be presented to

18       the District Attorney's Office Homicide Bureau Chief,

19       would a detective need to clear that and discuss it

20       with the Detective Sergeant?

21              MR. QUINN:  Object to the form.

22              THE WITNESS:  No.

23              MR. FELLE:  Would they have to clear it with
```

MCCANN & MCCANN REPORTING

A-486

249

1          anyone else in the Homicide and/or Major Crimes Unit?

2                    MR. QUINN:  Object to the form.

3                    THE WITNESS:  No.

4                    MR. FELLE:  Please mark this.

5

6          (Whereupon the reporter marked Exhibit 18, a

7          Recorded typed Statement of Jeilyn Mary Rosario

8          dated November 11th of 2004, for identification.)

9

10         (Whereupon a recess was taken.)

11                   MR. FELLE:  We're going back on the record.  We

12         took a short break.

13                   Detective, back on the record.  I was asking you

14         about information that you had available to you at the

15         time that you asked for permission to arrest

16         Mr. Ortiz.  Not necessarily you, but you and/or

17         Detective Lonergan; correct?

18                   MR. QUINN:  Object to the form.

19                   MR. FELLE:  At the time that that case was

20         presented to the DA Homicide Bureau Chief, what other

21         evidence did you have to link Mr. Ortiz to the crime

22         other than a Statement?

23                   MR. QUINN:  Object to the form.

MCCANN & MCCANN REPORTING

1              THE WITNESS:  His Statement.

2              MR. FELLE:  Did you have any other evidence that

3        would link Mr. Ortiz to the crime?

4              MR. QUINN:  Object to the form.

5              THE WITNESS:  None whatsoever.

6              MR. FELLE:  You were aware, at that time, the

7        time that you interviewed Mr. Ortiz, that there was

8        certain DNA evidence that was submitted for analysis?

9              MR. QUINN:  Object to the form.  Are you asking

10       him?

11             MR. FELLE:  I was asking him if he was aware

12       that a DNA analysis was --

13             MR. QUINN:  Stop.  That's a leading question.

14

15   BY MR. FELLE:

16   Q.  I was asking him if DNA matter was submitted for

17       analysis; that's a leading question?

18            Were you aware at the time?

19   A.  No, sir.

20   Q.  Subsequent to the interview and purported confession

21       of Mr. Ortiz, he agreed to allow your department to

22       search his apartment; correct?

23   A.  I'm not aware of it.  I'm sorry.

A-488

251

```
 1    Q.  Let me ask you this; did you become aware, at any

 2        time, that any other evidence came to light that

 3        corroborated the written Statement of Mr. Ortiz that

 4        was given to you about committing crimes?

 5            MR. QUINN:  Object to the form.

 6            THE WITNESS:  No, sir.

 7            MR. FELLE:  And of the various eyewitness

 8        reports that we see through P73s and typed Statements,

 9        none of them put the perpetrators of the crime over

10        six foot tall; do they?

11            MR. QUINN:  Object to the form.  Are you asking

12        for the documents he's referred to?  They speak for

13        themselves.  You can make your argument.

14            MR. FELLE:  Did any written Statements that you

15        reviewed before arresting Mr. Ortiz, did you see any

16        support that a witness identified the perpetrators of

17        the crime as over six foot tall?

18            MR. QUINN:  That's completely inappropriate.  I

19        don't understand.  Are you asking about the documents

20        we reviewed today?

21            MR. FELLE:  This is why we're going so long.

22            MR. QUINN:  I agree.  It's an inappropriate

23        question.
```

1          MR. FELLE:  It's not.  You're obstructing my

2     ability to conduct this deposition.  We're going to

3     have to call it and he's going to have to come back

4     again.  I'm sorry.

5          If you understand the question, your attorney

6     can object to the form of it so we can preserve it

7     later on, but you can answer it.

8          MR. QUINN:  Object to the form.  You can answer

9     it.

10          THE WITNESS:  It would be one of the aspects of

11     the case, yes.

12          MR. FELLE:  And were you aware of any Witness

13     Statement in the file, in the Homicide Unit File or

14     Evidence File, that suggested that any of the

15     perpetrators of the crime were over six foot?

16          MR. QUINN:  Object to the form.  He's already

17     testified.

18          MR. FELLE:  He said it was a consideration.  I'm

19     asking; did he see anything?

20          MR. QUINN:  You're asking him to prove a

21     negative.  It's a trick question.

22          MR. FELLE:  No.  He made a determination to

23     arrest somebody.  I'm allowed to ask him what the

A-490

253

```
 1        Witness Statements were; what he reviewed.

 2            You can protect your rights later.  You can

 3        answer the question.

 4            MR. QUINN:  Object to the form of the question.

 5        You can answer.

 6            THE WITNESS:  I was aware that two of the

 7        assailants were under six foot.

 8

 9   BY MR. FELLE:

10   Q.  Okay.  What did you know about the third assailant, if

11       anything, about his height?

12   A.  I had no information about the third person.

13   Q.  How did you have that information about two of the

14       assailants?

15   A.  From a Sworn Statement that was in the file that I

16       previously testified to and I previously just looked

17       at.

18   Q.  Who was that Sworn Statement by?

19   A.  You had it there just a few minutes ago.

20   Q.  Mr. Osario?

21   A.  I'm not sure, sir.  The Sworn Statement.

22   Q.  Under Exhibit 17 you're looking at in the Osario

23       Statement?
```