# 23-352

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

JOSUE ORTIZ,

*Plaintiff-Appellee,*

—against—

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA,
BUFFALO POLICE DEPARTMENT DOES 1-12, BUFFALO POLICE
DEPARTMENT, THE CITY OF BUFFALO, MARK VAUGHN,

*Defendants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE JOSUE ORTIZ

WAYNE C. FELLE
THE LAW OFFICE OF
 WAYNE C. FELLE, P.C.
5839 Main Street
Williamsville, New York 14221
(716) 505-2700

TIMOTHY W. HOOVER
SPENCER L. DURLAND
SAMUEL L. YELLEN
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600

*Attorneys for Plaintiff-Appellee Josue Ortiz*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION ...................................................................................... 1

COUNTER-STATEMENT OF THE ISSUES .................................................. 1

COUNTER-STATEMENT OF THE CASE ...................................................... 2

    A.    The Camacho murders. ............................................................. 2

    B.    Josue Ortiz is wrongfully convicted of the Camacho murders. ............................................................................... 4

    C.    A federal task force clears Ortiz of the Camacho murders and convicts the real killers. ....................................... 6

    D.    Ortiz brings a civil-rights action alleging that Detective Mark Stambach framed him for the Camacho murders. ................................................................ 7

    E.    After a five-day trial focused largely on Stambach's credibility, the jury finds for Ortiz. ......................................... 7

        1.    The stipulation. ................................................................ 7

        2.    Testimony of Dr. Evelyn Coggins. ................................... 9

        3.    Testimony of Detective Mark Lauber. ............................. 11

        4.    Testimony of Detective Mark Vaughn. ............................ 11

        5.    Testimony of Sergeant James Lonergan. ........................ 12

        6.    Testimony of Detective Mark Stambach. ........................ 15

        7.    Testimony of Officer Edwin Torres. ................................ 20

        8.    Testimony of Josue Ortiz. .............................................. 22

        9.    Testimony of Detective Mary Evans. ............................... 25

        10.    Verdict. .......................................................................... 26

F. The district court denies Stambach's post-verdict motions, finding ample evidence to support the jury's verdict. ............................................................ 26

SUMMARY OF ARGUMENT .................................................. 27

ARGUMENT .......................................................................... 30

I. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE MALICIOUS-PROSECUTION CLAIM. ............................... 31

    A. A reasonable juror could easily find that Stambach lacked probable cause to prosecute Ortiz and acted in bad faith. .................................................................. 34

        1. Ortiz presented compelling evidence that Stambach manufactured the only evidence against him. ...................................................... 34

            a. The jury could find that Ortiz was extremely vulnerable on November 16, and Stambach knew it. ................................................... 34

            b. The jury could find that Stambach planted nonpublic facts in Ortiz's signed confession. ...... 35

            c. The jury could find that Stambach reviewed the homicide file before interrogating Ortiz. ....... 37

            d. The jury could find Stambach guilty of affirmative, bad-faith misconduct. ..................... 37

        2. Stambach's contrary arguments misconstrue the law and ignore the trial evidence. ............................ 41

            a. Manipulating a schizophrenic interviewee into signing a false confession does not create probable cause. ................................................... 41

            b. Ortiz presented and substantiated his allegation of bad-faith misconduct. .................................... 42

    B. Stambach's qualified-immunity argument is waived and meritless. ............................................................ 46

II. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE FABRICATION CLAIM. ....................................................... 48

A. The same evidence supporting the malicious-prosecution claim also supports the fabrication claim. ................................................... 49

B. Stambach's contrary arguments again ignore the evidence. ............................................................ 51

C. Stambach cannot rely on the independent judgment of the prosecutor he misled with a fabricated confession. .......................................................... 52

III. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE COERCION CLAIM ............................................... 53

A. A reasonable juror could easily find that Stambach coerced Ortiz ...................................................... 53

1. Ortiz presented compelling evidence that Stambach exploited his vulnerabilities. ........................ 55

2. Stambach's contrary arguments yet again ignore the evidence. ............................................ 56

B. Stambach's qualified-immunity argument is waived and meritless. ......................................................... 56

IV. THE JURY PERMISSIBLY AWARDED COMPENSATORY AND PUNITIVE DAMAGES. ................................. 57

A. Ten years of wrongful imprisonment merits substantial compensation. ......................................... 57

B. Framing an innocent person for murder is despicable conduct warranting punitive damages. .................. 58

V. STAMBACH IS NOT ENTITLED TO A NEW TRIAL. ....................... 59

A. The district court permissibly concluded that the jury's verdict was neither seriously erroneous nor a miscarriage of justice. ................................................. 60

B. The district court upheld the jury's verdict on the same theory of liability that Ortiz advanced at trial. ............... 60

CONCLUSION ................................................................. 63

CERTIFICATE OF COMPLIANCE ........................................... 64

ADDENDUM ........................................................... ADD-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ali v. Kipp,*
891 F.3d 59 (2d Cir. 2018) ................................................................. 60, 61

*Aponte v. Perez,*
75 F.4th 49 (2d Cir. 2023) ........................................................................ 58

*Barnes v. City of New York,*
68 F.4th 123 (2d Cir. 2023) ......................................................... 31, 49, 52

*Blackburn v. Alabama,*
361 U.S. 199 (1960) .................................................................................. 54

*Blackmon v. Holder,*
No. 20-cv-524, 2022 WL 329256 (E.D.N.C. Feb. 3, 2022) ................ 51, 52

*Boyd v. City of New York,*
336 F.3d 72 (2d Cir. 2003) ............................................. 32, 41, 42, 43, 45

*Colorado v. Connelly,*
479 U.S. 157 (1986) .................................................................................. 54

*Deshawn E. by Charlotte E. v. Safir,*
156 F.3d 340 (2d Cir. 1998) ............................................................... 53, 54

*Dickerson v. United States,*
530 U.S. 428 (2000) .................................................................................. 53

*Dufort v. City of New York,*
874 F.3d 338 (2d Cir. 2017) ........................................... 32, 37, 41, 47

*Fikes v. Alabama,*
352 U.S. 191 (1957) .................................................................................. 54

*Gardner v. McArdle,*
461 F. App'x 64 (2d Cir. 2012) ................................................................ 54

*Garnett v. Undercover Officer C0039,*
838 F.3d 265 (2d Cir. 2016) ............................................................... 30, 50

*Green v. Scully,*
850 F.2d 894 (2d Cir. 1988) ..................................................................... 53

# **TABLE OF AUTHORITIES**

**Page(s)**

*Haywood v. Koehler*,
  78 F.3d 101 (2d Cir. 1996)............................................................... 60, 61

*Henry v. Poole*,
  409 F.3d 48 (2d Cir. 2005)...................................................................... 36

*Higazy v. Templeton*,
  505 F.3d 161 (2d Cir. 2007)............................................................. 47, 57

*Hughes v. Patrolmen's Benev. Ass'n*,
  850 F.2d 876 (2d Cir. 1988)................................................................... 59

*Ismail v. Cohen*,
  899 F.2d 183 (2d Cir. 1990)................................................................... 59

*Jennings v. Yurkiw*,
  18 F.4th 383 (2d Cir. 2021) .......................................................... 57, 58, 59

*Manganiello v. City of New York*,
  612 F.3d 149 (2d Cir. 2010)............................... 31, 32, 33, 39, 46, 47

*Morse v. Fusto*,
  804 F.3d 538 (2d Cir. 2015)............................................................. 30, 49

*Provost v. City of Newburgh*,
  262 F.3d 146 (2d Cir. 2001)................................................................... 46

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012)............................................................. 60, 61

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017)........................................................ 31, 57, 58

*Ricciuti v. N.Y.C. Transit Authority*,
  124 F.3d 123 (2d Cir. 1997)........................................................ 44, 46, 49

*Sedunova v. City of New York*,
  No. 13-cv-5262, 2015 WL 541408 (E.D.N.Y. Feb. 10, 2015) ................. 41

*Sedunova v. City of New York*,
  652 F. App'x 29 (2d Cir. 2016)............................................................... 49

*Sinclair v. Long Island Railroad*,
  985 F.2d 74 (2d Cir. 1993)..................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

*Spano v. New York,*
   360 U.S. 315 (1959) ........................................................................ 54, 55

*Thomsen v. City of New York,*
   No. 15-cv-2668, 2016 WL 590235 (S.D.N.Y. Feb. 11, 2016) ................. 41

*Townes v. City of New York,*
   176 F.3d 138 (2d Cir. 1999) ............................................................... 47, 48

*Tyler v. Bethlehem Steel Corp.,*
   958 F.2d 1176 (2d Cir. 1992) ..................................................................... 32

*United States v. Ebinger,*
   386 F.2d 557 (2d Cir. 1967) ........................................................................ 44

*United States v. MacPherson,*
   424 F.3d 183 (2d Cir. 2005) ........................................................................ 32

*United States v. Montalvo,*
   No. 11-cr-366 (W.D.N.Y.) ............................................................................ 3

*Washington v. Buraker,*
   322 F. Supp. 2d 702 (W.D. Va. 2004) ................................................ 49, 51

*Washington v. Wilmore,*
   407 F.3d 274 (4th Cir. 2005) ............................................................... 50, 51

*Weaver v. Brenner,*
   40 F.3d 527 (2d Cir. 1994) ......................................................................... 57

*Woods v. City of Reno,*
   No. 16-cv-494, 2020 WL 4194844 (D. Nev. July 21, 2020) ................... 54

*Zahrey v. Coffey,*
   221 F.3d 342 (2d Cir. 2000) ............................................................... 48, 49

**Statutes**

18 U.S.C. § 242 ................................................................................................ 59

42 U.S.C. § 1983 .................................................................... 1, 31, 48, 53

**Rules**

FED. R. CIV. P. 50 ..................................................................................... 26, 30

# TABLE OF AUTHORITIES

**Page(s)**

Fᴇᴅ. R. Cɪᴠ. P. 59 ............................................................................ 26

**Constitutional Provisions**

U.S. Cᴏɴsᴛ., amend. IV ................................................................... 31

U.S. Cᴏɴsᴛ., amend. V .................................................................... 53

## **INTRODUCTION**

Society entrusts police officers with enormous power. Most wield it honorably. Most, but not all.

On November 16, 2004, Detective Mark Stambach manufactured a false confession to frame Josue Ortiz, a helpless schizophrenic immigrant, for a brutal double murder. Crucially, for purposes of this appeal, though Ortiz had nothing to do with the crime and no knowledge of its particulars, his purported confession contained unique, nonpublic details that only a genuine perpetrator—or a detective familiar with the crime scene—could have known. Stambach's ruse was revealed a decade later, after a federal task force led by the U.S. Attorney's Office apprehended the real killers and exonerated Ortiz.

When Ortiz brought Stambach to trial on civil-rights claims, Stambach repeatedly and transparently perjured himself in a futile attempt to conceal his misconduct. The jurors who witnessed his lies firsthand, and sifted the copious evidence that Ortiz presented, found Stambach liable for malicious prosecution, fabrication of evidence, and coercion. To compensate Ortiz for the 10 years of wrongful imprisonment he endured, and to punish the reprehensible conduct that caused it, the jurors awarded $6.5 million in damages. Their verdict should stand.

## **COUNTER-STATEMENT OF THE ISSUES**

I. *Malicious prosecution.* After a five-day trial, the jury found Stambach liable under 42 U.S.C. § 1983 for malicious prosecution. The

district court denied Stambach's motion for judgment as a matter of law, finding ample basis for the jury's decision. Did the court err in upholding the jury's verdict?

II. *Fabrication*. The jury also found Stambach liable for fabrication of evidence, and the district court again declined to grant him judgment as a matter of law. Did the court err in upholding the jury's verdict?

III. *Coercion*. The jury also found Stambach liable for coercion, and the district court again declined to grant him judgment as a matter of law. Did the court err in upholding the jury's verdict?

IV. *Damages*. The jury awarded Ortiz $5 million in compensatory damages and $1.5 million in punitive damages. The district court found these awards proper and well within the permissible range. Was this decision an abuse of discretion?

V. *New trial*. The district court denied Stambach's motion for a new trial, finding no serious error or injustice in the jury's verdict. Was this decision an abuse of discretion?

## **COUNTER-STATEMENT OF THE CASE**

### **A.    The Camacho murders.**

The backdrop to this case is an armed robbery committed on November 11, 2004, by Misael Montalvo, Brandon Jonas, Efrain Hidalgo, and Frank Matias. Their target was an apartment occupied by two brothers,

Nelson "Lobo" Camacho and Miguel "Flaco" Camacho. (A.985, 1014-15.[1]) Montalvo orchestrated the heist. (A.1016-18.) Jonas, Hidalgo, and Matias carried it out. (A.1014-16.)

Jonas, Hidalgo, and Matias approached the Camachos' apartment around 9:30 pm. (A.985.) A television was on in the Camachos' living room. (A.986.) Hidalgo broke down the front door and Jonas rushed inside, where he immediately encountered Nelson Camacho and shot him through the back with an AK-47. (A.985, 1015.) As Nelson lay bleeding, Hidalgo removed a gold chain from his neck, then dropped it to the floor. (A.985, 1016.)

Miguel Camacho had been at the back of the apartment when the robbery began. (A.985.) Hearing shouts and gunshots, he telephoned his older brother for assistance. (A.986.) Then, pistol in one hand, cellphone still in the other, Miguel went to confront the intruders. (A.985, 988, 1016.) He tried to shoot Matias, but the gun did not fire. (A.1016, 1037.) Jonas sprang forward and sprayed Miguel with bullets, propelling him into a nearby wall. (A.985, 1016, 1037-38.)

---

[1] These background facts are drawn from the state-court decision granting Ortiz's motion under N.Y. Criminal Procedure Law § 440 and the proceedings in *United States v. Montalvo*, No. 11-cr-366 (W.D.N.Y.). The notation "*Montalvo* Dkt." refers to filings in the *Montalvo* prosecution. "Br." refers to Stambach's brief. "A." refers to Stambach's Appendix.

After ransacking the apartment and finding nothing of value, the blood-spattered trio escaped on foot and regrouped with Montalvo at the home of a mutual friend. (A.1015-17, 1033.)

Meanwhile, police had arrived at the scene and begun canvassing for witnesses. Eyewitness accounts identified the perpetrators as three slim males, none taller than 6'0". (A.986, 988, 991-93, 1009-10, 2491-92.)

## B. Josue Ortiz is wrongfully convicted of the Camacho murders.

Josue Ortiz, a native of Puerto Rico, stands 6'6" tall and weighs around 300 pounds. (A.1002, 2153, 2890.) He heard about the Camacho murders on the evening news. (A.2163.) Shortly thereafter, while visiting his cousin, Ortiz began to experience sensations "like [something] from another world." (A.2166.) His thoughts took a paranoid turn, voices spoke from inside his head, and visions appeared before his eyes. (*Id.*) Though he did not know it then, Ortiz was experiencing a psychotic break—a departure from reality—heralding the onset of the schizophrenia with which he would soon be diagnosed. (A.2079, 2094, 2110.) With each passing hour, he slid deeper into psychosis. (A.2125.)

Around 11:00 am on November 15, 2004, four days after the Camacho murders, Ortiz leapt into the back of a police car and said people were trying to kill him because they suspected him of the Camacho murders. (A.2901.) A detective called to the scene readily concluded that Ortiz had no credible information and summoned an ambulance to take

- 4 -

him for psychiatric treatment. (A.2513-20.) Three different detectives re-interviewed Ortiz at the hospital that evening, and they too concluded that he had no information about the Camacho murders and needed further treatment. (A.2200-08.)

Approximately 24 hours later, on the evening of November 16, 2004, Ortiz again flagged down a police officer, said he was in fear for his life, and offered information about the Camacho murders. (A.2263-64, 2311, 2335.) He was delivered to the Buffalo Police Department's Major Crimes Unit, where Detective Mark Stambach was waiting to question him. (A.2311, 2335.) Ortiz was placed in an empty office (not an interrogation room), and for the next 40 minutes Stambach questioned Ortiz alone, without summoning a Spanish-language translator or administering *Miranda* warnings. (A.2256-58, 2277-78, 2315-17, 2331-33, 2336.) Stambach emerged from this interrogation with what he claimed was a full confession to the Camacho murders. (A.2257-58, 2334-35.) Stambach then typed up a written confession, had Ortiz sign it, and charged him with two counts of second-degree murder. (A.2258-59, 2370-71, 2894-96.)

A search of Ortiz's apartment revealed no evidence linking him to the Camacho murders or to any other crime. (A.2217-18.) And none of the other evidence gathered in the Camacho investigation suggested that Ortiz had any role in the offense or any knowledge of its particulars. (A.2353-55, 2361, 2385, 2640.) Nevertheless, based solely on the

confession Stambach supposedly extracted, a grand jury indicted Ortiz for murder. (A.1998, 2019.)

Ortiz's defense attorneys told him that his detailed confession practically guaranteed a conviction at trial and a sentence of life imprisonment. (A.2172-75.) Far better, they said, to plead guilty to manslaughter in exchange for a 25-year sentence. (A.2173-75.) Ortiz resignedly took their advice. (A.2175.)

## C.  A federal task force clears Ortiz of the Camacho murders and convicts the real killers.

In September 2009, a federal task force began investigating gang activity on Buffalo's west side. (A.1484.) The leads it generated caused Detective Mary Evans to revisit the Camacho murders. (A.2476.) Over the next several years, Evans and her colleagues at the FBI, State Police, and U.S. Attorney's Office gathered evidence which uniformly inculpated Montalvo, Jonas, Hidalgo, and Matias, and uniformly exculpated Ortiz. (A.2019-20, 2473-78, 2491-2500.)

By November 8, 2012, Montalvo, Jonas, and Hidalgo were charged federally with the Camacho murders. (*Montalvo* Dkt. 68.) Matias— who was just 15 years old at the time of the homicides—received immunity in exchange for cooperation. (A.1014-15.) Jonas and Hidalgo ultimately pled guilty to the murders. (*Montalvo* Dkt. 239, 244.) Montalvo pled guilty to a drug-trafficking offense and, after a sentencing hearing, was found to have orchestrated the Camacho robbery. (*Montalvo* Dkt. 248 and Minute Entries for May 12-14, 2015, and December 1, 2020.)

Ortiz moved to vacate his conviction. (A.983.) The U.S. Attorney's Office, to its great credit, supported his application. (A.1045.) After a hearing, Hon. Thomas P. Franczyk found that Ortiz was actually innocent of the Camacho murders. (A.2020-21.) Ortiz was released from Attica Correctional Facility on December 9, 2014, more than 10 years after his prison term began. (A.2019, 2406.)

**D.    Ortiz brings a civil-rights action alleging that Detective Mark Stambach framed him for the Camacho murders.**

In April 2016, Ortiz brought an action alleging that he had been prosecuted and convicted on the basis of a manufactured confession. (A.4.) The district court granted summary judgment dismissing several of Ortiz's claims, but held that a reasonable jury could find Stambach liable for malicious prosecution, fabrication of evidence, and coercion. (A.1835.)

**E.    After a five-day trial focused largely on Stambach's credibility, the jury finds for Ortiz.**

**1.    The stipulation.**

The parties stipulated to, and the jury was instructed to accept, the following facts:

- "On November 16th, 2004, Josue Ortiz was interrogated by Mark Stambach, wherein Stambach, an investi[gating] official[,] claims Ortiz confessed to his involvement in the murders of the Camacho brothers."

- "On November 17th, 2004, Stambach initiated the prosecution of Ortiz by filing a felony complaint based solely on the alleged confession."

- "Stambach forwarded the alleged confession to the Erie County District Attorney's Office, knowing that the statement could be used in the prosecution of Ortiz."

- A grand jury "indicted Ortiz for the murders of the Camacho brothers [based on] the alleged confession taken by Stambach."

- "Ortiz was convicted of two counts of [m]anslaughter . . . after he pled guilty to those charges."

- "Ortiz was incarcerated and suffered a loss of his [l]iberty from November 17th, 2004 until December 9th, 2014[, a]s a result of the felony complaint filed by Stambach[, t]he alleged confession [that] was taken by Stambach[,] and his subsequent conviction."

- Law-enforcement agencies have "determined that Josue Ortiz was not involved in the [Camacho] murders."

- Three other individuals were charged and convicted in federal court "based on their admitted and corroborated involvement in the [Camacho] murders."

- A court has judged Ortiz "actually innocent of the [Camacho] murders."

(A.2018-21.)

### 2. Testimony of Dr. Evelyn Coggins.

Dr. Evelyn Coggins is a forensic psychiatrist who treated Ortiz following his arrest. (A.2060-61.) Dr. Coggins testified that she first saw Ortiz on November 19, 2004—three days after the supposed confession—while Ortiz was detained in the Erie County Holding Center. (A.2061, 2066.) She diagnosed him with schizophrenia. (A.2093-94.)

