23-0352-cv
*Ortiz v. Wagstaff*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2023

(Argued: February 1, 2024    Decided: May 9, 2025)

No. 23-0352-cv

_____

JOSUE ORTIZ,

*Plaintiff-Appellee,*

— v. —

MARK STAMBACH,

*Defendant-Appellant,*

RICHARD WAGSTAFF, MARY GUGLIUZZA, BUFFALO POLICE DEPARTMENT DOES 1-12, BUFFALO POLICE DEPARTMENT, THE CITY OF BUFFALO, MARK VAUGHN,

*Defendants.*

_____

Before:    LEVAL, RAGGI, and BIANCO, *Circuit Judges.*

Defendant-Appellant Detective Mark Stambach appeals from the judgment, deemed entered on February 17, 2023, in favor of Plaintiff-Appellee Josue Ortiz, after a jury trial in the United States District Court for the Western District of New

1

York (Elizabeth A. Wolford, *Judge*).  At trial, Ortiz claimed that Detective Stambach, exploiting Ortiz's severe mental illness, fabricated and coerced a confession from him in connection with a double homicide committed in 2004, for which Ortiz was subsequently charged and convicted in state court based upon that false confession.  In support of his claims, Ortiz introduced evidence that, in 2012, a reinvestigation by a law enforcement task force determined that Ortiz was not involved in the murders, and three other individuals were subsequently charged and convicted in federal court for those crimes.  Ortiz was wrongfully imprisoned for over a decade until his conviction was vacated and he was released in 2014.  A jury found Detective Stambach liable for malicious prosecution, fabrication of evidence, and violating Ortiz's right against self-incrimination, and awarded Ortiz $5 million in compensatory damages and $1.5 million in punitive damages.

On appeal, Detective Stambach argues that the district court erred in denying his post-trial motions for:  (1) judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b); (2) a new trial, pursuant to Federal Rule of Civil Procedure 59(a); and (3) remittitur, pursuant to Federal Rule of Civil Procedure 59(e).  In his Rule 50(b) motion, Detective Stambach asserted that he was entitled to judgment as a matter of law because, *inter alia*, there was insufficient evidence for a reasonable jury to have found in favor of Ortiz on any of the three causes of action presented at trial or, even if he was properly determined to be liable, to have found that an award of punitive damages was warranted.  In his Rule 59(a) motion, Detective Stambach contended that the verdict was against the weight of the evidence and, thus, he was entitled to a new trial.  Finally, in his Rule 59(e) motion, Detective Stambach argued that the jury's award of $5 million in compensatory damages was excessive in light of the evidence presented at trial regarding the harm to Ortiz and, thus, should be subject to remittitur.

We conclude that sufficient evidence supported the jury's finding of liability on all three causes of action and that Detective Stambach's other challenges to the verdict, including the award of compensatory and punitive damages, are without merit.

Accordingly, we **AFFIRM** the judgment of the district court.

> FOR APPELLEE: TIMOTHY W. HOOVER, SPENCER L. DURLAND, SAMUEL L. YELLEN, Hoover & Durland LLP, Buffalo, New York; WAYNE C. FELLE, The Law Office of Wayne C. Felle, P.C., Williamsville, New York.

> FOR APPELLANT: PETER A. SAHASRABUDHE, Hodgson Russ LLP, Buffalo, New York.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Detective Mark Stambach appeals from the judgment, deemed entered on February 17, 2023, in favor of Plaintiff-Appellee Josue Ortiz, after a jury trial in the United States District Court for the Western District of New York (Elizabeth A. Wolford, *Judge*). At trial, Ortiz claimed that Detective Stambach, exploiting Ortiz's severe mental illness, fabricated and coerced a confession from him in connection with a double homicide committed in 2004, for which Ortiz was subsequently charged and convicted in state court based upon that false confession. In support of his claims, Ortiz introduced evidence that, in 2012, a reinvestigation by a law enforcement task force determined that Ortiz was not involved in the murders, and three other individuals were subsequently charged and convicted in federal court for those crimes. Ortiz was wrongfully imprisoned for over a decade until his conviction was vacated and he was released

3

in 2014. A jury found Detective Stambach liable for malicious prosecution, fabrication of evidence, and violating Ortiz's right against self-incrimination, and awarded Ortiz $5 million in compensatory damages and $1.5 million in punitive damages.

On appeal, Detective Stambach argues that the district court erred in denying his post-trial motions for: (1) judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b); (2) a new trial, pursuant to Federal Rule of Civil Procedure 59(a); and (3) remittitur, pursuant to Federal Rule of Civil Procedure 59(e). In his Rule 50(b) motion, Detective Stambach asserted that he was entitled to judgment as a matter of law because, *inter alia*, there was insufficient evidence for a reasonable jury to have found in favor of Ortiz on any of the three causes of action presented at trial or, even if he was properly determined to be liable, to have found that an award of punitive damages was warranted. In his Rule 59(a) motion, Detective Stambach contended that the verdict was against the weight of the evidence and, thus, he was entitled to a new trial. Finally, in his Rule 59(e) motion, Detective Stambach argued that the jury's award of $5 million in compensatory damages was excessive in light of the

evidence presented at trial regarding the harm to Ortiz and, thus, should be subject to remittitur.

We conclude that sufficient evidence supported the jury's finding of liability on all three causes of action and that Detective Stambach's other challenges to the verdict, including the award of compensatory and punitive damages, are without merit.

Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### I.  Factual Background[1]

In May 2004, Ortiz moved from Puerto Rico to Buffalo, New York.  On November 11, 2004, two brothers, Nelson and Miguel Camacho, were murdered during an armed robbery in their home on Buffalo's west side (the "Camacho murders").  Although he did not consider them friends, Ortiz had met the Camacho brothers and saw them repeatedly at a bar in Buffalo that he visited weekly.  Shortly after hearing about the Camacho murders on the evening news the day after they occurred, Ortiz went to his cousin's house and began feeling

---

[1]  The following facts are drawn from the trial evidence and construed in the light most favorable to Ortiz unless otherwise noted.  *See Kerman v. City of New York*, 374 F.3d 93, 114 (2d Cir. 2004).

paranoid, hearing voices, and seeing things. Ortiz described it as "a mental breakdown" that was "something abnormal . . . like from another world," and he was scared because "[he] had never experienced anything like that before." App'x at 2165–66. Ortiz does not remember anything that happened during the several days between that visit to his cousin's house and waking up in the Erie County Medical Center ("ECMC") sometime after his November 17 arrest. During the several days between Ortiz's visit to his cousin's house and waking up at the ECMC, Ortiz interacted with law enforcement on several occasions, including allegedly confessing to his participation in the Camacho murders to Detective Mark Stambach on November 16, 2004, which resulted in his arrest on November 17 for those murders. A forensic psychiatrist, who met with Ortiz on November 19, diagnosed him with schizophrenia.