Schizophrenia, Dr. Coggins informed the jury, is characterized by "intense symptoms of delusions, which [are] fixed false beliefs[,] and confusion, disorganization[,] and hallucinations." (A.2094.) The illness first manifests itself with a psychotic break—"an acute break with reality" where "a person can't distinguish what is real from what's not, and may have paranoid fears that people are trying to hurt them or know things about them." (A.2094.) Onset in early adulthood, as in Ortiz's case, is common. (A.2080.)

When Dr. Coggins saw Ortiz on November 19, he was confused, fearful, and experiencing auditory hallucinations. (A.2068, 2077.) Ortiz's condition continued deteriorating to the point that he attempted suicide (A.2128) and then became "catatonic," a feature of "the most severe psychotic episodes" (A.2098-99). Ortiz's decompensation prompted an emergency psychiatric hospitalization at Erie County Medical Center ("ECMC") (A.2098), where he began receiving "a high dose of antipsychotic medication" (A.2113; *accord* A.2109).

By January 2005, when Dr. Coggins was asked to evaluate Ortiz's competency, she found that his condition had greatly improved (A.2107, 2113-18), and that he understood the charges against him (A.2111). Ortiz was also able to assert his innocence, and often did so when speaking to Dr. Coggins. (A.2111-12.)

Based on her examination of records from Ortiz's November 15 hospitalization, her own treatment of Ortiz beginning on November 19, and the typical trajectory of a psychotic break, Dr. Coggins was able to extrapolate Ortiz's mental state at the time of the November 16 interrogation. From the moment the psychotic break began, Dr. Coggins explained, Ortiz's "normal thinking process was deteriorating and he was becoming further and further separated from reality." (A.2125; *accord* A.2103.) Ortiz had suffered a "complete psychotic break" (A.2080), which was already underway by November 15 (A.2083-84, 2086, 2125), and by November 19 he was "one of the most seriously mentally ill people [Dr. Coggins] had ever seen" (A.2124). Thus, while Dr. Coggins could not be certain of Ortiz's "exact mental status" on November 16, she believes "that he was psychotic" (A.2131) and not "in good contact with reality" (A.2124; *accord* A.2097, 2128). When defense counsel asked whether a person in the throes of a psychotic break can experience moments of lucidity, Dr. Coggins replied, "usually not." (A.2124.)

### 3. Testimony of Detective Mark Lauber.

Detective Mark Lauber testified that on the morning of November 15, 2004, Ortiz had approached a patrol officer who summoned Lauber to assist. (A.2511-12, 2901.) When Lauber arrived on the scene, Ortiz seemed scared, disoriented, and high on marijuana. (A.2514.) Ortiz was Spanish speaking, so Lauber invited Officer Padillo Rodriguez to interpret. (A.2513.) Ortiz said that unknown people were trying to kill him because they suspected him of the Camacho murders, but when Lauber followed up Ortiz could not provide specifics. (A.2513-20.) Ortiz's behavior convinced Lauber that Ortiz needed psychiatric care, so he called for an ambulance. (A.2514-15, 2901.)

Lauber memorialized this encounter in an interdepartmental memorandum known as a "P73." (A.2508-09, 2901.) P73s are prepared shortly after the events they describe and placed into the investigative file. (A.2196-98, 2244-45, 2270-71, 2509, 2610.)

### 4. Testimony of Detective Mark Vaughn.

Detective Mark Vaughn testified that on November 15, 2004, around 4:45 pm, he received a call from the psychiatric ward at Buffalo General Hospital. (A.2200-02.) The caller said a patient named Josue Ortiz claimed to have information about the Camacho murders and "'was in fear of his life because the killers were after him.'" (A.2910.) Vaughn drove to the hospital to interview Ortiz, accompanied by Detective James Lema and Sergeant James Lonergan. (A.2203-04.) Because Ortiz was more

comfortable speaking Spanish, Vaughn summoned Officer Edwin Torres to translate. (A.2203.)

The interview took place in a hospital conference room. (A.2208.) After about 30 minutes, Vaughn and his colleagues concluded that Ortiz had no reliable information about the Camacho murders, and returned him to the care of hospital staff. (A.2205-06, 2208.)

With prompting from defense counsel, Vaughn testified that Ortiz did not seem to be "having some kind of episode" during the interview. (A.2223.) Vaughn acknowledged, however, that his P73 memorializing the interview indicates that Ortiz was "definitely upset," afraid for his life, and not in possession of "any reliable information" about the Camacho murders. (A.2205-07.) Vaughn also said that "Ortiz wasn't very clear about who was trying to kill him." (A.2223.) When Ortiz was asked who he was afraid of, he named his uncle, Reynaldo Velasquez. (A.2206.) Vaughn—evidently not crediting this claim—did not pursue it. (A.2207.) Vaughn further conceded that he and Stambach are longtime colleagues. (A.2190-92, 2227.)

### 5. Testimony of Sergeant James Lonergan.

Sergeant James Lonergan testified that the November 15 interview at Buffalo General Hospital was his first contact with Ortiz. (A.2241-42, 2246-48.) Like Vaughn, Lonergan recalled that Ortiz was "very frightened," and told the detectives that Reynaldo Velasquez was trying to kill him. (A.2249-50.) They did not follow up on this claim (A.2250), and

concluded that Ortiz had no reliable information about the Camacho murders (A.2251-55, 2263-64).

Lonergan's next contact with Ortiz came the following day, November 16. (A.2255-56.) In the early evening, patrol officers radioed to say they were bringing Josue Ortiz to the Major Crimes Unit to discuss the Camacho murders. (A.2259, 2263-64.) When Ortiz arrived at approximately 7:15 pm, Stambach was waiting to question him. (A.2256-58.) Though the Major Crimes Unit had a dedicated interview room, Stambach placed Ortiz in an empty office usually occupied by Sergeant Viviane. (A.2256.)

Initially, Stambach and Ortiz were alone. (A.2258.) A translator joined them at some point—Lonergan could not say when (*id.*)—and Ortiz signed a Spanish-language *Miranda* card at 8:20 pm, more than an hour after he arrived (A.2277). Beyond that, Lonergan did not know what occurred in Sergeant Viviane's office between 7:15 and 9:00 pm. (A.2260.)

When Lonergan entered Sergeant Viviane's office at 9:00 pm, Stambach told him that Ortiz had confessed to the Camacho murders. (A.2257-58.) All that remained to be done at that point was to type up a statement for Ortiz to sign. (A.2258-59.) Stambach completed the statement, Ortiz signed it, and in the early hours of November 17, Stambach arrested him. (A.2259, 2898.) Ortiz's booking photo shows him to be over 6'6" tall. (A.2261-62.)

A few hours after Ortiz's arrest, Lonergan led a search of Ortiz's apartment, to which Ortiz had consented. (A.2276-77.) According to Stambach, Ortiz had said "all of the evidence that you need is right in my apartment." (A.2276-77.) But Lonergan's search of the apartment did not uncover "any evidence at all." (A.2277.[2]) Lonergan agreed that, apart from the supposed confession, there was no evidence that Ortiz was even present at the scene of the Camacho murders. (A.2268.)

When asked whether Ortiz's arrival at the Major Crimes Unit on November 16 prompted anyone to review the eyewitness statements describing the three perpetrators seen fleeing the Camachos' apartment (A.2269), or the P73s memorializing the November 15 interviews of Ortiz (A.2265-67), Lonergan said he is "sure [the homicide file] was pulled," but he did not pull it. (A.2266-67; *accord* A.2263 ("I know the file would have been pulled."); *id*. ("I'm sure we did.").) Lonergan agreed that he recognized Ortiz when he arrived on November 16, having interviewed him the day before (A.2259-60), and thought he "may have" apprised Stambach of the November 15 encounter (A.2264-66).

Finally, Lonergan testified that because eyewitnesses had seen three perpetrators leaving the Camachos' apartment, not just one, the

---

[2]     Vaughn was present as well and testified similarly. (A.2217-19.)

homicide file should have remained active following Ortiz's arrest. (A.2278-79.)

### 6. Testimony of Detective Mark Stambach.

Detective Mark Stambach took no part in the Camacho investigation until November 16. (A.2311, 2366-68.) On that date, a call came into the Major Crimes Unit stating that Josue Ortiz wished to discuss the Camacho murders. (A.2311.) Stambach was to question him once he arrived. (*Id.*)

Stambach agreed that he put Ortiz in Sergeant Viviane's office (A.2314), that they were alone from 7:25 to 8:05 pm (A.2315, 2317, 2335-36, 2349), and that he took handwritten notes—Exhibit 10 at trial— purporting to memorialize what Ortiz said during this un-Mirandized interrogation (A.2338-39, 2351). Stambach testified that at 8:05 pm, Officer Edwin Torres arrived to read Ortiz his *Miranda* rights in Spanish. (A.2333.) Owing to some difficulty locating a Spanish-language *Miranda* card, Ortiz was not read his rights until 8:30 pm. (A.2333.) By 9:00 pm, when Lonergan looked in on proceedings, Stambach had a formal statement from Ortiz confessing to the murders. (A.2334-35.) Stambach said that he used his handwritten notes to ask questions during the Mirandized interrogation (A.2351), that Torres translated for Ortiz (A.2370), and that each page of the typed statement—Exhibit 406 at trial— was initialed by Ortiz, Stambach, and Torres, signifying that each answer had been read to Ortiz (A.2372-73). Stambach then arrested Ortiz and

signed a felony complaint charging him with two counts of second-degree murder. (A.2352-53.)

Stambach agreed that Ortiz's purported confession "was the only basis for [his] arrest" (A.2353) and subsequent charge (A.2385). When asked if he had any evidence incriminating Ortiz, apart from the confession, Stambach replied "'none whatsoever'" (A.2354; *accord* A.2353-55, 2361, 2385); indeed, there was no other evidence even placing Ortiz at the crime scene (A.2385).

Stambach denied closing the Camacho file after Ortiz's arrest (A.2382-83), but admitted that while he believed there were two other killers, he did nothing to find them (A.2356-57). Likewise, when Stambach learned of Ortiz's exoneration, he did not try to discover how this false confession had occurred. (A.2361.)

When questioned about what he knew when he first sat down with Ortiz, Stambach said that—despite having no prior involvement in the Camacho investigation (A.2310)—he did nothing to prepare for Ortiz's arrival (A.2316-19). In particular, Stambach insisted that he did not pull the homicide file, and so did not see the Lauber and Vaughn P73s pronouncing Ortiz to be an unreliable source of information who needed psychiatric treatment. (A.2317-19, 2347-48.) For the same reason, Stambach said that although he (somehow) knew there were three perpetrators (A.2340), he did not read any of the eyewitness statements

(A.2340-41, 2347-48), which described perpetrators considerably shorter than Ortiz (A.2491-92).

Probing these claims of ignorance, plaintiff's counsel confronted Stambach with his deposition testimony admitting that, before speaking with Ortiz, he reviewed the eyewitness statement of Carlos Osario. (A.2340-45.) Stambach said that he was confused during his deposition. (A.2346.) "There is no way I would have seen that statement," Stambach said; "[it] would have caused doubt in my mind." (*Id.*)

Similarly, Stambach initially testified that he was not present for Ortiz's booking photo (A.2309), which shows Ortiz to be much taller than the perpetrators seen fleeing the murder scene (A.2310, 2491-92). Confronted with contrary deposition testimony, Stambach admitted that he was present for Ortiz's booking photo. (A.2309-10.)

Stambach contradicted himself again when he was questioned about his review of crime-scene photos. Stambach first said he did not review crime-scene photos before interrogating Ortiz. (A.2324.) Then he said that he *did* review the photos (A.2324, 2326, 2353-54), and admitted that they were in the homicide file alongside the P73s and eyewitness statements that he supposedly never saw (A.2326-27). Later, Stambach went back to claiming that he did not "review any documents" before questioning Ortiz. (A.2368.)

When asked about Ortiz's condition during the November 16 interrogation, Stambach said that Ortiz "did not seem to be in distress in

any fashion," was eager "to tell his story," and gave no sign "whatsoever" of a psychotic break or other mental-health crisis. (A.2373-74.)

When asked about the 40 minutes he was alone with Ortiz, Stambach first claimed that he and Ortiz simply "sat there" waiting for Torres. (A.2323.[3]) "I wanted to ensure that his rights were read to him," Stambach explained; "I was having problems communicating with him. He spoke broken English." (A.2336.) After being impeached with his deposition testimony, Stambach admitted that he had asked "limited" questions about the Camacho murders. (A.2337-38.) Impeached again, Stambach admitted that he had gone into detail about the murders and extracted a confession from Ortiz before Torres arrived. (A.2338; *accord* A.2348.)

The notes Stambach said he took between 7:30 and 8:25 pm, during the period he was alone with Ortiz, include the following statements:

- "[Flaco had] cell phone in hand[,] pistol in other"

- "One victim in rear of house"

- "T.V. was on"

- "Gold chain ripped off Lobo who was at front door"

- "There were three there"

---

[3]     Stambach did not speak Spanish. (A.2305.)

- "AK was fired"

(A.2906-07.[4])

Stambach testified that these "very unique" details—which also appear in Ortiz's signed confession (A.2912-14)—could only be known to someone familiar with the crime scene (A.2378-80, 2384-86). He also testified that Ortiz had spontaneously volunteered these unique, nonpublic facts without leading or suggestion (A.2378-80, 2386), and it was too soon after the homicides for Ortiz to have learned them from another source (A.2378-79), so he felt confident "that [Ortiz] indeed was there, was involved, was a perpetrator" (A.2378).

The difficulty with this account is that Ortiz did not know any unique facts about the Camacho murders, since he did not commit them, had nothing to do with them, and was not present when they occurred. (A.2019-21, 2268, 2385.) When confronted with this proof that the "unique facts" came from Stambach himself, the detective could only claim— contrary to the parties' stipulation—that Ortiz was the real killer after all:

> Q. Mr. Stambach, you just told us that the facts contained in the confession could only be known by somebody who was there, correct?
>
> A. Yes.

---

[4]    These notes, the signed confession, the relevant P73s, and the decision below are attached in the Addendum to this brief.

Q. And we now know that Mr. Ortiz was not there based on the admissions of the real perpetrators, correct?

A. Again, that is what was in court. But independently, I'm still not comfortable with that . . . .

(A.2384.) Stambach went on to say that he is "not sold" on Ortiz's innocence (A.2355), and that although he "do[esn't] know what evidence [the federal task force] had"—apart from DNA evidence, crime-scene evidence, and confessions—he "disagree[s] with their findings" and maintains that Ortiz murdered the Camachos (A.2357-58).

### 7. Testimony of Officer Edwin Torres.

Officer Edwin Torres testified that he speaks fluent Spanish. (A.2658.) On November 15, 2004, Lonergan, Vaughn, and Lema brought him to the psychiatric ward at Buffalo General Hospital to facilitate an interview with Josue Ortiz. (A.2608-11.) Also present for this interview, according to sworn testimony Torres gave in 2005, was Stambach. (A.2615.) By the time of trial, Torres could no longer recall whether Stambach was present (A.2660-61), but he agreed that his memory of that evening was better in 2005 (A.2615-16).

As for the substance of the November 15 interview, Torres said Ortiz spoke some English but needed a Spanish translator. (A.2617.) Ortiz was nervous, afraid "that people were trying to kill him." (A.2619-20.) The detectives present concluded that Ortiz had no knowledge of the Camacho murders and needed further psychiatric treatment. (A.2622-24.)

Torres next encountered Ortiz on November 16, when he was called to translate for Stambach at the Major Crimes Unit. (A.2627-28.) Torres arrived after 8:00 pm. (A.2629.) He did not know what transpired before he arrived, but was able to identify Exhibit 10 as the handwritten notes Stambach said he took while alone with Ortiz. (A.2671-72.) Torres administered *Miranda* warnings in Spanish (A.2634), and a typed statement (Exhibit 406) was then read to Ortiz, who initialed each page and signed at the end (A.2666-68).

The typed statement is in question-and-answer format (A.2912-14), and closely tracks Stambach's handwritten notes (A.2906-07). Initially, Torres suggested that the typed statement reflects an actual dialogue that took place between Stambach and Ortiz in his presence. (A.2667.) Later, however, Torres agreed that Stambach was simply "asking [Ortiz] questions, pointing to his notes, and [Ortiz] was answering," suggesting that all Torres witnessed was Ortiz ratifying Stambach's reconstruction of the prior, un-Mirandized interrogation. (A.2672.) This latter version tallies with Stambach's testimony agreeing that, after the signed statement was "typed up," he went "question and answer with [Ortiz], and [Ortiz] responded in the affirmative and then signed this confession." (A.2352; *accord* A.2902 (P73 describing read-back); A.2914 (signed statement describing read-back).)

Torres was also asked about documents showing that while Stambach and Ortiz were in Sergeant Viviane's office, eyewitness Carlos

Osario was being questioned in an interview room. (A.2646-48; *accord* A.2272-75.) Torres said he only translated for Ortiz (A.2650), but also that he was in the interview room only, never in an office (A.2644, 2651), and that he did not recall seeing Lonergan on November 16 (A.2645). Torres also testified twice that he does not recall hearing Ortiz confess (A.2639, 2663), before later saying the opposite (A.2668-69).

As to Ortiz's mental state on November 16, Torres contradicted Stambach. When Stambach's counsel asked whether "Ortiz seem[ed] to be out of touch with reality," Torres replied: "He seemed to pause for seconds longer, that kind of stood out for me. I remember the long pauses." (A.2664.)

Finally, Torres testified that Stambach did not berate, threaten, or assault Ortiz during the Mirandized interview. (A.2669-71.) He also testified that Stambach's handwritten notes and the signed confession contain facts that "would only be known by somebody who committed the crimes," and "Ortiz did not commit the crime[s]." (A.2674.) Like Stambach, Torres could not identify any evidence linking Ortiz to the Camacho murders apart from the supposed confession. (A.2640.) Unlike Stambach, Torres said it "bothered [him] a lot" to learn that he'd had a hand in imprisoning an innocent person. (A.2652.)

### 8. Testimony of Josue Ortiz.

Josue Ortiz testified that he is a native of Puerto Rico with an eleventh-grade education. (A.2153-55, 2158.) When Ortiz was 18 or 19, his

mother died unexpectedly. (A.2159, 2427.) In May 2004, he left Puerto Rico to live with his uncle, Reynaldo Velasquez, in Buffalo. (A.2156-57, 2427.) Ortiz had been in Buffalo for six months when the Camachos were murdered. (A.2018, 2427.)

Ortiz was not friends with the Camachos, but he occasionally shot pool with them at a neighborhood bar (A.2163-64, 2427-28), and his cousin, Vanessa Velasquez, knew them rather well (A.2458). Their murders came as upsetting news. (A.2163, 2167.)

It was at Vanessa Velasquez's house, shortly after receiving this upsetting news, that Ortiz began feeling a wave of paranoia, hearing voices, and seeing visions. (A.2164-66, 2457-58.) The next thing he remembers is waking up at ECMC and seeing snow falling outside his window. (A.2165.) Ortiz has no memory of his interactions with law enforcement on November 15 and November 16. (A.2164-66, 2435, 2441-42.[5])

Ortiz said that he recognized his signature on the Spanish-language *Miranda* card (A.2436-37), and recognized his signature and initials on the signed confession (A.2438-42). When asked if he did indeed confess on November 16, Ortiz replied: "I don't remember exactly how I'm going to confess when I'm an innocent man." (A.2169.) Ortiz agreed that he blames Stambach for coercing and fabricating his confession. (A.2455.)

---

[5]   Dr. Coggins explained that such memory losses are typical. (A.2119-20.)

While recuperating in ECMC, Ortiz learned that he had been charged with the Camacho murders. (A.2170-71.) Though he assured his assigned attorneys that he was innocent, they urged him to take a plea. (A.2171-73.) He had given a highly detailed confession, they said, which practically guaranteed a conviction and life sentence if he went to trial. (A.2172-75.) Seeing "no other options" (A.2175), Ortiz pled guilty to two counts of manslaughter (A.2395). Shortly before sentencing, however, Ortiz told his attorneys he was innocent and wanted to withdraw his plea. (A.2174, 2176-77, 2395.) His attorneys relayed his request, but the judge denied it and sentenced him to 25 years' incarceration. (A.2176-77, 2393-94.)

Ortiz then gave a lengthy, at times emotional account of the decade he spent in prison surrounded by "violent criminals" (A.2403) and battling mental illness (A.2402). Ortiz described humiliating strip searches (A.2396-97, 2402-03, 2406-07); attacks by guards (A.2397-98, 2403); attacks by inmates, including a knife attack that left him with a scar across his face (A.2398-99); the "tension" of always "watching your back" (A.2403); the miseries of solitary confinement (A.2400-01); and the isolation from family members, some of whom died while he was incarcerated (A.2410-11).

Around 2011, Ortiz received a visit from Detective Mary Evans. (A.2404.) Ortiz was wary; he declined to speak about the Camacho murders (A.2406), and when called to testify before a federal grand jury, he again

took responsibility for them, fearing that asserting his innocence would provoke more charges (A.2453-54, 2459-60). As it became clear that Evans and the U.S. Attorney's Office believed in his innocence, Ortiz told them what he had told Dr. Coggins and his attorneys all along: he never killed the Camachos or anyone else. (A.2406-10.)