Ortiz was subsequently prosecuted and convicted of the Camacho murders and, after over ten years of incarceration, his conviction was vacated and he was released. The relevant circumstances surrounding these events are discussed in more detail below.

### A.    Interactions with Law Enforcement on November 15

On the morning of November 15, 2004, four days after the Camacho murders, Ortiz stopped a police car on patrol and jumped into the back seat claiming that people were trying to kill him because they suspected him of committing the Camacho murders. The patrol officers summoned Detective Mark Lauber, a member of the Buffalo Police Department's Major Crimes Unit ("MCU") who was investigating the Camacho murders, to the scene. Detective Lauber interviewed Ortiz with the assistance of a Spanish-speaking patrol officer.[2] According to Detective Lauber, when he arrived on scene, Ortiz seemed scared and disoriented, and was high on marijuana. Ortiz told Detective Lauber that he feared that people were trying to kill him, but he could not provide any specifics. After consulting with the other officers and observing Ortiz's behavior, Detective Lauber suggested that Ortiz be medically and psychiatrically evaluated. Ortiz agreed to go voluntarily to Buffalo General Hospital and was then brought there by ambulance. Detective Lauber memorialized his interaction with Ortiz in an interdepartment memorandum, which was placed in the investigative file for the

---

[2] Ortiz testified that he "was not able to speak, understand, or write English back in 2004." App'x at 2161.

Camacho homicides and could be reviewed by different officers and detectives working on the case.

During his evaluation at the hospital, Ortiz told the doctors that he had information about the Camacho murders (while also repeating that he feared for his life because people were trying to kill him). This led the emergency room staff counselor for psychiatric services to call law enforcement. MCU Detectives Mark Vaughn, James Lema, and Sergeant James Lonergan, as well as patrol officer Edwin Torres, went to the hospital to speak with Ortiz. Torres translated because Ortiz indicated he knew some English but was more comfortable speaking in Spanish. As Detective Vaughn's police report memorialized, Ortiz was asked explicitly if he had any direct knowledge of the murders, and he said he did not. When asked of whom specifically he was afraid, Ortiz answered with the name of his uncle, Reynaldo Valesquez, in whose home Ortiz was living at the time. When asked why he was afraid of his uncle, Ortiz answered that it was because Valesquez had a shotgun. The detectives took note of Ortiz's fear and left after their conversation, finding Ortiz had no reliable information regarding the Camacho murders. At that time, they did not consider him a suspect.

**B.     The November 16th Alleged Confession**

On November 16, 2004, after being released from Buffalo General Hospital, Ortiz attended the Camacho brothers' funeral around noon with his cousin.  Later that evening, Ortiz again flagged down a police car, stated that he feared for his life, and offered information about the Camacho murders.  The patrol officers took Ortiz to the MCU station, where MCU Detective Stambach met Ortiz to question him.   Upon his arrival at the station at around 7:15 pm and without being *Mirandized*, Ortiz was taken to an empty office and interviewed alone by Detective Stambach from around 7:25 p.m. to 8:05 p.m.   Within those forty minutes, Detective Stambach, who speaks no Spanish, elicited Ortiz's confession and detailed specifics of the crime which, according to Detective Stambach, only someone at the scene could have known.[3]  Detective Stambach testified that Ortiz "spoke broken English" and, although Ortiz understood him, "[Detective Stambach] was having problems communicating with him."   App'x at 2336.

---

[3]  Some of those details included the following:  three assailants kicked in the door and entered through the front door; an assailant struggled with one of the victims and tried to take his gold chain while the other victim was holding a gun in one hand and a phone in the other; the big TV in the apartment was on; one of the victims was shot in his stomach and the other was shot in the face and chest and then a couple more times on the floor.

According to Detective Stambach, "he wanted to ensure that the [*Miranda*] rights card was read to [Ortiz] in Spanish," and called Officer Torres to translate.  *Id.* at 2336.

At approximately 8:05 p.m., Officer Torres arrived at the office, at which point Detective Stambach and Ortiz moved from the office into the interview room with Torres, and, at approximately 8:30 p.m., Torres read Ortiz his *Miranda* rights in Spanish and Ortiz signed the *Miranda* card.  Ortiz was given food at 8:40 pm, and signed a formal sworn written statement.  According to Detective Stambach, he used his handwritten notes to prompt Ortiz during the post-*Miranda* questioning, which Torres translated to Ortiz.  Each page of the typed statement was then initialed by Ortiz, Stambach, and Torres, indicating that each answer Ortiz provided therein was "accurate."  App'x at 2372.

At trial, Detective Stambach testified that he did not coerce or trick Ortiz to elicit the confession, did not add any details to the confession, and that Ortiz showed no sign of mental health issues.[4]  He also denied any involvement in the

---

[4] Although Ortiz testified that he did not recall the confession, as discussed *infra*, the jury was not required to credit Detective Stambach's testimony regarding the circumstances surrounding the confession, but rather could evaluate the credibility of that testimony in light of all of the trial evidence, which we must construe in the light most favorable to Ortiz in connection with the Rule 50 motion.

investigation of the Camacho murders before he interviewed Ortiz and any awareness of Officers Lauber's and Lonergan's documented interactions with Ortiz.

### C.    Ortiz's Arrest and Hospitalization

A little after midnight, on November 17, 2004, Detective Stambach arrested Ortiz for the Camacho murders.  Detective Stambach filed a felony complaint that same day charging Ortiz with two counts of second-degree murder, initiating a prosecution based solely on the alleged confession.   There was no other corroborating evidence to support the complaint.  A subsequent search of Ortiz's apartment on consent revealed no evidence linking him to the Camacho murders or any other crime, and none of the other evidence gathered during the investigation into the Camacho murders suggested Ortiz had any knowledge of the offense or played any role in it.[5]

On November 19, 2004, approximately three days after his alleged confession, a forensic psychiatrist, Dr. Evelyn Coggins, evaluated Ortiz while he was detained at the ECMC and diagnosed him with schizophrenia.  Dr. Coggins

---

[5]  The evidence at trial also established that Ortiz is approximately 6'6" tall and that the descriptions of the perpetrators in the witness statements describing the murders were inconsistent with Ortiz's height.

described schizophrenia as "a slowly progressive disease that is characterized by acute exacerbations of intense symptoms of delusions, which [are] fixed false beliefs and confusion, disorganization, and hallucinations." App'x at 2094. She stated that, when she started treating Ortiz, she believed "he was in the thro[es] of a psychotic episode which did not start the moment [she] saw him," but rather had been ongoing for several days. App'x at 2097. She described Ortiz as confused, fearful, and experiencing auditory hallucinations, and said he was one of the most seriously ill people she had ever seen. She further noted that "he was taken [] for an emergency psychiatric hospitalization at ECMC" on November 22, during which Ortiz became "catatonic where he couldn't talk or move or even think," which "sometimes happens in schizophrenia when the symptoms become so intense that the brain and body actually end up freezing." App'x at 2098–99. After receiving a high dose of antipsychotic medications, Ortiz regained consciousness while at the ECMC, at which time he learned that he was charged with the Camacho murders. As noted *supra*, Ortiz could not remember anything that had happened between his visit to his cousin's house shortly after learning of the murders and regaining consciousness sometime after he was transferred to the ECMC.