It was several more years before Ortiz was formally exonerated. He was finally released from prison on December 9, 2014, 10 years and 22 days after Stambach arrested him. (A.2412.)

### 9. Testimony of Detective Mary Evans.

Detective Mary Evans testified that in the course of a federal-task-force investigation into gang activity on the west side of Buffalo, she learned that certain people had implicated themselves in the Camacho murders, causing her to revisit Ortiz's conviction. (A.2471-76.) Evans said that if one perpetrator is convicted and others are not yet apprehended, a file can be marked "partially cleared." (A.2497.) When she retrieved the Camacho file, it was marked "cleared." (A.2477.[6]) After re-opening the file, Evans was struck by the fact that the perpetrators described by eyewitnesses were much shorter than Ortiz. (A.2478-79, 2491-92.) And she saw no evidence tying Ortiz to the murders, apart from his confession. (A.2495.)

---

[6] Evans noted that the correct terminology is "cleared"; a homicide file is never "closed." (A.2497.)

The evidence the task force ultimately collected, including confessions from the real killers, proved that Ortiz was not even indirectly connected to the Camacho murders. (A.2476, 2492, 2494-95, 2500.)

### 10. Verdict.

As the district court later observed, the jurors clearly "did not believe that Mr. Stambach testified truthfully" about his November 16 interrogation of Ortiz. (A.3092.) They returned from their deliberations with a verdict finding Stambach liable for malicious prosecution, fabrication of evidence, and coercion (A.2743-44), and awarded Ortiz $5 million in compensatory damages (A.2744) and $1.5 million in punitive damages (A.2755).

### F. The district court denies Stambach's post-verdict motions, finding ample evidence to support the jury's verdict.

Stambach moved for judgment as a matter of law under Federal Rule of Civil Procedure ("Rule") 50, and for a new trial or remittitur under Rule 59. (A.2846.) Like his brief here, Stambach's post-trial motions contended that because Ortiz cannot recall the November 16 interrogation and Stambach described his own performance in glowing terms, "there was no evidence whatsoever" to support the jury's verdict. (A.2923-24; *see also, e.g.*, A.2941 ("The only evidence regarding Detective Stambach's conduct is that he accurately recorded a voluntary confession . . . .").) The district court rejected these arguments and denied Stambach's post-verdict motions. (A.3112-13.)

## <u>SUMMARY OF ARGUMENT</u>

Like his post-verdict motions, Stambach's brief to this Court is a study in willful blindness. To hear Stambach recount the trial, Ortiz relied solely on his exoneration and pursued a theory akin to *res ipsa loquitur*: Ortiz did not commit the murders he confessed to, ergo Stambach violated his constitutional rights. (Br.1-2, 26, 28, 40, 42-43, 47.) We share the district court's exasperation with this portrayal of the trial record. (A.3117 ("Defendant ignores key evidence presented at trial, and improperly construes the facts in a manner favorable to his position."); *id.* ("Defendant ignores or downplays the following critical evidence presented to the jury . . . ."); A.3121 ("[T]he jury was not required to find Defendant's version of events credible . . . ."); A.3125-26 ("Defendant's emphasis on [favorable testimony] . . . misses the point."); A.3126 ("[Defendant's] argument again fails to consider the evidence in the light most favorable to Plaintiff."); A.3132 ("Of course, for the reasons discussed above, the Court disagrees with Defendant's assessment of the proof . . . ."); A.3133 ("For the reasons discussed at length above, the Court disagrees [that Ortiz presented no evidence of wrongdoing.]"); *id.* ("Defendant's argument relies on his contention that he did nothing more than take a statement from Plaintiff, but that is not what the jury found." (cleaned up)).)

Ortiz presented much more than just his exoneration to establish Stambach's liability, and the district court relied on much more than his exoneration to uphold the jury's verdict. For example:

- From the P73s and the testimony of Lauber, Vaughn, Lonergan, Torres, and Dr. Coggins, the jury could find that Ortiz's psychotic break was exceptionally severe, that Ortiz was clearly not in touch with reality on November 15, and that his condition had further deteriorated by the time Stambach interrogated him on the evening of November 16.

- From the evidence regarding the November 15 interviews of Ortiz, the jury could find that Stambach immediately recognized, as his colleagues did the day before, that Ortiz was mentally ill and had no reliable information about the Camacho murders.

- From the testimony of Lonergan and its own commonsense, the jury could find that Stambach reviewed the homicide file before interrogating Ortiz, and therefore knew about the November 15 interviews and the eyewitness descriptions of perpetrators much shorter than Ortiz.

- From Torres's testimony, Stambach's admissions, the parties' stipulation, and Stambach's handwritten notes, the jury could find that Stambach fed nonpublic details to Ortiz during the 40 minutes they were alone together, and then induced Ortiz to sign a statement which falsely portrayed Ortiz as having volunteered these highly incriminating facts from his own knowledge.

- From Stambach's repeated perjury at trial, the jury could find that Stambach was conscious of his misconduct and lied to conceal it.

These factual findings plainly justify the jury's verdict on liability. (i) Stambach prosecuted Ortiz in bad faith and without probable cause, making him liable for malicious prosecution, because he manufactured the sole evidentiary basis for Ortiz's conviction and imprisonment. (ii) Stambach fabricated evidence by forwarding to prosecutors a confession he knew to be false, and by falsely representing to prosecutors that Ortiz had volunteered nonpublic details about the murders when in truth Stambach planted those details himself. (iii) Stambach coerced Ortiz by exploiting his extreme psychosis, paranoia, and suggestibility to manufacture a false confession.

The evidence also supports the jury's award of damages. Like assessing credibility and weighing evidence, calculating damages is a quintessential jury function. Considering the grievous injury Ortiz suffered (a decade of wrongful incarceration), the jury's compensatory award is eminently reasonable. It is established in this Circuit that $1 million per year of wrongful incarceration is reasonable compensation. Ortiz received half that. Likewise, Stambach's reprehensible conduct plainly merited punitive damages, and the $1.5 million sum the jury selected—less than a third of the compensatory-damages figure—falls well within the guideposts the Court has established. The district court did not abuse its discretion when it upheld these modest awards.

Nor did the district court abuse its discretion when it denied Stambach's motion for a new trial. Having seen the witnesses and

documentary evidence for itself, the district court found that the jury had good reason to disbelieve Stambach's testimony and find him liable. In making this determination, the court did not, as Stambach claims, deviate from the view of the evidence that Ortiz argued to the jury. And even if it had, a district court considering a post-trial motion, like a jury considering the evidence in the first instance, is not bound by the parties' positions.

## ARGUMENT

Jury verdicts rightly command extraordinary deference on appeal. Like a district court considering a Rule 50 motion in the first instance, an appellate court reviewing the denial of a Rule 50 motion "must draw all reasonable inferences in favor of the nonmoving party," "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016) (cleaned up). Having thus construed the evidence in the non-movant's favor, the Court must uphold the jury's verdict unless there is "a complete absence of evidence" to support it, or "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (cleaned up); *see also id.* at 550 (courts may not upset

verdicts merely because they "feel that other results are more reasonable." (cleaned up)).[7]

## I. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE MALICIOUS-PROSECUTION CLAIM.

"[M]alicious prosecution claims [brought under § 1983] essentially allege violations of the Fourth Amendment right to be free from unreasonable seizure." *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023). To prevail on such a claim, a plaintiff must establish that: (i) the defendant commenced a criminal proceeding against him; (ii) the proceeding terminated in his favor; (iii) the defendant lacked probable cause to commence the proceeding; and (iv) the defendant acted with actual malice. *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010).

Stambach conceded the first two elements. (A.2714, 2716.) And given the prevailing law and Ortiz's theory of the case, the two remaining issues—probable cause and actual malice—collapsed into one. Because Ortiz was indicted by a grand jury (A.2019), he faced a presumption of probable cause, which he could rebut with "evidence that the indictment

---

[7]    Upholding the liability verdict on any one of Ortiz's three claims suffices to "sustain the damages award against [Stambach] because there was a single injury: the wrongful imprisonment." *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017).

was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017) (cleaned up). Bad-faith misconduct sufficient to rebut the presumption of probable cause also establishes actual malice, both because "[a] lack of probable cause generally creates an inference of malice," *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003), and because bad-faith misconduct is itself a species of malice, *Manganiello*, 612 F.3d at 163-64. Thus, if Ortiz established that Stambach manufactured the confession—conceded to be the only evidence against him (A.2355, 2385)— he would simultaneously rebut the presumption of probable cause and establish actual malice.

In making his case, Ortiz was entitled to rely on any evidence, direct or circumstantial, sufficient to clear the mere-preponderance standard. As the district court explained to the jury, in an instruction that Stambach endorsed (A.2542), direct evidence and circumstantial evidence are equally valid forms of proof (A.2706); *accord Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir. 1992). Even in criminal cases, where life and liberty are at stake, "the law draws no distinction between direct and circumstantial evidence," and a jury's verdict "may be based entirely on circumstantial evidence." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005).

*Manganiello v. City of New York* applies all of these principles to a similar set of facts. The main defendant in that case, Agostini, had led

the investigation into the murder of a security guard, and quickly became fixated on Manganiello. 612 F.3d at 154-56. Annoyed that Manganiello would not confess, Agostini built a case against him by various crooked means. *Id.* at 156-59. Agostini ultimately signed a felony complaint charging Manganiello with murder, and a grand jury returned an indictment. *Id.* at 157-58. After winning acquittal at trial, Manganiello sued Agostini for malicious prosecution. *Id.* at 154-55. The jury found for Manganiello, and the district court denied Agostini's post-verdict motions. *Id.* at 154.

This Court affirmed, holding that given the deference owed to jury verdicts, "Agostini plainly was not entitled to judgment as a matter of law." *Id.* at 161. The jury was entitled to disbelieve Agostini's self-serving testimony and to infer that he ignored leads pointing to other perpetrators; mischaracterized evidence; "coerced a false statement about Manganiello" from a loan shark eager to avoid a referral to the organized-crime bureau; and used another witness "to inculpate Manganiello with no concern whatever for whether [the witness]'s statements were truthful." *Id.* at 162-63. Taking the evidence together, "the jury could permissibly infer that Agostini was determined simply to make a case against Manganiello," and "had engaged in misconduct" to do so. *Id.* at 163. That was enough to rebut the presumption of probable cause arising from Manganiello's indictment, and to show that probable cause was lacking. *Id.*

**A.    A reasonable juror could easily find that Stambach lacked probable cause to prosecute Ortiz and acted in bad faith.**

**1.    Ortiz presented compelling evidence that Stambach manufactured the only evidence against him.**

The evidence at trial, construed in Ortiz's favor, supports four broad conclusions.

**a.    The jury could find that Ortiz was extremely vulnerable on November 16, and Stambach knew it.**

Dr. Coggins established that schizophrenia's defining characteristic is the inability to distinguish reality from unreality (A.2094), and that Ortiz experienced an exceptionally severe psychotic episode which began *before* November 15, 2004 (A.2080, 2097-99, 2123-26, 2128-29, 2131). When Lauber interviewed Ortiz on the morning of November 15, and when Vaughn, Lema, and Lonergan re-interviewed Ortiz at Buffalo General Hospital that afternoon, they all swiftly recognized that he required a translator to communicate properly; he had no genuine information about the Camacho murders; he needed psychiatric treatment; and his paranoid fears were so patently the product of mental illness that they required no follow-up. (A.2206-08, 2249-53, 2513-15, 2519-20, 2901, 2910-11.)

Dr. Coggins also established that Ortiz's condition on November 16 was *worse* than it was the day before, explaining that a psychotic break is characterized by progressive decline, not alternating periods of disorientation and lucidity. (A.2103, 2124-25.) Thus, she concluded that

- 34 -

Ortiz was not in good contact with reality on November 16. (A.2097, 2124-26, 2128, 2131.) Torres's recollection of Ortiz's odd pauses during the Mirandized interview supports this conclusion. (A.2664.)

Stambach maintained that Ortiz was in no distress whatsoever, was eager to tell his story, and was readily able to do so (A.2373-74), though he conceded that Ortiz was "afraid that someone was trying to kill him" (A.2349). Having reviewed the documentary evidence and observed each witness testify, the jury was entitled to conclude that (i) Ortiz was even more obviously psychotic on November 16 than he was on November 15, (ii) Stambach recognized Ortiz's psychosis and unreliability at least as readily as the detectives who interviewed Ortiz the day before, and (iii) Stambach's contrary testimony was a lie.

### b. The jury could find that Stambach planted nonpublic facts in Ortiz's signed confession.

Stambach and Torres testified that Stambach's handwritten notes, which correspond to the 40-minute interrogation Stambach conducted alone (A.2338-39, 2671-72, 2906-07), contain facts only the real killer could have known (A.2378-80, 2384-86), and that those same facts are repeated in Ortiz's signed confession (A.2351, 2378-80, 2674, 2912-14). Stambach also insisted that Ortiz could *not* have learned these unique facts secondhand. (A.2379.) At the same time, Stambach stipulated that Ortiz had nothing to do with the Camacho murders (A.2019-21) and he agreed that there was no evidence, apart from the supposed confession, that even placed Ortiz at the crime scene (A.2353-55, 2385).

These are damning admissions. By disclaiming any notion that Ortiz learned nonpublic details through the grapevine or by visiting the crime scene, Stambach's own testimony foreclosed all explanations save two: either Ortiz killed the Camachos or Stambach planted the nonpublic facts. With the parties' stipulation eliminating the first option, the jury was not just entitled but practically *required* to find that Stambach fed Ortiz the nonpublic facts during the un-Mirandized interrogation, and Ortiz simply recited or adopted them during the Mirandized interview witnessed by Torres.[8]

A finding that Stambach supplied the nonpublic facts necessarily entails a further finding that Stambach perjured himself when he attributed those facts to Ortiz (A.2378-80, 2386). And the jury was entitled to interpret these lies as consciousness of wrongdoing. *See, e.g.*, *Henry v. Poole*, 409 F.3d 48, 65, 72 (2d Cir. 2005).

---

[8] Alternatively, the jury could have found that Torres was not present during the November 16 interrogation. Torres said he never left the interview room, he did not recall seeing Lonergan, and he was inconsistent on whether he heard Ortiz confess. (A.2639-45, 2663.) Other evidence, meanwhile, showed that Carlos Osario was questioned in the interview room (A.2272-75), Ortiz was questioned in Sergeant Viviane's office (A.2256), and Lonergan looked in on Ortiz's interrogation at 9:00 pm (A.2258). If the jury found that Torres was confusing Ortiz with Osario, it could conclude that Stambach simply typed a phony statement and presented it to Ortiz, who signed it without knowing what it said.

### c. The jury could find that Stambach reviewed the homicide file before interrogating Ortiz.

Commonsense dictates that a detective with no prior knowledge of a case would review the file before conducting an interrogation. And Lonergan was adamant that someone pulled the file when Ortiz arrived on November 16. (A.2263, 2266.) Moreover, once the jury found that Stambach fed nonpublic facts to Ortiz, it would stand to reason that he got those facts from the homicide file.

A finding that Stambach reviewed the file necessarily entails a finding of yet more perjury, and yet more consciousness of wrongdoing, since Stambach repeatedly denied that he reviewed the file before questioning Ortiz. (A.2318-19, 2341-48, 2368.)

### d. The jury could find Stambach guilty of affirmative, bad-faith misconduct.

The jury might have had more difficulty with this case if Stambach had said he simply got carried away during the un-Mirandized interrogation and inadvertently introduced nonpublic facts to Ortiz, not realizing that Ortiz was so suggestible. But Stambach gave the jury a much starker choice by insisting that he was merely a passive scribe, dutifully recording the highly incriminating nonpublic facts that Ortiz volunteered with no suggestion whatsoever. (A.2378-80, 2386.) As between these two options—an exemplary interview or a manufactured confession—the jury was entitled to select the latter. *See supra* § I.A; *Dufort*, 874 F.3d at 353

- 37 -

(presenting the grand jury with an identification procured through a suggestive lineup is bad-faith misconduct).

The other evidence in the case amply supports the conclusion that Stambach acted deliberately and in bad faith. To start, there was considerable evidence showing that Stambach knew Ortiz did not murder the Camachos. When Stambach reviewed the homicide file—as the jury was entitled to find he did—he would have seen the witness statements describing perpetrators much shorter than Ortiz. (A.2478-79, 2491-92.) This discrepancy certainly caught Evans's attention when she picked up the file (*id.*), and at trial Stambach conceded the import of the eyewitness accounts (A.2346). Stambach also would have seen the P73s showing that just 24 hours before the supposed confession, detectives whose judgment he trusts (A.2322) twice concluded that Ortiz had no information about the Camacho murders and needed psychiatric treatment. (A.2206-08, 2249-53, 2513-15, 2519-20, 2901, 2910-11.[9]) As with the eyewitness statements, Stambach conceded the import of the November 15 interviews. (A.2318-19, 2322.) Based on this evidence, the jury could find that Stambach (i) went into the interrogation knowing that Ortiz was mentally ill, needed a

_____

[9] The jury also could have found that Stambach was present for the interview on the evening of November 15, as Torres recalled (A.2615-16) or that either Torres or Lonergan told Stambach about this interview when Ortiz arrived on November 16, as one would expect them to do, and as Lonergan acknowledged he "may have" done (A.2264-65).

translator to communicate properly, and had been ruled out as a source for genuine information; (ii) reached the same conclusions as his colleagues based on his own interactions with Ortiz; and (iii) exploited Ortiz's vulnerabilities to manufacture a false confession.

The circumstances of the un-Mirandized interrogation bolster these conclusions. Torres testified that a suspect must immediately receive *Miranda* warnings (A.2626), and a detective as experienced as Stambach (A.2299-2300) would not forget this rule. Yet when Ortiz arrived, Stambach chose to isolate and question him for 40 minutes with no witnesses, no *Miranda* warnings, and no translator. These choices—made by a detective who knew his colleagues had recently deemed Ortiz not credible and mentally ill—connote an intent to exert exploitative pressure.

Stambach's behavior after November 16—failing to pursue other perpetrators and marking the file "cleared" (A.2356-57, 2477)— further supports the conclusion that his "investigation" was not a genuine search for the truth. *Manganiello*, 612 F.3d at 164 (statements made "after the initiation of the criminal proceeding" can be "indicative of [the detective]'s state of mind all along"). The jury could find that Stambach did not investigate the Camacho murders any further, and did not want anyone else to do so, because he knew he had fabricated Ortiz's confession and catching the real killers would expose his misconduct—which, of course, is exactly what happened.

Then there is all of Stambach's perjury. In addition to the lies about Ortiz's mental state, the nonpublic facts, and the homicide file, the jury could find that Stambach lied about his presence for Ortiz's booking photo (A.2309-10), his review of crime-scene photos (A.2324-26, 2368), and his knowledge of the Carlos Osario statement (A.2340-46). Stambach would not so thoroughly perjure himself, the jury could fairly conclude, to hide mere negligence.

The jury could draw similar conclusions from Stambach's behavior at trial. Whereas Torres expressed regret for Ortiz's wrongful conviction (A.2652), Stambach was strident and unapologetic (A.2383-84, 2387). And although the trial lasted just five days, Stambach often didn't bother to show up. (A.2134, 2389-90, 2425, 2468.) His lawyer told the jury that he was giving law-enforcement witnesses the freedom to testify without any sense of obligation to the fellow officer sitting in the courtroom. (A.2557.) But as the jury surely noticed, Stambach was missing during Ortiz's testimony as well. (A.2425 (district judge noting, at the end of Ortiz's testimony, that she saw Stambach "peeking in the door out there").) The jury could take Stambach's flippancy, hostility, and disingenuous insistence on Ortiz's guilt as further proof of his fixation on Ortiz, his bad-faith disregard for Ortiz's rights, and his contempt for the truth.

**2. Stambach's contrary arguments misconstrue the law and ignore the trial evidence.**

**a. Manipulating a schizophrenic interviewee into signing a false confession does not create probable cause.**

Stambach claims that because "Ortiz confessed to the Camacho murders," probable cause necessarily existed no matter what "manipulative tactics [he used] to get Ortiz to confess." (Br.37.) This is nonsensical. Probable cause requires such "facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76. A detective could beat a suspect until he says "I did it," or teach a child to say "I'm guilty," but no reasonable person would take these utterances as genuine self-inculpation. *Cf. Dufort*, 874 F.3d at 353 (suggestive lineup does not contribute to probable cause). When the circumstances surrounding a confession strip the statement of its probative force, a reasonably prudent person would *not* believe that the "confessor" is guilty—especially where, as here, all the other evidence points elsewhere.