### D.    The Grand Jury Indictment, Guilty Plea, and Sentencing

On December 8, 2004, an Erie County Grand Jury indicted Ortiz for the Camacho murders.  The only evidence presented to the grand jury that linked Ortiz to the murders was the alleged confession.  Although Ortiz told his defense attorneys that he was innocent, they advised him that, because of his confession, he should plead guilty, rather than risk being subjected to higher penalties if he exercised his right to trial.  Relying upon that advice, on March 22, 2006, Ortiz pled guilty to two counts of manslaughter in the first degree, in violation of New York Penal Law § 125.20[1].  On June 16, 2006, at his sentencing, Ortiz expressed his desire to withdraw his plea, but that request was denied and he was sentenced to 25 years' imprisonment, to be followed by five years' supervised release.  The Appellate Division, Fourth Department, affirmed Ortiz's conviction, and the New York Court of Appeals denied leave to appeal.

### E.    Reinvestigation and Exoneration

In November 2012, as a result of a separate reinvestigation conducted by a task force of special agents from the Federal Bureau of Investigation and federal prosecutors from the United States Attorney's Office for the Western District of New York, as well as members of the Buffalo Police Department and New York

State Police, it was determined that Ortiz did not participate in the Camacho

murders, and three other individuals were indicted by a federal grand jury for

their participation in those murders.[6]  Those three individuals were subsequently

convicted of the Camacho murders based upon their admitted and corroborated

involvement in the murders.

On April 23, 2013, Ortiz moved to vacate his conviction pursuant to New

York Criminal Procedure Law § 440.10.  In response to the motion, and the initial

opposition to the motion by the Erie County District Attorney's Office, Erie

County Court Judge Thomas P. Franczyk held a hearing in 2014.[7]  The Erie County

District Attorney's Office ultimately conceded that Ortiz was not involved in the

murders.  On December 9, 2014, Judge Franczyk granted the motion to vacate the

---

[6] In or around 2011, Ortiz was interviewed by Detective Mary Evans, who was a member of the task force undertaking this investigation.  Although during the interview Ortiz privately told Detective Evans that he was innocent, he testified in front of a federal grand jury in July 2011 that he participated in the Camacho murders.  Notwithstanding that testimony, the task force determined that Ortiz did not participate in those murders. Ortiz later explained that he gave that testimony in the grand jury because he was afraid of being charged federally, and receiving more prison time, if he said otherwise.

[7] Despite the fact that Ortiz reiterated his guilt to a federal grand jury in 2011, Judge Franczyk found that "the totality of evidence including sworn testimony before the Federal Grand Jury, the multiple eyewitnesses who observed three fleeing suspects not matching the defendant, the inconsistencies in and omissions from his confession, apparently made while under the influence of mental illness, provides a sufficient showing of possible merit to warrant a fuller exploration," and thus ordered this hearing, which eventually led to Ortiz's release.  App'x at 1054–55.

conviction and ordered that Ortiz be released on his own recognizance.  On May 8, 2015, Judge Franczyk granted Ortiz's motion to dismiss the indictment, which formally ended the criminal case.

## II.    Procedural History

In 2016, Ortiz commenced the instant action, pursuant to 42 U.S.C. § 1983, in the United States District Court for the Western District of New York.  On March 27, 2019, he filed an amended complaint alleging that the named defendants violated his constitutional rights in connection with the arrest and prosecution in state court, thereby resulting in his wrongful conviction for the Camacho murders and subsequent decade of incarceration.  At the close of discovery, the defendants moved for summary judgment and, on February 26, 2021, the district court granted that motion in part, dismissing all defendants except Detective Stambach, but otherwise denying defendants' motion, such that the three claims against Detective Stambach—malicious prosecution, fabrication

15

of evidence, and violation of the right against self-incrimination—survived summary judgment and the case against him proceeded to trial on May 3, 2022.[8]

At the conclusion of trial, the jury found in Ortiz's favor on each of the three claims and awarded him $5 million in compensatory damages and $1.5 million in punitive damages. On June 7, 2022, Detective Stambach filed post-trial motions for judgment as a matter of law ("JMOL"), a new trial, and remittitur and, after hearing oral argument on these motions on January 31, 2023, the district court issued a decision and order denying all three motions in their entirety. *See generally Ortiz v. Stambach*, 657 F. Supp. 3d 243 (W.D.N.Y. 2023). This appeal followed.

## DISCUSSION

On appeal, Detective Stambach raises several challenges to the district court's denial of his post-verdict motions for JMOL, a new trial, and remittitur. First, he argues that the district court erred in denying his JMOL motion because (i) there was insufficient evidence for the jury to find him liable for malicious prosecution, fabrication of evidence, and coercion, and (ii) the district court upheld

---

[8] The district court dismissed or granted summary judgment in defendants' favor on all claims against the other defendants, and also granted summary judgment in Detective Stambach's favor on the claim that he withheld *Brady* material.

16

the jury verdict on a theory of the evidence not argued by Ortiz. Second, he contends for the first time on appeal that, with respect to the malicious prosecution and coercion claims, he was also entitled to judgment as a matter of law on the ground of qualified immunity. Third, Detective Stambach asserts that the district court should have granted judgment as a matter of law in his favor on the issue of punitive damages because there was no evidence in the record demonstrating that he acted with the requisite intent for such damages. Finally, Detective Stambach argues, in the alternative, that the district court erred in denying his motion for a new trial because the verdict was against the weight of the evidence, and his motion for remittitur with respect to compensatory damages because the jury's award was excessive. We review each argument in turn.

## I.      Denial of Judgment as a Matter of Law

We review a district court's denial of a motion for judgment as a matter of law *de novo*. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016). "In so doing, we apply the same standard that is required of the district court." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007). A district court may grant a motion for judgment as a matter of law in a jury trial if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party"

opposing the request. Fed. R. Civ. P. 50(a)(1). "In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999). The court "must draw all reasonable inferences in favor of the nonmoving party . . . [and] although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Zellner*, 494 F.3d at 370 (emphases, internal quotation marks, and citation omitted). Thus, a court may not grant judgment as a matter of law unless: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Williams*, 171 F.3d at 101 (alterations adopted) (internal quotation marks and citation omitted).

18

As set forth below, applying this standard, we agree with the district court that Detective Stambach was not entitled to judgment as a matter of law on any of the three claims for which he was found liable.