The two cases that Stambach cites (Br.35-36) do not suggest otherwise. In *Thomsen v. City of New York*, No. 15-cv-2668, 2016 WL 590235, at *1-2, 7-8 (S.D.N.Y. Feb. 11, 2016), and *Sedunova v. City of New York*, No. 13-cv-5262, 2015 WL 541408, at *1 (E.D.N.Y. Feb. 10, 2015), *aff'd*, 652 F. App'x 29 (2d Cir. 2016), probable cause existed where police officers applied mild pressures to facilitate confessions, had no reason to doubt the veracity of the confessions thus obtained, and had some corroborating evidence.

Here, by contrast, the jury was entitled to find that Stambach exploited Ortiz's severe psychosis to manufacture a confession he knew to be false. *See supra* § I.A.1. A reasonably prudent person, presented only with a fabricated confession contradicted by all the genuine evidence, would not conclude that Ortiz murdered the Camachos.

### b. Ortiz presented and substantiated his allegation of bad-faith misconduct.

Citing *Boyd v. City of New York*, Stambach claims that a plaintiff seeking to rebut the presumption of probable cause must "offer testimony which contradicts the [officer's] account" (Br.39), and must corroborate his competing narrative (Br.40). Because Ortiz does not remember the November 16 interrogation, and so could not present his own account of the evening, Stambach concludes that the malicious-prosecution claim fails for lack of "competing testimony." (Br.39.)

As the district court observed, Stambach "overstates the holding in *Boyd*" (A.3120). The key issue in that case was whether an incriminating statement Boyd made to police was uttered before Boyd's arrest (as the officers contended) or after Boyd's arrest (as Boyd contended, with support from a police booking sheet). 336 F.3d at 74-77. The Court held that Boyd's testimony about when he was arrested, combined with the booking sheet indicating that the officers knew when Boyd was arrested, "move[d] beyond a simple conflict of stories or mistaken memories, and into the possibility" that the police "lied [about the arrest] in order to secure an indictment." *Id.*

at 77. Such bad-faith misconduct overcame the presumption of probable cause. *Id.*

In thus holding that Boyd's evidence created a factual dispute, *id.* at 77-78, the *Boyd* panel was simply deciding the case before it, not requiring all future malicious-prosecution claimants to offer personal narratives rather than, say, a defendant's admissions, or to rely on booking sheets rather than other records. If *Boyd* stands for any broader principle, it is that a plaintiff cannot overcome the presumption of probable cause merely by saying that the police engaged in bad-faith misconduct, for if such self-serving claims were enough to reach a jury, the presumption would mean little. Thus, in all the *Boyd* cases Stambach cites (Br.38-41), the plaintiff gave one account, law enforcement gave another, and the court required some corroboration for the plaintiff's version.

This expansion of *Boyd*, if valid, poses no obstacle here. Stambach claims that Ortiz presented "no evidence contradicting [his] version of events" (Br.39), but this is wishful thinking. Ortiz did not rely on "[m]ere suspicions" or "counsel's arguments" (*id.*) to make his case; he presented "concrete testimony" (*id.*) from himself and from Dr. Coggins, Lauber, Vaughn, Lonergan, Torres, Evans, and Stambach, together with a comprehensive stipulation, various P73s, his booking photo, Stambach's notes, and the signed confession. *See supra* § I.A.1.

Stambach tries to denigrate Ortiz's proof by comparing it unfavorably with the evidence deemed sufficient in *Ricciuti v. N.Y.C.*

*Transit Authority*, 124 F.3d 123 (2d Cir. 1997). (Br.41-42.) But *Ricciuti* cuts the other way. That case started with a street fight between plaintiff Ricciuti and a corrections officer. 124 F.3d at 125. Based on a racial epithet contained in a post-arrest statement that Ricciuti purportedly made to a police lieutenant, Ricciuti was charged with aggravated harassment. *Id.* at 126. Ricciuti and his nephew denied that Ricciuti gave any post-arrest statement, the statement ascribed to him was inconsistent with other evidence, and the arresting officer's notes did not reference any statement. *Id.* The Court held that neither the lieutenant *nor the arresting officer* was entitled to summary judgment. Though there was no *direct* evidence implicating the arresting officer in the fabricated statement, a jury could infer that he knew about the statement, knew it was false, and helped relay it to prosecutors. *Id.* at 129-31.

Similarly, Ortiz presented direct evidence of his extreme vulnerability during the November 16 interrogation, and a wealth of circumstantial evidence tending to show that Stambach manufactured the confession used to convict him. *See supra* § I.A.1. Weighing this mix of evidence against Stambach's self-serving testimony was a task for the jury. *Ricciuti*, 124 F.3d at 125; *United States v. Ebinger*, 386 F.2d 557, 560 (2d Cir. 1967) ("[E]ven purely circumstantial evidence may properly be found to outweigh conflicting direct testimony.").

Granted, unlike the Ricciutis, Ortiz did not present a personal account of the November 16 interrogation. But if Stambach means to argue

that the competing narrative must come from the plaintiff himself (Br.41-42), and that Ortiz's claim therefore fails because he cannot "remember the confession" (Br.39), he is clearly wrong. No case holds that a plaintiff presenting a competing narrative must himself serve as narrator. And such a requirement would—as the district court astutely observed (A.3120-21)—*invert* the very principle that Stambach draws from *Boyd*. The *Boyd* cases that Stambach cites hold that a competing narrative from the plaintiff himself is inherently self-interested, so corroboration is needed to overcome the presumption of probable cause. Ortiz's competing narrative is all the *more* probative for having derived mainly from sources other than himself.

Lastly, Stambach accuses the district court of holding that Ortiz's innocence was itself "sufficient to rebut the presumption of probable cause." (Br.42.) The district court said nothing of the kind; it simply included the parties' stipulation as one of seven pieces of "critical evidence" that Stambach "ignores or downplays" in his post-verdict motions. (A.3117.) Stambach persists in ignoring this evidence (and its import) on appeal, but the jury heard it all the same. As the district court explained, this evidence enabled the jury to find that Stambach used "[Ortiz]'s fragile mental state and limited command of the English language to manufacture a false confession." (A.3118.) Manufacturing the sole evidence used to convict an innocent person of murder is bad-faith misconduct sufficient to rebut the presumption of probable cause.

**B.    Stambach's qualified-immunity argument is waived and meritless.**

Stambach demands qualified immunity on the malicious-prosecution claim (Br.43-45), but he did not request a jury instruction or special interrogatory on qualified immunity (Br.10), and he did not raise the issue in his summation (A.2555-65) or his post-verdict motions (A.2675-77, 2846-2945, 3071-89). So the point is waived. *Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001).[10]

It is also meritless. "Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise." *Ricciuti*, 124 F.3d at 130. "Freedom from malicious prosecution is a constitutional right that has long been clearly established," *Manganiello*, 612 F.3d at 164 (cleaned up), and no reasonable detective could think it was lawful to fabricate evidence or otherwise "misrepresent[] the evidence to the prosecutors, or fail[] to pass on material information, or ma[ke] statements that were false," *id.* at 165. Here, the jury could find that Stambach knowingly commenced a prosecution based solely on a manufactured confession. *See supra* § I.A. Qualified immunity is therefore unavailable.

---

[10]    Waiver is excused only to prevent manifest injustice. *Provost*, 262 F.3d at 162. Stambach does not argue that this exception applies.

Stambach begins his contrary argument by construing the evidence in his favor: at most, he says, he merely "employ[ed] tactics that resulted in Ortiz's adopting a confession which he then repeated to Officer Torres." (Br.44.) Building on this faulty premise, Stambach contends that "tactics" which induce a confession always enjoy qualified immunity unless the officer "lied to prosecutors regarding the circumstances of the confession." (*Id.*) Since "there was no evidence adduced at trial suggesting that Detective Stambach ever spoke with a prosecutor regarding Ortiz's confession," Stambach reasons, he "is entitled to qualified immunity." (Br.44-45 (citing *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999).)

This is all incorrect. Manufacturing the evidence that launches a criminal prosecution is itself a basis for liability. *Manganiello*, 612 F.3d at 165; *see also Dufort*, 874 F.3d at 354 (jury question on malicious prosecution where police used "a deeply defective lineup" to "extract[] an 'identification'" of plaintiff, "and then withheld the suspect nature of this identification from prosecutors and the grand jury").

As for *Townes*, that decision addresses proximate cause in an unreasonable-search case, not qualified immunity in a malicious-prosecution case, 176 F.3d at 145-47, and its causation analysis is now considered incomplete, *Higazy v. Templeton*, 505 F.3d 161, 175-77 (2d Cir. 2007). Moreover, *Townes*'s notion that a prosecutor's "exercise of independent judgment" can break the causal chain between an

unreasonable search and a subsequent conviction, 176 F.3d at 147, is of no help to Stambach. First, Stambach conceded that the parties' stipulation barred him from using the prosecutor's independent judgment as a defense to malicious prosecution. (A.2529-30.) Second, even *Townes* warns that a prosecutor does not exercise independent judgment when he is "misled" by police. 176 F.3d at 147. Though Stambach's brief inexplicably denies any contact between himself and the assigned prosecutor (Br.44, 48-49), when questioned *by his own attorney* at trial, Stambach said that Ortiz volunteered unique, nonpublic facts about the murders that were highly probative of guilt (A.2378-80), he described his discussion with the on-duty prosecutor about Ortiz's confession and what charges to bring (A.2381-82), and he specified that the unique facts "were shown to the district attorney at that time to indicate, once again, that [Ortiz] was a perpetrator" (A.2379; *accord* A.2385-86). Thus, even if a detective must separately lie about the confession he manufactures before he faces liability for malicious prosecution, the jury could easily conclude that Stambach did so.

## II. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE FABRICATION CLAIM.

The Due Process Clause promises that no person shall "be deprived of liberty as a result of the fabrication of evidence by a government officer." *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). To prevail on a § 1983 claim for fabrication of evidence, the plaintiff "must establish that an (1) investigating official (2) fabricated information (3) that is likely to

influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Barnes*, 68 F.4th at 128 (cleaned up). Stambach conceded the first, fourth, and fifth elements. (A.2717.) The only genuine issue for the jury to resolve was whether Stambach fabricated Ortiz's confession.[11]

## A. The same evidence supporting the malicious-prosecution claim also supports the fabrication claim.

A detective fabricates evidence when he "creates false information." *Ricciuti*, 124 F.3d at 130. A statement is fabricated when it is forged, *id.* at 126, 130, or when it is manipulated to appear more incriminating, *Morse*, 804 F.3d at 550, or when the detective taking the statement "knew [it] was false when made," *Sedunova*, 652 F. App'x at 31 & n.1; *see also Zahrey*, 221 F.3d at 346, 348-49 (false, incomplete, or misleading witness statements are fabrications).

*Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004), *aff'd* 407 F.3d 274 (4th Cir. 2005), a case Stambach repeatedly cites (Br.46-49), is particularly instructive. There, the police interrogated Earl Washington, obtained a murder confession, typed a statement, and had Washington sign it. 322 F. Supp 2d at 706. Later DNA testing exonerated Washington, *id.* at 707, and he sued his interrogators for fabrication of

---

[11]    Stambach did not formally concede that Ortiz's confession was likely to influence a jury, but for obvious reasons he did not (and does not) contest the point.

- 49 -

evidence, *id.* at 708-09. Two officers did not possess nonpublic details, and a third had not said Washington volunteered nonpublic details. *Id.* at 709, 712. But the fourth, Wilmore, asserted in an internal report and at Washington's trial that Washington had "divulged non-public information about the . . . murder." *Id.* at 710-11. This evidence, the district court held, supported a finding "that Wilmore knowingly used false evidence to pursue [Washington's] conviction." *Id.* at 712. Citing this Court's opinion in *Zahrey*, the Fourth Circuit agreed that summary judgement was unavailable, since there was some evidence that Wilmore falsely portrayed Washington as having volunteered nonpublic facts about the crime. 407 F.3d at 282-84; *accord Garnett*, 838 F.3d at 279 (fabrication includes "a false account of something the officer claimed to have seen or heard the defendant say").

Ortiz's evidence supports two types of fabrication. First, the jury could conclude that Stambach forwarded a confession he knew to be false. *See supra* § I. Second, the confession that Stambach forwarded portrays Ortiz as supplying nonpublic facts in response to open-ended questions. (A.2912-14.) This highly incriminating circumstance made Ortiz's otherwise uncorroborated statement immeasurably more damaging, and Stambach used this incriminating circumstance to show the prosecutor "that [Ortiz] was a perpetrator" (A.2379). Ortiz's defense attorneys likewise identified his detailed confession as the reason trial was hopeless. (A.2172-75.) As in *Washington*, the jury could find that this highly incriminating

circumstance was false, and that Stambach, not Ortiz, was the source of the nonpublic facts. *See supra* § I.[12]

**B.     Stambach's contrary arguments again ignore the evidence.**

Stambach says "there is no evidence suggesting that [Ortiz's] confession was fabricated" (Br.46), and Ortiz's "innocence is insufficient to establish liability" (Br.48). But he makes no effort to explain the evidence set forth above, and the two cases he cites cut against him.

The first case, *Washington*, is discussed above. In the second, *Blackmon v. Holder*, No. 20-cv-524, 2022 WL 329256 (E.D.N.C. Feb. 3, 2022), the district court held that a police officer who obtains a confession is liable for fabrication if he "falsely represented that the plaintiff independently volunteered knowledge of nonpublic information," *id.* at *3 (citing *Washington*, 407 F.3d at 282), or otherwise "distorted or affirmatively mischaracterized [the] confession," *id.* at *5. The plaintiff in that case failed to state a claim because he alleged "at most, negligent conduct," *id.* at *2, not distortions or dishonesty, and he agreed that the

---

[12]     As explained in § I, the jury could have found that Stambach fed Ortiz the nonpublic facts during the un-Mirandized interrogation and then caused Ortiz to regurgitate them in front of Torres, or that Stambach typed a bogus recap of the un-Mirandized interrogation and had Ortiz adopt it in front of Torres, or that Torres was not present at all, and Ortiz simply signed the statement that Stambach proffered. Whatever the mechanics, the fabrication is the same: Stambach falsely portrayed Ortiz as having volunteered unique, nonpublic facts from his own knowledge when in truth this was Stambach's knowledge in disguise.

officers genuinely believed him guilty, *id.* at *4-5. Here, by contrast, the evidence showed that Stambach knew Ortiz did not murder the Camachos and falsely portrayed Ortiz as having volunteered nonpublic details. *See supra* §§ I-II.A.

## C. Stambach cannot rely on the independent judgment of the prosecutor he misled with a fabricated confession.

Though a plaintiff bringing a fabrication claim must show that the fabricated evidence was forwarded to prosecutors and caused a loss of liberty, *Barnes*, 68 F.4th at 128, Stambach conceded these elements at trial (A.2717). Breezing past his concessions, Stambach claims that a detective cannot be liable for fabrication unless "he deliberately misrepresents the circumstances of the confession to a prosecutor." (Br.48.) Ortiz did not satisfy this requirement, Stambach argues, because "[t]here was no testimony that Detective Stambach attempted to convince [the] prosecutor that Ortiz volunteered nonpublic information," and the prosecutor decided to prosecute Ortiz "without speaking to" Stambach. (Br.49.)

Stambach is wrong across the board. Knowingly forwarding a false confession is fabrication, as is knowingly forwarding a distorted confession. The jury could find that Stambach did both. *See supra* §§ I-II.B. And even if Ortiz had to show that Stambach took some further step, beyond forwarding the sworn statement, to "convince [the] prosecutor that Ortiz volunteered nonpublic information" (Br.49), *Stambach testified* that during his discussion with the prosecutor (A.2381-82), he pointed to Ortiz's

supposed knowledge of nonpublic facts to indicate "that [Ortiz] was a perpetrator" (A.2379; *accord* A.2385-86).

## III. THE JURY PERMISSIBLY FOUND STAMBACH LIABLE ON THE COERCION CLAIM.

The Fifth Amendment forbids compulsory self-incrimination. To prevail on a § 1983 claim for violation of this protection, the plaintiff must establish that "coercion was applied to obtain a waiver of [his] rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against [him] in a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998). The parties agreed that Ortiz's signed confession was used against him. (A.2720.) The jury had to decide "[w]hether that confession was obtained by coercion." (*Id.*)

### A. A reasonable juror could easily find that Stambach coerced Ortiz.

A jury considering a coercion claim must weigh "the circumstances of pressure" brought to bear on the suspect "against the [suspect's] power of resistance." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (cleaned up). Any factor or combination of factors may demonstrate that "[the] suspect's will was overborne and the confession was not therefore a free and voluntary act." *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) (cleaned up).

Relevant circumstances of pressure include "psychologically coercive techniques such as brainwashing." *Id*. The failure to give *Miranda*

warnings is also relevant (though not dispositive). *Deshawn E.*, 156 F.3d at 346; *Gardner v. McArdle*, 461 F. App'x 64, 66 (2d Cir. 2012). And a finding of coercive pressure is more readily reached where the police displayed an "undeviating intent . . . to extract a confession." *Spano v. New York*, 360 U.S. 315, 324 (1959).

In evaluating the suspect's power of resistance, lack of education is one relevant factor. *Blackburn v. Alabama*, 361 U.S. 199, 207 & n.7 (1960). Mental illness is another. *Compare id.* at 207 (confession coerced where a schizophrenic suspect in the midst of a psychotic episode was isolated and questioned in a small room, and the questioner prepared a statement for him to sign), *and*, *Fikes v. Alabama*, 352 U.S. 191, 192-97 (1957) (confession coerced where police put "leading or suggestive" questions to a "schizophrenic and highly suggestible" suspect over a prolonged period), *with*, *Colorado v. Connelly*, 479 U.S. 157, 160-64 (1986) (confession not coerced where schizophrenic suspect received *Miranda* warnings and was questioned without pressure by officers who did not recognize his illness).[13]

---

[13]     *See also Woods v. City of Reno*, No. 16-cv-494, 2020 WL 4194844, at *7-8 (D. Nev. July 21, 2020) (jury could find coercion where schizophrenic suspect was "in a state of psychosis," and police "corrected her answers," "suggested answers to her," and "supplied [her] with non-public facts that made her confession seem more reliable").

### 1. Ortiz presented compelling evidence that Stambach exploited his vulnerabilities.

The evidence supported a finding that Ortiz was extremely susceptible to pressure on November 16, 2004, and Stambach knew it. *See supra* § I.A.1.a. Indeed, given Ortiz's limited education, broken English, recent immigration, paranoia, inability to distinguish fact from fiction, and fixation on the Camacho murders, it is hard to imagine a person less equipped to resist police pressure.

The jury could likewise conclude that Stambach recognized and exploited these vulnerabilities. When Ortiz arrived at the Major Crimes Unit, Stambach did not dismiss his paranoid claims and send him for further psychiatric treatment, as his colleagues had twice done the day before. Instead, he isolated Ortiz, withheld *Miranda* warnings, withheld a translator, and spent 40 minutes feeding him nonpublic facts about the Camacho murders. *See supra* §§ I-II. Stambach then set about legitimizing the confession he had planted, summoning a translator, administering *Miranda* warnings, and inducing Ortiz to repeat or adopt the highly incriminating details that had been fed to him. *Id.*

That this was a manipulation, not a mistake, is apparent from (among other things) Stambach's evident determination to falsely present Ortiz as having volunteered nonpublic facts in response to open-ended questions. Such machinations reflect an "undeviating intent" to hang a conviction on Ortiz, *Spano*, 360 U.S. at 324, lending further support to the jury's finding of coercion.

**2. Stambach's contrary arguments yet again ignore the evidence.**

Stambach concedes that exploiting a suspect's mental illness qualifies as coercion, but says the jury heard no evidence of exploitation, since the only people who remembered the Mirandized interview claimed to see nothing coercive. (Br.50-52.) As the district court put it, Stambach "misses the point." (A.3125-26.) The jury did not have to believe these witnesses' endorsements, and much of their testimony actually supported the conclusion that Stambach exploited Ortiz and planted the nonpublic facts which appear in his signed statement. *See supra* §§ I-III.A.1. Stambach is also wrong to dismiss the testimony of Vaughn, Lauber, Evans, and Dr. Coggins (Br.52), all of whom provided important evidence about Ortiz's vulnerability and Stambach's knowledge at the time of the November 16 interrogation. *See supra* §§ I-III.A.1.

**B. Stambach's qualified-immunity argument is waived and meritless.**

Stambach demands qualified immunity on the coercion claim because "there is no federal authority establishing that a suspect with mental illness has a constitutional right not to be questioned in a one-on-one interview for a brief period." (Br.53.) This argument is waived for the reasons given above, *see supra* § I.B, and it once again elides the verdict. The jury permissibly found not just that Stambach interviewed a mentally ill suspect, but that he exploited the suspect's vulnerabilities to manufacture a false confession. *See supra* §§ I-III.A. No reasonable officer

could believe that such conduct is constitutional, *see, e.g.*, *Higazy*, 505 F.3d at 174-75; *Weaver v. Brenner*, 40 F.3d 527, 536-37 (2d Cir. 1994), and Stambach does not contend otherwise.