## A. Malicious Prosecution Claim

Claims for malicious prosecution brought under Section 1983 are substantially the same as claims for malicious prosecution brought under state law. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022). "A malicious prosecution claim under New York law," which the parties agree applies here, "requires the plaintiff prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (internal quotation marks and citation omitted). On appeal, Detective Stambach argues that "[t]he jury could not reasonably have concluded, based on the actual evidence presented, that probable cause for Ortiz's prosecution did not exist." Appellant's Br. at 34. We are unpersuaded.

19

"Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (internal quotation marks and citation omitted). As relevant here, "under New York law, indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (emphasis, internal quotation marks, and citation omitted). As we have explained, "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (internal quotation marks and citation omitted). Moreover, "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process," and thus, if proven, would rebut the presumption of probable cause

20

that attaches to an indictment. *Id*. (internal quotation marks and citation omitted);

*see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (holding that the

presumption of probable cause created by an indictment "may be overcome by

evidence establishing that the police witnesses have not made a complete and full

statement of facts . . . that they have misrepresented or falsified evidence . . . or

otherwise acted in bad faith" (internal quotation marks and citation omitted)).  For

example, in *Boyd v. City of New York*, we denied defendants' motion for summary

judgment, concluding that a reasonable jury could have found that the indictment

charging the Section 1983 plaintiff with the alleged theft of an automobile was

secured through bad faith or perjury where the officers' testimony concerning the

location of arrest was at odds with plaintiff's testimony corroborated by other

evidence, including police records.  336 F.3d at 77.

Detective Stambach argues that Ortiz's stipulation that he was indicted,

based on his confession, by a grand jury established a presumption of probable

cause, and Ortiz did not overcome this presumption "because there was no

testimony contradicting Detective Stambach's account of the confession, and

because there was no other corroborating evidence of bad faith," and, as a result,

"Ortiz's malicious prosecution claim failed as a matter of law."  Appellant's Br. at

21

38.   Thus, according to Stambach, unlike the situation in *Boyd*, here there is insufficient evidence to "move beyond a simple conflict of stories or mistaken memories, and into the possibility that the police . . . lied in order to secure an indictment."  336 F.3d at 77.  We disagree.

   As a threshold matter, to the extent Detective Stambach asserts that Ortiz had to offer direct evidence to contradict Detective Stambach's testimony regarding the confession, we reject that assertion as a matter of law.  Ortiz testified that, because of his mental state at the time of the confession, he was unable to remember his interaction with Detective Stambach.  However, the law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.  Indeed, "[j]uries are frequently (and correctly) instructed, as they were here, that the law makes no distinction between the weight to be given to either direct or circumstantial evidence."  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir. 1992) (alteration adopted) (internal quotation marks and citation omitted).  We have repeatedly emphasized this fundamental legal rule even in the context of a criminal case, with its higher burden of proof.  *See, e.g.*, *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)

22

("[T]he jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence, so long as the inference is reasonable, for it is the task of the jury, not the court, to choose among competing inferences." (internal quotation marks and citations omitted)); *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989) ("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence."). Thus, Ortiz's inability to testify to what took place in his time alone with Detective Stambach, or to provide another form of direct evidence contradicting Detective Stambach's testimony, did not oblige the jury to credit Detective Stambach's version of events regarding the confession. *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("[A] jury is free to believe part and disbelieve part of any witness's testimony."); *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007) ("A jury is under no obligation to find [a testifying defendant] credible or find [his] explanation believable."); *see also United States v. Ocampo-Guarin*, 968 F.2d 1406, 1410 (1st Cir. 1992) ("The jury, of course, was not required to believe [the defendant's] testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence."); *Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir. 1968)

23

("Credibility is for the trier of the facts and the uncontradicted testimony of a witness does not have to be accepted.").

Here, as the district court correctly determined in denying Detective Stambach's JMOL motion, there was more than sufficient circumstantial evidence from which a rational jury could find that Detective Stambach's testimony regarding the confession was not credible, and that he engaged in misconduct during the confession in order to fabricate evidence, such that the presumption of probable cause was overcome. Although Detective Stambach asserts that the "[d]istrict [c]ourt held that the parties' stipulation [that Ortiz did not commit the murders] alone was sufficient to overcome the presumption of probable cause," that assertion is incorrect. Appellant's Br. at 40. Instead, the district court thoroughly enumerated the combination of circumstantial evidence, including, but not limited to, the stipulation, that allowed a rational jury to find misconduct by Detective Stambach that could overcome the presumption:

> [Detective Stambach] ignores or downplays the following critical evidence presented to the jury: (1) it is undisputed that [Ortiz] was not involved in the murders of the Camacho brothers; (2) Dr. Evelyn Coggins testified that [Ortiz] was "in the throes of a psychotic episode" during the relevant time period; (3) [Ortiz] testified that he spoke very limited English at the relevant time period; (4) [Detective Stambach] testified, and record evidence corroborated, that he was alone with [Ortiz] for approximately 40 minutes prior to [Ortiz]

24

giving his confession, during which time he spoke to [Ortiz] about the crime without advising him of his *Miranda* rights; (5) Officer Edwin Torres, who had participated in an interview of [Ortiz] at Buffalo General Hospital the day prior to his interview with [Detective Stambach], testified that [Ortiz] was determined at that time not to have any credible information about the murders; (6) Officer Torres testified that [Detective Stambach's] notes from his conversation with [Ortiz] during the time that [Ortiz] and [Detective Stambach] were alone contained "details that would only be known by somebody who committed the crimes"; and (7) Officer Torres testified that those same details from [Detective Stambach's] notes and which would only have been known to the perpetrator were repeated by [Ortiz] in his confession.

*Ortiz*, 657 F. Supp. 3d at 254–55 (internal citations omitted). In addition to those enumerated facts, the jury could infer from Officer Torres's statement that details contained in Ortiz's confession "would only be known by somebody who committed the crimes" that those details were also known by police officers having access to the case file, including Stambach. *Id.* Thus, the district court concluded that "while it is certainly not the only conclusion a jury could have drawn, it is a reasonable inference from the circumstantial evidence set forth above that [Detective Stambach] deliberately fed [Ortiz] information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on [Ortiz's] fragile mental state and limited command of the English language to

manufacture a false confession, which [Ortiz] then repeated in front of Officer Torres as a direct result of [Detective Stambach's] conduct." *Id*. at 255.