## IV. THE JURY PERMISSIBLY AWARDED COMPENSATORY AND PUNITIVE DAMAGES.

Because awarding damages "is a quintessential responsibility of juries," a district court may not overturn a jury's award unless it shocks the conscience or amounts to a miscarriage of justice. *Jennings v. Yurkiw*, 18 F.4th 383, 389-90 (2d Cir. 2021). Appellate review of a district court's decision—already confined to abuses of discretion, *Restivo*, 846 F.3d at 587-88—is especially deferential "[w]hen, as here, a trial judge refuses to disturb a jury's award of a particular amount of damages," since in that case the two entities that "have observed the witnesses" and "considered the evidence" are "point[ing] in the same direction, *Jennings*, 18 F.4th at 389-90 (cleaned up).

## A. Ten years of wrongful imprisonment merits substantial compensation.

The district court found the jury's compensatory-damages award—$5 million (A.2762)—to be "well within a permissible range" (A.3131). Stambach objects, citing "the complete dearth of evidence demonstrating any wrongdoing" and Ortiz's failure to "provide detailed information or accounts of his emotional distress and trauma in prison." (Br.58.) His contentions lack merit.

Ortiz presented ample evidence of wrongdoing; Stambach just won't engage with it. *See supra* §§ I-III. As for Stambach's complaint that $500,000 per year of wrongful incarceration is "intrinsically excessive" (Br.58), it is established in this Circuit that "$1 million per year of wrongful incarceration" is "reasonable compensation." *Restivo*, 846 F.3d at 588. And while Stambach faults Ortiz for not introducing "detailed information" about the trauma he suffered (Br.58), any juror can readily appreciate why a decade of wrongful incarceration is a grievous injury, and these particular jurors had the benefit of Ortiz's testimony about the brutality of inmates and guards, the hopelessness of solitary confinement, the humiliation of strip searches, and so on (A.2396-2411). Stambach dismisses Ortiz's experiences as "a few isolated incidents" (Br.58), but the jury was not required to share his callous view, *Jennings*, 18 F.4th at 390 (rejecting officers' euphemistic description of a brutal beating as just "'a few minutes of violence'").

## B. Framing an innocent person for murder is despicable conduct warranting punitive damages.

Stambach contends that punitive damages were unwarranted because, at worst, he was simply "mistaken about the truth of Ortiz's confession." (Br.55.) Once again, he ignores the evidence. *See supra* §§ I-III. As the district court recognized (A.3127), the misconduct reflected in the jury's verdict clearly entails an "evil motive" and "reckless or callous indifference to [Ortiz's] federally protected rights," *Aponte v. Perez*, 75 F.4th 49, 55 (2d Cir. 2023) (cleaned up).

Nor did the district court abuse its discretion when it upheld the amount of the punitive-damages award (A.3132-33)—$1.5 million—since the three applicable guideposts, *Jennings*, 18 F.4th at 390-93, all favor Ortiz:

- *Reprehensibility*. Using fabricated evidence to maliciously prosecute a vulnerable schizophrenic for crimes carrying a possible life sentence, and then lying ad nauseum to cover it up, surely qualifies as reprehensible. *Id.* at 390-91 (affirmative misconduct, deceit, and "perjured trial testimony" are particularly egregious).

- *Relationship between compensatory and punitive damages*. The 3.3:1 ratio of compensatory damages to punitive damages is well within the permissible range, especially given Stambach's "misconduct directed at escaping liability." *Id.* at 391-92 (1:4 ratio); *see also Ismail v. Cohen*, 899 F.2d 183, 186-87 (2d Cir. 1990) (4.3:1 ratio); *Hughes v. Patrolmen's Benev. Ass'n*, 850 F.2d 876, 879, 883-84 (2d Cir. 1988) (1:1.5 ratio).

- *Penalties*. 18 U.S.C. § 242 put Stambach "on notice that abuse of power could lead to a term of imprisonment as well as to a substantial fine." *Jennings*, 18 F.4th at 393.

## V. STAMBACH IS NOT ENTITLED TO A NEW TRIAL.

A movant seeking a new trial must persuade the district court "that the jury has reached a seriously erroneous result or that the verdict is

a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (cleaned up). When considering a new-trial motion, the district court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Id.* All the same, the district court owes a "high degree of deference . . . to the jury's evaluation of witness credibility," and "jury verdicts should be disturbed with great infrequency." *Id.* When the district court denies a new-trial motion, this Court reviews its decision for abuse of discretion, viewing the evidence in the light most favorable to the non-movant. *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018).

**A.    The district court permissibly concluded that the jury's verdict was neither seriously erroneous nor a miscarriage of justice.**

The district court, having seen the parties' evidence and arguments firsthand, saw nothing seriously erroneous or unjust in the jury's verdict. (A.3130.) Stambach argues that "the jury's verdict is against the weight of the evidence" because "all of the testimony and evidence introduced at trial supported a finding for [him]." (Br.56-57.) But weight-of-the-evidence arguments are not reviewable on appeal, *Haywood v. Koehler*, 78 F.3d 101, 104 (2d Cir. 1996), and Stambach's assessment of the record is entirely incorrect, *see supra* §§ I-IV.

**B.    The district court upheld the jury's verdict on the same theory of liability that Ortiz advanced at trial.**

Separate from his generic new-trial argument, Stambach asserts that he is entitled to a new trial because the district court upheld the jury's

verdict on a view of the evidence not argued by Ortiz, in violation of the rule laid down in *Sinclair v. Long Island Railroad*, 985 F.2d 74 (2d Cir. 1993). (Br.32-33.) He is wrong, on the law and the facts.

Jurors "[a]re not required to accept the entirety of either side's account, but [a]re free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[]." *Haywood*, 78 F.3d at 105. Likewise, in deciding whether to uphold a jury's verdict, a district court "is not limited to the specific theories of the case presented by the parties, but may adopt any reasonable view that is consistent with the facts and testimony adduced at trial." *Ali*, 891 F.3d at 66. Harmonizing the evidence with the verdict in this manner does not qualify as injecting "a 'new theory' of liability not presented to the jury." *Id.*; *see also Raedle*, 670 F.3d at 419 & n.1, 420 (positing different lines of reasoning by which the jury could have reached its verdict).

*Sinclair* is wholly inapposite. There, a plaintiff who won a jury verdict on one theory of legal liability (notice of defect) sought to uphold the verdict on appeal, despite a clear instructional error, by asserting an entirely different theory of legal liability (non-delegable duty to inspect). 985 F.2d at 75-78. The Court declined to affirm on a legal theory never presented to the jury, and ordered a new trial to remedy the instructional error. *Id.* at 77-78.

Here, there is no instructional error. And in denying Stambach's post-verdict motions, the district court did not introduce a new theory of

legal liability. It simply articulated a reasonable view of the evidence that supports the jury's verdict—namely, that Stambach "deliberately fed [Ortiz] information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on [Ortiz]'s fragile mental state and limited command of the English language to manufacture a false confession, which [Ortiz] then repeated in front of Officer Torres" (A.3118-19). It makes no difference whether that view of the evidence is the one Ortiz espoused at trial.

In any event, that view of the evidence is *precisely* the one Ortiz espoused at trial. For example, Ortiz's counsel began his summation by arguing that because Ortiz "is completely innocent" of the Camacho murders, "was not there" when they occurred, and "has no information about how the scene looked," it would have been "impossible" for him to give "a confession that has specific details" of the "crime scene." (A.2571.) Stambach is "[t]he only guy who would have known those facts," and because "they were in the notes well before Torres even got there," Stambach must have used the "40 minutes alone" with Ortiz to "tak[e] advantage" of Ortiz's extreme suggestibility. (A.2571-72.) When Torres arrived, Ortiz was just saying "yes, no, and Stambach [wa]s typing it up. The fix was already in." (A.2572.) This is the same theory of the case that the district court posited.

## CONCLUSION

It is now almost 20 years since Stambach framed Ortiz for the Camacho murders. A jury has given Ortiz what justice the law can provide. The Court should uphold its verdict, and affirm the decision and judgment below.

Dated:    Buffalo, New York
           September 22, 2023

Respectfully submitted,

**HOOVER & DURLAND LLP**

By:  <u>s/Spencer L. Durland</u>
        Timothy W. Hoover
        Spencer L. Durland
        Samuel L. Yellen
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*
*syellen@hooverdurland.com*

**THE LAW OFFICE OF
WAYNE C. FELLE, P.C.**

By:  <u>s/Wayne C. Felle</u>
        Wayne C. Felle
5839 Main Street
Williamsville, New York 14221
(716) 505-2700
*waynefelle@waynefellelaw.com*

*Attorneys for Plaintiff-Appellee
Josue Ortiz*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in LOCAL R. APP. P. 32.1(a)(4)(A) because it contains 13,994 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and the type-style requirements of FED. R. APP. P. 32(a)(6), because it has been prepared using Microsoft Office Word and a proportionately spaced, serif font (Georgia Pro, 14 point).

**HOOVER & DURLAND LLP**

By: s/Spencer L. Durland
 Timothy W. Hoover
 Spencer L. Durland
 Samuel L. Yellen
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*
*syellen@hooverdurland.com*

**THE LAW OFFICE OF
WAYNE C. FELLE, P.C.**

By: s/Wayne C. Felle
 Wayne C. Felle
5839 Main Street
Williamsville, New York 14221
(716) 505-2700
*waynefelle@waynefellelaw.com*

*Attorneys for Plaintiff-Appellee
Josue Ortiz*

# ADDENDUM

A-2901

## City Of Buffalo - Department Of Police
### Major Crimes Unit

| | |
|---|---|
| **To:** | Captain Mark Morgan |
| | Crimes Against Persons Bureau |
| **From:** | Det. Mark J. Lauber |
| | Det/Sgt. Philip Torre |
| | Major Crime Unit |
| **Subject:** | MCU File #04-242, |
| | Homicides of Nelson & Miguel Camacho |
| **Date:** | November 15, 2004 |

Sir;

   In the continuing investigation of the above captioned file, your writers did respond at about 1100hrs. to the area of Hampshire & 19th St. This was in request to a call by car D-341 PO Marie Schreckenberger concerning a male she had encountered at that location.

   We arrived at about 1105hrs. and met with PO Schreckenberger, PO's Poleon (D-241) and Lewczyk (D 342) along with off-duty PO B. Rodriguez. We were informed that a subject identified as Josue Ortiz, DOB ███-1981 of 142 Germain St. Buffalo had stopped PO Schreckenberger and jumped into her patrol car saying that people were trying to kill him. Subject Ortiz was speaking Spanish and Rodriguez was interpreting for us.

   Ortiz had told the Officers that person(s) unknown were trying to kill him because they thought he was involved in the homicides of Nelson & Miguel Camacho. We talked with Ortiz and he stated he just came to Buffalo from Puerto Rico. Ortiz admitted that he had just smoked marihuana, his eyes were glassy and he exhibited signs of being under the influence of marihuana (dilated, red pupils and unsteady gait). He continued to state that unknown persons where attempting to kill him although he could not articulate the manner in which these attempts were being made, the location these attempts were occurring at, the identities or motives for those trying to kill him.

   Ortiz stated he was scared and needed help. After consulting with the Officers and observing the behavior of Ortiz it was decided that he might be in need of medical and or physiciatric evaluation. Ortiz agreed to voluntarily go to the Buffalo General Hospital for these examinations and was taken there via Rural/Metro ambulance.

   We departed the area at about 1135hrs. and continued to investigate the homicides. Your office will be kept informed of developments as they occur.

Respectfully Submitted,

Det. Mark Lauber
Major Crime Unit

00001189
DEF000613

**ADD-1**

A-2902

## City Of Buffalo - Department Of Police
### Major Crimes Unit

**To:**  Captain Mark Morgan
Crimes Against Persons Bureau

**From:**  Det. Mark R. Stambach
D/Sgt. James Lonergan
Major Crimes Unit

**Subject:**  FILE # 04-242

**Date:**  11/16/04

ATTN:  Lt. Margaret Sack
Major Crimes Unit

Sir:

Your writers did meet with P.O. David Sadlocha and P.O. John Lobaugh at the Major Crimes Unit Office. Both officers did have with them a Mr. Josue Daniel Ortiz. They responded to a call at 7:16pm. P.O. Sadlocha, Car D432, indicated the subject was confessing about the homicide on Niagara Street.

Mr. Josue Daniel Ortiz was placed into Sgt. Vivian's Office at 7:25pm. A formal interview was started at 7:30pm. He gave information during this interview that indicated he was involved in the homicides. Present in the Interview Room was P.O. Edwin Torres of B District. He was used as an interpreter as he informed your writers he spoke only a little English.

After listening to Mr. Ortiz explain what had happened, he was advised of his rights.

P.O. Edwin Torres read a Spanish Rights Card to Mr. Ortiz. The rights were read at 8:25pm. He then signed the Rights Card. His waiver was read at 8:30pm. This Rights Card shall now become a part of this file.

At 8:40pm, Mr. Ortiz was given a Coke, large fries and a sandwich from McDonald's .

At 9:00pm, a formal sworn statement was taken from him. Please see attached sworn statement for further details on this matter. This sworn statement will now become a part of this file. The statement was finished at 10:30pm, whereas it was read back to him and he signed it.

Your office will be kept apprised of any new developments in this case.

Respectfully,

Mark R. Stambach
Det. Mark R. Stambach
Major Crimes Unit

00001190
DEF000614

**ADD-2**

A-2906

EXHIBIT
3

EXHIBIT
10

NOTES                                    11-16 2004
3                                        7:30PM

        JOSUE              WM 23
        DANIEL             1981
        ORTIZ              142 GERMAIN ST.

        ARRESTED IN PUERTO RICO
        FOR GUNS AND DOPE . . .

                                    ,        VICTIM
(A)   CELL PHONE IN HAND      (A)   ONE IN
      PISTOL IN OTHER               REAR OF
      FLOCO HAD PISTOL IN HAND      HOUSE
      CELL

(A)   T.V. WAS BIG      (A)   GOLD CHAIN
(A)   T.V WAS ON              RIPPED OFF
                             LOBO WHO
                             WAS AT
      HE WAS WITH            FRONT DOOR
      UDAH
      HE IS JOEY             RAN AWAY

                    THREE
      THERE WERE THERE
                             GERMAIN WAS
                             HIMSELF

(☆)   THEY WENT
      THERE FOR DOPE    (A)   HE HAD A
      AND MONEY              SHOTGUN HE
                             DID NOT FIRE
      FLOCO HAD             ANY SHOTS
      PISTOL               INSIDE

**ADD-3**

A-2907

(★) NAME OF GUN

MILATARY GUN

AK —  ◄—  HIS WORDS

(★) YES AK WAS

FIRED

(★) Where is the milatary gun

right now

He knows                    8:25 PM

were it is                    Advised

                              8:30 PM

                              Waiver

                              8.40 PM

                    Feed

                    McDonalds

                    Cake - Fries

                    Sandwich

**ADD-4**

A-2910

City of Buffalo Police Department
Intra-Departmental Correspondence
Major Crimes Unit

To: Mark Morgan
    Capt., Crimes Against Persons Bureau

From: Det. Mark J. Vaughn
      Major Crimes Unit

Subject: MCU File #04-242
         879 Niagara

Date: November 15, 2004

Sir:

On the above date at approx. 1645 hrs., your writer received a phone call at the MCU office from Kevin Enburg. Mr. Enburg is the Emergency Room staff counselor for Psychiatric Services at Buffalo General Hospital. Mr. Enburg stated that a Hispanic male had been brought to the hospital for evaluation. The doctors had cleared him psychiatrically. During the evaluation, the Hispanic male claimed he had information on the recent double homicide that occurred at 879 Niagara. He further stated that he was in fear of his life because the killers were after him.

Your writer and Det. James Lema proceeded to Buffalo General. Det/Sgt. James Lonergan and P.O. Edwin Torres of B-District met us there. Torres was there to act as an interpreter.

At 1715 hrs., Mr. Enburg placed the four of us in the family conference room on the first floor just off the emergency room. He brought the Hispanic to the room. This male identified himself as Josue Ortiz, d.o.b. ███/81 of 19 Hoyt, rear. Ortiz stated that he spoke some English but was more comfortable speaking Spanish. P.O. Torres told us the following after conversing in Spanish with Ortiz.

Ortiz knew the deceased Camacho brothers. They were members of a cocaine ring that was headed up by Justo and Jose Caranzo (phonetically spelled). Ortiz was also a member of this ring. The Caranzo brothers rented an apartment in Ortiz's name at 142 Germain, upper. Ortiz lived there until moving to 19 Hoyt. Ortiz claims the



DEFENDANT'S
EXHIBIT
402

00001183

**ADD-5**

A-2911

Caranzo's stored large quantities of cocaine at the Germain address. The Caranzo's also had an apartment at 46 Blum.

Through the interpreter, we asked Ortiz if he had any direct knowledge of the murder at 979 Niagara. He claimed he did not. He said that it was his opinion that the Camacho brothers were killed because of jealousy due to their drug selling.

When asked whom he was specifically afraid of, Ortiz gave the name, Rinaldo Valesquez. When asked why he was afraid of Valesquez, Ortiz stated it was because he had a shotgun. Ortiz did not claim that Valesquez had anything to do with the above murders.

Mr. Ortiz was definitely upset at the time of the interview. He was given a card with our names and phone numbers on it and asked to call us if he had any further information. Ortiz was turned back over Mr. Enburg. Ortiz was going to be medically evaluated before being released from the hospital.

Your office will be kept apprised of any new developments in this case.


Respectfully submitted,

Det. Mark Vaughn


00001184

**ADD-6**

A-2912

November 16th, 2004

City of Buffalo
Department of the Police

State of New York
County of Erie
City of Buffalo

Mister Josue Daniel Ortiz, WM23-████-81 residing at 142 Germain Street in
the City of Buffalo, New York. Being duly sworn deposes and makes the follow-
ing sworn statement. This statement is taken by Detective Mark R. Stambach of
the HOMICIDE SQUAD in the presence of Det/Sgt James Lonergan. The statement
is typed by Detective Mark R. Stambach and the questions are being asked in
Spanish by Police Officer Edwin Torres.

Q. Do you kno how to read and write?
A. Séo- So with the english.

Q. How far have you gone in school and do you have a formal education?
A. ll grade I dropped out of the 11th grade.

Q. How long have you lived here in Buffalo, New York?
A. Four or five months I got here in May.

Q. Have you lived in the United States for how long?
A. This is my first time.

Q. The Buffalo Police Departments Homicide Squad is investigating the
shooting and the death of Mister Miguel Camacho and also Mistery Nelson
Camacho. Both were victims of a homicide that occured on 11-11-2004 at
or about 9:44 PM at 879 Niagara Street in the City of Buffalo. Can you
tell me in your own words what you know about those homicides?
A. It was about 9:30 PM we started to head over there. We went over there
to get money. There was three of us. Me, UDAH, and UDABS brother. We got
there. And we did what we did. Went over there and got in. Because we
heard that they were making money. We went over there to assault them only
He opened the door. I mean I did. UDAH kicked the door in. We entered.
We got in. All three of us entered. Entered and BAM. Fired shots. Forced o
way in and fired a shot. Then he heard the other brother yell out they
are killing my brother. They jumped on FLOCO. UDAHS brother fired the
nine millimeter. No the rifle I mean. Shot fired at FLOCO. FLOCO came and
then UDABS brother came and POW - POW. They ve rean off.

Q. Did you enter through the front or the side door?
A. The front door.

Q. How did you open the door?
A. We kicked in the door, I did.

Q. How may of there was it that went inside?
A. It was the three of us.

Q. Did you all have weapons?
A. Yes.

Q. Who do you meet first when you go in?
A. LOBO was the first person I saw.

Q. What kind of gun did you bring with you?
A. A shot gun.

Q. What did LOBO do when he saw you?
A. We entered and he was there and FLOCO was in the back.

Q. Was there a struggle with LOBO at the fron door?
A. Yes.

Q. Who was struggling with him?
A. Me.

Q. Did anyone try to take any thing from LOBO?
A. Yes I did his chain.





DEFENDANT'S
EXHIBIT
406

**ADD-7**

A-2913

STATEMENT PAGE TWO CONTD.. .......

Q.  Did you see anyone else inside the house with LOBO?
A.  The brother.

Q.  What was the brothers name?
A.  They called him EL-FLACO.

Q.  Where was EL-FLACO inside the house when he came in?
A.  He was standing in the rear of the apartment.

Q.  Did EL-FLACO have anything in his hands when he was standing?
A.  A gun, in one hand, and a telephone in his other hand.

Q.  What was EL-FLACO doing with the telephone?
A.  I heard him talking.

Q.  Did you hear what he was saying?
A.  Yes they are killing LOBO they are killing LOBO.

Q.  Did you see a T.V. inside the apartment?
A.  Yes.

Q.  Was it a small one or a large one?
A.  It was big.

Q.  Was the T.V on or off?
A.  The T.V. was on.

Q.  Did you go there to get drugs or money?
A.  Yes both.

Q.  Did anyone find the money or the drugs?
A.  I saw money there and drugs.

Q.  Can you name the three types of guns you took with you?
A.  A shotgun - A pistol, and a AK.

Q.  Who brought the AK to the house?
A.  It was UDAMS brother.

Q.  Who actually kicked the door in to the bottom apartment?
A.  I did/.

Q.  What were you wearing the night this all happened?
A.  Dark clothing, a dark hooded coat, combination matching set, not what
    I am wearing right now. sneakers white.