In addition to this circumstantial evidence, Ortiz points to inconsistencies in Detective Stambach's testimony which could be an additional, independent ground for a rational jury to find his testimony to be lacking in credibility. *See, e.g., United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) ("[W]hen testimonial inconsistencies are revealed on cross-examination, the jury is entitled to weigh the evidence and decide the credibility issues for itself." (alteration adopted) (internal quotation marks and citation omitted)). For example, Detective Stambach testified in his deposition that, before speaking with Ortiz, he reviewed the eyewitness statement of Carlos Osario (which described the perpetrators of the murder to be significantly shorter than him). However, at trial, Detective Stambach denied having reviewed that statement before speaking with Ortiz. *See* App'x at 2346. In addition, Detective Stambach initially testified at trial that he was not present for Ortiz's booking photo (which, according to Ortiz, would have made Detective Stambach aware that Ortiz was much taller than the description of the perpetrators provided by eyewitnesses). However, after he was presented with his contrary deposition testimony, Detective Stambach acknowledged that he was, in fact,

present for Ortiz's booking photograph. Similarly, Detective Stambach testified

during trial that he did not review the crime-scene photos before interviewing

Ortiz, but seemed to acknowledge in other portions of his testimony that he did

review the photos. Moreover, as the district court noted, Detective Stambach gave

inconsistent testimony about how much questioning he did of Ortiz before Torres

arrived. *See Ortiz*, 657 F. Supp. 3d at 260. In short, the jury could have rationally

rejected Detective Stambach's testimony as not credible based on (1) circumstantial

evidence supporting Ortiz's contrary testimony, and (2) Stambach's prior

inconsistent statements admitted at trial. *Zellner*, 494 F.3d at 370–71 ("[A] court

may grant a motion for judgment as a matter of law only if it can conclude that,

with credibility assessments made against the moving party and all inferences

drawn against the moving party, a reasonable juror would have been compelled

to accept the view of the moving party." (emphasis, internal quotation marks, and

citation omitted)); *see also Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 60 (2d Cir.

1993) (explaining that a court "cannot assess the weight of conflicting evidence,

pass on the credibility of the witnesses, or substitute its judgment for that of the

jury" (citation omitted)).

27

We also note that there was a portion of Detective Stambach's testimony that supports Ortiz's theory of the case. *See Ali v. Kipp*, 891 F.3d 59, 66 (2d Cir. 2018) (stating that "[t]he law is clear that the jurors were not required to accept the entirety of either side's account, but were free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credited" (internal quotation marks and citation omitted)).  In particular, during his trial testimony, Detective Stambach admitted that the details in the confession (which mirrored Detective Stambach's notes) were intricate, non-public details about the crime that Ortiz would have had no reason to know unless he was present during the murders:

> [The details in the confession] were unique in nature and they were specific in only a person that was inside of the crime scene would have known them.  This was in several days after the homicide.  There is no reason he would have known these specific type of items and described them to me in his sworn statement unless he was indeed there.

App'x at 2378–79.  When Detective Stambach was then asked how Ortiz could have known those details when he was not there, Detective Stambach suggested that Ortiz was present:

> Q.  Mr. Stambach, you just told us that the facts contained in the confession could only be known by somebody who was there, correct?

A. Yes.

Q.  And we now know that Mr. Ortiz was not there based on the admissions of the real perpetrators, correct?

A.  Again, that is what was in court.  But independently, I'm still not comfortable with that . . . .

*Id.* at 2384; *see also id*. at 2355 (testifying that he was "not sold" on Ortiz's innocence).  However, that assertion by Detective Stambach was undermined by the stipulation between the parties that:   (1) "law-enforcement agencies determined that Josue Ortiz was not involved in the [Camacho] murders"; (2) three other individuals were charged and convicted in federal court "based on their admitted and corroborated involvement in the [Camacho] murders"; and (3) a court has judged Ortiz "actually innocent of the [Camacho] murders."  *Id.* at 2020–21.  Furthermore, Detective Stambach concedes that no evidence, other than the purported confession, shows Ortiz was even at the crime scene.  In short, the evidence regarding the non-public nature of the details in the confession (including Detective Stambach's concession), when combined with the other evidence in the case, allowed the jury to rationally infer that Detective Stambach provided those details to Ortiz and manufactured the confession against him.

Finally, Detective Stambach argues that the district court erred by "sustain[ing] the jury's verdict based upon a theory of liability which was not

presented at trial"—namely, that Detective Stambach coerced Ortiz into confessing to the murders and that Ortiz subsequently repeated the confession in Spanish to Officer Torres. Appellant's Br. at 32–33. We find this argument unavailing.

A cornerstone of Ortiz's theory of the case was that Detective Stambach fabricated the confession by providing details of the murders that Ortiz could not know because Ortiz was not involved in the murders or present at the scene of the crime. Indeed, in his summation, Ortiz's counsel emphasized this fundamental theory to the jury:

> [W]e have a confession that has specific details that would only be known by somebody who was at the crime scene. A TV was on, so and so shot a gun, so and so took a chain. These are all in the confession. It's in the evidence and you can ask for it. That is impossible, ladies and gentlemen. That is impossible. My client was not there. My client has no information about how the scene looked at the time of the crime. So how are those facts inside of this confession? Stambach. The only guy who would have known those facts. And ask yourself, 30 to 40 minutes alone, why would he do that? Well, you know exactly why. He was taking advantage of a seriously ill person.

App'x at 2571. Ortiz's counsel further suggested in his summation that: (1) the details of the confession "were in the notes well before Torres even got there"; (2) when Torres arrived, Ortiz was just responding "yes, no, and Stambach [wa]s

typing it up," and "[t]he fix was already in"; and (3) "[t]hose details, those facts in that confession, could not, were not known to my client," and this was "a textbook false confession" that was "[m]anufactured by Stambach." *Id.* at 2572. In any event, we have made clear that, in deciding whether to uphold a jury's verdict, a district court "is not limited to the specific theories of the case presented by the parties, but may adopt any reasonable view that is consistent with the facts and testimony adduced at trial." *Ali*, 891 F.3d at 66. Here, at trial, Officer Torres initially suggested that the typed statement was the product of an actual dialogue that took place between Detective Stambach and Ortiz in his presence. However, later in his testimony, he agreed that Detective Stambach was simply "asking [Ortiz] questions, pointing to his notes, and [Ortiz] was answering." App'x at 2672. The latter testimony is corroborated by Detective Stambach himself, who testified after the signed statement was "typed up," he went "question and answer with [Ortiz], and [Ortiz] responded in the affirmative and then signed [the] confession." *Id.* at 2352. Thus, even if this view of the fabrication theory was not specifically argued by Ortiz, there was evidence in the record to support it and the district court correctly concluded that the jury could have rationally found the confession to have been manufactured in that manner.