Q.  Where are the clothes that you were wearing that night?
A.  They are on or at 19 Hoyt street.

Q.  Which way did you leave from the house?
A.  We came out of the house and across the street, and down Massachusetts.

Q.  How may shots were fired inside the house?
A.  A couple. it was rapid and real fast.

Q.  Did you see who was firing the AK inside the house?
A.  Yes I did see who was shooting. It was UDAMS brother.

Q.  Did you have the AK - 47?
A.  Yes I did.

Q.  Did you do the shooting?
A.  Yes.

Q.  Did you shoot EL-FLACC with the AK?
A.  Yes.

Q.  Where did you shoot FLOCO?
A.  In the belly.

Q.  Where did you shoot LOBO at?
A.  Face chest, I did a couple when he was on the floor.

Q.  The first man at the door when you entered did he have any type of weapon?
A.  No.

A-2914

.ATEMENT PAGE THREE. `.......  .....

Q. Did you take anything from the apartment?
A. No we got scared.

Q. Why did you tell us at first you had a shot gun instead of the AK?
A. I was scared.

Q. How have the police treated you tonight?
A. You treated me good.

Q. Did anyone yell at you tonight?
A. No.

Q. Did you have dinner here tonight?
A. Yes.

Q. Did anyone make you any promises?
A. No promises were made.

Q. And you had your rights read to you correct?
A. Yes.

Q. I am now going to have Police Officer Torres read this three page statement
   and ask you if it is correct?
A. It is correct.

Q. Will you now sign this statement for me now?
A. Yes.

STATEMENT IS STOPPED AT 10:30 PM.

                                    SIGNED

                  WITNESSED:

                  WITNESSED:

Sworn and subribed before me this
16th day of November 2004

        Mark R  Stanbach

Commissioner of Deed in and for the City of
Buffalo, New York. My commission expires
on 12-31-2004

**ADD-9**

A-2915

93 **BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE**

| TO C.O.H. c.m.m. | SUBJECT | DATE 11-16-04 |
|---|---|---|
| FROM DET. M.R.S. DET/SGT J.L. | RIGHTS CARD CASE 2004-242 | |

RIGHTS - CARD

8:25 pm
AVISO   DERECHOS DEL SOSPECHO ✓
1. Ud. tiene el derecho de quedarse callado. ✓
2. Cualquier declaración que ud. haga puede ser usada y sera usada contra ud. en el juicio. ✓
3. Ud. tiene el derecho de hablar con un abogado y de pedirle que este presente mientras lo interrogan a ud. ✓
4. Si ud. no puede pagar a un abogado, se nombrara uno para representarlo antes de que lo interroguen, si lo desea ud. ✓
11-16-2004   Mark R. Stambach

DO NOT REMOVE FROM FILE

FILE # 2004-242


DEFENDANT'S EXHIBIT 401

A-3112

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSUE ORTIZ,

                         Plaintiff,                         **DECISION AND ORDER**

              v.                                            1:16-CV-00321 EAW

MARK STAMBACH,

                    Defendant.
_____

## INTRODUCTION

Plaintiff Josue Ortiz ("Plaintiff") sued defendant Mark Stambach ("Defendant") for violations of his civil rights related to his arrest and conviction for the murders of Nelson and Miguel Camacho, and his subsequent exoneration. (Dkt. 1). A jury found in Plaintiff's favor after a five-day trial, and awarded $5 million in compensatory damages and $1.5 million in punitive damages. (Dkt. 158).

Currently pending before the Court are several post-trial motions: (1) a motion for attorneys' fees filed by Plaintiff (Dkt. 167); (2) a motion for attorneys' fees filed by Plaintiff's former counsel, Hancock Estabrook LLP ("Hancock") (represented here by Alan Pierce, Esq.) (Dkt. 169); and (3) motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), for a new trial pursuant to Fed. R. Civ. P. 59(a), and for remittitur pursuant to Fed R. Civ. P. 59(e) filed by Defendant (Dkt. 177). For the reasons that follow, the

- 1 -

**ADD-11**

A-3113

Court denies Defendant's motions, grants in part and denies in part Plaintiff's motion for attorneys' fees, and grants in part and denies in part Hancock's motion for attorneys' fees.

## **BACKGROUND**

Familiarity with the prior history of this case—including particularly the Court's Decision and Order entered on February 26, 2021 (Dkt. 82), and the evidence adduced at trial—is assumed for purposes of the instant Decision and Order. The Court has summarized the salient procedural background below.

Plaintiff commenced the instant action on April 26, 2015. (Dkt. 1). Following discovery and motion practice, the only claims that proceeded to trial were Plaintiff's claims against Defendant for malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination. (*See* Dkt. 82 at 36; Dkt. 160). The jury found in Plaintiff's favor on each of these claims. (Dkt. 160).

Following entry of judgment, Plaintiff filed his motion for attorneys' fees on May 20, 2022. (Dkt. 167). This motion did not include a request for any fees by Hancock, which had been terminated by Plaintiff on the eve of trial. (*See* Dkt. 140). Hancock filed its separate request for attorneys' fees on May 23, 2022. (Dkt. 169). Defendant filed his motion for judgment as a matter of law, for a new trial, and for remittitur on June 7, 2022. (Dkt. 177).

- 2 -

**ADD-12**

A-3114

On June 10, 2022, Defendant filed his opposition to both of the pending motions for attorneys' fees. (Dkt. 179; Dkt. 180). Hancock filed reply papers on June 21, 2022. (Dkt. 182).

Plaintiff filed his opposition to Defendant's post-trial motions on June 28, 2022. (Dkt. 187). Defendant filed his reply on July 8, 2022. (Dkt. 192). The Court heard oral argument on January 31, 2023, and reserved decision. (Dkt. 194).

## DISCUSSION

### I.   Defendant's Post-Trial Motions

Because Plaintiff's entitlement to attorneys' fees turns on his status as a prevailing party, the Court considers first Defendant's challenges to the trial and the jury's verdict.

### A.   Motion for Judgment as a Matter of Law

Pursuant to Rule 50, the Court may grant a motion for judgment as a matter of law in a jury trial if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request. Fed. R. Civ. P. 50(a). The same standard applies where, as here, a party renews its request for judgment as a matter of law after the trial is complete. *See* Fed. R. Civ. P. 50(b).

"In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. Cnty. of Westchester*, 171

- 3 -

**ADD-13**

A-3115

F.3d 98, 101 (2d Cir. 1999); *see also Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." (citation and alteration omitted)).  Accordingly, the Court may not grant judgment as a matter of law unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it."  *Williams*, 171 F.3d at 101 (alterations omitted and quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154 (2d Cir. 1994)); *see also Wierzbic v. Howard*, 331 F.R.D. 32, 45 (W.D.N.Y. 2019) ("In ruling on a motion for judgment as a matter of law, the motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." (quotation and alteration omitted)), *aff'd*, 836 F. App'x 31 (2d Cir. 2020).  This "standard places a particularly heavy burden on the movant where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant."  *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (quotations omitted).

A-3116

Defendant contends that a reasonable jury could not have found for Plaintiff on any of the three causes of action that were presented at trial. The Court disagrees, for the reasons that follow.

### 1.    Malicious Prosecution

The Court turns first to Plaintiff's claim for malicious prosecution. "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). "The existence of probable cause is a complete defense to a claim of malicious prosecution . . ., and indictment by a grand jury creates a presumption of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotations and citation omitted). This presumption "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 162 (quotation omitted).

Defendant argues that the evidence at trial was insufficient to permit a reasonable jury to find that the presumption of probable cause had been rebutted in this case.[1] In particular, Defendant argues that there was "no evidence, direct or circumstantial, of bad

---

[1]    It is undisputed that Plaintiff was indicted by a grand jury and that there was correspondingly a presumption of probable cause.

- 5 -

**ADD-15**

A-3117

faith" on his part. (Dkt. 177-4 at 18).  However, Defendant ignores key evidence presented at trial, and improperly construes the facts in a manner favorable to his position.

More particularly, Defendant ignores or downplays the following critical evidence presented to the jury: (1) it is undisputed that Plaintiff was not involved in the murders of the Camacho brothers; (2) Dr. Evelyn Coggins testified that Plaintiff was "in the throes of a psychotic episode" during the relevant time period (Dkt. 157 at 45-47); (3) Plaintiff testified that he spoke very limited English at the relevant time period (Dkt. 173 at 25-26); (4) Defendant testified, and record evidence corroborated, that he was alone with Plaintiff for approximately 40 minutes prior to Plaintiff giving his confession, during which time he spoke to Plaintiff about the crime without advising him of his *Miranda* rights (Dkt. 165 at 18-19, 39-42); (5) Officer Edwin Torres, who had participated in an interview of Plaintiff at Buffalo General Hospital the day prior to his interview with Defendant[2], testified that Plaintiff was determined at that time not to have any credible information about the murders (Dkt. 176 at 30-32); (6) Officer Torres testified that Defendant's notes from his conversation with Plaintiff during the time that Plaintiff and Defendant were alone contained "details that would only be known by somebody who committed the crimes" (*id*. at 81); and (7) Officer Torres testified that those same details from Defendant's notes and

---

[2]      At the time of trial, Officer Torres was unable to recall whether Defendant was present during the interview of Plaintiff at Buffalo General Hospital.  (Dkt. 176 at 18). However, Officer Torres was impeached at trial with testimony he provided at the state court proceeding in 2005, identifying Defendant as being present during Plaintiff's interview at the hospital.  (*Id*. at 18-23).

- 6 -

A-3118

which would only have been known to the perpetrator were repeated by Plaintiff in his confession (*id.*).

Distilled to its essence, Defendant's argument is that this circumstantial evidence is insufficient because Plaintiff was unable to remember his interaction with Defendant and provide direct eyewitness testimony to contradict Defendant's account.  However, Defendant has cited no authority holding that direct evidence is required to rebut a presumption of probable cause in a jury trial on a malicious prosecution claim.  Defense counsel did point at oral argument to certain reported decisions in which such direct evidence was presented, but the fact that other plaintiffs in other, unrelated cases were able to present stronger evidence does not render the jury's verdict in this case unreasonable. To the contrary, it is well established that—even in the more demanding criminal context— "the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence, so long as the inference is reasonable, for it is the task of the jury, not the court, to choose among competing inferences."  *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quotations and citations omitted).

In this case, while it is certainly not the only conclusion a jury could have drawn, it is a reasonable inference from the circumstantial evidence set forth above that Defendant deliberately fed Plaintiff information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on Plaintiff's fragile mental state and limited command of the English language to manufacture a false confession, which

- 7 -

**ADD-17**

A-3119

Plaintiff then repeated in front of Officer Torres as a direct result of Defendant's conduct. While defense counsel contended at oral argument that Plaintiff might have somehow been aware of the particulars of the murders despite not having been involved therein, the jury was not obliged to engage in that kind of speculation. Indeed, other than general references to Plaintiff having been associated with the Camacho brothers at the time of their murders, there was no other evidence presented at trial as to how Plaintiff, who was not at the crime scene, was able to provide accurate details regarding the murders in his confession. And, as previously noted, the day before Defendant interviewed Plaintiff, Plaintiff had been interviewed at the hospital by Buffalo Police Department detectives and had been determined not to be a suspect because he lacked any credible information regarding the crimes.

"[A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment. *Manganiello*, 612 F.3d at 162. Accordingly, a reasonable jury could have concluded, on the evidence presented at trial, that Defendant acted in bad faith and that the presumption of probable cause was accordingly overcome.

Defendant's arguments to the contrary miss the mark. As previously noted, Defendant relies heavily on the fact that Plaintiff himself is unable to remember his interaction with Defendant, and was accordingly unable to offer his own version of what happened during their 40-minute, pre-written confession interaction. According to

- 8 -

ADD-18

A-3120

Defendant, this dooms Plaintiff's malicious prosecution claim, because he cannot satisfy "the 'competing testimony plus' test announced in *Boyd v. City of New York*[, 336 F.3d 72 (2d Cir. 2003).]" (Dkt. 177-4). Defendant overstates the holding in *Boyd*. There, the Second Circuit found, at the summary judgment stage, that "a jury could reasonably find that the indictment was secured through bad faith or perjury" based on the plaintiff's testimony as corroborated by a booking shoot. 336 F.3d at 77. Defendant reads this case to mean that the <u>only</u> way a plaintiff claiming malicious prosecution can demonstrate bad faith is through a combination of his own contradictory version of events and some corroborating evidence. (*See* Dkt. 192 at 9). However, while the *Boyd* court found that the evidence in that case was sufficient to create a triable issue of fact, it did not suggest that a plaintiff could never prove bad faith in some other fashion.

In other words, while *Boyd* and its progeny indicate that a plaintiff may not rely solely on "his version of events" to rebut the presumption of probable cause, *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (citation omitted), they do not establish that a plaintiff who cannot remember his interaction with the defendant can never prevail on a malicious prosecution claim. To the contrary, the situation presented here is essentially the opposite of what courts have found prohibited by *Boyd*—that is, rather than relying solely on his own version of events without corroborating evidence, Plaintiff relies on circumstantial corroborating evidence but is unable to offer his own eyewitness account.

- 9 -

**ADD-19**

A-3121

This simply does not implicate the same prudential concerns as allowing the presumption to be overcome based solely on self-serving testimony.

Further, the jury was not required to find Defendant's version of events credible simply because Plaintiff was unable to offer his own recollection. *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony"); *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007) ("A jury is under no obligation to find [a defendant] credible or find [his] explanation believable."). The jury could, and plainly did, conclude that Defendant was not being truthful about what happened during the time that he and Plaintiff were alone. On a motion for judgment as a matter of law, the Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).

It is further not dispositive that certain evidence cited by the Court in denying Defendant's motion for summary judgment on Plaintiff's malicious prosecution claim was not ultimately introduced at trial. Defendant argues that "this Court's summary judgment decision required that certain evidence had to be introduced showing that [Defendant] knew that [Plaintiff] was not or could not have been a perpetrator at the time of the confession." (Dkt. 177-4 at 21). Defendant's argument misunderstands the task that a court undertakes in deciding whether summary judgment in favor of a defendant is

- 10 -

**ADD-20**

A-3122

appropriate.  In assessing such a motion, a court need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial.  If the court is satisfied that at least one material factual dispute exists, summary judgment must be denied. *See, e.g., Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 121 (S.D.N.Y. 1997) ("[I]t is basic, black-letter law that the existence of even one disputed issue of material fact renders a grant of summary judgment inappropriate. . . . Once this Court found that there existed one material issue of disputed fact regarding Count One, this Court did not need to consider any of [the defendant's] other alleged violations of the Factoring Agreement in order to deny summary judgment, and therefore, did not consider them. . . .  As a result, *all* of [the defendant's] conduct which was alleged by plaintiffs in Count One to violate the Factoring Agreement survived [the defendant's] summary judgment motion.").

Consistent with these principles, in its Decision and Order denying Defendant summary judgment on Plaintiff's malicious prosecution claim, the Court identified certain evidence that it found would allow a reasonable factfinder to conclude that Defendant had knowingly procured a false confession from Plaintiff and accordingly denied summary judgment.  (Dkt. 82 at 28).  The Court never held that some lesser quantum of evidence would be insufficient to sustain Plaintiff's burden of proof at trial, because it was not called upon to make such a determination at that time.  Nor did the Court grant partial summary judgment determining that any particular legal or factual theory of Plaintiff's as to this claim failed as a matter of law.  Accordingly, the fact that the evidence at trial did not line

- 11 -

A-3123

up precisely with the discussion in the Court's prior Decision and Order does not mean that Defendant is entitled to judgment in his favor.

For all these reasons, the Court cannot conclude that a reasonable jury would have been unable to find in Plaintiff's favor on his malicious prosecution claim, and Defendant's motion for judgment as a matter of law thereon is denied.

## 2.   Fabrication of Evidence

The elements of a fabrication of evidence claim are that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). A plaintiff "may rely on circumstantial evidence (and reasonable inferences drawn from such evidence)" to support a contention that a defendant engaged in the fabrication of evidence. *Anilao v. Spota*, 340 F. Supp. 3d 224, 251 (E.D.N.Y. 2018), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

Defendant argues that Plaintiff's fabrication of evidence claim is insufficient as a matter of law because "[t]here is no evidence whatsoever that [Plaintiff's] written confession is not an accurate account of what [Plaintiff] said to [Defendant] on November 16, 2004." (Dkt. 177-4 at 16). This argument fails for essentially the same reasons discussed above with respect to Plaintiff's malicious prosecution claim. Specifically, based on the evidence previously set forth, a reasonably jury could have concluded that

- 12 -

ADD-22

A-3124

Defendant created a false confession by providing Plaintiff, who was suffering from a psychotic episode, with the details of the murders and causing him to repeat those details in response to Defendant's subsequent questions. Having reached such a conclusion, a reasonable jury could further have found in Plaintiff's favor on his fabrication of evidence claim. The Court accordingly denies Defendant's Rule 50(b) motion as to this claim.

### 3.  Violation of Right Against Self-Incrimination

A plaintiff may recover "under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff[] in a criminal proceeding." *Deshawn E. by Charlotte E. v. Scfir*, 156 F.3d 340, 346 (2d Cir. 1998). Whether a statement was obtained by coercion is determined by the totality of the circumstances. *Id.*; *see also Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances."). "[F]actors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). "Psychologically coercive tactics" may include "techniques such as brainwashing or

- 13 -

ADD-23

A-3125

promises of leniency or other benefits." *Green*, 850 F.2d at 902; *see also United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirmative misrepresentations or improper "trickery" can render a confession involuntary (alteration omitted)).

Although it is a closer question than those presented by Plaintiff's other claims, the Court finds that the jury could have reasonably concluded that Defendant engaged in coercive conduct during the 40 minutes that he was alone with Plaintiff prior to the taking of Plaintiff's written confession. In particular, the jury could have taken into account Plaintiff's limited understanding of English, Plaintiff's psychological state, and the fact that Plaintiff had a limited education. (*See* Dkt. 173 at 23-24 (Plaintiff testifying that he only completed the 11th grade and had been unsuccessful in obtaining his GED)). The jury also could have reasonably inferred that Defendant employed a psychologically coercive interrogation technique and/or engaged in improper trickery, based on the evidence that: (1) Plaintiff had no credible information about the murders when interviewed by law enforcement the previous day; (2) Plaintiff had no involvement in the murders; (3) during the 40-minute interval where he was alone with Plaintiff, Defendant created notes that included details of the murders that could only have been known by someone with inside knowledge; and (4) those same details were then repeated by Plaintiff during his answers to Defendant's questions during the creation of his written confession.

Defendant's emphasis on the law enforcement witnesses' testimony about his conduct while taking Plaintiff's written confession (*see* Dkt. 177-4 at 13-15) misses the

- 14 -

ADD-24

A-3126

point.  As discussed above, the jury was free to disbelieve all or part of that testimony. Further, it is entirely plausible that, having successfully employed psychological coercion during the 40 minutes when he was alone with Plaintiff (an individual with a limited education, little understanding of the English language, and a fragile mental state), Defendant had no need to continue to do so in front of Officer Torres or Sergeant James Lonergan (the other witness to Defendant's post-interview conduct).  While the jury certainly was not compelled to reach that conclusion, it was permitted to do so.

Defense counsel also contended at oral argument that Defendant's version of events was corroborated by the facts that Plaintiff pled guilty in his state court criminal proceedings and reiterated his guilt years later before a federal grand jury.  However, this argument again fails to consider the evidence in the light most favorable to Plaintiff.  As to the former point, the evidence at trial was that Plaintiff attempted to withdraw his guilty plea and that the state court judge denied that request.  (Dkt. 175 at 6).  As to the latter point, Plaintiff explained at trial that when he testified before the federal grand jury, he was afraid that he would be prosecuted federally if he claimed not to have committed the murders.  (*Id*. at 66-67).  The jury was within its rights to credit this explanation.

In sum, the Court finds no basis to grant Defendant judgment as a matter of law on Plaintiff's claim that Defendant violated his right against self-incrimination.

- 15 -

ADD-25

A-3127

### 4.    Punitive Damages

Defendant contends that he is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages, because there was nothing shocking or offensive about his conduct, nor was there any evidence that he had an evil motive or intent or was acting based on personal animus.  (Dkt. 177-4 at 23-24).  The Court disagrees that a reasonable jury could not have awarded punitive damages in this case.

"Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)).  As detailed above, the jury in this case could have reasonably concluded that Defendant caused the fabrication of a false confession and then caused that false confession to be used to prosecute Plaintiff.  Such actions easily satisfy the standard for engaging in callous indifference to Plaintiff's constitutional rights.  Further, a reasonable jury could determine that such conduct was shocking, offensive, and sufficiently egregious to warrant an award of punitive damages.  *See, e.g., Niemann v. Whalen*, 928 F. Supp. 296, 300 (S.D.N.Y. 1996) (finding jury was warranted in awarding punitive damages where defendant coerced a false confession), *ʌ₂f'd,* 107 F.3d 3 (2d Cir. 1997).

For all these reasons, the Court denies in its entirety Defendant's motion for judgment as a matter of law.

- 16 -

ADD-26

A-3128

### B.   Motion for a New Trial

Defendant seeks in the alternative a new trial pursuant to Rule 59(a).  "As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotation and alterations omitted); *see also Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ("[A] decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice[.]"). "Rule 59(a) . . . has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (quotations and citation omitted).  "The legal standard for granting a new trial under Rule 59(a) calls for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice." *Top Ridge Invs., LLC v. Anichini, Inc.*, No. 5:16-CV-76, 2018 WL 11419657, at *1 (D. Vt. May 7, 2018).  Whether to grant a new trial under Rule 59(a) is entrusted to the Court's discretion.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 261 (2d Cir. 2002) ("This court reviews the grant of a new trial on the ground that the verdict was against the weight of the evidence for abuse of discretion.").

- 17 -

A-3129

The Court does not find that this is a case in which the jury's verdict was seriously erroneous or a miscarriage of justice.  The resolution of this case turned largely on the jury's assessment of Defendant's credibility, and Second Circuit precedent "teach[es] . . . the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  Indeed, "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case[.]"  *Id*. at 418-19  (reversing district court's grant of new trial where "[i]n the final analysis, the only testimony regarding what was actually said came from [one witness], and thus the entire case hinged on his credibility").

Here, the jury plainly concluded that Defendant was not being truthful about his interactions with Plaintiff, and there was support in the record for that conclusion.  For example, Defendant changed his testimony in some respects from his deposition testimony. (*See, e.g.,* Dkt. 165 at 45-47).  Perhaps most significantly, Defendant initially testified at trial that he did not have a conversation with Plaintiff during the 40 minutes they were alone.  (*Id*. at 39).  However, the jury subsequently learned that Defendant had testified at his deposition that he and Plaintiff had engaged in conversation during that time period, including conversation about the murders, and that Defendant had created two pages of notes during that time containing information specific to the crimes at issue.  (*Id*. at 40-44). After being confronted with his prior testimony, Defendant tried to claim that he had asked

- 18 -

**ADD-28**

A-3130

"[j]ust limited" questions of Plaintiff, but conceded on further cross-examination that he had asked Plaintiff "questions and details about how the crime had been committed" before a translator arrived and before Plaintiff was advised of his Fifth Amendment rights, and that it was during that same time frame that Plaintiff supposedly gave the facts that "led [Defendant] to believe he was the perpetrator of the crime[]." (*Id.* at 41-42).

The Court does not consider it seriously erroneous or a miscarriage of justice for the jury to have concluded that Defendant was not a credible witness, nor for the jury to have drawn reasonable inferences based on the circumstantial evidence as to what actually occurred during the 40 minutes that Plaintiff and Defendant were alone together prior to Plaintiff's written confession. Under the circumstances of this case, the Court does not find it to be the rare occasion on which the jury's verdict should be disturbed.

## C.   Motion for Remittitur

Defendant's final request is for remittitur pursuant to Rule 59(e). The Second Circuit has explained that:

> The district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotations and alterations omitted). In the latter case—where there is no particular discernable error—"generally . . .

- 19 -

**ADD-29**

A-3131

a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice[.]" *Id.* (quotation omitted; *see also Newton v. City of New York*, 171 F. Supp. 3d 156, 171 (S.D.N.Y. 2016) ("[T]his Court must evaluate whether [the plaintiff's] Section 1983 award shocks the judicial conscience given that there is no particular discernable error that caused the jury to include in the verdict a quantifiable amount that should be stricken." (quotations and original alterations omitted)).

Defendant contends that the jury's award of $5 million in compensatory damages was intrinsically excessive.  (Dkt. 177-4 at 26).  The Court disagrees.  As Defendant concedes, "there have been cases holding that an award of $1,000,000 . . . per year spent in prison is a reasonable award in wrongful conviction cases." (Dkt. 177-4 at 27); *see, e.g., Newton*, 171 F. Supp. 3d at 172-75 (collecting cases).  Here, Plaintiff spent 10 years in prison for a crime he did not commit, and so the $5 million award equates to $500,000 per year of wrongful confinement.  This is well within a permissible range.

Defendant argues that Plaintiff did not present "detailed evidence" of his emotional distress.  (Dkt. 177-4 at 27).  However, Plaintiff testified at trial about experiencing humiliating strip searches while imprisoned, about being attacked by other inmates, and about being assaulted by corrections officers.  (Dkt. 175 at 9-14).  He further expressly told the jury how difficult he found it to live in a cell, particularly in light of his mental health struggles.  (*Id.* at 15).  He also discussed feeling as though he constantly had to "watch[]

- 20 -

**ADD-30**

A-3132

his back." (*Id*. at 16). The jury could have reasonably concluded from this testimony that Plaintiff suffered significant emotional distress as a result of his wrongful conviction.

Defendant also argues that there was no "concrete evidence of a police officer's bad faith misconduct" in this case. (Dkt. 177-4 at 27). Of course, for the reasons discussed above, the Court disagrees with Defendant's assessment of the proof at trial that supported the jury's verdict. While circumstantial, a reasonable jury had a legally sufficient evidentiary basis to find in favor of Plaintiff. Moreover, the amount of compensatory damages does not depend on the presence of direct—as opposed to circumstantial—proof at trial. So long as the proof was sufficient to support a verdict in Plaintiff's favor, which the Court has determined it was in this case, the jury was entitled to determine the amount that would compensate Plaintiff for his damages.

As to the punitive damages amount, "no objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (citation and alteration omitted). However, there are three general "guideposts" a court may look to in reviewing whether a punitive damages award is excessive: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Id*. (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

- 21 -

**ADD-31**

A-3133

Defendant focuses solely on the first of these guideposts in seeking remittitur, arguing that "there was no evidence of reprehensible conduct by" Defendant.  (Dkt. 177-4 at 27).  For the reasons discussed at length above, the Court disagrees.  The jury reasonably found that Defendant, a law enforcement officer, fabricated a false confession, and thereby caused an innocent man to be imprisoned for 10 years.  That is reprehensible conduct as that term is used in this context.  *See Stampf,* 761 F.3d at 209 (explaining that "[c]onduct that involves deceit or malice is more reprehensible than conduct involving mere negligence" and "conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages").  Defendant's argument relies on his contention that he did nothing more than take a statement from Plaintiff (Dkt. 177-4 at 27), but that is not what the jury found.

The Court further notes that the ratio of punitive damages to compensatory damages in this case is 1.5:5, which is less than the 1:1 ratio that the Second Circuit has said does not "raise a suspicious judicial eyebrow."  *Stampf,* 761 F.3d at 211 (quoting *Gore,* 517 U.S. at 582).  Further, at least one other federal court has apparently approved an "award of $13,000,000 in punitive damages for 31 years of incarceration based on [a] false confession."  *Burton v. City of New York*, No. 20-CV-9025 ATR WL, 2022 WL 9491955, at *14 (S.D.N.Y. Sept. 26, 2022) (citing *McCollum v. Robeson County*, No. 15-CV-00451, Dkt. No. 429 (E.D.N.C. May 14, 2021)).

- 22 -

A-3134

In sum, Defendant has failed to persuade the Court that either the compensatory damages award or the punitive damages award in this case is greater than the amount a reasonable jury could have awarded.  Accordingly, the Court denies Defendant's request for remittitur.

## II.    Plaintiff's Motion for Attorneys' Fees

The Court turns next to Plaintiff's motion for attorneys' fees.  Pursuant to 42 U.S.C. § 1988, the Court may award the prevailing party in a § 1983 action a reasonable attorneys' fee.  *See Lilly v. City of New York*, 934 F.3d 222, 227 (2d Cir. 2019).  In determining what constitutes a reasonable fee, the Court must "calculate a presumptively reasonable fee by determining the appropriate billable hours expended and setting a reasonable hourly rate, taking account of all case-specific variables."  *Id*. at 229-30 (quotations omitted).  This constitutes the "lodestar figure," which "has, as its name suggests, become the guiding light of [federal] fee-shifting jurisprudence."  *Perdue v. Kenny A*., 559 U.S. 542, 551 (2010) (quotation omitted).

A reasonable hourly rate "is the rate a paying client would be willing to pay."  *Id*. (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008)).  "In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson*[3] factors; it should also

---

[3]      *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The twelve *Johnson* factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's

- 23 -

A-3135

bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* "The determination of an award of attorney's fees under 42 U.S.C. § 1988 is committed to the sound discretion of the district court because the appropriate amount is dependent on the unique facts of each case." *Raja v. Burns*, 43 F.4th 80, 86 (2d Cir. 2022) (quotation omitted).

"The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Torcivia v. Suffolk Cnty.*, 437 F. Supp. 3d 239, 251 (E.D.N.Y. 2020). Here, Plaintiff seeks $538,032.50 in attorneys' fees and $37,638.28 in costs. (Dkt. 167-1 at ¶¶ 6-7). Plaintiff is a prevailing party in this case, and so the Court concludes that a fee award is appropriate. However, for the reasons set forth below, the Court will award $123,550.00 in attorneys' fees and $2,474.81 in costs, rather than the amounts requested by Plaintiff.

A.    **Hours Expended**

1.    **Fees Incurred in Other Matters**

Turning first to the determination of the appropriate billable hours expended, Plaintiff seeks compensation for 1065.4 hours expended by Wayne Felle, Esq., 150.8 hours expended by Edward Markarian, Esq., 24 hours expended by Elizabeth Bruce, Esq., and

---

customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 522 F.3d at 186 n.3.

- 24 -

A-3136

190.7 hours expended by paralegal Briana Croce.  (Dkt. 167-1 at ¶ 6).  However, as Defendant correctly points out, Plaintiff has included in this request many hundreds of hours of time spent on other proceedings and legal matters to which Defendant was not a party.  This includes: proceedings in *Ortiz v. Case*, No. 1:16-cv-00322, a civil case in this District which was resolved in favor of the defendants; proceedings in the New York Court of Claims; proceedings in *United States of America v. Ortiz*, No. 1:16-cr-00077, a criminal case in this District wherein Plaintiff was convicted of being a felon in possession of a firearm; and Social Security, disability, and Medicare proceedings.

As the Second Circuit has recently explained, "[i]n section 1988, Congress authorized district courts only to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce section 1983."  *Raja*, 43 F.4th at 92 (quotation and alteration omitted).  Fees incurred in connection with related proceedings may generally be recovered only to the extent those proceedings were "useful and of a type ordinarily necessary to advance the civil rights litigation."  *Id.*  (quotation omitted).

Here, the Court largely agrees with Defendant that this standard has not been satisfied with respect to the other proceedings as to which Plaintiff seeks attorneys' fees, inasmuch as the other legal proceedings at issue were not sufficiently related to this action.  The exception is fees related to Plaintiff's "initial Section 440 proceeding to vacate his conviction."  (Dkt. 179 at ¶ 12).  Plaintiff could not pursue the instant action without first having his conviction vacated, or his claims would have been barred by *Heck v. Humphrey*,

- 25 -

ADD-35

A-3137

512 U.S. 477 (1994).   Accordingly, the state court proceeding to vacate his criminal conviction was both useful and necessary to advance the instant § 1983 action.

Defendant relies on an unreported, out-of-Circuit case to support his argument that fees related to the § 440 proceeding are not recoverable under § 1988.   (*See* Dkt. 179-1 at 14-15 (citing *DeLew v. Nevada*, No. 2:00-CV-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010))).   However, the *DeLew* case is not on point, as it involved fees related to a wrongful death suit, not fees related to seeking the vacatur of a criminal conviction.   *See* 2010 WL 11636127, at *6.   Further, the *DeLew* court acknowledged that "attorney's fees may be available 'where a state proceeding is a necessary preliminary action to the enforcement of a federal claim[.]'"   *Id*. (quoting *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 255 (5th Cir. 2000)).   Again, Plaintiff could not have pursued his § 1983 claims without first having his conviction vacated in state court.

Defendant has identified 438.7 hours of legal fees that he claims should be struck as having been incurred in connection with miscellaneous other legal proceedings.   (Dkt. 179 at ¶ 13).   The Court has reviewed the entries identified by Defendant and notes that the entries from April 11, 2014, to January 15, 2015, are related to the § 440 proceedings in which Plaintiff's conviction was vacated.   These entries total 57.3 hours.   The Court agrees with Defendant that most of the remaining 381.4 hours are not recoverable.   However, the entry on September 21, 2021, for 1.8 hours appears on its face to be related to this matter,

A-3138

as does the entry on May 9, 2022, for 13 hours.  The Court has not excluded these two entries on this basis.

Defendant has further identified 465.9 hours in fees that he asserts are associated with the actions before the New York Court of Claims and Appellate Division, Fourth Department and 47.7 hours that are associated with the *Ortiz v. Case* matter.  (Dkt. 179 at ¶¶ 14-15).[4]  The Court has reviewed the entries identified by Defendant and agrees that they are not recoverable.  The Court also agrees with Defendant that time spent on public relations events should be struck, and has not included the identified public relations entries in its lodestar calculation.  (*See id.* at ¶ 16).

The Court was not persuaded by Plaintiff's counsel's contention at oral argument that certain of the hours expended in connection with the other litigation discussed above were meant to overlap with and also be used in connection with this litigation.  Plaintiff's counsel was unable to point to any record support for that contention, and as the party seeking fees, it is Plaintiff's burden to "submit sufficient evidence to support the hours worked[.]"  *Torcivia*, 437 F. Supp. 3d at 251.  Without some kind of evidentiary support (and absent any identification of the specific hours at issue), an attorney's general assertion does not satisfy this standard.

---

[4]     There is some overlap in the entries identified in paragraphs 13, 14, 15, and 16 of Defendant's declaration.  The Court has accordingly independently cross-referenced the identified entries with Plaintiff's counsel's billing ledger, and has performed its own calculation of the hours remaining for each timekeeper when the entries described in this Decision and Order are excluded.

- 27 -

A-3139

### 2.    Vague Entries

Defendant next argues that the Court should strike 11 billing entries for "client meeting" or "meeting with client" as impermissibly vague. (*Id.* at ¶ 17).  The Court agrees. "Courts may deny compensation where the billing information submitted is too vague to sufficiently document the hours claimed."  *Decastro v. City of New York*, No. 16-CV-3850 (RA), 2017 WL 4386372, at *8 (S.D.N.Y. Sept. 30, 2017) (quotation omitted).  In the context of this case, where counsel was representing Plaintiff in connection with multiple actions, the phrases "client meeting" and "meeting with client" provide no useful information about the work done.  The Court accordingly will not include these entries in its calculation.  *See Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 3773856, at *3 (S.D.N.Y. Aug. 12, 2019) (describing "[c]alls with team and team meeting, call with client and review of additional documentation" as "exactly the type of descriptions that courts have found to be impermissibly vague in the context of recovering attorneys' fees").

### 3.    Unnecessary Pre-trial Motion Practice

Defendant further asks the Court not to award fees associated with pre-trial motion practice regarding Plaintiff's failure to disclose expert witnesses, Plaintiff's request for an adjournment of the trial date, and the termination of Hancock and withdrawal of Mr. Pierce. (*See* Dkt. 179 at ¶¶ 18-21).  Defendant contends that these activities were unnecessary and

- 28 -

A-3140

incurred because of Plaintiff's counsel's own failure to comply with the Federal Rules of Civil Procedure. (Dkt. 179-1 at 19).

"In determining the number of hours reasonably expended on a case, a district court properly excludes documented hours that are excessive, redundant, or otherwise unnecessary." *Raja*, 43 F.4th at 87 (quotation omitted). Here, the Court does not agree that the motion practice regarding expert witnesses falls within that category. While the Court ultimately largely found in Defendant's favor on those motions, the Court cannot say that the associated motion practice was unnecessary.

However, the Court agrees that Defendant should not have to bear the costs of Plaintiff's request for an adjournment of the trial date, which was entirely without basis and which the Court noted was made in an attempt at gamesmanship. (*See* Dkt. 138). Defendant also should not have to bear the costs of the internal dispute between Plaintiff's lawyers, which could and should have been handled without resort to motion practice.

Plaintiff's counsel has included litigation of the motion for an adjournment and his work related to his dispute with Mr. Pierce in large, blocked-billed entries in April of 2022. The Court accordingly strikes from the requested fees a 12.5-hour entry on April 14, 2022, a 7.5-hour entry on April 19, 2022, a 6.8-hour entry on April 20, 2022, a 7.2-hour entry on April 21, 2022, and an 8.6-hour entry on April 26, 2022, each of which references work on these items. (*See* Dkt. 167-2 at 19).

A-3141

### 4. Paralegal Time Charged to Attorney

Defendant has identified three specific occasions on which Mr. Felle appears to have billed hours that were actually worked by his paralegal, Ms. Croce. The first is an entry on June 3, 2019. (Dkt. 167-2 at 12). The time entry says: "Sent co-counsel transcripts and exhibits (WCF 1.5) (BEC 2)." (*Id.*). However, the corresponding hours charge 3.5 hours to Mr. Felle and none to Ms. Croce. This is clearly an error, as the time entry itself allocates 2 hours of work to Ms. Croce. Similar errors can be seen in an entry from November 8, 2019, attributing 0.3 hours of Ms. Croce's work to Mr. Felle, and in an entry from April 29, 2022, attributing 6.5 hours of Ms. Croce's work to Mr. Felle. (*Id.* at 12, 20). The entry from November 8, 2019, has already been disallowed by the Court as related to state court litigation. For the remaining misallocated 8.5 hours, the Court will apply Ms. Croce's rate and not Mr. Felle's rate.

### 5. Block Billing and Other Deficient Time-Keeping Practices

In addition to the specific arguments made above, Defendant seeks an across-the-board reduction in the requested hours, arguing that counsel's "time entries demonstrate widespread block-billing, excessively vague time-entries, and are suggestive of either deliberate overestimation or a failure to maintain contemporaneous records." (Dkt. 179-1 at 16). Defendant specifically seeks an across-the-board 75% reduction in the remaining hours. (*Id.* at 17).

- 30 -

**ADD-40**

A-3142

"Block billing—. . . the practice of lumping multiple distinct tasks into a single billing entry—is generally disfavored because it can complicate the district court's task of determining the reasonableness of the billed hours." *Reja*, 43 F.4th at 87. Nonetheless, "the practice is by no means prohibited in this Circuit because block billing will not always result in inadequate documentation of an attorney's hours." *Id.* In particular, block billing is "permissible as long as the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Id.* (quotation omitted) Here, while Plaintiff's counsel did engage in block billing, the Court does not find that the practice was so egregious as to prevent meaningful review of the requested hours.

However, the Court does agree that some reduction is appropriate due to the vagueness of the time entries and because they reflect excessive time spent on routine matters. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). To give just a few example of excessive time spent on routine matters, an entry on April 25, 2016, reflects two hours of attorney time for "filed, paid—claims against City and County"; an entry on November 2, 2016, reflects 0.5 hours of attorney time for "[s]ent correspondence to defense attorneys with discovery responses and demands"; an entry on June 3, 2019, reflects 3.5 hours being spent simply to send transcripts and exhibits to co-counsel; an entry on September 9, 2020, reflects 0.4 hours being spent to fax a request for records; and an entry on March 2, 2021, reflects 0.7 hours being spent to "[e]mail page count for draft record." (Dkt. 167-2). For examples of vague entries (and in addition to the "client meeting" and

- 31 -

A-3143

"meeting with client" entries already discussed), an entry on March 16, 2016, states, "[p]hone call with client"; an entry on May 1, 2017, states "[p]hone call with client"; an entry on August 8, 2017, states "[e]mail to co-counsel"; an entry on October 15, 2018, states "ltr to AP, t/c w/ client"; an entry on February 24, 2021, states, "[m]essage to counsel"; an entry on April 21, 2021, states "[p]hone call with counsel; discussed next steps"; an entry on April 30, 2021, states "[p]hone call with counsel; email with counsel"; and an entry on November 10, 2021, states "[l]etter to Fed. Ct., t/c AP." (*Id.*).  These lists are not exhaustive, but are representative of counsel's timekeeping practices.

"To address such redundancy or vagueness, 'the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" *Raja*, 43 F.4th at 87 (quoting *Kirsch*, 148 F.3d at 173).  Here, the Court finds an across-the-board reduction of 15% sufficient to account for these time-keeping deficiencies.  *See Mason Tenders Dist. Council Welfare Fund v. Gibraltar Contracting, Inc.*, No. 1:18-CV-3668-MKV, 2020 WL 6363960, at *2 (S.D.N.Y. Oct. 29, 2020) (applying 20% reduction to account for similar issues and collecting cases applying reductions between 15% and 30%).