In sum, the district court correctly determined that "a reasonable jury could have concluded, on the evidence presented at trial, that [Detective Stambach] acted in bad faith and that the presumption of probable cause was accordingly overcome," *Ortiz*, 657 F. Supp. 3d at 255–56, and could have found in Ortiz's favor on his malicious prosecution claim.[9]

### B. Fabrication of Evidence and Coercion Claims

Detective Stambach also argues that the district court erred in denying his JMOL motion with respect to the fabrication of evidence and coercion claims. As a threshold matter, our conclusion that there is no basis to disturb the jury's liability finding on the malicious prosecution claim is sufficient, even without the additional claims, to "sustain the damages award against [Detective Stambach]

---

[9] Detective Stambach did not challenge the proof with respect to the other elements of a malicious prosecution claim in his JMOL motion or on appeal, including the malice element. In any event, we note that, with respect to the malice element, the jury could have reasonably inferred malice from the lack of probable cause, as well as from the evidence of Detective Stambach's misconduct in fabricating the confession. *See Kee*, 12 F.4th at 167 n.17 ("To the extent the district court . . . referenced [plaintiff's] failure to proffer evidence of malicious intent, malice may be inferred if [plaintiff] is able to demonstrate a lack of probable cause or . . . the fabrication of evidence."); *Boyd*, 336 F.3d at 78 ("A lack of probable cause generally creates an inference of malice."); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." (internal quotation marks and citation omitted)).

because there was a single injury: the wrongful imprisonment." *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017). In any event, as set forth below, we conclude that Detective Stambach's challenges to the district court's denial of his JMOL motion with respect to the fabrication of evidence and coercion claims are similarly without merit.

The Due Process Clause promises a "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). More specifically, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Betts v. Shearman*, 751 F.3d 78, 83–84 (2d Cir. 2014) (citation omitted). In order to prevail on a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that "(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property

as a result." *Garnett*, 838 F.3d at 279 (citation omitted).  Detective Stambach

challenges Ortiz's proof of the second and fourth elements.

As for a coercion claim, a "[Section] 1983 action may exist under the Fifth

Amendment self-incrimination clause if coercion was applied to obtain a waiver

of the plaintiff['s] rights against self-incrimination and/or to obtain inculpatory

statements, and the statements thereby obtained were used against the plaintiff[]

in a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d

Cir. 1998).  Whether a statement was obtained by coercion is determined by the

totality of the circumstances.  *Id.*; *see also Green v. Scully*, 850 F.2d 894, 901 (2d Cir.

1988) ("No single criterion controls whether an accused's confession is voluntary:

whether a confession was obtained by coercion is determined only after careful

evaluation of the totality of the surrounding circumstances.").  A jury considering

a coercion claim must weigh "the circumstances of pressure against the [suspect's]

power of resistance." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting

*Stein v. New York*, 346 U.S. 156, 185 (1953)).  As relevant here, a suspect's mental

illness is a relevant factor to be considered.  *See Blackburn v. Alabama,* 361 U.S. 199,

207–08 (1960) (holding a confession had been coerced where a schizophrenic

suspect in the midst of a psychotic episode was isolated and questioned for eight

34

to nine hours in a small room filled with police officers, and the questioner

prepared a statement for him to sign); *see also Green*, 850 F.2d at 902 (noting that

the relevant "characteristics of the accused" include his "experience and

background"). So too is the interrogator's use of "psychologically coercive

techniques such as brainwashing or promises of leniency or other benefits." *Green*,

850 F.2d at 902. Moreover, another factor is a failure to *Mirandize*. *See Deshawn E.*,

156 F.3d at 346.

In challenging the district court's denial of his JMOL motion on the

fabrication of evidence and coercion claims, Detective Stambach principally relies

on the same argument he raised to challenge the malicious prosecution claim—

namely, that there was insufficient evidence to support a rational finding that he

fabricated the confession (or used coercive tactics) because there was no direct

evidence of such conduct. *See* Appellant's Br. at 46 ("Detective Stambach was

entitled to judgment as a matter of law on Ortiz's fabrication of evidence claim

because there is no evidence suggesting that the confession was fabricated."); *id*.

at 51–52 (arguing that none of the three law enforcement witnesses who testified

about Detective Stambach's conduct during Ortiz's confession, including

Detective Stambach, "suggested any coercion or coercive tactics employed by

[him]" and "[e]very other witness who testified had no personal knowledge and could not give any testimony about the actions or conduct of Detective Stambach during Ortiz's confession").

For the reasons discussed *supra* regarding the malicious prosecution claim, we conclude that the jury could rationally conclude from the circumstantial evidence in the record that Detective Stambach, in bad faith, fabricated the confession.[10]

We also agree with the district court that, with respect to the coercion claim, "the jury could have taken into account [Ortiz's] limited understanding of English, [his] psychological state, and the fact that [he] had a limited education" and then

> reasonably inferred that [Detective Stambach] employed a psychologically coercive interrogation technique and/or engaged in improper trickery, based on the evidence that: (1) [Ortiz] had no credible information about the murders when interviewed by law

---

[10] Detective Stambach's related argument with respect to the fabrication of evidence claim, namely, that "[t]here is no [e]vidence that Detective Stambach [i]ntentionally [m]isled the [p]rosecutors who [c]harged Ortiz with the Camacho [m]urders," fails for similar reasons. Appellant's Br. at 48. Detective Stambach conceded at trial that the confession had been forwarded to prosecutors and again acknowledges, on appeal, that "[he] gave the sworn confession to the prosecutor for his review." Appellant's Reply Br. at 17. Detective Stambach nevertheless contends that "[b]ecause [his] only relevant interaction with a prosecutor was related to the sworn confession which was indisputably not falsified, Stambach cannot be said to have misled the prosecutor." *Id*. at 18. We disagree. As set forth *supra*, the jury could rationally find based upon all of the evidence in the case that the confession was falsified by Stambach and that Stambach, knowing it was fabricated, sent the confession to prosecutors for use in Ortiz's prosecution.

enforcement the previous day; (2) [Ortiz] had no involvement in the murders; (3) during the 40-minute interval where he was alone with [Ortiz], [Detective Stambach] created notes that included details of the murders that could only have been known by someone with inside knowledge; and (4) those same details were then repeated by [Ortiz] during his answers to [Detective Stambach's] questions during the creation of his written confession.

*Ortiz*, 657 F. Supp. 3d at 258. In addition, Ortiz was neither *Mirandized* nor provided with a Spanish interpreter during the 40 minutes he spent alone with Detective Stambach. Given the totality of circumstances borne out by the trial evidence, Detective Stambach cannot show that "there is such a complete absence of evidence supporting the verdict" on the coercion claim "that the jury's findings could only have been the result of sheer surmise and conjecture." *Williams*, 171 F.3d at 101.

In short, we find Detective Stambach's challenges to the district court's denial of his JMOL motion with respect to the fabrication of evidence and coercion claims to be unavailing.

## C. Qualified Immunity

Detective Stambach argues, in the alternative, that he is entitled to qualified immunity on the malicious prosecution and coercion claims. We also find this argument unpersuasive.

Under federal law, a police officer is entitled to qualified immunity where "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks and citation omitted).