Taking all these rulings together, the Court finds that, prior to any across-the-board reduction, the reasonable hours spent on this litigation are as follows:  449 hours by Mr. Felle, 2.1 hours by Mr. Markarian, 23.2 hours by Ms. Bruce, and 55.8 hours by Ms. Croce.

A-3144

Applying the 15% across-the-board reductions results in a total of 381.7 hours by Mr. Felle, 1.8 hours by Mr. Markarian, 19.7 hours by Ms. Bruce, and 47.4 hours by Ms. Croce.

**B.** **Reasonable Hourly Rates**

Plaintiff seeks the following hourly rates: $425 per hour for Mr. Felle; $335 per hour for Mr. Markarian; $325 per hour for Ms. Bruce; and $125 per hour for Ms. Croce. (Dkt. 167-1 at ¶ 6). Defendant maintains that these rates are unreasonably high. (Dkt. 170-1 at 23-24). The Court agrees.

For purposes of calculating the lodestar figure, the Court applies "the prevailing hourly rate in the community," and "the community for purposes of this calculation is the district where the district court sits." *Arbor Hill*, 522 F.3d at 190 (quotations and alteration omitted). The Court may use an out-of-District hourly rate only "if it is clear that a reasonable, paying client would have paid those higher rates." *Id.* at 191. There is a presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally," and the burden is on the attorney seeking a higher rate to rebut that presumption. *Id.*

In the Western District of New York, the prevailing hourly rate for an experienced attorney in a civil rights matter is typically no more than $300 per hour, while less experienced attorneys typically have rates of no more $200 per hour. *See Warr v. Liberatore*, No. 13-CV-6508MWP, 2022 WL 969528, at *5 (W.D.N.Y. Mar. 31, 2022) (collecting cases and finding, in civil rights action, that $350 per hour rate for experienced

- 33 -

ADD-43

A-3145

attorney was unreasonable and should be reduced to $295 per hour).  The rates proposed by Plaintiff's counsel are far outside this range, and the Court finds no reason to apply out-of-District rates in this case.

The Court has considered the *Johnson* factors, among others, in making this determination.  As a threshold matter, the Court notes that Defendant contends that the Supreme Court's decision in *Perdue* "specifically rejected the use of the *Johnson* factors for § 1988 motions" and that *Arbor Hill* is "no longer good law" regarding calculation of a reasonable hourly rate.  (Dkt. 179-1 at 22-23).  However, the Second Circuit held to the contrary in *Lilly*, explaining that "*Perdue* . . . did not overrule *Arbor Hill* or otherwise prohibit district courts from considering the novelty or complexity of a case in determining the reasonable hourly rate or hours billed," and that "the twelve *Johnson* factors remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted."  934 F.3d at 232-33.  Accordingly, the Court rejects Defendant's invitation to ignore the *Johnson* factors.

As set forth above, the *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the

A-3146

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  The Court has considered these factors and does not find that they support the imposition of a higher hourly rate in this case.

Plaintiff's arguments to the contrary are not persuasive.  While counsel certainly expended significant time and labor, much of that time and labor (as set forth above) was spent on other legal proceedings.  Plaintiff concedes that "this matter did not present significant novel legal questions." (Dkt. 167-3 at 13).  The Court further does not find that this case required any unusual skill to pursue.

Counsel contends that he was unable to take on certain other paying matters "during the most intense periods of litigating this case[.]"  (*Id*. at 14).  While this may be true, those "intense periods" of litigation were relatively limited, and not out of the ordinary for a civil rights matter.

Counsel also contends that his customary hourly rate significantly exceeds the rates sought in the instant fee application.  (*Id*. at 15).  However, he has calculated his "hourly rate" by looking to contingent fee cases, which the Court does not find to be a useful comparison.  The effective hourly rate in a contingent fee case is recompense for the risk of not being paid at all, and is not reflective of the hourly rate a paying client would agree to in a traditional attorney-client relationship.  The Court further does not find the fact that

A-3147

counsel will receive a contingent fee from Plaintiff a reason to depart from the prevailing hourly rates in this District.

Counsel's argument that he was "tasked with conducting discovery and preparing for trial within an expedited timeframe" (Dkt. 167-4 at 15) is entirely belied by the history of this case. Discovery in this matter began in 2016 and did not close until 2020. (*See* Dkt. 68). Further, the Court resolved all dispositive motions by February 2021 (*see* Dkt. 82), and the trial did not occur until over a year later, in May of 2022. The Pretrial Order setting filing deadlines was entered in December of 2021, approximately five months before the trial occurred. (*See* Dkt. 98). This is not an expedited timeframe.

Counsel did obtain a significant award on behalf of his client. However, as discussed further below, there were also many unsuccessful claims brought in this action. Accordingly, the Court does not find that this factor warrants an upward adjustment in the hourly rate. The Court is further unpersuaded by counsel's arguments regarding his experience, inasmuch as counsel has previously represented to the Court that he is unexperienced in federal court matters such as this one.

Plaintiff's counsel argues that the case was "undesirable" because it is societally unpopular to sue law enforcement. (Dkt. 167-4 at 17-18). However, Plaintiff—who spent 10 years in jail for a crime he concededly did not commit—was a sympathetic litigant, and the potential damages were very high. The Court is not persuaded that this case was

- 36 -

ADD-46

A-3148

undesirable on the whole. The Court also does not find this case out of the ordinary with respect to the nature of the professional relationship between counsel and client.

Finally, counsel has not cited any civil rights cases in this District where hourly rates in line with those sought here were awarded. He has instead relied on cases from the Southern and Eastern Districts of New York, where the prevailing rates are significantly higher than in the Western District of New York. Indeed, in one of the cases that Plaintiff cites, *Vilkhu v. City of New York*, No. 06-CV-2095 CPS (JO), 2009 WL 1851019 (E.D.N.Y. June 26, 2009), the Second Circuit vacated and remanded the decision specifically because the district court had applied Southern District prevailing rates, and not rates from the Eastern District. *See Vilkhu v. City of New York*, 372 F. App'x 222, 224 (2d Cir. 2010).

The Court accordingly finds that the reasonable hourly rates in this case should be in line with the prevailing rates in this District. Specifically, the Court finds that rates of $300 per hour for Mr. Felle, $200 per hour for his associates, and $100 per hour for his paralegal are what a reasonable paying client would have been willing to pay. Multiplying these rates by the hours previously calculated by the Court results in a lodestar figure of $123,550.00.

C.     **Unsuccessful Claims**

Defendant asks the Court to reduce the fee award based on the fact that several claims and defendants were dismissed from this case prior to trial. (Dkt. 179-1 at 21). "[P]laintiffs may receive fees under § 1988 even if they are not victorious on every claim.

- 37 -

A-3149

A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011). Where "the plaintiff's claims involve a common core of facts or are based on related legal theories, and are therefore not severable, attorney's fees may be awarded for unsuccessful claims as well as successful ones." *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (quotations and alterations omitted). Nevertheless, "[a]lthough full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case." *Id*.

Here, the Court is not persuaded that a further reduction is warranted on this basis. In particular, in exercising its discretion, the Court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," and "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation[.]" *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983). Here, there is no question that Plaintiff obtained a very significant award in his favor, and he was fully successful on all the claims that proceeded to trial. The Court does not find that this is a case in which the lodestar figure should be reduced based on the presence of unsuccessful but intertwined claims.

- 38 -

A-3150

### D.  Costs

The Court turns to Plaintiff's request for costs.  "The Second Circuit has held for a prevailing plaintiff, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *Torcivia*, 437 F. Supp. 3d at 257 (quotation omitted).  In this case, Plaintiff seeks $37,638.00 in costs.  (Dkt. 167-1 at ¶ 7).  However, as Defendant has correctly noted, Plaintiff's fee request includes $27,899.50 for expert witness fees.  (*See* Dkt. 179 at ¶ 5).  "Section 1988 does not convey the authority to shift experts' fees to the losing party" in § 1983 cases.  *Stratakos v. Nassau Cnty.*, 574 F. Supp. 3d 154, 162 (E.D.N.Y. 2021) (quotation omitted); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006) ("'[C]osts' is a term of art that generally does not include expert fees." (citation omitted)).  Further, all four of the expert witnesses in question were precluded from testifying by the Court due to counsel's failures to comply with the Federal Rules of Civil Procedure, and the Court would not award their fees even if it had the authority to do so.

Additionally, and again as Defendant correctly points out (*see* Dkt. 179 at ¶ 8), the majority of the remaining costs sought by Plaintiff were incurred in connection with other actions.  For example, Plaintiff seeks reimbursement of his filing fee in the New York State Court of Claims, as well as service fees and transcripts associated with his state court proceedings and his federal criminal proceedings.  (*See* Dkt. 167-3).

- 39 -

**ADD-49**

A-3151

Having reviewed the documentation presented by Plaintiff, the Court finds he is entitled to reimbursement of: $400 in filing fees; $100 in service fees; $808.10 in transcript fees; and $1,166.71 in printing fees.  This is a total of $2,474.81, which is awarded to Plaintiff as costs.

**III.  Hancock's Motion for Attorneys' Fees**

The Court turns finally to Hancock's motion for attorneys' fees.  Hancock seeks fees pursuant to § 1988.  (Dkt. 169-1 at ¶ 2).  In the alternative, Hancock asks to intervene in this matter and for the Court to confirm that it has a charging lien that is enforceable against either Plaintiff or Mr. Felle.  (*See* Dkt. 169-2 at 15).

**A.    Request under § 1988**

Under § 1988, "it is the prevailing party rather than the lawyer who is entitled to attorney's fees."  *Brown v. Gen. Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1011 (2d Cir. 1983).  Accordingly, a claim for attorneys' fees under § 1988 "must itself be made by the party rather than the attorney."  *Id*.; *see also Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 361 (2d Cir. 1997) ("This Court, noting § 1988's provision for fees to be awarded to the party, has interpreted § 1988 to mean that the person who is entitled to the award of attorneys' fees is the prevailing party rather than the lawyer." (quotations omitted)).  Accordingly, under § 1988, "a former attorney who withdrew as counsel lack[s] standing to claim attorney's fees from a defendant in his own name."  *Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 552 (S.D.N.Y. 2016); *see also Babcock*

- 40 -

**ADD-50**

A-3152

*v. Rezak*, No. 96-CV-0394E(SC), 2004 WL 1574623, at *1 (W.D.N.Y. June 23, 2004) (denying former attorney's request for fees under § 1988 for lack of standing).

Hancock acknowledges that "[c]ase authority provides that under section 1988 it is the party and not the party's attorney who is entitled to apply for and obtain an award of attorneys' fees and costs" (Dkt. 169-2 at 15), but suggests that *Brown* should be limited to its facts, citing *Malarkey v. Texaco, Inc.*, 794 F. Supp. 1237 (S.D.N.Y. 1992). However, *Malarkey* did not discuss *Brown* or consider the issue of standing. Further, there is nothing in the *Malarkey* case suggesting that the plaintiff had not joined in the request for fees by her former counsel. By contrast, the record in this case reflects that Plaintiff deliberately did not include Hancock's fees and costs in his § 1988 application. (*See* Dkt. 170-3).

Under the circumstances of this case, Hancock lacks standing to seek attorneys' fees from Defendant under § 1988. The right to do so belongs to Plaintiff, who has chosen to exercise it solely with respect to fees and costs incurred by Mr. Felle and his associates and paralegal. Indeed, Mr. Pierce seemed to concede at oral argument that Hancock's request for fees under § 1988 was contingent upon Plaintiff having joined therein, which he has not done. Accordingly, Hancock's request for fees under § 1988 is denied.

### B.    Requests to Intervene and for a Charging Lien

The Court turns to Hancock's alternative requests to intervene and for a charging lien. As an initial matter, the Court notes that it has jurisdiction over Hancock's alternative requests. "Federal courts may exercise supplemental jurisdiction to hear fee disputes

- 41 -

**ADD-51**

A-3153

between litigants and their attorneys when the dispute relates to the main action." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (quotation omitted).   The Second Circuit has "held, in an unbroken line of cases, that a fee dispute between a party and its attorneys shares a common nucleus of operative fact with the underlying action." *Shukla v. Sharma*, 586 F. App'x 752, 753-54 (2d Cir. 2014) (quotation omitted).

"A charging lien is a security interest in the favorable result of litigation, giving the attorney [an] equitable ownership interest in the client's cause of action and ensuring that the attorney can collect his fee from the fund he has created for that purpose on behalf of the client." *Charnow v. Charnow*, 134 A.D.3d 875, 876 (2d Dep't 2015) (citation omitted). "The Second Circuit has made clear that Section 475 [of the New York Judiciary Law] governs attorneys' charging liens in federal courts sitting in New York, and such liens are 'enforceable in federal courts in accordance with its interpretation by New York courts.'" *Stair v. Calhoun,* 722 F.Supp.2d 258, 267 (E.D.N.Y. 2010) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 449 (2d Cir. 1998)).

"The Second Circuit has not decided whether attorneys may intervene solely for the purpose of protecting their contractual rights to fees or to enforce a charging lien." *United States v. Salix Pharms., Ltd.*, No. 15CV706 (DLC), 2016 WL 4402044, at *3 (S.D.N.Y. Aug. 18, 2016).  Indeed, the Second Circuit has noted that "there are arguments both for and against allowing discharged attorneys to intervene to protect their legal fees" and that it is a "close question." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171,

- 42 -

A-3154

176 (2d Cir. 2001); *see also Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 745-46 (2d Cir. 2017) (declining to reach issue of whether attorney's "asserted contractual interest and statutory charging lien on the proceeds from a judgment in favor of certain plaintiffs he used to represent" was "valid and sufficient to support intervention of right"). However, the Court does not find that intervention is required in order for Hancock to seek confirmation of its charging lien.   As noted above, the Second Circuit has made clear that Judiciary Law § 475 governs attorneys' charging liens in federal courts sitting in New York, and Judiciary Law § 475 empowers the Court "upon the petition of the client <u>or attorney</u>" to "determine and enforce the lien."  N.Y. Judiciary L. § 475 (emphasis added). Accordingly, in *Itar-Tass*, the Second Circuit held that former counsel may seek to enforce his lien even when permitted to withdraw as attorney of record.  140 F.3d at 451.  In other words, counsel who has "been an attorney of record" is "entitled to have . . . his charging lien determined by the district court under Section 475."  *Id*. at 452.  The Court thus denies Hancock's request for intervention as moot.

As to the request for confirmation of the charging lien, "attorneys who terminate their representation are . . . entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'"  *Stair*, 722 F. Supp. 2d at 267.  Here, while Mr. Felle apparently took the position at one time that Hancock had been discharged for cause (*see* Dkt. 170-5 at 4), Plaintiff did not file any opposition to Hancock's motion for attorneys' fees.  It is the client's burden to show a

- 43 -

A-3155

discharge for cause in opposition to an assertion of a charging lien. *See Love & Madness, Inc. v. Claire's Holdings, LLC*, No. 21 CIV 1913 ATSLC, 2021 WL 4554058, at *4 (S.D.N.Y. Oct. 4, 2021).  Plaintiff has not done so here.

As to the amount of the charging lien, "the proper method of fixing the sum of the lien is through a *quantum meruit* analysis, which requires ascertaining the reasonable value of the services rendered." *Pettiford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1331918, at *3 (S.D.N.Y. Mar. 20, 2020) (quotation and alteration omitted), *aff'd*, 833 F. App'x 893 (2d Cir. 2020).  Much like determining an award under § 1988, this generally involves calculating the lodestar figure, "which is the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Id*. at *5 (quotation omitted).

Here, Hancock seeks $183,426.50 in fees.  (*See* Dkt. 169-1 at ¶ 12).  This consists of 439.3 hours expended by Mr. Pierce, 11.8 hours expended by associate Paul Tuck, 2.1 hours expended by associate Mary D'Agostino, 27.6 hours expended by associate William Hython, and 2.1 hours expended by paralegal Amy Cobb.  (*Id*.).  However, in reply, Hancock concedes that certain entries were included in its request that should not have been, as they related to the *Ortiz v. Case* matter or the New York Court of Claims matter. The Court has reviewed the billing records submitted by Hancock, and concludes that 22.7 hours charged by Mr. Pierce, two hours charged by Mr. Tuck, and 8.3 hours charged by Mr. Hython were on matters other than the instant case.   This brings the hours totals to 416.6 for Mr. Pierce, 9.8 hours for Mr. Tuck, and 19.3 hours for Mr. Hython.

- 44 -

ADD-54

A-3156

The Court further finds that a 15% across-the-board reduction is appropriate, due to the vagueness of certain time entries and excessive time spent on certain routine matters. A few examples of vague entries include: an entry on August 3, 2017, that states "[r]eviewed documents for case"; an entry on August 21, 2017, that states "[e]mails with Attorney Felle re case"; an entry on November 21, 2017, that states "[t]elephone conference with Attorney Felle"; and an entry on March 16, 2022, that states "[p]repared pretrial filings." (Dkt. 170). As for examples of excessive time spent on routine matters: an entry on October 18, 2017, reflects 0.2 hours spent to "[r]eceive[] ECF notices re mediation"; an entry on November 12, 2019, reflects 0.3 hours spent on an email to opposing counsel "re extending schedule"; an entry on June 4, 2020, reflects 0.3 hours for "[r]eceived and reviewed notice of improper e-filing; re-filed letter to Judge Wolford; received extension grant from Judge"; and an entry on July 6, 2021, reflects 0.2 hours for receiving and reviewing a text order requiring the filing of a status report. (*Id*.). Applying this reduction results in a total of 354.1 hours expended by Mr. Pierce, 8.3 hours expended by Mr. Tuck, 1.8 hours expended by Ms. D'Agostino, 16.4 hours expended by Mr. Hython, and 1.8 hours expended by Ms. Cobb.

As to the requested rates, for essentially the reasons discussed above with respect to Mr. Felle and his associates and paralegals, the Court finds that a reasonable rate for Mr. Pierce is $300 per hour, a reasonable rate for Mr. Tuck is the requested $185 per hour, a reasonable rate for Ms. D'Agostino is $200 per hour, a reasonable rate for Mr. Hython is

- 45 -

A-3157

the requested $190 per hour, and a reasonable rate for Ms. Cobb is $100 per hour.[5]  This amounts to fees of $111,421.50.

Hancock also seeks $2,628.13 in disbursements.  A charging lien includes costs, so long as they are substantiated.  *See Winkfield v. Kirschenbaum & Phillips, P.C.*, No. 12 CIV. 7424 JMF, 2013 WL 371673, at *4 (S.D.N.Y. Jan. 29, 2013).  Here, Hancock has not substantiated its requests with documentation, but has simply submitted a list of purported disbursements with vague entries such as "travel."  (Dkt. 170-1 at 2-3).  The Court accordingly does not include the request for costs in its calculation of the charging lien. *See Winkfield*, 2013 WL 371673, at *4.

The Court rejects Hancock's alternative argument that it "is entitled to an award for its fees and costs from Mr. Felle under *Cheng v. Modansky Leasing Co., Inc.*, 73 N.Y.2d 454, 458 (1989)."  (Dkt. 169-2 at 20).  The provision of *Cheng* Hancock relies upon applies when "the fee dispute is . . . between the discharged attorney and a subsequently retained attorney."  *Crout v. Haverfield Int'l, Inc.*, 348 F. Supp. 3d 219, 229 (W.D.N.Y. 2018). Here, there is no indication that the fee dispute is between Hancock and Mr. Felle, as

---

[5]     Hancock has cited to a few cases approving higher hourly rates for experienced partners outside the civil rights context.  (*See* Dkt. 169 at 10-11).  However, "the range of 'reasonable' attorneys' fee rates varies depending on the type of case," *Yash Raj Films (USA) Inc v. Bobby Music Co. & Sporting Goods Inc.*, No. 01 CV 8378 (JFB), 2007 WL 9706613, at *4 (E.D.N.Y. Sept. 5, 2007), and the Court has focused its analysis on the rates typically charged in this District for civil rights litigation.

- 46 -

**ADD-56**

A-3158

opposed to Hancock and Plaintiff.   Under the circumstances of this case, Hancock is entitled to a charging lien against its former client.

## **CONCLUSION**

For the reasons set forth above, the Court: (1) denies Defendant's motions for judgment as a matter of law, for a new trial, and for remittitur (Dkt. 177); (2) grants Plaintiff's motion for attorneys' fees pursuant to § 1988 (Dkt. 167) to the extent it awards Plaintiff $123,550.00 in attorneys' fees and $2,474.81 in costs, and otherwise denies Plaintiff's motion for attorneys' fees; and (3) grants Hancock's motion for attorneys' fees (Dkt. 169) to the extent that it confirms Hancock's charging lien against Plaintiff in the amount of $111,421.50, and otherwise denies Hancock's motion.

SO ORDERED.

---

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 17, 2022
        Rochester, New York

- 47 -

**ADD-57**