Detective Stambach did not raise the qualified immunity argument in his post-trial JMOL motion in the district court and, thus, failed to comply with the procedural requirement of Rule 50. *See Pittman by Pittman v. Grayson*, 149 F.3d 111, 119 (2d Cir. 1998) (explaining that it is "well established" that a party cannot seek judgment as a matter of law on appeal "on a given issue unless it has timely moved in the district court for" such relief); *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("[T]he defense [of qualified immunity] cannot properly be decided by the court as a matter of law unless the defendant moves for judgment as a matter of law . . . in accordance with Fed. R. Civ. P. 50.").[11]   "We may excuse these

---

[11]  In moving for summary judgment, Detective Stambach argued that he was entitled to qualified immunity based on "arguable probable cause."  App'x at 104.  After denying Stambach's motion, the district court directed his counsel to consider whether "special interrogatories are needed for qualified immunity."  *Id.* at 1991.  At trial, Detective Stambach neither requested special interrogatories nor jury instructions on qualified

procedural errors only to prevent a manifest injustice." *Provost v. City of Newburgh*, 262 F.3d 146, 162 (2d Cir. 2001) (internal quotation marks and citation omitted).

Detective Stambach argues that it would be manifestly unjust if we did not grant him judgment as a matter of law with respect to the malicious prosecution and coercion claims on the ground of qualified immunity. We disagree. "Freedom from malicious prosecution is a constitutional right that has long been clearly established," *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003), and no reasonable officer could believe that it would be lawful to "misrepresent[] the evidence to the prosecutor[]" and "engage[] in such misconduct knowingly," *Manganiello*, 612 F.3d at 165. Similarly, no reasonable officer could believe "that it was constitutional to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired—for use in a criminal case." *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007). Here, because the jury was not asked to answer any special interrogatories to resolve any factual disputes that were material to the qualified immunity analysis, we must construe the evidence most favorably to Ortiz in

---

immunity, *see id.* at 2525–45, nor did he seek post-trial relief based on the "legal determination of whether qualified immunity attaches" on the facts found by the jury, *Kerman*, 374 F.3d at 109.

conducting that analysis. *See Jones v. Treubig*, 963 F.3d 214, 234–35 (2d Cir. 2020);

*see also Zellner*, 494 F.3d at 371 (emphasizing that the court is not "permitted to

make findings on factual questions not submitted to the jury where those findings

take the evidence in the light most favorable to the moving party, rather than the

opposing party"). Applying that standard, Detective Stambach has failed to

articulate how he could be entitled to qualified immunity given the evidence at

trial that, construed most favorably to Ortiz, allowed a rational jury to find that he

knowingly forwarded a fabricated and coerced confession to a prosecutor.[12]  In

short, no manifest injustice would result from this Court's conclusion that

Detective Stambach has forfeited these arguments based upon his failure to raise

this issue in his Rule 50 motion in the district court.

---

[12]  Detective Stambach suggests that he is entitled to qualified immunity on the coercion claim because there is an absence of any case authority establishing "that a police officer can be found liable under the Fifth Amendment for questioning a mentally ill witness for less than an hour." Appellant's Reply Br. at 20. However, it is well established under our case authority that "[n]o single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green*, 850 F.2d at 901. As discussed *supra*, construed in the light most favorable to Ortiz, the trial evidence allowed a reasonable jury to find that Detective Stambach used improper psychological tactics on Ortiz (who was mentally ill, not fluent in English, and un-*Mirandized*), including deliberately feeding him facts about the murders he could not have known, to coerce him into providing a false confession. No reasonable officer would believe that it was lawful to use psychologically coercive tactics on a mentally ill suspect to obtain a false confession, merely because that misconduct took less than an hour.

D.    **Punitive Damages**

Detective Stambach also contends that the district court erred in denying his

JMOL motion on the jury's award of $1.5 million in punitive damages.  Again, we

find this argument unavailing.

"Punitive damages are available in a [Section] 1983 action 'when the

defendant's conduct is shown to be motivated by evil motive or intent, or when it

involves reckless or callous indifference to the federally protected rights of

others.'"  *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,*

461 U.S. 30, 56 (1983)).  "To be entitled to an award of punitive damages, a claimant

must show 'a positive element of conscious wrongdoing.'"  *New Windsor Volunteer*

*Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad v.*

*Am. Dental Ass'n*, 527 U.S. 526, 538 (1999)).  A district court's determination as to

whether the evidence was sufficient for the jury to award punitive damages is a

question of law which we review *de novo*.[13]  *See Farias v. Instructional Sys., Inc.,* 259

---

[13]  We note that, with respect to a challenge to the amount of punitive damages awarded
by the jury, we review the district court's ruling for abuse of discretion unless the plaintiff
contends the awarded amount is constitutionally excessive, in which case our review is
*de novo*.  *See Payne v. Jones*, 711 F.3d 85, 100 (2d Cir. 2013).  On appeal, Detective Stambach
does not raise any challenge to the specific amount of punitive damages awarded by the
jury, but rather more broadly argues that the evidence was insufficient as a matter of law
to permit any award of such damages, which is reviewed *de novo* under the Rule 50

F.3d 91, 101 (2d Cir. 2001); *Hackert v. First Alert, Inc.*, 271 F. App'x 31, 32 (2d Cir. 2008) (summary order).

Here, Detective Stambach argues that the punitive damages award should have been stricken as a matter of law because there was "[n]o evidence in the record show[ing] that Detective Stambach's decision to take Ortiz's confession was motivated by evil motive or intent." Appellant's Br. at 55. He further notes that "[a]t best, Detective Stambach was mistaken about the truth of Ortiz's confession, but that is not the type of intentional or reckless conduct that warrants punitive damages." *Id*.

We emphasize that, under Rule 50, when assessing whether there was sufficient evidence for the jury to award punitive damages as a matter of law, both the district court and this Court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Wolf v. Yamin*, 295 F.3d 303, 308 (2d Cir. 2002). Under that standard, a rational jury could have found that Detective Stambach was not "mistaken about the truth of Ortiz's confession," Appellant's Br. at 55, but

standard. *See Farias*, 259 F.3d at 101; *Hackert*, 271 F. App'x at 32; *see also Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 942 (7th Cir. 2005) ("We review the appropriateness of punitive damages *de novo*. We consider whether the evidence, when viewed in a light most favorable to the prevailing party, suffices to support the verdict.").

rather knowingly fabricated the confession and then forwarded the false confession to prosecutors to be used against Ortiz in his criminal prosecution. As the district court noted, "[s]uch actions easily satisfy the standard for engaging in callous indifference to [Ortiz's] constitutional rights" and "a reasonable jury could determine that such conduct was shocking, offensive, and sufficiently egregious to warrant an award of punitive damages." *Ortiz*, 657 F. Supp. 3d at 259. To the extent Detective Stambach again argues that punitive damages were not warranted and the award should have been stricken because the evidence of his conscious wrongdoing was "at best, circumstantial," we find that argument unavailing. Appellant's Reply Br. at 22. As with liability determinations, a jury can rely on circumstantial evidence to reasonably infer the requisite mental state for an award of punitive damages. *See Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) (emphasizing that, to allow for an award of punitive damages, a plaintiff's evidence need only be enough "to permit the factfinder to *infer* that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference" (citation omitted)). As the Arizona Supreme Court has aptly observed, "unless the defendant is willing to take the stand and

admit [his] 'evil mind,' the plaintiff must prove entitlement to punitive damages with circumstantial evidence." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498 (1987).

Thus, the district court correctly denied Detective Stambach's motion to strike the award of punitive damages as a matter of law.

## II.    Denial of Motion for a New Trial

In the alternative, Detective Stambach argues that the district court abused its discretion in denying his motion for a new trial, pursuant to Rule 59(a), because (1) "all of the testimony and evidence introduced at trial supported a finding for [him] on the issues disputed by the parties," and (2) the jury verdict was upheld "based on a theory never presented at trial."  Appellant's Br. 32–33, 56–57.  We disagree.

We review a denial of a Rule 59 motion for a new trial under an abuse of discretion standard.  *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998).  There is some ambiguity in our precedents as to whether the denial of a new trial can be reviewed on grounds that the verdict is against the weight of the evidence. *Compare Ferreira v. City of Binghamton*, 975 F.3d 255, 265–66 (2d Cir. 2020) (explaining that the denial of a motion for a new trial on weight-of-the-evidence grounds "is not subject to appellate review"), *and Rasanen v. Doe*, 723 F.3d 325, 330

44

(2d Cir. 2013) (same), *with DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133

(2d Cir. 1998) ("A new trial may be granted . . . when the jury's verdict is against

the weight of the evidence."), *and ING Global v. United Parcel Serv. Oasis Supply

Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (reviewing the denial of a motion for a new

trial on weight-of-the-evidence).  We need not conclusively resolve that ambiguity

here because, even assuming reviewability, Detective Stambach has not shown

that he is entitled to a new trial on such grounds for the same reason we identified

no error in the district court's denial of his motion for judgment as a matter of law.

In contrast to that previously considered motion, however, a court may

grant a motion for a new trial "even if there is substantial evidence supporting the

jury's verdict." *DLC Mgmt. Corp.*, 163 F.3d at 134.  Additionally, "a trial judge is

free to weigh the evidence himself, and need not view it in the light most favorable

to the verdict winner." *Id*.  However, a court "must bear in mind . . . that the court

should only grant such a motion when the jury's verdict is egregious." *Id*. (internal

quotation marks and citation omitted).  For this reason, "a motion for a new trial

ordinarily should not be granted unless the trial court is convinced that the jury

has reached a seriously erroneous result or that the verdict is a miscarriage of

justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (alteration

adopted) (citation omitted). "Our cases teach that a high degree of deference is accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *ING Global*, 757 at 98–99 (internal quotation marks and citation omitted); *see also DLC Mgmt. Corp.*, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.").

Here, as the district court correctly noted, "[t]he resolution of this case turned largely on the jury's assessment of [Detective Stambach's] credibility," and "the jury plainly concluded that [he] was not being truthful about his interactions with [Ortiz], and there was support in the record for that conclusion." *Ortiz*, 657 F. Supp. 3d at 260. As an example, the district court noted that Detective Stambach "initially testified at trial that he did not have a conversation with [Ortiz] during the 40 minutes they were alone," but, after being confronted with his deposition testimony to the contrary, he "conceded on further cross-examination that he had asked [Ortiz] 'questions and details about how the crime had been committed' before a translator arrived and before [Ortiz] was advised of his Fifth Amendment rights, and that it was during that same time frame that [Ortiz] supposedly gave the facts that 'led [Detective Stambach] to believe he was the perpetrator of the crime[].'" *Id*. at 260 (citation omitted). The jury therefore could have found

Detective Stambach's claim that he did not provide Ortiz with any details about the murders to be not credible, especially given Detective Stambach's concession during his trial testimony about the non-public nature of those details and the parties' stipulation that Ortiz was not involved in the murders.  In short, the jury was entitled to make the necessary credibility determinations in reaching its verdict and, in light of the evidence presented at trial to support its verdict, the district court did not abuse its discretion in finding that this was not one of the "rare occasion[s] on which the jury's verdict should be disturbed," and denying the motion for a new trial.  *Id.*

## III.    Denial of Motion for Remittitur

Detective Stambach argues that the district court erred in denying his motion for remittitur as to the jury's award of $5 million in compensatory damages because it was "intrinsically excessive."  Appellant's Br. at 58.  The district court determined that the $5 million award in compensatory damages "for spen[ding] 10 years in prison for a crime he did not commit" was "well within a permissible range."  *Ortiz*, 657 F. Supp. 3d at 261.  As set forth below, on this record, we find no basis to disturb the district court's determination.

We review a district court's decision on a motion for remittitur for abuse of discretion. *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016); *see also Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d 137, 141 (2d Cir. 1998) ("Deference is justified because the district judge is closer to the evidence, and is therefore in a better position to determine whether a particular award is excessive given the facts of the case."). "The calculation of damages is the province of the jury, and we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (internal quotation marks and citations omitted). Instead, we narrowly review the district court's determination of "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Dancy*, 843 F.3d at 113.

Detective Stambach argues that "Ortiz's testimony did not provide detailed information or accounts of his emotional distress and trauma in prison" and "provided no economic information." Appellant's Br. at 58. Detective Stambach thus contends that, "[g]iven the evidence that came out at trial, there is no basis for the jury's award of $5,000,000 of compensatory damages, which essentially amounts to $500,000 per year Ortiz spent incarcerated." *Id*.

48

We find Detective Stambach's arguments unpersuasive.[14]  First, Ortiz did testify in some detail about the conditions of his confinement and the psychological effects of that confinement, including, as the district court noted, being attacked by other inmates and correction officers, the humiliation of strip searches, the isolation of solitary confinement, and the "difficul[ty] [of] living in a cell" in light of his mental health struggles.  App'x at 2402.  Second, we have emphasized that "damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering."  *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004).  Indeed, this Court and other courts have upheld awards of compensatory damages of approximately $1 million for each year of incarceration.  *See Restivo*, 846 F.3d at 588 (holding that "[t]he district court . . . plainly did not abuse its discretion in holding that the amount awarded, $1 million per year of wrongful incarceration per plaintiff, neither shocks the conscience nor materially deviates from reasonable compensation," and noting that "the jury award is in line with other approved awards in wrongful conviction

---

[14]  To the extent that Detective Stambach repeats the same argument raised in his Rule 50 motion regarding the purported lack of "evidence of bad faith misconduct by [him]" in his challenge to the compensatory damages award, Appellant's Br. at 58, we reject that argument for the same reasons discussed *supra*.

49

cases") (collecting cases).  In sum, the district court was well within its discretion to conclude that the jury's award of $5 million in compensatory damages was reasonable and to deny the remittitur motion.

## CONCLUSION

We have considered Detective Stambach's remaining arguments and find them to be without merit.  Accordingly, we **AFFIRM** the judgment of the district court.